E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
LEWIS ROCA ROTHGERBER CHRISTIE LLP
One East Liberty Street, Suite 300
Reno, NV 89501-2128
Tel:    775.823.2900
Fax:    775.823.2929
Email: lreid@lrrc.com
        kmartini@lrrc.com
        nscott@lrrc.com

Joseph M. Alioto, CA State Bar No. 42680, *PRO HAC VICE TO BE FILED*
Jamie L. Miller, CA State Bar No. 271452, *PRO HAC VICE TO BE FILED*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Tel:  415.434.8900
Fax:  415.434.9200
Email: jmalioto@aliotolaw.com
        jmiller@aliotolaw.com

James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
Jordan T. Smith, Nevada Bar No. 12097
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Telephone: 702.214.2100
Email: JJP@pisanellibice.com
        TLB@pisanellibice.com
        JTS@pisanellibice.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation,<br><br>               Plaintiff,<br><br>v.<br><br>SHELDON ADELSON, an individual and as the alter ego of News+Media Capital Group LLC and as the alter ego of Las Vegas Review Journal, Inc.; PATRICK DUMONT, an individual; NEWS+MEDIA CAPITAL GROUP LLC, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; and DOES, I-X, inclusive,<br><br>               Defendants. | Case No. 2:19-cv-01667<br><br><br>**VERIFIED COMPLAINT FOR DIVESTITURE, INJUNCTION, AND DAMAGES BY REASON OF DEFENDANTS' VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, AND THE NEVADA UNFAIR TRADE PRACTICES ACT**<br><br><br>**JURY DEMAND** |

109316305.1

**INTRODUCTION**

Defendant Sheldon Adelson has been a long-time enemy of the First Amendment and the press.   For decades, he has filed and prosecuted one frivolous and ultimately unsuccessful defamation case after another.  His object has always been clear: chill free speech and silence those that would speak out against him.  Against this campaign of oppression, courageous journalists have nonetheless doggedly investigated Adelson's suspicious business dealings, lawsuits, and political activities while shining a disinfecting sunlight on his actions.  Honest reporters, scathing editorials, and negative press coverage have continually plagued and maddened Adelson.   In December 2015, Adelson's intolerance for the Fourth Estate finally boiled over when he sought to commit a modern-day smashing of the printing presses.  He purchased the Las Vegas Review-Journal—one of only two daily newspapers published and distributed in Clark County, Nevada— and began a systematic silencing of all his local media critics.

Not only did Adelson remove any Review-Journal reporter who dared to challenge him, he began a calculated scheme to monopolize the local newspaper industry by strangling the sole remaining competitor and dissenting voice—the Las Vegas Sun ("the Sun").  Since 1989, the Review-Journal has published and distributed both papers under a 50-year Joint Operating Agreement ("JOA") authorized by the Newspaper Preservation Act (the "NPA") and approved by the Department of Justice.  The NPA provides a limited antitrust exemption for newspapers to combine production, marketing, distribution, and sales, so long as their editorial and reportorial functions are maintained separate and independent.  Congress designed the NPA, and allowed JOAs, to preserve the publication of competing newspapers that are facing economic distress.

Adelson, however, has weaponized the JOA for the opposite purpose.  Adelson has wielded the JOA to place the Sun *into* economic distress.  He virtually eliminated the required profit sharing under the JOA by predatorily adding improper expenses to reduce any share amount to zero.  At Adelson's direction, the Review-Journal's publisher omitted the Sun from promotional advertising and covered up the Sun's required "noticeable mention" on the front page of the Review-Journal.

- 2 -

Despite these and other efforts to suffocate the Sun, the Sun remains steadfast.  The Sun stands as political and philosophical counterbalance to the Review-Journal.  The Sun covers local news in greater depth, breath, and accuracy.  It reports on breaking stories and provides a more attractive mix of news, features, and formats.  The Sun's editorial page often speaks the truth to Adelson's power.

Unable to financially blot out the Sun, and tired of publishing his only rival, Adelson and the Review-Journal have recently filed a baseless and unlawful claim in Nevada state court seeking to terminate the JOA—the same agreement that grants antitrust protection to the Review-Journal. The JOA renders the Sun operationally and economically dependent on the Review-Journal. Terminating the JOA would effectively kill the Sun.  A termination would complete Adelson's plan to achieve 100% monopoly power of local daily newspapers in Las Vegas and stifle all dissenting views.

By reasons of these antitrust violations, under the authority of Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26,[1,2] and Section 2 of the Sherman Act, 15 U.S.C. § 2,[3] and Section 7 of the Clayton Act, 15 U.S.C. § 18,[4] an injunction should and must be issued to prevent any efforts by Adelson or the Review-Journal to terminate the JOA.  Further, because they have misused their fiduciary responsibilities to the specific detriment to the Sun, the Court must divest Adelson of any control over the Review-Journal.

---

[1] Under Section 4 of the Clayton Act, 15 U.S.C. § 15, "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[2] Under Section 16 of the Clayton Act, 15 U.S.C. § 26, "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws. . . . ."

[3] Under Section 2 of the Sherman Act, 15 U.S.C. § 2, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony . . . . "

[4] Under Section 7 of the Clayton Act, 15 U.S.C. § 18, "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

1   In addition, any damages found by a jury for the substantial loss of profits, the harm to the

2   Las Vegas Sun brand, and the value of the Las Vegas Sun as a going concern, must be trebled by

3   the Court as a just and reasonable estimate, which actual damages are reasonably believed to be in

4   excess of tens of millions of dollars before trebling, and award attorney's fees and costs.

5   **THE PARTIES**

6   **Plaintiff Sun**

7   1.      The Las Vegas Sun, Inc. (the "Sun"), a Nevada corporation, publishes the Sun

8   newspaper in Clark County, Nevada.  The Sun is a wholly-owned subsidiary of Greenspun Media

9   Group, LLC, which publishes various weekly magazines in Clark County, Nevada.

10   2.      The Sun is the second longest running daily newspaper in Las Vegas's history.  The

11   first edition of the Sun was published under the name, "Las Vegas Morning Sun," on July 1, 1950,

12   by Hank Greenspun.[5]  Hank Greenspun remained the Sun's editor and publisher until he passed

13   away in 1989.  Hank's son, Brian Greenspun, has been the Sun's editor since 1989 and the publisher

14   since 2010.

15   3.      The Sun's distinct journalistic voice is grounded in the newspaper's rich history.

16   Hank Greenspun, who wrote a front-page column entitled, "Where I Stand," was known for taking

17   on U.S. Senator Patrick McCarran and the casinos in federal court in 1952 for orchestrating an

18   illegal group boycott of advertising in the Sun newspaper, and for his public battles with Senator

19   Joseph McCarthy.  The Sun's record of "courageous reporting" and "forthright journalism" has

20   garnered it numerous awards and industry recognition, including: the Pulitzer Prize for Public

21   Service in 2009 for its reporting on construction deaths on the Las Vegas Strip; the Alfred I. duPont-

22   Columbia University Award in 2010 for its coverage of gambling addiction; first place for the Best

23   Editorial Page in 2018 from the Nevada Press Association, "Better Newspaper Contest"; first place

24   in Editorial Writing, Editorial of the Year, and Sports Feature Writing for 2019 from the Nevada

25   Press Association; and a multitude of other national, state, and regional awards.

26

27   _____
[5] https://lasvegassun.com/history/timeline/

28   - 4 -

109316305.1

4.      Today, the Sun is considered a left-leaning editorial voice in Southern Nevada for its liberal tilting editorials and its frequent endorsement of Democratic candidates.  It is known for its editorials by Brian Greenspun, the longest running metro columnist in Las Vegas history, which speak to everything from local events to observations of national politics, including challenging Donald Trump, the Review-Journal, and Adelson himself. The Sun and its sister publications currently employ approximately 90 individuals in Southern Nevada.

**Defendant Las Vegas Review-Journal, Inc., and the Review-Journal**

5.      Defendant Las Vegas Review-Journal, Inc., is a Delaware corporation doing business in the State of Nevada. Upon information and belief, Las Vegas Review-Journal, Inc., is a wholly-owned subsidiary of News+Media Group LLC ("News+Media").  Las Vegas Review-Journal, Inc., operates and publishes the Review-Journal daily newspaper in Clark County, Nevada. The Review-Journal began as a daily newspaper publication in 1929, under the name, "Las Vegas Evening Review-Journal."  It is the longest running daily newspaper in Las Vegas.

6.      Today the Review-Journal is known as a right-leaning newspaper that mirrors the conservative views and personal business interests of its owners, casino magnate Sheldon Adelson and the Adelson family.  The Review-Journal was the one of only two of the largest 100 newspapers in the country to endorse Donald J. Trump for President.

**Defendant News+Media**

7.      Defendant News+Media is a Delaware limited-liability company, doing business in the State of Nevada.  News+Media acquired the Review-Journal on December 10, 2015, from New Media Investment Group Inc. for $140 million.  As part of the transaction, New Media Investment Group Inc.'s subsidiary, GateHouse Media LLC ("GateHouse"), agreed to continue operating the Review-Journal under a management agreement.  The management agreement ended within only six weeks after the acquisition, when the Review-Journal hired a new publisher to replace the one under the GateHouse management agreement.

/ / /

/ / /

- 5 -

109316305.1

**Defendant Sheldon Adelson**

8.     Defendant Sheldon Adelson ("Adelson"), an individual and the alter ego of News+Media, Las Vegas Review-Journal, Inc., and the Review-Journal, is a resident of Nevada. Adelson is the 24th richest person in the world,[6] and the billionaire founder, chairman, and chief executive officer of the Las Vegas Sands Corporation (the "Sands"). The Sands owns and operates luxury hotels and casinos, including the Venetian Las Vegas and The Palazzo Las Vegas, among others. Mr. Adelson, his family members and trusts and other entities established for the benefit of Mr. Adelson and/or his family members, own approximately 56% of Sands' outstanding common stock as of December 31, 2018. As a result, "Mr. Adelson exercises significant influence over the [Sands] business policies and affairs."[7]

9.     Upon information and belief, Mr. Adelson, his family members and trusts, and other entities established for the benefit of Mr. Adelson and/or his family members, own News+Media and the Review-Journal. As he does with the Sands properties, Mr. Adelson exercises significant influence over the RJ's business policies and affairs, including its editorial content.

10.     Adelson is well-known for his record-breaking donations to Republican political candidates and causes, and has, "established himself as an influential figure in American politics with the amount of money that he has contributed."[8]   Forking over $30 million, Adelson was the largest donor to Donald Trump's presidential campaign in 2016 and of the entire presidential election. Adelson gave more than $100 million to support the Republican party in the 2018 midterm elections.

**Defendant Patrick Dumont**

11.     Patrick Dumont, an individual, is a resident of Nevada and is an officer and owner of News+Media (together with News+Media, Las Vegas Review-Journal, Inc., and the Review-Journal, the "RJ"). Dumont is also an executive vice president and chief financial officer of the Sands and a member of its Board of Directors. Dumont is the son-in-law of Sheldon Adelson and

---

[6] https://www.forbes.com/billionaires/#2add0a251c71
[7] https://s21.q4cdn.com/635845646/files/doc_financials/2018/annual/Annual-Report-2018.pdf, at p. 27.
[8] https://www.theguardian.com/us-news/2018/jun/08/sheldon-adelson-trump-middle-east-policy

- 6 -

"orchestrated" the Adelson family's purchase of the Review-Journal, under the direction of Adelson.

**Doe Defendants**

12.     The Sun alleges that Defendants named herein as Does I through X are individuals, corporations, limited-liability companies, partnerships, associations, or other persons or entities who are responsible in some manner or capacity for the acts alleged herein, but whose names are unknown to The Sun at this time. The Sun will seek leave to amend this Complaint to include the names of Does I through X when the identities of such defendants become known to the Sun.

**JURISDICTION, VENUE, AND INTERSTATE COMMERCE**

13.     This action is brought under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26, for damages and for injunctive relief for Defendants' monopolization, attempted monopolization, and conspiracy to monopolize the relevant market for the sale of local daily newspapers in Clark County, Nevada, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Nevada's Unfair Trade Practice Act, NRS Chapter 598A, and for injunctive relief to prohibit the unlawful elimination and/or acquisition of the Sun by RJ, in violation of Section 7 of the Clayton Act's, 15 U.S.C. § 18, prohibition on acquisitions that, "may . . . substantially . . . lessen competition, or . . . tend to create a monopoly."

14.     This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and 28 U.S.C. Sections 1331 and 1337.  This Court has supplemental jurisdiction over the Sun's claim arising under Nevada's Unfair Trade Practice Act pursuant to 28 U.S.C. Section 1367.

15.     Defendants reside in or maintain offices, transact business, and own substantial assets in this District.  Accordingly, this Court has personal jurisdiction over Defendants.  Because Defendants transact business in this judicial district, venue is proper pursuant to 15 U.S.C. Sections 15, 22 and 26, and 28 U.S.C. Section 1391.

16.     Both the RJ and the Sun publish substantial quantities of local, state, national, and international news.  The parties both pay substantial sums for such news and for material sent to

- 7 -

them from various parts of the United States and the rest of the world.  The parties' single-media product carries substantial quantities of national advertising sent to them from throughout the United States.  In addition, purchases of materials to publish the paper, including paper and ink, involve transactions in interstate or foreign commerce.  Thus, Defendants' violations of the antitrust laws involve and affect interstate commerce.

## FACTUAL BACKGROUND AND HISTORY

### The Newspaper Preservation Act of 1970

17.    In response to the Supreme Court's decision in *Citizen Publishing Co. v. United States,* 394 U.S. 131 (1969), which held that a joint newspaper operating agreement constituted illegal price fixing in violation of the antitrust laws, Congress enacted the Newspaper Preservation Act, 15 U.S.C. §§ 1801-04 (the "Act"), in 1970.  In so doing, Congress determined that the public interest in preserving multiple editorial voices was best served by permitting joint newspaper operations in the same market that were conditioned on maintenance of separate editorial functions. While the Act exempts newspapers in a JOA from some provisions of the antitrust laws, it expressly excludes predatory conduct and practices from antitrust immunity.  15 U.S.C. § 1803(c).

### 1989 Joint Operating Agreement

18.    By the late 1980s, the Sun had been operating at a substantial loss and was in probable danger of financial failure.  In order to ensure the continued publication of two separate and independent daily newspapers in Las Vegas, in June 1989, the Sun and the RJ's prior owners entered into a Joint Operating Agreement (the "1989 JOA").

19.    As consideration for the execution of the 1989 JOA, and in exchange for the ability to remain in publication until at least December 31, 2040, the Sun paid the Review-Journal $25 million in stock and relinquished its printing press, circulation lists, advertising lists, and all non-editorial business functions.

20.    Under the terms of the 1989 JOA, the Sun and Review-Journal produced and distributed separate daily newspapers using a single platform (the Review-Journal's plant and equipment). The 1989 JOA required the Sun to cease publication as a morning newspaper and to

- 8 -

instead be circulated in the less desirable afternoon position.  The Sun's circulation dropped precipitously as a result of its afternoon placement.

21.    The parties agreed that the Review-Journal would, among other things, handle all print advertising and circulation functions for both print newspapers, including setting pricing for all advertising and subscriptions. Both newspapers maintained their editorial independence, while enjoying the savings of joint production, distribution, advertising, business administration, accounting, and other non-editorial functions.

22.    The Sun became profitable under the 1989 JOA.

**The Operative JOA – The 2005 Amended and Restated Joint Operating Agreement**

23.    In 2005, the 1989 JOA was amended and called the Amended and Restated [Joint Operating] Agreement (the "2005 JOA").

24.    Under the 2005 JOA, the parties combined the two newspapers into a single-media product that separately branded the Review-Journal and the Sun, and included the Sun as a separate newspaper located inside the Review-Journal.

25.    The 2005 JOA explicitly acknowledges the public interest in remaining editorially independent, as required by the Act. ("Because of the public interest in maintaining editorially and reportorially independent and competitive newspapers" specific performance is available to enforce the 2005 JOA).  Article 5.2 of the 2005 JOA states: "Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the essence of this restated agreement."

26.    Under the terms of the 2005 JOA, the RJ agreed to continue to print the Sun and the RJ together in its facilities, and oversee all accounting, management, and operational control, except for the operation of the Sun's news and editorial department.

27.    With the new, single-media product, the 2005 JOA contains strict and mutually-agreed upon formatting specifications for the Sun's pages, including "the number, placement, and characteristics."  The 2005 JOA also requires the RJ to publish a box above the Review-Journal's own banner on its front page containing a "noticeable mention" for the Sun, which includes the

Sun's logo and a headline describing the Sun's lead story and where the Sun's lead story is located. The RJ promised to feature the Sun's "noticeable mention" according to the detailed specifications in the JOA, which provide as follows:

> The Monday-Sunday editions of the Review-Journal shall include a noticeable mention of the Sun, on the front page of the Review-Journal. The noticeable mention will appear in a box above the Review-Journal's masthead (the "Sun Box") and shall be in the form shown on Appendix B. The Sun Box shall not be smaller in proportion than shown in Appendix B. The Sun Box shall also include the Sun's masthead, and any emblem that is part of the Sun's masthead. The Sun Box shall include a promotion of a story in the Sun and refer readers to the Sun inside. The type face, editorial artwork, font, and editorial promotional content appearing in the Sun Box shall be determined by Sun, in its sole discretion. Any color in the Sun Box shall be restricted to constituent colors used by the Review-Journal on its front page. The Sun Box shall be the left-hand box unless it would be obscured by a spaeda fold, in which case the Sun Box shall be the right-hand box. In the event of major breaking news or for exigent production circumstances, the Sun Box may be moved below the Review-Journal's masthead. The Sun, on average, will receive as much editorial color as the local news section of the Review-Journal.

28.     The 2005 JOA changed the prior marketing provisions and requires the RJ to market and promote the Sun (using commercially reasonable efforts to maximize the circulation of both newspapers), including equal mention of the Sun in the RJ's promotional activities to ensure the Sun's brand remains as robust as the Review-Journal's.  The 2005 JOA requires the RJ to use "commercially reasonable efforts" to promote the Sun in "equal prominence" to the Review-Journal:

> 5.1.4   Promotional   Activities.   Review-Journal   shall   use commercially reasonable efforts to promote the Newspapers. Any promotion of the Review-Journal as an advertising medium or to advance circulation shall include mention of equal prominence for the Sun. Either the Review-Journal or Sun may undertake additional promotional activities for their respective newspaper at their own expense. For all promotional activities for the Newspapers paid for by the Review-Journal, the Review-Journal shall be responsible for all promotional copy preparation and placement, provided however, that the Sun shall have the right to approve all promotional copy for

- 10 -

the Sun that does not generically and concurrently promote both Newspapers.

29.     The 2005 JOA also included a new provision regarding the RJ's requirement to publish the Sun paper as part of its electronic replica edition.  The 2005 JOA, in part, provides:

> Review-Journal shall have the exclusive right and obligation to distribute the Sun through electronic replica technology (i.e. technology customarily used by metropolitan daily newspapers which transmits an entire Sun page to the subscriber or consumer in any form) to the same extent the Review-Journal distributes its own pages by such means provided.

30.     Under the 2005 JOA, the Sun and the RJ are required to "bear their own respective editorial costs" and "to maintain a staff of news and editorial employees."  However, the 2005 JOA provides that the "Sun shall receive an annual profits payment" which shall be paid monthly in advance of the first day of each month during the term of the agreement. The amount of subsequent Annual Profits Payments fluctuates in direct correlation with the amount of the joint operation EBITDA.

31.     Between 2005 and 2015, the Annual Profits Payments to the Sun had been as much as $12 million per year, and never less than $1.3 million per year.

32.     The 2005 JOA is effective for an initial period ending on December 31st of the 50th year from July 1, 1990, *i.e.*, December 31, 2040, at which point it automatically renews for succeeding periods of 10 years unless terminated by either party.

33.     The parties incorporated audit and arbitration rights exercisable only by the Sun in the 2005 JOA.  Because Defendants were in control of all aspects of non-editorial management, an audit was the Sun's sole mechanism to ensure that that Defendants were complying with the 2005 JOA.

34.     The 1989 JOA had originally provided that the Review-Journal had the right to terminate the agreement if the JOA failed to turn a profit for two consecutive years.  This provision was intentionally omitted from the 2005 JOA.  As set forth in the 2005 JOA, only three events may

- 11 -

109316305.1

trigger its termination: (1) the expiration of the term (December 31, 2040); (2) bankruptcy or default by either party; and (3) a change in the controlling ownership interest in the Las Vegas Sun away from any lineal descendants of Hank Greenspun without prior approval from the RJ.

35.    Under the 2005 JOA, "[i]n the event that the Review-Journal determines that the Sun's continued placement in the Review-Journal has a material and substantial negative financial impact on the revenue and profit of the Newspapers it may deliver the Sun separately from the Review-Journal but at the same time, place, and manner as the Review-Journal" and it requires the RJ to provide the Sun with 15 days' notice of its intent to change the manner in which the RJ publishes the Sun.

## **NATURE OF TRADE AND COMMERCE**

### **Relevant Product Market**

36.    Local daily newspapers provide a distinct package of characteristics to their readers. They supply readers with national, state, and local news and sports information in a timely manner and in a convenient, portable, hardcopy format.  Local newspapers are able to offer news stories with more in-depth coverage than the news reported by radio or television, and they cover a wider array of topics of interest to local readers—not just breaking news and major news stories of the day.  Newspapers are portable, allowing the reader to read the news, advertisements, and other information at his/or own convenience without the need to use an electronic device to access content.  Newspapers are also inexpensive, meaning there are virtually no socio-economic barriers for citizens to have access to news and information about their community, including those who are unable to afford Internet services.  Readers enjoy other features of local daily newspapers, such as local event calendars, movie and television listings, classified advertisements, commercial advertisements, legal notices, comics, syndicated columns, and obituaries.  Most readers of local daily newspapers in Clark County do not consider weekly newspapers, radio news, television news, Internet news, or any other media to be adequate substitutes for the only two local daily newspapers serving the Las Vegas area.

- 12 -

109316305.1

37.     Thus, the sale of local daily newspapers is a distinct relevant product market and line of commerce within the meaning of Section 2 of the Sherman Act and Section 7 of the Clayton Act.

**Relevant Geographic Market**

38.     The Sun and the Review-Journal are produced, published, and distributed to readers in or near Clark County, Nevada.  Both newspapers provide news relating to Clark County, in addition to state, national, and international news.  These two organizations gather Clark County news to include in their print newspapers as well as their associated news websites.

39.     Local daily newspapers that are not produced, published, and distributed in Clark County do not regularly provide local news specific to that county.  Local daily newspapers from outside of Clark County do not have any significant circulation or sales inside Clark County.  Thus, local newspapers serving areas outside of Clark County are not acceptable substitutes for the Sun and the Review-Journal.

40.     Accordingly, Clark County, Nevada is the relevant geographic market and section of the country for antitrust purposes under Section 2 of the Sherman Act and Section 7 of the Clayton Act.

**Market Power**

41.     The Review-Journal and the Sun together account for 100% of the circulation of local daily newspapers in Clark County.  The combined print media product that includes the Review-Journal and the Sun has a paid circulation for Sunday of 86,593 and an average daily (non-Sunday) paid circulation of 67,514.  Those two papers have been published and distributed under the terms of a Joint Operating Agreement that was first entered into in 1989 and amended in 2005, as authorized under the NPA.  The 2005 JOA confers monopoly power in RJ, who under terms of the JOA maintains the only printing facilities capable of efficiently printing a daily local newspaper in Clark County, sets the prices for daily newspaper advertising and circulation, and prints, distributes, and promotes the only two daily local newspapers in the relevant market—the Sun and

- 13 -

109316305.1

1   the RJ.  Accordingly, the RJ has market power and monopoly power in the relevant market in this

2   case—the sale of daily local newspapers in Clark County.

3   **Barriers to Entry**

4   42.    Entry into the local daily newspaper market in Clark County is not timely, likely, or

5   sufficient to prevent harm to competition that would result from the Sun's elimination from the

6   market.

7   43.    Local newspapers incur significant fixed costs, including building or gaining access

8   to a printing facility, establishing a distribution network, hiring reporters and editors, news

9   gathering, and marketing the newspaper, among others, that present barriers to entry.

10   44.    By way of example, printing presses for daily newspapers can cost more than $100

11   million.  Any new local daily paper would require a massive printing facility, typically over 150,000

12   square feet, to house and store newsprint, that includes a sufficiently large loading dock capable of

13   taking 1-ton rolls of newsprint in and feeding out thousands of printed newspapers to be distributed.

14   There is no printing facility in the Clark County market that can efficiently and effectively print a

15   local daily newspaper other than the facilities owned and controlled by the RJ.

16   45.    By way of further example, establishment of a highly efficient distribution operation

17   capable of circulating the newspaper across the County immediately after printing is complete and

18   the corresponding need to develop a network of drivers to support home delivery presents another

19   barrier to entry in the market.

20   46.    No local daily newspaper has attempted to enter the Clark County market since the

21   Las Vegas Valley Times (the "Valley Times") in 1975 when it converted from a weekly newspaper

22   to a daily.  The Valley Times was a small, community paper, with a maximum circulation of 10,000.

23   That paper, which closed in 1984, was sold only in racks and never competed in a meaningful way

24   against the Sun or the Review-Journal.

25   47.    Further, expansion of daily newspapers in areas adjacent to Clark County is not

26   timely, likely, or sufficient to prevent the harm to competition resulting from the threatened

27   elimination of the Sun from the market.  There are no local daily newspapers adjacent to Clark

28

County.  The nearest local daily newspapers are hundreds of miles away and do not regularly provide local news specific to Clark County.  Expanding into Clark County would require local daily newspapers in areas hundreds of miles away to expand their coverage of local news specific to Clark County, to attract local advertisers who target readers in those counties, and to expand their distribution into those counties.

**DEFENDANTS' PREDATORY CONDUCT AND ANTICOMPETITIVE SCHEME**

48.    Prior to and following the acquisition of the Review-Journal, Defendants orchestrated and implemented an anticompetitive scheme to eliminate the RJ's sole competitor, the Sun, and to monopolize, attempt to monopolize, and to conspire to monopolize the market for daily local newspapers in Clark County.  In addition, Defendants' unlawful attempts to acquire the Sun or put it out of business violate Section 7 of the Clayton Act.

49.    Defendant Adelson wanted a newspaper in his hometown that reflected his conservative political views, took favorable stances on his "passion topics" (*i.e.*, his opposition to the legalization of marijuana, attacks on competitors of the Sands, advancement of specific state legislation and amendments to the Nevada Constitution to benefit his companies, pressure applied to judges overseeing cases involving Adelson, his involvement with the Oakland Raiders' planned move to Las Vegas and his convention business competitors), and that printed coverage biased in his favor of any ongoing court proceedings in which he may be involved.  Unlike most people, Adelson was in a financial position to buy the sympathetic press coverage he craved by acquiring a paper over which he could have complete and unfettered editorial control.  To that end, Adelson, his family, and Defendants, acquired the Review-Journal on December 10, 2015.

50.    At first, Adelson attempted to conceal his new interest in Review-Journal by naming an unknown and unqualified figurehead to lead the RJ, Michael Schroder, so that he could manipulate the content of the Review-Journal without people realizing it was being controlled.  Soon after the deal closed, reporters at the newly-acquired Review-Journal broke the story of his ownership.  In response, the Adelson family released a statement acknowledging their new stake in the paper:

- 15 -

109316305.1

> Today we are proud to announce that the Adelson family has
> purchased the Review-Journal through a wholly owned fund both as
> a financial investment as well as an investment in the future of the
> Las Vegas community.

51.     One of Adelson's first actions, even before the purchase transaction closed, exerted control over the Review-Journal by ordering RJ reporters to be stationed in the courtroom of Nevada District Judge Elizabeth Gonzalez.  Judge Gonzalez was presiding over a high-profile wrongful termination case in which Adelson was a defendant and had issued rulings unfavorable to Adelson. Adelson's objective was to intimidate Judge Gonzalez by seating reporters in her courtroom all day long to search for dirt.

52.     Prior to the announcement of the sale, Adelson directed Michael Schroeder to use one of Schroeder's Connecticut newspapers and write and publish an article condemning Judge Gonzalez's record, which also contained plagiarized material and fabricated quotes. Schroeder did so under the pen name Edward Clarkin.  As one 20-year journalist who worked for Schroeder announced during his departure from Schroeder's newspaper, Schroeder had funneled "a terrible, plagiarized piece of garbage about the court system" into the paper, and had "used the pages of my newspaper, secretly, to further the political agenda of his master out in Las Vegas."

53.     As soon as Adelson and Defendants took over the Review-Journal, and even earlier, Adelson began taking an active role in its editorial voice by weighing in on the Review-Journal's coverage in advance of its publication, holding almost daily teleconferences with then-publisher Jason Taylor.

54.     But just one thing, or one newspaper, stands between Adelson and his vision of the Review-Journal as his mouthpiece and sole editorial voice in the Las Vegas area—the Sun.  The 2005 JOA envisions the publication of two distinct editorial voices that are packaged together for readers in the community.  The Sun often expresses attitudes that are contrary to Adelson's, and when necessary, features pieces that take direct aim at Adelson himself.  On one occasion, Adelson showed his then-publisher Jason Taylor a liberal column written by Brian Greenspun, and suggested that he did not want to include the Sun.

- 16 -

109316305.1

55.     During negotiations for the purchase of the Review-Journal, Adelson began exploring ways to either terminate the 2005 JOA or to acquire the Sun in order to dissolve the JOA. In meetings held before and after Defendants' acquisition of the Review-Journal, Adelson, and his son-in law, Patrick Dumont, asked then-publisher Jason Taylor how they could get out of the JOA with the Sun, whether the Sun had to exist at all, and how they could either buy Greenspun out or get rid of the Sun.  During one such meeting, Adelson asked what would happen to the Sun if, under the JOA, there was no profit, and in other meetings continued to hypothesize about what would happen to the Sun if the RJ squeezed the Sun out of the market by eliminating its profits payments.

56.     These discussions launched Defendants' predatory and anticompetitive scheme further, the components of which can be grouped as follows: (1) removing a publisher with a proven record of turning around declining newspapers, who had already been implementing a plan that was reversing negative trends, and installing a replacement publisher to execute their predatory scheme to eliminate the Sun; (2) abusing the RJ's control over operations and advertising (and the accounting thereof) under the JOA in such a way so as to either put the Sun out of business or to so diminish its value that the Sun will be forced to sell to the RJ at a fire-sale price; (3) redesigning the Review-Journal's front page and the Sun's box with the purpose of making the Sun's presence on the Review-Journal's front page less noticeable and selling advertising products concealing the Sun's front page presence; and (4) threatening involuntary termination of the JOA.

**The RJ Terminated its Relationship with Then-Publisher Jason Taylor in Furtherance of Its Anticompetitive Scheme**

57.     Jason Taylor, publisher of the Review-Journal from July 2015 to January 2016, was brought in initially by the Review-Journal's prior owner, GateHouse, to turn around declining trends at the Review-Journal.  Taylor is known in the industry as having success in generating revenue and being a powerful force, and he has won countless industry awards and honors.

58.     Soon after Taylor's arrival, he began implementing a strategic plan to reverse the Review-Journal's declining trends by reducing unnecessary costs, increasing revenue through

- 17 -

109316305.1

improved advertising sales and circulation, increasing the RJ's visibility, and modernizing its brands. Taylor's plan began to see improved financial performance almost immediately.

59.     In a meeting with Greenspun before Defendants' acquisition of the Review-Journal, Taylor projected that the JOA would have a financially strong close for fiscal year-end 2016, and that, based on trend, the Sun's profit payments could increase by more than 18% in 2017. Under Taylor's plan, the JOA profits in 2016-2017 were projected to be substantial. Taylor was also vocal about the value of the Sun and desired to strengthen the partnership between the newspapers in the JOA.

60.     As Review-Journal publisher, Taylor also discovered that the Review-Journal's former owner, Stephens Media Group, had been dishonest in calculating the profit payments under the 2005 JOA due and owing to the Sun. Because Taylor believed it was important to resolve any outstanding profit payment issues with the Sun in order to successfully implement his strategic plan for the Review-Journal, he raised the issue with Adelson on several occasions. But no resolution ever came.

61.     Even though Adelson had lobbied for Taylor to stay on as publisher of the Review-Journal after its acquisition, six weeks later, Taylor was removed from the Review-Journal because Adelson and Dumont wanted someone who was more in line with their vision and control.

62.     Consistent with journalistic practices, Taylor had been determined to insulate the newsroom from direct Adelson influence.

63.     The RJ did not follow Taylor's strategic plan after he was removed, and the revenue that was trending upward under Taylor quickly evaporated after his departure.

64.     In Taylor's place, Defendants hired Craig Moon as the new publisher of the Review-Journal in January 2016. At the close of the fiscal year March 31, 2016—buoyed by Taylor's performance the prior year, the JOA still reported a profit, though much smaller than Taylor had projected. Under Moon's tenure the RJ's fortunes quickly began to deteriorate. Moon executed on Defendants' strategy to financially starve the Sun and to force it out of business.

- 18 -

109316305.1

65.     A meeting was held on or about January 25, 2017, to preview financial results for the end of the fiscal year, in which Moon, Robert Cauthorn (the Sun's COO), Greenspun, and Adelson's newspaper consultant Frank Vega were in attendance.  At that meeting, the Sun was informed that its Annual Profits Payments were expected to significantly decrease as a result of poor performance of the joint operation, and that the RJ did not project *any* profits going forward for the joint operation.  At that same meeting, Greenspun and Cauthorn were also informed that, "Patrick [Dumont] says the JOA will never be worth more than it is now and Brian should call Patrick to make a deal."

66.     Alarmed at the situation at the conclusion of the meeting, the parties discussed the terms of a possible deal, but no offer made by Defendants was sufficient to maintain the Sun as an independent editorial voice.

67.     In March 2017, before the end of the close of fiscal year, Moon directed the RJ accounting department to write off hundreds of thousands of dollars so that when the Sun's profit payment was calculated that the payment owed to the Sun would be close to zero.

68.     Defendants made good on their promise and no profits payments have been made to the Sun since the close of the fiscal year in March 31, 2017.

69.     Taylor was removed by the RJ as an act in furtherance of its anticompetitive plan. Because Taylor advocated ceasing dishonest accounting practices utilized by the RJ and resolving the profit payments issues under the JOA to the Sun, and projected Annual Profit Payments *increases* to the Sun under his new strategic plan—which was contrary to Adelson and the remaining Defendants' plan to starve the Sun of funds needed to operate—Taylor was removed to pave the way for another publisher, Craig Moon, who would agree to engage in predatory conduct to eliminate the Sun.

/ / /

/ / /

/ / /

- 19 -

**Defendants Exploit the JOA by Charging Prohibited Editorial Expenses Against The Joint Operation to Reduce Profit Payments to the Sun**

70.     Defendants' plan to deprive the Sun of funds needed to operate by recording zero profit was successful by the fiscal year ending March 31, 2017.  Defendants, for the first time in the history of the joint operation, recorded a negative EBITDA in the amount of negative $2.25 million, constituting a negative 122.43% EBITDA change from the year prior.

71.     Higher operating expenses under the 2005 JOA reduces the joint EBITDA and, consequently, lead to lower Annual Profits Payments to the Sun.

72.     Defendants had increased the Review-Journal's editorial costs from $6.78 million in 2016 to $8.88 million in 2017 and charged all of the Review-Journal's editorial costs against the joint operation, even though under the 2005 JOA the parties are to "bear their own respective editorial costs" and "to maintain a staff of news and editorial employees."

73.     The Review-Journal's editorial costs in the amount of $8.88 million in 2017 was around the same level maintained by the Review-Journal in 2005, when the joint operation EBITDA was far greater – $121.56 million.

74.     Defendants continue to illegally charge the Review-Journal's individual editorial costs against the joint operation to this day, reducing the Sun's Annual Profits Payments, and furthering Defendants' unlawful plan to put the Sun out of business and to extinguish its distinct and independent editorial voice in the Las Vegas area.

**Defendants Charge the Review-Journal's Individual and Uncovered Promotional Expenses to the Joint Operation to Reduce Annual Profits Payments to the Sun in Furtherance of its Exclusionary Scheme**

75.     The 2005 JOA, which charged the RJ with responsibility for promoting and advertising both newspapers, requires the RJ to "use commercially reasonable efforts to promote the Newspapers" and any advertising requires the RJ to mention the Sun in "equal prominence." Any individual promotional costs are to be borne by each newspaper.

76.     Nearly all promotion for a newspaper is either to promote it as an advertising medium or to advance circulation.

- 20 -

77.     Defendants' predatory tactics include marketing and promoting the Review-Journal in various advertising mediums without any mention of the Sun, or displaying the Sun's logo disproportionately to the Review-Journal's, in contravention to the RJ's promotional responsibilities under the 2005 JOA, and then, compounding the effect of these failures to promote the Sun by charging these separate expenses against the joint operation, reducing the Sun's Annual Profits Payments.

78.     Virtually none of the RJ's promotional efforts comply with the demands of the 2005 JOA.

79.     All external RJ advertising, including television and billboards, omits the Sun entirely.

80.     When the Sun challenged the RJ to produce examples of promotional activities that mention the Sun in equal prominence, Defendants could not do so.

81.     Defendants admit that they have excluded the Sun from their advertising initiatives. Below is an example of an RJ advertisement that makes no mention of the Sun:




82.     Defendants have not used commercially reasonable efforts to promote the Sun in accordance with their obligation to do so.

83.     The RJ charged all promotional activity for the Review-Journal against the joint operation, the vast majority of which was either individual Review-Journal promotion or did not comply with the requirements of the JOA.  In addition, the RJ included millions of dollars of expenses it incurred for promoting itself and its separate website, reviewjournal.com.  Under the 2005 JOA, the newspapers' websites operate outside of the joint arrangement and are not costs chargeable to the JOA.

84.     While Defendants may promote the Review-Journal individually, those expenses are not chargeable against the joint operation. Defendants' inclusion of costs incurred for advertising the RJ individually, expenses that are barred by the 2005 JOA, reduces joint EBITDA, and, in turn, the Sun's Annual Profits Payments.

85.     Defendants continue to refuse to use commercially reasonable efforts to promote the Sun and continue to wrongly charge the RJ's unilateral promotional activities against the joint operation.  These are overt acts in furtherance of Defendants' plan to eliminate the Sun and to monopolize the market for the sale of local daily newspapers in Clark County.

**Defendants Abused Their Power Under the JOA by Unilaterally Removing the Sun Box from the Front Page Entirely, Minimizing Visibility of the Sun Logo on the Front Page, and by Covering the Sun's Mention on the Front Page with Advertising Stickers**

86.     In 2017, shortly after promising no further profit payments to the Sun and attempting to coerce the Sun into selling, the RJ informed the Sun that it was unilaterally changing the format of the front page of the combined publication.

87.     Two days later, the RJ commenced publishing a new front-page design that eliminates the Sun Box entirely and deviates from the Sun's noticeable mention specifications and illustrations in the 2005 JOA, including forcing a reduction in size of the Sun's logo. The Sun Box had been published in compliance with the 2005 JOA for the preceding 12 years.

- 22 -

109316305.1

88.   An example of the Sun Box on the Review-Journal front page from March 31, 2017, before the changes were unilaterally made by the RJ, is shown below:



89.   An example of the unilaterally-redesigned noticeable mention of the Sun on the Review-Journal front page from April 2, 2017, after the changes were unilaterally made by the RJ and the new design was rolled out, is shown below:



90.   By destroying the Sun's Box, the RJ also ensured that when a "spadea fold" (an advertising element covering approximately 40% of the left side of the page) was sold, the Sun content in the noticeable mention would be covered. The 2005 JOA specifically requires that the Sun Box to move to the right side when a spadea is present, ensuring the Sun is always visible. That is no longer the case. The RJ compounds this by regularly covering the Sun front page presence

- 23 -

with advertising stickers. It does so with strategic intent: in both the 2016 and 2018 elections, the Sun's announcements of political endorsements were covered by advertising stickers placed by the RJ. In the 2018 example, the Sun specifically asked the Review-Journal publisher not cover the endorsement announcements.  He refused and the Sun's endorsements were covered on the front page.

91.    Not only has the Sun suffered damage to its brand as a result of the RJ's unauthorized design, but by making the Sun less visible and less accessible to consumers, it reduces the number of available choices perceived by consumers and voters.

92.    The RJ continues to publish the unauthorized front-page design over the Sun's repeated objections.

93.    The RJ places advertising stickers on top of the Sun's logo and mentions on the front page of the Review-Journal, obscuring the Sun's message and making it less visible and accessible to readers.

94.    Defendants' acts to obscure the visibility of the Sun on the front page are designed to advance Defendants' unlawful and anticompetitive scheme.

**Defendants Eliminated the Sun from the Electronic Replica Edition**

95.    Section 10.6 of the JOA requires that the RJ include the Sun in all electronic replica editions it publishes.

96.    Prior to the time that the Review-Journal was owned by the Defendants, the Review-Journal always complied with Section 10.6 of the JOA and included the Sun in the digital replica editions of the newspapers.

97.    On or about January 25, 2018, the Sun requested that the RJ submit to an audit of its books and records.  Immediately following this request, the RJ stopped including the Sun in the electronic replica edition of the newspapers.

98.    On or about May 3, 2019, Keith Moyer, the Review-Journal's current publisher and editor telephoned Mr. Cauthorn, COO for the Sun, stating the RJ restored the Sun in the replica

- 24 -

edition that day.  Mr. Moyer further stated that he had looked into the removal and stated it was "kind of a unilateral decision by Craig Moon. He said, 'just take it out.'"

99.     The replica edition constitutes a meaningful percentage of Review-Journal circulation and is mostly used in educational environments, thus the RJ deprived the Sun of an opportunity to reach new young readers to allow its voice to be introduced to future readers.

100.     Defendants' removal of the Sun from the electronic replica edition, thereby reducing its visibility, is an act in furtherance of Defendants' predatory plot.

**Defendants Blocked the Sun from Exercising Their Audit Rights Under the JOA to Extend and Further their Plan to Eliminate the Sun**

101.     On May 12, 2016, and in accordance with the 2005 JOA (Appendix D), the Sun notified Defendants of its intent to examine and audit the Review-Journal's books and records to verify the RJ's Annual Profit Payment calculation, and to ensure that Defendants had not illegally redirected revenues from or charged expenses to the joint operation.

102.     The Sun forwarded its initial list of documentation, and Defendants rejected the Sun's request in late July 2016.

103.     Following the RJ's objection, the Sun attempted to informally negotiate with Defendants to obtain documents from the Review-Journal, party-to-party.

104.     Unable to reach an agreement, on September 5, 2017, the Sun renewed its formal audit request, expressly appointing its chosen law firm auditor to examine and audit the books and records of the Review-Journal.  The RJ rejected the request on the grounds that it "far exceed[ed] the limited audit provisions" of the 2005 JOA, even though all requested material had been available in prior audits when other ownership was in charge.  The RJ agreed to gather relevant, albeit very limited, information for production in due course. The RJ changed its position on November 16, 2017, a dilatory tactic commonly employed by Defendants, when the RJ again disputed the validity of the Sun's audit.  On, November 28, 2017, the RJ changed course again when it agreed to produce limited categories of documents requested by the Sun.

- 25 -

109316305.1

105.    After further discussions between counsel, on December 21, 2017, the RJ represented that its anticipated production would occur within the first two weeks of January 2018.

106.    The RJ never produced the requested documents, until after the Sun filed an action in state court and the matter was compelled to arbitration.

107.    Defendants' efforts to prevent the Sun from exercising its audit rights and from uncovering the truth regarding the RJ's misallocation of expenses and revenue are acts in furtherance of Defendants' illegal plan.

**Defendants Seek to Terminate the JOA on Made-Up Grounds**

108.    Following Defendants' loss in arbitration,  they moved to amend their answer and assert counterclaims in the state court action to terminate the JOA.  The grounds upon which the RJ seeks to terminate the JOA, that purportedly, the "Sun fails to meet the JOA's required high standards of newspaper quality," are not only bogus but are also objectively baseless, unreasonable, and impermissible grounds identified in the 2005 JOA to seek termination. No reasonable litigant could realistically expect success on the merits.  The counterclaims are a sham meant to directly interfere with, and destroy, a competitor.

109.    Defendants' steps to terminate the JOA are overt acts in furtherance of their scheme to monopolize the Clark County newspaper market in violation of antitrust laws.

**ANTICOMPETITIVE EFFECTS**

110.    The Review-Journal and the Sun are the only local daily newspapers in Clark County.  If Defendants' predatory conduct is permitted to continue unchecked and/or if the JOA is terminated, Defendants will control and monopolize 100% of the sale of local daily newspapers in Clark County.  Defendants' monopolistic practices in the market for the sale of newspapers in Clark County harm competition by weakening and threatening to eliminate the Review-Journal's only competition in the market— the Sun.

111.    There is no compelling commercial benefit under the joint operation for the RJ to attempt to end the 2005 JOA.  The RJ's actions speak to its true motive: more than simply a commercial monopoly, it wants a monopoly in daily print newspapers on thought and expression

and to silence those who would disagree.  This of course, is exactly the circumstance the NPA and the JOA sought to prevent.  The RJ's actions are intended to prevent anyone from naysaying the newspaper's owner in front of the important print audience.  Absent the Sun's editorial voice, the RJ would gain unrivaled powers in the relevant market.

112.  The owners of the Sun and the Review-Journal have always competed vigorously against each other for readers.  They do so in various ways, such as seeking to generate original news and other content of interest to readers; trying to cover local news with greater depth, breadth, and accuracy; breaking stories first; and offering the most attractive mix of news, features, and editorials to readers.  This head-to-head competition between the owners of the Sun and the Review-Journal will be lost unless Defendants' anticompetitive conduct is enjoined.

113.  Defendants' predatory conduct has already had and will continue to have the effect of reducing output (both quality and quantity) of newspapers.  By way of example, as a direct result of the Defendants' plan to squeeze out the Sun, the Sun had to lay off staff, including cutting back on their night staff in January 2018.  The practical consequence of cutting back on night staff meant that instead of sending stories over to the Review-Journal for print at 10:00 p.m., as it used to, the limited Sun staff now has to send stories to the Review-Journal for print at 4:00 p.m.  Before, a story arriving at 5:00 p.m. or later might have made it to print in the Sun the next morning, now it appears later than it otherwise would have in print.

114.  The termination of the 2005 JOA will eliminate the Sun newspaper by leaving it with no infrastructure or facilities within which to produce, print, and distribute its newspaper.  It will also improperly deprive the Sun of a print audience it has worked to build for more than 60 years.

115.  Further, Defendants' anticompetitive scheme threatens to decrease output.  From 2015-2018, the national total circulation revenue for newspapers increased by 1.1%.  During that same time period, 2015-2018, circulation revenue for the Review-Journal decreased by a whopping 16%.  Without the constraining influence of the Sun, and the independent editorial voice in the Las Vegas community that readers want, circulation, and thus, output is likely to decrease even further.

- 27 -

116.    Defendants' practices harm consumers by robbing them of the choice of an independent editorial voice in the Las Vegas area, offering them a check on and an alternative to Review-Journal coverage, and by limiting the Sun's ability to produce quality content.  After the RJ announced its intention to seek termination of the 2005 JOA, consumers loudly voiced their objections.

117.    Further, the Sun's readers' concerns are confirmed by a study of 2008-2009 of data following the ending of a joint operating agreement between the Denver Post and the Rocky Mountain News.[9]  The Rocky Mountain News printed its last edition on February 27, 2009. Comparing civic engagement following the death of the JOA to other cities in the nation, the study concluded that, "eliminating a local newspaper from a community leads to less civic engagement in the immediate aftermath among the citizens of that community."

118.    Absent outside influences or monopolistic business misconduct, neither the Sun nor the Review-Journal is in danger of failing in the near future. The 2005 JOA ensures continued publication of both newspapers until December 31, 2040.

## FIRST CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act – Monopolization, 15 U.S.C. § 2)

119.    Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

120.    The relevant market is the sale of local daily newspapers in Clark County.

121.    Defendants have gained and maintain monopoly power in the relevant market through a JOA permitted by the Department of Justice under the Newspaper Preservation Act of 1970.  15 U.S.C. §§ 1801-04.  Defendants have abused and maintained such power through patently exclusionary conduct, including, exploiting their powers and responsibilities under the 2005 JOA to deprive the Sun of its Annual Profit Payments, by reducing the visibility of the Sun to consumers in contravention to its obligations under the JOA, and by threatening to terminate the JOA.

---

[9]  Lee Shaker, *Dead Newspapers and Citizens' Civic Engagement,* http://leeshaker.com/wp-content/uploads/2013/01/Dead-Newspapers-and-Citizens-Civic-Engagement-Lee-Shaker-Forthcoming-in-Political-Communication.pdf, last accessed on September 20, 2019.

122.   For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant market.

123.   Defendants have the power to exclude competition in the relevant market and have used that power, including by way of its predatory conduct as described herein, in order to maintain and expand its monopoly power in that market.

124.   Defendants have behaved as alleged herein to maintain and grow its monopoly in the relevant market with the effect that competition is foreclosed, and consumer choice is gravely diminished in that the Sun's editorial voice in the Las Vegas community has been impaired, as alleged in this complaint.  Further, RJ's actions have and will decrease output (quantity and quality) of newspapers.

125.   There is no business necessity or other pro-competitive justification for Defendants' conduct.

126.   Plaintiff has been injured and will continue to be injured in its business and property as a result of Defendants' conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by Defendants.  *See* 15 U.S.C. § 15.

127.   Plaintiff is entitled to preliminary and permanent injunctive relief to prevent Defendants from persisting in their unlawful, inequitable, and unjustified behavior to Plaintiff's detriment, with such an injunction prohibiting Defendants from terminating the 2005 JOA, prohibiting Defendants from abusing the terms of the JOA to eliminate the Sun from the market, and ordering the RJ to divest itself of the newspaper, or in the alternative to divest itself of the newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation.  *See* 15 U.S.C. § 26.

/ / /

/ / /

/ / /

109316305.1

**SECOND CLAIM FOR RELIEF**

**(Violation of Section 2 of the Sherman Act – Attempted Monopolization, 15 U.S.C. § 2)**

128.    Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

129.    The relevant market is the sale of local daily newspapers in Clark County.

130.    Defendants have attempted to monopolize the market for the sale of local daily newspapers in Clark County.  Defendants gained and maintain monopoly power in the relevant market through a JOA permitted by the Department of Justice under the Newspaper Preservation Act of 1970. 15 U.S.C. §§ 1801-04.  Defendants have abused and maintained market power through patently exclusionary conduct, including, exploiting their powers and responsibilities under the 2005 JOA to deprive the Sun of its Annual Profit Payments, by reducing the visibility of the Sun to consumers in contravention of their obligations under the JOA, and by threatening to terminate the JOA.

131.    Defendants have created a dangerous probability of success that they will achieve monopoly power in the relevant market.

132.    Defendants have a specific intent to achieve monopoly power in the relevant market, as alleged in the paragraphs above.  Now, if their predatory and anticompetitive conduct is not checked, Defendants have a dangerous probability of success of monopolizing the relevant market.

133.    Defendants have the power to exclude competition in the relevant market for the sale of local daily newspapers in Clark County, and have used that power, including by way of their unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

134.    Defendants have behaved as alleged herein in an attempt to obtain a monopoly in the relevant market with the effect that competition is foreclosed, and consumer choice is gravely diminished in that the Sun's editorial voice in the Las Vegas community has been impaired and may be eliminated altogether, as alleged in this Complaint.  Further, Defendants' actions have and will decrease output (quantity and quality) of newspapers.

- 30 -

109316305.1

135.   There is no business necessity or other pro-competitive justification for Defendants' conduct.

136.   Plaintiff has been injured and will continue to be injured in its business and property as a result of Defendants' conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by RJ.  *See* 15 U.S.C. § 15.

137.    Plaintiff is entitled to preliminary and permanent injunctive relief to prevent Defendants from persisting in their unlawful, inequitable, and unjustified behavior to Plaintiff's detriment, with such an injunction prohibiting Defendants from terminating the JOA, prohibiting Defendants from abusing the terms of the JOA to eliminate the Sun from the market, and ordering the RJ to divest itself of the newspaper, or in the alternative to divest itself of the newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation.  *See* 15 U.S.C. § 26.

### THIRD CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act – Conspiracy to Monopolize, 15 U.S.C. § 2)

138.   Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

139.   Defendants have unlawfully conspired to monopolize the market for the sale of local daily newspapers in Clark County.

140.   Defendants have the specific intent to achieve monopoly power in the relevant market, as alleged in the paragraphs above.  Now, and if their predatory and anticompetitive conduct is not checked, Defendants have a dangerous probability of success of monopolizing the relevant market.

141.   In furtherance of the conspiracy, Defendants and have committed several overt acts as set out herein.

142.   Defendant' conspiracy has had the effect of foreclosing competition and reducing consumer choice in that the Sun's editorial voice in the Las Vegas community has been impaired

- 31 -

and may be eliminated altogether, as alleged in this Complaint.  Further, Defendants' actions have and will decrease output (quantity and quality) of newspapers.

143.    Defendants have engaged in anticompetitive conduct in an attempt to create a monopoly in the relevant market.

144.    The conspirators are jointly and severally liable for all damages caused by their conspiracy, at any time during the damage period, and by each member of the conspiracy, with no right of contribution against the other members of the conspiracy.

145.    Defendants' conduct has had anticompetitive effects in the relevant market, including those alleged and described above.

146.    Plaintiff has been injured and will continue to be injured in its business and property as a result of Defendants' conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by Defendants.  *See* 15 U.S.C. § 15.

147.     Plaintiff is entitled to preliminary and permanent injunctive relief to prevent Defendants from persisting in their unlawful, inequitable, and unjustified behavior to Plaintiff's detriment, with such an injunction prohibiting Defendants from terminating the JOA, prohibiting Defendants from abusing the terms of the JOA to eliminate the Sun from the market, and ordering the RJ to divest itself of the newspaper, or in the alternative to divest itself of the newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation.  *See* 15 U.S.C. § 26.

## FOURTH CLAIM FOR RELIEF

### (Violation of Section 7 of the Clayton Act – 15 U.S.C. § 18)

148.    Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

149.    The anticompetitive conduct described above, specifically Defendants' plan to attempt to purchase the Sun or terminate the 2005 JOA and silence editorial competition with the Sun constitutes a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

150.     The effect of the proposed termination of the JOA by Defendants may be to substantially lessen competition or tend to create a monopoly in the market for the sale of local daily newspapers in Clark County, Nevada.

151.     By reason of this violation, the Plaintiff is threatened with irreparable harm for which damages will be inadequate to fully compensate Plaintiff.

152.     Plaintiff is entitled to bring suit under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against Defendants' threatened termination of the 2005 JOA.

## FIFTH CLAIM FOR RELIEF

### (Violation of Nevada Unfair Trade Practices Act – NRS 598A)

153.     Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

154.     The Nevada Unfair Trade Practices Act construed in conformity with federal antitrust laws.

155.     Defendants' violation of the Nevada Unfair Trade Practices Act has caused or will cause injury to the Plaintiff as set forth above.

156.     Plaintiff is entitled to damages for Defendants' violation of the Nevada Unfair Trade Practices Act, in an amount to be demonstrated.

157.     Plaintiff is entitled to obtain preliminary and permanent injunctive relief for Defendants' violation of the Nevada Unfair Trade Practices Act.

## JURY TRIAL DEMANDED

158.     The Sun demands a trial by jury as its right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.

/ / /

/ / /

/ / /

- 33 -

109316305.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     A judicial declaration that:

(1)     Defendants have unlawfully monopolized, attempted to monopolize, and/or conspired to monopolize the market for the sale of local daily newspapers in Clark County, Nevada, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(3)     Defendants' threatened acquisition of the Sun and/or termination of the JOA may substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

(4)     Defendants' unlawful conduct violates the Nevada Unfair Trade Practices Act;

B.     That the Court enter judgment granting Plaintiff an injunction requiring Defendants to cease the abusive, unlawful, and anticompetitive practices described herein, including the threat to terminate the JOA before 2040;

C.     That the Court enter judgment granting Plaintiff an injunction prohibiting the Defendants from acquiring the Sun;

D.     That the Court enter judgment enjoining Defendants from terminating the 2005 JOA;

E.     That the Court enter judgment granting Plaintiff a preliminary and permanent injunction ordering the RJ to divest itself of the newspaper, or in the alternative to divest itself of the newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation as done in other similar JOAs;

F.     That the Court enter judgment for the Plaintiff to recover treble the amount of actual damages found by the jury (*see* 15 U.S.C. § 15(a));

G.     That the Court grant such additional orders or judgments as may be necessary to remedy or prevent the unlawful practices complaint of herein; and

- 34 -

109316305.1

1    H.    That the Court enter judgment granting Plaintiff its cost of suit, including reasonable

2  attorney's fees, costs, and expenses, as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15;

3  Section 16 of the Clayton Act, 15 U.S.C. § 26, and NRS 598A.210.

4         DATED this 24th day of September, 2019.

5                                                    LEWIS ROCA ROTHGERBER CHRISTIE LLP

6

7                                        By: /s/ E. Leif Reid

8                                            E. Leif Reid, Bar No. 5750
                                             Kristen L. Martini, Bar No. 11272
9                                            Nicole Scott, Bar No. 13757
                                             One East Liberty Street, Suite 300
10                                           Reno, NV 89501-2128

11                                           Joseph M. Alioto, CA Bar No. 42680, *pro
                                             hac vice to be filed*
12                                           Jamie L. Miller, CA Bar No. 271452, *pro hac
                                             vice to be filed*
13                                           ALIOTO LAW FIRM
                                             One Sansome Street, 35th Floor
14                                           San Francisco, CA  94104

15
                                             PISANELLI BICE PLLC
16                                           James J. Pisanelli, Bar No. 4027
                                             Todd L. Bice, Bar No. 4534
17                                           Jordan T. Smith, Bar No. 12097
                                             400 South 7th Street, Suite 300
18                                           Las Vegas, Nevada 89101

19                                           *Attorneys for Plaintiff*

20

21

22

23

24

25

26

27

28                                   - 35 -

**VERIFICATION**

I, Brian Greenspun, am the Chief Executive Officer, Publisher, and Editor of the Las Vegas Sun, Inc., Plaintiff in this action.

I have reviewed the Verified Complaint for Injunction and Damages by Reason of Defendants' Violations of the Sherman Antitrust Act, the Clayton Antitrust Act, and the Nevada Unfair Trade Practices Act and with regard to the allegations of which I have personal knowledge, I believe them to be true.  With regard to the allegations that are based upon information and belief and of which I do not have personal knowledge, I believe them to be true based upon information contained in the documents incorporated by referenced in this Verified Complaint, information obtained from published sources, and the information I acquired from my years in the newspaper industry.

I make this Verification under the penalty of perjury pursuant to 28 U.S.C. § 1746.

Dated:  September 24, 2019

Brian Greenspun

- 36 -

109316305.1