# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

Las Vegas Sun, Inc.,

                 Plaintiff,

     v.

Sheldon Adelson, et al.,

                 Defendant.

Case No. 2:19-cv-01667-RFB-BNW

**ORDER**

Before the Court is a motion to stay discovery (ECF No. 43) by defendants Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, Sheldon Adelson, and Patrick Dumont. Defendants ask this Court to stay discovery until the district judge resolves their motions to dismiss. Plaintiff Las Vegas Sun, Inc. ("LVS") opposes the request. This Court finds that defendants have failed to establish that their motions to dismiss are potentially dispositive. Further, after a preliminary peek at defendants' motions, the Court is not convinced that LVS will be unable to construct a claim for relief or that discovery would be a waste of effort. On these independent bases, and the considerations of Fed. R. Civ. P. 1, the Court will deny defendants' motion and discovery will begin.

## I.     Background.

### A.  Parties.

LVS is a Nevada corporation that publishes a daily newspaper in Clark County, Nevada. ECF No. 1 at ¶ 1. LVS first published its newspaper—the "Las Vegas Sun" (the "Sun")—in 1950, making it the second-longest-running daily newspaper in Las Vegas. *Id.* at ¶ 2. LVS describes itself as a "left-leaning editorial voice" that has won numerous accolades, including the Pulitzer Prize for Public Service. *Id.* at ¶¶ 3–4.

Las Vegas Review-Journal, Inc. ("LVRJ") is a Delaware corporation that also publishes a daily newspaper in Clark County, Nevada. *Id.* at ¶ 5. LVRJ first published its newspaper—the

"Las Vegas Review-Journal" (the "RJ")—in 1929, making it the longest-running daily newspaper in Las Vegas. *Id.* According to LVS, the RJ's paper "is known as a right-leaning newspaper." *Id.* at ¶ 6. LVRJ is a wholly owned subsidiary of defendant News+Media Capital Group, LLC ("News+"). *Id.* at ¶¶ 5, 7.

Defendant Sheldon Adelson is an individual and, according to LVS, the owner and alter ego of News+. *Id.* at ¶ 8. Adelson supposedly exercises significant influence over LVRJ's affairs and the editorial content of its newspaper. *Id.* at ¶ 9.

Defendant Patrick Dumont is an individual and an officer and owner of News+. *Id.* at ¶ 11. Dumont is Adelson's son-in-law. *Id.* Dumont facilitated Adelson's purchase of LVRJ, supposedly at Adelson's direction. *Id.*

**B. The 1998 and 2005 JOAs.**

The Sun and the RJ have a storied history in Southern Nevada. But by the late 1980s, the Sun was operating at a substantial loss that nearly caused its financial failure. *Id.* at ¶ 18. Thus, the Sun's and the RJ's storied histories became entwined when, in 1989, LVS and LVRJ entered into a Joint Operating Agreement (the "1989 JOA"). *Id.*

Through the 1989 JOA, LVS and LVRJ aimed "[t]o ensure the continued publication of two separate and independent daily newspapers in Las Vegas." *Id.* To that end, the 1989 JOA permitted LVRJ to assume control of the print advertising and circulation functions for both newspapers. *Id.* at ¶ 20. Further, the 1989 JOA permitted LVS to print its paper using LVRJ's publishing plant and equipment. *Id.* Despite these joint operations, the newspapers maintained their editorial independence. *Id.* at ¶ 21. The Sun became profitable under the 1989 JOA. *Id.* at ¶ 22.

The 1989 JOA was possible because of the Newspaper Preservation Act, 15 U.S.C. §§ 1801–04 (the "NPA"). *Id.* at ¶ 17. The NPA exempts joint newspaper operations from certain antitrust trust laws provisions. *Id.* To come within the NPA's protection, the joint newspaper operations must be conditioned on maintenance of separate editorial functions. *Id.*

LVS and LVRJ amended the 1989 JOA in 2005 (the "2005 JOA"). *Id.* at ¶ 23. Under the 2005 JOA, the Sun and the RJ became a single-media product: both newspapers remained

separately branded publications, but the Sun was included as a separate newspaper inside the RJ.
*Id.* at ¶ 24.  LVRJ continued to oversee "all accounting, management, and operational control" of
the Sun, "except for the operation of the Sun's news and editorial department."  *Id.* at ¶ 26.  LVS
alleges that the 2005 JOA remains operative and runs for an initial period ending on December
31, 2040.  *Id.* at ¶ 23.

Like the 1989 JOA, the 2005 JOA imposed many obligations onto LVRJ.  It contains, for
example, specific formatting specifications.  *Id.* at ¶ 27.  Further, it requires LVRJ to publish a
"noticeable mention" for the Sun's lead story and specifies that the "noticeable mention" must
generally be published above the RJ's own banner on its front page.  *Id.*  The RJ, furthermore, is
required to market and promote the Sun in "equal prominence" to the RJ, using "commercially
reasonable efforts to maximize circulation of both newspapers."  *Id.* at ¶ 28.  Both newspapers
bear their respective editorial costs under the 2005 JOA.  *Id.*  And LVRJ pays an "annual profits
payment" to the Sun before the first day of each month.  *Id.* at ¶ 30.

The 2005 JOA sets forth certain conditions for its termination.  Under the 1989 JOA,
LVRJ could terminate the JOA if the joint operation failed to turn a profit for two consecutive
years.  *Id.* at ¶ 34.  That provision was omitted from the 2005 JOA, which permits termination
only if 1 of 3 events occurs: (1) the expiration of the initial term (December 31, 2040);
(2) bankruptcy or default by LVRJ or LVS; or (3) a change in controlling ownership interest in
LVS away from any lineal descendants of Hank Greenspun—the Sun's founding editor and
publisher until 1989—without prior approval from the RJ.  *Id.*

**C. Defendants' allegedly predatory conduct and anticompetitive scheme.**

LVS alleges that defendants engaged in an anticompetitive scheme to eliminate the RJ's
sole competitor—the Sun—from the market for daily local newspapers in Clark County.  *Id.* at ¶
48.  Adelson acquired the RJ in December 2015, apparently because he desired to exert
"unfettered editorial control" over its content and produce press coverage sympathetic to his
business and personal interests.  *Id.* at ¶ 49.  Adelson began to exert this control immediately
upon his acquisition of the RJ.  *Id.* at ¶ 53.  The Sun, however, continued to express attitudes
contrary to Adelson's and published pieces that took direct aim at Adelson himself.  *Id.* at ¶ 54.

1    LVS alleges four different actions by defendants that together comprise defendants'

2    predatory conduct and anticompetitive scheme.  *Id.* at ¶ 56.

3    First, LVS claims that Adelson removed non-party Jason Taylor from his position as

4    publisher of the RJ in an effort to harm LVS.  *Id.*  Taylor, according to LVS, was publisher of the

5    RJ for about seven months starting in July 2015.  *Id.* at ¶ 57.  Prior to Adelson's acquisition of the

6    RJ, Taylor had implemented a plan to help increase the RJ's revenue, and he was on track to

7    increase the Sun's profit payments under the 2005 JOA, too.  *Id.* at ¶ 59.  Further, Taylor

8    identified that the RJ's owner prior to Adelson "had been dishonest in calculating profit

9    payments" to LVS under the 2005 JOA, and he raised this issue to Adelson but to no avail.  *Id.* at

10    ¶ 60.  Taylor endeavored to insulate the RJ's newsroom from Adelson's influence, which

11    supposedly resulted in Taylor's removal as publisher of the RJ, the abandonment of Taylor's plan

12    to increase the RJ's revenue, and the hiring of a new publisher who would execute on defendants'

13    "strategy to financially starve the Sun and to force it out of business."  *Id.* at ¶  64.

14    Second, LVS alleges that LVRJ abused its control over operations, advertising, and

15    accounting, with the goal of either ending the Sun's existence or diminishing the Sun's value and

16    forcing a sell to the RJ "at a fire-sale price."  *Id.* at ¶ 56.  Defendants allegedly achieved this by

17    increasing the JOA's operating expenses and recording—for the first time in the joint operation's

18    history—a negative EBITDA[1] in the amount of $2.25 million for the fiscal year ending on March

19    31, 2017.  *Id.* at ¶  70.  The negative EBITDA led to lower profit payments to the Sun.  *Id.* at ¶

20    71.  Compounding the problem, LVRJ charged editorial and certain advertising costs against the

21    joint operation, in derogation of the 2005 JOA.  *Id.* at ¶¶  72, 83.

22    Third, LVRJ redesigned the RJ's front page to make the Sun's presence less noticeable.

23    *Id.* at ¶  56.  In 2017, LVRJ deviated from the 2005 JOA's requirements for the RJ's "noticeable

24    mention" of the Sun's lead story.  *Id.* at ¶  87.  Similarly, LVRJ strategically obscured the Sun's

25    front-page presence in the RJ with advertising stickers.  *Id.* at ¶  90.  These stickers covered, for

26

27    [1]    EBITDA means "earnings before interest, taxes, depreciation, and amortization."
MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/EBITDA (last accessed Apr. 21,
28    2020).

example, the Sun's endorsements for public office.  *Id.* at ¶ 90.  Further, in or around January 2018, LVRJ began omitting the Sun from the electronic replica editions of its newspaper—also in derogation of the 2005 JOA—which further reduced the Sun's visibility.  *Id.* at ¶¶ 99–100.

Fourth, and finally, defendants threatened involuntary termination of the JOA.  *Id.* at ¶ 56.  LVRJ sought to terminate the 2005 JOA in Nevada state court (the "state court action") by claiming that the Sun failed "to meet the JOA's required high standard of newspaper quality."  *Id.* at ¶ 108.  This is an improper basis for termination of the JOA, LVS alleges, because it is not one of the grounds for termination set forth in the 2005 JOA.  *Id.* at ¶ 108.[2]

LVS alleges that if defendants are allowed to continue with their predatory conduct, defendants will control and monopolize 100% of the sale of local daily newspapers in Clark County.  *Id.* at ¶ 110.

**D.  Procedural history.**

LVS filed the underlying complaint in September 2019.  ECF No. 1.  In it, LVS asserts five causes of action: (1) monopolization, in violation of Section 2 of the Sherman Act;[3] (2) attempted monopolization, in violation of Section 2 of the Sherman Act; (3) conspiracy to monopolize, in violation of Section 2 of the Sherman Act; (4) violation of Section 7 of the Clayton Act;[4] and (5) violation of Nevada's Unfair Trade Practices Act.[5]  *Id.* at 28–33.

LVRJ and News+ filed a joint motion to dismiss on October 30, 2019, in which Adelson and Dumont have joined.  ECF Nos. 20 and 22.  That same day, Adelson and Dumont filed their own joint motion to dismiss.  ECF No. 21.  LVS timely opposed both motions.  ECF Nos. 35, 36, and 40.

The parties filed a joint stipulated discovery plan and scheduling order on December 16, 2019, wherein they offer divergent positions on several critical deadlines in the discovery process.

---

[2]    The state court matter is stayed pending a decision by the district judge in the underlying matter on certain "threshold questions of federal law."  ECF No. 43 at 4.

[3]    *See* 15 U.S.C. § 2.

[4]    *See* 15 U.S.C. § 8.

[5]    *See* NRS 598A.

1    ECF No. 42.  The following day, defendants filed a motion to stay discovery pending resolution

2    of their motions to dismiss.  ECF No. 43.  LVS timely responded and defendants timely replied.

3    ECF Nos. 50 and 52.

4        Defendants' motion came on for hearing on February 4, 2020.  This Court advised the

5    parties that it would issue a written order resolving defendants' motion and stayed discovery in

6    the meanwhile.

7    **II.    Discussion.**

8        "The Federal Rules of Civil Procedure do not provide for automatic or blanket stays of

9    discovery when a potentially dispositive motion is pending."  *Tradebay, LLC v. eBay, Inc.*, 278

10   F.R.D. 597, 600–01 (D. Nev. 2011) (citation omitted).  But trial courts enjoy broad authority to

11   manage discovery, and this authority encompasses the ability to issue a discovery stay.  *See, e.g.*,

12   *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Little v. City of Seattle*, 863 F.2d 681, 685 (9th

13   Cir. 1988).  Still, the trial court's broad authority must be balanced against Rule 1's expectation

14   that the Federal Rules of Civil Procedure be construed "to secure the just, speedy, and

15   inexpensive determination of every action and proceeding."  *See* FED. R. CIV. P. 1.

16       Courts in this district have formulated three requirements that, if met, can merit a stay of

17   discovery.  *Kor Media Grp., LLC v. Green*, 294 F.R.D. 579, 581 (D. Nev. 2013).  A motion to

18   stay discovery may be granted when: (1) the pending motion is potentially dispositive; (2) the

19   potentially dispositive motion can be decided without additional discovery; and (3) the court has

20   taken a "preliminary peek" at the merits of the potentially dispositive motion and is convinced

21   that the plaintiff will be unable to state a claim for relief.  *Id.*  The party seeking the stay bears the

22   "heavy" burden of establishing why discovery should be denied.  *Tradebay*, 278 F.R.D. at 601.

23       **A.  Potentially dispositive motions to dismiss.**

24       Defendants argue that they meet the first of three *Kor Media* requirements.  They contend

25   that all LVS's claims are erroneously premised on the Department of Justice's ("DOJ") purported

26   written approval of the 2005 JOA, which is a condition precedent to its enforceability.  ECF No.

27   43 at 6.  Defendants point to a 2008 letter from the DOJ, which the Sun and the RJ received after

28   the DOJ reviewed the 2005 JOA.  ECF No. 20-1 at 31.  In the letter, the DOJ wrote that after

1  reviewing the 2005 JOA, it had "closed its investigation." *Id.* It further wrote that the decision to

2  close its investigation was not based on a conclusion that the 2005 JOA was protected by the

3  NPA. *Id.* Further, the DOJ warned the newspapers that their conduct pursuant to the JOA

4  amendments remained "subject to antitrust scrutiny." *Id.* Defendants point to this letter as

5  evidence of the unenforceability of the 2005 JOA. And they argue that LVS has already conceded

6  that the 2005 JOA was never approved in writing by the DOJ. ECF No. 43 at 6 (citing ECF No.

7  40 at 28:13–17). As a result, they argue the JOA is unenforceable and forecloses success on all

8  LVS's claims.

9  Not so, according to LVS. LVS counters that its claims are viable independent of the

10  JOA's enforceability. ECF No. 50 at 7. The reason for this, LVS contends, is that the

11  enforceability of the JOA is not a required legal element to any of the LVS's antitrust claims. *Id.*

12  at 8. Further, LVS asserts that the parties' course of dealing for the last 15 years has been

13  premised on the understanding that the 2005 JOA is an operative, enforceable agreement. *Id.*

14  LVS argues that defendants cannot now disavow that course. *Id.*

15  Here, this Court finds that defendants fail at the first of the three *Kor Media* requirements

16  because they have not established that LVS's claims hinge on the enforceability of the 2005 JOA.

17  None of LVS's asserted claims require it to plead the enforceability of the 2005 JOA because

18  none of those claims are for breach of contract. Instead, LVS's burden at this juncture is to

19  "allege sufficient facts from which the court can discern the elements of an injury resulting from

20  an act forbidden by the antitrust laws." *Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.*, 99

21  F.3d 937, 950 (9th Cir. 1996). The crux of LVS's complaint is that defendants have violated

22  proscriptions that flow from the Sherman Act, the Clayton Act, and Nevada's Unfair Trade

23  Practices Act. True, LVS also alleges that defendants' conduct violated the 2005 JOA. But this

24  Court is not convinced that the enforceability of the 2005 JOA is a prerequisite to success on

25  LVS's claims, and it can deny defendants' motion to stay on this basis alone.[6] However, as

26

27          [6]   Defendants' briefing incorrectly states that the *Kor Media* standard for a discovery stay
contains three factors. ECF No. 43 at 5 ("The first two *Kor Media* factors counsel in favor of a stay.").
28  However, the *Kor Media* standard is a three-part test containing three requirements. *Kor Media Grp., LLC
v. Green*, 294 F.R.D. 579, 581 (D. Nev. 2013) ("Courts in this district have formulated three

1   explained more fully *infra* section II.C., even if this Court were to accept defendants' premise

2   (i.e., that LVS's claims hinge on the enforceability of the 2005 JOA), it would still deny

3   defendants' motion to stay because—following a preliminary peek of the underlying motions to

4   dismiss—the Court is not convinced that defendants will prevail on establishing that the 2005

5   JOA is unenforceable.

6        **B.   Need for additional discovery.**

7        Defendants argue that their motions to dismiss can be resolved without discovery.  ECF

8   No. 43 at 6–7.  To resolve the motions, defendants claim, the district judge need only apply the

9   NPA's plain language to the 2005 JOA and LVS's factual allegations.  *Id.*

10       Predictably, LVS opposes defendants' argument.  LVS argues that additional discovery

11  would prove that the DOJ, the parties, and other practitioners interpret the NPA's plain language

12  in a way that is contrary to defendants' interpretation.  ECF No. 50 at 10.  Further, LVS argues

13  that discovery would shed light on the meaning and impact of the 2008 letter from the DOJ,

14  especially given that the letter is "ambiguous as to its meaning and effect[.]"  *Id.* at 11.  LVS

15  further argues discovery would enable it to establish that defendants' conduct over the last fifteen

16  years precludes them from asserting the 2005 JOA's unenforceability.  *Id.*  Finally, LVS argues

17  that even if the district judge finds the 2005 JOA to be unenforceable because of the 2008 DOJ

18  letter, the parties would merely revert to the 1989 JOA and defendants would remain liable for

19  their alleged antitrust violations.  *Id.*

20       Here, the Court finds that the district judge will not require additional discovery to resolve

21  defendants' motions to dismiss.  Defendants' motions were brought under Rule 12(b)(6).  To

22  resolve a Rule 12(b)(6) motion, "the court asks only whether the pleadings are sufficient to

23  establish a claim," not whether plaintiff will be able to "find evidence to support the pleadings."

24  *Tracy v. U.S.*, 243 F.R.D. 662, 664 (D. Nev. 2007) (citing *Lee v. City of Los Angeles*, 250 F.3d

25

26

27  ───────────────

28  **requirements** in determining whether to stay discovery") (emphasis added).  Thus, a movant cannot
    prevail on a motion to stay under *Kor Media* if she fails to establish any of the three requirements.

668, 688 (9th Cir. 2001).  Therefore, defendants have established the second *Kor Media* requirement.

### C. Preliminary peek.

At the "preliminary peek" stage, the court does not prejudge the outcome of the underlying motion to dismiss because, ultimately, the district judge might "have a different view of the merits[.]" *Tradebay, LLC v. eBay, Inc.*, 278 F.R.D. 597, 603 (D. Nev. 2011).  Instead, the preliminary peek is meant to "evaluate the propriety of an order staying or limiting discovery with the goal of accomplishing the objectives of Rule 1."  *Id.*

With this goal in mind, a stay of discovery should be ordered only "if the court is 'convinced' that a plaintiff will be unable to state a claim for relief."  *Kor Media Grp.*, 294 F.R.D. 579, 583 (D. Nev. 2013) (internal citation omitted).  This is an onerous standard.  *Id.*  "Generally, there must be *no question* in the court's mind that the dispositive motion will prevail, and therefore, discovery is a waste of effort."  *Id.* (citing *Trzaska v. Int'l Game Techs.*, No. 2:10-cv-02268-JCM-GWF, 2011 WL 1233298, at *4 (D. Nev. Mar. 29, 2011)) (emphasis in original).

Defendants' arguments on the preliminary peek contains two prongs.  At the first prong, defendants argue that a preliminary peek at their motions to dismiss "yields the inescapable conclusion" that the NPA precludes enforceability of the 2005 JOA.  ECF No. 43 at 7.  At the second prong, defendants raise six independent reasons that together supposedly mandate dismissal of LVS's complaint.  *Id.* at 8.

### 1.    Defendants' argument regarding the 2005 JOA.

Defendants argue that the 2005 JOA is unenforceable under the NPA because it was never approved in writing by the DOJ.  In presenting this argument, defendants run into three problems, the first two are procedural and the third is substantive.

Through the NPA, Congress sought to address "the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States[.]"  15 U.S.C. § 1801.  To that end, the NPA provides antitrust immunity to JOAs that meet the requirements of 15 U.S.C. § 1803.

1     In § 1803, the NPA draws a firm line between JOAs entered into prior to July 24, 1970—

2     the NPA's effective date—and JOAs entered into after that date.  *See id.* §§ 1803(a)–(b).  JOAs

3     entered into before July 24, 1970 ("pre-1970 JOAs") are governed by § 1803(a), while JOAs

4     entered into after that date are governed by § 1803(b).

5     Under § 1803(a), a pre-1970 JOA automatically comes within the NPA's antitrust

6     immunity if, at the time it was entered into, "not more than one" of the newspapers performing

7     under the JOA "was likely to remain or become a financially sound publication."  *Hawaii*

8     *Newspaper Agency v. Bronster*, 103 F.3d 742, 745 (9th Cir. 1996) (quoting § 1803(a)).

9     Conversely, newspapers entering into a JOA *after* the NPA's effective date must, to receive

10    antitrust immunity, obtain the "prior written consent" of the United States Attorney General.

11    § 1803(b); *Hawaii Newspaper Agency*, 103 F.3d at 745.  Section 1803(b) provides: "It shall be

12    unlawful for any person to enter into, perform, or enforce a [JOA], not already in effect, except

13    with the prior written consent of the Attorney General of the United States."

14    Here, LVS alleged in its complaint that it and LVRJ operate under a JOA "approved by

15    the [DOJ]."  ECF No. 1 at 2:15–2:18.[7]  This allegation must be taken as true.  *Kwan v.*

16    *SanMedica, Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).  Defendants' argument—that the 2005

17    JOA is unenforceable under the NPA because it was never approved in writing by the DOJ—

18    undermines this bedrock principle.  Thus, defendants fall into their first procedural pitfall.

19    Not to worry, urge defendants, because the 2008 letter from the DOJ—which LVRJ and

20    News+ appended to their motion to dismiss—conclusively establishes that the DOJ did not give

21    written consent to the 2005 JOA.  However, defendants at this point fall into a second procedural

22    pitfall: it is a well-established principle that to resolve a Rule 12(b)(6) motion, generally "the

23    Court must limit its review to the four corners of the operative complaint and may not consider

24    facts presented in briefs or extrinsic evidence."  *McFadden v. Nat'l Title Co.*, No. CV 11-04175

---

[7]     Defendants concede that LVS made this allegation.  ECF No. 20 at 5 ("In [LVS's] *verified* complaint, Brian Greenspun, the Sun's CEO, Publisher[,] and Editor swore under oath that the 2005 JOA was "approved by the Department of Justice" and therefore authorized by the [NPA].") (emphasis in original) (citation omitted).

1  SJO (PLAx), 2011 WL 13220462, at *1 (C.D. Cal. Aug. 10, 2011); *Kramer v. MicroBilt Corp.*,

2  No. EDCV 19-1021 (JGB) (SPx), 2019 WL 8065849, at *1 n.1 (C.D. Cal. Sept. 12, 2019).  The

3  2008 DOJ letter is outside the four corners of the complaint and the district judge is therefore

4  unlikely to consider it.[8,9]  At most, defendants have raised a factual challenge to LVS's complaint.

5  But factual challenges have "no bearing on the legal sufficiency of the allegations under Rule

6  12(b)(6)."  *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

7          Still, even if defendants successfully overcame these two procedural hurdles, the Court's

8  preliminary peek at the underlying motions to dismiss leave it unconvinced of the merits of

9  defendants' argument.  As explained earlier, prior to the 2005 JOA the parties' conduct was

10 allegedly governed by the 1989 JOA.  Defendants concede that LVS alleged the 1989 JOA was

11 approved by the DOJ.  ECF No. 20 at 3.  In defendants' view, however, the 2005 JOA is not a

12 mere amendment but instead constitutes a new JOA, thus triggering the NPA's supposed

13 proscription against enforcing it without the prior written consent of the Attorney General.  *See*

14 15 U.S.C. § 1803(b).

15         LVS, in contrast, argues that the 2005 JOA is merely an amendment to the 1989 JOA.

16 Neither § 1803(a) nor § 1803(b), LVS further argues, requires or authorizes DOJ approval of

17 renewals or amendments to JOAs.

18         After considering the parties' arguments and authorities—and without prejudging the

19 merits of the parties' positions—the Court believes that the 2005 JOA constitutes an amendment

20

21 ───────────────

22          [8]      In their underlying motion to dismiss, LVRJ and News+ raise arguments that urge the
   district judge to consider the 2008 letter from the DOJ.  ECF No. 20 at 3 n.2 and 4 n.3.  The Court has

23 reviewed these arguments and LVS's arguments to the contrary.  *See* ECF No. 40 at 24–26.  Ultimately,
   the Court does not believe that LVRJ and News+ will prevail in their effort to have the district judge
   consider the 2008 letter at the pleading stage.

24          [9]      Defendants point out that LVS conceded the 2008 letter "was neither an approval nor a

25 rejection of the 2005 Amended JOA."  ECF No. 43 at 6.  However, defendants stretch this concession too
   far.  A concession that the 2008 DOJ letter does not constitute approval of the 2005 JOA does not

26 necessarily mean that the DOJ *never* approved the parties' arrangement.  But even if it did, the Court
   remains unconvinced that LVS's claims hinge on the 2005 JOA's enforceability or—as set forth more

27 fully below—that the NPA requires the DOJ's approval of the 2005 JOA in the first place.  *See* 28 C.F.R.
   § 48.1 ("The [NPA] does not require all joint newspaper operating agreement to obtain the prior written

28 consent of the Attorney General.").

1    under the NPA rather than an agreement "not already in effect."  *See* 15 U.S.C. § 1803(b).  The

2    Court finds it significant that both JOAs run for the same initial period.  *Compare* ECF No. 40-2

3    at 5 *with* ECF No. 20-1 at 6.  Both agreements contain the same provision allowing for

4    modification.  *Compare* ECF No. 40-2 at 33 *with* ECF No. 20-1 at 14.  And "[p]reservation of the

5    news and editorial independence and autonomy of both the [RJ] and the Sun is of the essence" to

6    both agreements.  *Compare* 40-2 at 18 *with* 20-1 at 9.

7            In any event, this Court is not convinced that § 1803(b) mandates the DOJ's written

8    approval of the 2005 JOA—whether as an amendment to the 1989 JOA or, as defendants argue, a

9    new, standalone JOA—for it to be enforceable.  For this proposition, LVS relies in part on the

10   Eastern District of Michigan's decision in *Mahaffey v. Detroit Newspaper Agency*.  969 F. Supp.

11   446 (E.D. Mich. 1997), *aff'd*  166 F.3d 1214 (6th Cir. 1998) (unpublished).  There, the Court

12   "decline[d] to find that, as a matter of law, any unapproved amendment would immediately cause

13   the forfeiture of antitrust immunity for an entire JOA."  *Id.* at 448.  If Congress intended "all

14   amendments to create such sweeping consequence, . . . it could have easily included language to

15   that effect in the statute."  *Id.*  This construction of the NPA was affirmed by the Sixth Circuit.

16   *Mahaffey v. Detroit Newspaper Agency*, 166 F.3d 1214, 1998 WL 739902, at *2 (6h Cir. 1998)

17   (unpublished) ("the Act and the regulations are silent [a]s to how post-1970 [JOAs] may be

18   amended.  We see no reason to suppose that Congress intended previously-approved agreements

19   to be stripped of all protection if amended by the addition of provisions for which no approval

20   procedure has been prescribed.").

21           LVS also relied on a decision from the District of Columbia Circuit.  *See Newspaper*

22   *Guild v. Levi*, 539 F.2d 755 (D.C. Cir. 1976).  There, plaintiffs sought to enjoin the

23   implementation of a regulation that provided:

24          The [NPA] does not require that all joint newspaper operating agreements obtain
            the prior written consent of the Attorney General.  The [NPA] and these
25          regulations provide a method for newspapers to obtain the benefit of a limited
            exemption from the antitrust laws if they desire to do so.  Joint newspaper
26          operating agreements that are put into effect without the prior written consent of
            the Attorney General remain fully subject to the antitrust laws.

27

28

1    *Id.* at 757 (citing 39 Fed. Reg. 7 (1974)).  The *Levi* Court conducted an extensive analysis of the

2    NPA's legislative history and text, and ultimately upheld the regulation.  *Id.* at 761.  Now, the

3    language in the proposed regulation lives on in 28 C.F.R. § 48.1.

4         Defendants take issue with LVS's reliance on *Mahaffey*, arguing in part that the Court

5    there did not address whether the amendments the newspaper made to the JOA were enforceable.

6    This Court agrees.

7         However, the *Levi* decision cannot be similarly explained away.  Defendants argue that

8    the district judge should not follow *Levi* because the court there improperly relied on legislative

9    history, which defendants caution is an anachronistic form of statutory interpretation under

10   contemporary Supreme Court jurisprudence.  This Court disagrees.  Although the *Levi* Court did

11   indeed consult legislative history, the Court does not believe that this was impermissible or that it

12   rids *Levi* of its persuasive value.

13        True, the *Levi* Court stated that "[a] rigidly literal reading of [the NPA] undeniably

14   provides support" for the conclusion that all post-1970 JOAs must obtain the Attorney General's

15   consent before they can be put into effect.  *Levi*, 539 F.2d 755.  But in moving beyond the NPA's

16   plain text to reach its legislative history, *Levi* applied a maxim of statutory construction that the

17   Supreme Court has, again and again, itself applied.  *Compare id.* ("a statute should not be read in

18   isolation from the context of the whole Act . . . we must not be guided by a single sentence or

19   member of a sentence, but (should) look to the provision of the whole law, and to its object and

20   policy.") (citation omitted), *with Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) ("It is a

21   fundamental canon of statutory construction that the words of a statute must be read in their

22   context and with a view to their place in the overall statutory scheme . . . the Court often looks to

23   history [and] purpose to divine the meaning of language.") (plurality) (citation omitted).

24        To be sure, *Levi* is not mandatory authority and the district judge is therefore not required

25   to follow it.  But *Levi* speaks directly to the enforceability of post-1970 JOAs, it has not been

26   overruled, and it supports LVS's position.  At minimum, 28 C.F.R. § 48.1—which defendants

27   concede "is still technically on the books" (ECF No. 20 at 20)—and *Levi* at least raise a *question*

28

1   about whether defendants will prevail in establishing that the 2005 JOA is unenforceable.[10]  Thus,

2   the Court is not "convinced" that plaintiffs will be unable to construct an antitrust claim.

3                          **2.      Defendants' independent arguments.**

4          In the alternative, defendants offer a patchwork of six independent reasons that they argue

5   mandate dismissal of LVS's complaint.  ECF No. 43 at 8–9.  The Court addresses each of these

6   arguments in turn.

7          First, defendants argue that LVS's complaint fails because LVS's alleged relevant market

8   posits an artificial market for the sale of local newspapers in Clark County that faces no

9   competition from TV, radio, internet, or electronically delivered news on portable devices.  ECF

10  No. 43 at 8.  At the pleading stage, plaintiff must allege a relevant market that includes "both a

11  geographic market and a product market."  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th

12  Cir. 2018).  The product market must account for the product at issue and "all economic

13  substitutes for the product."  *Id.* (citation omitted).

14         The Court is not convinced that LVS's proffered market is facially unsustainable.  As

15  LVS indicates, the relevant market need not be pled with specificity.  *Newcal Indus., Inc. v. Ikon*

16  *Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).  And "the validity of the 'relevant market'

17  is typically a factual element rather than a legal element."  *Id.* (citing *High Tech. Careers v. San*

18  *Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993)).  Thus, an alleged relevant market may

19  survive Rule 12(b)(6) scrutiny but ultimately fail at summary judgment or trial.  *Id.*  Even

20  applying its own common sense, as mandated by the Ninth Circuit, the Court disagrees that

21  LVS's alleged relevant market is "unnatural," "artificial," or "contorted to meet [its] litigation

22  needs."  *See Hicks*, 897 F.3d at 1121; *see also United States v. Tribune Publ'g Co.*, No. CV 16-

23  01822-AB (PJWx), 2016 WL 2989488, at *3 (C.D. Cal. Mar. 18, 2016) (rejecting an argument at

24  the preliminary injunction stage that the alleged product market for "the sale of Daily English-

25  language local daily newspapers to subscribers and the sale of local advertising in the

26  _____

27         [10]     "Generally there must be *no question* in the court's mind that the dispositive motion will
        prevail, and therefore, discovery is a waste of effort."  *Kor Media Grp., LLC v. Green*, 294 F.R.D. 579,
28      583 (D. Nev. 2013) (citation omitted) (emphasis in original).

newspapers" fails to account "for internet-based sources of local news and advertising as potential competition").

Second, defendants argue that there can be no "harm to competition" as a matter of law because the Sun and the RJ are sold as a single-media product and because the 2005 JOA requires LVRJ and LVS to cooperate, rather than compete, in the sale of newspapers.  ECF No. 43 at 8–9.  The Court disagrees with defendants on this point, too.  "The first clause of [the NPA] contemplates continued competition between editorially and reportorially distinct voices."  *U.S. v. Daily Gazette Co.*, 567 F. Supp. 2d 859, 869 (S.D.W. Va. 2008).  Further, as LVS points out, "a JOA partner  has at least two competitive and economic incentives": (1) "increasing its value, particularly in the eyes of potential acquisitors"; and (2) "enhancing its bargaining position when the JOA is up for re-negotiation or termination."  *Id.* at 870; *see also* ECF No. 1 at 27 ("The owners of the [S]un and the [RJ] have always competed vigorously against each other for readers.").

Third, according to defendants, LVS cannot use the antitrust laws to "force" the RJ to perform under the 2005 JOA "where the contract expressly permits termination for breach, and the state court may find that [LVS] did, in fact, breach the 2005 JOA."  ECF No. 3 at 9.  The problem with this argument—and the reason that this Court believes it will not succeed—is that it presupposes that LVS breached the 2005 JOA, which defendants have not established.  Further, the Ninth Circuit has rejected the "broad contention that the antitrust laws may never impose duties on a monopolist to aid its competitors."  *Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 368 (9th Cir. 1988); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

Fourth, plaintiffs urge that the *Noerr-Pennington* doctrine bars LVS's antitrust claims because LVS seeks to challenge the RJ's steps to terminate the 2005 JOA in the state court action.  ECF No. 43 at 9.  The *Noerr-Pennington* doctrine shields from statutory liability all those who petition any branch of the government for redress.  *Theme Promotions, Inc. v. News America Marketing FSI*, 546 F.3d 991, 1006 (9th Cir. 2008).  The doctrine is rooted in the First Amendment and, consequently, applies to "litigation activities which constitute

1   'communication[s] to the court[.]'" *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933 (9th Cir. 2006)

2   (alterations in original).  Those communications include "[a] complaint, an answer, a

3   counterclaim[,] [] other assorted documents and pleadings," and prelitigation settlement demands.

4   *Id.* at 933, 938.  Here, LVS alleges in its complaint an anticompetitive scheme that might capture

5   *some* petitioning activity (i.e., defendants' counterclaim in state court).  Based on a preliminary

6   peek, the Court agrees with LVS that none of LVS's claim is predicated exclusively on

7   petitioning activity.  Thus, the *Noerr-Penington* doctrine does not preclude any of LVS's antitrust

8   claims in their entirety.

9        Fifth, LVS's claim under Section 7 of the Clayton Act fails, defendants argue, because

10  LVS did not articulate or challenge any merger or acquisition.  ECF No. 43 at 9.  The Court

11  agrees.  Section 7 of the Clayton Act precludes mergers "whose effect may be substantially to

12  lessen competition, or to tend to create a monopoly."  *Saint Alphonsus Med. Ctr.-Nampa Inc. v.*

13  *St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015).  Here, based on a preliminary

14  peek, this Court does not believe that LVS has plausibly alleged an impermissible acquisition or

15  merger.  The district judge might disagree.  However, the Court will not grant defendants' motion

16  on this basis because this argument will not dispose of LVS's entire complaint.  *See Kor Media*

17  *Grp., LLC v. Green*, 294 F.R.D. 579, 581 (D. Nev. 2013) (requiring that a pending motion be

18  "potentially dispositive").

19       Sixth, and finally, defendants argue that LVS failed to allege any facts "that even remotely

20  suffice for alter-ego liability."  ECF No. 43 at 9.  To state a claim for alter ego liability, a plaintiff

21  must allege that: (1) the corporation is influenced and governed by the person asserted to be its

22  alter ego; (2) there is such a unity of interest and ownership that one is inseparable from the other;

23  and (3) the facts are such that adherence to the fiction of separate entity would sanction fraud or

24  promote injustice.  *Lorenz v. Beltio, Ltd.*, 963 P.2d 488, 496 (Nev. 1998).  Regarding the second

25  element, "commingling of funds, undercapitalization, unauthorized diversion of funds, treatment

26  of corporate assets as the individual's own, and failure to observe corporate formalities"

27  constitute a nonexhaustive list of factors that can be considered.  *Id.*  Here, following a

28  preliminary peek, the Court believes that LVS's alter-ego allegations suffice to survive a Rule

12(b)(6) challenge.  In this Court's view, LVS has plausibly alleged that LVRJ and News+ are influenced and governed by Adelson, that Adelson's actions since acquiring the RJ have rendered him inseparable from the newspaper, and that adherence to the fiction of separate entity would promote injustice.

Defendants also challenge LVS's conspiracy claim by arguing that individual employees or owners of a company cannot legally conspire with the company.  The Court believes that this argument goes to Adelson's and Dumont's reliance on *Copperweld* in their joint motion to dismiss.  *See* ECF No. 21 at 5.  However, as Adelson and Dumont indicate in their motion, success on this argument would eliminate only LVS's third claim.  To the extent that it would eliminate more claims, defendants have not carried their burden of showing so.

In sum, the Court finds that defendants have not met their burden of establishing all three *Kor Media* requirements.  Defendants' motions to dismiss are not frivolous.  However, "[a]bsent extraordinary circumstances" not present here, "litigation should not be delayed simply because a non-frivolous motion has been filed."  *Trzaska v. Int'l Game Tech.*, 2011 WL 1233298, at *3 (D. Nev. 2011).

### D. The burden of discovery.

Defendants' final arguments center around the costly, burdensome discovery that lies ahead if the Court declines to issue a stay.  ECF No. 43 at 9–10.  They urge that both the Supreme Court and Ninth Circuit have endorsed barring discovery in the antitrust context until there is a likelihood that plaintiffs can construct a claim.  *Id.*  Further, defendants argue that the now-stayed claims in the state court action justify a stay of discovery here.  *Id.* at 9.

Antitrust actions, as defendants point out, can result in prohibitive discovery costs. *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987).  However, "[t]he fact that discovery may involve inconvenience and expense is not sufficient, standing alone, to support a stay of discovery."  *Kor Media Grp., LLC v. Green*, 294 F.R.D. 579, 583 (D. Nev. 2013).  Further, a discovery stay is, in some ways, directly at odds with the need for expeditious resolution of litigation. *Ministerio Roca Solida v. U.S. Dept. of Fish and Wildlife*, 288 F.R.D.

1  500, 502 (D. Nev. 2013) (citing *Skellerup Indus. Ltd. v. City of L.A.*, 163 F.R.D. 598, 600–01

2  (C.D. Cal. 1995)).

3       The Court's preliminary peek did not leave it convinced that LVS will be unable to

4  construct a claim.  Thus, ordering that the parties move forward with discovery does not run afoul

5  of the Supreme Court's stated concern for "sending parties into discovery when there is no

6  reasonable likelihood that the plaintiffs can construct a claim from the events in the complaint."

7  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (citation omitted).  After assessing all the

8  concerns, arguments, and authorities raised by the parties, this Court finds that the interest in a

9  just, speedy, and inexpensive determination of this matter is not served by a discovery stay.

10  **III.     Conclusion.**

11       IT IS THEREFORE ORDERED that defendants' motion (ECF No. 43) to stay discovery

12  is DENIED.

13       IT IS FURTHER ORDERED IT IS FURTHER ORDERED that the parties are to submit a

14  new joint discovery plan and scheduling order by May 11, 2020.  To the extent the parties are

15  unable to agree on a comprehensive discovery plan, each party is directed to file its own proposal

16  by May 11, 2020, and the Court will resolve any disagreement on an expedited basis.

17       DATED: May 4, 2020.

BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE