1  J. RANDALL JONES, ESQ., SBN 1927
   r.jones@kempjones.com
2  MICHAEL J. GAYAN, ESQ., SBN 11135
   m.gayan@kempjones.com
3  MONA KAVEH, ESQ., SBN 11825
   m.kaveh@kempjones.com
4  KEMP JONES LLP
5  3800 Howard Hughes Parkway, 17th Floor
   Las Vegas, Nevada 89169
6  Telephone: (702) 385-6000

7
   RICHARD L. STONE, ESQ. (*pro hac vice*)
8  rstone@jenner.com
   DAVID R. SINGER, ESQ. (*pro hac vice*)
9  dsinger@jenner.com
   AMY M. GALLEGOS, ESQ. (*pro hac vice*)
10 agallegos@jenner.com
11 JENNER & BLOCK LLP
   633 West 5th Street, Suite 3600
12 Los Angeles, California 90071
   Telephone: (213) 239-5100
13
14 *Attorneys for Defendants*

15            **UNITED STATES DISTRICT COURT**

16                **DISTRICT OF NEVADA**

| | |
|---|---|
| 17 LAS VEGAS SUN, INC., a Nevada corporation, | Case No.: 2:19-cv-01667-GMN-BNW |
| 18 | |
| Plaintiff, | |
| 19 v. | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS [ECF NO. 76]** |
| 20 SHELDON ADELSON, an individual and as the alter ego of News+Media Capital | |
| 21 Group LLC and as the alter ego of Las Vegas Review Journal, Inc.; PATRICK | |
| 22 DUMONT, an individual; NEWS+MEDIA CAPITAL GROUP LLC, a Delaware | Hearing Date: July 14, 2020 |
| 23 limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware | Hearing Time: 9:00 a.m. |
| 24 corporation; and DOES, I-X, inclusive, | |
| 25 Defendants. | |
| 26 | |

27

28

1   **I.     Introduction**

2           Defendants agreed to produce documents responsive to 86 of the Sun's 90 requests (even

3   though many were facially overbroad and will require substantial time and effort to answer),

4   which stands in stark contrast to the Sun's refusal to adequately respond to nearly all of

5   Defendants' 166 requests. ECF No. 77. The Sun's four document requests at issue in its motion

6   to compel improperly seek:

7           1.      All materials and communications about the Review-Journal's exclusive, long-

8   running  investigation of the LVCVA (RFP 47), which includes 69 stories over 38 months all

9   protected by the reporter's shield, even though the LVCVA investigation has nothing to do with

10  the Sun's antitrust lawsuit and Defendants have already agreed to produce documents addressing

11  the Sun's only arguments of purported relevance (whether Sheldon Adelson exerted "control"

12  over the Review-Journal by telling the paper to conduct the investigation);[1]

13          2.      All materials from any time period related to the Sun's "editorial viewpoint"

14  (whatever that means) (RFP 48), even though the Sun is still not able to explain the meaning of

15  the request or the relevance of the materials sought;

16          3.      All materials related to the Review-Journal's alleged hiring of Sun employees over

17  the past 5 years (RFP 57), even though the complaint contains no allegations about hiring and, if

18  it did, such claims would have nothing to do with supposed anticompetitive behavior because

19  federal antitrust law *encourages* competitors to solicit and hire a competitor's employees, it does

20  not prohibit it; and

21          4.      All appraisals of the Review-Journal and each and every one of its assets for the

22  past five years (RFP 84), even though the Sun concedes  the only relevant information is the value

23

24  _____

[1] Defendants do not agree there is any relevance to whether Mr. Adelson told the newspaper to
25  conduct the investigation. However, Defendants agree, without waiving their objections or
    disclosing any privileged information, to supplement their response to RFP 47 by indicating they
26  have searched for and found no documents evidencing that Mr. Adelson had any involvement in
    the Review-Journal's decision to investigate the LVCVA. *See infra*, Section III.B. The remainder
27  of this request is an abusive fishing expedition by the Sun and its counsel (who represents the
    LVCVA).
28

of particularly expensive assets (like a printing press) that are alleged in the complaint to be "barriers to entry" in the relevant market.[2]

The Sun's motion to overrule all of Defendants' detailed objections to RFPs 47–48, 57, and 84 lacks any justification based on the scope of permissible discovery as framed by the Sun's Complaint. The Sun's baseless push for irrelevant documents and information from its news media competitor demonstrates a clear desire to harass Defendants and a complete disregard for basic First Amendment protections and healthy competition.  The Sun's motion improperly seeks access to a competitor's irrelevant newsgathering files; it attempts to pierce the reporter's shield—a pillar of free speech and free press; and it argues that employment mobility for journalists is somehow anticompetitive when the opposite is true under federal law.

Finally, almost as an afterthought, the Sun's motion asks to compel Defendants to provide a certain end-date for their document production. But the parties resolved this dispute when they met and conferred. The parties' post-discussion correspondence makes no reference to this issue, and the declaration submitted by the Sun's counsel does not describe the parties' discussion or their agreement. Under these circumstances, the issue is not ripe for judicial intervention. If the Court elects to consider the issue despite the parties' agreement, the Sun's voluminous discovery requests—combined with Defendants' cooperative approach—has resulted in a significant amount of work. Defendants' counsel have allocated substantial resources to gathering, searching, and reviewing potentially responsive documents as promptly as possible. As the parties discussed, Defendants will begin producing documents soon and provide the Sun with periodic updates on their progress. This approach is entirely reasonable in this complex antitrust dispute.

/ / /

/ / /

---

[2] Before the Sun filed the motion, Defendants agreed to respond to RFP 84 by producing "any appraisals . . . of RJ assets that the complaint alleges are barriers to entry in the relevant market (from 2015 to the present)." ECF No. 79-4 at APP0304 (¶ 9). The Sun has not explained why any other information, such as the Review-Journal's value as a going concern, could be relevant to barriers to entry or any other aspect of this case.

2

## II.     Procedural and Factual Background[3]

### A.     Historical Background

The Sun and the Review-Journal[4] are parties to a joint operating arrangement entered in 2005 when the Review-Journal had a different owner (the 2005 JOA). The 2005 JOA combined both newspapers into a joint media product wherein the *Sun* is printed as an insert within the *Review-Journal*. The Sun and its parent, Greenspun Media Group, have been complaining about the Sun's compensation under the 2005 JOA, and suing the Review-Journal for more money and accusing each of the Review-Journal's different owners of wrongdoing for nearly 15 years.[5]  The Adelson family is just Brian Greenspun's latest litigation target.

### B.     Procedural Background

There are currently two lawsuits pending between the parties, both of which were initiated by the Sun. In the first lawsuit, filed in 2018, the Sun alleged that the Review-Journal was not properly accounting for expenses under the 2005 JOA. The court compelled some of the Sun's claims to arbitration, and the court's ruling confirming the award is now the subject of appeals by both parties. Additionally, in that lawsuit, the Review-Journal filed counterclaims against the Sun, which, along with the Sun's non-accounting claims, are currently stayed. The Review-Journal's counterclaims allege that the Sun materially breached the sections of the 2005 JOA requiring it to produce a quality newspaper and take all actions to promote the success of the joint media product. This includes, among other things, intentionally degrading the quality of the print Sun, publishing quality content only on the Sun's website (which is outside the JOA) while filling its printed insert with stale, syndicated content, and publishing a "Note" urging readers that if they

---

[3] The Sun's motion includes extensive evangelism about issues and so-called facts that have little or no bearing on the Court's task of resolving the discrete discovery dispute. Rather than wasting the Court's time by responding to those irrelevant issues, Defendants note that many of the assertions are baseless, and Defendants note their disagreement with the Sun's tactic of foisting advocacy on the Court framed as fact, as it has done in the section it calls "Pertinent Factual Background." ECF No. 76 at 3:7–7:8.

[4] "Review-Journal" refers to Las Vegas Review-Journal, Inc.

[5] The 2005 JOA terminated and replaced an earlier JOA that was entered in 1989.

3

want the Sun's quality content, they should read the Sun's website instead of subscribing to the *Review-Journal/Sun* newspaper. ECF Nos. 78-2, 78-3 at APP0037 (⁋ 2), APP0044 (⁋⁋ 31–39).

In retaliation for the Review-Journal's counterclaims, the Sun initiated this federal antitrust action. Here, the Sun alleges that the Review-Journal and its owners are engaged in a conspiracy to drive the Sun into bankruptcy, eliminating it as a competitor.[6] *See* ECF No. 1 Intro., ¶ 48. That conspiracy supposedly included engaging in some (but not all) of the accounting practices that the Sun sued the Review-Journal over in the state-court case. *Id.*, ¶¶ 70–85. In addition, the Sun alleges that part of the "conspiracy" against it included the Review-Journal's mere filing of the counterclaims in the state-court suit. *Id.*, ¶¶ 108–09. From those contract disputes, the Sun has concocted claims for violations of the Sherman Act, Clayton Act, and Nevada Unfair Trade Practices Act. As the Court is aware, Defendants have moved to dismiss the Sun's complaint in its entirety. ECF Nos. 20, 21.

## C.    The Current Discovery Disputes (RFPs 47–48, 57, 84)

The Sun served its first set of requests for production on May 8, 2020. ECF No. 76-2. Defendants served their objections and responses on June 8. ECF No. 76-3. On June 10, Plaintiff's counsel sent an email asking to meet and confer about Defendants' objections and responses to various RFPs. ECF No. 76-4. Later that day, Defendants sent a letter to the Sun that, among other things, agreed to meet and confer on June 15. ECF No. 79-2. The parties conferred for several hours on June 15 and 16, resolving some of their disputes and agreeing to further discuss others. **Exhibit A** (Gayan Decl.) at ¶ 6.[7] On June 18, Plaintiff sent a letter to Defendants recapping some of the parties' discussions. ECF No. 79-3. On June 18 and 19, Defendants emailed Plaintiff regarding their positions on RFPs 68, 70, 84–85, and 88. ECF Nos. 76-6, 76-8. Later in the day

---

[6] Under the 2005 JOA, which eliminated the *Sun* as a separately circulated newspaper and made the *Sun* an insert in the *Review-Journal*, no economic competition exists between the two newspapers. Differing editorial viewpoints, which may cause the *Review-Journal*'s subscribers to read the *Sun* insert, does not constitute economic competition and, therefore, is not cognizable under the antitrust laws. ECF No. 20 at 24:16–26:7.

[7] An appendix of exhibits in support of this opposition will concurrently be filed with this opposition.

4

on June 19, Defendants sent a letter to Plaintiff with details of the parties' discussions and Defendants' positions on the various RFPs, including those raised by the instant motion. ECF No. 79-4.

### i.      The Review-Journal's LVCVA investigation (RFP 47)

The Sun has requested "all documents and communications in Your possession that concern or relate to Your investigation of the Las Vegas Convention and Visitors Authority, from December 10, 2015 to present." ECF No. 76-3 at 43:12–15.

The Las Vegas Convention and Visitors Authority ("LVCVA") is a government agency that serves as the official destination marketing organization of Las Vegas and owns and operates the Las Vegas Convention Center. It is well-funded by taxes on hotel rooms and has been a matter of great public interest for years.[8] In early April 2017, the Review-Journal published an exposé on the LVCVA's use, and perceived misuse, of public funds to pay exorbitant executive salaries,[9] expensive trips, events, and meals to supposedly wine and dine public officials, and other activities with questionable public benefits ("LVCVA Investigation"). **Exhibit A** at ¶ 11(b); **Exhibit B** (Chart). The LVCVA hired the Pisanelli Bice firm, which represents the Sun in this action, to assist in addressing the issues raised in the LVCVA Investigation. **Exhibit C** (7/10/18 LVCVA Minutes (Excerpts)). On July 10, 2018, the LVCVA authorized up to $200,000 for the Pisanelli Bice firm to assist with a forensic audit related to airline gift cards purchased with public LVCVA funds. *Id.*; **Exhibit D** (7/21/19 RJ story). The Pisanelli Bice firm retained an outside accountant to conduct the audit, which confirmed that CEO Rossi Ralenkotter used LVCVA "gift cards in 158 instances for 56 trips" having no connection to his official duties. **Exhibit E** at 13.

Based at least in part on those findings, Mr. Ralenkotter abruptly retired from his lucrative LVCVA post and became the focus of a criminal investigation. **Exhibit B** at rows 16, 20–21, 34, 37, 53–54. During the course of the criminal investigation, the *Sun* incorrectly reported that Mr.

---

[8] The LVCVA's budget for fiscal year 2019/2020 includes nearly $300,000,000 in room tax and gaming fee revenues. *See* LVCVA's Adopted Annual Budget, FY 2019/2020 at 19, https://www.lvcva.com/funding-finance/annual-budgets/ (last visited on July 4, 2020).

[9] For example, Rossi Ralenkotter, the LVCVA's CEO, made $768,000 in salary, bonus, and benefits in 2016. **Exhibit F** (4/3/17 RJ story).

Ralenkotter had been "cleared" of all wrongdoing. *See Convention authority CEO cleared in spending investigation* (Aug. 9, 2018), https://lasvegassun.com/news/2018/aug/09/convention-authority-ceo-cleared-in-spending-inves/ (last visited July 1, 2020). After the *Sun* embarrassingly misreported this news, prosecutors filed criminal charges against Mr. Ralenkotter and two other top former executives based on alleged theft and misuse of airline gift cards purchased with public funds. **Exhibit G** (9/9/19 RJ story). According to a story published by the Review-Journal in May 2020, Mr. Ralenkotter's criminal proceedings remain pending with the next hearing set in September 2020. *See Ralenkotter court hearing in criminal case delayed for months*, May 1, 2020, https://www.reviewjournal.com/investigations/ralenkotter-court-hearing-in-criminal-case-delayed-for-months-2018964/ (last visited on July 1, 2020).

Since breaking the LVCVA story, the Review-Journal has published 69 stories related to the LVCVA's use of public funds, the Pisanelli Bice firm's role in representing the LVCVA throughout the scandal, Mr. Ralenkotter's sudden retirement, the resulting criminal investigation, and the ongoing criminal proceedings against Mr. Ralenkotter and others. **Exhibit B**. The Review-Journal published a story as recently as May 1, 2020, and it will certainly publish more stories about the ongoing saga. *Id.* at row 69.

Against this backdrop, the Review-Journal asserted detailed objections that RFP 47 (1) is irrelevant to the Sun's claims (*i.e.*, antitrust claims about the sale of daily newspapers and alter ego allegations); (2) imposes an undue burden to collect "all documents and communications" related to an extensive ongoing investigation, particularly due to the lack of relevance; (3) violates the reporter's privilege under the reporter's shield laws, common law, and the First Amendment; (4) seeks materials protected by the attorney-client privilege and work product doctrine; and (5) seeks competitively sensitive, confidential, and proprietary information. ECF No. 76-3 at 43:16–44:4. With respect to the burden, the Review-Journal has already published 69 news stories over the past 38 months related to this ongoing scandal. **Exhibit A** at ¶ 11(b). Each story would involve reporter's notes, drafts, and correspondence, much or all of which are protected by the journalist's shield. On these facts, the burden is obvious.

1    When the parties met and conferred, the Sun failed to provide any viable explanation of

2  RFP 47's relevance to the claims asserted in the Complaint. The only theory proffered was that,

3  if documents show that Mr. Adelson directed the Review-Journal to investigate the LVCVA, it

4  may support the Sun's alter ego allegations against Mr. Adelson. Even if this unsubstantiated

5  allegation were true, that fact would have little or no relevance to proving the alter ego allegations.

6  ECF No. 79-4 at APP0302–03 (¶ 4). In addition to the lack of relevance, the voluminous requested

7  materials relate to an ongoing news story of great public interest that implicates Plaintiff's counsel

8  (Pisanelli Bice) and appears designed to benefit one of Pisanelli Bice's other clients (such as the

9  LVCVA). **Exhibit C** (7/10/18 LVCVA Minutes); **Exhibit D** (7/21/19 RJ story).

10   Nevertheless, Defendants agreed to supplement their response to RFP 47 to indicate that

11  they have searched for and found no documents evidencing that Mr. Adelson had any involvement

12  in the Review-Journal's decision to investigate the LVCVA.

13                    ***ii.        The Sun's editorial viewpoint (RFP 48)***

14   The Sun asked Defendants to "[p]roduce all documents and communications in Your

15  possession that discuss or mention the Sun's editorial viewpoint." ECF No. 76-3 at 44:5–7. In

16  response, Defendants asserted detailed objections that the request (1) is vague and ambiguous

17  with respect to the phrase "that discuss or mention the Sun's editorial viewpoint"; (2) is overly

18  broad and unduly burdensome for three specific reasons; (3) seeks material irrelevant to Plaintiff's

19  allegations and claims; (4) imposes undue burden via the extremely broad and undefined request

20  is not proportional to the needs of the case; (5) violates the reporter's privilege under Nevada

21  shield laws, common law, and the First Amendment; (6) seeks materials protected by the attorney-

22  client privilege and work product doctrine; and (7) seeks competitively sensitive, confidential,

23  and proprietary information. ECF No. 76-3 at 44:8–27.

24   When the parties met and conferred, the Sun could not explain the relevance of RFP 48

25  and refused to clarify or limit the scope of this request in any way. ECF No. 79-4 at APP0303 (¶

26  5). The Sun's refusals left no room for discussion or compromise.

27

28

### iii. The Review-Journal's hiring of Sun employees (RFP 57)

The Sun's lengthy Complaint contains no allegations remotely connected to the Review-Journal hiring Sun employees. Despite this omission, the Sun asked Defendants to produce "all communications in your possession that discuss or mention the hiring of any Sun employee from December 10, 2015, to present." ECF No. 76-3 at 50:20–22. In response, Defendants asserted detailed objections that the request (1) seeks materials irrelevant to Plaintiff's allegations, claims, and damages theory; (2) is vague and ambiguous in scope with respect to the date limitation; (3) seeks materials protected by the attorney-client privilege and work product doctrine; (4) seeks competitively sensitive, confidential, and proprietary information; and (5) seeks information giving rise to employee privacy concerns. *Id.* at 50:23–51:12.

When the parties met and conferred, the Sun claimed its Complaint contained allegations of the Review-Journal poaching Sun employees as part of the anticompetitive conduct. Defendants asked where, and the Sun promised to provide citations. Defendants also explained that soliciting and hiring a competitor's employees is *pro*-competitive and perfectly lawful, not *anticompetitive*. The Sun offered nothing to rebut that point of fact and law. **Exhibit A** at ¶ 11(d). The Sun's June 18 letter lists several paragraphs that it claims relate to poaching Sun employees. ECF No. 79-3 at APP0299 (¶ 5). Not one of those paragraphs touches on or even suggests the poaching of Sun employees, let alone how that amounts to an antitrust violation. ECF No. 79-4 at APP0303 (¶ 6).[10] The Sun never offered any other basis to obtain five-years' worth of information on this irrelevant subject. **Exhibit A** at ¶ 11(d).

### iv. Appraisals of the Review-Journal and its Assets (RFP 84)

The Sun asked Defendants to produce "all documents in your possession concerning or relating to any appraisals of the Review-Journal or its individual assets from January 1, 2015, to present." ECF No. 76-3 at 69:4–6. Defendants initially objected on various grounds, including relevance, and declined to produce any responsive documents. *Id.* at 69:7–18. When the parties

---

[10] Had the Sun actually included those allegations in its complaint, the Review-Journal would have addressed them in its pending motion to dismiss because it is well settled that hiring a competitor's employees is per se lawful.

met and conferred, the Sun explained this request relates to the "barriers to entry" into the market defined in the Complaint. ECF No. 79-4 at APP0304 (¶ 9). After considering that explanation and reviewing the Complaint, Defendants reasonably agreed to produce "any appraisals . . . of RJ assets that the complaint alleges are barriers to entry in the relevant market (from 2015 to the present)." *Id.* In response, the Sun never explained the relevance of appraisals beyond the "barriers to entry" issue and stood on its overbroad request without any further attempt to meet and confer. ECF No. 76-9 at 2. To date, the Sun has not explained how valuations of assets that are not barriers to entry (e.g., a company-owned vehicle) could possibly be relevant in this antitrust case, let alone valuations going back 5 years. *Id.*

### v.   *The production end-date*

Although the parties briefly discussed this issue on June 15, the Sun accepted Defendants' position of a rolling production with periodic updates and gave no indication that it would include this issue in its motion. **Exhibit A** at ¶ 13. The production end-date issue is not specifically referenced in the Sun's June 10 email, the Sun's June 18 letter, Defendants' June 19 letter, or counsel's declaration submitted with the Motion. ECF Nos. 76-4, 76-5, 76-10, 76-1.[11]

---

[11] The Sun's insistence on a production deadline is part of the same drumbeat for expedited discovery that the Sun has been sounding since the parties first appeared. But the Sun's grounds for seeking a compressed discovery schedule—which it argued to this Court on May 26, 2020—turned out to be false. At the May 26 hearing, the Court asked the Sun's counsel to explain the Sun's assertion that it would face an "income flow problem" if Defendants were given more time to conduct discovery and prepare for trial in this case. **Exhibit H** (5/26 Trans. (Excerpts)) at 24:24–25:7. The Sun's counsel replied that if the Sun wins a judgment that is "bonded or paid," "then investors have the likelihood of coming in to help the newspaper out in the interim." *Id.* at 25:23–26:3. But the Sun went on to explain that "[i]n the meantime, nobody is going to have anything to do with the paper that is under threat of termination and making no money and not getting any money . . . ." *Id.* at 26:4–6. The clear implication of this argument to the Court was that the Sun would lose investors if this case is not expedited, causing the Sun to go out of business. The next day, on May 27, Defendants served an interrogatory on the Sun asking it to identify any person with whom the Sun has communicated about investing in the Sun, including the "investors" referenced by the Sun's counsel in open court. Thirty (30) days later, Defendants were surprised to see the Sun's answer under oath: "None." **Exhibit I** (ROG Responses). So, the supposed harm hanging over the Sun's head—and the reason proffered by the Sun for a compressed discovery schedule—apparently does not exist. In light of these misrepresentations (or at a minimum, misleading statements), the Court should no longer accept the Sun's unsupported claims about the need for expediency in this litigation.

1
2

### III.     The Court Should Sustain Defendants' Legitimate Objections to the Sun's Irrelevant, Improper, and Abusive Requests for Production.

3       "While the scope of discovery is broad, it is not unlimited. '[D]iscovery, like all matters

4   of procedure, has ultimate and necessary boundaries.'" *Liberty Ins. Corp. v. Southwest Traders*

5   *Inc.*, 2013 WL 12140335, at *2 (C.D. Cal. Aug. 27, 2013) (quoting *Oppenheimer Fund, Inc. v.*

6   *Sanders*, 437 U.S. 340, 351 (1978)); *see Epstein v. MCA, Inc.*, 54 F.3d 1422, 1423 (9th Cir. 1995)

7   (holding the "right of a party to obtain discovery is not unlimited."). "'Unless otherwise limited

8   by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any

9   nonprivileged matter that is ***relevant to any party's claim or defense and proportional to the***

10  ***needs of the case***, considering the importance of the issues at stake in the action, the amount in

11  controversy, the parties relative access to relevant information, the parties' resources, the

12  importance of the discovery in resolving the issues, and whether the burden or expense of the

13  proposed discovery outweighs its likely benefits.'" *First American Title Ins. Co. v. Commerce*

14  *Associates, LLC*, 2017 WL 53704, at *1 (D. Nev. Jan. 3, 2017) (quoting FED. R. CIV. P. 26(b)(1))

15  (emphasis added). "Accordingly, the first limitation on permissible discovery is that it be

16  relevant." *Minden Air Corp. v. Starr Indem. & Liability Co.*, 2015 WL 419031, at *3 (D. Nev.

17  Jan. 30, 2015).

18      "On a motion to compel, the moving party bears the burden of showing good cause."

19  *Castro v. Poulton*, 2017 WL 3723651, at *9 (D. Nev. Aug. 29, 2017) (citing Fed. R. Civ. P.

20  26(b)(1)). "[L]itigants seeking to compel discovery ***must describe with a reasonable degree of***

21  ***specificity the information they hope to obtain and its importance to their case.***" *Johnson v.*

22  *Northwest Airlines, Inc.*, 2009 WL 839044, *2 (C.D. Cal. Mar. 30, 2009) (citing *Cervantes v.*

23  *Time, Inc.*, 464 F.2d 986, 994 (8th Cir. 1972)) (emphasis added). "Although the burden on the

24  party requesting discovery is low, the party must meet a threshold of relevance that is beyond

25  mere speculation that the requested information might be useful." *Feulufai v. Pacific Princess*

26  *Partnership Ltd.*, 2009 WL 10692823, *2 (D. Nev. Sept. 10, 2009) (citing *Johnson*, 2009 WL

27  839044, *2). A theory based on "unsubstantiated speculation" rather than "evidence in the record"

28  is not grounds to compel discovery. *Id.*

**A.    As an Initial Matter, Defendants' Objections are Far from Boilerplate.**

The Sun, without explanation or legal support, repeatedly characterizes Defendants' detailed objections as boilerplate. *See, e.g.*, ECF No. 76 at 2:23, 7:1, 8:6, 10:7, 14:21, 16:4, 18:21, 19:3. Boilerplate objections are rote recitations to buzz words and phrases, such as vague, ambiguous, unduly burdensome, and not proportional to the needs to the case, without any further explanation or context. *See Kristensen v. Credit Payment Services, Inc.*, 2014 WL 6675748, at *4 (D. Nev. Nov. 25, 2014) (citing Black's Law Dictionary definition of "boilerplate" as "Ready-made or all-purpose language that will fit in a variety of documents."). The *Kristensen* court further described boilerplate objections as looking "like a form provided to the firm's most junior attorney thirty years ago to teach new lawyers how to obstruct discovery." *Id.* at *5. Defendants' specific objections, which are tailored to each of the Sun's requests, look nothing like boilerplate objections. Each objection to RFPs 47–48, 57, and 84 is supported by a detailed explanation based on the unique facts of this case and the specific scope of each request. *See Federal Trade Commission v. Consumer Defense, LLC*, 2019 WL 7628980, *3 (D. Nev. Oct. 9, 2019) ("Proper objections detail why the disputed discovery request is improper.") (citing *Collins v. Landry's Inc.*, 2014 WL 2770702, at *3 (D. Nev. June 17, 2014)). Even a cursory review of Defendants' objections makes it clear that they are not boilerplate.

**B.    The Sun cannot show good cause to compel all documents for 69 news stories about the ongoing LVCVA scandal, particularly when the request lacks relevance and is based on unsubstantiated speculation (RFP 47).**

The Sun claims it needs *all* documents and communications related to its competitor the Review-Journal's exclusive investigation of the LVCVA, which has so far entailed 69 stories over 38 months and resulted in Mr. Ralenkotter's resignation, an audit overseen by the Pisanelli Bice firm, a police investigation, and criminal charges against Mr. Ralenkotter and others. The Sun's sole basis for this extremely broad request is that it *suspects* Mr. Adelson may have instructed the Review-Journal to conduct the investigation. The Sun has no factual basis for its suspicion. The Sun provided no other details on RFP 47's relevance. Based on the Sun's unsubstantiated speculation, it asks the Court to compel the production of "all documents and communications" in any way related to the Review-Journal's exclusive investigation and reporting on the resulting

11

scandal and pending criminal charges. To address this issue, without waiving their objections and assertion of privilege, Defendants will supplement their response to RFP 47 to indicate that they have searched for and found no documents evidencing that Mr. Adelson had any involvement in the Review-Journal's decision to investigate the LVCVA.

The Court should deny the Sun's motion with respect to RFP 47 for five independent reasons. *First*, even if Mr. Adelson asked the Review-Journal to investigate the LVCVA, that alleged fact has no bearing on whether the Review-Journal is his alter ego. Alter ego is an "extreme remedy" used in rare situations where adhering to the corporate fiction would sanction a fraud.[12] ECF No. 21 at 10:14–24. Decisions on what stories a newspaper pursues and publishes, without more, cannot support an alter ego claim. *See, e.g., Wyatt v. Bowers*, 103 Nev. 593, 596, 747 P.2d 881, 883 (1987) (holding individual must both influence *and* govern an entity to pierce the corporate veil). If having input on what stories to run in a newspaper met the alter ego requirements, the Sun would be Mr. Greenspun's alter ego because he overtly controls the Sun's editorial voice, frequently authors editorials, and uses the Sun to publish stories that further his many other business interests.

*Second*, the Sun's request involves serious First Amendment considerations because it seeks materials subject to the journalist's privilege. "Rooted in the First Amendment, the privilege is a recognition that society's interest in protecting the integrity of the newsgathering process, and in ensuring the free flow of information to the public, is an interest 'of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.'"

---

[12] To establish its alter ego claim against Mr. Adelson, the Sun must show: "(1) the [Review-Journal is] influenced and governed by the person asserted to be the alter ego; (2) there [is] such unity of interest and ownership that one is inseparable from the other; and (3) the facts [are] such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud or promote injustice." *First American Title Ins. Co.*, 2017 WL 53704, at *2 (quoting *Polaris Indus. Corp. v. Kaplan*, 747 P. 2d 884, 887 (Nev. 1987)). The following factors, though not conclusive, may indicate the existence of an alter ego relationship: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities. *See LFC Mktg. Grp., Inc. v. Loomis*, 116 Nev. 896, 904, 8 P.3d 841, 846–47 (2000). The Sun alleges none of these factors in its Complaint, nor could it under Rule 11, which is one reason the District Court should dismiss the alter ego portion of this case. ECF No. 21 at 10:12–12:3.

*Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) ("*Shoen I*") (quoting *Herbert v. Lando*, 441 U.S. 153, 183 (1979)). The shield "protects journalists against compelled disclosure in all juridical proceedings, civil and criminal alike." *Id.* (citing *Farr v. Pitchess*, 522 F.2d 464, 467–68 (9th Cir. 1975)). When a journalist invokes this privilege, "***compelled disclosure is the exception, not the rule.***" *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) ("*Shoen II*") (emphasis added) ("if the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished") (quoting *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981)).[13] "Once the privilege is properly invoked, the burden shifts to the requesting party to demonstrate a sufficiently compelling need for the journalist's materials to overcome the privilege. At a minimum, . . . before disclosure may be ordered, the requesting party must demonstrate that she has exhausted all reasonable alternative means for obtaining the information." *Shoen I* at 1292 (citing *Zerilli*, 656 F.2d at 713) (rejecting request to penetrate journalist's shield where other discovery tools available).[14]

---

[13] In *Shoen II*, the Ninth Circuit interpreted the journalist's privilege to prevent disclosure of research materials, including notes and interview tapes, reasoning that "routine, court-compelled disclosure of research materials poses a serious threat to the vitality of the newsgathering process." *Id.* at 417. Consistent with this reasoning, district courts within the Ninth Circuit have interpreted the reporter's privilege to cover a broad range of materials, including communications, notes, and memoranda "created with journalistic intent." *Jimenez v. City of Chi.*, 733 F. Supp. 2d 1268, 1272–73 (W.D. Wash. 2010) (privilege applied to records of communications with sources that reporter had "intended to culminate in a publicly-consumable publication"); *see also, e.g., Michael v. Estate of Kovarbasich*, 2015 WL 8750643, at *2, *6 (C.D. Cal. Dec. 11, 2015) (privilege covered records of investigative reporter's communications with interview subject); *Harbert v. Priebe*, 466 F. Supp. 2d 1214, 1214, 1216 (N.D. Cal. 2006) (privilege covered "documents, investigative notes and electronic files" related to news articles); *L.A. Mem'l. Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 489, 493, 496 (C.D. Cal. Jan. 5, 1981) (privilege covered reporter's materials, including "notes, file memoranda, [and] tape recordings," where permitting disclosure "would subvert the guarantee of freedom of the press embodied in the First Amendment").

[14] Although federal law applies to this case, it bears noting that Nevada has the strongest news shield law in the entire country. Nevada law confers an absolute privilege upon reporters and protects unpublished and published materials, and the sources of information, in any proceeding. *See* NEV. REV. STAT. § 49.275. "Although this Court is not bound to follow Nevada law in determining whether a reporter should be compelled to disclose his or her sources, when dealing with purely federal issues or law, it should not ignore Nevada's public policy, as expressed in [Nev. Rev. Stat. § 49.275], of providing reporters protection from divulging their sources." *See In re Stratosphere Corp. Sec. Litig.*, 183 F.R.D. 684, 686 (D. Nev. 1999) (federal reporter's privilege applied, in part because "[the journalist] had a reasonable expectation that he would be protected by Nevada's media privilege law").

Here, the broad journalist's privilege under federal law protects the Review-Journal from disclosing the materials sought via RFP 47. The Sun has made no other effort to obtain the only potentially relevant information—whether Mr. Adelson directed the Review-Journal to conduct the LVCVA investigation—before attempting to cast aside the First Amendment and pierce the journalist's shield. The Sun has many other ways to obtain this information before the Court should even consider penetrating the shield. Rather than attempting any less obtrusive means to determine whether Mr. Adelson had or has any influence over the Review-Journal, the Sun's first move is to trample on the First Amendment in an effort to get information it does not need. The Court should not endorse the Sun's flagrant abuse of the discovery process.

*Third*, because they are not clearly relevant to an important issue, the Sun has no conceivable need for *all* documents and communications related to 69 Review-Journal news stories published over the course of 38 months. *See Shoen II*, 48 F.3d at 416 (holding party seeking to piece journalist's shield even for non-confidential materials must show material is "(1) unavailable despite exhaustion of all reasonable alternative sources; (2) non-cumulative; and (3) clearly relevant to an important issue in the case" and clarifying "potential relevance will not suffice."). The Sun has not met its burden to show good cause by describing how *all* documents related to these dozens of news stories have any connection to this case. *See Johnson*, 2009 WL 839044, *2 (requiring moving party to describe what it expects to find and importance to case). At most, documents evidencing a directive from Mr. Adelson to investigate the LVCVA would be the outer limits of relevant documents sought by RFP 47. *See First American Title Ins. Co.*, 2017 WL 53704, at *2 (limiting alter ego discovery to essential information and barring far-reaching fishing expedition). Therefore, Defendants agreed to supplement their response to indicate that no responsive documents exist.

*Fourth*, gathering all documents and communications related to 69 news stories spanning 38 months would be an undue burden. **Exhibit B**. Each story involves reporter's notes, drafts, and correspondence. Because all of the requested materials are irrelevant, this burden is not proportional to the needs of the case (*i.e.*, the burden of gathering, reviewing, and producing the

1    materials and a privilege log for all materials protected by the journalist's shield vastly outweighs

2    the likely benefit to the Sun's case: zero).

3           **Fifth**, due to the Pisanelli Bice firm's involvement in the LVCVA scandal and its

4    representation of the LVCVA, Defendants have serious concerns that the Sun and/or its lawyers

5    have one or more improper purposes motivating the unexplained breadth of RFP 47. The Pisanelli

6    Bice firm, which represents the Sun, is also counsel for the LVCVA and was hired by the LVCVA

7    to oversee the audit that confirmed the misuse of public funds. **Exhibit E**. Additionally, the Sun

8    was publicly embarrassed when it falsely reported that the CEO of the LVCVA had been cleared

9    of criminal charges.  The fact that the Sun got the story wrong, and the Review Journal got it

10   right, has been a sore spot for the Sun. These facts, when considered along with RFP 47's breadth,

11   irrelevance, and First Amendment issues, certainly suggest the Sun and/or its lawyers harbor some

12   ulterior, improper motive for seeking all materials related to the Review-Journal's exclusive

13   investigation of this ongoing public scandal. Under Rule 26(g)(1), the Sun's attorneys certified

14   that RFP 47 was "not interposed for any improper purpose . . . ." FED. R. CIV. P. 26(g)(1)(B)(ii).

15   The Sun's inability to articulate *any* relevance for the Review-Journal's privileged investigative

16   materials for the LVCVA Investigation, which involves the Pisanelli Bice firm and one of its

17   other clients (LVCVA), calls that certification into question.

18           **C.    The Sun's Vague and Overbroad Request regarding its Editorial Viewpoint
19                 Seeks Irrelevant Materials, Many of Which are Protected from Disclosure by
                 the Journalist's Shield (RFP 48).**

20           The Sun's RFP 48 suffers from numerous fatal deficiencies, including being vague,

21   ambiguous, overbroad, and unduly burdensome as well as seeking materials protected from

22   disclosure by the journalist's shield. That request seeks "all documents and communications in

23   Your possession that discuss or mention the Sun's editorial viewpoint." ECF No. 76-3 at 44:5–7.

24   *First*, the request is so vague and ambiguous to render it impossible for Defendants to respond.

25   A party "is not required to puzzle out what [another party] intended to say" in its discovery

26   request. *Sattari v. Citi Mortgage*, 2010 WL 4782133, at *2 (D. Nev. Nov. 17, 2010); *see also*

27   *Blumhorst v. Pierce Manufacturing, Inc.*, 2014 WL 12593989, at *1 (D. Id. Oct. 6, 2014) (noting

28   defendant "has no duty to guess at what Plaintiff is seeking to know (or obtain)"); *Foster v.*

*Vasquez*, 2014 WL 5454188, at \*3 (E.D. Cal. Oct. 28, 2014) (sustaining vague and ambiguous objections for open-ended requests). The Sun does not define the phrase "that discuss or mention the Sun's editorial viewpoint," which forces Defendants to "puzzle out" its meaning. For example, Defendants will need to determine and identify "the Sun's editorial viewpoint" on unidentified issues. Applying the plain meaning of the phrase makes the request overbroad and unduly burdensome by encompassing a vast swath of materials, which Defendants' objection explains. ECF No. 76-3 at 44:8–27. Despite these obvious issues, the Sun refused to clarify or narrow RFP 48. ECF No. 79-4 at APP0303 (¶ 5).

**Second**, RFP 48 also seeks materials with no relevance to the issues raised in the Sun's Complaint. When the parties met and conferred, the Sun's only explanation of the relevance involved one instance when the Review-Journal's front-page stickers partially covered the Sun's content. *Id.* Because the Review-Journal agreed to produce all documents and communications related to stickers covering the Sun's content, RFP 48—as explained by the Sun—is entirely redundant of RFP 11, among others. *Id.*; ECF No. 76-3 at 16:1–5. In response to that discussion, the Sun offered no other explanation of RFP 48's relevance. ECF No. 79-4 at APP03030 (¶ 5). The newspapers' differing editorial viewpoints do not constitute competition under the antitrust laws and, therefore, have nothing to do with the Sun's alleged antitrust injury. ECF No. 20 at 24:16–26:7.

**Third**, in addition to these fundamental flaws, the Sun's request for all documents and communications related to the Sun's editorial viewpoint also implicates the First Amendment and reporter's shield issues discussed above. The Sun has come nowhere close to meeting its burden to disregard the First Amendment and penetrate the shield for what would likely involve voluminous materials protected from disclosure by the First Amendment and clear Ninth Circuit law. *See supra*, Section III.B. For these reasons, the Court should sustain Defendants' objections to RFP 48.

/ / /

/ / /

/ / /

1

2

**D.**      **The Sun's Request for Documents Related to the Review-Journal Hiring Sun Employees Does Not Relate to Any Allegations in its Complaint (RFP 57).**

3      The Sun's RFP 57 requests "communications . . . that discuss or mention the hiring of any

4  Sun employee from December 10, 2015, to present." ECF No. 76-2 at 18:4–6. Defendants

5  objected to this request for several reasons, including the fact that the Sun's 158-paragraph

6  Complaint contains no allegations even remotely connected to the Review-Journal hiring any Sun

7  employees. ECF No. 76-3 at 50:23–51:12. Like the parties' meet-and-confer efforts before it, the

8  Sun's motion provides no explanation for how RFP 57 logically or legally relates to any of the

9  allegations in the Complaint. The Sun has no right to discovery on issues irrelevant to the

10  allegations in its Complaint. *See Epstein*, 54 F.3d at 1423 (holding the "right of a party to obtain

11  discovery is not unlimited."); *Minden Air Corp.*, 2015 WL 419031, at *3 (holding "the first

12  limitation on permissible discovery is that it be relevant.").

13      The Sun's motion claims RFP 57 "seeks information relevant to Defendants' predatory

14  and anticompetitive conduct by poaching Sun employees and the anticompetitive effects of the

15  Sun having to lay off employees." ECF No. 76 at 16:22–24. It is difficult to comprehend any

16  correlation between potential poaching and the Sun's layoffs. If the Sun thought the Review-

17  Journal had documents somehow relevant to the Sun's allegations that the Sun has laid off

18  employees, it should have asked for them, though this seems like evidence that would be in the

19  Sun's possession, if it exists at all. Notably Defendants requested documents relating to the Sun's

20  2018 layoffs, but the Sun objected and refused to produce any documents. ECF No. 78-5 at

21  APP0207–08; *see also* ECF No. 77 at 11:14–12:2 (seeking to compel Sun to produce documents

22  for RFPs 62–65).

23      It is hardly surprising that the Complaint makes no mention of supposed poaching because

24  solicitation and hiring of a competitor's employees is *lawful and pro-competitive. See, e.g.*, *AMN*

25  *Healthcare, Inc. v. Aya Healthcare Services, Inc.*, 28 Cal.App.5th 923, 935 (2018) (holding laws

26  voiding contractual provisions restraining a lawful profession "settled public policy in favor of

27  open competition"). The Sun's contention in support of its discovery requests that poaching

28  employees is part of the alleged anticompetitive scheme simply makes no sense. Antitrust

17

concerns are raised when competitors agree to *not* poach or solicit each other's employees. *See In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1181-84, 1213 (N.D. Cal. 2015) (finding plausible per se violation of Sherman Act based on employee non-solicitation agreements); *United States v. eBay*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013) (government plausibly alleged no-solicitation and no-hire agreement between horizontal competitors was *per se* unlawful). "Antitrust law does not treat employment markets differently from other markets . . . . Antitrust law addresses employer conspiracies controlling employment terms precisely because they tamper with the employment market and thereby impair the opportunities of those who sell their services there. Just as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services." *Id.* at 1039 (citing II Phillip E. Areeda, Herbert Hovenkamp, Roger D. Blair & Christine Piette Durrance, Antitrust Law, ¶ 305e at 68 (3d ed. 2007)); *see also In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (plaintiffs plausibly alleged per se violation of Sherman Act where defendants agreed not to cold call their competitors' employees). For these reasons, the Court should sustain Defendants' objections to RFP 57.

### E. The Sun's Request for Appraisals Unrelated to Barriers to Entry Lacks Any Relevance to the Issues in this Case (RFP 84).

RFP 84 seeks "all documents in Your possession concerning or relating to any appraisals of the Review-Journal or its individual assets from January 1, 2015, to present." ECF No. 76-3 at 69:4–6. After the Sun explained that RFP 84 relates to alleged "barriers to entry" which supposedly make it hard for the Sun to compete against the Review-Journal, Defendants agreed to produce all appraisals of Review-Journal assets that the Sun has alleged to be barriers to entry into the local daily newspaper market.[15] ECF No. 79-4 at APP0304 (¶ 9). The Sun then filed this motion without any further attempt to meet and confer or explain the relevance of documents outside this scope. ECF No. 76-9 at 2 (Email at 1:41 PM). Like the parties' meet-and-confer

---

[15] Contrary to the Sun's contention, Defendants did not agree to waive their relevance objection— only to produce responsive documents.

discussions, the Sun's motion fails to describe the relevance of an appraisal for any other purpose.[16]

For any appraisal that does not place a value on a potential barrier to entry, the Sun has not overcome "the first limitation on permissible discovery . . . that it be relevant." *Minden Air Corp.*, 2015 WL 419031, at *3. Other than suggesting it would like appraisals of "newspaper boxes or racks for sidewalk purchase," ECF No. 76 at 22:17, the Sun's motion fails to "describe with a reasonable degree of specificity the information they hope to obtain and its importance to their case." *Johnson*, 2009 WL 839044, *2. The Sun has not and cannot explain a need for the appraised value of any aspect of the Review-Journal's business other than potential barriers to entry into the alleged market. The scope of discovery is not unlimited, and the Sun has no right to engage on a wide-ranging fishing expedition into the Review-Journal's business by seeking document unrelated to the Sun's allegations and claims. *See Epstein*, 54 F.3d at 1423 (holding the "right of a party to obtain discovery is not unlimited."). Therefore, Defendants respectfully request an order sustaining their objections and limiting RFP 84 to appraisals containing valuations of Review-Journal assets the Sun alleged to be barriers to entry into the relevant market.

**F.    The Sun's Complaints About the Document Production Date Conflicts with the Parties' Discussions and Are Disingenuous.**

The Sun failed to satisfy its burden to meet and confer on the production-date issue before filing its motion. Although the parties briefly discussed the issue, the Sun accepted Defendants' proposal of making an initial production on or about July 3, 2020 (subject to entry of a protective order), and a rolling production to follow subject to a commitment that Defendants would provide the Sun with regular updates on their progress. **Exhibit A** at ¶ 13. Proving the point, the Sun's production end-date concern is not addressed anywhere in the parties' meet-and-confer

---

[16] Basic procedural due process precludes the Sun from including new relevance positions in its reply brief for this or any of its other requests raised in the motion. *See Federal Nat. Mort. Assoc. v. SFR Investments Pool 1, LLC*, 2015 WL 5723647, at *2, fn16 (noting district court's discretion to ignore new arguments raised in reply brief ) (citing *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007))).

correspondence. ECF Nos. 76-4, 79-3, 79-4. And the declaration from the Sun's counsel does not even claim that the parties discussed this issue nor does it include the results of those discussions. ECF No. 76-1. The law in this district bars the Sun from filing a discovery motion without first adequately meeting and conferring in an effort to resolve the dispute and expressly describing what efforts were made and the results obtained. *See* LR 26-6(c); *Century-National Insurance Company v. Gardner*, 2019 WL 8128167, at *2–3 (D. Nev. Sept. 20, 2019); *Fitzwater v. Bank of America, N.A.*, 2015 WL 4110789, at *1 (D. Nev. July 7, 2015) ("Only after all the cards have been laid on the table, and a party has meaningfully assessed the relative strengths and weaknesses of its position in light of all available information, can there be a 'sincere effort' to resolve the matter.") (quoting *Nevada Power v. Monsanto*, 151 F.R.D. 118, 120 (D. Nev. 1993)). Further, because the parties reached an agreement on this issue, the Sun's motion should be denied.

On the substance of this issue, the Sun alleges Defendants violated Rule 34 by agreeing to produce documents "on an indefinite rolling basis without a start or end date." ECF No. 76 at 8:10. The first allegation is false, and the second is disingenuous because the parties resolved the dispute. Regarding a production "start" date, Defendants ***did*** specify when they will begin producing documents. Defendants' responses state the following: "Subject to the entry of a protective order, Defendants will begin producing non-privileged, responsive documents by **July 3, 2020**, and will continue their production on a rolling basis." ECF No. 76-3 at 2:16–18 (emphasis added).

Defendants were surprised to see the end-date issue raised in the motion because the parties resolved the Sun's concerns during the meet-and-confer discussions. **Exhibit A** at ¶ 13. When the Sun raised the completion date, Defendants explained that (1) this is a complex antitrust case with tens of thousands of pages of documents and ESI to review, (2) Defendants have been diligently collecting, searching, and reviewing documents and ESI since they received the Sun's requests, and (3) Defendants would provide an estimated completion date after they complete all searches and determine the number of potentially responsive documents. *Id.* After some additional discussion, Defendants committed to providing the Sun with periodic updates on their progress. The Sun did not object to that proposal, which is likely why the issue is absent in the

parties' post-discussion correspondence. *Id.*; *see* ECF Nos. 76-4, 79-3, 79-4. Now the Sun ambushes Defendants and seeks an order compelling a specific completion date.

"[A]ntitrust trials often encompass a great deal of expensive and time consuming discovery and trial work . . . ." *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1381 (9th Cir. 1981) (internal citations and quotations omitted); *see also Benson v. Rosenthal*, No. CV 15-782, 2016 WL 1046126, at *3 (E.D. La. Mar. 16, 2016) (commenting that "ongoing search and rolling production . . . are common and understandable in cases involving discovery of voluminous documents or electronically stored information"). This case is no exception. The Sun's 158-paragraph Complaint contains extensive factual allegations and asserts complex antitrust claims, which implicate and require discovery into the Review-Journal's counterclaims pending in the parallel state court action. *See, e.g.*, ECF No. 1 at ¶¶ 108–09. In other words, the parties will need to conduct discovery for two separate cases. The parties' initial rounds of written requests illustrate the voluminous nature of discovery in this case: (1) the Sun's first set of 90 requests to produce documents served on May 8; (2) the Sun's second set of 224 requests to produce documents served on June 23; (3) Defendants' first set of 166 requests to produce documents served on May 6; and (4) Defendants' first set of 19 interrogatories served on May 22.

The Sun's demand for a specific completion date for Defendants' document production is particularly unreasonable for a few reasons. ***First***, on the same date it filed this motion, the Sun served Defendants with another 234 documents requests bringing its total to **324 document requests**. **Exhibit J** (Sun RFPs (Second)). Many of the Sun's hundreds of new document requests purport to expand upon the same subject matter as its first 90 requests thereby forcing Defendants to re-do many of their document collection efforts. *Compare* ECF No. 76-2 at Nos. 8; 10; 47; 76; 84 *with* **Exhibit J** at Nos. 98–101; 94–97; 133–137; 282–284; 298. The Sun's strategy of serving voluminous discovery on overlapping subjects is causing even more delay than its obstructionist discovery response tactics. ECF Nos. 79 (in which the Review-Journal is forced to seek to compel the Sun to comply with its discovery obligations), 80–81 (in which the Sun is attempting to block Defendants from obtaining discoverable material from the Sun's JOA consultant). At the same

21

time the Sun sought certainty on when it would receive documents in response to its first 90 requests, and after Defendants explained their progress on that extensive work, the Sun served 234 new requests. Based on its voluminous, multi-staged requests, the Sun has shown that it has little or no legitimate desire to obtain all responsive documents any time soon.

**Second**, Defendants are taking their discovery obligations seriously and have agreed to produce responsive documents for nearly all of the Sun's first 90 requests (even though many are overly broad). That is why this motion only involves disputes over four requests. The Sun, on the other hand, has taken a much different approach to discovery—despite it being the party leveling dozens of serious accusations and claiming that discovery must proceed in an expedited fashion—and has refused to respond to more than 70 of Defendants' requests. ECF No. 77. The Sun's obstructionist tactics have lightened its discovery burden by allowing the Sun to take a *de facto* extension to respond to dozens of Defendants' legitimate document requests.[17]

**Third**, the complexity of this case and the volume of the Sun's requests make it impossible for Defendants to set a specific completion date at this early stage of discovery.[18] Defendants have largely agreed to search for and produce all of the documents sought by the Sun, which takes significant time. At least eight (8) different counsel and multiple paralegals for Defendants have been working diligently to (1) gather documents and ESI from Defendants in response to the Sun's requests; (2) work with a third-party vendor to run searches through the tens of thousands of gathered ESI documents; (3) review the physical documents and voluminous ESI search results

---

[17] According to the Sun, its documents should have been produced on June 6 or some reasonable time thereafter. ECF No. 76 at 24:1–4. The Sun committed to producing documents by June 26 or within two business days of the entry of a protective order. *See, e.g.*, ECF No. 78-5 at 5:13–17. By refusing to produce most of the requested documents, the Sun will not need to provide documents until after the Court hears and decides Defendants' motion to compel at the July 14 hearing.

[18] "Rule 34 requires that the requesting party specify a 'reasonable time, place, and manner' for inspection and copying. Fed. R. Civ. P. 34(b). Whether the requested time, place, and manner for production is reasonable must be determined on a case-by-case basis." *Williams v. Taser Int'l, Inc.*, 2006 WL 1835437, at *6 (N.D. Ga. June 30, 2006). The same case-by-case analysis should apply to Rule 34(b)(2)(B) when determining whether a rolling production completion date is reasonable. *See* FED. R. CIV. P. 34(b)(2)(B), Committee Notes on Rules—2015 Amendment (permitting rolling productions).

1   for responsiveness to the Sun's requests; and (4) review the responsive documents and ESI for

2   both privilege and confidentiality prior to producing the documents. **Exhibit A** at ¶ 14.

3   Defendants will repeat this process for the Sun's new set of 234 documents requests.

4         Given the complexity of the matter and the vast number of documents and requests

5   involved, where hundreds of new requests were recently served and are still being reviewed,

6   Defendants cannot reasonably be expected to provide a firm "completion" date at this early stage.

7   At this early stage in the process, Defendants do not yet know how many documents will need to

8   be reviewed. That being the case, Defendants cannot truthfully provide (or even estimate) an exact

9   completion date. Consistent with the parties' discussions, Defendants are willing to set regular

10   discovery status conferences with the Sun wherein each party provides an update on their

11   document searches and production dates. If the Court feels Defendants must provide a date certain

12   despite all of the challenges, Defendants will agree to make best efforts to produce all documents

13   responsive to the Sun's first set of RFPs by no later than October 2, 2020.

14   **IV.**   **Conclusion**

15         For the foregoing reasons, the Court should deny the Sun's motion with respect to RFP

16   Nos. 47 (LVCVA investigation), 48 (Sun's editorial viewpoint), 57 (hiring of Sun employees),

17   and 84 (appraisals unrelated to barriers to entry) as well as the production end-date issue.

18         Dated: July 6, 2020

19                       KEMP JONES LLP

20                       */s/ Michael Gayan*

21                       J. RANDALL JONES, ESQ., SBN 1927
                    MICHAEL J. GAYAN, ESQ., SBN 11135

22                       MONA KAVEH, ESQ., SBN 11825
                    3800 Howard Hughes Parkway, 17th Floor

23                       Las Vegas, Nevada 89169

24                       RICHARD L. STONE, ESQ. (*pro hac vice*)
                    DAVID R. SINGER, ESQ. (*pro hac vice*)

25                       AMY M. GALLEGOS, ESQ. (*pro hac vice*)

26                       JENNER & BLOCK LLP
                    633 West 5th Street, Suite 3600

27                       Los Angeles, California 90071

28                       *Attorneys for Defendants*

**PROOF OF SERVICE**

I hereby certify that on the 6th day of July, 2020, I served a true and correct copy of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS [ECF NO. 76]** via the United States District Court's CM/ECF electronic filing system to all parties on the e-service list.

E. Leif Reid, Bar No. 5750
Kristen L. Martini, Bar No. 11272
Nicole Scott, Bar No. 13757
LEWIS ROCA ROTHGERBER CHRISTIE LLP
One East Liberty Street, Suite 300
Reno, Nevada 89501

Joseph M. Alioto, *Pro Hac Vice*
Jamie L. Miller, *Pro Hac Vice*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104

James J. Pisanelli, Bar No. 4027
Todd L. Bice, Bar No. 4534
Jordan T. Smith, Bar No. 12097
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

*Attorneys for Plaintiff*

/s/ Ali Augustine
An employee of Kemp Jones LLP

24