J. RANDALL JONES, ESQ., SBN 1927
r.jones@kempjones.com
MICHAEL J. GAYAN, ESQ., SBN 11135
m.gayan@kempjones.com
MONA KAVEH, ESQ., SBN 11825
m.kaveh@kempjones.com
KEMP JONES LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000

RICHARD L. STONE, ESQ. (*pro hac vice*)
rstone@jenner.com
DAVID R. SINGER, ESQ. (*pro hac vice*)
dsinger@jenner.com
AMY M. GALLEGOS, ESQ. (*pro hac vice*)
agallegos@jenner.com
JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, California 90071
Telephone: (213) 239-5100

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>SHELDON ADELSON, an individual and as the alter ego of News+Media Capital Group LLC and as the alter ego of Las Vegas Review Journal, Inc.; PATRICK DUMONT, an individual; NEWS+MEDIA CAPITAL GROUP LLC, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; and DOES, I-X, inclusive,<br><br>Defendants. | Case No.: 2:19-cv-01667-GMN-BNW<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S RENEWED MOTION TO COMPEL DOCUMENTS PURSUANT TO THE COURT'S OCTOBER 9 ORDER [ECF NO. 175]**<br><br>Hearing Date:  November 17, 2020<br>Hearing Time: 9:00 a.m. |

## I.    **Introduction.**

In this motion, the Sun urges the Court to compel the production of attorney-client communications based on bald speculation that the communications did not actually convey legal advice and baseless assertions that no attorney-client relationship existed. The Court should reject the invitation to invade the privilege. Defendants' privilege log establishes a prima facie case that the communications at issue are privileged; the Sun conspicuously does not claim otherwise. All of the Sun's arguments for why the privilege should not be respected are based on misstatements of law or factually-incorrect claims about the communications at issue that are conclusively rebutted by the sworn declarations of both the relevant attorneys and their clients.[1] During the meet and confer process, Defendants repeatedly explained to the Sun why the communications were privileged and provided legal and factual support—but unfortunately, the Sun's predetermined goal was never to resolve the issues. The attorney-client privilege is a foundational principle of the American legal system; courts do not disregard it based on mere speculation, and this Court should not disregard it here.

The Sun also asks the Court to compel Defendants to produce a list of the search terms that Defendants and their counsel developed to collect, filter, and search for documents responsive to the Sun's requests.[2] The Court should reject this request as well. Discovery into the opposing party's discovery process is disfavored, and only permitted in cases where the moving party can establish facts—not mere speculation—showing that its adversary's production was incomplete.

---

[1] *See* Declarations of Steven Garfinkel, Calvin Siemer, Keith Moyer, and Craig Moon, attached as **Exhibits A–D**, respectively.

[2] The Sun's motion also asked for a list of custodians whose documents and emails were searched. In the meet and confer, Defendants stated that they would provide a custodian list if the Sun agreed to share a list of the custodians it had searched. The Sun agreed to provide a list on October 30, and Defendants provided their custodian list to the Sun on November 3. *See* **Exhibit E** (Gayan Decl.) at ¶ 5. Accordingly, the custodian issue has been resolved.

The Sun has not made any such showing here, and cannot do so for the first time on reply.[3] As with its attempt to invade the privilege, the Sun again relies on baseless assertions unsupported by any evidence. Contrary the Sun's claims, Defendants' production has not been paltry. It has been robust—Defendants have spent hundreds upon hundreds of hours over the past six months gathering and producing over 9,900 documents, comprising over 28,000 pages, collected from 58 different custodians.[4] Tellingly, the Sun's motion does not identify a *single request* where Defendants did not produce exactly what they agreed to produce. The Sun's vague suspicion that there should have been more documents for some unexplained reason is insufficient as a matter of law to justify the "discovery on discovery" it is seeking.

All of the Sun's arguments for why Defendants' production was supposedly insufficient crumble in the face of even minimal scrutiny. For example, the Sun repeatedly accuses Defendants of larding their production with irrelevant promotional materials without ever disclosing to the Court that it propounded document requests *asking for these very materials*. It tries to create the misimpression that Defendants are withholding documents from the Review-Journal's CFO, Steven Hall, by dropping a footnote listing dozens of requests for which he supposedly should have but did not produce documents—but the majority of those requests were either for specific financial records that were produced from other custodians, or they were random requests with no connection to Mr. Hall. The Sun complains that it already had many of the documents produced from its other lawsuits against the Review-Journal, but fails to acknowledge that the claims in the other cases overlapped factually with this one, so a fair amount of duplication in discovery was to be expected. Defendants explained these facts in the meet and

---

[3] "[I]t is the moving party's burden, at the time a motion is filed, to provide the Court with all evidence or information it seeks the Court to consider." *Wesco Ins. Co. v. Smart Industries Corp.*, 2020 WL 3050710 at fn 4 (D. Nev. June 8, 2020). "The Court need not consider information offered for the first time in a reply brief." *Id.*; *see also Lindner v. Ford Motor Co.*, 2020 WL 3598269 at *4 (D. Nev. Aug. 17, 2012) (declining to consider new arguments and new evidence offered for the first time in plaintiff's reply).

[4] **Exhibit E** at ¶ 4.

1   confer, but the Sun ignored the explanation and refused to provide additional information about

2   why they believed Defendants' production was deficient.

3          Finally, the Sun asks for an order requiring Defendants to search the text messages on its

4   employees' personal mobile devices for responsive communications. Defendants have already

5   collected and produced responsive any text messages on Defendants' mobile phones. There is no

6   legal basis for the Sun to demand that Defendants seize and search employees' personal mobile

7   devices. Even the case relied upon by the Sun is clear that, as the party seeking discovery, the Sun

8   has the burden of proving that the Review-Journal has control over the messages on its

9   employees' personal mobile devices, and the Sun has not established an such control here.

10         The Sun has failed to provide any evidence supporting its contentions that Defendants are

11  using the privilege to hide documents, or withholding responsive documents from their

12  production. The Sun was never able to justify or explain its claims in the meet and confer, and in

13  the rare instances where it even tried to (such as with its claims about Mr. Hall), Defendants

14  investigated the requests and explained that no documents were actually missing—but the Sun

15  ignored the explanations. The Sun knows that its arguments are baseless, but is trying to create a

16  narrative that Defendants are hiding evidence so that it can blame Defendants when there turns

17  out to be no evidence supporting its antitrust claims. For these reasons, and as detailed further

18  below, Defendants respectfully request that the Court deny this motion.

19

20  **II.      The Court Should Reject the Sun's Demand for Privileged Communications.**

21          **A.      The attorney-client privilege is a fundamental protection that should not be
                     tossed aside lightly.**

22         It is axiomatic that the "attorney-client privilege is, perhaps, the most sacred of all legally

23  recognized privileges, and its preservation is essential to the just and orderly operation of our

24  legal system." *United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997); *see also United States*

25  *ex rel. Bagley v. TRW, Inc.*, 204 F.R.D. 170, 181 (C.D. Cal. 2001) ("[T]he importance of the

26  attorney-client privilege should not be ignored"). "The purpose of the attorney-client privilege 'is

27  to encourage full and frank communication between attorneys and their clients and thereby

28  promote broader public interests in the observance of law and administration of justice.'" *Finn v.*

*City of Boulder City*, No. 2:14-cv-01835-JAD-GWF, 2016 WL 4529950, at *1 (D. Nev. Aug. 30, 2016) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). Because the privilege "is recognized as vital to the legal system," it "should not be easily invaded." *See GERS, Inc. v. Atl. Mut. Ins. Co.*, No. 02cv1130 IEG (JAH), 2003 WL 27386128, at *5 (S.D. Cal. June 23, 2003).

Indeed, the Ninth Circuit has vacated discovery orders compelling the production of privileged information on writ review. *Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Ariz.*, 881 F.2d 1486, 1494–95 (9th Cir. 1989) (granting petition for mandamus and remanding to district court with instructions to vacate order compelling disclosure of privileged statements); *see also Hernandez v. Tanninen*, 604 F.3d 1095, 1101–02 (9th Cir. 2010) (granting petition for mandamus and rejecting district court's order compelling the production of privileged documents on a blanket basis).[5]

**B.    For the purpose of the privilege, an attorney-client relationship simply requires that the client reasonably believed it was consulting an attorney and intended to seek legal advice—no formalities are required.**

The Sun's primary argument for invading the privilege is that there could not have been an attorney-client relationship between the Review-Journal and certain attorneys who provided legal advice—namely Calvin Siemer and Steven Garfinkel—because the attorneys were employed by other entities and because there were no engagement letters, fees, or other documentation proving they had an attorney-client relationship with the Review-Journal. Motion at 23:3-6. None of this is required. Whether an attorney-client relationship exists depends on the facts, namely whether the "client reasonably believed [it] was consulting an attorney as an attorney and manifested an intention to seek professional legal advice"—formalities such as a retainer agreement or payment are not necessary. *S. Union Co. v. Sw. Gas Corp.*, 205 F.R.D. 542, 546 (D. Ariz. 2002); *see also Pack v. Ryan*, 238 P.3d 844, 2008 WL 6102032, at *3 (Nev. 2008)

---

[5] "Whether information is covered by the attorney-client privilege is determined by an eight-part test: (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at [t]his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived." *United States v. Sanmina Corp.,* 968 F.3d 1107, 1116 (9th Cir. 2020).

("An attorney-client relationship does not require that the parties execute a formal agreement, and the inquiry is highly fact-specific.") (unpublished table decision); *Coleman v. Circus Circus Casinos, Inc.*, No. 2:04-cv-0747-PMP-GWF, 2006 WL 8441914, at *4 (D. Nev. Jan. 26, 2006) ("[N]o formal retainer agreement is required in order to give rise to an attorney-client relationship . . ."); *Williams v. Waldman*, 836 P.2d 614, 618 (Nev. 1992) ("[F]ormality is not a necessary element in the creation of [an attorney-client] relationship, and the relationship may exist even though the attorney renders his or her services gratuitously.").[6]

This rule protects against the inadvertent waiver of the privilege due to failure to comply with formalities. "Because the application of the privilege does not require formal representation by the attorney, neither the absence of a formal contract of employment nor the payment of fees preclude the attachment of the privilege. A person can communicate with an attorney with the assurance that the communications will be protected so long as the consultation satisfies the necessary elements of privilege." *S. Union Co.*, 205 F.R.D. at 546.

### C. Defendants' privilege log establishes a prima facie case of privilege, and the Sun has not met its burden of showing that the documents it seeks are not actually privileged.

The party asserting a privilege is not required to disclose privilege information in order to prove that the privilege applies. In *In re Grand Jury Investigation*, the Ninth Circuit held that a privilege log makes a *prima facie* showing that a given document is subject to the attorney-client privilege if it contains the following information: "(a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated." 974 F.2d 1068, 1071 (9th Cir. 1992).

---

[6] As the Restatement (Third) of the Law Governing Lawyers § 14 (2000), relied upon by the Sun, explains: "A relationship of client and lawyer arises when: (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either (a) the lawyer manifests to the person consent to do so; or (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services."

Defendants' privilege log makes a *prima facie* showing that the documents sought by the Sun are privileged. Defendants provided a detailed log demonstrating the authors and recipients of every withheld document, the document's nature, the document's subject, its date, the basis for the privilege, and its length. *See* ECF Nos. 175-4, 175-5. The documents are clearly identified, explaining the grounds on which Defendants claim privilege and the type of information conveyed, without disclosing the specific nature of the protected advice or communication. *Id*. Nothing more is required and the Sun, tellingly, does not appear to argue that the privilege log is insufficient. Defendants have thus satisfied their burden to make a *prima facie* showing that the documents requested by the Sun are privileged. Since Defendants made a *prima facie* showing of privilege, the Sun now has the burden of demonstrating that the privilege does not apply. *In re Grand Jury Investigation*, 974 F.2d at 1075.

Likely recognizing that it cannot meet this burden, the Sun argues in the alternative that the Court should conduct an *in camera* review of certain communications between the Review-Journal and its attorneys. The Sun has not put forward any evidence to support any conceivable ground on which it would be appropriate for the Court to invade the privilege by reviewing confidential communications between the Review-Journal and its counsel. As the Sun's own authority makes clear, "*in camera* review is generally disfavored" and "a district court should not conduct *in camera* review 'solely because a party begs it to do so.'" *Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 610 (D. Nev. 2005) (quoting *Diamond State Ins. Co. v. Rebel Oil Co.*, 157 F.R.D. 691, 700 (D. Nev. 1994)). In other words, this is not football; the Sun cannot trigger an *in camera* review merely by throwing a challenge flag.

To the contrary, the party seeking *in camera* review must present "a sufficient evidentiary basis to support a reasonable belief that the documents are not privileged." *Garcia v. Serv. Emps. Int'l Union,* No. 2:17-cv-01340-APG-NJK, 2018 WL 6566563, at *5–6 (D. Nev. Sept. 6, 2018) (finding *in camera* review inappropriate where the movant failed to show that an exception to attorney-client privilege applied); *see also Ekeh v. Hartford Fire Ins. Co.,* 39 F. Supp. 2d 1216, 1221 (N.D. Cal. 1999) (declining request for an *in camera* review of privileged documents and observing that the moving party "should proffer some factual evidence . . . before I would invade

1    the privilege by conducting an *in camera* review"). As detailed further below, the Sun's rank

2    speculation that the communications it challenges actually involved non-legal business advice is

3    far from being evidence sufficient to justify the forced disclosure of privileged communications

4    either directly to the Sun or to the Court for *in camera* review.

5 
6          **D.     The facts establish that the Review-Journal's communications with Messrs. Garfinkel and Siemer are privileged.**

7          Contrary to the Sun's assertions, the relevant facts—including the declarations of Mr.

8    Siemer, Mr. Garfinkel, and the Review-Journal's publishers—conclusively demonstrate that the

9    communications questioned by the Sun were privileged attorney-client communications

10   conveying legal advice. For a period running from March 2016 through January 2019, the

11   Review-Journal did not have a General Counsel. **Exhibit D** (Moon Decl.) at ¶ 4; **Exhibit C**

12   (Moyer Decl.) at ¶ 4. Because of that, it relied exclusively on the services of outside attorneys to

13   address its legal issues. **Exhibit C** at ¶ 4. The Sun's contention that, because these attorneys

14   worked in-house for other corporations, they could not have had an attorney-client relationship

15   with the Review-Journal is meritless.[7]

16         As explained above, all that is required to establish an attorney-client relationship for the

17   purpose of the privilege is that the client reasonably believed it was consulting an attorney as an

18   attorney and manifested an intention to seek professional legal advice. If these minimal

19   requirements are met, then the privilege attaches. *See*, *S. Union Co.*, 205 F.R.D. at 546.

20         Moreover, there is no rule providing that, just because an attorney has an in-house role at

21   a corporation, she cannot simultaneously provide legal services for another client. *Collum v.*

22   *Charlotte-Mecklenburg Bd. of Educ.*, No. 3:07cv534 RJC-DSC, 2009 WL 3784956, at *1–2

23   (W.D.N.C. Nov. 10, 2009) ("There is no legal precedent stating that an in-house counsel, acting

24   in his individual capacity and not as an agent of the corporation, may not practice law for clients

25 

26   ───────────────────
     [7]  The Sun has entirely failed to substantiate its speculation that any of Defendants'
27   communications with these attorneys were business communications.  The declarations submitted
     with this opposition confirm precisely the opposite. **Exhibit A** (Garfinkel Decl.) at ¶ 9; **Exhibit**
28   **B** (Siemer Decl.) at ¶ 6.

other than his corporate client."); *see also* Va. Legal Ethics Op. 1838, 2007 WL 2461909 (in-house attorneys are "regular, active member[s]" of the bar, and can represent clients other than their employers); Ill. State Bar Ass'n Op. No. 17-05, 2017 WL 5632975 (an in-house attorney's representation of her employer did not prevent her from simultaneously representing another corporation at her employer's request). That only makes sense, given that in-house attorneys take on outside *pro bono* clients as part of their service to the public and the bar all the time.[8]

**Mr. Garfinkel.** Mr. Steven Garfinkel is the General Counsel of Interface Operations LLC, doing business as Adfam, which is the private family office of Dr. Miriam and Sheldon G. Adelson and their family. **Exhibit A** at ¶ 2. He has been providing legal advice to the Adelson family and their affiliated businesses for more than 14 years, and often works with in-house and outside counsel for these affiliated entities as part of their legal teams on transactions or legal disputes. *Id.* In that role, he provided legal advice to the Adelson family and their agents regarding their contemplated acquisition of the *Las Vegas Review-Journal*, including advising on the due-diligence process (for example, reviewing contracts and other legal documents) and various legal aspects of the transaction. *Id.* ¶ 4.

---

[8] None of the cases cited by the Sun hold that in-house counsel *cannot* provide legal advice to clients other their corporate employers. Most of them simply stand for the irrelevant proposition that in-house counsel *generally* represent only the corporate entity, and not its constituents. *See United States v. Martin*, 278 F.3d 988, 1000 (9th Cir. 2002) ("Defendant did not present sufficient evidence to establish such a relationship. Wilson was hired as general counsel for a corporation. The corporation's privilege does not extend automatically to Defendant in his individual capacity."); *Waid v. Eighth Judicial Dist. Ct. ex rel. Cty. of Clark*, 121 Nev. 605, 611 (2005) ("Generally, a lawyer representing a corporate entity represents only the entity, not its officers, directors, or shareholders, and not any related entities such as parents, subsidiaries or sister companies."); *Lindley v. Life Inv'rs Ins. Co. of Am.*, 267 F.R.D. 382, 390 (N.D. Okla. 2010) (same). The balance of the cases allude to in-house counsel as having only one client to distinguish their posture relative to outside counsel. *See Karstetter v. King Cty. Corr. Guild*, 193 Wash. 2d 672, 679–80 (2019) (noting that "unlike outside counsel, for in-house attorneys with only one client—an employer—the "withdrawal 'remedy' fails to confront seriously the extraordinarily high cost that resignation entails" and, therefore, "the relationship between corporate counsel and the employer client 'cannot be characterized solely as an attorney-client relationship'; it must be "viewed as an employer-employee relationship as well"); *O'Brien v. Stolt-Nielsen Transp. Grp. Ltd.*, 838 A.2d 1076, 1081–82 (Conn. Super. Ct. 2003) (same).

1   Then, after the transaction closed, Mr. Garfinkel provided legal advice and counsel to the

2   Review-Journal and its parent company, News+Media Capital Group, LLC. *Id*. ¶ 9; *see also*

3   **Exhibit D** at ¶¶ 5–6; **Exhibit C** at ¶¶ 5–6. Mr. Garfinkel also advised the Review-Journal on its

4   rights and obligations under the 2005 JOA with the Sun. **Exhibit A** at ¶¶ 9–11. Finally, he

5   provided the Review-Journal with legal analysis regarding the Sun's request to review the

6   Review-Journal's books and records, which culminated in an arbitration. *Id.* Mr. Garfinkel's

7   understanding was that he was operating as the Review-Journal's attorney, that an attorney-client

8   relationship existed, and that their communications would be privileged and confidential. *Id.* For

9   its part, the Review-Journal's publishers also understood that Mr. Garfinkel was operating as the

10  Review-Journal's attorney and expected their communications to be privileged and confidential.

11  **Exhibit D** at ¶¶ 5–6; **Exhibit C** at ¶¶ 5–6.[9] Accordingly, the communications between Mr.

12  Garfinkel and the Review-Journal reflected on Defendants' log are privileged. *E.g.*, *S. Union Co.*,

13  205 F.R.D. at 546.

14  **Mr. Siemer.** Mr. Calvin Siemer is a Senior Vice President and Deputy Global General

15  Counsel for Las Vegas Sands Corp. ("LVSC"), where he has been employed for almost nine

16  years. **Exhibit B** at ¶ 2. Earlier in his career, he spent nine years working in different in-house

17  capacities for the Hearst Corporation, where he provided legal advice and counsel to various

18  newspapers, including the *San Francisco Chronicle*, *The Albany Times Union*, *The Houston*

19  *Chronicle*, and *The Seattle Post-Intelligencer*. *Id.*

20  In 2018, because of Mr. Siemer's extensive legal experience in the newspaper industry,

21  Patrick Dumont (the Chief Financial Officer of LVSC and a member of the Adelson family)

22  requested that Mr. Siemer provide legal advice to Review-Journal regarding its pending dispute

23  with the Sun. *Id.* ¶ 5. Mr. Siemer's employer, LVSC, consented to the representation. *Id.* Mr.

24  Siemer also provided legal analysis and advice to the Review-Journal on its rights and obligations

[9] The Sun's feigned confusion about who Defendants are claiming the "client" was in the relationship is a red herring designed to confuse the Court. At some points, Mr. Garfinkel's clients were members of the Adelson family or their agents, and at others it was the Review-Journal itself.

1    under the 2005 JOA with the Sun, and he spoke and corresponded directly on that subject with

2    Keith Moyer, the Review-Journal's publisher, and Frank Vega (a *Review-Journal* consultant). *Id.*

3    ¶¶ 5–6; **Exhibit C** at ¶¶ 5–6.

4           During that time, Mr. Siemer understood and believed that his substantive

5    communications with the executives of the Review-Journal were confidential and protected by

6    the attorney-client privilege, and that an attorney-client relationship existed. **Exhibit B** at ¶ 6. As

7    with Mr. Garfinkel, the Review-Journal understood that Mr. Siemer was operating as the Review-

8    Journal's attorney, and expected their communications to be privileged and confidential. **Exhibit**

9    **C** at ¶¶ 5–6.  Accordingly, because the Review-Journal understood itself to be a client seeking

10   advice from Mr. Siemer, and Mr. Siemer had the same understanding, the attorney-client privilege

11   attaches. *E.g.*, *S. Union Co.*, 205 F.R.D. at 546.[10]

12          **E.**    **The Sun's waiver arguments are meritless.**

13          The Sun also contends that Defendants waived the privilege as to three categories of

14   documents: (1) those sent to key decisionmakers on Defendants' side on which their assistants

15   were copied, (2) documents that were sent to or from Russel Pergament, and (3) documents sent

16   to or from Ron Reese. The Sun has not met its burden of showing that these documents are not

17   privileged nor any facts that warrant *in camera* review.

18          **Executive Assistants.** The Sun contends that the privilege was waived as to emails on

19   which the clients' or attorneys' executive assistants were copied. Specifically, the Sun contends

20   the privilege was waived as to documents sent to Ms. Yurcich, who is Mr. Adelson's executive

21   assistant, Ms. McCarthy, who was attorney Ira Raphaelson's executive assistant, and Ms. Proost,

22

23   _____

[10] The Sun has also contended that communications involving Ira Raphaelson, a former attorney
24   for Las Vegas Sands Corporation, are not privileged. For Mr. Raphaelson, only two documents
     are at issue. One is an internal document at LVSC, where Mr. Raphaelson worked as General
25   Counsel, and which Defendants only included in their collection and log because Mr. Dumont
     has an LVSC email address. ECF No. 175-4 at 4 (DEFSPRIV0000243-246). Defendants do not
26   understand the Sun to be contending that an internal document over which a third party has not
     waived privilege should be produced. The other document with Mr. Raphaelson's name on it was
27   provided to Mr. Garfinkel in the course of his work for the Adelsons' family office. *Id.* at
     DEFSPRIV0000229-235. Again, Defendants do not take the Sun to be challenging Mr.
28   Garfinkel's representation of the Adelsons.

1   who is the executive assistant for Steve O'Connor, the president of Defendant News+Media. That

2   position is meritless.

3          Case law overwhelmingly recognizes that otherwise-privileged communications that

4   include clients' or attorneys' executive assistants remain privileged. *See, e.g.*, *United States v.*

5   *Koerber*, No. 2:09-cr-302 CW, 2011 WL 2174355, at *9 (D. Utah June 2, 2011) (concluding that

6   executive assistant to client was covered by the privilege, and noting that "passing a

7   communication to a secretary does not waive privilege"); *United States ex rel. Miller v. Bill*

8   *Harbert Int'l Const., Inc.*, No. 95-1231 (RCL), 2007 WL 915235, at *2 (D.D.C. Mar. 27, 2007)

9   (holding that where a client did not waive privilege by sharing a privileged document with a

10  personal assistant, and reasoning that if privilege is not "waived if an attorney dictates a privileged

11  and confidential letter to his assistant for it to be typed" the "same rationale can and should very

12  easily apply to the client"); *Premier Dealer Servs., Inc. v. Duhon*, Nos. 12-1498, 12-2970, 2013

13  WL 5966123, at *7 (E.D. La. Nov. 8, 2013) (observing that privileged agents are sometimes

14  grouped into two categories (1) communicating agents and (2) representing agents; that "[b]oth

15  lawyers and clients will typically have communicating agents, who enable the lawyers and clients

16  to communicate effectively"; and that "[t]he most common example of communicating agents are

17  . . . couriers and secretaries"); *see also* Restatement (Third) of the Law Governing Lawyers § 70,

18  cmt. f (2000) (listing a client's secretary as among those constituting confidential agents for

19  purposes of the attorney-client privilege, which the Restatement defines as "[a] person [whose]

20  participation is reasonably necessary to facilitate the client's communication with a lawyer or

21  another privileged person and [who] the client reasonably believes . . . will hold the

22  communication in confidence").

23         The Sun does not dispute this case law. Its only argument—that the particular assistants

24  are not employed by the Review-Journal or News+Media but by other, related entities—elevates

25  form far over substance. The Sun cites no case law suggesting that the privilege is waived if the

26  assistant who receives the communication is employed by a different entity than the attorney or

27  client for whom she works.

28

**Russel Pergament.** Mr. Pergament is a consultant with decades of experience in the news industry whom Mr. Garfinkel retained on behalf of Adfam to conduct due diligence regarding the purchase of the Review-Journal. **Exhibit A** at ¶ 5. Mr. Pergament led the due-diligence team, and conferred and corresponded with Mr. Garfinkel on legal issues. *Id*. ¶¶ 5–7. The only document on Defendants' log including Mr. Pergament is an email chain between Mr. Pergament and Mr. Garfinkel, in which they discuss the due-diligence process and where Mr. Pergament provides information about the information his team was gathering to Mr. Garfinkel, which Mr. Garfinkel has attested was for the purpose of his providing legal advice to the Adelson family. *Id*. There is no basis for the Sun's contention that Mr. Pergament's inclusion on this communication waived the privilege, or its contention that the email did not contain legal advice.

**Ron Reese.** Mr. Reese is a communications executive employed by the Las Vegas Sands. The only reason he appears on Defendants' privilege log is that he is copied on emails between Patrick Dumont, who is a Sands executive in addition to being a defendant named in this case, and Mark Fabiani, an attorney who was consulting Messrs. Dumont and Reese regarding their responses to inquiries from a New York Times reporter. As with Mr. Raphaelson, these are internal Sands communications, and the Sands has not waived its privilege over them. Under those circumstances, there is no basis for the Sun to compel their disclosure.

**III.** **The Court Should Not Order the Review-Journal to Produce Search Terms or Any Other Work Product Relating to Its Attorneys' Collection, Review, and Production of Documents.**

    **A.** **Discovery on Discovery is disfavored, and only permitted if the moving party can establish that the opposing party's production was deficient.**

The Court should reject the Sun's demand for a list of the search terms that Defendants and their clients developed to search for and collect documents responsive to the Sun's requests. It is well established that "[d]iscovery into another party's discovery process is disfavored." *Ashcraft v. Experian Info. Sols., Inc.*, No. 2:16-cv-02978-JAD-NJK, 2018 WL 6171772, at *2 & n.2 (D. Nev. Nov. 26, 2018) (denying motion to compel where the disclosure of "meta-discovery" was not justified); *see also Fish v. Air & Liquid Sys. Corp.*, No. GLR-16-496, 2017 WL 697663, at *6, *15 (D. Md. Feb. 21, 2017) ("'discovery on discovery' . . . is not an appropriate topic of

discovery and numerous courts have disallowed such discovery."); *Hanan v. Corso*, No. CIV.A. 95-0292 TPJJMF, 1998 WL 429841, at *7 (D.D.C. Apr. 24, 1998) (declining plaintiff's request for all documents related to defendant's efforts to respond to discovery request and noting that "plaintiff cite[d] no authority for the proposition that the Federal Rules of Civil Procedure contemplate that discovery is itself a fit subject for discovery").

Because discovery on discovery risks multiplying and derailing the course of litigation, the party seeking to probe the sufficiency of the opposing party's discovery process must first make a factual showing that the production was incomplete. *See, e.g.*, *Freedman v. Weatherford Int'l Ltd.*, No. 12 Civ. 2121 (LAK) (JCF), 2014 WL 4547039, at *2 (S.D.N.Y. Sept. 12, 2014) ("In certain circumstances where a party makes some showing that a producing party's production has been incomplete, a court may order discovery designed to test the sufficiency of that party's discovery efforts in order to capture additional relevant material. However, requests for such "'meta-discovery' should be closely scrutinized in light of the danger of extending the already costly and time-consuming discovery process ad infinitum.").  This accords with the Sedona's Conference guidance: "as a general matter, neither a requesting party nor the court should prescribe or detail the steps that a responding party must take to meet its discovery obligations, and *there should be no discovery on discovery, absent an agreement between the parties, or specific, tangible, evidence-based indicia (versus general allegations of deficiencies or mere "speculation") of a material failure by the responding party to meet its obligations*." The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, 19 Sedona Conf. J. 1, 123 (2018) (emphasis added).

Courts in this circuit agree. For example, in *Jensen v. BMW of N. Am., LLC*, 328 F.R.D. 557, 566 (S.D. Cal. 2019), the plaintiff sought information regarding the defendant's "efforts to search for documents and information" responsive to discovery requests, including "the search terms employed" and the "custodians for such sources of information." *Id.* at 566. Observing that "[g]enerally, courts will only permit such discovery where there is some indication that a party's discovery has been insufficient or deficient," the court denied the plaintiff's motion to compel

1   because the plaintiffs had provided "no particularized reason whatsoever for why such discovery

2   should be ordered." *Id.*[11]

3          Numerous additional courts are in accord. As one court put it when rejecting the plaintiff's

4   request for "meta-discovery" regarding the defendant's process of preserving, locating, and

5   producing documents: "***speculation that there is more will not suffice; if the theoretical***

6   ***possibility that more documents exist sufficed to justify additional discovery, discovery would***

7   ***never end.***" *Hubbard v. Potter*, 247 F.R.D. 27, 29 (D.D.C. 2008) (emphasis added); *see also Ford*

8   *Motor Co. v. Edgewood Props., Inc.*, 257 F.R.D. 418, 427–28 (D.N.J. 2009) (refusing to compel

9   a new keyword search solely due to "nefarious speculation" about inadequate production of ESI);

10  *United States v. O'Keefe*, 537 F. Supp. 2d 14, 22–23 (D.D.C. 2008) (noting that in the face of a

11  protest of "inexplicable deficiencies" in government's production, "vague notions that there

12  should have been more than what was produced are speculative and are an insufficient premise

13  for judicial action," and party must "make [its] claim directly and support it with an evidentiary

14  basis—not merely surmise that they should have gotten more than they did"); *Larsen v. Coldwell*

15  *Banker Real Estate Corp.*, No. SACV 10-00401-AG (MLGx), 2012 WL 359466, at *7 (C.D. Cal.

16  Feb. 2, 2012) (rejecting plaintiffs' requested discovery regarding defendants' "ESI preservation,

17  collection, and processing," as well as re-collection and review by a neutral third party and

18  holding that plaintiffs "failed to meet their burden of showing that Defendants' preservation and

19  

---

20  [11] None of the cases cited by the Sun authorize a court to order the disclosure of search terms
    without a particularized showing that responsive documents have not been produced. *Soffer*
21  simply notes the parties agreed to the search terms. *Soffer v. Five Mile Capital Partners, LLC*,
    No. 2:12-CV-01407-JAD-GWF, 2013 WL 4499011 at *1 (D. Nev. Aug. 19, 2013).
22  *Cannata* required defendant to run narrowly tailored search terms supplied by plaintiff in lieu of
    re-ordering a Rule 30(b)(6) deposition. *Cannata v. Wyndham Worldwide Corp.*, No. 2:10-CV-
23  00068-PMP-VCF, 2011 WL 5598306, at *2 (D. Nev. Nov. 17, 2011).  *Alutiq* notes that the Court
    previously ordered a non-party to run search terms supplied by plaintiff. *Alutiq Int'l Sols., LLC v.*
24  *OIC Marianas Ins. Corp*., No. 2:10-CV-01189-JAD-VCF, 2018 WL 1336720, at *1 (D. Nev.
    Mar. 15, 2018). *SEC v. Banc de Binary* simply enforces a prior stipulation by the parties to meet
25  and confer to establish a list of search terms. *SEC v. Banc de Binary*, No. 2:13-CV-993-RCJ-
    VCF, 2014 WL 5506780, at *3 (D. Nev. Oct. 30, 2014). *Sedaghaty* is a criminal case that
26  discusses overly-broad search terms used by federal agents to search a suspect's computer while
    executing a warrant; it does not even involve discovery. *United States v. Sedaghaty*, 728 F.3d
27  885, 912 (9th Cir. 2013).

28

production of ESI was inadequate" by pointing to a "few isolated examples . . . out of a document production of approximately 9,000 pages"); *accord Klayman v. City Pages*, No. 5:13-cv-143-OC-22PRL, 2014 WL 5426515, at *4 (M.D. Fla. Oct. 22, 2014) (rejecting discovery-on-discovery where plaintiff's "mere speculation that more documents must exist" did not form "a sufficient basis for the Court to order an invasive search of Defendants computers and telephone records").

It makes sense that discovery on discovery is forbidden outside of very rare circumstances, since requests "designed to elicit information concerning [a party's] discovery efforts . . . tread[] dangerously close to encroaching on attorney work product privilege." *See Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc.*, No. 12-cv-2706 (MJD/LIB), 2014 10714011, at *15 (D. Minn. Dec. 5, 2014); *see also F.D.I.C. v. Johnson*, No. 2:12-cv-00209-KJD-PAL, 2013 WL 1195698, at *3 (D. Nev. 2013) (noting that "[a]ll searches, filters, document review, coding, and tagging of documents is the work product of the attorney and firm performing the work").

**B.     The Sun has not shown, nor can it, that Defendants' production was deficient.**

The Sun's attempts to establish deficiencies in the Review-Journal's production in order to justify discovery into Defendants' discovery processes fail. First, the Sun misrepresents the volume of Defendants' production, contending that the Review-Journal has produced fewer than 7,000 documents. Motion, ECF No. 175 at 24. That is false. Defendants have produced over 9,900 documents totaling over 28,000 pages, collected from 58 different custodians. **Exhibit E** at ¶ 4. The Sun has also received an additional 51,000 pages of Defendants' documents from Defendants' accountants (and the Sun itself reproduced almost 29,000 pages of the Review-Journal's documents from prior proceedings). *Id.*

Second, the Sun complains that it already had much of what Defendants produced from discovery in other proceedings. That is not a valid complaint. The Sun has sued the Review-Journal multiple times based on the same alleged facts. In the 2019 arbitration, the Sun alleged that the Review-Journal engaged in improper accounting practices in order to reduce the amount of the Sun's annual profits payment; the Sun also sought tort damages against the Review-Journal, contending that the Review-Journal breached the JOA in bad faith in order to starve the Sun of revenues and drive it out of business so that the Review-Journal could be the only editorial voice

in Las Vegas. In the state court action currently pending between the Review-Journal and the Sun, the Sun contends that the Review-Journal violated the JOA by removing, reducing, and/or covering the Sun logo that appears on the front page of the joint media product for the purpose of diminishing the Sun's brand and its voice in the market. ECF No. 40-10. In this lawsuit, the Sun alleges that by engaging in the same allegedly improper accounting practices that were at issue in the arbitration, and by removing, reducing, and/or covering the Sun logo on the media product's front page, the Review-Journal is seeking to drive the sun out of business so that it can obtain a monopoly in the market for daily print newspapers in Clark County. ECF No. 1 at ¶¶ 48–109. Because the Sun has filed duplicative lawsuits against the Review-Journal, it makes sense that the universe of relevant documents produced in those duplicative lawsuits would overlap.

Third, the Sun complains that many documents produced were promotional materials. That is not a valid complaint either. The Sun *requested* promotional materials. ECF No. 137-3 at APP049; ECF No. 137-2 at APP015 (RFP 295, 92, 93).

Fourth, the Sun argues that more documents from Mr. Adelson should have been produced. However, the Sun provides no evidence suggesting that documents are *missing* from the production; it simply speculates that Mr. Adelson must have had more documents without providing any evidentiary basis for its speculation. As noted above, rank speculation that a party should have more documents than were produced is insufficient to justify discovery into the opposing party's document collection process. *See, e.g., Hubbard*, 247 F.R.D. at 2; *Ford Motor Co.*, 257 F.R.D. at 427; *O'Keefe*, 537 F.Supp.2d at 22.

Fifth, the Sun argues that there should have been more documents produced from Steven Hall, the Review-Journal's Chief Financial Officer. In a footnote, the Sun lists several dozen requests for which it believes Mr. Hall should have had responsive documents. However, for the majority of those requests the Review-Journal *agreed to and did* produce specific records or documents sufficient to show specific costs or expenses, and the Sun did not complain or move to compel a broader production. For example, in response to RFP 2, Defendants agreed to and did produce "records of all promotional expenses from the requested time period and details regarding each related transaction as they are maintained in the ordinary course of business." ECF No. 76-

3 at 5. In response to RFP 4, Defendants agreed to and did produce "records of all promotional expenses from the requested time period and details regarding each related transaction as they are maintained in the ordinary course of business." *Id.* at 7. Defendants' responses to RFP 5, 19-20, 59, 66-68, 70, 73, 83 likewise identified specific documents that would be produced, and those documents were produced. *Id.* at 7-8, 19-20, 50, 54-59, 66-67. In other words, for each of these requests, Defendants produced the records they agreed to produce, and collected these records from custodians who had them. They were not obligated to collect them from Mr. Hall. ECF No. 175-10; *see also* **Exhibit E** at ¶ 6, **Exhibit F** (10/23 Letter).

Most of the other requests for which the Sun claims Mr. Hall should have had documents do not relate to topics about which a CFO would be expected to have documents. For example, RFP 53 asks for documents relating to the notice of default the Review-Journal sent to the Sun on August 29, 2019, notifying it that if was in default of the quality standards and cooperation provision in the 2005 JOA. ECF No. 76-3 at 45. RFP 64 asks for documents relating to the Review-Journal's statement that the "Sun fails to meet the JOA's required high standards of newspaper quality." *Id.* at 53. Request 76 asks for "third-party reports in Your possession concerning or relating to the digital traffic for Your digital operations." *Id.* at 61. And RFP 90 asks for "all documents listed in Section III of your May 6, 2020 initial disclosures." *Id.* at 70. There is no obvious reasons why the Review-Journal's CFO would have documents in these categories, and the Sun has not explained why it thinks he does.

A few of the requests identified by the Sun were ones where the Review-Journal did not agree to produce documents at all, and the Sun never challenged Defendants' responses. ECF No. 76-3 at 55-56, 62, 67-68 (RFP 68, 77, 84, 85).[12] Finally, as to the remaining RFPs listed by the Sun (42, 54-55, 58, 72, 81-82), Defendants agreed to verify that any responsive documents from Mr. Hall had been produced. ECF No. 175-10. The Review-Journal invited the Sun to provide

---

[12] Moreover, to the extent the Sun was dissatisfied with Defendants' written responses to RFPs 47 and 48, *see* ECF No. 175 at 34–35, the Sun could have moved to compel on this basis. Having chosen not to do so, it can hardly argue that Defendants' production is deficient because it is consistent with their written responses.

more information about why it contends Mr. Hall has additional responsive documents that have not been produced, but the Sun did not do so. *Id.*

### C. Defendants have complied with their discovery obligations with respect to text messages.

The Court should deny the Sun's request for an order compelling Defendants to produce text messages. Numerous courts have squarely held that "a company does not possess or control the text messages from the personal phones of its employees and may not be compelled to disclose text messages from employees' personal phones." *See, e.g.*, *Lalumiere v. Willow Springs Care, Inc.*, No. 1:16-CV-3133-RMP, 2017 WL 6943148, at *2 (E.D. Wash. Sept. 18, 2017); *see also RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.*, No. 4:18-cv-06037-DGK, 2019 WL 3291570, at *2 (W.D. Mo. July 22, 2019) (declining to compel production of text messages stored on personal phones of defendant company's employees); *cf. Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-cv-04236-BLF, 2015 WL 8482256, at *3–4 (N.D. Cal. Dec. 10, 2015) (denying motion to compel production of non-party employees' personal emails, reasoning that "even if the court were to order that [the plaintiff] collect emails from its employees' personal accounts, [the defendant] has not identified any authority under which [the plaintiff] could force employees to turn them over").

The case cited by the Sun, *Goolsby v. City of San Diego*, does not compel a different result. First, contrary to the Sun's insinuation, *Goolsby* is not a Ninth Circuit case, it is an unpublished Southern District of California case. *Goolsby v. City of San Diego*, No. 3:17-CV-564-WQH-NLS, 2019 WL 3891128, at *4 (S.D. Cal. Aug. 19. 2019). More to the point, *Goolsby* makes clear that a party can only be compelled to produce documents from its employees' personal mobile devices if the moving party establishes that the party "has actual possession, custody or control [of the devices], or has the legal right to obtain the documents on demand." *Id*. *Goolsby* also makes clear that the burden is on the moving party to establish that the party has control over the devices, and mere speculation that employees used the devices at work does not suffice. *Id*. Here, the Sun offers nothing but speculation that some employees must use their devices for business purposes because their mobile phone numbers are in their email signatures.

1   This is far from the evidence of "control" required for the court to order the Review-Journal to

2   search its employees' personal devices, which are owned by the employees and likely contain

3   reams of personal, private data—including passwords, credit card numbers, personal emails and

4   texts, photographs, private health-related information, and so on.

**IV.   <u>Conclusion.</u>**

6          The Sun has failed to establish a factual basis sufficient to justify invading the attorney-

7   client privilege or derailing this case with discovery on discovery. The Court should deny the

8   Sun's motion in its entirety.

9          Dated: November 6, 2020

10                                                  KEMP JONES LLP

11                                                  */s/ Michael Gayan*
                                                    J. RANDALL JONES, ESQ., SBN 1927
12                                                  MICHAEL J. GAYAN, ESQ., SBN 11135
                                                    MONA KAVEH, ESQ., SBN 11825
13                                                  3800 Howard Hughes Parkway, 17th Floor
                                                    Las Vegas, Nevada 89169
14

15                                                  RICHARD L. STONE, ESQ. (*pro hac vice*)
                                                    DAVID R. SINGER, ESQ. (*pro hac vice*)
16                                                  AMY M. GALLEGOS, ESQ. (*pro hac vice*)
17                                                  JENNER & BLOCK LLP
                                                    633 West 5th Street, Suite 3600
18                                                  Los Angeles, California 90071

19                                                  *Attorneys for Defendants*

20

21

22

23

24

25

26

27

28

19

### INDEX OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | Declaration of Steven Garfinkel in Support of Defendants' Opposition to Plaintiff's Renewed Motion to Compel Production of Documents Pursuant to the Court's October 9 Order |
| B | Declaration of Calvin Siemer in Support of Defendants' Opposition to Plaintiff's Renewed Motion to Compel Production of Documents Pursuant to the Court's October 9 Order |
| C | Declaration of Keith Moyer in Support of Defendants' Opposition to Plaintiff's Renewed Motion to Compel Production of Documents Pursuant to the Court's October 9 Order |
| D | Declaration of Craig Moon in Support of Defendants' Opposition to Plaintiff's Renewed Motion to Compel Production of Documents Pursuant to the Court's October 9 Order |
| E | Declaration of Michael J. Gayan in Support of Defendants' Opposition to Plaintiff's Renewed Motion to Compel Production of Documents Pursuant to the Court's October 9 Order |
| F | October 23, 2020, Letter from Michael Gayan to Marla Hudgens |

1

**PROOF OF SERVICE**

2

     I hereby certify that on the 6th day of November, 2020, I served a true and correct copy

3

of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFF'S RENEWED MOTION**

4

**TO COMPEL DOCUMENTS PURSUANT TO THE COURT'S OCTOBER 9 ORDER**

5

**[ECF NO. 175]** via the United States District Court's CM/ECF electronic filing system to all

6

parties on the e-service list.

7

E. Leif Reid, Bar No. 5750
Marla Hudgens, Bar No. 11098

8

Kristen L. Martini, Bar No. 11272
Nicole Scott, Bar No. 13757

9

LEWIS ROCA ROTHGERBER CHRISTIE LLP
One East Liberty Street, Suite 300

10

Reno, Nevada 89501

11

Joseph M. Alioto, *Pro Hac Vice*

12

Jamie L. Miller, *Pro Hac Vice*
ALIOTO LAW FIRM

13

One Sansome Street, 35th Floor
San Francisco, California 94104

14

15

James J. Pisanelli, Bar No. 4027
Todd L. Bice, Bar No. 4534

16

Jordan T. Smith, Bar No. 12097
PISANELLI BICE PLLC

17

400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

18

19

*Attorneys for Plaintiff*

20

21

                               /s/ Mona Kaveh

22

                               An employee of Kemp Jones LLP

23

24

25

26

27

28