# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| LAS VEGAS SUN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:19-cv-01667-GMN-BNW |
| vs. | ) | |
| | ) | **ORDER** |
| SHELDON ADELSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pending before the Court is the Motion to Dismiss, (ECF No. 20), filed by Defendants News+Media Capital Group, LLC and Las Vegas Review Journal, Inc. (collectively, "RJ Defendants").[1]  Plaintiff Las Vegas Sun, Inc. ("LVS") filed a Response, (ECF Nos. 39, 40),[2] and RJ Defendants filed a Reply, (ECF No. 45).

Also pending before the Court is the Motion to Dismiss, (ECF No. 21), filed by Defendants Sheldon Adelson and Patrick Dumont.  LVS filed a Response, (ECF No. 36), and Defendants Adelson and Dumont filed a Reply, (ECF No. 46).

For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** the Motions to Dismiss.

//

//

//

---

[1] RJ Defendants' Motion to Dismiss is joined by Defendants Sheldon Adelson and Patrick Dumont. (Adelson and Dumont Joinder, ECF No. 22) ("Messrs. Adelson and Dumont further join in the concurrently-filed motion to dismiss filed by Defendants Las Vegas Review-Journal, Inc. and News+Media Capital Group, LLC.").

[2] In addition, LVS separately filed Exhibits 6, 8, and 11, (ECF No. 109), in support of its Response.

I.   **BACKGROUND**

This is an antitrust action.  LVS's Complaint alleges the following:

A.   **The Parties**

LVS is a Nevada corporation that publishes a daily newspaper in Clark County, Nevada. (Compl. ¶ 1, ECF No. 1).  LVS first published its newspaper, the "Las Vegas Sun" ("Sun"), in 1950, making it the second-longest-running daily newspaper in Las Vegas. (*Id.* ¶ 2).  Defendant Las Vegas Review-Journal, Inc. ("LVRJ") is a Delaware corporation that also publishes a daily newspaper in Clark County, Nevada. (*Id.* ¶ 5).  LVRJ first published its newspaper—the "Las Vegas Review-Journal" ("RJ")—in 1929, making it the longest-running daily newspaper in Las Vegas. (*Id.*).  LVRJ is a wholly owned subsidiary of Defendant News+Media Capital Group, LLC ("News+Media"). (*Id.* ¶¶ 5, 7).

Defendant Sheldon Adelson is an individual and, according to LVS, the owner and alter ego of News+Media. (*Id.* ¶ 8).  Defendant Adelson purportedly exercises significant influence over LVRJ's affairs and the editorial content of its newspaper. (*Id.* ¶ 9).

Defendant Patrick Dumont is an individual and an officer and owner of News+Media. (*Id.* ¶ 11).  Dumont is Defendant Adelson's son-in-law. (*Id.*).  According to LVS, Defendant Dumont "orchestrated" the Adelson family's purchase of LVRJ, at Defendant Adelson's direction. (*Id.*).

B.   **The Joint Operating Agreements**

In the late 1980s, the Sun was operating at a substantial loss, which almost caused its financial failure. (*Id.* ¶ 18).  In 1989, LVS and LVRJ entered into a Joint Operating Agreement (the "1989 JOA"). (*Id.*).  Through the 1989 JOA, LVS and LVRJ sought "[t]o ensure the continued publication of two separate and independent daily newspapers in Las Vegas[.]" (*Id.*).  To that end, the 1989 JOA allowed LVRJ to assume control of the print advertising and circulation functions for both newspapers. (*Id.* ¶ 20).  Further, the 1989 JOA permitted LVS to

print its newspaper using LVRJ's publishing plant and equipment. (*Id.*).  Despite these joint operations, the newspapers maintained their editorial independence. (*Id.* ¶ 21).  The Sun ultimately became profitable under the 1989 JOA. (*Id.* ¶ 22).

The 1989 JOA was possible due to the Newspaper Preservation Act, 15 U.S.C. §§ 1801–04 (the "NPA"), which exempts joint newspaper operations from certain antitrust trust laws provisions. (*Id.* ¶ 17).  In order to obtain the NPA's protection, joint newspaper operations must be conditioned on maintenance of separate editorial functions. (*Id.*).

In 2005, LVS and LVRJ allegedly amended the 1989 JOA (the "2005 JOA"). (*Id.* ¶ 23).  Under the 2005 JOA, the Sun and the RJ became a single-media product, meaning that both newspapers remained separately branded publications, but the Sun was included as a separate newspaper inside the RJ. (*Id.* ¶ 24).  LVRJ continued to oversee "all accounting, management, and operational control" of the Sun, "except for the operation of the Sun's news and editorial department." (*Id.* ¶ 26).  According to LVS, the 2005 JOA remains operative and runs for an initial period ending on December 31, 2040. (*Id.* ¶ 32).  The 2005 JOA, like the 1989 JOA, imposed many obligations onto LVRJ.  For example, the 2005 JOA provides for certain formatting specifications. (*Id.* ¶ 27).  In addition, it requires that LVRJ publish a "noticeable mention" for the Sun's lead story and specifies that the "noticeable mention" must generally be published above the RJ's own banner on its front page. (*Id.*).  The RJ, furthermore, is required to market and promote the Sun in "equal prominence" to the RJ, using "commercially reasonable efforts to maximize circulation of both newspapers." (*Id.* ¶ 28).  The RJ and the Sun both bear their respective editorial costs under the 2005 JOA. (*Id.*).  Additionally, LVRJ pays an "annual profits payment" to the Sun before the first day of each month. (*Id.* ¶ 30).

The 2005 JOA specifies certain conditions for its termination. (*Id.* ¶ 34).  Under the 1989 JOA, LVRJ could terminate the JOA if the joint operation failed to turn a profit for two consecutive years. (*Id.*).  That provision was omitted from the 2005 JOA, which permits

termination only if one of three events takes place: (1) the expiration of the initial term (December 31, 2040); (2) bankruptcy or default by LVRJ or LVS; or (3) a change in controlling ownership interest in LVS away from any lineal descendants of Hank Greenspun (*i.e.*, the Sun's founding editor and publisher until 1989) without prior approval from the RJ. (*Id.*).

### C.   The Alleged Predatory Conduct

LVS claims that Defendants engaged in an anticompetitive scheme to eliminate the RJ's sole competitor—the Sun—from the market for daily local newspapers in Clark County. (*Id.* ¶ 48). Defendant Adelson acquired the RJ in December 2015, apparently because he desired to exert "unfettered editorial control" over its content and produce press coverage sympathetic to his business and personal interests. (*Id.* ¶ 49). Defendant Adelson began to exert this control immediately upon his acquisition of the RJ. (*Id.* ¶ 53). The Sun, however, continued to express attitudes contrary to Adelson's and published pieces that took direct aim at Defendant Adelson himself. (*Id.* ¶ 54).

LVS alleges four different actions by Defendants that together comprise Defendants' predatory conduct and anticompetitive scheme. (*Id.* ¶ 56). First, LVS claims that Defendant Adelson removed Jason Taylor from his position as publisher of the RJ in an effort to harm LVS. (*Id.*).[3] Taylor, according to LVS, was publisher of the RJ for about seven months starting in July 2015. (*Id.* ¶ 57). Prior to Defendant Adelson's acquisition of the RJ, Taylor had implemented a plan to help increase the RJ's revenue, and he was on track to increase the Sun's profit payments under the 2005 JOA. (*Id.* ¶ 59). Further, Taylor identified that the RJ's owner prior to Defendant Adelson "had been dishonest in calculating profit payments" to LVS under the 2005 JOA, and he raised this issue to Adelson but to no avail. (*Id.* ¶ 60). Taylor endeavored to insulate the RJ's newsroom from Adelson's influence, which supposedly resulted in Taylor's

---

[3] Jason Taylor is not a party to the instant action.

removal as publisher of the RJ, the abandonment of Taylor's plan to increase the RJ's revenue, and the hiring of a new publisher who would execute on Defendants' "strategy to financially starve the Sun and to force it out of business." (*Id.* ¶ 64).

Second, LVS alleges that LVRJ abused its control over operations, advertising, and accounting, with the goal of either ending the Sun's existence or diminishing the Sun's value and forcing a sale to the RJ "at a fire-sale price." (*Id.* ¶ 56).  Defendants allegedly endeavored to achieve this by increasing the JOA's operating expenses and recording—for the first time in the joint operation's history—a negative EBITDA[4] in the amount of $2.25 million for the fiscal year ending on March 31, 2017. (*Id.* ¶ 70).  The negative EBITDA led to lower profit payments to the Sun. (*Id.* ¶ 71).  Adding to the problem, LVRJ charged editorial and certain advertising costs against the joint operation, in derogation of the 2005 JOA. (*Id.* ¶¶ 72, 83).

Third, LVRJ redesigned the RJ's front page to make the Sun's presence less noticeable. (*Id.* ¶ 56).  In 2017, LVRJ deviated from the 2005 JOA's requirements for the RJ's "noticeable mention" of the Sun's lead story. (*Id.* ¶ 87).  Similarly, LVRJ strategically obscured the Sun's front-page presence in the RJ with advertising stickers. (*Id.* ¶ 90).  These stickers covered, for example, the Sun's endorsements for public office. (*Id.*).  Further, in or around January 2018, LVRJ began omitting the Sun from the electronic replica editions of its newspaper, which further reduced the Sun's visibility. (*Id.* ¶¶ 99–100).

Fourth, Defendants threatened involuntary termination of the JOA. (*Id.* ¶ 56).  LVRJ sought to terminate the 2005 JOA in Nevada state court (the "state court action") by claiming that the Sun failed "to meet the JOA's required high standard of newspaper quality." (*Id.* ¶ 108).  LVS alleges this is an improper basis for termination of the JOA because it is not one of the grounds for termination articulated in the 2005 JOA. (*Id.*).  LVS asserts that if

---

[4] EBITDA means "earnings before interest, taxes, depreciation, and amortization."

Defendants are allowed to continue with their predatory conduct, Defendants will control and monopolize 100 percent of the sale of local daily newspapers in Clark County. (*Id.* ¶ 110).

### D.    Procedural History

LVS commenced the instant action on September 24, 2019.  In its Complaint, LVS sets forth the following claims: (1) monopolization, in violation of § 2 of the Sherman Act; (2) attempted monopolization, in violation of § 2 of the Sherman Act; (3) conspiracy to monopolize, in violation of § 2 of the Sherman Act; (4) violation of § 7 of the Clayton Act; and (5) violation of Nevada's Unfair Trade Practices Act. (Compl. ¶¶ 119–157).  Defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.    <u>LEGAL STANDARD</u>

Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) where a pleader fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, legal conclusions couched as a factual allegations are insufficient. *Twombly*, 550 U.S. at 555.  Accordingly, Rule 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

If the court grants a motion to dismiss for failure to state a claim, leave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by

amendment. *DeSoto v. Yellow Freight Sys., Inc.,* 957 F.2d 655, 658 (9th Cir. 1992).  Pursuant to Rule 15(a), the court should "freely" give leave to amend "when justice so requires," and in the absence of a reason such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## III.   DISCUSSION

The Court begins its discussion by addressing the RJ Defendants' Motion to Dismiss. The Court then considers the arguments made in Defendant Adelson and Dumont's Motion to Dismiss.

### A.   RJ Defendants' Motion to Dismiss

#### i.   The 2005 JOA and illegality

The first and primary argument raised by the RJ Defendants is an affirmative defense—that the 2005 JOA is illegal and unenforceable under the NPA because the 2005 JOA was not approved by the United States Attorney General. (RJ Defs.' Mot. Dismiss ("MTD") at 5–13, ECF No. 20).  More specifically, RJ Defendants contend that LVS's entire case relies on the 2005 JOA and because the 2005 JOA cannot be enforced, LVS's Complaint must be dismissed. (*Id.*).

Through the NPA, Congress sought to address "the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States[.]" 15 U.S.C. § 1801.  To that end, the NPA provides antitrust immunity to JOAs that meet the requirements of 15 U.S.C. § 1803.  Relevant to the instant case, under § 1803(b), newspapers entering into a JOA after 1970 must obtain the "prior written consent" of the United States Attorney General to receive antitrust immunity. 15 U.S.C. § 1803(b); *Hawaii Newspaper Agency v. Bronster*, 103 F.3d 742, 745 (9th Cir. 1996).  Section 1803(b) provides:

1  "It shall be unlawful for any person to enter into, perform, or enforce a [JOA], not already in

2  effect, except with the prior written consent of the Attorney General of the United States." 15

3  U.S.C. § 1803(b).  The parties agree that the 1989 JOA received the required written consent.

4  However, the RJ Defendants maintain the 2005 JOA is not an amendment, but rather a new

5  agreement, which required the U.S. Attorney General's (*i.e.*, the Department of Justice) written

6  consent.  Because written consent was not obtained, Defendants argue the 2005 JOA is illegal

7  and unenforceable.

8        Generally, "dismissal based on an affirmative defense is permitted when *the complaint*

9  establishes the defense." *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931

10 F.3d 966, 973 (9th Cir. 2019) (citing *See Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir.

11 2013)).  Unfortunately for the RJ Defendants, that is not the situation at hand.  LVS's

12 Complaint alleges that since 1989, the RJ has distributed and published both the RJ and the Sun

13 under a 50-year JOA authorized by the NPA and approved by the Department of Justice

14 ("DOJ"). (Compl. 2:13–21, ECF No. 1).  Further, the Complaint alleges the DOJ "permitted"

15 the 2005 JOA. (*Id.* ¶¶ 121, 130).  The Complaint is silent as to "written consent," and federal

16 pleading rules generally do not require a plaintiff to anticipate and plead around an affirmative

17 defense. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *United States v. Northern Trust Co.*,

18 372 F.3d 886, 888 (7th Cir. 2004).  Moreover, while the RJ Defendants request that the Court

19 incorporate by reference a DOJ letter, which the RJ Defendants characterize as "expressly

20 refus[ing] to approve" the 2005 JOA, (RJ Defs.' MTD 5:12–21), the Court is not persuaded.

21       A district court may, but is not required to, incorporate by reference documents outside

22 the pleadings. *See, e.g.*, *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (observing that a

23 court "may consider" evidence that is incorporated by reference); *Davis v. HSBC Bank Nevada,*

24 *N.A.*, 691 F.3d 1152, 1159–60 (9th Cir. 2012).  A court may consider materials if (1) the

25 authenticity of the materials is not disputed, and (2) the plaintiff has alleged the existence of the

materials in the complaint or the complaint "necessarily relies" on the materials. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted).  However, a court should refrain from incorporating documents by reference in circumstances where the facts given in the incorporated document "only serve to dispute facts stated in the well-pleaded complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1003 (9th Cir. 2018).

Here, LVS has neither alleged the existence of the DOJ letter in its Complaint, nor does the Complaint necessarily rely on the letter.  In addition, RJ Defendants submit the letter as an exhibit to their Motion to Dismiss only to dispute facts stated in the Complaint—namely, that the 2005 JOA is enforceable pursuant to the NPA.  For these reasons, the Court will not consider the letter at this time.  Thus, as the face of the Complaint does not establish the proffered affirmative defense, and because the RJ Defendants have not established a basis for the letter's incorporation by reference, the RJ Defendants' first argument fails.

ii.   Relevant Market

Next, the RJ Defendants argue that LVS's Complaint fails because LVS's alleged relevant market is facially unsustainable. (RJ Defs.' MTD 13:15–16:15).  At the pleading stage, a plaintiff must allege a relevant market that includes "both a geographic market and a product market." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).  The product market must account for the product at issue and "all economic substitutes for the product." *Id.* (citation omitted).

In this case, the Complaint alleges that the sale of Clark County local daily newspapers is a distinct relevant product market. (*See* Compl. ¶¶ 36–40).  As LVS alleges, local daily newspapers "supply readers with national, state, and local news and sports information," in a "convenient, portable, hardcopy format." (*Id.* ¶ 36).  Further, "[l]ocal newspapers are able to offer news stories with more in-depth coverage" than TV and radio news reports, and cover a wide array of topics of interest, not just breaking news stories. (*Id.*).  Plaintiff asserts that daily

newspapers are inexpensive, thereby eliminating "socio-economic barriers for citizens to have access to news and information about their community, including those who are unable to afford Internet services." (*Id.*).  In addition, local daily newspapers feature "local event calendars, movie and television listings, classified advertisements, commercial advertisements, legal notices, comics, syndicated columns, and obituaries." (*Id.*).

The RJ Defendants challenge the alleged product market as facially unsustainable because it fails to include economic substitutes such as local broadcast TV stations, local radio stations, and local physical and online newspapers and magazines. (RJ Defs.' MTD 13:16–15:8).  As RJ Defendants correctly point out, the product market "must encompass the product at issue as well as all economic substitutes for the product." *Hicks*, 897 F.3d at 1120 (quotation marks omitted).  "Economic substitutes have a 'reasonable interchangeability of use' or sufficient 'cross elasticity of demand' with the relevant product." *Id.* (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)).

However, as LVS explains, the RJ Defendants do not support their argument by citing antitrust cases analyzing the newspaper industry. (LVS's Resp. to RJ Defs.' MTD 4:21–5:9, ECF No. 39).  To be sure, other courts have recognized relevant markets similar to that Plaintiff alleges here. *See, e.g.*, *Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180, 1184 (8th Cir. 1998) ("We are not yet ready to say that for antitrust purposes local daily newspapers and other media outlets always occupy the same product market.  Having reviewed the record made in this case, we are satisfied the District Court did not clearly err in limiting the product market to local daily newspapers."); *United States v. Tribune Publ'g Co.*, No. CV1601822ABPJWX, 2016 WL 2989488, at *3 (C.D. Cal. Mar. 18, 2016) (rejecting an argument at the preliminary injunction stage that the alleged product market for "the sale of Daily English-language local daily newspapers to subscribers and the sale of local advertising in the newspapers" fails to account "for internet-based sources of local news and advertising as potential competition").

Moreover, it is well-established that "the validity of the 'relevant market' is typically a factual element rather than a legal element." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044–46 (9th Cir. 2008).  Thus, alleged relevant markets may survive Rule 12(b)(6) scrutiny, and courts may reserve factual inspection for summary judgment or trial. *Id.* (citing *High Technology Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). Accordingly, the Court finds that LVS's Complaint sufficiently alleges a plausible "relevant market" definition.

iii.   <u>Antitrust Injury</u>

The RJ Defendants' contend that LVS's Complaint must be dismissed because it fails to allege antitrust injury, and therefore, LVS has no standing to bring its claims. (RJ Defs.' MTD 17:7–13).  Indeed, in order to have standing to bring an antitrust claim, a plaintiff "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis added).  "Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  Rather, an antitrust injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'" *Brunswick*, 429 U.S. at 489 (alteration in original) (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969)).

The RJ Defendants contend that because the Sun and the RJ are sold jointly as a single-media product pursuant to the 2005 JOA, there cannot plausibly be any harm to competition in the sale of local newspapers in Clark County. (RJ Defs.' MTD 17:14–18:7); (*see* Compl. ¶ 24). Rather, "a reader either buys a package that includes both printed newspapers, or buys

neither[.]" (RJ Defs.' MTD 17:14–15).  According to the RJ Defendants, "[s]o-called editorial competition, without actual economic competition, is not even 'trade or commerce' within the meaning of the Sherman Act, and thus cannot be the basis of an antitrust claim." (*Id.*).  Notably, the RJ Defendants' fail to cite any supporting case law addressing the newspaper industry and JOAs.

On the other hand, LVS points the Court's attention to *U.S. v. Daily Gazette Co.*, 567 F. Supp. 2d 859 (S.D. W. Va. 2008).  There, the court considered a Rule 12(b)(6) motion to dismiss, wherein the defendants similarly argued that "editorial competition is not commercial in nature and, hence, is beyond the reach of antitrust laws." *Id.* at 870.  The court rejected the defendants' argument, explaining that "section 1801 [of the NPA] contemplates continued competition between editorially and reportorially distinct views." *Id.* at 869.  The further court observed that "a JOA partner has at least two competitive and economic incentives in pursuing editorial and news-gathering efforts that attract readers, subscribers, and advertisers to its own newspaper, namely, (1) increasing its value, particularly in the eyes of potential acquisitors, and (2) enhancing its bargaining position when the JOA is up for re-negotiation or termination." *Id.* at 870.

The rationale in *Daily Gazette Co.* is instructive regarding the present case.  While the RJ Defendants' argument assumes that under the 2005 JOA, there is no actual economic competition between the Sun and the RJ, a JOA partner has economic and competitive incentives to pursue editorial and news-gathering efforts that attract readers.  To be sure, LVS's Complaint alleges the Sun and the RJ's respective owners "have always competed vigorously against each other for readers." (Compl. ¶ 112).  They do so by "seeking to generate original news and other content of interest to readers; trying to cover local news with greater depth, . . . breaking stories first; and offering the most attractive mix of news, features, and editorials[.]" (*Id.*).  Moreover, as explained in *Daily Gazette Co.*, "[t]he first clause of section

1801 contemplates continued competition between editorially and reportorially distinct voices." *Daily Gazette Co.*, 567 F. Supp. 2d at 869; *see also Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1249 (D. Haw.), *aff'd sub nom. State of Hawaii v. Gannett Pac. Corp.*, 203 F.3d 832 (9th Cir. 1999) ("Defendants argue that there can be no antitrust violation because there is no economic competition at all in light of the [NPA's] antitrust exemptions. The Court recognizes that the Advertiser and Star-Bulletin operate to some extent as a single economic entity under the JOA. However, . . . these actions receive antitrust exemption only so long as they are taken to preserve the independent editorial and reportorial voices of competing newspapers."). Accordingly, the Court finds that LVS sufficiently alleges a plausible antitrust injury.

### iv.   "Duty to Deal"

The RJ Defendants assert that LVS cannot use the antitrust laws to "force" LVRJ to perform under the parties' JOA for 20 more years, "even if the state court agrees that the Sun materially breached the [2005 JOA]." (RJ Defs.' MTD 18:11–21:5). The first issue with Defendants' argument is that it presumes that the 2005 JOA is unenforceable based on LVS's alleged breach thereof—something Defendants have not established in the present case. In addition, while the RJ Defendants contend there is no "duty to deal" under antitrust law, the Ninth Circuit has rejected the "broad contention that the antitrust laws may never impose duties on a monopolist to aid its competitors." *Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 368 (9th Cir. 1988); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985) ("The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified."); *Lorain Journal Co. v. United States*, 342 U.S. 143, 155 (1951) ("The operator of the radio station, equally with the publisher of the newspaper, is entitled to the protection of [the Sherman Act]. *In the absence of any purpose to create or maintain a monopoly*, the act does not restrict the long recognized right of trader or

manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.") (emphasis added).  The RJ Defendants are correct that *Aspen Skiing Co.* only recognized a "limited" exception to the "no duty to deal" rule, (RJ Defs.' MTD 19:13–20:16), but Defendants have not established that the exception does not apply in the present case based on the facts alleged in the Complaint.  For example, a critical fact in *Aspen Skiing Co.* was that there were no valid business reasons for the defendant's refusal to do business with the plaintiff. *Aspen Skiing Co.*, 472 U.S. at 608, 610–11. Therefore, a fuller factual record is necessary for the Court to determine whether this case presents a similar situation.  At this early stage in litigation, the Court declines to dismiss the Complaint based on Defendants' claimed right to refuse to deal with LVS.

### v.   *Noerr-Pennington* Doctrine

Next, the RJ Defendants contend that "any claims based on the state court action are barred by [the] *Noerr-Pennington* [doctrine]." (RJ Defs.' MTD 21:6–28).[5]  "The essence of the *Noerr-Pennington* doctrine is that those who petition any department of the government for redress are immune from statutory liability for their petitioning conduct." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1006 (9th Cir. 2008) (citing *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006)).  The doctrine is rooted in the First Amendment and, consequently, applies to "litigation activities which constitute 'communication[s] to the court[.]'" *Sosa*, 437 F.3d at 933.  Those communications (or "petitioning activity") include "[a] complaint, an answer, a counterclaim and other assorted documents and pleadings, in which plaintiffs or defendants make representations and present arguments to support their request that the court do or not do something." *Id.* (quoting *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005)).

---

[5] The RJ Defendants, however, do not identify any particular claim which they contend is based on the state court action. (*See id.*).

Here, LVS's Complaint alleges an anticompetitive scheme with several independent acts which do not include petitioning activity. For example, LVS alleges that Defendants have: exploited the 2005 JOA to deprive LVS of its annual profit payments; reduced the Sun's visibility to consumers by, *inter alia*, minimizing the Sun's logo on the RJ's front page; and precluded LVS from conducting an audit of the RJ's books and records. (*See* Compl. ¶¶ 60–107). Because none of Plaintiff's claims are based entirely on petitioning activity (*i.e.*, Defendants' state court counterclaim), the *Noerr-Pennington* doctrine does not preclude any of LVS's claims in their entirety.

vi.   LVS's Claim for Violation of § 7 of the Clayton Act

Defendants argue that LVS's fourth cause of action for violation of § 7 of the Clayton Act fails because the Complaint does not allege that any of the Defendants have acquired stock or assets. (RJ Defs.' MTD 22:1–10). LVS counters that § 16 of the Clayton Act can be used to bar proposed acquisitions that violate § 7. (LVS's Resp. to RJ Defs.' MTD 21:17–22:23).

Section 7 of the Clayton Act makes it unlawful for any person to "acquire . . . the stock or other share capital . . . or any part of the assets of another person . . . where . . . the effect of such acquisition may be substantially to lessen competition or tend to create monopoly." 15 U.S.C. § 18. Here, the Complaint only alleges that Defendants "plan[ned] to attempt to purchase the Sun or terminate the 2005 JOA . . . ." (Compl. ¶ 149). Because the Complaint does not plausibly allege an acquisition, or even a "proposed acquisition" as LVS now argues, LVS's fourth claim is dismissed without prejudice as to all Defendants.

**B.   Adelson and Dumont's Motion to Dismiss**

i.   Alter Ego Liability Against Defendant Adelson

Defendant Adelson argues that every claim against him fails because the Complaint does not allege any basis for alter ego liability. (Adelson Dumont MTD 8:14–10:3, ECF No. 21). To state a claim for alter ego liability, a plaintiff must allege that: (1) the corporation is influenced

and governed by the person asserted to be its alter ego; (2) there is such a unity of interest and ownership that one is inseparable from the other; and (3) the facts are such that adherence to the fiction of separate entity would sanction fraud or promote injustice. *Lorenz v. Beltio, Ltd.*, 963 P.2d 488, 496 (Nev. 1998).  In addressing the second element, courts may consider "commingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities." *Id.* However, this is not an exhaustive list of factors. *Id.*  "There is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case." *Polaris Indus. Corp. v. Kaplan*, 747 P.2d 884, 887 (Nev. 1987) (citations omitted); *see S.E.C. v. Elmas Trading Corp.*, 620 F. Supp. 231, 233–34 (D. Nev. 1985), *aff'd*, 805 F.2d 1039 (9th Cir. 1986) ("Other factors to be considered in piercing the corporate veil are: failure to observe corporate formalities; nonpayment of dividends; the insolvency of the debtor corporation at the time; siphoning of funds of the corporation by the dominant stockholder; nonfunctioning of other officers or director; absence of corporate records; use of the same office or business location by the corporation and its individual stockholders; and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.").

In this case, LVS alleges that Defendant Adelson owns both LVRJ and News+Media and exercises significant influence over the RJ's policies, business, and editorial content. (*See, e.g.*, Compl. ¶¶ 9, 49, 61).  LVS further alleges that Adelson: ordered Michael Schroeder to use one of his "Connecticut newspapers and write and publish an article condemning" a Nevada state court judge which presided over a high profile case in which Adelson was a defendant; removed the RJ's publisher, Jason Taylor, because Adelson wanted someone who was more in line with his vision; and replaced Taylor with Craig Moon, who subsequently "executed on Defendants' strategy to financially starve the Sun and to force it out of business." (*See, e.g.*, *id.*

¶¶ 50–53, 61–64).  As such, LVS's Complaint asserts sufficient factual matter to establish the influence and unity of interest elements.  Moreover, the Complaint claims that adherence to the fiction of separate entity would sanction fraud or promote injustice. (*See, e.g.*, *id.* ¶¶ 136, 146).  The Court therefore finds that LVS's Complaint sufficiently alleges alter ego liability.

ii.   *Copperweld* Doctrine

Defendants Adelson and Dumont argue that the *Copperweld* doctrine bars LVS's third cause of action for conspiracy to monopolize. (Adelson Dumont MTD 5:16–6:13).  In *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), the Supreme Court held that a parent and its wholly owned subsidiary cannot initiate Sherman Act conspiracy violations among themselves. *Id.* at 771–73 ("A parent and its wholly owned subsidiary have a complete unity of interest"); *see also Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1463 (9th Cir. 1993) (applying *Copperweld* doctrine in the context of § 2 of the Sherman Act).  Further, the officers or employees of a single firm cannot conspire with each other while pursuing the firm's interest. *Copperweld*, 467 U.S. at 771.

In response, LVS assert that Defendant Adelson's ownership of LVRJ and News+Media is uncertain. (LVS's Resp. to Adelson Dumont MTD 10:8–11:19, ECF No. 36).  LVS represents that its third cause of action is pleaded in the alternative to "account for this ambiguity." (*Id.*).

"Our ordinary Rules [of Civil Procedure] recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to 'set forth two or more statements of a claim or defense alternately or hypothetically,' and to 'state as many separate claims or defenses as the party has regardless of consistency.'" *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999); *see* Fed. R. Civ. P. 8(d)(2)–(3).  "However, pursuit of alternative relief does not relieve plaintiffs of their obligation to plead sufficient factual allegations in support of that [alternative] request." *FT Travel-New York, LLC v. Your*

1   *Travel Ctr., Inc.*, 112 F. Supp. 3d 1063, 1073 (C.D. Cal. 2015) (quoting *Milo & Gabby, LLC v.*

2   *Amazon.com, Inc.*, 12 F. Supp. 3d 1341, 1353–54 (W.D. Wash. 2014)); *see also Holman v.*

3   *Indiana*, 211 F.3d 399, 407 (7th Cir. 2000) ("While [plaintiffs] need not use particular words to

4   plead in the alternative, they must use a formulation from which it can be reasonably inferred

5   that this is what they were doing.").

6        Here, the Complaint alleges that Defendant News+Media acquired LVRJ in 2015.

7   (Compl. ¶ 7).  It further alleges "upon information and belief," that Defendant Adelson, his

8   family members and trusts, and other entities established for the benefit of Adelson and his

9   family members, own News+Media and LVRJ. (*Id.* ¶ 9).  Absent from the Complaint, however,

10  is any alternative allegation that Adelson does not own LVRJ or News+Media and is thus

11  capable of conspiring with either of those entities.  As such, the Complaint does not contain

12  sufficient factual allegations so as to support a conspiracy claim against Adelson.  LVS's third

13  cause of action is therefore dismissed without prejudice with respect to Defendant Adelson.

14       Regarding Defendant Dumont, LVS argues that he acted at the direction of Adelson

15  since before LVRJ was purchased by News+Media and that the "predatory plot was hatched"

16  before Dumont was ever an owner, employee, or agent of News+Media or LVRJ. (LVS's Resp.

17  to Adelson Dumont MTD 12:1–12) (citing Compl. ¶¶ 11, 55, 61).  However, the paragraphs of

18  the Complaint on which LVS relies in making this argument do not indicate when Dumont

19  became officer and owner of News+Media.  Moreover, while LVS summarily states that "an

20  employee or agent can participate in a conspiracy if [he] is acting outside his normal

21  employment capacity," LVS cites only one case for this proposition, *Bhan v. NME Hosps., Inc.*,

22  669 F. Supp. 998 (E.D. Cal. 1987).  In *Bhan*, the court observed that "officers or employees

23  acting on their own behalf may be subject to liability for an antitrust conspiracy," and that the

24  "question is whether the ultimate interests of the firm and the alleged co-conspirators are

25  identical." *Id.* at 1016.  The court explained that if the answer to that question is no, then the

claim for conspiracy may proceed. *Id.*  In other words, if an employee or officer has an independent personal stake apart from the interests of the firm, then it is capable of conspiracy with its corporate employer.

Here, the Complaint does not allege that Dumont participated in the conspiracy in order to advance his own independent interest.  Rather, the Complaint alleges that each of the Defendants "orchestrated and implemented an anticompetitive scheme to eliminate the RJ's sole competitor . . . and to conspire to monopolize the market for daily newspapers in Clark County." (Compl. ¶ 48).  Because the Complaint does not allege that Dumont had an independent stake in the alleged conspiracy, *Bhan* does not apply.  LVS does not provide any other legal authority in support of its conspiracy claim against Dumont.  Accordingly, the Court finds that the *Copperweld* doctrine applies and the Complaint fails to state a claim as to Dumont.  Moreover, because the only two remaining Defendants are News+Media and its wholly-owned subsidiary, LVRJ, then LVS's third cause of action as pleaded is barred by the *Copperweld* doctrine.[6]

### iii.  Single-Enterprise Theory

Defendants Adelson and Dumont argue that LVS fails to allege each of the elements of monopolization and attempted monopolization as to them, and therefore, LVS's first and second causes of action should be dismissed. (Adelson Dumont MTD 4:1–5:15).  In response, LVS submits that, under the "single-enterprise theory" each of the elements of monopolization and attempted monopolization need not be satisfied by each individual defendant. (LVS's Resp. to Adelson Dumont MTD 4:6–6:14).  LVS directs the Court to *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017).  In *Lenox*,

---

[6] Adelson and Dumont's Motion to Dismiss also argues that the Complaint fails to allege any facts supporting any Defendant's involvement in an antitrust conspiracy. (Adelson Dumont MTD 6:14–8:11).  Given that the conspiracy to monopolize claim has been dismissed, the Court does not reach this argument.

the district court had granted summary judgment to the defendant on claims under Section 2 of the Sherman Act.  The plaintiff in *Lenox* argued that "its burden of establishing any individual defendant's liability required showing only that the defendant's conduct played a 'role' in the overall anticompetitive scheme perpetrated by the enterprise as a whole."  The Tenth Circuit panel agreed.  It held that, under *Copperweld*, the plaintiff did not need to prove that "'*specific* Defendants' independently satisfied each necessary element of the claims," because "in a single-enterprise situation, it is the affiliated corporations' collective conduct—*i.e.*, the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a [Section 2] claim."  Therefore, the Tenth Circuit panel concluded that the plaintiff "advanced a viable, if somewhat unusual, antitrust theory."

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 631 (9th Cir. 2018) (summarizing *Lenox*) (internal citations omitted).

Defendants Adelson and Dumont counter that the Ninth Circuit recently addressed *Lenox* and clearly understood its holding as applying to corporate affiliates, not individuals. (Adelson Dumont Reply at 10, ECF No. 46).  In *Arandell Corp.*, after addressing the *Copperweld* doctrine and analyzing *Lenox*, the Ninth Circuit concluded: "*Copperweld* supports the following rule: A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single 'economic unit' of which it is a part." *Arandell Corp.*, 900 F.3d at 632.  Adelson and Dumont further emphasize that "other courts have also read *Lenox* as applying to corporate affiliates." (Adelson and Dumont Reply at 10) (citing *Unigestion Holding, S.A. v. UPM Tech., Inc.*, 305 F. Supp. 3d 1134 (D. Or. 2018); (*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019)).  However, none of the cases Adelson and Dumont cite hold that *Lenox* and the single-enterprise theory are not applicable to individuals that own or manage a company.  The respective courts were not faced with that particular question.

"[U]nder Rule 12 (b)(6), the defendant has the burden of showing that no claim has been stated." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991); *Raymond v. Avectus Healthcare Sols., LLC*, 859 F.3d 381, 383 (6th Cir. 2017) ("The defendant has the burden of showing that the plaintiff has failed to state a claim for relief."); *see generally* 5B Charles Wright et al., Federal Practice & Procedure § 1357 (3d ed. 2004) ("federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists."). The Court finds that Defendants Adelson and Dumont have not met their burden of showing that LVS's claims for monopolization and attempted monopolization are subject to dismissal under Rule 12(b)(6), particularly in light of the lack of authority cited to support their argument.

### iv.   Remedy of Divestiture

Lastly, Defendants Adelson and Dumont argue that divestment is authorized to remedy violations of § 7 of the Clayton Act and is not available for alleged violations of § 2 of the Sherman Act that do not involve an illegal acquisition. (Adelson Dumont MTD 10:6–11:17). Thus, Adelson and Dumont maintain that LVS's request for this remedy must be rejected. (*Id.*).

Section 16 of the Clayton Act provides that

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief . . . .

15 U.S.C. § 26. Section 16 "states no restrictions or exceptions to the forms of injunctive relief a private plaintiff may seek, or that a court may order . . . . Rather, the statutory language indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief." *California v. Am. Stores Co.*, 495 U.S. 271, 281 (1990) (quoting *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 416 (1st Cir. 1985)). As explained by the First Circuit in *Cia. Petrolera Caribe, Inc.*, "[a] range of injunctive relief is possible and, like all

equitable remedies, the relief ordered is highly dependent upon the proof adduced at trial." *Cia. Petrolera Caribe, Inc.*, 754 F.2d at 430.  Thus, "[a]ny determination regarding whether divestiture would be an appropriate remedy in this case is, of course, premature[.]" *Id.*  In light of the foregoing, the Court will not reject LVS's requested remedy of divestiture at this early juncture.[7]

### C.    Leave to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure permits courts to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  The Ninth Circuit "ha[s] held that in dismissing for failure to state a claim under Rule 12(b)(6), 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States,* 58 F.3d 494, 497 (9th Cir. 1995)).

The Court finds that LVS may be able to plead additional facts to cure the deficiencies identified herein.  Accordingly, the Court will grant LVS leave to file an amended complaint. LVS shall file its amended complaint within twenty-one (21) days of the entry of this Order.

//

//

//

//

//

//

//

---

[7] The Court further notes that Adelson and Dumont fail to cite a court decision holding that divestiture may never be granted as a remedy for violations of § 2 of the Sherman Act that do not involve an illegal acquisition.

1

**IV.     CONCLUSION**

2

       **IT IS HEREBY ORDERED** that the Motion to Dismiss, (ECF No. 20), filed by

3

Defendants News+Media Capital Group, LLC and Las Vegas Review Journal, Inc. is

4

**GRANTED in part and DENIED in part**.

5

       **IT IS FURTHER ORDERED** that Defendants Adelson and Dumont's Motion to

6

Dismiss, (ECF No. 21), is **GRANTED in part and DENIED in part**.

7

       **IT IS FURTHER ORDERED** that LVS shall have twenty-one (21) days from the date

8

of this Order to file an amended complaint, if it is able to plead additional facts to cure the

9

deficiencies identified herein.

10

       **DATED** this  30   day of November, 2020.

11

12

_____

13

Gloria M. Navarro, District Judge
United States District Court

14

15

16

17

18

19

20

21

22

23

24

25