1  J. RANDALL JONES, ESQ., SBN 1927
   r.jones@kempjones.com
2  MICHAEL J. GAYAN, ESQ., SBN 11135
   m.gayan@kempjones.com
3  MONA KAVEH, ESQ., SBN 11825
   m.kaveh@kempjones.com
4  KEMP JONES LLP
5  3800 Howard Hughes Parkway, 17th Floor
   Las Vegas, Nevada 89169
6  Telephone: (702) 385-6000

7
   RICHARD L. STONE, ESQ. (*pro hac vice*)
8  rstone@jenner.com
   DAVID R. SINGER, ESQ. (*pro hac vice*)
9  dsinger@jenner.com
   AMY M. GALLEGOS, ESQ. (*pro hac vice*)
10 agallegos@jenner.com
11 JENNER & BLOCK LLP
   633 West 5th Street, Suite 3600
12 Los Angeles, California 90071
   Telephone: (213) 239-5100
13
14 *Attorneys for Defendants and Counterclaimant*

15           **UNITED STATES DISTRICT COURT FOR THE**

16                    **DISTRICT OF NEVADA**

| | |
|---|---|
| 17 LAS VEGAS SUN, INC., a Nevada corporation, | Case No.: 2:19-cv-01667-GMN-BNW |
| 18 | |
| Plaintiff, | **DEFENDANTS' ANSWER AND DEFENSES TO LAS VEGAS SUN, INC.'S COMPLAINT** |
| 19 v. | |
| 20 | |
| SHELDON ADELSON, an individual and | **AND** |
| 21 as the alter ego of News+Media Capital Group LLC and as the alter ego of Las | **LAS VEGAS REVIEW-JOURNAL, INC.'S COUNTERCLAIMS** |
| 22 Vegas Review Journal, Inc.; PATRICK DUMONT, an individual; NEWS+MEDIA | |
| 23 CAPITAL GROUP LLC, a Delaware limited liability company; LAS VEGAS | |
| 24 REVIEW-JOURNAL, INC., a Delaware corporation; and DOES, I-X, inclusive, | |
| 25 | |
| 26 Defendants. | |

27

28

1   LAS VEGAS REVIEW-JOURNAL, INC.,
2   a Delaware corporation,

3            Counterclaimant,
             v.

4
5   LAS VEGAS SUN, INC., a Nevada
    corporation; BRIAN GREENSPUN, an
6   individual and as the alter ego of Las Vegas
    Sun, Inc.; GREENSPUN MEDIA GROUP,
7   LLC, a Nevada limited liability company,
    as the alter ego of Las Vegas Sun, Inc.,

8
9            Counterclaim Defendants.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEFENDANTS' ANSWER TO COMPLAINT

Pursuant to Rules 7 and 8 of the Federal Rules of Civil Procedure, Defendants News+Media Capital Group LLC ("News+Media"), Las Vegas Review-Journal, Inc. ("LVRJ"), Sheldon Adelson, and Patrick Dumont hereby answer and assert defenses to the claims and allegations made by plaintiff Las Vegas Sun, Inc. ("LV Sun") in its Complaint.

### RESPONSES TO INDIVIDUAL PARAGRAPHS

Except as specifically admitted, Defendants deny the allegations in the Complaint, including without limitation the Introduction, headings, and subheadings contained within the Complaint. LV Sun's Complaint also contains footnotes. Any allegations contained in LV Sun's footnotes do not comply with Federal Rule of Civil Procedure 10(b), providing that allegations be stated "in numbered paragraphs, each limited as far as practicable to a single set of circumstances." FED. R. CIV. P. 10(b); *see also Bernath v. YouTube LLC*, 2017 WL 1050070, at *2 (M.D. Fla. Mar. 20, 2017) ("Plaintiff also alleges facts in various and lengthy footnotes that will not be considered as they are not properly stated in numbered paragraphs pursuant to Fed. R. Civ. P. 10(b)."). No response is therefore required to the Complaint's footnotes. In any event, except as expressly admitted, Defendants deny any and all allegations contained in LV Sun's footnotes.

1.      Answering the unnumbered statement labeled as "Introduction" to the Plaintiff's Complaint, the Defendants admit LVRJ's predecessor(s) and LV Sun entered into a joint operating arrangement in 1989 that was expressly approved in writing by the Department of Justice, as required by the Newspaper Preservation Act. The Defendants further admit that News+Media Capital Group LLC acquired the Review-Journal in December 2015 and members of the Adelson family own a controlling interest in News+Media Capital Group LLC. Many of the allegations contained in the "Introduction" are legal conclusions, and as such, require no response. To the extent that a response is required, the Defendants deny such allegations. In addition, the Defendants deny the remaining allegations contained in the "Introduction".

2.      Answering Paragraph "1" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

3.      Answering Paragraph "2" of the Plaintiff's Complaint, the Defendants admit that Brian Greenspun is the editor, publisher, and owner of LV Sun. The Defendants are without sufficient knowledge or information upon which to base a response to the remaining allegations in said paragraph, and therefore deny the remaining allegations contained in said paragraph.

4.      Answering Paragraph "3" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations contained in said paragraph.

5.      Answering Paragraph "4" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations contained in said paragraph.

6.      Answering Paragraph "5" of the Plaintiff's Complaint, the Defendants admit that Defendant LAS VEGAS REVIEW-JOURNAL, INC. is a Delaware corporation doing business in the State of Nevada, which operates and publishes the *Las Vegas Review-Journal*. The Defendants admit that the *Las Vegas Review-Journal* was a daily print newspaper in 1929, but its origins pre-date 1929. The Defendants deny the remaining allegations contained in said paragraph.

7.      Answering Paragraph "6" of the Plaintiff's Complaint, the Defendants admit LVRJ endorsed Donald J. Trump for President in 2016. Allegations contained in said paragraph are legal conclusions, and as such, require no response. The Defendants deny the remaining allegations contained in said paragraph.

8.      Answering Paragraph "7" of the Plaintiff's Complaint, the Defendants admit that Defendants NEWS+MEDIA GROUP LLC is a Delaware limited-liability company, which acquired LVRJ on December 10, 2015. The Defendants admit that GateHouse Media LLC continued to operate LVRJ under a management agreement that was terminated after a certain period of time and that the interim publisher was replaced with a new publisher. The Defendants deny the remaining allegations contained in said paragraph.

9.      Answering Paragraph "8" of the Plaintiffs' Complaint, the Defendants admit that Defendant Sheldon Adelson is an individual and the founder, chairman, and chief executive

1    officer of the Las Vegas Sands Corporation and, as such, influences the Las Vegas Sands

2    Corporation's business. The Defendants admit that Mr. Adelson, his family members and trusts

3    and other entities established for the benefit of Mr. Adelson and/or his family members, owned

4    approximately 56% of Las Vegas Sands Corporation's outstanding common stock as of

5    December 31, 2018. The Defendants admit that the Las Vegas Sands Corporation owns and

6    operates the Venetian Las Vegas and The Palazzo Las Vegas. The Defendants are without

7    sufficient knowledge or information upon which to base a response to the allegation comparing

8    Mr. Adelson's wealth to others contained in said paragraph, and therefore deny that allegation.

9    The Defendants deny the remaining allegations contained in said paragraph.

10         10.    Answering Paragraph "9" of the Plaintiff's Complaint, the Defendants admit that

11   News+Media Capital Group LLC acquired LVRJ in December 2015 and members of the Adelson

12   family own a controlling interest in News+Media Capital Group LLC. The Defendants deny the

13   remaining allegations contained in said paragraph.

14         11.    Answering Paragraph "10" of the Plaintiff's Complaint, the Defendants admit that

15   Mr. Adelson has made financial contributions during the referenced time period to various

16   political candidates, causes, parties, and political action committees, including those supporting

17   Republican candidates as well as President Donald J. Trump. Defendants deny the Complaint's

18   assertions or implications about Mr. Adelson's purported influence. Defendants lack sufficient

19   information to admit or deny the allegations about any "records" being broken and on that basis

20   deny them. The Defendants deny the remaining allegations contained in said paragraph.

21         12.    Answering Paragraph "11" of the Plaintiff's Complaint, the Defendants admit that

22   Patrick Dumont is a Nevada resident, a son-in-law of Defendant Sheldon Adelson, and the

23   executive vice president and chief financial officer of the Las Vegas Sands Corporation and a

24   member of its Board of Directors. The Defendants deny the remaining allegations contained in

25   said paragraph.

26         13.    Answering Paragraph "12" of the Plaintiff's Complaint, the Defendants deny the

27   allegations contained in said paragraph.

28         14.    Answering Paragraph "13" of the Plaintiff's Complaint, the allegations contained

DEFENDANTS' ANSWER AND LVRJ'S COUNTERCLAIMS

3

in said paragraph are legal conclusions, and as such, require no response. To the extent that a response is required, the Defendants deny said allegations.

15.     Answering Paragraph "14" of the Plaintiff's Complaint, the Defendants deny the merit of the allegations contained in said paragraph and the Plaintiff's claims but admit the Court has subject matter jurisdiction over the claims asserted in this action.

16.     Answering Paragraph "15" of the Plaintiff's Complaint, the Defendants are not challenging the Court's personal jurisdiction over them for purposes of the Plaintiff's Complaint.

17.     Answering Paragraph "16" of the Plaintiff's Complaint, the Defendants admit that LVRJ's collection, production, and/or distribution of its newspaper involves transactions affecting interstate commerce. The Defendants deny the remaining allegations contained in said paragraph.

18.     Answering Paragraph "17" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no response is required. To the extent any response is required, the Defendants deny the allegations contained in said paragraph.

19.     Answering Paragraph "18" of the Plaintiff's Complaint, the Defendants admit that LV Sun and Donrey of Nevada, Inc. entered into a joint operating arrangement, the 1989 JOA, and that, on information and belief, at that time LV Sun was a failing newspaper. As to the remaining allegations, the Defendants are without sufficient knowledge or information upon which to base a response to said allegations, and therefore deny said allegations.

20.     Answering Paragraph "19" of the Plaintiff's Complaint, the 1989 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph. The Defendants deny the remaining allegations contained in said paragraph.

21.     Answering Paragraph "20" of the Plaintiff's Complaint, the 1989 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph. The Defendants are without sufficient knowledge or information upon which to base a response to the remaining allegations contained in said paragraph, and

therefore deny such allegations.

22.     Answering Paragraph "21" of the Plaintiff's Complaint, the 1989 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph.

23.     Answering Paragraph "22" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations contained in said paragraph.

24.     Answering Paragraph "23" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph. Further answering, the Defendants affirmatively state that the parties terminated the 1989 JOA and replaced it with a new agreement entitled "Amended and Restated Agreement" that was dated June 10, 2005.

25.     Answering Paragraph "24" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

26.     Answering Paragraph "25" of the Plaintiff's Complaint, the 2005 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph. The Defendants deny the remaining allegations contained in said paragraph.

27.     Answering Paragraph "26" of the Plaintiff's Complaint, the 2005 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph. The Defendants deny the remaining allegations contained in said paragraph.

28.     Answering Paragraph "27" of the Plaintiff's Complaint, the Defendants admit and affirmatively state that Section 5.1, and Appendices A and B of the 2005 JOA set forth specifications that apply to LV Sun's pages and its "noticeable mention" on the front page of the Las Vegas Review Journal. Defendants further admit that the quoted language is contained in Appendix A to the 2005 JOA. The Defendants deny the remaining allegations contained in said paragraph.

29.     Answering Paragraph "28" of the Plaintiff's Complaint, the Defendants admit that

the language quoted in said paragraph is contained in Section 5.1.4 if the 2005 JOA. The 2005 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph. The Defendants deny the remaining allegations contained in said paragraph.

30.    Answering Paragraph "29" of the Plaintiff's Complaint, the Defendants admit that the language quoted in said paragraph is contained in the 2005 JOA. The 2005 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph. The Defendants deny the remaining allegations contained in said paragraph.

31.    Answering Paragraph "30" of the Plaintiff's Complaint, the 2005 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph. The Defendants deny the remaining allegations contained in said paragraph.

32.    Answering Paragraph "31" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

33.    Answering Paragraph "32" of the Plaintiff's Complaint, the 2005 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph. The Defendants affirmatively state that the 2005 JOA purports to be effective for the stated period but, as alleged below, it is an unenforceable agreement. The Defendants deny the remaining allegations contained in said paragraph.

34.    Answering Paragraph "33" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

35.    Answering Paragraph "34" of the Plaintiff's Complaint, the 2005 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph. The Defendants are without sufficient knowledge or information upon which to base a response to the allegations regarding the parties' intent contained in said paragraph, and therefore deny such allegations. The Defendants deny the allegations contained in said paragraph.

36.     Answering Paragraph "35" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

37.     Answering Paragraph "36" of the Plaintiff's Complaint, the Defendants admit that the LVRJ (and many other quality local daily print newspapers, though the printed *Sun* is not a quality newspaper) supplies readers with national, state, and local news and sports information in a timely manner. The Defendants affirmatively state that LVRJ competes for readers with other sources of news, including but not limited to radio news, television news, and Internet news. The Defendants deny the remaining allegations contained in said paragraph.

38.     Answering Paragraph "37" of the Plaintiff's Complaint, the allegations contained in said paragraph are legal conclusions, and as such, require no response. To the extent that a response is required, the Defendants deny said allegations.

39.     Answering Paragraph "38" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph as they relate to LVRJ. The Defendants admit that LV Sun is published and distributed in or near Clark County, Nevada and affirmatively state that the printed *Sun* insert contains limited, typically stale local news because LV Sun hoards its original and most timely local content for use on its separate news website. The Defendants are without sufficient knowledge or information upon which to base a response to said paragraph as it relates to the remaining allegations concerning LV Sun, and therefore deny the allegations in said paragraph. The Defendants deny the remaining allegations contained in said paragraph.

40.     Answering Paragraph "39" of the Plaintiff's Complaint, certain of the allegations contained in said paragraph are legal conclusions, and as such, require no response. To the extent that a response is required, the Defendants deny said allegations. The Defendants deny the remaining allegations contained in said paragraph.

41.     Answering Paragraph "40" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

42.     Answering Paragraph "41" of the Plaintiff's Complaint, the Defendants admit that the print *Review-Journal*, which contains the print *Sun* insert, accounts for 100% of the circulation of locally-published daily newspapers in Clark County, Nevada. The Defendants affirmatively

state that daily newspapers from other cities, as well as regional and national newspapers, are also distributed and sold in Clark County, Nevada. The Defendants admit that LVRJ has a paid circulation for Sunday of 86,038 and an average daily (non-Sunday) paid circulation of 67,347 as of June 30, 2019. The allegations regarding monopoly power, market power, and the relevant market contained in said paragraph are legal conclusions, and as such, require no response. To the extent that a response is required, the Defendants deny said allegations. The Defendants deny the remaining allegations contained in said paragraph.

43.    Answering Paragraph "42" of the Plaintiff's Complaint, the Defendants deny the allegations in said paragraph.

44.    Answering Paragraph "43" of the Plaintiff's Complaint, the Defendants admit that local newspapers incur fixed costs. The allegation regarding barriers to entry contained in said paragraph is a legal conclusion, and as such, require no response. To the extent that a response is required, the Defendants deny said allegations. The Defendants deny the remaining allegations contained in said paragraph.

45.    Answering Paragraph "44" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response as to the allegations regarding the lack of any printing facility in Clark County, Nevada other than LVRJ's printing facility contained in said paragraph, and therefore deny that allegation. The Defendants deny the remaining allegations contained in said paragraph.

46.    Answering Paragraph "45" of the Plaintiff's Complaint, the allegation regarding barriers to entry contained in said paragraph is a legal conclusion, and as such, require no response. To the extent that a response is required, the Defendants deny said allegations. The Defendants deny the remaining allegations contained in said paragraph.

47.    Answering Paragraph "46" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations contained in said paragraph.

48.    Answering Paragraph "47" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph,

and therefore deny the allegations in said paragraph. The allegation regarding harm to competition contained in said paragraph is a legal conclusion, and as such, require no response. To the extent that a response is required, the Defendants deny said allegation.

49.     Answering Paragraph "48" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

50.     Answering Paragraph "49" of the Plaintiff's Complaint, the Defendants admit that News+Media Capital Group LLC acquired the Review-Journal in December 2015 and members of the Adelson family own a controlling interest in News+Media Capital Group LLC. The Defendants deny the remaining allegations contained in said paragraph.

51.     Answering Paragraph "50" of the Plaintiff's Complaint, the Defendants admit that the Adelson family released the statement referenced in said paragraph. The Defendants deny the remaining allegations contained in said paragraph.

52.     Answering Paragraph "51" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

53.     Answering Paragraph "52" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to the quotations contained in said paragraph, and therefore deny those allegations in said paragraph. The Defendants deny the remaining allegations contained in said paragraph.

54.     Answering Paragraph "53" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

55.     Answering Paragraph "54" of the Plaintiff's Complaint, the 2005 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph. The Defendants admit that LV Sun, often via Brian Greenspun's editorials, gratuitously features pieces that take aim at Mr. Adelson as part of Mr. Greenspun's scheme to monopolize speech in Las Vegas and to undermine those who disagree with him. The Defendants deny the remaining allegations contained in said paragraph.

56.     Answering Paragraph "55" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

57.     Answering Paragraph "56" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

58.     Answering Paragraph "57" of the Plaintiff's Complaint, the Defendants affirmatively state that after News+Media Capital Group LLC acquired the Review-Journal in December 2015, Jason Taylor served as publisher, from December 2015 until January 2016. The Defendants are without sufficient knowledge or information upon which to base a response to the remaining allegations contained in said paragraph, and therefore deny those allegations in said paragraph.

59.     Answering Paragraph "58" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

60.     Answering Paragraph "59" of the Plaintiff's Complaint, the Defendants affirmatively state that Jason Taylor created an unreasonable assessment of the anticipated advertising revenues for LVRJ. The Defendants deny the remaining allegations and characterizations contained in said paragraph.

61.     Answering Paragraph "60" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

62.     Answering Paragraph "61" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

63.     Answering Paragraph "62" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

64.     Answering Paragraph "63" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

65.     Answering Paragraph "64" of the Plaintiff's Complaint, the Defendants admit that Craig Moon replaced Jason Taylor at LVRJ. The Defendants deny the remaining allegations contained in said paragraph.

66.     Answering Paragraph "65" of the Plaintiff's Complaint, the Defendants admit that a meeting was held on or about January 25, 2017, to preview financial results for the end of the fiscal year, in which Craig Moon, Robert Cauthorn (LV Sun's COO), Brian Greenspun, and Frank

Vega were in attendance. The Defendants further admit that, at that meeting, LV Sun was informed that, despite LVRJ's best efforts, LVRJ's profits, and LV Sun's annual profits payments, were expected to significantly decrease as a result of industry-wide conditions and disappointing performance of LVRJ. The Defendants deny the remaining allegations contained in said paragraph.

67.    Answering Paragraph "66" of the Plaintiff's Complaint, the Defendants affirmatively state that shortly after the Adelson family obtained control of LVRJ, Brian Greenspun began agitating to be bought out of the 2005 JOA, and tried to persuade LVRJ to collaborate with him in his plans to monopolize other segments of the market for printed media in Clark County, Nevada, and, after LVRJ rejected Mr. Greenspun's demand for $20 million to make him go away, turned to attacks against LVRJ. The Defendants deny the remaining allegations contained in said paragraph.

68.    Answering Paragraph "67" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

69.    Answering Paragraph "68" of the Plaintiff's Complaint, the Defendants admit that LVRJ, due to a lack of profits, has not made any JOA-related profit payments to LV Sun since the end of the 2017 fiscal year. The Defendants deny the remaining allegations contained in said paragraph.

70.    Answering Paragraph "69" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

71.    Answering Paragraph "70" of the Plaintiff's Complaint, the Defendants affirmatively state that LVRJ's EBITDA information constitutes confidential commercial information that has been produced in this case subject to the terms of the Court's protective order and, therefore, will not respond to the allegations related to that information contained in said paragraph. The Defendants deny the remaining allegations contained in said paragraph.

72.    Answering Paragraph "71" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

73.    Answering Paragraph "72" of the Plaintiff's Complaint, the Defendants

affirmatively state that LVRJ's EBITDA information constitutes confidential commercial information that has been produced in this case subject to the terms of the Court's protective order and, therefore, will not respond to the allegations related to that information contained in said paragraph. The Defendants deny the remaining allegations contained in said paragraph.

74.     Answering Paragraph "73" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations contained in said paragraph.

75.     Answering Paragraph "74" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

76.     Answering Paragraph "75" of the Plaintiff's Complaint, the 2005 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph.

77.     Answering Paragraph "76" of the Plaintiff's Complaint, Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations contained in said paragraph.

78.     Answering Paragraph "77" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

79.     Answering Paragraph "78" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

80.     Answering Paragraph "79" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations contained in said paragraph.

81.     Answering Paragraph "80" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

82.     Answering Paragraph "81" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations contained in said paragraph.

83.     Answering Paragraph "82" of the Plaintiff's Complaint, the Defendants deny the

1   allegations contained in said paragraph.

2       84.   Answering Paragraph "83" of the Plaintiff's Complaint, the Defendants deny the

3   allegations contained in said paragraph.

4       85.   Answering Paragraph "84" of the Plaintiff's Complaint, the 2005 JOA, including

5   Appendix B, speaks for itself. The Defendants deny the unnecessary and incomplete

6   characterizations and allegations contained in said paragraph.

7       86.   Answering Paragraph "85" of the Plaintiff's Complaint, the Defendants deny the

8   allegations contained in said paragraph.

9       87.   Answering Paragraph "86" of the Plaintiff's Complaint, the Defendants admit that

10  LVRJ informed the Plaintiff in March 2017 that it would be publishing the *Las Vegas Review-

11  Journal* with a redesigned front page commencing with the beginning of April 2017. Defendants

12  further affirmatively state that the redesigned front page was in full compliance with the

13  provisions of the 2005 JOA. The Defendants deny the remaining allegations and characterizations

14  contained in said paragraph.

15      88.   Answering Paragraph "87" of the Plaintiff's Complaint, the Defendants admit that

16  the *Las Vegas Review-Journal* was published with a redesigned front page at the beginning of

17  April 2017. The Defendants further affirmatively state that the redesigned front page was and is

18  in compliance with the 2005 JOA. The Defendants deny the remaining allegations and

19  characterizations contained in said paragraph.

20      89.   Answering Paragraph "88" of the Plaintiff's Complaint, the Defendants admit the

21  image in said paragraph depicts a portion of the front page of the *Las Vegas Review-Journal*

22  published on March 31, 2017. The Defendants deny the remaining allegations contained in said

23  paragraph.

24      90.   Answering Paragraph "89" of the Plaintiff's Complaint, the Defendants admit the

25  image in said paragraph depicts a portion of the front page of the *Las Vegas Review-Journal*

26  published on April 2, 2017, and affirmatively state that the Sun Box was subsequently modified

27  shortly after April 2, 2017. The Defendants deny the remaining allegations contained in said

28  paragraph.

DEFENDANTS' ANSWER AND LVRJ'S COUNTERCLAIMS

13

91.     Answering Paragraph "90" of the Plaintiff's Complaint, the 2005 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph.

92.     Answering Paragraph "91" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

93.     Answering Paragraph "92" of the Plaintiff's Complaint, the Defendants admit that the redesigned front page of the *Las Vegas Review-Journal* has been published from April 2017 to the present. The Defendants deny the remaining allegations and characterizations contained in said paragraph.

94.     Answering Paragraph "93" of the Plaintiff's Complaint, the Defendants affirmatively state that advertising stickers have, on occasion, inadvertently covered a portion of LV Sun's front-page content due to unintended mechanical errors with the machine used to apply the advertising stickers. The Defendants deny the remaining characterizations and allegations contained in said paragraph.

95.     Answering Paragraph "94" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

96.     Answering Paragraph "95" of the Plaintiff's Complaint, the 2005 JOA speaks for itself. The Defendants deny the unnecessary and incomplete characterizations and allegations contained in said paragraph.

97.     Answering Paragraph "96" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations contained in said paragraph.

98.     Answering Paragraph "97" of the Plaintiff's Complaint, the Defendants admit that the electronic replica edition did not include the *Sun* insert for a period of time after LV Sun was in material breach of the 2005 JOA. The Defendants deny the remaining allegations and characterizations contained in said paragraph.

99.     Answering Paragraph "98" of the Plaintiff's Complaint, the Defendants admit that Keith Moyer called Robert Cauthorn in or about early May 2019 to inform him that LVRJ had

1  restored or would shortly restore the *Sun* insert to the electronic replica edition to reverse a

2  decision by LVRJ's prior publisher, Craig Moon. The Defendants deny the remaining allegations

3  and characterizations contained in said paragraph.

4       100.    Answering Paragraph "99" of the Plaintiff's Complaint, the Defendants deny the

5  allegations contained in said paragraph.

6       101.    Answering Paragraph "100" of the Plaintiff's Complaint, the Defendants deny the

7  allegations contained in said paragraph.

8       102.    Answering Paragraph "101" of the Plaintiff's Complaint, the Defendants admit

9  that the Plaintiff, through its lawyers, sent to LVRJ a letter on or about May 12, 2016, purporting

10  to be its 30-day notice of intent to examine and audit LVRJ's books and records. The Defendants

11  further admit that the Plaintiff stated that its "audit request" was made pursuant to Appendix D of

12  the 2005 JOA. The Defendants deny any remaining allegations and characterizations contained

13  in said paragraph.

14       103.    Answering Paragraph "102" of the Plaintiff's Complaint, the Defendants admit

15  that LVRJ received a list of the documentation which the Plaintiff was requesting. The Defendants

16  further admit and affirmatively state that LVRJ responded in July 2016 to the Plaintiff's "request"

17  by way of a letter from its counsel objecting to the Plaintiff's request as being outside the scope

18  of the Plaintiff's rights under the 2005 JOA. The Defendants deny the remaining allegations and

19  characterizations contained in said paragraph.

20       104.    Answering Paragraph "103" of the Plaintiff's Complaint, the Defendants admit the

21  parties attempted to informally negotiate regarding the documents. The Defendants deny the

22  remaining allegations contained in said paragraph.

23       105.    Answering Paragraph "104" of the Plaintiff's Complaint, the Defendants admit

24  that on September 5, 2017, the Plaintiff once again made a formal demand to conduct an audit

25  inconsistent with the audit set forth in the 2005 JOA and that LVRJ rejected the request on the

26  grounds that it "far exceed[ed] the limited audit provisions of the JOA" but agreed to gather

27  relevant information for production in due course. The Defendants further admit that on

28  November 28, 2017, LVRJ had agreed to produce certain categories of documents requested by

the Plaintiff. The Defendants deny the remaining allegations contained in said paragraph as worded.

106.    Answering Paragraph "105" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

107.    Answering Paragraph "106" of the Plaintiff's Complaint, the Defendants admit that the anticipated production of documents and information to LV Sun did not occur within the first two weeks of January 2018, due to logistical obstacles. Defendants further admit that it subsequently agreed to share with LV Sun additional records and information (beyond that to which LV Sun was actually entitled), and made arrangements to begin LV Sun's audit on January 23, 2018. The Defendants deny the remaining allegations and characterizations contained in said paragraph.

108.    Answering Paragraph "107" of the Plaintiff's Complaint, Defendants deny the allegations contained in said paragraph.

109.    Answering Paragraph "108" of the Plaintiff's Complaint, the Defendants admit that, after the arbitration result, News+Media and LVRJ moved to amend their answer and assert a counterclaim in the state court action to, among other things, terminate the 2005 JOA, a request which the state court granted. The Defendants deny the remaining allegations and characterizations contained in said paragraph.

110.    Answering Paragraph "109" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

111.    Answering Paragraph "110" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

112.    Answering Paragraph "111" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

113.    Answering Paragraph "112" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

114.    Answering Paragraph "113" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to the allegations

1   regarding the Plaintiff's operations contained in said paragraph, and therefore deny the allegations

2   in said paragraph. The Defendants deny the remaining allegations and characterizations contained

3   in said paragraph.

4     115. Answering Paragraph "114" of the Plaintiff's Complaint, the Defendants deny the

5   allegations in said paragraph.

6     116. Answering Paragraph "115" of the Plaintiff's Complaint, the Defendants are

7   without sufficient knowledge or information upon which to base a response to the allegations

8   regarding circulation contained in said paragraph, and therefore deny the allegations in said

9   paragraph. The Defendants deny the remaining allegations and characterizations contained in said

10   paragraph.

11     117. Answering Paragraph "116" of the Plaintiff's Complaint, the Defendants deny the

12   allegations contained in said paragraph.

13     118. Answering Paragraph "117" of the Plaintiff's Complaint, the Defendants are

14   without sufficient knowledge or information upon which to base a response to said paragraph,

15   and therefore deny the allegations in said paragraph.

16     119. Answering Paragraph "118" of the Plaintiff's Complaint, the Defendants deny the

17   allegations contained in said paragraph.

18   **FIRST CLAIM FOR RELIEF**

19   **(Violation of Section 2 of the Sherman Act – Monopolization, 15 U.S.C. § 2)**

20     120. Answering Paragraph "119" of the Plaintiff's Complaint, the Defendants hereby

21   reallege and incorporate by reference as though set forth herein, the responses contained in the

22   paragraphs above.

23     121. Answering Paragraph "120" of the Plaintiff's Complaint, the allegations in such

24   paragraphs are legal conclusions to which no response is required. To the extent any response is

25   required, the Defendants deny the allegations contained in said paragraph.

26     122. Answering Paragraph "121" of the Plaintiff's Complaint, the allegations in such

27   paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory

28   language, to which no response is required. To the extent any response is required, the Defendants

deny the allegations contained in said paragraph.

123.     Answering Paragraph "122" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

124.     Answering Paragraph "123" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

125.     Answering Paragraph "124" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

126.     Answering Paragraph "125" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions to which no response is required. To the extent any response is required, the Defendants deny the allegations contained in said paragraph.

127.     Answering Paragraph "126" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

128.     Answering Paragraph "127" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

## SECOND CLAIM FOR RELIEF

**(Violation of Section 2 of the Sherman Act – Attempted Monopolization, 15. U.S.C. § 2)**

129.     Answering Paragraph "128" of the Plaintiff's Complaint, the Defendants hereby reallege and incorporate by reference as though fully set forth herein, the responses contained in the paragraphs above.

130.     Answering Paragraph "129" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions to which no response is required. To the extent any response is required, the Defendants deny the allegations contained in said paragraph.

131.     Answering Paragraph "130" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no response is required. To the extent any response is required, the Defendants deny the allegations contained in said paragraph.

132.     Answering Paragraph "131" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

133.     Answering Paragraph "132" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph, as worded.

134.     Answering Paragraph "133" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

135.     Answering Paragraph "134" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

136.     Answering Paragraph "135" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

137.     Answering Paragraph "136" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

138.     Answering Paragraph "137" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

## THIRD CLAIM FOR RELIEF

**(Violation of Section 2 of the Sherman Act – Conspiracy to Monopolize, 15 U.S.C. § 2)**

139.     Answering Paragraph "138" of the Plaintiff's Complaint, the Defendants reallege and reincorporate by reference as though fully set forth herein, the responses contained in the paragraphs above.

140.     Answering Paragraph "139" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

141.     Answering Paragraph "140" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

142.     Answering Paragraph "141" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

143.     Answering Paragraph "142" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

144.     Answering Paragraph "143" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

145.     Answering Paragraph "144" of the Plaintiff's Complaint, the Defendants deny the

allegations contained in said paragraph.

146.    Answering Paragraph "145" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions to which no response is required. To the extent any response is required, the Defendants deny the allegations contained in said paragraph.

147.    Answering Paragraph "146" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

148.    Answering Paragraph "147" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

## FOURTH CLAIM FOR RELIEF

### (Violation of Section 7 of the Clayton Act – 15 U.S.C. § 18)

149.    Answering Paragraph "148" of the Plaintiff's Complaint, the Defendants hereby reallege and incorporate by reference as though fully set forth herein, the responses contained in the paragraphs above.

150.    Answering Paragraph "149" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions to which no response is required. To the extent any response is required, the Defendants deny the allegations contained in said paragraph.

151.    Answering Paragraph "150" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

152.    Answering Paragraph "151" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

153.    Answering Paragraph "152" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions to which no response is required. To the extent any response is required, the Defendants deny the allegations in said paragraph. The Defendants deny that Plaintiff is entitled to any of the relief it seeks.

## FIFTH CLAIM FOR RELIEF

### (Violation of Nevada Unfair Trade Practices Act – NRS 598A)

154.    Answering Paragraph "153" of the Plaintiff's Complaint, the Defendants hereby reallege and incorporate by reference as though fully set forth herein, the responses contained in

1    the paragraphs above.

2        155.    Answering Paragraph "154" of the Plaintiff's Complaint, the allegations in such

3    paragraph are legal conclusions to which no response is required. To the extent any response is

4    required, the Defendants deny the allegations contained in said paragraph.

5        156.    Answering Paragraph "155" of the Plaintiff's Complaint, the Defendants deny the

6    allegations contained in said paragraph.

7        157.    Answering Paragraph "156" of the Plaintiff's Complaint, the Defendants deny the

8    allegations contained in said paragraph.

9        158.    Answering Paragraph "157" of the Plaintiff's Complaint, the Defendants deny the

10   allegations contained in said paragraph.

11                                **JURY TRIAL DEMANDED**

12       159.    Answering Paragraph "158" of the Plaintiff's Complaint, said paragraph contains

13   the Plaintiff's demand for a jury trial on its claims for relief and requires no response. To the

14   extent the Plaintiff's jury trial demand requires a response, the Defendants deny that the Plaintiff

15   has stated any viable claim for relief that may be heard and considered by a jury.

16                                **PRAYER FOR RELIEF**

17       160.    Answering the provisions of the Plaintiff's Complaint designated as its "Prayer for

18   Relief", the statements contained therein constitute descriptions of the remedies sought by the

19   Plaintiff and require no response. To the extent the Plaintiff's Prayer for Relief requires a

20   response, the Defendants deny that the Plaintiff is entitled to any of the relief it seeks from the

21   Court.

22                         *        *        *

23       Defendants deny any allegation not specifically admitted.

24       Defendants deny all argument and any allegation made in the headings of LV Sun's

25   complaint.

26   / / /

27

28   / / /

DEFENDANTS' ANSWER AND LVRJ'S COUNTERCLAIMS

21

**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**

Plaintiff fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

Plaintiff's claims fail because the 2005 JOA is an unenforceable agreement due to it never being expressly approved in writing by the Attorney General of the United States and because the requested relief is barred by 15 U.S.C. 43, *et seq.*

**THIRD AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred because they are a sham and violate the Sherman Act.

**FOURTH AFFIRMATIVE DEFENSE**

LVRJ's performance under the 2005 JOA is excused by Plaintiff's prior material breaches of the 2005 JOA.

**FIFTH AFFIRMATIVE DEFENSE**

LVRJ's performance under the 2005 JOA is excused by the lack and/or failure of consideration.

**SIXTH AFFIRMATIVE DEFENSE**

LVRJ's performance under the 2005 JOA is excused by *force majeure*.

**SEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred by res judicata, collateral estoppel, claim prelusion and/or issue preclusion.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

**TENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

**ELEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

1                    **TWELTH AFFIRMATIVE DEFENSE**

2          Plaintiff's claims are barred, in whole or in part, by the doctrine of setoff.

3                  **THIRTEENTH AFFIRMATIVE DEFENSE**

4          Plaintiff's claims are barred, in whole or in part, by a failure of a condition.

5                  **FOURTEENTH AFFIRMATIVE DEFENSE**

6          The Defendants' obligations were excused by Plaintiff's conduct.

7                  **FIFTEENTH AFFIRMATIVE DEFENSE**

8          Plaintiff's claims fail for the want of any controversy as Plaintiff already settled its claims

9  with LVRJ and/or its predecessors.

10                **SIXTEENTH AFFIRMATIVE DEFENSE**

11         Plaintiff's claims are barred by the applicable statute of limitations.

12               **SEVENTEENTH AFFIRMATIVE DEFENSE**

13         The Complaint is barred, in whole or in part, by the doctrines of acquiescence, unclean

14  hands, unjust enrichment and/or ratification, as well as other applicable equitable doctrines.

15               **EIGHTEENTH AFFIRMATIVE DEFENSE**

16         Plaintiff's claims are barred, in whole or part, by payment.

17              **NINETEENTH AFFIRMATIVE DEFENSE**

18         Plaintiff's claims are barred, in whole or part, by mistake.

19              **TWENTIETH AFFIRMATIVE DEFENSE**

20         Plaintiff's claims are barred, in whole or part, by ratification.

21           **TWENTY-FIRST AFFIRMATIVE DEFENSE**

22         Plaintiff's claims for punitive damages are barred because none of the alleged acts or

23  omissions was or is malicious, willful, wanton, reckless, or grossly negligent.

24          **TWENTY-SECOND AFFIRMATIVE DEFENSE**

25         Any alleged damages allegedly incurred by Plaintiff are the result of acts and omissions

26  of persons other than Defendants and therefore any alleged acts or omissions of the Defendants

27  did not proximately cause Plaintiff's alleged damages.

28

1

### TWENTY-THIRD AFFIRMATIVE DEFENSE

2    Plaintiff failed to mitigate its alleged damages.

3

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

4    Defendants' performance is excused by the doctrines of commercial frustration and/or

5    frustration of purpose.

6

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

7    Defendants' performance is excused under section 8.2 of the parties' agreement because

8    of events substantially beyond their control.

9

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

10    Pursuant to Federal Rule of Civil Procedure 11, at the time of the filing of this Answer,

11    all possible affirmative defenses may not have been alleged inasmuch as sufficient facts and other

12    relevant information may not have been available after reasonable inquiry, and therefore the

13    Defendants reserve their right to amend this Answer to allege additional affirmative defenses if

14    subsequent investigation warrants the same.

15    / / /

16

17

18

19    / / /

20

21

22

23    / / /

24

25

26

27    / / /

28

## **PRAYER FOR RELIEF**

WHEREFORE, the Defendants pray for relief as follows:

1.      Dismissal of Plaintiff's Complaint with prejudice;

2.      An award of reasonable attorney's fees and costs to the Defendants for their defense of this matter; and

3.      For such other relief as the Court deems just and proper.

Dated: January 4, 2021

                                        KEMP JONES, LLP

                                        */s/ Michael Gayan*

                                        J. RANDALL JONES, ESQ., SBN 1927
                                        MICHAEL J. GAYAN, ESQ., SBN 11135
                                        MONA KAVEH, ESQ., SBN 11825
                                        3800 Howard Hughes Parkway, 17th Floor
                                        Las Vegas, Nevada 89169

                                        RICHARD L. STONE, ESQ. (*pro hac vice*)
                                        DAVID R. SINGER, ESQ. (*pro hac vice*)
                                        AMY M. GALLEGOS, ESQ. (*pro hac vice*)
                                        JENNER & BLOCK LLP
                                        633 West 5th Street, Suite 3600
                                        Los Angeles, California 90071

                                        *Attorneys for Defendants and*
                                        *Counterclaimant*

/ / /

/ / /

/ / /

## **LAS VEGAS REVIEW-JOURNAL, INC.'S COUNTERCLAIMS**

Defendant and Counterclaimant Las Vegas Review-Journal, Inc. ("LVRJ"), on personal knowledge as to its own acts, and on information and belief as to all other facts, alleges the following Counterclaims against Plaintiff and Counterclaim Defendants Las Vegas Sun, Inc. ("LV Sun"), Brian Greenspun, both as an individual and as LV Sun's alter ego, and Greenspun Media Group, LLC ("GMG") as LV Sun's alter ego.

### **NATURE OF THE ACTION**

1. When the *Las Vegas Review-Journal*'s ("*Review-Journal*") current owners purchased the newspaper and succeeded to the joint operating arrangement ("JOA") between the *Review-Journal* and the *Las Vegas Sun*, LV Sun's and GMG's owner, multimillionaire media magnate Brian Greenspun, almost immediately began pestering the new owners to buy him out of the JOA for tens of millions of dollars. The new owners rejected Mr. Greenspun's exorbitant demand. Mr. Greenspun then offered to accept less cash for a buyout, but demanded that the LVRJ and Mr. Greenspun's company, GMG, agree to divide the Clark County printed media market between them. The LVRJ rejected Mr. Greenspun's proposal and refused to collaborate with his illegal market-allocation scheme. Frustrated and angry, Mr. Greenspun launched a barrage of anti-competitive conduct against the LVRJ—including deliberately degrading the *Sun*, sabotaging the joint operation, coercing the LVRJ to continue to financially support LV Sun pursuant to a JOA the Counterclaim Defendants know is unenforceable, and filing a sham antitrust lawsuit based on the unenforceable JOA.

2. Mr. Greenspun likes to portray himself as a man of the people speaking "truth to power." In truth, Mr. Greenspun abuses his power and wealth to advance his own agenda—including the litany of anti-competitive and predatory conduct described in detail below. Indeed, Mr. Greenspun was born into the kind of wealth most Americans can only dream about. A few years ago, he sold a Malibu mansion for $25 million; he recently completed the sale of a cannabis business he partly owned for nearly a third of a billion dollars; and the Greenspun family's land holdings in Nevada are legendary. Mr. Greenspun inherited the *Sun*—the newspaper his father built—and proceeded to waste millions upon millions of dollars through mismanagement, to the

1   point where his brother and his two sisters attempted to end LV Sun's JOA with the LVRJ to take

2   the paper out of his hands. In response, Mr. Greenspun filed a lawsuit, claiming that his siblings

3   were engaged in an antitrust conspiracy against him.

4       3.    After that case ended, Mr. Greenspun assumed full control over the *Sun*. Now, he

5   uses the paper as his personal mouthpiece, advocating for his businesses and attempting to bolster

6   his political allies and quash negative coverage about them. Mr. Greenspun's track record of

7   quashing negative coverage of his friends and promoting his political allies is no secret. Jon

8   Ralston—one of the most prominent political writers in Nevada—famously resigned from the

9   *Sun* after Mr. Greenspun killed a column Mr. Ralston wrote that was critical of then-Senator Harry

10   Reid (an ally of Mr. Greenspun's and the father of Mr. Greenspun's long-time lawyer).

11       4.    Mr. Greenspun hates the *Review-Journal*. He considers it his "lifelong nemesis"

12   because it offers an editorial viewpoint that competes with his own, a circumstance that existed

13   well before the *Review-Journal* was acquired by the Adelson family through News+Media

14   Capital Group LLC ("News+Media"). Greenspun also resents the fact that LV Sun cannot

15   financially support itself and, in 1989, had to enter a JOA in which the *Review-Journal* props up

16   the *Sun* in order for the *Sun* to remain in existence. The JOA has been a huge success for LV Sun.

17   In particular, the new JOA entered in 2005, which replaced the 1989 JOA and which converted

18   the *Sun*'s daily edition to a *Sun*-branded insert in the *Review-Journal*, increased the *Sun*'s

19   circulation by 700 percent. Additionally, the 2005 JOA required the LVRJ to shoulder *all* of LV

20   Sun's non-editorial costs, meaning that LV Sun contributes *no money at all* to selling advertising,

21   or to producing or distributing the joint media product. Instead, it free-rides on the LVRJ for

22   circulation and all of LV Sun's business expenses. Even though the JOA has given him a huge

23   and virtually free platform to advocate for his political views and business interests, Mr.

24   Greenspun has never been able to see past his hatred of the *Review-Journal*. At no point has he

25   ever been satisfied with the *Review-Journal*'s actions as a JOA partner (regardless of who owned

26   it) or with the amount of money he has made under the JOA.

27       5.    Shortly after the Adelson family purchased the *Review-Journal* through

28   News+Media, Mr. Greenspun began agitating to be bought out of the JOA, trying to persuade the

LVRJ to collaborate with him in his plans to monopolize other segments of the market for printed media in Clark County. He tried to secure the LVRJ's agreement to an illegal market allocation proposal and then, later, an illegal no-poach-of-employees agreement. When the LVRJ refused to participate in Mr. Greenspun's anti-competitive proposals, he demanded more and more money to end the JOA and insinuated that the LVRJ would be sorry if it did not buy him out—warning, ominously, that it would take "$20 million to make me go away."

6.      The LVRJ did not pay, and Mr. Greenspun turned his anti-competitive attacks against his JOA partner. He started working to sabotage the joint media product and divert readers to his separate website, LasVegasSun.com, which is outside of the JOA. He did this by stuffing the printed *Sun* insert with recycled wire-service stories and syndicated content, while hoarding breaking local news stories and running them only on his separate website. Then, he ran advertisements in the newspaper telling readers that all of LV Sun's best content was on the *Sun* website. In an astonishing act of betrayal, Mr. Greenspun went so far as to publish a "Note to Readers," urging people not to buy the *Review-Journal/Sun* joint newspaper, but to subscribe to the *Sun*'s website instead. Because the JOA requires the LVRJ to bear all of the business costs of both the *Sun* and the *Review-Journal*, the LVRJ was effectively forced to pay to publish and distribute these messages from Mr. Greenspun that were designed to *drive customers away* from the joint media product.

7.      LV Sun's actions to sabotage the joint media product breached the 2005 JOA. However, when the LVRJ tried to exercise its right to terminate the 2005 JOA due to LV Sun's material breaches—which the 2005 JOA expressly allows—LV Sun filed a sham antitrust lawsuit. In that suit, LV Sun contended that it would violate antitrust law to terminate a JOA that was authorized under the Newspaper Preservation Act ("NPA"). It would not. Moreover, the NPA expressly states that a newspaper JOA entered after 1970 is unlawful and unenforceable if it is not approved in writing by the DOJ. *See* 15 U.S.C. § 1803(b). The 2005 JOA was never approved in writing by the DOJ, a fact LV Sun knew when it filed its lawsuit but which it concealed from the Court. LV Sun's antitrust lawsuit is a complete sham, designed to coerce the LVRJ to continue bankrolling LV Sun even as LV Sun actively works against the interests of the joint newspaper

and tries to punish the LVRJ for publishing an editorial viewpoint and business viewpoints that Mr. Greenspun does not like.

8.      LV Sun's predatory conduct violates the Sherman Act and other laws. It has harmed competition for the sale of newspapers in Clark County and threatened the viability of the print *Review-Journal* in the relevant market alleged by the Sun in its complaint. Accordingly, the LVRJ has been forced to file these counterclaims and seek remedies for LV Sun's illegal conduct including, among other things, treble damages and a judicial declaration that the 2005 JOA is not enforceable and/or that the LVRJ is entitled to terminate the 2005 JOA due to LV Sun's material breaches.

## PARTIES, JURISDICTION, AND VENUE

9.      Counterclaimant LVRJ is a Delaware corporation with its principal place of business in Las Vegas, Nevada. It is the owner and publisher of the print and online *Review-Journal* newspaper, which primarily serves the metropolitan Las Vegas area.

10.      Counterclaim Defendant LV Sun is a Nevada corporation with its principal place of business in Henderson, Nevada. It is the owner and publisher of the *Sun* print and online newspaper, which also serves metropolitan Las Vegas.

11.      Counterclaim Defendant GMG is a Nevada limited liability corporation with its principal place of business in Henderson, Nevada. It is the corporate parent of LV Sun.

12.      Counterclaim Defendant Brian Greenspun is the CEO, Editor, and Publisher of the *Las Vegas Sun*, and the ultimate owner of GMG. He resides in Henderson, Nevada.

13.      This Court has subject-matter jurisdiction over the LVRJ's federal antitrust claims pursuant to 28 U.S.C. § 1331. It has supplemental jurisdiction over the LVRJ's state-law claims pursuant to 28 U.S.C. § 1367. Finally, it has jurisdiction over the LVRJ's declaratory relief claims under 28 U.S.C. § 2201, *et seq.*

14.      This Court has personal jurisdiction over LV Sun because it submitted to this Court's jurisdiction by filing its complaint. Moreover, each of the Counterclaim Defendants reside or maintain offices in, transact business in, and own substantial assets in this District.

15.     Venue is proper in this District because LV Sun filed its complaint in this Court, and because LV Sun, GMG and Mr. Greenspun reside in this District.

16.     LV Sun pays for wire-service content from around the country, and it is carried as part of the joint *Review-Journal/Sun* newspaper, which depends on the purchase of materials transacted in interstate commerce. Thus, Counterclaim Defendants' violations of antitrust laws involve and affect interstate commerce.

## ALTER EGO ALLEGATIONS

### A.     GMG is LV Sun's alter ego.

17.     LV Sun is GMG's wholly owned subsidiary. Both entities are ultimately owned and controlled by Mr. Greenspun, who has publicly stated that he operates his various media enterprises collectively. Mr. Greenspun has acknowledged that both LV Sun's and GMG's employees are ultimately his own.

18.     GMG owns, directly or through subsidiaries, LV Sun, media websites—including LasVegasSun.com—and weekly magazines. GMG also employs LV Sun's personnel and highest level executives.

19.     Mr. Greenspun commingles the finances of the various media entities under GMG's umbrella. GMG also improperly allocates expenses to the printed *Sun* instead of *Sun* website to inflate the profitability of the website and to make the *Sun* paper appear less profitable.

20.     Adhering to the fiction that GMG and LV Sun are separate entities would sanction fraud and promote injustice because GMG is the pertinent actor for much of the misconduct alleged in these claims.

### B.     Mr. Greenspun is LV Sun's alter ego.

21.     Mr. Greenspun owns GMG, including LV Sun, GMG's wholly owned subsidiary. The *Sun* is a puppet and mouthpiece for Mr. Greenspun. He uses the *Sun* to promote his personal political agenda and business interests. For example, before selling the cannabis business described above, Mr. Greenspun used the *Sun* to advocate for the liberalization of Nevada's marijuana laws.

22.     Mr. Greenspun likes to say that the *Review-Journal* is Mr. Adelson's mouthpiece. This is classic projection. Mr. Greenspun is the one who openly uses the *Sun* as his editorial megaphone. Mr. Greenspun is the owner, Publisher, and Editor of the *Sun*. He exercises absolute, unfettered control of the paper, including both its editorial and business functions. Mr. Greenspun controls every corporate decision, directs LV Sun's revenues, and profits, and dictates its editorial positions. In short, the *Sun*'s voice is Mr. Greenspun's voice. They are one and the same. Mr. Greenspun is proud of this—he publishes a weekly editorial column, and, as the self-appointed Editor of the *Sun*, he clearly controls the newspaper's editorial page.

23.     Adhering to the fiction that Mr. Greenspun and LV Sun are separate entities would sanction fraud and promote injustice, because he is the pertinent actor for much of the misconduct alleged in these claims.

24.     In accordance with this Court's November 30, 2020 order holding that allegations that a newspaper's owner exercises significant influence over the newspaper's "policies, business, and editorial content" satisfy the standard to allege that the owner is the newspaper's alter ego, the LVRJ alleges that Mr. Greenspun exercises significant influence over the *Sun*'s "policies, business, and editorial content," and is therefore its alter ego. *See* ECF No. 243 at 16–17.

## GENERAL ALLEGATIONS

### A.     The LVRJ and the Adelson family.

25.     The LVRJ publishes the *Las Vegas Review-Journal* newspaper, the longest running daily newspaper in Las Vegas. The LVRJ's roots date back to 1909 (it was originally called the *Clark County Review*). The LVRJ has had various owners since its inception. From the 1960s until the early 1990s, the LVRJ was owned by Arkansas billionaire and media mogul Donald W. Reynolds and his Donrey Media Group. Mr. Reynolds died in 1993, and his longtime friend Jack Stephens bought the company, renamed it Stephens Media, and moved the company's headquarters to Las Vegas. In March 2015, New Media Investment Group (the parent of GateHouse Media) bought Stephens Media's newspaper assets (including eight daily newspapers in seven states and more than 65 weekly and niche publications), including the LVRJ.

26.    Sheldon Adelson and members of his family are long-time residents of Las Vegas. They operate multiple local businesses and philanthropic endeavors.

27.    As residents, stakeholders, and leaders of the Las Vegas community, the Adelsons were passionate about having a world-class metropolitan daily newspaper in their hometown. The Adelsons felt that the quality of local news was being threatened by newspaper owners failing to invest in their papers.

28.    In December 2015, News+Media purchased the LVRJ. The Adelsons have a controlling interest in News+Media Capital Group LLC. Under this new ownership, the LVRJ has increased the benefits of its employees, invested in and expanded the editorial staff, hired a new investigative journalism team, and opened a Washington, D.C. bureau. Since 2015, the LVRJ has received substantial praise and awards for its quality journalism, local news, and investigative journalism—more than any other newspaper in the state of Nevada.

**B.    The *Las Vegas Sun* has been a chronically failing newspaper and was saved from extinction by the LVRJ with a 1989 Joint Operating Arrangement.**

29.    The *Las Vegas Sun* was founded in 1950 by Hank Greenspun, a prominent real-estate developer who acquired most of the western portion of Henderson, Nevada for a development that eventually became Green Valley. Despite all of his wealth and influence in Las Vegas, Hank Greenspun could not make the *Sun* succeed. Even though the *Sun* was a financial failure from its inception, it served an important function for Hank Greenspun, as he used the *Sun* to promote his political and other business and financial interests. Hank Greenspun's son, Brian Greenspun, has testified that during the time of Hank Greenspun's ownership, "[t]he *Las Vegas Sun* was barely profitable and in many years lost significant money." He said the *Sun* "probably never made much money or any money to be precise." By the late 1980s, LV Sun was on the verge of collapse.

30.    On June 12, 1989, six weeks before Hank Greenspun's death, LV Sun entered into a Joint Operating Arrangement with Donrey of Nevada, Inc., then the owner of the *Review-Journal* (the "1989 JOA") pursuant to the NPA. The NPA allows financially troubled newspapers to partner with their competitors to help prevent communities with struggling papers from losing

editorial diversity. The 1989 JOA was approved in writing by the Department of Justice, which the NPA requires, and as part of that process, LV Sun was required to certify to the Department of Justice that it was a "failing newspaper."

31.     Under the 1989 JOA, LV Sun and the LVRJ continued to produce and distribute separate newspapers, delivered to separate subscribers, but both newspapers used the LVRJ's plant and equipment, and the LVRJ handled the advertising and circulation functions for the separately-distributed newspapers. Entering into the 1989 JOA with the LVRJ literally saved LV Sun from extinction. As a result of the JOA, LV Sun claims it became profitable.

**C.     In 2005, LV Sun and the LVRJ's prior owner terminated the 1989 JOA and replaced it with an entirely new JOA.**

32.     LV Sun had ongoing disputes with the LVRJ's longtime owner, Stephens Media, concerning the 1989 JOA. Due to those issues, LV Sun and Stephens Media decided to fundamentally alter their relationship. In 2005, LV Sun and Stephens Media executed a new Joint Operating Arrangement (the "2005 JOA"). Though titled as an "Amended and Restated Agreement," the new 2005 JOA expressly terminated the 1989 JOA and completely replaced it. Under the new 2005 JOA, the *Sun* and the *Review-Journal* ceased being sold and distributed as two separate newspapers; the parties combined the two newspapers into a single media product whereby the *Sun* would be included as a separate newspaper inside the *Review-Journal* newspaper (*i.e.*, an insert). Because the *Sun* would be distributed to the *Review-Journal*'s subscribers under the 2005 JOA, the 2005 JOA instantly gave the *Sun* a 700 percent circulation increase, making it the largest circulated newspaper in Nevada, co-extensive with the *Review-Journal*'s readership.

**D.     The 2005 JOA requires the parties to cooperate and support the joint printed *Review-Journal/Sun* paper.**

33.     The 2005 JOA was intended to benefit both parties, not just LV Sun. Section 5.3 requires that both parties "take *all corporate action* necessary to carry out and effectuate the intent, purposes and provisions of [the 2005 JOA]," and to "*cooperate with the other party in every reasonable way* that will promote successful and lawful operation under [the 2005 JOA] for both parties." 2005 JOA § 5.3 (emphasis added).

34. The 2005 JOA also seeks to prevent LV Sun from publishing stale news in the printed *Sun* and restricts LV Sun from publishing its printed stories on LV Sun's website much before they appear in print. LV Sun routinely violates its obligations under that provision, running articles in the printed *Sun* that appeared days earlier on LasVegasSun.com.

35. LV Sun's practice of routinely running days-old stories in the printed *Sun* is yet another example of its derogation of its contractual agreement to cooperate in the production of a high-quality printed newspaper.

36. The 2005 JOA's provisions requiring LV Sun to support the joint printed product in every reasonable way, and restricting LV Sun from contributing stale news stories, are necessary obligations in order for the LVRJ to benefit from the contract (*i.e.*, having a quality *Sun* printed insert with fresh news stories that attract readers to the joint printed product). These provisions prevent LV Sun from "free-riding" on the back of the LVRJ's investment in the printed newspaper.

37. Together, Sections 5.2 and 5.3 of the 2005 JOA ensured that LV Sun and the LVRJ would cooperate, rather than compete, for the sale of newspapers in Clark County.

**E.  The 2005 JOA provides LV Sun with editorial discretion but also limits that discretion with a quality standard.**

38. Under Section 5.2 of the 2005 JOA, the parties agreed that LV Sun would have editorial discretion over the *Sun* printed insert, but they expressly limited that discretion by requiring that each newspaper "*preserve high standards of newspaper quality . . . consistent with United States metropolitan daily newspapers*." (emphasis added).

39. When Stephens Media negotiated the 2005 JOA on behalf of the LVRJ, it included Section 5.2 to prevent LV Sun from transforming the *Sun* insert into something other than a high-quality metropolitan daily newspaper.

**F.  The parties agreed that the 2005 JOA can be terminated for breach.**

40. The 2005 JOA is governed by Nevada law. Under Nevada law, every contract can be terminated for material breach. On top of that, Sections 9.1.2 and 10.10 of the 2005 JOA

1    expressly state that it can be terminated if a party defaults in the performance of a material

2    obligation.

3    **G.      The 2005 JOA was not approved in writing by the Department of Justice.**

4        41.     Under the NPA, any joint operating arrangement entered into after 1970 is

5    unlawful and unenforceable unless it is approved in writing by the Attorney General of the United

6    States. 15 U.S.C. § 1803(b).

7        42.     Although LV Sun and the prior owners of the LVRJ notified the Department of

8    Justice ("DOJ") about the 2005 JOA and titled it as a mere "amendment" to the previously

9    approved 1989 JOA, the DOJ took a different view. In September 2005, the DOJ repeatedly

10   characterized the 2005 JOA as the new JOA and indicated that it would require written approval

11   from DOJ to fall within the ambit of the NPA.

12       43.     LV Sun concealed DOJ's September 2005 communication when it filed its sham

13   antitrust lawsuit in this Court.

14       44.     After conducting a nearly three-year investigation into the 2005 JOA, the DOJ

15   expressly declined to approve the 2005 JOA in writing.

16       45.     LV Sun concealed the DOJ's non-approval of the 2005 JOA when it filed its sham

17   antitrust lawsuit.

18
19       **H.      Mr. Greenspun's and LV Sun's long history of accusing competitors and
             partners of antitrust violations and other unfair business practices.**

20       46.     The Adelsons did not mastermind a scheme to put LV Sun out of business. They

21   are just the latest victim of Mr. Greenspun's attacks, blame-shifting, and scapegoating. For nearly

22   40 years, Mr. Greenspun has been accusing those around of him of conspiring to push him out of

23   the market, rather than accepting his responsibility for the complete failure of LV Sun's financial

24   viability, regardless of the efforts of others to try to rescue it. Mr. Greenspun is not shy about

25   hurling accusations of antitrust violations against anyone who disagrees with, or dares compete

26   against, him.

27       47.     Mr. Greenspun has a history of fighting with his competitors and business partners.

28

1      48.    When Donrey owned the LVRJ in the 1980s, Mr. Greenspun accused them of

2  being anti-competitive.

3      49.    When Donrey entered a JOA with LV Sun, Mr. Greenspun had disputes with

4  Donrey over JOA accounting.

5      50.    When Stephens Media took over the LVRJ, Mr. Greenspun accused them of

6  cheating. LV Sun sued Stephens Media three separate times.

7      51.    On information and belief, in 2013, when LV Sun was jointly owned by Mr.

8  Greenspun and his siblings (Danny Greenspun, Susan Greenspun Fine, and Jane Greenspun

9  Gale), all of the siblings except for Brian voted to dissolve the JOA with Stephens Media (then

10  owner of the *Review-Journal*).

11      52.    After not getting his way, Greenspun filed an antitrust lawsuit against Stephens

12  Media and accused his siblings of illegally conspiring with Stephens Media to restrain trade in

13  the market for the sale of newspapers. *See Greenspun v. Stephens Media LLC*, No. 2:13-cv-01494-

14  JCM-PAL, ECF No. 34 (D. Nev. Sept. 13, 2013). Mr. Greenspun sought a preliminary injunction,

15  which was denied, and the case subsequently settled, resulting in Mr. Greenspun receiving the

16  full control of the *Sun* that he so coveted.

17      53.    After Mr. Greenspun assumed complete control of LV Sun, he hired Elizabeth

18  Cain as an outside consultant and accountant. Ms. Cain, a non-lawyer, "analyzed" the 2005 JOA

19  and came up with a novel interpretation of the contract: that the LVRJ is prohibited from

20  deducting its editorial costs from the EBIDTA calculation that is used to determine LV Sun's

21  JOA profit payment.

22      54.    Even though LV Sun had accepted and agreed with the current accounting method

23  for nearly a decade, Mr. Greenspun seized on Ms. Cain's "analysis" and again used litigation to

24  bully the LVRJ's owners into yet another settlement. In 2015, LV Sun sued DR Partners in the

25  Eighth Judicial District Court for allegedly improperly accounting under the JOA. *Las Vegas Sun*

26  *Inc. v. DR Partners*, No. A-15-715008-B. That matter settled in 2016, more than a year after

27  Stephens Media had sold the LVRJ to GateHouse Media LLC ("GateHouse").

28

55.    GateHouse was not exempt from Mr. Greenspun's crusade either—he accused GateHouse of wrongdoing and mismanaging the 2005 JOA.

I.    **After News+Media bought the LVRJ, Mr. Greenspun repeatedly sought to end the JOA in exchange for a lucrative payout, and tried to replace the printed *Sun* with a self-serving personal column dedicated to his views.**

56.    From the moment the News+Media bought the LVRJ from GateHouse, Mr. Greenspun saw an opportunity to cash out and expressed an intense interest in the LVRJ buying him out of the 2005 JOA.

57.    Within the first few months, Mr. Greenspun came to visit Mr. Adelson and his son-in-law, Patrick Dumont, at their office in Las Vegas and expressed his interest in being "bought out" for $20 million. The Adelsons balked at Mr. Greenspun's totally unreasonable proposal.

58.    In the ensuing months, Mr. Greenspun continued to regularly visited with Mr. Dumont and repeatedly conveyed his desire to be bought out and the possibility of ending the JOA. At one point, Mr. Greenspun simply told Mr. Dumont "I don't want to do this anymore."

59.    Each time Mr. Greenspun spoke about ending the JOA, he also conveyed how such a deal would make the Adelsons' lives easier, or comments to that effect. He said things like "$20 million to make me go away." The strong implication was always that the failure to do a deal would result in Mr. Greenspun making the Adelsons' lives more difficult through the JOA. This included LV Sun's insistence on a brand new accounting scheme under the JOA, using a novel reading of the contract that differed from how the LVRJ's prior owners had accounted to LV Sun since the 2005 JOA was executed.

60.    Throughout these discussions, Mr. Greenspun concealed the fact that the JOA was never actually approved by the DOJ, attempting to leverage millions of dollars out of the LVRJ by intimating that he would enforce an agreement he knew to be unlawful.

61.    Eventually, Mr. Greenspun indicated he would accept less money. In March 2017, following conversations and negotiations between Messrs. Greenspun and Dumont, Mr. Greenspun's proposed buyout was reduced to a Term Sheet. The Term Sheet contemplated

discontinuing the printed *Sun* insert and replacing it with "one editorial column" carried within the *Review-Journal*, and a payment of around $2.4 million to LV Sun.

62.     On April 11, 2017, about a week after the LVRJ redesigned its format, Mr. Greenspun objected to the "Sun Box" masthead on the front page, even though it was larger and more prominent than the old *Sun* masthead, and used that manufactured dispute and the veiled threat of more litigation as leverage in his negotiations with Mr. Dumont. Mr. Greenspun told Mr. Dumont that "[t]his thing is going to build up again—fighting over how you want to run your business—unless we can figure out a way to get out of each other's way so we can serve this community as we see fit."

63.     Mr. Greenspun met in person with Mr. Dumont to discuss ending the JOA, but no agreement was reached. The next day, Mr. Greenspun continued to push for a deal, asking Mr. Dumont "to take one more shot to get something done."

64.     Then, after a meeting on May 9, 2017, Mr. Greenspun emailed Mr. Dumont and proposed additional buyout terms. Specifically, Mr. Greenspun asked for a $5 million payment and proposed replacing the *Sun* entirely with a single weekly column in the *Review-Journal* written by Mr. Greenspun. In other words, Mr. Greenspun wanted to end the 2005 JOA and terminate the printed *Sun* in exchange for $5 million and his own column in the *Review-Journal*.

65.     Mr. Greenspun never expressed any real concern about the printed *Sun* or its editorial voice ceasing to exist, in sharp contrast to assertions used in pleadings to this Court in an effort to support LV Sun's sham litigation. To the contrary, Mr. Greenspun was eager to be bought out, repeatedly attempting to push the deal forward.

66.     Moreover, far from being the victim of a supposed scheme to put the printed *Sun* out of business, Mr. Greenspun actually proposed that the parties allocate the printed media market between them, writing that "I will agree to stay out of daily newspapers in Clark County and you agree to stay out of those weekly news and entertainment magazines that I am currently in, with exceptions of products you already produce beyond the daily RJ."

67.     Messrs. Greenspun and Dumont continued to discuss ending the JOA and the printed *Sun* through May 2017. At no point did Mr. Greenspun show any concern for the supposed

monopolization of the sale of newspapers in Clark County. Indeed, the parties were set to begin drafting papers to end the 2005 JOA.

68.     At that stage, Mr. Greenspun's interests were clearly not in line with the corporate interests of LV Sun.

69.     Mr. Greenspun's willingness to give up the *Sun* newspaper was conditioned on plan that he referred to as "my weekly column" that would be published on Sundays in the *Review-Journal* or "as often as I choose to write it."

70.     Mr. Greenspun was not even committing to write a column every Sunday. He told Mr. Dumont "[t]he space will be mine to use as I choose and after me, my wife's or daughter's or a person who I choose who will carry on in a quality manner."

71.     Far from being pressured into ending the JOA and the printed *Sun*, Mr. Greenspun was eager to move forward. Mr. Greenspun's buyout negotiations with Mr. Dumont continued into the summer of 2017.

72.     The LVRJ had increased its offer to $4.3 million, but it refused to agree to the various anti-competitive market-allocation provisions that Mr. Greenspun sought. Mr. Dumont was uncomfortable with and disturbed by Mr. Greenspun's anti-competitive overtures.

73.     Mr. Greenspun complained about the LVRJ's refusal to voluntarily restrict its market opportunities.

74.     Later, Mr. Greenspun again invited the LVRJ to engage in anti-competitive conduct, and asked Mr. Dumont to "keep the circle tight" and move forward with ending the printed *Sun* "as quickly as possible."

75.     Mr. Greenspun asked Mr. Dumont if—as part of the larger buyout—the LVRJ and Mr. Greenspun's various media operations could agree not to solicit each other's employees (the proposed "no-poach" agreement). Mr. Dumont was troubled by this inappropriate request and declined.

76.     After the LVRJ rejected Mr. Greenspun's anti-competitive proposal, he retaliated by drastically increasing his payment demand, while still withholding from LVRJ's new owners the fact that DOJ never approved the JOA, and therefore that LVRJ could have walked away at

any point. Mr. Greenspun told Mr. Dumont that it would now take at least $10 million for him to end the JOA, but added that the Adelsons could afford it.

77.     Mr. Greenspun continued to imply that there would be negative consequences if the LVRJ did not accede to his demand, for example by saying that the Adelsons could pay him to "go away."

78.     When it became clear to Mr. Greenspun that the LVRJ and the Adelsons would not pay him at least $10 million to end the 2005 JOA, or agree to refrain from future competition with him, Mr. Greenspun devised a scheme to retaliate against the LVRJ and either pressure it into accepting Mr. Greenspun's demands for more money and a non-compete agreement, or to drive the LVRJ out of business.

79.     As discussed below, Mr. Greenspun's scheme included directing LV Sun to breach the 2005 JOA by tanking its quality and sabotaging the JOA, and it culminated with the filing of a sham antitrust lawsuit in this Court.

**J.      When the Adelsons refused to pay Mr. Greenspun tens of millions of dollars to end the 2005 JOA, Mr. Greenspun retaliated by sabotaging the joint *Review-Journal/Sun* newspaper and diverting readers to his separate online news product, which does not participate in the JOA.**

80.     LV Sun has been aggressively working to undermine and subvert the 2005 JOA by diverting readers away from the joint printed newspaper to LV Sun's separately-owned online site, LasVegasSun.com.

81.     LasVegasSun.com is outside of the JOA, so the LVRJ receives no revenue from it.

82.     Although the LVRJ receives nothing from LasVegasSun.com, it is involuntarily subsidizing it. Mr. Greenspun has publicly admitted that he uses the profit payments from the LVRJ to fund the operations of LasVegasSun.com, and the other magazines and websites owned by GMG.

83.     To drive readers away from the *Review-Journal/Sun* newspaper and to LasVegasSun.com—and to effectuate Mr. Greenspun's sabotage—LV Sun has largely ceased publishing original or breaking local news stories in the printed *Sun*. Instead, LV Sun hoards

1  breaking local news stories generated by its newsroom for LasVegasSun.com and, on information

2  and belief, other GMG publications.

3      84.   For example, the *Sun* won first place for Best Breaking News Reporting in the

4  2018 Nevada Press Association Better Newspaper Contest for its coverage of the October 1, 2017,

5  mass shooting on the Las Vegas Strip. The award-winning story appeared only on

6  LasVegasSun.com website, *never* in print. In the following days, the printed Sun contained

7  woefully little original coverage of the biggest breaking news story in Las Vegas history. On

8  information and belief, LV Sun has repeatedly used its newsroom to produce content for stories

9  that appear in other GMG publications outside of the JOA.

10      85.   Instead of original content, LV Sun now fills its printed *Sun* pages with national

11  syndicated and wire-service content that is readily available from other sources and often days

12  old by the time it appears in the *Sun*.

13      86.   When the printed *Sun* does run local stories, they are often stories that had already

14  appeared earlier in other GMG publications. For example, on August 15, 2019, LasVegasSun.com

15  ran an article about a petition filed the day before (August 14) by the Center for Biological

16  Diversity that had the potential to derail a controversial proposal put forth by Clark County to

17  open protected lands to development. The story did not appear in the printed Sun until over a

18  week later, on August 22, 2019. Similarly, an article about the impact the reorganization of the

19  Bureau of Land Management would have on Nevadans appeared on LasVegasSun.com on August

20  14, 2019, but did not appear in the printed Sun until August 21, 2019.

21      87.   Mr. Greenspun has deliberately sabotaged the printed *Sun*. LV Sun could easily

22  run its original news stories in the printed *Sun*, in addition to LasVegasSun.com, at no extra cost.

23  The same newsroom—which the LVRJ is subsidizing—generates content for both the printed

24  *Sun* and LasVegasSun.com. And because the LVRJ is carrying the costs of publishing and

25  distributing the printed *Sun*, the cost to LV Sun is the same (*i.e.*, zero dollars) whether its pages

26  contain original news or days-old reprints.

27      88.   In early 2018, GMG moved LasVegasSun.com behind a paywall.

28

89.     Mr. Greenspun then openly declared war on his own business partner. For more than 30 days beginning on January 11, 2018, the *Sun* published a message to its readers on the first page of its printed insert to the *Review-Journal*. It was called "A Note from the Sun" (the "Note").

90.     In the Note, LV Sun brazenly urged readers to "subscribe to the Las Vegas Sun online" and promised that by doing so readers would be "doing your part in providing fact-based, quality journalism to readers across the valley who depend on that information for their daily family, business and political decisionmaking."

91.     The Note did not explain why the "fact based, quality journalism" readers could access on LasVegasSun.com was not appearing in the printed *Sun*. The LVRJ, by contrast, also has an online version (ReviewJournal.com) that is outside the parties JOA—but the most important original, breaking news stories that appear in the online LVRJ are also timely published in the printed newspaper.

92.     The Note made clear that Counterclaim defendants were undermining the JOA. By subscribing to LasVegasSun.com, the Note told readers, "you will ensure that Nevada has multiple, vibrant viewpoints on the news and competing opinions about what the news means to each of us." This, of course, was the entire point of the JOA, under which the LVRJ has been carrying the production, distribution, and business costs of LV Sun to ensure that Nevada readers have access to diverse news and editorial content in their printed newspapers.

93.     The Note attacked the LVRJ's management—LV Sun's JOA business partner—and blamed it for ongoing revenue and circulation decline.

94.     The Note encouraged readers not to subscribe to the printed *Review-Journal/Sun*, advising them that "no, purchasing a print subscription to the Sun and R-J doesn't benefit the Sun in this current scenario."

95.     LV Sun has continued to use the free printing and distribution being provided by the LVRJ to advertise against the joint *Review-Journal/Sun* printed newspaper. For example, until earlier this year, every printed Sun now carries an advertisement admitting that the best content is on LasVegasSun.com, not in the printed paper, and directing readers to LasVegasSun.com "TO FIND EVERYTHING WE'VE GOT":

96.     To put it mildly, LV Sun is not taking all actions necessary or cooperating with the LVRJ to successfully carry out the intent and purpose of the JOA. It is doing the exact opposite. Instead of helping to make the *Review-Journal/Sun* newspaper a success, Mr. Greenspun is deliberately subverting it—starving LV Sun's pages of original content, loading them with syndicated filler, which is often outdated, as well, and using its access to the LVRJ's large readership to try to convince those readers to drop the printed newspaper in favor of LasVegasSun.com.



97.     Moreover, under the 2005 JOA, LV Sun is obligated not to publish stale news in the printed *Sun*, yet, as described above, LV Sun routinely posts news stories online several days before they appear in print, diminishing the value of the joint *Review-Journal/Sun* newspaper.

**K.     LV Sun's sham antitrust lawsuit is based on materially false facts and was brought with malice to coerce the LVRJ to continue under the unlawful JOA and, ultimately, to run the LVRJ out of business if it did not accede to Mr. Greenspun's extortionate buyout demands.**

98.     Under the 2005 JOA, the LVRJ is obligated to account for its profits and pay a certain percentage of those profits to LV Sun.

DEFENDANTS' ANSWER AND LVRJ'S COUNTERCLAIMS

43

99.     For the first nine years after the parties entered into the 2005 JOA, the LVRJ and LV Sun agreed on the formula that the LVRJ used to calculate LV Sun's profit payment, without any concerns raised by Mr. Greenspun, or from LV Sun's Chief Financial Officer, or from anyone else, even though LV Sun audited the LVRJ's accounting.

100.    However, as part of his effort to squeeze more money out of the JOA, Mr. Greenspun enlisted Ms. Cain, who engineered a contrived formula under which LV Sun was supposedly entitled to significantly more money. When the LVRJ's then-owner disagreed with Ms. Cain's analysis, LV Sun filed an arbitration demand against the LVRJ, followed by a state-court lawsuit in April 10, 2018.

101.    In August 2019, the LVRJ sought permission from the state court to bring counterclaims against LV Sun for its serial breaches of the 2005 JOA and sought approval to terminate the 2005 JOA because its original purpose had been frustrated.

102.    On September 24, 2019—the day before the state court granted the LVRJ permission to file its counterclaims against LV Sun, LV Sun filed this baseless, sham antitrust lawsuit against the LVRJ, its parent company, News+Media Capital Group LLC, Patrick Dumont and Sheldon Adelson.

103.    LV Sun's sham antitrust lawsuit relies on numerous, false factual allegations, including:

a.     LV Sun's sham antitrust complaint falsely alleged (and then LV Sun argued to the Court) that the 2005 JOA was approved by the Department of Justice pursuant to the NPA (which requires written approval) when, in fact, the September 2008 DOJ Letter had stated that DOJ was *not* approving the 2005 JOA. LV Sun materially omitted any mention of the September 2008 DOJ letter in its sham antitrust complaint. This Court's denial of Defendants' motion to dismiss was premised on its acceptance of LV Sun's falsity as true for pleading purposes.

b.     LV Sun falsely alleged (and then argued to the Court) that the 2005 JOA was merely an amendment to the 1989 JOA that did not require separate written approval from the DOJ. Putting aside that NPA expressly requires approval of all joint operating arrangements

1   (making no exceptions for amendments), LV Sun's complaint never mentioned the April 2005

2   DOJ letter which made clear that DOJ was treating the 2005 JOA as a "new JOA" that required

3   separate approval under the NPA.

4           c.    LV Sun's sham antitrust complaint falsely alleged that Defendants devised

5   an anti-competitive scheme to harm LV Sun by "illegally" charging editorial expenses as part of

6   the 2005 JOA accounting as part of an "unlawful plan to put LV Sun out of business." But LV

7   Sun's sham complaint never mentioned that every prior owner since the inception of the 2005

8   JOA accounted to LV Sun the same exact way, and did not disclose that the JOA isn't even

9   enforceable because it was not approved by DOJ. Indeed, for nine years after entering into the

10   2005 JOA, LV Sun agreed with the LVRJ's deduction of editorial expenses when calculating LV

11   Sun's profit share payment. LV Sun even hired independent auditors who confirmed on multiple

12   occasions that the deduction of editorial expenses was appropriate. When News+Media purchased

13   the LVRJ, it simply continued to do the JOA accounting in the same manner as its predecessors.

14   None of these damning facts are revealed in LV Sun's sham pleading. LV Sun's complaint is

15   materially misleading and objectively false.

16           d.    LV Sun's sham antitrust complaint alleges that Defendants' predatory

17   conduct included the firing of Jason Taylor, the publisher of the LVRJ, shortly after News+Media

18   bought the newspaper, and replacing him with a new publisher. But LV Sun's complaint conceals

19   that the 2005 JOA—which LV Sun is asking this Court to enforce, despite its non-approval by

20   DOJ—expressly states that the "Review-Journal shall have exclusive and complete control,

21   authority and direction over the news and editorial content features and services in its newspaper,

22   including without limitation the right of selection of all its news and editorial employees, and the

23   exclusive right to hire and discharge such employees." 2005 JOA § 5.2. It is objectively baseless

24   for LV Sun to allege that the Defendants' replacement of their own publisher is somehow

25   predatory or unlawful when LV Sun expressly consented to it.

26           e.    LV Sun's sham antitrust lawsuit alleges that Defendants are precluded

27   from terminating the JOA despite the Sun's material breach. That allegation is objectively

28   baseless because Section 9.1.2 of the 2005 JOA provides, in relevant part: "if either party defaults

in the performance of any of its material obligations hereunder and does not cure such default within sixty (60) days after receiving written notice thereof from the other party, then such other party may, at its election, and in addition to all other remedies available to it at law or in equity, terminate this restated Agreement." Moreover, Nevada law generally allows a party whose contractual counter-party has materially breached their agreement to elect to terminate.

104.    On information and belief, LV Sun, at Mr. Greenspun's insistence, filed its sham antitrust lawsuit to force the LVRJ to incur massive defense costs so that the LVRJ would either capitulate to Mr. Greenspun's demands for a multimillion dollar payout, or be forced to sell its newspaper operation to LV Sun and exit the market.

105.    Despite having initially told Mr. Dumont that "I don't want to do this anymore" when he was looking to be bought out, Mr. Greenspun's rhetoric changed when he could not get what he wanted through an arm's length negotiation. After devising his predatory scheme to bring LVRJ to its knees, and just weeks before filing his sham antitrust lawsuit in September 2019, Mr. Greenspun told KNPR's Joe Schoenmann during an interview that he would buy the *Review-Journal* "in a heartbeat."

## COMMON ANTITRUST ALLEGATIONS

### A.    The alternative relevant market.

106.    In its complaint against the LVRJ, LV Sun alleges the existence of a relevant product market limited to the sale of newspapers in Clark County, Nevada. ECF No. 1 ¶¶ 36–37. As set forth in the LVRJ's motion to dismiss, the LVRJ challenges the plausibility of a relevant product market that is limited to printed newspapers and excludes obvious sources of competition such as internet news websites, mobile news apps, local TV news, cable TV news, radio stations, and satellite radio. The LVRJ also challenges the notion that a relevant antitrust market can include so-called editorial competition, which is competition of ideas, not trade or commerce.

107.    In light of this Court's ruling on Defendants' motion to dismiss, in the alternative, the LVRJ pleads LV Sun's market definition (the "alternative relevant market") as alleged in paragraphs 36–37 of the Complaint, ECF No. 1.

**B.    LV Sun's market power.**

108.    LV Sun has gained and maintains market power in the alternative relevant market through the 2005 JOA. Even though the 2005 JOA was never approved in writing by the DOJ as required by the NPA, LV Sun and prior owners of the LVRJ abided by its terms.

109.    LV Sun's complaint alleges that the alternative relevant market for the sale of daily newspapers in Clark County is a single-product market. LV Sun alleges that the combined media product that includes the *Review-Journal* and the *Sun* accounts for 100 percent of the circulation of local daily newspapers. ECF No. 1 ¶ 41. LV Sun further alleges that the *Review-Journal* and *Sun* each have the same exact paid circulation in the alternative relevant market.

110.    In its November 30, 2020, order denying Defendants motion to dismiss, the Court accepted LV Sun's argument that even though the LVRJ and LV Sun do not actually compete for the sale of newspapers in the alternative relevant market, the Court's analysis of competition in the alternative relevant market must also take into account editorial competition. ECF No. 243 at 12. The Court's ruling appears to hold this form of competition is distinct from sales of newspapers and focuses instead on additional competitive and economic incentives for a JOA partner to pursue editorial and news-gathering efforts to attract readers. Therefore LVRJ pleads in the alternative that Counterclaim Defendants have injured it by, among other things, diminishing the value of the *Review-Journal* by harming the quality of the printed product, diverting management time and resources to sham litigation, reducing LVRJ's ability to innovate, and attempting to direct readers to the Sun's website.

111.    Subject to and without waiving its objections to the alternative relevant market, the LVRJ pleads in the alternative for purposes of this Counterclaim that LV Sun exercises market power in the alternative relevant market because it has market power in the market for editorial competition within printed newspapers in Clark County. LV Sun's editorial voice is heard by 100 percent of the readers and subscribers who purchase the joint media product in the alternative relevant market. As long as LV Sun is able to coerce the LVRJ to perform under the 2005 JOA,

1   LV Sun will maintain its market power in the alternative relevant market and its dominant

2   editorial voice in Las Vegas.

3       **C.**    **Barriers to entry.**

4       112.   Although Defendants deny that there are barriers to entry in the alternative

5   relevant market, for purposes of this Counterclaim, LVRJ pleads LV Sun's allegations in the

6   alternative. *See* ECF No. 1 ¶¶ 42–47.

7       113.   Therefore, to the extent that the Court and jury accept that there are barriers to

8   entry in the alternative relevant market, LVRJ pleads in the alternative that due to the significant

9   fixed costs of operating a daily newspaper, especially those associated with printing and

10   distribution, it is unlikely that the harm to competition caused by the LVRJ's termination from

11   the market could be prevented or ameliorated through new entrants to the market.

12       **D.**    **Counterclaim Defendants' predatory conduct.**

13       114.   During the relevant time period, Counterclaim Defendants have perpetuated a

14   calculated scheme to silence the LVRJ's editorial viewpoint in the alternative relevant market and

15   to monopolize that market with its own editorial viewpoint. Counterclaim Defendants' predatory

16   acts include, but are not limited to:

17       a.   Attempting to pressure the LVRJ to accept anti-competitive agreements

18   including a market allocation and non-compete agreement, as well as "no-poach" agreement for

19   employees;

20       b.   Coercing the LVRJ to maintain the 2005 JOA, draining its resources and

21   depriving it of opportunities, even though the agreement is unlawful and unenforceable under the

22   NPA and despite the LVRJ's attempt to lawfully terminate the agreement;

23       c.   Filing a sham antitrust lawsuit against the LVRJ; and

24       d.   Willfully breaching the 2005 JOA and undermining the parties' joint media

25   product.

26   / / /

27   / / /

28

**E.** **Antitrust injury, anti-competitive effects, and damages.**

115.     Counterclaim Defendants have engaged in these predatory acts as part of a scheme to maintain and abuse their market power. Counterclaim Defendants' predatory conduct has harmed competition in the alternative relevant market, resulting in anti-competitive injury to the LVRJ.

116.     Counterclaim Defendants have taken extraordinary measures to keep the 2005 JOA in place, even though it is unlawful and unenforceable under the NPA, its purpose has been frustrated, and LV Sun continues to be in default of its obligations.

117.     As a direct and proximate result of the Counterclaim Defendants' predatory conduct alleged herein, LV Sun is continuing to free-ride on the LVRJ's investment, allowing LV Sun to dominate the alternative relevant market with its editorial voice at almost no cost to LV Sun.

118.     Meanwhile, due to LV Sun's coercion and predatory conduct, the LVRJ is being forced to pay for the printing, promotion, and distribution of the printed *Sun* while suffering massive annual losses that are already plaguing the entire newspaper industry—a situation that was never contemplated by the 2005 JOA, the NPA, or healthy competition under the Sherman Act.

119.     The LVRJ is being forced to artificially prop up a low-quality printed *Sun* that would not otherwise succeed in a competitive marketplace. This allows LV Sun to maintain market power that it otherwise would not have in a competitive marketplace.

120.     LV Sun's predatory acts have further damaged the LVRJ by artificially decreasing the quality of the joint *Review-Journal/Sun* printed product, increasing the LVRJ's costs and expenses, making the LVRJ less attractive to buyers, impeding the LVRJ's ability to streamline its print operations to save costs, and diminishing the LVRJ's ability to reinvest in its product.

121.     As a further direct and proximate result of Counterclaim Defendants' predatory conduct, the LVRJ has incurred above-market, artificially inflated operating expenses. The LVRJ has been suffering operating losses since 2018 and it would not survive financially if coerced to

perform under the 2005 JOA unless it continues to receive cash infusions from its owners. LV Sun's anti-competitive conduct and scheme threaten the viability of the printed *Review-Journal* in the alternative relevant market.

122.   If the LVRJ were forced to exit the alternative relevant market, LV Sun (with its existing market power and subscriber base) would be in a unique position to buy the LVRJ's assets at fire-sale prices, thereby securing a complete monopoly in the alternative relevant market.

## FIRST CLAIM FOR RELIEF

### Violation of Section 2 of the Sherman Act—Monopolization, 15 U.S.C. § 2

### Against All Counterclaim Defendants

123.   LVRJ realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

124.   The alternative relevant market—as alleged by LV Sun and accepted for pleading purposes by this Court—is the sale of local daily newspapers in Clark County.

125.   Counterclaim Defendants have obtained and maintain monopoly power in the alternative relevant market because the *Sun* is distributed as part of the joint media product that is the sole local daily newspaper in Clark County and is purchased by every buyer of and subscriber to the joint *Review-Journal/Sun* newspaper.

126.   For the reasons previously stated, LVRJ pleads in the alternative that substantial barriers to entry and expansion exist in the alternative relevant market.

127.   Counterclaim Defendants have abused that power by anti-competitive means, including attempting to pressure the LVRJ to accept anti-competitive agreements including a market allocation and non-compete agreement, as well as "no-poach" agreement for employees; coercing the LVRJ to maintain the 2005 JOA, even though the agreement is unlawful and unenforceable under the NPA and despite the LVRJ's attempt to lawfully terminate the agreement; filing a sham antitrust lawsuit against the LVRJ; and willfully breaching the 2005 JOA and undermining the parties' joint media product.

128.   As described above for purposes of this Counterclaim and alleged by LV Sun, barriers to entry exist in the alternative relevant market.

129.   LV Sun has the power to exclude competitors from the alternative relevant market, including by the predatory conduct described above.

130.   LV Sun's predatory conduct has the effect of growing its monopoly power and diminishing output—the LVRJ would be in a position to improve its circulation and quality if it were not forced to expend resources bolstering and litigating against LV Sun.

131.   There is no business necessity or other pro-competitive justification for Counterclaim Defendants' conduct.

132.   LVRJ has been injured and will continue to be injured in its business and property as a result of Counterclaim Defendants' conduct, because it has been forced to expend resources propping up and litigating against LV Sun.

133.   LVRJ is entitled to treble damages, including its attorneys' fees and costs.

**SECOND CLAIM FOR RELIEF**

**Violation of Section 2 of the Sherman Act—Attempted Monopolization, 15 U.S.C. § 2**

**Against All Counterclaim Defendants**

134.   LVRJ realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

135.   The alternative relevant market—as alleged by LV Sun and accepted for pleading purposes by this Court—is the sale of local daily newspapers in Clark County.

136.   Counterclaim Defendants have willfully obtained and maintain monopoly power in the alternative relevant market because the *Sun* is distributed as part of the joint media product that is the sole local daily newspaper in Clark County and is purchased by every buyer of and subscriber to the joint *Review-Journal/Sun* newspaper.

137.   As described above, LVRJ pleads in the alternative that substantial barriers to entry and expansion exist in the alternative relevant market.

138.   Counterclaim Defendants have abused that power by anti-competitive means, including pressuring the LVRJ to accept anti-competitive agreements including a market allocation and non-compete agreement, as well as "no-poach" agreement for employees; coercing the LVRJ to maintain the 2005 JOA, even though the agreement is unlawful and unenforceable

under the NPA and despite the LVRJ's lawful attempt to terminate the agreement; filing a sham antitrust lawsuit against the LVRJ; and willfully breaching the 2005 JOA and undermining the parties' joint media product.

139. Counterclaim Defendants have a specific intent to achieve monopoly power in the alternative relevant market, and if their anti-competitive behavior is not checked, they have a dangerous probability of achieving their desired monopoly.

140. As described above for purposes of this Counterclaim and alleged by LV Sun, barriers to entry exist in the alternative relevant market.

141. LV Sun has the power to exclude competitors from the alternative relevant market, including by the predatory conduct described above.

142. LV Sun's predatory conduct has the anti-competitive effect of growing its monopoly power and diminishing output, including because the LVRJ would be in a position to improve its circulation and quality if it were not forced to expend resources bolstering and litigating against LV Sun.

143. There is no business necessity or other pro-competitive justification for Counterclaim Defendants' conduct.

144. LVRJ has been injured and will continue to be injured in its business and property as a result of Counterclaim Defendants' conduct, because it has been forced to expend resources propping up and litigating against LV Sun.

145. LVRJ is entitled to treble damages, including its attorneys' fees and costs.

**THIRD CLAIM FOR RELIEF**

**Violation of Section 1 of the Sherman Act—Restraint of Trade, 15 U.S.C. § 1**

**Against All Counterclaim Defendants**

146. LVRJ realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

147. Subject to the alternative pleadings above, to the extent that the Court or jury accept the alternative relevant market in this case and antitrust injury in that market is established, the 2005 JOA is a per se horizontal restraint of trade because it is a contract, combination, or

conspiracy to cooperate on supply, market allocation, profits and other commercial terms between horizontally situated newspaper companies engaged in head-to-head editorial competition to unlawfully cooperate on output, profits, and expenses, and the allocation of customers.

148.    This agreement unlawfully restrains trade in the alternative relevant market because it was never approved in writing by the Attorney General of the United States, as required by the NPA.

149.    The 2005 JOA is an unlawful restraint of trade under the *per se* standard.

150.    Alternatively, the 2005 JOA is and operates as an unreasonable restraint on trade under a quick look or full-fledged "rule of reason" mode of analysis.

151.    The 2005 JOA unreasonably restrains trade because it forces the LVRJ to financially support LV Sun even if the LVRJ is suffering operating losses. The 2005 JOA allows LV Sun to free-ride on the LVRJ's investment and gives LV Sun artificial market power in the alternative relevant market.

152.    The LVRJ has tried to terminate the 2005 JOA, but LV Sun refuses to terminate the agreement. Instead, LV Sun has used threatened and actual sham litigation to coerce the LVRJ into continuing to perform under the 2005 JOA.

153.    But for the 2005 JOA and LV Sun's coercion, the LVRJ would have greater resources and freedom to compete, innovate, and improve its product.

154.    For purposes of this cause of action, LVRJ pleads in the alternative that LV Sun could overcome the barriers to entry into the alternative relevant market by using a third party printing press service. The LVRJ makes these services available to third parties at fair market prices, as do other owners of printing presses.

155.    But for the 2005 JOA and LV Sun's coercion, LV Sun would be incentivized to compete and innovate, too. LV Sun would stand on its own two feet and publish a separate printed newspaper in the alternative relevant market. LV Sun would no longer be restricted to an 8–10 page insert in the *Review-Journal*. It could increase the size of its product and, therefore, increase output in the alternative relevant market. This would lead to an increase in product available for sale as well an increase in editorial voices. But for the JOA, LV Sun would also not be limited to

the existing subscriber base of the printed *Review-Journal/Sun* joint media product, but could compete to grow its subscriber base even further. If, as LV Sun contends, readers value LV Sun's editorial viewpoint and news reporting more than the LVRJ's editorial viewpoint and news reporting, then a termination of the coerced 2005 JOA would logically lead to an increase in LV Sun's own quality and innovation.

156.    The alternative relevant market—as alleged by LV Sun and accepted for pleading purposes by this Court—is the sale of local daily newspapers in Clark County.

157.    Counterclaim Defendants have entered into a contract, combination, or conspiracy in restraint of trade, and have committed several overt acts in aid of their scheme, which restrains trade in interstate commerce.

158.    The restraint of trade is unreasonable and has had substantial anti-competitive effects on quality competition in the alternative relevant market.

159.    The anti-competitive effects are not offset by procompetitive effects in the alternative relevant market.

160.    LVRJ has been injured and will continue to be injured in its business and property as a result of Counterclaim Defendants' conduct, because, among other things, it has been forced to expend resources propping up and litigating against LV Sun.

161.    LVRJ is entitled to treble damages, including its attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**

**Declaratory Relief (Invalidity of the 2005 JOA)**

162.    LVRJ realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

163.    Counterclaim Defendants contend that the 2005 JOA is valid and enforceable under the NPA. Counterclaim Defendants have therefore created a substantial, immediate, and real controversy between the parties as to the invalidity of the 2005 JOA.

164.    A judicial declaration is necessary and appropriate so that LVRJ can ascertain its rights regarding the 2005 JOA.

165.   LVRJ seeks a judicial declaration that, because the 2005 JOA was not approved in writing by Attorney General of the United States, as required by the NPA, it is invalid under the NPA.

**FIFTH CLAIM FOR RELIEF**

**Breach of Contract**

**Against All Counterclaim Defendants**

166.   LVRJ realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

167.   LVRJ pleads this claim for relief in the alternative, because, as described above, the JOA is not enforceable.

168.   The 2005 JOA requires the parties to "take all corporate action necessary to carry out and effectuate the intent, purposes, and provisions of this Restated Agreement." 2005 JOA § 5.3.

169.   The 2005 JOA also requires each party "to cooperate with the other party in every reasonable way that will promote successful and lawful operation under this Restated Agreement for both parties." 2005 JOA § 5.3.

170.   The 2005 JOA additionally requires the parties to "preserve high standards of newspaper quality throughout the term of this Restated Agreement consistent with United States metropolitan daily newspapers." 2005 JOA § 5.2.

171.   Counterclaim Defendants have breached Section 5.3 by engaging in a course of conduct that includes, among other things: intentionally withholding original and/or breaking local news content from the printed *Sun* newspaper; filling the printed *Sun* newspaper with dated, recycled content such as days-old wire-service articles and stories that had already appeared days earlier on LasVegasSun.com instead of original content; taking these and other actions to undermine the quality of the printed product for the purpose of diverting readers from the printed *Review-Journal/Sun* newspaper to LasVegasSun.com, which is outside of the JOA; and telling readers not to subscribe to the *Review-Journal/Sun*.

172.    Counterclaim Defendants have likewise breached Section 5.2 by failing to preserve high standards of newspaper quality consistent with United States metropolitan newspapers and instead relying primarily on recycled content to fill the *Sun*'s printed pages. By any objective measure, the printed *Sun* of today is a far cry from the high standards of newspaper quality required by the 2005 JOA.

173.    Counterclaim Defendants' breaches have damaged LVRJ by diminishing the quality of the printed *Review-Journal/Sun* newspaper and diverting revenue and profits from LVRJ.

### SIXTH CLAIM FOR RELIEF

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**Against All Counterclaim Defendants**

174.    LVRJ realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

175.    LVRJ pleads this claim for relief in the alternative, because, as described above, the JOA is not enforceable.

176.    An implied covenant of good faith and fair dealing is recognized in every contract under Nevada law. Accordingly, in the 2005 JOA there was an implied covenant of good faith and fair dealing between the parties whereby each party covenanted not to do anything to destroy or injure the rights of the other to receive the benefits of the agreement.

177.    Counterclaim Defendants breached the covenant of good faith and fair dealing by, among other things, intentionally causing the printed *Sun* to deteriorate and using LVRJ's resources and the joint media product created under the JOA to advertise against the *Review-Journal/Sun* newspaper and urge readers to instead subscribe to its owner's online product outside of the JOA.

178.    Counterclaim Defendants' breaches of the covenant have damaged LVRJ by diminishing the quality of the printed *Review-Journal/Sun* newspaper and diverting revenue and profits from LVRJ.

/ / /

**SEVENTH CLAIM FOR RELIEF**

**Tortious Interference with Contractual Relations**

**Against Brian Greenspun**

179.    LVRJ realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

180.    In the alternative to LVRJ's claims for relief regarding the invalidity or terminability of the 2005 JOA, the 2005 JOA is a valid and existing contract between the LVRJ and LV Sun.

181.    Mr. Greenspun has knowledge of the 2005 JOA.

182.    In derogation of LV Sun's corporate interests, as well as the LVRJ's—to say nothing of those of LV Sun's employees—Mr. Greenspun took several intentional actions intended or designed to disrupt the 2005 JOA, including intentionally reducing the quality of the printed *Sun*, directing subscribers to the printed *Review-Journal/Sun* combined newspaper to LV Sun's website, which he ultimately controls, and seeking an extortionate buyout from the LVRJ to terminate the printed *Sun*.

183.    Mr. Greenspun's actions in fact disrupted the 2005 JOA.

184.    LVRJ was damaged by Mr. Greenspun's conduct, including by the loss of subscription revenue from subscribers, including that diverted to LV Sun's website or other GMG media entities, which were unjustly enriched by Counterclaim Defendants' conduct.

185.    Mr. Greenspun's conduct was willful and intentional, and expressed oppression, fraud, or malice, justifying exemplary or punitive damages.

**EIGHTH CLAIM FOR RELIEF**

**Declaratory Relief (Termination for Material Breach)**

186.    LVRJ realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

187.    The 2005 JOA allows a party to terminate the agreement in the event of a material breach by the other party. Specifically, Section 9.1.2 provides, in relevant part: "if either party defaults in the performance of any of its material obligations hereunder and does not cure such

default within sixty (60) days after receiving written notice thereof from the other party, then such other party may, at its election, and in addition to all other remedies available to it at law or in equity, terminate this restated Agreement." Moreover, Nevada law generally allows a party whose contractual counter-party has materially breached their agreement to elect to terminate.

188.     In the event the 2005 JOA is found to be enforceable, LV Sun materially breached the agreement in numerous ways including, but not limited to: withholding original and/or breaking local news content from the printed *Sun* newspaper; filling the printed *Sun* newspaper with dated, recycled content such as days-old wire-service articles and stories that had already appeared days earlier on LasVegasSun.com instead of original content; taking these and other actions to undermine the quality of the printed product for the purpose of diverting readers from the printed *Review-Journal/Sun* newspaper to LasVegasSun.com, which is outside of the JOA; and telling readers not to subscribe to the *Review-Journal/Sun*.

189.     LVRJ contends that Counterclaim Defendants' breaches described herein are material, and therefore that it can elect to terminate the 2005 JOA. Counterclaim Defendants contend that they have not materially breached the 2005 JOA, and therefore that LVRJ has no right to terminate it. Counterclaim Defendants further contend that even if they have materially breached the 2005 JOA, LVRJ is prohibited from terminating the 2005 JOA. Counterclaim Defendants have therefore created a substantial, immediate, and real controversy between the parties as to LVRJ's termination rights.

190.     A judicial declaration is necessary and appropriate so that LVRJ can ascertain its rights regarding the 2005 JOA.

191.     LVRJ seeks a judicial declaration that, because the Counterclaim Defendants have materially breached the 2005 JOA, LVRJ may exercise its right to terminate it.

### NINTH CLAIM FOR RELIEF

### Declaratory Relief (Excused Performance Due to Frustration of Purpose)

192.     LVRJ realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

193.   In the event the 2005 JOA is found to be enforceable, LVRJ contends that its obligation to continue performance under the 2005 JOA is excused pursuant to the doctrine of frustration of purpose.

194.   The proliferation of smartphones and mobile devices that made Internet access ubiquitous, and the exponential growth of online advertising, was not foreseeable when the JOA was executed in 2005.

195.   Nor was it foreseeable that in the face of this existential threat to the print newspaper industry, Counterclaim Defendants would essentially abandon the joint *Review-Journal/Sun* printed newspaper and divert readers to their separate online product, LasVegasSun.com.

196.   These events have destroyed the value of the JOA and rendered it unenforceable due to the commercial frustration of its intended purpose.

197.    Moreover, LV Sun alleges that the 2005 JOA was entered under the NPA. The purpose of the NPA is to preserve editorial voices that otherwise might be lost by permitting a failing newspaper and another newspaper to combine their business operations, and thus achieve profitability for the business as a whole. But the NPA was never intended to cause the risk of loss of editorial voices by requiring the JOA as a whole to lose money, which the contract itself makes clear by the fact that LV Sun's profit payment is calculated as a share of the LVRJ's profit, with no accounting for the possibility that the LVRJ might be forced to operate at a loss.

198.   As a result of Counterclaim Defendants' conduct, LV Sun has become an albatross around LVRJ's neck with no associated benefits, in an increasingly challenging business environment for print newspapers. The continuation of the JOA would frustrate the purpose of the statute under which LV Sun alleges it was formed, and the basis of the parties' bargain.

199.   Counterclaim Defendants contend that the purpose of the 2005 JOA has not been frustrated, and therefore that LVRJ is not excused from its obligations. Counterclaim Defendants have therefore created a substantial, immediate, and real controversy between the parties as to LVRJ's termination rights.

200.    A judicial declaration is necessary and appropriate so that LVRJ can ascertain its rights regarding the 2005 JOA.

201.    LVRJ seeks a judicial declaration that, because the purpose of the 2005 JOA has been frustrated, LVRJ's continued performance is excused.

### PRAYER FOR RELIEF

LVRJ respectfully requests the following relief:

1.    A judgment in its favor on all claims herein.

2.    Damages in an amount to be proven at trial, including treble damages and punitive or exemplary damages.

3.    A judicial declaration that the 2005 JOA is not enforceable under the NPA.

4.    A judicial declaration that LV Sun is in material breach of the 2005 JOA, and that LVRJ may exercise its right to terminate the 2005 JOA.

5.    A judicial declaration that LVRJ's further performance under the 2005 JOA is excused by the doctrine of frustration of purpose.

6.    A judicial determination that Mr. Greenspun and GMG are jointly and severally liable for LVRJ's damages as LV Sun's alter egos.

7.    Attorneys' fees, as allowable by law.

8.    Costs, as allowable by law.

9.    Such other relief as the Court deems just and proper.

/ / /

/ / /

Dated: January 4, 2021

KEMP JONES, LLP

*/s/ Michael Gayan*

J. RANDALL JONES, ESQ., SBN 1927
MICHAEL J. GAYAN, ESQ., SBN 11135
MONA KAVEH, ESQ., SBN 11825
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169

RICHARD L. STONE, ESQ. (*pro hac vice*)
DAVID R. SINGER, ESQ. (*pro hac vice*)
AMY M. GALLEGOS, ESQ. (*pro hac vice*)
JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, California 90071

*Attorneys for Defendants and
Counterclaimant*

## **DEMAND FOR JURY TRIAL**

LVRJ hereby demands a jury trial on all matters so triable.

Dated: January 4, 2021

KEMP JONES, LLP

*/s/ Michael Gayan*

J. RANDALL JONES, ESQ., SBN 1927
MICHAEL J. GAYAN, ESQ., SBN 11135
MONA KAVEH, ESQ., SBN 11825
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169

RICHARD L. STONE, ESQ. (*pro hac vice*)
DAVID R. SINGER, ESQ. (*pro hac vice*)
AMY M. GALLEGOS, ESQ. (*pro hac vice*)
JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, California 90071

*Attorneys for Defendants and
Counterclaimant*

**PROOF OF SERVICE**

I hereby certify that on the 4th day of January, 2021, I served a true and correct copy of the foregoing **DEFENDANTS' ANSWER AND DEFENSES TO LAS VEGAS SUN, INC.'S COMPLAINT AND LAS VEGAS REVIEW-JOURNAL, INC.'S COUNTERCLAIMS** via the United States District Court's CM/ECF electronic filing system to all parties on the e-service list.

E. Leif Reid, Bar No. 5750
Marla Hudgens, Bar No. 11098
Kristen L. Martini, Bar No. 11272
Nicole Scott, Bar No. 13757
LEWIS ROCA ROTHGERBER CHRISTIE LLP
One East Liberty Street, Suite 300
Reno, Nevada 89501

Joseph M. Alioto, *Pro Hac Vice*
Jamie L. Miller, *Pro Hac Vice*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104

James J. Pisanelli, Bar No. 4027
Todd L. Bice, Bar No. 4534
Jordan T. Smith, Bar No. 12097
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

*Attorneys for Plaintiff and Counterclaim Defendants*


/s/ Alison Augustine
An employee of Kemp Jones LLP