**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| LAS VEGAS SUN, INC., | |
| Plaintiff, | Case No.: 2:19-cv-01667-GMN-BNW |
| vs. | **ORDER** |
| SHELDON ADELSON, *et al.*, | |
| Defendants. | |

Pending before the Court is the Motion for Certificate of Appealability, (ECF No. 251), filed by Defendants News+Media Capital Group, LLC; Las Vegas Review Journal, Inc.; Sheldon Adelson; and Patrick Dumont (collectively, "Defendants"). Plaintiff Las Vegas Sun, Inc. ("LVS") filed a Response, (ECF No. 293), and Defendants filed a Reply, (ECF No. 311).

For the reasons discussed below, the Court **DENIES** the Motion for Certificate of Appealability.

**I.    BACKGROUND**

This is an antitrust action. LVS's Complaint alleges the following:

**A.    The Parties**

LVS is a Nevada corporation that publishes a daily newspaper in Clark County, Nevada. (Compl. ¶ 1, ECF No. 1). LVS first published its newspaper, the "Las Vegas Sun" ("Sun"), in 1950, making it the second-longest-running daily newspaper in Las Vegas. (*Id.* ¶ 2). Defendant Las Vegas Review-Journal, Inc. ("LVRJ") is a Delaware corporation that also publishes a daily newspaper in Clark County, Nevada. (*Id.* ¶ 5). LVRJ first published its newspaper—the "Las Vegas Review-Journal" ("RJ")—in 1929, making it the longest-running daily newspaper in Las

Vegas. (*Id.*). LVRJ is a wholly owned subsidiary of Defendant News+Media Capital Group, LLC ("News+Media"). (*Id.* ¶¶ 5, 7).

Defendant Sheldon Adelson is an individual and, according to LVS, the owner and alter ego of News+Media. (*Id.* ¶ 8). Defendant Adelson purportedly exercises significant influence over LVRJ's affairs and the editorial content of its newspaper. (*Id.* ¶ 9).

Defendant Patrick Dumont is an individual and an officer and owner of News+Media. (*Id.* ¶ 11). Dumont is Defendant Adelson's son-in-law. (*Id.*). According to LVS, Defendant Dumont "orchestrated" the Adelson family's purchase of LVRJ, at Defendant Adelson's direction. (*Id.*).

### B. The Joint Operating Agreements

In the late 1980s, the Sun was operating at a substantial loss, which almost caused its financial failure. (*Id.* ¶ 18). In 1989, LVS and LVRJ entered into a Joint Operating Agreement (the "1989 JOA"). (*Id.*). Through the 1989 JOA, LVS and LVRJ sought "[t]o ensure the continued publication of two separate and independent daily newspapers in Las Vegas[.]" (*Id.*). To that end, the 1989 JOA allowed LVRJ to assume control of the print advertising and circulation functions for both newspapers. (*Id.* ¶ 20). Further, the 1989 JOA permitted LVS to print its newspaper using LVRJ's publishing plant and equipment. (*Id.*). Despite these joint operations, the newspapers maintained their editorial independence. (*Id.* ¶ 21). The Sun ultimately became profitable under the 1989 JOA. (*Id.* ¶ 22).

The 1989 JOA was possible due to the Newspaper Preservation Act, 15 U.S.C. §§ 1801–04 (the "NPA"), which exempts joint newspaper operations from certain antitrust trust laws provisions. (*Id.* ¶ 17). In order to obtain the NPA's protection, joint newspaper operations must be conditioned on maintenance of separate editorial functions. (*Id.*).

In 2005, LVS and LVRJ allegedly amended the 1989 JOA (the "2005 JOA"). (*Id.* ¶ 23). Under the 2005 JOA, the Sun and the RJ became a single-media product, meaning that both

newspapers remained separately branded publications, but the Sun was included as a separate newspaper inside the RJ. (*Id.* ¶ 24). LVRJ continued to oversee "all accounting, management, and operational control" of the Sun, "except for the operation of the Sun's news and editorial department." (*Id.* ¶ 26). According to LVS, the 2005 JOA remains operative and runs for an initial period ending on December 31, 2040. (*Id.* ¶ 32). The 2005 JOA, like the 1989 JOA, imposed many obligations onto LVRJ. For example, the 2005 JOA provides for certain formatting specifications. (*Id.* ¶ 27). In addition, it requires that LVRJ publish a "noticeable mention" for the Sun's lead story and specifies that the "noticeable mention" must generally be published above the RJ's own banner on its front page. (*Id.*). The RJ, furthermore, is required to market and promote the Sun in "equal prominence" to the RJ, using "commercially reasonable efforts to maximize circulation of both newspapers." (*Id.* ¶ 28). The RJ and the Sun both bear their respective editorial costs under the 2005 JOA. (*Id.*). Additionally, LVRJ pays an "annual profits payment" to the Sun before the first day of each month. (*Id.* ¶ 30).

The 2005 JOA specifies certain conditions for its termination. (*Id.* ¶ 34). Under the 1989 JOA, LVRJ could terminate the JOA if the joint operation failed to turn a profit for two consecutive years. (*Id.*). That provision was omitted from the 2005 JOA, which permits termination only if one of three events takes place: (1) the expiration of the initial term (December 31, 2040); (2) bankruptcy or default by LVRJ or LVS; or (3) a change in controlling ownership interest in LVS away from any lineal descendants of Hank Greenspun (*i.e.*, the Sun's founding editor and publisher until 1989) without prior approval from the RJ. (*Id.*).

    **C.**    **The Alleged Predatory Conduct**

LVS claims that Defendants engaged in an anticompetitive scheme to eliminate the RJ's sole competitor—the Sun—from the market for daily local newspapers in Clark County. (*Id.* ¶ 48). Defendant Adelson acquired the RJ in December 2015, apparently because he desired to exert "unfettered editorial control" over its content and produce press coverage sympathetic to

his business and personal interests. (*Id.* ¶ 49). Defendant Adelson began to exert this control immediately upon his acquisition of the RJ. (*Id.* ¶ 53). The Sun, however, continued to express attitudes contrary to Adelson's and published pieces that took direct aim at Defendant Adelson himself. (*Id.* ¶ 54).

LVS alleges four different actions by Defendants that together comprise Defendants' predatory conduct and anticompetitive scheme. (*Id.* ¶ 56). First, LVS claims that Defendant Adelson removed Jason Taylor from his position as publisher of the RJ in an effort to harm LVS. (*Id.*).[1] Taylor, according to LVS, was publisher of the RJ for about seven months starting in July 2015. (*Id.* ¶ 57). Prior to Defendant Adelson's acquisition of the RJ, Taylor had implemented a plan to help increase the RJ's revenue, and he was on track to increase the Sun's profit payments under the 2005 JOA. (*Id.* ¶ 59). Further, Taylor identified that the RJ's owner prior to Defendant Adelson "had been dishonest in calculating profit payments" to LVS under the 2005 JOA, and he raised this issue to Adelson but to no avail. (*Id.* ¶ 60). Taylor endeavored to insulate the RJ's newsroom from Adelson's influence, which supposedly resulted in Taylor's removal as publisher of the RJ, the abandonment of Taylor's plan to increase the RJ's revenue, and the hiring of a new publisher who would execute on Defendants' "strategy to financially starve the Sun and to force it out of business." (*Id.* ¶ 64).

Second, LVS alleges that LVRJ abused its control over operations, advertising, and accounting, with the goal of either ending the Sun's existence or diminishing the Sun's value and forcing a sale to the RJ "at a fire-sale price." (*Id.* ¶ 56). Defendants allegedly endeavored to achieve this by increasing the JOA's operating expenses and recording—for the first time in the joint operation's history—a negative EBITDA[2] in the amount of $2.25 million for the fiscal

---

[1] Jason Taylor is not a party to the instant action.

[2] EBITDA means "earnings before interest, taxes, depreciation, and amortization."

year ending on March 31, 2017. (*Id.* ¶ 70). The negative EBITDA led to lower profit payments to the Sun. (*Id.* ¶ 71). Adding to the problem, LVRJ charged editorial and certain advertising costs against the joint operation, in derogation of the 2005 JOA. (*Id.* ¶¶ 72, 83).

Third, LVRJ redesigned the RJ's front page to make the Sun's presence less noticeable. (*Id.* ¶ 56). In 2017, LVRJ deviated from the 2005 JOA's requirements for the RJ's "noticeable mention" of the Sun's lead story. (*Id.* ¶ 87). Similarly, LVRJ strategically obscured the Sun's front-page presence in the RJ with advertising stickers. (*Id.* ¶ 90). These stickers covered, for example, the Sun's endorsements for public office. (*Id.*). Further, in or around January 2018, LVRJ began omitting the Sun from the electronic replica editions of its newspaper, which further reduced the Sun's visibility. (*Id.* ¶¶ 99–100).

Fourth, Defendants threatened involuntary termination of the JOA. (*Id.* ¶ 56). LVRJ sought to terminate the 2005 JOA in Nevada state court (the "state court action") by claiming that the Sun failed "to meet the JOA's required high standard of newspaper quality." (*Id.* ¶ 108). LVS alleges this is an improper basis for termination of the JOA because it is not one of the grounds for termination articulated in the 2005 JOA. (*Id.*). LVS asserts that if Defendants are allowed to continue with their predatory conduct, Defendants will control and monopolize 100 percent of the sale of local daily newspapers in Clark County. (*Id.* ¶ 110).

### D. Procedural History

LVS commenced the instant action on September 24, 2019. In its Complaint, LVS sets forth the following claims: (1) monopolization, in violation of § 2 of the Sherman Act; (2) attempted monopolization, in violation of § 2 of the Sherman Act; (3) conspiracy to monopolize, in violation of § 2 of the Sherman Act; (4) violation of § 7 of the Clayton Act; and (5) violation of Nevada's Unfair Trade Practices Act. (Compl. ¶¶ 119–157). Defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), which the Court granted in part and denied in part. (*See* Order, ECF No. 243). Defendants now seek a certificate of

appealability on three issues the Court dismissed in its Order. (*See* Mot. Certificate of Appealability, ECF No. 251).

## II. <u>LEGAL STANDARD</u>

Federal district courts certify orders for interlocutory appeal only when exceptional circumstances exist. *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982) (citing *U.S. Rubber Co., v. Wright*, 359 F.2d 784, 785 (9th Cir. 1966) ("[28 U.S.C. § 1292(b)] was not intended merely to provide review of difficult rulings in hard cases.")). Even when exceptional circumstances exist, the petitioner must also satisfy three criteria before a district court will certify an order for interlocutory appeal. *See* 28 U.S.C. § 1292(b). The requirements are: "(1) that there be a controlling question of law, (2) that there be substantial grounds for difference of opinion, and (3) that an immediate appeal may materially advance the ultimate termination of the litigation." *In re Cement*, 673 F.2d at 1026. However, even when all three statutory criteria are satisfied, district court judges have complete discretion to deny certification, and a district judge's decision to deny certification is unreviewable. *Executive Software North America, Inc. v. U.S. Dist. Court for Cent. Dist. of California*, 24 F.3d 1545, 1550 (9th Cir. 1994), *overruled on other grounds by California Dept. of Water Resources v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008); *see also United States v. W.R. Grace*, 526 F.3d 499, 522 (9th Cir. 2008) ("[T]he district judge's decision to deny certification escapes our scrutiny.").

The Ninth Circuit has cautioned that section 1292(b) "is to be applied sparingly and only in exceptional circumstances." *United States v. Woodbury*, 263 F.2d 784, 799 n.11 (9th Cir. 1959). The statute "was not intended merely to provide review of difficult rulings in hard cases." *United States Rubber Co.*, 359 F.2d at 785. The party seeking review bears the burden of showing that "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lyband v. Livesay*, 437 U.S. 463, 474–75 (1978).

## III. DISCUSSION

Defendants assert that the Court's Order, (ECF No. 243), concerns three controlling questions of law for which there are substantial grounds for difference of opinion. (*See* Mot. for Certificate of Appealability, ECF No. 251). The alleged questions are: (1) whether LVS adequately pled an antitrust injury for purposes of standing; (2) whether LVS was required to plead the statutory prerequisites for enforceability of a JOA; and (3) whether LVS adequately defined a market definition for antitrust purposes. (*Id*. 3:4–10). The Court begins by addressing Defendants' first and third questions.

### A. Standing and Market Definition

Defendants first dispute the Court's ruling on standing, arguing that a reasonable judge could conclude that LVS's failure to allege antitrust injury in the relevant market requires dismissal of its antitrust claims. (*Id*. 5:19–10:20). In addition, Defendants argue that the LVS's definition of the relevant market—the sale of local daily newspapers in Clark County—is a controlling legal issue for which there is a difference of opinion because a reasonable judge could have found LVS's market definition "unsustainable." (*Id*. 17:7–11). In response, LVS asserts that the questions on standing and the relevant market do not involve "controlling" questions of law. (Resp. to Mot. for Certificate of Appealability ("Resp.") 6:17–8:2, ECF No. 293). The definition of a "relevant market," LVS argues, is highly fact-specific and may be developed in discovery. (*Id*. 10:1–14:15). Relatedly, LVS argues that the issue regarding LVS's standing is also not a question of law because the issue is premised on whether LVS's alleged injuries occurred within the fact-specific, relevant market. (*Id*. 13:10–12). LVS thus contends that both questions do not warrant interlocutory certification. (*Id*. 13:12–14).

A question of law is "controlling" where "resolution of the issue on appeal could materially affect the outcome of the litigation in the district court." *Shurance v. Planning Control Int'l, Inc.*, 839 F.2d 1347 (9th Cir. 1988) (quoting *In re Cement Antitrust Litig.* (MDL

No. 296), 673 F.2d 1020, 1026 (9th Cir. 1981)). In *In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litigation*, the Ninth Circuit rejected a certification of appeal pursuant to Section 1292(b) because "[t]he question . . . is not exclusively one of law, and in any case the determination is not controlling since the question may so easily be revisited by the district court at any time." 928 F.2d 1136, 1136 (9th Cir. 1991). Other circuit courts have similarly held that a Section 1292(b) appeal includes only a "pure" question of law "rather than merely to an issue that might be free from a factual contest." *Ahrenholz v. Bd. of Trs.*, 219 F. 3d at 676–76; *see also McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004) ("§ 1292(b) appeals were intended, and should be reserved, for situations in which the court of appeals can rule on a pure, controlling question of law without having to delve beyond the surface of the record in order to determine the facts.").

Here, resolution of the first and third questions on appeal would not materially affect the outcome of the litigation because the questions include factual assumptions. *See Porter v. Mabus*, 1:07-CV-0825 AWI SMS, 2014 WL 669778, at *2 (E.D. Cal. Feb. 20, 2014) (To be a controlling question of law, "[t]he legal question must be stated at a high enough level of abstraction to lift the question out of the details of the evidence of facts of a particular case and give it general relevance to other cases in the same area of law.") (quoting *Simmons v. Akanno*, 1:09-CV-00659-GBC PC, 2011 WL 1566583, at *3 (E.D. Cal. Apr. 22, 2011)). As to the third question, the definition of the relevant market is fact specific. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482, 112 S. Ct. 2072, 2090 (1992) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)) (The "proper market definition . . . can be determined only after a factual inquiry into the 'commercial realities' faced by consumers."). Indeed, the Court determined in its Order that "the validity of the 'relevant market' is typically a factual element rather than a legal element." (Order 11:1–2, ECF No. 243) (citing *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044–46 (9th Cir. 2008). Defendant blanketly asserts that "the

proper market definition is a controlling legal issue in any antitrust case;" however, fails to provide any case law or authority to support its assertion. (Mot. for Certificate of Appealability 17:9–11). Because Defendant fails to provide any supporting authority and existing authority establishes that market definition is a factual issue in the context of antitrust, the Court finds that the third question for certification is not a controlling question of law.

Relatedly, the first question—whether LVS has standing—also concerns factual assumptions. Although "the court (and not a jury) decides standing, the district court must decide issues of fact necessary to make the standing determination." *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 747 (9th Cir. 2012). Indeed, when "assessing alleged antitrust injuries, courts must focus on anticompetitive effects 'in the market where competition is [allegedly] being restrained.'" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (citing *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)). Thus, in analyzing whether LVS has sufficiently alleged an injury, the Court must consider whether anticompetitive behavior has affected the relevant market. Because the definition of the relevant market is a factual inquiry, the ultimate issue of whether LVS has alleged standing is premised upon a factual finding. *See John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 499 (9th Cir. 1977) (when determining whether there is standing in the antitrust context, the Court must first identify the "affected area of the economy which is the target of the alleged anticompetitive conduct"). Accordingly, the Court also finds that the first question is not suitable for certification because the question is not a "controlling question of law."

Defendants further fail to demonstrate a substantial difference in opinion as to the questions on standing and the relevant market definition. "Courts traditionally will find that a substantial ground for difference of opinion exists where 'the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are

presented." *Couch v. Telescope, Inc.*, 611 F.3d 629, 633 (9th Cir. 2010) (citing 3 Federal Procedure, Lawyers Edition § 3:212 (2010) (footnotes omitted)). As to the first issue, Defendants assert that "[r]easonable judges could disagree with the Court's decision—and contrary to LVS's assertion, the fact that one district judge in West Virginia [in *United States v. Daily Gazette Co.*] reached the same conclusion on different facts does not mean no reasonable judge could ever see the issue differently." (Reply 2:26–3:3, ECF No. 311). Defendants, however, fail to provide any evidence of an existing difference of opinion as to the holding in *Gazette*. (*See* Mot. for Certificate of Appealability 8:17–19) (broadly arguing that "*Gazette* was wrongly decided, and, more importantly, it conflicts with both Ninth Circuit law defining antitrust injury and the NPA itself"). As to the third issue, Defendants similarly argue that a reasonable judge could have found LVS's market definition unsustainable. (*Id*. 17:7–9). Defendants, however, do not argue that this law involves a complicated or novel question, merely that this Court incorrectly applied the proper, settled law. *See Couch*, 611 F.3d at 633 ("That settled law might be applied differently does not establish a substantial ground for difference of opinion."). Instead, Defendants, in the instant Motion, allege that the recently decided case, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1009 (9th Cir. 2018), emphasizes that the alleged relevant market must include all economic substitutes for the product at issue. The Court, however, addressed this exact argument in the Order and ultimately denied Defendants' argument that the relevant market must include economic substitutes in the Order given that Defendants did not support their arguments with applicable caselaw. (See Order 10:6–11:7, ECF No. 243). Though Defendants disagree with the Court's ruling, such disagreement does not justify certification of interlocutory appeal. Accordingly, the Court declines to certify Defendant's first and third proposed questions for appeal.[3]

---

[3] Because the Court finds that the questions are not controlling questions of law and there are no substantial grounds for difference of opinion, the Court declines to certify Defendants' first and third questions without

### B. Burden of Proof

Defendants additionally assert that the Court's ruling that LVS was not required to plead the statutory prerequisites for enforceability of a JOA conflicts with settled law. (Mot. for Certificate of Appealability 10:23–26). Because a reasonable judge could disagree with the Court's conclusion, Defendants assert that there are substantial grounds for a difference of opinion. (*Id.* 13:21–24). LVS, in response, argues that Defendants fail to demonstrate substantial grounds for disagreement or explain how an interlocutory appeal for this defense would materially advance the termination of this case. (*Id.* 21:8–10).

The question regarding LVS's burden of proof does not involve an area where there are substantial grounds for a difference of opinion. The question does not concern a circuit split where the Ninth Circuit is silent, a complicated issue of foreign law, or a novel or difficult question of first impression. *See Couch*, 611 F.3d at 633. Defendants broadly assert that reasonable judges could disagree on the burden of proof because the Court failed to apply the "usual rule . . . that the party suing to enforce a contract 'bears the burden of proving the existence of an enforceable contract.'" (Mot. for Certificate of Appealability 15:1–2) (citing *Value Linx Servs., LLC v. Linx Card Inc.*, 2019 WL 3502895, at *6 (D. Or. Aug. 1, 2019). Defendants, however, do not cite to any case law that applies such a rule in the antitrust context. (*See* Mot. for Certificate of Appealability 15:12–21) (citing examples in the mortgage and loan modification context). Rather than demonstrating a true conflict of opinion, the question reflects Defendants' disagreement with this Court's application of the relevant law. *See Couch*, 611 F.3d at 633.

---

discussing whether an immediate appeal may materially advance the ultimate termination of the litigation. *See In re Cement*, 673 F.2d at 1026 (listing three criteria a petitioner must meet before a district court will certify an order for interlocutory appeal).

Defendant relies on *Reese v. BP Expl. (Alaska) Inc.* in arguing that "a reasonable judge could disagree with the Court's conclusion that LVS did not have the burden of pleading and proving that the 2005 JOA was enforceable." (Mot. for Certificate of Appealability 13:12–24). The Ninth Circuit in *Reese*, however, clarified that there is a substantial ground for difference of opinion "*when novel legal issues are presented*, on which fair-minded jurists might reach contradictory conclusions." 643 F.3d 681, 688 (9th Cir. 2011) (emphasis added). Defendant has not demonstrated, in the present case, that LVS's burden of proof concerns a novel legal issue. Because Defendant fails to show a substantial ground for difference of opinion, the Court declines to certify Defendants' second question.[4]

This case does not involve the exceptional circumstances Congress contemplated when it enacted Section 1292(b). *See Woodbury*, 263 F.2d at 799 n.11. Given that the case is not suitable for interlocutory appeal, the Court thus denies certification.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that the Motion for Certification of Order for Appeal, (ECF No. 251), filed by Defendants News+Media Capital Group, LLC; Las Vegas Review Journal, Inc.; Sheldon Adelson; and Patrick Dumont is **DENIED.**

**DATED** this __27__ day of May, 2021.

_____
Gloria M. Navarro, District Judge
United States District Court

---

[4] Because the Court finds that there is no substantial ground for difference of opinion, the Court declines to certify Defendants' second question without discussing the other two factors: (1) whether the question is a "controlling" question of law; and (2) whether an immediate appeal may materially advance the ultimate termination of the litigation. *See In re Cement*, 673 F.2d at 1026 (listing three criteria a petitioner must meet before a district court will certify an order for interlocutory appeal).