# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| LAS VEGAS SUN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:19-cv-01667-GMN-BNW |
| vs. | ) | |
| | ) | **ORDER** |
| SHELDON ADELSON; PATRICK | ) | |
| DUMONT; NEWS+MEDIA CAPITAL | ) | |
| GROUP, LLC; LAS VEGAS REVIEW- | ) | |
| JOURNAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| LAS VEGAS REVIEW-JOURNAL, | ) | |
| | ) | |
| Counterclaimant, | ) | |
| vs. | ) | |
| | ) | |
| LAS VEGAS SUN, INC., a Nevada | ) | |
| corporation; BRIAN GREENSPUN, an | ) | |
| individual and as the alter ego of Las Vegas | ) | |
| Sun, Inc.; GREENSPUN MEDIA GROUP, | ) | |
| LLC, a Nevada limited liability company, as | ) | |
| the alter ego of Las Vegas Sun, Inc., | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

Pending before the Court is the Motion to Dismiss Counterclaims, (ECF No. 363), filed by Plaintiff/Counterclaim Defendants Las Vegas Sun, Inc. ("LVS"), Brian Greenspun, and Greenspun Media Group, LLC ("GMG") (collectively, "Counterclaim Defendants"). Defendant/Counter Claimant Las Vegas Review Journal, Inc. ("RJ") filed a Response, (ECF No. 373), and Counterclaim Defendants filed a Reply, (ECF No. 388).

//

Also pending before the Court is the Motion for Leave to File Excess Pages, (ECF No. 372), filed by RJ.  LVS does not oppose the Motion. (*See* Order Granting Stipulation ¶ 7, ECF No. 381).[1]

Also pending before the Court is the Motion to Substitute Party, (ECF No. 380), filed by LVS.  RJ filed a Response, (ECF No. 386), and LVS filed a Reply, (ECF No. 392).

Also pending before the Court is the Report and Recommendation, (ECF No. 394), by Magistrate Judge Cam Ferenbach.  Defendants Sheldon Adelson, Patrick Dumont, RJ, and News+Media Capital Group, LLC (collectively, "Defendants") filed an Objection, (ECF No. 395).  LVS filed a Response to the Objection, (ECF No. 401).

Also pending before the Court is the Motion for Leave to File a Reply in Support of Objection to the Report and Recommendation, (ECF No. 413), filed by Defendants.  LVS filed a Response, (ECF No. 422), and RJ filed a Reply, (ECF No. 429).[2]

For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** Counterclaim Defendants' Motion to Dismiss, **GRANTS** RJ's Motion for Leave to File Excess Pages, **GRANTS** LVS's Motion to Substitute Party, **ADOPTS in full** the Report and Recommendation, and **GRANTS** Defendants' Motion for Leave to File a Reply.

## I.    BACKGROUND

This is an antitrust action.  LVS's Complaint alleges the following:

### A.    THE PARTIES

LVS is a Nevada corporation that publishes a daily newspaper in Clark County, Nevada. (Compl. ¶ 1, ECF No. 1).  LVS first published its newspaper, the "Las Vegas Sun" ("Sun"), in 1950, making it the second-longest-running daily newspaper in Las Vegas. (*Id.* ¶ 2).  Defendant

---

[1] Given that LVS does not oppose the Motion, the Court grants RJ's Motion for Leave to File Excess Pages.

[2] For good cause appearing, the Court grants Defendants' Motion for Leave to File a Reply.

Las Vegas Review-Journal, Inc. ("LVRJ") is a Delaware corporation that also publishes a daily newspaper in Clark County, Nevada. (*Id.* ¶ 5). LVRJ first published its newspaper—the "Las Vegas Review-Journal" ("RJ")—in 1929, making it the longest-running daily newspaper in Las Vegas. (*Id.*). LVRJ is a wholly owned subsidiary of Defendant News+Media Capital Group, LLC ("News+Media"). (*Id.* ¶¶ 5, 7).

Defendant Sheldon Adelson is an individual and, according to LVS, the owner and alter ego of News+Media. (*Id.* ¶ 8). Defendant Adelson purportedly exercises significant influence over LVRJ's affairs and the editorial content of its newspaper. (*Id.* ¶ 9).

Defendant Patrick Dumont is an individual and an officer and owner of News+Media. (*Id.* ¶ 11). Dumont is Defendant Adelson's son-in-law. (*Id.*). According to LVS, Defendant Dumont "orchestrated" the Adelson family's purchase of LVRJ, at Defendant Adelson's direction. (*Id.*).

## B.    THE JOINT OPERATING AGREEMENTS

In the late 1980s, the Sun was operating at a substantial loss, which almost caused its financial failure. (*Id.* ¶ 18). In 1989, LVS and LVRJ entered into a Joint Operating Agreement (the "1989 JOA"). (*Id.*). Through the 1989 JOA, LVS and LVRJ sought "[t]o ensure the continued publication of two separate and independent daily newspapers in Las Vegas[.]" (*Id.*). To that end, the 1989 JOA allowed LVRJ to assume control of the print advertising and circulation functions for both newspapers. (*Id.* ¶ 20). Further, the 1989 JOA permitted LVS to print its newspaper using LVRJ's publishing plant and equipment. (*Id.*). Despite these joint operations, the newspapers maintained their editorial independence. (*Id.* ¶ 21). The Sun ultimately became profitable under the 1989 JOA. (*Id.* ¶ 22).

The 1989 JOA was possible due to the Newspaper Preservation Act, 15 U.S.C. §§ 1801–04 (the "NPA"), which exempts joint newspaper operations from certain antitrust trust laws

provisions. (*Id.* ¶ 17).  In order to obtain the NPA's protection, joint newspaper operations must be conditioned on maintenance of separate editorial functions. (*Id.*).

In 2005, LVS and LVRJ allegedly amended the 1989 JOA (the "2005 JOA"). (*Id.* ¶ 23). Under the 2005 JOA, the Sun and the RJ became a single-media product, meaning that both newspapers remained separately branded publications, but the Sun was included as a separate newspaper inside the RJ. (*Id.* ¶ 24).  LVRJ continued to oversee "all accounting, management, and operational control" of the Sun, "except for the operation of the Sun's news and editorial department." (*Id.* ¶ 26).  According to LVS, the 2005 JOA remains operative and runs for an initial period ending on December 31, 2040. (*Id.* ¶ 32).  The 2005 JOA, like the 1989 JOA, imposed many obligations onto LVRJ.  For example, the 2005 JOA provides for certain formatting specifications. (*Id.* ¶ 27).  In addition, it requires that LVRJ publish a "noticeable mention" for the Sun's lead story and specifies that the "noticeable mention" must generally be published above the RJ's own banner on its front page. (*Id.*).  The RJ, furthermore, is required to market and promote the Sun in "equal prominence" to the RJ, using "commercially reasonable efforts to maximize circulation of both newspapers." (*Id.* ¶ 28).  The RJ and the Sun both bear their respective editorial costs under the 2005 JOA. (*Id.*).  Additionally, LVRJ pays an "annual profits payment" to the Sun before the first day of each month. (*Id.* ¶ 30).

The 2005 JOA specifies certain conditions for its termination. (*Id.* ¶ 34).  Under the 1989 JOA, LVRJ could terminate the JOA if the joint operation failed to turn a profit for two consecutive years. (*Id.*).  That provision was omitted from the 2005 JOA, which permits termination only if one of three events takes place: (1) the expiration of the initial term (December 31, 2040); (2) bankruptcy or default by LVRJ or LVS; or (3) a change in controlling ownership interest in LVS away from any lineal descendants of Hank Greenspun (*i.e.*, the Sun's founding editor and publisher until 1989) without prior approval from the RJ. (*Id.*).
//

1

2        C.      THE ALLEGED PREDATORY CONDUCT

3            LVS claims that Defendants engaged in an anticompetitive scheme to eliminate the RJ's

4    sole competitor—the Sun—from the market for daily local newspapers in Clark County. (*Id.*

5    ¶ 48).  Defendant Adelson acquired the RJ in December 2015, apparently because he desired to

6    exert "unfettered editorial control" over its content and produce press coverage sympathetic to

7    his business and personal interests. (*Id.* ¶ 49).  Defendant Adelson began to exert this control

8    immediately upon his acquisition of the RJ. (*Id.* ¶ 53).  The Sun, however, continued to express

9    attitudes contrary to Adelson's and published pieces that took direct aim at Defendant Adelson

     himself. (*Id.* ¶ 54).

10           LVS alleges four different actions by Defendants that together comprise Defendants'

11   predatory conduct and anticompetitive scheme. (*Id.* ¶ 56).  First, LVS claims that Defendant

12   Adelson removed Jason Taylor from his position as publisher of the RJ in an effort to harm

13   LVS. (*Id.*).[3]  Taylor, according to LVS, was publisher of the RJ for about seven months starting

14   in July 2015. (*Id.* ¶ 57).  Prior to Defendant Adelson's acquisition of the RJ, Taylor had

15   implemented a plan to help increase the RJ's revenue, and he was on track to increase the Sun's

16   profit payments under the 2005 JOA. (*Id.* ¶ 59).  Further, Taylor identified that the RJ's owner

17   prior to Defendant Adelson "had been dishonest in calculating profit payments" to LVS under

18   the 2005 JOA, and he raised this issue to Adelson but to no avail. (*Id.* ¶ 60).  Taylor endeavored

19   to insulate the RJ's newsroom from Adelson's influence, which supposedly resulted in Taylor's

20   removal as publisher of the RJ, the abandonment of Taylor's plan to increase the RJ's revenue,

21   and the hiring of a new publisher who would execute on Defendants' "strategy to financially

22   starve the Sun and to force it out of business." (*Id.* ¶ 64).

23

24   _____

25   [3] Jason Taylor is not a party to the instant action.

Second, LVS alleges that LVRJ abused its control over operations, advertising, and accounting, with the goal of either ending the Sun's existence or diminishing the Sun's value and forcing a sale to the RJ "at a fire-sale price." (*Id.* ¶ 56). Defendants allegedly endeavored to achieve this by increasing the JOA's operating expenses and recording—for the first time in the joint operation's history—a negative EBITDA[4] in the amount of $2.25 million for the fiscal year ending on March 31, 2017. (*Id.* ¶ 70). The negative EBITDA led to lower profit payments to the Sun. (*Id.* ¶ 71). Adding to the problem, LVRJ charged editorial and certain advertising costs against the joint operation, in derogation of the 2005 JOA. (*Id.* ¶¶ 72, 83).

Third, LVRJ redesigned the RJ's front page to make the Sun's presence less noticeable. (*Id.* ¶ 56). In 2017, LVRJ deviated from the 2005 JOA's requirements for the RJ's "noticeable mention" of the Sun's lead story. (*Id.* ¶ 87). Similarly, LVRJ strategically obscured the Sun's front-page presence in the RJ with advertising stickers. (*Id.* ¶ 90). These stickers covered, for example, the Sun's endorsements for public office. (*Id.*). Further, in or around January 2018, LVRJ began omitting the Sun from the electronic replica editions of its newspaper, which further reduced the Sun's visibility. (*Id.* ¶¶ 99–100).

Fourth, Defendants threatened involuntary termination of the JOA. (*Id.* ¶ 56). LVRJ sought to terminate the 2005 JOA in Nevada state court (the "state court action") by claiming that the Sun failed "to meet the JOA's required high standard of newspaper quality." (*Id.* ¶ 108). LVS alleges this is an improper basis for termination of the JOA because it is not one of the grounds for termination articulated in the 2005 JOA. (*Id.*). LVS asserts that if Defendants are allowed to continue with their predatory conduct, Defendants will control and monopolize 100 percent of the sale of local daily newspapers in Clark County. (*Id.* ¶ 110).

*//*

---

[4] EBITDA means "earnings before interest, taxes, depreciation, and amortization."

**D.   PROCEDURAL HISTORY**

LVS commenced the instant action on September 24, 2019.  In its Complaint, LVS sets forth the following claims: (1) monopolization, in violation of § 2 of the Sherman Act; (2) attempted monopolization, in violation of § 2 of the Sherman Act; (3) conspiracy to monopolize, in violation of § 2 of the Sherman Act; (4) violation of § 7 of the Clayton Act; and (5) violation of Nevada's Unfair Trade Practices Act. (Compl. ¶¶ 119–157).  On November 30, 2020, this Court granted in part and denied in part Defendants' Motion to Dismiss the Complaint. (*See* ECF No. 243).  On January 4, 2021, Defendants RJ filed an Answer to Plaintiff LVS's Complaint and also filed a Counterclaim. (*See* Counterclaim, ECF No. 296).  A month later, Defendants filed a Suggestion of Death after Defendant Sheldon Adelson passed away. (*See* Suggestion of Death, ECF No. 358).

In March 2021, Counterclaim Defendants filed their Motion to Dismiss the Counterclaim, (ECF No. 363).  In April 2021, LVS then timely filed its Motion to Substitute Party, (ECF No. 380).

**II.   LEGAL STANDARD**

**A.   REPORT AND RECOMMENDATION WITH OBJECTION**

A party may file specific written objections to the findings and recommendations of a United States Magistrate Judge made pursuant to Local Rule IB 1-4. 28 U.S.C. § 636(b)(1)(B); D. Nev. R. IB 3-2.  Upon the filing of such objections, the Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections are made. *Id*.  The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); D. Nev. IB 3-2(b).

//

//

//

**B.    MOTION TO DISMISS**

Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) where a pleader fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, legal conclusions couched as factual allegations are insufficient. *Twombly*, 550 U.S. at 555.  Accordingly, Rule 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

If the court grants a motion to dismiss for failure to state a claim, leave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment. *DeSoto v. Yellow Freight Sys.*, *Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).  Pursuant to Rule 15(a), the court should "freely" give leave to amend "when justice so requires," and in the absence of a reason such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

//

//

//

## III.   DISCUSSION

The Court begins its discussion by addressing LVS's Motion to Substitute Party and the Report and Recommendation ("R&R") relating to the Motion to Substitute Party.   Thereafter, the Court considers the arguments made in Counterclaim Defendants' Motion to Dismiss.

### A.   MOTION TO SUBSTITUTE PARTY, (ECF NO. 380) and REPORT AND RECOMMENDATION, (ECF NO. 394)

LVS seeks to substitute the deceased defendant, Sheldon Adelson, with Dr. Miriam Adelson as Special Administrator of the Estate of Sheldon Adelson. (Mot. Substitute, ECF No. 380).  RJ only opposes the Motion with respect to the survivability of the "statutory trebling of damages and fee-shifting because those damages are penal rather than remedial." (Resp. to Mot. Substitute, ECF No. 394).  In his Report and Recommendation ("R&R"), Magistrate Judge Cam Ferenbach recommends granting the Motion to Substitute, to which the RJ filed an Objection. (*See* R&R, ECF No. 394); (*see also* Obj. to R&R, ECF No. 401).  The Court analyzes the Motion to Substitute *de novo*. *See* 28 U.S.C. § 636(b)(1)(B).

Pursuant to Federal Rule of Civil Procedure 25(a)(1), "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party.  A motion for substitution may be made by any party or by the decedent's successor or representative.  If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Fed. R. Civ. P. 25(a)(1).  As such, if there is no motion for substitution filed within ninety (90) days from the date of this order, the Court will dismiss the case.[5]

"It is 'a well-settled rule that actions upon penal statutes do not survive the death' of a party." *Reiserer v. United States*, 479 F.3d 1160, 1162 (9th Cir. 2007) (citing *Ex parte*

_____

[5] The parties do not dispute the timeliness of the Motion to Substitute.

*Schreiber*, 110 U.S. 76, 80, 3 S. Ct. 423, 28 L. Ed. 65 (1884)).  In determining whether a statute is "penal," courts apply a three-factor test to determine the claims' survivability. *Id.* at 1163. "Those factors are: 1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; 2) whether recovery under the statute runs to the harmed individual or to the public; and 3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered." *Bracken v. Harris & Zide, L.L.P.*, 219 F.R.D. 481, 483 (N.D. Cal. 2004).  "While courts must assess each factor in turn, the legislative intent behind the law is the dominant factor." *Jim 72 Props., LLC v. Montgomery Cleaners*, 151 F. Supp. 3d 1092, 1098 (C.D. Cal. 2015); *see also Reiserer*, 479 F.3d at 1165.  Ultimately, the decision to substitute a party upon death is within the court's discretion. *United States for Use of Acme Granite & Tile Co. v. F. D. Rich Co.,* 437 F.2d 549, 552 (9th Cir. 1970); *McComb v. Row River Lumber Co.*, 177 F.2d 129, 130 (9th Cir. 1949).

Here, LVS seeks treble damages pursuant to its antitrust claims under 15 U.S.C. § 15(a) and its claim under the Nevada Unfair Trade Practices Act.  The Court begins by discussing whether treble damages under the federal antitrust statutes—Sherman Act and Clayton Act—are remedial or penal.

### 1.     Federal Antitrust Claims

Defendants object to the R&R, arguing that neither the Ninth Circuit nor any other federal court has directly addressed the survivability of the antitrust provisions under Rule 25(a). (Obj. to R&R 1:18–21).  The Court agrees.  According to the Court's review of the parties' briefing and its own research, no court has explicitly addressed the exact scenario at issue—whether a plaintiff's claim for treble damages under the antitrust provisions survive upon the plaintiff's death.  The Court nevertheless finds that Plaintiff's federal antitrust claims survive Defendant Sheldon Adelson's death under the existing caselaw and the three-factor test. //

### a.     Existing Caselaw

The Supreme Court has explicitly held that treble damages under antitrust statutes are "primarily remedial." *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485-86, 97 S. Ct. 690, 696 (1977); *Hicks v. Bekins Moving & Storage Co.*, 87 F.2d 583, 585 (9th Cir. 1937); *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 575, 102 S. Ct. 1935, 1947 (1982).  In *Brunswick*, the Supreme Court concluded that:

> Section 4, in contrast, is in essence a remedial provision.  It provides treble damages to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws…."  Of course, treble damages also play an important role in penalizing wrongdoers and deterring wrongdoing, as we also have frequently observed.  It nevertheless is true that the treble-damages provision, which makes awards available only to injured parties, and measures the awards by a multiple of the injury actually proved, is designed primarily as a remedy.

*Brunswick Corp.*, 429 U.S. at 485-86 (citations omitted).  Later, in *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, the Supreme Court reiterated that "antitrust treble damages were designed in part to punish past violations of the antitrust laws." *Am. Soc'y of Mech. Eng'rs.*, 456 U.S. at 575.  The Ninth Circuit has similarly followed the Supreme Court's ruling in *Brunswick*, acknowledging that "[w]hile §4 does play an important part in penalizing and deterring wrongdoing, it was designed primarily as a remedy." *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 498 (9th Cir. 1977) (citations omitted).

Although treble damages are typically sought for punitive purposes, Congress imposed treble damages in antitrust suits also "as an important means of enforcing the law." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 635-36, 105 S. Ct. 3346, 3358-59 (1985) (citing *Brunswick Corp.*, 429 U.S. at 491 n.10).  The Supreme Court in *Brunswick* specifically analyzed the legislative intent of the treble damages provision under the Sherman Act and Clayton Act in the following footnote:

Treble-damages antitrust actions were first authorized by § 7 of the Sherman Act, 26 Stat. 210 (1890). The discussions of this section on the floor of the Senate indicate that it was conceived of primarily as a remedy for "[t]he people of the United States as individuals," especially consumers. Treble damages were provided in part for punitive purposes, but also to make the remedy meaningful by counterbalancing "the difficulty of maintaining a private suit against a combination such as is described" in the Act.

When Congress enacted the Clayton Act in 1914, it "extend[ed] the remedy under section 7 of the Sherman Act" to persons injured by virtue of any antitrust violation. The initial House debates concerning provisions related to private damages actions reveal that these actions were conceived primarily as "open[ing] the door of justice to every man, whenever he may be injured by those who violate the antitrust laws, and giv[ing] the injured party ample damages for the wrong suffered." The House debates following the conference committee report, however, indicate that the sponsors of the bill also saw treble-damages suits as an important means of enforcing the law. In the Senate there was virtually no discussion of the enforcement value of private actions, even though the bill was attacked as lacking meaningful sanctions.

*Brunswick Corp.*, 429 U.S. at 491 n.10.

Defendants, in their Objection, argue that existing Supreme Court and Ninth Circuit precedent suggests that antitrust treble damages are punitive. (Obj. to R&R 13:16–15:8). Primarily, Defendants object to Judge Ferenbach's analysis distinguishing *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 235 (9th Cir. 1974) from the present case. (*Id*. 14:11–23). In his Report and Recommendation, Judge Ferenbach concluded that *Kline* is not dispositive because the Ninth Circuit in *Kline* uniquely considered treble damages in the context of certifying a class action lawsuit. (R&R 5:6–8). The Court agrees with Judge Ferenbach's analysis and further notes that the Ninth Circuit in *Kline* did not cite or reference the existing Supreme Court precedent such as *Hicks* in determining that treble damages under the antitrust statutes are punitive. *Kline*, 508 F.2d at 235. Additionally, the Supreme Court issued its decisions in

*Brunswick* and *Am. Soc'y of Mech. Eng'rs* after *Kline*.[6]  Though there appears to be some disagreement between federal courts, the Court cannot disregard the existing Supreme Court precedent in *Brunswick* and *Am. Soc'y of Mech. Eng'rs*.

### b.    Three-Part Test

The three-part test additionally confirms existing Supreme Court precedent.  The three factors are "1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; 2) whether recovery under the statute runs to the harmed individual or to the public; and 3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered." *Bracken v. Harris & Zide, L.L.P.*, 219 F.R.D. 481, 483 (N.D. Cal. 2004).

The first factor weighs in favor of finding the antitrust treble damages as remedial.  "If the purpose of the statute is to redress an individual wrong it is more likely to have a remedial purpose." *Bracken v. Harris & Zide, L.L.P.*, 219 F.R.D. 481, 484 (N.D. Cal. 2004); *see also Riggs v. Gov't Emps. Fin. Corp.*, 623 F.2d 68 (9th Cir. 1980).  In *Riggs*, the Ninth Circuit determined that treble damages under the Truth-in-Lending Act were ultimately remedial and transferable, even though the Act serves a dual purpose of providing a remedy to the individual while deterring "socially undesirable lending practices." *Riggs*, 623 F.2d at 72.  The Ninth Circuit ultimately determined that "Congress intended to secure compliance with the Act by creating a civil recovery incentive for private litigants." *Id*.  Likewise, Congress, when enacting the Sherman Act and Clayton Act, determined that the damages "were conceived of primarily as a remedy for '[t]he people of the United States as individuals.'" *Brunswick Corp.*, 429 U.S. at 491 n.10.  Because the remedy alleviates harm to the individual, the first factor suggests that treble damages under federal antitrust statutes are remedial.

---

[6] The Ninth Circuit issued its decision in *Kline* on December 20, 1974, whereas the Supreme Court issued its decisions in *Brunswick* and *Am. Soc'y of Mech. Eng'rs.* on January 25, 1977, and May 17, 1982, respectively.

Similarly, the second factor also supports concluding that the treble damages are remedial.  "The second factor whether the recovery runs to the individual or the public is obviously closely related to the first." *Bracken v. Harris & Zide, L.L.P.*, 219 F.R.D. 481, 484 (N.D. Cal. 2004) (citing *James v. Home Constr. Co.*, 621 F.2d 727, 730 (5th Cir. 1980)).  As explained above, Congress seemingly intended for the treble damages to directly aid individuals by allowing them to directly file a lawsuit for antitrust violations. *Brunswick Corp.*, 429 U.S. at 491 n.10.

The last factor, however, weighs against finding treble damages remedial in nature.  Treble damages, by its very nature, multiples the damages if antitrust liability is found.  Indeed, the Supreme Court acknowledged that "[t]reble damages were provided in part for punitive purposes but also to make the remedy meaningful by counterbalancing 'the difficulty of maintaining a private suit against a combination such as is described' in the Act. *Brunswick Corp.*, 429 U.S. at 491 n.10.

In balancing the above factors, the Court finds that the three-part test affirms the Supreme Court's precedent on antitrust treble damages because two of the three factors weigh in favor of treating antitrust treble damages as remedial in nature.  The Court, in its discretion, thus grants LVS's Motion to Substitute Party as to LVS's federal antitrust claims because the treble damages survive even upon Sheldon Adelson's passing.

### 2.     Nevada Unfair Trade Practices Claim

Defendants correctly note that Nevada substantive law applies as to whether Plaintiff's treble damages claim under the Nevada Unfair Trade Practices Act ("NUTPA") survives under Rule 25. *See Robertson v. Wegmann*, 436 U.S. 584, 603, 98 S. Ct. 1991, 2002 (1978) (Rule 25 "does not resolve the question [of] what law of survival of actions should be applied in this case.  [It] simply describes the manner in which parties are to be substituted in federal court once it is determined that the applicable substantive law allows the action to survive a party's

death." (internal quotation marks and citation omitted); *see also* 6 Moore's Federal Practice - Civil § 25.11 (2022) ("Because survival is governed by the law that creates the cause of action, federal courts must apply state survival statutes or other relevant state law to determine survival of state law claims.").

Unlike the federal antitrust claims, Nevada state law does not explicitly state whether antitrust treble damages are penal or remedial in nature.  Nevada courts, however, have routinely adhered to federal courts' interpretation of antitrust statutes under the NUTPA. *See* NEV. REV. STAT. § 598.050 (acknowledging that "provisions of [NRS 598A.50] shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."); *see also Boulware v. Nevada*, 960 F.2d 793, 800 (9th Cir. 1992).  The Court thus incorporates its prior analysis for the federal antitrust claims and accordingly grants LVS's Motion to Substitute Party in full.

## B.     MOTION TO DISMISS THE COUNTERCLAIM, (ECF NO. 363)

Counterclaim Defendants LVS, Brian Greenspun, and Greenspun Media Group move to dismiss all claims raised in RJ's Counterclaim. The Court addresses each argument below.

### 1.     Market Power

Counterclaim Defendants first move to collectively dismiss RJ's Sherman Act claims, specifically Counterclaim 1: Monopolization in violation of Section 2 of the Sherman Act; Counterclaim 2: Attempted Monopolization in violation of Section 2 of the Sherman Act; and Counterclaim 3: Restraint of Trade in violation of Section 1 of the Sherman Act (collectively, the "Sherman Act claims"). (MTD 5:16–17).  Specifically, they argue that RJ has not plausibly pled—neither directly nor indirectly—that LVS possesses market or monopoly power under its three Sherman Act claims. (*Id*. 5:14–12:13).  RJ rebuts, as to the Section 1 claim, that market power is not a requisite element. (Resp. to MTD 9:9–10:8).  Nevertheless, RJ also asserts that it has plausibly alleged that market power as to all of its Sherman Act claims. (*Id*. 10:9–18:16).

1

2    "In order to state a valid claim under the Sherman Act, a plaintiff must allege that the

3    defendant has market power within a 'relevant market.'" *Newcal Indus. v. Ikon Office Sol.*, 513

4    F.3d 1038, 1044 (9th Cir. 2008).[7]   A party has market power when, "by restricting its own

5    output, it can restrict market wide output and, hence, increase market wide prices." *Rebel Oil*

6    *Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

### a.    Section 1 Claim

RJ, in its Counterclaim, alleges that the 2005 JOA is a *per se* horizontal restraint of trade

because it was a contract between two horizontally situated newspaper companies to cooperate

on supply, market allocation, and profits. (Counterclaim ¶¶ 146–161).   Alternatively, it alleges

that "the 2005 JOA is and operates as an unreasonable restraint on trade under a quick look or

full-fledged 'rule of reason' mode of analysis." (*Id.* ¶ 150).

Defending its Section 1 claim, RJ correctly argues that market power is not a requisite

element for its Section 1 claim because a horizontal restraint of trade is *per se* unlawful. (Resp.

to MTD 9:9–10:8).   Some restraints on trade are *per se* unreasonable because they "always or

almost always tend to restrict competition and decrease output." *Business Electronics*

*Corp.* v. *Sharp Electronics Corp.*, 485 U. S. 717, 723, 108 S. Ct. 1515, 99 L. Ed. 2d 808

(1988).   "Typically only 'horizontal' restraints—restraints 'imposed by agreement between

competitors'—qualify as unreasonable *per se*." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274,

2283-84 (2018) (citing *id.* at 730).   Given that RJ alleges the 2005 JOA is a horizontal restraint

on trade, RJ need not allege market power as to its horizontal restraint claim. (Counterclaim ¶¶

146–161).   Indeed, Counterclaim Defendants, in their Reply, do not directly respond to the

RJ's argument—instead, they assert that RJ's alternative Section 1 claim should be dismissed.

(Reply to MTD 4:11–23).   RJ's Section 1 claim, alleged on the theory of horizontal restraint,

---

[7] The "market power" requirement applies identically under Section 1 and Section 2 of the Sherman Act. *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1057 n.3 (9th Cir. 2008).

thus survives Counterclaim Defendants' Motion to Dismiss.  The Court accordingly analyzes whether RJ plausibly alleges market power as to the remaining Sherman Act claims.

### b.   *Remaining Sherman Act Claims*

There are two ways to demonstrate market power—direct evidence and circumstantial evidence. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  Counterclaim Defendants argue that RJ fails to plausibly allege both direct and indirect allegations of market power as to its alternative Section 1 claim and Section 2 claim.  As to direct evidence, Counterclaim Defendants contend that RJ cannot plausibly allege that LVS has market power because LVS is entirely dependent on the RJ. (MTD 7:1–8:25).  This reliance, Counterclaim Defendants argue, demonstrates that LVS can neither unilaterally reduce the output of the joint paper nor increase the prices to a supra competitive level. (*Id.* 7:2–21).  In response, RJ argues that allegations of reduction in quality of the joint product, along with reduction in output and increase in price, demonstrate anticompetitive harm. (Resp. to MTD 11:23–12:7).

"Direct evidence of anticompetitive effects would be proof of actual detrimental effects, such as reduced output, increased prices, or *decreased quality* in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284, 201 L. Ed. 2d 678 (2018) (emphasis added); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("[A]n act is deemed anticompetitive under the Sherman Act only when it harms both allocative efficiency and raises the prices of goods above competitive levels or *diminishes their quality*.") (emphasis added).  Here, RJ plausibly alleges, under its First Counterclaim, that LVS's predatory conduct diminished output and quality such that the RJ "would be in a position to improve its circulation and quality if it were not forced to expend resources bolstering and litigating against" LVS. (Counterclaim ¶¶ 130, 142).  Given that RJ alleges that LVS's anticompetitive behavior reduced the quality of the paper and reduction of quality is direct evidence of

anticompetitive effects, the Court finds that RJ plausibly alleges market power for purposes of its Sherman Act claims.[8]

### 2. Predatory Conduct

Counterclaim Defendants additionally move to dismiss RJ's claims for monopolization and attempted monopolization under Section 2 of the Sherman Act on grounds that RJ fails to plausibly allege predatory conduct. (MTD 12:14–17:17). RJ, in its Counterclaim, alleges four categories of predatory acts: (1) attempting to pressure the RJ to accept anti-competitive agreements including a market allocation and non-compete agreement, as well as "no-poach" agreement for employees; (2) coercing the RJ to maintain the 2005 JOA, draining its resources and depriving it of opportunities, even though the agreement is unlawful and unenforceable under the NPA and despite the RJ's attempt to lawfully terminate the agreement; (3) filing a sham lawsuit against the RJ; and (4) willfully breaching the 2005 JOA and undermining the parties' joint media product. (Counterclaim ¶ 114). Counterclaim Defendants target two of the four categories—attempting to pressure the RJ to accept anti-competitive agreements and filing a sham lawsuit against RJ—in ultimately seeking dismissal of RJ's Section 2 claims. (MTD 13:5–9); (*see also* Reply to MTD 12:17–20).

### a. Standing/Antitrust Injury

First, Counterclaim Defendants assert that RJ cannot demonstrate standing or antitrust injury because, as to RJ's first category, RJ rejected LVS's alleged invitations to enter into anti-competitive agreements. (MTD 13:10–15:4). In order to have standing to bring an antitrust claim, a plaintiff "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts

---

[8] Because the Court finds that RJ plausibly alleges market power based on its allegations of diminished quality and output, the Court does not consider LVS's additional arguments concerning indirect allegations of market power.

unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis added). "Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). Rather, an antitrust injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'" *Brunswick,* 429 U.S. at 489 (alteration in original) (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969)).

Here, RJ plausibly alleges an antitrust injury. RJ alleges four categories of predatory conduct. (*See* Counterclaim ¶ 114). Of those four categories, Counterclaim Defendants move to dismiss one of the four categories because RJ fails to adequately allege an antitrust injury. (MTD 13:10–15:4). The Court agrees that RJ does not plausibly allege an antitrust injury as to the anticompetitive agreements because RJ refused to accept the anti-competitive agreements. (*See* Counterclaim ¶ 72) (RJ "refused to agree to the various anti-competitive market-allocation provisions that Mr. Greenspun sought."). Because RJ refused to enter into the agreements, RJ cannot allege antitrust injury from the anticompetitive agreements. *Liu v. Amerco*, 677 F.3d 489, 494 (1st Cir. 2012) (finding that "precedent is scarce since an unsuccessful attempt rarely causes damages"). Indeed, RJ does not rebut LVS's arguments concerning standing and antitrust injury. (Resp. to MTD 18:17–21:18); (*see also* Reply to MTD 12:21–26).

RJ's remaining allegations nonetheless demonstrate an antitrust injury. The Ninth Circuit in *Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992), explained that:

> it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. At the same time, if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing. Similarly, a finding of some slight wrongdoing in certain areas need not by itself add up to a violation. We are not dealing with a mathematical equation. We are dealing with what has been called the "synergistic effect" of the mixture of the elements.

*Anaheim*, 955 F.2d at 1376.  Even if this Court discounted RJ's first allegation that LVS pressured the RJ to accept anti-competitive agreements, RJ still alleges three other categories of predatory conduct, which the Court can reasonably infer to establish an antitrust injury.  RJ alleges, and Counterclaim Defendants do not dispute, that LVS engaged in predatory acts by "coercing RJ to maintain the JOA, filing a sham lawsuit against the RJ, and willfully breaching the 2005 JOA by undermining the parties' joint media product." (Counterclaim ¶ 114).   In looking at the "synergistic effect" of the overall allegations, RJ alleges predatory conduct that allegedly silenced RJ's editorial viewpoint, which this Court has already classified as an antitrust injury. (*See* Order Granting in Part and Denying in Part MTD 11:8–13:10, ECF No. 243).  The Court accordingly find that RJ plausibly alleges antitrust injury.

### b.    Sham Litigation

Counterclaim Defendants seek to invoke immunity from RJ's claims under the *Noerr-Pennington* doctrine. (MTD 15:6–12).  "The essence of the *Noerr-Pennington* doctrine is that those who petition any department of the government for redress are immune from statutory liability for their petitioning conduct." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1006 (9th Cir. 2008); *see also Sosa v. DIRECTV, Inc*., 437 F.3d 923, 929 (9th Cir. 2006).  *Noerr*, however, excludes from immunity those who file sham litigations and "use the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advert.*, 499 U.S. 365, 380, 111 S. Ct. 1344, 1354 (1991).  "A 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all, not one 'who genuinely seeks to achieve his governmental result, but does so through improper means.'" *Id*. (citations omitted).

Counterclaim Defendants argue that RJ cannot plausibly allege predatory conduct because the Noerr Pennington doctrine immunizes them and further, that RJ does not provide sufficient facts that the sham litigation exception to the Noerr-Pennington doctrine applies.

(MTD 17:1–17).  Specifically, RJ does not allege sufficient facts demonstrating that LVS filed a sham lawsuit against the RJ. (*Id.*).  LVS contends, in response, that this Court's denial of the RJ's Motion to Dismiss the Complaint demonstrates that LVS's underlying lawsuit is not objectively baseless. (*Id.* 17:7–8).

"For a plaintiff to succeed in invoking the sham exception to defeat *Noerr-Pennington* immunity, a plaintiff must plead with specificity the 'sham-ful' nature of the alleged interference." *Las Vegas Sands, Inc. v. Culinary Workers Union Local # 226*, 82 F. App'x 580, 585 (9th Cir. 2003).  A two-part test applies to determine whether litigation is a "sham." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008).  First, courts consider whether the lawsuit is "objectively baseless in the sense that no reasonable litigant could reasonably expect success on the merits." *Id.* (citing *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993)).  If the challenged litigation is objectively baseless, courts then "consider the litigant's subjective motivation." *Id.*

Here, Counterclaim Defendants' argument supporting dismissal is solely premised upon the fact that this Court "already considered each of RJ's legal and factual disputes when denying the [RJ's] Motion to Dismiss, . . . and rejected them." (*See* MTD 17:4–6).  The Ninth Circuit in *Boulware v. Nevada* did not automatically determine that the lawsuit had merit based on the fact that a party succeeded in obtaining an injunction in trial court.  *Boulware*, 960 F.2d 793, 798 (9th Cir. 1992).  The Ninth Circuit clarified that "success on the merits, while not dispositive, is an important factor to be considered under the sham inquiry." *Id*.  The fact that this Court previously denied RJ's Motion to Dismiss cannot itself demonstrate a "sham litigation."  The Court accordingly denies Counterclaim Defendants' Motion to Dismiss and declines granting *Noerr-Pennington* immunity to Counterclaim Defendants.

//

### 3.    Restraint of Trade

Counterclaim Defendants additionally move to dismiss RJ's restraint of trade claim in violation of Section 1 of the Sherman Act. (MTD 17:18–19:23).  They specifically assert that RJ's complete involvement in the 2005 JOA defeats its Section 1 claim because "a complete participant in restraint of trade cannot recover against the other party to the restraint." (*Id.* 18:23–19:2).  RJ argues, in response, that the complete involvement defense implicates numerous disputed facts that cannot be resolved at the motion to dismiss stage. (Resp. to MTD 21:19–23:16).

"A plaintiff is barred from recovery only when the illegal conspiracy would not have been formed but for the plaintiff's participation." *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 279 (9th Cir. 1976).  In arguing that the RJ was completely involved in the 2005 JOA, Counterclaim Defendants heavily rely on *Thi-Hawaii, Inc. v. First Commerce Fin. Corp.*, 627 F.2d 991, 995 (9th Cir. 1980).  There, the Ninth Circuit held that "complete involvement [in a monopolistic scheme . . .] constitute[s] a defense to a treble damage claim in an antitrust action. *Thi-Hawaii, Inc.*, 627 F.2d at 995.

*Thi-Hawaii, Inc.*, however, is procedurally distinct from the present case.  The Ninth Circuit in *Thi-Hawaii, Inc.* considered whether complete involvement is a defense at the summary judgment stage. *See id.*  The relevant standard for a motion for summary judgment significantly differs from the standard for a motion to dismiss.  At the motion to dismiss stage, the Court must accept all factual allegations as true. *Twombly*, 550 U.S. at 555.  Thus, though the district court in *Thi-Hawaii, Inc.* likewise analyzed the complete involvement defense before the close of discovery, the different procedural standard in *Thi-Hawaii, Inc.* fatally distinguishes the Ninth Circuit's application of the complete involvement defense to the present case.  Key questions remain as to whether RJ's complete involvement in the 2005 JOA bars its Section 1 claim. *Javelin Corp.*, 546 F.2d  at 279 (To satisfy the complete involvement test, "the

jury must necessarily find that the degree of participation of the plaintiff must be equal to that of any defendant and a substantial factor in the formation of the conspiracy.").  The Court accordingly denies Counterclaim Defendants' Motion to Dismiss as to RJ's Section 1 claim.

### 4.    Declaratory Relief

Counterclaim Defendants move to dismiss RJ's declaratory relief claims, specifically Counterclaim 4: Invalidity of the 2005 JOA, Counterclaim 8: Termination for Material Breach, and Counterclaim 9: Excused Performance Due to Frustration of Purpose. (Counterclaim ¶¶ 162–165, 186–191, 192–201).  Specifically, they argue that RJ's declaratory relief claims are duplicative of its affirmative defenses. (MTD 19:24–21:26).  RJ, in response, contends that the claims and affirmative defense are factually and legally distinct such that its declaratory claims survive. (Resp. to MTD 23:17–25:2).

"A district court 'has discretion to dismiss, under Rule 12(b)(6), a declaratory relief counterclaim which mirrors the complaint or raises the same factual or legal issues as those placed at issue in the pleadings.'" *BOKF, NA v. Estes*, No. 3:17-cv-0694-LRH-(WGC), 2018 U.S. Dist. LEXIS 60884, at *2-3 (D. Nev. Apr. 10, 2018).  Here, RJ's declaratory claims mirror its affirmative defenses.  For example, the RJ's fourth counterclaim is identical to its second affirmative defense.  In its second affirmative defense, RJ alleges that "Plaintiff's claims fail because the 2005 JOA is an unenforceable agreement due to it never being expressly approved in writing by the Attorney General of the United States and because the requested relief is barred by 15 U.S.C. 43, et seq." (Ans. to Compl. 22:5–7, ECF No. 296).  RJ's fourth counterclaim seeks declaratory relief on the ground that "Counterclaim Defendants [improperly] contend that the 2005 JOA is valid and enforceable under the NPA.  Counterclaim Defendants have therefore created a substantial, immediate, and real controversy between the parties as to the invalidity of the 2005 JOA." (Counterclaim ¶ 163).   The second affirmative defense thus mirrors, factually and legally, RJ's fourth counterclaim.  The same analysis applies

to RJ's eighth counterclaim with its fourth affirmative defense, and RJ's ninth counterclaim with its twenty-fourth affirmative defense.[9]  Because the claims are nearly identical and mirror each other, the Court thus dismisses RJ's fourth counterclaim, eighth counterclaim, and ninth counterclaim with leave to amend.

### 5.   Tortious Interference with Contractual Relations

RJ, in its Counterclaim, alleges that Brian Greenspun ("Mr. Greenspun") intentionally interfered with the 2005 JOA by reducing the quality of the printed Sun, directing subscribers of the Review-Journal/Sun printed paper to LVS's website, and seeking an extortionate buyout from the RJ to terminate the printed Sun. (Counterclaim ¶¶ 179–185).  Counterclaim Defendants now seek dismissal of that claim, arguing that Mr. Greenspun cannot tortiously interfere with the 2005 JOA because, as the owner of LVS, Mr. Greenspun cannot interference with his own contract. (MTD 22:1–23:12).  Mr. Greenspun, RJ responds, can nevertheless remain liable because he acted outside the scope of his agency and thus, is not "one in the same as Sun." (Resp. to MTD 25:3–27:3).

In Nevada, intentional interference with contractual relations requires a plaintiff to establish five elements: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 71 P.3d 1264, 1267 (Nev. 2003).  "[A] party cannot tortiously interfere with its own

---

[9] RJ, in its eighth counterclaim, seeks declaratory relief that Counterclaim Defendants materially breached the 2005 JOA by, inter alia, withholding local breaking news, filling the printed Sun newspaper with old content, and told readers not to subscribe to the Review-Journal/Sun. (Counterclaim ¶¶186–191).  Likewise, RJ raises an affirmative defense that its performance under the 2005 JOA is by Plaintiff's prior material breaches of the 2005 JOA. (Ans. to Compl. 22:10–12).

In its ninth counterclaim, RJ alleges declaratory relief that it was excused from continuing to perform under the 2005 JOA under the frustration of purpose doctrine. (Counterclaim ¶¶ 192–201).  RJ similarly alleges the same claim in its twenty-fourth affirmative defense, alleging that "Defendants' performance is excused by the doctrines of commercial frustration and/or frustration of purpose." (Ans. to Compl. 24:3–5).

contract." *From the Future v. Flowers*, No. 2:06-CV-00203-PMP-RJJ, 2009 U.S. Dist. LEXIS 152506, at *22 (D. Nev. Apr. 20, 2009) (citing *Bartsas Realty, Inc. v. Nash*, 402 P.2d 650, 651 (Nev. 1965)).  However, "[t]he agent may be an interfering third party if the agent was acting outside the scope of the agency, was not acting in the principal's interest, or was motivated by malice towards one or both of the contracting parties." *Id.*

Here, RJ plausibly alleges a claim of tortious interference with contractual relations.  RJ alleges that Mr. Greenspun intentionally interfered with the 2005 JOA, a valid and existing contract between LVS and RJ. (Counterclaim ¶ 180).  RJ also claims that Mr. Greenspun intentionally disrupted the 2005 JOA by "intentionally reducing the quality of the printed Sun, directing subscribers to the printed Review-Journal/Sun combined newspaper to LV Sun's website, which he ultimately controls, and seeking an extortionate buyout from the LVRJ to terminate the printed Sun." (*Id.* ¶ 182).  As to personal benefit, RJ claims that "Mr. Greenspun asked for a $5 million payment and proposed replacing the Sun entirely with a single weekly column in the Review-Journal written by Mr. Greenspun.  In other words, Mr. Greenspun wanted to end the 2005 JOA and terminate the printed Sun in exchange for $5 million and his own column in the Review-Journal." (*Id.* ¶ 64).  In sum, RJ sufficiently alleges that Mr. Greenspun made such efforts to enrich his personal column and ultimately, for his personal benefit.[10]  RJ thus provides sufficient facts to plausibly infer that Mr. Greenspun interfered with the 2005 JOA, for his personal benefit, by diverting readership and profits from RJ.  The Court accordingly denies Counterclaim Defendants' Motion to Dismiss Counterclaimant RJ's seventh claim for tortious interference with contractual relations.

---

[10] LVS argues that this Court similarly held that Plaintiff failed to allege that Dumont participated in the conspiracy . . . [b]ecause the Complaint does not allege that Dumon had an independent stake in the alleged conspiracy." (Order Granting in Part and Denying in Part MTD at 19, ECF No. 243).  The Court's analysis there, however, concerned an entirely different cause of action—LVS's third claim for conspiracy to monopolize. (Id. 17:6–7).  Because the analysis is distinguishable, the Court is thus not bound by its prior decision on Defendant's Motion to Dismiss.

### 6.  Greenspun Media Group

Counterclaim Defendants move to dismiss Greenspun Media Group ("GMG") from the Counterclaim because RJ seemingly does not provide any details about GMG's wrongful conduct. (MTD 23:13–24:2).  In response, RJ argues that its allegations are more than sufficient to put GMG on notice regarding its claims because RJ alleges that GMG is LVS's alter ego. (Resp. to MTD 27:4–28:17).

An alter ego showing in Nevada requires that (1) the entity is "influenced and governed by" the member; (2) there is "such unity of interest and ownership" that the LLC and the member are inseparable from each other; and (3) adherence to the fiction of a separate entity "would, under the circumstances, sanction a fraud or promote a manifest injustice." *Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 124 Nev. 629, 189 P.3d 656, 660 (Nev. 2008) (quoting *Ecklund v. Nevada Wholesale Lumber Co.*, 93 Nev. 196, 562 P.2d 479, 479-80 (Nev. 1977)). Although "there is no litmus test for determining when the corporate fiction should be disregarded," factors indicating the existence of an alter ego include: "(1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities." *Id.* at 847.

Here, RJ provides sufficient facts that "GMG is the pertinent actor for much of the misconduct alleged in these claims. (Counterclaim ¶ 20).  In addition to this claim, RJ alleges that "GMG owns, directly or through subsidiaries, LV Sun, media websites—including LasVegasSun.com—and weekly magazines." (*Id.* ¶ 18).  RJ also alleges that GMG "comingles the finances of the various media entities" and "improperly allocates expenses to the printed *Sun* instead of the *Sun* website to . . . make the *Sun* paper appear less profitable." (*Id.* ¶ 19).   RJ thus alleges a plausible claim of alter ego for GMG.

//

//

### C.    LEAVE TO AMEND

Rule 15(a)(2) of the Federal Rules of Civil Procedure permits courts to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  The Ninth Circuit "ha[s] held that in dismissing for failure to state a claim under Rule 12(b)(6), 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States,* 58 F.3d 494, 497 (9th Cir. 1995)).

As explained above, the Court solely dismisses declaratory counterclaims—specifically, RJ's Fourth Counterclaim, Eighth Counterclaim, and Ninth Counterclaim. (*See supra* 24:1–2). Because RJ may be able to plead additional facts to allege factually and legally distinct counterclaims from its affirmative defenses, the Court will grant RJ leave to file an amended counterclaim.  RJ shall file its amended counterclaim within twenty-one (21) days of the entry of this Order.

### IV.    **CONCLUSION**

**IT IS HEREBY ORDERED** that the Motion to Dismiss, (ECF No. 363), filed by Las Vegas Sun, Inc. is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Las Vegas Review Journal's Motion for Leave to File Excess Pages, (ECF No. 372), is **GRANTED**.

**IT IS FURTHER ORDERED** that Las Vegas Sun's Motion to Substitute Party, (ECF No. 380), is **GRANTED**.

**IT IS FURTHER ORDERED** that the Report and Recommendation, (ECF No. 394), is **ADOPTED in full**.

**IT IS FURTHER ORDERED** that Las Vegas Review Journal's Motion for Leave to File a Reply, (ECF No. 413), is **GRANTED**.

1      **IT IS FURTHER ORDERED** that RJ shall have twenty-one (21) days from the date of

2 this Order to file an amended counterclaim, if it is able to plead additional facts to cure the

3 deficiencies identified herein.

4      **DATED** this __23__ day of March, 2022.

5

6                    _____

7                    Gloria M. Navarro, District Judge

8                    United States District Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25