# EXHIBIT 36

Declaration of Brian Greenspun in Support of Plaintiff/ Counterdefendants' Opposition to Defendants' Motion for Summary Judgment

# EXHIBIT 36

SOA534

**DECLARATION OF BRIAN GREENSPUN IN SUPPORT OF PLAINTIFF/COUNTERDEFENDANTS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

I, Brian Greenspun, do hereby swear under penalty of perjury that the following assertions are true and correct to the best of my knowledge:

1. I am the Chief Executive Officer, Publisher, and Editor of Plaintiff Las Vegas Sun, Inc. (the "Sun"). I make this Declaration in support of Plaintiff/Counterdefendants' Opposition to Motion for Summary Judgment ("Opposition"). The statements herein are based upon my personal knowledge.

2. On December 16, 2020, February 4, 2021, August 31, 2022, and September 17, 2022, I was interviewed by Michael Katz, the Sun's expert witness in this matter. I believe what I told him to be true, accurate, and to the best of my knowledge.

3. I believe that consideration of bargaining power in negotiation with the Review-Journal is one of the factors that drives the Sun to compete with the Review-Journal. The greater the degree to which the presence of the Sun contributes to bringing readers to the Newspaper Bundle, the stronger the Sun's bargaining position will be.

4. I believe one of the reasons the Sun competes with the Review-Journal is to make a greater contribution to the sales of the Newspaper Bundle in order to increase the value that could be derived from a potential partnership with a third party or form a potential sale to a third party.

5. I believe that attracting buyers of the Newspaper Bundle to read one newspaper's section(s) of the Newspaper Bundle will increase the traffic to that newspaper's digital operations, that fall outside the scope of the JOA, and that the Sun's web presence can help strengthen the "Sun" brand, which benefits the Newspaper Bundle. I believe that the value of promoting the related websites is one of the factors that drives the Sun to compete with the Review-Journal.

6. When the I told the RJ that the Sun does not "monetize the number of readers it has for the printed Sun publication," I was answering this question in the narrow sense of the Sun not having separate circulation or advertising revenue, and whether the Sun was able to track and monetize the subscribers separately, as one would if selling consumer data to advertisers.

7. I believe that the Sun covers stories in greater depth or from a different perspective than the Review-Journal. As the Publisher of the Sun, I sometimes write editorials specifically to provide a counterpoint to an editorial or column printed in the Review-Journal, and respective staff members of the Review-Journal and Sun each try to hold the other accountable.

8. The Sun's principal focus is on the Las Vegas metropolitan area, but the Sun's newsroom also writes news stories on Pahrump and other southern Nevada locations if the stories are of interest to metropolitan Las Vegas readers. The Review-Journal also covers southern Nye County, specifically Pahrump, while the bulk of its local coverage concerns Clark County. I believe some residents of southern Nye County commute to Clark County, which makes them potential readers of the Sun.

9. The Sun's news and reporting staff produce almost entirely state and local stories that affect southern Nevada, but the newsroom sometimes covers stories originating elsewhere in the state if those stories affect or otherwise are of interest to readers in southern Nevada. I, as the Sun's Editor, sometimes write, or work with the Sun's editorial board, or encourage guest columnists to write, editorials on local, regional, or sometimes even national issues, with the aim of identifying how those issues specifically affect the Las Vegas area. For example, the Sun might have an editorial about regional water policy that affects Las Vegas.

10. I do not consider newspapers located outside of the Las Vegas metropolitan area to be competitive threats for readers to the print Sun. I consider the Review-Journal to be the Sun's only meaningful competitor for readers.

11. I believe that because weekly papers are distributed over several days and a single reader may look at a weekly publication repeatedly over a period of several days, stories need to have a long shelf life. I do not consider weekly papers competitors of the Sun.

12. Likewise, I do not consider the Nevada Independent to be a competitor for readers of the Sun, in part because the Nevada Independent is a niche publication with a limited scope of coverage, such as political coverage.

13. I do not consider any internet-native websites to be competitors for readers of the print Sun, although the Review-Journal and Sun have affiliated websites, reviewjournal.com and lasvegassun.com, respectively.

14. Allowing the RJ to terminate the JOA and essentially eliminate the Sun newspaper would deprive readers of independent editorial and reportorial voices and would result in the loss of jobs and competition for creators of news, editorial, and entertainment content. I also believe that if the if the Sun is driven out of business, it is highly likely that the Sun will also close lasvegassun.com because it would not be able to generate sufficient revenue to support the newsroom on its own.

15. The Sun does not have printing facilities or a newspaper distribution network, or many of the other assets required to print and distribute a newspaper. I believe that only the Review-Journal has the capacity to print and distribute a daily newspaper in the relevant geographic market. Because of the large startup costs for a newspaper and the inability to reach a financially viable scale, I believe that terminating the JOA would immediately kill the Sun.

16. The Sun has had to reduce its operations because of financial pressures. For example, the Sun reduced the size of its staff to save costs.

17. I believe the reduced staff size has adversely affected the Sun's ability to cover as many stories as it would otherwise like to cover. In January 2018, the Sun reduced its night staff. These staffing reductions have adversely affected the Sun's ability to have late-breaking stories appear in the newspaper in a timely manner. I believe the Sun has a smaller newsroom staff than it otherwise would have had the JOA payments been larger.

18. I considered expenditures to promote the Sun but given the overall lack of funding for the newspaper, I felt that it would have been necessary to make further cuts in the newsroom in order to be able to pay for the promotional activity.

19. If the Review-Journal had paid the Sun the amount it owes, I would have been able to invest more in promotional activities as well as additional news reporters.

20. I believe the loss of these payments deprived the Sun of a funding source for investments, which reduced the Sun's incentives to invest in the Sun more broadly.

21. As long as the Joint Operations' EBITDA is negative, the Sun earns no incremental JOA payment from an increase in EBITDA, which eliminates what would otherwise be a financial incentive to invest in such an increase.

22. I believe the Review-Journal does not have the right to terminate the JOA.

23. I, as the Chief Executive Officer of the Sun, feel the need to assure the staff of the Sun that it will continue to operate.

24. I believe that potential lenders are unwilling to make loans to the Sun if there are no prospects that the Sun will receive payments from the Joint Operations. I believe publication of the RJ's Termination Litigation creates doubts in the minds of potential lenders regarding the viability of the Sun and thus makes lending to the Sun less attractive.

25. I believe the uncertainty and lack of payments from the Joint Operations, created by the Review-Journal's challenged conduct, has made it impossible to raise sufficient funds through the sale of equity to finance the operations of the Sun.

26. I believe the uncertainty regarding the outcome of the present antirust case, and the Review-Journal's conduct in this regard reduces incentives to invest in the Sun.

27. I believe that without the presence of the Sun, the RJ will have a literal monopoly and the competition between the two newspapers that benefits consumers today will be eliminated. Absent payments from the Joint Operations, it would not be profitable to continue to operate the Sun newsroom, and the lasvegassun.com would cease functioning as a newspaper website.

28. Attached as **Exhibit 5** to the Opposition is a true and correct copy of an August 30, 2019, email that I received from T. Burkholder (SUN_00000293). I have personal knowledge of this Exhibit as I was a recipient of the email thread. This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

1    29.    Attached as **Exhibit 6** to the Opposition is a true and correct copy of September 5, 2019, email from C. Sappraicone to the Las Vegas Sun's "Letters" email address (SUN_00000298). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

30.    Attached as **Exhibit 7** to the Opposition is a true and correct copy of September 15, 2019, email from P. Ryan to the Las Vegas Sun's "Letters" email address (SUN_00000303-04). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

31.    Attached as **Exhibit 8** to the Opposition is a true and correct copy of a January 15, 2019, email that I received from K. Woods (SUN_00000315). I have personal knowledge of this Exhibit as I was a recipient of the email thread. This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

32.    Attached as **Exhibit 9** to the Opposition is a true and correct copy of a September 3, 2019, email from A. Marshall to the Las Vegas Sun's "Letters" email address (SUN_00024479). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

33.    Attached as **Exhibit 19** to the Opposition is a true and correct copy of a September 15, 2019, email from W. Witte to the Las Vegas Sun's "Letters" email address (SUN_00000300). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

34. Attached as **Exhibit 20** to the Opposition is a true and correct copy of a February 26, 2019, email from V. Lewis to the Las Vegas Sun's "Letters" email address (SUN_00055338). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

35. Attached as **Exhibit 21** to the Opposition is a true and correct copy of an August 27, 2017, email from M. Spigelman to the Las Vegas Sun's "Letters" email address (SUN_00000376-77). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

36. Attached as **Exhibit 22** to the Opposition is a true and correct copy of a September 5, 2019, email from R. Ransom to the Las Vegas Sun's "Letters" email address (SUN_00000307-08). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

37. Attached as **Exhibit 23** to the Opposition is a true and correct copy of a September 1, 2019, email from J. Dombek to the Las Vegas Sun's "Letters" email address (SUN_00000305). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

38. Attached as **Exhibit 24** to the Opposition is a true and correct copy of a September 15, 2019, email from January 19, 2019, email from N. Rodriguez to the Las Vegas Sun's "Letters" email address (SUN_000000294). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

39. Attached as **Exhibit 45** to the Opposition are true and correct copies of JOA EBITDA calculations the Sun received from the RJ for the fiscal years ending March 31, 2016,

through 2022 (SUN_00018997-19000, SUN_00024682, SUN_00007067, SUN_00008771-72, SUN_00008774-75, SUN_00057632-33, SUN_000084446-47). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of July, 2023.

_____
Brian Greenspun