UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

LAS VEGAS SUN, INC.,

                                    Plaintiff,

          v.

SHELDON ADELSON, *et al.*,

                                    Defendants.

_____

LAS VEGAS REVIEW-JOURNAL, INC.,

                           Counter Claimant,

          v.

LAS VEGAS SUN, INC., *et al.*,

                        Counter Defendants.

Case No. 2:19-cv-01667-ART-MDC

ORDER

        This is an antitrust action between media companies. Plaintiff Las Vegas Sun, Inc. brings this action against Defendants Sheldon Adelson, Patrick Dumont, News+Media Capital Group LLC, and Las Vegas Review-Journal, Inc. Las Vegas Review Journal, Inc. brings counterclaims against Las Vegas Sun, Inc., Brian Greenspun, and Greenspun Media Group, LLC.

        Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 829, 843), the RJ's motions to dissolve preliminary injunction (ECF Nos. 852, 915), the RJ's motion to dismiss (ECF No. 632), and several evidentiary (ECF Nos. 751, 772, 819, 867, 897) and procedural (ECF Nos. 922, 923, 925, 946) motions.

## I.    BACKGROUND

        This is an antitrust action with breach of contract counterclaims. The material facts are largely undisputed.

### A. The 1989 JOA

On June 12, 1989, Donrey of Nevada, Inc., which at the time published the

Las Vegas Review-Journal ("the RJ") newspaper, and the Las Vegas Sun, Inc., which publishes the Las Vegas Sun ("the Sun") newspaper, entered a joint operating arrangement (the "1989 JOA"). ((ECF No. 837-2); *see also* ECF No. 40 ("Martini Decl.") at 53 ¶ 3 (authenticating the 1989 JOA).)

The 1989 JOA included the following key provisions:

The Sun agreed to dispose of its publishing infrastructure. (ECF No. 837-2 at 10 (§ 3.3), 14-15 (§ 5.1).)

The RJ was to print the Sun, though the RJ and Sun were sold and distributed separately, save for joint publications on weekends and holidays. (*Id.* at 14-15 (§ 5.1).)

The RJ, operating through a separate entity referred to in the JOA as the "Agency," was responsible for, among other things, handling the production, circulation, and print advertising functions for both newspapers. (*Id.* at 14-15 (§ 5.1), 6 (Art. 2).)

With respect to each newspaper's editorial expenses, the "Review-Journal shall establish an allocation for Review-Journal news and editorial expenses, and the allocation for, news and editorial expenses for the Sun shall be equal to sixty-five percent (65%) of the Review-Journal allocation, subject to a minimum of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) per fiscal year, . . . ." (*Id.* at 34 (App. A § A.1).)

With respect to each newspaper's promotional activities expenses, "the Review-Journal shall establish for each fiscal year after the Effective Date a budget for promotional activities of the Review-Journal and the Sun and at least forty percent (40%) of each total budget shall be allocated to the Sun." (*Id.* (App. A § A.3).)

The parties also agreed to share in the operation's operating profit, with the RJ receiving 90% and the Sun receiving 10%. (*Id.* at 20 (§ 6.4), 44 (App. D).)

**B. The 2005 JOA**

In June 2005, the Sun and the RJ's owner at that time, Stephens Group, Inc. ("Stephens"), executed an "Amended and Restated Agreement" (the "2005 JOA"). (ECF No. 837-6; *see also* ECF No. 40 at 53 ¶ 6 (authenticating the 2005 JOA).)

Under the 2005 JOA, the print *RJ* newspaper and the print *Sun* newspaper are no longer sold and distributed separately. (ECF No. 837-6 at 15 (App. A § A.3).)

Instead, the two papers are distributed together in a bundle. The 2005 JOA limits the print *Sun*'s page count to "an open front page with the Las Vegas Sun flag and seven (7) additional editorial pages" on weekdays; "an open front page with the Las Vegas Sun flag and nine (9) additional editorial pages" for the Sunday edition, and for Saturday and holiday editions, "an open front page with the Las Vegas Sun flag and five (5) additional editorial pages . . . ." (*Id.* at 14 (App. A § A.2(a)–(c)).)

Instead of the percentage split set forth in the 1989 JOA, the 2005 JOA provides that the Sun shall receive an annual payment based on profits, if any, which is to be determined by a formula tied to a contractual earnings, before interest, taxes, depreciation and amortization ("EBITDA") calculation that includes earnings from the RJ newspaper. (*Id.* at 22-25 (App. D).)

In place of the of the allocations for news and editorial expenses set forth in the 1989 JOA, the 2005 JOA states: "[t]he Review-Journal and the Sun shall each bear their own respective editorial costs and shall establish whatever budgets each deems appropriate." (*Id.* at 3 (§ 4.2).) Only those promotional costs that include both the Sun and the RJ in equal prominence can be charged against the joint operation. (*Id.* at 5 (§ 5.1.4); ECF No. 838 at 6-7.)

Despite their separate promotional budgets, the RJ is required to "use commercially reasonable efforts to promote the Newspapers" and to "maximize

the circulation of the Newspapers." (ECF No. 837-6 at 5 (§§ 5.1.3, 5.1.4).) This requires mentioning the Sun equally with the RJ's promotional activities to ensure the Sun's brand remains as visible as the RJ. (*Id.*)

Under the 2005 JOA, the RJ is granted the power to "determine the rates for, solicit and sell all advertising space in the Newspapers." (*Id.* at 4-5 (§ 5.1).) It is also granted the power to "control, supervise, manage and perform all operations involved in managing and operating under this Restated Agreement" and to "determine circulation rates" of the joint product. (*Id.* § 5.1.)

The 2005 JOA also requires parties "to preserve high standards of newspaper quality throughout the term of this Restated Agreement consistent with United States metropolitan daily newspapers." (*Id.* § 5.2)

The 2005 JOA includes several Non-Liability Provisions, including one on "Force Majeure." (ECF No. 837-6 at 7 (§ 8.2).)

The 2005 JOA describes three grounds for termination of the agreement: expiration of the "Stated Duration," "Bankruptcy or Default," and "Change of Controlling Interest." (ECF No. 837-6 at 7 (Art. 9).)

Among the Miscellaneous provisions are those identifying how each party can use their content on various non-print media platforms, including their respective websites operations (*id.* at 10 (§ 10.6)), and releasing the parties from "any claims related to the conduct or operation of lvrj.com, reviewjournal.com, lasvegasnewspapers.com . . . [and those] related to the operation of lasvegassun.com or lasvegasnewspapers.com." (*Id.* at 11-12 (§ 10.13).)

**C. Arbitration and Purchase of the RJ**

In 2014, the Sun filed suit in state court against the RJ alleging that the RJ was violating the 2005 JOA by charging its editorial and promotional costs against the joint operation. (ECF Nos. 126 at 9-10, 181-3 ¶ 5.) The parties were ordered to arbitrate but settled the dispute before an award was issued. (ECF No. 181-3 ¶ 8.) The RJ experienced two ownership changes during that arbitration,

which ultimately resulted in Defendants' ownership and operation of the RJ as of December 10, 2015. (*Id.*)

In April 2018, the Sun filed a new complaint in state court alleging the RJ breached the 2005 JOA by "illegally charg[ing] the Review-Journal's individual editorial costs against the joint operation," "improperly charg[ing] the Review-Journal's unilateral promotional activities against the joint operation," and refusing to allow the Sun to conduct an audit. (ECF No. 40-10 at 18, 20-22.) The Sun also brought a claim for tortious breach of the implied covenant of good faith and fair dealing and sought punitive damages. (*Id.* at 34-35.) The state court compelled arbitration, which resulted in a Final Arbitration Award in 2019. (ECF No. 837-8.)

### D. The Present Litigation

The Sun filed this action against the RJ in September 2019. In its First Amended Complaint, which is the operative complaint, the Sun alleges claims under Section 2 of the Sherman Act (Claims 1, 2, and 3 for Monopolization, Attempted Monopolization, and Conspiracy to Monopolize), Section 7 of the Clayton Act (Claim 4), Nevada's Unfair Trade Practices Act (Claim 5), and Section 1 of the Sherman Act (Claim 6).

The RJ asserts counterclaims under Section 2 of the Sherman Act (Claims 1 and 2 for Monopolization and Attempted Monopolization), Section 1 of the Sherman Act (Claim 3), and Nevada common law (Claims 5, 6, and 7 for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, and Tortious Interference with Contractual Relations). It also asserts 26 affirmative defenses. At issue in this order are its second, fourth, sixth, fourteenth, and twenty-fourth affirmative defenses, which argue, respectively, that the 2005 JOA is invalid and that the RJ is entitled to terminate its obligations under the 2005 JOA because of the Sun's material breach, the JOA's force majeure clause, the Sun's "conduct," and the common law doctrines of commercial frustration and

frustration of purpose.

**II.   ANALYSIS**

**A. RJ's Motion to Dismiss**

The RJ moves to dismiss or strike the Sun's Claims 3, 4, and 6 on two different grounds (ECF No. 632), both related to Judge Navarro's earlier dismissal of the Sun's Sherman § 2 conspiracy claim and its Clayton § 7 claim. (ECF No. 243.) The Court dismissed the Sun's Sherman § 2 conspiracy claim under the *Copperweld* doctrine, which provides that a parent company and its wholly owned subsidiary cannot commit Sherman Act conspiracy violations among themselves. (*Id.* at 19 (citing *Copperweld Corp. v. Indep. Tube. Corp.*, 467 U.S. 752, 771-73 (1984)).). Dismissal was required because the Sun had not alleged that the defendants were economically distinct from each other. (*Id.*)

Although it was given leave to timely amend both claims (ECF No. 243 at 23), the Sun instead, many months later, filed a new, Third Amended Complaint, which again included the same claims under Sherman § 2 (Claim 3) and Clayton § 7 (Claim 4). The Sun did not cure the dismissed claims but instead repleaded them "for appellate preservation purposes." (ECF No. 628 at 4 n.6.) The Sun also added a new Sherman § 1 conspiracy (Claim 6) claim against a new party: Adfam. The Sun alleges that Adfam is an alter ego of its co-defendants, or alternatively, that it is "an entity sufficiently separate and distinct as an economic unit from [its co-defendants] such that they operate as separate decision-makers." (ECF No. 621 at ¶ 18.)

The RJ moves to strike the Sun's repleaded Sherman § 2 and Clayton § 7 claims (Claims 3 and 4) as immaterial and impertinent under Fed. R. Civ. P. 12(f) and moves to dismiss Adfam (Claim 6) based on the *Copperweld* doctrine. The Court grants the RJ's motion as to Claims 3 and 4 and denies it as to Claim 6.

**1. Preserving Claims for Appellate Review (Claims 3 and 4)**

The RJ argues that the Sun's Claims 3 and 4, which it repleaded "for

appellate preservation purposes only" (ECF No. 628 at 4 n.6.), are unnecessary, confusing, and prejudicial and should be stricken under Fed. R. Civ. P. 12(f). The Court may strike "any redundant, immaterial, impertinent, or scandalous matter in any pleading." Fed. R. Civ. P. 12(f); 5C WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 1382 (3d ed.). "Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pled." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (internal quotation marks and citations omitted). "Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Id.* If it is unnecessary for the Sun to reassert Claims 3 and 4 in order to preserve them for appeal, those claims are both immaterial and impertinent.

The Sun is not required to replead Claims 3 and 4 in order to preserve them for appellate review. A plaintiff is not required to replead claims that have been dismissed with leave to amend to include certain additional allegations if the plaintiff is either unwilling or unable to include those allegations. *Vien-Phuong Thi Ho v. ReconTrust Company, NA*, 858 F.3d 568, 577 (9th Cir. 2017); *see also Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012) (holding that a plaintiff is not required to replead claims that have been dismissed without leave to amend). Here the Sun's failure to reassert its claims within the given time period demonstrates that it was either unwilling or unable to replead those claims. Thus, the Sun's claims are preserved without need to replead them in its Amended Complaint.

Because Claims 3 and 4 serve no purpose beyond preservation for appellate review, they are immaterial and impertinent. The Court strikes those claims from the Amended Complaint pursuant to Rule 12(f).

### 2. Failure to State a Sherman § 1 Conspiracy Claim (Claim 6)

In order to show that that the claim against Adfam is not barred by the *Copperweld* doctrine, the Sun must allege facts to establish that it was

economically distinct from any other defendant. *See Copperweld Corp.*, 467 U.S. at 771-73. *Copperweld* provides that officers or employees of a single firm cannot commit Sherman Act conspiracy with that firm when they are pursuing the firm's interests. *Id.* at 771.

According to the Sun, Adfam is a small company whose sole purpose "is to benefit and promote the business and personal interests of the Adelson family." (ECF No. 621 at ¶9.) The Sun alleges that Adfam is an alter-ego of its co-defendants, in which case, its actions can be ascribed to all parties for purposes of the Sun's monopolization and attempted monopolization claims (Claims 1 and 2). The Sun alternatively alleges that Adfam is "an entity sufficiently separate and distinct as an economic unit from [its co-defendants] such that they operate as separate decision-makers" (in which case, it is a unique entity capable of conspiring with its co-defendants). (ECF No. 621 at ¶ 18.) The Sun's new claim (Claim 6) alleges a conspiracy to violate Sherman § 1, which prohibits the formation of contracts in restraint of trade. (ECF No. 621 at ¶¶ 187-94.) The Sun brings this claim against all defendants, including Adfam. (ECF No. 621 at ¶¶ 187-94.)

The RJ argues that the Sun's Claim 6 should be dismissed under the *Copperweld* doctrine because the Sun has made a conclusory and legally insufficient allegation that Adfam and its co-defendants are distinct entities capable of conspiring with one another in restraint of trade, and even if that allegation is not conclusory, the Sun has failed to allege an agreement to restrain trade.

### a. *Copperweld* and Defendants' "Unity of Interest"

Because the Court agrees that *Copperweld* applies to Claim 6, *see Copperweld*, 467 U.S. at 771 (*Copperweld* applies to conspiracies to violate Sherman § 1), the issue is whether the Sun has alleged that Adfam and its co-defendants are separate economic entities with distinct interests. The Sun has

1    properly alleged this point.

2        To state a claim under Fed. R. Civ. P. 8, the Sun must plead "enough facts

3    to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

4    550 U.S. 544, 570 (2007). On a motion to dismiss under Rule 12(b)(6), such as

5    this one, the Court must accept as true all well-pleaded factual allegations,

6    *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009), but it need not accept allegations

7    "that are merely conclusory, unwarranted deductions of fact, or unreasonable

8    inferences," *Sprewell v. Golden State Warriors*, 226 F.3d 979, 988 (9th Cir. 2001).

9    Furthermore, a party may pursue relief "in the alternative," and it may plead

10   contradictory facts in order to do so. *See FT Travel-New York, LLC v. Your Travel

11   Ctr., Inc.*, 112 F. Supp. 3d 1063, 1073 (C.D. Cal. 2015); Fed. R. Civ. P. 8(d)(2).

12       The Sun's Amended Complaint states a claim for antitrust conspiracy that

13   is plausible on its face. In addition to alleging each other element of Sherman § 1

14   conspiracy, the Sun alleges Adfam is "an entity sufficiently separate and distinct

15   as an economic unit from [its co-defendants] such that they operate as separate

16   decision-makers." (ECF No. 621 at ¶ 18.) The existence of decision-making

17   independence is ultimately a question of fact that cannot easily be resolved at the

18   motion to dismiss stage. *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d

19   919, 927 n.5 (9th Cir. 1980) (reversing the district court's order dismissing

20   plaintiffs' Sherman § 1 claim and holding that the question of whether defendant

21   corporations are distinct economic entities could not be resolved at the motion to

22   dismiss stage); *In re Pearson Indus., Inc.*, 147 B.R. 914, 918 (Bankr. C.D. Ill. 1992)

23   (holding that the question of whether the defendants "operated as a single

24   economic unit" raises "intensely factual questions which cannot be decided" at

25   the summary judgment stage).

26       Further, the Sun's allegations are not conclusory. The Sun makes factual

27   claims to support its allegation that Defendants are distinct under *Copperweld*.

28   For example, the Sun alleges that Adfam's business mission is to provide

professional services "to support the Adelson family and members' personal and business interests." (ECF No. 621 at ¶ 15.) Read in a light most favorable to the Sun, the Amended Complaint alleges that Adfam's mission could diverge or conflict with its co-Defendants because it does not share a "complete unity of interest" with each of its co-Defendants. This is sufficient at the motion to dismiss stage.

### b. Agreement to Restrain Trade

The Sun has also alleged an agreement between Defendants sufficient to sustain its Sherman § 1 conspiracy claim. To state a claim for conspiracy under Sherman § 1, a plaintiff must allege "a contract, combination or conspiracy among two or more persons or distinct business entities . . . by which the persons or entities intend to harm or restrain trade or commerce . . . ." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 45 (9th Cir. 2022). An agreement in restraint of trade may be "tacit or express," but allegations of tacit agreement "must allege something more than conduct merely consistent with agreement." *In re DRAM*, 28 F.4th at 46 (quoting *Twombly*, 550 U.S. at 553). When alleging a tacit agreement, plaintiffs must also allege "certain plus factors" which "elevate allegations of parallel conduct to plausibly suggest the existence of a conspiracy." *Id.* These "plus factors" are often "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Id.* at 47.

The Sun alleges a tacit agreement, not an explicit one. While the Sun argues that Defendants' agreement to buy the RJ constitutes an explicit agreement, they fail to indicate what aspect of that agreement, if executed, would constitute a restraint of trade. *See Standard Oil Co. of New Jersey v. U.S.*, 221 U.S. 1, 63 (1911) (Sherman § 1 covers only agreements which are "restraint[s] of trade within the intendment of the act."). There is nothing inherently anticompetitive about buying a newspaper. The Sun suggests that the agreement

to buy the RJ was really an agreement to buy the RJ *and* restrain trade through anticompetitive managerial practices, but it points to no allegations sufficient to support this conclusion. Because the Sun can assert only a tacit agreement to restrain trade, it must allege parallel conduct and "plus factors."

The Sun has pled several "plus factors" sufficient to state a claim for conspiracy under *DRAM*. The Sun alleges that Adfam acted solely in the interests of the RJ to further its anticompetitive scheme by (1) allowing its longtime CFO, Steven O'Conner, to serve as the RJ's only corporate officer and News+Media's sole manager (ECF No. 621 at ¶ 17); (2) advising the Adelson family on its purchase of the RJ (*Id.* at ¶¶ 63-64); (3) participating in the illicit redesign of the Newspapers' shared front page (*Id.* at 146); and (4) involving itself in the RJ's finances, including by weighing in on the RJ's financial and operational decisions, reviewing and overseeing the RJ's funding requests to Adelson and Dumont, performing monthly accounting "control checks" on the RJ, and drafting annual "going concern" letters to the RJ's outside auditing firm (*Id.*).

These "plus factors," if true, constitute parallel behavior that is inconsistent with Adfam unilaterally seeking its own self-interest. The Court therefore denies the RJ's motion to dismiss the Sun's Sherman § 1 conspiracy claim (Claim 6).

### B. MOTIONS FOR SUMMARY JUDGMENT AND OTHER MOTIONS

In addressing the parties' cross-motions for summary judgment (ECF Nos. 829, 843), the Court's analyzes the issues in the following order: (1) whether the 2005 JOA is enforceable; (2) whether the Sun has suffered an antitrust injury sufficient to bring its Sherman Act claims; (3) whether arguments related to the RJ's intent to breach the 2005 JOA, the Sun's damages flowing from the RJ's breach of the promotional activities and expenses provision of the 2005 JOA, and the RJ's ability to charge editorial and promotional expenses against the joint operation, are precluded by the 2019 Arbitration, and whether the Sun may seek treble damages on the award it received in the 2019 Arbitration; (4) whether the

RJ is barred from bringing its Sherman § 1 claim as a complete participant in the 2005 JOA; (5) whether the Sun has monopoly power sufficient to support the RJ's Sherman § 2 claims; (6) whether the RJ's counterclaims based in Nevada common law survive summary judgment; and (7) whether the RJ may terminate the 2005 JOA pursuant to the force majeure clause or because of frustration of purpose.

### 1. Legal Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This means that if the evidence, viewed in the light most favorable to the non-moving party, shows that there is no genuine issue of material fact, the court can grant summary judgment in favor of the moving party. In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).

In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the

opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## 2. JOA Enforceability

The question before the Court is whether the Newspaper Preservation Act ("NPA"), 15 U.S.C. §§ 1801-04a, required the Attorney General to sign the 2005 JOA. The RJ argues that 2005 is unenforceable because it was not signed by the Attorney General. The RJ argues the NPA's signature requirement applies to amended JOAs or, alternatively, that the 2005 JOA is a novation, making it a new JOA not an amended JOA. Both arguments fail because there is no signature requirement for amended JOAs and the 2005 JOA is clearly an amended JOA not a new JOA. These conclusions are supported by the text and structure of NPA, case law, and the text and history of the 2005 JOA.

A JOA is a contract between newspapers to consolidate operations. *See Michigan Citizens for an Independent Press v. Thornburgh*, 868 F.2d 1285, 1287-88 (D.C. Cir. 1989). Typically, a JOA involves one of the newspapers selling off its

printing equipment and other assets in order to reduce costs. *Id.* Papers enter JOAs in order to preserve editorial competition in their region, rather than let a failing paper go out of business and expose the surviving paper to antitrust liability.

The NPA was enacted in 1970. Congress passed the NPA in response to a Supreme Court decision limiting the circumstances in which newspapers could legally enter JOAs. *See Citizen Publishing Co. v. United States*, 394 U.S. 131 (1969). The NPA expands access to JOAs in order to "maintain[] a newspaper press editorially and reportorially independent and competitive in all parts of the United States." 15 U.S.C. § 1801. To that end, the NPA provides limited antitrust immunity for parties to JOAs that comply with the NPA's provisions; such immunity is important because without it, the parties to a JOA could violate antitrust laws. *Michigan Citizens for an Independent Press*, 868 F.2d at 1287 ("The [NPA] creates an exemption to the antitrust laws that permits a joint newspaper operation agreement between two newspapers . . . .").

A plain reading of the NPA indicates that signatures are not required for amendments to existing JOAs. *See Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."). The provisions regarding JOA review are contained in §§ 1803(a) and (b), which are reprinted below in their entirety:

> (a) Joint Operating Arrangements Entered Into Prior To July 24, 1970
> It shall not be unlawful under any antitrust law for any person to perform, enforce, renew, or amend any joint newspaper operating arrangement entered into prior to July 24, 1970, if at the time at which such arrangement was first entered into, regardless of ownership or affiliations, not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become a financially sound publication: *Provided, That the terms of a renewal or amendment to a joint operating arrangement must be filed with the Department of Justice* and that

the amendment does not add a newspaper publication or newspaper publications to such arrangement.

(b) Written Consent For Future Joint Operating Arrangements
*It shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States.* Prior to granting such approval, the Attorney General shall determine that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of this chapter.

[Section (c) omitted]

15. U.S.C. § 1803 (emphasis added).

The NPA specifies three levels of review for different kinds of JOAs—none, some, and "prior written consent of the Attorney General." The level of review depends on the kind of JOA. The NPA identifies three kinds of JOAs: pre-1970 JOAs, amended JOAs, and new JOAs "not already in effect." For the first category, which are JOAs entered into before July 24, 1970, no review is required. Section 1803(a) states that pre-1970 JOAs are "not unlawful" provided certain criteria are met. 15 U.S.C. § 1803(a). For amended JOAs, the second category, some review is required. Section 1803(a) provides that a renewed or amended JOA can not add another newspaper and "*must be filed with the Department of Justice.*" *Id.* (emphasis added). The third category is new JOAs, which require "prior written consent." These are governed by § 1803(b) which provides that "[i]t shall be unlawful" to enter a JOA "not already in effect, except with the prior written consent of the Attorney General of the United States." 15 U.S.C. § 1803(b).

These different levels of review for JOAs are calibrated to the NPA's stated purpose of preserving newspapers and guarding against antitrust violations. 15 U.S.C. § 1803(b) ensures thorough vetting of new JOAs when they are first established. 15 U.S.C. § 1803(b) (requiring that any new JOA "effectuates the policy and purpose" of the NPA). Section 1803(a) provides for no review of pre-

1970 JOAs if not more than one of the papers "was likely to remain or become a financially sound publication." Amended JOAs must "not add a newspaper publication or newspaper publications to such arrangement," signaling that such a change might be regarded as a new JOA and trigger more scrutiny. 15 U.S.C. § 1803(a). Additionally, § 1803(c) provides that parties to a JOA are not exempt from antitrust liability for any anti-competitive predatory conduct flowing from the JOA. 15 U.S.C. § 1803(c).

Only new JOAs, those "not already in effect," require "prior written consent of the Attorney General." 15 U.S.C. § 1803(b). Neither pre-1970 nor amended JOAs require such "prior written consent." Section1803(a) is the only portion of the NPA that explicitly mentions amendments and makes plain that amended JOAs must be filed with the DOJ. *See* 15 U.S.C. § 1803(a) ("the terms of a renewal or amendment to a joint operating arrangement must be filed with the Department of Justice"). That the amendment language is found in §1803(a), which applies to pre-1970 JOAs, does not mean that a different process applies for amendment to JOAs entered into after 1970. This is because the signature requirement in §1803(b) only applies to JOA's "not already in effect." 15 U.S.C. § 1803(b). It would contravene the statute for the Court to impose the Attorney General signature requirement ("prior written consent") on amended JOAs when the NPA only imposes the signature requirement on new JOAs and specified a lesser requirement (filing with DOJ) for amended JOAs.

Courts have recognized that an amended JOA does not require prior written consent of the Attorney General. *See Mahaffey v. Detroit Newspaper Agency*, 969 F. Supp. 446, 448 (E. D. Mich. 1997) (holding amended JOA did not require prior written consent of the Attorney General) *aff'd by Mahaffey v. Detroit Newspaper Agency*, 166 F.3d 1214, 1998 WL 739902 (6th Cir. 1998); *Hawaii ex rel. Anzai v. Gannett Pacific Corp.*, 99 F. Supp. 2d 1241, 1251 (D. Haw. 1999) (stating the NPA expressly permits amendment of a pre-1970 JOA by filing the amendment with

the Department of Justice). The RJ has not identified any courts that have reached an alternative conclusion.

The text and history of the 2005 JOA clearly show that it is an amended JOA, not a new JOA, that did not require the signature of the Attorney General. As a preliminary matter, the Attorney General signed the 1989 JOA when it was a new JOA, as required by § 1803(b). (ECF No. 846-2.) The 2005 JOA is titled "Amended and Restated Agreement" and is referred to throughout the agreement as "Restated Agreement." *Id.* The 2005 JOA continued the fifty-year term contained in the 1989 JOA, which was tethered to the Attorney General's approval of the agreement on June 1, 1990. (ECF Nos. 837-2, 837-4, 837-6.) The 2005 JOA was subject to a multi-year review process by the DOJ. This is consistent with the requirement in § 1803(a) that amended JOAs "must be filed with the Department of Justice." 15 U.S.C. § 1803(a). As part of that review, the DOJ issued Civil Investigative Demands to both parties for documents, interrogatory responses, and depositions. (*See, e.g.*, ECF Nos. 838-5, 838-6, 838-7, 838-8 at 11, 838-4 at 10, 838-9 at 6.) The DOJ inquired into whether the RJ had the means to "unilaterally terminate the amended JOA" and whether the RJ could control the Sun's editorial content. (ECF No. 838-10 at 3; *see* ECF No. 838-5 at 6 (CID Nos. 4(a) and (b)).) At the end of its investigation, the DOJ issued a letter to both parties informing them that it had "closed its investigation" into the "2005 amendments to the parties Joint Operating Agreement." (ECF No. 831-13.) Mark Hinueber, former in-house counsel to the owner of the RJ at the time it entered the 2005 JOA, testified that the DOJ's letter was "a no-action letter" and that the NPA "has no mechanism to approve an amended JOA." (ECF No. 838-8 at 11.) In sum, the parties pursued the DOJ review process for amended JOAs consistent with § 1803(a), not the "prior written consent of the Attorney General" process for new JOAs under § 1803(b). The fact that the 2005 JOA was not signed by the Attorney General is not a defect, but rather consistent with its being an

1  amended JOA.

2      The RJ's argument that the 2005 JOA was a novation lacks record support.

3  A novation occurs when parties expressly terminate an existing contract and

4  enter a new contract that materially changes their rights and obligations. *See*

5  *United Fire Ins. Co v. McClelland*, 780 P.3d 193, 195-96 (Nev. 1989). The intent of

6  all parties to cause a novation must be clear. *Id.* (citing *Pink v. Busch,* 691 P.2d

7  456, 460 (Nev. 1984)). Consent to novation may be implied from the

8  circumstances of the transaction and by the subsequent conduct of the

9  parties, *id.* (citing *Sans Souci v. Div. of Fla. Land Sales*, 448 So. 2d 1116, 1121

10  (Fla. Dist. Ct. App. 1984)), and lack of novation can be determined as a matter of

11  law if no reasonable person could conclude that a novation existed, *id.* (citing

12  *Herb Hill Ins., Inc. v. Radtke,* 380 N.W. 2d 651, 654 (N.D. 1986)).

13      Here, the Court finds no triable issues of fact on the issue of novation. The

14  parties' intention to amend the 1989 JOA is evident from the face of the 2005

15  JOA. The 2005 JOA is titled "Amended and Restated Agreement." (ECF NO. 837-

16  6 at 2.) It tracks the structure and language of the 1989 JOA. (*Id.*) It continues

17  the original term of the 1989 JOA. (*Id.* at 3.) While the 2005 JOA includes changes

18  to the profit-sharing scheme and the distribution of the newspapers, the material

19  elements of the 1989 JOA that eliminated price and other non-editorial and non-

20  reportorial competition, elements previously approved by the Attorney General,

21  remain unchanged. Indeed, the 1989 JOA included a joint distribution scheme

22  on Saturdays, Sundays, holidays, and special editions, so even the joint

23  distribution scheme is not new to the 2005 JOA.

24      Moreover, correspondence between the parties and the DOJ show that the

25  parties intended to amend the 1989 JOA. The RJ's counsel Gordon Lang

26  represented to the DOJ in the submission of the 2005 JOA that the parties "have

27  amended the JOA, and filed the Amended Restated Agreement with the Assistant

28  Attorney General for Administration." (ECF No. 837-11.) Unlike the process for

the approval of the 1989 JOA, the DOJ did not publish the 2005 JOA in the Federal Register, issue any report, accept public comment, or hold a hearing on whether the 2005 JOA should be allowed to proceed. (ECF No. 837-1 at ¶6.)

The evidence supporting the parties' intent to amend is not adequately rebutted by the RJ's reference to provisions in the 2005 JOA expressly terminating the 1989 JOA on the "Transition Date" and releasing all claims and obligations arising under the 1989 JOA. The Court finds that even viewing the RJ's evidence in the light most favorable to the RJ, it does not create triable issues of fact pertaining to novation. The Court therefore grants summary judgment to the Sun on this issue.

Even if it were a novation, the 2005 JOA would be enforceable without the Attorney General's signature. *See Newspaper Guild v. Levi*, 539 F.2d 755, 759-60 (D.C. Cir. 1976) (holding JOA was valid without the Attorney General's signature); *News Weekly Systems, Inc. v. Chattanooga News-Free Press*, 986 F.2d 1422, 1993 WL 47197, at *2 (6th Cir. 1993) (rejecting as "devoid of merit" the plaintiff's argument "that any joint agreement not approved by the Attorney General is per se illegal"). Courts recognize that absence of the Attorney General's signature may expose the parties to antitrust liability but does not invalidate the JOA or render is unlawful or unenforceable. *See Newspaper Guild*, 986 F.2d at 760.

Because the Court finds that the 2005 JOA is enforceable, it denies the RJ's motion for summary judgment on this ground. For the same reason, the RJ's motion to dissolve preliminary injunction and motion to expedite resolution of that motion (ECF Nos. 853, 915) are both denied, and the Sun's motion for summary judgment on the RJ's second affirmative defense (ECF No. 836 at 23) is granted.

Because the 2005 JOA is enforceable, Lawrence J. Aldrich's opinions as to (1) the meaning of the NPA or related regulations and whether DOJ has legal authority to approve "Amended and Restated" JOAs; (2) the DOJ's practices in

and around 2008 with respect to newspaper JOAs, including "Amended and Restated" JOAs; and (3) the intent, motive, of state of mind of the DOJ or any lawyers working for the DOJ, will no longer assist the trier of fact in understanding the evidence before it or determining a fact at issue. (*See* ECF No. 838-1 at 4-5). The RJ's motion to exclude that testimony (ECF No. 868) is granted pursuant to Fed. R. Evid. 702.

### 3. Antitrust Injury

"The antitrust laws do not provide a remedy to every party injured by unlawful economic conduct. . . . [A]ntitrust laws are only intended to preserve competition for the benefit of consumers." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999). A plaintiff may only pursue an antitrust action if it can show "'*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (emphasis in original) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977)). Antitrust injury is an essential requirement to each of the Sun's claims under the Sherman Act. *Id.*

The Ninth Circuit has identified four requirements for antitrust injury: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1055. There is an additional fifth requirement: "that 'the injured party be a participant in the same market as the alleged malefactors,' meaning 'the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market.'" *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quoting *Glen Holly Entm't, Inc. v. Tektronix,* Inc., 343 F.3d 1000, 1008 (9th Cir. 2003)).

Before analyzing antitrust injury, the Court must define the relevant

market. *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("A threshold step in any antitrust case is to accurately define the relevant market.") Relevant market refers to "the area of effective competition." *Id.* (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)). Generally, "[t]he process of defining the relevant market is a factual inquiry for the jury." *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). But here, for the purposes of its summary judgment motion, the RJ does not contest the Sun's market definition as it is pled. The Sun's complaint alleges that the "sale of local daily newspapers is a distinct relevant product market and line of commerce within the meaning of Section 2 of the Sherman Act and Section 7 of the Clayton Act." (ECF No. 621 at ¶ 44.) The Sun's complaint also alleges that the relevant geographic market is Clark County, Nevada. The Court therefore adopts the relevant market the Sun alleges in its complaint, the sale of local daily newspapers in Clark County, Nevada, for the purposes of deciding this motion.

### a. Unlawful Conduct

Turning to the elements of antitrust injury, the Court begins by analyzing whether there are genuine issues of material fact concerning whether the RJ acted unlawfully under antitrust laws. "Without a violation of the antitrust laws, there can be no antitrust injury." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1055. This inquiry requires a showing that there was some "competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co*, 495 U.S. at 344 (emphasis in original). Thus, to show unlawful conduct in the context of an antitrust claim, the Sun must show that there was competition in the relevant market and that the RJ's alleged conduct reduced competition.

### i.    Competition in the Relevant Market

The Sun argues that editorial and reportorial competition amongst newspapers is economic competition under antitrust laws. The RJ contends that editorial and reportorial competition, or competition for readers' attention, is not

commercial competition. According to the RJ, because the RJ and the Sun are sold together in a bundle, they do not compete economically for sales, which means there is no competition in the relevant market.

The RJ supports its argument that antitrust laws only apply to commercial competition with citations to cases that do not deal with competition between newspapers. *See Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1121 (E.D. Cal. 2002), *aff'd on other grounds sub nom. Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 985 (9th Cir. 2001) (sports contests are not competition under the Sherman Act); *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 983 (D.C. Cir. 2017) (political competition is not competition under the Sherman Act). The Sun points to authority analyzing competition in the context of newspapers to support its argument that editorial and reportorial competition is economic competition under antitrust laws. *See United States v. Daily Gazette Co.*, 567 F. Supp. 2d 859 (S.D. W. Va. 2008); *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241 (D. Haw. 1999). The Court is persuaded by the Sun's argument.

The holding in *Daily Gazette* directly contradicts the RJ's argument. In that case, the defendants made the same argument the RJ makes here, saying "editorial competition is not commercial in nature and, hence, is beyond the reach of antitrust laws." *Daily Gazette Co.*, 567 F. Supp. 2d at 870. Defendants also argued that "[e]ditorial competition for readers' attention, which is all that the complaint alleges, cannot have financial consequences for the JOA parties" because all revenue is collected into a common fund and distributed to the parties according to the terms of the JOA, just like in this case. *Id.* The court in *Daily Gazette* rejected these arguments, identifying at least "two competitive and economic incentives in pursuing particular editorial and news-gathering efforts that attract readers, subscribers, and advertisers to its own newspaper, namely, (1) increasing its value, particularly in the eyes of potential acquisitors, and (2) enhancing its bargaining position when the JOA is up for re-negotiation or

termination." *Id.* Essentially, the court held that editorial competition plays a role in "valuing newspapers as a going concern and for saleability purposes." *Id.* Thus, editorial competition is commercial competition in the newspaper context.

There are two distinctions between *Daily Gazette* and this case, namely that the two newspapers in *Daily Gazette* were distributed separately and had separate subscriber bases and that the court's decision was denying a motion to dismiss, not a motion for summary judgment. But the court's holding is still instructive despite these distinctions. Editorial competition for readers' attention, even in the context of jointly distributed papers, has economic effects on the newspapers. Here, the Sun's expert opined on the Sun's economic incentives in the ways identified in *Daily Gazette*, in addition to other ways, including increasing traffic to the Newspapers' digital operations outside of the JOA, and promoting their principal owners' economic or business interests more broadly. The Court finds that editorial competition for readers' attention in the relevant market can be the basis for an antitrust claim in the newspaper context.

To show editorial competition, the Sun must further show that the Sun and the RJ are reasonably interchangeable products that may be substituted for each other in the relevant market. The RJ argues this is impossible because the products are not economic substitutes, meaning one product cannot take away sales from the other because they are sold as a bundle. The Sun argues that the products compete within the bundle for readers' attention and can be substituted for one another by the buyer of the bundle.

The outer boundaries of a product market are determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Interchangeability of use "may be determined by examining such practical indicia" as (1) "industry or public recognition of the market as a separate economic entity," (2) "the product's peculiar characteristics and uses,"

(3) "unique production facilities," (4) "distinct customers," (5) "distinct prices," (6) "sensitivity to price changes," and (7) "specialized vendors." *Brown Shoe*, 370 U.S. at 325-28.

The Sun has marshaled evidence in the record weighing in its favor on all the listed indicia except sensitivity to price changes, demonstrating that both the RJ and the Sun exist within the relevant market. (ECF No. 871 at 39-42.) The Sun concedes that there is no price elasticity between the two newspapers because they are not priced separately, but points to evidence in the record establishing a lack of price sensitivity between the newspaper bundle and other media. (*Id.*) With six of the indicia clearly weighing in the Sun's favor, a reasonable juror could conclude that the Sun and the RJ compete in the same market for readers' attention, even though they are sold in a bundle. The totality of the evidence presents triable issues of fact on whether the RJ and the Sun compete for readers' attention in the relevant market.

### ii.     Reduction in Competition

The next question is whether there are triable issues of fact on whether the RJ's alleged conduct reduced competition for readers' attention in the relevant market. The RJ contends that because there is no direct evidence showing the Sun lost readers as a result of the alleged reduction in editorial competition for readers' attention, the Sun has failed to show a reduction in competition. The RJ points to statements in the Sun's antitrust economist expert report admitting that there is a lack of evidence of readership shifting between the Sun and the RJ. (ECF No. 845 at 34.)

The Sun points to findings its antitrust economist expert, Dr. Michael Katz, made concerning the effect the RJ's alleged conduct had on the Sun, competition in the market, and consumers. (ECF No. 871 at 18-19.) Specifically, Dr. Katz opined that the RJ's accounting abuses, failure to maximize profits, failure to promote the Sun, and the RJ's prosecution of its counterclaims as "sham"

24

litigation all harm "competition by weakening the Sun's ability and incentives to compete with the Review-Journal—thus lessening the competitive pressures on the Review-Journal, to the detriment of consumers." (ECF No. 875-1 at 14.) Dr. Katz observed that, due to alleged accounting abuses by the RJ, the Sun has not been paid a profit payment from the joint operation since 2017, which weakens the Sun's ability to compete with the RJ and threatens to drive the Sun out of business. (*Id.*) He opined that the RJ's alleged failure to maximize profits artificially reduces payments due to the Sun, weaking the Sun's ability to compete. (*Id.* at 15.) He opined that the RJ's alleged failure to promote the Sun diminished the Sun's appearance, hindering the Sun's ability to communicate with consumers and potential readers about its newspaper, thereby reducing consumer knowledge of the Sun and undermining its ability to compete. (*Id.* at 15-16.) Specifically, he opined that this alleged conduct "has weakened editorial and reportorial competition between the *Review-Journal* and the *Sun*, both directly—because it collectively reduces consumers' knowledge of the Sun and its brand—and indirectly—because the Sun's owners have less incentive to invest in a newspaper that obtains less readership and attention." (*Id.* at 16.) Finally, Dr. Katz opined that the RJ's pursuit of its counterclaims, assuming they are found to be objectively baseless, harms competition "by both imposing large litigation costs on the Sun and by creating uncertainty that further raises the Sun's costs, . . . [and] weakens the Sun's ability to compete with the Review-Journal— regardless of which party prevails in the litigation." (*Id.* at 17.)

The totality of the evidence presents triable issues of fact on whether the RJ's alleged conduct reduces editorial competition for reader's attention in the relevant market. Therefore, the Sun has satisfied the first prong of the Ninth Circuit test for antitrust injury, marshaling triable issues of fact on the issue of whether the RJ's alleged conduct is unlawful under antitrust laws.

**b. Injury to the Sun**

Next, the Sun must show that the RJ's unlawful conduct caused it to suffer injury. "A plaintiff must also allege some credible injury caused by the unlawful conduct. There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1056. The RJ does not argue that the Sun stands to gain from its alleged conduct. Instead, the RJ argues that the Sun has failed to show any injury from the Sun's alleged conduct, both because the record lacks any evidence showing the Sun lost readers due to the RJ's actions and because the Sun's complaints about having less money due to the RJ's alleged breach of the 2005 JOA are simply contract damages, not damages flowing from a reduction in competition.

The Sun contends that the RJ's anticompetitive conduct has weakened the Sun's ability to compete, resulting in harm to the Sun, competition in the relevant market, and consumers. The Sun's argument is supported by Dr. Katz's report analyzing the effect of the RJ's alleged conduct on the Sun, competition, and consumers. The Court also finds that the RJ's alleged failure to promote the Sun harms competition and decreases the Sun's value "as a going concern and for saleability purposes." *Daily Gazette Co.*, 567 F. Supp. 2d at 870. This is a harm that Dr. Katz opined on in his expert report (ECF No. 875-1 at 39-42), and it is a harm caused by the RJ's alleged anticompetitive conduct. The Court therefore finds triable issues of fact on the issue of whether the RJ's allegedly unlawful conduct caused injury to the Sun.

**c. The Injury Flows from that Which Makes the Conduct Unlawful**

Next, the Sun must show that the claimed injury flows from that which makes the RJ's alleged conduct anticompetitive and unlawful. "It is not enough that the plaintiff's claimed injury flows from the unlawful conduct. An antitrust injury must 'flow[] from that which makes defendants' acts unlawful.'" *Am. Ad*

*Mgmt., Inc.*, 190 F.3d at 1056 (quoting *Brunswick Corp.*, 429 U.S. at 489). In *Brunswick*, the Supreme Court held that a plaintiff failed to show antitrust injury when its claimed injury was the additional profit it would have earned had its competitors been allowed to fold. *Brunswick*, 429 U.S. at 479–81, 487–89. The defendant's potential to monopolize the market by buying out the competitors would injure the plaintiff in the same way as any rescue of the plaintiff's competitors. *Id.* at 487. The Supreme Court held that the defendant's actions actually preserved competition, and that the plaintiff could not recover damages related to profits it would have realized had competition been reduced. *Id.* at 488. The plaintiff in *Brunswick* failed to establish antitrust injury because its alleged injury did not flow from the monopolistic actions taken by the defendant.

Here, the facts are distinguishable from those in *Brunswick*. There, the defendant's purchase of the plaintiff's competitors was not in itself unlawful but was only potentially unlawful because of the defendant's size. Here, the RJ's alleged anticompetitive conduct is itself potentially unlawful because it reduces editorial competition in the relevant market and harms consumers. The Sun's claimed injury is harm to its ability to compete and decreased visibility, which hurts its value. This claimed injury flows directly from the RJ's alleged unlawful conduct. Thus, the Court finds triable issues of fact on the issue of whether the Sun's claimed injury flows from that which makes the RJ's alleged conduct unlawful.

### d. The Injury Is the Type the Antitrust Laws Were Intended to Prevent

Next, the Sun must show that its claimed injury is the type the antitrust laws were intended to prevent. "Finally, the plaintiff's injury must be 'of the type the antitrust laws were intended to prevent.' The Supreme Court has made clear that injuries which result from *increased* competition or lower (but non-predatory) prices are not encompassed by the antitrust laws." *Am. Ad Mgmt., Inc.*,

190 F.3d at 1057 (citing *Atl. Richfield Co.*, 495 U.S. at 337–40) (emphasis in original). No party has argued that the Sun's claimed injury was the result of increased competition or lower, non-predatory prices. The Sun's claimed injury, especially as it pertains to its reduced ability to compete, is exactly the type of injury the antitrust laws were intended to prevent. The Court therefore finds triable issues of fact on the issue of whether the Sun's injury is the type the antitrust laws were intended to prevent.

**e. The Sun Is a Participant in the Relevant Market**

Finally, the Sun must show that it is a participant in the relevant product market. The stated purpose of the 2005 JOA is to preserve "editorially and reportorially independent and competitive newspapers in Las Vegas and its environs." (ECF No. 837-6.) The Sun supplies content to the RJ "for publication in the Sun," not in the RJ. (*Id.*) The Sun has full editorial independence, and the RJ must publish the Sun so long as the Sun complies with production requirements. (*Id.*) Given the parties' treatment of the Sun in the 2005 JOA, the Court finds that the Sun is a separate and independent newspaper product distributed in the newspaper bundle. The Court further finds that the Sun editorially competes with the RJ for readers' attention in the relevant market. The Sun is therefore a "competitor of the alleged violator in the restrained market," *Somers*, 729 F.3d at 963, meaning the Sun is a participant in the relevant market. The court therefore finds triable issues of fact on the issues of whether the Sun is a participant in the relevant market.

The Sun has satisfied its burden of production as to each of requirements of antitrust injury and presented triable issues of fact on each element. The Court therefore denies the RJ's motion for summary judgment on the issue of antitrust injury.

**4. Preclusion and Treble Damages**

The parties each argue that certain aspects of the Arbitrator's 2019

28

decision (ECF No. 837-8) should have a preclusive effect on issues presented in the cross motions for summary judgment. The preclusive effect of a former adjudication is generally referred to as *res judicata*. *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321 (9th Cir. 1988). *Res judicata* "includes two distinct types of preclusion, claim preclusion and issue preclusion."[1] *Id.* "The doctrine of issue preclusion prevents relitigation of all 'issues of fact or law that were actually litigated and necessarily decided' in a prior proceeding." *Id.* at 322 (quoting *Segal v. American Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979)). Federal law requires "federal courts to apply the *res judicata* rules of a particular state to judgments issued by courts of that state." *Robi*, 838 F.2d at 322 (citing *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 519, (1986)); 28 U.S.C. § 1738.

> In Nevada, four elements must be met for issue preclusion to apply: "'(1) the issue decided in the prior litigation must be identical to the issue presented in the current action; (2) the initial ruling must have been on the merits and have become final; ... (3) the party against whom the judgment is asserted must have been a party or in privity with a party to the prior litigation'; and (4) the issue was actually and necessarily litigated."

*Five Star Cap. Corp. v. Ruby*, 194 P.3d 709, 713 (Nev. 2008) (alteration in original) (quoting *Univ. of Nev. v. Tarkanian*, 879 P.2d 1180, 1191 (Nev. 1994).

The Sun says that the Arbitrator's findings preclude the RJ from arguing that the 2005 JOA permits it to charge its editorial and independent promotional costs against the joint operation. The RJ does not contest the Sun's argument for issue preclusion. The Court will therefore grant summary judgment to the Sun on its Second Affirmative Defense and preclude the RJ from arguing that it may charge its editorial and independent promotional costs against the joint operation under the 2005 JOA.

The RJ's issue preclusion argument is contested. The RJ first argues that

---

[1] Neither party argues that claim preclusion applies to any cause of action in this case.

the Arbitrator's findings preclude the Sun from relitigating the RJ's intent to breach the JOA. On this point, the Sun concedes that the Arbitrator issued a ruling on the merits and that the parties in the 2019 Arbitration and this action are in privity, satisfying two of the elements. The Sun argues that the intent required for its monopoly claims is not identical to the intent issues raised in the 2019 Arbitration and that the RJ's intent to harm competition was not necessarily and actually litigated. The Court agrees with the Sun.

For an issue to be identical and therefore appropriate for issue preclusion, it must involve "the same ultimate issue previously decided in the prior case." *Alcantara ex rel. Alcantara v. Wal-Mart Stores, Inc.*, 321 P.3d 912, 917 (Nev. 2014). Raising "a new legal or factual argument" that involves the same ultimate issue will not prevent the application of issue preclusion. *Id.* at 916. Issue preclusion may apply "even though the causes of action are substantially different, if the same fact issue is presented." *Clark v. Clark*, 389 P.2d 69, 71 (Nev. 1964).

Here, the Court is satisfied that the intent issue raised in the Sun's monopoly claims does not involve the same ultimate issue decided in the 2019 Arbitration. The intent the parties are litigating in this action is distinct from the intent litigated in the 2019 Arbitration. The Sun's claims in this action are based in § 2 of the Sherman Act and have two essential elements: "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (applying these elements to attempt to monopolize under § 2 of the Sherman Act).

In the 2019 Arbitration, intent was relevant to the Sun's cause of action for tortious breach and its request for punitive damages. In the Final Award, the Arbitrator mentioned the RJ's intent to breach only once, in a section denying

the Sun's claim for tortious breach:

> The tortious breach claim requires that the Review-Journal's actions in connection with the JOA be more than an inaction or breach but rather rise (or perhaps fall) to the level of an intent to breach the implied covenant of good faith and fair dealing. While the Review-Journal appears to have dragged its feet and otherwise been less than easy to work with, it is possible that [the Sun] may not always have been easy to deal with either. The weight of the evidence indicates that the level of conduct of the Review-Journal does not qualify for tortious breach and the (seventh) claim is denied in its entirety.

(ECF No. 837-8 at 11.) The Arbitrator made no specific findings on intent to breach for the purposes of a punitive damages award. Thus, the only finding with any potential preclusive effect is the Arbitrator's finding on tortious breach.

In Nevada, a claim for tortious breach requires a showing that one party "deliberately countervene[d] the intention and spirit of the contract" and that "a special element of reliance or fiduciary duty was present." *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991). The Sun's claim required a showing that the RJ intended to breach the covenant of good faith and fair dealing in the 2005 JOA, and the Arbitrator found that the evidence did not support such a showing.

The Sun's Sherman Act claims require a showing that the RJ "willfully" acquired or maintained monopoly power. *Kodak Co.*, 504 U.S. at 481. The Sun's alleges that the RJ has "the specific intent to achieve monopoly power" and that it "abused and maintained market power" by exploiting its "powers and responsibilities under the 2005 JOA to deprive the Sun of its Annual Profit Payments," "reducing the visibility of the Sun to consumers in contravention of their obligations under the JOA," and "threatening to terminate the JOA." (ECF No. 621 at 39.) While there are overlapping factual issues present in this matter and the 2019 Arbitration related to the RJ's conduct under the 2005 JOA, the intent litigated in the 2019 Arbitration is not identical to the intent being

31

currently litigated in this case. Here, the Sun must show that the RJ intended to acquire or maintain monopoly power through its conduct. Nothing in the Arbitration Final Award addresses this issue. The Arbitrator's conclusion that the RJ did not intentionally breach the implied covenant of good faith and fair dealing in the 2005 JOA does not preclude further litigation on whether the RJ intended to monopolize the market through its conduct. In short, the intent issue the parties litigated in the 2019 Arbitration does not involve the same ultimate issue the parties are litigating here. Because the RJ has failed to show that the intent issue decided in the 2019 Arbitration is identical to the intent issue presented in this case, the Court denies the RJ's motion for summary judgment on this issue.

Next, the RJ argues that the Sun is precluded from relitigating its failure to prove damages flowing from the RJ's breach of the promotional activities and expenses provision of the 2005 JOA. Here, the Court agrees with the RJ. In the Arbitration, the Sun sought damages for the RJ's breach of contract "related to additional promotional activities expenses seeking . . . damages for the period from December 11, 2015 through March 31, 2018." (ECF No. 837-8 at 3.) While the Arbitrator concluded that the RJ breached this provision, the Arbitrator also found that a "crucial element of a breach of contract action is the proof of damages beyond speculation" and that there "was not enough evidence presented in this matter to make a definitive damages calculation of wrongfully charged additional promotional activities expenses by the RJ." (*Id.* at 6.) The Arbitrator speculated that the audit awarded to the Sun could determine damages with specificity, but the Final Award concluded that the Sun did not present sufficient evidence of damages on this breach of contract claim. (*Id.*) The Court therefore finds that the Sun is precluded from arguing for damages stemming from this breach during the period of time from December 11, 2015 through March 31, 2018 and grants summary judgment to the RJ on this issue.

Finally, the RJ contends that because it fully satisfied the state court

judgment stemming from the Final Arbitration Award, the principle of double recovery bars the Sun from seeking further compensatory damages related to accounting for editorial and promotional expenses from December 11, 2015 through March 31, 2018. Thus, the RJ argues, because the Sun is not entitled to any further compensatory damages for the RJ's breach of the 2005 JOA during the Arbitration timeframe, the Sun cannot seek treble damages based on that same conduct, as it does in this antitrust action. The Sun argues that trebling of damages should happen before subtracting the sum the RJ already paid, and that the remaining figure is the proper damage award in an antitrust suit. The Sun's argument is better supported by this circuit's precedent.

In *Flintkote Co. v. Lysfjord*, 246 F.2d 368 (9th Cir. 1957), the Ninth Circuit addressed a sufficiently analogous scenario where a prior settlement from one defendant offset a jury verdict of treble damages for antitrust violations against other defendants. "Irrespective of the nature of the cause of action, a plaintiff is entitled to one full satisfaction of his claim . . . such satisfaction would not be achieved by the award of any sum, which added to the settlement sum, did not total [three times the jury's award]." *Id.* at 398. Thus, "[a]ny other method [of calculating damages] would have resulted in plaintiffs' receiving less than the whole to which they were entitled." *Id.* Thus, when deciding when to credit prior payments against a treble damage award, "to ensure that plaintiffs receive complete satisfaction of their claims, settlement payments should be deducted from the award . . . *after* actual damages are trebled." *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 636 F. Supp. 1138, 1151 (C.D. Cal. 1986) (emphasis in original). Based on clear precedent from the Ninth Circuit, the Court concludes that the RJ's prior payment satisfying the judgment stemming from the 2019 Arbitration should be deducted from any actual damages awarded at trial after the award is trebled. The Court therefore denies the RJ's request for summary judgment on this issue.

### 5. Complete Participation

The Sun seeks summary judgment on the RJ's Sherman § 1 claim (Counter Claim 3) because it is barred by the NPA and the doctrine of complete participation. Because the Court finds that the RJ is a complete participant in the 2005 JOA, it declines to reach whether the NPA is also a bar.

As stated, Sherman § 1 prohibits agreements in restraint of trade. 15 U.S.C. § 1. The RJ alleges that the 2005 JOA is a *per se* violation of Sherman § 1 because it is a horizontal agreement to fix prices. (ECF No. 861 at 37 (quoting ECF No. 296 ¶ 147)); *Ohio v. American Express Co.*, 585 U.S. 529, 540-41 (2018) ("horizontal restraints . . . qualify as unreasonable *per se*."). In response, the Sun raises the "complete participant" defense (sometimes called "complete involvement" defense), which bars a "complete participant" in the challenged agreement from bringing a claim under Sherman § 1. *THI-Hawaii, Inc. v. First Commerce Financial Corp.*, 627 F.2d 991, 995 (9th Cir. 1980).

A "complete participant" is an entity that has "actively support[ed] the entire restrictive program . . . participating in its formulation and encouraging its continuation." *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 278 (9th Cir. 1976) (quoting *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 140 (1968)). A plaintiff's "complete participation" is determined by the facts, including (1) whether it was present at the agreement's formation, (2) whether it entered a restrictive contract after an "arm's length bargaining process," and (3) the degree to which it was coerced into the anti-competitive agreement. *See THI-Hawaii*, 627 F.2d at 995-96; *Javelin Corp.*, 546 F.2d at 277, 279 (finding the plaintiff was not coerced when its own lack of capital motivated it to enter an anticompetitive agreement that existed years before the plaintiff joined); *Perma Life Mufflers*, 392 U.S. at 138-40 (finding no coercion when a group of small franchisees that had merely agreed to terms set by their more powerful multinational franchisor). While a defendant's complete participation is generally a question of fact, *Javelin*

*Corp.*, 546 F.2d at 279, summary judgment is appropriate where the undisputed facts clearly support a finding of complete participation, *THI-Hawaii*, 627 F.2d at 995-96.

The undisputed facts show that the RJ Defendants are complete participants in the 2005 JOA because they agreed upon acquiring the RJ to step into the shoes of the JOA's original parties, without coercion. Defendants adopted the JOA pursuant to an "arm's length bargaining process," free from coercion, in which they and the Sun were the only parties. *THI-Hawaii*, 627 F.2d at 996. Both sides agree that Defendants performed extensive background research into the effects and implications of the JOA, with the help of experts who were members of the legal team that drafted the 2005 JOA. (ECF Nos. 839-1 at 11, 58; 839-4 at 4; 906-14 at 7.) They were neither forced into the agreement by a need for capital nor overpowered by the Sun's stronger bargaining position. *See Javelin Corp.*, 546 F.2d at 277, 279; *Perma Life Mufflers*, 392 U.S. at 138-40; *see also THI-Hawaii*, 627 F.2d at 995-96 (finding no coercion even when a court order had helped to push parties into the challenged agreement).

As successors in interest to the 2005 JOA, Defendants stepped into the shoes of their predecessors, as if they had been present at the JOA's formation. Restatement (Second) of Contracts § 328(2) (1981) ("the acceptance by an assignee of . . . an assignment operates as a promise to the assignor to perform the assignor's unperformed duties . . . ."); *In re Boyajian*, 564 F.3d 1088, 1091 (9th Cir. 2009) ("under general principles of assignment law an assignee steps into the shoes of the assignor"). The 2005 JOA expressly binds "successors and assigns." (ECF No. 837-6 at 11 (2005 JOA § 10.9) ("[t]his Restated Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their permitted successors and assigns.").) The RJ is therefore a complete participant in the 2005 JOA and thus barred from bringing its Sherman § 1 Counterclaim. Accordingly, the Court grants summary judgment in favor of the

Sun on the RJ's Sherman § 1 Counterclaim.

### 6. Monopoly Power

The Sun seeks summary judgment on the RJ's Sherman § 2 claims (Counterclaims 1 and 2) because it lacks monopoly power in the relevant market. The Court grants the Sun's motion because the facts cannot support a conclusion that the Sun has monopoly power.

To bring a claim under Sherman § 2, a plaintiff must show that the defendant has monopoly power in the relevant market. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (monopoly power required for monopolization claim); *Rebel Oil Co., Inc. v. Atlantic Richfield, Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (monopoly power required for attempted monopolization claim). "Monopoly power is the power to control prices or exclude competition in a given market." *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) (quoting *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). The question of whether a defendant "possesses monopoly power is essentially one of fact," *L.A. Land Co.*, 6 F.3d at 1425, that can be shown through direct or indirect evidence, *Atlantic Richfield*, 51 F.3d at 1434. Expert testimony is helpful to demonstrate the existence of monopoly power, but it is not required. *See Forro Precision, Inc. v. Int'l Bus. Machs. Corp.*, 673 F.2d 1045, 1058-59 (9th Cir. 1982); *contra Am. Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1579 (11th Cir. 1985) (stating that a showing of monopoly power cannot be based upon lay opinion testimony).

The RJ attempts to show the Sun's monopoly power by reducing its own editorial quality. (ECF No. 861 at 51.) To show this, the RJ must show that the Sun's alleged reduction in editorial quality was an "injurious exercise of market power" that detrimentally affected the market. An injurious exercise of market power could include restricting its own output or artificially lowering prices, which caused the sort of injury that could be inflicted by an entity with market

power. *Atlantic Richfield*, 51 F.3d at 1434 ("If the plaintiff puts forth evidence of restricted output and supracompetive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power."). The injurious effect of the defendant's exercise of monopoly power must be "market-wide." *Id.* ("A predator has sufficient market power when, by restricting its own output, it can restrict marketwide output . . . ."); *L.A. Land Co.*, 6 F.3d at 1425 ("Monopoly power is the ability to control prices and exclude competition *in a given market.*") (emphasis added). It is not enough for a plaintiff to show that a defendant reduced the quality of its goods unilaterally, without showing an effect on its competitors' goods. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3rd Cir. 2007) ("If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power.").

According to the RJ, the Sun undertook an "injurious exercise of market power" by purposefully reducing its own editorial quality, thereby reducing the quality of the combined Sun/RJ newspaper. (ECF No. 861 at 51-52.) It is possible to show an injurious exercise of market power through a reduction in the quality of goods, rather than a reduction in prices. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ("[d]irect evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or *decreased quality* in the relevant market.") (emphasis added); *Atlantic Richfield*, 51 F.3d at 1433 ("[A]n act is deemed anticompetitive under the Sherman act only when it harms both allocative efficiency and raises the price of goods above competitive levels or *diminishes their quality.*") (emphasis added).

Even if the RJ could show the *Sun* reduced its editorial quality, it has not offered evidence showing that had an injurious effect on the market sufficient to demonstrate monopoly power. Here, the market is two papers: the *Sun* and the *RJ.* (ECF No. 871 at ¶ 43.) The RJ offers facts showing that the Sun's actions

reduced the quality of the *Sun*. (*See, e.g.,* ECF No. 863-1 at 14-23, 27-37, 40-44.) But the RJ does not demonstrate that the quality of the *RJ* was negatively affected by the Sun's actions. In fact, the RJ asserts that its own quality has improved or at least remained stable in recent years. (ECF Nos. 862-18 at 9:13-19, 10:11-23; 862-16 at 3:6-24, 6:7-25; 862-19 at 5:20-6:5.) These facts cannot support a finding that the Sun has monopoly power in the relevant market.

The Court therefore grants the Sun's motion for summary judgment on the RJ's Sherman § 2 counterclaims (Counterclaims 1 and 2).

### 7. The RJ's Remaining Counterclaims

The RJ's bring three additional counterclaims based in Nevada common law: 1) breach of contract against all counterclaim Defendants; 2) breach of the implied covenant of good faith and fair dealing against all counterclaim Defendants; and 3) tortious interference with contractual relations against Brian Greenspun.

In Nevada, "the plaintiff in a breach of contract action [must] show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919–20 (D. Nev. 2006) (citing *Richardson v. Jones,* 1 Nev. 405, 408 (1865)).

To establish a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must prove: (1) the existence of a contract between the parties; (2) that defendant breached its duty of good faith and fair dealing by acting in a manner unfaithful to the purpose of the contract; and (3) the plaintiff's justified expectations under the contract were denied. *See Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1251 (D. Nev. 2016) (citing *Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995)). A party breaches the implied covenants of good faith and fair dealing by engaging in conduct that "deliberately countervenes the intention and spirit of the contract." *Id.* (quoting *Hilton Hotels Corp., v. Butch Lewis Prod. Inc.*, 808 P.2d 919, 923-24 (Nev. 1991)).

Finally, in a claim for tortious, or intentional, interference with contractual relations, "a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003).

Given the Court's finding that the 2005 JOA is valid and enforceable, the first element of all of these claims is established as a matter of law. The Sun argues it is entitled to summary judgment on these claims because the RJ's allegations regarding breach are impermissible challenges to the Sun's content prohibited by the terms of the 2005 JOA, the NPA, and the First Amendment. The Sun also argues that the RJ has failed to establish any damages flowing from any alleged breach.

The RJ alleges that the Sun breached two provisions of the 2005 JOA by allegedly engaging in a course of conduct to deteriorate the printed *Sun*'s quality and divert readers to the LasVegasSun.com website that includes: 1) intentionally withholding original and/or breaking local news content from the printed *Sun* newspaper and publishing that content on LasVegasSun.com instead; 2) filling the printed *Sun* with dated, recycled content such a days-old wire-service articles and stories that appeared on the LasVegasSun.com website days earlier; and 3) telling readers in an advertisement published in the newspaper bundle to not subscribe to the newspaper bundle and to instead subscribe to the LasVegasSun.com website. According to the RJ, this alleged conduct breached two provisions of the 2005 JOA: 1) the agreement to "preserve high standards of newspaper quality throughout the term of this Restated Agreement consistent with United States metropolitan daily newspapers" (ECF No. 837-6 at 6 (§ 5.2) ("Quality Provision")); and 2) the agreement to "take all corporate action necessary to carry out and effectuate the intent, purposes and provisions of this Restated Agreement, and to cooperate with the other party in every reasonable way that

will promote successful and lawful operation under this Restated Agreement for both parties" (*Id.* (§ 5.3) ("Cooperation Provision")).

The Sun does not argue that the Quality Provision or the Cooperation Provision are unenforceable; it contends that neither can apply to the editorial decisions the Sun makes about the content it places in the printed *Sun*. According to the Sun, if either did, it would violate the First Amendment, the NPA, and the 2005 JOA. Specifically, the Sun says that the Quality Provision, when read in concert with the entirety of the 2005 JOA, "ensures that the Sun is creating a newspaper that facially comports with what consumers recognize as a newspaper." (ECF No. 836 at 41.) The Sun contends that because the RJ's allegations all involve challenges to its editorial decisions about content, they fall short of establishing breach.

The RJ argues that the Quality Provision relates to more than just the appearance of the printed *Sun*; according to the RJ, it sets forth an objective standard for quality that can be applied to the content in the printed *Sun* without encroaching on the Sun's editorial independence.

The parties' arguments concerning the meaning of the Quality Provision raise the issue of ambiguity. In interpreting a contract, "the court shall effectuate the intent of the parties, which may be determined in light of the surrounding circumstances if not clear from the contract itself. A contract is ambiguous when it is subject to more than one reasonable interpretation. . . . The parties' intentions regarding a contractual provision present a question of fact." *Anvui, LLC v. G.L. Dragon, LLC,*163 P.3d 405, 407 (2007) (internal quotation marks and citations omitted).

Here, the Court finds that there is more than one reasonable interpretation of the Quality Provision. On one hand, the 2005 JOA states that "[p]reservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the essence of this Restated Agreement." (ECF No. 830-6 at 6

(§ 5.2).)  Article 4 also includes extensive instructions concerning the nature of the copy the Sun must deliver to the RJ for publication. (*Id.* at 3-4.) Taking the contract as a whole, a plausible reading of the Quality Provision is that it applies to the appearance of the *Sun*, not its content.

But the RJ's reading is equally plausible. Specifically, the term "quality" plausibly applies to the content of the printed *Sun*, and the standard laid out in the Quality Provision can be read as an objective standard that does not encroach on the Sun's editorial independence. The Court therefore finds that the Quality Provision is ambiguous.

As outlined above, the goal of contractual interpretation is to ascertain the intent of the parties. When a contractual term is ambiguous, the parties' intentions regarding the ambiguous term ordinarily present a question of fact. *Anvui, LLC*, 163 P.3d at 407. "Parol evidence is admissible for the purpose of ascertaining the true intentions and agreement of the parties when the written instrument is ambiguous." *State ex rel. List v. Courtesy Motors*, 590 P.2d 163, 165 (1979). Here, the issue of the parties' intent as it relates to the meaning of the Quality Provision requires submission to a jury.

The RJ, in rebutting the Sun's motion for summary judgment on its breach counterclaims, has pointed to substantial evidence in the record tending to support its reading of the Quality Provision. For example, the RJ points to a declaration from Michael Ferguson, who was Vice President and Chief Operating Officer of Stephens at the time the JOA was renegotiated and was involved in the negotiations of the 2005 JOA. Mr. Ferguson's declaration explains that the quality provision was extremely important to Stephens during the 2005 JOA negotiations. (ECF No. 862-4 at ¶ 8.) According to Mr. Ferguson, Stephens proposed the language in the Quality Provision requiring that the papers "preserve high standards of newspaper quality . . . consistent with United States metropolitan daily newspapers" because it was concerned that the printed *Sun's*

41

quality might deteriorate and therefore wanted assurance that, despite being converted to an insert, the Sun would continue to operate as a quality newspaper and would continue to be a legitimate second source of news coverage of Clark County. (ECF No. 862-4 at ¶ 7.) Mr. Ferguson further states that the parties understood the quality provision to be an objective standard based on peer metropolitan city newspapers as a benchmark. (ECF No. 862-4 at ¶ 6.) A redlined portion of the 2005 JOA submitted by the RJ shows that the "consistent with United States metropolitan daily newspapers" language was added by the RJ to the 2005 JOA. (ECF No. 862-26.)

Given this evidence, the Court finds that the RJ has met its burden to survive summary judgment and leaves the question of the parties' intent as to the meaning of the Quality Provision to the jury, specifically whether it applies to only the printed *Sun*'s appearance or to the quality of its content. The Court does find, however, that the Quality Provision cannot interfere with the Sun's editorial independence in any way to be read consistently with the entirety of the 2005 JOA. This means the Quality Provision cannot apply to "the exercise of editorial control and judgment." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (suggesting that the "choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair" all relate to editorial control and judgment). The Quality Provision, then, if it does apply to the Sun's content, must do so without regard for choices that fall within editorial control and judgment.

The Court further finds that the First Amendment does not prohibit the application of the Quality Provision or Cooperation Provision so long as neither interferes with the Sun's editorial independence. "The Supreme Court has recognized that constitutional rights may ordinarily be waived if it can be established by clear and convincing evidence that the waiver is voluntary,

knowing and intelligent." *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1394 (9th Cir. 1991) (citing *D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 185, 187 (1972). In *Davies,* the Ninth Circuit found that an individual's constitutional right to run for elected office could be validly waived in a settlement agreement. *Id.* at 1395 (concluding the waiver was knowing but deciding to not enforce the waiver on other grounds). In *Leonard v. Clark,* the Ninth Circuit upheld a provision in a collective bargaining agreement limiting the First Amendment expression of a labor union. 12 F.3d 885, 892 (9th Cir. 1994).

Given this authority, the Court finds that the Sun can waive its First Amendment expression in the 2005 JOA. Even if the Court adopted the Sun's interpretation of the Quality Provision and found that it only applied to the printed *Sun*'s appearance, that would entail a waiver of the Sun's First Amendment rights to print anything it wanted, regardless of appearance. Thus, under any interpretation of the 2005 JOA, the Sun has waived its First Amendment rights. Because the Sun has not argued that its waiver was not voluntary, knowing, or intelligent, the Court finds the waiver was valid.

But "even if a party is found to have validly waived a constitutional right, we will not enforce the waiver if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Id.* at 890. Here, the public policy for a free and independent press is not harmed by the enforcement of a Quality Provision or Cooperation Provision that does not encroach on the Sun's editorial independence, as the terms of the 2005 JOA requires. Even taking into account the First Amendment's extensive protection provided to the press, so long as the Quality Provision is interpreted as an objective quality standard, it will not impermissibly control the viewpoints the Sun promotes or the news it covers. The Cooperation Provision also cannot encroach upon the Sun's editorial independence under the terms of the 2005 JOA. Thus, the right the Sun waived in the 2005 JOA does not harm the public

policy for a free and independent press. The Court therefore finds that the First Amendment does not prevent application of either the Quality Provision or Cooperation Provision, so long as neither encroaches upon the Sun's editorial autonomy.

Given the conclusion that the Quality Provision and the Cooperation Provision are enforceable and applicable to the Sun's conduct so long as they do not interfere with the Sun's editorial autonomy, what is left to determine is whether the RJ has marshaled sufficient evidence to survive summary judgment on the issue of breach. The Court finds that it has. Specifically, the RJ's expert Kenneth Paulson has opined that the Sun's quality has deteriorated, pointing to data supporting his opinion. Moreover, the RJ has pointed to specific ads the Sun has published in the printed *Sun* driving readers and revenue away from the joint operation and to the Sun's website. These facts are sufficient to survive summary judgment on the issue of breach for the RJ's breach of contract and breach of the implied covenant of good faith and fair dealing claims. Moreover, the ads the RJ points to are sufficient to create a triable issue of fact on whether Brian Greenspun engaged in intentional acts intended or designed to disrupt the contractual relationship.

The only remaining issue is whether the RJ has shown sufficient evidence of damages to survive summary judgment. The RJ alleges three kinds of damages flowing from the Sun's conduct: (1) attorney and expert fees incurred as a result of defending against the Sun's "sham litigation"; (2) loss of revenue caused by the Sun pushing subscribers to cancel their subscriptions to the print newspaper and subscribe to its website; and (3) damages "caused by having been forced to print the *Sun* after the Sun began breaching the JOA, after the purpose of the joint operation has been frustrated, and as a result of being forced to perform under an unlawful JOA." (ECF No. 840-7 at 23-24.)

To survive the Sun's motion for summary judgment, the RJ must show

there is a triable issue of fact on its claim that it suffered damages caused by the Sun's actions. *Richardson v. Jones*, 1 Nev. 405, 408 (1865) (damages required for breach of contract claim); *State, University and Community College System v. Sutton*, 103 P.3d 8, 19 (Nev. 2004) (damages required for breach of implied covenant of good faith and fair dealing); *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003) (damages required for intentional interference with contractual relations). "The party seeking damages has the burden of proving the fact that he was damaged and the amount thereof." *Gibellini v. Klindt*, 885 P.2d 540, 543 (Nev. 1994) "To meet this burden, the plaintiff must provide an evidentiary basis from which a fact finder could determine a reasonably accurate amount of damages." *Baroi v. Platinum Condominium Development LLC*, 2012 WL 2860655, at *2 (D. Nev. 2012) (citing *Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co.*, 784 P.2d 954, 955 (Nev. 1989)). Although a plaintiff need not establish the amount of damages "with mathematical certainty, testimony on the amount may not be speculative." *Clark Cty. Sch. Dist. v. Richardson Constr., Inc.*, 168 P.3d 87, 97 (Nev. 2007).

### i.   Sham Litigation Costs

This damage claim is not a subject of the Sun's motion for summary judgment. (ECF No. 836 at ii n.1.)

Even if it were, the Sun's actions do not constitute sham litigation. To obtain relief for an opposing party's sham litigation, a defendant must show that the litigation against it is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 61 (1993). The Sun's antitrust claims, which have survived summary judgment, are not "objectively baseless." Sham litigation costs are therefore not a cognizable damage.

### ii.   Loss of Subscribers

The RJ fails to show there is a triable issue of fact on its claim that it

1    suffered damages because the Sun's actions caused it to lose subscribers. The

2    RJ effectively concedes this point in its opposition by failing to respond to the

3    Sun's argument. *Compare* (ECF No. 836 at 59) *with* (ECF No. 861 at 52-54). The

4    RJ offers no evidence indicating that it lost subscribers as a result of the Sun's

5    actions. The RJ's 30(b)(6) witness on the subject of "harms and damages" could

6    only quantify the RJ's costs related to sham litigation and continued printing of

7    the Sun. (ECF No. 863-12 at 3:22-24 ("the only two things that we provided a

8    definitive value for are the . . . legal expenses and the printing expenses for the

9    Sun"); *Id.* at 4:21-5:1 ("I'm sounding like . . . a broken record here. . . . [T]here's

10   only two that we've quantified at this point, which is relating to the attorney's fees

11   and the printing expenses.").) That witness could not quantify or support the

12   existence of costs related to lost subscribers. (*Id.*) The RJ has therefore failed to

13   carry its burden of showing damages related to any alleged loss of subscribers.

14              **iii.   Printing Costs**

15              Finally, the RJ has carried its burden of showing damages related to

16   printing costs it incurred for printing the Sun after the Sun's alleged breaches.

17   The RJ is contractually obligated to print both papers in the newspaper bundle,

18   so the only way the RJ can claim printing costs as damages is if it is entitled to

19   terminate its printing obligations under the 2005 JOA. The Court finds that a

20   plain reading of Article 9 of the 2005 JOA allows for termination "if either party

21   defaults in the performance of any of its material obligations hereunder . . . ."

22   (ECF No. 830-6 at 8 (§ 9.1.2).) Should the RJ succeed in proving the Sun breached

23   the Quality Provision or Cooperation Provision at trial, it will also necessarily

24   show that it had a right to terminate the 2005 JOA at the time of breach. Any

25   printing costs it incurred after the alleged breach are therefore a cognizable

26   damage. The RJ has pointed to evidence of the amount of the printing costs

27   damages, thereby satisfying its burden. (ECF No. 861 at 46.)

28              Thus, the RJ has pointed to evidence creating genuine issues of material

facts on all necessary elements of its claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference with contractual relations. The Sun's motion for summary judgment on these claims is therefore denied.

### 8. Frustration of Purpose and Force Majeure

Finally, the RJ argues it has the power to terminate through the Nevada frustration of purpose doctrine and the JOA's force majeure clause. The parties disagree about whether the force majeure clause preempts application of the frustration of purpose doctrine. (*Compare* ECF No. 836 at 54-55 *with* ECF No. 861 at 54.) The Court does not reach that issue because neither doctrine allows the RJ to terminate under the alleged facts.

Nevada recognizes both frustration of purpose and impossibility as valid bases for terminating one's obligations under a contract. *Graham v. Kim*, 899 P.2d 1122, 1124 (Nev. 1995) (frustration of purpose); *Nebaco, Inc. v. Riverview Realty Co.*, 482 P.2d 305, 307 (Nev. 1971) (force majeure), *cited in Baroi v. Platinum Condominium Development, LLC*, 874 F. Supp. 2d 980, 984 (D. Nev. 2012). Force majeure applies when a promisor's performance "is made impossible or highly impractical by the occurrence of unforeseen contingencies," *Nebaco*, 482 P.2d at 307 (internal quotation marks omitted), while frustration applies "when performance remains possible but the expected value of performance to the party seeking to be excused has been destroyed by a fortuitous event," *Graham*, 899 P.2d at 1124. Both doctrines require that the events giving rise to their application be unforeseeable. *Nebaco*, 482 P.2d at 307 ("The doctrine of commercial frustration does not apply if the unforeseen contingency is one which the promisor should have foreseen, and for which he should have provided."); *Graham*, 899 P.2d at 1124 (applying *Nebaco*'s foreseeability requirement to the impossibility defense).

The RJ argues that the purpose of the 2005 JOA has been frustrated by

the "proliferation of internet-enabled mobile devices," such as smartphones and tablets, which have drastically reduced the public's interest in daily print news. It argues that performance has become impossible because the "catastrophic decline" of the print newspaper industry makes continued performance "excessively and unreasonably difficult or expensive." (ECF No. 861 at 56.) These arguments fail because such changes were foreseeable by the parties when they entered into the 2005 JOA. Congress enacted the NPA to "preserve the publication of newspapers," recognizing that JOAs were entered by "failing newspaper[s]" in "probable danger of financial failure." *See* 15 U.S.C. §§ 1801 and 1802(6); *see also Committee for and Independent P-I v. Hearst Corp.*, 704 F.2d 467, 471 (9th Cir. 1983) (noting, in 1983, that "[n]ewspapers have been folding at an alarming rate"). The 2005 JOA explicitly refers to electronic (non-print) news media (ECF No. 837-6 at 10 (§ 10.6) (referencing "electronic replica technology" and other media distinct from "the printed newspaper")), and the parties' websites, (*id.* at 11 (§ 10.13) (referencing "lvrj.com, reviewjournal.com, [and] lasvegasnewspapers.com")). It also contemplates the possibility of separately delivering the RJ and the Sun based on a decline in the newspaper bundle's revenue and profits. (*Id.* at 15 (App. A.5).) Though the parties may not have anticipated smartphones, the 2005 JOA anticipated technological and financial challenges that could affect the profitability and viability of each newspaper.

The RJ argues that the JOA's force majeure provision allows it to terminate its printing obligations, but that argument fails because the provision is not sufficiently specific. The force majeure clause states:

> "[n]either party shall be liable to the other for any failure or delay in performance . . . occasioned by war, riot, government action, act of God or public enemy, acts of terrorism, damage to or destruction of facilities, strike, labor dispute, failure of supplies or worker, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform . . . ."

(*Id.* at 7 (§ 8.2).)

Parties can agree to force majeure protections that are more extensive than the protections afforded to them under common law. *Nebaco*, 482 P.2d at 307. But any such protections must be provided for in the contract with adequate specificity. *Id.* at 306-07 (declining to apply a contract's impossibility provision, which excused performance if one party was unable to procure funding, when the party's specific difficulty procuring funding was not described with adequate specificity). Here the force majeure provision's catch-all clause cannot be stretched to apply to the present situation because it does not describe the "catastrophic decline" of the print newspaper industry with sufficient specificity. *See id.*

Thus, neither force majeure nor frustration of purpose is a sufficient basis for termination of the 2005 JOA.

As for the remaining non-evidentiary motions before the Court, good cause appearing, and under its inherent power to control its docket, the Court grants the Sun's motions for leave to file excess pages (ECF No. 925) and motion for leave to file reply (ECF No. 946). It denies the RJ's motion to strike (ECF No. 922) and denies its motion to file sur-reply (ECF No. 923).

## V.   CONCLUSION

It is therefore ordered that the RJ's motion (ECF No. 632) to dismiss or strike various claims in the Sun's Amended Complaint is granted in part and denied in part. The Sun's Claim 3 (Sherman § 2 conspiracy) and Claim 4 (Clayton § 7) are stricken. Its Claim 6 (Sherman § 1) may move forward.

It is further ordered that the RJ's motion to dissolve preliminary injunction (ECF No. 852/853) is denied, and its motion to expedite resolution of that motion (ECF No. 915) is denied as moot.

It is further ordered that the RJ's motion for summary judgment on each of the Sun's claims (ECF No. 843/845) is denied, except for its claim for preclusion on the Sun's failure to prove damages flowing from the breach of the

promotional expenses provision during the period from December 11, 2015, through March 31, 2018, which is granted.

It is further ordered that the Sun's motion for summary judgment (ECF No. 829/836) is granted in part and denied in part consistent with this Order.

It is further ordered that the RJ's motion to exclude the testimony of Lawrence J. Aldrich (ECF No. 867/868) is granted.

It is further ordered that the Sun's motions for leave to file excess pages (ECF No. 925) is granted *nunc pro tunc*.

It is further ordered that the RJ's motions to strike and file sur-reply (ECF Nos. 922, 923) are denied.

It is further ordered that the Sun's motion to file reply (ECF No. 946) is granted *nunc pro tunc*.

Dated this 31st day of March 2024.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE