J. RANDALL JONES, ESQ., SBN 1927
r.jones@kempjones.com
MICHAEL J. GAYAN, ESQ., SBN 11135
m.gayan@kempjones.com
MONA KAVEH, ESQ., SBN 11825
m.kaveh@kempjones.com
KEMP JONES LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone:      +1 702 385 6000

DAVID R. SINGER, ESQ. (*pro hac vice*)
dsinger@jenner.com
AMY M. GALLEGOS, ESQ. (*pro hac vice*)
agallegos@jenner.com
ANDREW G. SULLIVAN, ESQ. (*pro hac vice*)
agsullivan@jenner.com
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, California 90071
Telephone:      +1 213 239 5100
Facsimile:      +1 213 239 5199

RICHARD L. STONE, ESQ. (*pro hac vice*)
rstone@fastmail.com
850 Devon Avenue
Los Angeles, California 90024
Telephone:      +1 310 993 2068

*Attorneys for Defendants/Counterclaimant*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| LAS VEGAS SUN, INC., | Case No. 2:19-cv-01667-ART-MDC |
| Plaintiff, | **REPLY IN SUPPORT OF MOTION TO STAY PROCEEDINGS PENDING APPEAL OF THE COURT'S DECISION TO DENY DEFENDANTS' MOTION TO DISSOLVE PRELIMINARY INJUNCTION** |
| v. | |
| SHELDON ADELSON, et al., | |
| Defendants. | |
| AND RELATED COUNTERCLAIM | |

**INTRODUCTION**

This is a textbook case where further proceedings should be deferred or stayed. As Defendants explained—and the Sun does not dispute—Defendants' appeal raises a narrow legal question of statutory interpretation (and of first impression in this Circuit) that will be decided on an expedited basis and could obviate a complex multi-week jury trial or substantially alter its scope. ECF No. 979 ("Defs. Br."). This Court has well-established authority to exercise its broad discretion to wait to set a trial date until the expedited appeal is decided. If this Court does so, it will resolve this motion and the Court need not determine whether Defendants have satisfied their burden to obtain a stay pending appeal.

If the Court opts to address Defendants' request for a stay, it should conclude that a stay is warranted. Defendants have made a "strong showing" on the merits of their appeal, or alternatively raised "serious" and "novel" issues of law sufficient to satisfy the likelihood-of-success prong of the stay analysis. Defendants have shown that they will suffer prejudice without a stay by being forced to spend extraordinary time and energy to prepare for a trial that may not occur at all. The Sun has not shown any reason to believe that it will suffer undue prejudice from a short temporary stay, and in fact the Sun and Defendants will benefit equally from a stay. A stay will also benefit the public interest by reserving judicial resources for litigants whose disputes (unlike this one) are presently ripe for adjudication.

In response, the Sun concedes that a relatively "short delay generally" is "not … prejudicial." ECF No. 982 ("Sun Opp.") at 21. And the Sun fails to provide any credible reason to believe that a temporary stay would cause any meaningful prejudice in this specific long-running dispute. The Sun *asserts* that a short delay supposedly "threatens the Sun's existence." *Id.* But the Sun does not offer any factual basis for its illogical claim that deferring further action until Defendants' expedited appeal is resolved will have such apocalyptic impact now, when the Sun has agreed to extend deadlines many times before. Pausing unnecessary litigation will conserve the Sun's resources, not drain them. If the Sun truly has the limited resources it claims, it should not want to waste them preparing for a trial that may never occur. This Court should issue a stay pending Defendants' expedited appeal to benefit the parties, the Court, and the public interest.

1

**ARGUMENT**

**I.** **The Court Should Exercise Its Discretion To Postpone Setting A Trial Date Until Defendants' Expedited Appeal Is Resolved.**

In its motion, Defendants requested that, at a minimum, this Court should defer setting a trial date until after Defendants' expedited appeal is resolved. *See* ECF No. 979 at 10. This Court undoubtedly has "broad discretion to stay proceedings as an incident to its power to control its own docket," *Clinton v. Jones*, 520 U.S. 681, 706 (1997), and has "inherent power to manage the course of trials," *Lister v. City of Las Vegas*, No. 21-cv-00589, 2024 WL 493292, at *1 (D. Nev. Feb. 7, 2024) (quoting *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)). Nor is there any doubt that exercising that discretion here would yield many of the same benefits as issuing a stay—such as avoiding needless litigation until it is certain whether and to what extent a trial will go forward, advancing judicial economy, and dedicating judicial resources to cases that are ready to be decided. *See infra* Section II.B, II.C.

In its response, the Sun never directly addresses Defendants' request to defer setting a trial date until the appeal is resolved. The Sun acknowledges that "at the earliest, trial is still a year away and the RJ's appeal is expedited," contending that is reason to press ahead. ECF No. 982 at 11. The Sun has it backwards. Waiting a relatively short time to set a trial date—especially when the parties have litigated this case for years and periodically agreed upon extensions as needed—makes perfect sense when the appeal is expedited, the parties and the Court will bear a heavy burden to prepare for trial, and the trial date is not imminent.

The Sun does not explain why deferring the trial date decision will cause it to suffer any undue prejudice. For example, the Sun does not suggest that a short delay will create any risk that the mountains of evidence gathered in discovery will be lost, the testimony of witnesses will be impaired, or the Sun's ability to try its claims will be impinged. *See* ECF No. 982 at 20. Instead, trying its best to gin up a reason to oppose a stay, the Sun asserts that it will suffer "extensive" prejudice if the trial is deferred from mid-2025 to 2026. *Id.* at 21. The Sun breathlessly contends that "a lengthy" delay supposedly "threatens the Sun's existence," and that Defendants' request to delay trial is "part and parcel" of their supposed "scheme to eliminate the Sun from the market"

2

and to extend litigation "so long that the Sun has no choice but to close its doors." *Id.* at 20–21. Hyperbolic rhetoric aside, the Sun does not offer any factual basis (much less evidence) to support such a far-fetched theory. *Cf.* ECF No. 982-3 (Martini Declaration).

The Sun's actions speak far louder than its words—and squarely undermine the Sun's claim that the sky will suddenly fall if trial occurs in 2026 rather than mid-2025. *See, e.g.*, ECF No. 389 (2021 stipulation to extend discovery cutoff by more than a year); ECF No. 671 (2022 stipulation to permit depositions after the close of fact discovery and to extend multiple case deadlines); ECF No. 855 (2023 stipulation to extend briefing deadlines on Defendants' motion to dissolve and the parties' cross-motions for summary judgment). The Sun even *opposed* Defendants' request to expedite consideration of the motion to dissolve, arguing "[t]here is no emergency that warrants departing from the ordinary course," and citing the parties' history of agreeing to extend various deadlines. ECF No. 919 at 1–2. Having already spent nearly five years and tens of millions of dollars to litigate this case, there is simply no reason to believe that a short stay pending a decision on Defendants' expedited appeal will cause the Sun any harm whatsoever.

Defendants' request to wait to set a trial date is just what it appears to be on its face: a reasonable request to efficiently manage litigation by saving the parties and the Court from expending further time and resources to advance a trial that may never occur, or may occur in substantially different form, until after the Ninth Circuit's decides Defendants' expedited appeal.

The Sun's wild speculation does not make any sense, either. The crux of the Sun's theory is that currently the Court's earliest available trial dates are in mid-2025, and a stay might push the trial back to 2026. ECF No. 982 at 21. But the Sun offers absolutely no explanation for its assertion that waiting six more months to try this case will dramatically change the Sun's current trajectory for the worse. The *Sun* has been a "failing newspaper" since at least 1989, and it would have folded decades ago if not for the *Review-Journal*. ECF No. 830-4 at SA132-SA135 (Attorney General opinion approving 1989 JOA). If anything, deferring the trial date will *help* the Sun by allowing it to avoid spending money to prepare for trial until it can be sure the trial will go forward. And preparing for trial and the trial itself will be incredibly expensive—involving multiple *Daubert* motions and motions in limine, "hundreds if not thousands of trial exhibits," testimony by

"potentially more than a dozen" witnesses," and weeks of attorney time. ECF No. 975, ¶¶ 2–3; ECF No. 984, ¶¶ 2–4 (same).[1] Most if not all of that effort and accompanying expense will be wasted if the Ninth Circuit reverses or reverses in part. Waiting to set a trial date until after Defendants' expedited appeal is resolved does not change in any way.

The sensible and prudent course forward is for the Court to exercise its broad discretion to defer setting a trial date until after Defendants' expedited appeal is resolved. If the Court does so, it need do no more to resolve Defendants' motion.

## II.    A Stay Pending Defendants' Expedited Appeal Is Warranted.

If the Court opts to reach Defendants' request for a stay pending appeal, it should grant the request. Defendants have shown (1) that they are likely to succeed on the merits because they have "made a strong showing" of likelihood of success" or "raised serious questions" that "present a substantial case for relief"; (2) that they will suffer "irreparable harm absent a stay"; (3) that a stay will not prejudice the Sun; and (4) that a stay is in the public interest. *Lair v. Bullock*, 697 F.3d 1200, 1203–04 (9th Cir. 2012) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)); *see also Fed. Trade Comm'n v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (per curiam) (same).

The Sun's arguments to the contrary distort the legal standard, suggesting Defendants must *prove* that they *certainly* will prevail and *certainly* will suffer irreparable harm. That is not the correct test. "The decision whether to grant a stay is a 'probabilistic' endeavor" in which the Court evaluates "the merits of a stay request in 'likelihood terms,' and exercise[s] a 'restrained approach to assessing the merits.'" *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1264 (9th Cir. 2020). Under the Ninth Circuit's sliding-scale approach, Defendants "need not demonstrate that it is more likely than not they will win on the merits," but rather need only show "a reasonable probability" or "fair prospect" of success, and "a probability of irreparable harm." *Qualcomm*, 935 F.3d at 755–56 (citations omitted). Defendants have met their burden here.

---

[1] The Sun makes much of Defendants' inadvertent suggestion that it would be sufficient to show a "possibility of irreparable injury." ECF No. 982 at 17–18. Nevertheless, the Sun does not dispute that Defendants recite the proper legal test under Ninth Circuit precedent: "whether the applicant will be irreparably injured absent a stay." ECF No. 979 at 1 (citing *Lair*, 697 F.3d at 1203–04; *Qualcomm*, 935 F.3d at 755). And Defendants' analysis explains that they "*will* suffer irreparable harm if the case proceeds." *Id.* at 8–9 (emphasis added); *see also id.* at 1–2.

4

**A.  Defendants Have Shown A Likelihood Of Success On The Merits Of The Appeal.**

To satisfy the likelihood of success prong, Defendants may make either a "strong showing" that they will prevail on appeal or raise "serious legal questions" that present a "substantial case for relief on the merits." *Lair*, 697 F.3d at 1203–04. Defendants have made both showings here.

**1.  Defendants Have Made A "Strong Showing" On The Merits.**

As Defendants explained in detail, the NPA's text and structure (as well as its history and purpose) demonstrate that the 2005 JOA is unlawful and unenforceable, and therefore that the stipulated injunction should have been dissolved. *See* ECF No. 979 at 3–6.

Defendants opening appeal brief, which has been filed in the Ninth Circuit concurrently with this reply in support of Defendants' motion for a stay, delves into the many reasons why this Court's atextual interpretation of the NPA cannot stand. *See* Exhibit A ("Ex. A"), Opening Brief of Defendants-Appellants at 33-56, *Las Vegas Sun, Inc. v. Adelson et al.*, No. 24-2287 (9th Cir. May 9, 2024), ECF No. 14. For example, the Court read Section 1803(a) as applying to a post-1970 JOA, when that section of the statute on its face applies only to pre-1970 JOAs. The Court read Section 1803(b) to mean the Attorney General must approve only "new JOAs" that merge two newspapers' operations for the first time, and need not approve "amended" JOAs even if they rewrite the material terms of the original JOA—even though Section 1803(b) makes no distinction between "new" and "amended" post-enactment JOAs and the statute makes it "unlawful" to "perform" or "enforce" such agreements. This Court ignored (and never even acknowledged) the statute's definition of "joint newspaper operating arrangement" in Section 1802(2), when it clearly covers the 2005 JOA and therefore triggers the written-approval requirement. This Court also ignored DOJ's subsequent regulations, which allow an amendment to a *pre*-enactment JOA to be merely filed, but require a *post*-enactment JOA to obtain written approval. No court has *ever* read the NPA as this Court did. Indeed, no court should.

In response, the Sun insists that Defendants have not made a "showing [they] *will* succeed on the merits." ECF No. 982 at 12 (emphasis added). But the Ninth Circuit has repeatedly made clear that Defendants need not satisfy such a high bar. *See E. Bay Sanctuary Covenant*, 950 F.3d at 1264; *Qualcomm*, 935 F.3d at 755–56.

In any event, the Sun's attempts to defend this Court's decision only reveal the weakness of its position and reinforce that Defendants have in fact made a "strong showing" on the merits. For example, the Sun contends that the district court "conducted a plain language analysis of the statute" in concluding that Section 1803(a) governs every "amended JOA" and that Section 1803(b)'s written-approval requirement only applies to a "new JOA." ECF No. 982 at 12–14. But the Sun never grapples with the "plain language" of the NPA itself, which contradicts the district court's conclusion in multiple ways.

- Section 1803(a), entitled "Joint operating arrangements entered into prior to July 24, 1970," grants antitrust immunity to JOAs entered prior to July 24, 1970, and allows such JOAs to be amended provided the parties "file[]" the amendment with the Department of Justice (and so long as the amendment does not add additional newspapers). 15 U.S.C. § 1803(a). Nothing in 1803(a) suggests that it applies to post-1970 JOAs or that its procedure for filing a "renewal or amendment" to a pre-1970 JOA applies to a post-1970 JOA.

- Section 1803(b), entitled "Written consent for future joint operating arrangements," makes it "unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect"—meaning after July 24, 1970—without "prior written consent from the Attorney General." *Id.* § 1803(b). Section 1803(b) does not distinguish between a "new JOA" and an "amended JOA," does not suggest that its written-approval requirement applies only to a "new JOA," and does not say anything to suggest that the written-approval requirement does not apply to a so-called amendment of a JOA.

- Section 1802(2) defines a "joint newspaper operating arrangement" as "any contract, agreement, joint venture . . . , or other arrangement" between two or more newspapers that addresses, among other things, how the newspapers would be printed: "the time, method, and field of publication; distribution; advertising and circulation solicitation; and revenue distribution." *Id.* § 1802(2). Nothing in the NPA's definition of "joint

6

newspaper operating arrangement" describes a "new JOA" or an "amended JOA" or distinguishes based on whether a JOA is "new" or "amended."

Applying that plain text here, it is "unlawful" to "enter in, perform, or enforce" the 2005 JOA because it is a "joint operating arrangement[]," *Id.* § 1803(b)—meaning a "contract, agreement, joint venture" or "arrangement" entered into between two newspapers after 1970 that prescribed terms for joint operations of printing, distribution, advertising, revenue, and other key aspects of operating a newspaper business, *id.* § 1802(2). Any other conclusion cannot be squared with the text or structure of the NPA. *See* Ex. A at 37–43.

The Sun fares no better arguing that the district court's position is "well-supported by the spirit of the NPA and caselaw." ECF No. 982 at 14; *see* Ex. A at 44–45. The Supreme Court long ago rejected an approach to statutory interpretation that allows purpose, legislative history, or the views of a specific legislator to override otherwise clear statutory text. *See, e.g.*, *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) ("resort[ing] to legislative history before consulting the statute's text and structure" is a "relic from a bygone era of statutory construction"); *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 49 (2024) (noting that statutory interpretation "trains on statutory text rather than legislative history"). But that is precisely the approach advocated by the Sun, adopted nearly 50 years ago by *Newspaper Guild v. Levi*, 539 F.2d 755 (D.C. Cir. 1976), and followed by the few courts that the Sun cites. The Sun (like the district court) also overlooks that the NPA was a carefully negotiated compromise—designed to balance the competing interests of urban newspapers, suburban newspapers, newspaper unions, and some segments of the public—by protecting JOAs already in existence but requiring DOJ approval for any future JOAs. *See Levi*, 539 F.2d at 763 (Tamm, J. dissenting). That understanding confirms that congressional intent and legislative history actually support *Defendants'* reading of the statute.

At bottom, the Sun essentially contends that because this Court has disagreed with Defendants' well-supported reading of the NPA, Defendants necessarily have no chance to prevail on appeal. Under the Sun's logic, the likelihood of success prong would *never* be satisfied—and a stay would *never* issue—because the district court *always* disagrees with the party seeking a stay.

7

This Court should ignore the Sun's flawed reasoning and find that Defendants have satisfied their burden to make a "strong showing" on the merits of their appeal.

### 2. Alternatively, Defendants Have Shown Their Appeal Raises "Serious Legal Questions," Which Is Sufficient Under Ninth Circuit Precedent.

As Defendants highlighted in their motion, even if the Court finds that Defendants have not made a "strong showing" on the merits of their appeal, they still satisfy the likelihood of success prong because their appeal unquestionably raises novel and serious legal questions. ECF No. 979 at 7–8. The Sun accepts that the likelihood of success factor has been satisfied where the "issue presented was 'novel,' 'serious,' or of first impression." ECF No. 982 at 15 (citing Ninth Circuit cases). The Sun also accepts that the Ninth Circuit has not "had the occasion to decide [the] precise issue" presented by Defendants' appeal, and does not identify any other court that actually has. *Id.* at 19.[2] Thus, under Ninth Circuit precedent, Defendants' appeal unquestionably raises a "serious" legal issue sufficient to satisfy the first prong of the stay analysis. *See, e.g.*, *Echevarria v. Aerotek, Inc.*, No. 16-cv-04041, 2019 WL 3207812, at \*2, \*4 (N.D. Cal. July 16, 2019) (finding serious legal issue raised "in the absence of a Ninth Circuit case squarely on point" and granting motion to stay); *Qualcomm*, 935 F.3d at 755–756 (finding likelihood-of-success prong satisfied where movant "has shown, at minimum, the presence of serious questions on the merits").

Unable to seriously contest this conclusion, the Sun resorts to misconstruing Defendants' position. The Sun suggests that Defendants' view is that the first stay factor is satisfied *solely* because the appeal raises an issue of first impression "*regardless*" of Defendants' chance of success on the merits. ECF No. 982 at 17 (emphases added). That is incorrect. Defendants' position, consistent with Ninth Circuit precedent, is that showing that an appeal demonstrates serious legal issues is an alternative way to *demonstrate* likelihood of success on the merits. *See*

---

[2] The Sun asserts that "several other courts, including the [D.C.] and Sixth Circuits have" addressed the issues in this appeal. ECF No. 982 at 17. Not so. *Mahaffey v. Detroit Newspaper Agency* involved a completely different legal issue, the court did not reach the question of whether Attorney General approval was needed for an amended JOA, and the court assumed that post-1970 JOAs cannot be freely amended and that unapproved amendments are not immune from legal challenge. 969 F. Supp. 446, 448 (E.D. Mich. 1997). *See* ECF No. 979 at 5–6; Ex. A at 44–45. *Levi* likewise involved a different legal issue and its mode of reasoning is no longer defensible. *See* ECF No. 979 at 6; Ex. A at 53–56.

*Leiva-Perez v. Holder*, 640 F.3d 962, 966–67 (9th Cir. 2011) ("likelihood of success" prong requires a party seeking a stay to show "*either* a 'probability of success on the merits' *or* that 'serious legal questions are raised'") (emphasis added). As the *Leiva-Perez* Court emphasized, showing that "serious legal questions are raised" is just another "way[] to articulate the minimum quantum of likely success necessary to justify a stay" that is "essentially interchangeable" with the formulations "reasonable probability," "fair prospect," and "a substantial case on the merits." *Id.*

The Sun ignores this established precedent and instead cites *Manrique v. Kolc*, 65 F.4th 1037 (9th Cir. 2023) for the proposition that "[a]lone, 'serious,' 'novel,' or 'first impression' issues are not enough" to establish likelihood of success. ECF No. 982 at 15. *Manrique* does not say that. In *Manrique*, the Ninth Circuit *confirmed* that a stay movant can satisfy the "likelihood of success" prong by showing "'serious legal questions' going to the merits." *Id.* at 1041. The court then clarified that a "serious question" "is more than 'a merely plausible claim,' and [that] a court cannot 'forgo legal analysis just because it has not identified precedent that places the question beyond debate.'" *Id.* (citing *Where Do We Go Berkeley v. Cal. Dep't of Transportation*, 32 F.4th 852 (9th Cir. 2022)). *Manrique* did not purport to undermine or overrule established Ninth Circuit precedent holding that the presence of a "serious question" may be sufficient to establish the first prong of the stay analysis. *See id.*; *Lair*, 697 F.3d at 1204; *Qualcomm*, 935 F.3d at 756; *accord United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1112 (9th Cir. 2012) ("As a three-judge panel, we must follow prior decisions of our court unless 'intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority.'" (citation omitted)).

The Sun's reliance on *Where Do We Go Berkeley* is similarly misplaced. There, the district court issued a preliminary injunction after finding the plaintiffs had established "likelihood of success on the merits" because they "had shown serious questions on the merits" sufficient to "establish[] a *plausible claim*" to relief. 32 F.4th at 862–63 (emphasis added). But as *Manrique* later reiterated, the "serious question" legal standard does not "allow the district court to enter an injunction on a *merely plausible* claim" or permit the district court to "forgo legal analysis just because it has not identified precedent that places the question beyond debate." *Id.* (emphasis added). And like *Manrique*, *Where Do We Go Berkeley* re-affirmed that Ninth Circuit precedent

"permits plaintiffs to satisfy" the likelihood-of-success "requirement with a 'serious question' on the merits," so long as the district court also "analyze[s] the merits." *Id.* That is precisely Defendants' position here.[3]

### B. Defendants Will Suffer Irreparable Harm If The Case Proceeds, But The Sun Will Suffer No Harm From A Stay Pending Defendants' Expedited Appeal.

Defendants' motion explains that they "*will* suffer irreparable harm if the case proceeds." ECF No. 979 at 8–9 (emphasis added). That is because "a trial in this case *will* involve extraordinary effort"—including because "the parties *will* be forced to prepare for a wide-ranging and prolonged trial that *will* be preceded by multiple *Daubert* motions and motions in limine," and because the trial itself "*will* include hundreds if not thousands of exhibits, testimony by dozens of witnesses, and weeks of attorney time." *Id.* at 1–2 (citing ECF No. 975, ¶ 2) (emphases added). Just days ago, the parties again confirmed that the "scope of the case" is massive and that they envision trial preparations to be an enormous undertaking. ECF No. 984, ¶¶ 2–3.[4] Most if not all of that effort will be wasted if the Ninth Circuit reverses or reverses in part.

The Sun's concessions thus leave no reasonable doubt that Defendants have shown that without a stay "an irreparable injury is the more probable or likely outcome," *Leiva-Perez*, 640 F.3d at 968, and that Defendants have met their burden to show irreparable harm in light of Defendants' strong showing with respect to the other stay factors, *id.* at 965 (a "stronger showing of one element may offset a weaker showing of another").

The Sun responds that Defendants "cannot demonstrate" that harm is "likely to occur before the appeal will be decided, because Defendants can simply wait to prepare for trial. ECF No. 982 at 19–20. Yet the Sun admits Defendants "will need to participate in preparing the

---

[3] *Where Do We Go Berkeley* is also inapposite because it involved a motion for a preliminary injunction, where the court takes a less "flexible" approach as compared to a stay application because "stays are typically less coercive and less disruptive than are injunctions." *Leiva-Perez*, 640 F.3d at 966 (citing *Nken*, 556 U.S. at 427–28).

[4] The Sun makes much of Defendants' inadvertent suggestion that it would be sufficient to show a "possibility of irreparable injury." ECF No. 982 at 17–18. Nevertheless, the Sun does not dispute that Defendants recite the proper legal test under Ninth Circuit precedent: "whether the applicant will be irreparably injured absent a stay." ECF No. 979 at 1 (citing *Lair*, 697 F.3d at 1203–04; *Qualcomm*, 935 F.3d at 755). And Defendants' analysis explains that they "*will* suffer irreparable harm if the case proceeds." *Id.* at 8–9 (emphasis added); *see also id.* at 1–2.

proposed pretrial order," and also recognizes that preparing for a multi-week trial of the scope and magnitude predicted will require filing many motions and spending many hours preparing witnesses. *See id.* Defendants are not required to choose between needlessly expending resources to prepare for a trial that may never occur, or conforming their trial preparation to suit the Sun's desires. *See id.* at 19. Instead, this Court should exercise its significant discretion to issue a stay so that the parties can efficiently and effectively prepare for the trial that will actually occur (if at all), once the scope and timeline is certain following the resolution of Defendants' expedited appeal. *See Risinger v. SOC LLC*, No. 12-cv-063, 2015 WL 7573191, at *2 (D. Nev. Nov. 24, 2015) (citing *Richards v. Ernst & Young LLP*, No. C-08-04988, 2012 WL 92738, at *3 (N.D. Cal. Jan. 11, 2012)) (granting motion to stay pending appeal).

The Sun contends that Defendants' stated harms are categorically insufficient, *see* ECF No. 982 at 18–19, but the authority the Sun cites says otherwise. In the context of motions to stay, "[w]hether litigation expenses constitute irreparable harm is considered on a case by case basis," *Risinger*, 2015 WL 7573191, at *2. And the cases the Sun cites actually *support* finding irreparable harm under the circumstances here. In *Mohamed v. Uber Technologies*, for example, the court allowed discovery to continue but granted a stay as to all other proceedings, reasoning that if activity in the district court continued and "the Ninth Circuit ultimately reverse[d]" the district court's decision, the parties would have "expended significant resources to obtain … non-binding advisory opinions." 115 F. Supp. 3d 1024, 1034 (N.D. Cal. 2015). The same is true here, where any decision to resolve pre-trial matters may have no practical effect depending on the outcome of the expedited appeal. Likewise, in *Topia Technology, Inc. v. Dropbox, Inc.*, the district court issued a stay pending an appeal where the outcome would determine whether and to what extent there would be further proceedings in the district court. No. 23-CV-00062, 2023 WL 3437823 (N.D. Cal. May 12, 2023). So too here, the outcome of Defendants' expedited appeal will decide whether and to what extent there will be a trial at all.[5]

---

[5] The Sun's other cases are inapposite. In *Ostrander v. Heights of Summerlin*, LLC, No. 2:21-cv-001418-JAD-NJK, 2022 WL 1694219, at *2 (D. Nev. 2022), the Court refused to grant a stay pending appeal because the case had "been returned to the state court and no further action [was going to] be taken in [the] federal district-court matter." In *Jones v. Skolnik*, No. 3:10-cv-00162-

While a stay here would avoid irreparable harm to Defendants, the Sun has not offered any basis to believe that it would be harmed by a stay. *See supra* Section I. Like with waiting to set a trial date until after Defendants' expedited appeal is resolved, a stay pending appeal will actually benefit the Sun by preserving its resources without creating a risk that any evidence will be lost or hampering its ability to try its claims in due course. *See id.*

**C. A Stay Of Proceedings Pending Appeal Is In The Public Interest.**

The Sun has no real rebuttal to the fact that a stay pending Defendants' expedited appeal serves the public interest by preventing "unnecessary litigation and conserv[ing] judicial resources." *Risinger*, 2015 WL 7573191, at *2; *see infra* Section II.B. Instead, the Sun repackages its baseless and unsupported arguments about the harm that will supposedly be caused if the Court's calendar requires that trial be slightly delayed. *See* ECF No. 982 at 21–22. The Sun's reference to the Court's "limited availability" actually highlights why a stay is in the public interest even if it is not the Sun's preference: a stay would allow the Court to dedicate its scarce resources to cases in need of decisions rather than to issuing potentially advisory opinions here. And rather than "work to delay resolution of the Sun's claims," *id.* at 21, a stay pending appeal will speed the ultimate resolution in this case by deciding—before prolonged trial preparation and a multi-week trial—whether the 2005 JOA is "unlawful" under the NPA because the Attorney General did not provide "prior written approval." 15 U.S.C. § 1803(b).

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court exercise its discretion to postpone setting a trial date until after Defendants' expedited appeal has been decided, or stay proceedings pending resolution of that expedited appeal.

---

LRH-VPC, 2015 WL 4488076, at *2 (D. Nev. July 22, 2015), the court found that the harm the defendants would suffer by "having to engage in costly discovery and potentially trial" was insufficient to justify a stay—but only because the defendants had "not established any likelihood of success on appeal." Additionally, *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974) and *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020), are both inapposite because they involved analysis of irreparable harm in the context of motions for preliminary injunctions, where the applicable standard is more stringent. *See supra* note 3.

Dated:   May 9, 2024              KEMP JONES LLP

By:   */s/Michael J. Gayan*
J. RANDALL JONES, ESQ., SBN 1927
MICHAEL J. GAYAN, ESQ., SBN 11135
MONA KAVEH, ESQ., SBN 11825
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169

DAVID R. SINGER, ESQ. (*pro hac vice*)
AMY M. GALLEGOS, ESQ. (*pro hac vice*)
ANDREW G. SULLIVAN, ESQ. (*pro hac vice*)
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, California 90071

RICHARD L. STONE, ESQ. (*pro hac vice*)
850 Devon Avenue
Los Angeles, California 90024

*Attorneys for Defendants/Counterclaimant*

13

**PROOF OF SERVICE**

I hereby certify that on the 9th day of May, 2024, I served a true and correct copy of the foregoing **REPLY IN SUPPORT OF MOTION TO STAY PROCEEDINGS PENDING APPEAL OF THE COURT'S DECISION TO DENY DEFENDANTS' MOTION TO DISSOLVE PRELIMINARY INJUNCTION** via the United States District Court's CM/ECF electronic filing system to all parties on the e-service list.

E. Leif Reid, Bar No. 5750
Kristen L. Martini, Bar No. 11272
Nicole Scott, Bar No. 13757
LEWIS ROCA ROTHGERBER CHRISTIE LLP
One East Liberty Street, Suite 300
Reno, Nevada 89501

Joseph M. Alioto, Pro Hac Vice
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104

James J. Pisanelli, Bar No. 4027
Todd L. Bice, Bar No. 4534
Jordan T. Smith, Bar No. 12097
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

*Attorneys for Plaintiff/Counterclaim Defendants*

/s/ Ali Lott
An employee of Kemp Jones LLP

14

# EXHIBIT A

No. 24-2287

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

LAS VEGAS SUN, INC.,
*Plaintiff-Appellee,*

v.

SHELDON ADELSON; PATRICK DUMONT; NEWS+MEDIA CAPITAL
GROUP, LLC; LAS VEGAS REVIEW-JOURNAL, INC.; INTERFACE
OPERATIONS, LLC D/B/A ADFAM,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Nevada
Case No. 2:19-cv-01667-ART-MDC
The Honorable Anne R. Traum, District Judge

---

## OPENING BRIEF OF DEFENDANTS-APPELLANTS

---

J. Randall Jones
Michael J. Gayan
Mona Kaveh
KEMP JONES LLP
3800 Howard Hughes Pkwy., 17th Fl.
Las Vegas, Nevada 89169
(702) 385-6000

Richard L. Stone
850 Devon Avenue
Los Angeles, California 90024
(310) 993-2068

Gabriel Gillett
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7220

Ian Heath Gershengorn
Illyana A. Green
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

David R. Singer
Amy M. Gallegos
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, California 90071
(213) 239-5100

*Counsel for Defendants-Appellants*

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendants-Appellants Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, Estate of Sheldon Adelson, Patrick Dumont, and Interface Operations, LLC d/b/a Adfam state that Las Vegas Review-Journal, Inc., is a non-governmental, privately held corporate party. Las Vegas Review-Journal, Inc. is a wholly owned subsidiary of News+Media Capital Group, LLC. No publicly held corporation owns more than 10% of Las Vegas Review-Journal, Inc.'s stock. News+Media Capital Group, LLC is a wholly owned subsidiary of Orchid Flower LLC. No publicly held corporation owns more than 10% of News+Media Capital Group, LLC's stock. Interface Operations, LLC d/b/a Adfam is a non-governmental, privately held corporate party. No publicly held corporation owns more than 10% of Interface Operations, LLC d/b/a Adfam's stock.

## STATEMENT REQUESTING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Defendants-Appellants respectfully request oral argument. This appeal presents significant issues relating to the proper interpretation of the Newspaper Preservation Act, 15 U.S.C. § 1801 *et seq*. Defendants-Appellants respectfully submit that oral argument will assist the Court in resolving this appeal.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ............................................................................. i

STATEMENT REQUESTING ORAL ARGUMENT ..................................... ii

TABLE OF AUTHORITIES .......................................................................... vi

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................ 6

STATEMENT OF THE ISSUE PRESENTED ............................................... 7

STATUTORY AUTHORITY ......................................................................... 7

STATEMENT OF THE CASE........................................................................ 8

I.      THE 1989 JOA BETWEEN THE REVIEW-JOURNAL AND
        SUN. ...................................................................................................... 8

II.     THE SUN AND THE *REVIEW-JOURNAL*'S THEN-OWNER,
        STEPHENS, ENTERED A NEW ARRANGEMENT IN 2005
        WITHOUT THE ATTORNEY GENERAL'S APPROVAL............... 9

        A.    The 2005 JOA Replaces The 1989 JOA. .................................. 9

        B.    The DOJ Declines To Approve The 2005 JOA After An
              Extensive Investigation. .......................................................... 12

III.    TEN YEARS LATER, THE ADELSONS PURCHASED THE
        *REVIEW-JOURNAL* AND THE SUN SUED THEM FOR
        SEEKING TO TERMINATE THE 2005 JOA. .................................. 13

IV.     THE STIPULATED PRELIMINARY INJUNCTION AND
        MOTION TO DISMISS. ..................................................................... 15

V.      AFTER THE SUN AVOIDS DISMISSAL BY CLAIMING
        THE 2005 JOA WAS DOJ-APPROVED, DISCOVERY
        CONFIRMS IT WAS NOT ACTUALLY APPROVED. ................... 17

VI.     THE REVIEW-JOURNAL MOVES TO DISSOLVE THE
        PRELIMINARY INJUNCTION; THE DISTRICT COURT
        DENIES THE MOTION. ..................................................................... 19

SUMMARY OF THE ARGUMENT ............................................................ 21

STANDARD OF REVIEW ....................................................................... 25

ARGUMENT ............................................................................................ 26

I.    THIS COURT HAS JURISDICTION TO HEAR THIS APPEAL
      UNDER 28 U.S.C. § 1292(A)(1). ................................................... 26

      A.    The Status Quo Order Is An Injunction. ............................. 26

      B.    The District Court Order Refused To Dissolve An
            Injunction. ......................................................................... 29

      C.    The Review-Journal's Agreement To The Stipulation Is
            Of No Moment. .................................................................. 31

      D.    Appellants Have Standing To Appeal The District Court's
            Denial Of The Motion To Dissolve. ................................... 32

II.   THE DISTRICT COURT'S ORDER SHOULD BE REVERSED
      BECAUSE THE NPA'S PLAIN TEXT MAKES THE 2005 JOA
      UNLAWFUL. .................................................................................. 34

      A.    The 2005 JOA Is A Joint Operating Arrangement Under
            The NPA. ............................................................................ 34

      B.    It Is Unlawful To Perform Or Enforce The 2005 JOA Because
            It Is A Post-Enactment Joint Operating Arrangement Not
            Approved In Writing By The Attorney General. .................... 36

III.  THE DISTRICT COURT MISREAD THE STATUTE TO HOLD
      THAT WRITTEN APPROVAL WAS NOT REQUIRED. ............... 38

      A.    The District Court Misapprehended The Statute's Text
            And Structure. .................................................................... 38

      B.    No Case Law Supports The District Court's Interpretation..... 45

IV.   THE COURT SHOULD REJECT THE SUN'S ARGUMENT
      THAT THERE IS A STATUTORY GAP AS TO
      AMENDMENTS OF POST-ENACTMENT AGREEMENTS. ........ 47

iv

V.      THE COURT SHOULD REVERSE THE DISTRICT COURT'S
        HOLDING THAT THE 2005 JOA IS AN "AMENDED JOA"
        AND NOT A "NEW JOA." ................................................................. 49

VI.     THE DISTRICT COURT ERRED BY HOLDING THAT EVEN IF
        THE ATTORNEY GENERAL'S APPROVAL WAS REQUIRED,
        IT IS NOT UNLAWFUL TO ENFORCE THE 2005 JOA. .............. 53

VII.    THE INJUNCTION SHOULD BE DISSOLVED. ........................... 57

CONCLUSION ................................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Perez*,
  585 U.S. 579 (2018).................................................................................26

*ACF Indus. Inc. v. California State Bd. of Equalization*,
  42 F.3d 1286 (9th Cir. 1994) ...........................................................31, 32, 33

*Advanced Micro Devices, Inc. v. Intel Corp.*,
  292 F.3d 664 (9th Cir. 2002), *aff'd*, 542 U.S. 241 (2004)................................25

*Alto v. Black*,
  738 F.3d 1111 (9th Cir. 2013) ..................................................................25

*Hawaii ex rel. Anzai v. Gannett Pacific Corp.*
  99 F. Supp. 2d 1241 (D. Haw. 1999)............................................................44

*BedRoc Ltd., LLC v. United States*,
  541 U.S. 176 (2004)......................................................................44, 47, 53

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020).................................................................................54

*Bryant v. Tech. Rsch. Co.*,
  654 F.2d 1337 (9th Cir. 1981) ...............................................................26, 32

*Burgess v. United States*,
  553 U.S. 124 (2008)..................................................................................39

*Carson v. American Brands, Inc.*,
  450 U.S. 79 (1981)....................................................................27, 30, 31

*Citizen Publ'g Co. v. United States*,
  394 U.S. 131 (1969)..................................................................................42

*Comm. for an Indep. P-I v. Hearst Corp.*,
  704 F.2d 467 (9th Cir. 1983) .......................................................................43

*Credit Suisse First Boston Corp. v. Grunwald*,
  400 F.3d 1119 (9th Cir. 2005) ................................................................24, 25

*Culbertson v. Berryhill*,
    586 U.S. 53 (2019)..................................................................................38

*K.W. ex rel. D.W. v. Armstrong*,
    789 F.3d 962 (9th Cir. 2015) ............................................................31, 33

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
    601 U.S. 42 (2024)..................................................................................39

*Dep't of Hous. & Urban Dev. v. Rucker*,
    535 U.S. 125 (2002)................................................................................39

*Digital Realty Tr. v. Somers*,
    583 U.S. 149 (2018)................................................................................38

*Dole v. United Steelworkers of Am.*,
    494 U.S. 26 (1990)............................................................................40, 41

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
    554 U.S. 33 (2008)............................................................................40, 41

*Food Mktg. Inst.* v. *Argus Leader Media*,
    588 U.S. 427 (2019)..........................................................................53, 55

*Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*,
    739 F.2d 466 (9th Cir. 1984) ................................................................32

*Gon v. First State Ins. Co.*,
    871 F.2d 863 (9th Cir. 1989) ...........................................................27, 28

*Guido v. Mount Lemmon Fire Dist.*,
    859 F.3d 1168 (9th Cir. 2017) ..............................................................53

*Hurd v. Hodge*,
    334 U.S. 24 (1948)................................................................................57

*Jones v. Riot Hosp. Grp. LLC*,
    No. 20-15407, 2022 WL 401329 (9th Cir. Feb. 9, 2022)....................27

*Kaiser Steel Corp. v. Mullins*,
    455 U.S. 72 (1982)............................................................................56, 57

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ...........................................................25

*Lockyer v. Mirant Corp.*,
   398 F.3d 1098 (9th Cir. 2005) ...........................................................33

*Mahaffey v. Detroit Newspaper Agency*,
   969 F. Supp. 446 (E.D. Mich. 1997) ...........................................45, 46

*Mark H. v. Lemahieu*,
   513 F.3d 922 (9th Cir. 2008) ...........................................................53

*Moglia v. Pac. Emps. Ins. Co. of N. Am.*,
   547 F.3d 835 (7th Cir. 2008) ...........................................................27

*Mohasco Corp. v. Silver*,
   447 U.S. 807 (1980).........................................................................43

*N. Cent. Distrib., Inc. v. Bogenschutz*,
   2019 WL 1004843 (E.D. Cal. Mar. 1, 2019)......................................28

*Negrete v. Allianz Life Ins. Co. of N.A.*,
   523 F.3d 1091 (9th Cir. 2008) ..........................................26, 27, 31

*Newspaper Guild v. Levi*,
   539 F.2d 755 (D.C. Cir. 1976)...............................5, 42, 43, 54, 55, 56

*Righthaven LLC v. Hoehn*,
   716 F.3d 1166 (9th Cir. 2013) ...........................................................50

*Rodriguez v. Compass Shipping Co. Ltd.*,
   451 U.S. 596 (1981).........................................................................43

*Sharp v. Weston*,
   233 F.3d 1166 (9th Cir. 2000) ...........................................................25

*Thompson v. Enomoto*,
   815 F.2d 1323 (9th Cir. 1987) ...........................................................27

*United States v. El Dorado Cnty.*,
   704 F.3d 1261 (9th Cir. 2013) ..............................................27, 29, 30

*United States v. One 1997 Toyota Land Cruiser*,
  248 F.3d 899 (9th Cir. 2001) ..................................................................53

*Valdivia v. Schwarzenegger*,
  599 F.3d 984 (9th Cir. 2010) ............................................................32, 33

*Whitehead v. Nev. Comm'n on Jud. Discipline*,
  873 P.2d 946 (Nev. 1994)......................................................................50

*In re Wind N' Wave*,
  509 F.3d 938 (9th Cir. 2007) ..................................................................25

**Statutes**

15 U.S.C. § 1 ..........................................................................................7

15 U.S.C. § 2 ..........................................................................................7

15 U.S.C. § 13(a) ..................................................................................53

15 U.S.C. § 17........................................................................................53

15 U.S.C. § 78j(a)(1)..............................................................................54

15 U.S.C. § 1802(2) ...........................................................4, 8, 21, 38, 34, 47

15 U.S.C. § 1803(a) ............................................................4, 20, 36, 39, 51, 52

15 U.S.C. § 1803(b) ...................................................................*passim*

18 U.S.C. § 1962(a) ..............................................................................54

28 U.S.C. § 1292(a)(1)................................................................25, 26, 29, 30, 33

28 U.S.C. § 1331 ....................................................................................6

28 U.S.C. § 1337....................................................................................6

**Other Authorities**

28 C.F.R. § 48.1 ....................................................................................44

28 C.F.R. § 48.2 ....................................................................................48

28 C.F.R. § 48.2(d) ..........................................................................12, 44, 48

28 C.F.R. § 48.16 ...........................................................................12, 46, 47, 47

*Amendment*, Black's Law Dictionary (11th ed. 2019) ...........................................49

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .....................................................................................36

4 Charles Alan Wright et al., *Federal Practice and Procedure*, § 1017 (4th ed.) .........................................................................................................28

16 Charles Alan Wright et al., *Federal Practice and Procedure* § 3924.2 (3d ed.) ...............................................................................................30

**INTRODUCTION**

The Newspaper Preservation Act ("NPA") allows competing newspapers to combine their business operations if certain requirements are met. One such requirement is that the United States Attorney General must approve in writing any newspaper joint operating arrangement ("JOA") entered after the statute's July 1970 enactment date. The statute is unambiguous on this point:

> It *shall be unlawful* for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, *except with the prior written consent of the Attorney General of the United States*.

15 U.S.C. § 1803(b) (emphasis added).

As this language makes clear, it is *unlawful* to perform or enforce any joint newspaper operating arrangement not already in effect when the statute was enacted *unless* the parties have obtained the Attorney General's written approval. Yet the district court held otherwise. It disregarded the plain text and interpreted the statute to mean that only "new JOAs" that merge two newspapers' operations for the first time require Attorney General approval. JOAs created by *amending* post-enactment JOAs, the court held, are entirely lawful and enforceable—even if they rewrite the material terms of the original JOA; even though Section 1803(b) makes no distinction between "new" and "amended" post-enactment JOAs; and even though the statute makes performing or enforcing such agreements "unlawful."

Based on this atextual reading of the NPA, the district court refused to dissolve an injunction, forcing the Review-Journal[1] to perform under an unlawful JOA. The JOA at issue here (the "2005 JOA") was executed in 2005 by the then-owners of the *Las Vegas Review-Journal* and *Las Vegas Sun* ("Sun") newspapers, replacing their original 1989 JOA. The new 2005 JOA eliminated the *Las Vegas Sun* as a standalone afternoon newspaper and converted it into a six to ten page insert inside the *Review-Journal* morning newspaper, ending all sales competition between the two papers.

The *Review-Journal*'s current owners acquired the newspaper a decade later in December 2015, and they had no involvement in the negotiations that led to the 2005 JOA or in the interactions with the Department of Justice that followed.

The genesis of the injunction at issue is an antitrust lawsuit the Sun filed in 2019 to force the Review-Journal to perform under the 2005 JOA. The Sun sought to cement the illegal 2005 JOA in place for the next twenty-six years, treble damages, and a divestment order stripping the *Review-Journal* newspaper from its current owners. In support of that lawsuit, the Sun alleged expressly that the Attorney General had approved the 2005 JOA.

---

[1] In this brief, "Review-Journal" refers collectively to Defendants-Appellants Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, Estate of Sheldon Adelson, Patrick Dumont, and Interface Operations, LLC d/b/a Adfam.

Faced with allegations in the complaint that the Attorney General had approved the 2005 JOA, the Review-Journal initially stipulated to a preliminary injunction requiring it to continue performing under the 2005 JOA. Discovery conclusively established, however, that the allegations in the complaint were false: the 2005 JOA was never approved by the Attorney General, notwithstanding the Sun's pleading to the contrary. The Review-Journal then moved to dissolve the injunction. In the order now on review, the district court refused to dissolve the injunction: the court concluded that the 2005 JOA was "lawful" and enforceable—notwithstanding the text of the NPA—because the 2005 JOA was supposedly just an "amendment" to the 1989 JOA.

That holding was plainly wrong. There is no coherent way to get from the text of the NPA to the district court's conclusion that the 2005 JOA is lawful and enforceable.

To start, the district court read the NPA as identifying three levels of review for different kinds of JOAs: (a) "pre-1970 JOAs" are lawful with no review required; (b) "new JOAs" entered post-1970 require the Attorney General's written approval; and (c) all "amended JOAs," regardless of when the original JOA was entered, need only be filed but not approved. But that is not at all what the statute says. The district court made several fundamental errors to land on this interpretation. First, the district court ignored—and never even acknowledged—the statute's definition of "joint

3

newspaper operating arrangement." Section 1803(b), which is quoted in full *supra*, does not speak in terms of "new" or "amended" JOAs. Instead, the NPA defines "joint newspaper operating arrangement" broadly to include both: the definition includes "*any* contract, agreement, joint venture (whether or not incorporated), or other arrangement" in which two newspapers "*establish[]* or *operate[]*" joint production facilities and take joint actions with respect to "one or more" foundational aspects of the newspaper business that drive competition between newspapers, such as printing, distribution, or distributing revenue. 15 U.S.C. § 1802(2) (emphasis added). The 2005 JOA fits squarely within this statutory definition.

Next, the district court took language that applies only to pre-1970 JOAs and applied it to post-1970 JOAs. The NPA separates JOAs into two categories: JOAs in effect *when the statute was enacted on July 24, 1970*, and JOAs created *after* the statute was enacted. Pre-enactment JOAs are covered by Section 1803(a), which grants antitrust immunity to JOAs entered prior to July 24, 1970, and allows such JOAs to be freely amended provided the parties file the amendment with the DOJ and the amendment does not add another newspaper. 15 U.S.C. § 1803(a)

JOAs not already in effect when the statute was enacted are treated differently. They are governed by Section 1803(b), which states that it is "unlawful" to "perform or enforce" a JOA "*not already in effect*" unless the JOA is approved in writing by

4

the Attorney General. 15 U.S.C. § 1803(b) (emphasis added). The district court conflated these two distinct sections to hold, incorrectly, that parties can freely amend all pre- and post-1970 JOAs, provided they file the amendment with the Attorney General.

Compounding these errors, the district court likewise disregarded the text in reaching its alternative holding that even if the 2005 JOA required the Attorney General's approval, the agreement is nonetheless lawful and enforceable without it. That holding is impossible to square with the statutory language which declares it "unlawful for any person to enter into, perform, or enforce" an unapproved joint operating arrangement. 15 U.S.C. § 1803(b). The non-binding case the court relied on to hold otherwise, *Newspaper Guild v. Levi*, 539 F.2d 755 (D.C. Cir. 1976), is nearly fifty years old and admittedly employed a method of statutory interpretation that elevated legislative history and the views of a single legislator over the statute's plain language—an approach long ago rejected by the Supreme Court.

The district court's wholesale abandonment of the NPA's plain text is particularly inappropriate here because Congress intentionally drew an express line between pre- and post-enactment JOAs as part of a carefully crafted legislative compromise. After the Supreme Court ruled in 1969 that a twenty-nine-year-old newspaper JOA violated antitrust law, Congress wanted to protect longstanding JOAs from prosecution. But the bill faced opposition because of fears that

5

consolidation threatens competing papers and destroys industry jobs. Congress balanced these interests by immunizing *then-existing JOAs* from antitrust liability but declaring "unlawful" *all future JOAs* absent written Attorney General approval. The district court's reading eviscerates the written approval requirement and opens the door to anticompetitive JOAs—once parties obtain the Attorney General's approval, they can simply "amend" the JOA to change any or all of the terms, circumventing the Attorney General's oversight and upsetting the delicate balance Congress struck. The statute does not allow this.

It is critical to address this issue now. The injunction the district court left in place forces the Review-Journal to carry speech that is not its own in its newspaper, and yokes it to a toxic business partner who is intentionally degrading the newspaper's quality and who has spent the last six years attacking and suing the Review-Journal—even going so far as to seek an order forcing the owners to divest themselves of their newspaper. That all of this is being accomplished pursuant to an agreement that the NPA establishes is unlawful to perform or enforce makes this Court's intervention imperative. The district court's order refusing to dissolve the injunction should be reversed.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because the complaint asserts federal antitrust claims under Sections 1 and 2

of the Sherman Act, 15 U.S.C. §§ 1, 2. The order on appeal was issued on March 31, 2024, 1-ER-2-51, and the Review-Journal timely appealed on April 10, 2024, 4-ER-689-747. Because the order on appeal refuses to dissolve an injunction, this Court has jurisdiction to review the order under 28 U.S.C. § 1292(a)(1). On May 1, 2024, this Court requested briefing on specific issues relating to the basis for jurisdiction, which is provided *infra*.

## STATEMENT OF THE ISSUE PRESENTED

The NPA makes it unlawful for any person to enter into, perform, or enforce a newspaper joint operating arrangement, not already in effect when the statute was enacted, without the prior written approval of the Attorney General. The 2005 JOA falls squarely within the NPA's definition of "newspaper joint operating arrangement" and was entered decades after the NPA was enacted. The Attorney General did not consent in writing to the 2005 JOA. The issue presented is: did the district court err by holding the 2005 JOA was nonetheless lawful and enforceable?

## STATUTORY AUTHORITY

Title 15, Section 1803 of the U.S. Code provides, in relevant part:

**(a) Joint operating arrangements entered into prior to July 24, 1970**

It shall not be unlawful under any antitrust law for any person to perform, enforce, renew, or amend any joint newspaper operating arrangement entered into prior to July 24, 1970, if at the time at which such arrangement was first entered into, regardless of ownership or affiliations, not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become

7

a financially sound publication: *Provided*, That the terms of a renewal or amendment to a joint operating arrangement must be filed with the Department of Justice and that the amendment does not add a newspaper publication or newspaper publications to such arrangement.

**(b) Written consent for future joint operating arrangements**

It shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States. Prior to granting such approval, the Attorney General shall determine that not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of this chapter.

Title 15, Section 1802(2) of the U.S. Code provides, in relevant part:

The term "joint newspaper operating arrangement" means any contract, agreement, joint venture (whether or not incorporated), or other arrangement entered into by two or more newspaper owners for the publication of two or more newspaper publications, pursuant to which joint or common production facilities are established or operated and joint or unified action is taken or agreed to be taken with respect to any one or more of the following: printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; establishment of circulation rates and revenue distribution: *Provided*, That there is no merger, combination, or amalgamation of editorial or reportorial staffs, and that editorial policies be independently determined.

## STATEMENT OF THE CASE

**I.      THE 1989 JOA BETWEEN THE REVIEW-JOURNAL AND SUN.**

In 1989, when the *Sun* newspaper was on the verge of financial collapse, it entered a joint operating arrangement with Donrey of Nevada, Inc. ("Donrey"), the

then-publisher of the *Las Vegas Review-Journal* (the "1989 JOA"). *See* 1989 JOA, 4-ER-645-88. The 1989 JOA was approved in writing by the U.S. Attorney General on June 1, 1990, pursuant to the NPA. *See* 4-ER-563.

Under the 1989 JOA, the then-owners of the *Review-Journal* and the *Sun* continued to produce and distribute separate newspapers, with each newspaper having its own separate subscribers. 1989 JOA, 4-ER-657-58, 661, §§ 5.1, 5.1.8. The *Review-Journal* was published as a morning newspaper, and the *Sun* was published as an afternoon newspaper. 4-ER-657-58, § 5.1. But the two newspapers combined their back-office operations and shared their profits with each other. *See id*. The Review-Journal's financial support enabled the Sun to continue publishing even though it could not turn a profit on its own. 4-ER-574.

## II. THE SUN AND THE *REVIEW-JOURNAL*'S THEN-OWNER, STEPHENS, ENTERED A NEW ARRANGEMENT IN 2005 WITHOUT THE ATTORNEY GENERAL'S APPROVAL.

### A. The 2005 JOA Replaces The 1989 JOA.

In June 2005, the Sun and Donrey's successor, Stephens Group, Inc. ("Stephens"), executed the 2005 JOA. 3-ER-478-502. This new arrangement was dramatically different and unique among newspaper JOAs in that it eliminated one of the two newspapers—the *Sun*—as a standalone paper, combining both newspapers into a "single media product" and eliminating all sales competition between them. *See* 2-ER-209, 211-12, 215, ¶¶ 23, 31, 34, 48.

The 2005 JOA materially changed how the newspapers would be printed and published. It converted the *Sun* from a separate afternoon newspaper with its own subscribers to an insert that would be published as the "third section" inside the *Review-Journal* morning newspaper. 2005 JOA, 3-ER-491, § A.3; *see also* 3-ER-490, § A.2(a)-(c). The 2005 JOA also limited the Sun section to six to ten pages. *Id*. Under this new arrangement, the print *Sun* would no longer be delivered or sold separately but instead would only be delivered and sold inside the *Review-Journal*. *See id*.

Additionally, Stephens and the Sun agreed in the 2005 JOA to restrict their ability to publish competing newspapers. 2005 JOA, 3-ER-487, § 10.12. The 2005 JOA banned each party from publishing any other newspaper in Clark, Nye, or Lincoln Counties more than two days per week. *Id*.

The 2005 JOA created new financial terms reflecting this new arrangement, including a new method for determining the Sun's share of any JOA profits. 2005 JOA, 3-ER-498-501. Instead of the percentage split set forth in the 1989 JOA, the 2005 JOA provides that the Sun receives an "annual" payment based on an EBITDA calculation. *Id*. And instead of allocating funds for news and editorial expenses as in the 1989 JOA, the 2005 JOA requires each newspaper to bear its own editorial costs and establish its own budget. *Id*., 3-ER-479, § 4.2. The 2005 JOA also added several new Review-Journal affiliate publications to the profit-sharing arrangement. *See id*.,

3-ER-498-99 (stating "EBIDTA shall include the earnings of the Newspapers and the earnings of the Review-Journal's Affiliates derived from publications generally circulated in Clark, Nye, or Lincoln Counties, Nevada, or any parts thereof").[2]

In the new arrangement, Stephens and the Sun replaced the original JOA's provisions governing advertising, circulation, and promotions with new and different terms. Instead of the 1989 JOA's requirement that the Review-Journal establish a budget for promotional activities and allocate a portion of that budget to the Sun, the 2005 JOA made the Review-Journal responsible for promoting both newspapers. *Compare*, 1989 JOA, 4-ER-659-60, § 5.1.4, *with* 2005 JOA, 3-ER-480-81, § 5.1. It also established various new rules and guidelines for promotions that were not included in the 1989 JOA. 2005 JOA, 3-ER-479, 481, §§ 4.2, 5.1.4.

Stephens and the Sun expressly intended the 2005 JOA to replace, and not merely continue, the 1989 arrangement. The 2005 JOA terminated the 1989 JOA as of September 30, 2005. *See* 2005 JOA, 3-ER-479, § 1.2 (stating that the 1989 JOA would only "remain in full force and effect through September 30, 2005 (the Transition Date))." Stephens and the Sun further ensured that no obligations under the 1989 JOA survived the transition, with each "unconditionally releas[ing] and forever discharg[ing]" the other party "from any and all … claims connected with

---

[2] These included weeklies such as *Pahrump Valley Times*, *El Tiempo* (now called Las Vegas Review-Journal en español), and *Boulder City Review*.

operations under the 1989 Joint Operating Agreement between the parties[.]" *Id.*, 3-ER-487-88, § 10.13.

### B. The DOJ Declines To Approve The 2005 JOA After An Extensive Investigation.

Even though their new arrangement eliminated one of the two JOA newspapers as a standalone product, added new and different material terms limiting competition, and was completely unprecedented in the world of newspaper JOAs, Stephens and the Sun did not submit their new 2005 JOA to the Attorney General for approval under the NPA. Instead, they filed it with the Attorney General pursuant to 28 C.F.R. § 48.16, which sets forth a process for filing amendments and renewals of "existing" arrangements, meaning JOAs "entered into *before July 24, 1970.*" *See* 28 C.F.R. § 48.16 (setting out process for filing "a renewal of or an amendment to" existing arrangement) (emphasis added); 28 C.F.R. § 48.2(d) (defining "existing arrangement" as "any joint newspaper operating arrangement entered into before July 24, 1970"). Stephens and the Sun then began operating under the 2005 JOA.

The DOJ initiated an extensive, years-long investigation into the 2005 JOA. *See* 3-ER-463-73; 3-ER-436-44; 3-ER-428-31; 3-ER-420. Several years later, in April 2008, the DOJ issued a letter closing its investigation of the new arrangement without approving the 2005 JOA. 3-ER-427 ("Non-Approval Letter"). The Letter expressly stated that the DOJ did *not* conclude "the 2005 amendments to the parties' Joint Operating Agreement are protected by the antitrust immunity afforded by the

Newspaper Preservation Act." *Id*. To the contrary, the DOJ warned Stephens and the

Sun that conduct pursuant to the amendments "remains subject to antitrust scrutiny."

*Id*. The relevant part of the letter states:

> The Antitrust Division has closed its investigation. *However, that decision was not based on a conclusion that the 2005 amendments to the parties' Joint Operating Agreement are protected by the antitrust immunity afforded by the Newspaper Preservation Act*. Accordingly, the parties' conduct pursuant to those amendments — and in particular conduct not integral to the parties' revised arrangements for the joint distribution of the *Review-Journal* and the *Sun*, the effects of which we reviewed as part of our investigation — remains subject to antitrust scrutiny.

*Id*. (most emphasis added).

Despite not having obtained written approval, and despite having been warned

that the 2005 JOA was not protected by the NPA, Stephens and the Sun continued

to operate under the new 2005 arrangement for the next ten years. *See, e.*g., 3-ER-

409, 411, ¶¶ 30-34, 167. During this time, their relationship was very contentious,

plagued by litigation and ongoing disputes over how to interpret the profit-sharing

provisions in the 2005 JOA. *See generally*, 3-ER-407-12.

## III.   TEN YEARS LATER, THE ADELSONS PURCHASED THE *REVIEW-JOURNAL* AND THE SUN SUED THEM FOR SEEKING TO TERMINATE THE 2005 JOA.

In March 2015, the *Review-Journal* was acquired by a new publisher,

GateHouse Media. *See* 2-ER-188, ¶ 4. In December 2015, the Adelson family,

longtime residents of Las Vegas, purchased the *Review-Journal* newspaper from

GateHouse.[3] *See id.*; 3-ER-410, ¶ 79.

The Adelsons inherited the Review-Journal's contentious relationship with the Sun. When they acquired the newspaper, the Sun and Stephens were embroiled in an arbitration over the Sun's profit share. *See* 3-ER-410, ¶¶ 79-80. Then, in April 2018, the Sun filed a new lawsuit in state court against the Review-Journal, alleging that its profit share under the formula set out in 2005 JOA should have been more. *See* 3-ER-407-12.

In August 2019, the Review-Journal sought and obtained leave to assert a breach of contract counterclaim against the Sun in the state-court lawsuit. The counterclaim alleged that the Sun breached provisions in the 2005 JOA requiring the Sun to cooperate with the Review-Journal and maintain a certain quality standard in its section of the joint product. 2-ER-263-64. As relief, the Review-Journal sought, among other things, an order terminating the 2005 JOA due to the Sun's material breaches—a remedy expressly allowed by the 2005 JOA. 2-ER-265.

The Sun declared war on the Review-Journal in response. The Sun raced into federal court to halt the state-court lawsuit and force the Review-Journal to remain in the unapproved, unlawful 2005 JOA. 3-ER-371-406. The Sun falsely alleged that the 2005 JOA was approved by the DOJ, then argued that because the 2005 JOA

---

[3]The purchase was through News+Media Capital Group, LLC, in which the Adelsons indirectly own a controlling interest. 2-ER-188.

14

was supposedly "approved" under the NPA, it cannot be terminated under any circumstances—even the Sun's own material breach. *See* 3-ER-372, 3-ER-396, 398, ¶¶ 109, 118. The Sun sought an injunction requiring the Review-Journal to remain in the JOA until the end of its term in 2040, and barring the Review-Journal from proceeding with its state-court counterclaims. *Id.*, 3-ER-396, ¶ 108; 3-ER-404, §§ B, D; *see also* 2-ER-243.

The Sun also argued that because the 2005 JOA was "approved," any failure to perform under it or attempts to terminate it violated antitrust law, and subjected the Review-Journal to draconian antitrust remedies like an injunction barring the Review-Journal from terminating the 2005 JOA under any circumstances, treble damages and even an order stripping the Adelsons of their ownership of the *Review-Journal* newspaper. *See* 2-ER-236-39, ¶¶ 150, 156, 159, 166, 2-ER-243, §§ E, F.

## IV.   THE STIPULATED PRELIMINARY INJUNCTION AND MOTION TO DISMISS.

As noted *supra*, the Review-Journal's current owners did not acquire the newspaper until 2015—ten years after Stephens and the Sun opted to move forward under the 2005 JOA despite not having obtained DOJ approval. *See* 2-ER-188, ¶ 4. The current owners were thus not involved in the process by which the 2005 JOA was implemented. *See id*.

Shortly before the Sun's lawsuit was filed, however, the Review-Journal obtained a copy of the Non-Approval Letter. 2-ER-188, ¶ 5. Facing the threat of

treble damages, an injunction cementing the 2005 JOA into place until 2040, and the potential loss of the newspaper—and recognizing that its relationship with the Sun was unsalvageable in any event—the Review-Journal elected to seek dismissal on the ground that the JOA was unenforceable because it was not approved by the Attorney General. *See* 3-ER-333-36.

On September 27, 2019, the Sun informed the Review-Journal it intended to move for a preliminary injunction barring the Review-Journal from terminating the 2005 JOA. 3-ER-369-70; *see also* 2-ER-188, ¶ 6. In lieu of litigating the preliminary injunction motion, and because the Review-Journal anticipated that a ruling on its motion to dismiss would moot any preliminary injunction requiring its compliance with the unlawful 2005 JOA, the Review-Journal agreed to a stipulated preliminary injunction maintaining the status quo. Thus, on October 4, 2019, the parties filed a joint stipulation and proposed order pursuant to which the Review-Journal agreed "that Defendants will maintain the status quo (*i.e.*, RJ will continue to perform under the 2005 JOA), including without limitation, that Defendants will refrain from taking any non-judicial steps to terminate the 2005 JOA until after the entry of final judgment by a court of competent jurisdiction permitting such termination." 2-ER-188-89, ¶ 7; 1-ER-52-55.

16

## V.   AFTER THE SUN AVOIDS DISMISSAL BY CLAIMING THE 2005 JOA WAS DOJ-APPROVED, DISCOVERY CONFIRMS IT WAS NOT ACTUALLY APPROVED.

On October 30, 2019, the Review-Journal filed its motion to dismiss arguing, among other things, that because the Attorney General had not approved the 2005 JOA in writing, the agreement was unenforceable under the NPA's plain language. 3-ER-349-57.

The district court denied the motion in part and granted it in part on November 30, 2020. 3-ER-289. With respect to the Review-Journal's argument that the 2005 JOA is unenforceable, the court accepted the Sun's allegations that the JOA was approved as true for the purposes of the motion, declined to take judicial notice of the Non-Approval Letter, and denied the motion. *Id*.

The parties then spent more than three years in discovery. Among other things, the Review-Journal sought to ascertain whether there was any evidence supporting the Sun's allegation that the 2005 JOA was approved by the Attorney General. *See* 2-ER-236, 238, ¶¶ 150, 159; 2-ER-202; *see also* 3-ER-372 (alleging the 2005 JOA was "authorized by the Newspaper Preservation Act . . . and approved by the Department of Justice"). Among other things, the Review-Journal asked for documents to support the contention that the Attorney General or DOJ "approved the 2005 JOA in writing," 3-ER-297, and requested that the Sun "[a]dmit that the 2005 JOA was never approved in writing" by the Attorney General, 3-ER-291.

17

The Sun obfuscated. For example, the Sun objected to the Review-Journal's clear and tailored request for documents related to the Attorney General's approval, claiming the request was "unduly burdensome and overbroad," and not "relevant." 3-ER-297. The Sun likewise refused to answer the Review-Journal's straightforward request for admission, instead claiming the question was "vague and ambiguous" about what it means for the 2005 JOA to be "approved in writing by the" Attorney General. 3-ER-291.

When the Sun did provide bits of information, they were inconsistent and opaque. For example, at various points the Sun stated that the 2005 JOA was "approved by," DOJ, 2-ER-202, that DOJ gave "tacit approval" of the 2005 JOA, 3-ER-291-92, that DOJ did not provide "either an approval or a rejection of the" 2005 JOA, 2-ER-198, and that the 2005 JOA did not need to be approved by the Attorney General at all, 3-ER-297-98; 2-ER-258.

At one point the Sun even represented that it "previously produced" documents responsive to a request for documents showing "[t]he written approval of the 2005 JOA by the Attorney General of the United States required under 15 U.S.C. § 1803(b)." 2-ER-257-58; *see also* 3-ER-423, ¶ 16 (Sun stating in its complaint that "[t]he 2005 Amended JOA was approved by the Attorney General of the United States in the same manner as the 1989 JOA"). When pressed, however, the Sun could not point to any such documents. *See, e.g.*, 2-ER-249, 2-ER-251-52

18

(Sun's 30(b)(6) witness walking back the Sun's statement that 2005 JOA was approved by the Attorney General). Meanwhile, the Sun did produce evidence showing the DOJ Antitrust Division's decision to close an investigation into the 2005 JOA "was *not* based on a conclusion that" the 2005 JOA is "protected by the antitrust immunity afforded by the Newspaper Preservation Act." 3-ER-427 (emphasis added).

Ultimately the Sun failed to produce *any* evidence reflecting the Attorney General's written approval of the 2005 JOA. Faced with this reality, the Sun ultimately conceded in summary-judgment briefing that the DOJ never approved the 2005 JOA in writing. *See* 2-ER-152-53 (noting the 2005 JOA was "filed" with DOJ and that the Attorney General did not "approve[]" the 2005 JOA in writing).

## VI. THE REVIEW-JOURNAL MOVES TO DISSOLVE THE PRELIMINARY INJUNCTION; THE DISTRICT COURT DENIES THE MOTION.

On May 30, 2023, with the issue of the 2005 JOA's approval conclusively resolved, the Review-Journal moved for summary judgment on various grounds, including that the 2005 JOA was invalid and unenforceable under the NPA because it was not approved in writing by the Attorney General. ECF No. 843. Anticipating that it would take the court a substantial amount of time to rule on the motions and that it could be a year or more before the trial, the Review-Journal filed a motion to dissolve the preliminary injunction on June 9, 2023, arguing that changed

circumstances compelled dissolution of the preliminary injunction, and seeking an expedited ruling on that motion. 2-ER-162-85; ECF No. 915. The Review-Journal argued that now that discovery was complete and the key allegation upon which the Sun's claims relied—that the 2005 JOA was "approved by the Department of Justice" as required by the NPA, 3-ER-372—had been conclusively proven false, dissolution was warranted, 2-ER-177; *see also* 2-ER-85-91, 103, 125; 2-ER-69, 81. The Review-Journal also emphasized that the Supreme Court's well-established principles of statutory interpretation demonstrate that it was "unlawful" to "enter into, perform, or enforce" the 2005 JOA, 15 U.S.C. 1803(b). 2-ER-164, 178-79; 2-ER-91-106, 122-28; 2-ER-70-81.

The court declined to address the motion to dissolve on an expedited basis. Instead, nearly a year later on March 31, 2024, the district court issued a combined ruling addressing both parties' summary-judgment motions and the Review-Journal's motion to dissolve the injunction. 1-ER-1-51.

Without addressing whether the changed circumstances warranted dissolution of the preliminary injunction, the court held that the 2005 JOA was valid and enforceable under Section 1803(a) even though it was not approved in writing by the Attorney General. The district court reached this result by holding that Section 1803(b)'s approval requirement only applies to "new" JOAs and not to JOAs created when the parties "amend" a prior JOA. 1-ER-15-16; *see also* 15 U.S.C. § 1803(a).

The court then held as a matter of law that the 2005 JOA was not a "joint operating arrangement" as defined by the statute but instead was merely an "amendment" that did not require approval. 1-ER-17-20.

In the alternative, the district court held that even if DOJ approval were required for the 2005 JOA, the lack of approval did not render the arrangement unlawful or unenforceable. 1-ER-20. This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court's reading of the NPA was clearly incorrect. The NPA's text is unambiguous: it states that newspaper joint operating arrangements entered after the statute's July 24, 1970 enactment date are unlawful to perform or enforce unless they are approved in writing by the Attorney General.

Applying the statute is straightforward. The first step asks whether the JOA in question falls under the statute's broad definition of "joint newspaper operating arrangement." That definition encompasses "*any* contract, agreement, joint venture . . . , *or any other arrangement*" between two or more newspapers pursuant to which they "*establish[]* or *operate[]*" joint production facilities and agree to take unified actions as to "*one or more*" foundational aspects of the newspaper business such as printing, publication, distribution, revenue allocation, and so on. 15 U.S.C. § 1802(2) (emphasis added). The 2005 JOA fits within this definition squarely.

21

The next step is to determine whether the JOA falls under Section 1803(a), which governs JOAs created before the statute was enacted on July 24, 1970, and amendments to those JOAs, or whether it falls into Section 1803(b), which governs all post-enactment JOAs. Because the Review-Journal and the Sun entered their first JOA in 1989 and their second JOA in 2005, Section 1803(a) cannot apply.

The 2005 JOA thus falls within Section 1803(b). As previously mentioned, this section states that newspaper joint operating arrangements entered into after the statute's July 24, 1970, enactment date are unlawful to perform or enforce unless they are approved in writing by the Attorney General. Section 1803(b) applies to all post-1970 "joint operating arrangements" and does not distinguish between "new JOAs" and "amended JOAs."

The district court's contrary interpretation clashes with the statute's text, structure, and purpose. Instead of following the statute's plain language, the district court decided that the 2005 JOA did not require approval because it was an "amended JOA" and not a "new JOA." To reach this result, the district court ignored the statute's broad definition of joint operating arrangements. It instead added new terms to Section 1803(b)—"new JOA" and "amended JOA."

Then, failing to grasp that Section 1803(a) applies only to pre-1970 JOAs, the district court looked to the language in that section stating that *pre-1970 JOAs* can be amended so long as the amendment is filed with the DOJ, and then held that

22

provision applied to amendments to *all JOAs* regardless of whether they are pre- or post-1970 JOAs. The district court's interpretation of the statute defies the rules of plain English and deep-rooted principles of statutory construction.

Rewriting the NPA's statutory text is particularly inappropriate in light of the statute's purpose and history. Congress intentionally drew a clear line between pre-enactment and post-enactment JOAs as part of a hard-fought legislative compromise designed to protect against improper JOAs that harm competition and cost jobs. By scrambling the statute's provisions, the district court upended the careful balance Congress struck when it wrote the statute.

The Sun argued below that the statute is silent as to the process for amending post-enactment JOAs, and that the implementing regulations establish that amendments to post-enactment JOAs do not require approval. This argument fares no better than the district court's reasoning. The statute is not silent about how to treat amended post-1970 JOAs. Section 1803(b) says that *all* post-1970 JOAs must be approved, and does not draw any distinctions (as Section 1803(a) does, for pre-1970 JOAs) between JOAs created when two newspapers first merge operations and JOAs created when prior JOAs are amended. Moreover, the regulation the Sun claims fills in the "gap" does not even do so—by definition, the regulation specifies that it only applies to amending pre-1970 JOAs, not post-1970 JOAs.

Because the approval requirement for post-1970 JOAs does not turn on whether the JOA is "new" or "amended," this Court should reverse without reaching the question of which bucket the 2005 JOA falls into. But in the event the distinction matters, the Court should reverse the district court's ruling that, as a matter of law, the 2005 JOA is an "amended JOA" and not a "new JOA." The record is replete with facts showing that the 2005 JOA was a new JOA—most significantly, the 2005 JOA terminated and replaced the parties' 1989 JOA and changed virtually all of the material terms. *See* 3-ER-479, § 1.2. The district court got that issue wrong; at the very least, it was error for the district court to take the issue away from the jury.

Finally, the Court should reject the district court's alternative holding that even if the 2005 JOA required the Attorney General's approval, it is nonetheless lawful and enforceable without it. Again, the NPA's plain text states that post-enactment JOAs are *unlawful to perform or enforce* unless they are approved by the Attorney General. The deeply-divided case the court relied on to hold otherwise is nearly fifty years old, out of circuit, and admittedly employed a method of statutory interpretation that elevated legislative history and the views of a single legislator over the statute's plain language—an approach that was soundly rejected by the Supreme Court long ago.

24

## STANDARD OF REVIEW

This Court reviews a district court's decision disposing of a "motion to modify or dissolve" an injunction for "abuse of discretion." *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1126 n.7 (9th Cir. 2005). A district court abuses its discretion when it makes an error of law, such as erroneously interpreting a statute or resting its decision on an incorrect view of the law. *See id.*; *see also In re Wind N' Wave*, 509 F.3d 938, 941 (9th Cir. 2007) ("An erroneous interpretation of a statute is an abuse of discretion.").

In "reviewing denials of motions to dissolve injunctions," this Court does "not consider the propriety of the underlying order, but limit[s] ... review to the new material presented with respect to the motion to dissolve." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (quoting *Sharp v. Weston*, 233 F.3d 1166, 1169-70 (9th Cir. 2000)). "A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp*, 233 F.3d at 1170; *see also Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013).

As noted *supra*, the district court's ruling was based solely on its interpretation of the NPA. "Questions of statutory interpretation are subject to de novo review[.]" *Advanced Micro Devices, Inc. v. Intel Corp.*, 292 F.3d 664, 666 (9th Cir. 2002), *aff'd*, 542 U.S. 241 (2004).

25

## ARGUMENT

## I. THIS COURT HAS JURISDICTION TO HEAR THIS APPEAL UNDER 28 U.S.C. § 1292(A)(1).

Under 28 U.S.C. § 1292(a)(1), this Court has jurisdiction to review "[i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." The district court's October 19, 2019, order adopting the parties' "Stipulation And [Proposed] Order To Maintain Status Quo" (1-ER-52-55, the "Status Quo Order") is an "injunction" under this Court's precedents, and the Order on review is an order refusing to dissolve that injunction.

And, the Review-Journal is "aggrieved" by the Order on review because it requires the Review-Journal—under threat of contempt—to continue to perform under the unlawful 2005 JOA and to continue to bear the burden to carry the *Sun* insert within the *Review-Journal* newspaper. *Bryant v. Tech. Rsch. Co.*, 654 F.2d 1337, 1343 (9th Cir. 1981). Therefore, this Court has jurisdiction to review the Order under Section 1292(a)(1).

### A. The Status Quo Order Is An Injunction.

Whether an order is an injunction for purposes of Section 1292(a)(1) is a practical inquiry that looks to the effect of the order, not to "the label attached." *Abbott v. Perez*, 585 U.S. 579, 594 (2018); *Negrete v. Allianz Life Ins. Co. of N.A.*, 523 F.3d 1091, 1097-98 (9th Cir. 2008) ("We cannot content ourselves with the

surface" of an order and "are not bound . . . . by a failure to give an order a particular

name." (cleaned up)).

An injunction is an "order that is directed to a party, enforceable by contempt,

and designed to accord or protect some or all of the substantive relief sought by a

complaint in more than temporary[] fashion." *Gon v. First State Ins. Co.*, 871 F.2d

863, 865 (9th Cir. 1989); *see also Thompson v. Enomoto*, 815 F.2d 1323, 1326 (9th

Cir. 1987) (citing *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981)) (treating

a "consent decree" as an "injunction" for purposes of interlocutory appeal because

it "prescribes conduct" and "compels compliance").[4]

The Status Quo Order meets all three prongs of that definition.

First, the Status Quo Order is "directed to" the Review-Journal. *Gon*, 871 F.2d

at 865. It applies only to the Review-Journal. And it does not "concern only the

---

[4] The Court's order requesting that the parties' brief jurisdiction also cites *Negrete*, 523 F.3d at 1097. *See* App. ECF No. 7.1. *Negrete*, like some courts, applies the three-part test set forth in *Carson v. American Brands, Inc.* to determine whether an interlocutory order is sufficiently related to an injunction to fall under Section 1292(a)(1). 523 F.3d at 1097. Other courts treat the *Carson* test as governing whether an interlocutory order "grant[s], continu[es], modifi[es], refus[es], or dissolve[s] injunctions" under Section 1292(a)(1); not whether the order constitutes an "injunction" in the first instance. *See, e.g.*, *United States v. El Dorado Cnty.*, 704 F.3d 1261, 1263 (9th Cir. 2013); *Jones v. Riot Hosp. Grp. LLC*, No. 20-15407, 2022 WL 401329, at *2 (9th Cir. Feb. 9, 2022), *cert. denied*, 143 S. Ct. 205 (2022). That distinction is of no moment here because the Status Quo Order also passes the *Negrete/Carson* test—the Status Quo Order has the practical effect of granting an injunction that creates serious consequences for the Review-Journal and can only be effectively challenged on immediate appeal. *See infra* 29-32.

conduct of the litigation," *id.* at 866; but instead requires "specific performance on the merits." *Moglia v. Pac. Emps. Ins. Co. of N. Am.*, 547 F.3d 835, 838 (7th Cir. 2008). It mandates that the Review-Journal must "maintain the status quo"; "continue to perform under the 2005 JOA"; and refrain from taking any non-judicial steps to terminate the 2005 JOA until after the entry of final judgment." 1-ER-54-55.

Second, the Status Quo Order is enforceable by contempt, as the Review-Journal could be sanctioned for violating the Status Quo Order's terms. *N. Cent. Distrib., Inc. v. Bogenschutz*, No. 17-cv-01351, 2019 WL 1004843, at *3 (E.D. Cal. Mar. 1, 2019) (noting that defendants were held in contempt for violating stipulated injunction); 4 Charles Alan Wright et al., *Federal Practice and Procedure*, § 1017 (4th ed.) (explaining that civil contempt proceedings can be initiated following non-compliance with a court order).

Third, the Status Quo Order is designed to "protect some . . . of the substantive relief" permanently sought by the Sun. *Gon*, 871 F.2d at 865. Among other things, the Sun alleges that it brought suit "to obtain preliminary and permanent injunctive relief against Defendants' threatened termination of the JOA." 2-ER-242, ¶ 194; *see also* 2-ER-243, §§ B, D (same). The Status Quo Order temporarily provides that relief to the Sun.

28

Treating the Status Quo Order as an injunction is also consistent with the understanding of the parties and the district court. At the outset of the litigation, the Sun wrote that it was "prepared to file a motion requesting an injunction" and "asked if the Defendants would be willing to stipulate to an injunction in lieu of requiring [the Sun] to pursue the motion." 3-ER-369. The Sun continued that the "stipulated preliminary injunction" it envisioned "would enjoin Defendants from[]," among other things, "terminating the 2005 JOA." *Id.* Rather than litigate, the Review-Journal agreed to stipulate to the injunction the Sun sought; indeed, the Status Quo Order expressly states that the Review-Journal agrees to be enjoined "[i]*n lieu of litigating the [Sun's threatened] motion for preliminary injunction.*" 1-ER-54 (emphasis added). Consistent with this understanding, the Sun, the Review-Journal, and the district court subsequently and repeatedly referred to the Status Quo Order as an "injunction." *See, e.g.*, 1-ER-20, 50; 2-ER-140, 143-44, 146.

## B. The District Court Order Refused To Dissolve An Injunction.

A district court order is immediately appealable when (among other things) it is an order "*refusing to dissolve or modify* [an] injunction[]." 28 U.S.C. § 1292(a)(1) (emphasis added). To determine whether a particular order meets this requirement, this Court looks to the order's "substantial effect rather than its terminology." *El Dorado Cnty.*, 704 F.3d at 1265.

29

Here, there is no doubt that the Order on review was one "refusing to dissolve or modify" the injunction imposed by the Status Quo Order. To start, the Review-Journal's motion asked the district court to "dissolve" the Status Quo Order. 2-ER-184. In adjudicating that motion, the district court made clear that it was refusing to dissolve the Status Quo Order when it held that "the RJ's motion to dissolve preliminary injunction (ECF No. 852/853) is denied." 1-ER-50; *see also* 1-ER-20. The Order is therefore immediately appealable under 1292(a)(1). *See* 16 Charles Alan Wright et al., *Federal Practice and Procedure* § 3924.2 (3d ed.) ("Refusals of explicit motions to modify or dissolve injunctions are readily appealed.").

Were there any lingering doubt about whether the Order actually "refus[ed] to dissolve" an injunction, 28 U.S.C. § 1292(a)(1), this Court would apply a three-part test from a line of cases beginning with *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981). *See supra* note 4. *See generally El Dorado Cnty.*, 704 F.3d at 1263.

The Order on review here easily satisfies all three *Carson* criteria.

First, the Order has "the practical effect" of refusing to dissolve injunctive relief imposed by the Status Quo Order. *El Dorado Cnty.*, 704 F.3d at 1263. The Status Quo Order required the Review-Journal to continue to perform under the 2005 JOA or be subject to contempt. 1-ER-54-55. The Review-Journal moved for the Status Quo Order to be dissolved. The district court denied the Review-Journal's

30

request and left in place the Status Quo Order with its threat of contempt. 1-ER-20.

Second, the Order may have "serious, perhaps irreparable consequences." *El Dorado Cnty.*, 704 F.3d at 1263. As explained in the Review-Journal's motion to dissolve briefing, the Order forces the Review-Journal to collude with a competitor and to carry speech that is not its own within its newspaper, handcuffing the Review-Journal to a competitor that is "intentionally degrading the quality of the *Review-Journal* newspaper." *See* 2-ER-173-84; 6-ER-854-55.

Third, the Order can be "effectively challenged" only by immediate appeal. *El Dorado Cnty.*, 704 F.3d at 1263. No final determination at trial in favor of the Review-Journal can repair the damage to the Review-Journal's business and brand from being forced to perform under this unlawful agreement. *See Negrete*, 523 F.3d at 1097 (finding factor satisfied where appealing from "the final determination" cannot "repair the damage" suffered in the interim).

## C. The Review-Journal's Agreement To The Stipulation Is Of No Moment.

That the Status Quo Order relates to an agreed-upon so-ordered stipulation does not change the analysis. This Court and others have consistently treated stipulated orders as injunctions and permitted interlocutory appeals from subsequent orders seeking to dissolve or modify the stipulated injunction. Thus, in *Carson*, the court found the interlocutory order refusing to approve the consent decree was appealable even though the parties had agreed to the underlying injunctive relief.

31

*See Carson*, 450 U.S. at 86. Similarly, in *Valdivia v. Schwarzenegger*, this Court held that an interlocutory order modifying a stipulated injunction was appealable under Section 1292(a)(1). 599 F.3d 984, 988 (9th Cir. 2010). *See also K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 968-69 (9th Cir. 2015) (same, as to order modifying "stipulated preliminary injunction"); *ACF Indus. Inc. v. California State Bd. of Equalization*, 42 F.3d 1286, 1288-89 (9th Cir. 1994) (same).

Indeed, that has to be the rule. Otherwise, parties would have to litigate every request for interim injunctive relief to preserve a right to appeal a subsequent order relating to that relief. That would upend current practice and would have significant practical consequences, as it would discourage parties from compromise and would force parties into needless litigation that wastes party and judicial resources.

**D.    Appellants Have Standing To Appeal The District Court's Denial Of The Motion To Dissolve.**

For a party to have Article III standing to appeal an order, that party must be "aggrieved by the district court order." *Bryant*, 654 F.2d at 1343 (citations omitted). Here, the Review-Journal is aggrieved by the Order because it denied the relief the Review-Journal sought—namely, dissolving the Status Quo Order and reviving the Review-Journal's right to terminate the 2005 JOA via non-judicial means. The Order precludes the Review-Journal from taking that action, on pain of contempt, thereby "aggriev[ing]" the Review-Journal. *See, e.g.*, *ACF Indus. Inc.*, 42 F.3d at 1288-89, 1290-91 (holding that defendant had standing to challenge an order denying

32

defendant's motion to modify a stipulated injunction that prevented defendant from collecting taxes for use of its property); *Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*, 739 F.2d 466, 468 n.2 (9th Cir. 1984) (holding that a party had standing to appeal an order that left them "powerless to enforce their state court judgment").

To be sure, in some sense, denial of the motion to dissolve effectively "maintains the parties' agreed-upon status quo." App. ECF No. 7.1. But the critical point is that the Review-Journal actively seeks to *change* the status quo, and it has been precluded from doing so by the district court's refusal to dissolve the injunction. That in turn harms the Review-Journal by forcing it to continue to comply with the unlawful 2005 JOA or suffer contempt. *See* 2-ER-173-84; 6-ER-853-54. That is sufficient for the Review-Journal to have standing to appeal. *See Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1105 (9th Cir. 2005) (holding that an order that "deprived the Attorney General—at least temporarily and perhaps permanently—of the legal remedy he seeks" is sufficient to confer appellate standing). Indeed, just as this Court has recognized in its cases granting review of orders involving stipulated injunctions, a party may still be harmed by an order "refusing to dissolve or modify" an injunction even when the party has stipulated to the injunction. 28 U.S.C. § 1292(a)(1); *see Valdivia*, 599 F.3d at 987-88; *K.W.*, 789 F.3d at 970-71; *ACF Indus. Inc.*, 42 F.3d at 1288-89.

33

## II. THE DISTRICT COURT'S ORDER SHOULD BE REVERSED BECAUSE THE NPA'S PLAIN TEXT MAKES THE 2005 JOA UNLAWFUL.

### A. The 2005 JOA Is A Joint Operating Arrangement Under The NPA.

In analyzing whether the NPA's written-approval requirement applies to the 2005 JOA, the starting point is the definition of joint operating arrangement. The statute defines "joint newspaper operating arrangement" broadly:

> The term 'joint newspaper operating arrangement' means *any contract, agreement, joint venture . . . or other arrangement* entered into by two or more newspaper owners for the publication of two or more newspaper publications, *pursuant to which joint or common production facilities are established or operated and joint or unified action is taken or agreed to be taken with respect to any one or more of the following*: printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; establishment of circulation rates and revenue distribution . . . .

15 U.S.C. § 1802(2)) (emphases added).

The 2005 JOA falls squarely within this definition. It is a contract between two or more newspaper publications, the *Review-Journal* and the *Sun*. *See* 2005 JOA, 3-ER-478. It provides for the operation of joint or common production facilities. *See, e.g.*, *id.*, 3-ER-479-82, §§ 4.3, 5.1 *et seq.*, 3-ER-490-96. And it provides for new joint or unified actions to be taken with respect to one or more of the foundational aspects of a newspaper business listed in the statute, *e.g.*, printing, publication, distribution, and so on. In fact, even though the statute only requires that

34

the agreement address "one or more" of these aspects to qualify as a JOA, the 2005 JOA covers many of them, to wit:

**Printing and time, method, and field of publication**. Under the 1989 JOA, the Review-Journal and the Sun were separately sold as morning and afternoon papers, respectively. 4-ER-657. In the 2005 JOA, Stephens and the Sun agreed to stop printing the Sun as a separate standalone afternoon paper, to convert it into a section inside the Review-Journal, and to limit it to six to ten pages. 2005 JOA, 3-ER-480-81, §§ 5.1-5.1.8 & 3-ER-490-92; *see also* 1-ER-4. They also prohibited other competition by agreeing not to publish other newspapers in Clark, Nye, and Lincoln counties more than two days per week. 3-ER-487, § 10.12. And the field of publication was limited to morning newspapers. *See* 3-ER-480, § 5.1.

**Distribution.** Under the 1989 JOA, the Review-Journal and the Sun were distributed separately to separate subscribers. 4-ER-657. In the 2005 JOA, Stephens and the Sun agreed to stop distributing the newspapers separately. The *Sun* would no longer be delivered as an afternoon newspaper, would no longer have its own circulation base or subscribers, and would no longer be sold separately from the *Review-Journal*. Instead, the *Sun* would be distributed as an insert inside the *Review-Journal* morning newspaper. 2005 JOA, 3-ER-480-81, §§ 5.1-5.1.8 & 3-ER-490-492; *see also* 1-ER-4.

***Advertising Solicitation and Circulation Solicitation***. Under the 1989 JOA, each newspaper had its own share of the promotional budget to attract advertisers and increase circulation. 1989 JOA, 4-ER-657-60, §§ 5.1, 5.1.4. The 2005 JOA, however, required the Review-Journal to promote both newspapers pursuant to certain guidelines. 2005 JOA, 3-ER-481, § 5.1.4; *see also* 1-ER-4-5.

***Revenue Distribution***. The 2005 JOA created a whole new financial structure and new terms for distributing revenue. Instead of the percentage split set forth in the 1989 JOA, 4-ER-688, the 2005 JOA provides that the Sun shall receive an annual payment based on profits, if any, which is to be determined by a formula tied to a contractual EBITDA calculation that includes earnings from the *Review-Journal* newspaper. 2005 JOA, 3-ER-498-501. The 2005 JOA also added several additional Review-Journal affiliate news publications to the profit-sharing formula. *See id*.

## B. It Is Unlawful To Perform Or Enforce The 2005 JOA Because It Is A Post-Enactment Joint Operating Arrangement Not Approved In Writing By The Attorney General.

The NPA divides JOAs into pre-enactment JOAs and post-enactment JOAs, and sets out different rules for each.

Section 1803(a) of the NPA, titled "Joint operating arrangements entered into prior to July 24, 1970," creates antitrust immunity for JOAs entered before the statute was enacted, provided they meet certain criteria. 15 U.S.C. § 1803(a). It also allows pre-1970 JOAs to be amended and maintain their immunity by merely filing

36

the amendment with the DOJ (so long as the amendment does not add additional newspapers). *Id.* Section 1803(a) says nothing about post-1970 JOAs and is thus cabined to pre-1970 JOAs. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) (discussing "obvious" principle that "a matter not covered" in a statute "is to be treated as not covered"). The Review-Journal and the Sun entered their first JOA in 1989 and their second JOA in 2005, so this section—which only applies to pre-1970 JOAs—cannot apply to their arrangement.

Section 1803(b), titled "Written consent for future joint operating arrangements," addresses JOAs created after the statute's enactment in 1970. This section makes it unlawful to perform or enforce future JOAs, *i.e.*, those enacted after 1970, unless the Attorney General provides written approval. It states:

> It *shall be unlawful* for any person to enter into, perform, or enforce a *joint operating arrangement*, not already in effect, *except with the prior written consent of the Attorney General of the United States*. …

15 U.S.C. § 1803(b) (emphasis added).

Because the 2005 JOA is a joint operating arrangement that was not already in effect when the NPA was enacted in July 1970, Section 1803(b)—and not Section 1803(a)—is the governing provision. It is undisputed that the Attorney General did not approve the 2005 JOA in writing. *See, e.g.*, 2-ER-152. Accordingly, the 2005 JOA is unlawful and unenforceable under the statute's plain terms.

37

## III. THE DISTRICT COURT MISREAD THE STATUTE TO HOLD THAT WRITTEN APPROVAL WAS NOT REQUIRED.

### A. The District Court Misapprehended The Statute's Text And Structure.

The district court read the NPA as identifying three levels of review for different kinds of JOAs: (a) "pre-1970 JOAs," which are lawful with no review required; (b) "new JOAs" entered post-1970, which require the Attorney General's written approval; and (c) all "amended JOAs," which need only be filed with the Department of Justice but not approved by the Attorney General. 1-ER-16. The district court then held that the 2005 JOA did not require approval because, according to the district court, it is an "amended JOA." 1-ER-17-18.

The district court's conclusion is built on a foundation of errors. First, although Section 1803(b) states that it is unlawful to perform or enforce a joint operating arrangement unless approved by the Attorney General, the district court never once looked to the statutory definition set forth in Section 1802(2) to determine whether the 2005 JOA fit it. Rather than "begin with the language of the statute," *Culbertson v. Berryhill*, 586 U.S. 53, 58 (2019), the district court ignored the statute's definition entirely.

As discussed *supra*, the 2005 JOA is plainly a joint operating arrangement under the statute. The NPA's definition of joint newspaper operating arrangement does not include the words "new" or "amended, "much less distinguish between "amended" JOAs for newspapers that already merged operations and "new" JOAs

between newspapers merging operations for the first time. To the contrary, the statutory definition encompasses both. It includes agreements pursuant to which joint production facilities are *establishe*d as well as agreements pursuant to which joint production facilities are *operated*. 15 U.S.C. § 1802(2) (defining joint newspaper operating arrangement as "any … agreement … pursuant to which joint or common production facilities are *established* or *operated* …") (emphasis added).

The district court was not at liberty to ignore the statutory definition. "When a statute includes an explicit definition," the court "must follow that definition." *Digital Realty Tr. v. Somers*, 583 U.S. 149, 160 (2018) (quoting *Burgess v. United States*, 553 U.S. 124, 130 (2008)); *see also Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024) ("a court must respect [] definitions given by Congress as 'virtually conclusive'" (citation omitted)).

Second, the district court failed to grasp that Section 1803(a) applies only to JOAs that existed before the NPA was enacted on July 24, 1970. When Section 1803(a) states that JOA amendments must be filed, that language refers *only* to amendments to *pre-1970* JOAs. This is basic grammar. Section 1803(a) states, in full:

> **It shall not be unlawful under any antitrust law for any person to perform, enforce, renew, or amend any joint newspaper operating arrangement entered into prior to July 24, 1970**, if at the time at which such arrangement was first entered into, regardless of ownership or affiliations, not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain

or become a financially sound publication: ***Provided,* That the terms of a renewal or amendment to a joint operating arrangement must be filed with the Department of Justice** and that the amendment does not add a newspaper publication or newspaper publications to such arrangement.

(bold emphasis added).

The "Provided" clause in Section 1803(a) is a subordinate clause in a sentence about pre-1970 JOAs. Its purpose is to explain the circumstances under which an amendment to a *pre-1970* JOA can be filed. It cannot be read as a freestanding provision creating a broad new rule that applies to *both* pre- and post-1970 JOAs. *See, e.g., Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 131 (2002) (rejecting an interpretation of a statute that "runs counter to basic rules of grammar"); *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990) (rejecting narrow focus on "a single sentence or member of a sentence," rather than "look[ing] to the provisions of the whole law" (citations omitted)).

Section 1803(a)'s heading, "joint operating arrangements entered into prior to July 24, 1970," confirms that the logical reading of Section 1803(a) is that it applies to JOAs entered prior to July 24, 1970. *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("[S]ection headings are 'tools available for the resolution of a doubt about the meaning of a statute.'" (citation omitted)); Scalia

& Garner, *supra*, at 221 ("headings are permissible indicators of meaning").[5]

Third, having completely missed that Section 1803 divides JOAs into two categories—JOAs in effect as of the statute's July 24, 1970, enactment date and future JOAs—the district court misread the phrase "not already in effect" in Section 1803(b). Consistent with the statute's structure and focus on pre-1970 versus post-1970 JOAs, the "not already in effect" language means JOAs *not in effect as of July 24, 1970. See* 15 U.S.C. § 1803(b). The district court improperly looked at the phrase "not already in effect" in a vacuum without considering the statute's structure and the context in which the phrase was used. *Piccadilly Cafeterias*, 554 U.S. at 47; *Dole*, 494 U.S. at 35. This error caused the district court to incorrectly assume that when the statute refers to JOAs "not already in effect," it means "new JOAs" where the parties merged two newspapers' operations for the first time. 1-ER-17.

Fourth, the district court erred in concluding that the 2005 JOA did not need Attorney General approval because it was "tethered to the Attorney General's approval" of the 1989 JOA." 1-ER-18. As discussed *supra*, Section 1803(b) does not distinguish between a "new JOA" and an "amended JOA." Nowhere does Section 1803(b) say that amendments to approved post-1970 JOAs do not need approval.

---

[5] Although courts have cautioned that headings created by the Office of Legal Revision Counsel, like the headings in Section 1803(a) and (b), cannot be used to change the plain meaning of the statute's text, in this case, the heading is consistent with and accurately reflects the plain meaning of the text.

The fact that the Attorney General approved the 1989 JOA is therefore irrelevant to the analysis. Indeed, if Congress had wanted to allow parties to amend post-1970 JOAs without Attorney General approval, it knew how to do so: it could have used the same language it used in Section 1803(a) to require mere filing of amendments to pre-1970 JOAs.

Congress drew a clear line between pre-1970 and post-1970 JOAs for a reason. The statute's text and structure clearly express what Congress was trying to accomplish, *i.e.*, protecting pre-enactment JOAs from antitrust challenges while banning future JOAs unless they met certain criteria and the Attorney General approved them. In the decades before the NPA was enacted, a number of newspapers in major cities had entered joint operating arrangements and depended on them for survival. 4-ER-568. In 1969, however, the Supreme Court held that one such JOA, which had been in place in Tucson for more than twenty-nine years, violated the Sherman Act. *See Citizen Publ'g Co. v. United States*, 394 U.S. 131, 134-35 (1969). The NPA was a legislative response to that ruling.

Congress wanted to protect the Tucson publications and twenty-one other joint newspaper operating arrangements that were in existence at the time. *See Levi*, 539 F.2d at 756. But competing suburban papers and newspaper-industry unions, which are disadvantaged when urban newspapers consolidate operations, opposed JOAs in general and opposed the NPA in particular. *See id*. at 763 (Tamm, J.

dissenting) (explaining the "genuine fear expressed by suburban papers, newspaper unions, and some segments of the public" concerning the improper use of JOAs).

The NPA, as enacted, was a carefully negotiated compromise designed to balance these competing interests. Congress protected newspapers already in joint operating arrangements by granting those arrangements broad antitrust immunity even if amended. *See* 15 U.S.C. § 1803(a); *Levi*, 539 F.2d at 762-63. It protected the interests of newspapers that might someday have to turn to JOAs for survival by allowing future JOAs if one of the newspapers was failing. 15 U.S.C. § 1803(b); *Levi*, 539 F.2d at 762-63. And Congress protected competing newspapers and newspaper industry workers by requiring DOJ approval for any future JOAs, ensuring an investigation wherein stakeholders could be heard and the DOJ could be certain the new arrangement was essential and justified. *Id.*; *see also Comm. for an Indep. P-I v. Hearst Corp.*, 704 F.2d 467, 481-82 & n.11 (9th Cir. 1983) (explaining the intent behind the approval requirement as an effort to engage stakeholders who opposed JOAs). By scrambling the carefully-drafted provisions relating to pre-enactment and post-enactment JOAs, the district court upended both the statute's text and Congress' underlying purpose.

Moreover, the district court's interpretation, if accepted, would mean that once the parties have the Attorney General's stamp of approval, they are free to toss aside their approved arrangement and replace it with a whole different one. That

43

would render the approval process meaningless and open the door to all manner of anticompetitive arrangements. The DOJ has never endorsed this view, and it is not what Congress intended. *See, e.g., Levi*, 539 F.2d at 767 (Tamm, J. dissenting) ("The prior approval concept, presented first in the Dirksen amendment, introduced an element of governmental supervision to limit the use of future arrangements.").

The NPA's plain language is clear, and the statute's history and purpose only confirm that Congress meant what it said. Courts must "respect the compromise embodied in the words chosen by Congress." *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980); *see also Rodriguez v. Compass Shipping Co. Ltd.*, 451 U.S. 596, 617 (1981) ("As with other problems of interpreting the intent of Congress in fashioning various details of this legislative compromise, the wisest course is to adhere closely to what Congress has written."); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to 'presume that the legislature says in a statute what it means and means in a statute what it says there.'" (citation omitted) (collecting cases)).[6]

---

[6] The DOJ regulations, codified a few years after the NPA's enactment, confirm that *only* amendments to pre-1970 JOAs can be filed. Those regulations established procedures for seeking the Attorney General's "approval of joint newspaper operating arrangements entered into after July 24, 1970, and for the filing with [DOJ] of the terms of a renewal or amendment of existing joint newspaper operating arrangements." 28 C.F.R. § 48.1. The "existing" JOAs for which amendments can be filed are explicitly defined as pre-enactment JOAs. *See* 28 C.F.R. § 48.2(d) ("The term existing arrangement means any joint newspaper operating arrangement entered into before July 24, 1970.").

### B.    No Case Law Supports The District Court's Interpretation.

No court has ever adopted the district court's three-part reading of the NPA. The two lower-court cases the district court cited, 1-ER-17-18, are not on point. If anything, they highlight that the district court's interpretation is wrong.

One case the district court cited, *Hawaii ex rel. Anzai v. Gannett Pacific Corp.* 99 F. Supp. 2d 1241 (D. Haw. 1999), involved a JOA entered in 1962. *Id*. at 1245. In that case, while discussing whether it had the power to enjoin the defendants from terminating their JOA, the court noted in passing that the defendants could have amended their JOA "simply by filing the amendment." *Id*. at 1251. That statement was correct because the JOA at issue was a pre-1970 JOA governed by Section 1803(a). *See id*. at 1245. But nothing in *Gannett Pacific* suggests an amended *post-1970* JOA can simply be filed and does not require approval.

The other case the district court cited, *Mahaffey v. Detroit Newspaper Agency*, 969 F. Supp. 446 (E.D. Mich. 1997), involved a JOA entered in 1986 that was approved by the Attorney General. *Id*. at 447. Without obtaining the Attorney General's approval, the parties amended that JOA to add provisions allowing them to temporarily publish a joint newspaper that would be distributed to both papers' subscribers in the event of a labor strike. *Id*. There was a strike, they published a joint newspaper, and they were subsequently sued for alleged antitrust violations. *Id*. In addition to challenging the joint publication, the plaintiffs also challenged the

prior joint setting of prices under the original JOA, arguing the defendants forfeited the original JOA's immunity when they added an unapproved amendment. *Id*. at 448.

In analyzing the immunity issues, the *Mahaffey* court acknowledged (in line with the Review-Journal's arguments here) that the plaintiffs "may be correct in their suggestion that [the] [d]efendants cannot amend their post-1970 JOA freely." *Id*. However, with respect to the joint setting of prices, the court reasoned that amending a JOA without approval would not strip the original JOA of immunity. *Id*. The court indicated that the defendants were probably *not* immune from claims based on actions taken pursuant to the new provisions in the amendment, but it ultimately granted summary judgment for the defendants on a different, unrelated basis. *Id*. at 449-50.

In other words, the *Mahaffey* court assumed that post-1970 JOAs cannot be freely amended and that unapproved amendments are not immune from legal challenge. 969 F. Supp. at 448. This is consistent with the statute's plain language. Here, the district court held the *opposite—i.e.*, that post-1970 JOAs can in fact be amended freely without Attorney General approval. 1-ER-16-17. Neither *Mahaffey* nor *Gannett Pacific* supports this holding.

## IV.  THE COURT SHOULD REJECT THE SUN'S ARGUMENT THAT THERE IS A STATUTORY GAP AS TO AMENDMENTS OF POST-ENACTMENT AGREEMENTS.

In the proceedings below, the Sun argued for a reading of the NPA that was different from the one the district court ultimately adopted—but was equally wrong. The Sun did not argue that amendments to post-enactment JOAs were covered by Section 1803(a). Instead, the Sun argued that the NPA is *silent* as to whether amended post-enactment JOAs require approval. According to the Sun, the NPA's implementing regulations—specifically 28 C.F.R. § 48.16—fill that gap. The Court should reject this meritless argument for three reasons.

First, it contradicts the statutory text because Congress did not omit amendments to post-1970 JOAs from its coverage. The statute is not silent. It plainly states that *all* post-1970 joint newspaper operating arrangements require written approval. 15 U.S.C. § 1803(b). As discussed *supra*, Congress defined "joint newspaper operating arrangement" broadly, as "*any*" arrangement for the establishment or operation of joint production facilities touching on the business aspects enumerated in the statute. *See id.*, § 1802(2) (emphasis added). In adopting that broad definition, Congress focused on the *substance* of the arrangement, not whether it was "new" or the product of amending a prior arrangement. That is not a "gap" in the statute. It is a legislative choice, clearly expressed in the statute's text, that courts must respect. *BedRoc Ltd.*, 541 U.S. at 183 ("The preeminent canon of

47

statutory interpretation requires us to 'presume that the legislature says in a statute what it means and means in a statute what it says there.'" (citation omitted)).

Second, the Sun's position defies logic. It would make no sense for Congress to deliberately omit from the NPA any reference to a foreseeable form of JOA—one created by amending a post-1970 agreement—when Congress structured the statute recognizing that there would be post-1970 JOAs. And it would be especially illogical for Congress to ignore that obvious category of JOAs when the NPA was driven by an attempt to forge a workable and durable compromise for both pre- and post-enactment JOAs.

Third, the regulation that the Sun claims fills the gap, 28 C.F.R. § 48.16, does not even address or apply to post-enactment JOAs. *Id*. That regulation describes a procedure for filing renewals or amendments to an "existing arrangement." 28 C.F.R. § 48.16. The Sun assumes the term "existing arrangement" includes post-enactment JOAs, but that is incorrect. The term "existing arrangement" is explicitly defined in 28 C.F.R. § 48.2 as a *pre*-enactment JOA: the term existing arrangement means "*any joint newspaper operating arrangement entered into before July 24, 1970*." 28 C.F.R. § 48.2(d) (emphasis added). So, this regulation could not be read to fill a gap in the NPA even if one existed in the first place.

48

**V.    THE COURT SHOULD REVERSE THE DISTRICT COURT'S HOLDING THAT THE 2005 JOA IS AN "AMENDED JOA" AND NOT A "NEW JOA."**

As set forth *supra*, the 2005 JOA required the Attorney General's written approval because it was a post-enactment joint operating arrangement under the NPA. There is no reason to analyze whether the 2005 JOA is a "new JOA" or an "amended JOA" because whether it is unlawful to perform or enforce a JOA under Section 1803(b) does not turn on which of these categories it falls into. Accordingly, this Court need not address that aspect of the district court's ruling. However, in the event the Court finds that the distinction matters, it should reverse the district court's holding that, as a matter of law, the 2005 JOA is an "amended JOA" and not a "new JOA." In fact, it is a "new JOA" and not an "amended JOA," and this Court should so hold. At the very least, it is a question of fact for the jury to decide.

Because the NPA neither uses nor defines the terms "new JOA" or "amended JOA," it provides no guidance as to how one would determine which category the 2005 JOA falls within. However, the generally understood definition of amendment is a "formal and usually minor revision or addition" to a contract. *Amendment*, Black's Law Dictionary (11th ed. 2019). The record is replete with evidence that the 2005 JOA is not a mere minor revision of the 1989 JOA.

The 2005 JOA materially changed the parties' rights and obligations. It created a new and different relationship between the Review-Journal and the Sun. It

49

eliminated the print *Sun* as a standalone afternoon newspaper and converted it into a six to ten page insert inside the *Review-Journal* morning newspaper. *Compare* 4-ER-657-62, art. 5, *with* 3-ER-480-81, § 5.1 & 3-ER-490-92. It restricted both Stephens' and the Sun's ability to publish other newspapers. 3-ER-487, § 10.12. The 2005 JOA also created a whole new financial structure reflecting the new arrangement, and a whole new way of calculating the split of annual profits. *Compare* 4-ER-654-56, 662-63, arts. 2-4, 6, *and* 4-ER-677-88, *with* 3-ER-479-82, §§ 2, 6, 7, *and* 3-ER-579-82. It even added new affiliate news publications to the arrangement. 2005 JOA, 3-ER-498-501.

Indeed, the 2005 JOA cannot be just a "minor revision or addition" to the 1989 JOA because, in the 2005 JOA, the parties expressly *terminated* the 1989 JOA and released all claims and obligations arising from it. 2005 JOA, 3-ER-479, § 1.2; 3-ER-487-88, § 10.13. In other words, none of the terms or obligations in the 1989 JOA survived; the entire agreement was replaced by the 2005 JOA.

The DOJ's own conduct was also inconsistent with the notion that it viewed the 2005 JOA as an amendment that only needed to be filed. If that were the case, the DOJ presumably would have accepted the filing and that would have been the end of the process. Instead, the DOJ investigated the 2005 JOA for two years, then issued a letter stating that the 2005 JOA was not protected by the NPA's antitrust immunity. 3-ER-427; *see also* 3-ER-449 (letter from Ben Matelson, a trial attorney

with the DOJ's Antitrust Division, questioning Stephens and the Sun about whether they believe that this *new agreement*, and any conduct undertaken by the parties pursuant thereto, is entitled to antitrust immunity" under the NPA (emphasis added)). And even the Sun's own consultant, Gary Gomm, understood at the time of negotiations that the 2005 JOA would require DOJ approval. *See, e.g.*, 4-ER-544 (explaining that the 2005 JOA "[m]ust be approved by the DOJ"); 3-ER-508 (outlining the Sun's "[c]ontingency strategy" in case "the DOJ does not approve the necessary amendments to the JOA").

In holding that the 2005 JOA is an "amended JOA" and not a "new JOA" as a matter of law, the district court looked to the document's title. But when courts interpret an agreement, they look to the substance, not labels. *See, e.g.*, *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169-70 (9th Cir. 2013) (looking to "the substance" of the agreement and rejecting argument that "the labels parties use" is conclusive); *Whitehead v. Nev. Comm'n on Jud. Discipline*, 873 P.2d 946, 961 (Nev. 1994) ("This court will recognize a document for what it is, rather than the name assigned to it.").

The district court also relied heavily on the fact that the Sun and Stephens filed the 2005 JOA as an amendment instead of submitting it for approval as a new JOA—but that does not prove anything. It just shows that the Sun and Stephens chose not to submit the 2005 JOA for approval; it says nothing about whether that was the correct choice under the NPA, and does not provide any legal protection if

51

that was the wrong choice. Likewise, the district court found it significant that the DOJ investigated the 2005 JOA and then closed its investigation without providing written approval, reasoning that this must mean the 2005 JOA was an amended JOA for which approval was not required. 1-ER-18-19 ("The fact that the 2005 JOA was not signed by the Attorney General is not a defect, but rather consistent with its being an amended JOA."). But the DOJ certainly did not say that, and that logical leap is not supported by any evidence. The fact that the Attorney General declined to approve the 2005 JOA just means the 2005 JOA is not approved. The Non-Approval Letter provides no basis to infer that approval was not required in the first instance.

Finally, even if the 2005 JOA were merely an "amendment" covered by Section 1803(a), as the district court wrongly concluded, there is another, independent reason it required Attorney General approval. As mentioned *supra*, the 2005 JOA added several Review-Journal affiliate newspapers to the arrangement. *See* 2005 JOA, 3-ER-498-501. But amendments covered by Section 1803(a) can only be filed without first seeking approval if the amendment "does not add a newspaper publication or newspaper publications to such arrangement." 15 U.S.C. § 1803(a). Thus, even if the district court were correct that the 2005 JOA were merely an "amendment," and even if the district court were correct that Section 1803(a) applies to amendments to both pre- and post-1970 JOAs, it would still not satisfy Section 1803(a).

52

## VI.   THE DISTRICT COURT ERRED BY HOLDING THAT EVEN IF THE ATTORNEY GENERAL'S APPROVAL WAS REQUIRED, IT IS NOT UNLAWFUL TO ENFORCE THE 2005 JOA.

The district court likewise erred when it held that even if the 2005 JOA was a new agreement that required the Attorney General's written approval, it would still be enforceable without that approval. According to the district court, proceeding under an unapproved JOA may "expose the parties to antitrust liability," "but does not invalidate the JOA or render i[t] unlawful or unenforceable." 1-ER-20. In short, as the district court saw it, failure to obtain written approval simply denies an antitrust immunity that written approval would otherwise provide.

The short answer: That is not what Section 1803(b) says. Section 1803(b) states that: "It *shall be unlawful* for any person to enter into, perform, or enforce a joint operating arrangement, not already in effect, except with the prior written consent of the Attorney General of the United States." 15 U.S.C. § 1803(b) (emphasis added). This language means—as the text makes clear—that performing or enforcing any unapproved post-1970 JOA is "unlawful." It cannot plausibly be read to mean that post-1970 JOAs not approved by the Attorney General are "lawful" but may be subject to antitrust liability to the extent the Attorney General or some private party elects to sue.

Because Section 1803(b) plainly states that it is "unlawful" to "enter into, perform, or enforce" an unapproved JOA, the district court's analysis should have

53

stopped there. *Food Mktg. Inst.* v. *Argus Leader Media*, 588 U.S. 427, 436 (2019) (where a statute's meaning is clear on its face, the court's statutory interpretation "must stop"); *BedRoc Ltd.*, 541 U.S. at 183 (same). This Court has consistently reversed district courts that refuse to follow a statute's plain language. *See, e.g., Guido v. Mount Lemmon Fire Dist.*, 859 F.3d 1168, 1174-75 (9th Cir. 2017); *Mark H. v. Lemahieu*, 513 F.3d 922, 934, 940 (9th Cir. 2008); *United States v. One 1997 Toyota Land Cruiser*, 248 F.3d 899, 902-03, 906 (9th Cir. 2001). It should do the same here.

If Congress had intended to create an immunity from antitrust liability, it knew how to do so. *See, e.g.*, 15 U.S.C. § 17 ("Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of [certain] labor, agricultural, or horticultural organizations . . ."). Instead, Congress chose not the language of immunity, but instead the broad language of prohibition that Congress uses with regularity throughout the U.S. Code—it declared the conduct "unlawful." *See, e.g.*, 15 U.S.C. § 13(a) (Clayton Act) (providing that: "*It shall be unlawful* for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality . . ."); 18 U.S.C. § 1962(a) (RICO) (providing that: "*It shall be unlawful* for any person" to engage in a "pattern of racketeering activity"); 15 U.S.C. § 78j(a)(1) (Securities Exchange Act § 10a) (providing that: "[*i*]*t shall be unlawful* for any person, directly or indirectly, . . . [t]o effect a short

sale . . ."). Again, Congress's deliberate choice of words must be given effect.

Instead of following the NPA's plain language, the district court chose to follow the sharply divided decision in *Newspaper Guild v. Levi*, 539 F.2d 755 (D.C. Cir. 1976). In *Levi*, the D.C. Circuit framed the issue just as it is framed here: does the NPA "make it unlawful to enter a joint newspaper operating agreement without the prior approval of the Attorney General, or does it rather require prior approval only for parties seeking an antitrust exemption for such an agreement[.]" *Id*. at 755. *Levi* acknowledged that the statute's plain language makes enforcing post-enactment JOAs unlawful if not approved—but then it rejected the plain-meaning reading of the statute as "rigidly literal." *Id*. at 757. Disregarding the statute's text, the *Levi* court turned instead to legislative history, specifically remarks by the bill's sponsor during committee hearings, and concluded that Congress did not mean what it wrote in the statute. *Id*. at 758.

*Levi*'s approach to statutory construction has been relegated to the dustbin of history. Long gone are the days when courts had free rein to rewrite the statutes Congress enacted. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 673-74 (2020) ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration."); *Food Mktg. Inst.*, 588 U.S. at 437 (stating that

the practice of "resort[ing] to legislative history before consulting the statute's text and structure" is a "relic from a 'bygone era of statutory construction'"); *see also id.* ("we can all agree that 'excerpts from committee hearings' are 'among the least illuminating forms of legislative history'" (citation omitted)). *Cf. Levi*, 539 F.2d at 758 (noting that "[i]t is appropriate to start with the views of Senator Dirksen, the sponsor of the amendment").

Moreover, *Levi* also fails on its own terms because even the legislative history does not support the *Levi* court's reading. As Justice Tamm explained in his persuasive dissent, Congress made a deliberate choice to make it unlawful to enforce or perform all future JOAs unless the Attorney General consented. 539 F.2d at 762-63 (Tamm, J. dissenting). This choice was the product of a careful "compromise" and was designed to protect the interests of newspaper employees and smaller suburban newspapers that would be harmed when large urban papers consolidated operations. *Id.* at 763. In particular, Congress wanted to minimize the dangers inherent if other urban newspapers were to "improperly enter into joint operating arrangements resulting in what might be a stronger competitive force, the loss of jobs, and, maybe, eventually a loss of independent viewpoints." *Id.* Judge Tamm thus concluded that "[t]he legislative history, . . . convinces me that the broad language employed in section 1803(b) means exactly what it says: *all new joint operating arrangements which do not receive prior approval are illegal, regardless*

*of whether they would otherwise violate the antitrust laws.*" *Id.* at 762-63 (emphasis

added & footnote omitted).

In sum, this Court cannot and should not follow *Levi*. *Levi* is at odds with

decades of precedent requiring courts to interpret statutes according to their plain

language, and it compounds that mistake by misreading the legislative history it

invokes. The statute means what it says: it is "unlawful" to "perform, or enforce" the

2005 JOA.

## VII.   THE INJUNCTION SHOULD BE DISSOLVED.

Because the 2005 JOA is unlawful and unenforceable under the NPA, the

district court should have dissolved the injunction requiring the Review-Journal to

continue performing under it. Any other factors relating to injunctions are irrelevant,

as federal courts have no power to enforce agreements where Congress has made

enforcement of those agreements "unlawful": "The power of the federal courts to

enforce the terms of private agreements is at all times exercised subject to the

restrictions and limitations of the public policy of the United States as manifested in

federal statutes." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83-84 (1982) (quoting

*Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948)). "Where the enforcement of private

agreements would be violative of that policy, it is the obligation of courts to refrain

from such exertions of judicial power." *Id*. at 84.

## CONCLUSION

Defendants respectfully request that the Court reverse the district court's order

denying the *Review-Journal's* motion to dissolve the preliminary injunction.

Dated May 9, 2024                                        Respectfully submitted,


J. Randall Jones                               /s/ Ian Heath Gershengorn
Michael J. Gayan
Mona Kaveh                                     Ian Heath Gershengorn
KEMP JONES LLP                                 Illyana A. Green
3800 Howard Hughes Pkwy., 17th Fl.             JENNER & BLOCK LLP
Las Vegas, Nevada 89169                        1099 New York Ave. NW, Suite 900
(702) 385-6000                                 Washington, DC 20001
r.jones@kempjones.com                          (202) 639-6000
m.gayan@kempjones.com                          igershengorn@jenner.com
m.kaveh@kempjones.com                          igreen@jenner.com


Richard L. Stone                               David R. Singer
RStone@fastmail.com                            Amy M. Gallegos
850 Devon Avenue                               JENNER & BLOCK LLP
Los Angeles, California 90024                  515 South Flower Street, Suite 3300
(310) 993-2068                                 Los Angeles, California 90071
                                               (213) 239-5100
                                               Dsinger@jenner.com
Gabriel Gillett                                agallegos@jenner.com
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7220
ggillett@jenner.com

*Counsel for Defendants-Appellants*

58

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the undersigned attorney or self-represented party states the following:

      [**X**]    I am unaware of any related cases currently pending in this court.

      [ ]    I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

      [ ]    I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature:** /s/ Ian Heath Gershengorn      **Date:** May 9, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form08instructions.pdf](http://www.ca9.uscourts.gov/forms/form08instructions.pdf)

**9th Cir. Case Number(s)** <u>24-2287</u>

I am the attorney or self-represented party.

**This brief contains 13,873 words,** including _____ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

> [ ] it is a joint brief submitted by separately represented parties.
> [ ] a party or parties are filing a single brief in response to multiple briefs.
> [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** <u>/s/ Ian Heath Gershengorn</u>  **Date:** <u>May 9, 2024</u>
*(use "s/[typed name]" to sign electronically-filed documents)*

---