| | |
|---|---|
| 1 | E. LEIF REID, Nevada Bar No. 5750 |
| | KRISTEN L. MARTINI, Nevada Bar No. 11272 |
| 2 | NICOLE S. SCOTT, Nevada Bar No. 13757 |
| | LUCY C. CROW, Nevada Bar No. 15203 |
| 3 | WOMBLE BOND DICKINSON (US) LLP |
| | 3993 Howard Hughes Parkway, Suite 600 |
| 4 | Las Vegas, Nevada 89169 |
| | Tel:    702.949.8200 |
| 5 | Fax:    702.949.8398 |
| | One East Liberty Street, Suite 300 |
| 6 | Reno, Nevada 89501 |
| | Tel:    775.823.2900 |
| 7 | Fax:    775.823.2929 |
| | Email: leif.reid@wbd-us.com |
| 8 |         kristen.martini@wbd-us.com |
| |         nicole.scott @wbd-us.com |
| 9 |         lucy.crow@wbd-us.com |
| 10 | JAMES J. PISANELLI, Nevada Bar No. 4027 |
| | TODD L. BICE, Nevada Bar No. 4534 |
| 11 | JORDAN T. SMITH, Nevada Bar No. 12097 |
| | PISANELLI BICE PLLC |
| 12 | 400 South 7th Street, Suite 300 |
| | Las Vegas, Nevada 89101 |
| 13 | Tel: 702.214.2100 |
| | Email: JJP@pisanellibice.com |
| 14 |         TLB@pisanellibice.com |
| |         JTS@pisanellibice.com |

JOSEPH M. ALIOTO, *PRO HAC VICE*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

*Attorneys for Plaintiff/Counterdefendants*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation, | Case No. 2:19-cv-01667-ART-MDC |
| Plaintiff, | **(REDACTED)** |
| v. | **[PROPOSED] AMENDED JOINT PRETRIAL ORDER** |
| SHELDON ADELSON, an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC DBA ADFAM, a Delaware limited liability company and as alter ego of Las Vegas Review-Journal, | |

i

Inc., and News+Media Capital Group, LLC; and
DOES, I-X, inclusive,

                    Defendants.

LAS VEGAS REVIEW-JOURNAL, INC., a
Delaware corporation,

                    Counterclaimant,

v.

LAS VEGAS SUN, INC. a Nevada corporation;
BRIAN GREENSPUN, an individual and as the
alter ego of Las Vegas Sun, Inc.; GREENSPUN
MEDIA GROUP, LLC, a Nevada limited
liability company, as the alter ego of Las Vegas
Sun, Inc.,

                    Counterclaim Defendants.

- ii -

125912233.1

After pretrial proceedings in this case,

IT IS ORDERED:

## I.  NATURE OF ACTION AND CONTENTIONS OF THE PARTIES (LR 16-3(b)(1))

### A.  THE SUN'S STATEMENT OF NATURE OF THE ACTION AND CONTENTIONS

This action arises under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15(a), 26, whereby Plaintiff Las Vegas Sun, Inc. (the "Sun"), seeks damages and injunctive relief against Defendants (together, "Defendants" or the "RJ") for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Nevada's antitrust laws. Nev. Rev. Stat. §§ 598A.060(1)(e); 598A.210(1), (2). The RJ restrained trade in monopolizing, attempting to monopolize, and conspiring to monopolize the distinct relevant market for English-language, daily, local, print newspapers in Clark County and southern Nye County, harming competition. The Sun further seeks injunctive relief enjoining the RJ from: (1) the abusive, unlawful, and anticompetitive practices alleged, including the threat to terminate the Amended JOA before 2040; (2) acquiring the Sun; and (3) terminating the Amended JOA; and additional injunctive relief ordering the RJ to divest itself of: (1) the Las Vegas Review-Journal newspaper; or, alternatively, (2) the Las Vegas Review-Journal newspaper's non-editorial business operations, and requiring the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation as done in other similar newspaper joint operating agreements. *See* 15 U.S.C. § 26; Nev. Rev. Stat. § 598A.210(1). The Sun seeks to recover money damages for injuries to its business and property, automatically trebled as provided for under 15 U.S.C. Section 15, and Nev. Rev. Stat. Section 598A.210(2), as well as costs of suit, including reasonable attorney and expert fees. 15 U.S.C. §§ 15, 26; Nev. Rev. Stat. § 598A.210(2), (1).

The product at issue in this case is English-language, daily, local, print newspapers, *i.e.*, the relevant product market, as always advanced by both the Sun and the RJ throughout years of discovery, and opined by the Sun's expert economist, Dr. Michael Katz. While the Sun's complaint includes reference to the "sale" of the newspaper product, the focus of the Sun's complaint was on the newspaper product, and a sale is an activity that occurs within the market defined by its product and geographic scope. Moreover, this Court denied the RJ's motion for summary judgment challenging

1

"the sale of local daily newspapers" as a relevant market, concluding that a reasonably jury could find for the Sun under even that market definition. ECF No. 970 at 21-28.

During summary judgment, this Court further rejected the RJ's position—holding as a matter of law—that the "editorial competition for newspapers for readers' attention, even in the context of jointly distributed newspapers [like in JOAs], has economic effects on the newspapers," and is commercial activity under antitrust laws. ECF No. 970 at 23. This Court further rejected the RJ's position that the Sun and RJ do not compete in the relevant market because the newspapers are sold in a bundle; instead, finding as a matter of law, "[T]he Sun is a separate and independent newspaper product distributed in the newspaper bundle," "[h]ere, the market is two papers: the *Sun* and the *RJ*." *Id.* at 28, 37. The RJ's former and current publishers agreed that the Review-Journal competes against the Sun, and this Court found that the Sun has presented additional evidence, through Dr. Katz and others, that "a reasonable juror could conclude that the Sun and the RJ compete in the same market for readers' attention, even though they are sold in a bundle," demonstrating the Sun and Review-Journal's interchangeability of use and substitution. *Id.* at 23-24. The RJ has been able to raise, and has in fact raised, the price of the Newspaper Bundle through small but significant increases in price. And when it did, the Newspaper Bundle did not lose consumers to any other media. The point is this: the evidence shows that the Sun and Review-Journal newspapers have low elasticity against all other media, and they meet the practical indicia of reasonable interchangeability. They are, therefore, a distinct product in the defined relevant product market. (The RJ has not challenged the Sun's relevant geographic market, being Clark County and southern portions of Nye County.)

The RJ possesses monopoly power in the relevant market because only it has the power to control prices or exclude competition. The evidence shows that the RJ can, and has, profitably raised prices substantially above the competitive level for a significant period of time without attracting any new entry. The Sun is the RJ's only competitor, and the RJ has the ability to exercise direct control over the Sun newspaper's output. Under all reasonable measures, the evidence proves the RJ controls a dominant share of the relevant market, including as measured by readership, newshole, newsroom staff, division of the Joint Operation EBITDA, and capacity. There are high barriers to entry, which have prevented new market entrants for decades.

Before the Adelson family even closed on its purchase of the Review-Journal, the RJ started to explore ways to eliminate the Sun, including by terminating the Amended JOA or eliminating the Sun's Annual Profits Payments, which the RJ knew was the Sun's funding for its newsroom. The RJ implemented a multi-pronged attack on the Sun, including: (1) a litany of accounting abuses to overstate the costs attributable to the Joint Operation and exclude revenue attributed to the Joint Operation EBITDA; (2) reducing consumer knowledge of the Sun by eliminating nearly all mention of the Sun when promoting the Newspaper Bundle, unilaterally redesigning the Sun's noticeable mention on the Review-Journal frontpage and thereafter concealing it with stickers and spadea, and removing the Sun from the electronic replica edition of the Newspapers without notice or the Sun's knowledge; (3) failing in various ways to conduct the Joint Operation in a commercially reasonable manner; (4) obstructing the Sun's audit rights to conceal its accounting and operational abuses; and (5) and filing sham litigation against the Sun to interfere with the Sun's ability to compete and compromise the Sun's entire existence. The RJ's widespread anticompetitive conduct unreasonably restrained trade in the relevant market, and was without any valid business justification. The RJ did a lot of things that harmed the Sun, none of which can be fairly characterized as competition on the merits. The RJ knew that the natural and probable consequences of its actions would eliminate the Sun from the market.

When the Sun prevailed in arbitration, proving the RJ committed accounting abuses that deprived the Sun of all JOA payments for several years, the RJ, in response, sought to terminate the Amended JOA on made-up grounds never raised to the Sun before the RJ's notice of termination (despite the RJ claiming that the grievances spanned back to the RJ's purchase date). The RJ also changed the inputs to the Joint Operation EBITDA calculation to reduce the Sun's Annual Profits Payments in other ways. As this Court explained in denying the RJ's motion for summary judgment, the RJ's conduct is, itself, "unlawful because it reduces editorial competition in the relevant market and harms consumers." ECF No. 970 at 27. The result of the RJ's conduct is not only a dangerous probability but a certainty that, if allowed to continue, the RJ will succeed in its scheme to eliminate its only competitor, the Sun, from the market. The RJ has not acted as a business partner, but instead as a monopolist.

It is undisputed that the Sun does not "stand[ ] to gain from [the RJ's] conduct." ECF No. 970 at 26. As this Court recognized, a reasonable jury could find that the RJ's accounting abuses, failure to maximize profits, failure to promote the Sun, and prosecution of its counterclaims as "sham" litigation "all harm 'competition by weakening the Sun's ability and incentives to compete with the Review-Journal—thus lessening the competitive pressures on the Review-Journal, to the detriment of consumers,'" including by threatening to drive the Sun out of business, weakening the Sun, reducing consumer knowledge, and "decreas[ing] the Sun's value 'as a going concern and for saleability purposes.'" *Id.* at 24-26 (citations omitted). This Court found that the Sun's "claimed injury, especially as it pertains to its reduced ability to compete, is exactly the type of injury antitrust laws were intended to prevent." *Id.* at 28.

The Sun's damages to its business and brand, none of which are attributable to market decline, are over $100 million. Prior to the RJ's purchase, its predecessor's executive and former Review-Journal publisher (who was promptly removed for failing to cower to the Adelson family) had been implementing revenue initiatives from which the RJ's own valuation forecasted EBITDA to grow from ███████████ in 2015 to ███████████ in 2020—a stark contrast to the immediate plunge to negative EBITDA in 2017 under the Adelson family's leadership. The Sun's damages expert first calculated almost $16 million in damages to the Sun from the RJ's underperformance based on the RJ's own valuation model, and second by comparing the RJ's underperformance to an average EBITDA from multiple newspaper companies. Had the RJ wanted to be profitable, it could have been. The Sun's expert concluded it was not reasonable for the Joint Operation EBITDA to have been consistently negative when the benchmark companies experienced the same purported "downturn of daily circulation and advertising revenue in the print newspaper industry" without any negative EBITDA margins. Under this comparison, the Sun's damages from the RJ's underperformance are over $10 million. Besides these past underperformance damages, the Sun's expert also calculated future underperformance damages in a range of $1.9 million to $3.9 million. The Sun's damages arising from the RJ's accounting abuses total over $6 million with interest. The Sun has incurred millions of attorney and expert fees as a result of the RJ's sham litigation. In total, treble damages for the categories of damages described above (net of the $2.1 million arbitration

125912233.1

1  award paid by RJ) are $82.4 million to $106.3 million with a preliminary estimate of prejudgment

2  interest.

3      Regardless of the fact that this Court denied the Sun's motion for summary judgment on the

4  RJ's state law counterclaims based on certain issues of law advanced, this Court's Order does not

5  prevent the jury from deciding the Sun's damages stemming from the RJ's sham litigation. The RJ's

6  only source of sham litigation damages was its now-dismissed antitrust counterclaims (ECF No. 970

7  at 34-38); therefore, no issues of fact remained as to whether the RJ was entitled to its sham litigation

8  damages. *Id.* at 45. Unlike the RJ's antitrust claims and sham damages, the Sun's antitrust claims all

9  survived summary judgment. The Sun's sham litigation damages flow from the RJ's anticompetitive

10  conduct, including its efforts to terminate the Amended JOA as unenforceable under the NPA—efforts

11  this Court rejected as a matter of law (*id.* at 13-19). The Sun did not move for summary judgment on

12  the predicate factual issues as to whether, as the RJ's state law counterclaims allege, the Sun breached

13  Sections 5.2 and 5.3 of the Amended JOA or the implied covenant of good faith and fair dealing, or

14  interfered with contractual relations. Therefore, these predicate factual issues, together with the factual

15  issue of whether the RJ's dismissed antitrust counterclaims have dominated this action such that all

16  of the RJ's counterclaims are sham litigation, must be resolved by the jury.

17      The RJ's contract and interference counterclaims are mere sham litigation—a piece of its

18  scheme to eliminate the Sun from the market. Only after the Sun won a significant judgment in

19  arbitration, and after the RJ deprived the Sun of funding for its newsroom, the RJ served the Sun with

20  a termination notice claiming that the Sun breached the "quality" and "cooperation" provisions of the

21  Amended JOA. The RJ's own expert testified that there are no established standards for "quality" of

22  metropolitan newspapers, and admitted his opinion about the Sun's quality and alleged withholding of

23  local or "breaking" news content is subjective and riddled with errors. When rendering his opinions,

24  the RJ's expert failed to consider the impact of the RJ's anticompetitive conduct on the Sun's quality,

25  such as withholding the Sun's Annual Profit Payments that fund its newsroom. This Court held that

26  there is no "triable issue of fact on [the RJ's] claim that it suffered damages because the Sun's actions

27  caused it to lose subscribers" or that "the quality of the *RJ* was negatively affected by the Sun's

28  actions." ECF No. 970 at 45-46, 38.

The RJ's counterclaim that Brian Greenspun disrupted the Amended JOA ignores that the RJ's then-publisher proposed a buyout of the Sun during a time when the Sun was pleading with the RJ to correct its anticompetitive behavior. The RJ continued its efforts to harm the Sun, forcing the Sun to initiate litigation or be eliminated from the market. While the RJ alleges the Sun's litigation is retaliatory for a failed buyout, this Court already concluded that a reasonable jury could find in favor of the Sun on its antitrust claims.

**B.    DEFENDANTS'[1] STATEMENT OF NATURE OF THE ACTION AND CONTENTIONS**

### 1.    <u>Defendants' Statement of Nature of Case</u>

Las Vegas Review-Journal, Inc. ("Review-Journal") asserts counterclaims against Counterclaim Defendants Las Vegas Sun, Inc., Brian Greenspun (as an individual and alleged alter ego of the Sun), and Greenspun Media Group, LLC (as alleged alter ego of the Sun). The Review-Journal asserts claims for (1) breach of contract against all Counterclaim Defendants, (2) breach of the implied covenant of good faith and fair dealing against all Counterclaim Defendants, (3) tortious interference with contractual relations against Brian Greenspun, and (4) declaratory relief related to the Sun's breach of contract. The first three claims arise from Nevada common law. *See Cain v. Price*, 134 Nev. 193, 196, 415 P.3d 25, 29 (2018); *Richardson v. Jones*, 1 Nev. 405, 408 (1865) (breach of contract); *Torres v. Nev. Direct Ins. Co.*, 131 Nev. 531, 541, 353 P.3d 1203, 1210 (2015); *Perry v. Jordan*, 111 Nev. 943, 947 (1995) (breach of the implied covenant of good faith and fair dealing); *J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 2743 (2003) (tortious interference with contractual relations). The declaratory judgment claim is statutory. Nev. Rev. Stat. Ann. § 30.040 (West). The Review-Journal alleges that the Sun materially failed to perform its duties under Sections 5.2 and 5.3 of the 2005 JOA, thereby breaching the contract. The Review-Journal also alleges that the Sun deliberately contravened the purpose of the 2005 JOA, breaching the implied

---

[1] The Sun insists on referring to Defendants collectively as a single unit, "the RJ," despite Defendants' objection to this naming convention. The Sun insists that "Courts disfavor referring to Plaintiffs and Defendants as such, and prefer names." This Court has never expressed any such preference. Defendants believe the Sun's naming convention is prejudicial because the Sun has alleged that Defendants are alter egos of one another and operate as a single entity. By employing a naming convention that refers to these independent entities as a single entity, the Sun is favoring its own claims and prejudicing defendants.

covenant of good faith and fair dealing. Finally, the Review-Journal alleges that the Sun's CEO, Brian Greenspun, engaged in actions designed to disrupt the Review-Journal's contractual relationship with the Sun, resulting in liability for tortious interference with contractual relations. The Review-Journal seeks termination of the 2005 JOA due to the Sun's material breaches, recovery of money damages flowing from the Sun's alleged breach of contract and alleged breach of the implied covenant of good faith and fair dealing, as well as recovery of monetary damages from Brian Greenspun for his alleged tortious interference with the contract between the Review-Journal and the Sun.

Defendants object to the Sun's statement of the nature of the case as argumentative and misleading, including the assertion that mere alleged contractual breaches constitute predatory and anticompetitive conduct. The Sun's statement also includes an inaccurate description of its alleged relevant product market. The product market alleged in the Sun's complaint is for "the sale of local daily newspapers." *See* ECF No. 621 ¶¶ 20, 44, 48, 96, 122, 149, 158, 159, 162, 168, 179 (emphasis added). The Sun's antitrust expert adopted this same market definition, and the Court adopted this definition for the purpose of summary judgment. *See* ECF No. 970 at 21. As explained further below, the Sun should be barred from advancing a materially different market definition after the close of fact and expert discovery. Allowing the Sun to change positions at this stage would be unduly prejudicial to Defendants.

Defendants also object to the Sun's description of the nature of its claims to the extent it suggests there remains a triable issue as to whether Defendants engaged in anticompetitive conduct by bringing claims to terminate the 2005 JOA due to the Sun's breaches. Throughout this litigation, the Sun has maintained that these claims related to the print Sun's quality and the Sun's failure to cooperate were a "sham" as part of Defendants' alleged anticompetitive scheme. But the Court has ruled that these claims raise triable issues for the jury. *See* ECF No. 970 at 44; ECF No. 969 at 16. The Sun can no longer argue that Defendants' litigation of this triable claim is an anticompetitive or predatory act.

Defendants additionally object to the Sun's reliance on and citations to the Court's order on the parties' motions for summary judgment. The Sun misquotes and mischaracterizes the Court's

125912233.1

order, falsely asserting that the Court has resolved numerous factual disputes in this case which have not been and could not be resolved as a matter of law on summary judgment. The Court did not resolve any factual issues on summary judgment, nor did it have the discretion to do so. It is black-letter law that district courts cannot resolve disputed questions of material fact on summary judgment. Given the confusion caused by the Sun's assertions that key issues of have fact have been resolved, Defendants seek clarification from the Court on this issue.

For the sake of additional clarity, the Sun's equitable request for injunctive relief is a matter to be decided by the Court.

### 2.     Defendants' Statement of Contentions

Las Vegas Sun, Inc., has alleged that Las Vegas Review-Journal, Inc., is monopolizing or attempting to monopolize the market for the sale of local daily print newspapers in Clark County through various alleged breaches of the parties' joint operating arrangement (the "2005 JOA"). However, antitrust laws only protect competition in economic markets. By the terms of the 2005 JOA, the parties do not compete for sales or subscribers, as both the print *Review-Journal* and print *Sun* are sold together as a single media product. While the Sun is attempting an eleventh-hour shift of its market definition to "editorial and reportorial competition for readers," it remains the case that any supposed intra-product competition for readership within the single media product has no measurable economic impact. The Sun cannot show any such impact because it has not tracked or even attempted to measure changes in the readership of the print *Sun* insert or relative shifts of readership between the different components of the joint print product such as the printed *Sun* insert and other sections.

The Review-Journal and the Sun are simply business partners that disagree about their contractual obligations and how the joint print product should be run. The crux of the Sun's antitrust claims, and the lion's share of its claimed damages, are based on the theory that Defendants intentionally mismanaged the joint print product as part of an anticompetitive scheme to harm the Sun. The Sun claims Defendants made the JOA unprofitable on purpose so it would not have to pay the Sun a profit share. But the Sun ignores, first, that the Review-Journal works tirelessly to make the business successful, and second, that the print newspaper business is dying as consumers

125912233.1

switch to other sources (like the internet) for news. Like all print newspapers, the Review-Journal has suffered and is continuing to suffer heavy losses due to competition from online news sources. The JOA's revenue was cratering long before the current publishers of the *Review-Journal* acquired the newspaper. The Review-Journal's print revenue dropped from ███████ in 2005 to less than ███████ in 2015, with the Sun's profit share dropping more than ██ in the same period. Regardless, if Defendants' goal had been to harm the Sun by driving its profit payments to zero, Defendants would only have needed the joint print product to break even. Instead, since acquiring the Review-Journal in 2015, the current owners have invested *more than* ███████ to cover the Review-Journal's losses.

The Sun's theory not only defies common sense and the reality that consumers have been switching from print to digital (and other sources of) news in droves, it also fails to meet basic required elements of an antitrust claim. First, the market that the Sun pled Defendants are allegedly monopolizing—the market "for the sale of local daily newspapers"—is not a viable antitrust market. The Sun's market definition requires the Sun to prove that print newspapers face no competition from other forms of media, including online news, digital news apps, social media, or local TV news. But even Brian Greenspun, the Sun's CEO, editor, publisher, and owner, acknowledged under penalty of perjury in 2013 that "for many readers, online newspaper websites are considered adequate substitutions for printed newspapers…Newspaper websites will be the likely successor to the traditional printed newspaper." Greenspun's under-oath admission—acknowledging that print media competes with digital media—is consistent with the testimony of all disinterested media participants, and obvious to anyone paying attention to the media landscape over the past two decades. By claiming that online news sources do not compete with print, the Sun is asking jurors to ignore the sworn admissions of its CEO and the undeniable reality of the world we live in.

Second, the Sun's antitrust claims fail because there is no competition in the Sun's alleged relevant market. The Sun's alleged product market is "the sale of local daily newspapers." However, *the Sun does not sell a print newspaper*. The print *Sun* is a section inside the *Review-Journal* newspaper. The print *Review-Journal* and *Sun* are only sold together as a single product.

1  They cannot be purchased separately and thus do not compete for sales. Because the Sun does not

2  sell a print newspaper, it does not compete in the alleged market. The Sun also concedes there are

3  no other competing newspapers in the alleged market, meaning that the market the Sun pled is a

4  single-product market in which no competition takes place.

5      Faced with these fundamental defects in its antitrust theory, the Sun shifted to the theory

6  that the relevant antitrust market is not the "sale of newspapers," but rather "editorial and reportorial

7  competition for readers." The Sun proffered this new market definition after the close of fact and

8  expert discovery, and after its own antitrust expert had already adopted a version of the market

9  definition the Sun pled in its operative complaint (i.e., for the "sale of local daily newspapers"). As

10  a result, the Sun is barred from belatedly changing positions and advancing its new market

11  definition at trial because doing so would cause undue prejudice.

12      If the Sun is permitted to advance its new market definition theory, it will have to prove that

13  the *Sun* section competes economically for readers with the *Review-Journal*. This requires the Sun to

14  show that the print *Review-Journal* newspaper and *Sun* section are substitutes, meaning that readers

15  actually see them as reasonably interchangeable, and that this choice has economic impacts on the Sun

16  and Review-Journal. Yet the Sun's own expert, Dr. Katz, admitted he is not aware of any data that

17  would show substitution between the print *Review-Journal* and *Sun*, and he admitted that he did not

18  know if such substitution has occurred. Accordingly, even if the jury finds the Sun has proven a

19  relevant market for post-sale "editorial and reportorial competition for readers," the Sun will not be

20  able to prove that the Sun and the Review-Journal actually compete in that market, that any

21  competition in that market has any economic impact in terms of newsstand sales, subscriber numbers,

22  or otherwise, or that there was a reduction in competition within that market—all of which are

23  necessary elements of a monopolization claim.

24      The Sun's damage claims are also fatally flawed. The Sun claims it suffered millions of

25  dollars in damages due to past and future "underperformance" on the theory that the Review-

26  Journal's owners intentionally caused the *Review-Journal* newspaper to lose money so it would not

27  have to pay the Sun a profit share. But the Sun's evidence in support of these so-called

28  "underperformance damages" is based on a hypothetical forecast that the Sun's own expert

- 10 -

admitted does not take into account the nationwide downturn of daily circulation and advertising revenue in the print newspaper industry during the relevant time period. The Sun also speculates about the profits the joint print product supposedly should have earned by making comparisons to publicly traded media conglomerates, but these entities are vastly different from the Review-Journal, which is a privately held stand-alone newspaper and not a multi-publication news empire. The evidence at trial will show that conditions in the declining newspaper market are the cause of the Review-Journal's alleged "underperformance."

The Sun likewise cannot recover the $13.2 million it seeks in attorneys' fees and expert fees it allegedly incurred defending against the Review-Journal's breach of contract counterclaims, which the Sun contended were a "sham." The Court denied the Sun's summary judgment motion as to these counterclaims, ruling that there was sufficient evidence for the claims to go to a jury. Since these claims have been deemed triable, they cannot be a "sham."

Moreover, there is extensive evidence in the record, including expert testimony, that the Sun has been continuously breaching the 2005 JOA by sabotaging the Review-Journal and Sun's joint print product. Section 5.2 of the 2005 JOA requires the Sun "to preserve high standards of newspaper quality…consistent with United States metropolitan daily newspapers." Meanwhile, Section 5.3 of the Agreement requires the Sun "to cooperate with the [Review-Journal] in every reasonable way that will promote successful and lawful operation" of the joint print product. The Sun has continuously breached these provisions over the past several years by intentionally including stale content in the print *Sun* insert and withholding original local news content created by the Sun's newsroom (so the Sun can publish that valuable content on its website only). Defendants' expert Ken Paulson, former editor-in-chief of *USA Today*, has closely tracked the print *Sun*'s dramatic decline over more than a decade. While the Sun previously followed quality standards that led to a Pulitzer Prize in 2009, Mr. Paulson shows that the print *Sun* now publishes almost twice as much content from the New York Times syndication service as it does from its own newsroom. And this decline is not because the Sun does not have the resources to produce local news. Rather, the Sun newsroom continues to produce original local news content—but it withholds these stories from the joint print product and publishes approximately 80 percent of the content

produced by its newsroom only on the Sun's website. The Sun published a "Note to Readers" telling print readers not to subscribe to the joint *Review-Journal/Sun* newspaper but to subscribe to the Sun's website *instead*.

Finally, Brian Greenspun is liable for tortiously interfering with the contractual relationship between the Review-Journal and the Sun. Upon learning of the Adelson family's acquisition, Mr. Greenspun immediately began pursuing a strategy of seeking an outsized buyout to benefit himself. However, when Mr. Greenspun did not get the offer he wanted, he began taking retaliatory actions to disrupt the contractual relationship between the Sun and Review-Journal.

## II.    STATEMENT OF JURISDICTION (LR 16-3(B)(2)

This Court has subject matter jurisdiction over the Sun's federal antitrust claims asserted in this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26, and 28 U.S.C. Sections 1331 and 1337(a). This Court has supplemental jurisdiction over the Sun's and the Las Vegas Review-Journal, Inc.'s ("Review-Journal") state law claims under 28 U.S.C. Section 1367(a).

The Sun and Counterdefendant Greenspun Media Group, LLC's ("GMG"), principal places of business are in Henderson, Nevada, and they transact business and are subject to personal jurisdiction in this judicial district. Counterdefendant Brian Greenspun resides in Henderson, Nevada, and is subject to personal jurisdiction in this district. The alleged conduct giving rise to the Sun's antitrust claims took place in this judicial district, and the Sun sustained injury in this district.

Defendants reside in, maintain offices, and/or have agents, transact business, and own assets in this judicial district; therefore, venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. Sections 15(a), 22, 26, and 28 U.S.C. Section 1391.

## III.    UNCONTESTED FACTS ADMITTED BY THE PARTIES WHICH REQUIRE NO PROOF (LR 16-3(b)(3))

The following facts are admitted by the parties and require no proof:

1.    The Sun is a Nevada corporation doing business in the State of Nevada.

2.    The Sun is a wholly owned subsidiary of GMG.

125912233.1

3.      Las Vegas Review-Journal, Inc., is a Delaware corporation doing business in the State of Nevada.

4.      In 1989, the Sun was in probable danger of financial failure.

5.      Las Vegas Review-Journal, Inc., is a wholly owned subsidiary of News + Media Capital Group LLC.

6.      Orchid Flower LLC is the sole member of News + Media Capital Group LLC.

7.      The Orchid Trust, for the benefit of its beneficiaries, owns Orchid Flower LLC.

8.      Defendant Patrick Dumont, Dr. Miriam Adelson, and Sivan Dumont are the Trustees of The Orchid Trust.

9.      Patrick Dumont is married to Sivan Dumont, and thus a son-in-law to Sheldon Adelson and Dr. Miriam Adelson.

10.      The manager of News + Media Capital Group LLC is NMCG Manager LLC.

11.      Stephen O'Connor is the manager of NMCG Manager LLC.

12.      O'Connor does not receive compensation directly from the Las Vegas Review-Journal, Inc., or News + Media Capital Group LLC.

13.      O'Connor is the Chief Financial Officer of Interface Group - Massachusetts, LLC.

14.      Defendant Interface Operations LLC dba Adfam ("Adfam") is a Delaware limited liability company that does business in the State of Nevada.

15.      Adfam was founded by Sheldon Adelson and operates as the private family office of the Adelson family. Adfam provides professional services to support the Adelson family ~~and~~ members' personal and business interests, including Las Vegas Review-Journal, Inc. and News + Media Capital Group LLC.

16.      In 2019, the Sun, as claimant, and Las Vegas Review-Journal, Inc. and News + Media Capital Group LLC, as respondents, engaged in an Arbitration, AAA Case Number: 01-18-0000-7567 (the "2019 Arbitration").

17.      On August 30, 2019, after the 2019 Arbitration, in the related state court action pending in Clark County, Nevada, as Case No. A-18-772591-B, Las Vegas Review-Journal, Inc. and News + Media Capital Group LLC moved to amend their answer, and Las Vegas Review-Journal,

125912233.1

1  Inc. moved to assert counterclaims against the Sun to, among other things, terminate the 2005
2  Amended JOA.

3        18.    Brian Greenspun is the Chief Executive Officer of the Sun, and Publisher and Editor
4  of the Sun newspaper.

5        19.    Las Vegas Review-Journal, Inc., (also referred to as the "Review-Journal") operates
6  and publishes the *Las Vegas Review-Journal* daily print newspaper in Clark County, Nevada.

7        20.    Under the 2005 Amended JOA, the newspapers' websites operate outside of the joint
8  arrangement and are not costs chargeable to the JOA.

9        21.    Stephen O'Connor is not involved in day-to-day operational matters regarding the
10 Review-Journal; he is not involved in the hiring or firing of employees of the Review-Journal; and
11 he does not make significant decisions on behalf of either the Review-Journal or News+Media
12 without prior consultation with certain members of the Adelson family (including when responding
13 to funding requests).

14       22.    Mr. O'Connor's role includes ensuring that certain members of the Adelson family is
15 informed regarding Review-Journal matters.

16       23.    Employees of Adfam receive updates regarding the financial performance of the
17 Review-Journal.

18       24.    Certain employees of Adfam create and perform internal control checks on the Review-
19 Journal and oversee the preparation of "going concern" letters to the Review-Journal's outside auditing
20 firm, which are approved by Mr. Dumont and executed by Mr. O'Connor.

21       25.    After News+Media acquired the Review-Journal, GateHouse continued to operate
22 the Review-Journal under a management agreement that was later terminated.

23       26.    On November 28, 2017, the Review-Journal agreed to produce certain categories of
24 documents requested by the Sun.

25       27.    On January 25, 2017, a meeting with Craig Moon, Robert Cauthorn, Brian
26 Greenspun, and Frank Vega was held to preview financial results for the end of the fiscal year.

27

28

125912233.1

28.     In early May 2019, Keith Moyer called Robert Cauthorn to inform him that the Review-Journal had restored or would shortly restore the Sun to the electronic replica edition to reverse a decision by Craig Moon.

29.     The Las Vegas Review-Journal is a daily newspaper published in Clark County, Nevada. The newspaper's publication dates back to 1909, when it was first published as the Clark County Review. In 1929, the Clark County Review purchased the Clark County Journal, and the two publications began being published as a single newspaper, subsequently named the Las Vegas Review-Journal (the "Review-Journal").

30.     The Las Vegas Sun newspaper began publication as a daily newspaper in Clark County, Nevada, in 1950.

31.     On June 12, 1989, Donrey of Nevada, Inc., which at the time published the Review-Journal newspaper, and the Las Vegas Sun, Inc. (the "Sun"), which publishes the Las Vegas Sun newspaper, entered a joint operating arrangement (the "1989 JOA").

32.     Under the 1989 JOA, the *Review-Journal* was a morning newspaper, and the *Sun* was an afternoon newspaper, save for joint publications on weekends, holidays, and special editions.

33.     Under the 1989 JOA, the *Review-Journal* and the *Sun* remained separately sold and distributed newspapers with separate subscriber bases, except that both newspapers were jointly published on weekends, holidays, and for special editions.

34.     In June 2005, the Sun and the publisher of the *Review-Journal* at that time, DR Partners, a Nevada Partnership, the successor-in-interest to Donrey of Nevada Inc., with Stephens Group, Inc., as its General Partner, executed an "Amended and Restated Agreement" (the "2005 Amended JOA").

## IV.     FACTS UNADMITTED THAT WILL NOT BE CONTESTED AT TRIAL (LR 16-3(b)(3)-(4))

None.

## V.     CONTESTED ISSUES OF FACT TO BE TRIED AND DETERMINED AT TRIAL (LR 16-3(b)(4), (6)-(7))

125912233.1

The following are the issues of fact identified separately by the parties to be tried and determined at trial:[2]

### A.    SUN'S CONTESTED ISSUES OF FACT

The Sun states the following are the issues of fact to be tried and determined at trial.

### 1.    Sun's First Claim for Relief: Monopolization (15 U.S.C. § 2 and Nev. Rev. Stat. § 598A.060(1)(e))

1.    Relevant Market: Whether English-language, daily, local, print newspapers (the product market) in Clark County and southern portions of Nye County, Nevada (these Counties are together referred to herein as, "Clark County," and together, the geographic market, which together with the product market comprise the "Relevant Market"), is a distinct antitrust market. Sub-issues of fact include:

    a.    Whether English-language, daily, local, print newspapers are a distinct antitrust product market. Sub-issues of fact include:

        i.    Whether a hypothetical monopolist in the market for English-language, daily, local, print newspapers in Clark County could profitably raise its prices above the competitive level through a small but substantial, non-transitory increase in price. Sub-issues of fact include:

        •    Whether the RJ, as the only publisher of English-language, daily, local, print newspapers, in Clark County, has been able to profitably maintain a quality-adjusted price above the competitive level for a significant period of time;

---

[2] The Sun reserves its right to modify and/or supplement its list of disputed fact issues as necessary or appropriate, including in response to any ruling from this Court or from the Ninth Circuit Court of Appeals. Should the Court determine that any issue identified below as an issue of fact is more appropriately considered an issue of law, the Sun incorporates such issue by reference into the Sun's Statement of Issues of Law. Should the Court determine that any issue identified by Sun as an issue of law is more properly considered an issue of fact, the Sun incorporates such issue herein by reference. Issues of fact and/or law that relate to claims that have been dismissed by the Court are excluded from the list below except, except where the RJ has attempted to raise them again as triable issues.

- 16 -

ii.     Whether other news and information media are reasonable substitutes for English-language, daily, local print newspapers;

iii.    Whether English-Language, daily, local, print newspapers have:

- Recognition by courts, the U.S. Department of Justice, the newspaper industry, the parties themselves, and the public as a separate economic entity;

- Peculiar characteristics and unique uses valued by readers, including their: daily combination of a mix of editorial, local, regional, national, and international news, syndicated content, public service notices, and cartoons, in addition to other content; depth of stories; ease of consumption, requiring no specialized equipment through their convenient, portable, hardcopy format; role in political and community engagement;

- Unique production facilities, including their specialized printing presses and facilities, pre- and post-press equipment, distribution channels and delivery systems, and market resources;

- Distinct sets of customers, including: older, more educated, and/or more affluent readers than other media audiences; local readers; married readers; and readers with a preference for print products or who do not have internet access; and advertisers that seek an audience who will give their advertisements more attention, who are local, and to whom they can provide more information;

- Distinct prices, including from free news sources, such as news shared on social media feeds, websites, and radio; sources included as part of another service, such as news

- 17 -

125912233.1

channels included in a cable television bundle; and paid digital sources, such as those that require a reader to pay per story;

- Changes in the prices that track changes in the prices for other news and information media;

- Specialized vendors, including in the form of home delivery networks.

iv.  Whether publishers of English-language, daily, local, print newspapers monitor the prices of other news and information media in order to determine whether they need to respond to those changes;

v.  The Newspaper Bundle's price changes in response to changes in other news and information media.

b.  Whether Clark County is a distinct antitrust geographic market for English-language, daily, local, print newspapers. Sub-issues of fact include:

i.  Whether English-language, daily, local, print newspapers that focus on content for locations outside of Clark County are poor substitutes for English-language, daily, local, print newspapers that focus on local content for Clark County;

ii.  Whether English-language, daily, local, print newspapers who do not have a delivery territory in Clark County are poor substitutes for English-language, daily, local, print newspapers that are delivered in Clark County;

iii.  Whether the Newspaper Bundle has distinct customers from English-language, daily, local, print newspapers outside of Clark County, including whether English-language, daily, local, print newspapers outside of Clark County have significant circulation or sales in Clark County;

iv.    Whether English-language, daily, local, print newspapers outside of Clark County do not have economic incentives to incur the expenses of creating content for Clark County readers;

v.    Whether producers of English-language, daily, local, print newspapers in Clark County consider English-language, daily, local, print newspapers outside of Clark County to be competitive threats for readers. Sub-issues of fact include:

- Whether the Review-Journal and the Sun's agreement to restrict publishing an ancillary newspaper three or more days per week that is directed to Clark County evidences that Clark County is the relevant geographic scope for the Relevant Market.

vi.    Whether Clark County and southern portions of Nye County are economically and socially linked, including as a Combined Statistical Area by the United States Office of Management and Budget;

vii.    Whether the industry and public recognize English-language, daily, local, print newspapers inside of Clark County as a separate economic entity from English-language, daily, print newspapers outside of Clark County;

viii.    Whether English-language, daily, local, print newspapers inside of Clark County have peculiar characteristics and uses unique from English-language, daily, print newspapers outside of Clark County;

ix.    Whether English-language, daily, local, print newspapers inside of Clark County have distinct prices from English-language, daily, local, print newspapers outside of Clark County;

x.    Whether English-language, daily, local, print newspapers inside of Clark County have changes in prices that track changes in the prices

for English-language, daily, local, print newspapers outside of Clark County.

xi. Whether the publishers of English-language, daily, local, print newspapers monitor the prices of English-language, daily, local, print newspapers outside of Clark County in order to determine whether they need to respond to those changes;

xii. Whether the Newspaper Bundle's price changes in response to changes in English-language, daily, local, print newspapers outside of Clark County;

xiii. Whether English-language, daily, local, print newspapers inside of Clark County have vendors distinct from other English-language, daily, local, print newspapers outside of Clark County.

2. <u>Monopoly Power</u>: Whether the RJ possessed monopoly power in the Relevant Market. Sub-issues of fact include:

a. Whether the RJ has the power to exclude, and whether it has excluded competition in the Relevant Market.

b. Whether the RJ possesses the power to control prices in the Relevant Market.

c. Whether the RJ can profitably raise or has profitably maintained prices substantially above the competitive level for a significant period of time without attracting new entry.

d. Whether the RJ has the ability to exercise direct control over the Sun newspaper's output.

e. Whether the RJ controls a dominant share of the Relevant Market as measured by readership, newshole, newsroom staff, division of the Joint Operation EBITDA, and capacity.

f. Whether there are high barriers to entry into the Relevant Market, including: capital requirements for acquiring and establishing necessary operating facilities, equipment, production, and distribution; hiring personnel necessary for business,

125912233.1

advertising, circulation, editorial content, reportorial content, production, and distribution; investing in significant marketing efforts for circulation and advertising; and reader loyalty.

g.      Whether the Sun, the RJ's only current competitor in the market for English-Language, daily, local, print, newspapers in Clark County, has the ability to expand its production in the Relevant Market.

h.      Whether there are any potential competitors who have the ability and incentive to enter the Relevant Market and could capture a share of the market sufficient to undermine the RJ's exercise of market power.

i.       Whether the RJ controls inputs essential to the production of daily print newspapers in Clark County that could not be replicated by an entrant on commercially viable terms.

j.       Whether there have been successful attempts to enter the Relevant Market.

k.      Whether there have been any unsuccessful attempts to enter the Relevant Market.

3.      Anticompetitive Conduct: Whether the RJ engaged in anticompetitive acts and/or practices through which the RJ willfully acquired or maintained monopoly power. Sub-issues of fact include whether the RJ willfully engaged in the following acts and/or practices and, if so, whether those acts and/or practices contributed to or reasonably threatened to contribute to the RJ's acquisition or maintenance of monopoly power:

a.      The RJ's accounting practices overstated the costs attributable to the Joint Operation and understated the revenues attributed to the Joint Operation EBITDA, including:

i.       Charging the RJ's editorial costs to the Joint Operation;

ii.      Charging the RJ's independent promotional expenses for promotional activities of the Review-Journal as an advertising medium or to advance circulation that did not include mention of equal prominence for the Sun to the Joint Operation;

- 21 -

iii.    Charging the RJ's separate digital operations' expenses to the Joint Operation;

iv.    Charging the RJ's costs of legal settlements, fees, and costs arising from claims outside the 2005 Amended JOA activities to the Joint Operation;

v.    Charging the RJ's expenses for "Stephens Contingency Accrual" to the Joint Operation;

vi.    Charging the RJ's Center Curve payments to the Joint Operation;

vii.    Charging the RJ's payments to Defendant Adfam to the Joint Operation;

viii.    Diverting Joint Operation revenue to, and recording Joint Operation revenue in, the RJ's separate digital operations;

ix.    Changing the Joint Operation EBITDA revenue categories in 2022 to exclude historically recognized revenues from the Joint Operation;

x.    Failing to maintain accounting records and appropriate internal controls for the Joint Operation.

b.    The RJ's actions that reduced consumer knowledge of the Sun, including:

i.    Failing to mention the Sun in equal prominence when promoting the Review-Journal as an advertising medium or to advance circulation;

ii.    Unilaterally redesigning the Sun's noticeable mention from the Sun Box specified in Appendices A.2(d) and B of the 2005 Amended JOA, and continuing to thereafter publish the redesigned front page;

iii.    Concealing the Sun's noticeable mention with advertising stickers and/or spadeas;

iv.    Removing the Sun from the electronic replica edition of the Newspapers without notice or the Sun's knowledge;

v.    Omitting the Sun entirely from the RJ's promotion of the Review-Journal as an advertising medium or to advance circulation.

- 22 -

125912233.1

c.      The RJ's failure to conduct the Joint Operation in a commercially reasonable manner, including by:

     i.     Engaging in the above accounting practices;

     ii.     Engaging in the above conduct that reduced consumers' knowledge of the Sun;

     iii.     Employing a "Digital First" initiative to convert print subscribers of the Newspapers to the RJ's separate, non-JOA company digital operations (while planning to significantly reduce the print days of the Newspapers);

     iv.     Rejecting viable revenue and expense initiatives—either those proposed and projected by GateHouse or equivalent alternatives as projected by Valuation Research Corporation—that likely would have resulted in improved performance.

d.      Obstructing the Sun's audit rights. Sub-issues of fact include:

     i.     Whether the RJ refused to produce the books and records of the Review-Journal and the other publications whose earnings are included in the Joint Operation EBITDA;

     ii.     Whether the RJ improperly objected to the participation of the Sun's law firm and accounting firm in reviewing the books and records of the Review-Journal and the other publications whose earnings are included in the Joint Operation EBITDA;

     iii.     Whether the RJ refused or otherwise did not permit the Sun's representatives to examine and audit the books and records of the Review-Journal and the other publications whose earnings are included in the Joint Operation EBITDA for the purposes of verifying the determinations of the changes to the Annual Profit Payments due pursuant to the 2005 Amended JOA;

- 23 -

iv.  Whether the Sun was required to seek judicial relief to compel the RJ to submit to an audit;

v.  Whether the financial statements the RJ provided to the Sun in connection with the annual JOA EBITDA calculations were in accordance with generally accepted newspaper industry accounting principles consistently applied;

vi.  Whether the RJ attempted to blunt, avoid, deter, and postpone the Sun's right to audit the RJ each year;

vii.  Whether the RJ refused and failed to submit payment to the Sun of the recalculated EBITDA within thirty days of the delivery of the findings made by the appointed law firm, accounting firm, and/or arbitrator.

e.  Initiating sham litigation against the Sun. Sub-issues of fact include:

i.  Whether the litigation initiated by the RJ was baseless because (1) RJ was not in compliance with the 2005 Amended JOA, and undertaking Anticompetitive Conduct, since the inception of the RJ's ownership; (2) the RJ is obligated "to use their best efforts and take all action necessary to effect the intent" of the 2005 Amended JOA with respect to the DOJ process (2005 Amended JOA § 1.1) and was therefore obligated to take further action if the RJ believed the 2005 Amended JOA was hindered or otherwise unenforceable, and not try to terminate it; (3) the RJ's already-dismissed antitrust counterclaims dominated this action such that the entirety of the RJ's counterclaims are sham litigation; and (4) for the reasons described *infra*, the RJ's remaining counterclaims are sham litigation;

ii.  Whether the objectively baseless litigation the RJ initiated was an attempt to interfere directly with the business of the Sun through the

- 24 -

125912233.1

1    use of governmental process as opposed to through the outcome of

2    the litigation;

3          f.     Whether the RJ's conduct, taken together, unreasonably restrained trade in

4    the Relevant Market or, conversely, whether it benefitted competition and was consistent with

5    competition on the merits and led to a more efficient and better performing market.

6          g.     Whether the RJ's conduct was reasonably necessary to achieve any resulting

7    benefits to competition.

8          h.     Whether the RJ willfully engaged in the conduct, directed at acquiring or

9    maintaining its monopoly, as distinguished from growth or development as a consequence of a

10   superior product, business acumen, or historic accident.

11         i.     Whether the RJ's proffered justifications for the conduct are pretextual.

12         j.     Whether the competitive harm resulting from the RJ's conduct, taken

13   together, outweighed any competitive benefits.

## 2.    Sun's Second Claim for Relief: Attempt to Monopolize (15 U.S.C. § 2 and Nev. Rev. Stat. § 598A.060(1)(e))

4.    <u>Relevant Market</u>: The same contested issues of fact raised *supra* Section V(A)(1) ¶ 1 ("<u>Relevant Market</u>") are applicable and incorporated here.

5.    <u>Intent</u>: Whether the RJ had a specific intent to achieve monopoly power, *i.e.*, the power to control prices or exclude competition, in the Relevant Market. Sub-issues of fact include:

      a.     Whether the RJ's specific intent to achieve monopoly power can be inferred from direct evidence of the subjective intent of the people who carried out the RJ's Anticompetitive Conduct, such as oral or written statements about the motivations, purposes, goals, or anticipated effects of those actions.

      b.     Whether the RJ's specific intent to achieve monopoly power can be inferred from indirect evidence of the objective intent of the people who directed and carried out the RJ's Anticompetitive Conduct, such as the absence of legitimate business justification, the awareness or obvious foreseeability of the natural and probable consequences of those actions.

125912233.1

6. <u>Anticompetitive Conduct</u>: The same contested issues of fact raised *supra* Section V(A)(1) ¶ 3 ("<u>Anticompetitive Conduct</u>") apply and are incorporated here.

7. <u>Dangerous Probability of Success</u>: Whether at the time of the Anticompetitive Conduct there was a dangerous probability that the RJ would, by virtue of that conduct, achieve monopoly power in the Relevant Market. Sub-issues of fact include the following:

a. One set of sub-issues of fact parallels the contested issues of fact raised *supra* Section V(A)(1) ¶ 2 ("<u>Monopoly Power</u>"). The issues of fact identified in measuring monopoly power are also relevant in determining whether the RJ had a dangerous probability of success, except that a lesser degree of market power (including that falling short of monopoly power) will suffice here. Accordingly, the same contested issues of fact raised in Section V(A)(1) ¶ 2, <u>Monopoly Power</u>, are incorporated here.

b. A second set of sub-issues of fact considers the context of the RJ's market power, including that revealed by the monopoly power issues incorporated above, in addition to the following observed trends:

i. The number of competitors in the Relevant Market;

ii. The size and power of the RJ in the Relevant Market as compared with its competitors;

iii. The RJ's share of the Relevant Market and whether it was increasing or decreasing;

iv. The impact on competition of the RJ's Anticompetitive Conduct, *i.e.*, whether the RJ's Anticompetitive Conduct began to control prices or exclude competition.

**3.    Sun's Sixth Claim for Relief: Agreement in Restraint of Trade (15 U.S.C. § 1 and Nev. Rev. Stat. § 598A.060(1)(e))**

8. <u>Agreement</u>: Whether Defendant Adfam and at least one other Defendant knowingly entered into a combination or conspiracy to engage in the Anticompetitive Conduct with either the knowledge that this conduct would have unreasonable anticompetitive effects or with the purpose of producing those effects. Sub-issues of fact include:

125912233.1

a. Whether Adfam is an entity separate and distinct as an economic unit.

b. Whether Adfam acted solely in the interests of the other Defendants in participating in the Anticompetitive Conduct alleged, or whether it had an independent reason for and interest in improperly disadvantaging or eliminating the Sun as a competitor in the Relevant Market.

9. <u>Relevant Market</u>: Same as *supra* Section V(A)(1) ("<u>Relevant Market</u>").

10. <u>Restraint of Trade</u>: Whether the combination(s) or conspiracy(ies), taken together, unreasonably restrained trade in the Relevant Market. Sub-issues of fact include:

a. Whether the "<u>Anticompetitive Conduct</u>" (as set forth *supra* Section V(A)(1) ¶ 3) undertaken by the RJ pursuant to the combination(s) or conspiracy(ies) unreasonably restrained trade in the Relevant Market or, conversely, whether the Anticompetitive Conduct was consistent with competition on the merits and led to a more efficient and better performing market.

b. Whether the Anticompetitive Conduct undertaken by the RJ pursuant to the combination(s) or conspiracy(ies) was reasonably necessary to achieve any resulting benefits to competition.

c. Whether the RJ's proffered justification for the Anticompetitive Conduct undertaken by the RJ pursuant to the combination(s) or conspiracy(ies) is pretextual.

d. Whether the competitive harm resulting from the Anticompetitive Conduct undertaken by the RJ pursuant to the combination(s) or conspiracy(ies), taken together, outweighed any competitive benefits.

**4. Sun's Claims of Causation and Damages for First, Second, and Sixth Claims for Relief (15 U.S.C. § 15 and Nev. Rev. Stat. §§ 598A.060(1)(e), 598A.210(2))**

11. Whether the Sun was injured as a result of the RJ's violations of the antitrust laws.

12. Whether the RJ's Anticompetitive Conduct was a material cause of the Sun's injury.

13. Whether the Sun's injury is an injury of the type that the antitrust laws were intended to prevent.

- 27 -

125912233.1

14. Whether it is possible to make a just and reasonable estimate of the amount by which the Sun was damaged as a result of the RJ's alleged violation of antitrust laws and, if so, the amount of those damages.

15. Whether the Sun mitigated its antitrust damages, or was capable of mitigating its antitrust damages without undue risk.

16. Whether the RJ's Anticompetitive Conduct constituted continuing violations in which the Sun's interests have been repeatedly invaded. *Klehr v. A.O. Smith Corp*., 521 U.S. 179, 189 (1997); *Pace Indus. v. Three Phoenix Co*., 813 F.2d 234, 237 (9th Cir. 1987).

### 5. Sun's Claims for Injunction and Divestiture (15 U.S.C. § 26 and Nev. Rev. Stat. § 598A.210(1))

17. Whether injunctive relief should issue to prevent the RJ from continuing the Anticompetitive Conduct alleged by the Sun. Sub-issues of fact include:

a. Whether the Sun will continue to suffer threatened loss or damage if the RJ's Anticompetitive Conduct is not enjoined.

b. Whether successive litigation to recover money damages for continued antitrust injury would be inadequate to compensate the Sun for continuous injury.

c. Whether the Sun's remedy in equity is justified when balancing the hardships between the Sun and the RJ as a result of an injunction prohibiting the RJ's continued Anticompetitive Conduct.

d. Whether a permanent injunction enjoining the RJ from continuing the Anticompetitive Conduct would harm the public interest.

18. Whether injunctive relief should issue ordering the RJ to divest itself of the Review-Journal newspaper. Sub-issues of fact include:

a. Whether the RJ has misused its power and responsibilities as owner of the Review-Journal and the dominant partner in the 2005 Amended JOA to the specific detriment of the Sun and of consumers of English-language, daily, local, print newspapers in Clark County.

- 28 -

125912233.1

b.    Whether the Sun and consumers of English-language, daily, local, print newspapers in Clark County will continue to suffer threatened loss or damage if the RJ is not divested of its continued ownership and operation of the Review-Journal newspaper.

c.    Whether successive litigation to recover money damages for continued injury would be inadequate to compensate the Sun.

d.    Whether the Sun's remedy in equity is justified when balancing the hardships between the Sun and the RJ as a result of an injunction divesting the RJ of its ownership and operation of the Review-Journal newspaper.

e.    Whether divesting the RJ of the Review-Journal newspaper would harm the public interest.

19.    Whether injunctive relief should issue ordering the RJ to divest itself of the Review-Journal newspaper's non-editorial and -reportorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial and -reportorial business of the Joint Operation. Sub-issues of fact include:

a.    Whether the RJ has misused its power and responsibilities as owner of the Review-Journal and dominant partner in the 2005 Amended JOA to the specific detriment of the Sun and of consumers of English-language local print newspapers in Clark County.

b.    Whether the Sun and consumers of English-language local print newspapers in Clark County will continue to suffer threatened loss or damage if the RJ is not divested of its continued operation of the Review-Journal newspaper's non-editorial and -reportorial business operations, and an independent agency (or trustee) is not created in the RJ's stead to conduct the non-editorial business of the Joint Operation.

c.    Whether successive litigation to recover money damages for continued injury would be inadequate to compensate the Sun.

d.    Whether the Sun's remedy in equity is justified when balancing the hardships between the Sun and the RJ as a result of an injunction divesting the RJ of the Review-Journal newspaper's non-editorial and -reportorial business operations.

e.    Whether divesting the RJ of its continued ownership and operation of the Review-Journal newspaper's non-editorial and -reportorial business operations, and creating an independent agency (or trustee) to conduct the Review-Journal's non-editorial and -reportorial business of the Joint Operation would harm the public interest.

**6.    Defendants' Joint, Several, and Alter Ego Liability**

20.    Whether each Defendant personally, individually, directly, and knowingly participated in the Anticompetitive Conduct alleged by the Sun.

21.    Whether Defendants share a unity of interest such that they function as a single economic unit.

22.    Whether Defendant Adelson/Estate of Adelson was the alter ego of Defendants News+Media, the Review-Journal, and/or Adfam. Sub-issues of fact include:

a.    Whether Adelson/Estate of Adelson exercised significant influence and control over these Defendants' business policies and affairs.

b.    Whether there existed such a unity of interest and ownership that Adelson/Estate of Adelson and the other Defendants are inseparable from each other.

c.    Whether News+Media, the Review-Journal, and Adfam, adhered to corporate formalities.

d.    Whether News+Media, the Review-Journal, and Adfam, had inadequate capitalization or are undercapitalized, or the financial setup of these Defendants is a sham.

e.    Whether there was an overlap in ownership, officers, directors, and personnel.

- 30 -

125912233.1

f.    Whether the use of these Defendants' services only benefitted Adelson/Estate of Adelson.

g.    Whether there was a lack of arms-length dealing between Adelson/Estate of Adelson and these Defendants.

h.    Whether Adelson/Estate of Adelson used corporate assets of these Defendants as an extension of individual assets and personal interest.

i.    Whether Adelson/Estate of Adelson integrated the operations and resources of these Defendants to achieve a common business purpose.

j.    Whether Adelson/Estate of Adelson controlled these Defendants to such a degree that the latter is the mere instrumentality of the former.

k.    Whether adherence to the notion that these Defendants were entities separate from Adelson/Estate of Adelson would sanction fraud or promote a manifest injustice.

23.    Whether Defendant Dumont was the alter ego of Defendants News+Media, the Review-Journal, and/or Adfam. Sub-issues of fact include:

a.    Whether Dumont exercises significant influence and control over these Defendants' business policies and affairs.

b.    Whether there exists such a unity of interest and ownership that Dumont and these Defendants are inseparable from each other.

c.    Whether News+Media, the Review-Journal, and Adfam, adhered to corporate formalities.

d.    Whether News+Media, the Review-Journal, and Adfam, have inadequate capitalization or are undercapitalized, or the financial setup of these Defendants are a sham.

e.    Whether there is an overlap in ownership, officers, directors, and personnel.

f.    Whether the use of these Defendants' services only benefits Defendant Dumont.

- 31 -

125912233.1

g.      Whether there is a lack of arms-length dealing between Dumont and these Defendants.

h.      Whether Dumont used corporate assets of these Defendants as an extension of individual assets and personal interest.

i.      Whether Dumont has integrated the operations and resources of these Defendants to achieve a common business purpose.

j.      Whether Dumont controls these Defendants to such a degree that the latter is the mere instrumentality of the former.

k.      Whether adherence to the notion that these Defendants are entities separate from Dumont would sanction fraud or promote a manifest injustice.

24.      Whether Defendant Adfam was the alter ego of the Review-Journal and/or News+Media. Such issues of fact include:

a.      Whether Adfam exercises significant influence and control over these Defendants' business policies and affairs.

b.      Whether there exists such a unity of interest and ownership that Adfam and these Defendants are inseparable from each other.

c.      Whether News+Media and the Review-Journal adhered to corporate formalities.

d.      Whether News+Media and the Review-Journal have inadequate capitalization or are undercapitalized, or the financial setup of these Defendants are a sham.

e.      Whether there is an overlap in ownership, officers, directors, and personnel.

f.      Whether the use of these Defendants' services only benefits Adfam.

g.      Whether there is a lack of arms-length dealing between Adfam and these Defendants.

h.      Whether Adfam used corporate assets of these Defendants as an extension of individual assets and personal interest.

- 32 -

i.   Whether Adfam has integrated the operations and resources of these Defendants to achieve a common business purpose.

j.   Whether Adfam controls these Defendants to such a degree that the latter is the mere instrumentality of the former.

k.   Whether adherence to the notion that these Defendants are entities separate from Adfam would sanction fraud or promote a manifest injustice.

### 7.   Review-Journal's Counterclaim for Breach of Contract, Sections 5.2 and 5.3 of the 2005 Amended JOA

25.   <u>Interpretation and Application of Sections 5.2 and 5.3</u>: What the drafting parties to the 2005 Amended JOA intended, in light of the surrounding circumstances, Section 5.2's provision that "each hereby agrees to preserve high standards of newspaper quality . . . consistent with United States metropolitan daily newspapers" ("Quality Provision") to mean. Sub-issues of fact include:

a.   Whether the drafting parties to the 2005 Amended JOA intended that Section 5.2's Quality Provision would apply to the Sun's appearance as a daily print newspaper, including being printed on newsprint, distributed daily offering a mix of editorial, local, regional, national, and international news, syndicated content, public service notices, and cartoons, in addition to other mixes of content. Sub-issues of fact include:

i.   Whether the Review-Journal's conduct ratified this interpretation of Section 5.2's Quality Provision in the 2005 Amended JOA;

ii.   If the drafting parties intended this interpretation of Section 5.2's Quality Provision, whether the Sun newspaper meets this standard.

b.   Whether the RJ's interpretation of Section 5.2's Quality Provision, and Section 5.3's provision requiring the Sun and Review-Journal "to cooperate with the other party in every reasonable way that will promote successful and lawful operation under th[e] Restated Agreement for both parties" ("Cooperation Provision"), is capable of being applied without interfering with the Sun's editorial independence and autonomy. Sub-issues of fact include:

- 33 -

i.      Whether an established standard for "newspaper quality" in "United States metropolitan daily newspapers" exists in the newspaper industry.

ii.     Whether the RJ's interpretation of Section 5.2's Quality Provision, and by extension Section 5.3's Cooperation Provision, can be applied:

- Without contradicting the entirety of the 2005 Amended JOA;

- Without contradicting the Newspaper Preservation Act, 15 U.S.C. §§ 1801-1804;

- In a way that judges the quality of the Sun's content as entire body of work;

- Without encroaching on the Sun's choices in the news and editorial content it publishes in its newspaper;

- Without harming public policy for a free and independent press.

iii.    Whether, if the RJ's interpretation of Section 5.2's Quality Provision, and by extension Section 5.3's Cooperation Provision, is capable of being applied without interfering with the Sun's editorial and reportorial independence and autonomy, the Sun has met the Quality and Cooperation Provisions. Sub-issues of fact include:

- Whether the Sun newspaper, as an entire body of work, provides news and editorial content to the community;

- Whether the Sun newspaper is a valid source of news and editorial content to the community;

- Whether the Sun newspaper, as an entire body of work, informs the community;

- 34 -

- Whether the Sun newspaper, as an entire body of work, provides the community with news, editorials, and information that is timely and valuable to the community.

26. <u>The Sun's Performance Under Sections 5.2 and 5.3</u>: Whether the Sun performed under Section 5.2's Quality Provision and Section 5.3's Cooperation Provision. Sub-issues of fact include:

    a. Whether the Sun intentionally withheld original and/or breaking local news content from the Sun newspaper and published that content on lasvegassun.com instead. Sub-issues of fact include:

        i. Whether there is a set minimum requirement for the number of original local news stories in the Sun newspaper;

        ii. Whether "breaking" news has an established definition in the newspaper industry;

        iii. Whether there is a set minimum requirement for the number of "breaking" news stories in the Sun newspaper;

        iv. Whether the drafting parties to the 2005 Amended JOA intended that the Sun newspaper would cover the same daily "breaking" news stories as the Review-Journal newspaper.

    b. Whether the Sun filled the Sun newspaper with dated, recycled content that appeared on lasvegassun.com days earlier. Sub-issues of fact include:

        i. Whether the Sun's content of which the Review-Journal complains is still:

- a valid source of news and editorial content for the community;
- informative to the community;
- timely;
- valuable to readers.

1                ii.       Whether there is a set prohibition in the newspaper industry or the

2                        2005 Amended JOA that precludes the Sun from publishing the

3                        content of which the Review-Journal complains.

4                iii.      Whether the Review-Journal publishes the stories appearing in its

5                        newspaper on its website before the Newspaper Bundle is published

6                        and distributed.

7          c.      Whether the Sun's "Note to Readers" told readers of the Newspaper Bundle

8      to not subscribe to the Newspaper Bundle and instead subscribe to lasvegassun.com.

9          d.      Whether the Sun intended to divert readers from the Newspaper Bundle to

10    lasvegassun.com. Sub-issues of fact include:

11              i.       Whether readers cancelled their subscriptions to the Newspaper

12                        Bundle and instead subscribed to lasvegassun.com as a result of the

13                        Sun's alleged conduct.

14          e.      Whether, if the Sun undertook this conduct, the Sun was entitled to do so

15    within its editorial and reportorial independence and autonomy under the 2005

16    Amended JOA.

17          f.      Whether, if the Sun undertook this conduct, this conduct constituted a breach

18    of Section 5.2's Quality Provision and Section 5.3's Cooperation Provision.

19      27.    Whether the Review-Journal's conduct ratified the Sun's conduct. Sub-issues of fact

20    include:

21          a.      Whether the RJ received, accepted, and retained benefits from the 2005

22    Amended JOA. Sub-issue of fact include:

23              i.       The Sun relinquishing all of its non-editorial infrastructure and

24                        contracts that allowed the Sun newspaper to operate, publish, and

25                        distribute its newspaper, including all inventory, supplies, and

26                        equipment used in the production and distribution of the Sun

27                        newspaper in 1989;

28

| | | |
|---|---|---|
| 1 | ii. | The Sun assigning to the Review-Journal all subscription, sales, |
| 2 | | circulation, dealer and sub-dealer, and delivery agent lists; all |
| 3 | | contracts held by the Sun relating to advertising, and all of the Sun's |
| 4 | | non-editorial departments in 1989; |
| 5 | iii. | The Sun newspaper ceding its morning position and moving to an |
| 6 | | afternoon newspaper in 1989; |
| 7 | iv. | The Sun assigning to the Review-Journal a percentage of all |
| 8 | | dividends and distributions of CCTV stock in 1989; |
| 9 | v. | The cost-savings resulting from combining the Sun and Review- |
| 10 | | Journal's non-editorial operations, including savings from the joint |
| 11 | | production, distribution, and advertising in 1989 and thereafter; |
| 12 | vi. | The Review-Journal's ability to reach the Sun newspapers' audience |
| 13 | | as a result of the combined operations; |
| 14 | vii. | The Sun's content attracting readers to the Newspaper Bundle, which |
| 15 | | increases advertising and subscription revenues; |
| 16 | viii. | The absence of price competition from the Sun newspaper as a result |
| 17 | | of the combined operations; |
| 18 | ix. | The absence of non-editorial and non-reportorial competition from |
| 19 | | the Sun newspaper; |
| 20 | x. | The Review-Journal's majority profit-split arrangement in the 1989 |
| 21 | | JOA and the 2005 Amended JOA; |
| 22 | xi. | The Review-Journal's dominant position in the joint operation under |
| 23 | | the 1989 JOA and the 2005 Amended JOA; |
| 24 | xii. | The Review-Journal's continued exclusive possession of such |
| 25 | | production and distribution equipment, non-editorial contracts, and |
| 26 | | subscription, sales, circulation, dealer and sub-dealer, and delivery |
| 27 | | agent lists. |
| 28 | | |

- 37 -

        b.      Whether the RJ remained silent, acquiesced, and failed to repudiate the Sun's conduct.

        c.      Whether the RJ otherwise exhibited conduct demonstrating an adoption and recognition of the Sun's conduct.

28.     Whether, if the Sun failed to perform under the Quality and Cooperation Provisions, the Sun was excused from performing, including because of the Review-Journal's and other Defendants' prior, material breaches of the 2005 Amended JOA.

29.     Whether the Review-Journal could have sought specific performance of the Sun's material obligations.

30.     Whether the Review-Journal could have sought arbitration to print and publish the Sun separately from the Review-Journal.

31.     Whether, if the Sun breached the Quality and Cooperation Provisions, its breaches were not material breaches.

32.     Whether, if the Sun breached the Quality and Cooperation Provisions, its breaches were the direct and proximate result of Review-Journal's own, or other Defendants' or third-parties' conduct.

33.     Whether, if the Sun breached the Quality and Cooperation Provisions, the Review-Journal has waived its claims. Sub-issues of fact include:

        a.      Whether the Review-Journal had full knowledge of the Sun's alleged conduct.

        b.      Whether the Review-Journal failed to raise any of its concerns to the Sun concerning the Sun's conduct.

        c.      Whether the Review-Journal's conduct evidences its intention to waive its right, if any, to claim the Sun breached the Quality and Cooperation Provisions.

34.     Whether, if the Sun breached the Quality and Cooperation Provisions, the Review-Journal acquiesced in the Sun's alleged breaches of Section 5.2 and 5.3. Sub-issue of fact include:

        a.      Whether the Review-Journal knew of the Sun's alleged conduct.

b.      Whether the Review-Journal failed to raise, and was silent in asserting, its claims that the Sun breached the Quality and Cooperation Provisions.

c.      Whether the Review-Journal's conduct and/or silence led the Sun to reasonably believe that the Review-Journal waived its rights, if any, to complain that the Sun breached the Quality and Cooperation Provisions.

d.      Whether the Sun detrimentally relied on the Review-Journal's conduct and/or silence.

35.     Whether, if the Sun breached the Quality and Cooperation Provisions, the Review-Journal's delay in raising or asserting its claims that the Sun breached prohibits the Review-Journal from recovering now. Sub-issues of fact include:

a.      Whether the Review-Journal inexcusably delayed in bringing the challenge.

b.      Whether the Review-Journal's inexcusable delay constitutes acquiescence to the condition it is challenging.

c.      Whether the Review-Journal's inexcusable delay was prejudicial to the Sun.

36.     Whether the Review-Journal's claims are barred by the doctrine of claim preclusion. Sub-issues of fact include:

a.      Whether this action is based on the same claims or any part of them that the Review-Journal could have asserted as a defense in the 2019 Arbitration, including whether the Sun previously breached the Quality and Cooperation Provisions.

37.     Whether the Review-Journal has unclean hands. Sub-issues of fact include:

a.      Whether the Review-Journal publishes original and/or breaking local news content on the RJ's websites before publishing the content in the Review-Journal newspaper.

b.      Whether the Review-Journal newspaper publishes national stories from syndicated content.

c.      Whether the Review-Journal advertises the RJ's websites in the Newspaper Bundle.

- 39 -

125912233.1

1        d.     Whether the Review-Journal advertises the RJ's websites in promotional

2    activities of the Review-Journal as an advertising medium or to advance circulation

3    of the Review-Journal newspaper, including whether the Review-Journal advertises

4    the RJ's websites in the Sun's stead.

5        e.     Whether the Review-Journal incentivizes readers of the Newspaper Bundle

6    to subscribe to lasvegasreviewjournal.com.

7        f.      Whether the RJ undertook the anticompetitive conduct alleged by the Sun.

8        g.     Whether the RJ's own misconduct caused the Sun serious harm such that the

9    RJ is barred from seeking relief for the Sun's alleged conduct.

10      38.    Whether the Review-Journal's claims are barred by the doctrine of unjust

11  enrichment. Sub-issues of fact include:

12        a.     Whether the Sun conferred a benefit on the Review-Journal. Sub-issue of

13    fact include:

14            i.     The Sun relinquishing all of its non-editorial infrastructure and

15           contracts that allowed the Sun newspaper to operate, publish, and

16           distribute its newspaper, including all inventory, supplies, and

17           equipment used in the production and distribution of the Sun

18           newspaper in 1989;

19           ii.     The Sun assigning to the Review-Journal all subscription, sales,

20           circulation, dealer and sub-dealer, and delivery agent lists; all

21           contracts held by the Sun relating to advertising, and all of the Sun's

22           non-editorial departments in 1989;

23          iii.     The Sun newspaper ceding its morning position and moving to an

24           afternoon newspaper in 1989;

25          iv.     The Sun assigning to the Review-Journal a percentage of all

26           dividends and distributions of CCTV stock in 1989;

27

28

v.       The cost-savings resulting from combining the Sun and Review-Journal's non-editorial operations, including savings from the joint production, distribution, and advertising in 1989 and thereafter;

vi.      The Review-Journal's ability to reach the Sun newspapers' audience as a result of the combined operations;

vii.     The Sun's content attracting readers to the Newspaper Bundle, which increases advertising and subscription revenues;

viii.    The absence of price competition from the Sun newspaper as a result of the combined operations;

ix.      The absence of non-editorial and non-reportorial competition from the Sun newspaper;

x.       The Review-Journal's majority profit-split arrangement in the 1989 JOA and the 2005 Amended JOA;

xi.      The Review-Journal's dominant position in the joint operation under the 1989 JOA and the 2005 Amended JOA;

xii.     The Review-Journal's continued exclusive possession of such production and distribution equipment, non-editorial contracts, and subscription, sales, circulation, dealer and sub-dealer, and delivery agent lists.

b.       Whether the Review-Journal appreciated such benefit(s).

c.       Whether the Review-Journal accepted and retained the benefit(s) under circumstances such that it would be inequitable for the Review-Journal to retain the benefits without payment of the value thereof.

39.      Whether, in equity and good conscience, the Review-Journal should not be allowed to recover under its claims because of the RJ's own conduct, including its failure to raise complaints to the Sun or in prior litigation. Sub-issues of fact include:

a.       Whether the Review-Journal was aware of the true facts.

- 41 -

125912233.1

b.      Whether the Review-Journal intended that its conduct, including it silence, would be acted upon by the Sun, or that the Review-Journal acted in such a way that the Sun had a right to believe the Review-Journal's conduct was intended.

c.      Whether the Review-Journal's affirmative conduct mislead the Sun.

d.      Whether the Sun was ignorant of the true facts.

e.      Whether the Sun relied to its detriment on the Review-Journal's conduct.

40.     Whether the Sun's breaches, if any, amounted to a "default[ ] in performance of any of its material obligations" under the 2005 Amended JOA that would allow for termination under Article 9 of the 2005 Amended JOA.

**8.      Review-Journal's Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing**

41.     Whether the Review-Journal performed all, or substantially all, of its obligations pursuant to the 2005 Amended JOA.

42.     Whether the Sun's performance under the Quality and Cooperation Provisions was faithful to the 2005 Amended JOA. Several sub-issues of fact overlap with the contested factual issues set forth *supra* Section V(A)(7) ("**Review-Journal's Counterclaim for Breach of Sections 5.2 and 5.3 of the Amended JOA**"), including the following paragraphs, incorporated here:

a.      Section V(A)(7) ¶ 22 ("Interpretation and Application of Sections 5.2 and 5.3");

b.      *Id.* ¶ 23(a)-(e) ("The Sun's Performance Under Sections 5.2 and 5.3").

43.     Whether the Review-Journal's justified expectations of the Sun were denied. Sub-issues of fact include:

a.      Whether the Review-Journal was justified in its expectations. Sub-issues of fact include:

i.      Whether the Review-Journal was justified in expecting that the Sun would not publish original and/or breaking local news content on the Sun's website before the content was published in the Newspaper Bundle;

- 42 -

ii.      Whether the Review-Journal was justified in expecting that the Sun would not publish national stories from syndicated content;

iii.     Whether the Review-Journal was justified in expecting that the Sun would not advertise or promote lasvegassun.com in the Newspaper Bundle;

iv.     Whether the Review-Journal was justified in expecting that the Sun would not incentivize readers of the Newspaper Bundle to subscribe to lasvegassun.com.

b.     Whether the Review-Journal informed the Sun of its expectations, if they were justified.

c.     Whether the Sun's conduct was a substantial factor in causing the Review-Journal damage in the form of having to print the Sun newspaper.

44.     Whether the Review-Journal's claim is barred by the Sun's affirmative defenses. The sub-issues of fact overlap with the contested factual issues set forth *supra* Section V(A)(7) ¶¶ 24-37, and are incorporated here.

45.     Whether the Sun's breaches, if any, amounted to a "default[ ] in performance of any of its material obligations" under the 2005 Amended JOA that would allow for termination under Article 9 of the 2005 Amended JOA.

**9.**     **Review-Journal's Counterclaim for Tortious Interference with Contractual Relations**

46.     <u>Intentional Conduct</u>: Whether Counterdefendant Greenspun undertook actions intended or designed to disrupt the Sun and Review-Journal's relationship under the 2005 Amended JOA. Sub-issues of fact include:

a.     Whether the Review-Journal commenced efforts to eliminate the Sun newspaper before the RJ purchased the Review-Journal and continued its Anticompetitive Conduct thereafter. Sub-issues of fact include:

i.     Whether the RJ knew of and understood that the 2005 Amended JOA governed the relationship between the Sun and the Review-Journal;

125912233.1

ii.    Whether the RJ commenced undertaking its Anticompetitive Conduct as set forth *supra* Section V(A)(1) ¶ 3, and incorporated herein;

iii.   Whether the Review-Journal, through its agent(s), proposed that the Sun amend the 2005 Amended JOA, in part to avoid disputes between the Sun and the Review-Journal;

iv.    Whether the RJ continued undertaking Anticompetitive Conduct thereafter, and after the Sun notified the RJ of the Sun's concerns with the RJ's management of the Joint Operation;

v.     Whether the RJ informed the Sun that the Joint Operation was not profitable and would not be profitable again, and that the Sun should amend the 2005 Amended JOA;

vi.    Whether the Sun continuously notified the RJ of the Sun's complaints about the RJ's mismanagement of the Joint Operation;

vii.   Whether the RJ ever asserted that the Sun's complaints about the RJ's management of the Joint Operation were invalid;

viii.  Whether the RJ prepared a Second Amended JOA reducing the Sun newspaper to a column as initially proposed by RJ;

ix.    Whether the RJ informed the Sun thereafter that it, again, would not be receiving a profit payment;

x.     Whether Mr. Greenspun agreed to consider a Second Amended JOA as a settlement of the legal disputes between the Sun and the RJ;

xi.    Whether the Sun's continued efforts to resolve its complaints about the RJ's management of the Joint Operation were valid.

b.     Whether Mr. Greenspun intended to induce the Sun to breach the Quality and Cooperation Provisions of the 2005 Amended JOA with the Review-Journal. The contested issues of fact related to Sections V(A)(7) ¶ 22 ("Interpretation and

Application of Sections 5.2 and 5.3") and V(A)(7) ¶ 23(a)-(e) ("The Sun's Performance Under Sections 5.2 and 5.3") apply and are incorporated here.

c.    Whether Mr. Greenspun's alleged conduct was the result of a business decision made on behalf of the Sun that is presumed to be made on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the Sun newspaper, and therefore the Newspaper Bundle.

47.    Mr. Greenspun's Capacity: Whether Mr. Greenspun was an intervening third party to the 2005 Amended JOA such that he was capable of interfering with the Sun and the Review-Journal's relationship thereunder. Sub-issues of fact include:

a.    Whether Mr. Greenspun was an agent of the Sun.

b.    Whether Mr. Greenspun was acting within the scope of his employment as Chief Executive Officer, Publisher, and Editor of the Sun.

c.    Whether Mr. Greenspun was acting in the interest of the Sun.

48.    Disruption of the Amended JOA: Whether, if Mr. Greenspun intended to induce the Sun to breach the Quality and Cooperation Provisions of the Amended JOA and was acting in an intervening third-party capacity capable of inferring with the Amended JOA, actual disruption of the 2005 Amended JOA occurred as result of Mr. Greenspun's alleged conduct.

49.    Whether the Review-Journal's conduct ratified the Sun's conduct.

50.    Whether, if Mr. Greenspun interfered with the Sun's performance under the 2005 Amended JOA, his actions were the direct and proximate result of the Review-Journal's own, or other Defendants' or third-parties' conduct.

51.    Whether, if Mr. Greenspun interfered with the Sun's performance under the 2005 Amended JOA, the Sun was excused from performing, including because of the Review-Journal's and other Defendants' prior, material breaches of the Amended JOA.

52.    Whether, if Mr. Greenspun interfered with the Sun's performance under the 2005 Amended JOA, the Sun's alleged breaches were not material.

53.    Whether the Review-Journal has unclean hands. Sub-issues of fact include:

- 45 -

      a.      Whether the Review-Journal publishes original and/or breaking local news content on the RJ's websites before publishing the content in the Review-Journal newspaper.

      b.      Whether the Review-Journal newspaper publishes national stories from syndicated content.

      c.      Whether the Review-Journal advertises the RJ's websites in the Newspaper Bundle.

      d.      Whether the Review-Journal advertises the RJ's websites in promotional activities of the Review-Journal as an advertising medium or to advance circulation of the Review-Journal newspaper, including whether the Review-Journal advertises the RJ's websites in the Sun's stead.

      e.      Whether the Review-Journal incentivizes readers of the Newspaper Bundle to subscribe to lasvegasreviewjournal.com.

      f.      Whether the RJ undertook the anticompetitive conduct alleged by the Sun.

      g.      Whether the RJ's own misconduct caused the Sun serious harm such that the RJ is barred from seeking relief for the Sun's alleged breach and, therefore, Mr. Greenspun's alleged interference.

54.    Whether, if Mr. Greenspun interfered with the Sun's performance under the 2005 Amended JOA, the Review-Journal has waived its claims. Sub-issues of fact include:

      a.      Whether the Review-Journal had full knowledge of Mr. Greenspun's alleged conduct.

      b.      Whether the Review-Journal failed to raise any of its concerns to Mr. Greenspun concerning his conduct.

      c.      Whether the Review-Journal's conduct evidences its intention to waive its right, if any, to claim the Sun breached the Section 5.2's Quality Provision.

55.    Whether, if Mr. Greenspun interfered with the Sun's performance under the 2005 Amended JOA, the Review-Journal acquiesced in the Sun's alleged breaches of Section 5.2 and 5.3. Sub-issue of fact include:

1          a.      Whether the Review-Journal's knew of the Sun's alleged conduct.

2          b.      Whether the Review-Journal failed to raise, and was silent in asserting, its

3          claims that the Sun breached Sections 5.2 and 5.3.

4          c.      Whether the Review-Journal's conduct and/or silence led the Sun to

5          reasonably believe that the Review-Journal waived its rights, if any, to complain that

6          the Sun breached Sections 5.2 and 5.3.

7          d.      Whether the Sun and Mr. Greenspun detrimentally relied on the Review-

8          Journal's conduct and/or silence.

9      56.    Whether, if Mr. Greenspun interfered with the Sun's performance under the 2005

10   Amended JOA, the Review-Journal's delay in raising or asserting its claims that Mr. Greenspun

11   interfered prohibits the Review-Journal from recovering now. Sub-issues of fact include:

12         a.      Whether the Review-Journal inexcusably delayed in bringing the challenge

13         against Mr. Greenspun.

14         b.      Whether the Review-Journal's inexcusable delay constitutes acquiescence to

15         the condition it asserts Mr. Greenspun interfered with.

16         c.      Whether the Review-Journal's inexcusable delay was prejudicial to

17         Mr. Greenspun.

18     57.    Whether, in equity and good conscience, the Review-Journal should not be allowed

19   to recover under its claims because of the RJ's own conduct, including its failure to raise complaints

20   to the Sun or Mr. Greenspun, or in prior litigation. Sub-issues of fact include:

21         a.      Whether the Review-Journal was aware of the true facts.

22         b.      Whether the Review-Journal intended that its conduct, including it silence,

23         would be acted upon by the Sun, or that the Review-Journal acted in such a way that

24         the Sun had a right to believe the Review-Journal's conduct was intended.

25         c.      Whether the Review-Journal's affirmative conduct mislead the Sun and

26         Mr. Greenspun.

27         d.      Whether Mr. Greenspun was ignorant of the true facts.

28

- 47 -

e.      Whether Mr. Greenspun relied to his detriment on the Review-Journal's conduct.

### 10.      Review-Journal's Claims of Causation and Damages

58.      Printing Costs: Whether the Review-Journal is entitled to recover its printing costs as damages for printing the Sun newspaper. Sub-issues of fact include:

a.      Whether the Review-Journal was injured as a result of the Sun's alleged breaches of the 2005 Amended JOA.

b.      Whether the Sun's alleged breaches were a material cause of the Review-Journal's injury, if any.

c.      Whether the Review-Journal's costs incurred for printing the Sun newspaper flowed from the Sun's alleged breaches and were reasonably foreseeable as the probable result of the breach when the 2005 Amended JOA was entered into.

d.      Whether the Review-Journal would have incurred the same amount of printing costs, even if it did not print the Sun newspaper.

e.      Whether the Sun's alleged conduct, if any, dated back to December 10, 2015, allowing the Review-Journal to recover its costs for printing the Sun newspaper from that date.

f.      Whether the Review-Journal could have avoided or lessened its losses, if any, by reasonable efforts.

g.      Whether the Review-Journal's damages were caused by the Review-Journal's own, other Defendants', or third-parties' conduct.

h.      If the Review-Journal is entitled to recover any printing costs as damages, a just and reasonable estimate of the amount by which the Review-Journal was damaged as a result of the Sun's alleged conduct.

i.      Whether a damage award recovered by the Review-Journal, if any, must be reduced by the damages due to the Sun.

- 48 -

1          j.      Whether the Sun's breaches, if any, amounted to a "default[ ] in performance

2          of any of its material obligations" under the 2005 Amended JOA that would allow

3          for termination under Article 9 of the 2005 Amended JOA.

4      59.    <u>Punitive Damages</u>. If Mr. Greenspun is found liable for tortiously interfering in the

5  contractual relations between the Sun and Review-Journal, whether the Review-Journal should be

6  able to recover any punitive damages. Sub-issues of fact include:

7          a.      Whether the Review-Journal established by clear and convincing evidence

8          that Mr. Greenspun was guilty of oppression, fraud, or malice in the conduct

9          providing basis for liability. Sub-issues of fact include:

10            i.      Whether the conduct providing the basis for finding liability was

11            despicable and subjected the Review-Journal to cruel and unjust

12            hardship with conscious disregard for the rights of the Review-

13            Journal;

14            ii.      Whether Mr. Greenspun intentionally misrepresented, deceived, or

15            concealed a material fact from the Review-Journal, in connection

16            with the conduct providing the basis for finding liability, with the

17            intent to injure or deprive the Review-Journal of its rights;

18            iii.      Whether Mr. Greenspun undertook the conduct providing the basis

19            for finding liability with intent to injure the Review-Journal, or

20            engaged in the conduct with a conscious disregard for the Review-

21            Journal's rights;

22          b.      Whether Mr. Greenspun's conduct providing the basis for finding liability

23          was sufficiently reprehensible to support a punitive damage award.

24          c.      If warranted, an amount that will serve the purpose of punishment and

25          deterrence, taking into account Mr. Greenspun's financial condition.

26      60.    <u>Joint, Several, and Alter Ego Liability</u>: Whether each Counterdefendant personally,

27  individually, and directly engaged in the conduct alleged by the Review-Journal.

28      61.    Whether GMG was the alter ego of the Sun. Sub-issues of fact include:

125912233.1

a.    Whether GMG exercised significant influence and control over the Sun's business policies and affairs.

b.    Whether there existed such a unity of interest and ownership that GMG and the Sun are inseparable from each other.

c.    Whether the Sun adhered to corporate formalities.

d.    Whether GMG adhered to corporate formalities.

e.    Whether the Sun had inadequate capitalization or was undercapitalized, or the financial setup of the Sun was a sham.

f.    Whether there was an overlap in ownership, officers, directors, and personnel of GMG and the Sun.

g.    Whether the use of the Sun's services only benefitted GMG.

h.    Whether there was a lack of arms-length dealing between GMG and the Sun.

i.    Whether GMG used corporate assets of the Sun as an extension of individual assets and personal interest.

j.    Whether GMG integrated the operations and resources of the Sun to achieve a common business purpose.

k.    Whether GMG controlled the Sun to such a degree that the latter is a mere instrumentality of the former.

l.    Whether adherence to the notion that the Sun was an entity separate from GMG would sanction fraud or promote a manifest injustice.

62.    Whether Mr. Greenspun was the alter ego of the Sun. Sub-issues of fact include:

a.    Whether Mr. Greenspun exercised significant influence and control over the Sun's business policies and affairs.

b.    Whether there existed such a unity of interest and ownership that Mr. Greenspun and the Sun are inseparable from each other.

c.    Whether the Sun adhered to corporate formalities.

d.    Whether the Sun had inadequate capitalization or was undercapitalized, or the financial setup of the Sun was a sham.

e.      Whether there was an overlap in ownership, officers, directors, and personnel with Mr. Greenspun and the Sun.

f.      Whether the Sun's services only benefitted Mr. Greenspun.

g.      Whether there was a lack of arms-length dealing between Mr. Greenspun and the Sun.

h.      Whether Mr. Greenspun used corporate assets of the Sun as an extension of individual assets and personal interest.

i.      Whether Mr. Greenspun integrated the operations and resources of the Sun to achieve a common business purpose.

j.      Whether Mr. Greenspun controlled the Sun to such a degree that the latter is a mere instrumentality of the former.

k.      Whether adherence to the notion that the Sun was an entity separate from Mr. Greenspun would sanction fraud or promote a manifest injustice.

**B.      DEFENDANTS' CONTESTED ISSUES OF FACT[3]**

1.   Whether the Las Vegas Sun, Inc. (the "Sun") has proven a valid antitrust market. Sub-issues of fact include:

   a.   Whether "the sale of local daily newspapers" is a plausible, relevant product market. *See* ECF No. 621 ("Amended Cplt.") at ¶¶ 20, 44, 96, 122, 149, 158, 159, 162, 168, 179.

2.   Whether the Sun has proven that it competes in the alleged valid antitrust market. Sub-issues of fact include:

   a.   Whether the Sun competes in the market for "the sale of local daily newspapers." *Id.*

---

[3] Defendants reserve their right to modify and/or supplement this list of disputed fact issues as necessary or appropriate, including in response to any ruling from this Court or from the Ninth Circuit Court of Appeals. Should the Court determine that any issue identified below as an issue of fact is more appropriately considered an issue of law, Defendants incorporate such issue by reference into Defendants' Statement of Issues of Law. Should the Court determine that any issue identified by Defendants as an issue of law is more properly considered an issue of fact, Defendants incorporate such issue herein by reference. Issues of fact and/or law that relate to claims that have been dismissed by the Court are excluded from the list below.

- 51 -

b.  Whether the print editions of the *Las Vegas Review-Journal* and the *Las Vegas Sun* are engaged in competition in trade or commerce in the relevant market.

    i.  Whether the relevant market is a single product market with no competition in trade or commerce.

    ii.  Whether competition for post-sale readership of the print editions of the *Las Vegas Review-Journal* and the *Las Vegas Sun*, such as editorial or reportorial competition for readers' attention, is competition in trade or commerce.

c.  Whether the print editions of the *Las Vegas Sun* and *Las Vegas Review-Journal* are reasonably interchangeable products that are substitutes for consumers in the relevant market.

d.  Whether the Sun and the Review-Journal have the actual or potential ability to deprive each other of significant levels of business in the relevant market.

e.  Whether the joint print media product (*Las Vegas Review-Journal / Sun*) faces any competition in trade or commerce in Clark County. This includes whether actual or potential customers of print newspapers consider other sources of news, including news websites, to be reasonably interchangeable with print newspapers.

f.  Whether the Sun's alleged product market encompasses all economic substitutes that have a reasonable interchangeability of use.

g.  Whether the *Las Vegas Sun* and the *Las Vegas Review-Journal* print editions are engaged in editorial and reportorial competition.

h.  If the *Las Vegas Sun* and the *Las Vegas Review-Journal* print editions are engaged in editorial and reportorial competition, whether such competition impacts consumers' choice with respect to whether to buy any product in the market.

i.  If the *Las Vegas Sun* and the *Las Vegas Review-Journal* print editions are engaged in editorial and reportorial competition, whether such competition constitutes economic competition.

j.  If the *Las Vegas Sun* and the *Las Vegas Review-Journal* print editions are engaged in editorial and reportorial competition, whether such competition involves either

1    competitor taking sales or subscribers away from the other competitor.

2   3. If the Sun has proven a valid antitrust market, then whether the Las Vegas Review-Journal,

3    Inc. (the "Review-Journal") possesses monopoly power in that market. Sub-issues of fact

4    include:

5    a. Whether the Review-Journal has the power to profitably raise prices substantially

6     above the competitive level for a significant period of time or exclude competition,

7     accounting for the existence of a two-sided market and dual revenue business model

8     (i.e., circulation and advertising).

9    b. Whether the Review-Journal possesses a significant share of the relevant market,

10     with market share measured as a percentage of total sales in the relevant market.

11    c. Whether trends in the Review-Journal's share of the relevant market support a

12     finding of monopoly power.

13    d. Whether there are barriers to entry into the relevant market sufficient to bar a new

14     competitor from entering the market or an existing competitor from expanding their

15     output to challenge predatory prices.

16    e. Whether the history of entry into and exit from the relevant market by other

17     companies supports a finding of monopoly power.

18    f. Whether the Review-Journal's competitors are not able to effectively compete

19     against the Review-Journal.

20   4. If the Review-Journal is found to possess monopoly power in a valid antitrust market, then

21    whether Defendants willfully acquired or maintained such monopoly power through

22    anticompetitive acts or practices. Sub-issues of fact include:

23    a. Whether Defendants engaged in exclusionary actions to acquire or maintain

24     monopoly power without a valid business reason for doing so.

25    b. Whether the Review-Journal willfully attained its alleged monopoly power through

26     anticompetitive means.

27    c. Whether Defendants intentionally operated the *Las Vegas Review-Journal*

28     newspaper in an unprofitable manner for the purpose of harming competition or

- 53 -

maintaining a monopoly in the relevant market. Sub-issues of fact include:

    i.   Whether Defendants' challenged accounting methodology under the 2005 JOA was done for the purpose of harming competition or maintaining a monopoly in the relevant market.

    ii.   Whether Defendants' redesign of the Sun Box was done for the purpose of harming competition or maintaining a monopoly in the relevant market.

    iii.   Whether Defendants' use of stickers was done for the purpose of harming competition or maintaining a monopoly in the relevant market.

    iv.   Whether Defendants' use of spadea was done for the purpose of harming competition or maintaining a monopoly in the relevant market.

    v.   Whether Defendants' promotions of the joint printed media product were done for the purpose of harming competition or maintaining a monopoly in the relevant market.

    vi.   Whether the exclusion of the *Las Vegas Sun* from the digital version of the print newspaper (the "e-Edition") was done for the purpose of harming competition or maintaining a monopoly in the relevant market.

    d.   Whether Defendants' alleged anticompetitive acts harmed both allocative efficiency and raised the prices of goods above competitive levels or diminished their quality.

5.   Whether Patrick Dumont shares a unity of purpose with the remaining Defendants such that Defendants can be deemed to have engaged in coordinated activity with the purpose of a single economic unit.

6.   Whether News+Media Capital Group LLC ("News+Media") shares a unity of purpose with the remaining Defendants such that Defendants can be deemed to have engaged in coordinated activity with the purpose of a single economic unit.

7.   Whether Sheldon Adelson shared a unity of purpose with the remaining Defendants such that Defendants can be deemed to have engaged in coordinated activity with the purpose of a single economic unit.

8.   Whether Interface Operations LLC dba Adfam ("Adfam") shares a unity of purpose with

the remaining Defendants such that Defendants can be deemed to have engaged in coordinated activity with the purpose of a single economic unit.

9. If Defendants are deemed to have engaged in coordinated activity with the purpose of a single economic unit, then whether Patrick Dumont engaged in independent action in furtherance of the anticompetitive scheme that was the purpose of such single economic unit.

10. If Defendants are deemed to have engaged in coordinated activity with the purpose of a single economic unit, then whether News+Media engaged in independent action in furtherance of the anticompetitive scheme that was the purpose of such single economic unit.

11. If Defendants are deemed to have engaged in coordinated activity with the purpose of a single economic unit, then whether Sheldon Adelson engaged in independent action in furtherance of the anticompetitive scheme that was the purpose of such single economic unit.

12. If Defendants are deemed to have engaged in coordinated activity with the purpose of a single economic unit, then whether Adfam engaged in independent action in furtherance of the anticompetitive scheme that was the purpose of such single economic unit.

13. If Defendants are found to have engaged in anticompetitive conduct to willfully acquire or maintain a monopoly in the alleged relevant market, then whether the Sun was injured in its business or property as a result of such anticompetitive conduct.  Sub-issues of fact include:

   a. Whether the Sun was in fact injured as a result of Defendants' alleged violation of the antitrust laws.

   b. Whether Defendants' alleged anticompetitive conduct itself was a material cause of the Sun's injury.

14. Whether the Sun's injury flows from an anticompetitive effect or aspect of the Defendants' behavior, as evidenced by a reduction of competition that has the effect of harming consumer welfare through higher prices or diminished quality. Sub-issues of fact include:

   a. Whether the Sun suffered injury in the market in which it alleges the Defendants

- 55 -

125912233.1

have harmed competition, the market for the sale printed daily newspapers in Clark County.

15. If Defendants are found to have engaged in anticompetitive conduct, then whether such conduct was undertaken by each Defendant with the specific intent for the Review-Journal to achieve monopoly power in the relevant market. Sub-issues of fact include:

    a. Whether each Defendant lacked a legitimate business justification for the conduct that is alleged to be anticompetitive.

    b. Whether the purpose of each Defendant's alleged anticompetitive conduct was to gain control over the pricing of print newspapers and / or to exclude or destroy competition in the relevant market.

    c. Whether each Defendant's alleged intent goes beyond the mere intent to do the conduct that is alleged to be anticompetitive.

    d. Whether the alleged anticompetitive conduct forms the basis for a substantial claim of restraint of trade, is clearly threatening to competition, or clearly exclusionary.

16. If Defendants are found to have had the specific intent to achieve a monopoly in the relevant market and engaged in anticompetitive conduct in order to do so, then whether there was a dangerous probability that the Review-Journal would succeed in achieving monopoly power in the relevant market if it continued to engage in the same or similar conduct.

17. If Defendants are found to have violated antitrust laws, and such violation is found to have caused injury to the Sun of the type that antitrust laws were intended to prevent, then the amount necessary to compensate the Sun for the alleged damages to its business or property that were a direct result or likely consequence of the conduct found to have violated antitrust laws.

18. If the Sun's injuries are determined to be caused by a combination of lawful and unlawful conduct by Defendants, then whether the Sun's alleged injury can be reasonably apportioned between the amounts attributable to lawful and unlawful anticompetitive conduct.

19. If the Sun is found to have been injured by the unlawful anticompetitive conduct of

Defendants, then whether the Sun took all reasonable steps it could have to avoid further injury and thereby reduce its loss.  Sub-issues of fact include:

    a.  Whether the Sun acted unreasonably in contributing to its losses and / or failing to take steps to minimize or limit its losses.

    b.  Whether the Sun's failure to take steps to minimize or limit its losses resulted in its losses being greater than they would have been had the Sun taken such steps.

    c.  If the prior two sub-issues of fact are determined in the affirmative, then the amount of the Sun's loss that would have been reduced had the Sun taken those steps.

20. Whether Adfam entered into a contract, combination, or conspiracy with News+Media and/or the Review-Journal to unreasonably restrain trade or commerce in the relevant market.

21. Whether Adfam and its alleged co-conspirators the Review-Journal and News+Media are separate economic entities from one another, with distinct interests, such that they are capable of conspiring with one another.

22. Whether Adfam on the one hand, and the Review-Journal and/or News+Media on the other hand, knowingly became members of a contract, combination or conspiracy intended to unreasonably harm or restrain trade or commerce in the relevant market. Sub-issues of fact include:

    a.  Whether Adfam engaged in economic actions that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action with the Review-Journal and/or News+Media,

23. Whether the contract, combination, or conspiracy at issue did in fact result in an unreasonable restraint of trade or commerce in the relevant market. Sub-issues of fact include:

    a.  Whether the Sun has shown the contract, combination, or conspiracy has resulted (or is likely to result) in substantial harm to competition in the relevant market, including consideration of:

        i.  the purpose and nature of the restraint;

125912233.1

ii.  the nature and structure of the relevant market;

iii.  whether the restraint involved a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality;

iv.  the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

v.  whether the Review-Journal possesses monopoly power.

b.  Whether such contract, combination or conspiracy was undertaken by each alleged participant with the specific intent to eliminate the print *Las Vegas Sun* insert from the market.

c.  Whether the alleged harm to competition caused by the restraint on trade is outweighed by pro-competitive effects of such alleged restraint or is otherwise justified.

24. Whether the alleged restraint on trade at issue has caused the Sun to suffer an injury to its business or property.

25. Whether the Sun's injury attributable to the alleged restraint of trade flows from an anticompetitive effect or aspect of the Defendants' behavior, as evidenced by a reduction of competition that has the effect of harming consumer welfare through higher prices or diminished quality. Sub-issues of fact include:

a.  Whether the Sun suffered the relevant injury in the market in which it alleges the Defendants have harmed competition, the market for the sale of printed daily newspapers in Clark County.

26. Whether each of the RJ's promotional activities satisfies Section 5.1.4 of the 2005 JOA.

27. Whether the Section 5.2 quality provision applies only to the printed Sun's appearance or the quality of its content.

28. Whether the Sun complied at all times with its obligation to "preserve high standards of newspaper quality throughout the term of this Restated Agreement consistent with United States metropolitan daily newspapers." ECF No. 40-5 ("2005 JOA") at § 5.2.

29. Whether the Sun complied at all times with its obligation to "take all corporate action necessary to carry out and effectuate the intent, purposes and provisions of [the 2005 JOA]," and to "cooperate with the other party in every reasonable way that will promote successful and lawful operation under [the 2005 JOA] for both parties." 2005 JOA § 5.3.

    a. This includes whether the Sun engaged in the following conduct:

        i. intentionally withholding original and/or breaking local news content from the printed *Sun*;

        ii. filling the printed *Sun* with a disproportionate quantity of content from third parties, such as days-old wire-service articles, instead of original content from its newsroom which was placed exclusively on the Sun's website;

        iii. taking these and other actions to undermine the quality of the printed product for the purpose of diverting readers from the joint newspaper to the Sun's website; and

        iv. publishing a "Note to Readers" which encouraged readers not to subscribe to the joint newspaper.

    b. Whether the foregoing conduct was in breach of the Sun's obligations under Section 5.3 of the 2005 JOA.

30. Whether the Review-Journal has been damaged in connection with the Sun's breach of Section 5.2 and / or Section 5.3 of the 2005 JOA.

31. If the Review-Journal has been damaged in connection with the Sun's breach of Section 5.2 and / or Section 5.3 of the 2005 JOA, then the amount necessary to compensate the Review-Journal for such damages.

32. Whether the Sun has breached the Implied Covenant of Good Faith and Fair Dealing by acting in a manner that deliberately contravenes the intention and spirit of the 2005 JOA. This includes whether the Sun's lowering of the quality of the *Sun*'s print insert by intentionally withholding original content from the *Sun*'s print insert, and its efforts to divert readers from the joint newspaper to the Sun's website, are inconsistent with the Sun's duties to follow the intention and spirit of the 2005 JOA.

125912233.1

33. If the Sun is found to have breached the Implied Covenant of Good Faith and Fair Dealing, then whether the Review-Journal's justified expectations that the Sun would perform in good faith pursuant to the 2005 JOA were denied.

34. If the Sun is found to have breached the Implied Covenant of Good Faith and Fair Dealing, then whether the Sun's conduct in breach of the Covenant was a substantial factor in causing damage to the Review-Journal.

35. If the Review-Journal has been damaged in connection with the Sun's breach of the Implied Covenant of Good Faith and Fair Dealing, then the amount necessary to compensate the Review-Journal for such damages.

36. Whether Brian Greenspun engaged in actions intended to disrupt the contractual relationship between the Sun and the Review-Journal under the 2005 JOA. Sub-issues of fact include:

    a. Whether Brian Greenspun engaged in intentional actions that caused or contributed to the Sun withholding the large majority of its original reporting from the print edition of the *Sun*, and instead publishing the withheld original content exclusively on the Sun's website.

    b. Whether Brian Greenspun engaged in an intentional strategy aimed at diverting existing print subscribers away from the joint newspaper and toward the Sun's website.

    c. Whether Brian Greenspun engaged in intentional actions to disrupt the contractual relationship between the Sun and the Review-Journal with the goal of allowing the Sun to obtain an outsized buyout from the owners of the Review-Journal.

37. Whether Brian Greenspun's actions in the foregoing regard in fact disrupted operations of the 2005 JOA.

38. Whether Review-Journal was damaged by Mr. Greenspun's conduct.

39. If the Review-Journal has been damaged in connection with the Brian Greenspun's tortious interference, then the amount necessary to compensate the Review-Journal for such damages.

- 60 -

40. Whether Brian Greenspun's conduct was willful and intentional, and expressed oppression, fraud, or malice, justifying exemplary or punitive damages.

41. Whether the Sun has proven each of the following alleged alter ego relationships: (i) Adfam is the alter ego of the Review-Journal and News+Media; (ii) Sheldon Adelson was the alter ego of the Review-Journal, News+Media, and Adfam; and (iii) Patrick Dumont is the alter ego of the Review-Journal, News+Media, and Adfam. With respect to each of the foregoing alleged alter ego relationships, the following inquiries are to be addressed by the Court (not a jury) in order to allow the Court to make any ultimate determination as to alter ego status:

   a. Whether the alleged alter ego influences and/or governs the entity for which they are alleged to have alter ego status.

   b. Whether there is a unity of interest and ownership such that the alleged alter ego and the corresponding entity are inseparable from one other.  This includes whether there was: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as belonging to the alleged alter ego; and (5) failure to observe corporate formalities.

   c. Whether treating the alleged alter ego and corresponding entity as separate from one another would sanction fraud or promote a manifest injustice.

42. Whether the Review-Journal has proven each of the following alleged alter ego relationships: (i) Greenspun Media Group is an alter ego of the Sun; and (ii) Brian Greenspun is an alter ego of the Sun. With respect to each of the foregoing alleged alter ego relationships, the following inquiries are to be addressed by the Court (not a jury) in order to allow the Court to make any ultimate determination as to alter ego status:

   d. Whether the alleged alter ego influences and/or governs the entity for which they are alleged to have alter ego status.

   e. Whether there is a unity of interest and ownership such that the alleged alter ego and the corresponding entity are inseparable from one other.  This includes whether there was: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as belonging to the alleged alter ego; and

- 61 -

1    (5) failure to observe corporate formalities.

2    f.    Whether treating the alleged alter ego and corresponding entity as separate from one

3    another would sanction fraud or promote a manifest injustice.

4    43. Whether the Review-Journal's performance under the 2005 JOA is excused by the Sun's

5    prior breaches of the 2005 JOA. Sub-issues of fact include:

6    a.    Whether the Sun breached Section 5.2 of the 2005 JOA by failing to maintain high

7    quality standards consistent with U.S. metropolitan daily newspapers, and whether

8    this breach excuses the Review-Journal's performance under the 2005 JOA.

9    b.    Whether the Sun breached Section 5.3 of the 2005 JOA by failing to cooperate with

10    the Review-Journal and whether this breach excuses the Review-Journal's

11    performance under the 2005 JOA

12    c.    Whether the Sun breached Section 10.6 of the 2005 JOA by putting its editorial

13    content in print after publishing that content on its website, and whether this breach

14    excuses the Review-Journal's performance under Section 10.6 or otherwise under

15    the 2005 JOA.

16    44. Whether the Review-Journal's performance under the 2005 JOA is excused by the lack

17    and/or failure of consideration (i.e., the ongoing consideration the 2005 JOA contemplated

18    would be received by the Review-Journal).

19    45. Whether the Sun's claims are barred, in whole or in part, by the doctrine of waiver. Sub-

20    issues of fact include:

21    a.    Whether the Sun's ongoing knowledge of the omission of the *Las Vegas Sun* section

22    from the e-Edition of the joint newspaper, and the Sun's inaction in failing to notify

23    the Review-Journal during the period when it had full knowledge of this fact,

24    operates to bar the Sun's claims, in whole or in part, by the doctrine of waiver and /

25    or acquiescence.

26    b.    To the extent the Sun claims other purported breaches of the 2005 JOA are

27    predicates of the Sun's claims (including any alleged non-compliance with respect

28    to the Sun's audit rights under the 2005 JOA), and the Sun did not provide the

125912233.1

Review-Journal notice of such purported breach or an opportunity to cure such purported breach, whether such facts operate to bar the Sun's claims, in whole or in part, by the doctrine of waiver.

46. Whether the Sun's claims are barred, in whole or in part, by a failure of a condition. Sub-issues of fact include:

    a.  Whether the Sun complied with Section 10.6 of the 2005 JOA by putting its editorial content in print after publishing that content on its website in violation of Section 10.6.

47. Whether the Sun's claims are barred, in whole or in part, by the doctrines of acquiescence, unclean hands, unjust enrichment and/or ratification, as well as other applicable equitable doctrines. Sub-issues of fact include:

    a.  Whether the Sun had prior knowledge of the Review-Journal's practices with respect to allocation of editorial costs in the calculation of the Sun's annual profits payments, leading the Review-Journal to believe the Sun approved of this accounting practice.

    b.  Whether the Sun's knowledge of the omission of the *Las Vegas Sun* section from the e-Edition of the joint newspaper, and the Sun's inaction in failing to notify the Review-Journal during the period when it had knowledge of this fact, led Defendants to believe the Sun approved of this practice.

    c.  Whether the Sun intentionally withheld timely original content from its print insert, while filling its print insert with stale content, as well as a disproportionate amount of wire service and / or syndicated content, thereby reducing the quality of the joint newspaper and breaching Sections 5.2 and 5.3 of the 2005 JOA.

    d.  Whether the Sun breached its obligations under Section 10.6 of the 2005 JOA by putting its editorial content in print after publishing that content on its website in violation of Section 10.6.

48. Whether any damages allegedly incurred by the Sun are the result of acts and omissions of persons other than Defendants and therefore any alleged acts or omissions of Defendants

- 63 -

did not proximately cause the Sun's alleged damages. Sub-issues of fact include:

    a.   Whether any damages allegedly incurred by the Sun are the result of market conditions.

    b.   Whether any damages allegedly incurred by the Sun are the result of the Sun's conduct which led to a reduction of quality of the print *Las Vegas Sun* insert.

49. Whether the Sun failed to mitigate its alleged damages. Sub-issues of fact include:

    a.   To the extent the Sun is found to have suffered damages, whether the Sun has taken all reasonable steps to avoid further injury and thereby reduce its associated loss.

    b.   Whether the Sun took reasonable steps to mitigate its damages by complying with the audit and arbitration provisions of the 2005 JOA and the arbitrator's 2019 ruling.

    c.   Whether the Sun has ever independently engaged in any advertising or promotional efforts to promote the joint print media product or the print *Las Vegas Sun* insert.

    d.   Whether the Sun took adequate steps to put the Review-Journal on notice of the exclusion of the Sun section from the e-Edition of the joint newspaper and / or exclusion of the Sun logo from promotions.

    e.   Whether the Sun took adequate steps to put the Review-Journal on notice of the alleged failure to include the Sun logo, and / or alleged lack of prominence of the Sun logo, in promotional materials.

    f.   Whether the Sun took deliberate actions to drive readers away from the joint newspaper, including taking intentional action which reduced the quality of the print *Las Vegas Sun* insert.

## VI.   CONTESTED ISSUES OF LAW TO BE TRIED AND DETERMINED UPON TRIAL (LR 16-3(b)(5))

The following are the issues of law identified separately by the parties to be tried and determined at trial:

### A.   SUN'S CONTESTED ISSUES OF LAW

The Sun states that, in addition to evidentiary issues, including the issues to be raised in the parties' motions *in limine*, the following issues of law have arisen from the RJ's Contested Issues of Law and Fact listed *supra*.

1.     Whether the RJ has admitted, as a matter of law, the following issues of fact:

a.     The Sun publishes a daily print newspaper in Clark County, Nevada. ECF No. 978 ¶ 2.

b.     The Sun and the Review-Journal newspapers are the only English-language daily, local, print newspapers published in Clark County and southern portions of Nye County. ECF No. 978 ¶ 49.

c.     Local newspapers incur fixed costs. ECF No. 978 ¶ 51.

d.     In 1989, the Sun and the Review-Journal entered into a joint operating arrangement memorialized in the Joint Operating Agreement ("1989 JOA"). ECF No. 978 ¶ 26.

e.     Under the terms of the 1989 JOA, the "Review-Journal agree[d] to produce the Sun daily as an afternoon newspaper" and produce the "Review-Journal daily as a morning newspaper" using "equipment owned or leased by the Review-Journal in the Review-Journal plant or plants." 1989 JOA § 5.1.

f.     The Review-Journal was "responsible for and ha[d] ultimate decision-making authority" for all non-editorial operations of the Newspapers, including "responsib[ilities] for management, printing, and other commercial functions of the newspapers," such as setting the rates for, and soliciting, advertising and circulation, among other obligations. 1989 JOA §§ 5.1, 6.1-.4.

g.     The 1989 JOA required the Sun to cease publication as a morning newspaper and to instead be circulated in the afternoon position. *See* 1989 JOA § 5.1.

h.     In the 1989 JOA, the parties promised to "[p]reserve[e] … the news and editorial independence and autonomy of both" Newspapers, which was the "essence" of the agreement, and each newspaper had "exclusive and complete control, authority

and direction over the news and editorial content, features and services." 1989 JOA § 5.2.

i.      The 1989 JOA was approved in writing by the Department of Justice, under the Newspaper Preservation Act of 1970, 15 U.S.C § 1803(b).  ECF No. 978 ¶ 1.

j.      In 2005, the Sun and Review-Journal entered into the Amended and Restated Agreement ("2005 Amended JOA"). ECF No. 978 ¶ 32.

k.      Under the 2005 Amended JOA, the parties combined the two newspapers into a dually packaged bundle ("Newspaper Bundle"). ECF No. 978 ¶ 32.

l.      Under the 2005 Amended JOA, the Review-Journal is required to "produce the Sun daily as a morning newspaper" and "print the Newspapers in the Review-Journal plant or plants located at such place or places as Review-Journal may determine." 2005 Amended JOA § 5.1.

m.      The Review-Journal is also required to "control, supervise, manage and perform all operations involved in managing and operating under th[e] Restated Agreement, including . . . printing, selling and distributing the Newspapers, . . . solicit[ing] and sell[ing] all advertising space in the Newspapers, [and] . . . determin[ing] circulation rates." 2005 Amended JOA § 5.1.

n.      While the RJ assumes these operational responsibilities, the Sun has retained "exclusive and complete control, authority and direction over the news and editorial content, features and services to be furnished by Sun to Review-Journal to be included in its newspaper." 2005 Amended JOA § 5.2.

o.      "So long as Sun furnishes news and editorial copy, features and services to Review-Journal in accordance with Article 4 of th[e] Restated Agreement, Review-Journal agree[d] to produce the Sun daily as a morning newspaper as provided" in the Amended JOA. 2005 Amended JOA § 5.1.

p.      Section 5.1 and Appendices A.2 and B set forth specifications that apply to the Sun newspaper's "number, placement, and characteristics of Sun pages." 2005 Amended JOA App'x A.2, § 5.1, App'x B.

q.      Appendix A.2(d) provides for a "noticeable mention" of the Sun to appear "on the front page of the Review-Journal" according to the following specifications:

The Monday-Sunday editions of the Review-Journal shall include a noticeable mention of the Sun, on the front page of the Review-Journal. The noticeable mention will appear in a box above the Review-Journal's masthead (the "Sun Box") and shall be in the form shown on Appendix B. The Sun Box shall not be smaller in proportion than shown in Appendix B. The Sun Box shall also include the Sun's masthead, and any emblem that is part of the Sun's masthead. The Sun Box shall include a promotion of a story in the Sun and refer readers to the Sun inside. The type face, editorial artwork, font, and editorial promotional content appearing in the Sun Box shall be determined by Sun, in its sole discretion. Any color in the Sun Box shall be restricted to constituent colors used by the Review-Journal on its front page. The Sun Box shall be the left-hand box unless it would be obscured by a spaeda fold, in which case the Sun Box shall be the right-hand box. In the event of major breaking news or for exigent production circumstances, the Sun Box may be moved below the Review-Journal's masthead. The Sun, on average, will receive as much editorial color as the local news section of the Review-Journal.

2005 Amended JOA App'x A.2(d).

r.      Appendix B of the Amended JOA provided illustrations as samples of how the Sun Box is to appear when the Review-Journal published the Newspaper Bundle with a spadea and without a spadea. 2005 Amended JOA App'x B.

s.      Section 5.1.4 provides, in part, "Review-Journal shall use commercially reasonable efforts to promote the Newspapers. Any promotion of the Review-Journal as an advertising medium or to advance circulation shall include mention of equal prominence for the Sun. Either the Review-Journal or Sun may undertake additional promotional activities for their respective newspaper at their own expense." 2005 Amended JOA § 5.1.4.

t.      Under Section 10.6, the Review-Journal is "obligat[ed] to distribute the Sun through electronic replica technology (i.e. technology customarily used by metropolitan daily newspapers which transmits an entire Sun page to the subscriber or consumer in any form) to the same extent the Review-Journal distributes its own pages by such means provided." 2005 Amended JOA § 10.6. The Review-Journal's

- 67 -

electronic replica technology is referred to as the "electronic replica edition" of the newspapers.

u.      The Amended JOA provides that the "Sun shall receive an annual profits payment (the 'Annual Profits Payment'), one-twelfth (1/12th) of which shall be paid monthly in advance on the first day of each month during the Term." 2005 Amended JOA App'x D.

v.      The term of the Amended JOA is set to expire on December 31, 2040. 2005 Amended JOA § 1.2.

w.      The Sun and Review-Journal are published and distributed to readers in or near Clark County, and southern portions of Nye County, Nevada. ECF No. 978 ¶ 49.

x.      Clark County, and southern portions of Nye County, Nevada, is the relevant geographic market and sections of the country for antitrust purposes as alleged by the Sun for its relevant market. ECF No. 978 ¶ 48.

y.      On December 10, 2015, Defendant News+Media, through members of the Adelson family who own a controlling interest, acquired the Review-Journal from GateHouse Media LLC (also referred to herein as "GateHouse") for $140 million. ECF No. 978 ¶¶ 1, 8, 12.

z.      Dr. Miriam Adelson and Sivan Dumont have employment relationships with News+Media and the Review-Journal. ECF No. 978 ¶ 9.

aa.     Defendant Sheldon Adelson was co-employed by the Review-Journal and News+Media, and he was the co-publisher of the Review-Journal. ECF No. 978 ¶¶ 9, 12.

bb.     Dumont is co-employed by the Review-Journal and News+Media, and he is the deputy publisher of the Review-Journal. ECF No. 978 ¶¶ 9, 14.

cc.     Adelson was the founder, chairman, and Chief Executive Officer of the Las Vegas Sands Corporation and, as such, influenced the Las Vegas Sands Corporation's business. ECF No. 978 ¶ 11.

dd.    The Las Vegas Sands Corporation previously owned and operated the Venetian Las Vegas and the Palazzo Las Vegas. ECF No. 978 ¶ 11.

ee.    As of December 31, 2018, Adelson, his family members, trusts and other entities established for his benefit and/or his family members' benefit owned approximately 56% of Las Vegas Sands Corporation's outstanding common stock. ECF No. 978 ¶ 11.

ff.    Dumont was previously the Executive Vice President and Chief Financial Officer of the Las Vegas Sands Corporation. ECF No. 978 ¶ 14.

gg.    Dumont is the President and Chief Operating Officer of the Las Vegas Sands Corporation, and he is a member of the board of directors of the Las Vegas Sands Corporation. ECF No. 978 ¶ 14.

hh.    O'Connor was appointed as the President, Secretary, Treasurer, and Director of the Review-Journal on January 20, 2016. ECF No. 978 ¶ 18.

ii.    Jason Taylor served as publisher of the Review-Journal from December 2015 until January 2016. ECF No. 978 ¶ 68.

jj.    The RJ replaced Jason Taylor with Craig Moon as Publisher of the Review-Journal in 2016. ECF No. 978 ¶ 75.

kk.    O'Connor was not involved in the RJ's decision to replace Jason Taylor with Craig Moon. ECF No. 978 ¶¶ 81, 140.

ll.    In 2016, the Review-Journal endorsed Donald J. Trump for President, and Adelson made financial contributions to Donald J. Trump's campaign. ECF No. 978 ¶¶ 7, 13.

mm.    On May 12, 2016, the Sun notified the RJ of the Sun's intent to examine and audit the Review-Journal's books and records pursuant to Appendix D of the 2005 Amended JOA. ECF No. 978 ¶ 114.

nn.    In May 2016, the Sun requested documentation for the audit from the Review-Journal. ECF No. 978 ¶¶ 114, 115.

oo.     In July 2016, the Review-Journal objected to the Sun's request for documentation. ECF No. 978 ¶ 115.

pp.     During the January 25, 2017, meeting, the Review-Journal informed the Sun that the Sun's annual profits payments were expected to significantly decrease. ECF No. 296 ¶ 66.

qq.     Since the end of the 2017 fiscal year, the RJ has not made any JOA-related profit payments to the Sun. ECF No. 978 ¶ 79.

rr.     In March 2017, the RJ informed the Sun that it would be publishing the Review- Journal with a redesigned front page commencing at the beginning of April 2017. ECF No. 978 ¶ 98.

ss.     An accurate depiction of the March 31, 2017, front page of the Review-Journal with the Sun's noticeable mention in the "Sun Box" published pursuant to Appendices A.2(d) and B is shown below:



ECF No. 978 ¶ 101.

tt.     Beginning in April 2017, the Review-Journal published its newspaper with a redesigned front page that changed the Sun's noticeable mention from the Sun Box. ECF No. 978 ¶ 99.

uu.     An accurate depiction of the April 2, 2017, front-page of the Review-Journal is shown below:

125912233.1

IN THE SUN TIRED OF 'NEGATIVE' NEWS? BLAME PRESIDENT TRUMP LAS VEGAS SUN

LAS VEGAS
REVIEW-JOURNAL

NEW SECTIONS ENT. and ETC. debut, bring more entertainment and style

RAIDERS SECTION Everything you need to know about Las Vegas' new team

$674 IN COUPONS INSIDE

SUNDAY
April 2, 2017
$3

BREAKING NEWS
24-7-365

MUST READS
Nevada & the West

Vegas
CONVENTION AND VISITORS AUTHORITY

KEITH MOYER
FROM THE EDITOR-IN-CHIEF
We've changed for the better

ECF No. 978 ¶ 102.

vv. The RJ has published the Review-Journal's redesigned front page from April 2, 2017, to the present. ECF No. 978 ¶¶ 99, 102.

ww. The Review-Journal has covered a portion of the Sun's front-page content with advertising stickers. ECF No. 978 ¶ 106.

xx. On September 5, 2017, the Sun renewed its audit request and the Review-Journal objected to the Sun's request. ECF No. 978 ¶ 117.

yy. On November 28, 2017, the Review-Journal agreed to produce certain categories of documents requested by the Sun. ECF No. 978 ¶ 117.

zz. On December 21, 2017, the RJ represented that its anticipated production of documents would occur within the first two weeks of January 2018. ECF No. 978 ¶ 119.

aaa. The Review-Journal did not provide the anticipated audit documents to the Sun within the first two weeks of January 2018. ECF No. 978 ¶ 119.

bbb. From January 26, 2018, to May 3, 2019, the Review-Journal omitted the Sun from the electronic replica edition of the Newspapers. ECF No. 978 ¶¶ 110-111.

ccc. The electronic replica edition of the Newspaper Bundle is made available for free to students as part of the Newspapers in Education program ("NIE"). The NIE program assists the community and education, and its goal is to inspire the next generation of newspaper readers. The NIE program provides local teachers with online classroom resources to use the newspapers as a living textbook in their

classrooms. Participating in the NIE program has many benefits for local children and schools, including sharpening thinking skills, increasing students' interest and motivation by providing study materials relevant to their lives, preparing students for active citizenship in their democracy, heightening teachers' interest in new teaching techniques, involving schools in the lives of the communities they serve, improving relations with students' families, responding to the needs of local businesses for future employers, and helping prepare students for state and national standardized tests. The NIE program also benefits the Clark County community by enhancing the quality of citizen participation in schools and local government through better mutual understanding among journalists, educators, students and parents, transforming students into interested, active citizens, and recognizing newspapers as the main source of continuing education for members of the community once they are no longer in the classroom. The electronic replica edition of the Newspaper Bundle is available for free to students as part of the NIE program, and is available on the Review-Journal's website through a subscription. *See* Defs.' First Am. Resp. to Pl.'s Interrog. (First Set), at 21-22 (Mar. 19, 2021).

ddd.    The 2019 Arbitration resulted in a valid, final judgment. ECF No. 970 at 29-30.

eee.    The RJ cannot charge the Review-Journal's editorial costs against the Joint Operation EBITDA. ECF No. 970 at 29.

fff.    The RJ cannot charge the Review-Journal's independent promotional expenses for promotional activities of the Review-Journal as an advertising medium or to advance circulation that do not include mention of equal prominence for the Sun against the Joint Operation EBITDA. ECF No. 970 at 29.

ggg.    On August 30, 2019, after the 2019 Arbitration, in the related state court action pending in Clark County, Nevada, as Case No. A-18-772591-B, the Review-Journal and News+Media moved to amend their answer, and the Review-Journal

moved to assert counterclaims against the Sun to, among other things, terminate the 2005 Amended JOA.

2.      Whether this Court already resolved the following issues as a matter of law in its Order on the parties' cross-motions for summary judgment (ECF No. 970), or in its Order Granting Motion for Reconsideration (ECF No. 1006), thereby precluding the RJ from challenging these issues at trial:

a.      The 2005 Amended JOA is a valid and existing contract. ECF No. 970 at 13-20, 39.

b.      The dimension of competition at issue between the Sun and the Review-Journal newspapers is editorial and reportorial competition for readers. ECF No. 970 at 21-24.

c.      The Sun is a separate and independent newspaper product distributed in the jointly packaged Newspaper Bundle, and not, as the RJ contends, a single product. *Compare* ECF No. 970 at 28 *with supra* § V(B) ¶ 2(b)(i) & *infra* § VI(B) ¶ 5. Sub-issues of law include:

i.      What a "single product market," as the RJ contends, means, if anything, under the law;

ii.      Whether the Sun and the Review-Journal's collection of content for their respective newspapers, and the production, sale, and distribution of the Newspaper Bundle affect interstate commerce. *See generally* ECF No. 970 at 22-23.

d.      The Sun competes editorially and reportorially with the Review-Journal for readers' attention. ECF No. 970 at 28.

e.      The Sun and Review-Journal's editorial and reportorial competition for readership/readers' attention has economic effects on newspapers under antitrust laws, and affects interstate commerce, and is not as the RJ contends, "competition for post-sale readership" not within trade or commerce. *Compare* ECF No. 970 at 22-23 *with supra* § V(B) ¶ 2(b).

- 73 -

f.      The Sun and the Review-Journal's collection of content for their respective newspapers, and the production, sale, and distribution of the Newspaper Bundle affect interstate commerce. *See generally* ECF No. 970 at 22-23; *Lorain Journal Co. v. United States*, 342 U.S. 143, 151 (1951).

g.      The RJ's payment of the 2019 Arbitration Award does not bar the Sun from recovering damages resulting from the RJ's editorial cost accounting abuses; however, the RJ's prior payment satisfying the judgment from the 2019 Arbitration Award should be deducted from any actual damages awarded to the Sun on its antitrust claims after the award is trebled. *Compare* ECF No. 970 at 33 *with infra* § VI(B) ¶ 13.

h.      The 2019 Arbitration does not bar the Sun from arguing for damages stemming from the RJ's charging its independent promotional expenses (for promotional activities of the Review-Journal as an advertising medium or to advance circulation that did not include mention of equal prominence for the Sun) to the Joint Operation during the time period from December 11, 2015, through March 31, 2018. ECF No. 1006 at 5.

i.      The Sun did not stand to gain from the conduct the Sun alleges the RJ undertook. ECF No. 970 at 26.

j.      The Sun's claimed injury is not the result of increased competition or lower, non-predatory prices. ECF No. 970 at 28.

k.      A reasonable jury could find for the Sun on its antitrust claims:

      i.      Monopolization under Section 2 of the Sherman Act;

      ii.     Attempted Monopolization under Section 2 of the Sherman Act;

      iii.    Violation of Nevada's Unfair Trade Practices Act;

      iv.     Violation of Section 1 of the Sherman Act;

      v.      Damages resulting from the RJ's Anticompetitive Conduct.

      *Compare* ECF No. 970 at 20-28, 49 *with infra* § VI(B) ¶¶ 15-19.

l.      The Newspaper Bundle did not lose subscribers as a result of the Sun's actions alleged by the Review-Journal to support its claims. ECF No. 970 at 45-46.

m. The only triable damages alleged to have been incurred by the Review-Journal as a result of the Sun's alleged conduct are the printing costs associated with printing the Sun newspaper. *See* ECF No. 970 at 45-47.

3. Whether the RJ is precluded from arguing that the Sun's relevant product market is anything other than English-language, local, daily, print newspapers. *See, e.g.*, ECF No. 621 ¶¶ 43, 45-46, 49, 50-53, 124, 62, 128; ECF No. 187 at 3, 4, 9; ECF No. 20 at 1-2, ECF No. 296 ¶ 106; ECF No. 311 at 13; ECF No. 752 at 8, 13; *see also* ECF No. 475 at 15, 18-21; *id.* at 19; ECF No. 449 at 22; ECF No. 514 at 3; ECF No. 535 at 4; ECF No. 585 at 3, 13 n.5; ECF No. 693 at 13; ECF No. 733 at 3, 13-14; ECF No. 761 at 4. Sub-issues of law include:

a. Whether the Sun's claimed relevant product market is English-language, local, daily, print newspapers.

b. Whether the Sun is entitled to rely on its expert economist, Dr. Michael Katz's relevant product market, which is English-language, daily, local, print newspapers. *See, e.g.*, *Bristol-Myers Squibb Co. v. Ben Venue Lab'ys*, 90 F. Supp. 2d 540, 546-47 (D. N.J. 2000); *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 648 F. Supp. 3d 679, 725 (E.D. Va. 2023); *Nukote of Ill., Inc. v. Clover Holdings, Inc.*, 2015 WL 13729264, at *9 (N.D. Tex. Sept. 10, 2015).

c. Whether a "sale" is a "product (or product line)" for purposes of antitrust relevant product market, or whether the sale is an activity that occurs within the market defined by its product and geographic scopes. *See JBL Enters., Inc. v. Jhirmack Enters., Inc.*, 698 F.2d 1011, 1016 (9th Cir. 1983).

4. If the RJ is suggesting (as it has previously argued) that the Sun can be a substitute for the Review-Journal newspaper only if readers consume one newspaper to the exclusion of the other, then whether that suggestion is correct or if the Sun and the Review-Journal can be substitutes as long as they are reasonably interchangeable.

5. If the RJ now contends (as it has previously argued) that whether a product "faces *any* competition" for the Review-Journal and Sun newspapers is the appropriate legal standard for determining the relevant product market (*see supra* § V(B) ¶ 2(e) (emphasis added)), or whether

the products must be sufficiently close substitutes, whereby the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it (*see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)), including through a Hypothetical Monopolist Test, which asks "whether a [hypothetical] monopolist in the proposed market could profitably impose a small but significant and nontransitory price increase" (*Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008)), to accurately define the relevant product market.

6.     Whether, as the RJ contends, a two-sided platform that participates in two related but distinct markets such as newspapers is the same as a two-sided transaction platform under antitrust laws, and requires that both sides be included in a single relevant market. *Compare supra* § V(B) ¶ 3(a) *with Ohio v. Am. Express Co*., 585 U.S. 529, 544-45 (2018) & ECF No. 475 at 17-19. Sub-issues of law include:

   a.     Whether the advertising side of the Sun's and RJ's newspaper platforms is at issue in this lawsuit. *See generally* ECF No. 621; *compare* ECF No. 475 at 19-22 *with* ECF No. 482 at 11.

   b.     Whether the RJ has waived or is otherwise precluded from arguing that the relevant market includes the advertising market. *See* ECF No. 482 at 11; ECF No. 505 at 5-6; ECF No. 693 at 12-15; ECF No. 703 at 13-14; ECF No. 713 at 2; ECF No. 716 at 16-18; ECF No. 752 at 8-13.

7.     Whether, as the RJ contends, that market share in the relevant market is solely measured "as a percentage of total sales in the relevant market." *See supra* § V(B) ¶ 3(b).

8.     Whether, as the RJ contends, its Anticompetitive Conduct is limited to "operat[ing] the *Las Vegas Review-Journal* newspaper in an unprofitable manner. *Compare supra* § V(B) ¶ 4(c) *with supra* § V(A)(1) ("Anticompetitive Conduct").

9.     Whether specific intent is required for the Sun's monopolization claim, as suggested by the RJ (*see supra* § V(B) ¶¶ 4(c), (c)(i)-(vi)), or whether, instead, the Sun must show that the RJ undertook the Anticompetitive Conduct that, taken as a whole, demonstrates a general intent to exclude competition from the relevant market. *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th

125912233.1

1130, 1137 (9th Cir. 2022); *Verizon Commc'ns, Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

      10.    Whether, as the RJ contends, each Defendant is required as a matter of law to have "*engaged in independent action* in furtherance of the anticompetitive scheme that was the purpose of such single economic unit." *Supra* § V(B) ¶¶ 9-12 (emphasis added)). Sub-issues of law include:

          a.    Whether, instead, "in a single-enterprise situation, it is the affiliated corporations' [and individuals'] collective conduct—i.e., the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a monopolization or attempted monopolization claim" and not each individual Defendant. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc*., 847 F.3d 1221, 1236 (10th Cir. 2017) (emphasis in original); *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 631 (9th Cir. 2018) (summarizing *Lenox* and the Tenth Circuit's conclusion that the plaintiff's burden in establishing liability requires "showing only that the defendant's conduct played a 'role' in the overall anticompetitive scheme perpetrated by the enterprise as a whole"); *see also* ECF No. 243 at 19-20.

          b.    Whether, instead, Adfam acted solely in the interests of the other Defendants in participating in the Anticompetitive Conduct alleged, or whether it had an independent reason for and interest in improperly disadvantaging or eliminating the Sun as a competitor in the Relevant Market.

      11.    Whether, as the RJ contends, consumer welfare can only be harmed through "higher prices or diminished quality" (*see supra* § V(B) ¶¶ 14, 25), and not also by elimination of a newspaper editorial voice (15 U.S.C. § 1801; *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1195 (N.D. Cal. 2000); *U.S. v. Daily Gazette Co.*, 567 F. Supp. 2d 859, 868 (S.D. W. Va. 2008); *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1251-52 (D. Haw. 1999)), and diminished choice. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983-84 (9th Cir. 2023) (citing *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n Inc.*, 883 F.3d 32, 42 (2d Cir. 2018)); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983).

125912233.1

12.     Whether, as the RJ contends, each Defendant was required to possess "specific intent" in undertaking the Anticompetitive Conduct for the RJ to achieve monopoly power in the Relevant Market" (*see supra* § V(B) ¶¶ 15, 23(b)), or whether the Sun only needs to demonstrate each Defendants' "specific intent" to monopolize for its attempted monopolization and conspiracy to monopolize claims. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997); *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir. 1980). Sub-issues of law include:

a.     Whether the Sun need only establish "the existence of a conspiracy in violation of antitrust laws and that [Defendants] were a part of such a conspiracy," for Defendants to be "liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of [each Defendants'] own actions," for "the action of any of the conspirators to restrain trade or monopolize trade is, in law, the action of all." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980).

b.     Whether, as the RJ contends, "each" Defendant was required to lack a legitimate business justification for the Anticompetitive Conduct. *See supra* § V(B) ¶ 15(a).

c.     Whether, as the RJ contends, Defendants' alleged intent must "go[ ] beyond the mere intent to do the conduct that is alleged to be anticompetitive" (*see supra* § V(B) ¶ 15(c)), or whether, for a conspiracy to monopolize claim, the Sun must show through direct or circumstantial evidence that Defendants undertook the Anticompetitive Conduct with the intent to monopolize. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926-27 (9th Cir. 1980).

d.     Whether, as the RJ contends, the Anticompetitive Conduct must be "clearly" threatening to competition, or "clearly" exclusionary under antitrust law (*see supra* § V(B) ¶ 15(d)), or whether such "evidence of conduct amounting to a substantial claim of restraint of trade or conduct clearly threatening to competition or clearly exclusionary" is only necessary if "evidence of specific intent is ambiguous." *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1192 (9th Cir. 1984) (citation omitted).

13.     Whether, as the RJ contends, the Sun must prove that Adfam and at least one other Defendant "knowingly became members of a contract, combination or conspiracy intended to unreasonably harm or restrain trade or commerce in the relevant market" (*see supra* § V(B) ¶ 22), or whether the Sun must prove that Adfam and at least one other Defendant knowingly entered into a combination or conspiracy to engage in the Anticompetitive Conduct and "[acted] either with the knowledge that the . . . [action] would have unreasonable anticompetitive effects or with the purpose of producing those effects." *See Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 629 (9th Cir. 2018) (citation omitted) (alterations in original).

14.     Whether, as the RJ contends, the contract, conspiracy, or combination was required to be undertaken by "each alleged participant with the specific intent to eliminate the" Sun newspaper from the market (*see supra* § V(B) ¶ 23(b)), or whether the Sun must show that each alleged participant in the contract, conspiracy, or combination had the intent to monopolize. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926-27 (9th Cir. 1980).

15.     Whether, as the RJ contends, the Sun was required, as a matter of law, to strictly comply with Sections 5.2 and 5.3 "at all times" or else the Sun materially breached the 2005 Amended JOA. *See supra* § V(B) ¶¶ 28, 29.

16.     Whether, as the RJ contends, it must establish only that Brian Greenspun "engaged in intentional actions" that caused disruption of the 2005 Amended JOA (*supra* § V(B) ¶¶ 36(a)-(c)), or whether the RJ must prove that Brian Greenspun "had a motive to induce breach of the" 2005 Amended JOA, and "intended to induce the [Sun] to breach" the 2005 Amended JOA. *See J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1268 (Nev. 2003).

17.     Whether the inquiries enumerated by the RJ *supra* § V(B) ¶¶ 41, 41(a)-(c), 42, 42(d)-(f) are "issues to be addressed by the Court (not a jury)," or whether material factual disputes for the underlying factors go to the jury to decide with the Court deciding the ultimate legal conclusion of whether a person acts as the alter ego of a limited-liability company. *See Capital Advisors, LLC v. Cai*, 548 P.3d 1202, 1207 (Nev. 2024) ("If there is conflicting evidence on a material issue, or if reasonable persons could draw different inferences from the facts, the question is one of fact for the jury and not one of law for the court." (citation omitted)).

18.    Whether the RJ's asserted "lack and/or failure" of "ongoing consideration" (*supra* § V(B) ¶ 44), is legally cognizable to excuse performance under a valid and enforceable contract.

19.    Whether the RJ is precluded by the doctrines of issue and claim preclusion from arguing that the Sun had prior knowledge of the RJ's editorial costs accounting practices, barring the Sun's claims. *Compare supra* § V(B) ¶ 47(a) *with* Final Award of Arbitrator 5-6.

20.    Whether failure to mitigate damages is a legal defense to the RJ's Anticompetitive Conduct (*see supra* § V(B) ¶¶ 49, 19), and, if so:

a.    Whether the Sun was able to mitigate its antitrust injury and damages without undue risk.

b.    Whether the Sun, as the RJ contends, was obligated or permitted under the 2005 Amended JOA to "independently engage[ ] in any advertising or promotional efforts to promote" the Newspaper Bundle. *Compare supa* § V(B) ¶ 49(c) *with* 2005 Amended JOA §§ 5.1, 5.1.4.

c.    Whether the Sun, as the RJ contends, was required to place the RJ on notice of the RJ's own Anticompetitive Conduct. *See supra* § V(B) ¶¶ 49(d)-(e), 45(a)-(b), 47(b).

21.    Whether the RJ has waived all additional, undisclosed issues not specified in this Amended Joint Pretrial Order, including but not limited to the following unspecified issues:

a.    "[*An]other[ ] justifi[cation]*," besides alleged procompetitive effects, to potentially outweigh the Sun's alleged harm. *See supra* § V(B) ¶ 23(c) (emphasis added).

b.    Whether the Sun engaged in "*other actions*" to undermine the quality of the Sun newspaper for purposes of diverting readers from the joint newspaper to lasvegassun.com. *Supra* § V(B) ¶ 28(a)(iii) (emphasis added).

c.    Whether the Sun breached Section 10.6, and whether such alleged breach excuses the RJ's performance "under Section 10.6 *or otherwise*" under the 2005 Amended JOA. *Supra* § V(B) ¶ 43(c) (emphasis added).

125912233.1

    d.    Whether the Sun's claims are barred "by the doctrines of acquiescence, unclean hands, unjust enrichment and/or ratification, *as well as other applicable equitable doctrines*." *Supra* § V(B) ¶ 47 (emphasis added).

    e.    Whether the Sun is barred by res judicata and/or collateral estoppel from asserting claims and/or litigating "issues" that were adjudicated or required to be adjudicated "in a prior arbitration." *Infra* § VI(B) ¶ 13.

    *See Hotel Emps., et al. Health Tr. v. Elks Lodge 1450*, 827 F.2d 1324, 1329 (9th Cir. 1987) ("Issues not preserved in the pretrial order are eliminated from the action.").

22.    Whether, as the RJ contends, there is no dispute over the predicate facts underlying the legal proceeding, such that this Court can determine whether the RJ's counterclaims are objectively baseless as a matter of law (*see infra* § VI(B) ¶¶ 1, 2), or whether predicate factual issues exist as to:

    a.    Whether the Sun breached Sections 5.2 and 5.3 of the 2005 Amended JOA, and the implied covenant of good faith and fair dealing, and whether Mr. Greenspun tortiously interfered with the 2005 Amended JOA, requiring the jury to determine whether the RJ's counterclaims are sham litigation. *See Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc*., 508 U.S. 49, 63 (1993).

    b.    Whether the RJ's already-dismissed antitrust counterclaims dominated this action such that all of the RJ's counterclaims are sham litigation.

23.    Whether, as the RJ contends, its right to terminate the 2005 Amended JOA as a result of a breach is an issue of law (*see infra* § VI(B) ¶ 6), or whether it is an issue of fact.

24.    Whether a prior material breach of the 2005 Amended JOA by the Sun can be a defense, as a matter of law, to the Sun's antitrust claims against the RJ. *See infra* § VI(B) ¶ 7.

25.    Whether the RJ is precluded under claim and/or issue preclusion, or otherwise as a matter of law, from arguing that the Sun's settlement and release of claims against Stephens Media in the 2016 arbitration, which expressly did not release "News+Media or any other person or entity

that acquired or shall acquire an ownership interest in the Review-Journal on or after December 10, 2015," bars the Sun's claims. *See infra* § VI(B) ¶ 12.

26.    Whether "any portion of the Sun's claimed damages relate to conduct which occurred prior to the applicable statute of limitations period," which the RJ contends is an issue of law (*see infra* § VI(B) ¶ 8), is an issue of fact, including whether the RJ's Anticompetitive Conduct constituted continuing violations. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).

## B.    DEFENDANTS' CONTESTED ISSUES OF LAW

Defendants reserve their right to modify and/or supplement the below list as necessary or appropriate, including in response to any ruling from this Court or from the Ninth Circuit Court of Appeals. Should the Court determine that any issue identified below as an issue of law is more appropriately considered an issue of fact, Defendants incorporate such issue by reference into their Statement of Issues of Fact. Should the Court determine that any issue identified by Defendants as an issue of fact is more properly considered an issue of law, Defendants incorporate such issue herein by reference. The issues below do not include legal questions ruled upon by the Court in prior dispositive motions, which are preserved for appeal. Issues of fact and/or law that relate to claims that have been dismissed by the Court are excluded from the list below.

1.    Whether the allegations by the Las Vegas Sun, Inc. (the "Sun") that Defendants engaged in anticompetitive conduct by filing "sham" counterclaims related to the Sun's alleged breach of Sections 5.2 and 5.3 of the 2005 JOA (ECF No. 621 at ⁋ 120), and the Sun's associated affirmative defense (ECF No. 668 at 24-25), should be stricken from the Sun's operative pleadings in light of the Court's denial of the Sun's summary judgment motion and ruling that the breach of contract and breach of the implied covenant of good faith and fair dealing claims pled by the Las Vegas Review-Journal, Inc. present triable issues for the jury. *See* ECF No. 969 at 16; ECF No. 970 at 44.

2.    Whether the Sun is precluded from seeking damages in the form of attorneys' fees and expert fees incurred in defending against the Review-Journal's alleged "sham" counterclaims in light of the Court's denial of the Sun's summary judgment motion and ruling that the Review-Journal's breach of contract and breach of the implied covenant of

125912233.1

1  good faith and fair dealing claims present triable issues for the jury. *See* ECF No. 969 at 16;

2  ECF No. 970 at 44.

3  3.  Whether the Review-Journal's counterclaims are immune and privileged under the Noerr-

4  Pennington doctrine and cannot serve as a predicate for the Sun's antitrust claims as a matter

5  of law.

6  4.  Whether the Sun should be precluded as a matter of law from altering its antitrust market

7  definition following the close of fact and expert discovery from the market pled in its

8  complaint (i.e., "the sale of local daily newspapers in Clark County, Nevada"). ECF No. 1

9  ¶ 13; ECF No. 621 ¶ 20, 44.

10  5.  Whether intra-product competition, wherein one part of a product competes with another

11  part of the same product, assuming it can be shown to exist, constitutes commercial

12  competition for the purpose of establishing a violation of the Sherman Act and / or a

13  violation of the Nevada Unfair Trade Practices Act.

14  6.  If the Review-Journal is successful in proving the Sun breached Sections 5.2 and 5.3 of the

15  2005 JOA, whether the Review-Journal therefore had a right to terminate the 2005 JOA at

16  the time of breach or any time thereafter. *See* ECF No. 970 at 46.

17  7.  Whether the Sun can bring antitrust claims based on Defendants' conduct that occurred

18  following the Sun's material breach of the 2005 JOA.

19  8.  Whether any portion of the Sun's claimed damages relate to conduct which occurred prior

20  to the applicable statute of limitations period.

21  9.  Whether the Sun has ground to seek damages attributable to conduct by prior owners of the

22  *Las Vegas Review-Journal* newspaper that pre-dates the current ownership of the

23  newspaper.

24  10.  Whether the Sun can prove that it suffered recoverable antitrust damages, as opposed to

25  contract damages, attributable to the Review-Journal's calculation of JOA EBITDA (e.g.,

26  by including costs for promotional materials that allegedly failed to include the Sun logo in

27  equal prominence).

28  11.  Whether the Sun's breach of its obligations under Section 10.6 of the 2005 JOA operates as

- 83 -

125912233.1

1   a failure of a condition precedent that in turn extinguishes the Review-Journal's

2   corresponding obligations under Section 10.6.

3   12.  Whether the Sun's prior settlement and release of claims based on conduct that occurred

4       prior to the current ownership of the *Las Vegas Review-Journal* newspaper bars the Sun's

5       claims, in whole or in part, under the doctrine of waiver.

6   13.  Whether the Sun is barred by res judicata and/or collateral estoppel (i.e., claim prelusion

7       and/or issue preclusion) from asserting claims and/or litigating issues that were already

8       finally determined and/or were required to be adjudicated in a prior arbitration.

9   14.  Whether the Sun's receipt of an arbitration award from the Review-Journal intended to

10      compensate for alleged misallocation of editorial expenses under the 2005 JOA operates to

11      bar the Sun's claims, in whole or in part, by payment in satisfaction of prior judgment.

12  15.  Whether a reasonable jury would have a legally sufficient evidentiary basis to find that each

13      Defendant is liable to the Sun for Monopolization, in violation of Section 2 of the Sherman

14      Act.

15  16.  Whether a reasonable jury would have a legally sufficient evidentiary basis to find that each

16      Defendant is liable to the Sun for Attempted Monopolization, in violation of Section 2 of

17      the Sherman Act.

18  17.  Whether a reasonable jury would have a legally sufficient evidentiary basis to find that each

19      Defendant is liable to the Sun for violation of the Nevada Unfair Trade Practices Act.

20  18.  Whether a reasonable jury would have a legally sufficient evidentiary basis to find that each

21      Defendant is liable to the Sun for violation of Section 1 of the Sherman Act.

22  19.  Whether a reasonable jury would have a legally sufficient evidentiary basis to find that the

23      Sun sustained legally cognizable damages attributable to any of its claims.

24  20.  Whether the parties have submitted jury instructions that accurately explain the elements of

25      the claims and defenses at issue.

26  / / /

27  / / /

28  / / /

- 84 -

1    **VII.    EXHIBITS (LR 16-3(b)(8)-(11))**

2        **A.    EXHIBIT NUMBERING DISPUTE**

3        During the parties' discussions before they exchanged trial exhibits, Defendants requested

4    to use "Defendants' exhibit numbers consistent with the numbering [it had] been using throughout

5    depositions (which covers the range of 200-724)." The Sun proposed that the parties number their

6    exhibits with the Sun's exhibits in a block (*e.g.*, 1-4999) and Defendants' exhibits in a subsequent

7    block (*e.g.*, 5000+). Defendants declined and proposed that it be allowed to reserve exhibit ranges

8    200-724, with the Sun using 1-199 and any other exhibit numbers. The Sun declined this proposal.

9    The parties were unable to resolve their dispute and have set forth their positions below.

10        **1.    Sun's Position**

11        The RJ failed to confer with the Sun about its intentions to use deposition exhibit numbers

12   as trial exhibits, or what number the RJ was starting at, and unilaterally chose to begin its deposition

13   exhibits at 200—without considering that the Sun would surely have more than 199 trial exhibits.

14   Had the RJ informed the Sun of its intentions, the parties could have agreed to a uniform numbering

15   protocol consistent with the traditional formatting that grants Plaintiff and Defendants each separate

16   blocks of numbers. Any prejudice to the RJ as a result of adhering to the normal procedure is caused

17   by the RJ's unilateral decision-making. Further, the RJ's untimely request to use its deposition

18   exhibit numbers as its trial exhibit numbers, not only deviates from the normal trial exhibit marking

19   procedures, but it will certainly cause confusion among counsel, the Court, and the jury, and

20   prejudices the Sun (which, as the Plaintiff in this case, is entitled to the first set of numbered trial

21   exhibits). Compounding confusion, the RJ's proposed trial exhibits start at 200 and end at 1675,

22   with *non*-consecutive exhibits (*e.g.*, Exhibits 454, 499, 505-509, 596-615, 665-672, 689-700 are

23   missing), and *extensions* to exhibit numbers as additional exhibits (*e.g.*, Exhibits 292-A, 292-A-2,

24   304-A, 304-A-1, 304-A-2, 340-B). The RJ's proposed trial exhibit numbering is anomalistic and

25   will be problematic. There is no reason why the RJ should not be compelled to renumber its trial

26   exhibits in the customary practice.

27   / / /

28   / / /

### 2. **Defendants' Position**

As noted above, the parties have a dispute regarding the numbering of their respective trial exhibits. Throughout the years of discovery in this matter, Defendants intentionally used a sequential numbering system (sometimes called "running exhibits")[4] to identify exhibits introduced at depositions. Defendants used this consistent numbering system with an eye toward trial, such that when witnesses testify in depositions and at trial about a specific document, the deposition and trial exhibit numbers match. Defendants began numbering exhibits at 200 so that plaintiffs had the opportunity to use the first 199 exhibits. Instead of using sequential exhibits, the Sun's counsel chose to restart its exhibit numbers at "Exh. 1" with each new deposition, often marking the same documents with different exhibit numbers at different depositions.

Allowing Defendants to maintain their deposition exhibit numbers at trial would greatly benefit the jury, avoid confusion, and eliminate cumbersome pretrial work. It would take advantage of Defendants' planning and allow key documents to be referred to at trial with the same exhibit numbers that appear in the deposition transcripts and videos. This is a common practice by experienced trial counsel because it makes the jury's job easier and helps to minimize confusion between deposition and trial exhibits. The exhibit range requested by Defendants (200-724) would still allow the Sun to claim exhibit numbers 1-199 (or use these numbers for joint exhibits), and Defendants offered the Sun any other exhibit range they preferred. The Sun has refused Defendants' request and unilaterally laid claim to exhibit numbers 1-5000. Given Defendants' years of advanced planning, and in the interest of aiding the jury in this case, Defendants request the Court's permission to retain their deposition exhibit numbers at trial.

/ / /

/ / /

/ / /

---

[4] Each document that Defendants introduced at depositions was marked with a unique exhibit number. When introducing a document that had already been marked in a prior deposition, Defendants used the same exhibit number it was marked with originally. For example, when Defendants marked a document as Exhibit 215 in one deposition, they referred to that same document as Exhibit 215 when it was used in subsequent depositions. (In very few cases, Defendants' exhibits were inadvertently re-marked with a new number.)

**B.    STIPULATED EXHIBITS AS TO AUTHENTICITY AND ADMISSIBILITY**

The Court has entered an order extending the parties' deadline to submit to the Court the parties' agreements as to admissibility with respect to the opposing party's exhibits pursuant to LR 16-3(b)(8)(A) until 120 days before the trial date. *See* ECF No. 1000.

**C.    SUN'S EXHIBITS SUBJECT TO PENDING OBJECTIONS**

The Sun's Exhibits are attached as <u>Exhibit 1</u>. The Sun reserves the right to utilize other documents for impeachment/rebuttal purposes as needed. The Sun also reserves its right to utilize any document designated as an Exhibit by Defendants for any purpose. The Court has entered an order extending the parties' deadline to submit the parties' objections, and the grounds for them, to the opposing party's exhibits pursuant to LR 16-3(b)(8)(B) until 120 days before the trial date. *See* ECF No. 1000.

**D.    DEFENDANTS' EXHIBITS SUBJECT TO PENDING OBJECTIONS**

Defendants' Exhibits are attached as <u>Exhibit 2</u>. Defendants reserve their right to utilize other documents for impeachment/rebuttal purposes as needed. Defendants also reserve their right to utilize any document designated as an Exhibit by the Sun for any purpose. As noted above, the Court has entered an order extending the parties' exhibit objection deadline pursuant to LR 16-3(b)(8)(B) until 120 days before trial. *See* ECF No. 1000.

**E.    STATEMENT REGARDING EVIDENCE PRESENTED IN ELECTRONIC FORMAT TO JURORS (LR 26-1(b)(9))**

The parties hereby certify that they discussed their intentions to present evidence in electronic format to jurors for the purposes of jury deliberations. As to providing discovery in an electronic format compatible with the Court's electronic jury evidence display system, the parties stipulate that the parties will submit all proposed in accordance with the Court's Jury Evidence Recording System, and will meet and confer prior to contacting the assigned Judge's courtroom administrator for the Court's direction and other requirements for the Court's electronic jury evidence display system.

/ / /

/ / /

- 87 -

F.    **DEPOSITIONS**

The Court has entered an order extending the parties' deadline to submit to the Court the parties' designations (and counter-designations) of the portions of the depositions to be offered at trial with respect to the witnesses to be identified in the joint proposed pretrial order pursuant to LR 16-3(b)(10), as well as the parties' objections, and the grounds for them, to the deposition testimony the opposing party has designated, pursuant to LR 16-3(b)(11), until 120 days before the trial date. *See* ECF No. 1000.

1.    <u>The Sun will offer the following depositions against all Defendants and Counterclaimant</u>

1.    Russel Pergament (December 13, 2021)

2.    Michael Schroeder (March 15, 2022)

3.    Jason Taylor (March 21, 2019; April 25, 2019; May 10, 2022; May 12, 2022)

4.    Craig Moon (March 3, 2022)

5.    Frank Vega (April 25, 2019; August 9, 2022)

6.    Ed Cassidy (June 3, 2022)

7.    Matt Lindsay (August 22, 2022)

8.    Stephen O'Connor (December 9, 2021; February 7, 2022; July 29, 2022)

9.    John Perdigao (February 28, 2019)

10.    Chase Rankin (August 24, 2022)

11.    Mark Hinueber (October 6, 2016)

12.    Paul Doyle (August 27, 2019)

13.    Keith Moyer (April 5, 2022)

14.    Patrick Dumont (October 28, 2021)

15.    Chris Blaser (August 11, 2022; August 12, 2022)

16.    Glenn Cook (August 19, 2022)

17.    Stephen Hall (March 13, 2019; April 17-18, 2019; July 20, 2022)

18.    Peggy McGuire (April 19, 2019)

19.    Kenneth Paulson (April 20, 2023)

20.    David Evans (April 12, 2023)

21.    Mark Rainey (March 9, 2023)

22.    Larry Miller  (April 19, 2019)

- 88 -

125912233.1

23.     David Nolte (April 10, 2023)

        **2.      Defendants will offer the following depositions**

1. Craig Moon – Mar. 3, 2022

2. Robert Cauthorn – Feb. 16, 2022; Mar. 18, 2022; Aug., 15, 2022; Aug. 29, 2022

3. Brian Greenspun – Mar. 23, 2022

4. Jason Taylor – May 10, 2022; May 12, 2022

5. Paul Mather "Matt" Lindsay – Aug. 22, 2022

6. Steve Gray – Jul. 12, 2022

7. Chase Rankin – Aug. 24, 2022

8. Ric Anderson – Jan. 12, 2022

9. Frank Vega – Aug. 9, 2022

10. Ray Brewer – Jun. 24, 2022

11. Katie Horton – Aug. 5, 2022

**VIII.    WITNESSES (LR 16-3(b)(12)-(13))**

   **A.     SUN'S WITNESSES**

        **1.      Witnesses the Sun Expects to Present at Trial**

        1.      Brian Greenspun, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott, Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada 89169, Tel: (702) 949-8200.

        2.      Robert Cauthorn, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott, Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada 89169, Tel: (702) 949-8200.

        3.      Jason Taylor, c/o F. Chris Austin, Weide & Miller, Ltd., 10655 Park Run Drive, Suite 100, Las Vegas, Nevada 89144, Tel: (702) 382-4804.

        4.      Patrick Dumont, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

        5.      Keith Moyer, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

6.     Craig Moon, c/o Robb Harvey, Waller Lansden Dortch and Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, Tel: (202) 965-1202.

7.     Frank Vega, c/o Nathan Hill, Gunster, Yoakley and Stewart, P.A., 200 South Orange Avenue, Suite 1400, Orlando, Florida 32801, Tel: (407) 406-5246, c/o J. Randall Jones, Michael J. Gayan, and Mona Kaveh, Kemp Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

8.     J. Ford Huffman, 900 Hughes Mews NW, Washington, D.C. 20037, c/o J. Randall Jones, Michael J. Gayan, and Mona Kaveh, Kemp Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

9.     Glenn Cook, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

10.     Ray Brewer, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott, Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada 89169, Tel: (702) 949-8200.

11.     Steven O'Connor, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

12.     Russel Pergament, c/o Bruce Singal, Hinckley Allen, 280 State Street, Boston, Massachusetts 02109; 37 Holly Road, Waban. MA 02468; Tel: (617) 345-9000.

13.     Michael Schroeder, c/o Leonard M. Braman, Wofsey, Rosen, Kweskin & Kuriansky, LLP, 600 Summer Street, Stamford, Connecticut 06901, Tel: (203) 354-1282.

14.     Belinda Englman, c/o J. Randall Jones, Michael J. Gayan, and Mona Kaveh, Kemp Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

15.     Ed Cassidy, 63 Champlin Ridge Road, Rochester, New Hampshire 03867, Tel: Unknown.

16.     Mike Hengel, 2112 Timber Rose Drive, Las Vegas, Nevada 89134, Tel: (702) 340-2406.

1          17.     John L. Smith, 1260 Denver Street, Boulder City, Nevada 89005, Tel: (702)

2  523-1332.

3          18.     Howard Stutz, 11651 Flowing Sunset Lane, Las Vegas, Nevada 89135, Tel:

4  (702) 324-1293, (702) 658-2271.

5          19.     John Perdigao, 2854 Geary Place, Unit 3813, Las Vegas, Nevada 89109, Tel:

6  (805) 428-7363.

7          20.     Matt Lindsay, c/o John O'Shea Sullivan, Burr & Forman LLP, 171 17th

8  Street, Suite 1100, Atlanta, Georgia 30363, Tel: (404) 685-4268.

9          21.     Stephen Hall, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP, 3880

10  Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

11         22.     Chris Blaser, c/o J. Randall Jones, Michael J. Gayan, and Mona Kaveh,

12  Kemp Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel:

13  (702) 385-6000.

14         23.     Chase Rankin, c/o J. Randall Jones, Michael J. Gayan, and Mona Kaveh,

15  Kemp Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel:

16  (702) 385-6000.

17         24.     David Kordalski, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott,

18  Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada

19  89169, Tel: (702) 949-8200.

20         25.     Lawrence Aldrich, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott,

21  Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada

22  89169, Tel: (702) 949-8200.

23         26.     Robert Picard, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott,

24  Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada

25  89169, Tel: (702) 949-8200.

26         27.     Michael Katz, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott,

27  Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada

28  89169, Tel: (702) 949-8200.

125912233.1

1    28.    Gregory Gundlach, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott,

2    Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada

3    89169, Tel: (702) 949-8200.

4    29.    Barbara Gottlieb, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott,

5    Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada

6    89169, Tel: (702) 949-8200.

7    30.    Russell Lamb, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott,

8    Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada

9    89169, Tel: (702) 949-8200.

10    **2.    Witnesses the Sun May Call at Trial If the Need Arises**

11    1.    Jackson Farrow, Stephens Capital Partners LLC, 111 Center Street, Little

12    Rock, AR 72201, Tel: (501) 377-2261.

13    2.    Gabriel Utasi, 8472 Kempton Lane, Maineville, Ohio 45039, Tel: (513) 253-

14    6497.

15    3.    Paul Doyle, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP, 3880

16    Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

17    4.    Jennifer Wilson-Scholtes, c/o J. Randall Jones and Mona Kaveh, Kemp

18    Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-

19    6000.

20    5.    Dr. Miriam Adelson, c/o J. Randall Jones and Mona Kaveh, Kemp Jones,

21    LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

22    6.    BDO USA, LLP, Custodian of Records, c/o Steven DeGeorge, 100 Park

23    Avenue, New York, New York 10017, Tel: (212) 885-8377.

24    7.    Armanino LLP, Custodian of Records, c/o Astine Alaverdyan, 12657

25    Alcosta Boulevard, Suite 500, San Ramon, California 94583, Tel: (844) 582-8883.

26    8.    Steven Gray, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott,

27    Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada

28    89169, Tel: (702) 949-8200.

125912233.1

1            9.      Steven Garfinkel, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP,

2  3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

3           10.     Calvin Siemer, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP,

4  3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

5           11.     Todd Nelson, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP, 3880

6  Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

7           12.     Sivan Ochshorn Dumont, c/o J. Randall Jones and Mona Kaveh, Kemp

8  Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-

9  6000.

10           13.     David Leake, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP, 3880

11  Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

12           14.     David Bloom, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP,

13  3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

14           15.     Don Nizen, 4201 N. Ocean Boulevard, Apt. C1506, Boca Raton, Florida

15  33431; Tel: Unknown.

16           16.     Mike Reed, c/o F. Chris Austin, Weide & Miller, Ltd., 10655 Park Run

17  Drive, Suite 100, Las Vegas, Nevada 89144, Tel: (702) 382-4804.

18           17.     Kirk Davis, c/o F. Chris Austin, Weide & Miller, Ltd., 10655 Park Run

19  Drive, Suite 100, Las Vegas, Nevada 89144, , Tel: (702) 382-4804.

20           18.     Jennifer Robinson, 120 Roble Road, Apt. 303, Walnut Creek, California

21  94597, Tel.: (702) 256-3156, (702) 302-3955.

22           19.     James DeHaven, 900 Pat Lane, Carson City, Nevada 89701, Tel: (775) 720-

23  4092, (775) 781-7998.

24           20.     David Serfozo, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP,

25  3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

26           21.     Brenda Manfre, c/o J. Randall Jones and Mona Kaveh, Kemp Jones, LLP,

27  3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel: (702) 385-6000.

28

- 93 -

1        22.    Russell Lively, c/o F. Chris Austin, Weide & Miller, Ltd., 10655 Park Run

2    Drive, Suite 100, Las Vegas, Nevada 89144, Tel: (702) 382-4804.

3        23.    Betty Yurcich, c/o J. Randall Jones, Michael J. Gayan, and Mona Kaveh,

4    Kemp Jones, LLP, 3880 Howard Hughes Parkway, 17th Floor, Las Vegas, Nevada 89169, Tel:

5    (702) 385-6000.

6        24.    Valuation Research Corporation, Custodian of Records, 312 Walnut Street,

7    Suite 1700, Cincinnati, Ohio 45202; Tel: (513) 579-9100.

8        25.    Ernst & Young, Custodian of Records, 1101 New York Avenue, Washinton,

9    D.C. 20002; Tel: (202) 327-6000.

10        26.    John Taylor, c/o E. Leif Reid, Kristen L. Martini, and Nicole S. Scott,

11    Womble Bond Dickinson (US) LLP, 3993 Howard Hughes Parkway, Suite 600, Las Vegas, Nevada

12    89169, Tel: (702) 949-8200.

13    The Sun reserves the right to call any witness identified by the RJ, whether or not called to

14    testify at trial.

15        **B.    DEFENDANTS' INTENDED TRIAL WITNESSES[5]**

16        1.  Patrick Dumont
        c/o Randall Jones, Esq. and Mona Kaveh, Esq.

17            Kemp Jones, LLP
        3800 Howard Hughes Parkway, 17th Floor

18            Las Vegas, Nevada 89169
        Tel: (702) 385-6000

19

20        2.  Keith Moyer
        c/o Randall Jones, Esq. and Mona Kaveh, Esq.

21            Kemp Jones, LLP
        3800 Howard Hughes Parkway, 17th Floor

22            Las Vegas, Nevada 89169
        Tel: (702) 385-6000

23

24        3.  Glenn Cook
        c/o Randall Jones, Esq. and Mona Kaveh, Esq.

25            Kemp Jones, LLP
        3800 Howard Hughes Parkway, 17th Floor

26            Las Vegas, Nevada 89169

27    _____

28    [5] In addition to the witnesses listed in this section whom Defendants expect to present, Defendants may call any witness identified in the Sun's corresponding witness disclosure, and hereby reserve their right to do so consistent with LR 26-1(b)(6) and FRCP 26(a)(3)(A)(i).

Tel: (702) 385-6000

4.  Chris Blaser
    c/o Randall Jones, Esq. and Mona Kaveh, Esq.
    Kemp Jones, LLP
    3800 Howard Hughes Parkway, 17th Floor
    Las Vegas, Nevada 89169
    Tel: (702) 385-6000

5.  Stephen Hall
    c/o Randall Jones, Esq. and Mona Kaveh, Esq.
    Kemp Jones, LLP
    3800 Howard Hughes Parkway, 17th Floor
    Las Vegas, Nevada 89169
    Tel: (702) 385-6000

6.  Peggy McGuire
    c/o Randall Jones, Esq. and Mona Kaveh, Esq.
    Kemp Jones, LLP
    3800 Howard Hughes Parkway, 17th Floor
    Las Vegas, Nevada 89169
    Tel: (702) 385-6000

7.  Wanda Blair
    c/o Randall Jones, Esq. and Mona Kaveh, Esq.
    Kemp Jones, LLP
    3800 Howard Hughes Parkway, 17th Floor
    Las Vegas, Nevada 89169
    Tel: (702) 385-6000

8.  Janet Owen
    c/o Randall Jones, Esq. and Mona Kaveh, Esq.
    Kemp Jones, LLP
    3800 Howard Hughes Parkway, 17th Floor
    Las Vegas, Nevada 89169
    Tel: (702) 385-6000

9.  Frank Vega
    c/o Randall Jones, Esq. and Mona Kaveh, Esq.
    Kemp Jones, LLP
    3800 Howard Hughes Parkway, 17th Floor
    Las Vegas, Nevada 89169
    Tel: (702) 385-6000

10. Steve O'Connor
    c/o Randall Jones, Esq. and Mona Kaveh, Esq.
    Kemp Jones, LLP
    3800 Howard Hughes Parkway, 17th Floor

125912233.1

Las Vegas, Nevada 89169
Tel: (702) 385-6000

11. J. Ford Huffman
c/o Randall Jones, Esq. and Mona Kaveh, Esq.
Kemp Jones, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Tel: (702) 385-6000

12. Paul Mather "Matt" Lindsay
Mather Economics
1215 Hightower Trail,
Building A, Suite 100
Atlanta, GA 30350
Tel: (770) 993-4111

13. Michael Ferguson
c/o Jenner & Block LLP
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071-2246
Tel: (213) 239-5100

14. Mark Rainey
c/o Jenner & Block LLP
515 Flower Street, Suite 3300
Los Angeles, CA 90071-2246
Tel: (213) 239-5100

15. David Evans
c/o Jenner & Block LLP
515 Flower Street, Suite 3300
Los Angeles, CA 90071-2246
Tel: (213) 239-5100

16. Ken Paulson
c/o Jenner & Block LLP
515 Flower Street, Suite 3300
Los Angeles, CA 90071-2246
Tel: (213) 239-5100

17. David Nolte
c/o Jenner & Block LLP
515 Flower Street, Suite 3300
Los Angeles, CA 90071-2246
Tel: (213) 239-5100

125912233.1

18. Brian Greenspun
   c/o Leif Reid, Esq., Kristen Martini, Esq., and Nicole Scott, Esq.
   Womble Bond Dickinson (US) LLP
   One East Library Street, Suite 300
   Reno, Nevada 89501
   Tel: (775) 823-2900

19. Robert Cauthorn
   c/o Leif Reid, Esq., Kristen Martini, Esq., and Nicole Scott, Esq.
   Womble Bond Dickinson (US) LLP
   One East Library Street, Suite 300
   Reno, Nevada 89501
   Tel: (775) 823-2900

20. Ric Anderson
   c/o Leif Reid, Esq., Kristen Martini, Esq., and Nicole Scott, Esq.
   Womble Bond Dickinson (US) LLP
   One East Library Street, Suite 300
   Reno, Nevada 89501
   Tel: (775) 823-2900

21. Ray Brewer
   c/o Leif Reid, Esq., Kristen Martini, Esq., and Nicole Scott, Esq.
   Womble Bond Dickinson (US) LLP
   One East Library Street, Suite 300
   Reno, Nevada 89501
   Tel: (775) 823-2900

22. Katie Horton
   c/o Leif Reid, Esq., Kristen Martini, Esq., and Nicole Scott, Esq.
   Womble Bond Dickinson (US) LLP
   One East Library Street, Suite 300
   Reno, Nevada 89501
   Tel: (775) 823-2900

23. Steven Gray
   c/o Leif Reid, Esq., Kristen Martini, Esq., and Nicole Scott, Esq.
   Womble Bond Dickinson (US) LLP
   One East Library Street, Suite 300
   Reno, Nevada 89501
   Tel: (775) 823-2900

## IX.    MOTIONS IN LIMINE

The parties reserve the right to file motions *in limine* as permitted under the Federal Rules of Civil Procedure and Local Rules of this Court. The parties, however, agree to a modified briefing schedule that would require motions *in limine* to be filed sufficiently in advance of trial to allow

125912233.1

the Court to consider and rule on the parties' anticipated motions. The parties therefore agree to have all motions *in limine* fully briefed sixty (60) days before the trial date.

## X.    JUROR QUESTIONNAIRE

The parties are in agreement that the Court's administration of a juror questionnaire would allow for a more efficient jury selection process. If the Court is amenable to engaging in this process, the parties request that the Court allow the parties to jointly prepare and submit a draft jury questionnaire for the Court's review sixty (60) days prior to the trial date.

## XI.    AVAILABLE TRIAL DATES

On May 16, 2024, the Sun filed a Motion to Set Trial (ECF No. 988). Defendants had filed a Motion to Stay Proceedings Pending Appeal of the Court's Decision to Deny Defendants' Motion to Dissolve Preliminary Injunction. ECF No. 979. On June 18, 2024, this Court denied Defendants' motion to stay, and denied the Sun's motion to set as premature, further stating, "The Court will set trial at a later date, by separate order." ECF No. 997.

## XII.    ESTIMATED TIME OF TRIAL

### A.    THE SUN'S STATEMENT

Forced litigation and delays is a part of the RJ's anticompetitive conduct at issue in this lawsuit. The RJ's refusal to set trial, and now its complaints about the length of trial and self-manufactured trial availability are extensions of the RJ's overarching scheme to force the Sun out of business. Six months ago, a paralegal from the Sun team contacted the Court's Courtroom Administrator to inquire about availability for a five-week jury trial in preparation for the parties' meet and confer on anticipated trial dates in this pretrial order. ECF No. 982-3 ¶ 3. The Court's soonest availability for a five-week trial was in 2025, starting on April 7, 14, or 21, or June 9 or 16. *Id.* Otherwise, the Sun understands that the Court is not available for such a lengthy trial until 2026. *Id.*

During the meet and confer, when the Sun informed the RJ about this Court's limited availability, the RJ asserted its only scheduling concerns was the potential availability of David Singer, because all other counsel was available for the court's open trial dates. ECF No. 982-2 at 4:18-5:17, 16:6-18, 27:3-17. When then came to light a few days later that Mr. Singer was, in fact,

available, the RJ then changed its story, claiming that it was entirely unavailable for any of the Court's open trial dates in 2025 due to Defendant Dumont's vague "Las Vegas Sands" business in April, and another RJ witness's attendance at a wedding in June. ECF No. 982-4 at 2-5. The next day, the RJ again backtracked, this time asserting that it was available for trial in late April 2025, but that it was still "not willing to stipulate to a trial date." *Id.* at 1.

Despite knowing that this Court has limited availability for trial in 2025—and knowing that April 21, 2025, is seemingly the *only* date that the Court, the parties, and all counsel were available (*id.*; ECF No. 982-3 ¶ 3)—the RJ's counsel "recently" set a trial for April 21, 2025, to serve as a second chair in another matter. *See infra* § XI(B). Of all the dates the RJ's counsel could have chosen to begin a two-week bench trial, they chose the exact (and only) date that all counsel and parties are available for the five-week trial in this five-year-old action. Given this Court's limited availability and the RJ's purported unavailability, the Sun and its counsel have reasonably been holding all of the court's available dates on their calendar (including April 21, 2025), with the expectation that trial will be set on one of these dates. It is rudimentary that the RJ's counsel should have been doing the same, especially given the number of attorneys and party representatives, and the Court's known limited availability. Instead, the RJ's counsel intentionally created a "scheduling conflict." *See infra* § XI(B). This is an unwarranted delay tactic to push trial into 2026. The Sun again reiterates its request for a preferred early trial setting in this case. The Sun has suffered and is continuing to suffer from the RJ's war of attrition, which is causing the Sun to face immediate decisions on how to continue its operations. Mr. Greenspun is 78 years old and an expedited trial setting should be afforded due to his age. The Sun clarifies that it is not seeking a trial date before the Ninth Circuit rules on the RJ's pending appeal—only that once Order is issued, this matter receive a preferred early trial setting. The Sun disagrees that any Order issued by the Ninth Circuit would obviate the need for a trial in this matter. The Sun's claims are antitrust claims, not contract claims as the RJ argues.

As for the RJ's grievance that the Sun has listed too many witnesses, or that more time is needed for trial, these are issues left to the Court's good judgment at the time of trial. While the witness list is extensive, the Sun has broken down the witnesses it intends to call at trial, and the

1    witnesses it may call at trial should the need arise, and the Sun's number of witnesses is not unusual

2    for a case of this type. And, more importantly, even if all listed witnesses are called (which is

3    unlikely), there is no reason to believe that every witness will spend significant time on the stand,

4    or that trial counsel cannot manage their time efficiently within the time frame granted by the Court.

5    In other words, the RJ's cries that the sky will fall and that nearly double the time is needed for the

6    trial is, by all measures, yet another step in its endless effort to delay.[6]

7    **B.    DEFENDANTS' STATEMENT**

8    On April 22, 2024, the Review-Journal's counsel indicated to the Sun's counsel during a

9    meet-and-confer discussion regarding the joint pretrial order that a trial duration of five weeks

10   seemed appropriate at that time; however, the Review-Journal's counsel stated that this would

11   "depend on the parties' witness disclosures and…exhibit list[s]." ECF No. 982-2 at 3:4-13. During

12   this discussion, the Sun reported that it had reached out to the Court, which had reported five-week

13   windows available starting in April and June of 2025. In June 2024, the Court confirmed the

14   availability of these five-week windows in April and June of 2025. *See* ECF No. 997 at 1. If these

15   windows are not chosen, the Court has indicated trial will likely be scheduled in 2026. *Id.*

16   An April or June 2025 trial date is no longer feasible for Defendants due to scheduling

17   conflicts. This includes the fact that one of Defendants' lead trial counsel, Michael Gayan, has

18   recently been scheduled for a two-week bench trial set on a five-week trial stack (second of 32

19   cases set for trial on the stack) that starts on April 21, 2025, in the matter of *Dayco Funding*

20   *Corporation v. Shumway Van LLC, et al.*, Case No. A-20-812894-C, pending in the Eighth Judicial

21   District Court, Clark County, Nevada. Mr. Gayan is co-lead trial counsel for Dayco Funding

22   Corporation. In addition, following the recent expiration of a Nevada Supreme Court stay, Mr.

23   Gayan was recently informed that a jury trial will likely be set on that same trial stack. Mr. Gayan

24   is co-lead court-appointed class counsel in that matter, *In re: Go Wireless Commission Litigation*,

---

25
26   [6] The Sun objects to the RJ's improper challenges to certain of the Sun's witnesses in this Joint
     Pretrial (*see infra* n.7). As the Sun explained to the RJ, this Joint Pretrial Order is not the appropriate
27   mechanism to bring such challenges, which should be raised in *motions in limine* to be briefed at a
     later date. In addition to the procedural impropriety of the RJ's objections, they are substantively
     meritless. The RJ raised the same or similar objections when challenging the Sun's exhibits filed
28   in support of its summary judgment briefing. *See, e.g.*, ECF No. 892 at 6-12, 17-19; ECF No. 927
     at 14; ECF No. 954 at 9-11; ECF No. 892 at 14-17.

1   Case No. A-17-752802-C, pending in the same department of the Eighth Judicial District Court,

2   which involves thousands of class members and will likely last two to three weeks. This action will

3   likely be placed first on the trial stack starting on April 21, 2025.

4        The scheduling of Mr. Gayan's other trials is not, as the Sun claims, an effort to delay trial

5   in this case. Mr. Gayan is managing an active caseload and the courts' selection of trial dates in

6   each of those matters was based on numerous considerations, including the parties' availability, the

7   availability of the court, and NRCP 41(e) considerations. Defendants have been forthright and

8   consistent in their disclosure of conflicts to the Sun and to the Court. This additionally includes the

9   conflicts in April and June of 2025 that Defendants previously disclosed to the Sun and to the Court.

10  See ECF No. 992-1.

11       Separately, Defendants have serious concerns that this case cannot be tried in five weeks

12  because the Sun has disclosed 56 witnesses that it may call live at trial. This includes 30 witnesses

13  that the Sun has specifically identified as individuals they expect to call – a number of witnesses

14  that would be infeasible for a five-week timeframe, particularly because Defendants must put on

15  their defense and the Review-Journal must put on its counterclaims after the Sun is done calling 30

16  or more witnesses. The Sun also identified a partially overlapping list of 23 witnesses that it may

17  present via deposition testimony.[7] The Sun's potential trial witness list is inexplicably *longer*—not

18

19  ───────────────
    [7] Defendants object to the inclusion of the following witnesses in the Sun's pretrial disclosures
    pursuant to LR 16-3(b)(10) and (12), as well as LR 26-1(b)(6). Specifically:

20       (i) Defendants object to the inclusion of Jackson Farrow, a third-party witness that the Sun
    only added to its Rule 26 witness disclosures on August 27, 2024, more than two years after the

21  close of fact discovery in violation of FRCP 26(a)(1)(A)(i) and 37(c)(1);

         (ii) Defendants object to the Sun's inclusion of John Taylor, a Sun employee whom the Sun
22  only added to its Rule 26 witness disclosures on March 19, 2023, more than nine months after the
    close of fact discovery in violation of FRCP 26(a)(1)(A)(i) and 37(c)(1);

23       (iii) to the extent the Sun seeks to present deposition testimony from a prior arbitration
    proceeding of Jason Taylor, John Perdigao, and/or Stephen Hall, Defendants object on the grounds

24  that the prior arbitration proceeding did not involve the same subject matter as this proceeding and
    the testimony at issue is not permitted under FRCP 32(a)(8);

25       (iv) to the extent the Sun seeks to present hearing testimony from a prior arbitration from
    third-party and Review-Journal witnesses Frank Vega, Stephen Hall, Peg McGuire, and/or Mark

26  Hinueber, Defendants object that the prior arbitration proceeding did not involve the same parties
    and/or subject matter as this proceeding and the testimony at issue is not permitted under

27  FRCP 32(a)(8) (additionally, Mark Hinueber was not disclosed in the Sun's Rule 26 witness
    disclosures in violation of FRCP 26(a)(1)(A)(i) and 37(c)(1));

28       (v) the Sun has disclosed that it intends to present deposition testimony of former Review-
    Journal employee Paul Doyle taken in a prior state court action, and Defendants object to the

                                        - 101 -

shorter—than its Rule 26(a) initial disclosure list of all witnesses who may have discoverable information. The Sun's approach violates the spirit of trial witness disclosures, which is to help the parties and the Court meaningfully prepare for and anticipate the length of trial.

The Sun's witness list is incongruent with the five-week trial that the parties previously discussed. The Sun cannot insist the parties will be able to complete trial in five weeks, while at the same time disclosing nearly five dozen witnesses that it may choose to call for its case in chief (plus deposition video clips and read-ins). The Sun has provided no rational basis for its insistence that a five-week timeframe is realistic.

The Sun's insistence that it will be able to complete trial within five weeks may be due to the Sun's misapprehension that numerous key issues of fact in this action were resolved by the Court at summary judgment. *See* Section I.B.1, *supra*. As noted above, the District Court did not resolve these factual issues on summary judgment, nor did it have the discretion to do so. Defendants seek the court's clarification that it did not resolve key factual issues in its summary judgment order, as the Sun suggests.

While the Sun acknowledges its witness list is "overinclusive" and it "do[es] not intend to call 57 live witnesses," the Sun is still reserving its right to present testimony from all its designated witnesses. The Sun's expansive witness disclosures shifts the burden to Defendants to prepare for cross-examining 56 witnesses, many of whom were never deposed in this case, for the Sun's case in chief. This is an enormous undertaking that will take months of work in addition to the numerous motions *in limine* that would accompany such a long list of proffered witnesses and testimony. The

---

inclusion of this testimony pursuant to FRCP 32(a)(8) as the prior state court proceeding did not involve the same subject matter as this proceeding;

(vi) the Sun has disclosed that it intends to present hearing testimony from a prior arbitration hearing of the Review-Journal's expert witness in that arbitration, Larry Miller; however, the hearing testimony from the prior arbitration proceeding is not deposition testimony and did not involve the same subject matter as this proceeding. The testimony is not permitted under FRCP 32(a)(8). Additionally, the Sun never disclosed Mr. Miller on its Rule 26 witness disclosures in violation of FRCP 26(a)(1)(A)(i) and 37(c)(1); and

(vii) the Sun has disclosed that it intends to present deposition testimony from Defendants' experts Ken Paulson, David Evans, Mark Rainey, and David Nolte, and Defendants object to the Sun's use of such deposition testimony for purposes other than impeachment pursuant to FRCP 32(a).

- 102 -

1    cost of doing all of this work in advance of trial will be enormous and require the Court to devote

2    substantial time and resources to resolve the pretrial motions.

3         Additionally, as the Court knows, there is a pending interlocutory appeal in this case before

4    the Ninth Circuit. Although the Court denied Defendants' motion to stay the litigation, the Court

5    recognized that the pending appeal could have a material impact on the scope of the issues to be

6    tried. The Ninth Circuit heard oral argument in this matter on December 5, 2024, and its ruling is

7    forthcoming. Under this schedule, it would be highly inefficient and unduly burdensome for the

8    parties and the Court to prepare for trial when the Court of Appeals' ruling may dramatically impact

9    the scope of trial in this case or obviate trial altogether. It is far more judicious and economical for

10   the parties and the Court to wait for the Court of Appeals' ruling before setting this matter for trial.

11   Doing so will also avoid a situation where Defendants are forced to spend millions of dollars

12   preparing to examine nearly 60 witnesses when some or all of those examinations may never take

13   place (depending on how the Ninth Circuit rules).

14        The Review-Journal objects to the Sun's improper, renewed request that trial be set before

15   the Ninth Circuit issues its pending ruling on whether the 2005 JOA at the center of this lawsuit is

16   unlawful. The Court has already denied the Sun's motion to set trial while the Review-Journal's

17   appeal has been pending. ECF No. 997. There is no reason the Court should reconsider its decision

18   now. The supposed financial difficulties faced by the Sun have nothing to do with the timing of

19   trial; virtually every print newspaper in America faces financial difficulties and losses. That is

20   because print newspapers have been, and continue to be, replaced by competing digital, online, and

21   other local news sources. Indeed, if the Sun's goal is to save money, then it should agree with

22   Defendants to wait for the Ninth Circuit's ruling which may obviate the need for trial altogether,

23   thereby saving the parties millions of dollars in trial preparation.

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1    Defendants request that the Court schedule a status conference pursuant to LR 16-2 as soon

2 as possible after the Ninth Circuit issues its ruling to discuss the scheduling of trial, as well as the

3 Review-Journal's objections and concerns about the feasibility of preparing for trial given the Sun's

4 identification of 56 witnesses it may call at trial.

5 APPROVED AS TO FORM AND CONTENT:

6 DATED this 6th day of March, 2025.

7

8 WOMBLE BOND DICKINSON (US) LLP        KEMP JONES LLP

9 By: */s/ Kristen L. Martini*            By: */s/ Mona Kaveh*

10    E. Leif Reid, Bar No. 5750            Mona Kaveh, Esq., Bar No. 11825
      Kristen L. Martini, Bar No. 11272        J. Randall Jones, Esq., Bar No. 1927

11    Nicole S. Scott, Bar No. 13757        3800 Howard Hughes Parkway, 17th Fl.
      Lucy C. Crow, Bar No. 15203          Las Vegas, Nevada 89169

12    One East Liberty Street, Suite 300
      Reno, Nevada 89501-2128            Amy M. Gallegos, Esq., *Pro Hac Vice*

13                                David R. Singer, Esq., *Pro Hac Vice*

14    PISANELLI BICE PLLC                JENNER & BLOCK LLP
      James J. Pisanelli, Bar No. 4027        515 South Flower Street, Suite 3300

15    Todd L. Bice, Bar No. 4534          Los Angeles, California 90071
      Jordan T. Smith, Bar No. 12097

16    400 South 7th Street, Suite 300        Michael J. Gayan, Esq., Bar No. 11135
      Las Vegas, Nevada 89101            CLAGGETT & SYKES LAW FIRM

17                                4101 Meadows Lane, Ste. 100
                                Las Vegas, Nevada 89107

18    ALIOTO LAW FIRM
      Joseph M. Alioto, *Pro Hac Vice*

19    One Sansome Street, 35th Floor        Richard L. Stone, Esq., *Pro Hac Vice*
      San Francisco, California 94104        850 Devon Avenue

20                                Los Angeles, California 90024

21    *Attorneys for Plaintiff/Counterdefendants*
                                *Attorneys for Defendants/*

22                                *Counterclaimant*

23

24

25    _____
      UNITED STATES DISTRICT JUDGE or

26    UNITED STATES MAGISTRATE JUDGE

27    DATED: _____

28

- 104 -

125912233.1

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b), I certify that I am an employee of Womble Bond Dickinson (US) LLP, and that on the 6th day of March, 2025, I caused the foregoing **[PROPOSED] AMENDED JOINT PRETRIAL ORDER** to be served by electronically filing the foregoing with the CM/ECF electronic filing system, which will send notice of electronic filing to:

> J. Randall Jones, Esq.
> Mona Kaveh, Esq.
> KEMP JONES, LLP
> 3800 Howard Hughes Parkway, 17th Floor
> Las Vegas, Nevada 89169
>
> Michael J. Gayan, Esq.
> CLAGGETT & SYKES LAW FIRM 4101
> Meadows Lane, Ste. 100
> Las Vegas, Nevada 89107
>
> Amy M. Gallegos, Esq.
> David R. Singer, Esq.
> Andrew G. Sullivan, Esq.
> Alison I. Stein, Esq.
> JENNER & BLOCK LLP
> 515 South Flower Street, Suite 3300
> Los Angeles, California 90071
>
> Richard L. Stone, Esq.
> 850 Devon Avenue
> Los Angeles, California 90024
>
> Hon. Philip M. Pro (Ret.)
> Special Master
> philipmpro@gmail.com
> sparreno@jamsadr.com

*/s/ Jessie M. Helm*
Employee of Womble Bond Dickinson (US) LLP

- 105 -

125912233.1

1

## INDEX OF EXHIBITS

2

3

| Exhibit No. | Description | Page Nos. |
|:---:|:---|:---:|
| 1 | Sun's Exhibit List | 82 |
| 2 | Defendants' Exhibit List | 83 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

125912233.1