E. LEIF REID, Nevada Bar No. 5750
KRISTEN L. MARTINI, Nevada Bar No. 11272
NICOLE SCOTT, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavillion Center Dr., Suite 500
Las Vegas, Nevada 89135
Tel: 702.862.8300
Fax: 702.778.9709
Email: lreid@clarkhill.com
        kmartini@clarkhill.com
        nscott@clarkhill.com

JAMES J. PISANELLI, Nevada Bar No. 4027
TODD L. BICE, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Tel: 702.214.2100
Fax: 702.214.2101
Email: JJP@pisanellibice.com
        TLB@pisanellibice.com

JORDAN T. SMITH, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Tel: 702.464.7022
Fax: 702.382.8135
Email: jsmith@bhfs.com

JOSEPH M. ALIOTO, *PRO HAC VICE*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

*Attorneys for Plaintiff/Counterdefendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

LAS VEGAS SUN, INC., a Nevada corporation,

        Plaintiffs,

v.

SHELDON ADELSON (Estate Of), an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC,, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC dba ADFAM, a Delaware limited liability company and as the alter ego of Las Vegas Review-Journal, Inc., and News+Media Capital Gorup, LLC; and DOES,

Case No.: 2:19-CV-01667-ART-MDC

**(REDACTIONS/FILED UNDER SEAL)**

**PLAINTIFF/COUNTERDEFENDANTS' _EMERGENCY_ MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

1    I-X, inclusive,

2                          Defendants.

3    LAS VEGAS REVIEW-JOURNAL, a
     Delaware corporation,

4                          Counterclaimant,

5    v.

6    LAS VEGAS SUN, INC., a Nevada
     corporation; BRIAN GREENSPUN, an
7    individual and as alter ego of Las Vegas Sun,
     Inc.; GREENSPUN MEDIA GROUP, LLC, a
8    Nevada limited liability company, as the alter
     ego of Las Vegas Sun, Inc.,
9
                          Counterclaim Defendants.
10

11

12          Plaintiff/Counterdefendant Las Vegas Sun, Inc., and Counterdefendants Brian Greenspun

13   and Greenspun Media Group, LLC (together, for purposes of this Motion and for ease of reference,

14   referred to as, the "Sun"), move this Court pursuant to Local Rule 7-4, Federal Rule of Civil

15   Procedure 65, and Section 16 of the Clayton Act, 15 U.S.C. § 26, for an emergency temporary

16   restraining order ("TRO") and preliminary injunction due to Defendants' (the "RJ") ongoing threats

17   to end the parties' joint operation and cease printing and distributing the Sun in violation of Section

18   2 of the Sherman Act, 15 U.S.C. § 2. The Sun requests a TRO and preliminary injunction that:

19          1.    enjoins the RJ from unilaterally ending the joint operation and ceasing to print and

20                distribute the Sun until a final judgment on the merits,

21          2.    compels the RJ to use its best efforts and take all action necessary to obtain Attorney

22                General written consent of the 2005 JOA, and

23          3.    compels the RJ to revert to the 1989 JOA until a final judgment on the merits or an

24                earlier order of the Attorney General granting written approval of the 2005 JOA

25                under 28 C.F.R. § 48.14.

26   / / /

27   / / /

28   / / /

1    This Motion is based on the following Memorandum of Points and Authorities, the attached

2    Declaration of Kristen L. Martini (pursuant to Local Rule 7-4(a)) and Exhibits, and the pleadings

3    and papers on file herein.

4    Dated this 23rd day of February 2026.

5

6                                                            By: */s/ Kristen L. Martini*

7                                                            E. Leif Reid, Nevada Bar No. 5750
                                                             Kristen L. Martini, Nevada Bar No. 11272

8                                                            Nicole Scott, Nevada Bar No. 13757
                                                             1700 S. Pavillion Center Drive, Suite 500

9                                                            Las Vegas, Nevada 89169

10

11                                                           PISANELLI BICE PLLC
                                                             James J. Pisanelli, Nevada Bar No. 4027

12                                                           Todd L. Bice, Nevada Bar No. 4534
                                                             400 South 7th Street, Suite 300

13                                                           Las Vegas, Nevada 89135

14                                                           BROWNSTEIN HYATT FARBER
                                                             SHRECK, LLP

15                                                           Jordan T. Smith, Nevada Bar No. 12097
                                                             100 North City Parkway, Suite 1600

16                                                           Las Vegas, Nevada 89106

17                                                           ALIOTO LAW FIRM
                                                             Joseph M. Alioto, Pro Hac Vice

18                                                           One Sansome Street, 35th Floor
                                                             San Francisco, California 94104

19

20                                                           *Attorneys for Plaintiff/Counterdefendants*

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.  INTRODUCTION……………………………………………………………………1

II.  STATEMENT OF THE FACTS…………………………………………………..3

    A.  The Parties' Original Combination Under the 1989 Joint Operating Agreement…………………………………………………………………3

    B.  The Parties' 2005 JOA and the RJ's Continuing Control…………………………8

    C.  The Parties Litigation…………………………………………………12

    D.  The RJ's Anticompetitive Conduct………………………………………13

        1.  Accounting Abuses……………………………………………14

        2.  Failure to Maximize Joint Operation Profits……………………………...16

        3.  Actions that Reduce Consumer Knowledge of the Sun and Its Value……18

        4.  Efforts to Terminate the Joint Operation…………………………………20

III.  LEGAL STANDARD FOR GRANTING A TRO AND PRELIMINARY INJUNCTION…………………………………………………..………………24

IV.  A TRO AND PRELIMINARY INJUNCTION ARE NECESSARY…………………….25

    A.  The Sun has a Likelihood of Success on the Merits of Its Section 2 Claims: The Facts and Law Clearly Favor It…………………………………………..……………25

        1.  Monopolization…………………………………………………...25

            i.  *The Relevant Market*………………………………...…………25

                The Product Market………………………………………26

                The Geographic Market…………………………………28

            ii.  *The RJ Possesses Monopoly Power in the Newspaper* Market…..28

            iii.  *The RJ Has Willfully Acquired and Maintained Monopoly Powe*r…………………………………………………………31

            iv.  *The RJ's Conduct Has Caused Antitrust Injury* …………………32

                Unlawful Conduct………………………………..………33

                Injury to the Sun………………………………………34

                Injury Flowing from That which Makes the Conduct Unlawful…………………………………………34

iv

The Sun's Injury is the Type Antitrust Laws were Intended to Prevent……………………………………………35

The Sun Participates in the Market………………………36

2.      Attempted Monopolization……………………………………………36

i.      *The RJ's Has Undertaken Anticompetitive Conduct with a Specific Intent to Monopolize*……………………………………………...37

ii.     *The RJ's Has a Dangerous Probability of Success*………………38

B.      The Sun Will Suffer Extreme, Irreparable Harm if the RJ is Not Enjoined……...38

C.      The Balance of Hardships Tips Sharply in the Sun's Favor………………………...40

D.      The Public Interest is Served by Granted Injunctive Relief………………………41

E.      A Bond Should Not be Required……………………………………………………42

V.      CONCLUSION………………………………………………………………………...42

CERTIFICATE OF SERVICE………….…………………………………………………………44

APPENDIX INDEX

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Ad Management, Inc. v. General Telephone Co. of California*,
190 F.3d 1051 (9th Cir. 1999) ……………………………………………………32, 34

*American Impex Corp. v. International Ace Tex, Inc.*,
2009 WL 3963791 (C.D. Cal. Nov. 16, 2019) ……………………………………….…..41

*American Passage Media Corp. v. Cass Communications, Inc.*,
750 F.2d 1470 (9th Cir. 1985) …………………………………………………………...39

*Archetype Capital Partners, LLC v. Bullock Legal Group, LLC*,
2025 WL 3500688 (D. Nev. Dec. 5, 2025) …………………………………….………..40

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ……………………………………………….……………………...33

*Baharona-Gomez v. Reno*,
236 F.3d 1115 (9th Cir. 2001)………………………………………………………………42

*Barahona-Gomez v. Reno*,
167 F.3d 1228 (9th Cir. 1999)………………………………………………………………42

*Boardman v. Pacific Seafood Group*,
822 F.3d 1011 (9th Cir. 2016)…………………………………………………...38, 41

*Boulware v. Nevada*,
960 F.2d 793 (9th Cir. 1992)...………………………………………………………...25

*Bristol-Myers Squibb Co. v. Ben Venue Laboratories*,
90 F. Supp. 2d 540 (D. N.J. 2000) …………………………………….……………25

*Brown Shoe Co. v. U.S.*,
370 U.S. 294 (1962) …………………………………………………………………26, 34

*California v. American Stores*,
492 U.S. 1301 (1989)……………………………………………………………………38

*Cascade Health Solutions v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) …………………………………………………...36, 37

*Community Publishers, Inc. v. DR Partners*,
    139 F.3d 1180 (8th Cir. 1998) ……………………………………………....26

*Committee for an Independent P-I v. Hearst Corp.*,
    704 F.2d 467 (9th Cir. 1983) …………………………………………33, 41, 42

*Cost Management Services, Inc. v. Washington Natural Gas Co.*,
    99 F.3d 937 (9th Cir. 1996)…………………………………………….………25

*CoStar Grp., Inc. v. Commercial Real Estate Exchange, Inc.*,
    150 F.4th 1056 (9th Cir. 2025) ………………………………………………28

*Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022)………………………………………….………..24

*Dreamstime.com, LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) …………………………………….…………...31

*Forro Precision, Inc. v. International Business Machines Corp.*,
    673 F.2d 1045 (9th Cir. 1982) ………………………………………………..37

*Great Caesars Ghost LLC v. Unachukwu*,
    2020 WL 2394052 (D.N.J. May 12, 2020) ……………………………….…...41

*Hawaii ex rel. Anzai v. Gannett Pacific Corp.*,
    99 F. Supp. 2d 1241 (D. Haw. 1999) …………………………………….…*passim*

*High Technology Careers v. San Jose Mercury News*,
    996 F.2d 987 (9th Cir. 1993)…………………………………………….………25

*Hillstone Restaurant Group Inc. v. Houston's Hot Chicken Inc.*,
    2023 WL 110926 (D. Ariz. Jan. 5, 2023) ………………………………….……40

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
    627 F.2d 919 (9th Cir. 1980) ……………………………………….…………38

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ………………………………………………...31

*L.A. Land Co. v. Brunswick Corp.*,
    6 F.3d 1422 (9th Cir. 1993) ……………………………….…………………28

*Las Vegas Sun v. Adelson*,
    147 F.4th 1103 (9th Cir. 2025)…....………………………………………13

*Los Angeles Memorial Coliseum Commission v. National Football League*,
    634 F.2d 1197 (9th Cir. 1980) ………………………………………………….40

*Moltan Co. v. Eagle-Picher Industries, Inc.*,
    55 F.3d 1171 (6th Cir. 1995) …………………………………………………..42

*Newcal Industries, Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008)…………..…………………………………….25, 26

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018) ……..…………………………………………………….25

*Patmont Motor Werks, Inc. v. Pedego LLC*,
    2012 WL 13071201 (D. Nev. Mar. 6, 2012)…………………………………...24

*PLS.com, LLC v. National Association of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ……………………………..…………………….35

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th 1995)……………………………………………...…28, 29, 38

*Reilly v. Medianews Group, Inc.*,
    2006 WL 2419100 (N.D. Cal. July 28, 2006) ………………………………….26

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) …………………………………..……………….39

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ………………………………..………………….33, 36

*State College Area School Dist. v. Royal Bank of Canada*,
    2012 WL 12893876 (M.D. Pa. Oct. 5, 2012)…………..……………………….23

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009)………………………………………...24, 41

*Stuhlbarg International Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001)………………………….…………………………24

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co.*,
    284 F.2d 1 (9th Cir. 1960) ……………………………………………………….37

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*,
    370 U.S. 19 (1962) ………………………….……………………………...37

*Syufy Enterprises v. Am. Multicinema, Inc.*,
    793 F.2d 990 (9th Cir. 1986) ………….…………………………………38

*United States v. Daily Gazette Co.*,
    567 F. Supp. 2d 859 (S.D. W. Va. 2008) ………….………………….....26, 33, 34, 35

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ………….…………………………….…………………28

**STATUTES**

15 U.S.C. § 2………………………………………………………………..ii

15 U.S.C. § 26…………………………………………………………………24

15 U.S.C. § 1801……………………………………………….……….…4, 21, 41

15 U.S.C. § 1802(2)……………………………………………………….........5, 9

15 U.S.C. § 1803(b)………………………………………………………….6

15 U.S.C. §§ 1801-04……………………………………………………….2, 14

NRS 598A.050………………………………………………….……………...25

**RULES**

Local Rule 7-4……………………………………………….………………..ii, iii

Federal Rule of Civil Procedure 65……………………………….……………….iii

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3    This Court is well versed in the history between the parties and their dispute, having

4    presided over this litigation for the better half of a decade and having ruled on the parties' cross-

5    motions for summary judgment. This Court is also privy to the recent Ninth Circuit's Opinion on

6    the RJ's interlocutory appeal, and the Supreme Court's denial of the Sun's Petition for a Writ of

7    Certiorari today. As a result of these recent events, given the RJ's specific purpose of its appeal,

8    the RJ's threats to put the Sun out of business are reinstated. Hence, the necessity and urgency of

9    this Motion.

10   This antitrust action was borne from the RJ's initial attempt to end the parties' joint

11   operation and cease printing and distributing the Sun. That plan was thwarted first by the Sun's

12   filing of this action, and second by the entry of a (stipulated) injunction from this Court which

13   required the RJ to abide by the terms of the JOA (as amended in 2005). But things have changed.

14   According to the RJ, the Ninth Circuit's judicial declaration that the 2005 JOA is unlawful (because

15   there was no Attorney General approval) is the final nail in the Sun's coffin, absolving the RJ of

16   anticompetitive conduct spanning over 10 years and entitling it to eliminate the Sun from the

17   market. The RJ is wrong. In fact, the RJ's position, itself, is just another spoke in its wheel of

18   anticompetitive conduct. The Ninth Circuit's recent divergence from 50-years of established law

19   and practice to conclude the 2005 JOA is unlawful for lack of Attorney General approval neither

20   exonerates the RJ from antitrust liability nor grants it permission to snuff out its only competitor.

21   The Ninth Circuit made no conclusions about the merits of the Sun's claims for relief. It did not

22   address the Attorney General's approval of the 1989 JOA, nor its impact on the continuation of

23   those material obligations post-2005.

24   Even with the Ninth Circuit's ruling, the unenforceability of the 2005 JOA cannot function

25   to end the joint operation under any circumstance. An unlawful 2005 JOA cannot terminate the

26   lawful 1989 JOA, and this Court concluded as a matter of law that the 2005 JOA did not operate

27   expressly or impliedly as a novation of the 1989 JOA. ECF No. 970 at 18. Equally important, under

28   both the 1989 and the 2005 JOA, the RJ was obligated to use its "best efforts" and "take all action

necessary" to comply with the NPA's requirements and cooperate to ensure the parties' "lawful operation" under the JOAs.[1] In fact, the Sun and RJ further solidified their intentions to ensure their operations were always lawful by memorializing a contingency provision providing for reversion to the 1989 JOA if the DOJ hindered or impaired the parties' 2005 amendment. In the simplest of terms, the RJ cannot now claim that the joint operation can be terminated when it expressly and willingly agreed to revert back to the 1989 JOA in all circumstances where the 2005 JOA was otherwise ineffective.[2] And the RJ is required to use its best efforts to obtain the Attorney General's consent for the 2005 JOA (bearing all costs in doing so), reverting to the 1989 JOA in the meantime and permanently in the event the Attorney General does not approve the 2005 JOA.[3] The RJ's obligations to the joint operation remain materially the same. Under all circumstances, terminating the joint operation was never the outcome of an invalid 2005 JOA.

Over 36 years ago, under the NPA[4] and with the Attorney General's blessing, the RJ voluntarily agreed to possess complete control over, and bear sole responsibility for, <u>all</u> non-editorial and -reportorial operations of the Sun, and they shared in the joint operation's profits. As a result of their combined operations in 1989, the Sun became entirely dependent on the RJ for business management, and printing, distributing, promoting, and accounting and disbursing profits to the Sun. After availing itself for decades of the benefits and privileges of its dominance, the RJ has wielded its power as a sword, undertaking a litany of anticompetitive conduct to terminate the longstanding, voluntary, and beneficial course of dealing under the joint operation, thereby reducing competition and harming the Sun and consumers. This is the opposite of the NPA's purpose and the Attorney General's intent when approving the parties' combination. The RJ's control over the joint operation was bestowed to _preserve_ the Sun, not eliminate it. The 1989 JOA required the RJ to continue to print and distribute the Sun through 2040. These obligations, in all material respects, remained unchanged under the 2005 framework and remain unchanged today.

---

[1] *See* 2SA293 § 1.1; 2SA310 § 5.3; 2SA449 § 1.1; 2SA453 § 5.3. The Sun's citations to its Appendices are in the form of: Volume "SA" page number.
[2] *See* 2SA294 § 1.1.
[3] *Id*. § 1.1.
[4] The NPA refers to the Newspaper Preservation Act of 1970, 15 U.S.C. §§ 1801-04.

1  Regardless of the unenforceability of the 2005 JOA, the RJ is still liable for its anticompetitive

2  conduct.

3      Despite the undisputable fact that the 1989 JOA remains effective even after the Ninth

4  Circuit Opinion, the RJ has consistently repeated its threat to immediately stop printing and

5  distributing the Sun. This threat is imminent. And it is real. The Sun faces an immediate, existential

6  threat of being shut down. The threatened loss of a competitor, especially a JOA newspaper, is

7  precisely the type of irreparable harm Congress contemplated when enacting Section 16 of the

8  Clayton Act to afford antitrust plaintiffs injunctive relief. Because the Sun satisfies all required

9  elements for a TRO and preliminary injunction, the Sun respectfully requests that this Court grant

10  the Sun's Motion.

11  **II.    STATEMENT OF THE FACTS**

12      **A.    The Parties' Original Combination Under the 1989 Joint Operating Agreement**

13      The Sun is one of two daily print newspapers in Clark County; the Review-Journal is the

14  other (the "Newspapers"). With its first edition published in 1950 by Hank Greenspun, the Sun is

15  the second longest running daily newspaper in Las Vegas's history. ECF 830-1 ¶ 2. The Review-

16  Journal began as a daily newspaper in 1929. ECF No. 1 ¶ 5. The Sun is an alternative editorial voice

17  for the Las Vegas metropolitan area, often featuring attitudes, opinions, and coverage diametrically

18  opposed to the RJ. *Id.* ¶¶ 4, 6; 1SA45-47; 2SA271-72. The Sun has won numerous awards,

19  including the Pulitzer Prize, for its outstanding journalism. ECF No. 1 ¶ 3; 2SA290.

20      By the late 1980s, the Sun had been operating at a substantial loss when Hank Greenspun

21  was facing terminal illness: the Sun was in probable danger of financial failure. *See* 2SA293 at

22  Prelim. Statement; ECF 830-1 ¶ 4. To ensure the continued publication of two separate and

23  independent daily newspapers in Las Vegas, in June 1989, the Sun and the Review-Journal's prior

24  owners voluntarily entered into a 50-year Joint Operating Agreement (the "1989 JOA") to combine

25  all non-editorial and -reportorial operations pursuant to the NPA, with the intention that the joint

26  operation would continue until December 31, 2040 (with the possibility of renewal). *See* 2SA293

27  at Prelim. Statement & 2SA296 § 1.2.

28

3

The parties expressed their firm belief that the "continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent, is of paramount importance to the citizens of Las Vegas and its environs." 2SA293 at Prelim. Statement. Their belief reflected Congress's stated purpose in enacting the NPA:

> In the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States, it is hereby declared to be the public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into because of economic distress or is hereafter effected in accordance with the provisions of this chapter.

15 U.S.C. § 1801.

In further conjunction with this express public policy, the parties reiterated the importance of preserving their respective editorial and reportorial independence and autonomy as "the *essence*" of their agreement. 2SA309 § 5.2 (emphasis added). They mandated that the parties "shall have exclusive and complete control, authority and direction" over their respective "news and editorial content, [and] features and services." *Id.* The "public interest of maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs" was so imperative, they included specific performance as an express remedy. 2SA323 § 10.8.

The Sun and RJ agreed that merging non-editorial and -reportorial operations under the RJ's stewardship would preserve the Sun as a distinct newspaper voice:

> The parties further believe that publication of the Sun c[ould] be carried on profitably, and its continued editorial existence and independence thereby assured, if its production, distribution and advertising functions and related non-news and non-editorial activities are conducted and performed by the Review-Journal, through a single staff of Review-Journal employees utilizing the Review-Journal's plant and equipment under a joint newspaper operating arrangement ... , under which the Review-Journal will act on its own behalf with respect to the Las Vegas Review-Journal and on behalf of the Sun with respect to the Las Vegas Sun.

2SA293 at Prelim. Statement.

The combination aligned with Congress's delineation of a proper arrangement under the NPA; that is, to merge production facilities and joint operations for the: "printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; [and]

4

establishment of circulation rates and revenue distribution." 15 U.S.C. § 1802(2). The Sun and RJ agreed that the RJ would be responsible for and in control of all business aspects of the joint operation, including: "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation (2SA293 § 5.1); acting on behalf of both Newspapers (2SA293 at Prelim. Statement); printing and producing the Newspapers, using the RJ's printing plant, employees, and equipment (*id.*; 2SA302-3 § 4.3; 2SA305-06 § 5.1); sales and distribution (2SA305-06 § 5.1); purchasing newsprint, materials, and supplies (*id.*); soliciting, selling, and collecting on the Newspapers' advertising and circulation (*id.*; 2SA307 § 5.1.3); promoting and circulating the Newspapers, using the RJ's "best efforts" (2SA305-06 § 5.1; 2SA307-08 § 5.1.3-.4); establishing advertising and circulation rates for the Newspapers (2SA305-06 § 5.1); paying, recording, and maintaining all expenses and revenues of the joint operation (2SA310-11 §§ 6.1, 6.2); accounting to the Sun after the close of each fiscal year (2SA311 § 6.3); and distributing the Sun's share of the joint operation's profits, derived from all advertising and circulation revenues of the Newspapers and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel. 2SA311 § 6.4. "So long as [the] Sun furnish[ed] news and editorial copy, features and services to [the] Review-Journal in accordance with Article 4" (setting forth the technical specifications for publishing), the RJ "agree[d] to produce the Sun" and "include the Sun copy and features in jointly published newspapers ... and to sell all advertising for, promote and circulate such newspapers." 2SA305-06 § 5.1.

Because of the RJ's complete control over the joint operation, the Sun also had the right to inspect the Review-Journal's books and records for the joint operation's finances and profit payments. *See* 2SA319-20 § 10.3.

For the format of the Newspapers, the RJ agreed to produce the Sun as an afternoon newspaper and the Review-Journal as a morning newspaper, with the Newspapers being published in a joint edition bundle on weekends, holidays, and special editions. 2SA303-04 § 4.4; 2SA325-26 at App'x A.2; 2SA327 at App'x A.5. The joint edition included the Sun within the sections of the Review-Journal and featured both the Sun and the Review-Journal on the front-page nameplate and on all folios. *Id.*

The parties agreed to share the joint operation's profit with the RJ receiving 90 percent and the Sun receiving 10 percent. 2SA311 § 6.4; 2SA335 at App'x D.

"To enable Review-Journal to perform its functions" as manager and controller of the joint operation, the Sun was required to relinquish its equipment (including its printing press), supplies (including its newsprint, newsracks, and production film), contracts (including for circulation, supplies, and advertising), and all other non-editorial and-reportorial infrastructure that would allow the Sun to publish and distribute its Newspaper independently. 2SA297-302 at Art. 3 & § 3.1. The Sun therefore became entirely dependent on the RJ for its continued business operations. As such, the Sun relied on the RJ to use its best efforts in managing and controlling the joint operation, for the benefit of both Newspapers. 2SA307 § 5.1.3; 2SA309 § 5.1.8; 2SA310 § 5.3. The 1989 JOA was binding upon and inured to the benefit of the parties and their successors and assigns. 2SA324 § 10.9.

In order to avail themselves of the NPA's limited antitrust exemption, the Sun and RJ agreed "to pursue diligently the filing of the application for approval of th[e 1989 JOA] to the Department of Justice and to use their best efforts to take all action necessary to obtain such written consent as expeditiously as possible within the procedures set forth in applicable regulations of the Department of Justice." 2SA293 § 1.1. They jointly applied for Attorney General approval pursuant to Section 1803(b) of the NPA, governing agreements "not already in effect." 15 U.S.C. § 1803(b); 2SA340. They followed the regulations' application procedures. *See, e.g.*, 2SA408-20. They provided the required documents to the DOJ and published notice of their application in their Newspapers. *See id.*; *see also* 2SA410. The DOJ published the application in the Federal Register, and thoroughly investigated the 1989 JOA and the parties' separate businesses. *Id.*; 2SA415-18; 2SA361-62. It served civil investigative demands, conducted interviews, and received public comment. 2SA410; 2SA361-62.

The DOJ then issued its report and approval recommendation to the Attorney General. *See* 2SA338-405. In it, the DOJ analyzed whether the 1989 JOA met the requirements of Section 1803(b) of the NPA. 2SA350-60.

The DOJ found that the Sun's losses were "genuine" and satisfied the "failing newspaper" test. 2SA388. To determine whether the arrangement served the purpose of the NPA, the DOJ examined whether, "as a practical matter, the failing newspaper [the Sun] will remain capable of maintaining independent reporting and editorial activities after the JOA [went] into effect." 2SA360-61. The DOJ concluded that the 1989 JOA provided the Sun "sufficient operating guarantees" "to enable it to continue to provide an independent reportorial and editorial voice in the Las Vegas community," with the RJ being "responsible for and have ultimate decision-making authority with respect to advertising and circulation rates, printing functions, managerial services, and all other functions of both newspapers except for news and editorial functions." 2SA346, 363. Because the RJ could not unilaterally revise or reduce the Sun and could not interfere with the Sun's editorial and reportorial autonomy (among other Sun protections), the DOJ found that the 1989 JOA "[w]as designed to allow the parties to continue to produce separate and independent editorial products, thereby effectuating the purpose of the [NPA]." 2SA391-92, 363-66. The DOJ recognized that the RJ and Sun would be a morning and afternoon newspaper, respectively, and they would be published as a "joint edition" "on Saturday, Sunday and holidays." 2SA363-64; 2SA325-27 at App'x A.2. Because the 1989 JOA satisfied the requirements of Section 1803(b), the DOJ recommended approval. 2SA391-92.

The Attorney General adopted the DOJ's recommendation and granted its written approval of the 1989 JOA. *See* 2SA408-20. In doing so, the Attorney General restated that the "proposed JOA is intended to combine the business operations of the two newspapers, while preserving the newspapers' editorial and reportorial independence." 2SA408. It noted the parties' "joint edition on Saturdays, Sundays, and holidays," and focused on the parties' intent and agreed-upon undertakings to: "combine the business operations" (with the Review-Journal bearing responsibility for "the management, printing, and other commercial functions of the newspapers"); share the profits from the joint operation 90/10; and "preserv[e] their respective editorial and reportorial independence," further maintaining separate staff, editors, and reporters. *E.g.*, 2SA408-09. After concluding that the Sun was a "failing newspaper," the Attorney General agreed that the 1989 JOA would effectuate the policy and purpose of the NPA by "preserv[ing] the Sun in operation ... as a

1    <u>second editorial voice</u>." 2SA418-19 (emphasis added). The Attorney General entered its written

2    opinion of approval without an evidentiary hearing. 2SA411.

3        The Sun became profitable under the 1989 JOA. The parties operated under it for 16 years,

4    where the Sun depended on the joint operation under the RJ's control and management. *See* ECF

5    830-1 ¶¶ 4-5.

6        **B.    The Parties' 2005 JOA and the RJ's Continuing Control**

7        In 2005, the Sun remained without infrastructure to independently print, publish, or

8    distribute its Newspaper. The Sun was facing economic pressure to resolve issues over the editorial

9    cost calculations, increased traffic in the market due to demographic patterns impacting the Sun's

10   afternoon delivery, and costs to the joint operation from the Sun's second press run, mailroom,

11   circulation, and delivery. *See* 2SA435-38. The RJ sought to amend the 1989 JOA. 2SA445 ¶ 3. The

12   parties entered into the Amended and Restated [Joint Operating] Agreement on June 10, 2005. 2005

13   JOA. 2SA449-81. Based on existing caselaw throughout the country and over 30 years of DOJ and

14   NPA lawyers' practice, both the Sun and the RJ believed that the 2005 JOA would be valid and

15   enforceable upon submission of the amendment to, and absent an enforcement action by, the DOJ.

16   2SA438-41; 2SA481-82; 2SA495; *see also* ECF No. 970 at 16-17, 19 (collecting cases); 28 U.S.C.

17   § 48.1; 3SA505-07.

18       To maintain the immunity afforded their original combination, and at the advice of the

19   parties' counsel (who were NPA and former DOJ antitrust lawyers), the Sun and RJ agreed to

20   continue their original combination in all "material" respects, which were the focus of the DOJ and

21   Attorney General 15 years prior. 2SA438-41; 2SA481-82; 2SA495; 3SA538-41; ECF No. 970 at

22   18. The parties tracked the 1989 JOA as closely as possible. *See* 2SA481-82. And the RJ remained

23   in complete control over, and continued bearing all responsibility for, the non-editorial and -

24   reportorial aspects of the joint operation and the Sun. *Compare* 2SA449-81 *with* 2SA-293-336.

25       Under the 2005 JOA, the parties voluntarily continued the 50-year term of the 1989 JOA,

26   intending their joint operation to run to December 31, 2040 (with the possibility of renewal).

27   2SA450 § 1.2.

28

They reaffirmed their commitment to the public interest in remaining editorially independent, as required by the NPA and the Attorney General, repeating the importance of preserving their respective editorial and reportorial independence and autonomy as "*the essence*" of their agreement. 2SA453 § 5.2 (emphasis added). They again mandated that the parties "shall have exclusive and complete control, authority and direction" over their respective "news and editorial content, [and] features and services." *Id.* They reiterated that, "[b]ecause of the public interest in maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs," specific performance was an available remedy. 2SA457 § 10.8.

Their ongoing combination remained in alignment with Congress' specifications of a proper arrangement under the NPA, *i.e.*, undertaking joint operations for the: "printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; [and] establishment of circulation rates and revenue distribution." 15 U.S.C. § 1802(2). *See*, *e.g.*, 2SA481-82. Operating under the same material framework approved by the Attorney General in 1989, the RJ would still be responsible for and in control of all business aspects of the joint operation, including: "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation (2SA452 § 5.1); acting on behalf of both Newspapers (*see generally* 2SA449-73); printing and producing the Newspapers, using the RJ's printing plant, employees, and equipment (*id.* & 2SA450-51 § 4.3, 2SA452 § 5.1); sales and distribution (2SA452 § 5.1); purchasing newsprint, materials, and supplies (2SA450-51 § 4.3); soliciting, selling, and collecting on the Newspapers' advertising and circulation (2SA451-52 §§ 5.1, 5.1.3); promoting and circulating the Newspapers, using "commercially reasonable efforts to maximize the circulation of the Newspapers" and the same efforts to "promote the Newspapers" (2SA451-52 §§ 5.1 & 5.1.3-.4); establishing advertising and circulation rates for the Newspapers (2SA452 § 5.1); paying, recording, and maintaining all expenses of the joint operation (2SA469-72 at App'x D); accounting to the Sun after the close of each fiscal year (*id.*); and distributing the Sun's share of the joint operation's profits, derived from all advertising and circulation revenues of the Newspapers, and sales incidental to the publication of the Newspapers or involving the Review-

Journal's facilities or personnel. *Id*. Just as they agreed in 1989, "[s]o long as the Sun furnish[ed] news and editorial copy, features and services to the Review-Journal in accordance with Article 4" (setting for the technical specifications for publishing), the RJ would "produce the Sun" and "include the Sun copy and to sell all advertising  for, promote and circulate such newspapers." 2SA451 § 5.1. Because of the RJ's continued control over the joint operation, the Sun retained rights to examine (and also audit) the Review-Journal's books and records. *Id.*

Regarding the format of the Newspapers, to further reduce production and distribution costs (2SA435-38; 2SA445 ¶ 3), the parties elected to print and distribute the Newspapers on a daily basis in a joint edition like they had been doing for nearly 15 years on weekends, holidays, and special editions (the "Newspaper Bundle"). *See* 2SA325-27 at App'x A.2-.4. And, like before, the Newspaper Bundle included the Sun within the sections of the Review-Journal and continued to feature both the Sun and Review-Journal on the front page. *Id.* To maintain visibility of the Sun and promote its branding in the Newspaper Bundle, the RJ agreed to publish a box above the Review-Journal's nameplate containing a "noticeable mention" with the Sun's logo and a headline promoting the Sun's lead story (the "Sun Box"). *E.g.*, *compare* 2SA303-04 § 4.4 *with* 2SA461-62 at App'x A.2-.4. The RJ had physical control over publishing the Sun Box along with the rest of the Newspaper Bundle.

The RJ also remained in control of promoting the Sun. *See supra.* In contemplation of the now daily joint edition Newspaper Bundle, the RJ agreed to use commercially reasonable efforts to maximize the circulation of both Newspapers and include the Sun in equal prominence in the RJ's promotional material and activities. 2SA452 § 5.1.4. In similar vein, the RJ also voluntarily agreed that the Sun would be a part of the electronic replica edition of the Newspapers distributed to consumers. 2SA457 § 10.6.

As before, the parties continued sharing in the joint operation's profits. 2SA469-72 at App'x D. Similar to the 90/10 split under the 1989 JOA, the Sun's profit share for each year under the 2005 JOA formula approximated 9.87 percent of the previous year's reported joint operation EBITDA. 3SA545 & *id.* n.61.

Having already received Attorney General consent for their combination in 1989, in accordance with existing caselaw, DOJ Regulations, and practice for amendments to previously approved post-NPA JOA, the Sun and RJ "agree[d] to file the Restated Agreement" with the DOJ. 2SA449 § 1.1; 2SA482; 2SA439, 441; 3SA563-68; 3SA505-07. The RJ again covenanted "to use [its] best efforts and take all action necessary to effect the intent of this Restated Agreement" in this process. 2SA449 § 1.1. It reaffirmed the same obligation when "agree[ing] to take all corporate action necessary *to carry out and effectuate the intent, purposes* and provisions of th[e] Restated Agreement, and to cooperate with the [Sun] in every reasonable way that will promote *the successful **and lawful** operation* under this Restated Agreement for both parties." 2SA453 § 5.3 (emphasis added). The RJ was to bear all fees and costs of post-submission proceedings connected to "seeking any required approval by the Department of Justice" from and after the filing of the 2005 JOA. 2SA450 § 1.1.

The Sun and RJ included a contingency provision in the 2005 JOA to ensure that their joint operation would continue to operate under a valid, lawful, and enforceable agreement:

> In the event of any action by the United States Department of Justice after the filing of the Restated Agreement which, in the sole opinion of either party hinders, impairs, seeks to halt or otherwise materially impacts this Restated Agreement, then either party may declare the Restated Agreement null and void, and the 1989 Agreement between the parties shall be reinstituted and remain in full force and effect.

2SA449.

On June 15, 2005, the Sun and RJ jointly submitted the 2005 JOA to the DOJ for review and investigation. 3SA539-42; 3SA576-87. The DOJ accepted the filing and thoroughly investigated the 2005 JOA as an amendment. *See* 3SA589-99; 3SA601-610; 3SA611-14; 2SA440-41; 3SA623; 2SA495; *see also* ECF 830-1 ¶ 6. Like before, the DOJ focused on whether the 2005 JOA preserved the Sun's as a separate and independent editorial and reportorial voice in the community. *See*, *e.g.*, 3SA639; 3SA593 (CID Nos. 4(a) and (b)). The RJ represented to the DOJ that the RJ could not unilaterally terminate the 2005 JOA and that the Sun had exclusive control over its content. 3SA642-44.

The DOJ closed its investigation without an enforcement action. *See* 3SA647. It explained that only the ancillary conduct "***not integral* to the parties' *revised* arrangements for the *joint distribution of the Review-Journal and the Sun***, the effects of which we reviewed as part of our investigation—remain[ed] subject to antitrust scrutiny." *Id.* (emphasis added). Based on the existing law and practice, the parties understood that this "no action letter" confirmed that the DOJ was not bringing an enforcement action and allowed the parties to operate under the 2005 JOA. 2SA482; 2SA439, 441; 3SA624-35; *see also* 3SA559-65, 571-72; 3SA506-07; 2SA495. No one believed the DOJ's letter hindered or otherwise impaired the joint operation. *E.g.*, 2SA439-41; 2SA495. They, along with the rest of the country, believed that they followed the proper procedures under the NPA. 3SA568-70; 3SA507; *see also* 3SA626-27.

### C.    The Parties' Litigation

The parties operated under the 2005 JOA for nearly 15 years without any suggestion that it was unlawful or otherwise reduced competition in any way not already sanctioned by the Attorney General in 1989. 3SA634-35; 3SA664; *see also* 3SA680-81 (where Adelson informed Greenspun that "he was going to abide by the letter of the JOA, to the letter and [Greenspun] didn't have to worry"). The RJ even argued for its enforcement during the parties' arbitration over an accounting dispute in 2019. *See*, *e.g.*, 3SA691-702.

Only after the Sun won a multi-million-dollar judgment in that arbitration—which barred the RJ from charging millions of improper expenses to the joint operation—did the RJ seek to terminate the joint operation. *See* 3SA700-02; 3SA704-06. But, even then, the RJ's 60-day notice of termination was for the Sun's purported breaches of the 2005 JOA—not that the 2005 JOA was unlawful. *See* 3SA704-06.

The Sun initiated this antitrust action, and was preparing to seek injunctive relief preventing the RJ from terminating and ceasing to print and distribute the Sun during the pendency of this litigation. *See* ECF No. 6. The RJ instead "made repeated assurances … that [it] w[ould] continue to print the Sun and perform under the 2005 JOA until a court issue[d] a ruling that would allow the RJ to terminate the agreement," "consistent with the RJ's prior public and private commitment to continue publishing the Sun until a court of competent jurisdiction rules on the issue." 3SA710-

11. Therefore, the parties stipulated that the RJ "w[ould] maintain the status quo" and refrain from taking non-judicial steps to terminate the joint operation until after the entry of final judgment allowing such termination. ECF No. 6 at 3-4. This Court entered the Stipulated Order on October 9, 2019. ECF No. 13.

Shortly after, the RJ initiated its campaign to have the 2005 JOA declared unlawful for lack of Attorney General signature. *See* ECF No. 20 at 9, 13-21. Once the parties cross-moved for summary judgment on this issue, the RJ filed a motion to dissolve the Stipulated Order. *See* ECF No. 829 at 12-13, 34-43; ECF No. 843 at 47-53, 853. This Court entered summary judgment in favor of the Sun on the 2005 JOA's enforceability, and denied the RJ's motion to dissolve on the same basis. ECF No. 970 at 19. The RJ appealed.

At the RJ's behest, the Ninth Circuit entered its Opinion diverging from half a century of caselaw, DOJ Regulations, and practice. *See Las Vegas Sun v. Adelson*, 147 F.4th 1103 (9th Cir. 2025). Despite that the parties had been operating under the framework of the 2005 JOA for 20 years, the Ninth Circuit concluded that the 2005 JOA was illegal and unenforceable under Section 1803(b) of the NPA due to lack of Attorney General approval. *Id.* at 1121-22. Today, the United States Supreme Court denied the Sun's Petition for a Writ of Certiorari.

### D.    The RJ's Anticompetitive Conduct

Even before the Adelson family's purchase of the Review-Journal closed, the RJ began exploring ways to terminate the Sun. From the inception of the due diligence process, the RJ discussed ways to end the joint operation, including through squeezing the Sun out of the market by eliminating its profits payments. *See* 3SA722; 4SA753-59 (where the RJ's then-publisher Jason Taylor testified to frequent meetings in which the Adelson family: inquired, " ████████████████████████████████████████████████████████████████ " and asking more than once, " ████████████████████████████████████████████████████████████████████████████████████████ "; and expressed desire for the Sun to be excluded from the Newspaper Bundle); 4SA778-80. This is precisely the plan the RJ embarked on.

The RJ used its exclusive power over the joint operation and the Sun—harnessed since 1989—to manipulate the framework under which both parties believed was valid and enforceable to: (1) abuse the RJ's joint operation accounting to reduce and eliminate the Sun's profit payments; (2) fail to maximize the joint operation's profits to further drive the joint operation into a loss and eliminate the Sun's profits; (3) reduce the Sun's visibility and consumers' knowledge of the Sun; and (4) threaten unilateral termination of the joint operation through pretextual, sham litigation (together, "Anticompetitive Conduct"). *See*, *e.g.*, ECF No. 970 at 24-25; 1SA171-83. These categories of Anticompetitive Conduct are discussed below, in turn.

### 1.    Accounting Abuses

The NPA does not determine how JOA newspapers are to account for their joint operation's revenues and expenses. *See* 15 U.S.C. §§ 1801-04. Rather, the NPA's standard is "the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States …." *Id.* § 1801. Consequently, how the newspapers account for joint operation expenses and revenues are determined by the parties, and are sufficient so long as the weaker newspaper has enough resources to deliver on the NPA's policy and purpose. *See* 3SA509-11; *see also* 2SA388-90. The Sun's share of the joint operation's profits under both JOAs approximated 10 percent (2SA336; 2SA469-70; 3SA545 & *id.* n.61), which the DOJ deemed a "sufficient operating guarantee[ ]" "to enable [the Sun] to continue to provide an independent reportorial and editorial voice in the Las Vegas community." 2SA346, 365, 388-89.

In contravention of the NPA and the parties' long-standing course of dealing, the RJ abused its power over the joint operation accounting to eliminate the Sun's profits—the Sun's sole revenue source to fund its newsroom. 1SA71-72; 3SA508-21. The RJ's power over the joint operation accounting was highlighted when the RJ directed its accounting department to write off hundreds of thousands of dollars specifically because "███████████████████████████████████ ███████████████████████" 4SA792. When asked what "prevented [the RJ] from increasing expenses so much that the Sun would receive nothing from the JOA calculation," the RJ testified, "Nothing." 4SA803. The RJ knew that higher operating expenses under the 2005 JOA

14

1    formula would reduce the joint operation EBITDA and, consequently, lead to lower profit payments

2    to the Sun. The RJ continued to exploit its power.

3         To illustrate, the RJ increased the Review-Journal's editorial costs from █████████████

4    █████████████████████, and charged all of it to the joint operation even though the parties'

5    editorial costs were disallowed expenses under the 2005 framework. 4SA813; 3SA691-702; *see

6    also* 3SA508-12. For a comparison of how excessive the RJ's disallowed charges were, the RJ

7    charged ██████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████ 4SA816;

10   4SA820; 4SA823. The RJ continued to charge the Review-Journal's editorial costs against the joint

11   operation and did so even after the 2019 arbitration judgment confirmed it legally could not. *See*,

12   *e.g.*, 4SA837-40; 4SA852-53; 4SA808-10.

13        The RJ, again under the belief that the 2005 JOA was valid and enforceable, further

14   manipulated and abused the joint operation accounting under that framework to harm the Sun by:

15   charging disallowed promotional expenses that did not include equal mention of the Sun, and/or

16   that promoted the RJ's separate digital entity (4SA853, 854, 856; 3SA513-16); charging the RJ's

17   separate, non-JOA digital entity's expenses to the joint operation (4SA854, 855, 857; 3SA516-17);

18   charging other, miscellaneous disallowed expenses (4SA856-57; 3SA517-19); removing joint

19   operation revenue categories (4SA856-57; 3SA519-21); and diverting joint operation revenue to

20   the RJ's separate digital entity. 4SA855-57; 3SA521. Compounding these accounting abuses, the

21   RJ systematically failed to maintain separate books and records for the joint operation, conflating

22   the joint operation accounting with its separate accounting (which included the RJ's separate digital

23   entity), even after the arbitrator criticized the RJ's practices in 2019. 4SA850-51; 3SA697. The RJ

24   concealed this conduct by blocking the Sun's attempts to review the RJ's books and records

25   3SA698.

26        In short, the RJ's accounting practices worked to overstate the costs attributable, and

27   understate the revenues attributed to the joint operation, thereby suppressing the joint operation

28   EBITDA and reducing the Sun's profit payments. 1SA171-72; 4SA851, 858.

### 2.     Failure to Maximize Joint Operation Profits

Both newspaper owners in a JOA traditionally have strong economic interests in the success of the joint operation and the combined financial results. 3SA503-04. Since 1989, the RJ committed to the Sun—and the DOJ—that it would control and manage the joint operation in furtherance of the NPA and preservation of the Sun's competing editorial voice. *E.g.*, 2SA293-336; 2SA340, 388-90. This commitment included using its "best efforts" or, at minimum "commercially reasonable efforts," to maximize the Newspapers' circulation, and agreeing to take all reasonable measures to promote the successful operation of the Newspapers for the benefit of both parties. 2SA307 §§ 5.1.3, 5.1.8, 5.3; 2SA452 §§ 5.1.3, 5.1.4, 5.3; 3SA502-04. Especially in a declining market, newspapers have an increased incentive to generate even incremental profits. *See* 3SA525-26, 534-35.

However, the RJ again exploited its dominant position by failing to maximize the joint operation's profits. The RJ failed to undertake commercially reasonable efforts to reduce costs and raise the revenues of the joint operation. 3SA501, 526, 534. As one method of the RJ's failure to maximize the joint operation's profits, it unreasonably rejected revenue and expense initiatives set out by the Review-Journal's then-publisher Jason Taylor; instead, the RJ removed and replaced Taylor with a publisher who would accomplish the RJ's plan to drive the joint operation EBITDA into the ground and eliminate the Sun. 3SA526-34.

The Review-Journal's prior owners (GateHouse) brought Taylor on as publisher in July 2015. 4SA730-31. Soon after Taylor's arrival, he began implementing a 2016 strategic action plan to reduce unnecessary costs and increase revenue through various means. 4SA738-43. Taylor's plan incited improved financial performance almost immediately. 4SA732-37. Before the Adelson family's acquisition, Taylor projected that the joint operation would have a financially strong close for fiscal year-end 2016, and that, based on trend, the joint operation profits in 2016-2017 were projected to be substantial, with the Sun's profit payments increasing by more than 18% in 2017. *Id.*; 4SA863-84; 4SA774-77, 785-86; 4SA732-37. Taylor's projections were consistent with the RJ's valuation obtained from a third party, VRC—both projected the joint operation EBITDA to

16

1    grow to ████████. 4SA863-84; 4SA889-923, 892, 899. The RJ heavily lobbied for Taylor to

2    remain as publisher after the Adelson family's purchase, which Taylor did. 4SA748-50.

3         In his role as publisher, Taylor discovered that profit payments were due and owed to the

4    Sun. 4SA744-47. Because Taylor believed it was important to resolve any outstanding profit

5    payment issues with the Sun in order to successfully implement his strategic plan, he raised the

6    issue with Adelson on several occasions. 4SA753-63. No resolution ever came. *See*, *e.g.*, *id*. Based

7    on Adelson's statements, the RJ "did not want the Sun to exist." 4SA789.

8         Six weeks after the purchase, the RJ removed Taylor because the RJ wanted someone who

9    was more in line with its vision and control. *See*, *e.g.*, 4SA751-52. GateHouse, which had stayed

10   on as manager of the Review-Journal with Taylor, ended its management agreement with the

11   Adelson family, noting, "████████████████████████████████████████

12   ████████████," attaching Taylor's strategic plan. 4SA861-87, 862.

13        The RJ hired Craig Moon as Taylor's replacement in January 2016. 4SA787-88; 4SA801.

14   Thereafter, the RJ did not follow Taylor's commercially reasonable strategic plan, or any other

15   commercially reasonable strategy. 3SA529-33. The RJ not only diverged from implementing

16   Taylor's or any other reasonable expense initiatives, but, as company revenue was decreasing, the

17   RJ also unreasonably increased the joint operation's expenses. 3SA531-33, 535-36. Naturally, the

18   revenue that was trending upward under Taylor quickly evaporated after his departure. 3SA527-33.

19        At the close of the fiscal year on March 31, 2016—buoyed by Taylor's performance the

20   prior year—the joint operation still reported a profit, though much smaller than Taylor had

21   projected. *See* 4SA820. By February 2017, the RJ informed the Sun that its profit payments were

22   expected to significantly decrease by fiscal year-end March 31, 2017, and the RJ did not project

23   *any* joint operation profits going forward. *See* 4SA925. The RJ simultaneously threatened the Sun:

24   "Patrick [Dumont] says the JOA [*i.e.*, the joint operation] will never be worth more than it is now

25   and Brian [Greenspun] should call Patrick to make a deal." *Id.* No offer made by the RJ was

26   sufficient to maintain the Sun as an independent editorial voice. 3SA687. And the RJ made good

27   on its threats to squeeze the Sun out with "██████." 4SA778-80; 4SA925.

28

17

It was in March 2017, before the close of fiscal year, that the RJ directed its accounting department to make the Sun's profit payment zero. 4SA792. Upon the close of the first full fiscal year under the Adelson family's ownership (ending March 31, 2017, a mere two months after Taylor's departure), the RJ reported a negative joint operation EBITDA for the first time in the history of the parties' combination. 4SA816. As the RJ intended, the Sun's profit payment for the following year was, in fact, zero. *Id.* The joint operation's performance worsened each year, while the RJ wrote off all goodwill associated with its purchase of the Newspaper. 4SA928-47, 942, 947; 4SA833-34; *see also* 4SA835-36. The RJ has not made any profit payment to the Sun since the close of the fiscal year on March 31, 2017. 4SA816; 5SA949; 5SA953-54.

The RJ's failure to undertake commercially reasonable efforts to lower the costs and raise the revenues of the joint operation reduced and eliminated the Sun's profit payments. 1SA15, 172. The RJ has failed to take all reasonable measures to promote the successful operation for the benefit of both Newspapers (2SA310 § 5.3; 2SA453 § 5.3) and abused its power to drive the joint operation into a loss, in turn, threatening the Sun's existence.

### 3.    Actions that Reduced Consumer Knowledge of the Sun and Its Value

The RJ has been responsible for and in control of promoting the Sun since 1989. 2SA305 § 5.1 & 2SA297-98 §§ 5.1.3 & 5.1.4; 2SA452 § 5.1.4. The RJ has always been required to use, at minimum, commercially reasonable efforts in doing so. 2SA307 § 5.1.3; 2SA452 § 5.1.4. The Sun, like all weaker newspapers in a JOA, has a long-term interest in ensuring that its voice is preserved, a key part of which is how the Sun's separate brand and content are promoted. 3SA524; 2SA277-78; *see* 2SA422-23. If the RJ were honoring the joint operation and the intent of the NPA, the RJ would share in that interest, too. Ensuring that both Newspapers are healthy benefits the joint operation by expanding consumer awareness of the diverse editorial voices, bolstering joint operation revenue. 3SA522-24; 5SA957-58.

Yet again, the RJ has exploited its control over the Sun's promotions and brand visibility by taking actions that undermine the Sun's ability to communicate with consumers about the nature and value of its Newspaper and brand, in turn reducing people's awareness of the Sun's presence and content. 1SA172-73; 5SA972-81; 5SA1012-19. The RJ's anticompetitive promotional abuses

18

involve its (1) failure to promote the Sun in equal prominence with the RJ, (2) destroying the Sun Box and diminishing the Sun's presence on the front page of the Newspaper Bundle, and (3) omitting the Sun from the electronic replica edition of the Newspaper Bundle.

First, the RJ voluntarily agreed to mention the Sun in "equal prominence" with the Review-Journal in any promotion of the Review-Journal to ensure the Sun's brand remained as robust as the Review-Journal's. 2SA452 § 5.1.4 The RJ omitted the Sun entirely in virtually all external advertising—including sponsorships, billboards, banners, displays, other signage, events, house ads and circulars, bills and renewal notices, television and radio advertising, and trade and barter agreements. 5SA968-72; 5SA1021-25. The RJ could not produce any examples of promotional activities that mentioned the Sun in equal prominence. *See id.* In the less than 1 percent of times the RJ did mention the Sun, it displayed the Sun's logo disproportionately to the Review-Journal's. 5SA968-72. The RJ's exclusion of the Sun in equal prominence from the Review-Journal's promotions is a change from past practices pre-Adelson family purchase. *See* 5SA1027.

Second, the RJ agreed to publish the Sun's noticeable mention in the form of the Sun Box to effectively communicate the Sun to consumers to advance their knowledge of the Sun and the Sun's brand. 2SA451 § 5.1, 2SA461 at App'x A.2(d); *see* 5SA1008-09, 1012-19; 5SA981-90. But the RJ used its control over the physical printing of the Newspaper Bundle to remove the Sun Box and reduce the Sun's noticeable mention on the front page of the Newspaper Bundle. *See* 5SA1032-33; 5SA1009-12. In 2017, shortly after promising no further profit payments and attempting to coerce the Sun into selling, the RJ deviated from the parties' practice of 12 years and unilaterally removed the Sun Box, and instead published an inconspicuous noticeable mention in the form of a weak banner. *See id.*; *see also* 5SA1008; 5SA991. Besides its diminished visibility, by destroying the Sun's Box, the RJ ensured that when a "spadea fold" (an advertising element covering approximately 40% of the left side of the page) was published or when advertising stickers are placed on the Newspaper Bundle, the Sun's banner would be covered. 5SA1012-15; 5SA992-1002.

Third, the RJ voluntarily exercised its control over publishing and distributing the electronic replica edition of the Newspapers and removed the Sun from it. *See* 2SA457 § 10.6; 5SA1035-37. Both parties agree that the electronic replica edition constitutes a meaningful percentage of the

Newspapers' circulation and is mostly used in educational environments to communicate with younger readers. 5SA1047-48. It is one of the Sun's promotional strategies to advance these readers' knowledge of the Sun and its brand. *See* 5SA1003-04. The RJ had a longstanding practice (13 years) of including the Sun in the electronic replica edition of the Newspapers. However, on or about January 25, 2018, the RJ admittedly and intentionally just "t[ook]" the Sun out, depriving the Sun of opportunity to reach and introduce itself to new young readers, *i.e.*, future consumers, reducing the Sun's visibility. 5SA1063. The RJ only restored the Sun in the electronic replica edition on May 3, 2019, amidst the parties' 2019 arbitration. 5SA1063-65.

The RJ's various actions harmed the Sun's ability to communicate with consumers about the nature and value of its Newspaper and brand, reducing people's awareness of the Sun's presence and content, and harming the Sun's brand and value.

### 4.  Efforts to Terminate the Joint Operation

Because the Sun gave up control of its assets and non-editorial and -reportorial operations as a condition of entering into the 1989 JOA, the Sun lost its ability to independently print and distribute its Newspaper and became dependent on the joint operation and the RJ. 2SA293 at Prelim. Statement; 2SA307 §§ 5.1.3, 2SA309 § 5.1.8, 2SA310 § 5.3; 2SA297-302 Art. 3 & 3.1; 2SA450-51 § 4.3; 2SA451-52 § 5.1; *see also* 2SA346, 363. The Sun did so based on the parties' and the DOJ's intentions that the Sun would be preserved as a second, independent Newspaper voice until at least 2040. 2SA296-97 § 1.2; 2005 JOA 2SA450 § 1.2; 2SA409; *see also* 2SA391-92; 3SA642-44. If the RJ is allowed to succeed in terminating the joint operation, the RJ would succeed in terminating the Sun—the RJ's lone competitor in the market.

When the RJ's efforts to starve the Sun out of existence were decelerated by the 2019 arbitration judgment (*see supra* § II(D)(1), (2)), the RJ swiftly implemented a more direct, two-part plan to hasten the Sun's shut down. For the first part, the RJ attempted to terminate by serving the Sun with a 60-day notice "to cure" alleged defaults under "the governing agreement," *i.e.*, the 2005 JOA. 3SA704-06. The RJ claimed that the Sun failed to publish a "quality" Newspaper, and attempted to divert print readers to lasvegassun.com through a 2018 "Note to Readers" ("Note"). *Id.* The RJ realleged these bases as counterclaims and affirmative defenses in an underlying state

20

court action and here. *See* ECF No. 621 at 30; *see generally* ECF No. 296. (The RJ also claimed frustration of purpose as a reason to terminate, but this Court subsequently granted the Sun summary judgment on this 'reason.' 3SA705-06; ECF No 970 at 49.) For the second part, the RJ sought to terminate the Sun by obtaining a judicial declaration that the 2005 JOA is unenforceable under the NPA for lack of Attorney General approval. *See supra* § II(D). The RJ's attempts to terminate the joint operation for these reasons are not only essential to the RJ's overall anticompetitive scheme, but they are objectively meritless.

Regarding the RJ's quality challenge, it is nonsensical that the Sun would fail to maintain its own quality electively. The Sun has both short- and long-term incentives to maintain its quality, including the success of the joint operation from which its revenues flow, and maintaining and increasing its own value and going concern for a stronger bargaining position in renegotiation or renewal discussions, or for partnership or saleability to a third party. 2SA291; 1SA39-42; *see also* ECF No. 970 at 22-23; ECF No. 876-6 ¶ 3; ECF No. 876-7 ¶ 3. The timing of the RJ's quality challenge is significant: only after the RJ undertook the Anticompetitive Conduct to eliminate the Sun's profit payments and weaken the Sun's ability to compete, did the RJ use the consequence of its conduct as a reason to terminate the Sun. *See supra* § II(D)(1)-(3)). The level of quality provided by a newspaper is affected by the resources available for news operations. *See* 2SA288. The RJ's elimination of the Sun's sole source of revenue naturally impacted its ability to compete by impacting the Sun's quality. 1SA14-15.

Nonetheless, even under these circumstances the Sun remains a quality newspaper by all reasonable measures. 2SA270-76, 282-291; 5SA1070-73; 5SA1078; 5SA1088-89; *see generally* ECF No. 876-7. Dr. Robert Picard, the Sun's JOA newspaper and media industry expert, concluded that the nebulous quality standard in both JOAs is to ensure that quality remains at a level that does not affect sales or advertising revenue by negatively affecting the reputation of either paper. 2SA283-84; *see also* 2SA462-63 at App'x A.5. Nowhere did the parties specify what "quality" meant or stipulate to the number, percentage, or kinds of content the Sun would publish. *See generally* 2SA293-336, 449-73; 2SA285, 287. The NPA actually prevents such oversight. *E.g.*, 15 U.S.C. § 1801; SUN 24439-40, 24411-14; 3SA593 (CID Nos. 4(a) and (b)). Consistent with the

1  NPA, the parties repeatedly emphasized the Sun's complete editorial and reportorial independence

2  as being of "paramount importance" and the "essence" of their agreements. 2SA293 at Prelim.

3  Statement & 2SA309 § 5.2, 2SA323; § 10.8; 2SA453 § 5.2; 2SA457-58 § 10.8. This Court, too,

4  concluded that the RJ's quality challenge cannot interfere with the Sun's "choices" that fall within

5  the Sun's "exercise of editorial control and judgment," and cannot "impermissibly control the

6  viewpoints the Sun promotes or the news it covers." ECF No. 970 at 42-44.

7        The Review-Journal's own newsroom guide is silent as to the aspects over which the RJ

8  criticizes the Sun—speaking only to journalistic standards and ethical practices. 5SA1092-108. Dr.

9  Picard likewise concluded:



14  2SA286. Former RJ publisher Tayor agreed. 4SA781-84. The Sun meets every reasonable quality

15  element, and more. 2SA286-87, 289-90. The Sun's quality is not a terminable basis.

16        Concerning the Sun's Note as a reason for termination, preliminarily, the RJ has been

17  promoting its separate digital operations for years, and did so in the Sun's stead. *E.g.*, 5SA959-62;

18  5SA1110. The RJ has also tied the Newspaper Bundle subscriptions to the RJ's digital website.

19  *E.g.*, 5SA1061-62. Moreover, to be clear, the Note only ran from January 11, 2018, to February 13,

20  2018; therefore, the Sun had 'cured' this alleged breach over a year before the RJ's 60-day notice.

21  5SA1112; 5SA1114; *see also* 5SA1116. Notwithstanding all of this, like the RJ's challenge to the

22  Sun's quality raised *after* eliminating the Sun's sole revenue source, the Note is yet another

23  consequence of the RJ's Anticompetitive Conduct. Because the RJ had plunged the joint operation

24  into a loss, acting on its threats that there would be no profits going forward (*see supra* § II(D)(1)-

25  (2)), the Sun had to find ways to replace its newsroom funding. *See* 5SA1112. The Note merely

26  informed readers that their free access to lasvegassun.com's articles would be capped at 10 stories

27  per month, after which the reader would be asked to subscribe for further access. *Id.* Nothing in the

28  Note directed readers to not subscribe, or to cancel their subscriptions, to the Newspaper Bundle.

1  *See id.* There is also no evidence that any reader subscribing to lasvegassun.com had replaced his

2  or her subscription to the Newspaper Bundle, or that the Newspaper Bundle otherwise lost any

3  subscriber as a result of the Note. This Court already granted the Sun summary judgment on the

4  RJ's claimed damages from loss of subscribers (which the RJ didn't even bother to oppose). ECF

5  No. 970 at 45-46. The Note is not a valid reason to eliminate the Sun.

6      Lastly, turning to the RJ's effort to terminate the Sun by having the 2005 JOA declared

7  invalid, the RJ believes its effort succeeded when it obtained the circuit-splitting Opinion from the

8  Ninth Circuit. The unenforceability of the 2005 JOA, however, cannot operate to end the joint

9  operation and the Sun. The RJ's obligations to the joint operation, the material aspects of which

10  remained unchanged under the 2005 JOA framework, continue still. Furthermore, because the 2005

11  JOA is unlawful, it is legally incapable of terminating the 1989 JOA. Most importantly, this Court

12  already concluded, as a matter of law, that the 2005 JOA was not a novation. ECF No. 970 at 18-

13  19. Despite the unenforceability of the 2005 JOA, the parties' intentions in this regard are

14  discernible from the terms they memorialized in it. *State College Area School Dist. v. Royal Bank*

15  *of Canada*, 2012 WL 12893876, at **7-8 (M.D. Pa. Oct. 5, 2012) (relying on invalidated

16  amendment to agreement to determine parties intended to maintain the provisions of the original

17  agreement). They specifically accounted for this contingency and agreed that in the event the lawful

18  operation of the 2005 JOA was hindered or impaired, reversion to the 1989 JOA was *the* remedy—

19  not termination. 2SA449 § 1.1. In 2019, when the RJ believed the 2005 JOA was unlawful for lack

20  of Attorney General approval, the RJ was required to revert to the 1989 JOA. Instead, it initiated

21  years' long litigation to have the courts conclude that the 2005 JOA did not comply with the NPA's

22  procedures for the specific purpose of using that judicial declaration to eliminate the Sun from the

23  market.

24      The parties' intention to operate under the 2005 JOA lawfully was further evidenced by the

25  RJ's stated intent to use its "best efforts and take all action necessary to ['carry out' and] effect the

26  intent of the [2005 JOA]," and cooperate to promote both the "successful *and* lawful operation

27  under th[e 2005 JOA] for both parties"). 2SA449 § 1.1; 2SA453 § 5.3. The parties then followed

28  what the country thought was the required procedure under the then-existing state of the law to

23

*ensure* that their operation under the 2005 JOA was valid and enforceable. *See supra* §II(B); 2SA453 § 5.3; *see also* 3SA647. Therefore, the instant the RJ believed that the 2005 JOA was noncompliant for lack of Attorney General approval in 2019, the RJ was obligated to take all action necessary—using its best efforts—to get it approved. But again, the RJ litigated the enforceability of the 2005 JOA to drive the Sun out. That the parties did not know (in 2005) to follow the newly established, correct procedure does not excuse the RJ from its obligations to revert to the 1989 JOA and seek Attorney General approval for the 2005 JOA.

Under no circumstance does the Ninth Circuit's opinion allow the RJ to terminate the joint operation and eliminate its only competitor and JOA partner. The Ninth Circuit did not address the consequences of the Attorney General's approval of the 1989 JOA or the parties' continuation of those material elements under the 2005 JOA framework. Under all circumstances, terminating the joint operation was never a potential outcome under an invalid 2005 JOA. Yet the RJ specifically engaged in litigation as a war of attrition, using the costs of the litigation to increase the Sun's costs, and creating uncertainty that raises the Sun's costs of capital and labor. 1SA174-75.

## III.    THE LEGAL STANDARD FOR GRANTING A TRO AND PRELIMINARY INJUNCTION

Plaintiffs have the right to "injunctive relief … against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. The legal standard for issuing a temporary restraining order is the same for issuing a preliminary injunction. *E.g.*, *Patmont Motor Werks, Inc. v. Pedego LLC*, 2012 WL 13071201, at *1 (D. Nev. Mar. 6, 2012) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). To prevail on a TRO and preliminary injunction pursuant to Federal Rule of Civil Procedure 65, the moving party must establish: (1) a likelihood of success on the merits, (2) the threat of irreparable injury, (3) the balance of equities tips in its favor, and (4) the injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009). For a mandatory injunction, it will be granted upon a showing that "extreme or very serious damage" will result in the absence of the injunction. *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). The Sun satisfies all combinations of the test for granting its requested relief.

**IV.    A TRO AND PRELIMINARY INJUNCTION ARE NECESSARY**

    **A.    The Sun has a Likelihood of Success on the Merits of Its Section 2 Claims: The Facts and Law Clearly Favor It[5,6]**

Below, the Sun establishes that it is likely to succeed on the merits of its monopolization and attempted monopolization claims under Section 2 of the Sherman Act.

    **1.    Monopolization**

To establish a claim for monopolization the plaintiff must show: "(1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury." *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co*., 99 F.3d 937, 949 (9th Cir. 1996). Each of these elements, and their sub-elements, are addressed below, in turn.

    *i.    The Relevant Market*

The first step in any antitrust case is to accurately define the relevant market, *i.e.*, "the area of effective competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018). It is determined only after a factual inquiry into the "'commercial realities' faced by consumers" (*High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993)), and includes both a product market and geographical market. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 n.4 (9th Cir. 2008). As the Sun's renowned expert economist Dr. Michael Katz concluded, the relevant market here is English-language, local, daily, print newspapers in Clark County and the southern portion of Nye County, Nevada (the "Newspaper Market"). 1SA50.[7]

/ / /

/ / /

---

[5] The Sun's analysis on its antitrust claims simultaneously supports its Nevada Unfair Trade Practice Act claims. *See* NRS 598A.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."); *Boulware v. Nevada*, 960 F.2d 793, 800-01 (9th Cir. 1992) ("The Nevada statute adopts by reference the case law applicable to the federal antitrust laws.").

[6] In the interest of condensing this already enlarged brief, and for lack of necessity, the Sun does not analyze its Section 1 claim.

[7] Given that the market definition is a highly fact-based inquiry governed by the evidence, where the plaintiff has offered expert testimony defining the relevant market, that market controls. *E.g.*, *Bristol-Myers Squibb Co. v. Ben Venue Laboratorie*s, 90 F. Supp. 2d 540, 546-47 (D. N.J. 2000).

The Product Market

The relevant product market "must encompass the product at issue as well as all economic substitutes for the product." *Newcal Indus., Inc.*, 513 F.3d at 1045. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," which "may be determined by examining [the] practical indicia" identified in *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325-28 (1962). *See* ECF No. 970 at 23-24. These practical indicia include: (1) industry or public recognition of the market as a separate economic entity, (2) "the product's peculiar characteristics and uses," (3) unique production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors. *Brown Shoe*, 370 U.S. at 325-28. Dr. Katz analyzed the factual realities of the market in which the Sun and the RJ compete, including the *Brown Shoe* indicia, and concluded that the relevant product market in this matter is the Newspaper Market. 1SA60-153 & 6SA1150-95.

The industry and the public recognize the Newspaper Market as a separate economic entity. Courts, including this Court, have recognized that daily print newspapers are a distinct relevant product market. *E.g.*, *Reilly v. Medianews Group, Inc*., 2006 WL 2419100, at *7 (N.D. Cal. July 28, 2006) (restricting the relevant market to "daily newspapers" for the purposes of analyzing temporary restraining order); *Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180, 1184 (8th Cir. 1998) (affirming the district court's finding of "local daily newspapers" as the relevant market definition); ECF No. 970 at 22-23; ECF No. 243 at 10; *see also United States v. Daily Gazette Co*., 567 F. Supp. 2d 859, 868 (S.D. W. Va. 2008) (recognizing that the elimination of a JOA newspaper represents a cognizable injury to interests protected by the antitrust laws); *Hawaii ex rel. Anzai v. Gannett Pac. Corp*., 99 F. Supp. 2d 1241, 1251-52 (D. Haw. 1999) (same). Not only have courts found that local, daily print newspapers constitute a relevant product market, but the DOJ and the parties also recognize daily print newspapers as a distinct product market. 1SA88-91, 140-45; 2005 JOA at § 10.12; *see also* ECF No. 876-6 ¶¶ 3-13 & 876-7.

Newspapers have peculiar characteristics and uses, comprising of a unique bundle of characteristics that readers value, not possessed by other media. 1SA60-88; 2SA249-63; *see also*

26

ECF No. 1 ¶ 36 (attested by the Sun's Publisher); ECF No. 876-7 ¶¶ 6-14; 6SA124-43; 2SA251-52, 255. Newspaper readers enjoy the mix of news, analysis, commentary, and opinion, along with the other features of local daily newspapers like entertainment events, legal notices, comics, and syndicated columns. 2SA255-57; ECF No. 1 ¶ 36. Newspapers offer content in a timely manner that is in a convenient, portable, hardcopy format, requiring no specialized equipment for consumption, and can be read at readers' convenience, for which they are specifically willing to pay. 1SA65-67, 76-78. Newspapers also play a significant role in political and community engagement. 1SA127-30. Additionally, they have unique production facilities in that they are created, placed in a template, and printed by a newspaper printing press, which is distinct from other types of media. 2SA249. Newspapers are platforms that serve multiple, distinct sets of customers, including older readers, and advertisers, which have been recognized by both economists and courts. 1SA73-75, 86, 58-60, 59 n.116.; *see also* 2SA258-63. Newspapers are priced distinctly when compared to other media, particularly in that newspapers have a price and many other news media are free. 1SA76, 126-27, 127 n.304; 2SA249-50. Finally, they have specialized vendors in the form of their home delivery network. 2SA265. Each of these practical indicia demonstrate that the Newspaper Market is a distinct product market.

While the Newspapers in this case do not have data on the price sensitivity between each other because they are not separately priced, the data regarding the price sensitivity of demand between the Newspaper Bundle and other media shows a lack price sensitivity compared to other media. 1SA53, 92-127; *see also* 1SA145-53 (where Dr. Katz analyzed the market under the "Hypothetical Monopolist Test" as well and concluded that the test supported the Newspaper Market defined). This elasticity data evidences that the RJ has been able to raise, and has in fact raised, the price of the Newspaper Bundle through small but significant increases in price (SSNIP), and when it did, the Newspaper Bundle did not lose consumers to any other media. Consequently, there is a low cross-elasticity between the Newspapers and other media products. 1SA92-127. The evidence of low own-price elasticity for the Newspaper Bundle—of which the Sun is a part—still separates the Newspapers from other media and demonstrates that the Newspapers are a distinct product in the defined product market. *Id.* English-language, local, daily, print newspapers are the

appropriate relevant product market.

The Geographic Market

The relevant geographic market is the area in which the defendant faces competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases. *United States v. Grinnell Corp.*, 384 U.S. 563, 575-76 (1966). Dr. Katz examined the geographic market and concluded that the area in which the Newspaper Bundle faces competition from other firms in the Newspaper Market is Clark County and the southern portion of Nye County, Nevada. 1SA12. His conclusion was supported by his findings that: (1) "

" (1SA131); (2) "

" (1SA131-32); (3) "'

" (1SA132-34); and (4) the Sun does not consider newspapers outside of the Las Vegas metropolitan area to be competitive threats for readers.[8] 1SA134-37; *see also* ECF No. 876-6 ¶¶ 8-10 & 876-7 ¶¶ 6-8. Dr. Katz's findings were consistent with other evidence, including the parties' statements made in Section 10.12 of the 2005 JOA, PEW foundation data studies, and findings made by the U.S. Office of Management and Budget. 1SA138-39. Clark County and the southern portion of Nye County, Nevada, is the appropriate relevant geographic market.

> ii.    *The RJ Possesses Monopoly Power in the Newspaper Market*

"Monopoly power is the power to control prices or exclude competition." *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) (quotations omitted). Monopoly power can be established by direct or indirect evidence. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). A defendant's ability to profitably raise prices substantially above the competitive level for a significant period of time is direct evidence that the defendant is a monopolist. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1069 (9th Cir. 2025). Indirect evidence in

---

[8] *See also* 1SA137; *see also* ECF No. 877-6 ¶ 10; ECF No. 877-7 ¶ 7; ECF No. 877-16 ¶ 8.

1  the form of a market share analysis, *i.e.*, the defendant's possession of a dominant share of a relevant

2  market protected by entry barriers is "evidence from which the existence of monopoly power may

3  be inferred." *Rebel Oil Co.*, 51 F.3d at 1437-38. A "market share of 44 percent is sufficient as a

4  matter of law to support a finding of market power, if entry barriers are high and competitors are

5  unable to expand their output in response to supracompetitive pricing." *Id.* at 1438.

6      There is both direct and indirect evidence demonstrating the RJ's power to control prices

7  and exclude competition. Starting with the direct evidence, the RJ has had exclusive and unilateral

8  control over the prices charged by the RJ and its sole competitor (the Sun) spanning back to 1989.

9  1SA11, 155; 2SA306-07 § 5.1; 2SA451-52 § 5.1; *see also* 3SA658-61 (the RJ confirming that the

10  Sun has no ability to set prices, and no control over subscription sales and circulation). Dr. Katz's

11  investigation of consumer responses to the RJ's past changes in the prices of the Newspaper Bundle

12  revealed that the RJ "█████████████████████████████████████████████████████████

13  ████████████████████," which "████████████████████████████████." 1SA155,

14  126-27. In other words, because the RJ has been able to set the price of the Newspaper Bundle at

15  its own choosing without regard for competition, the RJ controls price.

16      The direct evidence further shows that the RJ has the ability to exclude competition.

17  1SA155-57. Since the parties' combination in 1989, the Sun has been operationally and

18  economically dependent on the joint operation, which is exclusively controlled by the RJ. 2SA306-

19  07 § 5.1; 2SA451-52 § 5.1. The Sun has neither printing facilities nor a newspaper distribution

20  network, among other assets necessary to operate a newspaper. 1SA156; ECF No. 877-6 ¶ 15;

21  2SA279-82, 264-69. Terminating the joint operation would immediately destroy the Sun because

22  of the large startup costs and inability to reach a financially viable scale. 1SA156; ECF No. 877-6

23  ¶ 15; 2SA279-82, 264-69.

24      The RJ also has the ability to exercise direct control over its competitor's output. 1SA155-

25  66. In addition to controlling overall pricing and marketing of the Newspaper Bundle and the

26  relative promotion of the RJ and Sun (all of which affects the Newspaper Bundle's sales and thus

27  the Sun's output), the RJ controls the number of pages available to the Sun for news and editorial

28  content (*i.e.*, the size of the Sun's newshole). 1SA156-57. The Sun would need the RJ's permission

1  and agreement to expand its output per issue. 2SA450-51 § 4.3; 2SA462 at App'x A.2; 6SA1258.

2  Stated another way, the RJ has the power to exclude its competitor.

3      Turning to the indirect evidence, Dr. Katz analyzed the RJ's market share and concluded

4  that the RJ possessed a "███████████" of the Newspaper Market, and trends make entry by new

5  competitors unlikely, demonstrating the RJ's substantial market power. 1SA157-66;

6  ████████████████" Dr. Katz concluded, "███████████████████████

7  ██████." 1SA167-69. Dr. Katz detailed the RJ's market share in various categories and found as

8  follows: (1) readership—between 2013 and 2018, the RJ's market share ranged from 61 to 94

9  percent and was at least 83 percent in the 2016 and 2018 surveys of readers, with at least six non-

10  advertising sections read by a higher percentage of readers, rendering the RJ's market share over

11  83 percent; (2) newshole—RJ's market share was more than 75 percent; (3) newsroom staff—RJ's

12  market share was between 82 and 86 percent; (4) division of profit share—RJ's market share was

13  90 percent; and (5) capacity—RJ's market share is much greater than 50 percent. 1SA159-70. Dr.

14  Katz further concluded that "█████████████████████████████████

15  ████████████████████████████████████████████████████

16  ██████." 1SA164.

17      When considering the possibility of entry by new competitors, the RJ controls inputs (*e.g.*,

18  suitable printing facilities and a home-delivery distribution network) essential to the production of

19  daily print newspapers in Clark and southern Nye Counties. 1SA165. These inputs could not be

20  replicated by an entrant on commercially viable terms because it would have difficulty reaching

21  efficient scale or density. *Id.* There are also significant barriers to entry in the form of capital

22  investments required, lack of access to established distribution channels, limited market resources

23  (consumers and advertising), constraints on consumer willingness to pay, workforce requirements,

24  economic advantages of incumbent competitors (economies of scale and marginal costs), and

25  competitive advantages of incumbent competitors (quality, reputation, market knowledge, and

26  contracts). 2SA264-269. No local, daily print newspaper has successfully entered the Newspaper

27  Market since the Sun was founded in 1950, and the Sun would not be able to survive as an

28  independently printed and produced newspaper. 1SA165; 2SA279-82; ECF No. 877-7 ¶¶ 15, 27.

Under all considerations, the RJ has the ability to control the price of the Newspaper Bundle and exclude the Sun. The RJ has monopoly power in the Newspaper Market.

### iii.    The RJ Has Willfully Acquired and Maintained Monopoly Power

"Willful acquisition or maintenance of monopoly power involves exclusionary conduct, not power gained from growth or development as a consequence of a superior product, business acumen, or historic accident." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) (quotations omitted). "Exclusionary conduct" refers to acts that "tend[ ] to impair the opportunities of rivals" and "do[ ] not further competition on the merits or do[ ] so in an unnecessarily restrictive way." *See, e.g.*, *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) (quotations omitted) (alterations in original).

The RJ's Anticompetitive Conduct described above in Section II(D) was exclusionary, not power gained from the creation of a superior product or exercise of business acumen. Instead of actions to improve the RJ's product, the RJ's Anticompetitive Conduct was purely aimed at degrading the Sun's product. The RJ has exploited its power over the Sun in ways that do not further competition on the merits and, instead, raise the Sun's costs of competing. 1SA30-31.

This Court is already aware of Dr. Katz's conclusions on this subject. *See* ECF No. 970 at 24-25. To recap, he concluded that, due to the RJ's accounting abuses, the RJ has artificially depressed the joint operation's EBITDA, thereby improperly reducing and eliminating the Sun's profit payments, weakening the Sun's ability to compete with the RJ and threatening to drive the Sun out of business. 1SA14, 170-72; 4SA816; 4SA820; 5SA949; 5SA952-53. Dr. Katz likewise concluded that the RJ's failure to maximize the joint operation's profits also reduced and eliminated the Sun's payments and similarly weakened the Sun's ability to compete and threatening the Sun's shut down. 1SA15, 172. He opined that the RJ's actions in its failure to promote the Sun diminished the Sun's appearance, hindering the Sun's ability to communicate with consumers and potential readers about its Newspaper, in turn reducing consumer knowledge of the Sun and "

1    ████████." 1SA14-16, 172-74. Finally, Dr. Katz opined that the RJ's pursuit of its termination

2    litigation harms competition "███████████████████████████████

3    ████████████████████████████████████████████████████████

4    ████████████████████████████████████████████." *Id.* The RJ's efforts to

5    terminate the joint operation by having the 2005 JOA declared unlawful while (1) baselessly

6    disavowing the enforceability of, and its obligation to revert to, the 1989 JOA; and (2) refusing to

7    seek Attorney General approval of the 2005 JOA, has further harmed competition for the same

8    reasons. *See id.* These different categories of the RJ's conduct work together to reinforce and

9    amplify one another's harm to competition, as explained by Dr. Katz. 1SA170, 181-82. None of it

10   amounts to the RJ harming the Sun merely because the RJ is offering a product that is more

11   attractive to readers. 1SA183-84. There is no evidence that the RJ's Anticompetitive Conduct has

12   spurred the RJ to be a better newspaper either. To the contrary, the RJ's own Publisher testified that

13   (because the Sun is the RJ's only competitor), more reportorial competition from the Sun would

14   spur the RJ to be a better newspaper. 6SA1255-63; 6SA1256 ("Would we rather the Sun be more

15   competitive with us[?] ... Actually, we would … [I]t would be ... good ... for both newspapers and

16   the joint operat[ion].").

17        In summary, the RJ's conduct was not competition on the merits. "██████████████

18   ████████████████████" Dr. Katz concluded that "████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████" 1SA14, 170-87.

21   The evidence shows that the RJ has willfully acquired and maintained monopoly power.

22                    *iv.    The RJ's Conduct Has Caused Antitrust Injury*

23        This Court is well-versed in the law and facts supporting the Sun's antitrust injury. ECF

24   No. 970 at 20-28. As it previously explained, "[A]ntitrust laws are only intended to preserve

25   competition for the benefit of consumers." *Id.* at 20 (quotations omitted). The five requirements for

26   antitrust injury are: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from

27   that which makes the conduct unlawful, … (4) that is of the type the antitrust laws were intended

28   to prevent" (*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Ca.*, 190 F.3d 1051, 1055 (9th Cir. 1999)), and

(5) the plaintiff is "a participant in the same market as the alleged malefactors, meaning 'the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market.'" *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quotations omitted). Like this Court already considered, and further discussed below, the Sun satisfies all five requirements for antitrust injury. *See* ECF No 970 at 20-28.

<u>Unlawful Conduct</u>

The first factor of antirust injury requires a showing that there was some "competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). The plaintiff must therefore demonstrate that (1) there was competition in the relevant market, and (2) the defendant's conduct reduced competition. ECF No. 970 at 21.

First, courts, including this one (ECF No. 970 at 22-23; ECF No. 243 at 13), have held that editorial competition between JOA newspapers, like the Sun and the RJ, is cognizable competition for purposes of antitrust laws. *See, e.g.*, *Comm. for Indep. P-I v. Hearst Corp.*, 704 F.2d 467, 477 n.8 (9th Cir. 1983) (providing that only few things affecting a business can "truly be characterized as noneconomic," and the viewpoint of a newspaper publisher, which appears in the editorial policies of a newspaper, and "in turn may either attract or reduce readership," thus cannot be deemed noneconomic); *United States v. Daily Gazette Co.*, 567 F. Supp. 2d 859, 869-70 (S.D. W. Va. 2008) (concluding, the "[e]conomic reality indicates that a JOA does not eliminate all commercial competition" because of the parties' requirement "to preserve independent editorial and reportorial competition"); *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1249, 1251-52 (D. Haw. 1999) (concluding that preserving "the independent editorial and reportorial voices of competing newspapers" falls within the scope of economic competition). This Court already ruled that even when newspapers merge operations and share in profits, they have at least "'two competitive and economic incentives in pursuing particular editorial and news-gathering efforts that attract readers, subscribers, and advertisers to its own newspaper, namely, (1) increasing its value, particularly in the eyes of potential acquisitors, and (2) enhancing its bargaining position when the JOA is up for re-negotiation or termination.'" ECF No. 970 at 22-23 (quoting *Daily Gazette Co.*, 567 F. Supp. 2d at 870). Dr. Katz opined on the Sun's economic incentives identified

33

in *Daily Gazette*, and more, including increasing traffic to the Newspapers' digital operations outside of the JOA, and promoting their principal owners' economic or business interests more broadly. 1SA39-45; ECF No. 876-6 ¶¶ 4-6 & 876-7 ¶ 3-4.

Furthermore, the Sun and the RJ are competitors in the Newspaper Market, for both the Sun and the RJ fall within the same *Brown Shoe* indicia identifying the outer bounds of the relevant product market. *See supra* § IV(A)(1)(i). This Court agreed. *See* ECF No. 970 at 23-24. Therefore, despite being sold in the Newspaper Bundle, the parties engage in editorial and reportorial competition in the Newspaper Market.

Second, the RJ's Anticompetitive Conduct reduced competition in the Newspaper Market. As explained above and previously summarized by this Court (ECF No. 970 at 24-25), the RJ's Anticompetitive Conduct has harmed "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" 1SA1, 13-17; ECF No. 876-6 ¶¶ 17-20; *see also supra* §§ IV(A)(1)(iii), II(D).

### Injury to the Sun

The second consideration for antitrust injury requires the plaintiff to establish "some credible injury caused by the unlawful conduct. There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1056. This Court already found that there is no evidence that the Sun "stands to gain" from the RJ's Anticompetitive Conduct. ECF No. 970 at 26. Rather, as explained above, the RJ's Anticompetitive Conduct has weakened the Sun's ability to compete, resulting in harm to the Sun and its value "as a going concern for saleability purposes" and harm to competition in the Newspaper Market and consumers. ECF No. 970 at 26 (quoting *Daily Gazette Co.*, 567 F. Supp. 2d at 870); *see supra* §§ IV(A)(1)(iii), II(D); *see also* 1SA39-45.

### Injury Flowing from That which Makes the Conduct Unlawful

Under the third antitrust injury requirement, when a defendant's conduct harms the plaintiff but actually preserves competition, the plaintiff's injury does not flow from that which makes the conduct unlawful. *See* ECF No. 970 at 26-27 (citing *Brunswick Corp.*, 429 U.S. at 489)). Because

1    the RJ's conduct reduces editorial and reportorial competition in the Newspaper Market and harms

2    consumers, nothing about the RJ's conduct preserves competition. *See supra*; 1SA170-87; *see also*

3    1SA49, 49 n.92 (citing 6SA1259-60 & 3SA662-63 (where the RJ's Publisher and Executive Editor

4    recognized the benefits to consumers from the editorial competition between the Sun and the RJ);

5    6SA1266, 6SA1268, 6SA12706SA1272-736SA1275, 6SA1277, 6SA1279-80 (readers voicing the

6    harm they will suffer if the Sun is excluded from the Newspaper). As the court in *Hawaii ex rel.*

7    *Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1244-45 (D. Haw. 1999), stated, conduct that

8    threatens to eliminate the weaker JOA paper—like the Sun—would deprive readers "of

9    independent editorial and reportorial voices," and lead to the loss of jobs and the loss of competition

10   for "creators of news, editorial, and entertainment content." *See also* 2SA422 ¶ 3. Consequently,

11   the RJ's Anticompetitive Conduct itself is unlawful "because it reduces editorial competition in the

12   relevant market and harms consumers. The Sun's claimed injury is harm to its ability to compete

13   and decreased visibility, which hurts its value. This claimed injury flows directly" from the RJ's

14   unlawful conduct. ECF No. 970 at 27.

15              The Sun's Injury is the Type Antitrust Laws were Intended to Prevent

16              Because "the plaintiff's injuries must be 'of the type the antitrust laws were intended to

17   prevent,'" under the fourth factor for antitrust injury, "injuries which result from *increased*

18   competition or lower (but non-predatory) prices are not encompassed by the antitrust laws." ECF

19   No. 970 at 27 (quoting *Am. Ad Mgmt., Inc.*, 190 F.3d at 1057). There is no evidence, nor has the RJ

20   ever argued, that Sun's injury is the result of increased competition or lower, non-predatory prices.

21   *Id.* at 28. And, courts have repeatedly held that elimination (or the threatened elimination[9]) of a

22   JOA newspaper establishes antitrust injury. *E.g.*, *Daily Gazette Co.*, 567 F. Supp. 2d at 868

23   (determining that "the continued viability of reportorial competition" is a cognizable injury under

24   the antitrust laws); *Gannett*, 99 F. Supp. 2d at 1251 (holding that termination of JOA threatened

25   "antitrust injury because no other daily newspaper would be published ... [and] there would be the

26

27   _____

     [9] *See PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 840-41 (9th Cir. 2022) (providing that
     plaintiffs needn't be completely eliminated from the market to establish antitrust injury: they can

28   "prove antitrust injury before they are actually driven from the market and competition is thereby
     lessened").

1    concomitant loss of competition for advertisers and creators of news, editorial, and entertainment

2    content"). Like this Court found before, "The Sun's claimed injury, especially as it pertains to its

3    reduced ability to compete, is exactly the type of injury the antitrust laws were intended to prevent."

4    ECF No. 970 at 28.

5    <u>The Sun Participates in the Market</u>

6    When considering the fifth, and final, requirement for antitrust injury, this Court agreed that

7    the Sun is a market participant. ECF No. 970 at 28. To recall, the purpose of both the 1989 and the

8    2005 JOAs, as intended and memorialized by the parties, is to preserve "editorially and reportorially

9    independent and competitive newspapers in Las Vegas and its environs." 2SA293 at Prelim.

10    Statement; 2SA309 § 5.2; 2SA323 § 10.8; 2SA453 § 5.2; 2SA457 §10.8. The Sun supplies content

11    to the RJ "for publication in the Sun," not in the RJ. 2SA305 § 5.1; *see also* 2SA451 § 5.1.  The

12    Sun has full editorial independence, and the RJ must publish the Sun so long as the Sun complies

13    with production requirements. *See id.* Given the parties' treatment of the Sun in their joint operation,

14    "the Sun is a separate and independent newspaper product distributed in the newspaper bundle,"

15    and the Sun editorially competes with the RJ for readers' attention in the relevant market,"

16    rendering it a competitor of the alleged violator in the restrained market"—"meaning the Sun is a

17    participant in the relevant market." ECF No. 970 at 28 (quoting *Somers*, 729 F.3d at 963); *see also*

18    *supra* §IV(A)(1)(iv); *see also* 6SA1255 (The RJ "look[s] at [the Sun]—we look at it every day.");

19    6SA1266-80. The Sun has established all five requirements for antitrust injury.

20    Having demonstrated that the facts and law on all elements for monopolization clearly favor

21    the Sun, the Sun has satisfied its burden in showing that it will likely succeed on this claim.

22    **2.    Attempted Monopolization**

23    To succeed on a claim for attempted monopolization, "a plaintiff must prove (1) that the

24    defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to

25    monopolize and (3) a dangerous probability of achieving monopoly power." *Cascade Health*

26    *Solutions v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2008) (quotations omitted). Each of these

27    elements are discussed below.

28

i.    *The RJ's Has Undertaken Anticompetitive Conduct with a Specific Intent to Monopolize*

The specific intent necessary for attempted monopolization "may … be proved by direct evidence but is more usually proved by inference from anticompetitive conduct." *Forro Precision, Inc. v. Int'l Bus. Machs. Corp.*, 673 F.2d 1045, 1059 (9th Cir. 1982) (citations omitted). Where "behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way," specific intent may be inferred. *Cascade Health Sols.*, 515 F.3d at 894; *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co.*, 284 F.2d 1, 18 (9th Cir. 1960) (explaining that specific intent can be inferred from anticompetitive conduct "since everyone is presumed to intend the natural and probable results or consequences of his conduct"), *rev'd on other grounds by Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19 (1962).

The RJ's specific intent to monopolize the Newspaper Market is inferred by the RJ's Anticompetitive Conduct. *See supra* § II(D) & § IV(A)(1)(iii)-(iv). Destruction of competition and the Sun was not only the probable and foreseeable consequences of the RJ's Anticompetitive Conduct, but it was the specific result the RJ desired to achieve. The RJ reduced and eliminated the Sun's profits from the joint operation, reducing consumer awareness of the Sun, and has endeavored to terminate the joint operation through baseless litigation and refusal to revert to the 1989 JOA or seek Attorney General approval of the 2005 JOA—all with the objective of weakening the Sun's ability and incentives to compete, creating uncertainty, and driving it out of the Newspaper Market.

When exploring how to "████████" the Sun, the RJ repeatedly inquired "████████████ ████████" 4SA758-59, 764. The RJ examined the joint operation information "█ ████████████████" confirming that if expenses were held at current levels "█ █████████" 6SA1282. The RJ then wrote off hundreds of thousands of dollars specifically so "█████████████████████████████████████ ██████" 4SA792. The RJ simultaneously threatened the Sun that the joint operation would "never make money" under new ownership and attempted to intimate the Sun to "do a deal," but no offer made by the RJ was sufficient to maintain the Sun as an independent editorial voice. 4SA925;

4SA758-59, 764; 2SA422-23. These threats alone have been held adequate for a jury to reasonably infer specific intent to monopolize the market. *See Syufy Enterprises v. Am. Multicinema, Inc*., 793 F.2d 990, 999 (9th Cir. 1986) (providing that testimony about conversations where the CEO discussed "making us an offer of the depreciated book value, and so on," and threatened to sue and "start a massive building program against us if we didn't sell out," was appropriate for a jury to reasonable infer a specific intent to monopolize).

### ii.    *The RJ's Has a Dangerous Probability of Success*

Generally, courts consider the same factors as those in assessing whether a defendant has sufficient market power for monopolization when considering a defendant's probability of success; but, because the attempt offense requires *only* a dangerous probability, a lesser showing is required. *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th 1995). Although the dangerous probability of success factor is considered a separate element, it, too, "may be established by direct proof, or it may be inferred from predatory conduct and specific intent to control prices or exclude competition." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 n.3 (9th Cir. 1980). Section IV(A)(1)(ii), above, establishes the RJ's sufficiently substantial market power for monopolization. And the RJ's Anticompetitive Conduct—specifically designed to eliminate the only other competitor with the RJ facing no constraining influence or potential new entrants— satisfies this factor. *See supra* & 1SA13; 2SA264-69, 279-82. The RJ has a dangerous probability of achieving a literal monopoly in the Newspaper Market. 1SA13.

With the law and the facts clearly in its favor, the Sun has demonstrated a likelihood of success on its attempted monopolization claim.

### B.    The Sun Will Suffer Extreme, Irreparable Harm if the RJ is Not Enjoined

Under Section 16 of the Clayton Act, the threatened elimination of competition, including the threat of being driven out of business, is a *per se* showing of irreparable harm. *E.g.*, *California v. American Stores*, 492 U.S. 1301, 1304 (1989) (The "lessening of competition is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent.") (citations and quotations omitted); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A lessening of competition constitutes an irreparable injury under our case law.");

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("The threat of being driven out of business is sufficient to establish irreparable harm.").

Pointedly, even the mere threat of elimination of a JOA newspaper has been held to warrant an injunction due to the irreparable injury sustained from the loss of competition. *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1253 (D. Haw. 1999). The *Gannett* court reasoned that the dominant JOA newspaper's impairment of circulation and access to the weaker paper, which harmed the public perception of the viability of the weaker paper, would cause irreparable injury if not enjoined because the weaker paper "would no longer be a viable newspaper." *Id.* "Once closed, the [weaker paper] is unlikely to be reopened." *Id.* This injury is extreme and irreparable and precisely why an injunction is needed:

> no monetary amount will be able to compensate for the loss of the [weaker paper]'s editorial and reportorial voice, the elimination of a significant forum for the airing of ideas and thoughts, the elimination of an important source of democratic expression, and the removal of a significant facet by which news is disseminated in the community.

*Id.* at 1253-54 (citing *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991) ("[W]e have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.")).

No different from the scenario in *Gannett*, if the RJ is not enjoined, the RJ will terminate the joint operation and cease printing and distributing the Sun, eliminating it from the Newspaper Market. As noted above, in exchange for and in consideration of all of the benefits the RJ received from the joint operation in 1989, the Sun also agreed to surrender to the RJ all of its printing, distribution, and marketing resources, among other things. Accordingly, once the Sun is put out of business, it will undoubtedly not be reopened due to lack of infrastructure necessary to print and distribute its Newspaper, and its loss of staff and ability to recruit new employees, loss of future capital with which to fund operations, and loss of readership and visibility. *E.g.*, 2SA422-23 ¶¶ 2-4; 2SA264-69, 279-82; 1SA185. No monetary amount can compensate the Sun's lost editorial and reportorial voice. 2SA422-23 ¶ 5; *see Gannett*, 99 F. Supp. 2d at 1253-54. This harm is critical, irreparable, and certain should the Sun's requested preliminary relief be denied.

**C.      The Balance of Hardships Tips Sharply in the Sun's Favor**

Balancing the hardships of the parties requires this Court to review and consider both sides of the coin. That is, while the harm to the Sun is obvious if not irrefutable, the Court must also "identify the harm which a TRO or preliminary injunction might cause the [RJ] and weigh it against the [Sun's] threatened injury." *See Gannett*, 99 F. Supp. 2d at 1254 (quotations omitted); *see also Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). Respectfully, the balance of hardships is not a close call.

Plainly, the balance of hardships weighs heavily in Sun's favor. Indeed, the hardship to the Sun is existential, as "the economic demise of the [Sun] will impair the ability of this Court to provide the relief requested by the [Sun] and will result in the silencing of competing news and editorial voices as well as curtailing, if not eliminating, the competition for … creators of news, editorial, and entertainment content." *See Gannett*, 99 F. Supp. at 1254; 2SA422-23 ¶¶ 3-5; 2SA264-69, 279-82; 1SA185. Under no reasonable interpretation of the facts here can it be said that the injury to the Sun is anything short of catastrophic.

On the other hand, the "harm" to the RJ should an injunction issue is virtually nonexistent. Under the crudest of interpretations, the RJ would merely lose its opportunity to eliminate its sole competitor from the market. This "is not a relevant harm." *See Archetype Capital Partners, LLC v. Bullock Legal Group, LLC*, 2025 WL 3500688, at *17 (D. Nev. Dec. 5, 2025). It is no harm at all.

Furthermore, the RJ will only be required to continue printing and publishing the Sun, and maintaining its responsibilities to the joint operation in the interim. The 1989 JOA required the RJ to continue to print and distribute the Sun through 2040, and the same material obligations to print and distribute the Sun continue under the 2005 JOA framework. *See* ECF. 970 at 18; *see also*, *e.g.*, *Hillstone Restaurant Group Inc. v. Houston's Hot Chicken Inc.*, 2023 WL 110926, at *5 (D. Ariz. Jan. 5, 2023) (finding that the balance of equities tipped in the plaintiff's favor where the defendants "knowingly and freely entered into the Agreement" and concluding that "[t]heir failure to abide by the terms that the parties bargained for continues to cause substantial hardship to Plaintiff, at least because Plaintiff must expend resources to continually monitor Defendants' performance with the Agreement"); *Am. Impex Corp. v. Int'l. Ace Tex, Inc.*, 2009 WL 3963791, at

*3 (C.D. Cal. Nov. 16, 2019) (finding that the "balance of equities tips in Plaintiff's favor, since Plaintiff only seeks an injunction ordering Defendants to do what they have already agreed to do); *Great Caesars Ghost LLC v. Unachukwu*, 2020 WL 2394052, at *4 (D.N.J. May 12, 2020) (same). Thus, that the injunction would be both prohibitory and mandatory is of no moment: the mandatory nature of the relief sought (reversion to the 1989 JOA, and use of best efforts to obtain Attorney General approval of the 2005 JOA) is nothing more than fulfillment of the express contractual terms that the RJ willingly and knowingly agreed to. And they are all part of the bargained-for exchange that resulted in the RJ reaping the many benefits of JOA for decades. To allow the RJ to repudiate its promises under the guise of "harm" from an injunction would set not only the promises and intentions made in both the 1989 and 2005 JOAs on their head, but also pervert the public policy underlying the NPA and the law governing equitable relief generally.

Therefore, issuance of the injunction would not modify the rights and responsibilities of the parties and/or it would simply require the RJ to do what it has always been obligated to do. In the meantime, the RJ would continue receiving the benefits of the joint operation, including increased competition as a result of the Sun (6SA1255-56, 1258-63; 3SA660, 662-63), and revenues from consumers who would otherwise terminate their subscriptions if the Sun is eliminated from the market. *See* 6SA1266-80. When weighed against the hardship suffered by the Sun if injunctive relief is not granted, any hardship to the RJ pales.

### D.    The Public Interest is Served by Granting Injunctive Relief

When considering whether to grant injunctive relief, this Court must determine whether "'the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences.'" *Boardman*, 822 F.3d at 1023-24 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009)). Injunctive relief in an antitrust case is always deemed to further the public interest, for "the central purpose of the antitrust laws is to preserve competition," which is "*vital to the public interest*." *Id.* at 1024. Even more significant, the preservation of a JOA newspaper's distinct editorial and reportorial voice is a paramount public interest. *E.g.*, 15 U.S.C. § 1801; *Comm. for Indep. P-I v. Hearst Corp.*, 704 F.2d 467, 480 (9th Cir. 1983); 1SA26-50. The RJ and consumers agree. *E.g.*, 6SA1255-63-80. Because the loss of the Sun's independent editorial and reportorial

1 voice, the loss of competition to attract creators of news, editorial, and entertainment content, and

2 the loss of jobs "would severely harm the public interest" "this factor weighs in favor of granting

3 injunctive relief." *See Gannett*, 99 F. Supp. 2d at 1254.

4        **E.**      **A Bond Should Not be Required**

5        The Court has broad discretion to set a bond under Federal Rule of Civil Procedure 65(c),

6 including a nominal bond or no bond at all in cases involving the public interest. *E.g.*, *Barahona-*

7 *Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999), *supplemented by Baharona-Gomez v. Reno*,

8 236 F.3d 1115 (9th Cir. 2001); *Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171, 1176

9 (6th Cir. 1995). If any bond is required, it should be *de minimis*. The Sun's financial resources are

10 already significantly strained because of the RJ's Anticompetitive Conduct. Additionally, this case

11 centers around the public's interest in maintaining competition and a diverse newspaper editorial

12 voice. *See Gannett*, 99 F. Supp. 2d at 1255 (ordering a nominal bond due to the plaintiff's financial

13 resources). If the Court orders a bond at all, it should not exceed $5,000.

14 **V.**     **CONCLUSION**

15        For the foregoing reasons, this Court should issue a TRO and preliminary injunction that:

16 (1) enjoins the RJ from unilaterally ending the joint operation and ceasing to print and distribute

17 the Sun during the pendency of this litigation, (2) compels the RJ to use its best efforts to and take

18 all action necessary to obtain Attorney General written consent of the 2005 JOA, and (3) compels

19 the RJ to revert to the 1989 JOA until a final judgment on the merits or an earlier order of the

20 Attorney General granting written approval of the 2005 JOA under 28 C.F.R. § 48.14.

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

DATED this 23rd day of February, 2026.

CLARK HILL PLC

By: */s/ Kristen L. Martini*

E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
1700 S. Pavillion Center Drive, Suite 500
Las Vegas, Nevada 89169

PISANELLI BICE PLLC
James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
400 South 7th Street, Suite 300
Las Vegas, Nevada 89135

BROWNSTEIN HYATT FARBER
SHRECK, LLP
Jordan T. Smith, Nevada Bar No. 12097
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

ALIOTO LAW FIRM
Joseph M. Alioto, Pro Hac Vice
One Sansome Street, 35th Floor
San Francisco, California 94104

*Attorneys for Plaintiff/Counterdefendants*

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I certify that I am an employee of CLARK HILL PLC, and I caused a true and correct copy

3

of the foregoing **EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

4

**AND PRELIMINARY INJUNCTION** to be served electronically filing the foregoing with the

5

CMECF electronic filing system which will send notice of electronic filing to:

6

7

J. Randall Jones, Esq.
Michael J Gayan, Esq.
Mona Kaveh, Esq.

8

KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor

9

Las Vegas, NV 89169

10

11

Amy M. Gallegos, Esq.
David R. Singer, Esq.

12

Andrew G. Sullivan, Esq.
Alison I Stein, Esq.

13

JENNER & BLOCK LLP
515 South Flower Street, Suite 3300

14

Los Angeles, CA 90071

15

16

Richard L. Stone, Esq.
850 Deveon Avenue

17

Los Angeles, CA 90024

18

DATED: February 23, 2026.

19

/s/  Jill Nelson
An Employee of Clark Hill PLC

20

21

22

23

24

25

26

27

28

INDEX OF EXHIBITS

| Exhibit No. | Description | Vol. | Page Nos. |
|---|---|---|---|
| 1 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Michael Katz (**FILED UNDER SEAL**) | 1 | SA1-SA246 |
| 2 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Robert Picard (**FILED UNDER SEAL**) | 2 | SA247-SA291 |
| 3 | June 17, 1989, Joint Operating Agreement (the "1989 JOA") (SUN_00001996-2039) | 2 | SA292-SA336 |
| 4 | Report of the Assistant Attorney General in Charge of the Antitrust Division, Public File No. 44-03-13, In the Matter of: Application by the Las Vegas Sun, Inc. and Donrey of Nevada, Inc. for Approval of a Joint Newspaper Operating Arrangement Pursuant to the Newspaper Preservation Act, 15. U.S.C. §§ 1801-1804 (SUN_00024386-453) | 2 | SA337 – SA405 |
| 5 | June 1, 1990, Opinion of The Attorney General, Public File No. 44-03-13, In the Matter of: Application by the Las Vegas Sun, Inc. and Donrey of Nevada, Inc. for Approval of a Joint Newspaper Operating Arrangement Pursuant to the Newspaper Preservation Act, 15. U.S.C. §§ 1801-1804 (SUN_00024373-85) | 2 | SA406 – SA420 |
| 6 | Declaration of Brian Greenspun in Support of Plaintiff/Counterdefendants' Emergency Motion for Temporary Restraining Order and Preliminary Injunction | 2 | SA421 – SA428 |
| 7 | Hearing Transcript Excerpts of Mark Hinueber, *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case No. 01-16-0001-9187 (Oct. 6, 2016) (Vol. 4) (SUN_00023106-08, 273-74, 278, 280, 282-86, 383) (**FILED UNDER SEAL**) | 2 | SA429 – SA442 |
| 8 | Sept. 8, 2016, Declaration of Mark Hinueber in Support of Stephens Media LLC's Opposition to Las Vegas Sun's Motion for Summary Judgment, AAA Case No. 01-16-0001-9187 (SUN-00064364-67) (**FILED UNDER SEAL**) | 2 | SA443 – SA447 |
| 9 | June 10, 2005, Amended and Restated Agreement (the "2005 JOA") (SUN_00002045-69) | 2 | SA448 – SA473 |
| 10 | Hearing Transcript Excerpts of Jackson Farrow, *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case No. 01-16-0001-9187 (Oct. 5, 2016) (Vol. 3) (SUN_00021972-74, 76-83, 159) (**FILED UNDER SEAL**) | 2 | SA474 - SA486 |
| 11 | Hearing Transcript Excerpts of Brian Greenspun, *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case No. 01-16-0001-9187 (Oct. 3, 2016) (Vol. 1) (SUN_00019641-43, 70, 96-97, 99, 703, 842) (**FILED UNDER SEAL**) | 2 | SA487 – SA496 |

| | 12 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Lawrence Aldrich (**FILED UNDER SEAL**) | 3 | SA497 – SA537 |
|---|---|---|---|---|
| | 13 | June 16, 2005, email from G. Lang to J. Farrow et al., re DR Partners' submission of 2005 JOA to DOJ "pursuant to the Newspaper Preservation Act, 15 USC § 1801 et seq. and 28 CFR § 48.16 (SUN_00005886-89) (**FILED UNDER SEAL**) | 3 | SA538 – SA542 |
| | 14 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Russell Lamb (**FILED UNDER SEAL**) | 3 | SA543 - 548 |
| | 15 | Deposition Transcript Excerpts of Las Vegas Sun, Inc.'s Expert L. Aldrich, *Las Vegas Sun, Inc. v. Adelson*, No. 2:18-cv-0166-ART-VCF (D. Nev. March 15, 2023) | 3 | SA549 – SA575 |
| | 16 | Sept. 23, 2005, email from C. Cliff to D. Jordan, et al., re Amendment of the Las Vegas JOA – Joint Defense Agreement (SUN_00001673-84) (**FILED UNDER SEAL**) | 3 | SA576 – SA587 |
| | 17 | Aug. 5, 2005, facsimile from B. Matelson to G. Lang re Las Vegas JOA, CID No. 23751 (SUN_00012237-47) (**FILED UNDER SEAL**) | 3 | SA586- SA599 |
| | 18 | Oct. 12, 2005, letter from A. Marx to B. Matelson, re responses to CID No. 23751 (SUN_00001806-14) (**FILED UNDER SEAL**) | 3 | SA600 – SA609 |
| | 19 | Feb. 13, 2006, facsimile from B. Matelson to A. Marx, re Civil Investigative Demand Nos. 24097 & 24098 (SUN_00012233-36) (**FILED UNDER SEAL**) | 3 | SA610 – SA614 |
| | 20 | Deposition Transcript Excerpts of Las Vegas Sun, Inc.'s 30(b)(6) Corporate Representative Robert Cauthorn, *Las Vegas Sun, Inc. v. Adelson*, No. 2:18-cv-0166-ART-VCF (D. Nev. Feb. 16, 2022) (**REDACTED**) | 3 | SA615 – SA636 |
| | 21 | Aug. 16, 2005, letter from B. Matelson to G. Lang re 8/16/05 DOJ faxed letter to G. Lang re Civil Investigative Demand No. 23751 (SUN_00012248-50) (**FILED UNDER SEAL**) | 3 | SA637 – SA640 |
| | 22 | Aug. 25, 2005, letter from G. Lang to B. Matelson re Las Vegas JOA (SUN_00001965-68) (**FILED UNDER SEAL**) | 3 | SA641 – SA645 |
| | 23 | Apr. 9, 2008, letter from B. Matelson to G. Lang, et al., re Las Vegas Joint Operating Agreement ("No Action Letter") (DEFS0000418) | 3 | SA646 – SA647 |
| | 24 | Deposition Transcript Excerpts of Las Vegas Review-Journal 30(b)(6) Corporate Representative Glenn Cook, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Aug. 19, 2022) (**REDACTED**) | 3 | SA648 – SA669 |
| | 25 | Deposition Transcript Excerpts of Brian Greenspun, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Mar. 23, 2022) (**REDACTED**) | 3 | SA670 – SA689 |
| | 26 | Final Award of Arbitrator, *Las Vegas Sun, Inc. v. News+Media Capital Group, LLC*, AAA Case No. | 3 | SA690 – SA702 |

| | | | |
|---|---|---|---|
| | | 01-18-0000-7568 (July 2, 2019) (SUN_00013635-46) **(FILED UNDER SEAL)** | | |
| 27 | Aug. 29, 2019, letter from K. Moyer to B. Greenspun re: Notice of Default (SUN_00053251-53) | 3 | SA703 - SA706 |
| 28 | Sept. 27-Oct. 4, 2019, email between counsel re Preliminary Injunction Motion | 3 | SA707 -SA718 |
| 29 | Jan. 11, 2015, email from R. Pergament to P. Dumont et al., re Preliminary Observations (DEFS0028645-47) **(FILED UNDER SEAL)** | 3 | SA719 – SA722 |
| 30 | Deposition Transcript Excerpts of Jason Taylor, *Las Vegas Sun, Inc. v. News+Media Capital Group, LLC*, AAA Case No. 01-18-0000-7568 (Mar. 21, 2019) **(FILED UNDER SEAL)** | 4 | SA723 – SA765 |
| 31 | Deposition Transcript Excerpts of Jason Taylor, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. May 12, 2022) | 4 | SA766 – SA790 |
| 32 | April 3, 2017, email from J. Wilson to N. Cusick re Monday Meeting Notes (DEFS0016006-07) **(FILED UNDER SEAL)** | 4 | SA791 – SA793 |
| 33 | Deposition Transcript Excerpts of Craig Moon, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Mar. 3, 2022) | 4 | SA794 – SA804 |
| 34 | Jan. 18, 2023, Rebuttal Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Barbara Gottlieb **(FILED UNDER SEAL)** | 4 | SA805 – SA813 |
| 35 | Las Vegas Review Journal Payment Calculation JOA Fiscal Year Ending March 2018 **(FILED UNDER SEAL)** | 4 | SA814 – SA816 |
| 36 | Mar. 3, 2017, email from P. McGuire to C. Moon re Revised Summary of JOA Pmt. Calc. (DEFS0165095-97) **(FILED UNDER SEAL)** | 4 | SA817 – SA820 |
| 37 | Stephens Media Group's Las Vegas Review Journal Fiscal Year End March 31, 2006, Financials (Exhibit 7 to Deposition of Robert Cauthorn, *Las Vegas Sun, Inc. v. News+Media Capital Group, LLC*, AAA Case No. 01-18-0000-7568 (Mar. 27, 2019)) **(FILED UNDER SEAL)** | 4 | SA821 – SA824 |
| 38 | Deposition Transcript Excerpts of Las Vegas Review-Journal 30(b)(6) Corporate Representative Stephen Hall, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. May 12, 2022) **(REDACTED)** | 4 | SA825 – SA846 |
| 39 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Barbara Gottlieb **(FILED UNDER SEAL)** | 4 | SA847 – SA859 |
| 40 | Feb. 12, 2016, email from P. Sack to S. Garfinkel re Las Vegas (DEFS0093000-24) **(FILED UNDER SEAL)** | 4 | SA860 – SA887 |
| 41 | Feb. 9, 2015, VRC Valuation of Certain Intangible Assets of Las Vegas Review Journal as of Dec. 10, 2015 (DEFS0092587-621) **(FILED UNDER SEAL)** | 4 | SA888 – SA923 |

| | 42 | March 3, 2017, Email from C. Moon to F. Vega re an update and two quick questions (DEFS0013609-10) **(FILED UNDER SEAL)** | 4 | SA924 – SA926 |
|---|---|---|---|---|
| | 43 | Las Vegas Review-Journal, Inc. Financial Statements December 31, 2019, and 2018 (DEFS0083496-515) **(FILED UNDER SEAL)** | 4 | SA927 – SA947 |
| | 44 | Las Vegas Review Journal Payment Calculation JOA Fiscal Year Ending March 2020 (SUN_00008774) **(FILED UNDER SEAL)** | 5 | SA948 – SA950 |
| | 45 | Apr. 30, 2022, email from S. Hall to R. Cauthorn re JOA Calculation – JOA Year Ended March 2022 (SUN_00084445-47) **(FILED UNDER SEAL)** | 5 | SA951 – SA954 |
| | 46 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Gregory Gundlach **(FILED UNDER SEAL)** | 5 | SA955 – SA1005 |
| | 47 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert J. David Kordalski **(FILED UNDER SEAL)** | 5 | SA1006 – SA1020 |
| | 48 | Apr. 4, 2023, Supplemental Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Gregory Gundlach **(FILED UNDER SEAL)** | 5 | SA1021 – SA1025 |
| | 49 | Sept. 19, 2016, email from J. Wilson to E. Cassidy re: RJ with Sun? (DEFS01454464-67) **(FILED UNDER SEAL)** | 5 | SA1026 – SA1030 |
| | 50 | Apr. 2, 2017, email from C. Moon to R. Cauthorn Re: Concerns about your new design (DEFS0002488-89) **(FILED UNDER SEAL)** | 5 | SA1031 – SA1033 |
| | 51 | Apr. 17, 2019, email from K. Espejo to K. Moyer re: The Sun in eEdition (DEFS0166089-94) **(FILED UNDER SEAL)** | 5 | SA1034 – SA1040 |
| | 52 | RESERVING FOR RJ'S ANSWERS TO ROG 13 MARCH 2022 | 5 | SA1041 – SA1052 |
| | 53 | Deposition Transcript Excerpts of Las Vegas Review-Journal 30(b)(6) Corporate Representative Chris Blaser, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Aug. 11, 2022) **(REDACTED)** | 5 | SA1053 – SA1069 |
| | 54 | Chris Jones & J.M. Kalil's article, Las Vegas Sun to rise with morning RJ, published in the Las Vegas Review Journal on June 15, 2005 (SUN_0000627-32) | 5 | SA1070 – SA1076 |
| | 55 | Steve Kanigher's article, *Sun deal with R-J "a tremendous opportunity" Newspaper to return to morning delivery*, published in the Las Vegas Sun on June 15, 2005 (DEFS0190559-61) | 5 | SA1077 – SA1080 |
| | 56 | Deposition Transcript Excerpts Ray Brewer, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. June 24, 2022 | 5 | SA1081 – SA1091 |
| | 57 | Las Vegas Review Journal Newsroom Guide (DEFS0185654-69) (**(FILED UNDER SEAL)** | 5 | SA1092 – S1108A |
| | 58 | June 4, 2016, Front Page of Newspapers (SUN_00009885) | 5 | SA1109 – SA1110 |
| | 59 | Jan. 11, 2018, Front Page of Las Vegas Sun (DEFS0001703) | 5 | SA1111 – SA1112 |

| 60 | Feb. 13, 2018, Front Page of Las Vegas Sun (DEFS0001697) | 5 | SA1113 – SA1114 |
|---|---|---|---|
| 61 | Feb. 12, 2018, Email from R. Brewer to R. Cauthorn re: Two quick questions from LV Sun print (SUN_00055720) (**FILED UNDER SEAL**) | 5 | SA1115 – SA1116 |
| 62 | Jan. 18, 2023, Rebuttal Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Michael Katz (**FILED UNDER SEAL**) | 6 | SA1117 – SA1229 |
| 63 | Deposition Transcript Excerpts Patrick Dumont, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Oct. 28, 2021) (**FILED UNDER SEAL**) | 6 | SA1230 – SA1246 |
| 64 | Deposition Transcript Excerpts Keith Moyer, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Apr. 5, 2022 | 6 | SA1247 – SA1264 |
| 65 | Aug. 30, 2019, letter from T. Burkholder to B. Greenspun re Message via the Las Vegas Sun (SUN_00000293) (**REDACTED**) | 6 | SA1265 – SA1266 |
| 66 | Sept. 6, 2019, email originally from A. Marshall to Las Vegas Sun Letters, re Please work with the RJ to maintain the JOA (SUN_00024479) (**REDACTED**) | 6 | SA1267 – SA1268 |
| 67 | Jan. 15, 2019, email from K. Woods to B. Greenspun re Message via the Las Vegas Sun (SUN_00000315) (**REDACTED**) | 6 | SA1269 – SA1270 |
| 68 | Aug. 27, 2017, email from M. Spigelman to B. Greenspun re Message via the Las Vegas Sun (SUN_00000376-77) (**REDACTED**) | 6 | SA1271 – SA1273 |
| 69 | Aug. 30, 2019, email from W. Wreatha to Las Vegas Sun Letters, re Printing & distribution arrangement with LV Review-Journal (SUN_0000300) (**REDACTED**) | 6 | SA1274 – SA1275 |
| 70 | Sept. 6, 2019, email from C. Sappraicone to Las Vegas Review Journal Letters re Not printing The Las Vegas Sun? (SUN_0000298) (**REDACTED**) | 6 | SA1276 – SA1277 |
| 71 | Sept. 5, 2019, email from P. Ryan to B. Greenspun re Keep the Sun (SUN_0000303-04) (**REDACTED**) | 6 | SA1278 – SA1280 |
| 72 | June 13, 2016, email from J. Perdigao to F. Vega et al., re JOA Info (DEFS0146935) (**FILED UNDER SEAL**) | 6 | SA1281 – SA1282 |