E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavillion Center Dr., Suite 500
Las Vegas, Nevada 89135
Tel: 702.862.8300
Fax: 702.778.9709
Email: lreid@clarkhill.com
        kmartini@clarkhill.com
        nscott@clarkhill.com

James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Tel: 702.214.2100
Fax: 702.214.2101
Email: JJP@pisanellibice.com
        TLB@pisanellibice.com

Jordan T. Smith, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Tel: 702.464.7022
Fax: 702.382.8135
Email: jsmith@bhfs.com

Joseph M. Alioto, PRO HAC VICE
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

*Attorneys for Plaintiff/Counterdefendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

LAS VEGAS SUN, INC., a Nevada corporation,

                    Plaintiffs,

v.

SHELDON ADELSON (Estate Of), an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC,, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC dba ADFAM, a Delaware limited liability company and as the alter ego of Las Vegas Review-Journal, Inc., and

Case No.: 2:19-CV-01667-ART-MDC

**INDEX OF EXHIBITS TO EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (VOLUME 2)**

1

1  News+Media Capital Gorup, LLC; and DOES,
   I-X, inclusive,

2
                        Defendants.

3  _____

4  LAS VEGAS REVIEW-JOURNAL, a
   Delaware corporation,

5
                        Counterclaimant,

6  v.

7  LAS VEGAS SUN, INC., a Nevada
   corporation; BRIAN GREENSPUN, an

8  individual and as alter ego of Las Vegas Sun,
   Inc.; GREENSPUN MEDIA GROUP, LLC, a

9  Nevada limited liability company, as the alter
   ego of Las Vegas Sun, Inc.,

10
                        Counterclaim Defendants.

11

12                      **<ins>APPENDIX INDEX</ins>**

13

| Exhibit No. | Description | Vol. | Page Nos. |
|---|---|---|---|
| 1 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Michael Katz **(FILED UNDER SEAL)** | 1 | SA1-SA246 |
| 2 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Robert Picard **(FILED UNDER SEAL)** | 2 | SA247-SA291 |
| 3 | June 17, 1989, Joint Operating Agreement (the "1989 JOA") (SUN_00001996-2039) | 2 | SA292-SA336 |
| 4 | Report of the Assistant Attorney General in Charge of the Antitrust Division, Public File No. 44-03-13, In the Matter of: Application by the Las Vegas Sun, Inc. and Donrey of Nevada, Inc. for Approval of a Joint Newspaper Operating Arrangement Pursuant to the Newspaper Preservation Act, 15. U.S.C. §§ 1801-1804 (SUN_00024386-453) | 2 | SA337 – SA405 |
| 5 | June 1, 1990, Opinion of The Attorney General, Public File No. 44-03-13, In the Matter of: Application by the Las Vegas Sun, Inc. and Donrey of Nevada, Inc. for Approval of a Joint Newspaper Operating Arrangement Pursuant to the Newspaper Preservation Act, 15. U.S.C. §§ 1801-1804 (SUN_00024373-85) | 2 | SA406 – SA420 |
| 6 | Declaration of Brian Greenspun in Support of Plaintiff/Counterdefendants' Emergency Motion for Temporary Restraining Order and Preliminary Injunction | 2 | SA421 – SA428 |

| | 7 | Hearing Transcript Excerpts of Mark Hinueber, *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case No. 01-16-0001-9187 (Oct. 6, 2016) (Vol. 4) (SUN_00023106-08, 273-74, 278, 280, 282-86, 383) (**FILED UNDER SEAL**) | 2 | SA429 – SA442 |
|---|---|---|---|---|
| | 8 | Sept. 8, 2016, Declaration of Mark Hinueber in Support of Stephens Media LLC's Opposition to Las Vegas Sun's Motion for Summary Judgment, AAA Case No. 01-16-0001-9187 (SUN-00064364-67) (**FILED UNDER SEAL**) | 2 | SA443 – SA447 |
| | 9 | June 10, 2005, Amended and Restated Agreement (the "2005 JOA") (SUN_00002045-69) | 2 | SA448 – SA473 |
| | 10 | Hearing Transcript Excerpts of Jackson Farrow, *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case No. 01-16-0001-9187 (Oct. 5, 2016) (Vol. 3) (SUN_00021972-74, 76-83, 159) (**FILED UNDER SEAL**) | 2 | SA474 - SA486 |
| | 11 | Hearing Transcript Excerpts of Brian Greenspun, *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case No. 01-16-0001-9187 (Oct. 3, 2016) (Vol. 1) (SUN_00019641-43, 70, 96-97, 99, 703, 842) (**FILED UNDER SEAL**) | 2 | SA487 – SA496 |
| | 12 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Lawrence Aldrich (**FILED UNDER SEAL**) | 3 | SA497 – SA537 |
| | 13 | June 16, 2005, email from G. Lang to J. Farrow et al., re DR Partners' submission of 2005 JOA to DOJ "pursuant to the Newspaper Preservation Act, 15 USC § 1801 et seq. and 28 CFR § 48.16 (SUN_00005886-89) (**FILED UNDER SEAL**) | 3 | SA538 – SA542 |
| | 14 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Russell Lamb (**FILED UNDER SEAL**) | 3 | SA543 - 548 |
| | 15 | Deposition Transcript Excerpts of Las Vegas Sun, Inc.'s Expert L. Aldrich, *Las Vegas Sun, Inc. v. Adelson*, No. 2:18-cv-0166-ART-VCF (D. Nev. March 15, 2023) | 3 | SA549 – SA575 |
| | 16 | Sept. 23, 2005, email from C. Cliff to D. Jordan, et al., re Amendment of the Las Vegas JOA – Joint Defense Agreement (SUN_00001673-84) (**FILED UNDER SEAL**) | 3 | SA576 – SA587 |
| | 17 | Aug. 5, 2005, facsimile from B. Matelson to G. Lang re Las Vegas JOA, CID No. 23751 (SUN_00012237-47) (**FILED UNDER SEAL**) | 3 | SA586- SA599 |
| | 18 | Oct. 12, 2005, letter from A. Marx to B. Matelson, re responses to CID No. 23751 (SUN_00001806-14) (**FILED UNDER SEAL**) | 3 | SA600 – SA609 |
| | 19 | Feb. 13, 2006, facsimile from B. Matelson to A. Marx, re Civil Investigative Demand Nos. 24097 & 24098 (SUN_00012233-36) (**FILED UNDER SEAL**) | 3 | SA610 – SA614 |

| | | | |
|---|---|---|---|
| 20 | Deposition Transcript Excerpts of Las Vegas Sun, Inc.'s 30(b)(6) Corporate Representative Robert Cauthorn, *Las Vegas Sun, Inc. v. Adelson*, No. 2:18-cv-0166-ART-VCF (D. Nev. Feb. 16, 2022) (**REDACTED**) | 3 | SA615 – SA636 |
| 21 | Aug. 16, 2005, letter from B. Matelson to G. Lang re 8/16/05 DOJ faxed letter to G. Lang re Civil Investigative Demand No. 23751 (SUN_00012248-50) (**FILED UNDER SEAL**) | 3 | SA637 – SA640 |
| 22 | Aug. 25, 2005, letter from G. Lang to B. Matelson re Las Vegas JOA (SUN_00001965-68) (**FILED UNDER SEAL**) | 3 | SA641 – SA645 |
| 23 | Apr. 9, 2008, letter from B. Matelson to G. Lang, et al., re Las Vegas Joint Operating Agreement ("No Action Letter") (DEFS0000418) | 3 | SA646 – SA647 |
| 24 | Deposition Transcript Excerpts of Las Vegas Review-Journal 30(b)(6) Corporate Representative Glenn Cook, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Aug. 19, 2022) (**REDACTED**) | 3 | SA648 – SA669 |
| 25 | Deposition Transcript Excerpts of Brian Greenspun, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Mar. 23, 2022) | 3 | SA670 – SA689 |
| 26 | Final Award of Arbitrator, *Las Vegas Sun, Inc. v. News+Media Capital Group, LLC*, AAA Case No. 01-18-0000-7568 (July 2, 2019) (SUN_00013635-46) (**FILED UNDER SEAL**) | 3 | SA690 – SA702 |
| 27 | Aug. 29, 2019, letter from K. Moyer to B. Greenspun re: Notice of Default (SUN_00053251-53) | 3 | SA703 - SA706 |
| 28 | Sept. 27-Oct. 4, 2019, email between counsel re Preliminary Injunction Motion | 3 | SA707 -SA718 |
| 29 | Jan. 11, 2015, email from R. Pergament to P. Dumont et al., re Preliminary Observations (DEFS0028645-47) (**FILED UNDER SEAL**) | 3 | SA719 – SA722 |
| 30 | Deposition Transcript Excerpts of Jason Taylor, *Las Vegas Sun, Inc. v. News+Media Capital Group, LLC*, AAA Case No. 01-18-0000-7568 (Mar. 21, 2019) (**FILED UNDER SEAL**) | 4 | SA723 – SA765 |
| 31 | Deposition Transcript Excerpts of Jason Taylor, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. May 12, 2022) | 4 | SA766 – SA790 |
| 32 | April 3, 2017, email from J. Wilson to N. Cusick re Monday Meeting Notes (DEFS0016006-07) (**FILED UNDER SEAL**) | 4 | SA791 – SA793 |
| 33 | Deposition Transcript Excerpts of Craig Moon, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Mar. 3, 2022) | 4 | SA794 – SA804 |
| 34 | Jan. 18, 2023, Rebuttal Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Barbara Gottlieb (**FILED UNDER SEAL**) | 4 | SA805 – SA813 |

| | | | |
|---|---|---|---|
| 35 | Las Vegas Review Journal Payment Calculation JOA Fiscal Year Ending March 2018 (**FILED UNDER SEAL**) | 4 | SA814 – SA816 |
| 36 | Mar. 3, 2017, email from P. McGuire to C. Moon re Revised Summary of JOA Pmt. Calc (DEFS0165095-97) (**FILED UNDER SEAL**) | 4 | SA817 – SA820 |
| 37 | Stephens Media Group's Las Vegas Review Journal Fiscal Year End March 31, 2006, Financials (Exhibit 7 to Deposition of Robert Cauthorn, *Las Vegas Sun, Inc. v. News+Media Capital Group, LLC*, AAA Case No. 01-18-0000-7568 (Mar. 27, 2019)) (**FILED UNDER SEAL**) | 4 | SA821 – SA824 |
| 38 | Deposition Transcript Excerpts of Las Vegas Review-Journal 30(b)(6) Corporate Representative Stephen Hall, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. May 12, 2022) (**REDACTED**) | 4 | SA825 – SA846 |
| 39 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Barbara Gottlieb (**FILED UNDER SEAL**) | 4 | SA847 – SA859 |
| 40 | Feb. 12, 2016, email from P. Sack to S. Garfinkel re Las Vegas (DEFS0093000-24) (**FILED UNDER SEAL**) | 4 | SA860 – SA887 |
| 41 | Feb. 9, 2015, VRC Valuation of Certain Intangible Assets of Las Vegas Review Journal as of Dec. 10, 2015 (DEFS0092587-621) (**FILED UNDER SEAL**) | 4 | SA888 – SA923 |
| 42 | March 3, 2017, Email from C. Moon to F. Vega re an update and two quick questions (DEFS0013609-10) (**FILED UNDER SEAL**) | 4 | SA924 – SA926 |
| 43 | Las Vegas Review-Journal, Inc. Financial Statements December 31, 2019, and 2018 (DEFS0083496-515) (**FILED UNDER SEAL**) | 4 | SA927 – SA947 |
| 44 | Las Vegas Review Journal Payment Calculation JOA Fiscal Year Ending March 2020 (SUN_00008774) (**FILED UNDER SEAL**) | 5 | SA948 – SA950 |
| 45 | Apr. 30, 2022, email from S. Hall to R. Cauthorn re JOA Calculation – JOA Year Ended March 2022 (SUN_00084445-47) (**FILED UNDER SEAL**) | 5 | SA951 – SA954 |
| 46 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Gregory Gundlach (**FILED UNDER SEAL**) | 5 | SA955 – SA1005 |
| 47 | Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert J. David Kordalski (**FILED UNDER SEAL**) | 5 | SA1006 – SA1020 |
| 48 | Apr. 4, 2023, Supplemental Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Gregory Gundlach (**FILED UNDER SEAL**) | 5 | SA1021 – SA1025 |
| 49 | Sept. 19, 2016, email from J. Wilson to E. Cassidy re: RJ with Sun? (DEFS01454464-67) (**FILED UNDER SEAL**) | 5 | SA1026 – SA1030 |
| 50 | Apr. 2, 2017, email from C. Moon to R. Cauthorn Re: Concerns about your new design (DEFS0002488-89) (**FILED UNDER SEAL**) | 5 | SA1031 – SA1033 |

| | | | | |
|---|---|---|---|---|
| 51 | Apr. 17, 2019, email from K. Espejo to K. Moyer re: The Sun in eEdition (DEFS0166089-94) **(FILED UNDER SEAL)** | 5 | SA1034 – SA1040 | |
| 52 | RESERVING FOR RJ'S ANSWERS TO ROG 13 MARCH 2022 | 5 | SA1041 – SA1052 | |
| 53 | Deposition Transcript Excerpts of Las Vegas Review-Journal 30(b)(6) Corporate Representative Chris Blaser, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Aug. 11, 2022) **(REDACTED)** | 5 | SA1053 – SA1069 | |
| 54 | Chris Jones & J.M. Kalil's article, Las Vegas Sun to rise with morning RJ, published in the Las Vegas Review Journal on June 15, 2005 (SUN_0000627-32) | 5 | SA1070 – SA1076 | |
| 55 | Steve Kanigher's article, *Sun deal with R-J "a tremendous opportunity" Newspaper to return to morning delivery*, published in the Las Vegas Sun on June 15, 2005 (DEFS0190559-61) | 5 | SA1077 – SA1080 | |
| 56 | Deposition Transcript Excerpts Ray Brewer, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. June 24, 2022 | 5 | SA1081 – SA1091 | |
| 57 | Las Vegas Review Journal Newsroom Guide (DEFS0185654-69) ((**FILED UNDER SEAL**) | 5 | SA1092 – S1108A | |
| 58 | June 4, 2016, Front Page of Newspapers (SUN_00009885) | 5 | SA1109 – SA1110 | |
| 59 | Jan. 11, 2018, Front Page of Las Vegas Sun (DEFS0001703) | 5 | SA1111 – SA1112 | |
| 60 | Feb. 13, 2018, Front Page of Las Vegas Sun (DEFS0001697) | 5 | SA1113 – SA1114 | |
| 61 | Feb. 12, 2018, Email from R. Brewer to R. Cauthorn re: Two quick questions from LV Sun print (SUN_00055720) **(FILED UNDER SEAL)** | 5 | SA1115 – SA1116 | |
| 62 | Jan. 18, 2023, Rebuttal Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Michael Katz **(FILED UNDER SEAL)** | 6 | SA1117 – SA1229 | |
| 63 | Deposition Transcript Excerpts Patrick Dumont, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Oct. 28, 2021) **(FILED UNDER SEAL)** | 6 | SA1230 – SA1246 | |
| 64 | Deposition Transcript Excerpts Keith Moyer, *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-cv-0166-ART-VCF (D. Nev. Apr. 5, 2022 | 6 | SA1247 – SA1264 | |
| 65 | Aug. 30, 2019, letter from T. Burkholder to B. Greenspun re Message via the Las Vegas Sun (SUN_00000293) **(REDACTED)** | 6 | SA1265 – SA1266 | |
| 66 | Sept. 6, 2019, email originally from A. Marshall to Las Vegas Sun Letters, re Please work with the RJ to maintain the JOA (SUN_00024479) **(REDACTED)** | 6 | SA1267 – SA1268 | |
| 67 | Jan. 15, 2019, email from K. Woods to B. Greenspun re Message via the Las Vegas Sun (SUN_00000315) **(REDACTED)** | 6 | SA1269 – SA1270 | |
| 68 | Aug. 27, 2017, email from M. Spigelman to B. Greenspun re Message via the Las Vegas Sun (SUN_00000376-77) **(REDACTED)** | 6 | SA1271 – SA1273 | |

| 69 | Aug. 30, 2019, email from W. Wreatha to Las Vegas Sun Letters, re Printing & distribution arrangement with LV Review-Journal (SUN_0000300) (**REDACTED**) | 6 | SA1274 – SA1275 |
| 70 | Sept. 6, 2019, email from C. Sappraicone to Las Vegas Review Journal Letters re Not printing The Las Vegas Sun? (SUN_0000298) (**REDACTED**) | 6 | SA1276 – SA1277 |
| 71 | Sept. 5, 2019, email from P. Ryan to B. Greenspun re Keep the Sun (SUN_0000303-04) (**REDACTED**) | 6 | SA1278 – SA1280 |
| 72 | June 13, 2016, email from J. Perdigao to F. Vega et al., re JOA Info (DEFS0146935) (**FILED UNDER SEAL**) | 6 | SA1281 – SA1282 |

Date this 23rd of February 2026.

By: */s/ Nicole Scott*
E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
1700 S. Pavillion Center Drive, Suite 500
Las Vegas, Nevada 89169

PISANELLI BICE PLLC
James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
400 South 7th Street, Suite 300
Las Vegas, Nevada 89135

BROWNSTEIN HYATT FARBER
SHRECK, LLP
Jordan T. Smith, Nevada Bar No. 12097
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

ALIOTO LAW FIRM
Joseph M. Alioto, Pro Hac Vice
One Sansome Street, 35th Floor
San Francisco, California 94104

*Attorneys for Plaintiff/Counterdefendants*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I am an employee of CLARK HILL PLC, and I caused a true and correct copy of the foregoing **INDEX OF EXHIBITS TO EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (VOLUME 2)** to be served by electronically filing the foregoing with the CM/ECF electronic filing system which will send notice of electronic filing to:

J. Randall Jones, Esq.
Michael J Gayan, Esq.
Mona Kaveh, Esq.
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169

Amy M. Gallegos, Esq.
David R. Singer, Esq.
Andrew G. Sullivan, Esq.
Alison I Stein, Esq.
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, CA 90071

Richard L. Stone, Esq.
850 Deveon Avenue
Los Angeles, CA 90024

DATED: February 23, 2026.

_/s/  Jill Nelson_____
An Employee of Clark Hill PLC

# EXHIBIT 2

Sept. 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Robert Picard (**FILED UNDER SEAL**)

# EXHIBIT 2

# EXHIBIT 3

June 17, 1989, Joint Operating Agreement (the "1989 JOA")
(SUN_00001996-2039)

# EXHIBIT 3

## AGREEMENT

This Agreement is dated as of June __/7__, 1989, between Donrey of Nevada, Inc., a Nevada corporation ("Donrey"), and the Las Vegas Sun, Inc., a Nevada corporation ("Sun").

## PRELIMINARY STATEMENT

Donrey owns and publishes in Las Vegas, Nevada, an all day newspaper on weekdays, a morning newspaper on Saturdays and holidays, and a Sunday newspaper, each known as the Las Vegas Review-Journal (hereinafter referred to as the "Review-Journal"). Sun owns and publishes in Las Vegas, Nevada, a morning newspaper on weekdays and Saturdays and a Sunday newspaper, each known as the Las Vegas Sun (hereinafter referred to as the "Sun"). The Sun presently operates and for a number of years has operated at a substantial loss, and is in probable danger of financial failure. It is the firm belief of the parties that the continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent, is of paramount importance to the citizens of Las Vegas and its environs. The parties further believe that publication of the Sun can be carried on profitably, and its continued editorial existence and independence thereby assured, if its production, distribution and advertising functions and related non-news and non-editorial activities are conducted and performed by the Review-Journal, through a single staff of Review-Journal employees utilizing Review-Journal's plant and equipme t nder a joint

*Pages 12-13 relate to trade uc.*

newspaper operating arrangement (hereinafter referred to as "Agreement"), under which the Review-Journal will act on its own behalf with respect to the Las Vegas Review-Journal and on behalf of the Sun with respect to the Las Vegas Sun.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I

### TERM

1.1  Effective Date.  The term of this Agreement shall begin at 12:01 a.m. on the 10th day (or on such later day as the parties may agree) after the filing of written consent of the Attorney General of the United States to this Agreement under the Newspaper Preservation Act, which shall be known as "the Effective Date".  The parties agree to pursue diligently the filing of the application for approval of this Agreement to the Department of Justice and to use their best efforts and take all action necessary to obtain such written consent as expeditiously as possible within the procedures set forth in applicable regulations of the Department of Justice.  This Agreement does not constitute any limitation on either party's obligation to engage in good faith labor negotiations if and as required by the National Labor Relations Act, and to implement any understandings it may reach in such negotiations.

Upon execution hereof, each party shall furnish to the other a written opinion of its counsel that all necessary

SUN_00001997

corporate action has been taken to authorize this Agreement and that, subject to the conditions of the preceding paragraph, this Agreement shall constitute the valid and binding obligation of the respective party.  The parties agree to cooperate in coordinating meetings with government officials, community leaders, employees and their representatives, advertisers and others to explain the Agreement.

If, within eighteen (18) months after the filing of the application with the Department of Justice, the application has neither been approved by the Attorney General without a hearing nor been the subject of an order for a hearing, or if, within eighteen (18) months after the Attorney General has issued an order for a hearing, the application has not been approved by the Attorney General, the parties shall discuss the feasibility of continuing to seek approval of the application and either party may, after notification to the other, withdraw from the application.  The Review-Journal and Donrey intend to make a request, at the time of filing the application, under 28 CFR Section 48.5 for a protective order withholding from public disclosure their financial and other privileged and confidential commercial information to be filed with this application and restricting access to such materials to the applicants and the Department of Justice.  If the request is not granted the Review-Journal and Donrey reserve the right to unilaterally withdraw the application.  If the protective order is initially granted but, at a later date, access to or inspection of the protected information is to be afforded anyone other than the

-3-

SUN_00001998

applicants, the Department of Justice, or an administrative law judge, and their respective employees, without restrictions as to disclosure acceptable to the Review-Journal and Donrey, then the Review-Journal and Donrey shall have the unilateral right to withdraw the application and dismiss any further hearing or proceedings concerning the application.

Each party shall pay its own costs and professional fees in connection with the formulation and drafting of this Agreement and the preparation and filing of the application to the Department of Justice. From and after the filing of such application all costs and professional fees shall be borne equally by the parties with each party having reasonable approval of costs and fees to be incurred.

1.2 <u>Duration</u>. Subject to the termination provisions set forth in Article 9, this Agreement shall continue for an initial period ending at the close of business on the 31st day of December of the fiftieth (50th) year following the Effective Date. The Agreement shall automatically renew for succeeding renewal periods of ten (10) years each unless either party shall notify the other in writing at least two (2) years prior to the end of the initial period that it elects to terminate the Agreement at the end of said fiftieth (50th) year, or unless either party shall notify the other in writing at least two (2) years prior to the end of the renewal period that it elects to terminate the Agreement as of the end of said renewal

-4-

SUN_00001999

period.  The phrase "term of this Agreement" as used hereafter shall mean the initial period and any renewal period or periods.

## ARTICLE 2

### AGENCY

Donrey of Nevada, Inc. now owns and operates the Review-Journal, together with other unrelated business operations in the State of Nevada.  In order to facilitate management, administration, record keeping and tax administration under this Agreement, Donrey, as of the effective date of this Agreement, shall have established a separate Nevada business corporation which shall own or lease all assets related to the operation of the Las Vegas Review-Journal.  Donrey shall cause such corporate entity to assume and agree to perform all duties and obligations of the Review-Journal under the terms of this Agreement.

## ARTICLE 3

### TRANSFER OF CONTRACTS AND SALE OF SUPPLIES, INVENTORY AND EQUIPMENT BY SUN TO REVIEW-JOURNAL

3.1  <u>Transfer to and Assumption by Review-Journal of Certain Contracts</u>.  To enable Review-Journal to perform its functions hereunder on behalf of Sun, Sun shall (as of the Effective Date) transfer certain assets and assign certain contracts to Review-Journal subject to the procedures and conditions hereinafter specified in this Section 3.1.

3.1.1  <u>Delivery of Contracts and Data to Review-Journal</u>. Upon consent of the Attorney General as specified in Section 1.1, Sun shall furnish to the Review-Journal:

-5-

SUN_00002000

3.1.1.1   <u>Circulation Contracts</u>.   All subscription, bulk sales, circulation, dealer and sub-dealer, and delivery agent lists and contracts related to the Sun in the possession or control of Sun, and all books and statements of account, records and other information relating to or concerning routes, daily draws by editions, distribution, delivery, sales returns, or prepaid subscriptions of the Sun in any territory, but not including the Sun's general books of account.

3.1.1.2   <u>Contracts for Supplies</u>.   All contracts and other available information as may be reasonably necessary to form business judgments respecting such contracts, then held by Sun for the purchase of newsprint, film, ink and supplies for the Sun's mechanical departments, and all other similar contracts (other than those relating to the Sun's news and editorial departments) which would be helpful or beneficial to the Review-Journal in fulfilling its obligations hereunder.

3.1.1.3   <u>Advertising Contracts</u>.   A list of all contracts then outstanding for publication of advertising in the Sun, which list shall indicate in each case the date of the contract, the name and address of the advertiser, the amount of space used up to that time, the amount unpaid and owing the Sun for advertising run to that time, the amount prepaid as of the Effective Date, the frequency of insertions, the rate, the expiration date, and any special conditions, records, requirements or publication orders with the date thereof, and any special instructions, agreements or commitments made by the Sun with

-6-

SUN_00002001

the advertiser with respect thereto, and all insertion orders for advertising subsequent to the Effective Date. Sun shall make available to the Review-Journal at the Review-Journal's request copies of any or all such contracts.

   3.1.2   Analysis of Contracts and Assumption by Review-Journal. As soon as possible after such information and documents shall have been furnished to the Review-Journal, and in any event prior to the Effective Date, Review-Journal shall designate in writing to Sun those contracts that Sun shall assign to Review-Journal and which Review-Journal shall assume as of the Effective Date (excluding all portions which Sun had a duty to perform prior to the Effective Date); provided, that with respect to advertising contracts Review-Journal shall have no obligation to assume any advertising contract that is on a trade-out basis, and Review-Journal agrees that it will not refuse the assumption of any advertising contract solely on the basis of the contract rate. However, for advertising contracts containing rates which Review-Journal determines to be unreasonab: low, Review-Journal shall have the right to charge to Sun the difference between the contract rate and a rate determined by Review-Journal to be reasonable, effective ninety (90) days after the date of assumption and continuing for the balance of such contracts. Subject to the foregoing, Review-Journal shall use its best efforts to maximize its designation of such contracts

-7-

SUN_00002002

to be assigned to and assumed by Review-Journal.  Review-Journal pre-assumption analysis of such contracts and information may include consultation with the contracting parties, and Sun agrees to assist Review-Journal in that process.  Sun shall remit to Review-Journal (a) all dealers', vendors' and carriers' cash deposits (to the extent that the same shall not be due and owing to such depositors on the Effective Date) and (b) all sums in respect of prepaid subscriptions and prepaid advertising received by Sun but not earned prior to the Effective Date.  As to any assigned and assumed advertising contracts, Review-Journal shall have the right to make adjustments, such as rebates or short ratings of any of same so long as this shall not alter indebtedness due Sun prior to the Effective Date without Sun's approval.  All such contracts to be assumed by Review-Journal shall be assigned to Review-Journal by Sun as of the Effective Date, and such contracts shall be assumed by Review-Journal as of that date and thereafter shall be performed by Review-Journal, and Sun shall be relieved from any and all performance obligations under such contracts accruing after the Effective Date.

3.2  Newsprint.  Review-Journal shall procure, as of the Effective Date and thereafter, a supply of newsprint adequate to produce the Newspapers as defined in Section 5.1 below;

SUN_00002003

provided, that Review-Journal shall have the purchase and assumption obligations specified in Section 3.3 as to Sun newsprint.

3.3  <u>Sale of Supplies, Inventory and Equipment</u>.  As of the Effective Date, Review-Journal agrees to purchase Sun's inventory of newsprint and supplies common to or usable in the operations of both newspapers (i.e., newsracks, production film, rubber bands, plastic bags, etc.).  Upon the consent of the Attorney General as specified in Section 1.1, Sun shall deliver to Review-Journal a schedule identifying all supplies, inventory (on hand or in transit) and equipment owned or leased by Sun and used or available to be used in the production and distribution of the Sun.  On or before the Effective Date, Review-Journal shall designate in writing which of the scheduled items of supplies, inventory and equipment it wishes to purchase or sublease, as the case may be.

As to such of the equipment as is owned by Sun, which Review-Journal determines to purchase, Sun shall be obligated to sell and deliver same and Review-Journal shall be obligated to buy at a purchase price equal to the purchase cost of such equipment or its then market value, whichever is lower.

As to such of the supplies and inventory which Review-Journal is obligated to purchase or designates for purchase by it, Sun shall be obligated to sell and deliver same and Review-Journal shall be obligated to buy at a purchase price equal to the cost of same to Sun, or its then market value, whichever is lower.

SUN_00002004

Any newspaper production equipment of the Sun which is not purchased by the Review-Journal may be sold by the Sun to a third party, provided that the sale of any such equipment to any party within the State of Nevada shall require Donrey's prior approval.

## ARTICLE 4
### NEWS AND EDITORIAL COPY, FEATURES AND SERVICES

**4.1   Maintenance of News and Editorial Staff; Feature Materials**.  Review-Journal and Sun each shall maintain a staff of news and editorial employees, and shall license such feature materials (including, but not limited to, news and editorial services supplied by third parties), adequate to provide its respective newspaper with all of the news and editorial copy and related services deemed necessary by each of them as to its respective newspaper.

**4.2   News and Editorial Allocations**.  The Review-Journal and the Sun shall establish, in accordance with the provisions of Appendix A attached hereto and made a part hereof by reference, the amounts to be allocated to Agency Expense, as hereinafter defined, for each for news and editorial expenses.

**4.3   Furnishing News and Editorial Copy and Services**.  In furnishing features, news and editorial copy, and like materials to Review-Journal for publication in the Sun or the Sun portion of jointly published newspapers as provided in Section 4.4, and in providing layout for such material, Sun shall provide all such material in a form appropriate for the production of its

SUN_00002005

newspaper or its portion of jointly published newspapers hereunder, in conformity with the mechanical standards, deadlines and production requirements which prevail in the Review-Journal plant from time to time, including page sizes, column widths, and cut-offs established by Review-Journal, upon reasonable notice to Sun. Sun shall acquire and maintain at its expense such newsroom equipment (including, but not limited to, typewriters, video terminals and news editing systems) as may be required as of the Effective Date to interface with Review-Journal production facilities. Any changes or additions thereafter required in such equipment shall be covered by Appendix B hereto. Newshole limitations and other matters for separate and jointly published newspapers are set forth in Appendix A hereto.

4.4 <u>Furnishing Copy, Features and Services for Jointly Published Newspapers</u>. Sun shall furnish editorial copy, features and comics to permit the Review-Journal to include them within jointly published newspapers, which shall be Sundays, Saturdays, holidays, other special editions and total market coverage editions. The Sun portion of jointly published newspapers shall be in accordance with Appendix A hereto. All components of jointly published newspapers shall bear the Review-Journal's headdress, typeface and style. The front page logo of all jointly published newspapers shall read "Las Vegas REVIEW-JOURNAL and SUN," and all folios shall similarly refer to both papers, except for editorial and other pages described in Appendix A as being for the use of only one newspaper, which

SUN_00002006

pages shall bear only the name of such newspaper. The Review-Journal shall provide all of the news content of jointly published newspapers, except for stories and features included on those pages described in Appendix A as being only for the use of the Sun. The Review-Journal reserves the right to print conspicuous notices in jointly published newspapers to the effect that the news content of the non-Sun portion of the newspaper, including locally produced supplements, is produced by Review-Journal personnel.

4.5 <u>Showbiz Magazine</u>. Showbiz Magazine, which is owned or controlled by Sun, is carried as an insert by the Sun and distributed to hotels in Las Vegas. As of the Effective Date, Showbiz Magazine shall be a department or division of the Sun and <u>subject to the terms of this Agreement</u>. If the Review-Journal determines that it no longer desires Showbiz Magazine to be governed by the terms of this Agreement and/or no longer desires to carry Showbiz Magazine as an insert in the jointly published Sunday newspaper, Review-Journal shall give sixty (60) days prior written notice to Sun, and Sun shall have the right to transfer Showbiz Magazine out of Sun, or continue publication and distribution of Showbiz Magazine, and in either case, outside the terms of this Agreement. In this event, Review-Journal agrees to perform, at the request of Sun, composition, production and printing services at reasonable costs and further agrees not to engage in the production of an entertainment magazine for distribution to Las Vegas hotels for a period of two (2) years.

-12-

## ARTICLE 5

### CONTINUING PUBLICATION AND
### NEWS AND EDITORIAL AUTONOMY

5.1  <u>Production and Promotion of the Newspapers</u>.  Subject
to the terms of this Agreement, and as of the Effective Date,
Sun shall be a daily afternoon newspaper and Review-Journal
shall be a daily morning newspaper and on Saturday, Sunday,
holidays, and other special editions the newspapers shall be
jointly published as provided in Section 4.4.  So long as Sun
furnishes news and editorial copy, features and services to
Review-Journal in accordance with Article 4 of this Agreement,
Review-Journal agrees to produce the Sun daily as an afternoon
newspaper as provided herein, to include the Sun copy and
features in jointly published newspapers as specified in Article 4
above, and to sell all advertising for, promote and circulate
such newspapers as provided herein.  Review-Journal agrees that
the afternoon Sun and the Sun portion of jointly published
newspapers shall contain no editorial content other than that
furnished by Sun.  Also subject to the terms of this Agreement,
Review-Journal further agrees to publish and produce for the
term of this Agreement the Las Vegas Review-Journal daily as a
morning newspaper and to produce jointly published newspapers
as provided herein.  The daily Sun and the Sun portion of
jointly published newspapers, and the daily Review-Journal and
the balance of the jointly published newspapers are hereinbefore
and hereinafter referred to as the "Newspapers".

-13-

SUN_00002008

Review-Journal shall print the Newspapers on equipment owned or leased by the Review-Journal in the Review-Journal plant or plants located at such place or places as Review-Journal may determine, and all operations under this Agreement, except the operation of the Sun's news and editorial department, shall be carried on and performed by the Review-Journal with Review-Journal employees and equipment and in the Review-Journal's said plant or plants or by independent contractors selected by the Review-Journal.

The Review-Journal shall control, supervise, manage and perform all operations involved in managing and operating under this Agreement, including printing, selling and distributing the Newspapers, shall determine page sizes, number of columns per page, cut-offs, page makeup of non-news and non-editorial content (subject to the newshole formula set forth in Appendix A), and all other mechanical and technical functions of the Newspapers, shall purchase newsprint, materials and supplies as required (subject to Sun's obligations under Section 3.2), shall determine the rates for, solicit and sell all advertising space in the Newspapers, shall determine circulation rates, collect the Newspapers' circulation and advertising accounts receivable which come into existence after the Effective Date, and shall make all determinations and decisions and do any and all acts and things related to the foregoing activities, provided:

SUN_00002009

5.1.1 <u>Format</u>.  Review-Journal shall not change the format of the Sun to any size or format different from that of the Review-Journal without approval of Sun.

5.1.2 <u>Editions</u>.  The number of Sun editions shall not be changed without approval of Sun.

5.1.3 <u>Best Efforts</u>.  Review-Journal agrees that it will use its best efforts, using the same degree of diligence, to sell advertising space in the Sun and the Review-Journal and to promote and circulate the Sun and the Review-Journal.

5.1.4 <u>Promotional Activities</u>.  Review-Journal shall establish for each fiscal year a budget for promotional activities which shall be allocated between the Review-Journal and the Sun in accordance with the provisions of Appendix A, attached hereto and made a part hereof by reference.  Promotional activities may include radio and television, outdoor advertising, in-paper or house advertisements, and other advertising media.  All expenses of such promotional activities shall be Agency Expense, up to the amount of the promotional budget allocation.  If either the Review-Journal or the Sun determines that it wishes to incur expenses in excess of those in the promotional budget, such expenses shall not be included in Agency Expense.  Direct circulation sales expenses, including such items as carrier premiums and expenses of order generation shall not be included in the promotional budget and shall be allocated by Review-Journal between the newspapers so as to maximize the maintenance and enhancement of the circulation of the newspapers to the

SUN_00002010

extent economically feasible. The newsroom of each newspaper shall determine the nature, extent and timing of its promotional activities and shall supply basic information therefor. Review-Journal promotion management shall be responsible for all final promotional copy preparation and placements.

5.1.5 <u>Rates</u>. Review-Journal shall not increase the single copy or subscription prices of the daily edition of the Sun to an amount higher than the comparable rates for the Review-Journal. Review-Journal shall not change the rates for advertising to be run solely in the Sun in relation to the rates charged for comparable advertising to be run solely in the Review-Journal, unless such change is justified by the then-relative circulation of the Sun and the Review-Journal and other factors considered relevant in the industry.

5.1.6 <u>Meetings of JOA Participants</u>. Periodically, not less than four times per year, Donrey senior management shall meet with Sun senior management to discuss operations under this Agreement and future plans and opportunities.

5.1.7 <u>Advertising Acceptability</u>. Sun may reject any advertising or types of advertising for the Sun which is in the opinion of Sun undesirable or inappropriate for publication therein, and shall notify Review-Journal in writing of any specific advertising or types of advertising that Sun deems undesirable for publication. Review-Journal shall accept all advertising for the Sun other than the advertising indicated on

SUN_00002011

Sun's written notice, subject to all laws affecting the acceptability of advertising.

5.1.8  Sun Distribution.  To the extent economically feasible, Review-Journal shall use its best efforts to substantiall maintain the historical area and extent of distribution of the Sun.

5.2  News and Editorial Autonomy.  Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the essence of this Agreement.  Sun shall have exclusive and complete control, authority and direction over the news and editorial content, features and services to be furnished by Sun to Review-Journal to be included in its newspaper and in its portion of the jointly published newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees.  Review-Journal shall have exclusive and complete control, authority and direction over the news and editorial content, features and services in its newspapers and in its portion of the jointly published newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees.  The Review-Journal and Sun each hereby agrees to preserve high standards of newspaper quality throughout the term of this Agreement.  All news and editorial expense of the Sun or the Review-Journal in excess of the amounts set forth in Appendix A shall be borne by the respective newspaper.

-17-

5.3   <u>Performance and Cooperation</u>.   Sun and Review-Journal
agree to take all corporate action necessary to carry out and
effectuate the intent, purposes and provisions of this Agreement,
and to cooperate with the other party in every reasonable way that
will promote successful and lawful operation under this Agreement
for both parties.

5.4   <u>Sun Office Space</u>.   The Sun shall have the option to
provide its own offices for its news and editorial department
and senior management, or to occupy office space, to be provided
by the Review-Journal, adjacent to the Review-Journal's newspaper
building.

## ARTICLE 6

### PAYMENT OF EXPENSES, DISTRIBUTION OF REVENUES, AND OTHER FINANCIAL PROVISIONS

6.1   <u>Expenses and Revenues</u>.   Review-Journal shall pay and
record all Agency Expense, as defined in Appendix B hereto, and
collect and record all Agency Revenues as defined in Appendix C
hereto, and shall pay to Sun, monthly, a sum for Sun news and
editorial expense as provided in Appendix A hereto.

6.2   <u>Accounting Records</u>.   Accounting records of Agency
Revenues and Agency Expense shall be maintained by Review-
Journal.   Accounting records of news and editorial expense
shall be separately maintained by the Review-Journal and the
Sun for their respective newspapers.   All such records shall be
kept on a fiscal year basis in reasonable detail and in accordance
with generally accepted accounting principles.   Financial
statements to be provided under Section 6.3 shall be prepared

-18-

SUN_00002013

in accordance with generally accepted accounting principles and the applicable provisions of this Agreement.

6.3 <u>Financial Statements</u>. Within ninety (90) days following the close of each fiscal year, Review-Journal shall furnish to Sun financial statements in respect of such year which summarize Agency Revenues and Agency Expense hereunder. Within thirty (30) days after the end of each month, except the last month of the fiscal year, Review-Journal shall furnish to Sun a monthly financial statement summarizing Agency Revenues and Agency Expense. All Agency financial statements furnished by Review-Journal shall be certified by a financial officer of Review-Journal.

6.4 <u>Distributions</u>. Payments of Sun's share of operating profit, pursuant to Appendix D, shall be made with each financial statement to be furnished to Sun under the provisions of Section 6.3 above.

## ARTICLE 7

## <u>TRANSITIONAL MATTERS</u>

7.1 <u>Collection of Sun Receivables</u>. After the Effective Date, Review-Journal shall use its best efforts (without any obligation to institute legal proceedings) to collect Sun advertising and circulation accounts receivable which are outstanding on the Effective Date and shall remit same to Sun on a monthly basis, less the Agency's reasonable collection costs specifically incurred in connection therewith. Such collections and collection costs recovered by Review-Journal shall not be Agency Revenues or Agency Expense. Any such

SUN_00002014

advertising accounts which have not been collected by Review-Journal within sixty (60) days after the Effective Date shall be returned to Sun.  Collections from particular subscribers shall first be applied to circulation accounts receivable unless otherwise agreed by Sun.  As to any Sun advertising or circulation contracts assumed by Review-Journal under Section 3.1 above, Review-Journal will remit to Sun the portion of the receipts thereunder reflecting advertising run or circulation delivered by Sun prior to the Effective Date but not payable until on or after that date, and such portion shall not be Agency Revenues.

 7.2 <u>Termination Obligations</u>.  Sun shall be solely responsible for all notices, severance allowances, accrued benefits, or other related payments or obligations which may become due or payable to any terminated employee or agent of Sun.

 7.3 <u>Sun Personnel</u>.  Review-Journal shall be under no obligation to employ any terminated Sun employee.

ARTICLE 8

<u>NONLIABILITY PROVISIONS</u>

 8.1 <u>Defense of Claims and Indemnification</u>.  Any claim, demand, suit, action, obligation or other liability asserted against or sustained by Review-Journal and Sun, or either of them, in respect of any third party ("Claims") shall be dealt with as provided in this Article 8.  For all purposes of this Article 8, the term "cost or expense" shall include reasonable attorneys' fees.

-20-

8.1.1  <u>Claims Related to the Joint Operation</u>.  Review-Journal shall defend and shall control the defense or settlement of any third party Claims related to the joint operations or to its performance or non-performance under this Agreement (including but not limited to Claims arising from any advertising published in, or excluded from, any of the Newspapers -- except as provided in Section 8.1.2 -- and Claims in respect of feature, news and editorial content furnished by Sun hereunder arising as a result of any act or omission on the part of Review-Journal other than republication in the form furnished by Sun), devoting reasonable efforts to minimizing any resulting liability and related cost or expense.  Any such liability, and the cost or expense related thereto, shall be an Agency Expense, except to the extent any such Claim shall be covered by insurance. Review-Journal shall give written notice to Sun of any material Claims arising under this Section 8.1.1.

8.1.2  <u>Other Claims</u>.  Except as specifically provided in Section 8.1.1. or elsewhere in this Agreement, neither party hereto shall be charged with or held responsible for any third party Claims (except to the extent certain Sun contracts shall be assumed by Review-Journal under Article 3), arising before or after the Effective Date by reason of any act or omission on the part of the other party, and the responsible party shall indemnify and hold the other party harmless therefrom, including all related cost or expense.  The responsible party shall defend, settle, pay or discharge any such Claim and shall indemnify and hold harmless

-21-

SUN_00002016

the other party against any such Claim, and from any liability, cost or expense arising therefrom.  By way of example under this Section 8.1.2 and without limitation, the entire cost or expense of defending, settling or paying and discharging Claims relating to any feature, news or editorial copy published in, or excluded from the daily Review-Journal or the Review-Journal portion of the jointly published newspaper, or arising by reason of anything done or omitted by the news and editorial department of the Review-Journal in regard to its daily newspaper or the Review-Journal portion of the jointly published newspaper, or arising by reason of any advertising rejected by the Review-Journal or accepted by the Review-Journal in situations where such advertising would be rejected pursuant to Sun guidelines, shall be borne by the Review-Journal, and any such liability, cost or expense on account of Claims relating to any feature, news or editorial copy published in, or excluded by Sun from the daily Sun or the Sun portion of any jointly published newspaper, or arising by reason of anything done or omitted by the news and editorial department of the Sun, or arising by reason of any advertising rejected by the Review-Journal pursuant to Sun guidelines, or accepted in situations where such advertising would be rejected pursuant to Review-Journal guidelines, shall be borne by Sun, unless such Claims shall be an Agency Expense by reason of the operation of Section 8.1.1.

8.1.3  <u>Insurance</u>.  For the purposes of this Article 8, each party shall separately maintain and pay for, as an item of

-22-

SUN_00002017

news and editorial expense, insurance to the extent reasonably available protecting against losses from libel, invasion of privacy, copyright or trademark infringement and other matters related to the gathering or preparation of news and editorial matter for publication, in such amounts as the parties may agree upon from time to time, but in no event less than Ten Million Dollars ($10,000,000), and the other party shall be named as an additional insured.

8.2 <u>Force Majeure</u>.  Neither party shall be liable to the other for any failure or delay in performance under this Agreement, occasioned by war, riot, government action, act of God or public enemy, damage to or destruction of facilities, strike, labor dispute, failure of suppliers or workers, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform, provided that in the event partial performance under this Agreement is feasible, notwithstanding the occurrence of one or more of the foregoing, performance shall be allocated between the newspapers by the Review-Journal, in its sole judgment, and if it is feasible to publish only one newspaper product, Review-Journal shall exercise its best efforts to produce a jointly published newspaper in which the Sun portion shall be determined by Review-Journal, notwithstanding the provisions of Appendix A hereto, provided, that the Sun portion shall not be less than two (2) pages.

-23-

SUN_00002018

## ARTICLE 9

## TERMINATION

9.1 <u>Events of Termination</u>.  This Agreement shall continue in full force and effect unless and until it may be terminated by the occurrence of one of the following events of termination:

9.1.1 <u>Voluntary Termination</u>.  Voluntary termination under the provisions of Section 1.1.

9.1.2 <u>Bankruptcy or Default</u>.  If either party hereto makes an assignment of its assets for the benefit of creditors, is adjudged a bankrupt or has a receiver appointed for its business by a court of competent jurisdiction (provided, that such adjudication shall continue unstayed on appeal or otherwise in effect for a period of ninety (90) days after the entry of the decree related thereto before such adjudication becomes an event of termination, and further provided that the appointment of the receiver must continue unvacated, not set aside, not stayed or otherwise in effect for a period of ninety (90) days after such appointment before such appointment becomes an event of termination), or if either party defaults in the performance of any of its material obligations hereunder and does not cure such default within sixty (60) days after receiving written notice thereof from the other party, then such other party may, at its election, and in addition to all other remedies available to it at law or in equity, terminate this Agreement upon thirty (30) days' written notice by the Sun and sufficient notice by the Review-Journal to enable the Sun to arrange for the separate

-24-

SUN_00002019

production of the Sun, but not to exceed six (6) months; provided, that in the event of default, the other party shall have the additional option to cure such default and, on demand, be reimbursed by the defaulting party for all costs and expenses related thereto.

9.1.3 <u>Change of Controlling Interest</u>.  In view of the nature of the relationship established by this Agreement and the fact that the Sun is published under the direction and control of Herman M. Greenspun and Brian L. Greenspun, the Review-Journal shall not be required to carry out the terms of this Agreement or be associated with another party to which it objects.  Accordingly, ownership or control of the Sun shall not be transferred to any other entity or person without notice to and prior approval by the Review-Journal, provided that the Review-Journal will not object to any transfer of the ownership or control of Sun to any entity under the immediate direction and control of Herman M. Greenspun, or Brian L. Greenspun, or any other lineal descendant of Herman M. Greenspun.  If, following an approved or permitted change of control of Sun, a subsequent change of control occurs, notice as hereinabove shall be given and the Review-Journal may exercise the rights provided herein.

9.1.4 <u>Loss Operation</u>.  If there are any two (2) consecutive years in which the Agency does not have an operating profit (Agency Expenses in excess of Agency Revenues), despite the Review-Journal's good faith efforts to produce an operating

SUN_00002020

profit, the Review-Journal may terminate this Agreement upon ninety (90) days written notice.

9.2 <u>Mechanics of Termination</u>. Upon termination of this Agreement, Review-Journal shall take appropriate action to transfer to Sun: (a) all then current circulation contracts, agreements or lists concerning bulk sales, subscriptions, dealers and sub-dealers, distributions, deliveries, sales returns and prepaid subscriptions of the Sun's daily newspaper, and of all jointly published newspapers, plus all pertinent portions of then current records and data pertaining thereto, and all sums received by Review-Journal in respect of prepaid subscriptions and cash deposits relating to daily Sun circulation, and a pro rata portion of all sums received by Review-Journal in respect of such subscriptions and deposits relating to the jointly published newspaper circulation, and (b) all then current advertising contracts and all pertinent portions of then current records and data relating to advertising to be published in the Sun and in all jointly published newspapers. Review-Journal shall further provide Sun with the originals and all copies of all contracts relating solely to circulation and advertising of the daily Sun, and copies of all other contracts referred to in the immediately preceding sentence.

## ARTICLE 10

### MISCELLANEOUS

10.1 <u>Notices</u>. Each notice or other communication given pursuant to this Agreement shall be given in writing, delivered

SUN_00002021

in person or mailed by registered or certified mail, addressed to the respective parties as follows:

Review-Journal:        Donrey, Inc.
                       P. O. Box 410
                       Las Vegas, NV  89125
                       Attention:  Fred W. Smith

Sun:                   Las Vegas Sun, Inc.
                       P. O. Box 4279
                       Las Vegas, NV  89127
                       Attention:  Brian L. Greenspun

or, in the case of either party hereto, at such other address or marked for the attention of such other person, as such party may set forth in a written notice to the other party.

10.2  Disclaimer of Labor Related Obligations.  The parties specifically agree that neither party hereby assumes any obligations of the other party related to its employment practices or to any of its employees, whether or not arising under any collective bargaining agreements or arising prior to, on or subsequent to the Effective Date.

10.3  Inspection of Books and Records.  Either party shall have the right to authorize its independent certified public accountants or any of its corporate officers to inspect the books and records of the other party hereto at reasonable times and intervals in regard to the financial statements specified in Article 6, but only as to the three (3) years preceding the exercise of the right of inspection, commencing with the year immediately preceding the year in which the right is exercised. The expenses of any such inspection shall be borne by the party

-27-

SUN_00002022

causing such inspection to be made and shall not be included in Agency Expenses.

   10.4 <u>Limited Effect</u>. Nothing herein contained shall constitute the parties hereto partners, joint venturers, successors, alter egos, joint employers, an unincorporated association, or as having any relationship other than as specifically provided by this Agreement.  This Agreement is intended solely for the benefit of the parties hereto, and their permitted successors and assigns and not for the benefit of any other person or party.  This Agreement, including Appendices A through D hereto, and contracts and agreements supplemental hereto, comprises the entire understanding and agreement of the parties hereto on the subject matter herein contained and any and all other representations or agreements, which heretofore may have been made on such subject matter, whether oral or in writing, by any agent of either party shall be null, void and of no effect whatsoever.  Time is of the essence of this Agreement.

   10.5 <u>Community Cable TV</u>.  As of the Effective Date, Sun shall assign or cause to be assigned to Donrey the right to receive ten percent (10%) of all dividends or distributions of any kind paid or made by Community Cable TV ("CCTV"), a Nevada corporation which owns and operates a cable television system serving Las Vegas and surrounding communities and certain unincorporated areas of Clark County, Nevada, to any of its shareholders, including any payments in excess of current salaries or current percentages of income as management or

SUN_00002023

consultant fees paid by CCTV to any of its shareholders. With respect to payments to be made to Donrey hereunder, Sun shall cause CCTV to make such payments, or make such payments directly to Donrey. As soon as permitted under the terms of certain shareholder and financing agreements, CCTV shall issue to Donrey ten percent (10%) of the total issued and outstanding common stock of CCTV, which shall be issued as fully paid and nonassessable. In addition, at such time as Sun or its affiliates have purchased all of the issued and outstanding common stock of CCTV owned by third parties, Donrey shall have the right to purchase an additional thirty-five percent (35%) of the issued and outstanding common stock of CCTV on the same terms and conditions, including price, as those on which Sun or its affiliates acquired such stock, which shall be issued as fully paid and nonassessable. In the event of the sale by Sun or its affiliates of any interest in CCTV prior to Donrey's acquisition of stock, Donrey shall be entitled to receive ten percent (10%) of the net sale proceeds, and Donrey's right to receive its ten percent (10%) stock interest shall be ratably reduced. Donrey's rights with respect to CCTV as herein provided shall survive the expiration or termination of this Agreement, provided, in the event the Review-Journal and Donrey withdraw from the application to the Department of Justice, pursuant to Section 1.1 of this Agreement, or if the Review-Journal terminates this Agreement pursuant to Section 9.1.4. within the first three (3) years of the term of this Agreement, Donrey's rights with

SUN_00002024

respect to CCTV shall terminate, and in the event Donrey has
received any payments, issuances, or transfers of or with
respect to CCTV stock pursuant hereto prior to Donrey's withdrawal
from the application to the Department of Justice or the Review-
Journal's termination of this Agreement as herein provided,
such payments, issuances or transfers of or with respect to
CCTV stock shall be refunded or rescinded.

10.6 <u>Sun Trademark, Tradenames, Service Marks and Copyrights</u>.
In its use of such Sun trademarks, tradenames, service marks
and copyrights as may be required to perform its obligations
under this Agreement, Review-Journal shall use its best efforts
to comply substantially with all relevant laws of the State of
Nevada and of the United States pertaining to trademarks,
tradenames, service marks and copyrights in force at any time
during the term of this Agreement.  Sun shall use its best
efforts to maintain in effect said trademarks, tradenames,
service marks and copyrights, and shall make applications for
the registration and/or renewal thereof if and when required by
law.  Review-Journal acknowledges Sun's right, title and interest
in and to said trademarks, tradenames, service marks and copyrights
and all renewals thereof, and agrees that it shall not at any
time permit, take, or cause to be taken any action within its
control in any way impairing or tending to impair any part of
such right, title and interest.  Review-Journal agrees to
publish such notices in the Sun and the jointly published
newspapers as Sun reasonably may request in order to protect

-30-

SUN_00002025

said trademarks, tradenames, service marks and copyrights, or any of them.  Review-Journal shall not in any manner represent that it has any ownership interest in said trademarks, tradename. service marks or copyrights or in the registration thereof, and Review-Journal acknowledges that its use hereunder of said trademarks, tradenames, service marks or copyrights shall not create in its favor any right, title or interest in or to same beyond those created by this Agreement.

10.7   <u>Tax Treatment of Payments to Sun</u>.  It is contemplated by the parties that the payments to Sun under Section 6.4 of this Agreement will be, for federal income tax purposes, ordinary income to Sun and will be deductible by Review-Journal as a business expense.

10.8   <u>Specific Performance</u>.  Because of the public interest of maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs, and because of the inadequacy of damages in the event of default in the performance of material obligations hereunder, each party shall have the right to seek specific performance of the material provisions of this Agreement, provided, that in the event of any action by Sun for specific performance against Review-Journal, if Sun does not obtain an order of specific performance, Review-Journal shall be entitled to recover in such action its attorneys' fees and costs.

SUN_00002026

10.9  _Successors and Assignment_.  This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their permitted successors and assigns.

10.10  _Governing Law; Modification_.  This Agreement shall be construed and enforced in accordance with the laws of the State of Nevada.  This Agreement may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, modification or discharge shall be sought.

10.11  _Headings_.  Headings have been inserted in this Agreement for the purpose of convenience only.  They shall not be used to interpret or construe the meaning of any Articles or Sections, nor shall they have the effect of limiting or enlarging the meaning thereof.

IN WITNESS WHEREOF, this Agreement has been executed by the parties' respective corporate officers thereto duly authorized as of the day and year first above written.

DONREY, INC.

By _____
Fred W. Smith
President

LAS VEGAS SUN, INC.

By _____
Brian L. Greenspun
President

-32-

SUN_00002027

# APPENDIX A

A.1.  Pursuant to Section 4.2 of this Agreement, for each fiscal year after the Effective Date Review-Journal shall establish an allocation for Review-Journal news and editorial expenses, and the allocation for, news and editorial expenses for the Sun shall be equal to sixty-five percent (65%) of the Review-Journal allocation, subject to a minimum of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) per fiscal year, which shall be increased each year by a percentage equal to the percentage increase in the CPI for the Las Vegas metro area. Such allocations shall be prorated for any period less than a full fiscal year.  The aggregate allocations for news and editorial expenses shall constitute Agency Expense.  On the first day of each month following the Effective Date, Review Journal shall pay to Sun an amount equal to one-twelfth (1/12th) of the Sun's annual allocation for news and editorial expenses as herein provided.

A.2.  Pursuant to Sections 4.3 and 4.4 of this Agreement, the reading content of the newspapers shall be in accordance with the following formulas:

(a) For Monday through Friday editions, the number of pages of the Sun and the number of pages of the Review-Journal shall be determined by the ratio of the number of inches of advertising to be printed in each newspaper and the size of the newshole in each newspaper shall be determined by the same ratio, provided that in no event

SUN_00002028

shall the average newshole of the Sun in any month be less than eighty-five percent (85%) of the newshole of the Review-Journal in such month.

(b) For the jointly published Sunday edition, Sun shall be entitled to a separate section of three (3) open pages (one cover page, one editorial page and one op. ed. page), plus four hundred fifty (450) column inches, provided, that the Review-Journal may add additional pages to the Sun section comprised of news and advertising, as may be required by composition or printing requirements. The Review-Journal shall attempt to place the Sun section within the first four (4) sections of the Sunday edition. The Review Journal shall determine the number of pages for a comic section for jointly published Sunday editions which shall consist of strips and features selected equally by the Review-Journal and the Sun.

(c) For jointly published Saturday and holiday editions, the Sun shall be entitled to one editorial or op. ed. page and one comic page.

A.3. Pursuant to Section 5.1.4 of this Agreement, the Review-Journal shall establish for each fiscal year after the Effective Date a budget for promotional activities of the Review-Journal and the Sun and at least forty percent (40%) of each total budget shall be allocated to the Sun.

A.4. Edition times for Monday through Friday issues of the Review-Journal and the Sun and for jointly published Sunday,

-2-

SUN_00002029

Saturday and holiday editions shall be established by the Review-Journal in accordance with normal industry standards.

A.5. If the Review-Journal determines that it is feasible to publish an "extra" edition, such edition shall be a jointly published edition, but the content of any "extra" edition shall be determined solely by the Review-Journal.

SUN_00002030

# APPENDIX B

B.1.  Except as otherwise expressly provided for in this Agreement, the term "Agency Expense" shall mean and include all costs and expenses of the performance of the Review-Journal's obligations under this Agreement, including but not limited to:

B.1.1.  The amounts allocated to Review-Journal and Sun for news and editorial expenses and for promotional expenses as set forth in Appendix A.

B.1.2.  Costs and expenses incurred by Review-Journal, with respect to the newspapers, supplements and Showbiz Magazine, for composition, printing, and distributing; news content of Showbiz Magazine; solicitation and sale of advertising; circulation sales expenses; collection of circulation and advertising accounts receivable, including a reasonable allowance for doubtful receivables and write-offs of receivables deemed uncollectible.

B.1.3.  Compensation of Review-Journal's non-news and non-editorial employees, including, without limitation, salaries, commissions, payroll taxes, the cost of group insurance, retirement benefits, workers' compensation coverage, and other benefits for such employees as may be customary in the newspaper industry from time to time.

B.1.4.  Accrued vacation or severance pay for Review-Journal's non-news and non-editorial employees.



Agency costs s/h/ include
income taxes
RJ liable ins-

B.1.5.  Costs for supplies, postage, private couriers, freight, Sunday comics and supplements, film, photo paper and chemicals, ink, newsprint, plates, cuts and mats and contract trucking, and similar costs for all Review-Journal newspaper departments, other than news and editorial.

B.1.6.  Expenses for travel, auto allowances, mileage reimbursement, employee relations, recruiting, and attendance at seminars and conventions for Review-Journal's non-news and non-editorial employees.

B.1.7.  Sales and use taxes on equipment and personal property purchased for use by Review-Journal or otherwise applied to Agency operations under this Agreement to the extent that such taxes are not capitalized for purposes of depreciation or amortization.

B.1.8.  Taxes, license or permit fees paid by Review-Journal with respect to or resulting from the conduct of business under this Agreement or with respect to property used by Review-Journal in the operations under this Agreement, except federal, state or local taxes, if any, measured by net income.

B.1.9.  The cost of membership for Review-Journal and Sun and their non-news and non-editorial employees in the Better Business Bureau, Las Vegas Chamber of Commerce, and other business-oriented

-2-

memberships which shall be determined by Review-Journal to be in the best interests of the Agency.

B.1.10.  The cost of Review-Journal and Sun membership in the Newspaper Advertising Bureau, American Newspaper Publishers Association, and other similar newspaper organizations.

B.1.11.  The cost of public liability insurance, insurance against interruption or suspension of publication of the newspapers, carrier insurance, and libel, invasion of privacy and related insurance covering advertising printed in the newspapers. Insurance costs relating to the news or editorial activities of the Review-Journal or the Sun shall not be considered Agency Expense and such costs shall be borne separately by the parties; provided, that each party shall attempt to add the other as an additional named insured under such insurance, but Review-Journal may procure libel, invasion of privacy and related insurance to cover any otherwise inadequately insured exposure it may have as a republisher of Sun news, editorial or advertising copy, and the cost of such additional insurance shall be an Agency Expense.

B.1.12.  The cost of fire and casualty insurance on buildings, equipment, and other property utilized by Review-Journal in the performance of the Agreement.

-3-

B.1.13.  The cost of all utilities related to the Review-Journal's performance of the Agreement.

B.1.14.  Costs and expenses incurred in connection with hazardous waste materials.

B.1.15.  Costs and expenses incurred by Review-Journal in obtaining legal and other professional services which it deems necessary in performing its obligations under this Agreement, including but not limited to the costs and fees related to any defense against third party claims, charges, complaints and related matters asserted against the Review-Journal related to the Agreement or Review-Journal's performance of the Agreement; provided, that such costs and fees related to news and editorial liabilities as defined in Section 8.1.2 shall not be Agency Expense, except insofar as such liabilities are asserted against Review-Journal solely due to its republication of Sun news, editorial or feature material or advertising copy.

B.1.16.  A monthly charge of Five Hundred Fifty Thousand Dollars ($550,000) for the rental value of all Review-Journal real property, plant and equipment (including the value of Sun office space provided by Review-Journal under Section 5.4 of the Agreement), except that devoted to non-agency activities such as the Review-Journal's news and editorial operations. The rental charge would be adjusted each five (5)

-4-

SUN_00002034

years on the basis of the change in the CPI for the Las Vegas, Nevada, market.

B.1.17.   A monthly charge equal to one and one-half percent (1-1/2%) of the cost of all equipment acquired, expansion or remodeling of buildings, or other capital expenditures, in connection with Agency activities, subsequent to the date of the Agreement. The monthly charge would be subject to adjustment at any time on the basis of increases in the prime interest rate at First Interstate Bank, Las Vegas, Nevada.   The Review-Journal shall have sole discretion regarding the purchase of equipment or other necessary capital expenditures for the performance of the Agreement.

B.1.18.   A monthly charge for general management services equal to three and one-half percent (3-1/2%) of Agency Revenues.

B.2.   All costs and expenses in connection with the news content, composition, production, distribution and advertising sales in connection with Showbiz Magazine shall be included in Agency Expense for the period Showbiz Magazine is governed by the terms of this Agreement, pursuant to Section 4.5.

B.3.   Changes or additions in the Sun's newsroom equipment which may be required after the Effective Date to interface with Review-Journal production facilities shall be purchased or paid for by Review-Journal and a monthly charge equal to one and one-half percent (1-1/2%) of the cost thereof shall be

-5-

SUN_00002035

included in Agency Expense.  This monthly charge would be subject to adjustment at any time on the basis of increases in the prime interest rate at First Interstate Bank, Las Vegas, Nevada.

SUN_00002036

# APPENDIX C

## AGENCY REVENUES

C.1.  Except as otherwise expressly provided in this Agreement the term "Agency Revenues" shall mean and include:

C.1.1.  All advertising and circulation revenues of the newspapers, subject to the provisions of Section 7.1 of this Agreement with respect to accounts receivable outstanding on the Effective Date.

C.1.2.  All revenues from sales incidental to the publication of the newspapers or involving either the facilities used to produce the newspapers or personnel whose compensation is included in Agency Expense, such as sales of commercial printing, waste paper, press plates, and other production materials.

# APPENDIX D

Operating profit under the Agreement shall mean the excess
of Agency Revenues over Agency Expense, and shall be distributed
as follows:

> For each fiscal year during the term of the
> Agreement the operating profit shall be distributed
> ninety percent (90%) to the Review-Journal and ten
> percent (10%) to the Sun, with payment to be made to
> the Sun pursuant to the provisions of Section 6.4 of
> the Agreement, provided, that for the first fiscal
> year the Sun shall be guaranteed a minimum operating
> profit distribution of Three Million Dollars
> ($3,000,000).

SUN_00002038

## APPENDIX D

Operating profit under the Agreement shall mean the excess of Agency Revenues over Agency Expense, and shall be distributed as follows:

For each fiscal year during the term of the Agreement the operating profit shall be distributed ninety percent (90%) to the Review-Journal and ten percent (10%) to the Sun, with payment to be made to the Sun pursuant to the provisions of Section 6.4 of the Agreement.

# EXHIBIT 4

Report of the Assistant Attorney General in Charge of the Antitrust Division,
Public File No. 44-03-13, In the Matter of: Application by the Las Vegas Sun, Inc.
and Donrey of Nevada, Inc. for Approval of a Joint Newspaper Operating
Arrangement Pursuant to the Newspaper Preservation Act, 15. U.S.C. §§ 1801-
1804 (SUN_00024386-453)

# EXHIBIT 4

BEFORE THE
ATTORNEY GENERAL OF THE UNITED STATES

In the Matter of:                          )
Application By The Las Vegas Sun,)
Inc. and Donrey of Nevada, Inc.  )
For Approval Of A Joint News-    )          Public File No.:
paper Operating Arrangement      )             44-03-13
Pursuant To The Newspaper        )
Preservation Act, 15 U.S.C.      )
§§ 1801-1804                     )

REPORT OF THE ASSISTANT ATTORNEY GENERAL
IN CHARGE OF THE ANTITRUST DIVISION

SUN_00024386

PUBLIC REPORT WITH REDACTIONS

Redactions appear on:   pages 6, 27, and 42; tables 10 and 11; figures 10 and 11.

SUN_00024387

## I. EXECUTIVE SUMMARY

### A. Introduction

On August 8, 1989, the Las Vegas Sun, Inc. and Donrey of Nevada, Inc., publishers of the two daily newspapers in Las Vegas, Nevada, filed an application for approval of a joint newspaper operating arrangement ("JOA") between the Las Vegas Sun and the Las Vegas Review-Journal pursuant to the Newspaper Preservation Act of 1970, ("Act") 15 U.S.C. §§ 1801-1804. Under the proposed JOA, the two newspapers would maintain their separate news operations and editorial voices, but would combine their resources to publish, distribute and market the newspapers.

The Act provides a limited antitrust exemption for a JOA that receives the prior written approval of the Attorney General. A prerequisite for obtaining the Attorney General's approval is proof that one of the newspapers is a "failing newspaper," defined as "a newspaper publication which, regardless of ownership or affiliations, is in probable danger of financial failure." 15 U.S.C. § 1803(a). In addition, the Attorney General must determine that approval "would effectuate the policy and purpose" of the Act. 15 U.S.C. § 1803(b). Congress declared the purpose of the Act to be "maintaining a newspaper press editorially and reportorially independent and competitive. . . ." 15 U.S.C. § 1801.

-2-

Under Department regulations, 28 C.F.R. § 48, the Assistant
Attorney General in charge of the Antitrust Division is required
to submit a report to the Attorney General recommending that the
proposed arrangement be approved, disapproved, or that a hearing
be held before an administrative law judge to resolve material
issues of fact.[1]/

In the attached report, the Antitrust Division has
concluded that the Las Vegas Sun is a "failing newspaper" within
the meaning of the Act, and that the purpose of the Act would be
effectuated by approving the JOA. Accordingly, the Antitrust
Division recommends that the applicants' proposed JOA be
approved without a hearing.

B.   The Newspaper Preservation Act

The statutory language, its legislative history and the
circuit court decisions in Committee for an Independent P-I v.
The Hearst Corp., 704 F.2d 467 (9th Cir. 1983) and Michigan
Citizens For An Independent Press v. Attorney General of the
United States, 58 U.S.L.W. 3320 (U.S. Nov. 13, 1989), affirming,
868 F.2d 1285 (D.C. Cir. 1989), make it clear that the Act

---

[1]/  This summary of the report is not intended to substitute for
or supplant the Antitrust Division's report; it, as well as the
report, will be placed in the public docket maintained by the
Justice Management Division.

-3-

SUN_00024389

SAM1

created a limited antitrust exemption in order to prevent the
closure of competitive papers and to preserve independent
editorial voices in a community.  As with other antitrust
exemptions, the Act's terms must be narrowly construed.  Hearst,
704 F.2d at 477-78.  New JOAs that would otherwise violate the
antitrust laws may lawfully be formed only if (1) at least one
of the applicants is a "failing newspaper," and (2) approval of
the JOA "would effectuate the policy and purpose of {the Act}."
15 U.S.C. § 1803(b).  The test to determine whether a paper is
"failing" is whether it is "suffering losses which more than
likely cannot be reversed."  Hearst, supra, 704 F.2d at 478;
Michigan Citizens, supra, 868 F.2d at 1292.  This test requires
more than proof of the existence of losses.  The applicant must
also demonstrate that it is unlikely that the financial fortunes
of the failing newspaper could be reversed by reasonable
alternatives to the JOA.  Finally, the JOA must preserve the
reporting and editorial independence of the two newspapers.

C.  Discussion

The Las Vegas Sun is a daily newspaper, published six
mornings per week with one edition on Sunday.  Its current
average paid circulation is about 52,000 on weekdays and
Saturday and about 56,000 on Sunday.  The applicants contend

-4-

SUN_00024390

that the <u>Las Vegas Sun</u> is a failing newspaper. It has been
owned by the Greenspun family since it began publication in 1950.

The <u>Las Vegas Review-Journal</u> is a chain-owned daily
newspaper, published six mornings and afternoons per week with
one edition on Sunday. Its current average paid circulation is
130,000 on weekdays and Saturday and 153,000 on Sunday. The
applicants do not contend that the <u>Las Vegas Review-Journal</u> is a
failing newspaper.

The <u>Las Vegas Sun's</u> financial records support the
applicants' assertion that it has lost money for almost a
decade. Since 1981, it has suffered cumulative pre-tax losses
of approximately $13 million. These losses are attributable to
the fact that both the circulation and advertising of the <u>Las</u>
<u>Vegas Sun</u> have declined substantially in recent years. The
daily average paid circulation of the <u>Las Vegas Sun</u> has shrunk
from approximately 58,000 in 1982 to about 52,000 in 1989, while
its advertising linage has declined from about 2 million column
inches in 1984 to 1.3 million column inches in 1988.

In contrast, the <u>Las Vegas Review-Journal's</u> daily average
paid circulation grew from about 93,000 in 1982 to over 130,000
in 1989. Its advertising linage increased from about 2.9
million column inches in 1984 to nearly 3.1 million column
inches in 1988. The <u>Las Vegas Review-Journal</u> holds a commanding

-5-

SUN_00024391

Case 2:19-cv-01667-ART-MDC   Document 1028   Filed 02/23/26   Page 62 of 176

lead in the Las Vegas daily newspaper advertising market with
about      million in total advertising revenues compared to the
Las Vegas Sun's $15 million.  It is particularly significant
that over the 1984-1988 period, a period of rapid population
growth in the Las Vegas area, the Las Vegas Sun's advertising
revenues have declined by 10 percent while the Las Vegas
Review-Journal's revenues have increased by about      percent.

There is no indication that the Las Vegas Sun is in a
position to reverse the losses of the past eight years.  It
incurred pre-tax losses of approximately $3.6 million in 1988
and about $2.1 million for the nine months ending July 31,
1989.  Projected required capital expenditures, some of which
have been postponed and at least some of which will likely have
to be made in 1990 and 1991, range from $17-$19 million.  If the
Las Vegas Sun does not make these capital expenditures, it will
probably be at an increasing competitive disadvantage in its
battle with the Las Vegas Review-Journal.  Raising revenue by
increasing advertising rates that are already higher than the
Las Vegas Review-Journal's (on an average rate per inch per
reader basis) is not a realistic possibility.

The Antitrust Division has concluded that the losses of the
Las Vegas Sun were genuine.  They were not artifically inflated
by dealings with affiliated parties or by unreasonably high

-6-

expenses. The management practices, on balance, have been
reasonable considering the particular financial circumstances of
the Las Vegas Sun and the nature of the Las Vegas newspaper
market. The management has made numerous efforts to improve the
operation of the Las Vegas Sun and to enhance its acceptance by
both the community and the advertisers. Those efforts,
unfortunately, have not succeeded.

The Las Vegas Sun probably would not have survived the last
five years without the substantial cash subsidies provided
directly or indirectly by its owners, members of the Greenspun
family, who have provided or guaranteed loans of nearly $12
million since 1982. The Las Vegas Sun's
near-to-intermediate-term prospects indicate a continued cash
shortfall. Its long-term prospects are for increasingly larger
losses.

Under the JOA, the Las Vegas Sun will receive as its annual
reporting and editorial budget the higher of $2.25 million (with
an annual CPI adjustment) or 65 percent of the editorial and
news budget of the Las Vegas Review-Journal. This will provide
the Las Vegas Sun with at least as much, and possibly
considerably more, money than it is currently devoting to its
reporting and editorial functions. This funding and other
guarantees to the Las Vegas Sun in the JOA provide assurance
that the JOA will enable the Las Vegas Sun to continue providing

-7-

Case 2:19-cv-01667-ART-MDC   Document 1026   Filed 02/23/26   Page 64 of 176

the Las Vegas community with a second independent editorial voice, consistent with the Congressional purpose that engendered the Act.

The Antitrust Division has concluded that the Las Vegas Sun's losses show no substantial prospect of being reversed and that the Las Vegas Sun is a failing newspaper, i.e., it is in probable danger of financial failure. The Antitrust Division has also concluded that the JOA provides sufficient operating guarantees and funds to the Las Vegas Sun to enable it to continue to provide an independent reportorial and editorial voice in the Las Vegas community. Since there are no unresolved factual issues that would affect these conclusions or that would otherwise warrant a hearing, the JOA application should be approved.

-8-

SUN_00024394

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . .    1

II.   THE NEWSPAPER PRESERVATION ACT . . . . . . . . . . .    2

      A.   Statutory Provisions  . . . . . . . . . . . . .    2

      B.   The Failing Newspaper Test  . . . . . . . . . .    5

      C.   The JOA Must Serve the Purposes of the Act  . .   13

III.  THE PROPOSED JOINT OPERATING ARRANGEMENT . . . . . .   14

      A.   Application Procedures  . . . . . . . . . . . .   14

      B.   The Provisions of the JOA . . . . . . . . . . .   16

IV.   THE FINANCIAL CONDITION OF THE LAS VEGAS SUN . . . .   20

      A.   The Las Vegas Newspaper Market  . . . . . . . .   20

      B.   Circulation Statistics and Trends . . . . . . .   23

      C.   Advertising Statistics and Trends . . . . . . .   26

      D.   Historical Financial Performance
           of The Las Vegas Sun . . . . . . . . . . . . .    28

V.    ANALYSIS AND RECOMMENDATION  . . . . . . . . . . . .   39

      A.   The Las Vegas Sun Is A Failing Newspaper  . . .   39

      B.   Approval of the JOA Would Effectuate
           The Policy and Purpose of the Act  . . . . . .    42

      C.   There Is No Need for a Hearing In This Case . .   44

      D.   Recommendation  . . . . . . . . . . . . . . . .   45

APPENDIX A – TABLES 1-11 AND FIGURES 1, 2, 6, 10 AND 11

APPENDIX B – LAS VEGAS JOA CITIZEN COMMENTS

APPENDIX C – DEPARTMENT REGULATIONS

SUN_00024395

BEFORE THE
ATTORNEY GENERAL OF THE UNITED STATES

```
                                    )
In the Matter of:                   )
Application By The Las Vegas Sun,)
Inc. and Donrey of Nevada, Inc.     )
For Approval Of A Joint News-       )          Public File No.:
paper Operating Arrangement         )            44-03-13
Pursuant To The Newspaper           )
Preservation Act, 15 U.S.C.         )
§§ 1801-1804                        )
                                    )
```

### REPORT OF THE ASSISTANT ATTORNEY GENERAL
### IN CHARGE OF THE ANTITRUST DIVISION

I.   INTRODUCTION

This application for approval of a joint operating
arrangement ("JOA") under the Newspaper Preservation Act,
15 U.S.C. §§ 1801-1804, ("Act") between the Las Vegas Sun and
the Las Vegas Review-Journal involves the two daily newspapers
in Las Vegas, Nevada.

The Act authorizes the Attorney General to approve a new
JOA involving two newspapers if at least one of the newspaper
applicants is a "failing newspaper," and approval of the JOA
"would effectuate the policy and purpose of this Act."

15 U.S.C. § 1803(b).   A "failing newspaper" is defined as one
that "regardless of its ownership or affiliations, is in
probable danger of financial failure."   15 U.S.C. § 1802(5).
The purpose of the Act was to maintain "a newspaper press
editorially and reportorially independent and competitive."
15 U.S.C. § 1801.

For the reasons set forth below, the Antitrust Division
finds that the Las Vegas Sun is a failing newspaper, and that
the JOA will preserve the reporting and editorial independence
of the two newspapers.   Consequently, the Antitrust Division
recommends that the parties' JOA application be approved.

II.   THE NEWSPAPER PRESERVATION ACT

A.   Statutory Provisions

The Newspaper Preservation Act, 15 U.S.C. §§ 1801-1804, was
enacted to overturn, in part, Citizen Publishing Co. v. United
States, 394 U.S. 131 (1969), which held as unlawful under the
Sherman Act certain elements (including price fixing and profit
sharing) of a joint newspaper operating arrangement between two
daily newspapers in Tucson, Arizona.   The Act provides a limited
exemption from the antitrust laws for joint newspaper operating

-2-

SUN_00024397

arrangements[1]/ that receive prior written approval of the Attorney General.[2]/

Before granting approval of a proposed joint newspaper operating arrangement, the Attorney General must make two findings:  (1) that at least one of the participating newspapers is a "failing newspaper," and (2) that approval of the arrangement would "effectuate the policy and purpose" of the Act.[3]/

The Act defines a "failing newspaper" as "a newspaper publication which, regardless of its ownership or affiliations, is in probable danger of financial failure."  15 U.S.C.

---

[1]/  "The term joint newspaper operating arrangement means any contract, agreement, joint venture (whether or not incorporated), or other arrangement entered into by two or more newspaper owners for the publication of two or more newspaper publications, pursuant to which joint or common production facilities are established or operated and joint or united action is taken or agreed to be taken with respect to any one or more of the following: printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; establishment of circulation rates and revenue distribution:  Provided, that there is no merger, combination, or amalgamation of editorial or reportorial staffs, and that editorial policies be independently determined."  15 U.S.C. § 1802(2).

[2]/  The Act also provided retroactive antitrust exemption, without review, to joint newspaper arrangements existing at the time of enactment that satisfied certain statutory criteria.  15 U.S.C. § 1803(a).

[3]/  See 15 U.S.C. § 1803(b).

-3-

§ 1802(5).  The "policy and purpose of the Act" are stated in 15

U.S.C. § 1801:

> In the public interest of maintaining a newspaper
> press editorially and reportorially independent and
> competitive in all parts of the United States, it is hereby
> declared to be the public policy of the United States to
> preserve the publication of newspapers in any city,
> community, or metropolitan area where a joint operating
> arrangement has been heretofore entered into because of
> economic distress or is hereafter effected in accordance
> with the provisions of this chapter.4/

---

4/  To implement the Act, the Department published regulations
on January 2, 1974, now codified at 28 C.F.R. § 48.1 et seq.
These are summarized in Appendix C of this report.

The Department of Justice has received eight JOA
applications, including this one, since the Act was passed and
has completed action on five.  Applications for joint operating
arrangements for newspapers in Anchorage and Chattanooga were
approved without a hearing.  Applications involving newspapers
in Cincinnati, Seattle, and Detroit went to a hearing before an
administrative law judge.  After participating in those
hearings, the Antitrust Division recommended that the Cincinnati
application be approved and that the Seattle and Detroit
applications be disapproved.  The Attorney General approved the
Cincinnati application and, despite the Antitrust Division's
contrary recommendation, also approved the Seattle and Detroit
applications.

Attorney General William French Smith's decision to approve
the arrangement in Seattle ultimately was affirmed by the Ninth
Circuit in Hearst, 704 F.2d 467 (9th Cir.).  Attorney General
Edwin Meese III's decision to approve the application for the
Detroit newspapers was affirmed by an equally divided Supreme
Court, Michigan Citizens, 58 U.S.L.W. 3320 (U.S. Nov. 13, 1989),
affirming, 868 F.2d 1285 (D.C. Cir. 1989).  On June 9, 1989, the
Antitrust Division recommended that the Attorney General approve
without a hearing the application by the York, Pennsylvania
newspapers.  This application is now pending before the Attorney
General.  The Antitrust Division's report concerning the
Manteca, California newspapers is not yet before the Attorney
General.

-4-

SUN_00024399

## B.   The Failing Newspaper Test

Applicants for two-newspaper joint operating arrangements
bear the burden of proving that at least one of the parties is
a "failing newspaper" within the meaning of the Act.[5]
Committee for an Independent P-I v. Hearst Corp., 704 F.2d 467,
479 (9th Cir.), rev'g Committee for an Independent P-I
v. William French Smith, 549 F. Supp. 985 (W.D. Wash. 1982),
cert. denied, 464 U.S. 892 (1983); Michigan Citizens For An
Independent Press v. Attorney General of the United States, 58
U.S.L.W. 3320 (U.S. Nov. 13, 1989), affirming, 868 F.2d 1285,
1290 (D.C. Cir. 1989).

The language of the statute does not provide clear guidance
because it defines the term "failing newspaper" in a
tautological manner, i.e., "a newspaper publication which,
regardless of its ownership or affiliations is in probable
danger of financial failure." 15 U.S.C. § 1802(a). The
legislative history indicates, however, that this test was
intended to be "far more stringent" than the test the Act

---

[5]   As with all exemptions to the antitrust laws, exemptions for
joint operating arrangements under the Act must be narrowly
construed, Hearst, 704 F.2d at 477-78. This well-established
principle, however, may not be used by a reviewing court to
overturn a reasonable application of the Act to a particular set
of facts. Michigan Citizens, 868 F.2d at 1292-93.

-5-

SUN_00024400

created for arrangements already existing when the law was passed, i.e., that not more than one of the papers "was likely to remain or become a financially sound publication." 15 U.S.C. § 1803(a). See, 116 Cong. Rec. 23146 (statement of Rep. Kastenmeier); H. Rep. No. 1193, 91st Cong., 2d Sess. at 10 (1970) (hereinafter "H. Rep.").

In addition, the legislative history of the Act indicates that the "probable danger of financial failure" test was intended to be less stringent than the "failing company" standard under the antitrust laws applied by the Supreme Court in the Citizen Publishing case. In Citizen Publishing, the Supreme Court described a "failing company" as one with resources "so depleted and prospects for rehabilitation so remote" that it faced the "grave probability of a business failure." 394 U.S. at 930. The Court also held that before it would accept an anticompetitive acquisition of a "failing company," it would have to find that there were no other prospective purchasers and that the prospects of successful reorganization in bankruptcy were dim. Id. at 931. Congress rejected this antitrust failing company standard for the Newspaper Preservation Act because it believed that allowing a newspaper's financial condition to deteriorate to that extent would put it in a position "virtually beyond salvage" and would

SUN_00024401

render it of little value as an acquisition or as a JOA
partner.  See, e.g., 116 Cong. Rec. 23168 (statement of Rep.
Annunzio).

The "probable danger of financial failure" standard
ultimately adopted and applicable in this proceeding thus falls
somewhere between the failing company standard and the "not
likely to remain or become financially sound" definition used
for existing joint newspaper operating arrangements.  Hearst,
704 F.2d at 474; see, Michigan Citizens, 868 F.2d at 1293-94.
Restating the compromise in policy terms, Congress did not want
to encourage an easy or premature resort to JOAs, preferring
real business competition to JOAs; but on the other hand, being
anxious to preserve at least two separate editorial voices in a
community, Congress was unwilling to postpone the JOA solution
until the weaker newspaper reached a point of imminent
failure.  The question is precisely where on the spectrum of
possible failure Congress intended to draw the line when it
required "probable danger of financial failure."  Although the
line is a difficult one to draw or to articulate, the statutory
language, policy and legislative history underscore several
points.

First, and most obvious, Congress was concerned ultimately
about failure and not about doubtful prospects, financial

-7-

SUN_00024402

instability or a mere history of losses that might still be reversed. It was the threatened loss of a second voice that persuaded Congress to create the exemption. "In order to maintain editorial diversity, it is beyond question that the purpose of the Act is to prevent the closure of the ailing newspaper." Hearst, 704 F.2d at 480 (citing numerous remarks of Congressmen) (emphasis in original). Congress recognized that commercial competition between newspapers should be sacrificed only if "demonstrably essential to prevent a newspaper failure and to promote editorial and reportorial competition." 116 Cong. Rec. 23148 (statement of Rep. McCulloch).

Second, the explicit statutory language requires a "probability" of failure. How great a probability or likelihood the statute does not say. Nevertheless, there is a basis for believing that the legislators envisaged a substantial probability and not some abstract betting calculus that makes failure slightly more likely than success. Congress did not require that a newspaper be virtually doomed in order to qualify, for at that point its chance to find a JOA partner would be markedly diminished or perhaps non-existent. But the debates repeatedly offered examples of appropriate JOA cases which involved newspapers quite unlikely to survive. 116 Cong.

-8-

SUN_00024403

Rec. 1783 (statement of Sen. Hruska); 1787 (statement of Sen. Fong); 23146 (statement of Rep. Kastenmeier).

Third, in the Antitrust Division's view, Congress' test requires us to consider not only the likelihood of failure, but also its nearness in time. The underlying policies of the Act suggest that Congress wanted newspapers to compete independently until a threatened failure was close enough to make it dangerous to experiment further. The process of approval by the Attorney General under the Newspaper Preservation Act was intended "to act as a brake upon other newspapers which might otherwise prematurely turn to joint operating arrangements, without testing other means of maintaining full commercial and editorial competition." 116 Cong. Rec. 20006 (statement of Sen. Hruska). In other words, where there is still time for a newspaper to rescue itself through better management, reduced expenses or development of a superior product, Congress did not want to sacrifice the business competition that two independent newspapers normally provide.

Proponents of two-newspaper joint operating arrangements must show more than the fact that one paper has very serious financial problems. They must also demonstrate that the financial problems are not susceptible to resolution by

-9-

SUN_00024404

alternatives, i.e., reasonable management practices, short of
entry into a JOA that eliminates commercial competition between
the parties.  The purpose of subjecting the losses of the
alleged failing newspaper to scrutiny from a reasonable
management practice perspective is to prevent newspapers from
"allowing or encouraging financial difficulties in the hope of
reaping long-term financial gains through a JOA."  Hearst, 704
F.2d at 478.6/  This affirmative burden of JOA proponents is
grounded in the Act's "probable danger of financial failure"
standard.  It is a way of asking "is the newspaper suffering
losses which more than likely cannot be reversed?"  Hearst, 704
F.2d at 478; see Michigan Citizens, 868 F.2d at 1292.7   In

---

6/  More pointedly, the Hearst court stated:  "A JOA applicant
should not be allowed to engage in poor business practices or
maintain inept personnel in anticipation that it may later
qualify for an antitrust exemption in the future."  Hearst, 704
F.2d at 478.

7/  Implicit in this test is the requirement that alternative
forms of relief for the failing paper be examined before a JOA
is approved.  Hearst, 704 F.2d at 478; Michigan Citizens, 868
F.2d at 1292.  The Act's legislative history reflects Congress'
intent that the "failing newspaper" standard be interpreted with
reference to the Bank Merger Act, 12 U.S.C. § 1828(c), and the
Supreme Court's interpretation of it in United States v. Third
National Bank, 390 U.S. 171 (1967).  See, e.g., S. Rep. at 2;
116 Rep. Rec. 23146 (statement of Rep. Kastenmeier).

The Court in Third National Bank required that proponents
"reliably establish the unavailability of alternative solutions"
to anticompetitive bank mergers.  390 U.S. at 190.  Among the
alternatives to be considered are the feasibility of curative
measures short of merger and whether there are healthy aspects
of the business that minimize the danger of failure in the
foreseeable future.  390 U.S. at 187.  The merger should not be
approved where "injury to the public interest flowing from the
loss of competition could be avoided and the convenience and
needs of the community benefited in ways short of merger but
within the competence of reasonably able businessmen."  390 U.S.
at 189.  To that end, the Court held:
(Footnote continued on next page.)
-10-

SUN_00024405

particular, where poor management practices have contributed to a newspaper's failing condition, it is relevant to examine management practices, not only as a cause of the newspaper's decline, but also as offering, by way of prospects for managerial improvement, a solution to the newspaper's difficulties short of a JOA that eliminates commercial competition. Hearst, 704 F.2d at 478.

In applying the "probable failure" test, Congress expected that an objective standard of rational business behavior would be utilized. The statute would not be satisfied, for example,

(Footnote continued from previous page.)

> [W]e think it was incumbent upon those seeking to merge in this case to demonstrate that they made reasonable efforts to solve the management dilemma of the ["floundering" bank] short of merger with a major competitor but failed in these attempts, or that any such efforts would have been unlikely to succeed.

Third National Bank, 390 U.S. at 189.

-11-

SUN_00024406

by a willful or unsound decision to close a newspaper; rather, it is evidence of losses, cash flow, advertising and circulation trends, demonstrated capital needs and similar factual indicia that are required to meet the statutory test. Another form of "hard" evidence is actual past efforts to improve the failing newspaper's prospects. Where such efforts have been serious and extensive, but have still proved unsuccessful, it may be easier to conclude with confidence that all reasonable alternatives to a JOA have been exhausted.

One final observation may be helpful in describing the legal perspective from which this report is written. As a factual matter, the filing of JOA itself is an event that may well worsen the weaker paper's condition, increasing the likelihood that it will ultimately fail if the JOA is later denied. By filing a JOA, the newspaper may signal to reporters, advertisers and prospective creditors that denial of the JOA will be fatal and persuade them to act on this premise. Thus, the claim of probable failure (absent the JOA) may be converted into a reality by the very act of filing the JOA itself. Because Congress did not intend to allow JOAs that could reasonably have been avoided, the Antitrust Division's analysis gives no weight to any adverse effect that may ensue from the JOA filing itself.

-12-

SUN_00024407

In other words, a major question the Antitrust Division
must seek to answer is whether "probable failure" could have
been avoided by reasonable measures available to a private
business concern <u>before</u> the JOA application was filed.
Although post-application facts may be relevant in applying the
statute, any harm caused by the JOA application itself is not
among those relevant facts.  In this case, the JOA application
appears to pass the statutory test without giving weight to any
harm caused by the filing itself. [8]/

    C.   <u>The JOA Must Serve the Purposes of the Act</u>

In addition to determining that a proposed JOA involves a
failing newspaper, the Attorney General must determine that the
JOA would preserve the reporting and editorial independence of
the failing newspaper.  15 U.S.C. §§ 1803(b), 1801.  This
necessitates an examination of financial and operational
provisions of the JOA to determine whether, as a practical

_____

[8]/  This brief discussion omits a number of legal issues that
can arise under the statute but that are not presented in this
case.  There is here no issue that requires a parsing of the
"ownership or affiliations clause" (<u>see</u>, <u>Hearst</u>, 704 F.2d at
479-80); and the special problem of a business strategy arguably
shaped by the lure of a JOA is not apparent here, as the
Antitrust Division believed was the case in Detroit.  <u>See</u>,
<u>Michigan Citizens</u>, <u>supra</u>.  Rather, this case presents the
comparatively straightforward problem of applying the "probable
danger" standard to a particular set of facts and making the
forecast of future events inherent in that standard.

-13-

SUN_00024408

matter, the failing newspaper will remain capable of
maintaining independent reporting and editorial activities
after the JOA goes into effect.

III.   THE PROPOSED JOINT OPERATING ARRANGEMENT

A.   Application Procedures

On August 8, 1989, the Las Vegas Sun, Inc. ("LVS"), the
company that publishes the Las Vegas Sun, and Donrey of Nevada,
Inc. ("Donrey"), the company that publishes the Las Vegas
Review-Journal, filed with the Attorney General an application
for approval of a proposed JOA under the Newspaper Preservation
Act.$\underline{9/}$  As authorized by 28 C.F.R. § 48.7(a), the Antitrust
Division, on August 18, 1989, served requests for additional
information and documents on each applicant, including a
request for additional financial data from the Las Vegas Sun.
In response to the Antitrust Division's request, the parties
submitted approximately 5,000 pages of documents and

---

$\underline{9/}$  The application included information about the applicants,
local and national trends in the newspaper business, the
demographics of the Las Vegas newspaper market, circulation and
advertising data for both the Las Vegas Sun and the Las Vegas
Review-Journal, and profit and loss statements for each
newspaper.

-14-

approximately 150 pages of answers to requests for
information.[10]/

During the course of its investigation, the Antitrust
Division interviewed persons familiar with the operation of
both newspapers and with the newspaper market in Las Vegas.
Those interviewed included current and former executives and
managerial personnel of the applicants and their parent
companies, advertisers in the two newspapers, and officials of
newspaper companies who were approached about purchasing
minority interests in the <u>Las Vegas Sun</u>.  Business consultants
that reviewed the <u>Las Vegas Sun</u> and prepared recommendations
for improvements in its operations were also interviewed.

Because of the complexities of this matter, the extent of
the document production, and the scope of the investigation, on
September 14, 1989, the Antitrust Division requested an

---

[10]/  Simultaneously with the filing of the application, Donrey
filed a request that certain documents and information be
withheld from public disclosure as confidential under 28 C.F.R.
§ 48.5(a).  On September 28, 1989, Donrey requested further
confidential treatment of information supplied to the Antitrust
Division in response to the Antitrust Division's request for
additional information and documents.  On October 12, 1989, LVS
requested that portions of the tax returns of SunAn Corporation
("SunAn"), the parent of LVS, not be disclosed to the public.
Those requests are pending before the Attorney General.  In view
of their pendency, the Antitrust Division is filing a redacted
version of this report in the public file.

-15-

SUN_00024410

extension of time for filing this report.[11/]  On September 25,
1989, the Attorney General issued an order extending the time
for filing the report to November 20, 1989.  Thereafter, the
Attorney General granted the Antitrust Division's request for a
further extension of time to file the report to December 4,
1989.

As of December 1, 1989, the Department had received 19
comments from persons interested in the JOA.  These are
summarized in Appendix B of this report.

B.   The Provisions of the JOA

The JOA provides that Donrey will be responsible for and
have ultimate decision-making authority with respect to
advertising and circulation rates, printing functions,
managerial services, and all other functions of both newspapers
except for news and editorial functions.  The Las Vegas
Review-Journal will publish a morning newspaper and drop its

_____

[11/]  Department of Justice regulations implementing the
Newspaper Preservation Act, described in Appendix C, provide a
30-day period for public comment after notice of the JOA
application has been printed in the Federal Register.  Also
within 30 days of publication of the notice, the Assistant
Attorney General in charge of the Antitrust Division must file
with the Attorney General a report and recommendation concerning
the proposed JOA.  Thereafter, interested persons have 30 days
to respond to the report or to reply to comments.  28 C.F.R.
§§ 48.7, 48.8.  The Attorney General may extend these time
periods for good cause.  28 C.F.R. § 48.9.  Notice of this
application was published in the Federal Register on August, 17,
1989.  54 Fed. Reg. 33984 (1989).

-16-

afternoon edition, and the Las Vegas Sun will publish an evening newspaper five days a week. There will be a joint edition published on Saturday, Sunday and holidays.

The Las Vegas Review-Journal's press and personnel will be used to print both newspapers, and its staff will coordinate advertising and circulation functions. An Agency will be set up as a new subsidiary of Donrey. The Las Vegas Review-Journal will become part of this new subsidiary for purposes of operating the two newspapers under the proposed JOA. The Las Vegas Sun will contribute no assets to the Agency, and will have no voice in the management of the Agency. Each newspaper will maintain its own news and editorial staffs, and each is responsible for licensing its own features. The Las Vegas Sun will furnish its news, editorial, and feature material to the Las Vegas Review-Journal directly.

The initial term of the JOA is fifty years, with automatic renewals for ten-year periods thereafter, unless either party notifies the other in writing at least two years prior to the end of the initial period or the end of a renewal period that it elects to terminate the JOA. The Las Vegas Sun will receive an editorial and reportorial budget of at least $2.25 million (adjusted annually to reflect changes in the CPI for the Las Vegas area) or 65 percent of the editorial and news budget of

-17-

the _Las Vegas Review-Journal_, whichever is higher.  Other
operating expenses of the Agency will include $550,000 per
month (adjusted to reflect CPI changes) for property rental;
1.5 percent per month of all capital expenditures made in
connection with Agency activities; 1.5 percent per month of all
expenditures for newsroom equipment for the _Las Vegas Sun_; and
a management fee equal to 3.5 percent of Agency revenues.
Operating profits are to be split between the _Las Vegas
Review-Journal_ and the _Las Vegas Sun_ on a 90-10 percentage
basis, 10 percent for the _Las Vegas Sun_.

     In addition to the financial provisions, several other
provisions of the JOA appear to be designed to protect the
editorial integrity and continuing viability of the _Las Vegas
Sun_.  The _Las Vegas Review-Journal_ may not revise the size,
format, or number of editions of the _Las Vegas Sun_ without the
latter's consent.  The _Las Vegas Review-Journal_ agrees to use
its "best efforts" to sell advertising space in the _Las Vegas
Sun_.  The _Las Vegas Sun_ is guaranteed at least 40 percent of
combined promotional expenditures for the two newspapers.  The
number of pages and the amount of space available for news and
editorial material will be determined by the ratio of
advertising inches in the two papers.  The space for news and

-18-

editorials in the <u>Las Vegas Sun</u> will not be less than 85
percent of that of the <u>Las Vegas Review-Journal</u>.

The Agency will not charge higher subscription or
single-copy rates for the <u>Las Vegas Sun</u> than it does for the
<u>Las Vegas Review-Journal</u>. It will not charge different
advertising rates except to the extent that they are "justified
by the then relative circulation of the <u>Las Vegas Sun</u> and the
<u>Las Vegas Review-Journal</u> and other factors considered relevant
in the industry." The Agency will, "to the extent economically
feasible . . . use its best efforts to substantially maintain
the historical area and extent of distribution of the <u>Las Vegas
Sun</u>."

The JOA may be terminated if either party is bankrupt, has
its assets assigned to a third party, or fails in its duty to
perform some aspect of the JOA; if the <u>Las Vegas Sun</u> is sold to
someone who is not acceptable to the <u>Las Vegas Review-Journal</u>
(heirs to the Greenspun family are exempted from this
provision); or if the Agency fails to post an operating profit
for any two consecutive years.<u>12</u>/

---

<u>12</u>/   The applicants have reserved the right to reconsider the
application if there are long delays in receiving approval of
the JOA from the Attorney General. In addition, the <u>Las Vegas
Review-Journal</u> reserved the right to withdraw the application if
it is not granted confidentiality concerning certain financial
information and documents.

-19-

SUN_00024414

Part of the compensation received by the Las Vegas
Review-Journal to enter a JOA with the Las Vegas Sun will be a
10 percent interest in Community Cable TV ("CCTV"), which the
Greenspun family also controls. The approximate value of this
10 percent interest is stated by the applicants to be $20
million. In addition, "at such time as the Las Vegas Sun . . .
has purchased all of the . . . stock of CCTV owned by third
parties," Donrey will have an option to buy 35 percent of that
stock on the same terms as the Las Vegas Sun acquired it.  If
the JOA is terminated less than three years after it is
approved, Donrey will be required to return the CCTV stock to
LVS.

IV. THE FINANCIAL CONDITION OF THE LAS VEGAS SUN

    A.   The Las Vegas Newspaper Market

Las Vegas currently has two daily newspapers, the Las Vegas
Sun and the Las Vegas Review-Journal. The dominant Las Vegas
Review-Journal began publication in 1909, and until 1950 was
the only daily newspaper in Las Vegas. Donrey purchased the
Las Vegas Review-Journal in 1949. Donrey is owned by Donrey,
Inc., which also owns approximately 60 daily and more than 60
nondaily newspapers. The Las Vegas Review-Journal was
originally an evening newspaper, but in 1963 it commenced its
morning edition and is now classified as an all-day newspaper.

-20-

SUN_00024415

The daily Las Vegas Review-Journal is printed in a broadsheet format of about 60 pages. Its non-advertising content includes national and international stories, largely from the AP wire; local news written by Las Vegas Review-Journal's reporters; nationally-syndicated columnists; locally-prepared features; and editorial pages. The newspaper also has separate sections for sports and classifieds. The newspaper carries local and national display advertising, classified advertising, and preprinted advertising inserts. Sections dedicated to specific types of advertising, such as "people" and "food", appear on specific days of the week. The Sunday Las Vegas Review-Journal, which usually exceeds 150 broadsheet pages, contains, in addition to the above-mentioned sections, entertainment and comics sections, and a TV guide.

The Las Vegas Sun was founded by Hank Greenspun and commenced publication as Las Vegas' second daily newspaper in 1950. Until his death on July 22, 1989, Hank Greenspun was the Las Vegas Sun's editor, and he and his wife Barbara were the joint publishers of the newspaper. LVS, which publishes the Las Vegas Sun, is a Nevada corporation wholly-owned by SunAn, also a Nevada corporation. The stock of SunAn is owned by members of the Greenspun family. The Greenspun family also has extensive real estate holdings in and around Las Vegas,

-21-

controlling ownership of weekly newspapers in Boulder City,
Henderson and Green Valley, Nevada, and controlling ownership
of CCTV, the principal cable television franchise in Las
Vegas.  The Las Vegas Sun historically has been a six-day
morning and Sunday paper.

The Las Vegas Sun is printed in a broadsheet format of
about 40 pages.  Its non-advertising content includes national
and international stories, largely from the UPI wire; local
news, which is heavily emphasized; nationally syndicated
columnists; and an editorial page.  Like the Las Vegas
Review-Journal, the Las Vegas Sun has a separate section for
sports.  The newspaper carries local and national display
advertising, classified advertising, and preprinted advertising
inserts.  Showbiz Magazine ("Showbiz") is included in the
Saturday edition.  The Sunday edition, which is usually about
70 broadsheet pages, also contains separate business and comic
sections.

Virtually all of the sales of the Las Vegas Review-Journal
and the Las Vegas Sun occur in Clark County, Nevada.  While USA
Today, the Los Angeles Times and The San Francisco Chronicle
have small circulations in the Las Vegas area, no newspaper is

-22-

a significant competitor to the Las Vegas Review-Journal and Las Vegas Sun in providing news to and about the Las Vegas area.

B. Circulation Statistics and Trends

A newspaper's circulation is of great importance in determining its current profitability and future viability. In addition to its direct contributions to revenue, the extent and composition of circulation determine the rates a newspaper can charge for its advertising space. The Las Vegas Sun is trailing the Las Vegas Review-Journal in circulation by a wide margin, and this margin has grown considerably.[13] The Las Vegas Sun's inferior position and declining circulation support the contention that it is a failing newspaper under the Act.

The circulation of the Las Vegas Sun and its share of the Las Vegas newspaper market have declined since 1982. Over the same period, the Las Vegas Review-Journal has increased its circulation considerably.[14] The Las Vegas Sun's daily average paid circulation has fallen approximately 11 percent, from about 58,000 in 1982 to about 52,000 in 1989.[15] The Las Vegas Sun's share of daily average paid circulation has fallen

---

[13] See Tables 1-4, Appendix A.

[14] During much of this time period, the two papers have charged the same circulation prices. See Table 5, Appendix A.

[15] See Table 1, Appendix A.

SUN_00024418

from 38 percent in 1982 to 28 percent this year, [16]/ while the
Las Vegas Review-Journal's share has increased from 62 percent
to 72 percent. Over the same period, the Las Vegas
Review-Journal's circulation increased by almost 40 percent,
from approximately 93,000 to over 130,000. [17]/

Similar trends are evident for the average paid circulation
of the Sunday editions of the two newspapers. The Las Vegas
Sun's average paid circulation on Sundays has declined from
63,000 in 1982 to less than 56,000 in 1989. Its Sunday market
share has fallen from 38 percent to about 27 percent. [18]/ The
Las Vegas Review-Journal has increased its average paid
circulation on Sunday from 103,000 in 1982 to 153,000 in 1989.
Its share of Sunday average paid circulation has increased over
the same period from 62 percent to approximately 73 percent. [19]/

In some cases, a newspaper or other publication may have a
strong market position with respect to some distinct group of
readers, even if its share of total circulation is smaller than
that of its rival. The existence of a specialized reader niche

---

[16]/   See Table 1, Appendix A.

[17]/   Id.

[18]/   See Table 2, Appendix A. For reasons explained later, the
Las Vegas Sun experienced a brief increase in Sunday circulation
in 1986, followed by continued decline thereafter.

[19]/   Id.

-24-

can sometimes be quite important in attracting advertisers, and maintaining the profitability of a newspaper that trails its rival in overall circulation or advertising revenues.[20] In this case, however, there is no evidence that the Las Vegas Sun has significantly higher readership than the Las Vegas Review-Journal in any category of readers.  On the contrary, the Las Vegas Review-Journal is dominant in virtually every demographic category.[21]  Consequently, there is no apparent specialized reader niche that the Las Vegas Sun could utilize to attract advertisers in the Las Vegas market.

_____

[20]  For example, home-delivered newspapers may have greater appeal for advertisers than do street sales, because sales to subscribers may be more stable than are those to newsstand customers.  However, the Las Vegas Review-Journal has the same 1989 share of home-delivered newspapers sales (72 percent) as it does of all newspaper sales.  See Tables 3 and 4, Appendix A.

In addition, newspapers whose readers are generally wealthier or who are members of population groups that tend to spend more are more attractive to advertisers, other things being equal.  For this reason newspapers frequently collect and disseminate figures that they believe show attractive demographic characteristics on the part of their readers.  The limited evidence available here suggests that Las Vegas Sun readers are substantially outnumbered by Las Vegas Review-Journal readers in all age, education and income groups.

[21]  Las Vegas Review-Journal Document, RJ0080 at 158-159.

-25-

SUN_00024420

## C. Advertising Statistics and Trends

Advertising is by far the most important component of revenue for virtually all newspapers, including the Las Vegas Sun and the Las Vegas Review-Journal.

The Las Vegas Sun trails the Las Vegas Review-Journal by a wide margin in the Las Vegas newspaper advertising market. The Las Vegas Sun's share of advertising linage has declined sharply and consistently since 1984. Its share of total advertising linage declined from 40 percent in 1984 to less than 30 percent last year.[22/] Its 1988 total linage was less than 65 percent of its total linage in 1984.[23/] The Las Vegas Review-Journal's advertising linage total has stayed roughly constant over the same five-year period.[24/]

The same trends are apparent with respect to the three major categories of newspaper advertising linage: retail, classified, and national advertising.[25] The Las Vegas Sun

---

22/ See Table 6, Appendix A.

23/ Id.

24/ Id.

---

25/ See Tables 7, 8 and 9, Appendix A. "Retail", sometimes called "local", advertising is display advertising in which prices and business locations are listed. "National", sometimes called "general", advertising is advertising for products with no local outlets listed (e.g., cigarette advertising). Classified advertising is typeset, usually without graphics or illustrations.

-26-

SUN_00024421

trails the Las Vegas Review-Journal in all advertising linage categories by substantial percentages. In 1988, the Las Vegas Sun's share of retail, national and classified advertising linage was approximately 30 percent for each category.[26]/ Further, the Las Vegas Sun's share in each category has declined.[27]/ There is no category of advertising in which the Las Vegas Sun maintains a strong market position.

Another measure of newspaper market share, advertising revenue, may be a better measure of share than linage. Advertising revenue is more likely to reflect the differences in quality and effectiveness between different newspapers' advertisements. Under the assumption that advertisers "get what they pay for," the amount they spend may be the best indicator of the quantity and quality of their purchases. This measurement indicates a decline in the market share that parallels the decline in linage. The Las Vegas Sun's share of advertising revenues has fallen steadily from   percent in 1984 to   percent in 1988.[28]/

---

[26]/ See Tables 7, 8 and 9, Appendix A.

[27]/ Id.

[28]/ See Table 10, Appendix A.

-27-

D.   Historical Financial Performance of the Las Vegas Sun

The Las Vegas Sun's large losses, particularly since 1984, have resulted in severe liquidity problems exemplified by its negative working capital, negative equity and sizeable increase in debt.   In the 1960's and 1970's, the Las Vegas Sun, while not always profitable, survived without taking on substantial amounts of debt.   In the 1980's, the Las Vegas Sun's circulation and advertising shares have declined rapidly.   The financial statements of the Las Vegas Sun also reflect a severe decline in profitability over the same period.   Pre-tax losses in fiscal year 1988 were about $3 million on approximately $21 million in total revenue.[29]   Since 1984, cumulative pre-tax losses of the Las Vegas Sun have amounted to almost $13 million.[30]

As a result of those financial pressures, capital expenditures have been kept to a minimum for a number of years.[31]   The press and much of the other equipment required to publish a newspaper are antiquated.   The Las Vegas Sun

---

[29]   Application at 5.

[30]   Application at 24.

[31]   Capital expenditures over the past five years have been primarily for purchases of computer hardware and software.   Las Vegas Sun's Response to Antitrust Division's Requests for Information and Documents, pp. 45-53.

SUN_00024423

employs a direct lithography press that was purchased in 1982 as
used equipment. If the press, the antiquated front end and
mailroom equipment and other equipment required were replaced,
the estimated cost would be $17-$19 million.[32/] The Las Vegas
Sun leases its plant and most of its production equipment,
except the printing press, from a Greenspun family-controlled
affiliate. The lease rents have gone unpaid since 1987,
although the Las Vegas Sun continues to pay interest on the
unpaid balance.

The Las Vegas Sun has relied on the financial support of
the Greenspun family to fund its prior losses and capital
deficiencies. Total debt for the Las Vegas Sun is about $11
million, consisting of bank debt, debt owed to the Greenspuns or
Greenspun-controlled affiliates and other current
liabilities.[33/] Bank debt consists of a loan obtained in 1982
to purchase the press (approximately a $1.4 million outstanding
balance) and a $2.9 million loan obtained to fund losses; full
payment is due in November of 1989.[34/] The Las Vegas Sun will
not be able to repay these obligations, according to the

---

[32/] Application at 27-28.

[33/] Application at 5.

[34/] Application at 24.

-29-

SUN_00024424

Greenspun family. All bank debt has been collateralized and guaranteed by the Greenspuns or Greenspun-controlled affiliates and the bank will not advance further funds without additional security.35/ Outstanding unsecured loans for working capital from the Greenspuns and affiliated companies total approximately $6.5 million.36/

There is no evidence of any intent or pattern of practices by the Greenspun family to artificially inflate the Las Vegas Sun's costs. The Greenspuns' salaries were and are modest by newspaper industry standards.37/ The Las Vegas Sun does not pay management fees to LVS or SunAn affiliates. Advertising purchased by SunAn or LVS affiliates from the Las Vegas Sun was not discounted off the newspaper's rate card.38/

The Antitrust Division has discovered no evidence to suggest that the Las Vegas Sun, through unreasonable management practices, has been "allowing or encouraging financial difficulties in the hope of reaping long-term financial gains through a JOA." Hearst, 704 F.2d at 478. The Las Vegas Sun has

---

35/ Interview, Brian Greenspun, President of LVS.

36/ Application at 24.

37/ Las Vegas Sun's Response to Antitrust Division's Request for Information and Documents, pp. 31-22.

38/ Application at 25.

-30-

SUN_00024425

made numerous attempts to increase circulation and advertising
and improve overall managerial operations in an effort to
increase revenue and reduce expenses.$\underline{39}$/  While some of the
attempted changes proved unsuccessful, and thus with the benefit
of hindsight can be viewed as mistakes, there is no reason to
believe that the significant losses incurred by the Las Vegas
Sun either were deliberately incurred or could be avoided in the
future merely by the use of reasonably competent management
practices.

     The Las Vegas Sun's attempts to improve its competitive and
financial position were many and varied.  During the 1970's and
early 1980's, the Las Vegas Sun tried zoned editions without

_____

$\underline{39}$/  There was a significant increase in circulation expenses
between 1987 and 1988, from about $2.5 million to about $5.4
million.  This was attributable to the fact that in 1987 the Las
Vegas Sun changed the method by which its newspapers were
distributed, from independent distribution contractors to an
in-house function.  Circulation expenses increased for this
period due to the necessity of increased staffing and other
costs for the newspaper to provide its own distribution
network.  This program also resulted in revenue recorded at
retail rather than at wholesale levels and explains the large
increase in circulation revenue recorded in fiscal year 1988.
Circulation revenues increased from about $2.6 million in 1987
to about $5.3 million in 1988.  This program was implemented
with the goal of ultimately reducing the costs of circulating
the Las Vegas Sun to its subscribers.  According to the Las
Vegas Sun, the long term projections are for lower circulation
expenses.  Interview, Brian Greenspun, President of LVS.

-31-

success.40/   Initially, four zoned editions were published, but
these were later reduced to two before the effort was
cancelled.   The Las Vegas Sun tried twice to put out an
afternoon paper (newsracks only, no home delivery) to compete
with the Las Vegas Review-Journal's afternoon edition.   Two
total market coverage vehicles, The Advertiser, and Food News,
were attempted in 1978 and 1982, respectively.41/   None of
these efforts materially improved the newspaper's fortunes.

In 1985, the consulting firm of McGladrey and Pullen
performed a system review and recommended that certain cost
reduction programs be initiated, primarily in circulation
reporting and accounting.42/   Many of their recommendations
were ultimately implemented by management.   It appears, however,
that these recommendations resulted in little, if any,
improvement in the financial condition of the Las Vegas Sun.

---

40/   Application at 26.   A zoned edition of a newspaper is an
edition which is distributed in a specific portion of a
newspaper's circulation area and which contains advertising and
editorial material aimed at the area in which it is distributed.

41/   Application at 26.   A total market coverage publication is
a publication designed to reach all readers in an area,
including readers who do not subscribe to the newspaper that
offers the TMC.   A TMC usually consists of preprinted
advertising inserts in a "newswrapper" that contains
informational material.

42/   Las Vegas Sun Document, S001760-1837.

-32-

SUN_00024427

In 1987, the <u>Las Vegas Sun</u> replaced its general manager
with one more experienced in newspaper management. He
eliminated the use of advertising rate discounting in an effort
to stabilize advertising rates and thereby increase advertising
revenues.[43/] This policy change did not result in additional
income, however, because advertisers responded by buying fewer
column inches of advertising in the <u>Las Vegas Sun</u>.

Also in 1987, the <u>Las Vegas Sun</u> changed its payroll
structure for advertising representatives by reducing their
salaries and increasing commissions.[44/] Training programs for
employees were initiated.[45/] A 5 percent reduction in
workforce resulted in the elimination of 26 positions.[46/] The
<u>Las Vegas Sun</u> states that it may be able to effectuate a limited
number of additional layoffs, but this would not result in
material cost reductions.[47/]

In the spring of 1988, the <u>Las Vegas Sun</u> retained the
consulting firm of Deloitte, Haskins & Sells to "stop the

---

[43/] <u>Las Vegas Sun</u> Document, S001760-1837.

[44/] <u>Id</u>.

[45/] <u>Las Vegas Sun's</u> Response to the Antitrust Division's
Request for Documents, p. 16.

[46/] <u>Id</u>. at 15.

[47/] Interview, Brian Greenspun, President of LVS.

-33-

bleeding."[48]/   The <u>Las Vegas Sun</u> implemented many of its
consultants' recommendations for managerial improvements,
including more defined reporting levels, increased use of
targeted market surveys, and coordination of the newspaper's
computer systems.[49]/   In 1988, the <u>Las Vegas Sun</u> also tried
various additions to the newspaper in an effort to attract
readers.  It added a Monday business tabloid section and a
Tuesday sports section, and it increased local coverage by
hiring three additional reporters.[50]/   None of these efforts
resulted in increased circulation.[51]/

    From 1985-1987, the <u>Las Vegas Sun</u> even tried to utilize the
local Greenspun-controlled cable television system to increase
the newspaper's circulation and advertising.[52]   Under the

---

[48]/   See <u>Las Vegas Sun</u> Document, S001632-1759.  (The Deloitte,
Haskins & Sells Report.)

[49]/   Interview, Brian Greenspun, President of LVS.

[50]/   Interview, James McGlasson, General Manager of the <u>Las
Vegas Sun</u>.

[51]/   Application at 28.

[52]/   <u>Las Vegas Sun's</u> Response to the Antitrust Division's
Request for Additional Information and Documents, p. 13.  The
key provisions of the program were that (1) the <u>Las Vegas Sun</u>
would guarantee delivery of its Sunday edition to all the CCTV
subscribers; (2) the <u>Las Vegas Sun</u>, in turn, would cease direct
billing of CCTV's subscribers who subscribed to the Sunday
edition after the program commenced.  Thus, the Sunday
subscribers of the <u>Las Vegas Sun</u> who were also CCTV subscribers
now received the Sunday newspaper free-of-charge.  In addition,
the 7-day per week home delivery <u>Las Vegas Sun</u> subscribers had
their cable bills reduced by the amount of the subscription
price of the Sunday edition; (3) each week at no charge to CCTV,
two joint <u>Las Vegas Sun</u>/CCTV advertisements of 30 column inches
each would be placed in the <u>Las Vegas Sun</u> to promote Showbiz and
CCTV; (4) CCTV would cease publication and distribution of its
<u>Dimension Cable Guide</u>; (5) CCTV was to compensate the <u>Las Vegas</u>
(Footnote continued on next page.)

-34-

SUN_00024429

Case 2:19-cv-03587-ART-MDC   Document 1028   Filed 02/23/26   Page 100 of 176

program, the Sunday edition of the Las Vegas Sun, including
Showbiz,53/ was distributed at no additional cost to those CCTV
subscribers who did not subscribe to the Sunday edition. After
the program was launched, the Las Vegas Sun conducted an

(Footnote continued from previous page.)
Sun for the delivery of the Sunday edition in cash payments
ranging from $35,000 per month in 1985 to $29,000 per month in
1987, down to zero in 1988; and (6) the CCTV had to provide the
Las Vegas Sun with local advertising space on all channels of
its cable television system for which CCTV sold or inserted
local advertising.  The CCTV advertising alloted to the Las
Vegas Sun began at $10,000 per month in 1985, increased to
$16,000 per month in 1987 and dropped to $8,000 per month in
1988.   Las Vegas Sun Document, S001323-1344.

53/  Application at 18.  Showbiz was created in 1983 and is
promoted as a total entertainment, TV/Cable magazine.  It is
about 100 pages and contains a substantial amount of hotel and
entertainment advertising.  LVS publishes Showbiz, but an
independent contractor provides the printing services.  (This
printer uses off set printing techniques which are not available
from the Las Vegas Sun's printing press.)  The Showbiz operation
is profitable and is managed as a separate department.  The
Showbiz staff consists of five full-time employees who
specialize in hotel and entertainment advertising.  They report
to the general manager of the Las Vegas Sun.  Under the proposed
JOA, the Las Vegas Review-Journal has the option to continue to
publish Showbiz.  If it chooses not to undertake the publication
of the magazine, the Las Vegas Sun has the option to transfer
Showbiz out of the Las Vegas Sun or to continue to publish and
distribute Showbiz, but in either situation, outside the terms
of the JOA.

-35-

SUN_00024430

extensive advertising and circulation promotional campaign
proclaiming that it was the Sunday "circulation winner."[54]

The viability of the promotion depended on the ability of
the Las Vegas Sun to count the recipients of the Sunday
newspaper as paid subscribers for purposes of preparing Audit
Bureau of Circulations ("ABC") reports.[55] However, ABC would
not allow the CCTV subscribers to be counted in the Las Vegas
Sun's total paid circulation.[56] Advertising revenues and
volume did not increase as projected. Instead, circulation
expenses increased substantially and circulation revenue
declined.[57] In October of 1986, the program was changed to
provide CCTV subscribers a Saturday newspaper for no extra
charge, rather than a Sunday Las Vegas Sun. Showbiz was moved
from the Sunday to the Saturday newspaper at the same time.[58]
Although the costs of the program were somewhat less after this

_____

[54]   Las Vegas Sun's Response to the Antitrust Division's
Request for Additional Information and Documents, p. 14.

[55]   ABC reports provide verified information about a
newspaper's circulation. The reports are used by advertisers
and advertising agencies in making purchasing decisions for
newspaper advertising.

[56]   Application at 18.

[57]   Application at 18.

[58]   Application at 18.

-36-

SUN_00024431

change, they were still prohibitive and the program was
abandoned in 1987.[59]

The CCTV program and the loss of the ABC certification
resulted in lost circulation and advertising revenues and
increased circulation expenses which taken together totalled
nearly one million dollars annually.[60] The program, however,
was modeled after similar successful programs in other
communities.[61] The evidence establishes that the Las Vegas
Sun management took a calculated, but unsuccessful, risk that

---

[59] In 1987, ABC withdrew its certification of the Las Vegas
Sun because its circulation reports were deemed to be
inaccurate. Those inaccuracies were attributable, in part, to
the distribution of the Sunday paper to CCTV subscribers. In
order to satisfy ABC requirements, the CCTV subscribers were
informed of the cost of the Sunday Las Vegas Sun, and were given
an opportunity to forego the newspaper in return for a
corresponding discount from their CCTV subscription costs. When
a substantial number of CCTV subscribers exercised this option,
the Las Vegas Sun's circulation system proved incapable of
accurately maintaining circulation records. (Application at
18-19) In addition, changing the circulation distribution
network from one provided by an independent contractor to an
inhouse corporate function created deficiencies in the
subscriber billing list maintained by the Las Vegas Sun's
circulation department. The consulting firm of Deloitte,
Haskins & Sells was retained, in part, to find a solution to the
deficiencies that existed in the circulation department. The
key recommendations from the report regarding the circulation
department were put into effect, and the Las Vegas Sun regained
its ABC certification in 1988. Application at 18.

[60] Application at 18.

[61] Application at 18.

-37-

SUN_00024432

the short term costs of the program would produce greater long term gains. Although the CCTV program appears to have failed miserably, there is no evidence that the motivation for this program was to produce real or apparent financial losses in anticipation of a JOA or to inflate the earnings of CCTV.

## V.  ANALYSIS AND RECOMMENDATION

### A.  The Las Vegas Sun Is A Failing Newspaper

On the basis of the evidence discussed above, the Antitrust Division has concluded that the Las Vegas Sun is a "failing newspaper" within the meaning of the Act. The parties have demonstrated that the Las Vegas Sun is "suffering losses which more than likely cannot be reversed," Hearst, 704 F.2d at 478. These losses have occurred despite reasonable management practices, including a variety of efforts implemented over a period of years to improve the newspaper's financial condition. There is no apparent alternative course of action that offers reasonable prospects for the Las Vegas Sun to return to profitability.

The Las Vegas Sun has had pre-tax losses in every year since 1982. These losses ranged from about $1.2 million in 1982 to a high of $3.6 million in 1988, totalling more than $13 million. The newspaper had a substantial negative cash flow in 1987 ($2 million) and again in 1988 ($6 million).

-38-

SUN_00024433

The financial losses reflect the newspaper's deteriorating circulation and its loss of advertising market share. From 1982 to 1989, its average daily paid circulation declined from approximately 58,000, a 38.2 percent share of the market, to about 52,000, a 28.4 percent share. The Las Vegas Sun's share of advertising linage in the Las Vegas market has shown a comparable decline, dropping from approximately 40 percent in 1984 to approximately 29 percent in 1988. If advertising market share is measured by other standards, such as advertising revenue, the trends are similarly unfavorable to the Las Vegas Sun.

A newspaper's historical financial performance is not, of course, dispositive under the Act, which requires a prediction of the newspaper's future prospects. The historical losses here, however, are of such magnitude, and stem from such economic conditions, that they are not likely to be reversible. A financial analysis commissioned by the Las Vegas Sun in 1988 illustrates this point. [62] That analysis projected continued losses until 1992 (at which time it projected profitability), even using assumptions that appear to be implausibly optimistic. Most notably, the analysis assumed that the Las

_____

[62]   See Las Vegas Sun Document, S001632-1759.   (The Deloitte, Haskins & Sells Report).

-39-

Vegas Sun could simultaneously raise its advertising rates
substantially (76 percent from 1988 to 1993) and increase its
market share relative to the Las Vegas Review-Journal. Recent
experience has demonstrated, however, that rate increases by the
Las Vegas Sun are likely to produce a declining market share.63/

Substantial increases in circulation would be required to
produce any significant improvement in advertising revenue.
However, the Las Vegas Sun has been unable even to maintain
circulation in recent years, despite a variety of programs
specifically designed to attract new readers.

The newspaper's recent financial performance would have
been even worse had it not deferred the capital investment that
appears to be essential to its long term viability. The paper
will be at a continued competitive disadvantage if it does not
replace its press and improve other aspects of its physical

_____

63/ As indicated in Table 11, the Las Vegas Sun's average
advertising rate per column inch (calculated by dividing total
advertising revenue by total column inches of advertising)
increased steadily from 1984 to 1988. Because the Las Vegas
Sun's circulation declined through most of this period, its
average advertising rate per inch per reader increased by an
even greater proportion than its rate per column inch.  (The
"adjusted" rate in Table 11 indicates the rate per inch per
reader.  The adjusted rate was calculated by dividing total
advertising revenue by the product of total inches of
advertising and total circulation, in millions.)  The Las Vegas
Sun's rate increases from 1984 to 1988 were accompanied by a
declining share of the newspaper advertising market, as
indicated in Tables 6 and 10.

-40-

SUN_00024435

facilities.   Those improvements are estimated to cost $17-19
million, an investment that does not appear to be justifiable in
light of the financial condition of the Las Vegas Sun.

The Antitrust Division is convinced that the losses
reflected in the Las Vegas Sun's financial records are genuine
-- they were not artificially inflated by dealings with related
parties, and they do not reflect unreasonable expenses.   The
newspaper appears to have survived as long as it has primarily
because of direct and indirect cash infusions by the Greenspun
family.   The Act and its legislative history, however, make it
clear that the financial status of a JOA applicant is to be
determined on objective economic analysis of the applicant on a
stand alone basis without regard to the ability of its owners to
fund continued operations from their other wealth.

In sum, the applicants appear to have met the high standard
of proof that the Act imposes on them, and have demonstrated
that the Las Vegas Sun is a failing newspaper.

B.   Approval of the JOA Would Effectuate the Policy and
Purpose of the Act.

Currently, the Las Vegas Sun's total news and editorial
expenses approach $2.25 million.   The minimum news and editorial
expense allocation of $2.25 million to the Las Vegas Sun under
the JOA would be adequate to cover its expenses for 1989.   The

-41-

SUN_00024436

SA3M8

minimum allocation will be adjusted annually to reflect changes
in the CPI, and thus should be sufficient for the <u>Las Vegas Sun</u>
to produce editorial and reportorial coverage comparable to that
which it currently provides.

Under the alternative allocation, the <u>Las Vegas Sun</u> will
receive 65 percent of the <u>Las Vegas Review-Journal's</u> news and
editorial expenses.  On this basis, the <u>Las Vegas Sun</u> would
receive almost $    million in 1989.<u>64/</u>  Thus, it appears that
under the alternate formula the <u>Las Vegas Sun</u> would receive
about the same level of funding.  In the future, however, this
alternate formula may result in the <u>Las Vegas Sun</u> receiving a
higher level of funding which it could utilize to improve the
newspaper's editorial and reportorial coverage.

The 90/10 profit split to each newspaper is based on
operating profits of the JOA Agency and not Agency revenues.
Assuming that the Agency will be profitable, the <u>Las Vegas Sun</u>
will receive additional revenues above and beyond the production
costs of the newspaper.  These revenues could be used by the <u>Las
Vegas Sun</u> to improve or expand its newspaper.  The applicants

---

<u>64/</u>   <u>Las Vegas Review-Journal</u> Statements of Profit and Loss,
Application Supplemental Materials.

SUN_00024437

Case 2:19-cv-03667-ART-MDC   Document 1029   Filed 02/23/26   Page 108 of 176

are projecting substantial profits for the Agency.[65/]  Should
the Agency prove to be unprofitable or only marginally
profitable, however, the Las Vegas Sun's minimum expense
entitlement under the JOA should be sufficient to maintain the
Las Vegas Sun's news and editorial operations.  Therefore, the
Antitrust Division finds that approval of the JOA would
effectuate the Act's policy and purpose of preserving
independent editorial and reportorial competition in the
community.

    C.   There Is No Need for a Hearing In This Case

The Antitrust Division does not recommend a hearing in this
case.  The Department's regulation, 28 C.F.R. § 48.7(b)(2),
permits the Antitrust Division to recommend that a hearing be
held "to resolve material issues of fact."  This case, however,
is not one in which important factual issues have been raised
and remain unresolved.  Rather, this is a situation in which a
judgment can be made about the probability of the Las Vegas
Sun's failure on the basis of known facts.  A hearing, in these
circumstances, would only prolong the review process to the
detriment of the Las Vegas Sun.

_____

65/  Interviews, Brian Greenspun, President of LVS, and Fred
Smith, President of Donrey.

-43-

SUN_00024438

No party has come forward with information that would cast substantial doubt on the critical facts relating to the probable failure of the Las Vegas Sun. The comments that have been submitted to the Department in opposition to the application generally reflect the concern that quality and service at one or both newspapers could be diminished by a JOA, or the fear that the newspapers will not truly retain their separate editorial voices in a JOA, or a belief that subscription and advertising rates will go up if a JOA is approved. Some of these concerns are understandable, but they have little to do with the statutory standards that must be applied in this case. Congress deliberately chose to forego the benefits of economic competition in order to preserve diverse editorial voices. Thus, concerns about the loss of economic competition are irrelevant. The parties who are concerned about the potential loss of editorial diversity have not raised any significant factual questions that require a hearing. The course outlined in the regulations (see Appendix C), allowing written comments on the JOA and on this report, affords due process to all interested persons.

D.   Recommendation

The Antitrust Division has concluded that the Las Vegas Sun is "in probable danger of financial failure" within the meaning of the Act, and that the JOA is designed to allow the parties to continue to produce separate and independent editorial products, thereby effectuating the purposes of the Act. Accordingly, the

-44-

Case 2:19-cv-03667-ART-MDC   Document 1028   Filed 02/23/26   Page 110 of 176

Antitrust Division recommends that the JOA application be approved.

Respectfully submitted,

_____
JAMES F. RILL
Assistant Attorney General

−45−

SUN_00024440

# APPENDIX A
## TABLES 1-11 and FIGURES 1, 2, 6, 10 and 11

### Table 1

#### Daily (M-F) Average Paid Circulation

|      | Las Vegas Sun | Las Vegas Review-Journal | Las Vegas Sun's Share |
|------|---------------|--------------------------|------------------------|
| 1982 | 57,805 | 93,329 | 38.2% |
| 1983 | 57,044 | 96,414 | 37.2% |
| 1984 | 56,433 | 97,185 | 36.7% |
| 1985 | 55,167 | 97,346 | 36.2% |
| 1986 | 60,583 | 103,597 | 36.9% |
| 1987 | 58,184 | 110,632 | 34.5% |
| 1988 | 48,485 | 117,570 | 29.2% |
| 1989 | 51,648 | 130,103 | 28.4% |

### Figure 1

#### Market Share of Weekday Circulation



Table 2

Sunday Average Paid Circulation

|      | Las Vegas Sun | Las Vegas Review–Journal | Las Vegas Sun's Share |
|------|---------------|--------------------------|-----------------------|
| 1982 | 63,339        | 103,150                  | 38.0%                 |
| 1983 | 60,395        | 106,532                  | 36.2%                 |
| 1984 | 60,021        | 109,461                  | 35.4%                 |
| 1985 | 61,495        | 111,993                  | 35.4%                 |
| 1986 | 84,413        | 119,123                  | 41.5%                 |
| 1987 | 57,845        | 128,316                  | 31.1%                 |
| 1988 | 51,451        | 136,794                  | 27.3%                 |
| 1989 | 55,848        | 153,497                  | 26.7%                 |

Figure 2

Market Share of Sunday Circulation



SUN_00024442

Table 3

Daily (M-F) Home Delivery

|      | Las Vegas Sun | Las Vegas Review-Journal | Las Vegas Sun's Share |
|------|---------------|--------------------------|-----------------------|
| 1982 | 46,919        | 79,155                   | 37.2%                 |
| 1983 | 47,137        | 81,782                   | 36.6%                 |
| 1984 | 47,129        | 81,395                   | 36.7%                 |
| 1985 | 44,561        | 79,758                   | 35.8%                 |
| 1986 | 43,924        | 85,574                   | 33.9%                 |
| 1987 | 43,692        | 89,965                   | 32.7%                 |
| 1988 | 37,913        | 95,003                   | 28.5%                 |
| 1989 | 40,631        | 103,524                  | 28.2%                 |

Table 4

Sunday Home Delivery

|      | Las Vegas Sun | Las Vegas Review-Journal | Las Vegas Sun's Share |
|------|---------------|--------------------------|-----------------------|
| 1982 | 49,690        | 79,484                   | 38.5%                 |
| 1983 | 47,926        | 82,383                   | 36.8%                 |
| 1984 | 47,662        | 82,099                   | 36.7%                 |
| 1985 | 44,919        | 80,275                   | 35.9%                 |
| 1986 | 74,358        | 86,018                   | 46.4%                 |
| 1987 | 43,612        | 90,284                   | 32.6%                 |
| 1988 | 37,992        | 95,385                   | 28.5%                 |
| 1989 | 40,633        | 103,622                  | 28.2%                 |

SUN_00024443

Table 5

Subscription and Newstand Prices of the Las Vegas Sun
and Las Vegas Review-Journal

|      | Las Vegas Sun | | | Las Vegas Review-Journal | | |
|      | | Newstand | | | Newstand | |
|      | Subscriptions | Daily | Sunday | Subscriptions | Daily | Sunday |
|------|---------------|-------|--------|---------------|-------|--------|
| 1984 | $5.25 | .25 | .75 | $6.50 | .25 | .50 |
| 1985 | 6.50 | .25 | .75 | 6.50 | .25 | .50 |
| 1986 | 6.50 | .25 | .75 | 6.50 | .25 | 1.00 |
| 1987 | 6.50 | .25 | 1.00 | 6.50 | .25 | 1.00 |
| 1988 | 7.50 | .25 | 1.00 | 7.50 | .25 | 1.00 |
| 1989 | 7.50 | .25 | 1.00 | 7.50 | .25 | 1.00 |

Sources of Tables 1-5:  App. 17; Las Vegas Review-Journal Document
RJ0027-28; Las Vegas Sun's Response to the Antitrust Division's
Requests for Information and Documents, p. 65.

SUN_00024444

Table 6

Total Advertising Linage Comparison
(column inches of advertising)

|      | Las Vegas Sun | Las Vegas Review-Journal | Las Vegas Sun's Share |
|------|---------------|--------------------------|-----------------------|
| 1984 | 1,972,755     | 2,961,682                | 40.0%                 |
| 1985 | 1,643,462     | 2,848,582                | 36.6                  |
| 1986 | 1,508,557     | 2,873,135                | 34.4                  |
| 1987 | 1,334,654     | 2,895,055                | 31.6                  |
| 1988 | 1,272,672     | 3,051,146                | 29.4                  |

Figure 6

Market Share of Total Column Inches
of Advertising



Table 7

Retail Linage

(Column inches of advertising)

| | Las Vegas Sun | Las Vegas Review-Journal | Las Vegas Sun's Share |
|---|---|---|---|
| 1984 | 955,043 | 1,468,004 | 39.4% |
| 1985 | 771,346 | 1,343,213 | 36.5 |
| 1986 | 646,097 | 1,303,762 | 33.1 |
| 1987 | 608,315 | 1,366,519 | 30.8 |
| 1988 | 601,032 | 1,432,504 | 29.6 |

Table 8

Classified Linage

(Column inches of advertising)

| | Las Vegas Sun | Las Vegas Review-Journal | Las Vegas Sun's Share |
|---|---|---|---|
| 1984 | 962,963 | 1,408,528 | 40.6% |
| 1985 | 832,346 | 1,433,213 | 36.7 |
| 1986 | 823,486 | 1,499,330 | 35.5 |
| 1987 | 695,150 | 1,456,971 | 32.3 |
| 1988 | 643,216 | 1,557,922 | 29.9 |

SUN_00024446

Table 9

## National Linage

(Column inches of advertising)

|      | Las Vegas Sun | Las Vegas Review-Journal | Las Vegas Sun's Share |
|------|---------------|--------------------------|-----------------------|
| 1984 | 54,749        | 85,150                   | 39.1%                 |
| 1985 | 39,672        | 71,734                   | 35.6                  |
| 1986 | 38,974        | 70,043                   | 35.8                  |
| 1987 | 31,189        | 71,565                   | 30.4                  |
| 1988 | 28,424        | 60,720                   | 31.9                  |

Sources of Tables 6-9:  App. 21-22.

SUN_00024447

## Table 10

### Total Advertising Revenue

#### (in dollars)

| | Las Vegas Sun | Las Vegas Review-Journal | Las Vegas Sun's Share |
|---|---|---|---|
| 1984 | 17,253,349 | | |
| 1985 | 16,903,045 | | |
| 1986 | 15,880,442 | | |
| 1987 | 15,362,942 | | |
| 1988 | 15,136,781 | | |

### Figure 10

### Market Share of Advertising Revenue

Sources for Tables 10 and 11 and Figures 10 and 11:  App. 22 and Las Vegas Review-Journal Document, RJ 1000.

SUN_00024448

## Table 11

### Average Advertising Rates

#### (in Dollars)

| | Las Vegas Sun | | Las Vegas Review-Journal | |
|------|------|------|------|------|
| | Per Inch | Adjusted | Per Inch | Adjusted |
| 1984 | 8.75 | 145.98 | | |
| 1985 | 10.29 | 186.43 | | |
| 1986 | 10.53 | 173.76 | | |
| 1987 | 11.51 | 197.83 | | |
| 1988 | 11.89 | 245.31 | | |

## Figure 11

### Average Adjusted Advertising Rates
(in Dollars)

SUN_00024449

## APPENDIX B – LAS VEGAS JOA CITIZEN COMMENTS

The Department has received 19 letters from citizens commenting on the Las Vegas JOA application. The majority of respondents recommended that the JOA be approved. Ten letters recommended that the Department of Justice approve the JOA and seven letters recommended that the JOA be denied. Two complaints about the Las Vegas Sun and the Las Vegas Review-Journal did not relate to the JOA.

Among the respondents who recommended that the JOA be approved was the president of the Clark County School District; the chairman of Sahara Resorts; the Nevada State Press Association, Inc.; Harrah's Hotels and Casinos; the Las Vegas branch of the NAACP; Robert List, a former governor of Nevada, and the University of Nevada at Las Vegas. Most of the letters in support of the JOA pointed to the differing editorial positions of the Las Vegas Sun and the Las Vegas Review-Journal as an important consideration in determining the need for two newspapers in Las Vegas.

Of the seven respondents who opposed the JOA, two objected to the terms of the agreement which they believed were one-sided in favor of the Las Vegas Review-Journal. Tom Bradlee, President of the National Newspaper Association ("NNA") stated that his

association was increasingly concerned about the proliferation of JOA newspapers. One commenter was concerned that the advertising acceptability standards of the two newspapers would be merged. He stated that personal advertisements which are not accepted by the Las Vegas Review-Journal are frequently accepted by the Las Vegas Sun.

Four respondents, Sergio Lalli, the NNA, the trustee of the Clarence A. Heckethorn Living Trust et. al., and the International Union, Local 284c, AFL-CIO et. al., who opposed the JOA, requested that a hearing be held. The Antitrust Division does not believe that their filings raise issues of fact in addition to those discussed in this report and, therefore, does not believe that a hearing is warranted.

## APPENDIX C - DEPARTMENT REGULATIONS

The regulations implementing the Act, 28 C.F.R. §§ 48.1 et. seq. vest all decision-making responsibility in the Attorney General, who may delegate this responsibility to anyone other than an Antitrust Division employee.  When the parties file an application for a joint newspaper operating arrangement with the Assistant Attorney General for Administration, a notice of the application is published in the Federal Register.  The regulations prescribe a 30-day period during which interested parties may file written comments stating whether the application should or should not be approved, or that a hearing should be held to determine material issues of fact.  Within the same 30-day period, the Assistant Attorney General in charge of the Antitrust Division must submit a report recommending that the proposed arrangement be approved, disapproved, or that a hearing should be held.  The regulations also provide that the Attorney General may extend any time periods for good cause.

After the Antitrust Division's report is submitted to the Attorney General, the regulations provide an additional 30-day period during which any interested party may reply in writing to the Antitrust Division's report or to the other comments.  At the end of this reply period, the Attorney General may approve or disapprove

SUN_00024452

the application without a hearing or order that a hearing be held. If a hearing is ordered, an administrative law judge is appointed for this purpose by the Assistant Attorney General for Administration.

The Assistant Attorney General in charge of the Antitrust Division is, in effect, a party to the proceedings under these regulations. His report and recommendation, along with the comments of other interested parties, are to be considered by the Attorney General in reaching his decision. If a hearing is ordered, the Antitrust Division and the applicants must participate. The Attorney General may give other interested persons permission to intervene in the proceedings.

SUN_00024453

# EXHIBIT 5

June 1, 1990, Opinion of The Attorney General, Public File No. 44-03-13, In the Matter of: Application by the Las Vegas Sun, Inc. and Donrey of Nevada, Inc. for Approval of a Joint Newspaper Operating Arrangement Pursuant to the Newspaper Preservation Act, 15. U.S.C. §§ 1801-1804 (SUN_00024373-85)

# EXHIBIT 5

BEFORE THE
ATTORNEY GENERAL OF THE UNITED STATES

|  |  |
|---|---|
| In the Matter of: )<br>Application by Las Vegas Sun, Inc., and )<br>Donrey of Nevada, Inc., for Approval )<br>of a Joint Newspaper Operating )<br>Arrangement Pursuant to the Newspaper )<br>Preservation Act, 15 U.S.C. §§ 1801-1804 ) | Public File No. :<br><br>44-03-14 |

## ORDER

Upon consideration of the entire record and the applicable law,

IT IS ORDERED:

The Application for Approval of a Joint Newspaper Operating Arrangement, filed by Las Vegas Sun, Inc., and Donrey of Nevada, Inc., is approved pursuant to the Newspaper Preservation Act, 15 U.S.C. §§ 1801-1804, effective on the 10th day after filing of this Order.

DICK THORNBURGH
Attorney General

Dated:   June   1, 1990

BEFORE THE
ATTORNEY GENERAL OF THE UNITED STATES

```
                              )
In the Matter of:            )     Public File No. :
Application by Las Vegas Sun, Inc., and  )
Donrey of Nevada, Inc., for Approval  )        44-03-14
of a Joint Newspaper Operating  )
Arrangement Pursuant to the Newspaper  )
Preservation Act, 15 U.S.C. §§ 1801-1804 )
                              )
```

OPINION

On August 8, 1989, the Las Vegas Sun, Inc. ("LVS"), owner of
the Las Vegas Sun ("Sun"), and Donrey of Nevada, Inc. ("Donrey"),
owner of the Las Vegas Review-Journal ("Review-Journal"), applied
pursuant to the Newspaper Preservation Act ("NPA"), 15 U.S.C. §§
1801-1804, for approval of a joint newspaper operating
arrangement ("JOA").

I.

A.    Facts and Procedural History

The Sun and the Review-Journal are daily newspapers serving
Las Vegas, Nevada.  The Review-Journal was the only daily
newspaper serving the area from the time its predecessor was
founded in 1909 until the Sun began publication in 1950.  The
Application for Approval of a Joint Newspaper Operating
Arrangement ("Application") states that the Sun is now a failing
newspaper and that "[i]n the absence of the proposed JOA, the
Sun's future as an independent second newspaper voice in Las
Vegas is in grave jeopardy."  Application at 5.

The proposed JOA is intended to combine the business
operations of the two newspapers, while preserving the
newspapers' editorial and reportorial independence.  Through a
subsidiary to be known as the "Agency," Donrey will take
responsibility for the management, printing, and other commercial
functions of the newspapers.  Report of the Assistant Attorney
General in charge of the Antitrust Division ("Antitrust Report")
at 16; JOA, Art. 5.1.  It will set the advertising and

SUN_00024373

circulation rates.[1]  JOA, Art. 5.1.5.  Ninety percent of the
profits from operations will go to the Review-Journal; 10 percent
to the Sun.  JOA, App. D.

Both newspapers will be printed at the facilities of the
Review-Journal.  Application at 6; JOA, Art. 5.1.  The Review-
Journal will publish a morning edition and will cease publication
of its afternoon edition.  The Sun will publish an afternoon
edition instead of its present morning edition.  The newspapers
will publish a joint edition on Saturdays, Sundays, and holidays.
JOA, Art. 5.1.  The Sun's portion of the Sunday newspaper will be
a separate section.  Antitrust Report at 16-17; Application at 7.
There can be no changes in the format or number of editions of
the Sun without its consent.  Antitrust Report at 18; JOA, Art.
5.1.1, 5.1.2.

Each newspaper will maintain its own staff of editors and
reporters.  JOA, Art. 4.1, 5.2.  The Sun will have a budget for
editing and reporting that will amount to (a) $2.25 million, to
be increased annually according to the consumer price index for
Las Vegas, or (b) 65 percent of the Review-Journal's editorial
and news budget, whichever is greater.  Antitrust Report at 17-
18; JOA, Art. 4.2, App. A at A.1.  The space in the Sun for news
and editorials, as compared to that in the Review-Journal, will
correspond to the ratio of advertising inches in the two
newspapers, but is guaranteed not to be less than 85 percent of
the space in the Review-Journal.  JOA, Art. 4.3, App. A at
A.2(a).  Furthermore, the Review-Journal will use its best
efforts to sell advertising in the Sun, and at least 40 percent
of combined promotional expenditures will be devoted to the Sun.
Antitrust Report at 18-19; JOA, Art. 5.1.4, App. A at A.3.

The consideration from LVS for the JOA will include 10
percent of the stock in Community Cable TV ("CCTV"), now
controlled by the Greenspun family, which also owns LVS' parent
company.  Donrey also has an option to purchase an additional 35
percent of the CCTV stock, after that stock has been bought by
LVS from third parties.  Antitrust Report at 20; JOA, Art. 10.5.

The initial term of the JOA is 50 years, with automatic 10-
year renewals, unless either party gives notice two years before
the end of the initial period or any renewal period.  Antitrust
Report at 17; JOA, Art. 1.2.  The JOA may be terminated under a

---

[1] The JOA also provides, however, that the subscription and
single-copy rates for the Sun will be no higher than those for
the Review-Journal and that the advertising rates of the
newspapers are to be the same unless a difference is justified by
disparities in circulation or by other factors recognized as
relevant in the industry.  Antitrust Report at 16, 19; JOA, Art.
5.1.5.

- 2 -

SUN_00024374

SA409

number of specified circumstances, such as bankruptcy of either party or failure of the Agency to earn a profit for two consecutive years.  Antitrust Report at 19; JOA, Art. 9.1.4.

A notice of the Application appeared in the Federal Register on August 17, 1989.  54 Fed. Reg. 33984.  Notices also appeared in the Sun and Review-Journal from August 8 to August 14, 1989.  In response, the Department of Justice received 18 letters about the Application.  Nine urged approval; eight opposed the Application or sought a hearing; one raised complaints unrelated to the JOA.[2]

Pursuant to 28 C.F.R. § 48.7(a), the Antitrust Division requested additional documents and information from the applicants and received, in response, approximately 5,000 pages of documents and 150 pages of answers to interrogatories.  Antitrust Report at 14-15.  The Antitrust Division also interviewed a number of persons familiar with the two newspapers and the market in Las Vegas.  Id. at 15.  On December 4, 1989, the Antitrust Division filed a report pursuant to 28 C.F.R. § 48.7, recommending that the Application be approved without an evidentiary hearing.

On the same date, the Graphic Communications International Union, Local 284C, and the Las Vegas Typographical Union, Local 933 ("Unions"), filed comments opposing the Application and seeking a hearing.  On January 3, 1990, the Unions also filed a reply to the Antitrust Report.[3]  By letters dated April 11 and April 20, the Unions withdrew their opposition to approval of the JOA.[4]

_____

[2] This listing does not include the comments filed by the Graphic Communications International Union, Local 284C, and the Las Vegas Typographical Union, Local 933, since those comments were later withdrawn.

[3] LVS on that date filed a reply to the Unions' comments of December 4.

[4] In filing the Application and responding to the Antitrust Division's discovery demands, Donrey and LVS, pursuant to 28 C.F.R. § 48.5, sought an order withholding some documents from public disclosure.  An order disposing of the requests was issued February 16, 1990.  On March 2, Donrey requested reconsideration of a portion of that order.  Reconsideration was granted in an order issued April 27, 1990.

- 3 -

## B.  Need for an Evidentiary Hearing

Although the Antitrust Division recommends approval of the Application without an evidentiary hearing, three commenters from the public request such a hearing.  The Department's regulations provide that a commenter on a proposed JOA may ask for an evidentiary hearing and that the request must "set forth the issues of fact to be determined and the reasons that a hearing is required to determine them."  28 C.F.R. § 48.8(a)(2).  In this case, the commenters have not shown the need for an evidentiary hearing.

The National Newspaper Association ("NNA") asserts that each application under the NPA "deserves careful scrutiny" and that public hearings should "closely examine the factual nature of the market."  Letter from Tom Bradlee, President, NNA, to Harry H. Flickinger, Assistant Attorney General for Administration (Sept. 7, 1989) at 1.  NNA, however, does not identify any specific factual issue that necessitates a hearing in this case to determine whether the proposed arrangement satisfies the requirements of the NPA.

The Clarence A. Heckethorn Living Trust ("Trust") argues that the applicants have the burden of proof, see Request for Hearing ("Trust Request") at 3-4, but the Trust does not point to any specific deficiency in the factual showings by the applicants in this case.  The Trust also contends that the JOA goes beyond the scope of the NPA by including "provisions intended to assure that one of [the editorial] voices [in Las Vegas] shall be the voice of a lineal descendant of the late Herman M. Greenspun, founder of the Sun."  Trust Request at 4.  This contention, which is discussed below, raises no factual issue.

Sergio Lalli and the Free Press Committee ("Committee") raise issues that are irrelevant under the NPA or do not involve factual questions requiring a hearing.  The Committee asserts that the JOA would make the Sun "a second-class subordinate" because it will receive less money than the Review-Journal for its news budget.  Committee Comments at 4.  However, while the NPA requires that each party to a JOA be "editorially and reportorially independent and competitive," 15 U.S.C. § 1801, that "editorial policies be independently determined," id. at § 1802(2), and thus that each newspaper receive funds sufficient to ensure an independent and competitive role, the NPA does not require that the funds available to each newspaper be equal.  The adequacy of the funds available to the Sun is discussed below; equality of funds is not required under the NPA.  The Committee also states that "[e]ven a cursory examination of [the Sun's] spending and allocation practices will reveal its business incompetence," Committee Comments at 8, but the Committee makes no specific factual assertions supporting this statement, let alone any such assertions of a factual issue that would require a

- 4 -

SUN_00024376

hearing to resolve. In addition, the Committee maintains that approval of the JOA will permit the newspapers to raise advertising rates and, more generally, will reduce the vitality of the newspaper market in Las Vegas. Committee Comments at 6-7, 17. But even if these assertions are true, Congress, by passing the NPA, chose to accept such consequences of joint operating arrangements. The Committee contends, too, that Las Vegas can support two newspapers, Committee Comments at 7, but it does not specify any facts demonstrating that, absent the JOA, the Sun could survive. Finally, the Committee questions the propriety of the provisions in the JOA under which Donrey will acquire stock in CCTV. That issue, which is treated below, raises no factual questions that would require an evidentiary hearing.[5]

## II.

### A. The Newspaper Preservation Act

During the 1930's, newspapers began to enter into joint operating arrangements as "a method to reduce costs by combining the economic and business aspects of newspaper production, and at the same time, permitt[ing] the newspaper participants to maintain separate editorial and reportorial staffs and independent editorial and news policies." H.R. Rep. No. 1193, 91st Cong., 2d Sess. 3, reprinted in 1970 U.S. Code Cong. & Admin. News 3547, 3548. In 1969, the Supreme Court ruled that such a joint operating arrangement in Tucson, Arizona, violated the Sherman and Clayton Acts. Citizen Publishing Co. v. United States, 394 U.S. 131 (1969). Faced with this ruling and with a decline in the number of communities served by more than one newspaper, see H.R. Rep. No. 1193, 91st Cong., 2d Sess. 5-6, reprinted in 1970 U.S. Code Cong. & Admin. News 3547, 3548-49, Congress in 1970 passed the NPA to provide a limited antitrust

---

[5] To the extent that the other comments opposing approval of the JOA address the JOA at all, they generally raise the same issues as the comments that seek an evidentiary hearing. Two commenters question whether there is an economic justification for the Sun. If this argument is relevant at all, it supports the conclusion that the Sun is a "failing newspaper." 15 U.S.C. § 1802(5). Other commenters argue that JOAs stifle competition. That argument should be addressed to Congress, since it concerns the wisdom of the exemption from the antitrust laws granted by the NPA rather than whether the applicants have complied with the NPA's requirements. One commenter complains that the two newspapers will not print his letters. In addition to being submitted after the deadline set by the notice in the Federal Register, his comments do not warrant holding an evidentiary hearing on the JOA, since he does not show that the JOA will fail to preserve the independence of the newspapers' editorial judgment.

- 5 -

SUN_00024377

exemption for joint newspaper operating arrangements. The
exemption extends to new joint operating arrangements, but only
if they receive the prior written approval of the Attorney
General. 15 U.S.C. § 1803(b). See Application by York Daily
Record, Inc., and York Newspapers, Inc., for Approval of a Joint
Newspaper Operating Arrangement Pursuant to the Newspaper
Preservation Act, 15 U.S.C. §§ 1801-1804, issued February 21,
1990 ("York").

The statute provides for approval of the JOA if the Attorney
General finds (1) "that not more than one of the newspaper
publications involved in the arrangement is a publication other
than a failing newspaper," with a "failing newspaper" defined as
"a newspaper publication which, regardless of its ownership or
affiliations, is in probable danger of financial failure," 15
U.S.C. §§ 1802(5), 1803(b); and (2) "that approval of such
arrangement would effectuate the policy and purpose" of the NPA.
Id., § 1803(b). "The applicants have the burden of proving the
proposed arrangement satisfies the requirements of the [NPA]."
Opinion and Order of the Attorney General Regarding the
Application of Seattle Times Company and the Hearst Corporation
for Approval of a Joint Operating Arrangement ("Seattle JOA") at
1-2 (June 15, 1982)(citing 28 C.F.R. § 48.10(a)(4), which applies
to hearings before administrative law judges), aff'd, Committee
for an Independent P-I v. Hearst Corp., 704 F.2d 467 (9th Cir.),
cert. denied, 464 U.S. 892 (1983).

1. Failing Newspaper: The first issue is thus whether one
of the two applicants is a "failing newspaper" within the meaning
of the NPA -- "a newspaper publication which, regardless of its
ownership or affiliations, is in probable danger of financial
failure." 15 U.S.C. § 1802(5). Congress intended this standard
to be more permissive than the "failing company" test of Citizen
Publishing Co. v. United States, supra. Under the test in that
case, a company is "failing" only if "it is on the brink of
collapse, its prospects for reorganization are dim or
nonexistent, and no other noncompeting buyers are available."
Committee for an Independent P-I v. Hearst Corp., supra, 704 F.2d
at 474 (citing and explaining Citizen Publishing Co. v. United
States, supra, 394 U.S. at 137-38). To satisfy that test, a JOA
would need to be "the last straw at which [the financially
distressed newspaper] grasped." 394 U.S. at 137. On the other
hand, although Congress enacted the NPA to relax the "failing
company" test articulated by the Supreme Court, the "probable
danger of financial failure" standard of the NPA was intended to
be more stringent than a "not likely to remain or become
financially sound" test initially passed by the Senate but later
rejected by the Congress in the version of the bill that became
law. Committee for an Independent P-I v. Hearst Corp., supra,

- 6 -

SUN_00024378

SA413

Case 2:19-cv-03467-ART-NDC   Document 1029   Filed 02/23/26   Page 132 of 176

704 F.2d at 474.[6]  Thus, a showing of chronic difficulty or instability, in itself, is not sufficient to obtain approval of a JOA; the applicants must show financial problems that are likely to lead to financial failure.  The newspaper alleged to be "failing" must not merely be sick, with a significant chance of recovery; it must be suffering from an illness that is likely to be fatal.

In Committee for an Independent P-I v. Hearst Corp., supra, the Ninth Circuit held that, under a "commonsense construction," the "probable danger standard is, by the plain meaning of its words, primarily an economic standard:  Is the newspaper suffering losses which more than likely cannot be reversed?"  704 F.2d at 478.  Attorney General Meese adopted this construction in Application by Detroit Free Press, Inc., and the Detroit News, Inc., for Approval of a Joint Newspaper Operating Arrangement Pursuant to the Newspaper Preservation Act, Docket No. 44-03-24-8 (Aug. 8, 1988)("Detroit JOA"), at 7-8, aff'd, Michigan Citizens for an Independent Press v. Thornburgh, 868 F.2d 1285, 1292 (D.C. Cir.), aff'd by an equally divided court, 110 S. Ct. 398 (1989). This interpretation gives proper weight to the principle that exemptions from the antitrust laws must be narrowly construed, see Seattle JOA at 4; Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 231 (1979), while accounting for the legislative intent to create a standard less exacting than the "failing company" test.  In accordance with the intent behind the NPA, therefore, the paper need not be on its financial deathbed, but it must be in worse financial trouble than the rejected "not likely to remain or become financially sound" standard would imply.  To determine whether losses can be reversed may also entail an inquiry into the time left before the anticipated failure:  if sufficient time remains, the newspaper may have an opportunity to improve its position and thus reverse its losses.

2.  Policy and Purpose of Act:  The second issue to be decided is whether "approval of [the] arrangement would effectuate the policy and purpose" of the NPA.  15 U.S.C. § 1803(b).  The stated purpose of the NPA is to advance the "public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States."  Id. § 1801.  This purpose co-exists with the economically pro-competitive policies of the antitrust laws.  See Detroit JOA at 11.  The "probable danger of financial failure" test recognizes that, if a competing newspaper ceases publication

---

[6] For JOAs that existed when the NPA was passed in 1970, Congress did establish a standard of whether the newspaper was "[not] likely to remain or become a financially sound publication."  15 U.S.C. § 1803(a).  The more stringent test governs post-1970 JOAs.

SUN_00024379

altogether, economic and editorial competition will both be reduced.

## B.    The Sun as a Failing Newspaper

On the record here, the Sun has been shown to be a "failing newspaper" within the meaning of the NPA.  The record demonstrates that the Sun's losses are, in all likelihood, irreversible.

Since 1984, the cumulative pre-tax losses of the Sun have been nearly $13 million.  Antitrust Report at 28.  In 1988, the Sun posted a pre-tax loss of $3.6 million on less than $21 million in revenues.  The newspaper has lost money every year since 1981, when it posted a modest pre-tax profit of $183,000 on just under $16 million in revenues.  Application at Exhibit A. Cash flow was a negative $2 million in 1987 and a negative $6 million in 1988.  Antitrust Report at 38.

The total debt of the Sun, moreover, now amounts to $11 million.  The Greenspun family and companies controlled by the Greenspuns have advanced $6.5 million in unsecured loans for working capital.  Antitrust Report at 29-30.[7]

The Sun's trends in advertising and circulation have been unfavorable and leave little hope that these losses can be reversed.  From 1984 to 1988, total advertising lineage declined steadily, from almost 2,000,000 column inches to less than 1,300,000.  Antitrust Report at Table 6.  Advertising market share fell from 40 percent to less than 30 percent.  Retail, classified, and national lineage showed a comparable decline. Total advertising revenue shrank from over $17,250,000 to just over $15,135,000.  Id. at Table 10.[8]

---

[7] Under the NPA, whether a newspaper is "failing" must be determined "regardless of its ownership or affiliations."  15 U.S.C. § 1802(5).  Even if additional infusions of cash were available from the Greenspuns (and there is no indication that they would be), the availability of those funds would be irrelevant to the decision in this proceeding.  See Committee for an Independent P-I v. Hearst Corp., supra, 704 F.2d at 480.

[8] Because the Review-Journal's total advertising revenues have been given confidential treatment under 28 C.F.R. § 48.5, the figures for the drop in the Sun's market share of advertising revenues are not on the public record.  However, as the Review-Journal and the Sun have argued, those figures for market share would only reinforce the conclusion that the Sun is in serious and sustained financial difficulty.

- 8 -

Circulation trends, too, have been generally unfavorable to the Sun. Daily paid circulation was almost 58,000 in 1982; in 1989 it was less than 52,000. Antitrust Report at Table 1. During that period, the Sun's market share fell from 38.2 percent to 28.4 percent. Id. Paid circulation for the Sunday edition declined from over 63,000 in 1982 to less than 56,000 in 1989. Id. at Table 2. Market share was reduced from 38 percent to less than 27 percent. Id. Although the population of the Las Vegas area grew in the 1980s at an annual rate of 3.6 percent, compared to the national rate of 1.1 percent, Application at 13 n.3, the Sun has been unable to prevent the loss of readers.[9]

Indeed, the applicants contend that the Sun "is inextricably caught in the so-called 'downward-spiral' . . . where losses in circulation share lead to losses in advertising share, leading in turn to further circulation losses." Application at 1. However, the record does not unambiguously point to a classic "downward spiral." Although the Sun's market share in circulation has fallen in most years since 1982, market share in daily circulation increased in 1986, and the share for the Sunday edition held steady in 1985 and increased in 1986.[10] Antitrust Report at Table 1 and Table 2. Furthermore, while the Sun's circulation market share went down in 1989, the absolute numbers for both the daily and Sunday editions increased. Id. In this

---

[9] The Antitrust Division observes that "newspapers whose readers are generally wealthier or who are members of population groups that tend to spend more are more attractive to advertisers, other things being equal," but concludes that "[t]he limited evidence available here suggests that [Sun] readers are substantially outnumbered by [Review-Journal] readers in all age, education and income groups." Antitrust Report at 25 n.20. However, a report prepared in 1988 by management consultants Deloitte, Haskins & Sells ("DHS") determined that "the Sun does maintain a dominant market share in the 45-54 age group and an even more dominant market share in the 55+ age group" and that these groups are important, in part, because "they have a high per capita disposable income."

The Antitrust Division's conclusion rests on a study performed by Belden Associates, based on data collected from May to August 1988 through a telephone study of 1026 persons and 509 written questionnaires. See Doc. RJ 0085, 0158-59. In contrast, the DHS study used 1987 data. In light of its use of more recent data, the Antitrust Division's conclusion is accepted.

[10] The 1986 increases are probably attributable, in large measure, to a program undertaken from 1985 to 1987 in which the Sun sought to expand circulation by providing the Sunday edition (later replaced by the Saturday edition) free of charge to CCTV subscribers. Antitrust Report at 34 n.52; Application at 18-19.

- 9 -

SUN_00024381

respect, too, the record does not point unambiguously to a "downward spiral."[11]

Nevertheless, a newspaper can show that its losses are irreversible, even if it is not in a "downward spiral." See Michigan Citizens for an Independent Press v. Thornburgh, 868 F.2d 1285, 1292 (D.C. Cir.), aff'd by an equally divided court, 110 S. Ct. 398 (1989); York at 8-11. Here, the Sun's advertising revenues have declined in every year since 1982, without exception; the newspaper has lost money in each of those years; and, even with the 1989 increases in circulation, both the daily and the Sunday circulations are considerably smaller than in 1982. For an enterprise of its size, the Sun has serious cash flow problems and a large burden of debt. In addition, the Sun has deferred capital expenditures that would probably be necessary if the newspaper were to remain competitive. These deferred costs would include $1.5 to $2 million for new mailroom equipment and $13 to $15 million for a new press. Application at 27-28. The record therefore demonstrates that the Sun's losses are, in all likelihood, irreversible.[12]

Moreover, no alternative to the JOA appears feasible. New management would not be likely to reverse the Sun's losses, because the present management has made reasonable and diligent efforts to achieve profitability for the newspaper but has still failed in that attempt. See Committee for an Independent P-I v. Hearst Corp., supra, 704 F.2d at 478; Michigan Citizens for an Independent Press v. Thornburgh, supra, 868 F.2d at 1292. During the 1970s and 1980s, the Sun published "zoned" editions, which were distributed in specific local areas and contained advertisements and editorial material suited for those areas. The Sun at first tried four zoned editions and later published only two, but, in both instances, the zoned editions failed to improve the newspaper's market position. Antitrust Report at 31-32 & n.40. The Sun also attempted to publish two "total market coverage" publications designed to reach all readers, including those not subscribing to the Sun. These publications, The

---

[11] Perhaps significantly, the Antitrust Report, while noting the overall trends in circulation and advertising over the last several years and recommending approval of the JOA, never states that the Sun is in a downward spiral.

[12] The only indication in this record that there may remain sufficient time to reverse the Sun's losses is the DHS study, which projected that the Sun could again become profitable in 1992. Antitrust Report at 39. However, even assuming the Sun could continue to absorb losses until 1992, the DHS study assumed that the Sun could increase its market share while raising advertising rates. This assumption conflicts with recent experience. Id. at 40.

- 10 -

Advertiser (in 1978) and Food News (in 1982), did not appreciably
improve the Sun's position.  Id. at 32 & n.41.  In addition, the
Sun made two unsuccessful efforts to establish an afternoon
edition to compete with the Review-Journal's afternoon edition.
Id. at 32.  In 1988, the Sun also began to print, as additional
sections in its regular editions, a Monday business tabloid and a
special Tuesday sports section, but these efforts, too, failed to
attract more readers.  Id. at 34.

     The Sun retained consultants to recommend measures for
strengthening the paper.  In 1985, McGladrey and Pullen suggested
a cost reduction program.  Although the Sun adopted many of the
recommendations, the Sun's financial condition failed to improve.
Id. at 32.  In 1988, Deloitte, Haskins & Sells recommended
various managerial improvements, which were implemented.  Id. at
33-34.  The Sun's losses, however, have continued.

     As discussed above, the Sun carried out a program from 1985
to 1987 in which it used CCTV in an attempt to increase
circulation of the newspaper.  The program proved a costly
failure.  Id. at 37.  The program, however, followed the outline
of similar programs elsewhere that had succeeded.  Id.  Thus, as
the Antitrust Division concludes, the "evidence establishes that
the [Sun] management took a calculated, but unsuccessful, risk
that the short term costs of the program would produce greater
long term gains."  Id. at 37-38.

     The Sun has also tried to cut costs by reducing salaries and
increasing commissions for advertising representatives.  Id. at
33.  It has tried to enlarge revenues by eliminating discounts in
advertising rates.  Id.  These efforts, however, have not stopped
the Sun's accumulating losses.[13]

     In sum, the record reveals that the Sun's losses are, in all
likelihood, irreversible.  New management would not be likely to
save the Sun from the continuing losses with which the newspaper
is threatened.

C.   Policy and Purpose of NPA in This Case

     The record also establishes that approval of the JOA would
serve the policy and purpose of the NPA.  The Sun faces probable
failure, and there appears to be no feasible alternative to the
JOA that would preserve the Sun in operation.  By enabling the
Sun to continue publication as a second editorial voice in Las

     [13] Although the record does not show that there were any
attempts to sell the Sun, the owners apparently did seek, without
success, to sell minority interests to other newspaper companies.
Antitrust Report at 15.  See Committee for an Independent P-I v.
Hearst Corp., supra, 704 F.2d at 478.

- 11 -

SUN_00024383

Vegas, the JOA would serve the statutory goal of maintaining an
independent and competitive newspaper press.

The JOA will adequately provide for the editorial and
reportorial independence and competitiveness of the Sun.[14]  The
Sun will continue to have its own staff for news and editorial
operations.   To cover news and editorial expenses, the JOA
allocates to the Sun the greater of $2.25 million, increased
annually by the consumer price index for the Las Vegas area, or
65 percent of the Review-Journal's news and editorial expenses.
Because the Sun's current news and editorial budget is
approximately $2.25 million, this formula ensures maintenance of
current levels of expenditures; and, depending on the Review-
Journal's expenditures, the measure based on the 65 percent
figure could produce additional funds.   Antitrust Report at 17-
18, 41-42.   The JOA also contains a formula for the amount of
space in the Sun devoted to news and editorials.   The ratio of
the Sun's and the Review-Journal's "newsholes" will be the same
as the ratio of the advertising inches in the two newspapers, but
the Sun's newshole will in no event be less than 85 percent of
the Review-Journal's.   This formula assures that the Sun will
have substantial amounts of space for news and editorials.[15]

---

[14] One public commenter argues that the JOA is contrary to
the purpose of the NPA because it contains provisions intended to
assume that "one of [the editorial] voices shall be the voice of
a lineal descendant of the late Herman Greenspun, founder of the
Sun."   Trust Comments at 4.   However, the NPA aims at a press
editorially and reportorially independent and competitive, and
the commenter has not given any reason why that aim would be
frustrated by this provision of the JOA.   In any event, the
provision in question does not preclude transfer of the Sun to a
person who is not a descendant of Herman Greenspun, as long as
that person is acceptable to the Review-Journal.   See JOA, Art.
9.1.3.

[15] It does not appear that the JOA's provision for Donrey to
obtain 10 percent of the stock in CCTV, with an option for the
purchase of as much as another 35 percent of the company's stock,
is relevant to whether the JOA satisfies the policies and
purposes of the NPA.   The NPA is concerned only with whether the
agreement for the joint operation of the newspapers will prevent
the Sun from failing, while preserving that paper's editorial and
reportorial independence.   The transfer of stock in CCTV will
have no effect on this goal except that it constitutes additional
consideration that makes the JOA economically palatable to
Donrey.   The stock transfer, therefore, is not to be viewed as
covered by the JOA, and this Opinion should not be read as taking
any position on the propriety of that transfer under the
antitrust laws.

- 12 -

Because the record shows that the <u>Sun</u> is a failing newspaper within the meaning of the NPA and that the JOA will serve the policies and purposes of the NPA, the JOA will be approved.

DICK THORNBURGH
Attorney General

Dated:   June   1, 1990

- 13 -

SUN_00024385

# EXHIBIT 6

Declaration of Brian Greenspun in Support of Plaintiff/Counterdefendants'
Emergency Motion for Temporary Restraining Order and Preliminary Injunction

# EXHIBIT 6

1
2

**DECLARATION OF BRIAN GREENSPUN IN SUPPORT OF PLAINTIFF/COUNTERDEFENDANTS' *EMERGENCY* MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

3

4       I, Brian Greenspun, do hereby swear under penalty of perjury that the following assertions

5   are true and correct to the best of my knowledge:

6       1.      I am the Chief Executive Officer, Publisher, and Editor of Plaintiff Las Vegas Sun,

7   Inc. (the "Sun"). The statements herein are based upon my personal knowledge. I make this

8   Declaration in support of Plaintiff/Counterdefendants' *Emergency* Motion for Temporary

9   Restraining Order and Preliminary Injunction Should Not Issue ("Motion").

10      2.      As a result of the Sun's combination with the RJ under the 1989 JOA, the Sun

11  became dependent on the RJ for all business aspects of the joint operation. The Sun does not have

12  printing facilities or a distribution network, or many of the other assets required to print and

13  distribute a newspaper. I believe that only the Review-Journal has the capacity to print and

14  distribute a daily newspaper in the relevant geographic market. Because of the large startup costs

15  for a newspaper and the inability to reach a financially viable scale, I believe terminating the joint

16  operation would immediately kill the Sun.

17      3.      Allowing the RJ to terminate the joint operation and essentially eliminate the Sun

18  newspaper would deprive the Sun of its ability to reach readers with, and deprive readers of, the

19  Sun's independent editorial and reportorial voice. Terminating the joint operation and the Sun

20  would result in the loss of jobs and competition for creators of news, editorial, and entertainment

21  content.

22      4.      The Sun will also suffer immediate, irreparable injury in the form of public

23  perception of the viability of the Sun. Moreover, once the Sun is shut down, it is unlikely to be

24  reopened due to the lack of infrastructure necessary to print and distribute its Newspaper, and its

25  loss of staff and ability to recruit new employees, loss of future capital with which to fund

26  operations, loss of readership and visibility, and loss of goodwill.

27      5.      No monetary amount will be able to compensate the Sun for the losses it will sustain

28  if the RJ is allowed to terminate the joint operation, and cease printing and distributing the Sun.

- 1 -

6.      Attached as **Exhibit 3** to the Motion is a true and correct copy of the June 17, 1989, Joint Operating Agreement (the "1989 JOA") (SUN_00001996-2039). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

7.      Attached as **Exhibit 4** to the Motion is a true and correct copy of the Report of the Assistant Attorney General in Charge of the Antitrust Division, Public File No. 44-03-13, In the Matter of: Application by the Las Vegas Sun, Inc. and Donrey of Nevada, Inc. for Approval of a Joint Newspaper Operating Arrangement Pursuant to the Newspaper Preservation Act, 15. U.S.C. §§ 1801-1804 (SUN_00024386-453). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

8.      Attached as **Exhibit 5** to the Motion is a true and correct copy of the June 1, 1990, Opinion of The Attorney General, Public File No. 44-03-13, In the Matter of: Application by the Las Vegas Sun, Inc. and Donrey of Nevada, Inc. for Approval of a Joint Newspaper Operating Arrangement Pursuant to the Newspaper Preservation Act, 15. U.S.C. §§ 1801-1804 (SUN_00024373-85). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

9.      Attached as **Exhibit 9** to the Motion is a true and correct copy of the June 10, 2005, Amended and Restated Agreement (the "2005 JOA") (SUN_00002045-69). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

10.      Attached as **Exhibit 13** to the Motion is a true and correct copy of the June 16, 2005, email from G. Lang to J. Farrow et al., re DR Partners' submission of 2005 JOA to DOJ "pursuant to the Newspaper Preservation Act, 15 USC § 1801 et seq. and 28 CFR § 48.16 (SUN_00005886-89). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the

- 2 -

1  Sun, and this record was kept in the regular course of business of the Sun, which making such a
2  record is a regularly conducted business activity of the Sun. This document has been **FILED**
3  **UNDER SEAL**.

4        11.     Attached as **Exhibit 16** to the Motion is a true and correct copy of the Sept. 23,
5  2005, email from C. Cliff to D. Jordan, et al., re Amendment of the Las Vegas JOA – Joint Defense
6  Agreement (SUN_00001673-84). This Exhibit was a record made at or near the date indicated on
7  the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the
8  Sun, which making such a record is a regularly conducted business activity of the Sun. This
9  document has been **FILED UNDER SEAL**.

10        12.     Attached as **Exhibit 17** to the Motion is a true and correct copy of the Aug. 5, 2005,
11  facsimile from B. Matelson to G. Lang re Las Vegas JOA, CID No. 23751 (SUN_00012237-47).
12  This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun,
13  and this record was kept in the regular course of business of the Sun, which making such a record
14  is a regularly conducted business activity of the Sun. This document has been **FILED UNDER**
15  **SEAL**.

16        13.     Attached as **Exhibit 18** to the Motion is a true and correct copy of the Oct. 12, 2005,
17  letter from A. Marx to B. Matelson, re responses to CID No. 23751 (SUN_00001806-14). This
18  Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and
19  this record was kept in the regular course of business of the Sun, which making such a record is a
20  regularly conducted business activity of the Sun. This document has been **FILED UNDER SEAL.**

21        14.     Attached as **Exhibit 19** to the Motion is a true and correct copy of the Feb. 13, 2006,
22  facsimile from B. Matelson to A. Marx, re Civil Investigative Demand Nos. 24097 & 24098
23  (SUN_00012233-36). This Exhibit was a record made at or near the date indicated on the Exhibit
24  by someone at the Sun, and this record was kept in the regular course of business of the Sun, which
25  making such a record is a regularly conducted business activity of the Sun. This document has been
26  **FILED UNDER SEAL.**

27        15.     Attached as **Exhibit 21** to the Motion is a true and correct copy of the Aug. 16, 2005,
28  letter from B. Matelson to G. Lang re 8/16/05 DOJ faxed letter to G. Lang re Civil Investigative

SA424

Demand No. 23751 (SUN_00012248-50). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun. This document has been **FILED UNDER SEAL.**

16.     Attached as **Exhibit 22** to the Motion is a true and correct copy of the Aug. 25, 2005, letter from G. Lang to B. Matelson re Las Vegas JOA (SUN_00001965-68). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun. This document has been **FILED UNDER SEAL.**

17.     Attached as **Exhibit 27** to the Motion is a true and correct copy of the Aug. 29, 2019, letter from K. Moyer to B. Greenspun re: Notice of Default (SUN_00053251-53). I have personal knowledge of this Exhibit as I was a recipient of the email thread. This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

18.     Attached as **Exhibit 44** to the Motion is a true and correct copy of the Las Vegas Review Journal Payment Calculation JOA Fiscal Year Ending March 2020. This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun. This document has been **FILED UNDER SEAL.**

19.     Attached as **Exhibit 45** to the Motion is a true and correct copy of the Apr. 30, 2022, email from S. Hall to R. Cauthorn re JOA Calculation – JOA Year Ended March 2022 (SUN_00084445-47). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun. This document has been **FILED UNDER SEAL.**

20.     Attached as **Exhibit 54** to the Motion is a true and correct copy of the Chris Jones & J.M. Kalil's article, Las Vegas Sun to rise with morning RJ, published in the Las Vegas Review

- 4 -

Journal on June 15, 2005 (SUN_0000627-32). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

21.     Attached as **Exhibit 61** to the Motion is a true and correct copy of the Feb. 12, 2018, Email from R. Brewer to R. Cauthorn re: Two quick questions from LV Sun print (SUN_00055720). This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun.

22.     Attached as **Exhibit 65** to the Motion is a true and correct copy of the Aug. 30, 2019, letter from T. Burkholder to B. Greenspun re Message via the Las Vegas Sun (SUN_00000293). I have personal knowledge of this Exhibit as I was a recipient of the email thread. This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun. This document has been filed **REDACTED**.

23.     Attached as **Exhibit 66** to the Motion is a true and correct copy of the Sept. 6, 2019, email originally from A. Marshall to Las Vegas Sun Letters, re Please work with the RJ to maintain the JOA (SUN_00024479). I have personal knowledge of this Exhibit as I was a recipient of the email thread. This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun. This document has been filed **REDACTED**.

24.     Attached as **Exhibit 67** to the Motion is a true and correct copy of the Jan. 15, 2019, email from K. Woods to B. Greenspun re Message via the Las Vegas Sun (SUN_00000315). I have personal knowledge of this Exhibit as I was a recipient of the email thread. This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun. This document has been filed **REDACTED**.

25.     Attached as **Exhibit 68** to the Motion is a true and correct copy of the Aug. 27, 2017, email from M. Spigelman to B. Greenspun re Message via the Las Vegas Sun (SUN_00000376-77). I have personal knowledge of this Exhibit as I was a recipient of the email thread. This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun. This document has been filed **REDACTED**.

26.     Attached as **Exhibit 69** to the Motion is a true and correct copy of the Aug. 30, 2019, email from W. Wreatha to Las Vegas Sun Letters, re Printing & distribution arrangement with LV Review-Journal (SUN_0000300). I have personal knowledge of this Exhibit as I was a recipient of the email thread. This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun. This document has been filed **REDACTED**.

27.     Attached as **Exhibit 70** to the Motion is a true and correct copy of the Sept. 6, 2019, email from C. Sappraicone to Las Vegas Review Journal Letters re Not printing The Las Vegas Sun? (SUN_0000298). I have personal knowledge of this Exhibit as I was a recipient of the email thread. This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun. This document has been filed **REDACTED**.

28.     Attached as **Exhibit 71** to the Motion is a true and correct copy of the Sept. 5, 2019, email from P. Ryan to B. Greenspun re Keep the Sun (SUN_0000303-04). I have personal knowledge of this Exhibit as I was a recipient of the email thread. This Exhibit was a record made at or near the date indicated on the Exhibit by someone at the Sun, and this record was kept in the regular course of business of the Sun, which making such a record is a regularly conducted business activity of the Sun. This document has been filed **REDACTED**.

//

//

SA427

1       I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.

3       Executed this 23rd day of February 2026.

4

5                               /s/ Brian Greenspun

                                BRIAN GREENSPUN

- 7 -

SA428

# EXHIBIT 7

Hearing Transcript Excerpts of Mark Hinueber, *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case No. 01-16-0001-9187 (Oct. 6, 2016) (Vol. 4) (SUN_00023106-08, 273-74, 278, 280, 282-86, 383) (**FILED UNDER SEAL**)

# EXHIBIT 7

# EXHIBIT 8

Sept. 8, 2016, Declaration of Mark Hinueber in Support of Stephens Media LLC's Opposition to Las Vegas Sun's Motion for Summary Judgment, AAA Case No. 01-16-0001-9187 (SUN-00064364-67) (**FILED UNDER SEAL**)

# EXHIBIT 8

# EXHIBIT 9

June 10, 2005, Amended and Restated Agreement (the "2005 JOA")
(SUN_00002045-69)

# EXHIBIT 9

# AMENDED AND RESTATED AGREEMENT

This Amended and Restated Agreement ("Restated Agreement") dated as of June 10, 2005 between DR Partners, a Nevada General Partnership, the successor-in-interest to Donrey of Nevada, Inc. ("DR") and the Las Vegas Sun, Inc., a Nevada corporation ("Sun").

## PRELIMINARY STATEMENT

WHEREAS, DR owns and publishes in Las Vegas, Nevada, a morning newspaper on weekdays, a morning newspaper on Saturdays and holidays, and a Sunday newspaper, each known as the Las Vegas Review-Journal (hereinafter referred to as the "Review-Journal"); and

WHEREAS, Sun owns in Las Vegas, Nevada, an afternoon newspaper on weekdays, known as the Las Vegas Sun (hereinafter referred to as the "Sun") and a combined Saturday and Sunday paper with the Review-Journal; and

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I
## REGULATORY FILING AND TERM

1.1   Regulatory Filing.  Within ten business days (or on such later day as the parties may agree) the Parties agree to file the Restated Agreement with the Attorney General of the United States under the Newspaper Preservation Act within the Department of Justice and to use their best efforts and take all action necessary to effect the intent of this Restated Agreement.  In the event of any action by the United States Department of Justice after the filing of the Restated Agreement which, in the sole opinion of either party, hinders, impairs, seeks to halt or otherwise materially impacts this Restated Agreement, then either party may declare the Restated Agreement null and void, and the 1989 Agreement between the parties shall be reinstituted and remain in full force and effect.  The Restated Agreement does not constitute any limitation on either party's obligation to engage in good faith labor negotiations if and as required by the National Labor Relations Act, and to implement any understandings it may reach in such negotiations.

Upon execution hereof, each party shall furnish to the other a written opinion of its counsel that all necessary corporate or partnership action has been taken to authorize this Restated Agreement and that, subject to the conditions of the preceding paragraph, this Restated Agreement shall constitute the valid and binding obligation of the respective party.  The parties agree to cooperate in coordinating meetings with government officials, community leaders, employees and their representatives, advertisers and others to explain the Restated Agreement.

1

JOA 020705

SaltLake-251719.2 0062095-00001

Each party shall pay its own costs and professional fees in connection with the formulation and drafting of the Restated Agreement and the preparation and filing of the Restated Agreement with the Department of Justice. From and after the filing of such Restated Agreement, all costs and professional fees in connection with seeking any required approval by the Department of Justice shall be controlled and approved by the Review-Journal and such cost and shall be borne solely by Review-Journal.

1.2     Term. The term of this Restated Agreement shall begin at 12:00 a.m. on June 10, 2005 ("the Effective Date"). The 1989 Agreement shall remain in full force and effect through September 30, 2005 (the "Transition Date"). Subject to the termination provisions set forth in Article 9, the Restated Agreement shall continue for an initial period ending at the close of business on the 31st day of December of the fiftieth (50th) year from July 1, 1990. The Restated Agreement shall then automatically renew for succeeding periods of ten (10) years unless either party shall notify the other in writing at least two (2) years prior to the end of the then current period that it elects to terminate the Restated Agreement at the end of said period. The phrase "term of this Agreement" as used hereafter shall mean the initial period and any renewal period or periods.

ARTICLE 2
AGENCY
Intentionally omitted

ARTICLE 3
Intentionally omitted

ARTICLE 4
NEWS AND EDITORIAL COPY, FEATURES AND SERVICES

4.1     Maintenance of News and Editorial Staff; Feature Materials. Review-Journal and Sun each shall maintain a staff of news and editorial employees, and shall license such feature materials (including, but not limited to, news and editorial services supplied by third parties), adequate to provide its respective newspaper with all of the news and editorial copy and related services deemed necessary by each of them as to its respective newspaper. Review-Journal shall use commercially reasonable efforts to cause third party suppliers of feature materials and professional associations to provide such feature materials and association memberships to Sun at rates equivalent to those currently charged to Sun.

4.2     News and Editorial Allocations. The Review-Journal and the Sun shall each bear their own respective editorial costs and shall establish whatever budgets each deems appropriate.

4.3     Furnishing News and Editorial Copy and Services. In furnishing features, news and editorial copy, and like materials to Review-Journal for publication in the Sun, and in providing layout for such material, Sun shall provide all such material in a form appropriate for the production of its newspaper, in conformity with the mechanical standards, deadlines and production requirements which prevail in the Review-Journal plant from time to time, including

2

deadlines, page sizes, column widths, and cut-offs established by Review-Journal, upon reasonable notice to Sun. Sun shall acquire and maintain at its expense such newsroom equipment (including, but not limited to, newspaper production systems, i.e., "front-end" systems) as may be required to interface with Review-Journal production facilities. In the event that the newspaper production system used by the Review-Journal is changed and (i) the Sun has utilized a production system that is current with systems commonly employed in the newspaper industry; (ii) the change by the Review-Journal results in any loss of a fully functional interface with the Sun newspaper production system, the Review-Journal shall be responsible to furnish such additional software, hardware and technical services to the Sun as may be necessary to establish such an interface. The Review-Journal shall give Sun ninety (90) days advance notice of anticipated changes to the Review-Journal's production system, including technical specifications for the new or modified system. The Sun shall treat any software provided as confidential and conform to all applicable licensing requirements for such software. Newshole limitations and other matters are set forth in Appendix A hereto. The parties agree to begin the publication cycle changes for the Sun on the Transition Date (or on such latter day as the parties may agree). The Review-Journal reserves the right to print conspicuous notices to the effect that the news content of the non-Sun portion of the Newspapers, including locally produced supplements, is produced by Review-Journal personnel. The Sun reserves the right to print conspicuous notices to the effect that the news content of the non-Review-Journal portion of the Newspapers, including locally produced supplements, is produced by Sun personnel.

    4.4    Intentionally omitted.

ARTICLE 5

CONTINUING PUBLICATION AND
NEWS AND EDITORIAL AUTONOMY

    5.1    Production and Promotion of the Newspapers. Subject to the terms of the Restated Agreement, and as of the Transition Date, Sun shall be a daily morning newspaper as specified in Appendix A. The Review-Journal shall be a daily morning newspaper, as specified in Appendix A, including such sections and materials as are consistent with custom and practice in the United States metropolitan daily newspaper industry. So long as Sun furnishes news and editorial copy, features and services to Review-Journal in accordance with Article 4 of this Restated Agreement, Review-Journal agrees to produce the Sun daily as a morning newspaper as provided herein to include the Sun copy and to sell all advertising for, promote and circulate such newspapers as provided herein. The daily Sun and the daily Review-Journal are hereinbefore and hereinafter referred to as the "Newspapers". Review-Journal shall print the Newspapers in the Review-Journal plant or plants located at such place or places as Review-Journal may determine, and all operations under this Restated Agreement, except the operation of the Sun' news and editorial department, shall be carried on and performed by the Review-Journal with Review-Journal employees and equipment and in the Review-Journal's said plant or plants or by independent contractors selected by the Review-Journal. All costs, including capital expenditures, of operations under this Restated Agreement, except the operation of the Sun's news and editorial department, shall be borne by Review-Journal.

3

SUN_00002047

The Review-Journal shall control, supervise, manage and perform all operations involved in managing and operating under this Restated Agreement, including the need, if any, for Sunday supplements and comics, total or zoned market coverage, direct mail or other publication programs, zoned editions, and printing, selling and distributing the Newspapers, shall determine page sizes, number of columns per page, cut-offs, page makeup of non-news and non-editorial (subject to Appendix A), and all other mechanical and technical functions of the Newspapers, shall purchase newsprint, materials and supplies as required and shall determine the rates for, solicit and sell all advertising space in the Newspapers, shall determine circulation rates, collect the Newspapers' circulation and advertising accounts receivable, and shall make all determinations and decisions and do any and all acts and things related to the foregoing activities, provided:

5.1.1   Format.  Review-Journal shall not change the format of the Sun to any size or format different from that of the Review-Journal without approval of Sun.

5.1.2   Sun Editions.  The number of Sun editions shall not be changed without approval of Sun.

5.1.3   Circulation.  Review-Journal shall use commercially reasonable efforts to maximize the circulation of the Newspapers.

5.1.4   Promotional Activities.  Review-Journal shall use commercially reasonable efforts to promote the Newspapers.  Any promotion of the Review-Journal as an advertising medium or to advance circulation shall include mention of equal prominence for the Sun.  Either the Review-Journal or Sun may undertake additional promotional activities for their respective newspaper at their own expense.  For all promotional activities for the Newspapers paid for by the Review-Journal, the Review-Journal shall be responsible for all promotional copy preparation and placement, provided however, that the Sun shall have the right to approve all promotional copy for the Sun that does not generically and concurrently promote both Newspapers.

5.1.5   Intentionally omitted.

5.1.6   Meetings of JOA Participants.  DR senior management shall meet quarterly with Sun senior management to discuss performance under this Restated Agreement.

5.1.7   Advertising Acceptability.  Sun may reject any advertising or types of advertising for the Sun which is, in the opinion of Sun, undesirable or inappropriate for publication therein, and shall notify Review-Journal in writing of any specific advertising or types of advertising that Sun deems undesirable for publication.  Review-Journal shall accept all advertising for the Sun other than the advertising indicated on Sun's written notice, subject to all laws affecting the acceptability of advertising.

5.1.8   Intentionally omitted.

4

5.2. <u>News and Editorial Autonomy</u>. Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the essence of this Restated Agreement. Sun shall have exclusive and complete control, authority and direction over the news and editorial content, features and services to be furnished by Sun to Review-Journal to be included in its newspaper, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees. Review-Journal shall have exclusive and complete control, authority and direction over the news and editorial content, features and services in its newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees. The Review-Journal and Sun each hereby agrees to preserve high standards of newspaper quality throughout the term of this Restated Agreement consistent with United States metropolitan daily newspapers.

5.3. <u>Performance and Cooperation</u>. Sun and Review-Journal agree to take all corporate action necessary to carry out and effectuate the intent, purposes and provisions of this Restated Agreement, and to cooperate with the other party in every reasonable way that will promote successful and lawful operation under this Restated Agreement for both parties.

5.4 <u>Sun Office Space</u>. The Sun shall provide and pay for its own offices for its news and editorial department and management.

ARTICLE 6
Intentionally omitted

ARTICLE 7
PAYMENT

During the term of this Restated Agreement, DR and the Sun shall receive the amounts set forth in Appendix D.

ARTICLE 8
NON-LIABILITY PROVISIONS

8.1 <u>Defense of Claims and Indemnification</u>. Any claim, demand, suit, action, obligation or other liability asserted against or sustained by Review-Journal and Sun, or either of them, in respect of any third party ("Claims") shall be dealt with as provided in this Article 8. For all purposes of this Article 8, the term "cost or expense" shall include reasonable attorneys' fees and costs, whether or not taken to trial or appeal or in any bankruptcy or other related proceeding.

8.1.1 <u>Claims Related to the Joint Operation</u>. Review-Journal shall defend and shall control the defense or settlement of any third party Claims related to the joint operations or to its performance or non-performance under this Restated Agreement (including but not limited to Claims arising from any advertising published in, or excluded from, any of the Newspapers -

5

SUN_00002049

except as provided in Section 8.1.2 - and claims in respect of feature, news and editorial content furnished by Sun hereunder arising as a result of any act or omission on the part of Review-Journal other than republication in the form furnished by Sun), devoting reasonable efforts to minimizing any resulting liability and related cost or expense. Any such liability, and the cost of expense related thereto, shall be borne by the Review-Journal, except to the extent any such Claim shall be covered by insurance.

8.1.2    Other Claims.  Except as specifically provided in Section 8.1.1. or elsewhere in this Restated Agreement, neither party hereto shall be charged with or held responsible for any third party Claims, arising before or after the Effective Date by reason of any act or omission on the part of the other party, and the responsible party shall defend and indemnify and hold the other party harmless therefrom, including all related cost or expense.  The responsible party shall defend, settle, pay or discharge any such Claim and shall indemnify and hold harmless the other party against any such Claim, and from any liability, cost or expense arising therefrom.  By way of example under this Section 8.1.2 and without limitation, the entire cost or expense of defending, settling or paying and discharging Claims relating to any feature, news or editorial copy published in, or excluded from the daily Review-Journal or arising by reason of anything done or omitted by the news and editorial department of the Review-Journal in regard to its daily newspaper or arising by reason of any advertising rejected by the Review-Journal or accepted by the Review-Journal in situations where such advertising would be rejected pursuant to Sun guidelines, shall be borne by DR and any such liability, cost or expense on account of claims relating to any feature, news or editorial copy published in, or excluded by Sun from the daily Sun or, or arising by reason of anything done or omitted by the news and editorial department of the Sun, or arising by reason of any advertising rejected by the Review-Journal pursuant to Sun guidelines, or accepted in situations where such advertising would be rejected pursuant to Review-Journal guidelines, shall be borne by Sun, unless such Claims shall be an expense of the Review-Journal by reason of the operation of Section 8.1.1.

8.1.3    Insurance.  For the purpose of this Article 8, each party shall separately maintain and pay for, as an item of news and editorial expense, insurance to the extent reasonably available protecting against losses from libel, invasion of privacy, copyright or trademark infringement and other matters related to the gathering or preparation of news and editorial matter for publication, in such amounts as the parties may agree upon from time to time, but in no event less than Ten Million Dollars ($10,000,000), and the other party shall be named as an additional insured.

8.2    Force Majeure.  Neither party shall be liable to the other for any failure or delay in performance under this Restated Agreement, occasioned by war, riot, government action, act of God or public enemy, acts of terrorism, damage to or destruction of facilities, strike, labor dispute, failure of suppliers or worker, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform, provided that in the event partial performance under this Restated Agreement is feasible, notwithstanding the occurrence of one or more of the foregoing, performance shall be allocated between the newspapers by the Review-Journal, in its sole judgment, notwithstanding the provisions of Appendix A hereto, provided, that the Sun portion shall not be less than six (6) pages.

6

SUN_00002050

# ARTICLE 9
## TERMINATION

9.1     Events of Termination. This Restated Agreement shall continue in full force and effect unless and until it may be terminated by the occurrence of one of the following events of termination:

9.1.1   Stated Duration. Expiration of the term set forth in Section 1.1

9.1.2   Bankruptcy or Default. If either party hereto makes an assignment of its assets for the benefit of creditors, an order of relief is entered by any bankruptcy court or has a receiver appointed for its business by a court of competent jurisdiction (provided, that such assignment, order of relief or adjudication shall continue unstayed on appeal or otherwise in effect for a period of ninety (90) days after the assignment, the entry of the order of relief or decree related thereto before such assignment or adjudication becomes an event of termination, and further provided that the appointment of the receiver must continue unvacated, not set aside, not stayed or otherwise in effect for a period of ninety (90) days after such appointment before such appointment becomes an event of termination), or if either party defaults in the performance of any of its material obligations hereunder and does not cure such default within sixty (60) days after receiving written notice thereof from the other party, then such other party may, at its election, and in addition to all other remedies available to it at law or in equity, terminate this Restated Agreement. In the event of the entry of an unstayed order of relief in an involuntary bankruptcy by DR, the Sun shall have the right, at its option, to purchase from DR, the equipment necessary to publish the Sun. The value of the equipment shall be set by the bankruptcy trustee. In the event of an unstayed order of relief in an involuntary bankruptcy, the Sun may lease, at fair market value, for a period not to exceed five (5) years the assets necessary to the publish the Sun.

9.1.3.  Change of Controlling Interest. In view of the nature of the relationship established by this Restated Agreement and the fact that the Sun is published under the direction and control of the Estate of Herman Greenspun and Brian L. Greenspun, the Review-Journal shall not be required to carry out the terms of this Restated Agreement or be associated with another party to which it reasonably objects. Accordingly, ownership or control of the Sun shall not be transferred to any other entity or person without notice to and prior approval by the Review-Journal, provided that the Review-Journal will not object to any transfer of the ownership or control of Sun to any entity under the immediate direction of Brian L. Greenspun, or any other lineal descendant of Herman M. Greenspun. Notwithstanding the foregoing, controlling interest of the Sun may be transferred to any person that can provide the necessary editorial background and expertise to produce the Sun pursuant to the terms of this Restated Agreement. Following an approved or permitted change of control of Sun, if a subsequent change of control occurs, notice as hereinabove shall be given and the Review-Journal may exercise the rights provided herein.

9.1.4   Intentionally omitted.

7

9.2   Intentionally omitted.

9.3   Duties Upon Termination.  Upon termination of this Restated Agreement, either by expiration of its term or otherwise, the Review-Journal shall provide Sun with a complete list (including all contact information) of current newspaper subscribers and advertisers.

ARTICLE 10
MISCELLANEOUS

10.1   Notices.  Each notice or other communication given pursuant to this Agreement shall be given in writing, delivered in person or mailed by registered or certified mail, addressed to the respective parties as follows:

Review-Journal:      DR Partners
                     P. O. Box 70
                     Las Vegas, NV 89125
                     Attention: Sherman Frederick

Sun:                 Brian L. Greenspun, Esq.
                     President & Editor
                     Las Vegas Sun
                     2275 Corporate Circle Drive
                     Suite 300
                     Henderson, Nevada 89074

Or, in case of either party hereto, at such other address or marked for the attention of such other person, as such party may set forth in a written notice to the other party.

10.2   Disclaimer of Labor Related Obligations.  The parties specifically agree that neither party hereby assumes any obligations of the other party related to its employment practices or to any of its employees, whether or not arising under any collective bargaining agreements or arising prior to, on or subsequent to the Effective Date.

10.3   Intentionally omitted.

10.4   Limited Effect.  Nothing herein contained shall constitute the parties hereto partners, joint venturers, successors, alter egos, joint employers, an unincorporated association, or as having any relationship other than as specifically provided by this Restated Agreement. This Restated Agreement is intended solely for the benefit of the parties hereto, and their permitted successors and assigns and not for the benefit of any other person or party.  This Restated Agreement, including Appendices A through D hereto, and the contracts and agreements supplemental hereto, comprises the entire understanding and agreement of the parties hereto on the subject matter herein contained and any and all other representations or agreements, which heretofore may have been made on such subject matter, whether oral or in

8

JOA 020705

SaltLake-251719.2 0062095-00001

writing, by any agent of either party shall be null, void and of no effect whatsoever. Time is of the essence of this Restated Agreement.

      10.5   <u>Intentionally omitted</u>.

      10.6   <u>Sun Trademark, Tradenames, Service Marks and Copyrights</u>.  In its use of such Sun trademarks, tradenames, service marks and copyrights as may be required to perform its obligations under this Restated Agreement, including promotion of the Newspapers, Review-Journal shall use commercially reasonable effort to comply substantially with all relevant laws of the State of Nevada and of the United States pertaining to trademarks, tradenames, service marks and copyrights in force at any time during the term of this Restated Agreement.  Review-Journal shall have the exclusive right and the obligation to distribute the Sun through electronic replica technology (i.e. technology customarily used by metropolitan daily newspapers which transmits an entire Sun page to the subscriber or consumer in any form) to the same extent the Review-Journal distributes its own pages by such means provided, however, that Sun shall have the right to republish, license, or otherwise use its editorial content in any form or media, other than as an entire Sun page or pages, upon the earliest of:  (i) 7:00 a.m., (ii) the time the Review-Journal guarantees delivery to its subscribers, or (iii) the time the Review-Journal first uses its editorial content in any form or media other than in the printed newspaper or replica technology.  Sun shall use commercial reasonable efforts to maintain in effect said trademarks, trade names, services marks and copyrights, and shall make applications for the registration and/or renewal thereof if and when required by law. Review-Journal acknowledges Sun's right, title and interest in and to said trademarks, trade names, service marks and copyrights and all renewals thereof, and agrees that it shall not at any time permit, take, or cause to be taken any action within its control in any way impairing or tending to impair any part of such right, title and interest. Review-Journal agrees to publish such notices in the Sun as Sun reasonably may request in order to protect said trademarks, trade names, service marks and copyrights, or any of them.  Review-Journal shall not in any manner represent that it has any ownership interest in said trademarks, trade names, services marks or copyrights or in the registration thereof, and Review-Journal acknowledges that its use hereunder of said trademarks, trade names, services marks or copyrights shall not create in its favor any right, title or interest in or to same beyond those created by this Restated Agreement. The Review-Journal shall have the right to republish, license, or otherwise use its editorial content in any form or media.

      10.7   <u>Tax Treatment of Payments to Sun</u>.  Its is contemplated by the parties that the payments to Sun under Appendix D of this Restated Agreement will be, for federal income tax purposes, ordinary income to Sun and will be deductible by DR as a business expense.

      10.8   <u>Specific Performance</u>.  Because of the public interest in maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs, and because of the inadequacy of damages in the event of default in the performance of material obligations hereunder, each party shall have the right to seek specific performance of the material provisions of this Restated Agreement, provided, that in the event of any action by either party for specific performance, if that party does not obtain an order of specific

9

SUN_00002053

performance, the other party shall be entitled to recover in such action its attorneys' fees and costs.

10.9 <u>Successors and Assignment</u>. This Restated Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their permitted successors and assigns.

10.10 <u>Governing Law; Modification</u>. This Restated Agreement shall be construed and enforced in accordance with the laws of the State of Nevada. This Restated Agreement may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, modification or discharge shall be sought.

10.11 <u>Headings</u>. Headings have been inserted in this Restated Agreement for the purpose of convenience only. They shall not be used to interpret or construe the meaning of any Articles or Sections, nor shall they have the effect of limiting or enlarging the meaning thereof.

10.12 <u>Ancillary Publications</u>. Nothing in this Restated Agreement shall preclude either party from engaging in any lawful business outside of this Restated Agreement, except that neither Review-Journal, or any Affiliate of Review-Journal nor Sun, or any Affiliate of Sun, shall, outside of this Restated Agreement, publish a newspaper that is published three or more days per week and that is directed primarily to Clark, Nye, or Lincoln Counties, Nevada or any parts thereof. As used in this Restated Agreement, "Affiliate" means any person, corporation, partnership, trust or other entity which controls, is controlled by, or is under common control with either party.

10.13 <u>Release</u>. As a material inducement to DR to enter into this Restated Agreement, and for other good and valuable consideration, Sun, for itself, and its assigns, hereby unconditionally releases and forever discharges DR and the Las Vegas Review-Journal and their partners, predecessors, successors, assigns, agents, stockholders, directors, officers, current or former employees, representatives, attorneys, divisions, subsidiaries, affiliates, receivers, trustees, shareholders and all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, including, but not limited to, attorneys' fees and costs actually incurred of any nature whatsoever with respect to all those claims asserted or which could have been asserted which arise out of, or are related to, operation of the Las Vegas Review-Journal or Sun between June 17, 1989, and June 10, 2005, known or unknown, including, but not limited to, any claims connected with operations under the 1989 Joint Operating Agreement between the parties, during that time period, including those items set forth on Exhibit C to a release agreement between the parties dated June 20, 2002 and any claims related to the conduct or operation of lvrj.com, reviewjournal.com, lasvegasnewspapers.com.

As a material inducement to Sun to enter into this Restated Agreement, and for other good and valuable consideration, DR, for itself, its affiliates and assigns, hereby unconditionally releases and forever discharges Sun its partners, predecessors, successors, assigns, agents, stockholders, directors, officers, current or former employees, representatives, attorneys,

10

SUN_00002054

SA456

divisions, subsidiaries, affiliates, receivers, trustees, shareholders and all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, including, but not limited to, attorneys' fees and costs actually incurred of any nature whatsoever with respect to all those claims asserted or which could have been asserted which arise out of, or are related to, operation of the Las Vegas Review-Journal or Sun between June 17, 1989, and June 10, 2005, known or unknown, including, but not limited to, any claims connected with operations under the 1989 Joint Operating Agreement between the parties, during that time period, including those items set forth on Exhibit D to a release agreement between the parties dated June 20, 2002 and any claims related to the conduct or operation of lasvegassun.com or lasvegasnewspapers.com.

11

IN WITNESS WHEREOF, this Restated Agreement has been executed by the parties' respective

corporate officers thereto duly authorized as of the day and year first above written.

DR PARTNERS.
By: Stephens Group, Inc.
General Partner

By: _Warren A. Stephens_
Warren Stephens
Chief Executive Officer

LAS VEGAS SUN, INC.

By: _____
Brian L. Greenspun
President

12

SUN_00002056

## APPENDIX A

A.1. Intentionally omitted

A.2. Pursuant to Section 4.3. of this Restated Agreement, the number, placement, and characteristics of Sun pages shall be in accordance with the following specifications:

(a)     For Monday through Friday editions, the Sun shall be composed of an open front page with the Las Vegas Sun flag and seven (7) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun. The remaining pages may include advertising, subject to the restrictions in (d) below. For Monday-Friday editions, the Review-Journal shall be composed of as many pages as Review-Journal management determines in its sole discretion.

(b)     For the Sunday edition, the Sun shall be composed of an open front page with the Las Vegas Sun flag and nine (9) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun. The remaining pages may include advertising, subject to restrictions in (d) below. The Review-Journal shall determine the number of pages for a comic section for the Sunday edition which shall consist of strips and features selected by the Review-Journal. The Sunday paper, including comics, shall be composed of as many Review-Journal pages as Review-Journal management determines in its sole discretion.

(c)     For Saturday and holiday editions, the Sun shall be composed of an open front page with the Las Vegas Sun flag and five (5) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun. The Saturday and holiday editions shall be composed of as many Review-Journal pages as Review-Journal management determines in its sole discretion. The remaining pages may include advertising, subject to restrictions in (d) below.

(d)     The Sun shall not include any Review-Journal editorial content. Standard materials such as weather pages, comics, standardized television listings and the like shall not be considered Review-Journal editorial material and may be included in the Sun as additional pages unless the Sun objects in writing thereto. Other than open pages, the Sun may include advertising. No Sun page shall be more than 50% advertising, except for full page ads, and no advertising shall appear "above the fold" in the Sun, except for full page ads. Notwithstanding the foregoing, pages may contain, from time to time, more than 50% advertising due to production issues and advertising demands. Advertising will not be stacked in a pyramid format and shall be evened out in terms of height on the page. The Monday-Sunday editions of the Review-Journal shall include a noticeable mention of the

13

SUN_00002057

Sun, on the front page of the Review-Journal. The noticeable mention will appear in a box above the Review-Journal's masthead (the "Sun Box") and shall be in the form shown on Appendix B. The Sun Box shall not be smaller in proportion than shown in Appendix B. The Sun Box shall also include the Sun's masthead, and any emblem that is part of the Sun's masthead. The Sun Box shall include a promotion of a story in the Sun and refer readers to the Sun inside. The type face, editorial artwork, font, and editorial promotional content appearing in the Sun Box shall be determined by Sun, in its sole discretion. Any color in the Sun Box shall be restricted to constituent colors used by the Review-Journal on its front page. The Sun Box shall be the left-hand box unless it would be obscured by a spaeda fold, in which case the Sun Box shall be the right-hand box. In the event of major breaking news or for exigent production circumstances, the Sun Box may be moved below the Review-Journal's masthead. The Sun, on average, will receive as much editorial color as the  local news section of the Review-Journal.

A.3. Edition times for Monday through Sunday issues of the Review-Journal shall be established by the Review-Journal in accordance with normal industry standards. Deadlines for the Sun shall be the same as those established for the last local news sections of the Review-Journal. The Sun will be placed as the third section of the Newspapers except on occasions when exigent production circumstances require that it be placed as the fourth section. The Sun will be printed in the same press run as the Review-Journal local news section. The Review-Journal shall be solely responsible for determining the need for replating the Newspapers, and shall treat the Sun and the Review-Journal equally with respect to replating of page one for major breaking national or international news events

A.4. If the Review-Journal determines that it is feasible to publish an "extra" edition, such edition shall be a Review-Journal edition and the content of any "extra" edition shall be determined solely by the Review-Journal.

A.5. In the event the Review-Journal determines that the Sun's continued placement in the Review-Journal has a material and substantial negative financial impact on the revenue and profit of the Newspapers it may deliver the Sun separately from the Review-Journal but at the same time, place, and manner as the Review-Journal. The Review-Journal shall provide written notice to the Sun within fifteen (15) days of beginning such separate delivery specifying in detail the factual basis for its determination.

In the event the Sun disagrees with the Review-Journal's determination, it shall within seven (7) days of receipt of notice from the Review-Journal, request that the matter be submitted to arbitration by an arbiter mutually agreed upon by the parties. If Sun requests arbitration, the Review-Journal shall not deliver the Sun separately until sixty (60) days after selection of the arbitrator. In the event the parties are not able to agree upon an arbiter within seven (7) days, an arbiter shall selected by the Chairman of the Department of Journalism of Northwestern University, Evanston, Illinois, or a similar journalism school if Northwestern University has ceased operations of its School of Journalism. The parties shall request the arbitrator to render a decision within sixty (60) days of his or her selection, and Sun and the Review-Journal each

14

SUN_00002058

SAA62

hereby covenant to cooperate with the arbitrator to facilitate such request.

The arbitrator shall have experience in the senior management of metropolitan daily newspapers. In determining material and substantial negative financial impact, only the following factors shall be considered; advertiser abandonment of the Newspapers specifically due to the Sun's inclusion within the Review-Journal or subscriber cancellations of the Newspapers specifically due to the Sun's inclusion within the Review-Journal. The material and substantial negative financial impact shall be determined by reference to generally accepted standard newspaper industry sources. The decision of the arbitrator shall be final. The cost of the arbitration shall be borne by the non-prevailing party. The Review-Journal's rights under this section shall be cumulative and may not be exercised more often than once every eighteen (18) months.

In the event Sun determines, in its sole discretion, that the Sun's continued placement in the Review-Journal negatively impacts the Sun, the Review-Journal shall, upon fifteen (15) day written notice from Sun, thereafter deliver the Sun separately from the Review-Journal but at the same time, place and manner as the Review-Journal, provided that Sun shall pay any incremental expenditure reasonably incurred because of such separate delivery, which separate delivery shall be effected without any derogation in the publication, production, or delivery of the Review-Journal. Prior to giving its fifteen (15) day written notice, Sun may request and the Review-Journal shall provide a good faith estimate of such incremental expenditures and the parties shall meet and confer regarding the estimate. If the Sun is separately delivered, it will no longer receive noticeable mention in the Review-Journal.

JOA 20705

SaltLake-251719.2 0062095-00001

SUN_00002059

# APPENDIX B

[Sample to be attached]

16

SUN_00002060

Help pick the new Las Vegas city seal
DRAW YOUR OWN
SEE LIVING



# Batter Up
After finally breaking their 86-year-old Curse, the Red Sox start the season in a new role: defending champs
SEE SPORTS

## LAS VEGAS SUN
DOE knew of Yucca e-mails in December
INSIDE | SECTION E

**MONDAY**

# LAS VEGAS
# REVIEW-JOURNAL

www.reviewjournal.com

50 CENTS

MONTH XX, 2005

★ ★ ★

## Agency pursued damage control

*Documents show how DOE coped with e-mails about Yucca Mountain*

By MICHAEL JANOFSKY
THE NEW YORK TIMES

WASHINGTON — Although they were thought to be a big check on Energy Department officials collected trying in the process to protect against quality assurance standards...

---

**PUBLIC VIEWING OF POPE**

# Mourners pay respects



The late Pope John Paul II is carried to St. Peter's Basilica at the Vatican Monday for a period of public viewing before he is buried in the grotto of the Basilica after his funeral Friday.

PHOTO CREDIT / ASSOCIATED PRESS

*Thousands pack St. Peter's Square to see John Paul II ahead of burial*

By WILLIAM J. KOLE
and MARIA SALCONI
THE ASSOCIATED PRESS

VATICAN CITY — The mourners stood in line hour after hour, starting when the sun's heat blazed off the Vatican's old stones, and into the late night chill. Pilgrims older than the late pope struggled to remain standing. Young children, even infants, were reverently well behaved.



A newcomer views Pope John Paul II's body is carried through St. Peter's Square.

PETER DEJONG / ASSOCIATED PRESS

▶ AMERICAN CATHOLICS MOURN FOR AN ERA ENDING / PAGE 2AA
▶ POPE'S FUNERAL DELAYS CHARLES' WEDDING / PAGE 2AA

---

# Oil concerns increase as prices soar to record level

By REX NUTTING
THE ASSOCIATED PRESS

| Limited supply, rising demand, dominated weakness of U.S. dollar cited |

Oil prices were closed to record territory above $58 a barrel Monday, as investors about growing demand and possible supply disruptions...

Late in the day, traders took profits and considered a possible pullback but the increase by the organization of Petroleum Exporting Countries sent oil prices higher, even crude oil May futures down 26 cents to $57.01 a barrel on the New York Mercantile Exchange.

Prices had climbed as high as $58.28, topping the previous intraday record of $57.39 a barrel reached Friday, when futures settled at a record $57.27.

▶ SEE OIL / PAGE 4A

---

## Supreme Court rules IRAs protected from bankruptcy

By MARK SHERMAN
THE ASSOCIATED PRESS

▶ SUPREME COURT ASKED TO BLOCK AWARD AGAINST...

---

## Witness says Michael Jackson molested him



By LINDA DEUTSCH
THE ASSOCIATED PRESS

SANTA MARIA, Calif — In a halting, emotional choked voice, the son of Michael Jackson's former housekeeper testified...

trying to show the jury that the singer has a pattern of enticing young boys.

The judge told jurors the evidence of past uncharged crimes was being allowed to show a "propensity" by the defense...

Case 2:19-cv-01667-ART-MDC   Document 1028   Filed 02/23/26   Page 166 of 176

SUN_00002061

SA465

## LAS VEGAS SUN
DOE knew of Yucca
e-mails in December
**INSIDE | SECTION E**



# Batter Up
After finally breaking their 86-year-old
Curse, the Red Sox start the season in a
new role, defending champs
**SEE SPORTS**

Help pick the
new Las Vegas
city seal
**DRAW YOUR OWN
SEE LIVING**

**MONDAY**

# LAS VEGAS
# REVIEW-JOURNAL

50 CENTS

MONTH XX, 2005

www.reviewjournal.com

---

## Agency pursued damage control

*Documents show
how DOE coped
with e-mails about
Yucca Mountain*

BY KEITH ROGERS
REVIEW-JOURNAL

WASHINGTON — Although
there have been no legal brief
filed, one Energy Department
official believed he had
the first reports of possible falsi-
fied documents had hinted at
four or more sources supporting
that the Yucca Mountain nuclear
waste site documents made
public on Monday show.

---

## PUBLIC VIEWING OF POPE
# Mourners pay respects



The late Pope John Paul II is carried to St. Peter's Basilica at the Vatican Monday for a period of
public viewing before he is buried in the grotto of the Basilica after his funeral Friday.

### Thousands pack St. Peter's Square to see John Paul II ahead of burial

BY WILLIAM J. KOLE
and MARTA FALCONI
THE ASSOCIATED PRESS



A mourner weeps Monday as
John Paul II's body is carried
through St. Peter's Square.

VATICAN CITY — The remains
of John Paul II lay in state after
being carried into St. Peter's
Basilica on Monday.

► AMERICAN CATHOLICS HOPE FOR MAJOR CHANGES PAGE 10A
► POPE'S FUNERAL DELAYS CHARLES' WEDDING PAGE 19A

---

# Oil concerns increase as prices soar to record level

BY J. DAVID GOODMAN
THE ASSOCIATED PRESS

*Limited supply,
rising demand,
continued tensions
of U.S. dollar cited*

---

## Supreme Court rules IRAs protected from bankruptcy

BY PETE YOST
THE ASSOCIATED PRESS

WASHINGTON —

► SUPREME COURT ASKED
TO BLOCK AWARD FOR 9/11
FORMER IRAQI REGIME



## Witness says Michael Jackson molested him

BY LINDA DEUTSCH
THE ASSOCIATED PRESS

SANTA MARIA, Calif. —

SUN_00002062



Headline/teaser in Sun style, spelling out Sun typeface

## LAS VEGAS SUN



### Batter Up
After finally breaking their 86-year-old Curse, the Red Sox start the season in a new role: defending champs
**SEE SPORTS**

Help pick the new Las Vegas city seal
**DRAW YOUR OWN SEE LIVING**

**MONDAY**

# LAS VEGAS REVIEW-JOURNAL
www.reviewjournal.com

50 CENTS                 MONTH XX, 2005

---

masthead /flag

Sun logo using Sun typeface



DOE knew of Yucca e-mails in December
**INSIDE | SECTION E**

### Batter Up
After finally breaking their 86-year-old Curse, the Red Sox start the season in a new role: defending champs
**SEE SPORTS**

Help pick the new Las Vegas city seal
**DRAW YOUR OWN SEE LIVING**

**MONDAY**

# LAS VEGAS REVIEW-JOURNAL
www.reviewjournal.com

50 CENTS                 MONTH XX, 2005

# APPENDIX C
## Intentionally omitted

17

JOA 20705

SaltLake-251719.2 0062095-00001

SUN_00002064

## APPENDIX D

Sun shall receive an annual profits payment (the "Annual Profits Payment"), one-twelfth $(1/12^{th})$ of which shall be paid monthly in advance on the first day of each month during the Term. For the fiscal year beginning April 1, 2005, the Annual Profits Payment shall be Twelve Million Dollars ($12,000,000), provided, however, that payments to Sun shall continue in accordance with the 1989 Agreement until the Transition Date. Each fiscal year thereafter during the term of this Agreement the Annual Profits Payment shall be adjusted as set forth in this Appendix D. Within thirty (30) days following the beginning of each such fiscal year, Review-Journal shall calculate the percentage change (the "Percentage Change") between the earnings, before interest, taxes, depreciation and amortization ("EBITDA") for the fiscal year immediately preceding (the "LTM EBITDA") and the EBITDA for the penultimate fiscal year (the "Prior Period EBITDA"). The Annual Profits Payment shall be increased, or decreased, as the case may be, by the Percentage Change between the LTM EBITDA and the Prior Period EBITDA.

In calculating the EBITDA (i) for any period that includes earnings prior to April 1, 2005, such earnings shall not be reduced by any amounts that during such period may have been otherwise been deducted from earnings under section A.1 of Appendix A or sections B.1.16, B.1.17, B.1.18, or B.3 of Appendix B of the 1989 Agreement and (ii) for any period whether before or after April 1, 2005, such earnings shall not be reduced by any amounts paid to Sun as a percentage of operating profit under Appendix D of the 1989 Agreement or under this Appendix D. Any expense of the Review-Journal attributable to a transaction with an Affiliate shall not exceed fair market value. EBITDA shall include the earnings of the Newspapers and the

18

SUN_00002065

earnings of the Review-Journal's Affiliates derived from publications generally circulated in

Clark, Nye, or Lincoln Counties, Nevada or any parts thereof. For purposes of this paragraph,

Press Equipment shall mean the press equipment currently owned by the Review-Journal and

identified in Appendix D-1 and any additional equipment, whether owned by the Review-Journal

or third parties, to the extent that it produces substantially the same product or result, and Other

Equipment shall mean all equipment and facilities used for production or operation of the printed

Newspapers or other print publications whose earnings are included in EBITDA other than Press

Equipment. EBITDA, whether determined for any period before or after April 1, 2005, shall not

include (a) any expense for rents, leases or similar expense for Other Equipment (i) if such

expense, under generally accepted accounting principles, should be treated as a capitalized lease

obligation, or (ii) if such expense is made for the use of any capital asset the use of which is

intended to replace any item of Other Equipment that is owned by the Review-Journal as of the

Effective Date or (b) any expense for rents, leases, or similar expenses for Press Equipment,

including any portion of a printing services contract that is fairly attributable to the use of Press

Equipment. All calculations shall be made in accordance with generally accepted newspaper

industry accounting principles consistently applied. The Parties intend that EBITDA be

calculated in a manner consistent with the computation of "Retention" as that line item appears

on the profit and loss statement for Stephens Media Group for the period ended December 31,

2004. Sun shall have the right, exercisable not more than once every twelve months and only

after providing written notification no less than thirty days prior thereto, to appoint an certified

public accounting firm or law firm as Sun's representative to examine and audit the books and

records of the Review-Journal and the other publications whose earnings are included in

EBITDA for purposes of verifying the determinations of the changes to the Annual Profit

19

JOA 20705

SaltLake-251719.2 0062095-00001

Payments. Such representative shall agree in writing to maintain the confidentiality of all such financial records inspected. The confidentiality agreement shall not restrict the representative from disclosing to the management of Sun information concerning the audit of the Review-Journal, but shall restrict the representative from disclosing any specific individual salary information or advertiser-specific information (e.g., names, prices, contract terms, discounts, total inches) for the other publications whose earnings are included in EBIDTA. With respect to such other publications, the representative may only disclose summary information (e.g., total advertising revenue or total salaries) that is not identifiable with individual advertisers or employees. If as a result of such an audit, there is a dispute between Sun and the Review-Journal as to amounts owed to Sun and they are not able to resolve the dispute within 30 days, they shall select a certified public accountant to arbitrate the dispute. The arbitration shall be conducted according to the commercial arbitration rules of the American Arbitration Association, including such rules for the selection of a single arbitrator if Sun and the Review-Journal are not able to agree upon an arbitrator. Sun and the Review-Journal shall request the arbitrator to render a decision within sixty (60) days of his or her selection, and Sun and the Review-Journal each hereby covenant to cooperate with the arbitrator to facilitate such request. The arbitrator shall agree to be bound by terms of confidentiality to the same extent as the Sun's representative. The arbitrator shall make an award to Sun in the amount of the arrearage, if any, found to exist, together with interest thereon from the date any arrearage was due until paid at the corporate prime rate as quoted by the Wall Street Journal on the first business day of each month. The arbitrator shall also make an award of the fees and cost of arbitration, which may include a division of such fees and costs among the parties in a manner determined by the arbitrator to be reasonable in light of the positions asserted and the determination made.

20

SUN_00002067

DR shall be entitled to all of the profits of the Newspapers after the payments set forth

above to the Sun during the term of this Restated Agreement.

21

SUN_00002068

# APPENDIX D-1

1 Goss Urbanite Press (Pama Lane)
1 Goss Community Press (Press Annex)
2 Goss Newsliner presses (Main pressroom)
1  Didde press (Mailroom)
2 Lines of Heidelberg Inserters and GMA/Alphaliners

22

JOA 20705

SaltLake-251719.2 0062095-00001

# EXHIBIT 10

Hearing Transcript Excerpts of Jackson Farrow, *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case No. 01-16-0001-9187 (Oct. 5, 2016) (Vol. 3) (SUN_00021972-74, 76-83, 159) (**FILED UNDER SEAL**)

# EXHIBIT 10

SA474

# EXHIBIT 11

Hearing Transcript Excerpts of Brian Greenspun, *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case No. 01-16-0001-9187 (Oct. 3, 2016) (Vol. 1) (SUN_00019641-43, 70, 96-97, 99, 703, 842) (**FILED UNDER SEAL**)

# EXHIBIT 11