# EXHIBIT 1

Plaintiff's proposed Second Amended and Supplemental Complaint for Divestiture, Injunction, and Damages by Reason of Defendants' Violations of the Sherman Antitrust Act, the Clayton Antitrust Act, and the Nevada Unfair Trade Practices Act

# EXHIBIT 1

E. LEIF REID, Nevada Bar No. 5750
KRISTEN L. MARTINI, Nevada Bar No. 11272
NICOLE SCOTT, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavillion Center Dr., Suite 500
Las Vegas, Nevada 89135
Tel: 702.862.8300
Fax: 702.778.9709
Email: lreid@clarkhill.com
        kmartini@clarkhill.com
        nscott@clarkhill.com

JAMES J. PISANELLI, Nevada Bar No. 4027
TODD L. BICE, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Tel: 702.214.2100
Fax: 702.214.2101
Email: JJP@pisanellibice.com
        TLB@pisanellibice.com

JORDAN T. SMITH, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Tel: 702.464.7022
Fax: 702.382.8135
Email: jsmith@bhfs.com

JOSEPH M. ALIOTO, *PRO HAC VICE*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

*Attorneys for Plaintiff/Counterdefendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation,<br><br>                    Plaintiff,<br><br>v.<br><br>SHELDON ADELSON, an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC DBA ADFAM, a Delaware limited liability company and as alter ego of Las Vegas Review-Journal, Inc., and News+Media Capital Group, LLC; and DOES, I-X, inclusive, | Case No. 2:19-cv-01667-ART-MDC<br><br><br>**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DIVESTITURE, INJUNCTION, AND DAMAGES BY REASON OF DEFENDANTS' VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, AND THE NEVADA UNFAIR TRADE PRACTICES ACT**<br><br><br>**JURY DEMAND** |

Defendants.

LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation,

Counterclaimant,

v.

LAS VEGAS SUN, INC. a Nevada corporation; BRIAN GREENSPUN, an individual and as the alter ego of Las Vegas Sun, Inc.; GREENSPUN MEDIA GROUP, LLC, a Nevada limited liability company, as the alter ego of Las Vegas Sun, Inc.,

Counterclaim Defendants.

## INTRODUCTION

Defendant Sheldon Adelson has been a long-time enemy of the First Amendment and the press. For decades, he has filed and prosecuted one frivolous and ultimately unsuccessful defamation case after another. His objective has always been clear: chill free speech and silence those that would speak out against him. Against this campaign of oppression, courageous journalists have nonetheless doggedly investigated Adelson's suspicious business dealings, lawsuits, and political activities while shining a disinfecting sunlight on his actions. Honest reporters, scathing editorials, and negative press coverage have continually plagued and maddened Adelson. In December 2015, Adelson's intolerance for the Fourth Estate finally boiled over when he sought to commit a modern-day smashing of the printing presses. He purchased Las Vegas Review-Journal, Inc.,[1] and the Review-Journal newspaper—one of only two daily print newspapers published and distributed in Clark County, Nevada—and began a systematic silencing of all his local media critics. He used his family members, including his son-in-law Defendant Patrick Dumont, and other controlled entities, with their significant resources, to accomplish his grand scheme.

Not only did Adelson remove any Review-Journal reporter who dared to challenge him, he began a calculated scheme to monopolize the local newspaper industry by strangling the sole remaining competitor and dissenting voice—the Las Vegas Sun ("the Sun"). Since 1989, the

---

[1] Defendant Las Vegas Review-Journal, Inc., is also referred to herein as "Review-Journal" or "RJ."

- 2 -

Review-Journal has been in control of and responsible for all non-editorial and non-reportorial functions of the Sun, including printing, distributing, circulation, and promotion. The Review-Journal's dominant position resulted from the parties' voluntary combination to enter into a 50-year Joint Operating Agreement ("JOA"). The parties' original, 1989 JOA was authorized by the Newspaper Preservation Act (the "NPA") and approved by the Attorney General. The NPA provides a limited antitrust exemption for newspapers to combine production, marketing, distribution, and sales, so long as their editorial and reportorial functions remained separate and independent. Congress designed the NPA, and allowed JOAs, to preserve the publication of competing newspapers that are facing economic distress. As a result of the parties' original combination, the Sun became dependent on the Review-Journal, having been divested of its printing press and all infrastructure necessary to independently publish and distribute its newspaper.

When the parties amended the 1989 JOA in 2005 at the RJ's insistence, they continued the material elements of their original combination and, to further reduce the joint operation's production and distribution costs, they agreed to print and distribute the Sun and the Review-Journal newspapers (the "Newspapers") in a separately identified but dually packaged bundle as they previously did on weekends and holidays (the "Newspaper Bundle"). Both parties believed that the 2005 JOA was lawful and valid under the NPA. They complied with the existing practice and DOJ regulations for amendments to previously approved JOAs in submitting the 2005 JOA to the DOJ for review and investigation, which the DOJ did. Never did the DOJ or anyone else challenge the Newspapers' continued combination under the amended agreement. Consequently, for 14 years the parties voluntarily continued their joint operation under the framework of the 2005 JOA while adhering to the material elements of their original combination.

Adelson and Defendants, however, weaponized the Review-Journal's control and dominance over the joint operation for the opposite purpose. They wielded the parties' longstanding combination and operating framework to place the Sun *into* economic distress. Defendants, working together, eliminated all of the Sun's profit share by engaging in anticompetitive accounting and operational abuses to reduce any amount to zero. Abusing Defendants' control, the Review-Journal

- 3 -

also omitted the Sun from promotional advertising and covered up the Sun's presence on the front page of the Newspaper Bundle, obscuring the visibility of the Sun and impeding consumer awareness.

Despite these and other efforts to suffocate the Sun, the Sun remains steadfast. The Sun's diverse editorial voice stands as a political and philosophical counterbalance to the Review-Journal. The Sun covers local news in greater depth, breadth, and accuracy. It reports on breaking stories and provides a more attractive mix of news, features, and formats. The Sun's editorial page often speaks the truth to Defendants' power.

Unable to financially blot out the Sun, and tired of publishing his only rival, Adelson and the Review-Journal filed a baseless and unlawful claim in Nevada state court seeking to prematurely end the parties' 34-year joint operation and immediately cease printing and distributing the Sun. Because of the parties' multi-decade course of dealing, and the Sun's operational and economic dependence on the Review-Journal's control over the joint operation, ending the joint operation would effectively kill the Sun. The consequence: Defendants' plan to achieve 100% monopoly power in the market of local daily print newspapers in Las Vegas and stifle all dissenting, competing views would be complete.

By reasons of Defendants' antitrust violations, under the authority of Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26,[2,3] and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,[4,5] an injunction should and must be issued to prevent any efforts by Defendants

---

[2] Under Section 4 of the Clayton Act, 15 U.S.C. § 15, "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[3] Under Section 16 of the Clayton Act, 15 U.S.C. § 26, "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws. . . . ."

[4] Under Section 1 of the Sherman Act, 15 U.S.C. § 1, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

[5] Under Section 2 of the Sherman Act, 15 U.S.C. § 2, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . . "

- 4 -

to terminate the Review-Journal and Sun's joint operation and cease printing and distributing the Sun. Further, because they have misused their fiduciary responsibilities to the specific detriment to the Sun, the Court must divest the RJ of any control over the Review-Journal.

In addition, any damages found by a jury for the substantial loss of profits, the harm to the Sun brand, and the value of the Sun as a going concern, must be trebled by the Court as a just and reasonable estimate, which actual damages are reasonably believed to be in excess of tens of millions of dollars before trebling, and an award of attorney's fees and costs.

## THE PARTIES

### Plaintiff Sun

1. Las Vegas Sun, Inc. (the Sun), a Nevada corporation, publishes the Sun Newspaper in Clark County, Nevada. The Sun is a wholly owned subsidiary of Greenspun Media Group, LLC, which publishes various weekly magazines in Clark County, Nevada.

2. The Sun is the second longest running daily newspaper in Las Vegas's history. The first edition of the Sun was published under the name, "Las Vegas Morning Sun," on July 1, 1950, by Hank Greenspun.[6] Hank Greenspun remained the Sun's editor and publisher until he passed away in 1989. Hank's son, Brian Greenspun, has been the Sun's editor since 1989 and the publisher since 2010.

3. The Sun's distinct journalistic voice is grounded in the Newspaper's rich history. Hank Greenspun, who wrote a front-page column entitled, "Where I Stand," was known for taking on U.S. Senator Patrick McCarran and the casinos in federal court in 1952 for orchestrating an illegal group boycott of advertising in the Sun Newspaper, and for his public battles with Senator Joseph McCarthy. The Sun's record of "courageous reporting" and "forthright journalism" has garnered it numerous awards and industry recognition, including: the Pulitzer Prize for Public Service in 2009 for its reporting on construction deaths on the Las Vegas Strip; the Alfred I. duPont-Columbia University Award in 2010 for its coverage of gambling addiction; first place for the Best Editorial Page in 2018 from the Nevada Press Association, "Better Newspaper Contest"; first place

---

[6] https://lasvegassun.com/history/timeline/, last visited March 1, 2026.

- 5 -

in Editorial Writing, Editorial of the Year, and Sports Feature Writing for 2019 from the Nevada Press Association; and a multitude of other national, state, and regional awards.

4. Today, the Sun is considered a left-leaning editorial voice in Southern Nevada for its liberal tilting editorials and its frequent endorsement of Democratic candidates. It is known for its editorials by Brian Greenspun, the longest running metro columnist in Las Vegas history, which speak to everything from local events to observations of national politics, including challenging Donald Trump, the Review-Journal, and Adelson himself. In 2019, the Sun and its sister publications employed approximately 90 individuals in Southern Nevada.

**Defendant Las Vegas Review-Journal, Inc.**

5. Defendant Las Vegas Review-Journal, Inc. (the "Review-Journal"), is a Delaware corporation doing business in the State of Nevada. Upon information and belief, the Review-Journal is a wholly owned subsidiary of News+Media Group LLC ("News+Media"). The Review-Journal operates and publishes the Review-Journal daily print newspaper in Clark County, Nevada. The Review-Journal began as a daily newspaper publication in 1929, under the name, "Las Vegas Evening Review-Journal." It is the longest running daily newspaper in Las Vegas.

6. Today the Review-Journal is known as a right-leaning newspaper that mirrors the conservative views and personal business interests of its owners, casino magnate Sheldon Adelson and the Adelson family. The Review-Journal was the one of only two of the largest 100 newspapers in the country to endorse Donald J. Trump for President in 2016.

**Defendant News+Media Capital Group LLC**

7. Defendant News+Media Capital Group LLC ("News+Media") is a Delaware limited-liability company, doing business in the State of Nevada. News+Media acquired the Review-Journal on December 10, 2015, from New Media Investment Group Inc. for $140 million. As part of the transaction, New Media Investment Group Inc.'s subsidiary, GateHouse Media LLC ("GateHouse"), agreed to continue operating the Review-Journal under a management agreement. The management agreement ended within only six weeks after the acquisition, when the Review-Journal hired a new publisher to replace the one under the GateHouse management agreement.

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

8.    News+Media continues to operate as the parent company to the Review-Journal, its subsidiary. Upon information and belief, News+Media does not have any employees who are not also co-employed by the Review-Journal. News+Media has one member: Orchid Flower LLC, which is wholly owned by The Orchid Trust, whose Trustees are Dr. Miriam Adelson, Defendant Dumont, and Sivan Ochshorn-Dumont.

9.    News+Media is managed solely by Stephen O'Connor, who also holds all corporate positions with the Review-Journal. O'Connor is the Chief Financial Officer of Interface Group Massachusetts, which owns Defendant Interface Operations LLC dba Adfam ("Adfam"), an entity whose sole purpose is to benefit and promote the business and personal interests of the Adelson family. In his role with Adfam, Mr. O'Connor works with and directs employees under the Adfam umbrella.

**Defendant Sheldon Adelson**

10.    Defendant Sheldon Adelson (now substituted with the Estate of Defendant Sheldon Adelson), was a resident of Nevada. In 2019, Adelson was the 24th richest person in the world,[7] and the billionaire founder, chairman, and chief executive officer of the Las Vegas Sands Corporation (the "Sands"). The Sands owns and operates luxury hotels and casinos, including the Venetian Las Vegas and The Palazzo Las Vegas, among others. Mr. Adelson, his family members and trusts, and other entities established for the benefit of Mr. Adelson and/or his family members, own[ed] approximately 56% of the Sands' outstanding common stock as of December 31, 2018. As a result, "Mr. Adelson exercise[d] significant influence over the [Sands] business policies and affairs."[8] Adelson, now through his Estate, is sued as an individual and as the alter ego of News+Media, the Review-Journal, and Adfam.

11.    Upon information and belief, Mr. Adelson, his family members and trusts, and other entities established for the benefit of Mr. Adelson and/or his family members, own News+Media and the Review-Journal. As he did with the Sands properties, Mr. Adelson exercised significant

---

[7] https://www.forbes.com/billionaires/#2add0a251c71, last visited Sept. 24, 2019.
[8] https://s21.q4cdn.com/635845646/files/doc_financials/2018/annual/Annual-Report-2018.pdf, at p. 27, last visited Sept. 24, 2019.

- 7 -

influence over the RJ's business policies and affairs, including its editorial content. For example, until his death, Mr. Adelson was secretly "co-employed" by Las Vegas Review-Journal, Inc., and News+Media as "Co-Publisher" of the Review-Journal, which afforded Mr. Adelson the unfettered right:

> to confer with and provide editorial advice and assistance) as appropriate, to the President and Publisher and other editorial employees and contributors to the Las Vegas Review-Journal (the "Newspaper") concerning the direction of the Newspaper, topics for day-to-day or investigative or other coverage by the Newspaper and, from time to time, published or unpublished information obtained or prepared in gathering, receiving or processing information for communication by the Newspaper to the public, including the sources for and reliability of the information.

For pretense only, Mr. Adelson was given a nominal annual salary of $2,000. Despite his unfettered control and authority over the Review-Journal, Mr. Adelson was never disclosed to the public on the Review-Journal's masthead or otherwise in the Newspaper.

12.     Adelson was well-known for his record-breaking donations to Republican political candidates and causes and "established himself as an influential figure in American politics with the amount of money that he has contributed."[9] Forking over $30 million, Adelson was the largest donor to Donald Trump's presidential campaign in 2016 and of the entire presidential election. Adelson gave more than $100 million to support the Republican party in the 2018 midterm elections, and in 2020 set a new donation record in a single election cycle, giving $172.7 million. Adelson's surviving family continued his donor legacy by donating over $100 million to a pro-Trump Super PAC in 2024, a top political donation.[10]

**Defendant Patrick Dumont**

13.     Defendant Patrick Dumont, an individual, is a resident of Nevada and is an officer and owner of Defendant News+Media. He is also an employee of both the Review-Journal and

---

[9]   https://www.theguardian.com/us-news/2018/jun/08/sheldon-adelson-trump-middle-east-policy, last visited Sept. 24, 2019.
[10] https://www.politico.com/live-updates/2024/10/15/2024-elections-live-coverage-updates-analysis/miriam-adelson-donations-trump-super-pac-00183805, last visited Feb. 27, 2026.

- 8 -

News+Media, and, upon information and belief, the Deputy Publisher of the Review-Journal. Dumont, a trustee of The Orchid Trust (the entity that ultimately owns News+Media), speaks as the primary voice for all trustees on issues related to the Review-Journal. The former executive vice president and Chief Financial Officer of the Sands, as of January 2021, Dumont became the President and Chief Operating Officer of the Sands and a member of its Board of Directors. Dumont is the son-in-law of Sheldon Adelson and "orchestrated" the Adelson family's purchase of the Review-Journal, under the direction of Adelson.

### Defendant Interface Operations LLC dba Adfam

14. Defendant Adfam is a Delaware limited liability company doing significant business in the State of Nevada (Adfam, together with Adelson, News+Media, the Review-Journal, and Dumont are referred to as the "RJ" or "Defendants").

15. Adfam was founded by Adelson and operates as the private family office of Dr. Miriam and Sheldon G. Adelson and their family. Adfam provides professional services to support the Adelson family and members' personal and business interests, including the Review-Journal and News+Media.

16. Mr. Adelson and his family members, including Dumont, use Adfam as a tool to exercise significant corporate, strategic, and day-to-day control over the Review-Journal.

17. Upon information and belief, Adelson and Dumont appointed the family office's long-time Chief Financial Officer, Steven O'Connor, to serve as the only corporate officer of the Review-Journal, *i.e.*, its President, Secretary, Treasurer, and Director. Likewise, Mr. O'Connor is the sole manager of News+Media. O'Connor is not a "newspaper person," does not have any newspaper industry experience, and did not build his career in the newspaper business. He is employed strictly by the family office and does not receive compensation for services rendered for or on behalf of the Review-Journal from the Review-Journal or News+Media.

18. Adfam shares such a unity of interest and decision-making with Defendants Review-Journal and/or News+Media, that they function as a single economic unit. In the alternative, Adfam

- 9 -

is an entity sufficiently separate and distinct as an economic unit from Defendants the Review-Journal and/or News+Media such that they operate as separate decision-makers.

**Doe Defendants**

19.     The Sun alleges that Defendants named herein as Does I through X are individuals, corporations, limited-liability companies, partnerships, associations, or other persons or entities who are responsible in some manner or capacity for the acts alleged herein, but whose names are unknown to the Sun at this time. The Sun will seek leave to amend this Complaint to include the names of Does I through X when the identities of such defendants become known to the Sun.

**JURISDICTION, VENUE, AND INTERSTATE COMMERCE**

20.     This action is brought under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26, for damages and for injunctive relief for Defendants' monopolization, attempted monopolization, and conspiracy to monopolize the relevant market of English-language local, daily print newspapers in Clark and Southern Nye Counties, Nevada, in violation of Sections 2 and 1 of the Sherman Act, 15 U.S.C. §§ 2, 1, and Nevada's Unfair Trade Practice Act, NRS Chapter 598A, and for injunctive relief to prohibit the unlawful elimination and/or acquisition of the Sun by the RJ.

21.     This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. Sections 15, 26, and 28 U.S.C. Sections 1331 and 1337. This Court has supplemental jurisdiction over the Sun's claim arising under Nevada's Unfair Trade Practice Act pursuant to 28 U.S.C. Section 1367.

22.     Defendants reside in or maintain offices, transact business, and own substantial assets in this District. Accordingly, this Court has personal jurisdiction over Defendants. Because Defendants transact business in this judicial district, venue is proper pursuant to 15 U.S.C. Sections 15, 22 and 26, and 28 U.S.C. Section 1391.

23.     Both the Review-Journal and the Sun publish substantial quantities of local, state, national, and international news. The parties both pay substantial sums for such news and for material sent to them from various parts of the United States and the rest of the world. The

- 10 -

Newspaper Bundle carries substantial quantities of national advertising sent to them from throughout the United States. In addition, purchases of materials to publish the Newspapers, including paper and ink, involve transactions in interstate or foreign commerce. Thus, Defendants' violations of the antitrust laws involve and affect interstate commerce.

## FACTUAL BACKGROUND AND HISTORY

### The Newspaper Preservation Act of 1970

24. In response to the Supreme Court's decision in *Citizen Publishing Co. v. United States*, 394 U.S. 131 (1969) (which held that a joint newspaper operating agreement that fixed prices, pooled profits under an inflexible ratio, and divided the fields of publication violated antitrust laws), Congress enacted the Newspaper Preservation Act, 15 U.S.C. §§ 1801-04 (the NPA), in 1970. In so doing, Congress determined that the public interest in preserving multiple independent editorial voices was best served by permitting joint newspaper operations in the same market. While the NPA exempts newspapers in a JOA from some provisions of the antitrust laws, it expressly excludes conduct that would otherwise be unlawful under any antitrust law if engaged in by a single entity from antitrust immunity. 15 U.S.C. § 1803(c).

### 1989 Joint Operating Agreement

25. By the late 1980s, the Sun had been operating at a substantial loss and was in probable danger of financial failure. To ensure the continued publication of two separate and independent daily newspapers in Las Vegas, in June 1989, the Sun and the Review-Journal's prior owners voluntarily entered into a 50-year Joint Operating Agreement (the "1989 JOA"), to combine all non-editorial and -reportorial operations pursuant to the NPA, with the intention that the joint operation would continue until December 31, 2040 (with the possibility of renewal). *See* 1989 JOA, Prelim. Statement & § 1.2.

26. The Sun and the RJ were explicit as to the significant purpose of their combination. They expressed their firm belief that the "continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent, is of paramount

- 11 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

importance to the citizens of Las Vegas and its environs." *Id.* at Prelim. Statement. Their belief reflected Congress's purpose in enacting the NPA:

> In the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States, it is hereby declared to be the public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into because of economic distress or is hereafter effected in accordance with the provisions of this chapter.

15 U.S.C. § 1801.

27.    In further conjunction with this express public policy, the parties reiterated the importance of preserving their respective editorial and reportorial independence and autonomy as "the *essence*" of their agreement. 1989 JOA § 5.2 (emphasis added). They mandated that the parties "shall have exclusive and complete control, authority and direction" over their respective "news and editorial content, [and] features and services." *Id.* The "public interest of maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs" was so imperative, they included specific performance as an express remedy. *Id.* § 10.8.

28.    The Sun and RJ agreed that merging non-editorial and -reportorial operations under the RJ's stewardship would preserve the Sun as a distinct newspaper voice:

> The parties further believe that publication of the Sun c[ould] be carried on profitably, and its continued editorial existence and independence thereby assured, if its production, distribution and advertising functions and related non-news and non-editorial activities are conducted and performed by the Review-Journal, through a single staff of Review-Journal employees utilizing the Review-Journal's plant and equipment under a joint newspaper operating arrangement . . . , under which the Review-Journal will act on its own behalf with respect to the Las Vegas Review-Journal and on behalf of the Sun with respect to the Las Vegas Sun.

*Id.* at Prelim. Statement.

29.    The parties' combination aligned with Congress's delineation of a proper arrangement under the NPA; that is, to merge production facilities and joint operations for the: "printing; time, method, and field of publication; allocation of production facilities; distribution;

- 12 -

advertising solicitation; circulation solicitation; business department; establishment of advertising rates; [and] establishment of circulation rates and revenue distribution." 15 U.S.C. § 1802(2).

30. The Sun consented and the RJ voluntarily agreed that the RJ would be responsible for and in control of all business aspects of the joint operation, including: "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation (1989 JOA § 5.1); acting on behalf of both Newspapers (*id.* at Prelim. Statement); printing and producing the Newspapers, using the RJ's printing plant, employees, and equipment (*id.*; *id.* §§ 4.3, 5.1); sales and distribution (*id.* § 5.1); purchasing newsprint, materials, and supplies (*id.*); soliciting, selling, and collecting on the Newspapers' advertising and circulation (*id.*; *id.* § 5.1.3); promoting and circulating the Newspapers, using the RJ's "best efforts" (*id.* §§ 5.1, 5.1.3-.4); establishing advertising and circulation rates for the Newspapers (*id.* § 5.1); paying, recording, and maintaining all expenses and revenues of the joint operation (*id.* §§ 6.1, 6.2); accounting to the Sun after the close of each fiscal year (*id.* § 6.3); and distributing the Sun's share of the joint operation's profits, derived from all advertising and circulation revenues of the Newspapers and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel. *Id.* § 6.4. "So long as [the] Sun furnish[ed] news and editorial copy, features and services to [the] Review-Journal in accordance with Article 4" (setting forth the technical specifications for publishing), the RJ "agree[d] to produce the Sun" and "include the Sun copy and features in jointly published newspapers ... and to sell all advertising for, promote and circulate such newspapers." *Id.* § 5.1. Because of the RJ's complete control over the joint operation, the Sun also had the right to inspect the Review-Journal's books and records for the joint operation's finances and profit payments. *See id.* § 10.3.

31. For the format of the Newspapers, the RJ voluntarily agreed to produce the Sun as an afternoon newspaper and the Review-Journal as a morning newspaper, with the Newspapers being published in a joint edition bundle on weekends, holidays, and special editions. *Id.* § 4.4 &. App'x A.2. The joint edition included the Sun within the sections of the Review-Journal and featured both the Sun and the Review-Journal on the front-page nameplate and on all folios. *Id.*

- 13 -

32.    Regarding their profit sharing from the joint operation, the parties agreed that the RJ would receive 90% and the Sun would receive 10%. *Id.* § 6.4 & App'x D.

33.    The Sun also received an allocation for its news and editorial expenses in the amount of 65% of the Review-Journal's news and editorial expense allocation, "subject to a minimum of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) per fiscal year, . . . ." *Id.* at App'x A § A.1.

34.    With respect to each Newspaper's promotional activities expenses, "the Review-Journal shall establish for each fiscal year after the Effective Date a budget for promotional activities of the Review-Journal and the Sun and at least forty percent (40%) of each total budget shall be allocated to the Sun." *Id*. at App'x A § A.3.

35.    As a result of their combination and "[t]o enable Review-Journal to perform its functions" as manager and controller of the joint operation, the Sun was required to dispose of or relinquish its equipment (including its printing press), supplies (including its newsprint, newsracks, and production film), contracts (including for circulation, supplies, and advertising), and all other non-editorial and -reportorial infrastructure that would allow the Sun to publish and distribute its Newspaper independently. *Id.* at Art. 3. The Sun therefore became entirely dependent on the RJ for the Sun's continued printing, distribution, and operation. As such, the Sun relied on the RJ to use its best efforts in managing and controlling the joint operation, for the benefit of both Newspapers. *Id.* §§ 5.1.3, 5.1.8, § 5.3. The 1989 JOA was binding upon and inured to the benefit of the parties and their successors and assigns. *Id.* § 10.9.

36.    As additional consideration for their combination, and in exchange for the ability to remain in publication until at least December 31, 2040, the Sun was required to assign a percentage of all dividends and distributions of CCTV stock to the RJ. *Id.* § 10.5.

37.    The parties sought to avail themselves of the limited antitrust exemption for their combined operations offered by the NPA, and thus agreed "to pursue diligently the filing of the application for approval of th[e 1989 JOA] to the Department of Justice and to use their best efforts

- 14 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

to take all action necessary to obtain such written consent as expeditiously as possible within the procedures set forth in applicable regulations of the Department of Justice." *Id.* § 1.1.

38.   Upon execution of the 1989 JOA, they jointly applied for Attorney General approval pursuant to Section 1803(b), governing agreements "not already in effect." 15 U.S.C. § 1803(b).

39.   The parties followed the NPA's Regulations' application procedures. They provided the required documents to the DOJ and published notice of their application in their Newspapers.

40.   The DOJ published the parties' application in the Federal Register, and thoroughly investigated the 1989 JOA and the parties' separate businesses. It issued civil investigative demands, conducted interviews, and received public comment.

41.   The purpose of the DOJ's investigation was to determine whether the 1989 JOA met the requirements of 15 U.S.C. Section 1083(b), *i.e.*, "(1) that at least one of the participating newspapers is a 'failing newspaper,' and (2) that approval of the arrangement would 'effectuate the policy and purpose' of the [NPA]."

42.   The DOJ found that the Sun's losses were "genuine" and satisfied the "failing newspaper test." In determining if the arrangement served the purpose of the NPA, the DOJ examined whether, under the 1989 JOA, "as a practical matter, the failing newspaper will remain capable of maintaining independent reporting and editorial activities after the JOA goes into effect."

43.   The DOJ concluded that the 1989 JOA provided the Sun "sufficient operating guarantees" "to enable it to continue to provide an independent reportorial and editorial voice in the Las Vegas community," despite that the RJ would be "responsible for and have ultimate decision-making authority with respect to advertising and circulation rates, printing functions, managerial services, and all other functions of both newspapers except for news and editorial functions."

44.   Because the RJ could not unilaterally revise or reduce the Sun, and could not interfere with the Sun's editorial and reportorial autonomy (among other Sun protections), and the arrangement afforded the Sun additional protections, the DOJ found that the 1989 JOA "[w]as designed to allow the parties to continue to produce separate and independent editorial products,

- 15 -

thereby effectuating the purpose of the [NPA]," further expressly recognizing the parties' "joint edition" publication "on Saturday, Sunday and holidays."

45. Since the 1989 JOA satisfied the two requirements of Section 1803(b), the DOJ recommended the Attorney General approve it.

46. The Attorney General adopted the DOJ's recommendation and granted its written approval of the 1989 JOA. In doing so, the Attorney General restated that the "proposed JOA is intended to combine the business operations of the two newspapers, while preserving the newspapers' editorial and reportorial independence." It noted the parties' "joint edition on Saturdays, Sundays, and holidays," and focused on the parties' intent and agreed-upon undertakings to: "combine the business operations" (with the Review-Journal bearing responsibility for "the management, printing, and other commercial functions of the newspapers"); share the profits from the joint operation 90/10; and "preserv[e] their respective editorial and reportorial independence," further maintaining separate staff, editors, and reporters. After concluding that the Sun was a "failing newspaper," the Attorney General agreed that the 1989 JOA would effectuate the policy and purpose of the NPA by "preserv[ing] the Sun in operation . . . as a second editorial voice." The Attorney General entered its written opinion of approval without an evidentiary hearing.

47. The Attorney General concluded that the Sun was a "failing newspaper" and that approval of the 1989 JOA would effectuate the policy and purpose of the NPA by "preserv[ing] the Sun in operation . . . as a second editorial voice." The Attorney General approved the 1989 JOA without an evidentiary hearing.

48. The Sun became profitable under the 1989 JOA. And the parties operated under that framework for 16 years, with the Sun's continued dependence on the joint operation and the RJ's control and management thereof.

**The 2005 Amended and Restated Joint Operating Agreement**

49. In 2005, the Sun remained without infrastructure to independently print, publish, or distribute its Newspaper. The Sun was facing economic pressure and the RJ sought to amend the

- 16 -

1989 JOA. They entered into the Amended and Restated [Joint Operating] Agreement (the "2005 JOA") on June 10, 2005.

50.    Based on existing caselaw throughout the country and over 30 years of the DOJ's, NPA lawyers', and JOA newspapers' practice, both parties believed that the 2005 JOA would be valid and enforceable upon submission of the amendment to, and absent an enforcement action by, the DOJ.

51.    Thus, to maintain the immunity afforded by their original combination, and at the advice of the parties' counsel (who were NPA and former DOJ antitrust lawyers), the Sun and RJ agreed to continue their original combination in all material respects, which were the focus of the DOJ and Attorney General's approval 15 years prior. The parties tracked the 1989 JOA as closely as possible. And the RJ remained in complete control over, and continued bearing all responsibility for, the non-editorial and -reportorial aspects of the joint operation and the Sun.

52.    Under the 2005 JOA, the parties voluntarily continued the 50-year term of the 1989 JOA, intending their joint operation to run to December 31, 2040 (with the possibility of renewal). 2005 JOA § 1.2.

53.    As they agreed in 1989, the parties reaffirmed their commitment to the public interest in remaining editorially independent, as required by the NPA and the Attorney General, repeating the importance of preserving their respective editorial and reportorial independence and autonomy, stating, "Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the *essence* of this restated agreement." 2005 JOA § 5.2 ("News and Editorial Autonomy"). They again mandated that the parties "shall have exclusive and complete control, authority and direction" over their respective "news and editorial content, [and] features and services." *Id.* They reiterated that, "[b]ecause of the public interest in maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs," specific performance was an available remedy. *Id.* § 10.8.

54.    The parties' ongoing combination remained in alignment with Congress' specifications of a proper arrangement under the NPA, *i.e.*, undertaking joint operations for the:

- 17 -

"printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; [and] establishment of circulation rates and revenue distribution." 15 U.S.C. § 1802(2).

55. Their ongoing combination remained in alignment with Congress' specifications of a proper arrangement under the NPA, *i.e.*, undertaking joint operations for the: "printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; [and] establishment of circulation rates and revenue distribution." 15 U.S.C. § 1802(2).

56. Operating under the same material framework approved by the Attorney General in 1989, the RJ would still be responsible for and in control of all business aspects of the joint operation, including: "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation (2005 JOA § 5.1); acting on behalf of both Newspapers (*see generally* 2005 JOA); printing and producing the Newspapers, using the RJ's printing plant, employees, and equipment (*id.* §§ 4.3, 5.1); sales and distribution (*id.* § 5.1); purchasing newsprint, materials, and supplies (*id.* § 4.3); soliciting, selling, and collecting on the Newspapers' advertising and circulation (*id.* §§ 5.1, 5.1.3); promoting and circulating the Newspapers, using "commercially reasonable efforts to maximize the circulation of the Newspapers" and the same efforts to "promote the Newspapers" (*id.* §§ 5.1, 5.1.3-.4); establishing advertising and circulation rates for the Newspapers (*id.* § 5.1); paying, recording, and maintaining all expenses of the joint operation (*id.* at App'x D); accounting to the Sun after the close of each fiscal year (*id.*); and distributing the Sun's share of the joint operation's profits, derived from all advertising and circulation revenues of the Newspapers, and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel. *Id*. Just as they agreed in 1989, "[s]o long as the Sun furnish[ed] news and editorial copy, features and services to the Review-Journal in accordance with Article 4" (setting for the technical specifications for publishing), the RJ would "produce the Sun" and "include the Sun copy and to sell all advertising for, promote and circulate such newspapers." *Id.* § 5.1. Because of the RJ's continued control over the joint operation,

- 18 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

the Sun retained rights to examine (and also audit) the Review-Journal's books and records. *Id.* at App'x D.

57.    In order to further reduce the joint operation's production and distribution costs, the parties elected to print and distribute the Newspapers on a daily basis in a joint edition like they had been doing for nearly 15 years on weekends, holidays, and special editions (the Newspaper Bundle). *Id.* at App'x A.2-.4. And, like before, the Newspaper Bundle included the Sun within the sections of the Review-Journal and continued to feature both the Sun and Review-Journal on the front page. *Id.* § 5.1.

58.    To maintain visibility of the Sun and promote its branding in the Newspaper Bundle, the RJ voluntarily agreed to publish a box above the Review-Journal's nameplate containing a "noticeable mention" with the Sun's logo and a headline promoting the Sun's lead story (the "Sun Box"). *Id.* at App'x A.2-.4.

59.    The parties agreed as follows:

> The Monday-Sunday editions of the Review-Journal shall include a noticeable mention of the Sun, on the front page of the Review-Journal. The noticeable mention will appear in a box above the Review-Journal's masthead (the "Sun Box") and shall be in the form shown on Appendix B. The Sun Box shall not be smaller in proportion than shown in Appendix B. The Sun Box shall also include the Sun's masthead, and any emblem that is part of the Sun's masthead. The Sun Box shall include a promotion of a story in the Sun and refer readers to the Sun inside. The type face, editorial artwork, font, and editorial promotional content appearing in the Sun Box shall be determined by Sun, in its sole discretion. Any color in the Sun Box shall be restricted to constituent colors used by the Review-Journal on its front page. The Sun Box shall be the left-hand box unless it would be obscured by a spaeda fold, in which case the Sun Box shall be the right-hand box. In the event of major breaking news or for exigent production circumstances, the Sun Box may be moved below the Review-Journal's masthead. The Sun, on average, will receive as much editorial color as the local news section of the Review-Journal.

*Id.* at App'x A.2(d). The RJ had physical control over publishing the Sun Box along with the rest of the Newspaper Bundle.

- 19 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

60. The RJ also remained in control of promoting the Sun in other respects, as it had since 1989. In contemplation of the Newspaper Bundle, the RJ agreed to market and promote the Sun using commercially reasonable efforts to maximize the circulation of both Newspapers. *Id.* § 5.1.4. The RJ agreed to include the Sun in equal prominence to the Review-Journal in the RJ's promotional material and activities:

> 5.1.4 Promotional Activities. Review-Journal shall use commercially reasonable efforts to promote the Newspapers. Any promotion of the Review-Journal as an advertising medium or to advance circulation shall include mention of equal prominence for the Sun. Either the Review-Journal or Sun may undertake additional promotional activities for their respective newspaper at their own expense. For all promotional activities for the Newspapers paid for by the Review-Journal, the Review-Journal shall be responsible for all promotional copy preparation and placement, provided however, that the Sun shall have the right to approve all promotional copy for the Sun that does not generically and concurrently promote both Newspapers.

*Id.* This ensured that Sun's brand remained as visible and robust as the Review-Journal's.

61. In similar vein, to account for the new electronic replica edition created after 1989, and controlled by the RJ, the RJ also voluntarily agreed that the Sun would be a part of the electronic replica edition of the Newspapers distributed to consumers. The 2005 JOA, in part, provides:

> Review-Journal shall have the exclusive right and obligation to distribute the Sun through electronic replica technology (i.e. technology customarily used by metropolitan daily newspapers which transmits an entire Sun page to the subscriber or consumer in any form) to the same extent the Review-Journal distributes its own pages by such means provided.

*Id.* § 10.6.

62. The Sun and the RJ further intended that each would "bear their own respective editorial costs," and "maintain a staff of news and editorial employees." *Id.* §§ 4.2, 4.1.

- 20 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

63. As before, the parties continued sharing in the joint operation's profits. They agreed that the "Sun shall receive an annual profits payment" that shall be paid monthly in advance of the first day of each month during the term of the agreement. The amount of subsequent Annual Profits Payments would fluctuate in direct correlation with the amount of the joint operation EBITDA. These payments are the only source of revenue for the Sun's newsroom. Similar to the 90/10 split under the 1989 JOA, the Sun's profit share for each year under the 2005 JOA formula approximated 9.87 percent of the previous year's reported joint operation EBITDA.

64. Between 2005 and 2015, the Annual Profits Payments to the Sun had been as much as $12 million per year, and never less than $1.3 million per year.

65. Moreover, if the RJ determined that "the Sun's continued placement in the Review-Journal has a material and substantial negative financial impact on the revenue and profit of the Newspapers it may deliver the Sun separately from the Review-Journal but at the same time, place, and manner as the Review-Journal" with 15 days' notice of the RJ's intent to change the manner in which the RJ publishes the Sun. The RJ agreed that the Sun could arbitrate the RJ's notice, at which time the arbitrator's decision would be limited to determining whether the Sun's inclusion in the Newspaper Bundle had a material and substantial negative financial impact. *Id.* at App'x A.5. "[O]nly the following factors shall be considered[ in making that determination:] advertiser abandonment of the Newspapers specifically due to the Sun's inclusion within the Review-Journal or subscriber cancellations of the Newspapers specifically due to the Sun's inclusion within the Review-Journal." *Id.*

66. Having agreed to the terms of the 2005 JOA, and having already received Attorney General consent for their combination in 1989, the Sun and the RJ followed all procedures and practices confirmed by existing caselaw, the DOJ, NPA lawyers, and JOA newspapers, to ensure that their joint operation under the 2005 JOA was valid, lawful, and enforceable.

67. Accordingly, as their 2005 JOA was an amendment to their previously approved, post-1970 JOA, the Sun and the RJ "agree[d] to file the Restated Agreement" with the DOJ. *Id.* § 1.1.

- 21 -

68.    Had the parties known or believed that they were required obtain Attorney General consent under the NPA for their amendment, they would have applied for that consent in accordance with the DOJ Regulations like they had with the 1989 JOA.

69.    The RJ again covenanted "to use [its] best efforts and take all action necessary to effect the intent of this Restated Agreement" in this process. *Id*. It reaffirmed the same obligation when "agree[ing] to take all corporate action necessary *to carry out and effectuate the intent, purposes* and provisions of th[e] Restated Agreement, and to cooperate with the [Sun] in every reasonable way that will promote *the successful **and lawful** operation* under this Restated Agreement for both parties." *Id*. § 5.3 (emphasis added). The RJ was to bear all fees and costs of post-submission proceedings connected to "seeking any required approval by the Department of Justice" from and after the filing of the 2005 JOA. *Id*. § 1.1.

70.    The parties also included a contingency provision in the 2005 JOA to ensure that their joint operation would sustain to 2040:

> In the event of any action by the United States Department of Justice after the filing of the Restated Agreement which, in the sole opinion of either party hinders, impairs, seeks to halt or otherwise materially impacts this Restated Agreement, then either party may declare the Restated Agreement null and void, and the 1989 Agreement between the parties shall be reinstituted and remain in full force and effect.

*Id.*

71.    On June 15, 2005, the parties submitted the 2005 JOA to the DOJ for review and investigation. The DOJ accepted the filing and thoroughly investigated the amendment. Like before, the DOJ focused on whether the 2005 JOA preserved the Sun's as a separate and independent editorial and reportorial voice in the community. The RJ represented to the DOJ that the RJ could not unilaterally terminate the 2005 JOA and that the Sun had exclusive control over its content.

72.    The DOJ closed its investigation without an enforcement action. It explained that only the ancillary conduct "***not integral*** to the parties' ***revised*** arrangements for the ***joint***

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

*distribution of the Review-Journal and the Sun*, the effects of which we reviewed as part of our investigation—remain[ed] subject to antitrust scrutiny."

73.    Based on the existing law and practice, the parties understood that this "no action letter" confirmed that the DOJ was not bringing an enforcement action and allowed the parties to operate under the 2005 JOA. No one believed the DOJ's letter hindered or otherwise impaired the joint operation.

74.    For nearly 15 years, the parties believed that the 2005 JOA was lawful and enforceable under the NPA. They, along with the rest of the country, believed that they followed the proper procedures under the NPA.

75.    However, at the behest of the RJ, on August 5, 2025, the Ninth Circuit entered its Opinion diverging from half a century of caselaw, DOJ Regulations, and practice. After the parties had been operating under and relying on the 2005 JOA for 20 years, the Ninth Circuit concluded that the 2005 JOA was unenforceable under Section 1803(b) of the NPA due to lack of Attorney General approval. *See Las Vegas Sun v. Adelson*, 147 F.4th 1103 (9th Cir. 2025).

## NATURE OF TRADE AND COMMERCE

### Relevant Product Market

76.    English-language, local, daily print newspapers are recognized by the industry, courts, the DOJ, and the public as a separate economic entity. Newspapers have peculiar characteristics and uses, comprising of a unique bundle of characteristics that readers value, not possessed by other media. They supply readers with a mix of national, state, and local news, sports information, commentary, and opinion, among other features like local event calendars, movie and television listings, classified and commercial advertisements, legal notices, comics, syndicated columns, and obituaries. Newspapers offer content in a timely manner and in a convenient, portable, hardcopy format, allowing the reader to read the news, advertisements, and other information at his/her own convenience without the need to use an electronic device to access content. Local newspapers are able to offer news stories with more in-depth coverage than the news reported by radio or television, and they cover a wider array of topics of interest to local readers—not just

breaking news and major news stories of the day. Newspapers are also inexpensive, meaning there are virtually no socio-economic barriers for citizens to have access to news and information about their community, including those who are unable to afford internet services. Additionally, they have unique production facilities in that they are created, placed in a template, and printed by a newspaper printing press, which is distinct from other types of media. Newspapers are platforms that serve multiple, distinct sets of customers, including older readers, and advertisers, which have been recognized by both economists and courts. Newspapers are priced distinctly when compared to other media, particularly in that newspapers have a price and many other news media are free. They have specialized vendors in the form of their home delivery network. Most readers of local, daily print newspapers in Clark and Southern portions of Nye Counties do not consider weekly newspapers, radio news, television news, internet news, or any other media to be adequate substitutes for the only two local daily newspapers serving Las Vegas and the surrounding areas. There is a low cross-elasticity between the Newspapers and other media products.

77.     Thus, English-language, local, daily print newspapers are a distinct relevant product market and line of commerce within the meaning of Section 2 of the Sherman Act and Section 7 of the Clayton Act.

**Relevant Geographic Market**

78.     The Sun and the Review-Journal are produced, published, and distributed to readers in or near Clark County, and Southern portions of Nye County, Nevada (together, "Clark County"). Both Newspapers provide news relating to Clark County, in addition to state, national, and international news. These two organizations gather Clark County news to include in their print Newspapers as well as their associated news websites.

79.     English-language, local, daily print newspapers that are not produced, published, and distributed in Clark County do not regularly provide local news specific to that county. Local, daily print newspapers from outside of Clark County do not have any significant circulation or sales inside Clark County. Thus, English-language, local, daily print newspapers serving areas outside of Clark County are not acceptable substitutes for the Sun and the Review-Journal.

- 24 -

80.     Accordingly, Clark County, Nevada, is the relevant geographic market and section of the country for antitrust purposes under Sections 2 and 1 of the Sherman Act. This relevant geographic market, together with the relevant product market defined above, is referred to as the "Newspaper Market."

**Market Power**

81.     The Newspapers have been published and distributed under the framework of their original combination and their continued practice under the 2005 JOA since 1989. By virtue of the parties' original combination approved by the Attorney General in 1989, the Review-Journal and the Sun together account for 100% of the newspaper circulation in the Newspaper Market today. As of September 2019, the Newspaper Bundle that includes the Review-Journal and the Sun had a paid circulation for Sunday of 86,593 and an average daily (non-Sunday) paid circulation of 67,514. Since 1989, the Sun has been operationally and economically dependent on the joint operation, which is exclusively controlled by the RJ. 1989 JOA § 5.1; 2005 JOA § 5.1. The Sun has neither printing facilities nor a newspaper distribution network, among other assets and infrastructure necessary to operate a newspaper. Terminating the joint operation would immediately destroy the Sun because of the large startup costs and inability to reach a financially viable scale.

82.     The RJ has had exclusive and unilateral control over the prices charged by the RJ and its sole competitor (the Sun) spanning back to 1989. 1989 JOA § 5.1; 2005 JOA § 5.1. The Sun has no ability to set prices, and no control over subscription sales and circulation.

83.     In the past, the RJ has substantially raised the price of the Newspaper Bundle but has seen little effect on circulation levels, and those large price increases were profitable for the RJ.

84.     The RJ also has the ability to exercise direct control over the Sun's output, and exercises direct control over the Sun's payments. In addition to controlling overall pricing and marketing of the Newspaper Bundle and the relative promotion of the RJ and Sun (all of which affects the Newspaper Bundle's sales and thus the Sun's output), the RJ controls the number of pages available to the Sun for news and editorial content (*i.e.*, the size of the Sun's newshole). The

- 25 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

Sun would need the RJ's permission and agreement to expand its output per issue. 2005 JOA § 4.3, App'x A.2.

85. Furthermore, the RJ possesses high market share, much greater than 50 percent, by all applicable measures including readership, newshole, newsroom staff, division of joint operation profits, and capacity.

86. The RJ controls inputs (*e.g.*, suitable printing facilities and a home-delivery distribution network) essential to the production of daily print newspapers in Clark County. These inputs could not be replicated by a new entrant in the Newspaper Market on commercially viable terms because it would have difficulty reaching efficient scale or density.

**Barriers to Entry**

87. Entry into the Newspaper Market is not timely, likely, or sufficient to prevent harm to competition that would result from the Sun's elimination from the market.

88. English-language, local, daily print newspapers possess large economies of scale, incurring significant fixed costs, including building or gaining access to a printing facility, establishing a distribution network, hiring reporters and editors, news gathering, and marketing the newspaper, among others, that present barriers to entry.

89. By way of example, printing presses for daily newspapers can cost more than $100 million. Any new local, daily print newspaper would require a massive printing facility, typically over 150,000 square feet, to house and store newsprint, that includes a sufficiently large loading dock capable of taking 1-ton rolls of newsprint in and feeding out thousands of printed newspapers to be distributed. There is no printing facility in the Clark County market that can efficiently and effectively print a local, daily print newspaper for a timely and reasonable distribution other than the facilities owned and controlled by the RJ.

90. By way of further example, establishment of a highly efficient distribution operation capable of circulating a newspaper across Clark County immediately after printing is complete and the corresponding need to develop a network of drivers to support home delivery presents another barrier to entry in the market.

- 26 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

91.     More generally, the capital investments required, lack of access to established distribution channels, limited market resources (consumers and advertising), constraints on consumer willingness to pay, workforce requirements, economic advantages of incumbent competitors (economies of scale and marginal costs), and competitive advantages of incumbent competitors (quality, reputation, market knowledge, and contracts) are significant barriers to entry into the Newspaper Market.

92.     No local, daily print newspaper has attempted to enter the Clark County market since the Las Vegas Valley Times (the "Valley Times") in 1975 when it converted from a weekly newspaper to a daily. The Valley Times was a small, community paper, with a maximum circulation of 10,000. That paper, which closed in 1984, was sold only in racks and never competed in a meaningful way against the Sun or the Review-Journal. The Sun is the last successful new entrant into the Newspaper Market since 1950.

93.     Further, expansion of local, daily print newspapers in areas adjacent to Clark County is not timely, likely, or sufficient to prevent the harm to competition resulting from the threatened elimination of the Sun from the market. There are no English-language, local, daily print newspapers adjacent to Clark County. The nearest English-language, local, daily print newspapers are hundreds of miles away and do not regularly provide local news specific to Clark County. Expanding into Clark County would require local, daily print newspapers in areas hundreds of miles away to expand their coverage of local news specific to Clark County, to attract local advertisers who target readers in those counties, and to expand their distribution into those counties.

**DEFENDANTS' EXCLUSIONARY CONDUCT AND ANTICOMPETITIVE SCHEME**

94.     Before the RJ acquired the Review-Journal, it undertook extensive due diligence for the purchase, where the then-owner informed the Adelson family and its team of newspaper industry consultants and operators about the 2005 JOA and the Review-Journal's obligations thereunder. The Sun and the Review-Journal had been operating under the 2005 JOA for 10 years at that point, and all believed it was the valid and enforceable, governing agreement between them.

- 27 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

Even then, the Adelson family and their due diligence team started looking for ways to terminate it. No one contended the 2005 JOA was unenforceable.

95. Dumont and Adelson agreed to purchase the Review-Journal, which was inspired, in part, by their belief that the Review-Journal was a significant opportunity to influence public perception and achieve a monopoly position in the Newspaper Market. Defendants Adelson and Dumont wanted a newspaper in their hometown that reflected their conservative political views, that took favorable stances on their "passion topics" (*i.e.*, opposing the legalization of marijuana, attacking competitors of the Sands, advancing specific state legislation and amendments to the Nevada Constitution to benefit their companies, applying pressure to judges overseeing cases involving Adelson, and highlighting the Adelson family's involvement with the Oakland Raiders' planned move to Las Vegas and the Sands' convention business competitors), and that printed coverage biased in their favor of any ongoing court proceedings in which Adelson may be involved. Unlike most people, Adelson was in a financial position to buy the sympathetic press coverage he craved by acquiring a paper over which he could have complete and unfettered editorial control. To that end, Adelson, his family, and Defendants, acquired the Review-Journal on December 10, 2015.

96. Despite advice to the contrary from retained industry experts and consultants, at first, Adelson and Dumont attempted to conceal the Adelson family's interest in the Review-Journal by naming an unknown and unqualified figurehead to lead the RJ, Michael Schroeder, so that Adelson could manipulate the content of the Review-Journal without people realizing it was being controlled. Soon after the deal closed, reporters at the newly acquired Review-Journal broke the story of his ownership. In response, the Adelson family released a statement acknowledging their new stake in the paper:

> Today we are proud to announce that the Adelson family has purchased the Review-Journal through a wholly owned fund both as a financial investment as well as an investment in the future of the Las Vegas community.

97. One of Adelson's first actions, even before the purchase transaction closed, exerted control over the Review-Journal by ordering RJ reporters to be stationed in the courtroom of Nevada

- 28 -

District Judge Elizabeth Gonzalez. Judge Gonzalez was presiding over a high-profile wrongful termination case in which Adelson was a defendant and had issued rulings unfavorable to Adelson. Adelson's objective was to intimidate Judge Gonzalez by seating reporters in her courtroom all day long to search for dirt.

98.   Prior to the announcement of the sale, Adelson and Dumont directed Michael Schroeder to use one of Schroeder's Connecticut newspapers and write and publish an article condemning Judge Gonzalez's record, which also contained plagiarized material and fabricated quotes. Schroeder did so under the pen name Edward Clarkin. As one 20-year journalist who worked for Schroeder announced during his departure from Schroeder's newspaper, Schroeder had funneled "a terrible, plagiarized piece of garbage about the court system" into the paper, and had "used the pages of my newspaper, secretly, to further the political agenda of his master out in Las Vegas." Dumont was the point person for Schroeder's disparaging article, with Adelson weighing in. Dumont reviewed, approved, and applauded drafts sent to him by Schroeder, and, upon information and belief, reported his impressions of the article to Adelson, who was similarly pleased when the article was published.

99.   As soon as Adelson and Defendants took over the Review-Journal, and even earlier, Adelson began taking an active role in its editorial voice by weighing in on the Review-Journal's coverage in advance of its publication, holding almost daily teleconferences with then-publisher Jason Taylor. They directed Adfam lawyers to draft secret employment agreements with nominal salaries for Adelson and all trustees of The Orchid Trust (Dumont, Sivan Ochshorn-Dumont, and Dr. Miriam Adelson)—the parent of Orchid Flower LLC—under the façade of legitimacy all while guaranteeing they each had unrestrained, and undisclosed, control over the Review-Journal.

100.   Even after the Adelson family was forced to disclose their ownership interests in the Review-Journal, Adelson and Dumont continued to conceal the extent of their influence over the editorial content and operations of the Newspaper. The Review-Journal discloses in each print publication its publishers and other key employees, but it has never disclosed Adelson's or Dumont's roles as Co-Publisher or Deputy Publisher, respectively. Likewise, it has never disclosed

- 29 -

Dr. Miriam Adelson's, Sivan Ochshorn-Dumont's, or Adfam's or its employees' key roles in the Review-Journal either.

101.    But just one thing, or one newspaper, stood between the Adelson family and their vision of the Review-Journal as their mouthpiece and sole editorial voice in the Las Vegas area—the Sun. The parties' original combination, and continued practice under the 2005 JOA, envisioned the continued existence and the RJ's printing and distribution of two distinct editorial voices, including when packaged in a joint edition/Newspaper Bundle, for readers in the community. The Sun often expresses attitudes that are contrary to Adelson's, and when necessary, features pieces that take direct aim at Adelson himself. On one occasion, Adelson showed Taylor a liberal column written by Brian Greenspun, and suggested that he did not want to include the Sun.

102.    During negotiations for the purchase of the Review-Journal, Dumont led the due diligence team using Adfam's services, employees, and consultants, on behalf of and in collaboration with Adelson.

103.    Along with Adfam's Chief Accounting Officer and other Adfam employees, Adfam retained several consultants to conduct due diligence on behalf of the Adelson family. Adfam's General Counsel advised the Adelson family on strategies regarding the parties' combination and practices under the 2005 JOA, and the Review-Journal's business performance, employment, salary information, and commercial agreements, and provided analysis and assessment of this information and the overall strengths and weaknesses of the Review-Journal. The due-diligence consultants, along with Adfam employees, including Adfam's General Counsel and Chief Accounting Officer, reported to Dumont. Upon information and belief, Adfam's lawyers ultimately determined the corporate structure of the RJ entities, including the relationship between Defendants and Orchid Flower LLC (the sole member of News+Media). After the purchase was consummated, Adfam remained, and still remains today, intimately involved with the business of the Review-Journal, including overseeing, advising on, and participating in the control of the Review-Journal's accounting and operations.

- 30 -

104. To maximize their influence and power in the Newspaper Market, Adelson and Dumont sought to eliminate the Sun. Believing that the 2005 JOA was valid and enforceable, before the purchase transaction closed, the RJ orchestrated and implemented a multi-faceted anticompetitive scheme to eliminate the RJ's sole competitor—the Sun—and to monopolize, attempt to monopolize, and conspire to monopolize the Newspaper Market. For its strategy, the RJ would abuse its management of and complete control over the joint operation, and therefore the Sun, by manipulating the 2005 JOA framework under which the parties had been operating for the last decade to reduce competition, harm the Sun, and harm consumers.

105. From the inception of the due diligence process, both Dumont and Adelson began exploring ways to end the joint operation, including by theorizing termination of the 2005 JOA to do so, or acquiring the Sun to eliminate the combination. In meetings held before and after Defendants' acquisition of the Review-Journal, Adelson, and his son-in law, Patrick Dumont, asked Taylor how they could get out of the JOA with the Sun, whether the Sun had to exist at all, and how they could either buy Greenspun out or get rid of the Sun. During one such meeting, Adelson asked what would happen to the Sun if there was no joint operation profit, and in other meetings continued to hypothesize about what would happen to the Sun if the RJ squeezed the Sun out of the market by eliminating its profits payments from the joint operation.

106. These discussions launched Defendants' exclusionary and anticompetitive scheme further, whereby the RJ used its power over the joint operation and the Sun—harnessed since 1989—to manipulate the framework under which both parties believed was valid and enforceable to: (1) fail to maximize the joint operation's profits to drive the joint operation into a loss and eliminate the Sun's profits; (2) abuse the RJ's control over the joint operation accounting to further reduce and eliminate the Sun's profit payments; (3) reduce the Sun's visibility and consumers' knowledge of the Sun; and (4) threatening unilateral termination of the joint operation through pretextual, sham litigation (together, "Anticompetitive Conduct").

- 31 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

**The RJ has Wielded Its Control Over the Joint Operation, and Failed to Maximize the Joint Operation's Profits**

107.   Both newspaper owners in a JOA traditionally have strong economic interests in the success of the joint operation and the combined financial results.

108.   Since 1989, the RJ committed to the Sun—and the DOJ—that it would control and manage the joint operation in furtherance of the NPA and preservation of the Sun's competing editorial voice.

109.   This commitment included using its "best efforts" or, at minimum "commercially reasonable efforts," to maximize the Newspapers' circulation, and agreeing to take all reasonable measures to promote the successful operation of the Newspapers for the benefit of both parties. 1989 JOA §§ 5.1.3, 5.1.8, 5.3; 2005 JOA §§ 5.1.3, 5.1.4, 5.3. This commitment originated in the 1989 JOA and continued through the course of the RJ's control over all non-editorial and -reportorial functions of the joint operation, and the Sun.

110.   Especially in a declining market, newspapers have an increased incentive to generate even incremental profits.

111.   However, the RJ has used its power and control over the joint operation to exploit its dominant position and fail to maximize the joint operation's profits by failing to undertake commercially reasonable efforts to: reduce the costs of (and refrain from charging disallowed expenses to) the joint operation; and raise the revenues of the joint operation.

112.   As one method of the RJ's failure to maximize the joint operation's profits, it unreasonably rejected revenue and expense initiatives set out by the Review-Journal's then-publisher Jason Taylor; instead, the RJ removed and replaced Taylor with a publisher who would accomplish the RJ's plan to drive the joint operation EBITDA into the ground and eliminate the Sun.

113.   Taylor, publisher of the Review-Journal from July 2015 to January 2016, was brought in initially by the Review-Journal's prior owner, GateHouse, to turn around declining

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

trends at the Review-Journal. Taylor is known in the industry as having success in generating revenue and being a powerful force, and he has won countless industry awards and honors.

114.    Soon after Taylor's arrival, he began implementing a strategic plan to reverse the Review-Journal's—and consequently, the joint operation's—declining trends by reducing unnecessary costs, increasing revenue through improved advertising sales and circulation, increasing the RJ's visibility, and modernizing its brands, among other things. Taylor's plan began to see improved financial performance almost immediately.

115.    In a meeting with Greenspun before Defendants' acquisition of the Review-Journal, Taylor projected that the joint operation would have a financially strong close for fiscal year-end 2016, and that, based on trend, the Sun's profit payments could increase by more than 18% in 2017. Under Taylor's plan, the joint operation profits in 2016-2017 were projected to be substantial. Taylor's projections were consistent with the RJ's valuation obtained during its purchase of the Review-Journal from a third-party valuation firm. The RJ heavily lobbied for Taylor to remain as publisher after the Adelson family's purchase, which Taylor did.

116.    Taylor was also vocal about the value of the Sun and desired to strengthen the partnership between the Newspapers.

117.    As Review-Journal publisher, Taylor also discovered that the Review-Journal's former owner, Stephens Media Group, had been dishonest in calculating the profit payments pursuant to the 2005 JOA—which all believed was valid and enforceable under long-standing law and practice, and under which the parties had been operating for over a decade—and concluded payments were due and owing to the Sun. Because Taylor believed it was important to resolve any outstanding profit payment issues with the Sun in order to successfully implement his strategic plan for the Review-Journal, he raised the issue with Adelson on several occasions. But no resolution ever came.

118.    Even though Dumont was involved in interviewing Taylor and Adelson had lobbied for Taylor to stay on as publisher of the Review-Journal after its acquisition, six weeks later, Taylor

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

was removed from the Review-Journal because Adelson and Dumont wanted someone who was more in line with their vision and control.

119. Consistent with journalistic practices, Taylor had been determined to insulate the newsroom from direct Adelson influence.

120. In Taylor's place, Defendants hired Craig Moon as the new publisher of the Review-Journal in January 2016. Thereafter, the RJ did not follow Taylor's commercially reasonable strategic plan, or any other commercially reasonable strategy. The RJ not only diverged from implementing Taylor's or any other reasonable expense initiatives, but, as company revenue was decreasing, the RJ also unreasonably increased the joint operation's expenses. Naturally, the revenue that was trending upward under Taylor quickly evaporated after his departure.

121. At the close of the fiscal year March 31, 2016—buoyed by Taylor's performance the prior year—the JOA still reported a profit, though much smaller than Taylor had projected. Under Moon's tenure, the RJ's fortunes quickly began to deteriorate. Moon executed on Defendants' strategy to financially starve the Sun and to force it out of business.

122. A meeting was held on or about January 25, 2017, to preview financial results for the end of the fiscal year, in which Moon, Robert Cauthorn (the Sun's COO), Greenspun, and Adelson's newspaper consultant Frank Vega were in attendance. At that meeting, the Sun was informed that its Annual Profits Payments were expected to significantly decrease as a result of poor performance of the joint operation, and that the RJ did not project *any* profits going forward for the joint operation. At that same meeting, Greenspun and Cauthorn were also informed that, "Patrick [Dumont] says the JOA [*i.e.*, the joint operation] will never be worth more than it is now and Brian should call Patrick to make a deal."

123. Alarmed at the situation, at the conclusion of the meeting the parties discussed the terms of a possible deal, but no offer made by Defendants was sufficient to maintain the Sun as an independent editorial voice.

124. The RJ made good on its threats to squeeze the Sun out by eliminating the joint operation profits.

- 34 -

125. In March 2017, before the close of the fiscal year, Moon directed the RJ accounting department to write off hundreds of thousands of dollars so that when the Sun's profit payment was calculated, the payment owed to the Sun would be close to zero.

126. Upon the close of the first full fiscal year under the Adelson family's ownership (ending March 31, 2017, a mere two months after Taylor's departure), the RJ reported a negative joint operation EBITDA for the first time in the history of the parties' combination. As the RJ intended, the Sun's profit payment for the following year was, in fact, zero.

127. The Sun has not received a profit payment since the close of the fiscal year on March 31, 2017.

128. Taylor was removed by the RJ as an act in furtherance of its anticompetitive plan. Because Taylor advocated ceasing the RJ's dishonest accounting practices and resolving the profit payments to the Sun, and projected Annual Profits Payments *increases* to the Sun under his new strategic plan—contrary to Adelson and the remaining Defendants' plan to starve the Sun of funds needed to operate—Taylor was removed to pave the way for another publisher, Craig Moon, who would agree to engage in exclusionary conduct to eliminate the Sun.

129. Despite his role as President of the Review-Journal, and highlighting the charade that is his so-called leadership position, O'Connor was not involved in the removal of Taylor as publisher of the Review-Journal or the selection of Moon as Taylor's replacement. Instead, the Adelson family made the decision with no input from the supposed corporate head.

130. As the manager, controller, and dominant party responsible for all business aspects of the joint operation, the RJ was obligated to operate it in a commercially reasonable fashion. The RJ's failure to implement the Taylor plan, or any similarly profitable plan, was commercially unreasonable.

131. The RJ's failure to undertake commercially reasonable efforts to lower the costs and raise the revenues of the joint operation reduced and eliminated the Sun's profit payments. The RJ has failed to take all reasonable measures to promote the successful operation for the benefit of both

- 35 -

Newspapers and abused its power to drive the joint operation into a loss, in turn, threatening the Sun's existence.

132. The RJ's failure to maximize the profits of the joint operation was a part of the RJ's anticompetitive scheme to eliminate the Sun.

**The RJ, Through Its Control Over the Joint Operation, Exploited Its Power and Abused the Joint Operation Accounting to Reduce Profit Payments to the Sun**

133. The NPA does not determine how JOA newspapers are to account for their joint operation's revenues and expenses.

134. Rather, the NPA's standard is "the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States …." 15 U.S.C. § 1801.

135. Consequently, how the newspapers account for joint operation expenses and revenues are determined by the parties, and are sufficient so long as the weaker newspaper has enough resources to deliver on the NPA's policy and purpose.

136. The Sun's share of the joint operation's profits under both JOAs approximated 10 percent, which the DOJ deemed a "sufficient operating guarantee[ ]" "to enable [the Sun] to continue to provide an independent reportorial and editorial voice in the Las Vegas community."

137. Yet, by manipulating the 2005 JOA formula the RJ agreed to (and which all thought was valid and enforceable) and weaponizing the Sun's reliance and dependence, the RJ abused its control over the joint operation accounting. The RJ knew that its exclusive power over the joint operation accounting to increase expenses, charge disallowed expenses to the joint operation, and divert joint operation revenue to the RJ's outside entity, was unbridled. Under the belief that the 2005 JOA was valid and enforceable, the RJ knew that higher operating expenses under the 2005 JOA formula would reduce the joint operation EBITDA and, consequently, lead to lower profit payments to the Sun.

138. The RJ's plan to deprive the Sun of funds needed to operate by recording zero profit was successful by the fiscal year ending March 31, 2017. The RJ, for the first time in the history of

- 36 -

the joint operation, recorded a negative EBITDA in the amount of negative $2.25 million, constituting a negative 122.43% EBITDA change from the year prior.

139.    The RJ had increased the Review-Journal's editorial costs by almost 40 percent—over $3 million—in 2017 and charged all of the Review-Journal's editorial costs against the joint operation, even though under the 2005 JOA the parties had agreed to "bear their own respective editorial costs."

140.    For perspective, the Review-Journal's editorial costs in 2017 were over 30 percent more than the Review-Journal's editorial costs in 2005, when the RJ was calculating the joint operation EBITDA under the 2005 JOA as far greater—$121.56 million. The RJ continued to charge the Review-Journal's editorial costs against the joint operation and did so even after the 2019 arbitration judgment confirmed it legally could not.

141.    The RJ, again under the belief that the 2005 JOA was valid and enforceable, further manipulated and abused the joint operation accounting under that framework to harm the Sun by: charging disallowed promotional expenses that did not include equal mention of the Sun, and/or that promoted the RJ's separate digital entity; charging the RJ's separate, non-JOA digital entity's expenses to the joint operation; charging other, miscellaneous disallowed expenses; removing joint operation revenue categories; and diverting joint operation revenue to the RJ's separate digital entity. Compounding these accounting abuses, the RJ systematically failed to maintain separate books and records for the joint operation, conflating the joint operation accounting with its separate accounting (which included the RJ's separate digital entity), even after the arbitrator criticized the RJ's practices in 2019. The RJ concealed this conduct by blocking the Sun's attempts to review the RJ's books and records.

142.    The RJ has systematically failed to maintain separate books and records for the joint operation, conflating the joint operation accounting with its separate accounting, which included the RJ's separate digital entity.

143.    Each of the RJ's abuses under the accounting formula that both parties believed governed their joint operation, and on which the Sun relied, overstate the costs attributable, and

- 37 -

understate the revenues attributed to the joint operation, thereby suppressing the joint operation EBITDA and reducing the Sun's profit payments. The RJ's conduct was in furtherance of its unlawful plan to put the Sun out of business and to extinguish its distinct and independent editorial voice in Clark County.

### The RJ has Exploited Its Control Over the Sun's Promotions, and has Suppressed Promotion of the Sun, Which Further Reduced the Payments to the Sun

144.    The RJ has been responsible for and in control of promoting the Sun since 1989. 1989 JOA §§ 5.1, 5.1.3, 5.1.4; 2005 JOA § 5.1.4. The RJ has always been required to use, at minimum, commercially reasonable efforts in doing so. 1989 JOA § 5.1.3; 2005 JOA § 5.1.4. The Sun, like all weaker newspapers in a JOA, has a long-term interest in ensuring that its voice is preserved, a key part of which is how the Sun's separate brand and content are promoted. If the RJ were honoring the joint operation and the intent of the NPA, the RJ would share in that interest, too. Ensuring that both Newspapers are healthy benefits the joint operation by expanding consumer awareness of the diverse editorial voices, bolstering joint operation revenue.

145.    Promotion of the Sun bolsters the Sun's appearance and its ability to communicate with consumers and potential readers about its Newspaper. It also raises awareness of the Sun in the market. In turn, promotion of the Sun enhances its value and brand.

146.    Yet again, the RJ has exploited its control over the Sun's promotions and brand visibility by taking actions that undermine the Sun's ability to communicate with consumers about the nature and value of its Newspaper and brand, in turn reducing people's awareness of the Sun's presence and content. The RJ's anticompetitive promotional abuses involve its (1) failure to promote the Sun in equal prominence with the RJ, (2) destroying the Sun Box and diminishing the Sun's presence on the front page of the Newspaper Bundle, and (3) omitting the Sun from the electronic replica edition of the Newspaper Bundle.

147.    The RJ voluntarily agreed to mention the Sun in "equal prominence" with the Review-Journal in any promotion of the Review-Journal as an advertising medium or to advance circulation to ensure the Sun's brand remained as robust as the Review-Journal's.

- 38 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

148.    Nearly all promotion for a newspaper is either to promote it as an advertising medium or to advance circulation.

149.    The RJ's exclusionary tactics include marketing and promoting the Review-Journal in various advertising mediums without any mention of the Sun, or displaying the Sun's logo disproportionately to the Review-Journal's. Then, compounding the effect of these failures to promote the Sun, the RJ charged these separate expenses against the joint operation, further reducing the Sun's payments.

150.    Virtually none of the RJ's promotional efforts include mention of the Sun in equal prominence, and nearly all omit the Sun entirely. The RJ's exclusion of the Sun in equal prominence from promotion is a change, distinguishable from the past practices of the Review-Journal pre-Adelson purchase.

151.    Practically all external RJ advertising—including sponsorships, billboards, banners, displays, other signage, events, house ads and circulars, bills and renewal notices, television and radio advertising, and trade and barter agreements—omit the Sun entirely.

152.    When the Sun challenged the RJ to produce examples of promotional activities that mention the Sun in equal prominence, Defendants could not do so.

153.    Defendants admit that they have excluded the Sun from their advertising initiatives. Below is one example of an RJ advertisement that makes no mention of the Sun:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 39 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26



154.    In the less than 1 percent of times the RJ did mention the Sun, it displayed the Sun's logo disproportionately to the Review-Journal's. The RJ's exclusion of the Sun in equal prominence from the Review-Journal's promotions is a change from past practices pre-Adelson family purchase.

155.    Exerting its control over the physical printing of the Newspaper Bundle, the RJ also diminished the Sun's noticeable mention on the front page of the Newspaper Bundle. The Sun's noticeable mention, *i.e.*, the Sun Box, communicated the Sun to consumers to advance their knowledge of the Sun and its brand.

156.    In 2017, shortly after promising no further profit payments to the Sun and attempting to coerce the Sun into selling, the RJ abruptly informed the Sun that it was unilaterally changing the format of the front page of the Newspaper Bundle. The Sun was without recourse.

157.    Two days later, the RJ commenced publishing a new front-page design that eliminated the Sun Box entirely and deviated from the parties' longstanding practice of printing the Sun's noticeable mention in the specified Sun Box format for the preceding 12 years.

- 40 -

158. Upon information and belief, Dumont was a key decision-maker in the RJ's redesign and approved the redesign on behalf of the Adelson family.

159. An example of the Sun Box on the Review-Journal front page from March 31, 2017, before the changes were unilaterally made by the RJ, is shown below:



160. An example of the unilaterally redesigned noticeable mention of the Sun on the Review-Journal front page from April 2, 2017, after the changes were unilaterally made by the RJ and the new design was rolled out, is shown below:



161. By destroying the Sun Box, the RJ also ensured that when a "spadea fold" (an advertising element covering approximately 40% of the left side of the page) was published, the Sun's RJ-designed banner would be covered. The parties had always intended that the Sun Box

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

move to the right side when a spadea is present, ensuring the Sun is always visible. That is no longer the case.

162.    Compounding the harm to the Sun's visibility, the RJ places advertising stickers on top of the Sun's logo and mentions on the front page of the Newspaper Bundle, obscuring the Sun's message and making it less visible and accessible to readers. It does so with strategic intent: in both the 2016 and 2018 elections, the Sun's announcements of political endorsements were covered by advertising stickers placed by the RJ. In the 2018 example, the Sun specifically asked the Review-Journal publisher not to cover the endorsement announcements. He refused and the Sun's endorsements were covered on the front page.

163.    The RJ continues to publish the unauthorized front-page design over the Sun's repeated objections.

164.    In addition, the RJ voluntarily exercised its control over publishing and distributing the electronic replica edition of the Newspapers and removed the Sun from it. *See* 2005 § 10.6. Both parties agree that the electronic replica edition constitutes a meaningful percentage of the Newspapers' circulation and is mostly used in educational environments to communicate with younger readers. It is one of the Sun's promotional strategies to advance these readers' knowledge of the Sun and its brand. The RJ had a longstanding practice (13 years) of including the Sun in the electronic replica edition of the Newspapers.

165.    However, on or about January 25, 2018, the RJ stopped including the Sun in the electronic replica edition of the Newspapers.

166.    On or about May 3, 2019, Keith Moyer, the Review-Journal's current publisher and editor, telephoned Mr. Cauthorn, COO for the Sun, stating the RJ restored the Sun in the replica edition that day. Mr. Moyer further stated that he had looked into the removal and stated it was "kind of a unilateral decision by Craig Moon. He said, 'just take it out.'"

167.    The RJ only restored the Sun in the electronic replica edition on May 3, 2019, amidst the parties' 2019 arbitration.

- 42 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

168. The electronic replica edition constitutes a meaningful percentage of Review-Journal circulation and is mostly used in educational environments; hence, the RJ deprived the Sun of an opportunity to reach new young readers to allow its voice to be introduced to future readers, reducing the Sun's visibility.

169. Defendants have not used commercially reasonable efforts to promote the Sun. They continue to refuse to use commercially reasonable efforts to promote the Sun, and continue to wrongly charge the RJ's unilateral promotional activities against the joint operation. The RJ's various actions harmed the Sun's ability to communicate with consumers about the nature and value of its Newspaper and brand, reducing people's awareness of the Sun's presence and content, and harming the Sun's brand and value.

170. These are overt acts in furtherance of Defendants' plan to eliminate the Sun and to monopolize the Newspaper Market.

**Defendants Blocked the Sun from Examining the Review-Journal's Books and Records, Concealing the Extent of the RJ's Anticompetitive Conduct in Furtherance of the RJ's Plan to Eliminate the Sun**

171. As a result of the RJ's complete control over all business functions of the joint operation, the Sun is entitled to inspect the RJ's books and records. This had been the longstanding practice of the parties prior to Adelson's purchase.

172. On May 12, 2016, the Sun notified the RJ of the Sun's intent to examine and audit the Review-Journal's books and records to verify the RJ's Annual Profits Payment calculation, and ensure that Defendants had not illegally redirected revenues from or charged expenses to the joint operation.

173. The Sun forwarded its initial list of documentation, and Defendants rejected the Sun's request in late July 2016.

174. Following the RJ's objection, the Sun attempted to informally negotiate with Defendants to obtain documents from the Review-Journal, party-to-party.

175. Unable to reach an agreement, on September 5, 2017, the Sun renewed its formal audit request, expressly appointing its chosen law firm auditor to examine and audit the books and

- 43 -

records of the Review-Journal, under the practice the RJ voluntarily agreed to. The RJ rejected the request on the grounds that it "far exceed[ed] the limited audit provisions" of the 2005 JOA (which the RJ believed to be valid at that time), even though all requested material had been available in prior audits when other ownership was in charge. The RJ's refusal was a deviation from the parties' longstanding practice.

176.    Instead, the RJ agreed to gather relevant, albeit very limited, information for production in due course. The RJ changed its position on November 16, 2017, and again disputed the validity of the Sun's audit. On November 28, 2017, the RJ changed course again when it agreed to produce limited categories of documents requested by the Sun.

177.    After further discussions between counsel, on December 21, 2017, the RJ represented that its anticipated production would occur within the first two weeks of January 2018.

178.    The RJ never voluntarily produced the requested documents: they were provided only after the Sun filed an action in state court and the matter was compelled to arbitration, and after the Sun initiated this action.

179.    Defendants' efforts to prevent the Sun from inspecting the RJ's books and records, including through an audit, and from uncovering the truth regarding the RJ's accounting and operational abuses are acts in furtherance of Defendants' illegal plan.

**Defendants Seek to Terminate the Joint Operation and Eliminate the Sun on Made-Up and Legally Deficient Grounds in Furtherance of Its Anticompetitive Conduct**

180.    Because the Sun gave up control of its assets and non-editorial and -reportorial operations as a condition of entering into the 1989 JOA, the Sun lost its ability to independently print and distribute its Newspaper and became dependent on the joint operation and the RJ. 2005 JOA at Prelim. Statement, §§ 5.1.3, 5.1.8, § 5.3; 2005 JOA at Art. 3 & §§ 3.1, 4.3, 5.1. The Sun did so based on the parties' and the DOJ's intentions that the Sun would be preserved as a second, independent Newspaper voice until at least 2040.

181.    Following Defendants' loss in arbitration (in which they sought to enforce the 2005 JOA), and their efforts to starve the Sun out of existence were decelerated, the RJ moved to amend

- 44 -

its answer and assert counterclaims in the state court action to terminate the JOA. The purpose was to eliminate the joint operation entirely. The grounds upon which the RJ sought to terminate the joint operation were founded on the 2005 JOA, claiming that the Sun purportedly "fails to meet the JOA's required high standards of newspaper quality," breached the 2005 JOA, and force majeure. These bases are not only bogus but are also objectively baseless, unreasonable, and impermissible grounds for termination. No reasonable litigant could realistically expect success on the merits. The counterclaims are a sham meant to directly interfere with, and destroy, a competitor.

182.    During this litigation, as an alternative strategy to prematurely end the joint operation, the RJ asserted the belated claim that the 2005 JOA was unlawful and unenforceable under Section 1803(b) of the NPA for lack of written Attorney General consent.

183.    The RJ was attempting to explore ending the joint operation even before its purchase transaction for the Review-Journal closed. However, at no time during the due diligence process or in the years after did the RJ ever allege that the 2005 JOA was unenforceable under the NPA.

184.    Instead, the RJ waited until the Sun initiated this antitrust litigation—after the parties had been operating under the 2005 JOA for 14 years—to argue that it could cease printing and distributing the Sun, and terminate the joint operation, because the parties did not follow the correct procedure.

185.    And at no time did the RJ "use their best efforts to take all action necessary" to effectuate the intent of the 2005 JOA, including for "the successful and lawful operation" thereunder, but seeking Attorney General consent under the NPA. Nor did the RJ accept reversion to the 1989 JOA.

186.    Instead, while asserting that the 2005 JOA was unlawful, the RJ simultaneously claimed that the 2005 JOA effectively terminated the 1989 JOA, allowing the RJ to end the joint operation and cease printing and distributing the Sun.

187.    At every step, the RJ rejected the continued enforceability of the 1989 JOA and the lawfulness of the material aspects of their original combination that were approved by the Attorney General in 1989. These material aspects, which remain in full force and effect under the 1989

- 45 -

framework and decades of the RJ's voluntary practice include the RJ's responsibility for and complete control over: business management of the joint operation, including "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation; acting on behalf of Sun in the joint operation; printing and producing the Sun using the RJ's printing plant, employees, and equipment; the Sun's sales and distribution; purchasing newsprint, materials, and supplies for the joint operation; soliciting, selling, and collecting on the Newspapers' advertising and circulation; promoting and circulating the Sun, using commercially reasonable efforts in promoting and circulating the Sun; establishing advertising and circulation rates for the Sun; paying, recording, and maintaining all expenses of the joint operation; accounting to the Sun after the close of each fiscal year; and distributing the Sun's share of payments from the profits of the joint operation derived from all advertising and circulation revenues of the Newspapers and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel.

188.   Both parties cross-moved for summary judgment on the RJ's challenge to the enforceability of the 2005 JOA, and this Court granted summary judgment in the Sun's favor.

189.   The RJ appealed this Court's grant of summary judgment to the Sun on the enforceability of the 2005 JOA for lack of Attorney General consent. The Ninth Circuit reversed. While it concluded that the 2005 JOA was unlawful and unenforceable strictly based on the language of Section 1803(b) alone for lack of Attorney General approval, it gave no consideration to the 1989 JOA, the RJ's continuing obligations and control over the joint operation, or the last 20 years of the parties' joint operations.

190.   The United States Supreme Court denied the Sun's Petition for Certiorari on February 23, 2026. The Ninth Circuit issued its mandate two days later on February 25.

191.   The RJ's efforts to terminate the joint operation by having the 2005 JOA declared unenforceable for lack of Attorney General approval, yet having failed to seek the proper approval or revert to the 1989 JOA, is objectively baseless, unreasonable, and impermissible grounds for termination of the joint operation, or to cease printing and distributing the Sun. Each of the material

- 46 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

components and the RJ's obligations are valid and enforceable as a result of the valid and enforceable 1989 JOA that the Attorney General already approved. No reasonable litigant could realistically expect success on the merits. The RJ's counterclaims are a sham meant to directly interfere with, and destroy, a competitor.

192.    Each of Defendants' steps to end the joint operation and cease printing and distributing the Sun are overt acts in furtherance of their scheme to monopolize the Newspaper Market in violation of antitrust laws.

### ANTICOMPETITIVE EFFECTS

193.    The Review-Journal and the Sun are the only English-language, local, daily print newspapers in Clark County. They compete editorially and reportorially, which is economic competition under antitrust laws. If the RJ's Anticompetitive Conduct is permitted to continue unchecked and/or if the RJ ends the joint operation and ceases to print and distribute the Sun, Defendants will control and monopolize 100% of the Newspaper Market. The RJ's Anticompetitive Conduct undertaken in the Newspaper Market harms competition by weakening and threatening to eliminate the Review-Journal's only competition in the market—the Sun—thereby harming consumers.

194.    There is no compelling commercial benefit under the joint operation for the RJ to attempt to end the parties' longstanding combination. The RJ's actions speak to its true motive: more than simply a commercial monopoly, it wants a literal monopoly in the Newspaper Market, having exclusivity on thought and expression and to end all diverse editorial viewpoints, and silence those who would disagree. This is exactly the circumstance the NPA, the parties' original combination in 1989, and their continued practices under the 2005 amendment, sought to prevent. The RJ's actions are intended to prevent anyone from naysaying the Newspaper's owner in front of the important print audience. Absent the Sun's editorial voice, the RJ would gain unrivaled powers in the Newspaper Market.

195.    The owners of the Sun and the Review-Journal have always competed vigorously against each other for readers. They do so in various ways, such as seeking to generate original

- 47 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

news and other content of interest to readers; trying to cover local news with greater depth, breadth, and accuracy; breaking stories first; and offering the most attractive mix of news, features, and editorials to readers. This head-to-head competition between the owners of the Sun and the Review-Journal will be lost unless the RJ's Anticompetitive Conduct is enjoined.

196.   The RJ's Anticompetitive Conduct has already had and will continue to have the effect of reducing output (both quality and quantity) of newspapers. By way of example, as a direct result of the RJ's plan to squeeze out the Sun, the Sun had to lay off staff, including cutting back on their night staff in January 2018. The practical consequence of cutting back on night staff meant that instead of sending stories over to the Review-Journal for print at 10:00 p.m., as it used to, the limited Sun staff now has to send stories to the Review-Journal for print at 4:00 p.m. Before, a story arriving at 5:00 p.m. or later might have made it to print in the Sun the next morning. Now, it appears later than it otherwise would have in print.

197.   The termination of the parties' joint operation will eliminate the Sun Newspaper by leaving the Sun with no infrastructure or facilities within which to produce, print, and distribute its Newspaper. It will also improperly deprive the Sun of a print audience it has worked to build for more than 60 years.

198.   Further, the RJ's Anticompetitive Conduct threatens to decrease output. From 2015-2018, the national total circulation revenue for newspapers increased by 1.1%. During that same time period, 2015-2018, circulation revenue for the Review-Journal decreased by a whopping 16%. Without the constraining influence of the Sun, and the independent editorial voice in the Las Vegas community that readers want, circulation, and therefore output, is likely to decrease even further.

199.   The RJ's Anticompetitive Conduct harms competition and is not competition on the merits.

200.   The RJ's Anticompetitive Conduct has: improperly reduced and eliminated the Sun's payments and similarly weakened the Sun's ability to compete and threatening the Sun's shut down; created uncertainty that has raised the Sun's costs and weakened the Sun's investment incentives; and reduced consumers' awareness and knowledge of the Sun and its brand, harming

- 48 -

competition by weakening the Sun's ability and incentive to compete. Each of these different elements of the RJ's Anticompetitive Conduct reinforce each other to harm competition.

201.    Readers benefit from editorial and reportorial competition between the Sun and the Review-Journal. Consumers benefit from the choice and variety that competition between the Sun and Review-Journal offers them today, as recognized by the Attorney General's approval of the parties' original combination in 1989 JOA—to preserve the Sun for the benefit of the paramount public interest in maintaining two distinct newspaper voices in Clark County.

202.    The RJ's Anticompetitive Conduct harms consumers by robbing them of the choice of an independent editorial voice in the Las Vegas area, offering them a check on and an alternative to Review-Journal coverage, and by limiting the Sun's ability to produce quality content. After the RJ announced its intention to seek termination of the 2005 JOA, end the joint operation, and cease printing and distributing the Sun, consumers loudly voiced their objections.

203.    Further, the Sun's readers' concerns are confirmed by a study of 2008-2009 data following the ending of a joint operating agreement between the Denver Post and the Rocky Mountain News.[11] The Rocky Mountain News printed its last edition on February 27, 2009. Comparing civic engagement following the death of the JOA to other cities in the nation, the study concluded that, "eliminating a local newspaper from a community leads to less civic engagement in the immediate aftermath among the citizens of that community."

204.    Absent outside influences or monopolistic business misconduct, neither the Sun nor the Review-Journal is in danger of failing in the near future. The 1989 JOA, approved by the Attorney General, ensures continued publication of both Newspapers until December 31, 2040.

**DEFENDANTS' JOINT AND SEVERAL, AND ALTER EGO, LIABILITY**

205.    Defendants Adelson, Dumont, Adfam, News+Media, and the Review-Journal, each personally, individually, and directly, knowingly engaged and participated in the Anticompetitive Conduct alleged herein.

---

[11] Lee Shaker, *Dead Newspapers and Citizens' Civic Engagement,* http://leeshaker.com/wp-content/uploads/2013/01/Dead-Newspapers-and-Citizens-Civic-Engagement-Lee-Shaker-Forthcoming-in-Political-Communication.pdf, last accessed on September 20, 2019.

- 49 -

206.    Defendants have a unity of interest and at all relevant times have acted together in a coordinated activity, and collectively as a part of a single enterprise, or in the alternative as co-conspirators, in furtherance of the anticompetitive scheme.

**Defendants Adelson and Dumont**

207.    Adelson and Dumont used corporate shells the Review-Journal, News+Media, and Adfam as their alter egos in committing the legal violations alleged herein. To the extent that Adfam, the Review-Journal, and News+Media are held liable for acts, actions, and violations herein, Defendants Adelson and Dumont should be held liable based on alter ego liability.

208.    There is such unity of interest and ownership that the separate personalities of Defendants Adelson and Dumont cannot be separated from those of the Review-Journal, News+Media, and Adfam.

209.    The Review-Journal, News+Media, and Adfam are so dominated by Defendants Adelson and Dumont that the corporate form of the Review-Journal, News+Media, and Adfam can be disregarded.

210.    Specifically, as further alleged herein, one or more of the following are present, which permits personal liability against Defendants Adelson and Dumont for the acts of the Review-Journal and News+Media:

(i)    the significant exercise of editorial control as alleged herein;

(ii)    the absence of corporate formalities such as holding regular corporate meetings, keeping corporate minutes, election of directors, etc.—O'Connor, since being appointed to every corporate role for the Review-Journal and sole manager for News+Media in early 2016 has not noticed formal corporate meetings, nor does he keep corporate minutes;

(iii)    inadequate or under capitalization—Adelson family members, including Dumont, who are trustees of The Orchid Trust, have infused millions of dollars into the Review-Journal, and the trustees have approved the Review-Journal's budget to operate at a loss each year since the Adelson acquisition;

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

(iv)    overlap in ownership, officers, directors, and personnel—upon information and belief, all or most "employees" of News+Media are "co-employed" by the Review-Journal;

(v)    the lack of arm's-length dealing between Defendants Adelson and Dumont and the corporations—Adelson and Dumont influence, control, and direct the business of the Review-Journal and News+Media, including financial decisions and funding decisions;

(vi)    the significant influence and control over the Review-Journal, News+Media's business policies and affairs, and;

(vii)    the use of Adfam's services to benefit the Review-Journal and News+Media, which in turn, only benefits Adelson and Dumont.

211.    Similarly, as further alleged herein, one or more of the following are present which permits personal liability against Defendants Adelson and Dumont for the acts of Adfam:

(i)    significant influence and control over Adfam's policies and affairs—Adfam's sole purpose is to support and promote the Adelson family, and the family ultimately directs all of Adfam's decisions;

(ii)    the lack of arms-length dealing between Dumont and Adelson and Adfam;

(iii)    the corporate structure and purpose of Adfam, which is designed solely to benefit the affairs and finances of Adelson and Dumont and their family members;

(iv)    inadequate or undercapitalization—upon information and belief, Adfam has no business interests that are not ultimately funded or supported by the Adelson family;

(v)    the absence of corporate formalities;

(vi)    the use of corporate assets as an extension of individual assets, and;

(vii)    the admitted use of employees/personnel and Adfam services to serve Dumont and Adelson's individual business and personal interests.

212.    Adelson and Dumont have integrated the operations and resources of the Review-Journal, News+Media, and Adfam to achieve a common business purpose such that disregarding their individual entities is necessary to avoid an unjust result.

- 51 -

213.    To control the Review-Journal and News+Media, Adelson and Dumont selected a loyal Adfam employee, O'Connor, to hold every corporate role at the Review-Journal and at News+Media. Despite his leadership and supposed role as head of the Review-Journal and News+Media, O'Connor's work consists of little more than holding corporate titles. Mr. O'Connor invests very little time in the Review-Journal's business. The Review-Journal's publisher reports to the Adelsons, not to O'Connor. O'Connor is not involved in operational matters; he is not involved in the hiring or firing of key employees, including publishers; he does not make any independent decisions on behalf of either the Review-Journal or News+Media; he does not approve budgets or funding requests; he does not know basic information about the Review-Journal such as the price of a newspaper subscription or the pattern of advertising rates, and; O'Connor is not paid by either the Review-Journal or News+Media. Rather, O'Connor is merely a tool for the Adelson family, employed by the family business—to control the Review-Journal. The Adelson family makes all decisions about the Review-Journal and O'Connor views his role as information gatherer for the Adelson family to "carry out their wishes." For example, despite being the President of the Review-Journal, O'Connor executed Adelson's Employment Agreement without ever discussing the Agreement with Adelson. Instead, Adfam attorneys drafted the Employment Agreement, instructed Mr. O'Connor to sign it, and Mr. O'Connor did so at their behest.

214.    Defendant Adelson has a pattern of creating corporate forms to serve as the entity to run and manage his business interests, even though these businesses are only shell corporations that serve as his personal alter ego. It is not uncommon for Adelson to have O'Connor serve as apparent corporate head of Adelson's companies.

215.    Upon information and belief, the Review-Journal, News+Media, and Adfam would not be able to pay an eventual judgment without resort to Defendants Adelson's and Dumont's assets.

216.    Failure to disregard the Review-Journal, News+Media, and Adfam's corporate personalities and pierce the corporate veil would result in fraud or injustice.

- 52 -

**Defendant Adfam**

217.   Adfam also acts as alter ego to the Review-Journal and News+Media.

218.   The Adelson family, including Adelson and Dumont, own, either directly or through another entity, Adfam. Adfam provides services to Adelson family businesses, including the Review-Journal and its parent company, News+Media. The intimately intertwined nature of the relationship between Adfam and the Review-Journal/News+Media results in the Review-Journal/News+Media being nothing more than an instrument and/or conduit of Adfam in the pursuit of a single business venture and/or enterprise, which, in turn, benefits Adelson and Dumont. Economic unity exists between Adfam, Adelson, Dumont, News+Media, and the Review-Journal.

219.   Similarly, as further alleged herein, one or more of the following are present, which permits personal liability against Adfam for the acts of the Review-Journal and News+Media:

(i)   Adfam possesses and dominates control over the Review-Journal's finances, policies, and business practices, and Adfam directly and personally participated in the accounting and operational abuses alleged herein.

(ii) Adfam and the Review-Journal/News+Media share common directors, officers, and consultants/employees, and jointly benefit from transactions entered into by one another;

(iii)   upon information and belief, Adfam fails to adhere to corporate formalities such as holding regular corporate meetings, keeping corporate minutes, election of directors, etc.;

(iv)   inadequate or under capitalization—upon information and belief, Adelson family members have infused millions of dollars into Adfam-run or -operated businesses for their own benefit;

(v)   the lack of arm's-length dealing between Adfam and the Review-Journal and News+Media—Adelson and Dumont and other Adelson family members influence, control, and direct the business of Adfam, including financial decisions and funding decisions;

(vi)   the significant influence and control over the Review-Journal/News+Media's business policies and affairs as alleged herein, and;

- 53 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

(vii)   the use of Adfam's services to benefit the Review-Journal and News+Media, which in turn, only benefits Adelson and Dumont.

220.   Critical to this case, Adfam's Chief Financial Officer lead a team that developed accounting policies and procedures for the Review-Journal, which were in contravention of the joint operation. On at least a monthly basis, Adfam received and continues to receive sensitive financial information and documents from the Review-Journal's Chief Financial Officer, publisher, and Controller, and weighs in on the Review-Journal's financial and operational decisions. Adfam also reviews, oversees, and is the intermediary communicator to Dumont, Adelson, and other involved members of the Adelson family, regarding the Review-Journal's funding requests. Adfam receives quarterly and monthly budget updates from the Review-Journal to provide to Adelson, Dumont, and other involved members of the Adelson family. Adfam's employees perform monthly control checks on the Review-Journal, including creating internal controls separate from the Review-Journal's independent accounting firm. Adfam further drafts and provides, on the Review-Journal's behalf, yearly "going concern" letters to the Review-Journal's outside auditing firm, which are approved by Dumont and executed by O'Connor, Chief Financial Officer for the Adelson family office. Upon information and belief, Adfam employees and/or owners participated in the redesign of the Newspapers' front page to reduce the Sun's visibility.

221.   Defendants established this corporate relationship to avoid liability and to promote injustice.

## FIRST CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act – Monopolization, 15 U.S.C. § 2)

222.   Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

223.   The relevant market is the Newspaper Market.

224.   The RJ has gained and maintains monopoly power in the Newspaper Market through the parties' original combination in 1989, expressly approved by the Attorney General under the Newspaper Preservation Act of 1970. 15 U.S.C. §§ 1801-04. The RJ abused and maintained such

- 54 -

power through its Anticompetitive Conduct that is patently exclusionary, including, exploiting its powers and responsibilities over the joint operation to deprive the Sun of its sole revenue source, by reducing the visibility of the Sun to consumers, and by threatening to end the joint operation and cease printing and distributing the Sun.

225. The RJ has the power to control prices and exclude competition in the Newspaper Market.

226. The RJ possesses a significantly dominant share of the Newspaper Market protected by substantial barriers to entry and expansion.

227. The RJ has the power to exclude competition in the Newspaper Market and have used that power, including by way of its exclusionary Anticompetitive Conduct as described herein, in order to maintain and expand its monopoly power in the Newspaper Market.

228. The RJ's willful acquisition and/or maintenance of its monopoly power is from its exclusionary Anticompetitive Conduct—conduct that weakens the Sun's ability to compete and is not competition on the merits.

229. The RJ behaved as alleged herein to maintain and grow its monopoly in the Newspaper Market with the effect that competition is foreclosed, and consumer choice is gravely diminished in that the Sun's editorial voice in the Las Vegas community has been impaired. Further, the RJ's actions have and will decrease output (quantity and quality) of newspapers.

230. There is no business necessity or other pro-competitive justification for the RJ's Anticompetitive Conduct.

231. The Sun has been injured and will continue to be injured in its business and property as a result of the RJ's Anticompetitive Conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by Defendants. *See* 15 U.S.C. § 15.

232. The Sun is entitled to preliminary and permanent injunctive relief to prevent the RJ from persisting in its unlawful, inequitable, and unjustified behavior to the Sun's detriment, with such an injunction: prohibiting the RJ from ending the joint operation, prohibiting the RJ from

- 55 -

ceasing to print and distribute the Sun; prohibiting the RJ from abusing its control over the joint operation to eliminate the Sun from the market; and ordering the RJ to divest itself of the Newspaper, or in the alternative to divest itself of the Newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation. *See* 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF

**(Violation of Section 2 of the Sherman Act – Attempted Monopolization, 15 U.S.C. § 2)**

233.    The Sun realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

234.    The relevant market is the Newspaper Market.

235.    The RJ has attempted to monopolize the Newspaper Market. The RJ has gained and maintains monopoly power in the Newspaper Market through the parties' original combination in 1989, expressly approved by the Attorney General under the Newspaper Preservation Act of 1970. The RJ has abused and maintained such power through patently exclusionary Anticompetitive Conduct, including exploiting their powers and responsibilities over the joint operation to deprive the Sun of its sole revenue source, by reducing the visibility of the Sun to consumers, and by threatening to end the joint operation and cease printing and distributing the Sun.

236.    The RJ has created a dangerous probability of success that it will achieve monopoly power in the Newspaper Market.

237.    The RJ has a specific intent to achieve monopoly power in the Newspaper Market, as alleged in the paragraphs above. Now, if its Anticompetitive Conduct is not checked, the RJ has a dangerous probability of success of monopolizing the Newspaper Market.

238.    The RJ has the power to exclude competition in the Newspaper Market, and has used that power, including by way of its Anticompetitive Conduct in restraint of trade as described herein, in an attempt to monopolize that Newspaper Market.

- 56 -

239.    The RJ has behaved as alleged herein in an attempt to obtain a monopoly in the Newspaper Market with the effect that competition is foreclosed, and consumer choice is gravely diminished in that the Sun's editorial voice in the Las Vegas community has been impaired and may be eliminated altogether. Further, the RJ's Anticompetitive Conduct has and will continue to decrease output (quantity and quality) of newspapers.

240.    There is no business necessity or other pro-competitive justification for the RJ's Anticompetitive Conduct.

241.    The Sun has been injured and will continue to be injured in its business and property as a result of the RJ's Anticompetitive Conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by the RJ. *See* 15 U.S.C. § 15.

242.    The Sun is entitled to preliminary and permanent injunctive relief to prevent the RJ from persisting in its unlawful, inequitable, and unjustified behavior to Plaintiff's detriment, with such an injunction: prohibiting the RJ from ending the joint operation, prohibiting the RJ from ceasing to print and distribute the Sun; prohibiting the RJ from abusing its control over the joint operation to eliminate the Sun from the market; and ordering the RJ to divest itself of the Newspaper, or in the alternative to divest itself of the Newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation. *See* 15 U.S.C. § 26.

### THIRD CLAIM FOR RELIEF
**(Violation of Nevada Unfair Trade Practices Act – NRS 598A)**

243.    The Sun realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

244.    The Nevada Unfair Trade Practices Act is construed in conformity with federal antitrust laws.

245.    The RJ's violation of the Nevada Unfair Trade Practices Act has caused or will cause injury to the Sun as set forth above.

- 57 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

246.    The Sun is entitled to damages for the RJ's violation of the Nevada Unfair Trade Practices Act, in an amount to be demonstrated.

247.    The Sun is entitled to obtain preliminary and permanent injunctive relief for the RJ's violation of the Nevada Unfair Trade Practices Act.

### FOURTH CLAIM FOR RELIEF

**(Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1)**

248.    The Sun realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

249.    Defendants knowingly acted in concert in furtherance of a common scheme to eliminate the Sun and monopolize the Newspaper Market.

250.    These actions were undertaken as a result of agreement, both express and tacit, between and among Defendants.

251.    Defendants' Anticompetitive Conduct has produced, and if unchecked will continue to produce, significant anticompetitive effects in the Newspaper Market. Defendants' actions have increased, and if unchecked will continue to increase, the RJ's market power, which harms consumers and reduces consumer welfare.

252.    Defendants' actions constitute a conspiracy or combination in restraint of trade, which restraint is unreasonable, so inherently anticompetitive due to the predictable and pernicious anticompetitive effect and so lacking in procompetitive benefit that it is unlawful in and of itself, or its principal or only effect is anticompetitive.

253.    The Sun has been injured and will continue to be injured in its business and property as a result of Defendants' Anticompetitive Conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by the RJ. *See* 15 U.S.C. § 15.

254.    By reason of this violation, the Sun is threatened with irreparable harm for which damages will be inadequate to fully compensate it.

- 58 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

255.   The Sun is entitled to bring suit under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief, with such an injunction: prohibiting the RJ from ending the joint operation, prohibiting the RJ from ceasing to print and distribute the Sun; prohibiting the RJ from abusing its control over the joint operation to eliminate the Sun from the market; and ordering the RJ to divest itself of the Newspaper, or in the alternative to divest itself of the Newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation. *See* 15 U.S.C. § 26.

## JURY TRIAL DEMANDED

256.   The Sun demands a trial by jury as its right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.   A judicial declaration that:

(1)   Defendants have unlawfully monopolized, attempted to monopolize, and/or conspired to monopolize the Newspaper Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(2)   Defendants' Anticompetitive Conduct violates the Nevada Unfair Trade Practices Act;

(3)   Defendants' Anticompetitive Conduct also constitutes a conspiracy or combination in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.   That the Court enter judgment granting Plaintiff an injunction requiring Defendants to cease the Anticompetitive Conduct described herein;

C.   That the Court enter judgment enjoining Defendants from unilaterally ending the joint operation and ceasing to print and distribute the Sun until 2040;

D.   That the Court enter judgment granting Plaintiff a preliminary and permanent injunction ordering the RJ to divest itself of the Newspaper, or in the alternative to divest itself of the Newspaper's non-editorial business operations and to require the creation of an independent

- 59 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

agency (or trustee) to conduct the non-editorial business of the joint operation as done in other similar JOAs;

E.  That the Court enter judgment for the Plaintiff to recover treble damages in the amount of three times the actual damages found by the jury (*see* 15 U.S.C. § 15(a));

F.  That the Court grant such additional orders or judgments as may be necessary to remedy or prevent the unlawful practices complained of herein; and

G.  That the Court enter judgment granting Plaintiff its cost of suit, including reasonable attorney's fees, costs, and expenses, as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15; Section 16 of the Clayton Act, 15 U.S.C. § 26, and NRS 598A.210.

DATED this _____ day of _____, 2026.

CLARK HILL PLC

By: */s/* _____
E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
1700 S. Pavillion Center Drive, Suite 500
Las Vegas, Nevada 89169

PISANELLI BICE PLLC
James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
400 South 7th Street, Suite 300
Las Vegas, Nevada 89135

BROWNSTEIN HYATT FARBER SHRECK, LLP
Jordan T. Smith, Nevada Bar No. 12097
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

ALIOTO LAW FIRM
Joseph M. Alioto, Pro Hac Vice
One Sansome Street, 35th Floor
San Francisco, California 94104

*Attorneys for Plaintiff/Counterdefendants*

- 60 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I am an employee of CLARK HILL PLC, and I caused a true and correct copy of the foregoing **SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DIVESTITURE, INJUNCTION, AND DAMAGES BY REASON OF DEFENDANTS' VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, AND THE NEVADA UNFAIR TRADE PRACTICES ACT** to be served by electronically filing the foregoing with the CMECF electronic filing system which will send notice of electronic filing to:

J. Randall Jones, Esq.
Michael J Gayan, Esq.
Mona Kaveh, Esq.
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169

Michael J. Gayan
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite 100
Las Vegas, NV 89107

Amy M. Gallegos, Esq.
David R. Singer, Esq.
Andrew G. Sullivan, Esq.
Alison I Stein, Esq.
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, CA 90071

Richard L. Stone, Esq.
850 Deveon Avenue
Los Angeles, CA 90024

DATED: March ____, 2026.

/s/ _____
An Employee of Clark Hill PLC

- 61 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26