J. RANDALL JONES, ESQ., SBN 1927
r.jones@kempjones.com
MONA KAVEH, ESQ., SBN 11825
m.kaveh@kempjones.com
KEMP JONES LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone:    +1 702 385 6000

DAVID R. SINGER, ESQ. (*pro hac vice*)
dsinger@jenner.com
AMY M. GALLEGOS, ESQ. (*pro hac vice*)
agallegos@jenner.com
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, California 90071
Telephone:    +1 213 239 5100
Facsimile:    +1 213 239 5199

MICHAEL J. GAYAN, ESQ., SBN 11135
mike@claggettlaw.com
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite 100
Las Vegas, Nevada 89107
Telephone:    +1 702 333 7777
Facsimile:    +1 702 655 3763

RICHARD L. STONE, ESQ. (*pro hac vice*)
rstone@fastmail.com
850 Devon Avenue
Los Angeles, California 90024
Telephone:    +1 310 993 2068

*Attorneys for Defendants/Counterclaimant*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., | Case No. 2:19-cv-01667-ART-MDC |
| Plaintiff, | **DECLARATION OF DAVID NOLTE IN SUPPORT OF DEFENDANT LAS VEGAS REVIEW-JOURNAL'S OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| SHELDON ADELSON, et al., | |
| Defendants. | |
| | **(REDACTED)** |
| AND RELATED COUNTERCLAIM | |

## DECLARATION OF DAVID NOLTE

I, David Nolte, declare as follows:

1. I submit this declaration in connection with the Defendants' Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction filed by Defendant Las Vegas Review-Journal, Inc. ("LVRJ").[1]  I have knowledge of the facts set forth herein from (i) my personal knowledge, experience and training, and (ii) my review of the records identified herein.  If called as a witness, I could and would competently testify to all of said facts.

### Qualifications, Assignment, and Summary Conclusions

2. I am a retained expert in the above-captioned action and testified at deposition on April 10, 2023.  Generally, my deposition testimony involved (i) the calculation of monetary remedies under the assumptions that the Plaintiff was successful at trial on its claims, and (ii) the state of the newspaper industry and its competition based on publicly available information.  In this regard, I submitted (i) a September 22, 2022 affirmative expert report and (ii) a January 18, 2023 rebuttal expert report.  A true and correct copy of my summary resume is attached as Exhibit A hereto.

3. As a brief summary, I have been a Certified Public Accountant (CPA) since 1979, an Accredited Senior Appraiser (ASA) since 1995, and a Certified Management Accountant (CMA) since 1992.  I have over 40 years of experience in connection with the valuation of businesses and intangible business assets, economic studies, royalty and fraud auditing, and litigation-related financial analysis.

4. As a result of rulings that the June 10, 2005 Amended and Restated Agreement between the Sun and the LVRJ (the "invalid 2005 JOA") is not valid, I have additionally been asked to address financial and economic matters involving the June 12, 1989 Joint Operating Agreement between Donrey of Nevada, Inc. and the Las Vegas Sun, Inc. (hereinafter the "1989 JOA").  Specifically:

   a. Whether a commercially viable business could reasonably occur in 2026 and thereafter from the operation of an afternoon daily print newspaper by the Sun pursuant to the 1989 JOA; and

   b. What costs and resulting losses would be incurred by the LVRJ should the LVRJ be forced to comply with the 1989 JOA.

5. I have been instructed to calculate damages over a five-year period.  As explained herein, the damages that will be incurred by the LVRJ are **not less than $51.4 million** (see Table 2 below), and could be considerably higher.  Key aspects of this calculation include:

   a. The Sun has no reasonable chance of being successful as an afternoon print newspaper.  The era of afternoon newspapers is over; as of today, there are no afternoon-only print newspapers in any modest or larger city in the United States.  There is no valid basis to believe the Sun would be a commercially viable afternoon print newspaper in the Las Vegas area.

   b. The printed Sun newspaper would not generate meaningful revenue as an afternoon print newspaper.  Yet the cost to comply with the 1989 JOA would be substantial, which generates losses.  These losses are a damage to the LVRJ, who is required to fund these losses.

---

[1] LVRJ is also used herein to refer to the newspaper and its operations.  The context of the use should make it clear whether LVRJ refers to the legal entity or the newspaper and its operations.

**CONFIDENTIAL – FILED UNDER SEAL**

c.  The following table summarizes the total annual loss for publishing an afternoon printed Sun. The amounts in Table 1 are based on LVRJ data as of March 31, 2025 (roughly a year ago). If more current data were used, the amounts would likely increase because of inflation.

Table 1: Expected first year loss from operating an afternoon Sun

| Description | Detail shown herein | Total LOSS | LOSS without facility charges |
|---|---|---|---|
| Loss from printing and delivery (after including all expected revenue) | Table 5 | $    1,409,789 | |
| Formulaic costs for Editorial, Promotion, and Facilities | Table 6 | 25,698,727 | 7,708,854 |
| Total annual LOSS | | $ 27,108,517 | $ 9,118,643 |

Table 1 shows amounts that include the facility charges described in paragraphs 30 through 33 herein, and an alternate amount that excludes all of the facility charges. As described in paragraphs 30 and 31, excluding the entirety of the facility charge without adding other costs that have been incurred (and would be incurred) is not correct, and understates the damages amount.

6.  In the preceding table, no amounts are included for start-up costs, as the 1989 JOA does not provide for such additional funding of start-up costs. The lack of a funding mechanism for additional costs for start-up or other requirements would likely further hamper the already non-existent chances for success. Even if the start-up efforts were successful, the preceding table contains nothing for the costs of such start-up efforts, such as (not a complete list)

a.  Marketing to potential subscribers who want the afternoon print newspaper;
b.  Developing customers who wish to advertise in an afternoon print newspaper;
c.  Employing separate marketing personnel to sell Sun advertising in a print newspaper that has few subscribers; and
d.  Recruiting delivery workers for a separate afternoon newspaper at both retail (single copy) locations and for home delivery.

7.  If the LVRJ were required to continue to operate under the 1989 JOA until this case concludes, the losses would continue (and be increased for inflation) for whatever period is needed to resolve this case. The following table performs this math using a 4% inflation rate. Because there is uncertainty regarding the period necessary for such a resolution, the following table performs this math for five years, with cumulative loss amounts shown starting in year three:

Table 2: Loss amount for five year resolution period

| Period | 4% Inflation math | Single year loss amount[2] | |
|---|---|---|---|
| | | Total LOSS | LOSS without any facility charges |
| Year 1 amount | Table 1 times 1.04 | $    28.2 million | $    9.5 million |
| Year 2 amount | Year 1 times 1.04 | 29.3 million | 9.9 million |
| Year 3 amount | Year 2 times 1.04 | 30.5 million | 10.3 million |
| Year 4 amount | Year 3 times 1.04 | 31.7 million | 10.7 million |
| Year 5 amount | Year 4 times 1.04 | 33.0 million | 11.1 million |
| Five-year Total | | $ 152.7 million | **$51.4 million** |

---

[2] All amounts are rounded to the nearest $100,000. The rounded five-year total is correct, although the individual amounts may sum to a slightly different amount.

8. I independently performed the calculations contained herein. The views contained herein are mine, and do not commit the LVRJ to agree with my understanding of the 1989 JOA or its resulting calculations should the 1989 JOA need to be implemented.

### Summary of Records Relied upon for this Declaration

9. In addition to my experience and training, I relied upon the following information in preparing this declaration, each of which is of a type that is reasonably relied upon by experts in my field:

    a. The 1989 JOA and the invalid 2005 JOA;

    b. The LVRJ's accounting detail covering the years ending March 31, 2015 through March 31, 2025;

    c. Operating data from the LVRJ regarding (i) printing schedules, (ii) newspaper deliveries to retail outlets, and (iii) costs of servicing residential subscribers;

    d. LVRJ's residential subscriber addresses as of January 20, 2026;

    e. Other records produced in this litigation, as referenced herein;

    f. To the extent that explanation of the records relied upon was needed, I confirmed the use of the records described herein with LVRJ personnel. These LVRJ employees were:

       • Stephen Hall, Chief Financial Officer / SVP; and
       • Chris Blaser, Sr. Vice President of Audience and Circulation

    g. Publicly available data regarding the newspaper industry and its participants, as summarized and referenced herein.

### An afternoon print newspaper in Las Vegas has no reasonable basis for projecting that it would be financially successful.

10. The 1989 JOA and the invalid 2005 JOA do not cover digital or online distribution, and are limited to print newspapers. My two prior reports (described above in paragraph 2) described at length the demise of local newspapers. Since my two reports more than three years ago, the decline in paper newspapers continued. As a brief example, Northwestern University publishes an annual report entitled "The State of Local News". This most recent report (dated October 20, 2025)[3] includes:

    *Executive Summary*
    *Our first State of Local News report, published in 2016, examined the local news landscape across America over the previous 10 years, taking data from 2005 as its starting point. Now, in the project's 10th year, we are able to look back through the past two decades and see dramatic transformations in the ecosystem of local news. Almost 40% of all local U.S. newspapers have vanished …*

    *Over the past two decades, print newspaper circulation across the United States has dropped by an estimated 80 million, a loss of 70% from 2005 levels. … The model of the traditional daily newspaper is transforming with all these declines: in 2025, less than a fifth of U.S. dailies are still printed and delivered seven days a week. …"*

---

[3] https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2025/report/

11. In the following discussion, I use the U.S. Census Bureau's determination of a Metropolitan Statistical Area, or MSA. An MSA is a region with strong economic ties. Think of this as real-world footprint of a city, which includes suburbs that fall outside of a geographic legal boundary. Surrounding areas are included within an MSA if they have a high degree of integration with the core, typically measured by commuting patterns. For example, the Las Vegas MSA includes Las Vegas, North Las Vegas, Henderson and Paradise.

12. I understand that in its motion, the Sun asks the Court to order the LVRJ to recreate the Sun as a separate print newspaper in the Las Vegas market. But in 2026, there are few cities that continue to have more than one daily print newspaper. The exceptions are shown in the following table, all of which are locations substantially larger than Las Vegas:

Table 3: MSAs in the U.S. having more than one print newspaper

| City, State, using MSA geography | Print newspapers in broader geographic city[4] | MSA % compared to Las Vegas |
|---|---|---|
| Metro New York, including Long Island | New York Times, New York Post, New York Daily News & Newsday | 810% |
| Los Angeles, CA | Los Angeles Times, California Post[5] | 750% |
| Washington, D.C. | Washington Post and Washington Times | 420% |
| Chicago, IL | Chicago Tribune and Chicago Sun-Times. | 400% |
| San Francisco, Oakland & San Jose | San Francisco Chronicle, East Bay Times & Mercury News[6] | 370% |
| Boston, MA | Boston Globe and Boston Herald | 350% |

13. Measured by the most recent population statistics reported by the U.S. Bureau of the Census (as of July 2024),[7] Las Vegas is the 30th largest MSA in the United States. As measured by each city's MSA, the following cities are larger than Las Vegas, yet have only one print newspaper.

---

[4] Cities and the size of each is measure based on its metropolitan statistical area, or MSA, as reported by the U.S Bureau of the Census.

[5] On January 26, 2026, News Corp launched the California Post, following the style if its sister publication, the New York Post. As such, the California Post is a daily tabloid with a conservative leaning. The target market for the California Post is all of California, and not any single city within California. The California Post is reported within Table 3 in an abundance of caution, even though the target market for the California Post is broader geographically.

[6] The San Francisco Examiner is a free newspaper that operates based on advertising revenue. It is not listed because it has no paid subscribers. Nevertheless, the inclusion or exclusion of this free newspaper does not alter the conclusions regarding the ability of Las Vegas to support two daily print newspapers.

[7] https://www.census.gov/data/tables/time-series/demo/popest/2020s-total-metro-and-micro-statistical-areas.html#:~:text=Tables-,Metropolitan%20and%20Micropolitan%20Statistical%20Areas%20Population%20Totals:%202020%2D2024,and%20consistent%20set%20of%20estimates.

**CONFIDENTIAL – FILED UNDER SEAL**

Table 4: Cities larger than Las Vegas with only one daily print newspaper

| Count | City (MSA) larger than Las Vegas with only one print newspaper | City % compared to Las Vegas |
|---|---|---|
| 1 | Dallas - Ft. Worth, TX | 360% |
| 2 | Houston, TX | 330% |
| 3 | Philadelphia, PA | 310% |
| 4 | Atlanta, GA | 300% |
| 5 | Miami, FL | 300% |
| 6 | Detroit, MI[8] | 220% |
| 7 | Phoenix, AZ | 210% |
| 8 | Seattle – Tacoma, WA | 210% |
| 9 | Orlando, FL | 190% |
| 10 | Minneapolis – St. Paul, MN | 170% |
| 11 | Denver, CO | 150% |
| 12 | Cleveland, OH | 150% |
| 13 | Charlotte, NC-SC | 140% |
| 14 | Portland, OR | 140% |
| 15 | St. Louis, MO-IL | 120% |
| 16 | Salt Lake City, UT | 120% |
| 17 | San Antonio, TX | 120% |
| 18 | Sacramento, CA | 110% |
| 19 | Pittsburgh, PA-OH-WV | 110% |
| 20 | New Haven, CT | 110% |
| 21 | Columbus-Marion-Zanesville, OH | 110% |
| 22 | Indianapolis-Carmel-Muncie, IN | 110% |
| 23 | Kansas City, MO-KS | 110% |

14. Under the 1989 JOA, the Sun's situation is worse than the statistics cited above would indicate. This occurs because Section 5.1 of the 1989 JOA specifies that (i) the Sun is to be a daily afternoon print newspaper, and (ii) the LVRJ is a morning print newspaper. Through the 1970s and early 1980s, afternoon newspapers were substantially more numerous and had greater circulation than morning newspapers,[9] so the 1989 JOA provided the Sun no competition from the LVRJ in the (then) desirable afternoon delivery period. At the time of the 1989 JOA, this exclusive afternoon delivery period could reasonably be viewed as a benefit because afternoon print newspapers were then popular.

15. Afternoon print newspapers in the U.S have since disappeared. The following graphic shows the circulation of afternoon daily print newspapers in the United States:

---

[8] In this table, Detroit is not included as having two newspapers. Detroit briefly became a two newspaper city in January 2026 because the joint operating agreement between the Detroit Free Press and Detroit News expired at the end of 2025. There was a "transitional services agreement" between the two newspapers through March 31, 2026, during which time the Detroit Free Press handled distribution and printing. On January 26, 2026, USA Today Co. (fka Gannett), which owned the Detroit Free Press, announced that it was acquiring the Detroit News, with all non-editorial operations consolidated. For example, see https://www.metrotimes.com/news/usa-today-acquire-detroit-news-after-joa-ends/#:~:text=USA%20TODAY%20Co.%2C%20the%20nation's,long%2Drunning%20shared%20business%20arrangement.

[9] For example, citing *Editor and Publisher*, data is presented from 1919 through 1976, there were three to four times the number of evening newspapers, compared to morning newspapers. See Sterling, Christopher and Haight, Timoty *The Mass Media: Aspen Institute Guide to Communication Industry Trends*. 1978. Prager Publishers

**CONFIDENTIAL – FILED UNDER SEAL**



Source: Editor & Publisher International Yearbook

16. The decline of afternoon print newspapers is even more dramatic in larger cities, as shown in the following graph:



Note: Afternoon Newspapers in cities with more than 500,000 residents
Source: Editor & Publisher International Yearbook

CONFIDENTIAL — FILED UNDER SEAL

17. The last "major" afternoon daily print newspaper was the Honolulu Star-Bulletin, which merged with the Honolulu Advertiser in 2010. Prior to that, in 2006, the Buffalo News switched its afternoon schedule to a morning newspaper. In April 2022, the *Wall Street Journal*[10] reported that the last daily afternoon newspapers remaining in the U.S. were two commonly owned newspapers in the southwest corner of Montana that served (i) Park County/Bozeman, and (ii) Custer County/Miles City. These two cities each have a population of around 8,000 to 9,000. The *Wall Street Journal* reported that the afternoon timing for these print newspapers occurred in part because *"Here in Montana, it would be very difficult to hire staff to work at night and almost impossible to find carriers to deliver the papers before dawn when it's 20 below."* The situation in Montana is not comparable to what would occur if the Sun were to attempt to operate an afternoon print newspaper.

### The Sun's revenues would be a small fraction of the expected costs.

18. The 1989 JOA requires the LVRJ to fund the Sun's losses, subject to the termination provisions contained in the 1989 JOA Section 9.1.4. As described in the 1989 JOA Appendix B, "all costs and expenses of the performance of the Review-Journal's obligations" are to be charged to the joint operation (which the 1989 JOA calls the "Agency"). As summarized in the rest of this section, the cost of servicing each Sun subscriber/print newspaper sold is substantially greater than the revenues from an afternoon print Sun.

19. Even though the foregoing provides no basis for assuming that the Sun's new afternoon daily print newspaper would have any meaningful subscribers, I assume for purposes of the rest of this declaration that the Sun would obtain 10% of the LVRJ's Monday – Friday circulation, or approximately ▮▮▮▮ residential newspapers annually[11], or ▮▮▮▮ average daily circulation, and ▮▮▮▮ retail newspapers annually[12], or ▮▮▮ average daily circulation.

20. Total revenue per individual print newspaper sold by the Sun is calculated based on the same per subscriber amount obtained by the LVRJ. Revenues earned by the Sun under the 1989 JOA were estimated as follows:

    a. The LVRJ currently obtains average subscription revenue of around ▮▮▮▮ per subscriber per week. The LVRJ records average revenue of ▮▮▮▮ per home delivery print newspaper.[13] The 1989 JOA Section 5.1.5 limits the Sun's prices for both subscriptions to the comparable rates for the LVRJ.

---

[10] https://www.wsj.com/opinion/the-last-of-the-afternoon-newspapers-evening-yellowstone-livingston-delivery-montana-news-extinct-media-local-town-11650401205?gaa_at=eafs&gaa_n=AWEtsqeooj_55mzY1MV9pnsZQVkHGK6CClCiwdvWjulHQpbLq-cY3xYmaZ919mWzcLU%3D&gaa_ts=696e8000&gaa_sig=2KwbpYEXnpgrot1GfXOc2mQby5CR7V7NGe0PmvH8jI74XxcdNgGSxZSLJUhoYAzStJ8JVTmpPgiHPGrUte5YQg%3D%3D

[11] Source: "JB_Rates_Act Volumes and Rev_25.11.xlsx" Calculated using P4 through P12 data for 2024 plus P1 through P3 data for 2025. Calculated by removing "Sunday Volumes" from the worksheet (to reflect the Sun would not be a Sunday newspaper) and multiplying by five-sixths (to reflect that the Sun would be a weekday newspaper).

[12] Calculated as 25% of 2025 Single Copy "Average Daily Volume", plus 75% of 2024 Single Copy "Average Daily Volume", multiplied by 5 days per week multiplied by 52 weeks, multiplied by 10%.

[13] Calculated as ▮▮▮▮ home delivery revenue from the following accounts, divided by 10,971,523 home delivery newspapers:

    a. "Circ H.D. Revenue" including account 370150 "Subs Motor Route", account 370151 "Subs Vacation HD", and account 370160 "Subscriber-Mail/Postal"
    b. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**CONFIDENTIAL – FILED UNDER SEAL**

b. The LVRJ currently has approximately ▮▮▮▮ copies of single copy sales at newsstands and retail establishments annually.[14]  The LVRJ records average revenue of ▮▮▮ per single copy print newspaper.[15]

c. Other revenue, including advertising, classified and preprint revenue, would occur based on the number of readers.  There is no good basis for assuming that the Sun's reader demographic would be materially different than for the LVRJ.  For advertising rates, Section 5.1.5 acknowledges that advertising rates can vary if "such change is justified by the then-relative circulation of the Sun and the Review-Journal and other factors considered relevant in the industry."  Based on Section 5.1.5, the same advertising, classified and preprint revenue per newspaper is used for the Sun's afternoon print newspaper.  The LVRJ's non-circulation revenue per newspaper is ▮▮▮.[16]

21. These revenues cannot cover the costs of the Sun's afternoon print newspaper.  The 1989 JOA's Appendix B explicitly includes (but are not limited to) the following costs:

a. Under Section B.1.1, the editorial and promotion costs that are calculated formulaically, and are reported in Table 6 below;

b. Under Section B.1.2, "composition, printing, and distributing";

c. Under Section B.1.2, "solicitation and sale of advertising; circulation sales expenses; collection of circulation and advertising accounts receivable."

d. Under Section B.1.3, "compensation of Review-Journal's non-news and non-editorial employees, including without limitation salaries, commissions, payroll taxes, the cost of group insurance, retirement benefits, workers' compensation coverage, and other benefits  for such employees …"

e. Under Section B.1.4, "accrued vacation or severance pay…"

---

[14] Calculated as 25% of 2025 Single Copy "Average Daily Volume", plus 75% of 2024 Single Copy "Average Daily Volume"

[15] Calculated as ▮▮▮▮ of single copy revenue from the following accounts, divided by ▮▮▮▮ single copy newspapers:
   a. "Circ S.C. Revenue", including account 370120 "Single Copy", account 370130 "Single Copy-Hotel" and a prorated portion of account 370133 "Scan Credit"
   b. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[16] Calculated as ▮▮▮▮ of revenue from the following accounts, divided by ▮▮▮▮ newspapers (home delivery and single copy):
   a. "Local Revenue", including account 310100 "Local – Other", account 310185 "Majors, and account 310195 "Local Trade"
   b. "Preprint Revenue", including account 330100 "Preprints", account 330300 "Preprints-Political", and account 310270 "Direct Mail"
   c. "Classified Revenue", including account 340100 "Classified Other", account 340210 "Classified Auto", account 340310 "Classified Real Estate", and account "Classified Employment"
   d. Account 310300 "Political"
   e. Account 320100 "National"
   f. Account 340200 "Obituaries"
   g. Account 340510 "Legal"
   h. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**CONFIDENTIAL – FILED UNDER SEAL**

f.  Under Section B.1.5, "costs for supplies, postage, private couriers, freight, Sunday comics and supplements, film, photo paper and chemicals, ink, newsprint, plates, cuts and mats, and contract trucking, and similar costs for all Review-Journal departments, other than news and editorial.

g.  Under Sections B.1.11 and B.1.12, all insurance

The full list of costs under the 1989 JOA's Appendix B continues for roughly an additional two pages, and is not repeated here, but the longer list makes it clear that all costs incurred by the LVRJ outside of news and editorial are charged to the Agency that is responsible for producing, selling, delivering and servicing the Sun.

22.  Importantly, even ignoring the per unit costs of creating editorial content, promoting the Sun, and use of facilities, the costs of (i) printing and delivering the newspaper, and (ii) managing the subscription and delivery process, exceeds the revenue obtained per print newspaper.  The following table shows the total revenues per print newspaper and the related variable costs:

(Rest of page left blank intentionally)

Table 5: Loss per Sun print newspaper before editorial, promotion, and facility costs



| Description | Math & Source herein | Residential | Retail |
|---|---|---|---|
| Total newspapers sold per year | A, from ¶19 | ████ [17] | ████ [18] |
| Daily average circulation | | ████ | ████ |
| Newspaper sales price | ¶20.a/b | ████ [19] | ████ [20] |
| Advertising, classified and preprint revenue | ¶20.c | ████ [21] | ████ [22] |
| Total revenue per print newspaper | B | ████ | ████ |
| Less: Variable costs[23] | | | |
| Printing | C, from ¶34 - 36 | ████ [24] | ████ [25] |
| Delivery | D, from ¶41/¶46 | ████ [26] | ████ [27] |
| Delivery management & subscriber contacts | E, from ¶48 | ████ [28] | ████ [29] |
| Other variable costs | F, from ¶49 | ████ [30] | ████ [31] |
| General management services [32] | G = B * 3.5%, from ¶50 | ████ | ████ |
| Total variable costs | H=sum C thru G | ████ | ████ |
| Equals loss BEFORE EDITORIAL AND PROMOTION COSTS | I = B - H | ████ | ████ |
| Total (used in Table 1) | J = sum I | ████ | |

---

[17] Source: "JB_Rates_Act Volumes and Rev_25.11.xlsx"  Calculated using P4 through P12 data for 2024 plus P1 through P3 data for 2025.  Calculated by removing "Sunday Volumes" from the worksheet  (to reflect the Sun would not be a Sunday newspaper) and multiplying by five-sixths (to reflect that the Sun would be a weekday newspaper).

[18] Source: "JB_SC Fact Sheet.xlsx" Calculated as 25% of 2025 Single Copy "Average Daily Volume"plus 75% of 2024 Single Copy "Average Daily Volume" multiplied by 5 days per week multiplied by 52 weeks multiplied by 10%.

[19] Calculated as ████ per home delivery newspaper (¶20.a), multiplied by projected Sun home delivery circulation of ████ newspapers

[20] Calculated as ████ per single copy newspaper (¶20.b), multiplied by projected Sun single copy circulation of ████ newspapers

[21] Calculated as ████ per newspaper (¶20.c) multiplied by projected Sun home delivery circulation of ████ newspapers

[22] Calculated as ████ per newspaper (¶20.c) multiplied by projected Sun single copy circulation of ████ newspapers

[23] The items shown are generally considered variable costs; meaning, that the variable costs will increase as production or sales increase.  This does not mean that a single additional sale (e.g., an additional single copy sale at a newsstand) will incrementally increase the costs and losses.  However, a meaningful increase in revenue will increase total variable costs.

[24] Calculated as ████ per newspaper multiplied by the Sun's expected residential circulation of ████.

[25] Calculated as ████ per newspaper multiplied by the Sun's expected retail circulation of ████.

[26] Calculated as Sun's home delivery circulation, ████, multiplied by ████ home delivery cost per newspaper (Table 10)

[27] Calculated as projected Sun single copy circulation of ████ newspapers, multiplied by ████ per newspaper

[28] Calculated as ████ per newspaper multiplied by projected Sun home delivery circulation of ████ newspapers

[29] Calculated as ████ per newspaper multiplied by projected Sun single copy circulation of ████ newspapers

[30] Calculated as ████ per newspaper multiplied by projected Sun home delivery circulation of ████ newspapers

[31] Calculated as ████ per newspaper multiplied by projected Sun single copy circulation of ████ newspapers

[32] The per newspaper cost shown here is for "general management services", which the 1989 JOA (Section B.1.18) specifies as 3.5% of the Sun's revenues.  The other formulaic costs are treated as a fixed cost in Table 6.

23. A business whose variable costs exceeds the variable revenues is not commercially viable.  In the afternoon Sun's situation, additional print newspaper sales provide no contribution towards the payment of the fixed costs of running the business.  This means there is no commercially viable economic alternative to shutting down (or not opening) the prospective afternoon Sun print newspaper.  This should not be a surprise because (as discussed at the beginning of this declaration), every afternoon print newspaper serving a larger U.S. city has reached the same decision.

24. Importantly, the cost for the "general management services" reported in Table 5 is significantly less than what would have been reported had the formulaic cost contained in the 1989 JOA not been used.  This is important should one suggest that other formulaic costs (such as the charge for facilities shown in Table 6 below) not be used.  This declaration is based on what appears to this author to be unequivocal and clear language regarding a calculation.  Nevertheless, should one conclude that the contract language not be used for one cost component (such as a facility charge), the formulaic cost for overhead and management services should be similarly revisited.  This would result in much larger costs than reported herein for such overhead and management.

**The 1989 JOA calculates most of the Sun's costs formulaically.**

25. There are substantial costs specified formulaically in the 1989 JOA.  These costs will not vary meaningfully based on the number of the Sun's print newspapers sold.  The following table shows the most important of these costs:

Table 6: Formulaic fixed costs specified in the 1989 JOA

| Cost component | Described below in paragraph | Total cost | Average cost per copy |
|---|---|---|---|
| News & editorial | 27 (Table 7) | $ 6,132,911[33] | $ 7.90[34] |
| Promotion | 28 - 29 | 1,575,943[35] | 2.03[36] |
| Subtotal, excluding real estate and equipment rental | | 7,708,854 | 9.93 |
| Real estate & equipment rental | 30 – 33 (Table 8) | 17,989,873[37] | 23.17[38] |
| Total | | $ 25,698,727 | $ 33.09 |

26. The losses that are described throughout this declaration are funded by the LVRJ.  However, the news and editorial cost is not paid directly to outside vendors, but instead is paid to the Sun.  This means that the Sun could use at least a portion of the payment for news and editorial to pay remuneration to the Sun's owners, pay for overhead of the Sun, and/or make payments to other enterprises controlled by the Sun's owners.  Because of this, the Sun and/or the Sun's owners could benefit from the 1989 JOA even though the LVRJ was funding and losing millions of dollars pursuant to the 1989 JOA.

27. The 1989 JOA's Section 4.2 incorporates Appendix A, which in turn describes certain cost amounts.  Appendix A paragraph A.1 states that news and editorial expense for the Sun shall be equal to the greater of (i) 65% of the LVRJ allocation, or (ii) a minimum $2,250,000, adjusted by the consumer price index (CPI) for the Las Vegas metro area.  The amount included in the preceding table is the CPI

---

[33] Calculated as $2,250,000 multiplied by CPI adjustment of 2.73 (339.627 / 124.6)
[34] Calculated as $6,132,911 (Table 7), divided by ███████ newspapers (home delivery and single copy)
[35] Calculated as $2,363,914 revenue from the listed accounts, multiplied by two-thirds.
[36] Calculated as $1,575,943, divided by ███████ newspapers (home delivery and single copy)
[37] Calculated as $550,000 multiplied by CPI adjustment of 2.73 (339.627 / 124.6) multiplied by 12.
[38] Calculated as $17,989,872 (Table 8), divided by ███████ newspapers (home delivery and single copy)

adjusted minimum, which is higher than 65% of the LVRJ's allocation (███████[39]).  The following table shows the CPI adjustment:

Table 7: CPI adjustment for the Section A.1 minimum news & editorial expense

| Period | CPI increase[40] | Editorial minimum |
|---|---|---|
| June 12, 1989 (date of 1989 JOA) | 124.6 | $ 2,250,000 |
| March 31, 2025 | 339.627 | $ 6,132,911 |

28. Section 5.1.4 describes promotional costs as follows:

> "Promotional activities may include radio and television, outdoor advertising in-paper or house advertisements, and other advertising media.  … Direct circulation sales expenses, including such items as carrier premiums and expenses of order generation shall not be included in the promotional budget…"

29. Appendix A paragraph A.3 states that the promotional budget for the Sun shall be 40% of the combined total cost of the two newspapers.  Unless the current LVRJ promotion budget is reduced, this means that the Sun's budget needs to be two-thirds (66.7%) of the stand-alone LVRJ spending.[41]   The amount shown in the preceding table is two-thirds of the LVRJ's promotional spending FYE March 2025, or ████████.  Applying the math described above, the Sun's promotional budget would be ████████.[42]

30. Under Appendix B, Section B.1.16, there is a charge:

> "for the rental value of all Review-Journal real property, plant and equipment (including the value of Sun office space provided by Review Journal under Section 5.4 of the Agreement), except that devoted to non-agency activities such as the Review-Journal's news and editorial operations…"

Section B.1.17 also provides for a charge of all equipment acquired, expanded or remodeled subsequent to the date of the 1989 JOA.  In addition to historical depreciation cost or other recovery of historical costs, an owner of real estate and equipment faces a market-based opportunity cost based on the current values of the real estate and equipment used in a business operation.  This opportunity cost is not captured by the historical cost for depreciation.

31. This pre-negotiated, formulaic cost for building and equipment use is in lieu of the cost of depreciation of real estate and equipment, none of which has been included in any of the cost calculations and tables presented herein.  If this formulaic calculation contained in Section B.1.16 − 17 is not to be applied, then an alternate amount for the fair rental value of the LVRJ real estate and equipment must be added to the preceding tables.

---

[39] Calculated as the total expense from the following departments, less promotion expense, ████████, multiplied by 65%:
   a.  Department 100" News"
   b.  Departments 105 "News – Investigative" and 110 "News – Photo" would also be included, ████████ ████████████ FYE March 31, 2025.
[40]  https://data.bls.gov/timeseries/CUUR0400SA0?amp%253bdata_tool=XGtable&output_view=data&include_graphs=true
[41] As recorded in department 670 "Marketing".  If Promotional Expense recorded in other departments, it was included here.  The departments that recorded Promotional Expenses were departments (i) 100 "News", (ii) 350 "Circ - Home Delivery", (iii) 380 "Circ - Sales/Marketing", (iv) 600 "Adv – Retail", and (v) 625 "Adv – Classified"
[42] Calculated as ████████ revenue from the listed accounts, multiplied by two-thirds.

**CONFIDENTIAL – FILED UNDER SEAL**

32. The calculation in Section B.1.16 is clear and unambiguous.  To calculate this charge, the consumer price index (CPI) for the Las Vegas metropolitan area was obtained from data published by the U.S. Bureau of Labor Statistics.  Las Vegas is not one of the 23 metropolitan areas for which the BLS publishes dedicated independent index, so the West Region's CPI-U (Consumer Price Index for All Urban Consumers) should be used.[43]

33. The monthly amount is to be adjusted for the CPI.  The following table shows the monthly and annual CPI-adjusted amount:

Table 8: CPI adjustment for the Section B.1.16 charge for buildings and equipment

| Start of five-year period | CPI increase[44] | Monthly charge |
|---|---|---|
| June 12, 1989 (date of 1989 JOA) | 124.6 | $   550,000 |
| March 31, 2025 | 339.627 | ███████ |
| Times: 12 for an annual amount | | ███████ |

### Cost of printing the afternoon Sun

34. The calculations contained herein are based on the Sun being the same size and format as the LVRJ,[45] but with fewer copies printed (as described previously).  Based on this, the afternoon Sun would take approximately a half hour of press time.  The cost of having the LVRJ's print equipment used for a half hour per day is ███████.[46]  This amount was calculated by taking the costs[47] associated with printing costs divided by the total possible print time for two printing presses operated for 10 hours a day, 7 days per week.  This understates the cost because the LVRJ's printing presses are not fully engaged.

35. The cost of printing the Sun, when divided by the actual number of residential and retail newspapers, is ████ per print newspaper.[48]  When applied to the Sun's expected residential and retail circulation, that results in total annual expense of ███████[49] and ███████,[50] respectively.

### Delivery costs for an afternoon print newspaper

36. Under the 1989 JOA Section 5.1.8, the LVRJ is required as follows: *"To the extent economically feasible, Review-Journal shall use its best efforts to substantially maintain the historical area and extent of distribution of the Sun".*  As described below, the delivery costs and other costs of the Sun's afternoon print newspaper ensure the Sun cannot be profitable in today's environment.  Indeed, delivery costs is



---

[43] The West Region CPI-U index is available at https://www.bls.gov/regions/west/news-release/consumerpriceindex_west.htm.
[44] https://data.bls.gov/timeseries/CUUR0400SA0?amp%253bdata_tool=XGtable&output_view=data&include_graphs=true
[45] For example, see 1989 JOA, Section 5.1.1.
[46] Calculated as "Total Expenses" recorded in the referenced departments, ███████, divided by 7,280 print hours per year, divided by 2 for half an hour.
[47] Consists of departments 200 "Press", 250 "Press - Comm Broker", and 290 "Production Admin".
[48] Calculated as ███████ total print cost divided by ███████ print newspapers sold
[49] Calculated as ████ per newspaper multiplied by the Sun's expected residential circulation of ███████.
[50] Calculated as ████ per newspaper multiplied by the Sun's expected retail circulation of ███████.

one of the reasons that afternoon print newspapers in larger cities have become extinct.  The use of the words, "to the extent economically feasible", and "best efforts" means that there will likely be ongoing disputes over what the 1989 JOA requires.  If the substantial costs described below are not economically feasible, then the Sun is not delivered at all, and the rest of the 1989 JOA becomes moot.  The calculations contained herein are performed to demonstrate that an afternoon print newspaper in Las Vegas, like the rest of the afternoon print newspapers in the U.S., cannot survive economically.

37. I understand from LVRJ management that the following schedule and timetable would be necessary to print and deliver an afternoon print newspaper.[51]    Following this schedule impacts the options available and delivery costs that would be incurred:

   a. The LVRJ would receive completed content from the Sun no later than 10:50 a.m.

   b. Approximately 4,000 copies would be printed each day.[52]  The press would begin printing the Sun at approximately 11:20 a.m. and conclude the printing around noon.

   c. Truck loading and delivery to retail locations would begin when the first newspapers were printed and would be completed around noon.  There are currently approximately 920 retail locations that would receive the Sun for single copy sales.[53]  All commercial deliveries to retail (single copy sale) locations should be completed by 4:30 pm to allow commuters to buy the paper on their way home.

   d. Home/subscriber newspaper pickup would begin after the last commercial delivery truck leaves (approximately noon, as described above), with the last delivery vehicle leaving the LVRJ facility at approximately 1:20 p.m.  All home deliveries should be completed before 5 p.m. to be ready when subscribers arrive home.

38. The LVRJ's morning delivery to retail stores that sell single copies to non-subscribers is performed by outside vendors.  For the morning delivery, these same vendors deliver the *Wall Street Journal*, *USA Today*, the *New York Times*, and other newspapers to these same retail outlets at the same time, so the LVRJ pays only a portion of this total delivery cost.  For the Sun's afternoon delivery to retail locations, there is no other print newspaper to be delivered at the same time, so the Sun afternoon newspaper would bear the full cost of the delivery routes.

39. For the LVRJ, there are currently 37 delivery routes to the retail locations where single copy sales occur.  Five of these routes are outside of the greater Las Vegas area, leaving 32 routes for "local" deliveries.  A considerable challenge exists in that these deliveries must occur during the middle of the day, instead of the early morning time that occurs for the early morning newspapers.  In the afternoon, traffic is more congested, and available parking will not be as convenient or close to the delivery points.

40. To calculate the cost of delivery to retail establishments for single copy sales, general ledger departments relating to Single Copy expenses[54] were used to establish the cost of the morning

---

[51] The LVRJ prints newspapers and other printed materials for third party customers.  This schedule assumes that the print and other operations at the LVRJ have sufficient capacity to add the afternoon printed Sun.  Additional costs (which could be substantial) would occur if this assumption is not correct.

[52] See Table 5 for the number of newspapers used in daily revenue estimates.  Some newspapers will not be sold at the single copy/retail locations.

[53] Each location would receive an average of around two print newspapers.  This is an average and not a requirement for every location.  The number of copies delivered to any single location reasonably would and should be adjusted to match demand at that location.

[54] Departments 352 "Circ - Single Copy"

**CONFIDENTIAL – FILED UNDER SEAL**

deliveries to the same locations. This cost averaged ▮▮▮▮ per newspaper.[55] As described in the next paragraph, the travel time index was 1.5 times, causing the cost of the early morning delivery to be multiplied by 1.5 times, or ▮▮▮▮. To this, Analytics added pre-delivery expenses that are shared with residential deliveries, or ▮▮▮▮ per newspaper[56] for a total delivery cost of ▮▮▮▮ per single copy.

41. This early morning delivery cost (i.e., before any meaningful traffic occurs) needed to be increased because there is a significant difference between travel times in the early morning, and travel times during the afternoon. To determine this increased cost, data assembled and reported by TomTom was used. The TomTom travel time data is built from anonymized GPS data and real driving speeds recorded across trillions of kilometers in larger metropolitan areas. Las Vegas is included in this data, and the "metro" data (the larger economic region and not just the city center) was used for this purpose.[57] Travel times were compared between the early morning (e.g., 3 a.m. to 5 a.m.) and twelve hours later (e.g., 3 p.m. to 5 p.m.) to create an index or ratio of time incurred. For the Las Vegas metro area, the travel time index averaged 1.5 times; for example, a distance that would take 10 minutes to travel in the early morning would take 15 minutes to travel in the late afternoon. Importantly, this travel time index ignores the additional time incurred in parking and walking to the ultimate delivery point. In the early morning, there is little competition for parking, so (i) less time is incurred looking for a parking spot, and (ii) a lesser distance needs to be walked to the ultimate retail delivery point, yet no amount was added for these increased costs.

42. To calculate the cost of delivery of print newspapers to residential subscribers, an electronic list of existing subscribers was obtained from the LVRJ. The following graphic shows the locational distribution of these subscribers:[58] [59]

(Rest of page left blank intentionally)

---

[55] Calculated as the "Total Expense" in departments 352 "Circ - Single Copy", divided by LVRJ's Single Copy circulation, ▮▮▮▮.
[56] Calculated as the "Total Expense" in department 150 "Prepress", ▮▮▮▮, and department 300 "Packaging", ▮▮▮▮, all divided by ▮▮▮▮ LVRJ circulation (home delivery and single copy).
[57] https://www.tomtom.com/traffic-index/about
[58] This graphic and the delivery routes described blow were developed using a software package, Upper Route Planner. Analytics personnel independently ran all calculations described herein.
[59] Not pictured are addresses outside the immediate vicinity of Las Vegas, including Bullhead City, Moapa Valley and Mesquite.

**CONFIDENTIAL – FILED UNDER SEAL**



43. To model the location of expected Sun subscribers, five random collections of subscribers were selected from the total population of LVRJ subscribers.  As would be expected, each of the five subsets of representative Sun subscribers looked similar to the overall starting population, with fewer pins of course.  The following graphic shows the locational distribution of the first of the samples drawn from the LVRJ population of all subscribers:



Although not reproduced here, the appearance of the other four sampled routes are similar.

44. The distance between pins/subscribers was calculated using the built-in functionality of the software.  As shown in the following table, delivering 10% of the subscribers takes 29.1% of the miles driven. Expressing this as a cost index or multiple, the cost per home delivery subscriber is (before traffic considerations) 291% of the per subscriber cost of a much larger population.  The specific results are shown in the following table:

(Rest of page left blank intentionally)

Table 9: Residential delivery distances for the Sun

| Route | Subscriber count | Distance between all travel points | % of the LVRJ distance |
|---|---|---|---|
| Existing LVRJ subscribers | ■ | 6,285 | 100% |
| Sample #1 | ■ | 1,814 | 28.9% |
| Sample #2 | ■ | 1,815 | 28.9% |
| Sample #3 | ■ | 1,836 | 29.2% |
| Sample #4 | ■ | 1,850 | 29.4% |
| Sample #5 | ■ | 1,833 | 29.2% |
| Average of the samples | | 1,830 | 29.1% |
| Times: Travel time index based on time of day[60] | | | 1.5x |
| Equals cost ratio | | | 43.7% |

45. Based on the sample delivery routes, the cost of delivering residential home delivery newspapers is ■. This was calculated as the total cost of the LVRJ home delivery cost, times the cost percentage result in the preceding table.

46. There are two costs associated with home delivery: (i) shared, pre-delivery costs shared with Single Copy circulation[61], and (ii) Home Delivery costs.[62] As with Single Copy (described above), the LVRJ's pre-delivery costs were calculated at ■ per newspaper.[63] The delivery costs were subject to the cost ratio calculated in Table 9. This resulted in the following calculation:

Table 10: Sun's home delivery costs

| Department | Math | 350 "Circ - Home Delivery" |
|---|---|---|
| LVRJ's Home Delivery Costs[64] | A | ■ |
| Time and Distance (Table 9) | B see Table 9 | 43.7% |
| Delivery Days Multiple | C see FN 64 | 67%[65] |
| Sun's Home Delivery Costs | D=A*B*C | ■ |
| Sun's Home Delivery Circulation | E=10% of LVRJ | ■ |
| Cost per Newspaper | F=D/E | ■ |
| Add: Prepress & Packaging cost | G see ¶46 | ■[66] |
| Home Delivery cost per newspaper | H=F+G | ■ |
| Sun's residential delivery cost | I=E*H | ■ |

---

[60] This is based on the data appearing at https://www.tomtom.com/traffic-index/city/las-vegas-nv, which is discussed above regarding delivery to retail establishments for single copy sales.
[61] Departments 150 "Prepress" and 300 "Packaging"
[62] Departments 350 "Circ - Home Delivery"
[63] Calculated as the "Total Expense" in department 150 "Prepress", ■, and department 300 "Packaging", ■, all divided by ■ LVRJ circulation (home delivery and single copy).
[64] Excluding promotion expense, which is included in ¶25.
[65] This adjusts the total cost to exclude Saturday and Sunday editions. This is calculated as the ratio of LVRJ's total Home Delivery circulation to Monday – Friday Home Delivery circulation. This is calculated based on the number of annual newspapers; specifically, ■ newspapers for Monday through Friday, divided by ■ newspapers for all seven days. These newspaper counts are based on the twelve months ended March 31, 2025.
[66] See paragraphs 40 and 46 above. This is calculated as the "Total Expense" in department 150 "Prepress", ■, and department 300 "Packaging", ■, all divided by ■ LVRJ circulation (home delivery and single copy).

**CONFIDENTIAL – FILED UNDER SEAL**

47. There are variable costs associated with subscriber satisfaction and retention.[67]  They are expected to vary based on the number of subscribers.  For these cost categories, the LVRJ's costs were accumulated using LVRJ general ledger detail.  Such costs were then divided by the number of LVRJ newspapers to calculate the average per newspaper cost.  This average cost was applied to the number of Sun newspapers printed.  This resulted in a per newspaper cost of ███ per newspaper,[68] for a cumulative cost of ███████ for residential[69] and ███████ for retail.[70]

48. There are additional variable costs that are expected to vary based on the number of subscribers.[71]  For these cost categories, the LVRJ's costs were accumulated using LVRJ general ledger detail.  Such costs were then divided by the number of LVRJ newspapers to calculate the average per newspaper cost.  This average cost was applied to the number of Sun newspapers printed.  This resulted in a per newspaper cost of ███ per newspaper,[72] for a cumulative cost of ███████ for residential[73] and ██████ for retail.[74]

49. 1989 JOA Section B.1.18 states that a charge for "general management services" of 3.5% of the Sun's revenues shall occur.  This management cost is specified as a percentage of revenue, so this cost explicitly increases with revenue increases.[75]  Had the charge for "general management services" instead have been based on the LVRJ's actual costs, the cost included in this declaration's conclusions would be substantially larger than the 3.5% formula.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 3rd day of March, 2026, in Los Angeles County, California.

*David Nolte*

David Nolte

---

[67] Departments 370 "Circ – Retention", 380 "Circ - Sales/Marketing", and 390 "Circ – Administration"

[68] Calculated as ███████ "Total Expense" from the listed departments, excluding promotion expense, divided by ███████ total LVRJ circulation count (home delivery and single copy).

[69] Calculated as ████ per newspaper multiplied by projected Sun home delivery circulation of ████ newspapers

[70] Calculated as ████ per newspaper multiplied by projected Sun single copy circulation of ████ newspapers

[71] Departments 600 "Adv – Retail", 610 "Adv - National/Majors", 625 "Adv – Classified", 680 "Adv Serv/AD Building", and 690 "Adv – Administration".

[72] Calculated as ███████ "Total Expense" from the listed departments excluding Promotional expense, divided by ███████ total LVRJ circulation count (home delivery and single copy).

[73] Calculated as ████ per newspaper multiplied by projected Sun home delivery circulation of ████ newspapers

[74] Calculated as ████ per newspaper multiplied by projected Sun single copy circulation of ████ newspapers

[75] To avoid a double count of costs, executive management costs, as recorded in the following general ledger accounts have not been included in any of the other tables or loss amounts herein:
   a. Department 700 "General & Administration"
   b. Department 705 "Executive"
   c. Department 720 "Accounting"
   d. Department 740 "Information Technology"
   e. Department 750 "Human Resources"

**CONFIDENTIAL – FILED UNDER SEAL**

**Exhibit A**

# DAVID NOLTE

dnolte@nolteanalytics.com
562-449-4600  (home office)
213-315-2705  (downtown office, direct #)

## SUMMARY

With over 40 years of experience, Mr. Nolte has worked with a broad range of firms/industries in both litigation and non-litigation settings.  Mr. Nolte's client work focuses primarily on valuation of businesses and intangible business assets, economic studies, royalty and fraud auditing, and litigation-related financial analysis.

## LICENSES AND CERTIFICATIONS

Certified Public Accountant (CPA), 1979 to present

Accredited Senior Appraiser (ASA), 1995 to present

Certified Management Accountant (CMA), 1992 to present

## EDUCATION

MBA, California State University, Los Angeles, 1982

BA, Whittier College (graduated first in his class), 1977

## EMPLOYMENT

Nolte Analytics (April 2022 to Present)

Serves as client team leader

Fulcrum Financial Inquiry LLP (May 2002 to 2025)

Founded firm.  Served as Fulcrum's team leader for select client engagements.  Served as Fulcrum's managing partner from its founding through November 2019

Andersen LLP (1977 to 2002)

Responsible for the Southern California forensic accounting and damage analysis practice of this international accounting and consulting firm.  This practice was one of the largest such groups in the western United States.  In addition to leading the local group, served on the firm-wide steering committees for the litigation consulting and the bankruptcy & troubled company consulting service lines.

Prior to working as a full-time consultant, performed audits for large publicly traded and private companies, including serving as the overall audit partner for such services.

Other Employment

Adjunct Professor at Whittier College (1981 to 1986) - Taught upper division accounting and auditing classes

Darling Wold & Agee (1975 to 1977) Performed tax, business management, and accounting work at this CPA firm.

**PUBLICATIONS AUTHORED IN THE LAST TEN YEARS**

None

**LISTING OF TRIAL AND DEPOSITION TESTIMONIES IN THE LAST FOUR YEARS**

In the following listing, each case is listed only once, with the date of the most recent testimony shown.  For example, in a matter in which both deposition and trial testimony occurred, the date of the trial testimony is shown.

| | **LAW FIRM** **2022** | **NAMES OF PARTIES** | **DATE** | **CASE NO.** | **COURT/JURISDICTION** |
|---|---|---|---|---|---|
| 1 | Raines Feldman LLP | Questa vs. Tahiti Tourisme USA, Inc. | 6/9/22 | 19-ST-CV39066 | Superior Court of California, County of Los Angeles |
| 2 | Payne & Fears | TriPacific Advisors  LLC vs. Mahathirath, and related cross-complaint | 7/1/22 | 1200057704 | JAMS arbitration |
| 3 | Susman Godfrey L.L.P. | JKZ, Inc, vs. Joseph Dispenza et al | 7/14/22 | 19-2-03071-34 | Washington Superior Court, Thurston County |
| 4 | Sheppard Mullin Richter & Hampton | ACT, Inc. vs. Worldwide Interactive Network, and related cross complaint | 8/24/22 | 3:18 cv-00186 | U.S. District Court, Eastern District of Tennessee |
| 5 | Jenner & Block LLP | Terrence Howard vs. Twentieth Century Fox Film Corporation | 10/20/21 | 1220069473 | JAMS Arbitration |
| 6 | DVG Law Group | 615 Western LLC et al. vs. SBE Entertainment Group,  et al. | 10/21/22 | 01-20-0015-1201 | American Arbitration Association |
| 7 | Sheppard Mullin Richter & Hampton | FEM Employee's Defined Contribution Plan Trust vs. the City of Glendale | 10/25/22 | BS169892 | Superior Court of California, County of Los Angeles |
| 8 | Adam Kent, Esq. | John Ireland vs. Michael Dicks et al. | 12/19/22 | A259624-48 | Judicate West Arbitration |

| | **LAW FIRM 2023** | **NAMES OF PARTIES** | **DATE** | **CASE NO.** | **COURT/JURISDICTION** |
|---|---|---|---|---|---|
| 1 | McCune & Harbor | Jenny Villasenor (administrator) vs. International Healing, Inc. et al. | 2/15/23 | SC122575 | Superior Court of California, County of Los Angeles |
| 2 | Willkie Farr & Gallagher LLP | Mend Health, Inc. vs. Carbon Health Technologies, Inc. | 3/8/23 | 2:21-CV-06142-AB | U.S. District Court, Central District of California |
| 3 | Kemp Jones | Las Vegas Sun, Inc. vs. Las Vegas Review Journal, Inc. et al. | 4/10/23 | 2:19-CV-01667-GMN | U.S. District Court, Nevada District |
| 4 | Brown, White & Osborn LLP | Delis et al vs. Montecito Financial Services, Inc. et al | 7/17/23 | BC711642 | Superior Court of California, County of Los Angeles |
| 5 | Polsinelli LLP | Zheng Vs. United Safety Technology, Inc., | 10/20/23 | 01-22-0003-6962 | American Arbitration Association |
| 6 | Harper Meyer Perez Hagen Albert Dribin & DeLuca | American Window & Shutters, Inc. vs. Greenergy Distributing LLC | 11/30/23 | 21-CA-002935 | Circuit Court, Lee County Florida |
| 7 | Sheppard Mullin Richter & Hampton | S&J Builders and Restoration Services, Inc,. et al. vs. Interinsurance Exchange of the Automobile Club et al. | 12/11/23 | 37-2018-00006964 | Superior Court of California, County of San Diego |

| | LAW FIRM 2024 | NAMES OF PARTIES | DATE | CASE NO. | COURT/JURISDICTION |
|---|---|---|---|---|---|
| 1 | Mandour & Associates, APC | Pipe Restoration Technologies, LLC et al. vs. Florida Drain-Lining Solutions, LLC | 2/26/24 | 8:23-cv-00237-FWS | U.S. District Court, Central District of California |
| 2 | Greenberg Traurig, LLP | Nutrition Corp, Inc. vs. Trifecta Nutrition, Inc. | 3/4/24 | S295764) | Judicate West Arbitration |
| 3 | Miller Barondess LLP | Zouki For America Corporation vs. Prime Healthcare Centinela, LLC et al. | 3/25/24 | 20trcv00302 | Superior Court of California, County of Los Angeles |
| 4 | Sheppard Mullin Richter & Hampton | 360 N Rodeo Drive, LP vs. Wells Fargo Bank NA et al. | 4/15/24 | 1:22-cv-00767-AS | U.S. District Court, Southern District of New York |
| 5 | Armstrong Teasdale LLP | Weston Enterprises, LP et al vs. JP Morgan Chase Bank et al. | 4/18/24 | 2018 CH 05261 | Cook County Circuit Court |
| 6 | Marquis Aurbach | Interior Electric v. TWC et al. | 4/22/24 | 2:18-cv-01118-JAD | U.S. District Court, Nevada |
| 7 | Barnes & Thornburg LLP | Internet Connectivity Group vs. Manchester Financial Group, L.P et al | 4/23/24 | 30-2016-00861757 | Superior Court of California, County of Orange |
| 8 | Kaufman Dolowich & Voluck LLP | Wing Inflatables, Inc. vs. Certain Underwriters at Lloyd's, et al. | 7/10/24 | CGC-21-589722 | Superior Court of California, County of San Francisco |
| 9 | Raines Feldman LLP | Herrick Productions, LLC vs. Mattel, Inc | 07/17/24 | 19SMCV-01209 | Superior Court of California, County of Los Angeles |
| 10 | Chapman Spingola | Neiman vs. Green Thumb Industries et al. | 11/15/24 | 2017-L-008729 | Circuit Court of Cook County, Illinois |
| 11 | Jenner & Block LLP | Studiocanal S.A.S. vs.  Cross Creek Media, LLC, et al. | 12/4/24 | 20STCV08678 | Superior Court of California, County of Los Angeles |

| | LAW FIRM 2025 | NAMES OF PARTIES | DATE | CASE NO. | COURT/JURISDICTION |
|---|---|---|---|---|---|
| 1 | Caltrans Legal Division | SFL Carson, LLC vs. California Department of Transportation | 1/23/25 | 23LBCV02518 | Superior Court of California, County of Los Angeles |
| 2 | Sheppard Mullin Richter & Hampton | Vepo Design Corporation vs. American Economy Insurance Company | 8/20/2025 | 2:20-cv-04950 | U.S. District Court, Central District of California |
| 3 | Meylan Davitt Jain Arevian & Kim LLP | Mortgage Mart, Inc. et al. vs. Zimmerman, and related cross complaint | 9/23/2025 | 22TRCV00273 | Superior Court of California, County of Los Angeles |