E. LEIF REID, Nevada Bar No. 5750
KRISTEN L. MARTINI, Nevada Bar No. 11272
NICOLE SCOTT, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavilion Center Dr., Suite 500
Las Vegas, Nevada 89135
Tel: 702.862.8300
Fax: 702.778.9709
Email: lreid@clarkhill.com
kmartini@clarkhill.com
nscott@clarkhill.com

JAMES J. PISANELLI, Nevada Bar No. 4027
TODD L. BICE, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Tel: 702.214.2100
Fax: 702.214.2101
Email: JJP@pisanellibice.com
       TLB@pisanellibice.com

JORDAN T. SMITH, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Tel: 702.464.7022
Fax: 702.382.8135
Email: jsmith@bhfs.com

JOSEPH M. ALIOTO, *PRO HAC VICE*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

*Attorneys for Plaintiff/Counterdefendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation,<br><br>Plaintiffs,<br><br>v.<br><br>SHELDON ADELSON (Estate Of), an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC dba ADFAM, a Delaware limited liability company and as the alter ego of Las Vegas Review-Journal, Inc., and News+Media Capital Gorup, LLC; and DOES, I-X, inclusive,<br><br>Defendants. | Case No.: 2:19-CV-01667-ART-MDC<br><br>**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITON TO PLAINTIFF'S *EMERGENCY* MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [ECF NOS. 1069/1070 (FUS)]** |

1   LAS VEGAS REVIEW-JOURNAL, a
    Delaware corporation,
2
                        Counterclaimant,
3
    v.
4
5   LAS VEGAS SUN, INC., a Nevada
    corporation; BRIAN GREENSPUN, an
6   individual and as alter ego of Las Vegas Sun,
    Inc.; GREENSPUN MEDIA GROUP, LLC, a
7   Nevada limited liability company, as the alter
    ego of Las Vegas Sun, Inc.,
8
                        Counterclaim Defendants.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................... 1

II.  THE SUN'S REQUESTED PRELIMINARY RELIEF IS WELL WITHIN THIS COURT'S BROAD DISCRETION UNDER SECTION 16 OF THE CLAYTON ACT ................................................................................................................ 2

    A.  This Court Can Exercise Its Broad Powers to Enjoin the RJ from Terminating the Joint Operation and Ceasing to Print and Distribute the Sun ........................................................................................................... 3

    B.  It is Well Within This Court's Equitable Authority to Compel the RJ to Revert to the Valid and Existing 1989 JOA ................................................ 5

        1.  Reversion Is Required by Operation of Law and This Court's Order, as Further Evidenced by the Parties' Intentions ................................. 6

        2.  The RJ's "Impossibility" and "Impracticability" Arguments Fail Because This Circumstance was Foreseeable .................................... 8

        3.  The RJ Is Bound to the 1989 JOA as a Successor-In-Interest and Assignee ...................................................................................... 10

    C.  Compelling the RJ to Seek Attorney General Approval of the 2005 JOA Is Within Its Discretion .................................................................... 12

III.  THE SUN HAS SATISFIED THE LIKELIHOOD OF SUCCESS FACTOR ..... 13

    A.  The Sun's Market Definition is Viable Based on the Actual Evidence, Which Continues to be Supported by On-Point Caselaw .......................... 13

    B.  The RJ Has Monopoly Power ................................................................ 15

    C.  The RJ's Anticompetitive Conduct is Unlawful and Violates Antitrust Law ....................................................................................................... 16

        1.  The Editorial and Reportorial Competition Between the Sun and the RJ Is Economic Competition Under Antitrust Laws ...................... 18

        2.  The RJ's Anticompetitive Conduct is Not Competition on the Merits, has Reduced Competition, and Harmed Consumers .......... 19

    D.  The Sun's Injury Flows from That which Makes the RJ's Anticompetitive Conduct Unlawful ................................................................................. 22

    E.  The Sun Participates in the Newspaper Market ......................................... 23

IV.  THE SUN WILL SUFFER EXTREME, IRREPARABLE HARM WITHOUT AN INJUNCTION; THE RJ CANNOT CLAIM HARM UNDER THESE CIRCUMSTANCES ................................................................................... 24

105559\1015963\286898353.v1-3/10/26

V.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST SHARPLY TIP IN THE SUN'S FAVOR ................................................................ 25

VI.    A MINIMAL BOND IS APPROPRIATE AND WARRANTED ........................ 26

VII.    CONCLUSION ................................................................................ 27

DECLARATION OF KRISTEN L. MARTINI IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S *EMERGENCY* MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ...................................................................................... 28

INDEX OF EXHIBITS ........................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Airs Intern., Inc. v. Perfect Scents Distribs., Ltd.*,
  902 F. Supp. 1141 (N.D. Cal. 1995) ................................................................................7

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) .........................................................................................................22

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016) ...........................................................................................2

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) .........................................................................................................23

*Cal v. Am. Stores Co.*,
  495 U.S. 271 (1990) ...............................................................................................2, 3, 4, 24

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
  766 F.2d 1319 (9th Cir. 1985) .........................................................................................26

*Citizen Pub. Co. v. United States*,
  394 U.S. 131 (1969) .........................................................................................................17

*City of Vernon v. S. California Edison Co.*,
  955 F.2d 1361 (9th Cir. 1992) .........................................................................................17

*Comm. for Indep. P-I v. Hearst Corp.*,
  704 F.2d 467 (9th Cir. 1983) ...........................................................................................18

*Dedication & Everlasting Love to Animals (DELTA) v. Humane Society of U.S., Inc.*,
  50 F.3d 710 (9th Cir. 1995) .............................................................................................18

*Desertrain v. City of Los Angeles*,
  754 F.3d 1147 (9th Cir. 2014) ...........................................................................................5

*Dreamstime.com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) .........................................................................................16

*Décor Team LLC v. McAleenan*,
  2020 WL 1536260 (D. Ariz. Mar. 31, 2020) .....................................................................5

*Eagle v. Star-Kist, Inc.*,
  812 F.2d 538 (9th Cir. 1987) ...........................................................................................23

*Federal Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ...........................................................................................16

iii

*Freedom Watch Inc. v. Judicial Watch, Inc.*,
    289 F. Supp. 3d 1270 (S.D. Fla. 2018) ...................................................................18

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2020) ...............................................................................4

*Hawaii ex rel. Anzai v. Gannett Pac. Corp.*,
    99 F. Supp. 2d 1241 (D. Haw. 1999) ........................................................18, 24, 25

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972) .............................................................................................16

*High Tech. Careers v. San Jose Mercury News*,
    996 F.2d 987 (9th Cir. 1993) ...............................................................................13

*Hoffman for & on Behalf of N.L.R.B. v. Beer Drivers & Salesmen's Loc. Union No. 888*,
    536 F.2d 1268 (9th Cir. 1976) .............................................................................11

*Hussein v. Nev. Sys. of Higher Educ.*,
    2010 WL 3035140 (D. Nev. July 3, 2010) .............................................................11

*In re Google Play Store Antitrust Litig.*,
    147 F.4th 917 (9th Cir. 2025) ...............................................................................2

*J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*,
    89 P.3d 1009 (Nev. 2004) .......................................................................................8

*Johnson v. Comm'n on Presidential Debates*,
    869 F.3d 976 (D.C. Cir. 2017) ..............................................................................18

*L.A. Alliance for Human Rights v. Cnty of Los Angeles*,
    14 F.4th 947 (9th Cir. 2021) ...................................................................................6

*L.A. Land Co. v. Brunswick Corp.*,
    6 F.3d 1422 (9th Cir. 1993) ..................................................................................15

*Las Vegas Dev. Grp., LLC v. SRMOF II 2012-Tr., U.S. Bank Tr. Nat'l Ass'n*,
    2018 WL 1073385 (D. Nev. Feb. 26, 2018) .............................................................5

*Las Vegas Sun v. Adelson*,
    147 F.4th 1103 (9th Cir. 2025) .............................................................3, 12, 21, 29

*Las Vegas Sun v. Adelson*,
    2024 WL 6469664 (D. Nev. July 5, 2024) ..............................................................12

*Life Flight Network, LLC v. Metro Aviation, Inc.*,
    2017 WL 192706 (D. Or. Jan. 17, 2017) ...............................................................26

*Lord & Taylor, LLC v. White Flint, L.P.*,
    780 F.3d 211 (4th Cir. 2015) ...............................................................................11

iv

*Mahaffey v. Detroit Newspaper Agency,*
  969 F. Supp. 446 (E.D. Mich. 1997) ................................................................12

*MetroPCS Georgia, LLC v. Metro Dealer, Inc.,*
  2019 WL 1597111 (W.D. Wa. Apr. 15, 2019)...............................................26

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
  422 F.3d 782 (9th Cir. 2005) .............................................................................7

*Nebaco, Inc. v. Riverview Realty Co.,*
  482 P.2d 305 (Nev. 1971)...........................................................................8, 9, 10

*News+Media Cap. Grp. LLC v. Las Vegas Sun, Inc.,*
  495 P.3d 108 (Nev. 2021)...........................................................................10, 20

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,*
  20 F.4th 466 (9th Cir. 2021) .........................................................................3, 6

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,*
  810 F.3d 631 (9th Cir. 2015) .........................................................................5, 6

*Paparazzi, LLC v. Souza,*
  2025 WL 3705493 (D. Utah Dec. 22, 2025) ...............................................26

*Paterson v. Condos,*
  28 P.2d 499 (Nev. 1934).....................................................................................8

*PharmacyChecker.com LLC v. LegitScript LLC,*
  137 F.4th 1031 (9th Cir.) ..................................................................................16

*PLS.com, LLC v. Nat'l Ass'n of Realtors,*
  32 F.4th 824 (9th Cir. 2022) .............................................................................16

*Rebel Oil Co. v. Atl. Richfield Co.,*
  51 F.3d 1421 (9th Cir. 1995) .............................................................................15

*Reno v. Am. C.L. Union,*
  521 U.S. 844 (1997) ............................................................................................14

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,*
  944 F.2d 597 (9th Cir. 1991).............................................................................24

*Save Our Sonoran, Inc. v. Flowers,*
  408 F.3d 1113 (9th Cir. 2005) ..........................................................................27

*Sheppard v. Lee,*
  929 F.2d 496 (9th Cir. 1991) .............................................................................18

v

*Silva v. Stogner*,
   2023 WL 6973697 (D. Nev. Oct. 23, 2023) ............................................................. 5

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993) .............................................................................................. 16

*Times-Picayune Pub. Co. v. United States*,
   345 U.S. 594 (1953) .............................................................................................. 14

*Toscano v. PGA Tour, Inc.*,
   201 F. Supp. 2d 1106 (E.D. Cal. 2002) ................................................................ 18

*United States v. Daily Gazette Co.*,
   567 F. Supp. 2d 859 (S.D.W. Va. 2008)...................................................... 18, 19, 21

*United States v. Google LLC*,
   747 F. Supp. 3d 1 (D.D.C. 2024) .......................................................................... 15

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990) ................................................................................. 15

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*,
   540 U.S. 398 (2004) .............................................................................................. 15

*William Inglis & Sons Banking Co. v. ITT Continental Banking Co.*,
   668 F.2d 1014 (9th Cir. 1981) ............................................................................... 16

### Statutes

15 U.S.C. § 26...........................................................................................................2, 6
15 U.S.C. § 1801 ............................................................................................18, 21, 26
15 U.S.C. § 1802(2) ....................................................................................................23

### Rules

Fed. R. Civ. P. 8(c)(2)...................................................................................................5
Fed. R. Civ. P. 15(b) .....................................................................................................5

### Regulations

28 C.F.R. 48.4 .............................................................................................................25
28 C.F.R § 48.15 ..........................................................................................4, 5, 13, 25

### Other Authorities

Scientific & Advanced-Technology Act of 1992, Pub. L. No. 102-476, § 102, 106 Stat. 2297
   (1992)....................................................................................................................14

vi

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        The Sun's present Motion[1] is neither controversial, nor unpredictable. It is the natural next

4    step in the Sun's fight for its journalistic life. The RJ has predictably attempted to seize the

5    opportunity it believes was afforded by the Ninth Circuit's recent ruling to unilaterally declare

6    victory over the Sun, improperly (and unlawfully) expanding the language and reach of that ruling

7    in doing so. The RJ's Opposition[2] lays that strategy bare. The Sun filed its Motion for injunctive

8    relief immediately following the Supreme Court's denial of certiorari, knowing full well that the

9    RJ would overreach as it has. But, unlike the RJ's tactics, the Sun has narrowly fashioned its

10    requested relief to fit squarely within the facts and law governing this antitrust action, and more

11    specifically within the broad equitable powers of the Court under Section 16 of the Clayton Act.

12    The Sun has likewise expeditiously sought relief from the Court to amend and supplement its

13    presently operative first amended complaint ("FAC") to conform and consider the recent change in

14    the law of this case and the RJ's unlawful response to it.

15        The RJ's Opposition is more notable for its misdirection than its attempt to rebut the Sun's

16    evidentiary showing of its likelihood of success on the merits of its claims. While the Sun's Motion

17    is populated with both evidence and controlling (on point) statutory and common law authority, the

18    RJ's Opposition is largely a rehash of its failed summary judgment arguments. As this Court has

19    already analyzed, the Sun's antitrust claims enjoy, as their foundation, a viable and legally

20    recognizable market definition, a clear exercise of monopoly power by the RJ and its willful

21    maintenance thereof, and an unmistakable pattern of anticompetitive conduct hat has harmed, and

22    will continue to harm, consumers, satisfying the antitrust injury standard. Antitrust law makes clear

23    that the Ninth Circuit's Opinion does not change these facts: the unenforceability of the 2005 JOA

24    _____

25    [1] The Sun's "Motion" refers to its *Emergency* Motion for Temporary Restraining Order and Preliminary Injunction, filed at ECF Nos. 1061/1040(FUS), 1062/1047(FUS). Where the Sun cites

26    to its Motion, the Sun is referring to the analyses and evidence cited as though fully set forth herein. The same goes for the Sun's citations to the Sun's prior summary judgment briefs. *E.g.*, ECF Nos.

27    836 (with appendices), 871 (with appendices), 902 (with appendices).

28    [2] The RJ's opposition brief to the Sun's Motion is filed at ECF Nos. 1069/1070 (FUS).

1

1    is not and cannot be used to prevent the Sun's antitrust claims. On the other hand, the crux and

2    repeated theme of the shotgun "defenses" the RJ's offers as a rebuttal is that it too has suffered

3    harm, notwithstanding that its harm is entirely self-inflicted. The RJ complains that it should not

4    be held to its material obligations of the 1989 JOA it freely entered into, or its express intentions to

5    revert to it under the present circumstances, or not be held accountable for its anticompetitive

6    behavior because it suffered its own financial losses in its campaign to destroy the Sun. Nonsense.

7        All of the factors this Court must consider in a debate of this sort weigh heavily in one

8    direction. Be it the likelihood of success on the merits, the irreparable harm, the balance of equities,

9    or the public interest, all roads lead to the preservation of the status quo ante litem. With that

10   preservation, the Sun will be protected until it has its day in court before a jury of its peers, the

11   public will be protected from a literal monopolist in the Newspaper Market, and at worst the parties

12   will each be required to do no more and no less than they freely and openly contracted to do at the

13   inception of this intended 50 year relationship. The Sun's Motion should be granted in its entirety.

14   **II.    THE SUN'S REQUESTED PRELIMINARY RELIEF IS WELL WITHIN THIS
     COURT'S BROAD DISCRETION UNDER SECTION 16 OF THE CLAYTON ACT**

15       The law is clear: this Court "ha[s] broad latitude in fashioning equitable relief when

16   necessary to remedy an established wrong." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024

17   (9th Cir. 2016) (quotations omitted); 15 U.S.C. § 26. Conferred by Section 16, this Court is "clothed

18   with large discretion to fit the decree to the special needs of" this particular case to prevent the RJ's

19   Anticompetitive Conduct from eliminating competition in the relevant market. *In re Google Play*

20   *Store Antitrust Litig.*, 147 F.4th 917, 946 (9th Cir. 2025) (quotations omitted). There are "no

21   restrictions or exceptions to the forms of injunctive relief" sought by the Sun, or that this Court

22   "may order." *Cal. v. Am. Stores Co.*, 495 U.S. 271, 281 (1990) (quotations omitted). Upon finding

23   that the RJ's Anticompetitive Conduct threatens economic harm to consumers, this Court is well

24   within its discretion and power to fashion prohibitory or mandatory injunctive relief necessary to

25   prevent harm. *See id.* at 282-83.

26       When this Court is considering the Sun's requests, at front of mind is Section 16's "high

27   purpose of enforcing the antitrust laws" (*id.* at 284 (quotations omitted)), construing it "generously

28

2

1  and flexibly," and molding the relief "to the necessities of th[is] particular case." *Id*. at 284, 295.

2  This includes ordering an injunction "beyond a simple proscription against the precise conduct

3  previously pursued." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir.

4  2021) (quotations omitted). At the RJ's inevitable appeal, "[t]he reviewing court only asks if 'the

5  relief [granted is] a <u>reasonable method</u> of eliminating the consequences of the illegal conduct.'"

6  *See id.* (emphasis added). This is all the Sun is asking. Its three proposed remedies are well-

7  grounded in this Court's expansive equitable powers and fashioned to the necessities of this

8  particular case to prevent the RJ from eliminating its only competitor (and longstanding JOA

9  partner) from the market.

> ### A.    <u>This Court Can Exercise Its Broad Powers to Enjoin the RJ from Terminating the Joint Operation and Ceasing to Print and Distribute the Sun</u>

12        This Court can enjoin the RJ from ending the parties' combined operation and ceasing to

print and distribute the Sun and do so without enforcing the 2005 JOA in violation of the Ninth

13  Circuit's Opinion. *See* Opp'n 3-5. As predicted, the RJ's argument otherwise overstates the breadth

14  of the ruling. *See* ECF No. 1069. It is important to recognize what the Opinion actually addressed.

15  The Ninth Circuit's Opinion was narrow, limited to whether the 2005 JOA was unenforceable and

16  whether the Stipulated Order compelling continued "perform[ance] under the 2005 JOA" should

17  be dissolved. *Las Vegas Sun v. Adelson*, 147 F.4th 1103, 1111 (9th Cir. 2025). The RJ cannot cite

18  to any language in the Opinion that the 1989 JOA was terminated or that the RJ was otherwise

19  freed from all obligations to print and distribute the Sun (because there is none). *See generally*

20  Opp'n. The Opinion doesn't disturb the Attorney General's prior approval of the Newspapers'

21  combination of all business operations under the 1989 JOA or permit the RJ to cease performing

22  its material obligations—including printing and distributing the Sun. *See generally Adelson*, 147

23  F.4th 1103. The Opinion doesn't address the viability of the Sun's claims or this Court's authority

24  to fashion interim equitable remedies while the parties litigate this dispute. *See generally id.*

25  Because these issues are unresolved—and the RJ is undeterred in its intention eliminate the Sun—

26  it is immediately necessary for this Court to employ Section 16 to prevent this reduction in

27  competition and harm to consumers.

28

1    There are several reasonable methods by which this Court can enjoin the RJ from ending

2    the joint operation and ceasing to print and distribute the Sun without the 2005 JOA. Most obvious

3    would be compelling the RJ to revert to the 1989 JOA as the Sun also requested. As explained

4    further below (*infra* § II(B)), the 1989 JOA is not only the governing agreement since the RJ had

5    the 2005 JOA declared unenforceable, but, importantly, it has also been expressly approved by the

6    Attorney General and is the "status quo ante litem" for purposes of a preliminary injunction. *See*

7    *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2020) (defining "the status quo

8    ante litem" as "not simply to any situation before the filing of a lawsuit, but instead to "the last

9    uncontested status which preceded the pending controversy"). This remedy is valid and legal, and

10   "would effectuate the policy and purpose of the NPA by <u>preserv[ing] the Sun in operation ... as a</u>

11   <u>second editorial voice</u>," as the Attorney General concluded. Mot. 7-8 (emphasis added) (quotations

12   omitted). The RJ can print and distribute the Sun in accordance with Sections 4.3 and 4.4, and

13   Appendix A.2 of the 1989 JOA. Alternatively, the Court could fashion a different method of

14   printing and distribution by pulling from the method contemplated by Section 8.2 of the 1989 JOA,

15   where the RJ continues to publish a joint edition daily in times of dire necessity. ECF No. 1042 at

16   2SA315. It would also be within this Court's discretion to tailor a hybrid printing and distribution

17   scheme from Section 4.4, Appendix A.2, and Section 8.2 of the 1989 JOA, whereby the RJ

18   continues to publish the Sun daily in a joint edition like it previously did on weekends and holidays

19   between 1990 and 2005. Each of these provisions were considered by the Attorney General and

20   were approved pursuant to the NPA. *See* Mot. 7-8.

21   Even still, this Court is free to shape any other reasonable method of printing and

22   distribution that would prohibit the threatened loss of editorial and reportorial competition and

23   damage to the Sun as contemplated by Section 16. *See Am. Stores Co.*, 495 U.S. at 281-82; *see*

24   *also, e.g.,* 28 C.F.R § 48.15 (permitting "temporary" approval of "unified action" before JOA

25   approval is obtained when "one or more of the newspapers would otherwise fail before the

26   procedures under these regulations can be completed"). In all events, the RJ should be enjoined

27   from terminating the joint operation and ceasing to print and distribute the Sun.

28

4

1

2

**B.      It is Well Within This Court's Equitable Authority to Compel the RJ to Revert to the Valid and Existing 1989 JOA**

3        The RJ would have this Court believe that it cannot enforce the status quo ante litem and

4   order the RJ to revert to the 1989 JOA. Opp'n 5-9. Neither the RJ's procedural challenge nor its

5   enumerated other challenges have merit.

6        For its procedural challenge, the RJ rehashes the baseless argument that the Sun did not

7   plead reversion in its FAC. *See* Opp'n 5-6; ECF No. 861 at 1, 28-29. This challenge fails for the

8   same reasons explained by the Sun at summary judgment. *See* ECF No 902 at 21-22. The Sun plead

9   reversion to the 1989 JOA as its Twenty-Sixth affirmative defense and the parties litigated the

10  enforceability of the 2005 JOA and reversion throughout the entirety of this case, briefing the issue

11  numerous times and addressing it extensively in both fact and expert discovery. *Id*. Even if

12  reversion should have been raised as a separate claim for relief, justice requires that it be treated as

13  if it was correctly designated. *E.g.*, *id.* (citing Fed. R. Civ. P. 8(c)(2) & 15(b)); *Las Vegas Dev.*

14  *Grp., LLC v. SRMOF II 2012-Tr., U.S. Bank Tr. Nat'l Ass'n*, 2018 WL 1073385, at *3 (D. Nev.

15  Feb. 26, 2018). And because of the recent change in the law, the Sun has also sought leave to amend

16  and supplement its FAC and has explicitly raised this issue in its proposed pleading. *See* ECF No.

17  1065; *see also Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154-55 (9th Cir. 2014); Fed. R.

18  Civ. P. 15(b).

19       Importantly, not even one of RJ's cited cases support its assertion that reversion is unrelated

20  to the Sun's claims. *See* Opp'n 5-6.[3] Besides its explicit affirmative defense, the Sun's currently

21  _____

22  [3] Citing *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 637 (9th Cir. 2015)
    (where the plaintiff was trying to obtain injunctive relief for HIPAA violations that were unrelated

23  to its unfair trade practices claims, and the pleading contained no allegations of patient privacy
    violations); *Silva v. Stogner*, 2023 WL 6973697, at *1 (D. Nev. Oct. 23, 2023) (where the plaintiff

24  was seeking a TRO against individuals not named in complaint that related "to access to law library
    resources, violation of NDOC policy on law library hours, failure of non-parties to involve
    themselves in a particular litigation proceeding, interference with access to prison telephones,

25  violation of privacy, fraud, and bad-faith complaint filing" when complaint was based on violations

26  of religious rights); *Décor Team LLC v. McAleenan*, 2020 WL 1536260, *2 (D. Ariz. Mar. 31,
    2020) (where the plaintiff requested a TRO to enjoin expiration of an L-1A status, but the complaint

27  for judicial review requested the court to reverse a decision denying an 1-140 for EB-1C status, the
    latter of which would not entitle the plaintiff to remain in the United States, and was subject to

28  revocation at any time, thus did not concern the plaintiff's status or unlawful presence in the United

operative pleading includes dozens of allegations tying the Sun's claims for relief to the harm the Sun seeks to enjoin, *i.e.*, termination of the Sun. *See* ECF No. 621 at 17-30 (the RJ's anticompetitive scheme to eliminate the Sun), 30-31 (the anticompetitive effects), 37-38 (monopolization), 38-40 (attempted monopolization). The test is whether there is a "sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself," not that the claims and the relief must completely overlap. *Pac. Radiation Oncology*, 810 F.3d at 636. The Sun's FAC provides "a clear indication of a significant causal connection between the conduct enjoined or mandated" and the specific irreparable injury that reversion seeks to prevent. *See Optronic Techs.*, 20 F.4th at 486 (quotations omitted) (citing 15 U.S.C. § 26). As evidenced from the absurdly distinguishable circumstances at issue in the RJ's cited cases, the RJ's argument borders on frivolous. *Supra* n.3; *see also* ECF No. 1065. The RJ's procedural challenges in no way restrict this Court from granting an injunction compelling the RJ to revert to the 1989 JOA.

For its enumerated challenges, they are equally meritless because: (1) reversion is required by operation of law and this Court's Order,[4] as further evidenced by the parties' memorialized intentions; (2) the RJ cannot claim impossibility and impracticability for the same legal bases its frustration of purpose defense failed, and given the RJ's own conduct; and (3) the RJ is the indisputable successor-in-interest to the Review-Journal's owner in 1989. These issues are each addressed separately below.

### 1. Reversion Is Required by Operation of Law and This Court's Order, as Further Evidenced by the Parties' Intentions

The RJ reargues that reversion is an unavailable remedy because the 2005 JOA terminated the 1989 JOA, Section 1.1 of the 2005 JOA that provided for reversion to the 1989 JOA is unenforceable and inapplicable by its terms, and the 1989 JOA was abandoned. Opp'n 6-7 & n.4.

---

States); *L.A. Alliance for Human Rights v. Cnty of Los Angeles*, 14 F.4th 947, 957 (9th Cir. 2021) (where the Ninth Circuit reversed the district court's wildly unsupported injunction where the district court relied on almost exclusively extra-record evidence for the findings of fact, and granted an injunction on six claims for relief although plaintiff brought no such claims at all and lacked standing for such claims, *e.g.*, race-based claims where the plaintiff did not allege any plaintiff was black).

[4] ECF No. 970 (referred to herein as "Order").

6

The RJ is wrong.

Fundamentally, as a basic principle of contract law the unenforceable 2005 JOA cannot operate to displace or extinguish the valid, Attorney General-approved 1989 JOA. *See, e.g.*, *Airs Intern., Inc. v. Perfect Scents Distribs., Ltd.*, 902 F. Supp. 1141, 1148-49 (N.D. Cal. 1995) (providing that where "the new contract is invalid, there is no novation and the parties' previous obligations are not extinguished") (citations omitted). Moreover, this Court already disposed of the RJ's argument (as a matter of law) when it found that the parties clearly did not intend to terminate the 1989 JOA when they entered into the 2005 JOA. *Compare* Opp'n 6-8 *with* Order 18-19.[5]

Additionally, unlike the RJ's foreclosed argument that the unlawful 2005 JOA evidences the parties' intentions to terminate the 1989 JOA, Section 1.1 explicitly and unequivocally evidences the parties' clear intention to revert in the event the DOJ hindered or otherwise impaired the parties' operation under the 2005 JOA. ECF No. 1042 at 2SA449. The RJ's disputes about the language and limitations of Section 1.1 are disproved by the plain language of the provision itself. *See* Opp'n 7. It contains no temporal limitation, and it memorializes the parties' intention that the 1989 JOA is valid and enforceable now. ECF No. 1042 at 2SA449. It directs in no uncertain terms that if "any action" occurs to impair the agreement "*after*" the 2005 JOA is filed "<u>then either party may declare the Restated Agreement null and void</u>, *and* <u>the 1989 Agreement between the parties shall be reinstated and remain in full force and effect</u>." *Id.* (emphasis added). These express intentions are bolstered by the RJ's other promise to ensure the "lawful" operation of their combination. *Id.* at 2SA453 § 5.3. The RJ's ancillary argument that Section 1.1's provisions discuss the mere "filing" of the 2005 JOA with the DOJ is contradicted by the plain language found at the

---

[5] In a footnote, the RJ explicitly rejects this Court's findings that the parties did not clearly intend to terminate 2005 JOA and it was not a novation of the 1989 JOA. *See* Opp'n 7 n.4. This is not only improper, but it remains as unfounded as it was the first time. *Id.* (citing inapposite cases where there was a clear intent by the parties to terminate the original agreement). The Court's findings of fact were neither clearly erroneous nor based on an erroneous legal standard. *See* Order 18-19 & ECF Nos. 902 at 16-17 & ECF Nos. 871, 836; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005) (explaining that the appellate court's review of a preliminary injunction is "*very deferential*" and a "[m]ere disagreement with the district court's conclusions is not sufficient reason for [it] to reverse the district court's decision") (emphasis added).

conclusion of that very same provision: "From and after the filing of such Restated Agreement, all costs and professional fees in connection with seeking **any required approval** by the Department of Justice shall be controlled and approved by the Review-Journal." *Compare* ECF No. 1042 at 2SA450 § 1.1 (emphasis added) *with* Opp'n 5. Reversion would apply if the DOJ brought an enforcement action, or if (as now) following the law in effect at the time results in the 2005 Amendment being declared illegal, even if it was decades later. Importantly, this Court already disposed of the RJ's argument that the reversion language was limited to the "transition" period. Order 19.

The RJ's argument that the parties "abandoned" the 1989 JOA fails for the same reasons discussed above. *See* Opp'n 7-8. The RJ's two cited cases (*J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1019 (Nev. 2004), and *Paterson v. Condos*, 28 P.2d 499, 500 (Nev. 1934)) are unremarkable for the basic proposition abandonment law, and both are distinguishable. Opp'n 7-8. Neither case concerns an amended agreement whether the parties expressly agreed to revert to the original agreement. They are also inapposite for the fact that the parties here continued performing the material obligations of the original agreement after the 2005 JOA, even if the 1989 JOA provided for separate printing and distribution on weekdays.[6] *Compare* Opp'n 9 *with* Mot. 3-6, 8-10.

### 2.    The RJ's "Impossibility" and "Impracticability" Arguments Fail Because This Circumstance was Foreseeable

The law governing the RJ's "impossibility" and "impracticability" arguments contradicts its attempt to assert them here (Opp'n 8-9), just as this Court concluded when it previously rejected the RJ's argument (reasserted here) that mobile devices and industry decline have rendered its performance impossible. Order 47-49. Nevada courts treat impossibility and impracticability as the same defense. *E.g.*, *Nebaco, Inc. v. Riverview Realty Co.*, 482 P.2d 305, 307 (Nev. 1971) (cited by Order 47-49). As *Nebaco* makes clear,

---

[6] The details as to the format of printing and distribution on weekdays only, promoting the Sun in equal prominence, and a new accounting formula for their same 90/10 profit split did not materially alter their approved undertakings whereby the RJ remained charged with printing, distributing, promoting, and continued sharing profits split with the Sun, among other things. Mot. 3-6, 8-10.

8

the defense of impossibility is available to a promissor where his performance is made impossible or highly impractical by the occurrence of unforeseen contingencies <u>but if the unforeseen contingency is one which the promissor should have foreseen, and for which he should have provided, this defense is unavailable to him</u>.

482 P.2d at 307 (emphasis added) (citations omitted).

The RJ asked for the circumstance it currently faces when it sought to have the 2005 JOA declared unenforceable, knowing that the 1989 JOA would become the valid and enforceable agreement to which the parties would revert. The cost and expense of reverting to the 1989 JOA were foreseeable when the parties agreed to Section 1.1's contingency provision in 2005. The parties knew that reverting to the 1989 JOA would require everything the RJ now claims is too costly or difficult. *See* Opp'n 8-9.[7] They also knew in 1989 that afternoon newspapers posed logistical challenges. *Id.* at 9.[8] Aware of these risks, the RJ expressly agreed to revert should the 2005 JOA be impaired. And, critically, the parties made no mention of those risks as a basis to excuse performance, let alone continue the RJ Newspaper while ending the Sun. Therefore, the RJ assumed the risk. In the words of *Nebeco*, "[o]ne who contracts to render a performance for which government approval is required assumes the duty of obtaining such approval and risk of its refusal is on him." 482 P.2d at 307. In the absence of the parties expressly providing for termination based on the contingency of hardships in reverting to the 1989 JOA, the RJ assumed those risks associated

---

[7] The RJ's supplemental expert report from David Nolte and Declaration of Chris Blaser do not make the RJ's arguments any less legally and factually meritless. *See* ECF Nos. 1076 & 1078. Moreover, Nolte "relied" on "records" that cannot be verified because they were never disclosed and aren't attached. *See*, *e.g.*, ECF No. 1076 at 3; *see also* **Ex. 5** ¶ 7 n.8. Moreover, the RJ's "support" is based upon faulty assumptions and modeling. *See also* **Ex. 6** ¶¶ 22-26.

[8] The RJ's partial quotation of Section 5.1.8 is as confusing as it is misleading. It does not stand for the proposition that the RJ was only required to print the Sun if "economically feasible"—it reads, "<u>Sun Distribution</u>. To the extent economically feasible, Review-Journal shall use its best efforts to *substantially maintain the historical area and extent of distribution* of the Sun." ECF No. 1042 at 2SA309 (emphasis added).

9

1    with reversion and cannot avail itself of any impossibility or impracticability defense.[9] *See id.*

2

3    ### 3.    The RJ Is Bound to the 1989 JOA as a Successor-In-Interest and Assignee

4        The RJ's assertion that it would be inequitable to compel reversion because it was not a

5    party to the 1989 JOA nor a successor-in-interest is absurd. Opp'n 10-11. The very first sentence

6    of the 2005 JOA identifies the Review-Journal's owner as "DR Partners, a Nevada General

7    Partnership, *the* successor-in-interest to Donrey of Nevada, Inc. ('DR')." ECF No. 1042 at 2SA449

8    (emphasis added); *see also* ECF 978 ¶ 25. The very next sentence provides, "DR owns and

9    publishes in Las Vegas, Nevada, a morning newspaper on weekdays, a morning newspaper on

10   Saturdays and holidays, and a Sunday newspaper, each known as the 'Review-Journal." ECF No.

11   1042 at 2SA449 (emphasis added). Donrey of Nevada, Inc., was the original signatory to the 1989

12   JOA and owned the Review-Journal Newspaper. ECF No. 1042 at 2SA293. The RJ is obviously a

13   successor-in-interest of the Review-Journal parties to the 1989 JOA. The RJ admitted that it was

14   the "ultimate successor in interest of DR Partners" in its state court pleading (**Ex. 1**), and that

15   "LVRJ's predecessor(s) and LV Sun entered into a joint operating arrangement in 1989" in its

16   Answer in this case. ECF No. 978 ¶ 1. Both the 1989 JOA and the 2005 JOA also bind all successors

17   and assigns. ECF No. 1042 at 2SA323 § 10.9, 2SA458 § 10.9.

18       The RJ knew of the 1989 JOA during due diligence for its purchase of the Review-Journal

19   in 2015 (*See* ECF 832-1 at DEFS0112091) and used the 1989 JOA as its primary defense in the

20   state court action and the 2019 arbitration. *See* **Ex. 1 ¶¶** 12-13, 35, 35 n.7; **Ex. 2**; *see also*

21   *News+Media Cap. Grp. LLC v. Las Vegas Sun, Inc.*, 495 P.3d 108, 113 (Nev. 2021) (describing

22   the RJ's arguments relying upon 1989 JOA accounting to argue its editorial expenses should be

23   JOA expenses). The 2005 JOA repeatedly incorporates the provisions and structure of the 1989

24   JOA and requires reversion to the 1989 Agreement in the event the Attorney General's approval

25   isn't obtained. ECF No. 1042 at 2SA449, 2SA469-70.

26

27   _____

[9] The RJ's argument that performance is impossible because "to deliver the afternoon print *Sun* it
28   must exist[,] [b]ut here it does not" is a nonstarter. *See* Opp'n 8. The Sun Newspaper does exist,
     and its morning delivery time does not negate its existence.

10

1    Like this Court concluded at summary judgment, the RJ has "stepped into the shoes of their

2    predecessors, as if they had been present at the JOA's formation." Order 34. All of these reasons

3    bar the RJ from claiming any inequity for having to revert to the 1989 JOA because it didn't execute

4    the 1989 JOA.

5                                                    * * * * *

6    In sum, none of the RJ's arguments prevent this Court from exerting its broad discretion

7    and authority conferred by Section 16 to compel the RJ to revert to the 1989 JOA. Reversion would

8    not require excessive supervision either, contrary to the RJ's argument. *See* Opp'n 10. The

9    framework is already detailed in the 1989 JOA and is not subject to attack for lack of Attorney

10   General approval. Equally important, the parties have already operated under it for 15 years. This

11   Court's exercise of its supervisory power over the injunction would be nothing more than routine.

12   *See, e.g.*, *Hoffman for & on Behalf of N.L.R.B. v. Beer Drivers & Salesmen's Loc. Union No. 888*,

13   536 F.2d 1268, 1276 (9th Cir. 1976) (finding that, even while on appeal, a district court "has a

14   continuing duty to maintain a status quo, and where, as the days pass, new facts are created by the

15   parties and the maintenance of the status quo requires new action" may modify an injunction);

16   *Hussein v. Nev. Sys. of Higher Educ.*, 2010 WL 3035140, at *10 (D. Nev. July 3, 2010) ("A district

17   court also has continuing jurisdiction to supervise and enforce an injunction.").[10] There needing to

18   be some amount of supervision over an injunction is almost axiomatic, but this hasn't heretofore

19   been an issue in the last seven years during the parties' operations under the Stipulated Order.

20   Otherwise, this Court would have no ability to ensure its terms are complied with. Requiring the

21   RJ to revert to the 1989 JOA is appropriate and necessary equitable relief here.

22   

23   [10] The RJ haphazardly cites authorities that are neither binding on this Court, nor analogous to the

24   circumstances here. *See* Opp'n 10. Asking this Court to compel reversion to the 1989 JOA is
     nothing like asking this Court, for example, to supervise the demolition of a 75-percent vacant

25   Bloomingdale's store, then convert it to a vague "first class" shopping center contemplated by a
     redevelopment agreement, and then oversee "bringing tenants back in" "to the Mall." *Lord &*

26   *Taylor, LLC v. White Flint, L.P.*, 780 F.3d 211, 215 (4th Cir. 2015). Nor is the Sun asking this

27   Court to be "an account manager," micromanaging the operation of the 1989 JOA. The parties are
     intimately familiar with the operation of the 1989 JOA and its terms. Indeed, the Sun's request is

28   akin to asking a party that has breached a contract to continue performing under that contract. The
     Sun is simply asking the RJ to comply with the bargained-for agreements it freely entered into.

11

**C.** **Compelling the RJ to Seek Attorney General Approval of the 2005 JOA Is Within Its Discretion**

The RJ makes the same procedural challenge to the nexus between the Sun's FAC and its request compelling the RJ to seek Attorney General approval, and additionally maintains that it never agreed to seek Attorney General approval and the approval process is too cumbersome to be equitable. Opp'n 5-6. The RJ's procedural challenge fails for the same reasons explained above. *See supra* § II(B); ECF No. 1065.

In revisiting Section 1.1, the RJ argues it only agreed to "file" the 2005 with the DOJ. *See* Opp'n 5 n.2. The RJ willfully neglects the fact that the filing procedure only recently changed, and its argument directly contravenes the parties' clear purpose of the provision—the parties were seeking regulatory approval so their amendment and operations thereunder would be *lawful*.  It is self-evident that because the parties undertook the filing procedure in accordance with the law and practice at the time, they would have also followed the application procedures for Attorney General approval had they known they were required to. They dedicated over six months to negotiating and executing the 2005 JOA, and then submitted to the DOJ's three-year investigation thereafter. *See* Mot. 11-12; ECF No. 836 at 6, 11-13 It is ridiculous for the RJ to argue that it never intended to follow the correct procedure to get the 2005 JOA properly approved, and open itself to third-party liability for 20 years while operating under it.

Finally, the RJ's argument that it would be too cumbersome to obtain Attorney General approval is, itself, against all principles of equity. *See* Opp'n 9-10. This was precisely the reason the *Mahaffey* court concluded it was nonsensical to require amendments to previously approved, post-1970 JOAs to go through a second round of Attorney General approval, and the RJ disagreed. *Mahaffey v. Detroit Newspaper Agency,* 969 F. Supp. 446, 448 (E.D. Mich. 1997); *Adelson,* 2024 WL 6469664, at *23 (July 5, 2024) (arguing that complying with the law is required regardless of whether it "would be too 'cumbersome'"). The Ninth Circuit adopted the RJ's argument. *Adelson,* 147 F.4th at 1121 n.6.

An order compelling the RJ to seek Attorney General approval would not require undue oversight despite the RJ's contrary argument. *See* Opp'n 10; *see also supra* n.10. The DOJ would

12

1    be the entity supervising the application process—not the Court. Only if the RJ fails to comply with

2    the regulatory approval process or subverts the Attorney General's approval would this Court

3    become involved. In that event, the Court would use its customary enforcement powers though

4    contempt proceedings. This is no different than monitoring any other litigation dispute. The RJ has

5    offered no valid basis to prevent this Court from issuing the Sun's requested relief. An Order

6    compelling the RJ to seek Attorney General approval of the 2005 JOA would moot all of the RJ's

7    complaints about reverting to the 1989 JOA, and the RJ could seek temporary approval pursuant to

8    28 C.F.R. 48.15 while the application is pending.

9    **III.**     **THE SUN HAS SATISFIED THE LIKELIHOOD OF SUCCESS FACTOR**

10        **A.**     **The Sun's Market Definition is Viable Based on the Actual Evidence,**

11               **Which Continues to be Supported by On-Point Caselaw**

12        Despite the RJ's argument that the Newspaper Market is contrary to current reality, the

    evidence in this case proves that it is a valid antitrust market. *Compare* Opp'n 17-19 *with* Mot. 26-

13    28 & ECF No. 871 at 25-30. The relevant market is a highly fact-based inquiry into the market at

14    issue (*see*, *e.g.*, *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993))

15    and the evidence—when properly analyzed utilizing the *Brown Shoe* factors or the Hypothetical

16    Monopolist Test—establishes that the Newspaper Market is valid and appropriate. Opp'n 17-18;

17    ECF No. 836 at 34-37; ECF No. 871 at 14-18, 25, 28.

18        The RJ does not undertake the necessary fact-based inquiry here. At all times it fails to

19    address evidence of actual consumer behavior in the Las Vegas market. *See* Opp'n 18. Instead, it

20    offers generic statistics and statements about an overall decline in the newspaper industry to argue

21    the overly broad notion of substitution that "consumers have substituted" all other media sources

22    for print newspapers.[11] *See id.* This is not the test for determining the proper scope of an antitrust

23    relevant market. The proper scope of the market is limited to only those substitutes that are

24    sufficiently close. *See* ECF No. 1041 at 1SA52-59. Therefore, the RJ's bulleted 'evidence' pointing

25

26

27    ─────────────

   [11] The "introduction of smart phones" theory floated by the RJ is also unsupported by any empirical

28    data. *See* Opp'n 18.

1  to the general decline in the newspaper industry does not render the Newspaper Market unviable.[12]

2      As Dr. Katz explained, a decline in industry trends does not change the fact that only

3  sufficiently close competitors are properly included in the relevant market; thus, even when long-

4  term, or secular trends, suggest that one or more products might be replacing the core product

5  around the relevant market (the Newspaper Market here) does *not* mean that those other products

6  *should be included* in the relevant market when assessing newspaper competition. ECF No. 1046

7  at 6SA1165-78; ECF No. 1041 at 1SA88-92. Moreover, the decline in the newspaper industry has

8  been discussed since 1953 with the introduction of other media such as radio, television, and

9  magazines. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 600-602 (1953). The internet

10  was already widely adopted, and commercial restrictions were lifted, by 1998 and 1999. *See*

11  Scientific & Advanced-Technology Act of 1992, Pub. L. No. 102-476¸ § 102, 106 Stat. 2297

12  (1992)).[13] Even the United States Supreme Court recognized the internet as enabling "tens of

13  millions of people … to access vast amounts of information" back in 1997. *Reno v. Am. C.L. Union*,

14  521 U.S. 844, 850 (1997). Therefore, even when newspapers were facing an influx of all existing

15  sources of other media, courts have consistently held that newspapers are a distinct product market.

16  The RJ's criticism of these cases as outdated from the current market realities is unsupported. *See*

17  Opp'n 18.

18      The RJ's failure to offer any data-based analyses or quantitative evidence of economic

19  substitution cannot work to counter the actual data and analyses undertaken by Dr. Katz, as well as

20  additional evidence, that clearly establish the validity of the Newspaper Market.[14] *See* Mot. 26-28;

21  _____

22  [12] The statements made by McClatchy in its public bankruptcy filing suffers from the same defects,
   in addition to the fact the McClatchy's acquisition of Knight-Rider and taking on $2 billion in debt
23  was reported as contributing to its decline. *See* ECF No. 1046 at 6SA1140-41.

24  [13]  *See*,  *e.g.*,  https://www.pewresearch.org/internet/2007/06/21/the-internet-circa-1998/,  last
   accessed  Mar.  10,  2026;  https://www.computerhistory.org/internethistory/1990s/,  last  accessed
25  Mar. 10, 2026.

26  [14] The RJ's expert's opinion reference to Katz's analysis as "deeply flawed and irreconcilable with
27  economic reality" is particularly suspect based on the actual data analysis undertaken by Dr. Katz
   (which relies on data collected and utilized by a consultant working for the RJ to advise it on
28  pricing), and the complete absence of any proper data analysis given by the RJ or its expert. *See*

14

1    ECF No. 871 at 38-42 (citing evidence); ECF No. 1046 at 6SA1174-86, 89-95.

2    **B.** **The RJ Has Monopoly Power**

3           The RJ relegates the monopoly power element to a conclusory and inaccurate footnote. *See*

4    Opp'n 19 n.5. It skips over the evidence the Sun presented to instead claim that the RJ has not made

5    monopoly profits ergo it does not possess monopoly power. *Id.* This is not what determines

6    monopoly power. "'Monopoly power is the power to control prices or exclude competition.'" *See*

7    Mot. 25 (quoting *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993). The court

8    in *United States v. Syufy Enters.* (cited by the RJ) does not disagree. 903 F.2d 659, 664 (9th Cir.

9    1990) ("There is universal agreement that monopoly power is the power to exclude competition or

10   control prices."). This can be proved by direct evidence of the ability to control price or exclude

11   competition, or indirect evidence of market share and barriers to entry. "Importantly, a firm need

12   not actually have earned monopoly profits or excluded competition to possess monopoly power."

13   *United States v. Google LLC*, 747 F. Supp. 3d 1, 117 (D.D.C. 2024) ("[T]he material consideration

14   in determining whether a monopoly exists is not that prices are raised and that competition is

15   actually excluded but that *power exists* to raise prices or exclude competition when it is desired to

16   do so.") (alteration in original) (quotations omitted and emphasis added).[15] Hence, while the

17   presence of monopoly profits can be used as evidence in support of monopoly power, the absence

18   of monopoly profits does not mean the absence of monopoly power. This is rightfully so due to the

19   many reasons a monopolist might be showing current losses, including strategic losses to eliminate

20   rivals, which is directly at issue as a part of the RJ's Anticompetitive Conduct.[16] *See* Mot. 13-18.

21   _____

     Opp'n 19.

22
23   [15] *See also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (explaining that
     indirect evidence of monopoly power through entry barriers must be significant because, "with easy

24   entry, a predator charging supracompetitive prices will quickly lose market share (as well as any
     chance of reaping monopoly profits) as new rivals enter the market and undercut its high price")

25   (citing *Syufy*, 903 F.2d at 664).

26   [16] The RJ's additional citation to *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*,
     540 U.S. 398, 407 (2004), for the unremarkable proposition that both monopoly power and

27   anticompetitive conduct are required to establish a monopolization claim is confusing. Opp'n 19
     n.5. Nevertheless, *Trinko* didn't hold that monopoly profits are required for monopoly power either:

28   it merely iterated that monopoly prices might occur even in lawful markets. 540 U.S. at 407.

1    The Sun has established with direct and indirect evidence that the RJ has the power to control prices
2    and exclude competition. Mot. 29-33.

3    **C.    The RJ's Anticompetitive Conduct is Unlawful and Violates Antitrust Law**

4        In line with its earlier arguments, the RJ maintains that none of its conduct was undertaken
5    when the parties were operating under the now-unenforceable 2005 JOA. Opp'n 11-14. The RJ's
6    argument is devoid of merit for a critical overarching reason: it defies the fundamental principles
7    upon which antitrust laws were created.

8        The purpose of antitrust laws is to "promot[e] consumer welfare." *PLS.com, LLC v. Nat'l
9    Ass'n of Realtors*, 32 F.4th 824, 832 (9th Cir. 2022) (quotations omitted). "The law directs itself
10    not against conduct which is competitive, even severely so, but against conduct which unfairly
11    tends to destroy competition itself. It does so not out of solicitude for private concerns but out of
12    concern for the public interest." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).
13    Congress deputized citizens to act as "private attorneys general" by bringing antitrust actions to
14    further serve the public good as a result. *E.g.*, *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251,
15    262 (1972). In encouraging this function, where the plaintiff "is suing not only in its own behalf,
16    but as a 'private attorney general' representing the public interest," courts will allow antitrust
17    plaintiffs to proceed even in the face of an illegal agreement. *PharmacyChecker.com LLC v.
18    LegitScript LLC*, 137 F.4th 1031, 1041 (9th Cir.), *cert. denied*, 146 S. Ct. 209 (2025). Thus, when
19    firms undertake conduct that could generally be considered "legal" in other contexts, that conduct
20    is anticompetitive when it is not competition on the merits and is undertaken by firms with
21    monopoly power or a dangerous probability of achieving monopoly power to reduce competition,
22    exclude rivals, or harm consumers.[17] This is also why the Ninth Circuit has explained that antitrust

23    _____

24    [17] *E.g.*, *Federal Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (finding that
25    otherwise competitive conduct is anticompetitive when it "harm[s] the competitive *process* and
      thereby harm[s] consumers") (alteration in original); *Dreamstime.com, LLC v. Google LLC*, 54
26    F.4th 1130, 1137 (9th Cir. 2022) ("Exclusionary conduct" refers to acts that "tend[ ] to impair the
      opportunities of rivals" and "do[ ] not further competition on the merits or do[ ] so in an
27    unnecessarily restrictive way.") (alterations in original and quotations omitted); *Spectrum Sports,
      Inc. v. McQuillan*, 506 U.S. at 458-59 (holding that conduct is "unlawful only when it actually
28    monopolizes or dangerously threatens to do so"); *William Inglis & Sons Banking Co. v. ITT*

16

liability is distinct from contract disputes, and that while antitrust liability can be predicated on conduct that also happens to create a contract dispute, even in that instance any contractual rights do not grant the defendant "the freedom to act anticompetitively." *City of Vernon v. S. California Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992). Stated another way, contractual "limitations do[ ] not speak to antitrust concerns." *Id.*

Therefore, where the RJ has undertaken competition-*reducing* conduct that is not competition on the merits, not only is the Sun harmed but so are consumers. The fact that the 2005 JOA was just recently declared unenforceable does not alter this antitrust analysis.[18] The Sun has presented an abundance of evidence that the RJ's conduct was not competition on the merits, regardless of whether the 2005 JOA was valid. *See* Mot. 13-23. The RJ believed that the 2005 JOA was valid, and used its exclusive power and control over <u>all</u> non-editorial and -reportorial elements of the joint operation and the Sun since 1989 (which continued after the 2005 JOA) to weaken the Sun's ability and incentives to compete with the RJ, reduce the Sun's visibility and consumers' knowledge, and threaten unilateral termination of the joint operation through pretextual sham litigation. All of the RJ's Anticompetitive Conduct harms competition, the Sun, and consumers. *See*, *e.g.*, Order 24-25; 1SA171-83. It is therefore anticompetitive regardless of the unenforceability of the 2005 JOA.

/ / /

/ / /

/ / /

---

*Continental Banking Co.*, 668 F.2d 1014, 1030-31 (9th Cir. 1981) (explaining that conduct that "will support a claim of attempted monopolization [if its] anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. Such conduct is not true competition; it makes sense only because it eliminates competition. It does not enhance the quality or attractiveness of the product, reduce its cost, or alter the demand function that all competitors confront. Its purpose is to create a monopoly by means other than fair competition.").

[18] Notably, the reason newspaper JOAs were deemed illegal was because of price fixing. *See Citizen Pub. Co. v. United States*, 394 U.S. 131, 135-36 (1969). The parties here eliminated all price competition between them in the 1989 JOA, and the Attorney General approved it.

17

1    **1.    The Editorial and Reportorial Competition Between the Sun and the RJ**
2    **Is Economic Competition Under Antitrust Laws**

3    Before turning to the reduction of competition from its Anticompetitive Conduct, the RJ

4    advances its failed summary-judgment argument that the editorial and reportorial competition

5    between the Sun and the RJ is not economic competition contemplated by antitrust laws. Opp'n 15-

6    16; Order 21-24. Once again unable to find any authority in its favor, the RJ offers the same three

7    cases[19] this Court rejected the first time around because they are nothing like the competition

8    existing between JOA newspapers (which has been recognized as economic competition). Order

9    22-23; ECF No. 243 at 11-13; *see also* Mot. 33-34.[20]

10    The cases that involve newspapers, and particularly JOA newspapers, are directly on point,

11    and have held that the editorial and reportorial competition between them is economic. *United*

12    *States v. Daily Gazette Co.*, 567 F. Supp. 2d 859, 869-70 (S.D.W. Va. 2008); *Hawaii ex rel. Anzai*

13    *v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1249 (D. Haw. 1999); *Comm. for Indep. P-I v. Hearst*

14    [19] Opp'n 15 (citing *Dedication & Everlasting Love to Animals (DELTA) v. Humane Society of U.S.,*
15    *Inc.*, 50 F.3d 710, 712, 714 (9th Cir. 1995) (concluding that the plaintiff and defendant ("animal-
16    loving societies") were like philanthropists engaging in "self-serving activity" which only gained
reputation, prestige, and money for its officers—not profits); *Johnson v. Comm'n on Presidential*
17    *Debates*, 869 F.3d 976, 983 (D.C. Cir. 2017) (finding the non-profit political organizations had no
cognizable marketable product because "conducting the government" or "holding of a political
18    office" does not constitute trade or commerce, and there is no product market for "'information
about themselves or other presidential candidates,'" and citing *Sheppard v. Lee*, 929 F.2d 496, 498
19    (9th Cir. 1991), also cited by the RJ); *Freedom Watch Inc. v. Judicial Watch, Inc.*, 289 F. Supp. 3d
1270, 1274-76 (S.D. Fla. 2018) (finding that the plaintiff's exclusion from conservative political
20    organization trade fair, as "nothing more than a social event," was noncommercial activity outside
the Sherman Act, and further reiterating that the Sherman Act is tailored for the business world,
21    and "not at all appropriate for application in the political arena."); *Toscano v. PGA Tour, Inc*., 201
F. Supp. 2d 1106, 1121-23 (E.D. Cal. 2002) (applying the Sherman Act to eligibility rules for sports
22    and concluding under a rule of reason analysis that the rules had a "series of procompetitive
justifications"—without them, the product would not exist and consumer welfare would not be
23    furthered)).

24    [20]   That the Newspapers were sold in the Newspaper Bundle is inconsequential. Contrary to the
25    RJ's inference, the recently declared unenforceability of the 2005 JOA does not change the constant
editorial and reportorial competition existing between the Newspapers since the Attorney General
26    approved the 1989 JOA—it is undisputed that they have always remained editorially and
reportorially independent as required by the NPA. *Compare* Opp'n 15 ("Even if the 2005 JOA were
27    enforceable ….") *with* Mot. 7; 15 U.S.C. § 1801.

28

18

*Corp.*, 704 F.2d 467, 477 n.8 (9th Cir. 1983). The fact that the JOA newspapers in those cases were sold separately, or had different subscriber and advertiser bases, was not a qualification for these courts' well-reasoned holdings, nor was it for this Court's. Order 22-23. The reason being, JOA newspapers have already combined all non-editorial and -reportial business aspects, and price competition between them. In doing so, one party to the JOA sets all sales, circulation, and advertising rates, and the newspapers pool all revenue and then share in the profits. They do not compete for sales, subscriptions, and advertising in the economic sense that the RJ attempts to distinguish from the Sun and the RJ, and courts considering this issue have found the editorial and reportial competition between them as economic competition within antitrust laws. *See* ECF No. 871 at 35-36. This Court's previous rejection of the RJ's attempts to distinguish these instructive cases from the Sun and RJ was supported by the law and the evidence. Order 21-24. The Court agreed that the Sun's evidence shows that it monetizes its readership in the same ways identified in *Daily Gazette*, plus other ways like promoting its other businesses. *See* ECF No. 871 at 15-16, 35. The RJ's argument that the Sun cannot "measure its contribution" is likewise contrary to the evidence. *Compare* Opp'n 15-16 *with* ECF No. 871 at 15-16, 35. Having established that the competition between the Sun and the RJ is economic competition under antitrust laws, the question is whether the RJ has undertaken conduct that has reduced that competition, through means that are not competition on the merits, harming the Sun and consumers.

### 2. The RJ's Anticompetitive Conduct is Not Competition on the Merits, has Reduced Competition, and Harmed Consumers

The Sun's body of evidence demonstrates that the RJ used its exclusive power over the joint operation and the Sun—harnessed since 1989—to manipulate the framework under which both parties believed was valid and enforceable to: (1) abuse the RJ's joint operation accounting to reduce and eliminate the Sun's profit payments; (2) fail to maximize the joint operation's profits to further drive the joint operation into a loss and eliminate the Sun's profits; (3) reduce the Sun's visibility and consumers' knowledge of the Sun; and (4) threaten unilateral termination of the Sun through pretextual, sham litigation.[21] *See, e.g.*, Order 24-25; ECF No. 1041 at 1SA171-83. None of

---

[21] The RJ's analysis of its Anticompetitive Conduct is deliberately narrow, ignoring what discovery

1  this conduct is competition on the merits, and each aspect has worked together, compounding their

2  anticompetitive effects to harm the Sun, reduce competition, and harm consumers. All of it is

3  antithetical to consumer welfare, regardless of the enforceability of the 2005 JOA, which is the

4  focus of antitrust laws.

5      First, the RJ limits its discussion of accounting abuses with respect to its improper editorial

6  and promotional costs, pretending that the last six years of discovery and briefed disputes did not

7  capture its widespread accounting malfeasance. *See* Opp'n 11-12. Even still the RJ does not dispute

8  that it has possessed exclusive and complete control over the joint operation accounting since 1989,

9  and its power was unfettered and undeterred. Mot. 5, 9, 14-15. The evidence shows that the RJ

10  undertook a multitude of accounting abuses under the 2005 JOA framework. Whether the 2005

11  JOA was enforceable or not, the RJ's accounting abuses worked to overstate the costs attributable,

12  and understate the revenues attributed, to the joint operation thereby artificially suppressing the

13  joint operation EBITDA and reducing the Sun's profit payments.[22] *Id*. Neither JOA allowed for the

14  RJ to improperly increase expenses and artificially decrease revenues. *Id.* This conduct improperly

15  reduced and eliminated the Sun's profit payments, weakening the Sun's ability to compete with the

16  RJ and threatening to drive the Sun out of business. *Id.* at 31. This conduct is anticompetitive.

17      The RJ's argument that it had no duty to share in profits with the Sun because the 2005 JOA

18  _____

19  revealed in this case and pretending that the scope of its conduct was not fully at issue during
summary judgement. As the RJ is well-aware, when it was compelled to participate in discovery,

20  its documents revealed the details of the RJ's conduct undertaken with respect to each of the four
categories of Anticompetitive Conduct, *e.g.*, the RJ's additional accounting abuses, its expansive

21  failure to maximize profits after Jason Taylor was removed, and the RJ's wide-sweeping failure to
include the Sun in other public facing promotions (including trade-and-barter agreements, renewal

22  notices, etc.). Its attempt to create an inaccurate record by ignoring the last six years of discovery
and what has been actually litigated in this case fails. This is not the situation where a plaintiff is

23  seeking preliminary injunctive relief at the outset of the case. The RJ knows exactly what is at issue.

24  [22] The RJ's contention that it "merely" continued the same accounting procedures that Stephens
employed for charging of editorial costs is unpersuasive. *See* Opp'n 12; *see also* No. 1043 at

25  3SA519-21. The RJ knew the Sun was in litigation with Stephens Meida on that issue when it
purchased the Review-Journal, knew that Stephens settled the dispute on the last day of arbitration

26  in 2016 by paying the Sun millions of dollars, and the RJ *continued* to charge its editorial costs
against the joint operation even after the Sun won that issue in the 2019 Arbitration and the RJ had

27  to pay the Sun a substantial judgment. *See News+Media Cap. Grp. LLC v. Las Vegas Sun, Inc.,*

28  495 P.3d 108 (Nev. 2021).

1    is now unenforceable is diametrically opposed to the facts. *See* Opp'n 12-13. The Sun and the RJ

2    are not mere stranger-competitors. The RJ has a duty to deal with the Sun because of the parties'

3    combination in 1989 under the NPA and with the Attorney General's blessing. The RJ's duties to

4    the joint operation for the preservation of the Sun are specifically to protect the editorial and

5    reportorial competition between them. *See Comm. for an Indep. P-I*, 704 F.2dat 482 (explaining

6    that while JOA newspapers have eliminated all price and other non-editorial and -reportorial

7    competition between them, "those possibly harmful effects were outweighed by other

8    considerations and sufficiently alleviated by the requirements of the Act," in maintaining two

9    independent newspaper voices); 15 U.S.C. § 1801; *see also Adelson*, 147 F.4th at 1109-10

10   (recognizing the policy and purpose of the NPA). The Sun's relinquishing of all its infrastructure

11   and assignment to the RJ of all its subscriber, advertising, and other contracts (among other things),

12   from which the RJ has received the benefits for decades, highlights the outrageousness of the RJ's

13   argument. Because of these benefits, and the RJ's access to Sun readers, the parties have shared in

14   profits. Their 90/10 split remained unchanged even after the 2005 JOA. The RJ's duties to continue

15   to deal with the Sun are so reinforced, that even the termination of a JOA newspaper is subject to

16   antitrust scrutiny. *See Daily Gazette*, 567 F.Supp.2d at 870-71.

17        <u>Second</u>, the RJ was continuously in control over the joint operation profits, dating back to

18   1989. Mot. 5. The evidence establishes that the RJ exploited its power over the joint operation by

19   failing to maximize the joint operation's profits in several ways. *See* Mot. 16-18. The RJ's

20   conclusory assertions that it has "tried" to maximize profits but couldn't because of industry decline

21   is belied by the evidence. *See* Opp'n 13-14; ECF No. 1043 at 3SA500-01, 08, 15-21, 26-36. The

22   RJ's conduct drove the joint operation into a loss, in turn eliminating the Sun's profit payments,

23   weakening the Sun's ability to compete, and threatening the Sun's shut down. Mot. 18. The Sun

24   hasn't received a JOA EBITDA payment from the RJ since 2017. That is nine consecutive years of

25   negative financial performance. The fact that RJ hasn't taken significant steps to change this

26   negative financial course (cutting staff, reducing newshole, etc.) proves ulterior monopolistic

27   intent. This is not competition on the merits. And it reduces competition to the detriment of

28   consumers. *See* Mot. 31.

21

<u>Third</u>, even under the 1989 JOA the RJ was harnessed with the power over the promotions for the Sun. Mot. 5. Those obligations continued under the 2005 framework. Mot. 9-10. The RJ exploited that power over the Sun's promotions and brand visibility by taking actions that undermine the Sun's ability to communicate with consumers about the nature and value of its Newspaper and brand, in turn reducing people's awareness of the Sun's presence and content. Mot. 18-20. Regardless of whether the 2005 JOA is enforceable, the RJ's conduct was not competition on the merits. It weakened editorial and reportorial competition between the Sun and the RJ both directly—because it has collectively reduced consumers' knowledge of the Sun and its brand—and indirectly—because the Sun's owners have had less incentive to invest in a newspaper that obtains less readership and attention. *Id.*

<u>Fourth</u>, the RJ's litigation maneuvering to terminate the joint operation by having the 2005 JOA declared unlawful *while* (1) baselessly disavowing the enforceability of, and its obligation to revert to, the 1989 JOA; and (2) refusing to seek Attorney General approval of the 2005 JOA, is anticompetitive. Regardless of the RJ's success at the Ninth Circuit, the RJ's attempt to eliminate the Sun on that basis is not valid or reasonable for the reasons discussed herein. *See also* Mot. 32. The RJ's efforts to eliminate the Sun from the market through its other termination litigation is equally baseless. By both imposing large litigation costs on the Sun and by creating uncertainty, further raising the Sun's costs, and weakening the Sun's ability to compete with the Review-Journal—regardless of which party prevails in the litigation. Mot. 31; ECF No. 1042 at 2SA422; ECF No. 876-6 ¶¶ 14-27.

### D.    The Sun's Injury Flows from That which Makes the RJ's Anticompetitive Conduct Unlawful

The RJ's argument that the Sun's claimed injury does not flow from unlawful conduct that antitrust laws were designed to protect (Opp'n 16) fails on all grounds set forth above and in the Sun's Motion. *See supra* § III(C); Mot. 13-24, 31-35; *see also* ECF No. 871 at 18-20. The fact that the 2005 JOA was rendered unenforceable in no way renders the RJ's Anticompetitive Conduct lawful. *See supra* § III(C); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (explaining that this factor requires that the plaintiff need only show some "competition-*reducing*

22

1   aspect of effect" of the defendants behavior) (emphasis in original); *Brunswick Corp. v. Pueblo*

2   *Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (standing for the exact same proposition: the

3   defendants' conduct did not reduce competition, it *preserved* it, therefore benefitting consumer

4   welfare). The RJ's Anticompetitive Conduct to eliminate its sole competitor in no way benefits or

5   preserves competition like the defendant's conduct did in *Pueblo Bowl-O-Mat*. As this Court

6   properly found before, the Sun's "claimed injury directly flows from the RJ's unlawful conduct."

7   Order 26-27.

8           **E.      The Sun Participates in the Newspaper Market**

9           The RJ again asserts a market participant argument that it lost at summary judgment. Opp'n

10  16-17; ECF No. 845 at 28-30; *see also* Order 28 (concluding that the Sun is an independent

11  newspaper in the Newspaper Bundle (providing content for publication in its own Newspaper that

12  is sold to consumers) that competes with the RJ, and is therefore "a participant in the relevant

13  market" within the meaning of antitrust laws). The RJ continues to liken the Sun to the plaintiff-

14  crewmembers in *Eagle v. Star-Kist, Inc.*, 812 F.2d 538 (9th Cir. 1987). Opp'n 16-17. *Eagle* is

15  anything but "on point." *Id.* at 16.

16          The crewmember-plaintiffs in *Eagle* lacked standing because they were mere employees of

17  the tuna vessel owners who had not even contracted with the defendant-canneries. *Eagle*, 812 F.2d

18  at 540-41. The *Eagle* court stated the plaintiff-employees were not proper plaintiffs as sellers

19  because it was their employer-vessel owners that had control over the vessel and the selling price

20  of the fish to the defendants. Therefore, the vessel owners were the proper plaintiffs for directly

21  participating in the tuna market. *Id.* Applying this logic to this case would be the Sun's newsroom

22  staff advancing antitrust claims against the RJ, even though their stories are printed in each day's

23  Newspaper. That the Sun is not in control of the Newspapers' prices does not make *Eagle* more

24  analogous. In every host-tenant JOA relationship, like that of the Sun and the RJ, one critical

25  element of the combination under the NPA is that the dominant paper sets the prices of both

26  Newspapers (thereby eliminating price competition). *See* 15 U.S.C. § 1802(2); **Ex. 3** at 13; Order

27  at 18. The evidence supports this Court's finding again that the Sun is a market participant.

28

23

1
2

**IV.    THE SUN WILL SUFFER EXTREME, IRREPARABLE HARM WITHOUT AN INJUNCTION; THE RJ CANNOT CLAIM HARM UNDER THESE CIRCUMSTANCES**

3    Unable to counter the well-reasoned and directly applicable *Gannett* case, the RJ resorts

4    to its meritless fallback argument: there has been a decline in the newspaper industry. Opp'n 21-22;

5    *see supra* § III(A). The RJ's threatened elimination of its sole competitor is the exact kind of injury

6    Section 16 was intended to prevent. *Am. Stores*, 492 U.S. at 1304. Reinstating its printing and

7    distribution of the Sun after five years of litigation (according to the RJ's estimate) could not reverse

8    the irreparable harm caused by eliminating it from the Newspaper Market, as the RJ states. This is

9    precisely why courts consistently recognize that even the threatened shut-down of a competitor

10    triggers Section 16 relief. If the Sun could quantify the harm, as the RJ criticizes (Opp'n 12), then

11    monetary damages could possibly compensate the Sun. But the Sun cannot because the loss of its

12    Newspaper cannot be monetized. *See Gannett*, 99 F. Supp. 2d at 1253-54; *Rent-A-Center, Inc. v.*

13    *Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *see also* ECF No.

14    1042 at 2SA422-23. The high barriers to entry prevent the Sun from continuing independently. *See*

15    Mot. 29-31; ECF No. 1042 at 2SA422; *see also* ECF No. 871 at 42-43; ECF No. 1046 at 6SA1196,

16    1199-1204. There are no "alternatives" besides the RJ's printing press for the Sun to explore. *See*

17    Opp'n 21; **Ex. 4** at 121-28; *see also* ECF No. 1042 at 2SA422; ECF 1042 at 2SA264-49. And, the

18    Sun's website is not an option to preserve competition because it is not a local, daily print

19    newspaper. *See* Opp'n 19, 20; *see supra* § III(A). The Sun attested, and Dr. Katz opined, that

20    terminating the joint operation would eliminate the Sun and continuing lasvegassun.com would not

21    be commercially viable.[23] ECF No. 1046 at 6SA1202-03; ECF No. 1042 at 2SA422 ¶ 3; ECF No.

22

23    [23] In the absence of any real argument that the Sun's injury will not be irreparable, the RJ resorts to
deflection, misconstruing irrelevant 10-year-old text messages to imply the Sun's owners were
24    aiming for a buyout. *See* Opp'n 19-20. These communications are isolated, out-of-context texts,
which are not only jocular musings, but they actually show that the Sun was responding to the RJ
25    maliciously stealing an employee from the Sun and attempting to put the Sun out of business and
yet the Sun was planning to beat the RJ in every aspect of editorial and reportorial competition.
26    *Compare* Opp'n at Ex. H *with* ECF No. 902 at 9 (citing evidence). The RJ's citations to Mr.
Greenspun's notes are also without context, where the evidence shows that the RJ had already
27    implemented its scheme to starve the Sun, threatening Greenspun that he better do a deal because
the Sun would not be receiving profit payments going forward. *Compare* Opp'n 19-20 *with* ECF
28

24

876-6 ¶ 14.

## V.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST SHARPLY TIP IN THE SUN'S FAVOR

Every inequity the RJ claims to suffer have been disproved. *Compare* Opp'n 22-24 (arguing the Sun's request violates the Ninth Circuit's ruling, that reverting to the 1989 JOA is too 'hard,' and that seeking Attorney General approval is too cumbersome, and that the RJ did not agree to revert to the 1989 JOA or seek approval of the 2005 JOA) *with supra*. These so-called inequities are all self-inflicted in furtherance of the RJ's monopolistic intent. *See id.* The RJ has deliberately elected to forgo the approval process for the 2005 JOA (including the option to seek interim, temporary approval to continue printing the Sun as is (28 C.F.R. § 48.15, ), instead choosing to have it declared unlawful for lack of Attorney General approval, and continues to refuse to revert to the 1989 JOA, or propose any other alternative at all that would preserve the Sun. The 1989 JOA is a bargained-for Attorney-General-approved agreement under which the RJ has received the benefits for 36 years. *See also supra* § II(B), (C).

No First Amendment harm to the RJ would occur either. *See* ECF No. Opp'n 22-23. The RJ knowingly and voluntarily contracted away those rights when it entered into the 1989 JOA, and the evidence indicates the RJ's same intention under the 2005 JOA. "'The Supreme Court has recognized that constitutional rights may ordinarily be waived if it can be established by clear and convincing evidence that the waiver is voluntary, knowing and intelligent.'" ECF No. 1063 at 7 (quoting Order 42-43 (quotations omitted)). The RJ knowingly and voluntarily waived its First Amendment rights to not print and distribute the Sun when it entered into the 1989 JOA, as confirmed by the parties' memorialization of their intentions in 2005. ECF No. 1063 at 7-9; *Gannett*, 99 F. Supp. 2d at 1248-52.

The RJ requested a judicial declaration that the parties needed to go through the Attorney General approval process under 28 C.F.R. 48.4. Having got what it asked for, the RJ should be

---

No. 902 at 10. Under duress, with no alternative, Greenspun drafted notes for a meeting describing potential options that included some version of the Sun's permanent presence, including negotiating a global resolution. *See* ECF No. 902 at 9-11. The RJ's insinuation that the Sun *wants* to close is, to use the RJ's words, disingenuous. The fact that the Sun has fought as hard as it has to stay alive throughout this case shows otherwise.

105559\1015963\286898353.v1-3/10/26

1    prohibited from claiming any inequity by having to comply. This is not wasted effort because the

2    DOJ did not already "previously decline[ ] to approve" the 2005 JOA. *See* Opp'n 23. If anything is

3    to be gleaned from the DOJ's letter, only the ancillary provisions of the 2005 JOA that "were not

4    integral to the *revised* [JOA] for the joint distribution" of the Newspapers remained subject to

5    antitrust scrutiny. *See* ECF No. 1043 at 3SA519-21; Mot. 12. All equities and the public interest

6    sharply favor the Sun.

7    **VI.    A MINIMAL BOND IS APPROPRIATE AND WARRANTED**

8        The irony cannot be lost in the RJ's demand for an exorbitant bond to prevent it from

9    eliminating the Sun from the market. *See* Opp'n 24. This is just another legal tactic in the RJ's

10   arsenal of conduct to ensure the Sun's demise. The Sun's sole source of revenue is its profits from

11   the joint operation. The RJ does not dispute that the Sun has not received a joint operation profit

12   payment in nearly a decade. The fact that this litigation has been funded by loans from its owner's

13   personal funds to keep the Sun alive does not change the fact that the Sun cannot afford the

14   outrageous bond the RJ seeks. The law is clear that when a proposed bond, like the RJ's proposal,

15   is so prohibitive that it amounts to a denial of the otherwise merited relief, it should not be ordered.

16   *See, e.g.*, *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.

17   1985) ("The court has discretion to dispense with the security requirement, or to request mere

18   nominal security, where requiring security would effectively deny access to judicial review.").

19       There is no basis for the Sun to post anything more than a nominal bond: the RJ is merely

20   being compelled to do what it is either contractually obligated to do or required to do in the interest

21   of equity, antitrust laws, and the NPA. *MetroPCS Georgia, LLC v. Metro Dealer, Inc.*, 2019 WL

22   1597111, at *4 (W.D. Wa. Apr. 15, 2019) (finding no bond needed when the injunction "seeks only

23   to enjoin Defendants from doing what they have no right to do under their Agreements with

24   MetroPCS"); *Life Flight Network, LLC v. Metro Aviation, Inc.*, 2017 WL 192706, at *2 (D. Or.

25   Jan. 17, 2017); *Paparazzi, LLC v. Souza*, 2025 WL 3705493, at *8 (D. Utah Dec. 22, 2025)

26   (declining to impose a bond when "the parties' agreement specifically contemplates the remedy

27   requested"). Given that this matter involves public interest (15 U.S.C. § 1801), it is appropriate for

28

1  the Court to waive or require a nominal bond. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113,

2  1126 (9th Cir. 2005).

3  **VII.    CONCLUSION**

4       For the foregoing reasons, an Order granting the Sun's Motion is necessary and proper.

5       DATED this 10th day of March, 2026.

6

7                      CLARK HILL PLC

8                      By: */s/ Kristen L. Martini*

9                          E. Leif Reid, Nevada Bar No. 5750
                        Kristen L. Martini, Nevada Bar No. 11272

10                         Nicole Scott, Nevada Bar No. 13757
                        1700 S. Pavilion Center Drive, Suite 500

11                         Las Vegas, Nevada 89135

12                         PISANELLI BICE PLLC
                        James J. Pisanelli, Nevada Bar No. 4027

13                         Todd L. Bice, Nevada Bar No. 4534
                        400 South 7th Street, Suite 300

14                         Las Vegas, Nevada 89101

15                         BROWNSTEIN HYATT FARBER
                        SHRECK, LLP

16                         Jordan T. Smith, Nevada Bar No. 12097
                        100 North City Parkway, Suite 1600

17                         Las Vegas, Nevada 89106

18                         ALIOTO LAW FIRM
                        Joseph M. Alioto, Pro Hac Vice

19                         One Sansome Street, 35th Floor
                        San Francisco, California 94104

20                         *Attorneys For Plaintiff/Counterdefendants*

21

22

23

24

25

26

27

28

27

1
2

**DECLARATION OF KRISTEN L. MARTINI IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S *EMERGENCY* MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

3
4

I, Kristen L. Martini, do hereby swear under penalty of perjury that the following assertions are true and correct to the best of my knowledge:

5
6
7
8
9
10
11

1.    I am a duly licensed attorney admitted to practice in the State of Nevada. I am a member of Clark Hill PLC, and counsel for Plaintiff/Counterdefendants Las Vegas Sun, Inc., Counterdefendants Brian Greenspun and Greenspun Media Group, LLC (together, for purposes of this Motion and for ease of reference, referred to as, the "Sun") in this matter. I make this Declaration in support of Plaintiff's Reply to Defendants' Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction ("Reply").

12
13
14
15

2.    Attached as **Exhibit 1** to the Motion is a true and correct copy of excerpts of Defendants News+Media Capital Group LLC and Las Vegas Review-Journal Inc.'s RJ's First Amended Answer to Complaint and Counterclaims, in the case styled *Las Vegas Sun, Inc. v. News+Media Capital Group LLC* (Clark Cnty. Dist. Ct. Sept. 30, 2019).

16
17
18
19
20

3.    Attached as **Exhibit 2** to the Motion is a true and correct copy of excerpts of the transcript of the RJ's Rule 30(b)(6) corporate representative Stephen Hall's deposition testimony in the arbitration captioned *Las Vegas Sun, Inc. v. News+Media Capital Group LLC*, AAA Case No. 01-18-0000-7567 (Mar. 13, 2019) (SUN_00024708-09, 11, 14, 16, 32-33, 946). This document has been **FILED UNDER SEAL**.

21
22
23
24

4.    Attached as **Exhibit 3** to the Motion is a true and correct copy of excerpts from the September 19, 2022, initial report of Las Vegas Sun, Inc.'s expert Lawrence Aldrich. This document has been **FILED UNDER SEAL**.

25
26
27

5.    Attached as **Exhibit 4** to the Motion is a true and correct copy of excerpts of the transcript of the Sun's Rule 30(b)(6) corporate representative Robert Cauthorn's deposition testimony from February 16, 2022, in this case.

28

28

6.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of March, 2026.

_____

KRISTEN L. MARTINI

29

1

## CERTIFICATE OF SERVICE

2      I certify that I am an employee of CLARK HILL PLC, and I caused a true and correct copy

3   of the foregoing **PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO**

4   **PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

5   **AND PRELIMINARY INJUNCTION [ECF NOS. 1069/1070 (FUS)]** to be served by

6   electronically filing the foregoing with the CMECF electronic filing system which will send notice

7   of electronic filing to:

8      J. Randall Jones, Esq.
       Michael J Gayan, Esq.
9      Mona Kaveh, Esq.
       KEMP JONES, LLP
10     3800 Howard Hughes Parkway, 17th Floor
       Las Vegas, NV 89169
11

12     Michael J. Gayan
       CLAGGETT & SYKES LAW FIRM
13     4101 Meadows Lane, Suite 100
       Las Vegas, NV 89107

14     Amy M. Gallegos, Esq.
       David R. Singer, Esq.
15     Andrew G. Sullivan, Esq.
       Alison I Stein, Esq.
16     JENNER & BLOCK LLP
       515 South Flower Street, Suite 3300
17     Los Angeles, CA 90071

18     Richard L. Stone, Esq.
       850 Devon Avenue
19     Los Angeles, CA 90024

20
       DATED: March 10, 2026.
21
                                    /s/ Kristen L. Martini
22                                  An Employee of Clark Hill PLC

23

24

25

26

27

28

## INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 1 | Excerpts of Defendants News+Media Capital Group LLC and Las Vegas Review-Journal Inc.'s First Amended Answer to Complaint and Counterclaims, *Las Vegas Sun, Inc. v. News+Media Capital Group LLC* (Clark Cnty. Dist. Ct. Sept. 30, 2019) | 7 |
| 2 | Deposition Transcript Excerpts of the RJ's Rule 30(b)(6) corporate representative Stephen Hall, *Las Vegas Sun, Inc. v. News+Media Capital Group LLC*, AAA Case No. 01-18-0000-7567 (Mar. 13, 2019) (SUN_00024708-09, 11, 14, 16, 32-33, 946) **(FILED UNDER SEAL)** | 9 |
| 3 | Excerpts from the September 19, 2022, initial report of Las Vegas Sun, Inc.'s expert Lawrence Aldrich **(FILED UNDER SEAL)** | 3 |
| 4 | February 16, 2022, Deposition Transcript Excerpts of the Sun's Rule 30(b)(6) corporate representative Robert Cauthorn, Las Vegas Sun, Inc. v. Sheldon Adelson (Estate of), Case No. 2:19-cv-01667-ART-MDC | 24 |
| 5 | Declaration of Barbara J. Gottlieb in Support of Plaintiff/Counterdefendants' Emergency Motion for Temporary Restraining Order and Preliminary Injunction | 3 |
| 6 | Declaration of Robert G. Picard | 6 |

31