# EXHIBIT 1

Plaintiff's proposed Second Amended and Supplemental Complaint for Divestiture, Injunction, and Damages by Reason of Defendants' Violations of the Sherman Antitrust Act, the Clayton Antitrust Act, and the Nevada Unfair Trade Practices Act

# EXHIBIT 1

APP001

E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavilion Center Dr., Suite 500
Las Vegas, Nevada 89135
Tel: 702.862.8300
Fax: 702.778.9709
Email: lreid@clarkhill.com
        kmartini@clarkhill.com
        nsscott@clarkhill.com

James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Tel: 702.214.2100
Fax: 702.214.2101
Email: JJP@pisanellibice.com
        TLB@pisanellibice.com

Jordan T. Smith, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Tel: 702.464.7022
Fax: 702.382.8135
Email: jtsmith@bhfs.com

Joseph M. Alioto, PRO HAC VICE
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

*Attorneys for Plaintiff/Counterdefendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>SHELDON ADELSON, an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC DBA ADFAM, a Delaware limited liability company and as alter ego of Las Vegas Review-Journal, Inc., and News+Media Capital Group, LLC; and DOES, I-X, inclusive, | Case No. 2:19-cv-01667-ART-MDC<br><br>**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DIVESTITURE, INJUNCTION, AND DAMAGES BY REASON OF DEFENDANTS' VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, AND THE NEVADA UNFAIR TRADE PRACTICES ACT**<br><br><br>**JURY DEMAND** |

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

APP1

Defendants.

LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation,

Counterclaimant,

v.

LAS VEGAS SUN, INC. a Nevada corporation; BRIAN GREENSPUN, an individual and as the alter ego of Las Vegas Sun, Inc.; GREENSPUN MEDIA GROUP, LLC, a Nevada limited liability company, as the alter ego of Las Vegas Sun, Inc.,

Counterclaim Defendants.

**INTRODUCTION**

Defendant Sheldon Adelson has been a long-time enemy of the First Amendment and the press. For decades, he has filed and prosecuted one frivolous and ultimately unsuccessful defamation case after another. His objective has always been clear: chill free speech and silence those that would speak out against him. Against this campaign of oppression, courageous journalists have nonetheless doggedly investigated Adelson's suspicious business dealings, lawsuits, and political activities while shining a disinfecting sunlight on his actions. Honest reporters, scathing editorials, and negative press coverage have continually plagued and maddened Adelson. In December 2015, Adelson's intolerance for the Fourth Estate finally boiled over when he sought to commit a modern-day smashing of the printing presses. He purchased Las Vegas Review-Journal, Inc.,[1] and the Review-Journal newspaper—which has long been one of only two daily print newspapers published and distributed in Clark County, Nevada, and as of April 3, 2026, the **only** print newspaper published and distributed in Clark County, Nevada—and began a systematic silencing of all his local media critics. He used his family members, including his son-in-law Defendant Patrick Dumont, and other controlled entities, with their significant resources, to accomplish his grand scheme.

Not only did Adelson remove any Review-Journal reporter who dared to challenge him, he

---

[1] Defendant Las Vegas Review-Journal, Inc., is also referred to herein as "Review-Journal" or "RJ."

- 2 -

began a calculated scheme to monopolize the local newspaper industry by strangling the sole remaining competitor and dissenting voice—the Las Vegas Sun ("the Sun"). Since 1989, the Review-Journal has been in control of and responsible for all non-editorial and non-reportorial functions of the Sun, including printing, distributing, circulation, and promotion. The Review-Journal's dominant position resulted from the parties' voluntary combination to enter into a 50-year Joint Operating Agreement ("JOA"). The parties' original, 1989 JOA was authorized by the Newspaper Preservation Act (the "NPA") and approved by the Attorney General. The NPA provides a limited antitrust exemption for newspapers to combine production, marketing, distribution, and sales, so long as their editorial and reportorial functions remained separate and independent. Congress designed the NPA, and allowed JOAs, to preserve the publication of competing newspapers that are facing economic distress. As a result of the parties' original combination, the Sun became dependent on the Review-Journal, having been required to divest itself of its printing press, subscription lists, advertising contracts, independent marketing, and all infrastructure necessary to independently publish and distribute its newspaper.

When the parties amended the 1989 JOA in 2005, they continued performing all the material elements of their original combination and, to further reduce the joint operation's production and distribution costs, they agreed to print and distribute the Sun and the Review-Journal newspapers (the "Newspapers") in a separately identified but dually packaged bundle as they previously did on weekends, holidays, and special editions (the "Newspaper Bundle"). Both parties believed that the 2005 JOA was lawful and valid under the NPA. They complied with the existing practice and DOJ regulations for amendments to previously approved JOAs in submitting the 2005 JOA to the DOJ for review and investigation, which the DOJ did. Never did the DOJ or anyone else challenge the Newspapers' continued combination under the amended agreement. Consequently, for 14 years the parties voluntarily continued their joint operation under the framework of the 2005 JOA while adhering to the material elements of their original combination.

Adelson and Defendants, however, weaponized the Review-Journal's control and dominance over the joint operation for the opposite purpose. They wielded the parties' longstanding

- 3 -

combination and operating framework to place the Sun *into* economic distress. Defendants, working together, eliminated all of the Sun's profit share by engaging in anticompetitive accounting and operational abuses to reduce any amount to zero. Abusing Defendants' control, the Review-Journal also omitted the Sun from promotional advertising and covered up the Sun's presence on the front page of the Newspaper Bundle, obscuring the visibility of the Sun and impeding consumer awareness.

Despite these and other efforts to suffocate the Sun, the Sun had remained steadfast throughout this entire litigation; that is, until the RJ ceased printing and distributing the Sun's Newspaper on April 3, 2026, while refusing to comply with the now valid and governing 1989 JOA. The Sun's diverse newspaper editorial voice had stood as a political and philosophical counterbalance to the Review-Journal for 76 years. The Sun had covered local news in greater depth, breadth, and accuracy. It reported on breaking stories and provided a more attractive mix of news, features, and formats. The Sun's editorial page often spoke the truth to Defendants' power.

Unable to financially blot out the Sun, and tired of publishing his only rival, Adelson and the Review-Journal filed a baseless and unlawful claim in Nevada state court, realleging those counterclaims in this action, seeking to prematurely end the parties' then-27-year-old joint operation and immediately cease printing and distributing the Sun. Because of the parties' multi-decade course of dealing, and the Sun's operational and economic dependence on the Review-Journal's control over the joint operation, ending the joint operation would effectively kill the Sun. The consequence: Defendants' plan to achieve 100% monopoly power in the market of local daily print newspapers in Las Vegas and stifle all dissenting, competing views would be complete. When the RJ ceased printing and distributing the Sun on April 3, 2026, while refusing to comply with the valid and existing 1989 JOA and refusing to seek Attorney General approval of the 2005 JOA, the RJ's anticompetitive scheme culminated into a literal monopoly in the relevant market, completely excluding its sole competitor, the Sun.

By reasons of Defendants' antitrust violations, under the authority of Sections 4 and 16 of

- 4 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

APP4

the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26,[2,3] and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,[4,5] an injunction and judicial declaration should and must be issued to prevent the irreversible irreparable harm the Sun is suffering, which injunction and declaration: (1) requires Defendants to cease the Anticompetitive Conduct described herein; (2) enjoins Defendants from refusing to perform under the 1989 JOA; (3) requires Defendants to print and distribute the Sun on a daily basis under the joint edition format provided for in Section 4.4 and Appendix A.2(b) and (c) of the 1989 JOA on an interim basis pursuant to Section 8.2 until such time that the RJ determines that it is feasible to publish more than one newspaper product and that it is able to fully perform under the 1989 JOA; (4) requires the RJ to provide the Sun with the list of subscribers to the Newspapers; (5) declares that the RJ must obtain written Attorney General approval of an amendment to the 1989 JOA, including seeking temporary approval of the amendment pursuant to 28 C.F.R. § 48.15 while the application is pending; (6) enjoins Defendants from unilaterally ending the joint operation and ceasing to print and distribute the Sun until 2040; and (7) orders the RJ to divest itself of the Newspapers' non-editorial and -reportorial business operations as required by Article 2 of the 1989 JOA by creating a separate Nevada business corporation, an agency operating as fiduciary towards the Sun,  which shall separately own or lease all assets related to the operation of the RJ and causing such separate corporate entity to assume and perform all duties and obligations of the RJ. *See* 15 U.S.C. § 26.

In addition, any damages found by a jury for the substantial loss of past and future profits,

---

[2] Under Section 4 of the Clayton Act, 15 U.S.C. § 15, "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[3] Under Section 16 of the Clayton Act, 15 U.S.C. § 26, "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws. . . . ."

[4] Under Section 1 of the Sherman Act, 15 U.S.C. § 1, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

[5] Under Section 2 of the Sherman Act, 15 U.S.C. § 2, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . . "

- 5 -

the harm to the Sun brand, and the value of the Sun as a going concern, must be trebled by the Court as a just and reasonable estimate, which actual damages are reasonably believed to be in excess of tens of millions of dollars before trebling, and an award of attorney's fees and costs to also be trebled.

## THE PARTIES

**Plaintiff Sun**

1.      Las Vegas Sun, Inc. (the Sun), a Nevada corporation, publishes the Sun Newspaper in Clark County, Nevada. The Sun is a wholly owned subsidiary of Greenspun Media Group, LLC, which publishes various weekly magazines in Clark County, Nevada.

2.      As of April 3, 2026, the Sun was the second longest running daily newspaper in Las Vegas's history. The first edition of the Sun was published under the name, "Las Vegas Morning Sun," on July 1, 1950, by Hank Greenspun.[6] Hank Greenspun remained the Sun's editor and publisher until he passed away in 1989. Hank's son, Brian Greenspun, has been the Sun's editor since 1989 and the publisher since 2010.

3.      The Sun's distinct journalistic voice is grounded in the Newspaper's rich history. Hank Greenspun, who wrote a front-page column entitled, "Where I Stand," was known for taking on U.S. Senator Patrick McCarran and the casinos in federal court in 1952 for orchestrating an illegal group boycott of advertising in the Sun Newspaper, and for his public battles with Senator Joseph McCarthy. The Sun's record of "courageous reporting" and "forthright journalism" has garnered it numerous awards and industry recognition, including: the Pulitzer Prize for Public Service in 2009 for its reporting on construction deaths on the Las Vegas Strip; the Alfred I. duPont-Columbia University Award in 2010 for its coverage of gambling addiction; first place for the Best Editorial Page in 2018 from the Nevada Press Association, "Better Newspaper Contest"; first place in Editorial Writing, Editorial of the Year, and Sports Feature Writing for 2019 from the Nevada Press Association; and a multitude of other national, state, and regional awards.

---

[6] https://lasvegassun.com/history/timeline/, last visited March 1, 2026.

- 6 -

4. The Sun has always been considered a left-leaning editorial voice in Southern Nevada for its liberal tilting editorials and its frequent endorsement of Democratic candidates. It is known for its editorials by Brian Greenspun, the longest running metro columnist in Las Vegas history, which speak to everything from local events to observations of national politics, including challenging Donald Trump, the Review-Journal, and Adelson himself. In 2019, the Sun and its sister publications employed approximately 90 individuals in Southern Nevada.

**Defendant Las Vegas Review-Journal, Inc.**

5. Defendant Las Vegas Review-Journal, Inc. (the "Review-Journal"), is a Delaware corporation doing business in the State of Nevada. Upon information and belief, the Review-Journal is a wholly owned subsidiary of News+Media Group LLC ("News+Media"). The Review-Journal operates and publishes the Review-Journal daily print newspaper in Clark County, Nevada. The Review-Journal began as a daily newspaper publication in 1929, under the name, "Las Vegas Evening Review-Journal." It is the longest running daily newspaper in Las Vegas.

6. Today the Review-Journal is known as a right-leaning newspaper that mirrors the conservative views and personal business interests of its owners, casino magnate Sheldon Adelson and the Adelson family. The Review-Journal was the one of only two of the largest 100 newspapers in the country to endorse Donald J. Trump for President in 2016.

**Defendant News+Media Capital Group LLC**

7. Defendant News+Media Capital Group LLC ("News+Media") is a Delaware limited-liability company, doing business in the State of Nevada. News+Media acquired the Review-Journal on December 10, 2015, from New Media Investment Group Inc. for $140 million. As part of the transaction, New Media Investment Group Inc.'s subsidiary, GateHouse Media LLC ("GateHouse"), agreed to continue operating the Review-Journal under a management agreement. The management agreement ended within only six weeks after the acquisition, when the Review-Journal hired a new publisher to replace the one under the GateHouse management agreement.

8. News+Media continues to operate as the parent company to the Review-Journal, its subsidiary. Upon information and belief, News+Media does not have any employees who are not

- 7 -

also co-employed by the Review-Journal. News+Media has one member: Orchid Flower LLC, which is wholly owned by The Orchid Trust, whose Trustees are Dr. Miriam Adelson, Defendant Dumont, and Sivan Ochshorn-Dumont.

9.     News+Media is managed solely by Stephen O'Connor, who also holds all corporate positions with the Review-Journal. O'Connor is the Chief Financial Officer of Interface Group Massachusetts, which owns Defendant Interface Operations LLC dba Adfam ("Adfam"), an entity whose sole purpose is to benefit and promote the business and personal interests of the Adelson family. In his role with Adfam, Mr. O'Connor works with and directs employees under the Adfam umbrella.

**Defendant Sheldon Adelson**

10.     Defendant Sheldon Adelson (now substituted with the Estate of Defendant Sheldon Adelson), was a resident of Nevada. In 2019, Adelson was the 24th richest person in the world,[7] and the billionaire founder, chairman, and chief executive officer of the Las Vegas Sands Corporation (the "Sands"). At the time of the purchase of the Review-Journal, the Sands owned and operated luxury hotels and casinos, including the Venetian Las Vegas and The Palazzo Las Vegas, among others. Mr. Adelson, his family members and trusts, and other entities established for the benefit of Mr. Adelson and/or his family members, own[ed] approximately 56% of the Sands' outstanding common stock as of December 31, 2018. As a result, "Mr. Adelson exercise[d] significant influence over the [Sands] business policies and affairs."[8] Adelson, now through his Estate, is sued as an individual and as the alter ego of News+Media, the Review-Journal, and Adfam.

11.     Upon information and belief, Mr. Adelson, his family members and trusts, and other entities established for the benefit of Mr. Adelson and/or his family members, own News+Media and the Review-Journal. As he did with the Sands properties, Mr. Adelson exercised significant influence over the RJ's business policies and affairs, including its editorial content. For example,

---

[7] https://www.forbes.com/billionaires/#2add0a251c71, last visited Sept. 24, 2019.
[8] https://s21.q4cdn.com/635845646/files/doc_financials/2018/annual/Annual-Report-2018.pdf, at p. 27, last visited Sept. 24, 2019.

- 8 -

until his death, Mr. Adelson was secretly "co-employed" by Las Vegas Review-Journal, Inc., and News+Media as "Co-Publisher" of the Review-Journal, which afforded Mr. Adelson the unfettered right:

> to confer with and provide editorial advice and assistance) as appropriate, to the President and Publisher and other editorial employees and contributors to the Las Vegas Review-Journal (the "Newspaper") concerning the direction of the Newspaper, topics for day-to-day or investigative or other coverage by the Newspaper and, from time to time, published or unpublished information obtained or prepared in gathering, receiving or processing information for communication by the Newspaper to the public, including the sources for and reliability of the information.

For pretense only, Mr. Adelson was given a nominal annual salary of $2,000. Despite his unfettered control and authority over the Review-Journal, Mr. Adelson was never disclosed to the public on the Review-Journal's masthead or otherwise in the Newspaper.

12.    Adelson was well-known for his record-breaking donations to Republican political candidates and causes and "established himself as an influential figure in American politics with the amount of money that he has contributed."[9] Forking over $30 million, Adelson was the largest donor to Donald Trump's presidential campaign in 2016 and of the entire presidential election. Adelson gave more than $100 million to support the Republican party in the 2018 midterm elections, and in 2020 set a new donation record in a single election cycle, giving $172.7 million. Adelson's surviving family continued his donor legacy by donating over $100 million to a pro-Trump Super PAC in 2024, a top political donation.[10]

**Defendant Patrick Dumont**

13.    Defendant Patrick Dumont, an individual, is a resident of Nevada and is an officer and owner of Defendant News+Media. He is also an employee of both the Review-Journal and News+Media, and, upon information and belief, the Deputy Publisher of the Review-Journal.

---

[9] https://www.theguardian.com/us-news/2018/jun/08/sheldon-adelson-trump-middle-east-policy, last visited Sept. 24, 2019.
[10] https://www.politico.com/live-updates/2024/10/15/2024-elections-live-coverage-updates-analysis/miriam-adelson-donations-trump-super-pac-00183805, last visited Feb. 27, 2026.

- 9 -

Dumont, a trustee of The Orchid Trust (the entity that ultimately owns News+Media), speaks as the primary voice for all trustees on issues related to the Review-Journal. The former executive vice president and Chief Financial Officer of the Sands, as of January 2021, Dumont became the President and Chief Operating Officer of the Sands and a member of its Board of Directors, and is currently the CEO and Chairman of its Board of Directors. Dumont is the son-in-law of Sheldon Adelson and "orchestrated" the Adelson family's purchase of the Review-Journal, under the direction of Adelson.

**Defendant Interface Operations LLC dba Adfam**

14.     Defendant Adfam is a Delaware limited liability company doing significant business in the State of Nevada (Adfam, together with Adelson, News+Media, the Review-Journal, and Dumont are referred to as the "RJ" or "Defendants").

15.     Adfam was founded by Adelson and operates as the private family office of Dr. Miriam and Sheldon G. Adelson and their family. Adfam provides professional services to support the Adelson family and members' personal and business interests, including the Review-Journal and News+Media.

16.     Mr. Adelson and his family members, including Dumont, use Adfam as a tool to exercise significant corporate, strategic, and day-to-day control over the Review-Journal.

17.     Upon information and belief, Adelson and Dumont appointed the family office's long-time Chief Financial Officer, Steven O'Connor, to serve as the only corporate officer of the Review-Journal, *i.e.*, its President, Secretary, Treasurer, and Director. Likewise, Mr. O'Connor is the sole manager of News+Media. O'Connor is not a "newspaper person," does not have any newspaper industry experience, and did not build his career in the newspaper business. He is employed strictly by the family office and does not receive compensation for services rendered for or on behalf of the Review-Journal from the Review-Journal or News+Media.

18.     Adfam shares such a unity of interest and decision-making with Defendants Review-Journal and/or News+Media, that they function as a single economic unit. In the alternative, Adfam

- 10 -

is an entity sufficiently separate and distinct as an economic unit from Defendants the Review-Journal and/or News+Media such that they operate as separate decision-makers.

**Doe Defendants**

19.    The Sun alleges that Defendants named herein as Does I through X are individuals, corporations, limited-liability companies, partnerships, associations, or other persons or entities who are responsible in some manner or capacity for the acts alleged herein, but whose names are unknown to the Sun at this time. The Sun will seek leave to amend this Complaint to include the names of Does I through X when the identities of such defendants become known to the Sun.

**JURISDICTION, VENUE, AND INTERSTATE COMMERCE**

20.    This action is brought under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26, for damages and for injunctive relief for Defendants' monopolization, attempted monopolization, and conspiracy to monopolize the relevant market of English-language local, daily print newspapers in Clark and Southern Nye Counties, Nevada, in violation of Sections 2 and 1 of the Sherman Act, 15 U.S.C. §§ 2, 1, and Nevada's Unfair Trade Practice Act, NRS Chapter 598A, and for injunctive relief to prohibit the unlawful elimination and/or acquisition of the Sun by the RJ.

21.    This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. Sections 15, 26, and 28 U.S.C. Sections 1331 and 1337. This Court has supplemental jurisdiction over the Sun's claim arising under Nevada's Unfair Trade Practice Act pursuant to 28 U.S.C. Section 1367.

22.    Defendants reside in or maintain offices, transact business, and own substantial assets in this District. Accordingly, this Court has personal jurisdiction over Defendants. Because Defendants transact business in this judicial district, venue is proper pursuant to 15 U.S.C. Sections 15, 22 and 26, and 28 U.S.C. Section 1391.

23.    Both the Review-Journal and the Sun publish substantial quantities of local, state, national, and international news. The parties both pay substantial sums for such news and for material sent to them from various parts of the United States and the rest of the world. The

- 11 -

Newspaper Bundle carries substantial quantities of national advertising sent to them from throughout the United States. In addition, purchases of materials to publish the Newspapers, including paper and ink, involve transactions in interstate or foreign commerce. Thus, Defendants' violations of the antitrust laws involve and affect interstate commerce.

## FACTUAL BACKGROUND AND HISTORY

### The Newspaper Preservation Act of 1970

24. In response to the Supreme Court's decision in *Citizen Publishing Co. v. United States*, 394 U.S. 131 (1969) (which held that a joint newspaper operating agreement that fixed prices, pooled profits under an inflexible ratio, and divided the fields of publication violated antitrust laws), Congress enacted the Newspaper Preservation Act, 15 U.S.C. §§ 1801-04 (the NPA), in 1970. In so doing, Congress determined that the public interest in preserving multiple independent editorial voices was best served by permitting joint newspaper operations in the same market. While the NPA exempts newspapers in a JOA from some provisions of the antitrust laws, it expressly excludes conduct that would otherwise be unlawful under any antitrust law if engaged in by a single entity from antitrust immunity. 15 U.S.C. § 1803(c).

### 1989 Joint Operating Agreement

25. By the late 1980s, the Sun had been operating at a substantial loss and was in probable danger of financial failure. To ensure the continued publication of two separate and independent daily newspapers in Las Vegas, in June 1989, the Sun and the Review-Journal's prior owners, Donrey of Nevada, Inc., voluntarily entered into a 50-year Joint Operating Agreement (the "1989 JOA"), to combine all non-editorial and -reportorial operations pursuant to the NPA, with the intention that the joint operation would continue until December 31, 2040 (with the possibility of renewal). *See* 1989 JOA (attached hereto as **Ex. 1**) at Prelim. Statement & § 1.2.

26. The Sun and the RJ were explicit as to the significant purpose of their combination. They expressed their firm belief that the "continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent, is of paramount

- 12 -

importance to the citizens of Las Vegas and its environs." *Id.* at Prelim. Statement. Their belief reflected Congress's purpose in enacting the NPA:

> In the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States, it is hereby declared to be the public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into because of economic distress or is hereafter effected in accordance with the provisions of this chapter.

15 U.S.C. § 1801.

27.    In further conjunction with this express public policy, the parties reiterated the importance of preserving their respective editorial and reportorial independence and autonomy as "the *essence*" of their agreement. 1989 JOA § 5.2 (emphasis added). They mandated that the parties "shall have exclusive and complete control, authority and direction" over their respective "news and editorial content, [and] features and services." *Id.* The "public interest of maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs" was so imperative, they included specific performance as an express remedy. *Id.* § 10.8.

28.    The Sun and RJ agreed that merging non-editorial and -reportorial operations under the RJ's stewardship would preserve the Sun as a distinct newspaper voice:

> The parties further believe that publication of the Sun c[ould] be carried on profitably, and its continued editorial existence and independence thereby assured, if its production, distribution and advertising functions and related non-news and non-editorial activities are conducted and performed by the Review-Journal, through a single staff of Review-Journal employees utilizing the Review-Journal's plant and equipment under a joint newspaper operating arrangement . . . , under which the Review-Journal will act on its own behalf with respect to the Las Vegas Review-Journal and on behalf of the Sun with respect to the Las Vegas Sun.

*Id.* at Prelim. Statement.

29.    The parties' combination aligned with Congress's delineation of a proper arrangement under the NPA; that is, to merge production facilities and joint operations for the: "printing; time, method, and field of publication; allocation of production facilities; distribution;

- 13 -

advertising solicitation; circulation solicitation; business department; establishment of advertising rates; [and] establishment of circulation rates and revenue distribution." 15 U.S.C. § 1802(2).

30.    The Sun consented and the RJ voluntarily agreed that the RJ would be responsible for and in control of all business aspects of the joint operation, including: "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation (1989 JOA § 5.1); acting on behalf of both Newspapers (*id.* at Prelim. Statement); printing and producing the Newspapers, using the RJ's printing plant, employees, and equipment (*id.*; *id.* §§ 4.3, 5.1); sales and distribution (*id.* § 5.1); purchasing newsprint, materials, and supplies (*id.*); soliciting, selling, and collecting on the Newspapers' advertising and circulation (*id.*; *id.* § 5.1.3); promoting and circulating the Newspapers, using the RJ's "best efforts" (*id.* §§ 5.1, 5.1.3-.4); establishing advertising and circulation rates for the Newspapers (*id.* § 5.1); paying, recording, and maintaining all expenses and revenues of the joint operation (*id.* §§ 6.1, 6.2); accounting to the Sun after the close of each fiscal year (*id.* § 6.3); and distributing the Sun's share of the joint operation's profits, derived from all advertising and circulation revenues of the Newspapers and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel. *Id.* § 6.4. "So long as [the] Sun furnish[ed] news and editorial copy, features and services to [the] Review-Journal in accordance with Article 4" (setting forth the technical specifications for publishing), the RJ "agree[d] to produce the Sun" and "include the Sun copy and features in jointly published newspapers ... and to sell all advertising for, promote and circulate such newspapers." *Id.* § 5.1. Because of the RJ's complete control over the joint operation, the Sun also had the right to inspect the Review-Journal's books and records for the joint operation's finances and profit payments. *See id.* § 10.3.

31.    For the format of the Newspapers, the RJ voluntarily agreed to produce the Sun as an afternoon newspaper and the Review-Journal as a morning newspaper Monday through Friday, with the Newspapers being published in a joint edition bundle on weekends, holidays, and special editions. *Id.* § 4.4 &. App'x A.2. Section 4.4, governing the "Jointly Published Newspapers," provides, in pertinent part:

- 14 -

> Sun shall furnish editorial copy, features and comics to permit the Review-Journal to include them within jointly published newspapers, which shall be Sundays, Saturdays, holidays, other special editions and total market coverage editions. The Sun portion of jointly published newspapers shall be in accordance with Appendix A hereto.

*Id.* According to Appendix A.2(a), the RJ was required to allocate the Sun at least 85% of the newshole that the RJ publishes on a monthly basis. *Id.* Subsection A.2(b) governing the Sunday joint editions requires that the Sun contain "a separate section of three (3) open pages (one cover page, one editorial page and one op. ed. page), plus four hundred fifty (450) column inches" and also requires that the Sun be placed within the first four sections of the Newspaper Bundle. *Id.* Subsection A.2(c) governing the Saturday and holiday joint edition provides that the Sun is "entitled to one editorial or op. ed. page and one comic page." *Id.*

32. Section 4.4 further specifies the appearance of the jointly published Newspapers, providing,

> All components of jointly published newspapers shall bear the Review-Journal's headdress, typeface and style. The front-page logo of all jointly published newspapers shall read "Las Vegas REVIEW-JOURNAL and SUN," and all folios shall similarly refer to both Newspapers, except for editorial and other pages described in Appendix A as being for the use of only one newspaper, which pages shall bear only the name of such newspaper. The Review-Journal shall provide all of the news content of jointly published newspapers, except for stories and features included on those pages described in Appendix A as being only for the use of the Sun.

*Id.* The RJ had "the right to print conspicuous notices in jointly published newspapers to the effect that the news content of the non-Sun portion of the newspaper, including locally produced supplements, is produced by Review-Journal personnel." *Id.*

33. Regarding their profit sharing from the joint operation, the parties agreed that the RJ would receive 90% and the Sun would receive 10%. *Id.* § 6.4 & App'x D.

34. The Sun also received an allocation for its news and editorial expenses in the amount of 65% of the Review-Journal's news and editorial expense allocation, "subject to a minimum of

- 15 -

Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) per fiscal year, . . . ." *Id.* at App'x A § A.1.

35.    With respect to each Newspaper's promotional activities expenses, "the Review-Journal shall establish for each fiscal year after the Effective Date a budget for promotional activities of the Review-Journal and the Sun and at least forty percent (40%) of each total budget shall be allocated to the Sun." *Id.* at App'x A § A.3.

36.    As a result of their combination and "[t]o enable Review-Journal to perform its functions" as manager and controller of the joint operation, the Sun was required to dispose of or relinquish its equipment (including its printing press), supplies (including its newsprint, newsracks, and production film), contracts (including for circulation, supplies, and advertising), and all other non-editorial and -reportorial infrastructure that would allow the Sun to publish and distribute its Newspaper independently. *Id.* at Art. 3. The Sun therefore became entirely dependent on the RJ for the Sun's continued printing, distribution, and operation. As such, the Sun relied on the RJ to use its best efforts in managing and controlling the joint operation, for the benefit of both Newspapers. *Id.* §§ 5.1.3, 5.1.8, § 5.3.

37.    Section 8.2 of the 1989 JOA contemplates a joint edition publication on a daily basis, including when publication and distribution of two separate newspapers is infeasible. It provides as follows:

> Neither party shall be liable to the other for any failure or delay in performance under this Agreement, occasioned by war, riot, government action, act of God or public enemy, damage to or destruction of facilities, strike, labor dispute, failure of suppliers or workers, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform, provided that in the event partial performance under this Agreement is feasible, notwithstanding the occurrence of one or more of the foregoing, <u>performance shall be allocated between the newspapers by the Review-Journal</u>, in its sole judgment, and if it is feasible to publish only one newspaper product, <u>Review-Journal shall exercise its best efforts to produce a jointly published newspaper</u> in which the Sun portion shall be determined by Review-Journal, notwithstanding the provisions of Appendix A hereto, provided, that the Sun portion shall not be less than two (2) pages.

(Emphasis added.) The 1989 JOA empowers the RJ to publish and distribute a joint edition of the

- 16 -

Newspapers if it deems that publication of only one newspaper is feasible, which the RJ has stated to be the case in repeated pleadings in this case and before the Ninth Circuit.

38.    As additional consideration for their combination, and in exchange for the ability to remain in publication until at least December 31, 2040, the Sun was required to assign a percentage of all dividends and distributions of CCTV stock to the RJ. *Id.* § 10.5. The value of this assignment to the RJ from the Sun was, as of 1990, $25 million.

39.    Upon termination of the 1989 JOA, the RJ was required to provide the Sun with all subscriber lists and contracts, among other things:

> Upon termination of this Agreement, Review-Journal shall take appropriate action to transfer to Sun: (a) all then current circulation contracts, agreements or lists concerning bulk sales, subscriptions, dealers and sub-dealers, distributions, deliveries, sales returns and prepaid subscriptions of the Sun's daily newspaper, and f all jointly published newspapers, plus all pertinent portions of then current records and data pertaining thereto, and all sums received by Review-Journal in respect of prepaid subscriptions and cash deposits relating to daily Sun circulations, and a pro rata portion of all sums received by Review-Journal in respect of such subscriptions and deposits relating to the jointly published newspaper circulation, and (b) all then current advertising contracts and all pertinent portions of then current records and data relating to advertising to be published in the Sun and in all jointly published newspapers. Review-Journal shall further provide Sun with the originals and all copies of all contracts relating solely to circulation and advertising of the daily Sun, and copies of all other contracts referred to in the immediately preceding sentence."

*Id.* § 9.2

40.    The 1989 JOA was binding upon and inured to the benefit of the parties and their successors and assigns. *Id.* § 10.9. The RJ admitted that it was the "ultimate successor in interest of DR Partners" in its state court pleading, that "LVRJ's predecessor(s) and LV Sun entered into a joint operating arrangement in 1989" in its Answer in this case. ECF No. 978 ¶ 1. In Paragraph 1 of the "Nature of the Action" section of its Counterclaims, filed as Doc. 296 in January 2021 and repeated verbatim in Doc. 978 in April 2024, the RJ stated "the Las Vegas Review-Journal's current owners purchased the newspaper and succeeded to the joint operating arrangement ('JOA') between the Review-Journal and the Las Vegas Sun."

- 17 -

41.    The parties sought to avail themselves of the limited antitrust exemption for their combined operations offered by the NPA, and thus agreed "to pursue diligently the filing of the application for approval of th[e 1989 JOA] to the Department of Justice and to use their best efforts to take all action necessary to obtain such written consent as expeditiously as possible within the procedures set forth in applicable regulations of the Department of Justice." *Id.* § 1.1.

42.    Upon execution of the 1989 JOA, they jointly applied for Attorney General approval pursuant to Section 1803(b), governing agreements "not already in effect." 15 U.S.C. § 1803(b).

43.    The parties followed the NPA's Regulations' application procedures. They provided the required documents to the DOJ and published notice of their application in their Newspapers.

44.    The DOJ published the parties' application in the Federal Register, and thoroughly investigated the 1989 JOA and the parties' separate businesses. It issued civil investigative demands, conducted interviews, and received public comment.

45.    The purpose of the DOJ's investigation was to determine whether the 1989 JOA met the requirements of 15 U.S.C. Section 1083(b), *i.e.*, "(1) that at least one of the participating newspapers is a 'failing newspaper,' and (2) that approval of the arrangement would 'effectuate the policy and purpose' of the [NPA]."

46.    The DOJ found that the Sun's losses were "genuine" and satisfied the "failing newspaper test." In determining if the arrangement served the purpose of the NPA, the DOJ examined whether, under the 1989 JOA, "as a practical matter, the failing newspaper will remain capable of maintaining independent reporting and editorial activities after the JOA goes into effect."

47.    The DOJ concluded that the 1989 JOA provided the Sun "sufficient operating guarantees" "to enable it to continue to provide an independent reportorial and editorial voice in the Las Vegas community," despite that the RJ would be "responsible for and have ultimate decision-making authority with respect to advertising and circulation rates, printing functions, managerial services, and all other functions of both newspapers except for news and editorial functions."

- 18 -

48. Because the RJ could not unilaterally revise or reduce the Sun, and could not interfere with the Sun's editorial and reportorial autonomy (among other Sun protections), and the arrangement afforded the Sun additional protections, the DOJ found that the 1989 JOA "[w]as designed to allow the parties to continue to produce separate and independent editorial products, thereby effectuating the purpose of the [NPA]," further expressly recognizing the parties' "joint edition" publication "on Saturday, Sunday and holidays."

49. Since the 1989 JOA satisfied the two requirements of Section 1803(b), the DOJ recommended the Attorney General approve it.

50. The Attorney General adopted the DOJ's recommendation and granted its written approval of the 1989 JOA. In doing so, the Attorney General restated that the "proposed JOA is intended to combine the business operations of the two newspapers, while preserving the newspapers' editorial and reportorial independence." It noted the parties' "joint edition on Saturdays, Sundays, and holidays," and focused on the parties' intent and agreed-upon undertakings to: "combine the business operations" (with the Review-Journal bearing responsibility for "the management, printing, and other commercial functions of the newspapers"); share the profits from the joint operation 90/10; and "preserv[e] their respective editorial and reportorial independence," further maintaining separate staff, editors, and reporters. After concluding that the Sun was a "failing newspaper," the Attorney General agreed that the 1989 JOA would effectuate the policy and purpose of the NPA by "preserv[ing] the Sun in operation . . . as a second editorial voice." The Attorney General entered its written opinion of approval without an evidentiary hearing.

51. The Attorney General concluded that the Sun was a "failing newspaper" and that approval of the 1989 JOA would effectuate the policy and purpose of the NPA by "preserv[ing] the Sun in operation . . . as a second editorial voice." The Attorney General approved the 1989 JOA without an evidentiary hearing.

52. The RJ agreed in its state court counterclaim that "as a result of the [1989] JOA, the Sun became profitable." And the parties operated under that framework for 16 years, with the Sun's continued dependence on the joint operation and the RJ's control and management thereof.

- 19 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

**The 2005 Amended and Restated Joint Operating Agreement**

53.    In 2005, the Sun remained without infrastructure to independently print, publish, or distribute its Newspaper. The Sun was facing economic pressure and the RJ sought to amend the 1989 JOA. The Newspapers entered into the Amended and Restated [Joint Operating] Agreement (the "2005 JOA," attached hereto as **Ex. 2**) on June 10, 2005.

54.    Based on existing caselaw throughout the country and over 30 years of the DOJ's, NPA lawyers', and JOA newspapers' practice, both parties believed that the 2005 JOA would be valid and enforceable upon submission of the amendment to, and absent an enforcement action by, the DOJ.

55.    Thus, to maintain the immunity afforded by their original combination, and at the advice of the parties' counsel (who were NPA and former DOJ antitrust lawyers), the Sun and RJ agreed to continue their original combination in all material respects, which were the focus of the DOJ and Attorney General's approval 15 years prior. The parties tracked the 1989 JOA as closely as possible. *Compare* 1989 JOA *with* 2005 JOA. **Because the extent of the elements of the Attorney General approved-1989 JOA that remained in place and today is so voluminous, the Sun has attached a Comparison Chart to this amended complaint, the Chart and contents of which are incorporated by reference as though fully set forth herein**. *See* Comparison Chart (attached as Ex. 3 hereto).

56.    The 2005 JOA followed the same numbering and headings, and restated identical or substantively identical provisions from the 1989 JOA in the 2005 JOA. *Id.* Importantly, it incorporated by reference specific provisions of the 1989 JOA. *Id.* In fact, Appendix D of the 2005 JOA expressly cross referenced and necessitated reliance on various provisions of the 1989 JOA for calculating EBITDA. *Id.* The parties anchored the 2005 EBITDA calculation to a profit and loss statement under the 1989 JOA formula. *Id.* It stated where certain provisions were "Intentionally omitted." *Id.*

57.    And the RJ remained in complete control over, and continued bearing all responsibility for, the non-editorial and -reportorial aspects of the joint operation and the Sun.

- 20 -

58.     Under the 2005 JOA, the parties voluntarily continued the 50-year term of the 1989 JOA, intending their joint operation to run to December 31, 2040 (with the possibility of renewal). 2005 JOA § 1.2.

59.     As they agreed in 1989, the parties reaffirmed their commitment to the public interest in remaining editorially independent, as required by the NPA and the Attorney General, repeating the importance of preserving their respective editorial and reportorial independence and autonomy, stating, "Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the *essence* of this restated agreement." 2005 JOA § 5.2 ("News and Editorial Autonomy"). They again mandated that the parties "shall have exclusive and complete control, authority and direction" over their respective "news and editorial content, [and] features and services." *Id.* They reiterated that, "[b]ecause of the public interest in maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs," specific performance was an available remedy. *Id.* § 10.8.

60.     The parties' ongoing combination remained in alignment with Congress' specifications of a proper arrangement under the NPA, *i.e.*, undertaking joint operations for the: "printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; [and] establishment of circulation rates and revenue distribution." 15 U.S.C. § 1802(2).

61.     Operating under the same material framework approved by the Attorney General in 1989, the RJ would still be responsible for and in control of all business aspects of the joint operation, including: "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation (2005 JOA § 5.1); acting on behalf of both Newspapers (*see generally* 2005 JOA); printing and producing the Newspapers, using the RJ's printing plant, employees, and equipment (*id.* §§ 4.3, 5.1); sales and distribution (*id.* § 5.1); purchasing newsprint, materials, and supplies (*id.* § 4.3); soliciting, selling, and collecting on the Newspapers' advertising and circulation (*id.* §§ 5.1, 5.1.3); promoting and circulating the Newspapers, using "commercially reasonable efforts to maximize the circulation of the

- 21 -

Newspapers" and the same efforts to "promote the Newspapers" (*id.* §§ 5.1, 5.1.3-.4); establishing advertising and circulation rates for the Newspapers (*id.* § 5.1); paying, recording, and maintaining all expenses of the joint operation (*id.* at App'x D); accounting to the Sun after the close of each fiscal year (*id.*); and distributing the Sun's share of the joint operation's profits, derived from all advertising and circulation revenues of the Newspapers, and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel. *Id*. Just as they agreed in 1989, "[s]o long as the Sun furnish[ed] news and editorial copy, features and services to the Review-Journal in accordance with Article 4" (setting for the technical specifications for publishing), the RJ would "produce the Sun" and "include the Sun copy and to sell all advertising  for, promote and circulate such newspapers." *Id.* § 5.1. Because of the RJ's continued control over the joint operation, the Sun retained rights to examine (and also audit) the Review-Journal's books and records. *Id.* at App'x D.

62. These material provisions existed in the Attorney General-approved 1989 JOA and ran continuously and without interruption throughout the parties' relationship.

63. In order to further reduce the joint operation's production and distribution costs, the parties elected to print and distribute the Newspapers on a daily basis in a joint edition like they had been doing for nearly 15 years on weekends, holidays, and special editions (the Newspaper Bundle). *Id.* at App'x A.2-.4. And, like before, the Newspaper Bundle included the Sun as a separately branded newspaper within the sections of the Review-Journal and continued to feature both the Sun and Review-Journal on the front page. *Id.* § 5.1.

64. To maintain visibility of the Sun and promote its branding in the Newspaper Bundle, and as slight modification to the joint edition front page "Las Vegas REVIEW-JOURNAL and SUN" logo under the 1989 JOA, the RJ voluntarily agreed to publish a box above the Review-Journal's nameplate containing a "noticeable mention" with the Sun's logo and a headline promoting the Sun's lead story (the "Sun Box"). *Id.* at App'x A.2-.4.

65. The parties agreed as follows:

- 22 -

The Monday-Sunday editions of the Review-Journal shall include a noticeable mention of the Sun, on the front page of the Review-Journal. The noticeable mention will appear in a box above the Review-Journal's masthead (the "Sun Box") and shall be in the form shown on Appendix B. The Sun Box shall not be smaller in proportion than shown in Appendix B. The Sun Box shall also include the Sun's masthead, and any emblem that is part of the Sun's masthead. The Sun Box shall include a promotion of a story in the Sun and refer readers to the Sun inside. The type face, editorial artwork, font, and editorial promotional content appearing in the Sun Box shall be determined by Sun, in its sole discretion. Any color in the Sun Box shall be restricted to constituent colors used by the Review-Journal on its front page. The Sun Box shall be the left-hand box unless it would be obscured by a spaeda fold, in which case the Sun Box shall be the right-hand box. In the event of major breaking news or for exigent production circumstances, the Sun Box may be moved below the Review-Journal's masthead. The Sun, on average, will receive as much editorial color as the local news section of the Review-Journal.

*Id.* at App'x A.2(d). The RJ had physical control over publishing the Sun Box along with the rest of the Newspaper Bundle.

66.    The RJ also remained in control of promoting the Sun in other respects, as it had since 1989. The RJ similarly agreed as it did in 1989 to use its "best efforts" to promote and circulate the Sun, the RJ agreed to market and promote the Sun using commercially reasonable efforts to maximize the circulation of both Newspapers. *Id.* § 5.1.4. The RJ agreed to include the Sun in equal prominence to the Review-Journal in the RJ's promotional material and activities:

5.1.4 Promotional Activities. Review-Journal shall use commercially reasonable efforts to promote the Newspapers. Any promotion of the Review-Journal as an advertising medium or to advance circulation shall include mention of equal prominence for the Sun. Either the Review-Journal or Sun may undertake additional promotional activities for their respective newspaper at their own expense. For all promotional activities for the Newspapers paid for by the Review-Journal, the Review-Journal shall be responsible for all promotional copy preparation and placement, provided however, that the Sun shall have the right to approve all promotional copy for the Sun that does not generically and concurrently promote both Newspapers.

- 23 -

*Id.* This ensured that Sun's brand remained as visible and robust as the Review-Journal's—the same commitment from the 1989 JOA.

67.    In similar vein, to account for the new electronic replica edition created after 1989, and controlled by the RJ, the RJ also voluntarily agreed that the Sun would be a part of the electronic replica edition of the Newspapers distributed to consumers. The 2005 JOA, in part, provides:

> Review-Journal shall have the exclusive right and obligation to distribute the Sun through electronic replica technology (i.e. technology customarily used by metropolitan daily newspapers which transmits an entire Sun page to the subscriber or consumer in any form) to the same extent the Review-Journal distributes its own pages by such means provided.

*Id.* § 10.6.

68.    The Sun and the RJ further intended that each would "bear their own respective editorial costs," and "maintain a staff of news and editorial employees." *Id.* §§ 4.2, 4.1.

69.    As before, the parties continued sharing in the joint operation's profits. They agreed that the "Sun shall receive an annual profits payment" that shall be paid monthly in advance of the first day of each month during the term of the agreement. The amount of subsequent Annual Profits Payments would fluctuate in direct correlation with the amount of the joint operation EBITDA. These payments are the only source of revenue for the Sun's newsroom. Similar to the 90/10 split under the 1989 JOA, the Sun's profit share for each year under the 2005 JOA formula approximated 9.87 percent of the previous year's reported joint operation EBITDA.

70.    Between 2005 and 2015, the Annual Profits Payments to the Sun had been as much as $12 million per year, and never less than $1.3 million per year.

71.    Moreover, if the RJ determined that "the Sun's continued placement in the Review-Journal has a material and substantial negative financial impact on the revenue and profit of the Newspapers it may deliver the Sun separately from the Review-Journal but at the same time, place, and manner as the Review-Journal" with 15 days' notice of the RJ's intent to change the manner in

- 24 -

which the RJ publishes the Sun. The RJ agreed that the Sun could arbitrate the RJ's notice, at which time the arbitrator's decision would be limited to determining whether the Sun's inclusion in the Newspaper Bundle had a material and substantial negative financial impact. *Id.* at App'x A.5. "[O]nly the following factors shall be considered[ in making that determination:] advertiser abandonment of the Newspapers specifically due to the Sun's inclusion within the Review-Journal or subscriber cancellations of the Newspapers specifically due to the Sun's inclusion within the Review-Journal." *Id.*

72.     Similar to the 1989 JOA, the parties intended that upon termination of the 2005 JOA "by expiration of its term or otherwise, the Review-Journal shall provide the Sun with a complete list (including all contact information) of current newspaper subscribers and advertisers." *Id.* § 9.3.

73.     Having agreed to the terms of the 2005 JOA, and having already received Attorney General consent for their combination under the 1989 JOA, the Sun and the RJ followed all procedures and practices confirmed by existing caselaw, the DOJ, NPA lawyers, and JOA newspapers, to ensure that their joint operation under the 2005 JOA was valid, lawful, and enforceable.

74.     Accordingly, as their 2005 JOA was an amendment to their previously approved, post-1970 JOA, the Sun and the RJ "agree[d] to file the Restated Agreement" with the DOJ. *Id.* § 1.1.

75.     Had the parties known or believed that they were required obtain Attorney General consent under the NPA for their amendment, they would have applied for that consent in accordance with the DOJ Regulations like they had with the 1989 JOA.

76.     The RJ again covenanted "to use [its] best efforts and take all action necessary to effect the intent of this Restated Agreement" in this process. *Id*. It reaffirmed the same obligation when "agree[ing] to take all corporate action necessary *to carry out and effectuate the intent, purposes* and provisions of th[e] Restated Agreement, and to cooperate with the [Sun] in every reasonable way that will promote *the successful **and lawful** operation* under this Restated Agreement for both parties." *Id.* § 5.3 (emphasis added). The RJ was to bear all fees and costs of

- 25 -

post-submission proceedings connected to "seeking any required approval by the Department of Justice" from and after the filing of the 2005 JOA. *Id.* § 1.1.

77.     The parties also included a contingency provision in the 2005 JOA (not limited in time) to ensure that their joint operation would sustain to 2040 as originally approved by the Attorney General in the 1989 JOA:

> In the event of any action by the United States Department of Justice after the filing of the Restated Agreement which, in the sole opinion of either party hinders, impairs, seeks to halt or otherwise materially impacts this Restated Agreement, then either party may declare the Restated Agreement null and void, and the 1989 Agreement between the parties shall be reinstituted and remain in full force and effect.

*Id.* (emphasis added).

78.     On June 15, 2005, the parties submitted the 2005 JOA to the DOJ for review and investigation. The DOJ accepted the filing and thoroughly investigated the amendment. Like before, the DOJ focused on whether the 2005 JOA preserved the Sun's as a separate and independent editorial and reportorial voice in the community. The RJ represented to the DOJ that the RJ could not unilaterally terminate the 2005 JOA and that the Sun had exclusive control over its content.

79.     The DOJ closed its investigation without an enforcement action. It explained that only the ancillary conduct "***not integral*** to the parties' ***revised*** arrangements for the ***joint distribution of the Review-Journal and the Sun***, the effects of which we reviewed as part of our investigation—remain[ed] subject to antitrust scrutiny." (Emphasis added.)

80.     Based on the existing law and practice, the parties understood that this "no action letter" confirmed that the DOJ was not bringing an enforcement action and allowed the parties to operate under the 2005 JOA. No one believed the DOJ's letter hindered or otherwise impaired the joint operation.

81.     For nearly 15 years, the parties believed that the 2005 JOA was lawful and enforceable under the NPA. They, along with the rest of the country, believed that they followed the proper procedures under the NPA.

- 26 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

APP26

82.    However, at the behest of the RJ, on August 5, 2025, the Ninth Circuit entered its Opinion diverging from half a century of caselaw, DOJ Regulations, and practice. After the parties had been operating under and relying on the 2005 JOA for 20 years, the Ninth Circuit concluded that the 2005 JOA was unenforceable under Section 1803(b) of the NPA due to lack of Attorney General approval. *See Las Vegas Sun v. Adelson*, 147 F.4th 1103 (9th Cir. 2025).

83.    On remand, the Sun filed an *Emergency* Motion for Temporary Restraining Order and Preliminary Injunction, seeking preliminary relief to enjoin the RJ from ceasing to print and distribute the Sun, and compelling the RJ to comply with the valid and governing 1989 JOA, and to seek Attorney General approval of the 2005 JOA. The RJ opposed the Sun's *Emergency* Motion, refusing to undertake any action other than eliminating the Sun from the market.

84.    On March 12, 2026, this Court entered preliminary relief in the form of enjoining the RJ from ceasing to print and distribute the Sun, from which the RJ sought mandamus relief from the Ninth Circuit. This Court set an evidentiary hearing on the Sun's *Emergency* Motion for April 10, 2026.

85.    The RJ filed a Petition for Writ of Mandamus to vacate the Court's March 12 Order, and sought a stay of all proceedings pending a decision from the Ninth Circuit, including vacating the Court's April 10 evidentiary hearing. This Court granted the RJ's request.

86.    On March 30, 2026, the Ninth Circuit granted the RJ Petition and held that the relief which enjoined the RJ from ceasing to print and distribute the Sun based on the "core" of the 2005 JOA did not comport with the Ninth Circuit's Opinion. The Ninth Circuit expressly offered no direction or impediment to an injunction tied the 1989 JOA, reiterating, "[W]e do not have before us any issue concerning reversion to the 1989 JOA, and we express no views on any such questions."

87.    With the Sun's initial *Emergency* Motion seeking mandatory injunctive relief still pending, and this Court's previous findings that the Sun satisfied its burden in establishing a likelihood of success and irreparable harm, that the balance of hardships sharply tips in the Sun's favor, and the public interest is served by enjoining the RJ from ceasing to print and distribute the

- 27 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

APP27

Sun, on the morning of March 31, the Sun filed its Renewed *Emergency* Motion for Temporary Restraining Order and Preliminary Injunction, seeing to enjoin the RJ from ceasing to print and distribute the Sun under the 1989 JOA.

88.     On April 2, 2026, the Court vacated its March 12 Order, directing the parties to appear at a status conference to address the various pending motions at 1:00 p.m. the following day.

89.     On the morning of April 3, 2026, the RJ ceased printing and distributing the Sun. For the first time in 76 years, readers could not read the Sun Newspaper.

90.     That same morning, the RJ published an editorial titled, "Why we've stopped printing the Sun." The RJ falsely claimed, among other things, that:

- the Review-Journal has "prevaile[d] decisively" in this litigation and there is no joint operating agreement, ignoring the district court's prior rulings establishing the contrary which remain undisturbed following the RJ's appeals, the continued vitality of the Sun's antitrust claims regardless of the enforceability of the 2005 JOA, and the validity and enforceability of the 1989 JOA, which remains "in full force and effect" by operation of law and the parties' express intention;

- the RJ is "no longer printing the Sun because the courts have twice declared it would be unlawful for us to continue doing so";

- the RJ's printing and distribution of the Sun under the combined arrangement was at the "Review-Journal's cost" and that the Review-Journal was "foot[ing] the bill"— where the costs of the Sun, included in the Newspaper Bundle, were a *joint operation* expense and the RJ, through its share in the joint operation, was receiving revenues from subscribers to both Newspapers, including Sun readers;

- "[t]he Sun wanted the court to force the continuation of the partnership for 14 more years, until 2040. No more," which ignores that the express terms of the 1989 JOA (and the 2005 JOA) provided the RJ do so;

- the "Sun remains free to produce and print a newspaper on its own," intentionally neglecting that the Sun relinquishing all subscriber lists, contracts, and

- 28 -

infrastructure that would allow it to independently print and distribute its Newspaper in 1989 in order "[t]o enable Review-Journal to perform its functions" as manager and controller of the joint operation, and refusing to acknowledge the high barriers to entry into the market;

- the Sun's alleged product market is "laughable" despite that this Court has found that the Sun has presented not only triable issues but also a substantial likelihood of success on the Newspaper Market as alleged by the Sun.

91.     The same day the RJ ceased printing and distributing the Sun, and the same day it published its false editorial, the Review-Journal's subscription webpage misrepresented that subscribers would be receiving the Sun Newspaper. Up through April 3, 2026, all subscribers had subscribed to receive both the RJ and the Sun Newspapers.

92.     After the RJ obtained the Sun's subscriber list in 1989, and after benefiting from the joint operation for decades wherein the Sun contributed to building the subscription base of the Newspaper Bundle, on April 3, 2026, the RJ argued in open court that it would not provide the Sun with the subscriber list, going as far as asserting that it would be illegal for it to do so.

93.     As a result of the RJ's ceasing to print and distribute the Sun, coupled with the RJ's false and malignant editorial, consumers have voiced the harm they are suffering as a result of the RJ's elimination of the Sun's diverse newspaper voice.

### NATURE OF TRADE AND COMMERCE

### Relevant Product Market

94.     English-language, local, daily print newspapers are recognized by the industry, courts, the DOJ, and the public as a separate economic entity. Newspapers have peculiar characteristics and uses, comprising of a unique bundle of characteristics that readers value, not possessed by other media. They supply readers with a mix of national, state, and local news, sports information, commentary, and opinion, among other features like local event calendars, movie and television listings, classified and commercial advertisements, legal notices, comics, syndicated columns, and obituaries. Newspapers offer content in a timely manner and in a convenient, portable,

- 29 -

hardcopy format, allowing the reader to read the news, advertisements, and other information at his/her own convenience without the need to use an electronic device to access content. Local newspapers are able to offer news stories with more in-depth coverage than the news reported by radio or television, and they cover a wider array of topics of interest to local readers—not just breaking news and major news stories of the day. Newspapers are also inexpensive, meaning there are virtually no socio-economic barriers for citizens to have access to news and information about their community, including those who are unable to afford internet services. Additionally, they have unique production facilities in that they are created, placed in a template, and printed by a newspaper printing press, which is distinct from other types of media. Newspapers are platforms that serve multiple, distinct sets of customers, including older readers, and advertisers, which have been recognized by both economists and courts. Newspapers are priced distinctly when compared to other media, particularly in that newspapers have a price and many other news media are free. They have specialized vendors in the form of their home delivery network. Most readers of local, daily print newspapers in Clark and Southern portions of Nye Counties do not consider weekly newspapers, radio news, television news, internet news, or any other media to be adequate substitutes for the only two local daily newspapers serving Las Vegas and the surrounding areas. There is a low cross-elasticity between the Newspapers and other media products.

95.    Thus, English-language, local, daily print newspapers are a distinct relevant product market and line of commerce within the meaning of Section 2 of the Sherman Act and Section 7 of the Clayton Act.

**Relevant Geographic Market**

96.    From 2005 to April 2, 2026, the Sun and the Review-Journal were produced, published, and distributed to readers in or near Clark County, and Southern portions of Nye County, Nevada (together, "Clark County"). Both Newspapers provided news relating to Clark County, in addition to state, national, and international news. These two organizations gathered Clark County news to include in their print Newspapers as well as their associated news websites. As of April 3,

- 30 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26                                                                    APP30

2026, the Review-Journal continues to produce, publish and distribute to readers in Clark County, excluding the Sun entirely.

97.    English-language, local, daily print newspapers that are not produced, published, and distributed in Clark County do not regularly provide local news specific to that county. Local, daily print newspapers from outside of Clark County do not have any significant circulation or sales inside Clark County. Thus, English-language, local, daily print newspapers serving areas outside of Clark County are not acceptable substitutes for the Sun and the Review-Journal.

98.    Accordingly, Clark County, Nevada, is the relevant geographic market and section of the country for antitrust purposes under Sections 2 and 1 of the Sherman Act. This relevant geographic market, together with the relevant product market defined above, is referred to as the "Newspaper Market."

**Market Power**

99.    Until April 3, 2026, the Newspapers have been published and distributed under the framework of their original combination and their continued practice under the 2005 JOA since 1989. By virtue of the parties' original combination approved by the Attorney General in 1989, the Review-Journal and the Sun together account for 100% of the daily print newspaper circulation in the Newspaper Market today. As of September 2019, the Newspaper Bundle that included the Review-Journal and the Sun had a paid circulation for Sunday of 86,593 and an average daily (non-Sunday) paid circulation of 67,514. Since 1989, the Sun was and continues to remain operationally and economically dependent on the joint operation, which is exclusively controlled by the RJ. 1989 JOA § 5.1; 2005 JOA § 5.1. The Sun has neither printing facilities nor a newspaper distribution network, among other assets and infrastructure necessary to operate a newspaper. Permanently terminating the joint operation would immediately destroy the Sun because of the large startup costs and inability to reach a financially viable scale, among other barriers to entry as alleged below.

100.    The RJ has had exclusive and unilateral control over the prices charged by the RJ and its sole competitor (the Sun) spanning back to 1989. 1989 JOA § 5.1; 2005 JOA § 5.1. The Sun has no ability to set prices, and no control over subscription sales and circulation.

- 31 -

101. In the past, the RJ has substantially raised the price of the Newspaper Bundle but has seen little effect on circulation levels, and those large price increases were profitable for the RJ.

102. The RJ also has the ability to exercise direct control over the Sun's output, and exercises direct control over the Sun's payments. In addition to controlling overall pricing and marketing of the Newspaper Bundle and the relative promotion of the RJ and Sun (all of which affects the Newspaper Bundle's sales and thus the Sun's output), the RJ controls the number of pages available to the Sun for news and editorial content (*i.e.*, the size of the Sun's newshole). The Sun would need the RJ's permission and agreement to expand its output per issue. 2005 JOA § 4.3, App'x A.2. As of April 3, 2026, the RJ has exercised direct control over the Sun's output by refusing to print and distribute the Sun entirely.

103. Furthermore, the RJ possesses high market share, much greater than 50 percent, by all applicable measures including readership, newshole, newsroom staff, division of joint operation profits, and capacity. The RJ now has 100 percent market share in all aspects having excluded the Sun from the Newspaper Bundle and from any other method of printing and distribution.

104. The RJ controls inputs (*e.g.*, suitable printing facilities and a home-delivery distribution network) essential to the production of daily print newspapers in Clark County. These inputs could not be replicated by a new entrant, including the Sun on an independent basis, in the Newspaper Market on commercially viable terms because it would have difficulty reaching efficient scale or density.

105. As of April 3, 2026, the RJ has exclusive market power in the Newspaper Market, where the Sun has been excluded from the Newspaper Market entirely.

**Barriers to Entry**

106. Entry into the Newspaper Market is not timely, likely, or sufficient to prevent harm to competition that would result from the Sun's elimination from the market.

107. English-language, local, daily print newspapers possess large economies of scale, incurring significant fixed costs, including building or gaining access to a printing facility,

- 32 -

establishing a distribution network, hiring reporters and editors, news gathering, and marketing the newspaper, among others, that present barriers to entry.

108. By way of example, printing presses for daily newspapers can cost more than $100 million. Any new local, daily print newspaper would require a massive printing facility, typically over 150,000 square feet, to house and store newsprint, that includes a sufficiently large loading dock capable of taking 1-ton rolls of newsprint in and feeding out thousands of printed newspapers to be distributed. There is no printing facility in the Clark County market that can efficiently and effectively print a local, daily print newspaper for a timely and reasonable distribution other than the facilities owned and controlled by the RJ.

109. By way of further example, establishment of a highly efficient distribution operation capable of circulating a newspaper across Clark County immediately after printing is complete and the corresponding need to develop a network of drivers to support home delivery presents another barrier to entry in the market.

110. More generally, the capital investments required, lack of access to established distribution channels, limited market resources (consumers and advertising), constraints on consumer willingness to pay, workforce requirements, economic advantages of incumbent competitors (economies of scale and marginal costs), and competitive advantages of incumbent competitors (quality, reputation, market knowledge, and contracts) are significant barriers to entry into the Newspaper Market.

111. No local, daily print newspaper has attempted to enter the Clark County market since the Las Vegas Valley Times (the "Valley Times") in 1975 when it converted from a weekly newspaper to a daily. The Valley Times was a small, community paper, with a maximum circulation of 10,000. That paper, which closed in 1984, was sold only in racks and never competed in a meaningful way against the Sun or the Review-Journal. The Sun is the last successful new entrant into the Newspaper Market since 1950.

112. Further, expansion of local, daily print newspapers in areas adjacent to Clark County is not timely, likely, or sufficient to prevent the harm to competition resulting from the threatened

- 33 -

elimination of the Sun from the market. There are no English-language, local, daily print newspapers adjacent to Clark County. The nearest English-language, local, daily print newspapers are hundreds of miles away and do not regularly provide local news specific to Clark County. Expanding into Clark County would require local, daily print newspapers in areas hundreds of miles away to expand their coverage of local news specific to Clark County, to attract local advertisers who target readers in those counties, and to expand their distribution into those counties.

## DEFENDANTS' EXCLUSIONARY CONDUCT AND ANTICOMPETITIVE SCHEME

113.    Before the RJ acquired the Review-Journal and became the "ultimate successor in interest" to the Review-Journal's original owner, Donrey of Nevada, Inc., it undertook extensive due diligence for the purchase, where the then-owner informed the Adelson family and its team of newspaper industry consultants and operators about the 2005 JOA and the Review-Journal's obligations thereunder. The Sun and the Review-Journal had been operating under the 2005 JOA for 10 years at that point, and all believed it was the valid and enforceable, governing agreement between them. Even then, the Adelson family and their due diligence team started looking for ways to terminate it. No one contended the 2005 JOA was unenforceable. And at no time during these deliberations was there any discussion among the due diligence team and the Adelson family about how to comply with the terms of the JOA. All discussions centered on ending the Sun and the joint operation from the very first pre-acquisition meetings. The Adelson's goal was to monopolize the Newspaper Market, which the RJ acknowledged would allow them to "dominate this market to an extent no other medium can match literally down to every household."

114.    In the RJ's filings with this court, as well as with Ninth Circuit, the RJ complained that continuing the obligation to print and distribute the Sun in accordance with the terms of the 1989 JOA would require it to print a newspaper whose editorial viewpoints were adversarial to the Adelson family's interests. These admissions complete a full circle with the statements contained in the RJ's due diligence documents in which the Adelsons' due diligence team expressed the desire to silence the Sun's editorial voice. The RJ's refusal to continue publishing the Sun is the

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26                    **APP34**

culminating act of an anticompetitive campaign whose goal was identified before the Adelson's acquisition of the RJ was even completed.

115.  Dumont and Adelson agreed to purchase the Review-Journal, which was inspired, in part, by their belief that the Review-Journal was a significant opportunity to influence public perception and achieve a monopoly position in the Newspaper Market. Defendants Adelson and Dumont wanted a newspaper in their hometown that reflected their conservative political views, that took favorable stances on their "passion topics" (*i.e.*, opposing the legalization of marijuana, attacking competitors of the Sands, advancing specific state legislation and amendments to the Nevada Constitution to benefit their companies, applying pressure to judges overseeing cases involving Adelson, and highlighting the Adelson family's involvement with the Oakland Raiders' planned move to Las Vegas and the Sands' convention business competitors), and that printed coverage biased in their favor of any ongoing court proceedings in which Adelson may be involved. Unlike most people, Adelson was in a financial position to buy the sympathetic press coverage he craved by acquiring a paper over which he could have complete and unfettered editorial control. To that end, Adelson, his family, and Defendants, acquired the Review-Journal on December 10, 2015.

116.  Despite advice to the contrary from retained industry experts and consultants, at first, Adelson and Dumont attempted to conceal the Adelson family's interest in the Review-Journal by naming an unknown and unqualified figurehead to lead the RJ, Michael Schroeder, so that Adelson could manipulate the content of the Review-Journal without people realizing it was being controlled. Soon after the deal closed, reporters at the newly acquired Review-Journal broke the story of his ownership. In response, the Adelson family released a statement acknowledging their new stake in the paper:

> Today we are proud to announce that the Adelson family has purchased the Review-Journal through a wholly owned fund both as a financial investment as well as an investment in the future of the Las Vegas community.

117.  One of Adelson's first actions, even before the purchase transaction closed, exerted control over the Review-Journal by ordering RJ reporters to be stationed in the courtroom of Nevada

- 35 -

District Judge Elizabeth Gonzalez. Judge Gonzalez was presiding over a high-profile wrongful termination case in which Adelson was a defendant and had issued rulings unfavorable to Adelson. Adelson's objective was to intimidate Judge Gonzalez by seating reporters in her courtroom all day long to search for dirt.

118.    Prior to the announcement of the sale, Adelson and Dumont directed Michael Schroeder to use one of Schroeder's Connecticut newspapers and write and publish an article condemning Judge Gonzalez's record, which also contained plagiarized material and fabricated quotes. Schroeder did so under the pen name Edward Clarkin. As one 20-year journalist who worked for Schroeder announced during his departure from Schroeder's newspaper, Schroeder had funneled "a terrible, plagiarized piece of garbage about the court system" into the paper, and had "used the pages of my newspaper, secretly, to further the political agenda of his master out in Las Vegas." Dumont was the point person for Schroeder's disparaging article, with Adelson weighing in. Dumont reviewed, approved, and applauded drafts sent to him by Schroeder, and, upon information and belief, reported his impressions of the article to Adelson, who was similarly pleased when the article was published.

119.    As soon as Adelson and Defendants took over the Review-Journal, and even earlier, Adelson began taking an active role in its editorial voice by weighing in on the Review-Journal's coverage in advance of its publication, holding almost daily teleconferences with then-publisher Jason Taylor. They directed Adfam lawyers to draft secret employment agreements with nominal salaries for Adelson and all trustees of The Orchid Trust (Dumont, Sivan Ochshorn-Dumont, and Dr. Miriam Adelson)—the parent of Orchid Flower LLC—under the façade of legitimacy all while guaranteeing they each had unrestrained, and undisclosed, control over the Review-Journal.

120.    Even after the Adelson family was forced to disclose their ownership interests in the Review-Journal, Adelson and Dumont continued to conceal the extent of their influence over the editorial content and operations of the Newspaper. The Review-Journal discloses in each print publication its publishers and other key employees, but it has never disclosed Adelson's or Dumont's roles as Co-Publisher or Deputy Publisher, respectively. Likewise, it has never disclosed

- 36 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

APP36

Dr. Miriam Adelson's, Sivan Ochshorn-Dumont's, or Adfam's or its employees' key roles in the Review-Journal either.

121.    But just one thing, or one newspaper, stood between the Adelson family and their vision of the Review-Journal as their mouthpiece and sole editorial voice in the Las Vegas area—the Sun. The parties' original combination, and continued practice under the 2005 JOA, envisioned the continued existence and the RJ's printing and distribution of two distinct editorial voices, including when packaged in a joint edition/Newspaper Bundle, for readers in the community. The Sun often expresses attitudes that are contrary to Adelson's, and when necessary, features pieces that take direct aim at Adelson himself. On one occasion, Adelson showed Taylor a liberal column written by Brian Greenspun, and suggested that he did not want to include the Sun.

122.    During negotiations for the purchase of the Review-Journal, Dumont led the due diligence team using Adfam's services, employees, and consultants, on behalf of and in collaboration with Adelson.

123.    Along with Adfam's Chief Accounting Officer and other Adfam employees, Adfam retained several consultants to conduct due diligence on behalf of the Adelson family. Adfam's General Counsel advised the Adelson family on strategies regarding the parties' combination and practices under the 2005 JOA, and the Review-Journal's business performance, employment, salary information, and commercial agreements, and provided analysis and assessment of this information and the overall strengths and weaknesses of the Review-Journal. The due-diligence consultants, along with Adfam employees, including Adfam's General Counsel and Chief Accounting Officer, reported to Dumont. Upon information and belief, Adfam's lawyers ultimately determined the corporate structure of the RJ entities, including the relationship between Defendants and Orchid Flower LLC (the sole member of News+Media). After the purchase was consummated, Adfam remained, and still remains today, intimately involved with the business of the Review-Journal, including overseeing, advising on, and participating in the control of the Review-Journal's accounting and operations.

- 37 -

124. To maximize their influence and power in the Newspaper Market, Adelson and Dumont sought to eliminate the Sun. Believing that the 2005 JOA was valid and enforceable, before the purchase transaction closed, the RJ orchestrated and implemented a multi-faceted anticompetitive scheme to eliminate the RJ's sole competitor—the Sun—and to monopolize, attempt to monopolize, and conspire to monopolize the Newspaper Market. For its strategy, the RJ would abuse its management of and complete control over the joint operation, and therefore the Sun, by manipulating the 2005 JOA framework under which the parties had been operating for the last decade to reduce competition, harm the Sun, and harm consumers.

125. From the inception of the due diligence process, both Dumont and Adelson began exploring ways to end the joint operation, including by theorizing termination of the 2005 JOA to do so, or acquiring the Sun to eliminate the combination. In meetings held before and after Defendants' acquisition of the Review-Journal, Adelson, and his son-in law, Patrick Dumont, asked Taylor how they could get out of the JOA with the Sun, whether the Sun had to exist at all, and how they could either buy Greenspun out or get rid of the Sun. During one such meeting, Adelson asked what would happen to the Sun if there was no joint operation profit, and in other meetings continued to hypothesize about what would happen to the Sun if the RJ squeezed the Sun out of the market by eliminating its profits payments from the joint operation.

126. These discussions launched Defendants' exclusionary and anticompetitive scheme further, whereby the RJ used its power over the joint operation and the Sun—harnessed since 1989—to manipulate the framework under which both parties believed was valid and enforceable to: (1) fail to maximize the joint operation's profits to drive the joint operation into a loss and eliminate the Sun's profits; (2) abuse the RJ's control over the joint operation accounting to further reduce and eliminate the Sun's profit payments; (3) reduce the Sun's visibility and consumers' knowledge of the Sun; and (4) threatening unilateral termination of the joint operation and complete exclusion of the Sun from the Newspaper Market through pretextual, sham litigation (together, "Anticompetitive Conduct").

- 38 -

**The RJ has Wielded Its Control Over the Joint Operation, and Failed to Maximize the Joint Operation's Profits**

127.    Both newspaper owners in a JOA traditionally have strong economic interests in the success of the joint operation and the combined financial results.

128.    Since 1989, the RJ committed to the Sun—and the DOJ—that it would control and manage the joint operation in furtherance of the NPA and preservation of the Sun's competing editorial voice.

129.    This commitment included using its "best efforts" or, at minimum "commercially reasonable efforts," to maximize the Newspapers' circulation, and agreeing to take all reasonable measures to promote the successful operation of the Newspapers for the benefit of both parties. 1989 JOA §§ 5.1.3, 5.1.8, 5.3; 2005 JOA §§ 5.1.3, 5.1.4, 5.3. This commitment originated in the 1989 JOA and continued through the course of the RJ's control over all non-editorial and -reportorial functions of the joint operation, and the Sun.

130.    Especially in a declining market, newspapers have an increased incentive to generate even incremental profits.

131.    However, the RJ has used its power and control over the joint operation to exploit its dominant position and fail to maximize the joint operation's profits by failing to undertake commercially reasonable efforts to: reduce the costs of (and refrain from charging disallowed expenses to) the joint operation; and raise the revenues of the joint operation.

132.    As one method of the RJ's failure to maximize the joint operation's profits, it unreasonably rejected revenue and expense initiatives set out by the Review-Journal's then-publisher Jason Taylor; instead, the RJ removed and replaced Taylor with a publisher who would accomplish the RJ's plan to drive the joint operation EBITDA into the ground and eliminate the Sun.

133.    Taylor, publisher of the Review-Journal from July 2015 to January 2016, was brought in initially by the Review-Journal's prior owner, GateHouse, to turn around declining

- 39 -

trends at the Review-Journal. Taylor is known in the industry as having success in generating revenue and being a powerful force, and he has won countless industry awards and honors.

134.    Soon after Taylor's arrival, he began implementing a strategic plan to reverse the Review-Journal's—and consequently, the joint operation's—declining trends by reducing unnecessary costs, increasing revenue through improved advertising sales and circulation, increasing the RJ's visibility, and modernizing its brands, among other things. Taylor's plan began to see improved financial performance almost immediately.

135.    In a meeting with Greenspun before Defendants' acquisition of the Review-Journal, Taylor projected that the joint operation would have a financially strong close for fiscal year-end 2016, and that, based on trend, the Sun's profit payments could increase by more than 18% in 2017. Under Taylor's plan, the joint operation profits in 2016-2017 were projected to be substantial. Taylor's projections were consistent with the RJ's valuation obtained during its purchase of the Review-Journal from a third-party valuation firm. The RJ heavily lobbied for Taylor to remain as publisher after the Adelson family's purchase, which Taylor did.

136.    Taylor was also vocal about the value of the Sun and desired to strengthen the partnership between the Newspapers.

137.    As Review-Journal publisher, Taylor also discovered that the Review-Journal's former owner, Stephens Media Group, had been dishonest in calculating the profit payments pursuant to the 2005 JOA—which all believed was valid and enforceable under long-standing law and practice, and under which the parties had been operating for over a decade—and concluded payments were due and owing to the Sun. Because Taylor believed it was important to resolve any outstanding profit payment issues with the Sun in order to successfully implement his strategic plan for the Review-Journal, he raised the issue with Adelson on several occasions. But no resolution ever came.

138.    Even though Dumont was involved in interviewing Taylor and Adelson had lobbied for Taylor to stay on as publisher of the Review-Journal after its acquisition, six weeks later, Taylor

- 40 -

was removed from the Review-Journal because Adelson and Dumont wanted someone who was more in line with their vision and control.

139. Consistent with journalistic practices, Taylor had been determined to insulate the newsroom from direct Adelson influence.

140. In Taylor's place, Defendants hired Craig Moon as the new publisher of the Review-Journal in January 2016. Thereafter, the RJ did not follow Taylor's commercially reasonable strategic plan, or any other commercially reasonable strategy. The RJ not only diverged from implementing Taylor's or any other reasonable expense initiatives, but, as company revenue was decreasing, the RJ also unreasonably increased the joint operation's expenses. Naturally, the revenue that was trending upward under Taylor quickly evaporated after his departure.

141. At the close of the fiscal year March 31, 2016—buoyed by Taylor's performance the prior year—the JOA still reported a profit, though much smaller than Taylor had projected. Under Moon's tenure, the RJ's fortunes quickly began to deteriorate. Moon executed on Defendants' strategy to financially starve the Sun and to force it out of business.

142. A meeting was held on or about January 25, 2017, to preview financial results for the end of the fiscal year, in which Moon, Robert Cauthorn (the Sun's COO), Greenspun, and Adelson's newspaper consultant Frank Vega were in attendance. At that meeting, the Sun was informed that its Annual Profits Payments were expected to significantly decrease as a result of poor performance of the joint operation, and that the RJ did not project *any* profits going forward for the joint operation. At that same meeting, Greenspun and Cauthorn were also informed that, "Patrick [Dumont] says the JOA [*i.e.*, the joint operation] will never be worth more than it is now and Brian should call Patrick to make a deal."

143. Alarmed at the situation, at the conclusion of the meeting the parties discussed the terms of a possible deal, but no offer made by Defendants was sufficient to maintain the Sun as an independent editorial voice.

144. The RJ made good on its threats to squeeze the Sun out by eliminating the joint operation profits.

- 41 -

145.    In March 2017, before the close of the fiscal year, Moon directed the RJ accounting department to write off hundreds of thousands of dollars so that when the Sun's profit payment was calculated, the payment owed to the Sun would be close to zero.

146.    Upon the close of the first full fiscal year under the Adelson family's ownership (ending March 31, 2017, a mere two months after Taylor's departure), the RJ reported a negative joint operation EBITDA for the first time in the history of the parties' combination. As the RJ intended, the Sun's profit payment for the following year was, in fact, zero.

147.    The Sun has not received a profit payment since the close of the fiscal year on March 31, 2017.

148.    Taylor was removed by the RJ as an act in furtherance of its anticompetitive plan. Because Taylor advocated ceasing the RJ's dishonest accounting practices and resolving the profit payments to the Sun, and projected Annual Profits Payments *increases* to the Sun under his new strategic plan—contrary to Adelson and the remaining Defendants' plan to starve the Sun of funds needed to operate—Taylor was removed to pave the way for another publisher, Craig Moon, who would agree to engage in exclusionary conduct to eliminate the Sun.

149.    Despite his role as President of the Review-Journal, and highlighting the charade that is his so-called leadership position, O'Connor was not involved in the removal of Taylor as publisher of the Review-Journal or the selection of Moon as Taylor's replacement. Instead, the Adelson family made the decision with no input from the supposed corporate head.

150.    As the manager, controller, and dominant party responsible for all business aspects of the joint operation, the RJ was obligated to operate it in a commercially reasonable fashion. The RJ's failure to implement the Taylor plan, or any similarly profitable plan, was commercially unreasonable.

151.    The RJ's failure to undertake commercially reasonable efforts to lower the costs and raise the revenues of the joint operation reduced and eliminated the Sun's profit payments. The RJ has failed to take all reasonable measures to promote the successful operation for the benefit of both

- 42 -

Newspapers and abused its power to drive the joint operation into a loss, in turn, threatening the Sun's existence.

152.    The RJ's failure to maximize the profits of the joint operation was a part of the RJ's anticompetitive scheme to eliminate the Sun.

**The RJ, Through Its Control Over the Joint Operation, Exploited Its Power and Abused the Joint Operation Accounting to Reduce Profit Payments to the Sun**

153.    The NPA does not determine how JOA newspapers are to account for their joint operation's revenues and expenses.

154.    Rather, the NPA's standard is "the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States …." 15 U.S.C. § 1801.

155.    Consequently, how the newspapers account for joint operation expenses and revenues are determined by the parties, and are sufficient so long as the weaker newspaper has enough resources to deliver on the NPA's policy and purpose.

156.    The Sun's share of the joint operation's profits under both JOAs approximated 10 percent, which the DOJ deemed a "sufficient operating guarantee[ ]" "to enable [the Sun] to continue to provide an independent reportorial and editorial voice in the Las Vegas community."

157.    Yet, by manipulating the 2005 JOA formula the RJ agreed to (and which all thought was valid and enforceable) and weaponizing the Sun's reliance and dependence, the RJ abused its control over the joint operation accounting. The RJ knew that its exclusive power over the joint operation accounting to increase expenses, charge disallowed expenses to the joint operation, and divert joint operation revenue to the RJ's outside entity, was unbridled. Under the belief that the 2005 JOA was valid and enforceable, the RJ knew that higher operating expenses under the 2005 JOA formula would reduce the joint operation EBITDA and, consequently, lead to lower profit payments to the Sun.

158.    The RJ's plan to deprive the Sun of funds needed to operate by recording zero profit was successful by the fiscal year ending March 31, 2017. The RJ, for the first time in the history of

- 43 -

the joint operation, recorded a negative EBITDA in the amount of negative $2.25 million, constituting a negative 122.43% EBITDA change from the year prior.

159.   The RJ had increased the Review-Journal's editorial costs by almost 40 percent—over $3 million—in 2017 and charged all of the Review-Journal's editorial costs against the joint operation, even though under the 2005 JOA the parties had agreed to "bear their own respective editorial costs."

160.   For perspective, the Review-Journal's editorial costs in 2017 were over 30 percent more than the Review-Journal's editorial costs in 2005, when the RJ was calculating the joint operation EBITDA under the 2005 JOA as far greater—$121.56 million. The RJ continued to charge the Review-Journal's editorial costs against the joint operation and did so even after the 2019 arbitration judgment confirmed it legally could not. In so doing, the RJ defended its practice of charging editorial expenses to Newspapers joint operation based on its interpretation of the 2005 JOA and its validity, until it was foreclosed from using these expenses to reduce payments to the Sun, after which the RJ suddenly reversed course and began to assert that the 2005 JOA was invalid.

161.   The RJ, again under the belief that the 2005 JOA was valid and enforceable, further manipulated and abused the joint operation accounting under that framework to harm the Sun by: charging disallowed promotional expenses that did not include equal mention of the Sun, and/or that promoted the RJ's separate digital entity; charging the RJ's separate, non-JOA digital entity's expenses to the joint operation; charging other, miscellaneous disallowed expenses; removing joint operation revenue categories; and diverting joint operation revenue to the RJ's separate digital entity. Compounding these accounting abuses, the RJ systematically failed to maintain separate books and records for the joint operation, conflating the joint operation accounting with its separate accounting (which included the RJ's separate digital entity), even after the arbitrator criticized the RJ's practices in 2019. The RJ concealed this conduct by blocking the Sun's attempts to review the RJ's books and records.

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

162.     The RJ has systematically failed to maintain separate books and records for the joint operation, conflating the joint operation accounting with its separate accounting, which included the RJ's separate digital entity.

163.     Each of the RJ's abuses under the accounting formula that both parties believed governed their joint operation, and on which the Sun relied, overstate the costs attributable, and understate the revenues attributed to the joint operation, thereby suppressing the joint operation EBITDA and reducing the Sun's profit payments. The RJ's conduct was in furtherance of its unlawful plan to put the Sun out of business and to extinguish its distinct and independent newspaper editorial voice in Clark County.

### The RJ has Exploited Its Control Over the Sun's Promotions, and has Suppressed Promotion of the Sun, Which Further Reduced the Payments to the Sun

164.     The RJ has been responsible for and in control of promoting the Sun since 1989. 1989 JOA §§ 5.1, 5.1.3, 5.1.4; 2005 JOA § 5.1.4. The RJ has always been required to use, at minimum, commercially reasonable efforts in doing so. 1989 JOA § 5.1.3; 2005 JOA § 5.1.4. The Sun, like all weaker newspapers in a JOA, has a long-term interest in ensuring that its voice is preserved, a key part of which is how the Sun's separate brand and content are promoted. If the RJ were honoring the joint operation and the intent of the NPA, the RJ would share in that interest, too. Ensuring that both Newspapers are healthy benefits the joint operation by expanding consumer awareness of the diverse editorial voices, bolstering joint operation revenue.

165.     Promotion of the Sun bolsters the Sun's appearance and its ability to communicate with consumers and potential readers about its Newspaper. It also raises awareness of the Sun in the market. In turn, promotion of the Sun enhances its value and brand.

166.     Yet again, the RJ has exploited its control over the Sun's promotions and brand visibility by taking actions that undermine the Sun's ability to communicate with consumers about the nature and value of its Newspaper and brand, in turn reducing people's awareness of the Sun's presence and content. The RJ's anticompetitive promotional abuses involve its (1) failure to promote the Sun in equal prominence with the RJ, (2) destroying the Sun Box and diminishing the

- 45 -

Sun's presence on the front page of the Newspaper Bundle, and (3) omitting the Sun from the electronic replica edition of the Newspaper Bundle.

167. The RJ voluntarily agreed to mention the Sun in "equal prominence" with the Review-Journal in any promotion of the Review-Journal as an advertising medium or to advance circulation to ensure the Sun's brand remained as robust as the Review-Journal's.

168. Nearly all promotion for a newspaper is either to promote it as an advertising medium or to advance circulation.

169. The RJ's exclusionary tactics include marketing and promoting the Review-Journal in various advertising mediums without any mention of the Sun, or displaying the Sun's logo disproportionately to the Review-Journal's. Then, compounding the effect of these failures to promote the Sun, the RJ charged these separate expenses against the joint operation, further reducing the Sun's payments.

170. Virtually none of the RJ's promotional efforts include mention of the Sun in equal prominence, and nearly all omit the Sun entirely. The RJ's exclusion of the Sun in equal prominence from promotion is a change, distinguishable from the past practices of the Review-Journal pre-Adelson purchase.

171. Practically all external RJ advertising—including sponsorships, billboards, banners, displays, other signage, events, house ads and circulars, bills and renewal notices, television and radio advertising, and trade and barter agreements—omit the Sun entirely.

172. When the Sun challenged the RJ to produce examples of promotional activities that mention the Sun in equal prominence, Defendants could not do so.

173. Defendants admit that they have excluded the Sun from their advertising initiatives. Below is one example of an RJ advertisement that makes no mention of the Sun:

/ / /

/ / /

/ / /

/ / /

- 46 -

 

174.    In the less than 1 percent of times the RJ did mention the Sun, it displayed the Sun's logo disproportionately to the Review-Journal's. The RJ's exclusion of the Sun in equal prominence from the Review-Journal's promotions is a change from past practices pre-Adelson family purchase.

175.    Exerting its control over the physical printing of the Newspaper Bundle, the RJ also diminished the Sun's noticeable mention on the front page of the Newspaper Bundle. The Sun's noticeable mention, *i.e.*, the Sun Box, communicated the Sun to consumers to advance their knowledge of the Sun and its brand.

176.    In 2017, shortly after promising no further profit payments to the Sun and attempting to coerce the Sun into selling, the RJ abruptly informed the Sun that it was unilaterally changing the format of the front page of the Newspaper Bundle. The Sun was without recourse.

- 47 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

APP47

177. Two days later, the RJ commenced publishing a new front-page design that eliminated the Sun Box entirely and deviated from the parties' longstanding practice of printing the Sun's noticeable mention in the specified Sun Box format for the preceding 12 years.

178. Upon information and belief, Dumont was a key decision-maker in the RJ's redesign and approved the redesign on behalf of the Adelson family.

179. An example of the Sun Box on the Review-Journal front page from March 31, 2017, before the changes were unilaterally made by the RJ, is shown below:



180. An example of the unilaterally redesigned noticeable mention of the Sun on the Review-Journal front page from April 2, 2017, after the changes were unilaterally made by the RJ and the new design was rolled out, is shown below:



- 48 -

181. By destroying the Sun Box, the RJ also ensured that when a "spadea fold" (an advertising element covering approximately 40% of the left side of the page) was published, the Sun's RJ-designed banner would be covered. The parties had always intended that the Sun Box move to the right side when a spadea is present, ensuring the Sun is always visible. That is no longer the case.

182. Compounding the harm to the Sun's visibility, the RJ placed advertising stickers on top of the Sun's logo and mentions on the front page of the Newspaper Bundle, obscuring the Sun's message and making it less visible and accessible to readers. It did so with strategic intent: in both the 2016 and 2018 elections, the Sun's announcements of political endorsements were covered by advertising stickers placed by the RJ. In the 2018 example, the Sun specifically asked the Review-Journal publisher not to cover the endorsement announcements. He refused and the Sun's endorsements were covered on the front page.

183. The RJ continued to publish the unauthorized front-page design over the Sun's repeated objections.

184. In addition, the RJ voluntarily exercised its control over publishing and distributing the electronic replica edition of the Newspapers and removed the Sun from it. *See* 2005 § 10.6. Both parties agree that the electronic replica edition constitutes a meaningful percentage of the Newspapers' circulation and is mostly used in educational environments to communicate with younger readers. It is one of the Sun's promotional strategies to advance these readers' knowledge of the Sun and its brand. The RJ had a longstanding practice (13 years) of including the Sun in the electronic replica edition of the Newspapers.

185. However, on or about January 25, 2018, the RJ stopped including the Sun in the electronic replica edition of the Newspapers.

186. On or about May 3, 2019, Keith Moyer, the Review-Journal's current publisher and editor, telephoned Mr. Cauthorn, COO for the Sun, stating the RJ restored the Sun in the replica edition that day. Mr. Moyer further stated that he had looked into the removal and stated it was "kind of a unilateral decision by Craig Moon. He said, 'just take it out.'"

- 49 -

187. The RJ only restored the Sun in the electronic replica edition on May 3, 2019, amidst the parties' 2019 arbitration.

188. The electronic replica edition constitutes a meaningful percentage of Review-Journal circulation and is mostly used in educational environments; hence, the RJ deprived the Sun of an opportunity to reach new young readers to allow its voice to be introduced to future readers, reducing the Sun's visibility.

189. Defendants have not used commercially reasonable efforts to promote the Sun. They continue to refuse to use commercially reasonable efforts to promote the Sun, and continue to wrongly charge the RJ's unilateral promotional activities against the joint operation. The RJ's various actions harmed the Sun's ability to communicate with consumers about the nature and value of its Newspaper and brand, reducing people's awareness of the Sun's presence and content, and harming the Sun's brand and value.

190. As of April 3, 2026, the RJ has eliminated all efforts to promote the Sun, omitting the Sun from all print and distribution. What was previously the Newspaper Bundle now features only the RJ:



191. RJ has also prevented the Sun from accessing the list of subscribers to the Newspapers and otherwise contacting its subscribers.

- 50 -

192.    These are overt acts in furtherance of Defendants' plan to eliminate and their actual elimination of the Sun to monopolize the Newspaper Market.

**Defendants Blocked the Sun from Examining the Review-Journal's Books and Records, Concealing the Extent of the RJ's Anticompetitive Conduct in Furtherance of the RJ's Plan to Eliminate the Sun**

193.    As a result of the RJ's complete control over all business functions of the joint operation, the Sun is entitled to inspect the RJ's books and records. This had been the longstanding practice of the parties prior to Adelson's purchase. The Sun has always been entitled to inspect the RJ's books and records, both under Section 10.3 of the 1989 JOA and under Appendix D of the 2005 JOA.

194.    On May 12, 2016, the Sun notified the RJ of the Sun's intent to examine and audit the Review-Journal's books and records to verify the RJ's Annual Profits Payment calculation, and ensure that Defendants had not illegally redirected revenues from or charged expenses to the joint operation.

195.    The Sun forwarded its initial list of documentation, and Defendants rejected the Sun's request in late July 2016.

196.    Following the RJ's objection, the Sun attempted to informally negotiate with Defendants to obtain documents from the Review-Journal, party-to-party.

197.    Unable to reach an agreement, on September 5, 2017, the Sun renewed its formal audit request, expressly appointing its chosen law firm auditor to examine and audit the books and records of the Review-Journal, under the practice the RJ voluntarily agreed to. The RJ rejected the request on the grounds that it "far exceed[ed] the limited audit provisions" of the 2005 JOA (which the RJ believed to be valid at that time), even though all requested material had been available in prior audits when other ownership was in charge. The RJ's refusal was a deviation from the parties' longstanding practice.

198.    Instead, the RJ agreed to gather relevant, albeit very limited, information for production in due course. The RJ changed its position on November 16, 2017, and again disputed

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

the validity of the Sun's audit. On November 28, 2017, the RJ changed course again when it agreed to produce limited categories of documents requested by the Sun.

199.    After further discussions between counsel, on December 21, 2017, the RJ represented that its anticipated production would occur within the first two weeks of January 2018.

200.    The RJ never voluntarily produced the requested documents: they were provided only after the Sun filed an action in state court and the matter was compelled to arbitration, and after the Sun initiated this action.

201.    Defendants' efforts to prevent the Sun from inspecting the RJ's books and records, including through an audit, and from uncovering the truth regarding the RJ's accounting and operational abuses are acts in furtherance of Defendants' illegal plan.

**Defendants Seek to Terminate the Joint Operation, and Refusal to Comply with the 1989 JOA and Seek Approval of the 2005 JOA, to Eliminate the Sun on Made-Up and Legally Deficient Grounds in Furtherance of the RJ's Anticompetitive Conduct**

202.    Because the Sun gave up control of its assets and non-editorial and -reportorial operations as a condition of entering into the 1989 JOA, the Sun lost its ability to independently print and distribute its Newspaper and became dependent on the joint operation and the RJ. 2005 JOA at Prelim. Statement, §§ 5.1.3, 5.1.8, § 5.3; 2005 JOA at Art. 3 & §§ 3.1, 4.3, 5.1. The Sun did so based on the parties' and the DOJ's intentions that the Sun would be preserved as a second, independent Newspaper voice until at least 2040.

203.    Following Defendants' loss in the 2019 arbitration (in which they sought to *enforce* the 2005 JOA), and their efforts to starve the Sun out of existence were decelerated, the RJ moved to amend its answer and assert counterclaims in the state court action to terminate the 2005 JOA. The purpose was to eliminate the joint operation entirely, despite the RJ simultaneously admitting in its state court counterclaims that "the reality is that the two newspapers enjoyed a profitable business partnership for many years" and "the entire point of the JOA [stemming back from 1989 was] . . . to ensure that Nevada readers have access to diverse news and editorial content." (Citing the Preliminary Statement of the 1989 JOA). The grounds upon which the RJ sought to terminate the joint operation were founded on the 2005 JOA, claiming that the Sun purportedly "fails to meet

- 52 -

the JOA's required high standards of newspaper quality," breached the 2005 JOA, and force majeure. These bases were not only bogus but are also objectively baseless, unreasonable, and impermissible grounds for termination. No reasonable litigant could realistically expect success on the merits. The counterclaims are a sham meant to directly interfere with, and destroy, a competitor.

204.    During this litigation, as an alternative strategy to prematurely end the joint operation, the RJ asserted the belated claim that the 2005 JOA was unlawful and unenforceable under Section 1803(b) of the NPA for lack of written Attorney General consent.

205.    Section 1.1 of the 2005 JOA provided a mechanism to revert to operation under the 1989 JOA should either party conclude that the 2005 JOA had been materially impaired by action of the Department of Justice. The RJ sought to terminate the 2005 JOA in 2019 instead of reverting to the 1989 JOA because it maintained the monopolistic intent to exclude the Sun from the Newspaper Market. Reversion to the 1989 JOA would have required the RJ to reinstitute payments to support the Sun's editorial budget in the amount of sixty-five percent (65%) of the RJ's editorial budget. This obligation, contained in App. A.1 of the 1989 JOA, is subject to a minimum amount of $2,250,000 per fiscal year, which must also be increased annually consistent with the Consumer Price Index, which equates to a current obligation to provide the Sun with $5.7 million in annual payments for the Sun's editorial expenses. Additionally, when the RJ sought to terminate the 2005 JOA instead of reverting to the 1989 JOA, it also did not provide the Sun the option to pursue Attorney General approval of the 2005 JOA in the manner the RJ argued was necessary under the NPA, but instead pursued the litigation solely to end the RJ's obligation to publish and distribute the Sun, and thus grant the RJ a literal monopoly in the Newspaper Market.

206.    The RJ was attempting to explore ending the joint operation even before its purchase transaction for the Review-Journal closed. However, at no time during the due diligence process or in the years after (even when being counseled by same in-house Review-Journal lawyer who negotiated the 2005 JOA and received the DOJ Letter) did the RJ ever allege that the 2005 JOA was unenforceable under the NPA. To the contrary, in 2017, the RJ proposed a Second Amended JOA, wherein it reiterated that not only was it a successor-in-interest to the Review-Journal's

- 53 -

original owners under the 1989 JOA but acknowledged the original 1989 JOA as the underlying governing document, with the 2005 JOA being an amendment and restatement thereof. Section 10.14 of the RJ's June 2017 draft required that the Sun release all claims from June 17, 1989 through the Effective Date, specifically including "any claims connected with operations under the 1989 Joint Operating Agreement." The RJ included yet another contingency structure that in the event the performance under the proposed Second Amended and Restated JOA was hindered or otherwise impaired, the 2005 JOA would be reinstated and remain in full force and effect.

207. The RJ waited until after it lost in the 2019 arbitration on its interpretation of the 2005 JOA and the Sun initiated this antitrust litigation—and after the parties had been operating under the 2005 JOA for 14 years—to argue that it could cease printing and distributing the Sun, and terminate the joint operation, because the parties did not follow the correct procedure under the NPA.

208. And at no time did the RJ "use their best efforts to take all action necessary" to effectuate the intent of the 2005 JOA, including for "the successful and lawful operation" thereunder, by seeking Attorney General approval of the 2005 JOA under the NPA. Nor did the RJ accept reversion to the 1989 JOA as the parties' intentions were expressly memorialized in the 2005 JOA, which the RJ was required to do by operation of law if the 2005 JOA was unenforceable.

209. Instead, while asserting that the 2005 JOA was unlawful, the RJ simultaneously falsely claimed that the 2005 JOA effectively terminated the 1989 JOA, allowing the RJ to end the joint operation and cease printing and distributing the Sun.

210. At every step for going on seven years of litigation the RJ rejected the continued enforceability of the 1989 JOA and the lawfulness of the material aspects of their original combination that were approved by the Attorney General in 1990, with the intention that the parties' combination would continue until 2040. These material aspects, which remain in full force and effect under the 1989 framework and decades of the RJ's voluntary practice include the RJ's responsibility for and complete control over: business management of the joint operation, including "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and

- 54 -

operating" the joint operation; acting on behalf of Sun in the joint operation; printing and producing the Sun using the RJ's printing plant, employees, and equipment; the Sun's sales and distribution; purchasing newsprint, materials, and supplies for the joint operation; soliciting, selling, and collecting on the Newspapers' advertising and circulation; promoting and circulating the Sun, using commercially reasonable efforts in promoting and circulating the Sun; establishing advertising and circulation rates for the Sun; paying, recording, and maintaining all expenses of the joint operation; accounting to the Sun after the close of each fiscal year; and distributing the Sun's share of payments from the profits of the joint operation derived from all advertising and circulation revenues of the Newspapers and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel. These material components and obligations of the 1989 JOA never stopped being performed.

211.    Had the 1989 JOA actually been terminated as the RJ contends (even in contravention of the now-law of the case), the RJ would have been required to transfer to the Sun all circulation contracts and subscriber lists, advertising contracts, financial records pertaining to the joint operation, and all other records necessary for the Sun to continue independent operations. The RJ never made such transfers because the termination obligation under Section 9.2 never arose. The RJ also refused to do so in order to exclude the Sun from the Newspaper Market.

212.    Both parties cross-moved for summary judgment on the RJ's challenge to the enforceability of the 2005 JOA, and this Court granted summary judgment in the Sun's favor. In its summary judgment order, this Court concluded that the parties did not terminate the 1989 JOA and the 2005 JOA was not a novation.

213.    The RJ appealed this Court's grant of summary judgment to the Sun on the enforceability of the 2005 JOA for lack of Attorney General consent. The Ninth Circuit reversed. While it concluded that the 2005 JOA was unlawful and unenforceable strictly based on the language of Section 1803(b) alone for lack of Attorney General approval, it gave no consideration to the 1989 JOA, the RJ's continuing obligations and control over the joint operation, or the last 20 years of the parties' joint operations.

- 55 -

214. The United States Supreme Court denied the Sun's Petition for Certiorari on February 23, 2026. The Ninth Circuit issued its mandate two days later on February 25.

215. On March 30, 2026, the Ninth Circuit granted the RJ Petition and held that the relief which enjoined the RJ from ceasing to print and distribute the Sun based on the "core" of the 2005 JOA did not comport with the Ninth Circuit's Opinion. The Ninth Circuit expressly offered no direction or impediment to an injunction tied the 1989 JOA, reiterating, "[W]e do not have before us any issue concerning reversion to the 1989 JOA, and we express no views on any such questions."

216. With the Sun's initial *Emergency* Motion seeking mandatory injunctive relief still pending, and this Court's previous findings that the Sun satisfied its burden in establishing a likelihood of success and irreparable harm, that the balance of hardships sharply tips in the Sun's favor, and the public interest is served by enjoining the RJ from ceasing to print and distribute the Sun, the Sun filed an additional, on the morning of March 31, the Sun filed its Renewed *Emergency* Motion for Temporary Restraining Order and Preliminary Injunction, seeing to enjoin the RJ from ceasing to print and distribute the Sun under the 1989 JOA.

217. On April 2, 2026, the Court vacated its March 12 Order, directing the parties to appear at a status conference to address the various pending motions at 1:00 p.m. the following day.

218. On the morning of April 3, 2026, the RJ ceased printing and distributing the Sun. For the first time in 76 years, readers could not read the Sun Newspaper.

219. That same morning, the RJ published an editorial titled, "Why we've stopped printing the Sun." The RJ falsely claimed, among other things, that:

- the Review-Journal has "prevaile[d] decisively" in this litigation and there is no joint operating agreement, ignoring the continued vitality of the Sun's antitrust claims regardless of the enforceability of the 2005 JOA and the validity and enforceability of the 1989 JOA, which remains "in full force and effect" by operation of law and the parties' express intention;

- 56 -

- the RJ is "no longer printing the Sun because the courts have twice declared it would be unlawful for us to continue doing so";

- the RJ's printing and distribution of the Sun under the combined arrangement was at the "Review-Journal's cost" and that the Review-Journal was "foot[ing] the bill"— where the costs of the Sun, included in the Newspaper Bundle, were a *joint operation* expense and the RJ, through its share in the joint operation, was receiving revenues from Sun readers;

- "[t]he Sun wanted the court to force the continuation of the partnership for 14 more years, until 2040. No more," which ignores that the express terms of the 1989 JOA (and the 2005 JOA) provided the RJ do so;

- the "Sun remains free to produce and print a newspaper on its own," intentionally neglecting that the Sun relinquishing all subscriber lists, contracts, and infrastructure that would allow it to independently print and distribute its Newspaper in 1989 in order "[t]o enable Review-Journal to perform its functions" as manager and controller of the joint operation, and refusing to acknowledge the high barriers to entry into the market;

- the Sun's alleged product market is "laughable" despite that this Court has found that the Sun has presented not only triable issues but also a substantial likelihood of success on the Newspaper Market.

220.    The same day the RJ ceased printing and distributing the Sun, and the same day it published its false editorial, the Review-Journal's subscription webpage misrepresented that subscribers would be receiving the Sun Newspaper.

221.    After the RJ obtained the Sun's subscriber list in 1989, and after benefiting from the joint operation for decades wherein the Sun contributed to building the subscription base of the Newspaper Bundle, on April 3, 2026, the RJ argued in open court that it would not provide the Sun with the subscriber list, going as far as asserting that it would be illegal for it to do so.

- 57 -

222. As a result of the RJ's ceasing to print and distribute the Sun, coupled with the RJ's false and malignant editorial, consumers have voiced the harm they are suffering as a result of the RJ's elimination of the Sun's diverse newspaper voice.

223. The RJ has refused to provide the Sun with a list of subscribers, which the Sun turned over to the RJ in 1989 and which the Sun contributed to building through the Newspaper Bundle thereafter.

224. The RJ's efforts to terminate the joint operation by having the 2005 JOA declared unenforceable for lack of Attorney General approval, while refusing to seek the proper approval of the 2005 JOA and simultaneously refusing to acknowledge the enforceability of the 1989 JOA and comply with it, is anticompetitive, and it is objectively baseless, unreasonable, and impermissible grounds for termination of the joint operation, or to cease printing and distributing the Sun. The 1989 JOA, the material components of which have continued throughout the parties' relationship, and the RJ's obligations are valid and enforceable as a result of the governing 1989 JOA that the Attorney General already approved. The RJ's asserted defenses to the 1989 JOA's enforceability and its obligation to seek Attorney General approval of 2005 JOA contradict established law and this Court's prior rulings. The RJ's weaponization of the litigation process itself to create delay the Sun's preliminary and final relief to permanently eliminate the Sun from the Newspaper Market is anticompetitive.

225. No reasonable litigant could realistically expect success on the merits. The RJ's counterclaims, and leveraging of knowingly baseless legal positions to achieve through process what they cannot achieve through competition, are a sham meant to directly interfere with, and destroy, its sole competitor.

226. Each of Defendants' steps to end the joint operation and cease printing and distributing the Sun are overt acts in furtherance of their scheme to monopolize the Newspaper Market in violation of antitrust laws.

- 58 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

**ANTICOMPETITIVE EFFECTS**

227.    The Review-Journal and the Sun are the only English-language, local, daily print newspapers in Clark County. They compete editorially and reportorially, which is economic competition under antitrust laws. If the RJ's Anticompetitive Conduct is permitted to continue unchecked and/or if the RJ ends the joint operation and ceases to print and distribute the Sun, Defendants will control and monopolize 100% of the Newspaper Market. The RJ's Anticompetitive Conduct undertaken in the Newspaper Market harms competition by weakening and threatening to eliminate the Review-Journal's only competition in the market—the Sun—thereby harming consumers.

228.    There is no compelling commercial benefit under the joint operation for the RJ to attempt to end the parties' longstanding combination. The RJ's actions speak to its true motive: more than simply a commercial monopoly, it wants—and has now actually acquired—a literal monopoly in the Newspaper Market, having exclusivity on thought and expression and to end all diverse editorial viewpoints, and silence those who would disagree. This is exactly the circumstance the NPA, the parties' original combination in 1989, and their continued practices under the 2005 amendment, sought to prevent. The RJ's actions are intended to prevent anyone from naysaying the Newspaper's owner in front of the important print audience. Absent the Sun's editorial voice, the RJ has gained unrivaled powers in the Newspaper Market.

229.    The owners of the Sun and the Review-Journal have always competed vigorously against each other for readers. They do so in various ways, such as seeking to generate original news and other content of interest to readers; trying to cover local news with greater depth, breadth, and accuracy; breaking stories first; and offering the most attractive mix of news, features, and editorials to readers. This head-to-head competition between the owners of the Sun and the Review-Journal will be forever lost unless the RJ's Anticompetitive Conduct is enjoined.

230.    The RJ's Anticompetitive Conduct had the effect of reducing output (both quality and quantity) of newspapers. By way of example, as a direct result of the RJ's plan to squeeze out the Sun, the Sun had to lay off staff, including cutting back on their night staff in January 2018. The

- 59 -

practical consequence of cutting back on night staff meant that instead of sending stories over to the Review-Journal for print at 10:00 p.m., as it used to, the limited Sun staff now has to send stories to the Review-Journal for print at 4:00 p.m. Before, a story arriving at 5:00 p.m. or later might have made it to print in the Sun the next morning. Now, it appears later than it otherwise would have in print. As of April 3, 2026, the RJ has completely eliminated the Sun's output by refusing to print and distribute the Sun, including under the valid and existing 1989 JOA.

231. The RJ's termination of the parties' joint operation and refusal to acknowledge the governing 1989 JOA has eliminated the Sun from the Newspaper Market, leaving the Sun with no infrastructure or facilities within which to produce, print, and distribute its Newspaper. The RJ has also improperly deprived the Sun of the print newspaper audience it has worked to build for more than 75 years. The RJ's refusal to disclose the list of those who are subscribed to the Newspapers has compounded the Sun's exclusion from the Newspaper Market.

232. Further, the RJ's Anticompetitive Conduct threatened to decrease and has now actually decreased output. From 2015-2018, the national total circulation revenue for newspapers increased by 1.1%. During that same time period, 2015-2018, circulation revenue for the Review-Journal decreased by a whopping 16%. Without the constraining influence of the Sun, and the independent editorial voice in the Las Vegas community that readers want, circulation, and therefore output, is likely to decrease even further.

233. The RJ's Anticompetitive Conduct harms competition and is not competition on the merits.

234. The RJ's Anticompetitive Conduct has: improperly reduced and eliminated the Sun's payments and similarly weakened the Sun's ability to compete, threatened the Sun's shut down, and now actually excluded the Sun Newspaper entirely; created uncertainty that has raised the Sun's costs and weakened the Sun's investment incentives; and reduced consumers' awareness and knowledge of the Sun and its brand, harming competition by weakening and literally terminating the Sun's ability and incentive to compete. Each of these different elements of the RJ's Anticompetitive Conduct reinforce each other to harm competition.

- 60 -

235.   Readers benefit from editorial and reportorial competition between the Sun and the Review-Journal. Consumers benefit from the choice and variety that competition between the Sun and Review-Journal offers them today, as recognized by the Attorney General's approval of the parties' original combination in 1989 JOA—to preserve the Sun for the benefit of the paramount public interest in maintaining two distinct newspaper voices in Clark County.

236.   The RJ's Anticompetitive Conduct harms consumers by robbing them of the choice of an independent editorial voice in the Las Vegas area, offering them a check on and an alternative to Review-Journal coverage, and by limiting the Sun's ability to produce quality content. After the RJ announced its intention to seek termination of the 2005 JOA, end the joint operation, and cease printing and distributing the Sun, consumers loudly voiced their objections. On April 3, 2026, when the RJ excluded the Sun entirely by refusing to print and distribute the Sun, consumers objected even more vehemently, even immediately cancelling their subscriptions to the Review-Journal. Consumer complaints about the RJ's exclusion of the Sun continue to roll in on a daily basis.

237.   Further, the Sun's readers' concerns are confirmed by a study of 2008-2009 data following the ending of a joint operating agreement between the Denver Post and the Rocky Mountain News.[11] The Rocky Mountain News printed its last edition on February 27, 2009. Comparing civic engagement following the death of the JOA to other cities in the nation, the study concluded that, "eliminating a local newspaper from a community leads to less civic engagement in the immediate aftermath among the citizens of that community."

238.   Absent outside influences or monopolistic business misconduct, neither the Sun nor the Review-Journal is in danger of failing in the near future. The 1989 JOA, approved by the Attorney General, ensures continued publication of both Newspapers until December 31, 2040.

---

[11] Lee Shaker, *Dead Newspapers and Citizens' Civic Engagement,* http://leeshaker.com/wp-content/uploads/2013/01/Dead-Newspapers-and-Citizens-Civic-Engagement-Lee-Shaker-Forthcoming-in-Political-Communication.pdf, last accessed on September 20, 2019.

- 61 -

**DEFENDANTS' JOINT AND SEVERAL, AND ALTER EGO, LIABILITY**

239. Defendants Adelson, Dumont, Adfam, News+Media, and the Review-Journal, each personally, individually, and directly, knowingly engaged and participated in the Anticompetitive Conduct alleged herein.

240. Defendants have a unity of interest and at all relevant times have acted together in a coordinated activity, and collectively as a part of a single enterprise, or in the alternative as co-conspirators, in furtherance of the anticompetitive scheme.

**Defendants Adelson and Dumont**

241. Adelson and Dumont used corporate shells the Review-Journal, News+Media, and Adfam as their alter egos in committing the legal violations alleged herein. To the extent that Adfam, the Review-Journal, and News+Media are held liable for acts, actions, and violations herein, Defendants Adelson and Dumont should be held liable based on alter ego liability.

242. There is such unity of interest and ownership that the separate personalities of Defendants Adelson and Dumont cannot be separated from those of the Review-Journal, News+Media, and Adfam.

243. The Review-Journal, News+Media, and Adfam are so dominated by Defendants Adelson and Dumont that the corporate form of the Review-Journal, News+Media, and Adfam can be disregarded.

244. Specifically, as further alleged herein, one or more of the following are present, which permits personal liability against Defendants Adelson and Dumont for the acts of the Review-Journal and News+Media:

(i) the significant exercise of editorial control as alleged herein;

(ii) the absence of corporate formalities such as holding regular corporate meetings, keeping corporate minutes, election of directors, etc.—O'Connor, since being appointed to every corporate role for the Review-Journal and sole manager for News+Media in early 2016 has not noticed formal corporate meetings, nor does he keep corporate minutes;

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

(iii)    inadequate or under capitalization—Adelson family members, including Dumont, who are trustees of The Orchid Trust, have infused millions of dollars into the Review-Journal, and the trustees have approved the Review-Journal's budget to operate at a loss each year since the Adelson acquisition;

(iv)    overlap in ownership, officers, directors, and personnel—upon information and belief, all or most "employees" of News+Media are "co-employed" by the Review-Journal;

(v)    the lack of arm's-length dealing between Defendants Adelson and Dumont and the corporations—Adelson and Dumont influence, control, and direct the business of the Review-Journal and News+Media, including financial decisions and funding decisions;

(vi)    the significant influence and control over the Review-Journal, News+Media's business policies and affairs, and;

(vii)    the use of Adfam's services to benefit the Review-Journal and News+Media, which in turn, only benefits Adelson and Dumont.

245.    Similarly, as further alleged herein, one or more of the following are present which permits personal liability against Defendants Adelson and Dumont for the acts of Adfam:

(i)    significant influence and control over Adfam's policies and affairs—Adfam's sole purpose is to support and promote the Adelson family, and the family ultimately directs all of Adfam's decisions;

(ii)    the lack of arms-length dealing between Dumont and Adelson and Adfam;

(iii)    the corporate structure and purpose of Adfam, which is designed solely to benefit the affairs and finances of Adelson and Dumont and their family members;

(iv)    inadequate or undercapitalization—upon information and belief, Adfam has no business interests that are not ultimately funded or supported by the Adelson family;

(v)    the absence of corporate formalities;

(vi)    the use of corporate assets as an extension of individual assets, and;

(vii)    the admitted use of employees/personnel and Adfam services to serve Dumont and Adelson's individual business and personal interests.

- 63 -

246.    Adelson and Dumont have integrated the operations and resources of the Review-Journal, News+Media, and Adfam to achieve a common business purpose such that disregarding their individual entities is necessary to avoid an unjust result.

247.    To control the Review-Journal and News+Media, Adelson and Dumont selected a loyal Adfam employee, O'Connor, to hold every corporate role at the Review-Journal and at News+Media. Despite his leadership and supposed role as head of the Review-Journal and News+Media, O'Connor's work consists of little more than holding corporate titles. Mr. O'Connor invests very little time in the Review-Journal's business. The Review-Journal's publisher reports to the Adelsons, not to O'Connor. O'Connor is not involved in operational matters; he is not involved in the hiring or firing of key employees, including publishers; he does not make any independent decisions on behalf of either the Review-Journal or News+Media; he does not approve budgets or funding requests; he does not know basic information about the Review-Journal such as the price of a newspaper subscription or the pattern of advertising rates, and; O'Connor is not paid by either the Review-Journal or News+Media. Rather, O'Connor is merely a tool for the Adelson family, employed by the family business—to control the Review-Journal. The Adelson family makes all decisions about the Review-Journal and O'Connor views his role as information gatherer for the Adelson family to "carry out their wishes." For example, despite being the President of the Review-Journal, O'Connor executed Adelson's Employment Agreement without ever discussing the Agreement with Adelson. Instead, Adfam attorneys drafted the Employment Agreement, instructed Mr. O'Connor to sign it, and Mr. O'Connor did so at their behest.

248.    Defendant Adelson has a pattern of creating corporate forms to serve as the entity to run and manage his business interests, even though these businesses are only shell corporations that serve as his personal alter ego. It is not uncommon for Adelson to have O'Connor serve as apparent corporate head of Adelson's companies.

249.    Upon information and belief, the Review-Journal, News+Media, and Adfam would not be able to pay an eventual judgment without resort to Defendants Adelson's and Dumont's assets.

- 64 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26                                    APP64

250. Failure to disregard the Review-Journal, News+Media, and Adfam's corporate personalities and pierce the corporate veil would result in fraud or injustice.

**Defendant Adfam**

251. Adfam also acts as alter ego to the Review-Journal and News+Media.

252. The Adelson family, including Adelson and Dumont, own, either directly or through another entity, Adfam. Adfam provides services to Adelson family businesses, including the Review-Journal and its parent company, News+Media. The intimately intertwined nature of the relationship between Adfam and the Review-Journal/News+Media results in the Review-Journal/News+Media being nothing more than an instrument and/or conduit of Adfam in the pursuit of a single business venture and/or enterprise, which, in turn, benefits Adelson and Dumont. Economic unity exists between Adfam, Adelson, Dumont, News+Media, and the Review-Journal.

253. Similarly, as further alleged herein, one or more of the following are present, which permits personal liability against Adfam for the acts of the Review-Journal and News+Media:

(i) Adfam possesses and dominates control over the Review-Journal's finances, policies, and business practices, and Adfam directly and personally participated in the accounting and operational abuses alleged herein.

(ii) Adfam and the Review-Journal/News+Media share common directors, officers, and consultants/employees, and jointly benefit from transactions entered into by one another;

(iii) upon information and belief, Adfam fails to adhere to corporate formalities such as holding regular corporate meetings, keeping corporate minutes, election of directors, etc.;

(iv) inadequate or under capitalization—upon information and belief, Adelson family members have infused millions of dollars into Adfam-run or -operated businesses for their own benefit;

(v) the lack of arm's-length dealing between Adfam and the Review-Journal and News+Media—Adelson and Dumont and other Adelson family members influence, control, and direct the business of Adfam, including financial decisions and funding decisions;

- 65 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26                    **APP65**

(vi)    the significant influence and control over the Review-Journal/News+Media's business policies and affairs as alleged herein, and;

(vii)    the use of Adfam's services to benefit the Review-Journal and News+Media, which in turn, only benefits Adelson and Dumont.

254.    Critical to this case, Adfam's Chief Financial Officer lead a team that developed accounting policies and procedures for the Review-Journal, which were in contravention of the joint operation. On at least a monthly basis, Adfam received and continues to receive sensitive financial information and documents from the Review-Journal's Chief Financial Officer, publisher, and Controller, and weighs in on the Review-Journal's financial and operational decisions. Adfam also reviews, oversees, and is the intermediary communicator to Dumont, Adelson, and other involved members of the Adelson family, regarding the Review-Journal's funding requests. Adfam receives quarterly and monthly budget updates from the Review-Journal to provide to Adelson, Dumont, and other involved members of the Adelson family. Adfam's employees perform monthly control checks on the Review-Journal, including creating internal controls separate from the Review-Journal's independent accounting firm. Adfam further drafts and provides, on the Review-Journal's behalf, yearly "going concern" letters to the Review-Journal's outside auditing firm, which are approved by Dumont and executed by O'Connor, Chief Financial Officer for the Adelson family office. Upon information and belief, Adfam employees and/or owners participated in the redesign of the Newspapers' front page to reduce the Sun's visibility.

255.    Defendants established this corporate relationship to avoid liability and to promote injustice.

## FIRST CLAIM FOR RELIEF

**(Violation of Section 2 of the Sherman Act – Monopolization, 15 U.S.C. § 2)**

256.    Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

257.    The relevant market is the Newspaper Market.

- 66 -

258.    The RJ has gained and maintains monopoly power in the Newspaper Market through the parties' original combination in 1989, expressly approved by the Attorney General under the Newspaper Preservation Act of 1970. 15 U.S.C. §§ 1801-04. As of April 3, 2026, the RJ has obtained a literal monopoly in the Newspaper Market. The RJ abused and maintained such power through its Anticompetitive Conduct that is patently exclusionary, including, exploiting its powers and responsibilities over the joint operation to deprive the Sun of its sole revenue source, by reducing the visibility of the Sun to consumers, and by threatening to end and actually ending the joint operation and ceasing to print and distribute the Sun.

259.    The RJ has the power to and has actually controlled prices and excluded competition in the Newspaper Market.

260.    The RJ possessed a significantly dominant share of the Newspaper Market, and now possesses 100 percent of the share of the Newspaper Market, protected by substantial barriers to entry and expansion.

261.    The RJ has the power to exclude competition in the Newspaper Market and have used that power, including by way of its exclusionary Anticompetitive Conduct as described herein, in order to maintain and expand its monopoly power in the Newspaper Market.

262.    The RJ's willful acquisition and/or maintenance of its monopoly power is from its exclusionary Anticompetitive Conduct—conduct that weakens and has eliminated the Sun's ability to compete and is not competition on the merits.

263.    The RJ behaved as alleged herein to maintain and grow its monopoly in the Newspaper Market with the effect that competition is foreclosed, and consumer choice is gravely diminished and now eliminated in that the Sun's newspaper editorial voice in the Las Vegas community has been impaired and is now extinguished. Further, the RJ's actions have decreased output (quantity and quality) of newspapers, having excluded the Sun entirely.

264.    There is no business necessity or other pro-competitive justification for the RJ's Anticompetitive Conduct.

- 67 -

265. The Sun has been injured and will continue to be injured in its business and property as a result of the RJ's Anticompetitive Conduct, by way of the diminished value to the Sun's brand and business, and threatened permanent elimination of the Sun from the Newspaper Market. *See* 15 U.S.C. § 15.

266. By reason of this violation, the Sun is threatened with and is currently suffering irreparable harm for which damages will be inadequate to fully compensate it.

267. The Sun is entitled to preliminary and permanent injunctive relief, and declaratory relief, to prevent the RJ from persisting in its Anticompetitive Conduct to the Sun's and consumers' detriment, with such an injunction: (1) requires Defendants to cease the Anticompetitive Conduct described herein;  (2) enjoins Defendants from refusing to perform under the 1989 JOA; (3) requires Defendants to print and distribute the Sun on a daily basis under the joint edition format provided for in Section 4.4 and Appendix A.2(b) and (c) of the 1989 JOA on an interim basis pursuant to Section 8.2 until such time that the RJ determines that it is feasible to publish more than one newspaper product and that it is  able to fully perform under the 1989 JOA; (4) requires the RJ to provide the Sun with the list of subscribers to the Newspapers; (5) declares that the RJ must obtain written Attorney General approval of an amendment to the 1989 JOA, including seeking temporary approval of the amendment pursuant to 28 C.F.R. § 48.15 while the application is pending; (6) enjoins Defendants from unilaterally ending the joint operation and ceasing to print and distribute the Sun until 2040; and (7) orders the RJ to divest itself of the Newspapers' non-editorial and -reportorial business operations as required by Article 2 of the 1989 JOA by creating a separate Nevada business corporation, an agency operating as fiduciary towards the Sun, which shall separately own or lease all assets related to the operation of the RJ and causing such separate corporate entity to assume and perform all duties and obligations of the RJ. *See* 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF

**(Violation of Section 2 of the Sherman Act – Attempted Monopolization, 15 U.S.C. § 2)**

268. The Sun realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

- 68 -

269.   The relevant market is the Newspaper Market.

270.   The RJ has attempted to monopolize the Newspaper Market. The RJ has gained and maintains monopoly power in the Newspaper Market through the parties' original combination in 1989, expressly approved by the Attorney General under the Newspaper Preservation Act of 1970. The RJ has abused and maintained such power through patently exclusionary Anticompetitive Conduct, including exploiting their powers and responsibilities over the joint operation to deprive the Sun of its sole revenue source, by reducing the visibility of the Sun to consumers, and by threatening to end the joint operation and cease printing and distributing the Sun.

271.   The RJ has created a dangerous probability of success that it will achieve monopoly power in the Newspaper Market.

272.   The RJ has a specific intent to achieve monopoly power in the Newspaper Market, as alleged in the paragraphs above. Now, if its Anticompetitive Conduct is not checked, the RJ has a dangerous probability of success of monopolizing the Newspaper Market.

273.   The RJ has the power to exclude and has excluded competition in the Newspaper Market, and has used that power, including by way of its Anticompetitive Conduct in restraint of trade as described herein, in an attempt to monopolize that Newspaper Market.

274.   The RJ has behaved as alleged herein in an attempt to obtain a monopoly in the Newspaper Market with the effect that competition is foreclosed, and consumer choice is gravely diminished in that the Sun's editorial voice in the Las Vegas community has been impaired and may be eliminated altogether. Further, the RJ's Anticompetitive Conduct has and will continue to decrease output (quantity and quality) of newspapers.

275.   There is no business necessity or other pro-competitive justification for the RJ's Anticompetitive Conduct.

276.   The Sun has been injured and will continue to be injured in its business and property as a result of the RJ's Anticompetitive Conduct, by way of the diminished value to the Sun's brand and business, and threatened permanent elimination of the Sun from the Newspaper Market. *See* 15 U.S.C. § 15.

- 69 -

277.   By reason of this violation, the Sun is threatened with and is currently suffering irreparable harm for which damages will be inadequate to fully compensate it.

278.   The Sun is entitled to preliminary and permanent injunctive relief, and declaratory relief, to prevent the RJ from persisting in its Anticompetitive Conduct to the Sun's and consumers' detriment, with such an injunction: (1) requires Defendants to cease the Anticompetitive Conduct described herein;  (2) enjoins Defendants from refusing to perform under the 1989 JOA; (3) requires Defendants to print and distribute the Sun on a daily basis under the joint edition format provided for in Section 4.4 and Appendix A.2(b) and (c) of the 1989 JOA on an interim basis pursuant to Section 8.2 until such time that the RJ determines that it is feasible to publish more than one newspaper product and that it is  able to fully perform under the 1989 JOA; (4) requires the RJ to provide the Sun with the list of subscribers to the Newspapers; (5) declares that the RJ must obtain written Attorney General approval of an amendment to the 1989 JOA, including seeking temporary approval of the amendment pursuant to 28 C.F.R. § 48.15 while the application is pending; (6) enjoins Defendants from unilaterally ending the joint operation and ceasing to print and distribute the Sun until 2040; and (7) orders the RJ to divest itself of the Newspapers' non-editorial and -reportorial business operations as required by Article 2 of the 1989 JOA by creating a separate Nevada business corporation, an agency operating as fiduciary towards the Sun, which shall separately own or lease all assets related to the operation of the RJ and causing such separate corporate entity to assume and perform all duties and obligations of the RJ. *See* 15 U.S.C. § 26.

### THIRD CLAIM FOR RELIEF

### (Violation of Nevada Unfair Trade Practices Act – NRS 598A)

279.   The Sun realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

280.   The Nevada Unfair Trade Practices Act is construed in conformity with federal antitrust laws.

281.   The RJ's violation of the Nevada Unfair Trade Practices Act has caused or will cause injury to the Sun as set forth above.

- 70 -

282.    The Sun is entitled to damages for the RJ's violation of the Nevada Unfair Trade Practices Act, in an amount to be demonstrated.

283.    By reason of this violation, the Sun is threatened with and is currently suffering irreparable harm for which damages will be inadequate to fully compensate it.

284.    The Sun is entitled to preliminary and permanent injunctive relief, and declaratory relief, to prevent the RJ from persisting in its Anticompetitive Conduct to the Sun's and consumers' detriment, with such an injunction: (1) requires Defendants to cease the Anticompetitive Conduct described herein;  (2) enjoins Defendants from refusing to perform under the 1989 JOA; (3) requires Defendants to print and distribute the Sun on a daily basis under the joint edition format provided for in Section 4.4 and Appendix A.2(b) and (c) of the 1989 JOA on an interim basis pursuant to Section 8.2 until such time that the RJ determines that it is feasible to publish more than one newspaper product and that it is  able to fully perform under the 1989 JOA; (4) requires the RJ to provide the Sun with the list of subscribers to the Newspapers; (5) declares that the RJ must obtain written Attorney General approval of an amendment to the 1989 JOA, including seeking temporary approval of the amendment pursuant to 28 C.F.R. § 48.15 while the application is pending; (6) enjoins Defendants from unilaterally ending the joint operation and ceasing to print and distribute the Sun until 2040; and (7) orders the RJ to divest itself of the Newspapers' non-editorial and -reportorial business operations as required by Article 2 of the 1989 JOA by creating a separate Nevada business corporation, an agency operating as fiduciary towards the Sun, which shall separately own or lease all assets related to the operation of the RJ and causing such separate corporate entity to assume and perform all duties and obligations of the RJ.  *See* 15 U.S.C. § 26.

## FOURTH CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1)

285.    The Sun realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

286.    Defendants knowingly acted in concert in furtherance of a common scheme to eliminate the Sun and monopolize the Newspaper Market.

- 71 -

287.    These actions were undertaken as a result of agreement, both express and tacit, between and among Defendants.

288.    Defendants' Anticompetitive Conduct has produced, and if unchecked will continue to produce, significant anticompetitive effects in the Newspaper Market. Defendants' actions have increased, and if unchecked will continue to increase, the RJ's market power, which harms consumers and reduces consumer welfare.

289.    Defendants' actions constitute a conspiracy or combination in restraint of trade, which restraint is unreasonable, so inherently anticompetitive due to the predictable and pernicious anticompetitive effect and so lacking in procompetitive benefit that it is unlawful in and of itself, or its principal or only effect is anticompetitive.

290.    The Sun has been injured and will continue to be injured in its business and property as a result of the RJ's Anticompetitive Conduct, by way of the diminished value to the Sun's brand and business, and threatened permanent elimination of the Sun from the Newspaper Market. *See* 15 U.S.C. § 15.

291.    By reason of this violation, the Sun is threatened with and is currently suffering irreparable harm for which damages will be inadequate to fully compensate it.

292.    The Sun is entitled to preliminary and permanent injunctive relief, and declaratory relief, to prevent the RJ from persisting in its Anticompetitive Conduct to the Sun's and consumers' detriment, with such an injunction: (1) requires Defendants to cease the Anticompetitive Conduct described herein;  (2) enjoins Defendants from refusing to perform under the 1989 JOA; (3) requires Defendants to print and distribute the Sun on a daily basis under the joint edition format provided for in Section 4.4 and Appendix A.2(b) and (c) of the 1989 JOA on an interim basis pursuant to Section 8.2 until such time that the RJ determines that it is feasible to publish more than one newspaper product and that it is  able to fully perform under the 1989 JOA; (4) requires the RJ to provide the Sun with the list of subscribers to the Newspapers; (5) declares that the RJ must obtain written Attorney General approval of an amendment to the 1989 JOA, including seeking temporary approval of the amendment pursuant to 28 C.F.R. § 48.15 while the application is pending; (6)

- 72 -

enjoins Defendants from unilaterally ending the joint operation and ceasing to print and distribute the Sun until 2040; and (7) orders the RJ to divest itself of the Newspapers' non-editorial and -reportorial business operations as required by Article 2 of the 1989 JOA by creating a separate Nevada business corporation, an agency operating as fiduciary towards the Sun, which shall separately own or lease all assets related to the operation of the RJ and causing such separate corporate entity to assume and perform all duties and obligations of the RJ. *See* 15 U.S.C. § 26.

## **FIFTH CLAIM FOR RELIEF**

### **(Declaratory Relief)**

293.    The Sun realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

294.    Upon seeking and receiving a declaration from the Ninth Circuit that the 2005 JOA is unenforceable, the RJ has continuously and simultaneously refused to acknowledge any measure that would continue the parties' combination in any lawful way, in furtherance of the RJ's anticompetitive scheme to eliminate the Sun from the Newspaper Market. As of April 3, 2026, the RJ has ceased printing and distributing the Sun.

295.    The RJ's Anticompetitive Conduct has consistently weakened and now eliminated entirely the Sun's ability to compete in the Newspaper Market, harming competition and consumers, and causing the Sun irreparable harm in the form of injuries to its recruitment and retention efforts, and loss of readership, visibility, and goodwill, and continuation of the Sun Newspaper. The Sun is facing a present and dire risk of permanent closure of its newspaper operation for lack of infrastructure and necessary equipment and staff to print and distribute its Newspaper independently, having ceded those necessities to the RJ's control over the parties' combined business operations in 1989 with the Attorney General's blessing.

296.    The RJ has refused to recognize the current validity and enforceability of the 1989 JOA, the enforceability of which is the result of the 2005 JOA being declared unenforceable and as expressly intended by the parties, as memorialized in the 2005 JOA. The RJ has therefore created

a substantial, immediate, and real controversy between the parties as to the enforceability of the 1989 JOA and the RJ's current obligations thereunder.

297. A judicial declaration that the 1989 JOA is the present valid and enforceable agreement between the parties, to which the RJ is obligated to comply, is necessary and appropriate so that the Sun can enforce its rights and the RJ's obligations thereunder, including to have the Sun printed and distributed as a daily newspaper, among other things, pursuant to the terms of the 1989 JOA.

298. The RJ has also contended that it would be too time consuming and difficult to now perform under the 1989 JOA and print and distribute the Sun as an afternoon newspaper, despite the RJ's obligations to do so and knowing that the parties were required to operate under the 1989 JOA upon the 2005 JOA being declared unenforceable by the Ninth Circuit pursuant to the RJ's request. The RJ has further refused to print and distribute the Sun in the joint edition format on a daily basis as an interim measure, as provided for in the 1989 JOA. Here, government action has rendered printing and distributing two separate newspapers at two different times presently infeasible, as printing and establishing a distribution network (among other things) for the Sun as an afternoon newspaper will take time to ramp up for the parties to accomplish full performance under the 1989 JOA.

299. The RJ has therefore created a substantial, immediate, and real controversy between the parties as to the Sun's rights and the RJ's obligations to print and distribute the Sun in the interim period while reverting to the 1989 JOA.

300. A judicial declaration that the RJ is required to print and distribute the Sun on a daily basis under the joint edition format provided for in Section 4.4 and Appendix A.2(b) and (c) of the 1989 JOA on an interim basis pursuant to Section 8.2 until such time that the RJ determines that it is feasible to publish more than one newspaper product and that it is able to fully perform under the 1989 JOA.

301. Despite the parties' express intentions that their operations under the 2005 JOA would be lawful and their independent promise to obtain the requisite DOJ approval therefor, the

- 74 -

RJ has refused to obtain Attorney General approval of the 2005 JOA after requesting and receiving a declaration from the Ninth Circuit that such approval is required for the 2005 JOA to be lawful. The RJ has further refused to seek temporary approval of the 2005 JOA pursuant to 28 C.F.R. § 48.15 while the application is pending.

302. The RJ has therefore created a substantial, immediate, and real controversy between the parties as to the RJ's independent obligations to "use [its] best efforts and take all action necessary to effect the intent of this Restated Agreement" before the DOJ to perform lawfully thereunder, which included seeking the requisite approval from the Attorney General.

303. A judicial declaration that the RJ must obtain written Attorney General approval of the any JOA amendment, including seeking temporary approval of the the amendment pursuant to 28 C.F.R. § 48.15 while the application is pending is necessary.

304. While the RJ has ceased printing and distributing the Sun, on April 3, 2026, the RJ refused to provide the Sun with the list of subscribers to the Newspapers, and all circulation contracts, sales returns, and prepaid subscriptions to the Newspapers, prohibiting the Sun from reaching out to and communicating with its readers.

305. A judicial declaration that the RJ is required to provide the Sun with a list of subscribers to the Newspapers, and all circulation contracts, sales returns, and prepaid subscriptions to the Newspapers.

306. The Sun has been injured and will continue to be injured in its business and property as a result of the RJ's Anticompetitive Conduct and as a result of the present, actual and justiciable controversies between the parties as set forth above, by way of the diminished value to the Sun's brand and business, and threatened permanent elimination of the Sun from the Newspaper Market. *See* 15 U.S.C. § 15.

307. The Sun is entitled to preliminary and permanent injunctive relief, and declaratory relief, to prevent the RJ from persisting in its Anticompetitive Conduct to the Sun's and consumers' detriment, with such an injunction that: (1) requires Defendants to cease the Anticompetitive Conduct described herein; (2) enjoins Defendants from refusing to perform under the 1989 JOA;

- 75 -

(3) requires Defendants to print and distribute the Sun on a daily basis under the joint edition format provided for in Section 4.4 and Appendix A.2(b) and (c) of the 1989 JOA on an interim basis pursuant to Section 8.2 until such time that the RJ determines that it is feasible to publish more than one newspaper product and that it is able to fully perform under the 1989 JOA; (4) requires the RJ to provide the Sun with the list of subscribers to the Newspapers, and all current circulation contracts, sales returns, and prepaid subscriptions to the Newspapers; (5) declares that the RJ must obtain written Attorney General approval of an amendment to the 1989 JOA, including seeking temporary approval of the amendment pursuant to 28 C.F.R. § 48.15 while the application is pending; (6) enjoins Defendants from unilaterally ending the joint operation and ceasing to print and distribute the Sun until 2040; and (7) orders the RJ to divest itself of the Newspapers' non-editorial and -reportorial business operations as required by Article 2 of the 1989 JOA by creating a separate Nevada business corporation, an agency operating as fiduciary towards the Sun, which shall separately own or lease all assets related to the operation of the RJ and causing such separate corporate entity to assume and perform all duties and obligations of the RJ. *See* 15 U.S.C. § 26.

## JURY TRIAL DEMANDED

The Sun demands a trial by jury as its right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     A judicial declaration that:

(1)     Defendants have unlawfully monopolized, attempted to monopolize, and/or conspired to monopolize the Newspaper Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(2)     Defendants' Anticompetitive Conduct violates the Nevada Unfair Trade Practices Act;

(3)     Defendants' Anticompetitive Conduct also constitutes a conspiracy or combination in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

- 76 -

(4)    the 1989 JOA is the valid and enforceable agreement governing the parties' joint operation, and the RJ is obligated to perform under that agreement;

(5)    the RJ is obligated to print and distribute the Sun on a daily basis under the joint edition format provided for in Section 4.4 and Appendix A.2(b) and (c) of the 1989 JOA on an interim basis pursuant to Section 8.2 until such time that the RJ determines that it is feasible to publish more than one newspaper product and that it is able to fully perform under the 1989 JOA;

(6)    declares that the RJ must obtain written Attorney General approval of an amendment to the 1989 JOA, including seeking temporary approval of the amendment pursuant to 28 C.F.R. § 48.15 while the application is pending; and

(7)    the RJ is obligated to provide the Sun with the list of subscribers to the Newspapers.

B.    That the Court enter judgment granting Plaintiff a preliminary and permanent injunction:

(1)    requiring Defendants to cease the Anticompetitive Conduct described herein;

(2)    enjoining Defendants from refusing to perform under the 1989 JOA in the absence of another lawful JOA between the parties;

(3)    the RJ is obligated to print and distribute the Sun on a daily basis under the joint edition format provided for in Section 4.4 and Appendix A.2(b) and (c) of the 1989 JOA on an interim basis pursuant to Section 8.2 until such time that the RJ determines that it is feasible to publish more than one newspaper product and that it is able to fully perform under the 1989 JOA;

(4)    declaring that the RJ must obtain written Attorney General approval of an amendment to the 1989 JOA, including seeking temporary approval of the amendment pursuant to 28 C.F.R. § 48.15 while the application is pending; and

(5)    enjoining Defendants from unilaterally ending the joint operation and ceasing to print and distribute the Sun until 2040;

- 77 -

C.    That the Court enter judgment granting Plaintiff a preliminary and permanent injunction ordering the RJ to divest itself of the Newspapers' non-editorial and -reportorial business operations by requiring the creation of an independent agency (or trustee) to conduct the non-editorial and -reportorial business of the joint operation as required under Article 2 of the 1989 JOA;

D.    That the Court enter judgment for the Plaintiff to recover treble damages in the amount of three times the actual damages found by the jury (*see* 15 U.S.C. § 15(a));

E.    That the Court grant such additional orders or judgments as may be necessary to remedy or prevent the unlawful practices complained of herein; and

F.    That the Court enter judgment granting Plaintiff its cost of suit, including reasonable attorney's fees, costs, and expenses, as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15; Section 16 of the Clayton Act, 15 U.S.C. § 26, and NRS 598A.210.

DATED this _____ day of _____, 2026.

CLARK HILL PLC


By: */s/*  _____
E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
1700 S. Pavilion Center Drive, Suite 500
Las Vegas, Nevada 89135

PISANELLI BICE PLLC
James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

BROWNSTEIN HYATT FARBER SHRECK, LLP
Jordan T. Smith, Nevada Bar No. 12097
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

ALIOTO LAW FIRM

- 78 -

Joseph M. Alioto, Pro Hac Vice
One Sansome Street, 35th Floor
San Francisco, California 94104

*Attorneys for Plaintiff/Counterdefendants*

- 79 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

**CERTIFICATE OF SERVICE**

I certify that I am an employee of CLARK HILL PLC, and I caused a true and correct copy of the foregoing **SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DIVESTITURE, INJUNCTION, AND DAMAGES BY REASON OF DEFENDANTS' VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, AND THE NEVADA UNFAIR TRADE PRACTICES ACT** to be served by electronically filing the foregoing with the CMECF electronic filing system which will send notice of electronic filing to:

> J. Randall Jones, Esq.
> Mona Kaveh, Esq.
> KEMP JONES, LLP
> 3800 Howard Hughes Parkway, 17th Floor
> Las Vegas, NV 89169
>
> Michael J. Gayan, Esq.
> CLAGGETT & SYKES LAW FIRM
> 4101 Meadows Lane, Suite 100
> Las Vegas, NV 89107
>
> Amy M. Gallegos, Esq.
> David R. Singer, Esq.
> Andrew G. Sullivan, Esq.
> Alison I Stein, Esq.
> JENNER & BLOCK LLP
> 515 South Flower Street, Suite 3300
> Los Angeles, CA 90071
>
> Richard L. Stone, Esq.
> 850 Devon Avenue
> Los Angeles, CA 90024

DATED: March _____, 2026.

_/s/_____
An Employee of Clark Hill PLC

- 80 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

## INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 1 | June 17, 1989, Joint Operating Agreement (SUN_00001996-2039) | 44 |
| 2 | June 10, 2005, Amended and Restated Agreement (SUN_00002045-69) | 25 |
| 3 | Comparison Chart | 43 |

- 81 -

116312629.2
ClarkHill\09999\009998-10226\287261662.v1-4/6/26

**APP81**

# EXHIBIT 1

June 17, 1989, Joint Operating Agreement (the "1989 JOA")
(SUN_00001996-2039)

# EXHIBIT 1

SA292    **APP083**

## AGREEMENT

This Agreement is dated as of June __12__, 1989, between Donrey of Nevada, Inc., a Nevada corporation ("Donrey"), and the Las Vegas Sun, Inc., a Nevada corporation ("Sun").

## PRELIMINARY STATEMENT

Donrey owns and publishes in Las Vegas, Nevada, an all day newspaper on weekdays, a morning newspaper on Saturdays and holidays, and a Sunday newspaper, each known as the Las Vegas Review-Journal (hereinafter referred to as the "Review-Journal"). Sun owns and publishes in Las Vegas, Nevada, a morning newspaper on weekdays and Saturdays and a Sunday newspaper, each known as the Las Vegas Sun (hereinafter referred to as the "Sun"). The Sun presently operates and for a number of years has operated at a substantial loss, and is in probable danger of financial failure. It is the firm belief of the parties that the continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent, is of paramount importance to the citizens of Las Vegas and its environs. The parties further believe that publication of the Sun can be carried on profitably, and its continued editorial existence and independence thereby assured, if its production, distribution and advertising functions and related non-news and non-editorial activities are conducted and performed by the Review-Journal, through a single staff of Review-Journal employees utilizing Review-Journal's plant and equipment under a joint

*Pages 12, 13 relate to this case.*

SUN_00001996

SA293

newspaper operating arrangement (hereinafter referred to as "Agreement"), under which the Review-Journal will act on its own behalf with respect to the Las Vegas Review-Journal and on behalf of the Sun with respect to the Las Vegas Sun.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

### ARTICLE I

### TERM

1.1 <u>Effective Date</u>. The term of this Agreement shall begin at 12:01 a.m. on the 10th day (or on such later day as the parties may agree) after the filing of written consent of the Attorney General of the United States to this Agreement under the Newspaper Preservation Act, which shall be known as "the Effective Date". The parties agree to pursue diligently the filing of the application for approval of this Agreement to the Department of Justice and to use their best efforts and take all action necessary to obtain such written consent as expeditiously as possible within the procedures set forth in applicable regulations of the Department of Justice. This Agreement does not constitute any limitation on either party's obligation to engage in good faith labor negotiations if and as required by the National Labor Relations Act, and to implement any understandings it may reach in such negotiations.

Upon execution hereof, each party shall furnish to the other a written opinion of its counsel that all necessary

-2-

SUN_00001997

APP085

SA294

corporate action has been taken to authorize this Agreement and that, subject to the conditions of the preceding paragraph, this Agreement shall constitute the valid and binding obligation of the respective party. The parties agree to cooperate in coordinating meetings with government officials, community leaders, employees and their representatives, advertisers and others to explain the Agreement.

If, within eighteen (18) months after the filing of the application with the Department of Justice, the application has neither been approved by the Attorney General without a hearing nor been the subject of an order for a hearing, or if, within eighteen (18) months after the Attorney General has issued an order for a hearing, the application has not been approved by the Attorney General, the parties shall discuss the feasibility of continuing to seek approval of the application and either party may, after notification to the other, withdraw from the application. The Review-Journal and Donrey intend to make a request, at the time of filing the application, under 28 CFR Section 48.5 for a protective order withholding from public disclosure their financial and other privileged and confidential commercial information to be filed with this application and restricting access to such materials to the applicants and the Department of Justice. If the request is not granted the Review-Journal and Donrey reserve the right to unilaterally withdraw the application. If the protective order is initially granted but, at a later date, access to or inspection of the protected information is to be afforded anyone other than the

-3-

SUN_00001998

APP086

SA295

applicants, the Department of Justice, or an administrative law judge, and their respective employees, without restrictions as to disclosure acceptable to the Review-Journal and Donrey, then the Review-Journal and Donrey shall have the unilateral right to withdraw the application and dismiss any further hearing or proceedings concerning the application.

Each party shall pay its own costs and professional fees in connection with the formulation and drafting of this Agreement and the preparation and filing of the application to the Department of Justice.  From and after the filing of such application all costs and professional fees shall be borne equally by the parties with each party having reasonable approval of costs and fees to be incurred.

1.2  <u>Duration</u>.  Subject to the termination provisions set forth in Article 9, this Agreement shall continue for an initial period ending at the close of business on the 31st day of December of the fiftieth (50th) year following the Effective Date.  The Agreement shall automatically renew for succeeding renewal periods of ten (10) years each unless either party shall notify the other in writing at least two (2) years prior to the end of the initial period that it elects to terminate the Agreement at the end of said fiftieth (50th) year,  or unless either party shall notify the other in writing at least two (2) years prior to the end of the renewal period that it elects to terminate the Agreement as of the end of said renewal

-4-

SUN_00001999

APP087

SA296

period.  The phrase "term of this Agreement" as used hereafter shall mean the initial period and any renewal period or periods.

## ARTICLE 2

### AGENCY

Donrey of Nevada, Inc. now owns and operates the Review-Journal, together with other unrelated business operations in the State of Nevada.  In order to facilitate management, administration, record keeping and tax administration under this Agreement, Donrey, as of the effective date of this Agreement, shall have established a separate Nevada business corporation which shall own or lease all assets related to the operation of the Las Vegas Review-Journal.  Donrey shall cause such corporate entity to assume and agree to perform all duties and obligations of the Review-Journal under the terms of this Agreement.

## ARTICLE 3

### TRANSFER OF CONTRACTS AND SALE OF SUPPLIES, INVENTORY AND EQUIPMENT BY SUN TO REVIEW-JOURNAL

3.1  <u>Transfer to and Assumption by Review-Journal of Certain Contracts</u>.  To enable Review-Journal to perform its functions hereunder on behalf of Sun, Sun shall (as of the Effective Date) transfer certain assets and assign certain contracts to Review-Journal subject to the procedures and conditions hereinafter specified in this Section 3.1.

3.1.1  <u>Delivery of Contracts and Data to Review-Journal</u>. Upon consent of the Attorney General as specified in Section 1.1, Sun shall furnish to the Review-Journal:

-5-

SUN_00002000

APP088

SA297

3.1.1.1  <u>Circulation Contracts</u>.  All subscription, bulk sales, circulation, dealer and sub-dealer, and delivery agent lists and contracts related to the Sun in the possession or control of Sun, and all books and statements of account, records and other information relating to or concerning routes, daily draws by editions, distribution, delivery, sales returns, or prepaid subscriptions of the Sun in any territory, but not including the Sun's general books of account.

3.1.1.2  <u>Contracts for Supplies</u>.  All contracts and other available information as may be reasonably necessary to form business judgments respecting such contracts, then held by Sun for the purchase of newsprint, film, ink and supplies for the Sun's mechanical departments, and all other similar contracts (other than those relating to the Sun's news and editorial departments) which would be helpful or beneficial to the Review-Journal in fulfilling its obligations hereunder.

3.1.1.3  <u>Advertising Contracts</u>.  A list of all contracts then outstanding for publication of advertising in the Sun, which list shall indicate in each case the date of the contract, the name and address of the advertiser, the amount of space used up to that time, the amount unpaid and owing the Sun for advertising run to that time, the amount prepaid as of the Effective Date, the frequency of insertions, the rate, the expiration date, and any special conditions, records, requirements or publication orders with the date thereof, and any special instructions, agreements or commitments made by the Sun with

-6-

SUN_00002001

APP089

SA298

the advertiser with respect thereto, and all insertion orders for advertising subsequent to the Effective Date. Sun shall make available to the Review-Journal at the Review-Journal's request copies of any or all such contracts.

3.1.2 Analysis of Contracts and Assumption by Review-Journal. As soon as possible after such information and documents shall have been furnished to the Review-Journal, and in any event prior to the Effective Date, Review-Journal shall designate in writing to Sun those contracts that Sun shall assign to Review-Journal and which Review-Journal shall assume as of the Effective Date (excluding all portions which Sun had a duty to perform prior to the Effective Date); provided, that with respect to advertising contracts Review-Journal shall have no obligation to assume any advertising contract that is on a trade-out basis, and Review-Journal agrees that it will not refuse the assumption of any advertising contract solely on the basis of the contract rate. However, for advertising contracts containing rates which Review-Journal determines to be unreasonab low, Review-Journal shall have the right to charge to Sun the difference between the contract rate and a rate determined by Review-Journal to be reasonable, effective ninety (90) days after the date of assumption and continuing for the balance of such contracts. Subject to the foregoing, Review-Journal shall use its best efforts to maximize its designation of such contracts

-7-

SUN_00002002

APP090

SA299

to be assigned to and assumed by Review-Journal. Review-Journal pre-assumption analysis of such contracts and information may include consultation with the contracting parties, and Sun agrees to assist Review-Journal in that process. Sun shall remit to Review-Journal (a) all dealers', vendors' and carriers' cash deposits (to the extent that the same shall not be due and owing to such depositors on the Effective Date) and (b) all sums in respect of prepaid subscriptions and prepaid advertising received by Sun but not earned prior to the Effective Date. As to any assigned and assumed advertising contracts, Review-Journal shall have the right to make adjustments, such as rebates or short ratings of any of same so long as this shall not alter indebtedness due Sun prior to the Effective Date without Sun's approval. All such contracts to be assumed by Review-Journal shall be assigned to Review-Journal by Sun as of the Effective Date, and such contracts shall be assumed by Review-Journal as of that date and thereafter shall be performed by Review-Journal, and Sun shall be relieved from any and all performance obligations under such contracts accruing after the Effective Date.

3.2 <u>Newsprint</u>. Review-Journal shall procure, as of the Effective Date and thereafter, a supply of newsprint adequate to produce the Newspapers as defined in Section 5.1 below;

-8-

SUN_000002003

APP091

SA300

provided, that Review-Journal shall have the purchase and assumption obligations specified in Section 3.3 as to Sun newsprint.

3.3  Sale of Supplies, Inventory and Equipment. ·As of the Effective Date, Review-Journal agrees to purchase Sun's inventory of newsprint and supplies common to or usable in the operations of both newspapers (i.e., newsracks, production film, rubber bands, plastic bags, etc.).  Upon the consent of the Attorney General as specified in Section 1.1, Sun shall deliver to Review-Journal a schedule identifying all supplies, inventory (on hand or in transit) and equipment owned or leased by Sun and used or available to be used in the production and distribution of the Sun.  On or before the Effective Date, Review-Journal shall designate in writing which of the scheduled items of supplies, inventory and equipment it wishes to purchase or sublease, as the case may be.

As to such of the equipment as is owned by Sun, which Review-Journal determines to purchase, Sun shall be obligated to sell and deliver same and Review-Journal shall be obligated to buy at a purchase price equal to the purchase cost of such equipment or its then market value, whichever is lower.

As to such of the supplies and inventory which Review-Journal is obligated to purchase or designates for purchase by it, Sun shall be obligated to sell and deliver same and Review-Journal shall be obligated to buy at a purchase price equal to the cost of same to Sun, or its then market value, whichever is lower.

-9-

SUN_00002004

APP092

SA301

Any newspaper production equipment of the Sun which is not purchased by the Review-Journal may be sold by the Sun to a third party, provided that the sale of any such equipment to any party within the State of Nevada shall require Donrey's prior approval.

## ARTICLE 4

### NEWS AND EDITORIAL COPY, FEATURES AND SERVICES

4.1 <u>Maintenance of News and Editorial Staff; Feature Materials</u>. Review-Journal and Sun each shall maintain a staff of news and editorial employees, and shall license such feature materials (including, but not limited to, news and editorial services supplied by third parties), adequate to provide its respective newspaper with all of the news and editorial copy and related services deemed necessary by each of them as to its respective newspaper.

4.2 <u>News and Editorial Allocations</u>. The Review-Journal and the Sun shall establish, in accordance with the provisions of Appendix A attached hereto and made a part hereof by reference, the amounts to be allocated to Agency Expense, as hereinafter defined, for each for news and editorial expenses.

4.3 <u>Furnishing News and Editorial Copy and Services</u>. In furnishing features, news and editorial copy, and like materials to Review-Journal for publication in the Sun or the Sun portion of jointly published newspapers as provided in Section 4.4, and in providing layout for such material, Sun shall provide all such material in a form appropriate for the production of its

-10-

SUN_00002005

APP093

SA302

newspaper or its portion of jointly published newspapers hereunder, in conformity with the mechanical standards, deadlines and production requirements which prevail in the Review-Journal plant from time to time, including page sizes, column widths, and cut-offs established by Review-Journal, upon reasonable notice to Sun. Sun shall acquire and maintain at its expense such newsroom equipment (including, but not limited to, typewriters, video terminals and news editing systems) as may be required as of the Effective Date to interface with Review-Journal production facilities. Any changes or additions thereafter required in such equipment shall be covered by Appendix B hereto. Newshole limitations and other matters for separate and jointly published newspapers are set forth in Appendix A hereto.

4.4 <u>Furnishing Copy, Features and Services for Jointly Published Newspapers</u>. Sun shall furnish editorial copy, features and comics to permit the Review-Journal to include them within jointly published newspapers, which shall be Sundays, Saturdays, holidays, other special editions and total market coverage editions. The Sun portion of jointly published newspapers shall be in accordance with Appendix A hereto. All components of jointly published newspapers shall bear the Review-Journal's headdress, typeface and style. The front page logo of all jointly published newspapers shall read "Las Vegas REVIEW-JOURNAL and SUN," and all folios shall similarly refer to both papers, except for editorial and other pages described in Appendix A as being for the use of only one newspaper, which

-11-

SUN_00002006

APP094

SA303

pages shall bear only the name of such newspaper. The Review-Journal shall provide all of the news content of jointly published newspapers, except for stories and features included on those pages described in Appendix A as being only for the use of the Sun. The Review-Journal reserves the right to print conspicuous notices in jointly published newspapers to the effect that the news content of the non-Sun portion of the newspaper, including locally produced supplements, is produced by Review-Journal personnel.

4.5 <u>Showbiz Magazine</u>. Showbiz Magazine, which is owned or controlled by Sun, is carried as an insert by the Sun and distributed to hotels in Las Vegas. As of the Effective Date, Showbiz Magazine shall be a department or division of the Sun and <u>subject to the terms of this Agreement</u>. If the Review-Journal determines that it no longer desires Showbiz Magazine to be governed by the terms of this Agreement and/or no longer desires to carry Showbiz Magazine as an insert in the jointly published Sunday newspaper, Review-Journal shall give sixty (60) days prior written notice to Sun, and Sun shall have the right to transfer Showbiz Magazine out of Sun, or continue publication and distribution of Showbiz Magazine, and in either case, outside the terms of this Agreement. In this event, Review-Journal agrees to perform, at the request of Sun, composition, production and printing services at reasonable costs and further agrees not to engage in the production of an entertainment magazine for distribution to Las Vegas hotels for a period of two (2) years.

-12-

SUN_00002007

APP095

SA304

## ARTICLE 5

### CONTINUING PUBLICATION AND
### NEWS AND EDITORIAL AUTONOMY

5.1 <u>Production and Promotion of the Newspapers</u>. Subject to the terms of this Agreement, and as of the Effective Date, Sun shall be a daily afternoon newspaper and Review-Journal shall be a daily morning newspaper and on Saturday, Sunday, holidays, and other special editions the newspapers shall be jointly published as provided in Section 4.4. So long as Sun furnishes news and editorial copy, features and services to Review-Journal in accordance with Article 4 of this Agreement, Review-Journal agrees to produce the Sun daily as an afternoon newspaper as provided herein, to include the Sun copy and features in jointly published newspapers as specified in Article 4 above, and to sell all advertising for, promote and circulate such newspapers as provided herein. Review-Journal agrees that the afternoon Sun and the Sun portion of jointly published newspapers shall contain no editorial content other than that furnished by Sun. Also subject to the terms of this Agreement, Review-Journal further agrees to publish and produce for the term of this Agreement the Las Vegas Review-Journal daily as a morning newspaper and to produce jointly published newspapers as provided herein. The daily Sun and the Sun portion of jointly published newspapers, and the daily Review-Journal and the balance of the jointly published newspapers are hereinbefore and hereinafter referred to as the "Newspapers".

-13-

SUN_00002008

APP096

SA305

Review-Journal shall print the Newspapers on equipment owned or leased by the Review-Journal in the Review-Journal plant or plants located at such place or places as Review-Journal may determine, and all operations under this Agreement, except the operation of the Sun's news and editorial department, shall be carried on and performed by the Review-Journal with Review-Journal employees and equipment and in the Review-Journal's said plant or plants or by independent contractors selected by the Review-Journal.

The Review-Journal shall control, supervise, manage and perform all operations involved in managing and operating under this Agreement, including printing, selling and distributing the Newspapers, shall determine page sizes, number of columns per page, cut-offs, page makeup of non-news and non-editorial content (subject to the newshole formula set forth in Appendix A), and all other mechanical and technical functions of the Newspapers, shall purchase newsprint, materials and supplies as required (subject to Sun's obligations under Section 3.2), shall determine the rates for, solicit and sell all advertising space in the Newspapers, shall determine circulation rates, collect the Newspapers' circulation and advertising accounts receivable which come into existence after the Effective Date, and shall make all determinations and decisions and do any and all acts and things related to the foregoing activities, provided:

-14-

SUN_00002009

APP097

SA306

5.1.1  <u>Format</u>.  Review-Journal shall not change the format of the Sun to any size or format different from that of the Review-Journal without approval of Sun.

5.1.2  <u>Editions</u>.  The number of Sun editions shall not be changed without approval of Sun.

5.1.3  <u>Best Efforts</u>.  Review-Journal agrees that it will use its best efforts, using the same degree of diligence, to sell advertising space in the Sun and the Review-Journal and to promote and circulate the Sun and the Review-Journal.

5.1.4  <u>Promotional Activities</u>.  Review-Journal shall establish for each fiscal year a budget for promotional activities which shall be allocated between the Review-Journal and the Sun in accordance with the provisions of Appendix A, attached hereto and made a part hereof by reference.  Promotional activities may include radio and television, outdoor advertising, in-paper or house advertisements, and other advertising media.  All expenses of such promotional activities shall be Agency Expense, up to the amount of the promotional budget allocation.  If either the Review-Journal or the Sun determines that it wishes to incur expenses in excess of those in the promotional budget, such expenses shall not be included in Agency Expense.  Direct circulation sales expenses, including such items as carrier premiums and expenses of order generation shall not be included in the promotional budget and shall be allocated by Review-Journal between the newspapers so as to maximize the maintenance and enhancement of the circulation of the newspapers to the

-15-

SUN_00002010

APP098

SA307

extent economically feasible.  The newsroom of each newspaper shall determine the nature, extent and timing of its promotional activities and shall supply basic information therefor.  Review-Journal promotion management shall be responsible for all final promotional copy preparation and placements.

5.1.5  <u>Rates</u>.  Review-Journal shall not increase the single copy or subscription prices of the daily edition of the Sun to an amount higher than the comparable rates for the Review-Journal.  Review-Journal shall not change the rates for advertising to be run solely in the Sun in relation to the rates charged for comparable advertising to be run solely in the Review-Journal, unless such change is justified by the then-relative circulation of the Sun and the Review-Journal and other factors considered relevant in the industry.

5.1.6  <u>Meetings of JOA Participants</u>.  Periodically, not less than four times per year, Donrey senior management shall meet with Sun senior management to discuss operations under this Agreement and future plans and opportunities.

5.1.7  <u>Advertising Acceptability</u>.  Sun may reject any advertising or types of advertising for the Sun which is in the opinion of Sun undesirable or inappropriate for publication therein, and shall notify Review-Journal in writing of any specific advertising or types of advertising that Sun deems undesirable for publication.  Review-Journal shall accept all advertising for the Sun other than the advertising indicated on

-16-

SUN_00002071

SA308

Sun's written notice, subject to all laws affecting the acceptability of advertising.

5.1.8 <u>Sun Distribution</u>. To the extent economically feasible, Review-Journal shall use its best efforts to substantiall maintain the historical area and extent of distribution of the Sun.

5.2 <u>News and Editorial Autonomy</u>. Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the essence of this Agreement. Sun shall have exclusive and complete control, authority and direction over the news and editorial content, features and services to be furnished by Sun to Review-Journal to be included in its newspaper and in its portion of the jointly published newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees. Review-Journal shall have exclusive and complete control, authority and direction over the news and editorial content, features and services in its newspapers and in its portion of the jointly published newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees. The Review-Journal and Sun each hereby agrees to preserve high standards of newspaper quality throughout the term of this Agreement. All news and editorial expense of the Sun or the Review-Journal in excess of the amounts set forth in Appendix A shall be borne by the respective newspaper.

-17-

SA309

5.3  <u>Performance and Cooperation</u>.  Sun and Review-Journal agree to take all corporate action necessary to carry out and effectuate the intent, purposes and provisions of this Agreement, and to cooperate with the other party in every reasonable way that will promote successful and lawful operation under this Agreement for both parties.

5.4  <u>Sun Office Space</u>.  The Sun shall have the option to provide its own offices for its news and editorial department and senior management, or to occupy office space, to be provided by the Review-Journal, adjacent to the Review-Journal's newspaper building.

## ARTICLE 6

### PAYMENT OF EXPENSES, DISTRIBUTION OF REVENUES, AND OTHER FINANCIAL PROVISIONS

6.1  <u>Expenses and Revenues</u>.  Review-Journal shall pay and record all Agency Expense, as defined in Appendix B hereto, and collect and record all Agency Revenues as defined in Appendix C hereto, and shall pay to Sun, monthly, a sum for Sun news and editorial expense as provided in Appendix A hereto.

6.2  <u>Accounting Records</u>.  Accounting records of Agency Revenues and Agency Expense shall be maintained by Review-Journal.  Accounting records of news and editorial expense shall be separately maintained by the Review-Journal and the Sun for their respective newspapers.  All such records shall be kept on a fiscal year basis in reasonable detail and in accordance with generally accepted accounting principles.  Financial statements to be provided under Section 6.3 shall be prepared

-18-

SUN_00002013

in accordance with generally accepted accounting principles and the applicable provisions of this Agreement.

6.3  Financial Statements.  Within ninety (90) days following the close of each fiscal year, Review-Journal shall furnish to Sun financial statements in respect of such year which summarize Agency Revenues and Agency Expense hereunder.  Within thirty (30) days after the end of each month, except the last month of the fiscal year, Review-Journal shall furnish to Sun a monthly financial statement summarizing Agency Revenues and Agency Expense.  All Agency financial statements furnished by Review-Journal shall be certified by a financial officer of Review-Journal.

6.4  Distributions.  Payments of Sun's share of operating profit, pursuant to Appendix D, shall be made with each financial statement to be furnished to Sun under the provisions of Section 6.3 above.

## ARTICLE 7

## TRANSITIONAL MATTERS

7.1  Collection of Sun Receivables.  After the Effective Date, Review-Journal shall use its best efforts (without any obligation to institute legal proceedings) to collect Sun advertising and circulation accounts receivable which are outstanding on the Effective Date and shall remit same to Sun on a monthly basis, less the Agency's reasonable collection costs specifically incurred in connection therewith.  Such collections and collection costs recovered by Review-Journal shall not be Agency Revenues or Agency Expense.  Any such

-19-

SUN_00002014
APP102
SA311

advertising accounts which have not been collected by Review-Journal within sixty (60) days after the Effective Date shall be returned to Sun. Collections from particular subscribers shall first be applied to circulation accounts receivable unless otherwise agreed by Sun. As to any Sun advertising or circulation contracts assumed by Review-Journal under Section 3.1 above, Review-Journal will remit to Sun the portion of the receipts thereunder reflecting advertising run or circulation delivered by Sun prior to the Effective Date but not payable until on or after that date, and such portion shall not be Agency Revenues.

7.2  <u>Termination Obligations</u>. Sun shall be solely responsible for all notices, severance allowances, accrued benefits, or other related payments or obligations which may become due or payable to any terminated employee or agent of Sun.

7.3  <u>Sun Personnel</u>. Review-Journal shall be under no obligation to employ any terminated Sun employee.

ARTICLE 8

<u>NONLIABILITY PROVISIONS</u>

8.1  <u>Defense of Claims and Indemnification</u>. Any claim, demand, suit, action, obligation or other liability asserted against or sustained by Review-Journal and Sun, or either of them, in respect of any third party ("Claims") shall be dealt with as provided in this Article 8. For all purposes of this Article 8, the term "cost or expense" shall include reasonable attorneys' fees.

-20-

SUN_00002015

APP103

SA312

8.1.1  <u>Claims Related to the Joint Operation</u>.  Review-Journal shall defend and shall control the defense or settlement of any third party Claims related to the joint operations or to its performance or non-performance under this Agreement (including but not limited to Claims arising from any advertising published in, or excluded from, any of the Newspapers -- except as provided in Section 8.1.2 -- and Claims in respect of feature, news and editorial content furnished by Sun hereunder arising as a result of any act or omission on the part of Review-Journal other than republication in the form furnished by Sun), devoting reasonable efforts to minimizing any resulting liability and related cost or expense.  Any such liability, and the cost or expense related thereto, shall be an Agency Expense, except to the extent any such Claim shall be covered by insurance. Review-Journal shall give written notice to Sun of any material Claims arising under this Section 8.1.1.

8.1.2  <u>Other Claims</u>.  Except as specifically provided in Section 8.1.1. or elsewhere in this Agreement, neither party hereto shall be charged with or held responsible for any third party Claims (except to the extent certain Sun contracts shall be assumed by Review-Journal under Article 3), arising before or after the Effective Date by reason of any act or omission on the part of the other party, and the responsible party shall indemnify and hold the other party harmless therefrom, including all related cost or expense.  The responsible party shall defend, settle, pay or discharge any such Claim and shall indemnify and hold harmless

-21-

SUN_00002016

APP104

SA313

the other party against any such Claim, and from any liability, cost or expense arising therefrom. By way of example under this Section 8.1.2 and without limitation, the entire cost or expense of defending, settling or paying and discharging Claims relating to any feature, news or editorial copy published in, or excluded from the daily Review-Journal or the Review-Journal portion of the jointly published newspaper, or arising by reason of anything done or omitted by the news and editorial department of the Review-Journal in regard to its daily newspaper or the Review-Journal portion of the jointly published newspaper, or arising by reason of any advertising rejected by the Review-Journal or accepted by the Review-Journal in situations where such advertising would be rejected pursuant to Sun guidelines, shall be borne by the Review-Journal, and any such liability, cost or expense on account of Claims relating to any feature, news or editorial copy published in, or excluded by Sun from the daily Sun or the Sun portion of any jointly published newspaper, or arising by reason of anything done or omitted by the news and editorial department of the Sun, or arising by reason of any advertising rejected by the Review-Journal pursuant to Sun guidelines, or accepted in situations where such advertising would be rejected pursuant to Review-Journal guidelines, shall be borne by Sun, unless such Claims shall be an Agency Expense by reason of the operation of Section 8.1.1.

8.1.3  Insurance. For the purposes of this Article 8, each party shall separately maintain and pay for, as an item of

-22-

SUN_00002017

SA314

news and editorial expense, insurance to the extent reasonably available protecting against losses from libel, invasion of privacy, copyright or trademark infringement and other matters related to the gathering or preparation of news and editorial matter for publication, in such amounts as the parties may agree upon from time to time, but in no event less than Ten Million Dollars ($10,000,000), and the other party shall be named as an additional insured.

8.2  Force Majeure.  Neither party shall be liable to the other for any failure or delay in performance under this Agreement, occasioned by war, riot, government action, act of God or public enemy, damage to or destruction of facilities, strike, labor dispute, failure of suppliers or workers, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform, provided that in the event partial performance under this Agreement is feasible, notwithstanding the occurrence of one or more of the foregoing, performance shall be allocated between the newspapers by the Review-Journal, in its sole judgment, and if it is feasible to publish only one newspaper product, Review-Journal shall exercise its best efforts to produce a jointly published newspaper in which the Sun portion shall be determined by Review-Journal, notwithstanding the provisions of Appendix A hereto, provided, that the Sun portion shall not be less than two (2) pages.

-23-

SUN_00002018

APP106

SA315

## ARTICLE 9

### TERMINATION

9.1  Events of Termination.  This Agreement shall continue in full force and effect unless and until it may be terminated by the occurrence of one of the following events of termination:

9.1.1  Voluntary Termination.  Voluntary termination under the provisions of Section 1.1.

9.1.2  Bankruptcy or Default.  If either party hereto makes an assignment of its assets for the benefit of creditors, is adjudged a bankrupt or has a receiver appointed for its business by a court of competent jurisdiction (provided, that such adjudication shall continue unstayed on appeal or otherwise in effect for a period of ninety (90) days after the entry of the decree related thereto before such adjudication becomes an event of termination, and further provided that the appointment of the receiver must continue unvacated, not set aside, not stayed or otherwise in effect for a period of ninety (90) days after such appointment before such appointment becomes an event of termination), or if either party defaults in the performance of any of its material obligations hereunder and does not cure such default within sixty (60) days after receiving written notice thereof from the other party, then such other party may, at its election, and in addition to all other remedies available to it at law or in equity, terminate this Agreement upon thirty (30) days' written notice by the Sun and sufficient notice by the Review-Journal to enable the Sun to arrange for the separate

-24-

SUN_00002079

APP107

SA316

production of the Sun, but not to exceed six (6) months; provided, that in the event of default, the other party shall have the additional option to cure such default and, on demand, be reimbursed by the defaulting party for all costs and expenses related thereto.

9.1.3 <u>Change of Controlling Interest</u>. In view of the nature of the relationship established by this Agreement and the fact that the Sun is published under the direction and control of Herman M. Greenspun and Brian L. Greenspun, the Review-Journal shall not be required to carry out the terms of this Agreement or be associated with another party to which it objects. Accordingly, ownership or control of the Sun shall not be transferred to any other entity or person without notice to and prior approval by the Review-Journal, provided that the Review-Journal will not object to any transfer of the ownership or control of Sun to any entity under the immediate direction and control of Herman M. Greenspun, or Brian L. Greenspun, or any other lineal descendant of Herman M. Greenspun. If, following an approved or permitted change of control of Sun, a subsequent change of control occurs, notice as hereinabove shall be given and the Review-Journal may exercise the rights provided herein.

9.1.4 <u>Loss Operation</u>. If there are any two (2) consecutive years in which the Agency does not have an operating profit (Agency Expenses in excess of Agency Revenues), despite the Review-Journal's good faith efforts to produce an operating

-25-

SUN_00002020

SA317

profit, the Review-Journal may terminate this Agreement upon ninety (90) days written notice.

9.2 <u>Mechanics of Termination</u>. Upon termination of this Agreement, Review-Journal shall take appropriate action to transfer to Sun: (a) all then current circulation contracts, agreements or lists concerning bulk sales, subscriptions, dealers and sub-dealers, distributions, deliveries, sales returns and prepaid subscriptions of the Sun's daily newspaper, and of all jointly published newspapers, plus all pertinent portions of then current records and data pertaining thereto, and all sums received by Review-Journal in respect of prepaid subscriptions and cash deposits relating to daily Sun circulation, and a pro rata portion of all sums received by Review-Journal in respect of such subscriptions and deposits relating to the jointly published newspaper circulation, and (b) all then current advertising contracts and all pertinent portions of then current records and data relating to advertising to be published in the Sun and in all jointly published newspapers. Review-Journal shall further provide Sun with the originals and all copies of all contracts relating solely to circulation and advertising of the daily Sun, and copies of all other contracts referred to in the immediately preceding sentence.

ARTICLE 10

<u>MISCELLANEOUS</u>

10.1 <u>Notices</u>. Each notice or other communication given pursuant to this Agreement shall be given in writing, delivered

-26-

in person or mailed by registered or certified mail, addressed to the respective parties as follows:

Review-Journal:     Donrey, Inc.
P. O. Box 410
Las Vegas, NV  89125
Attention:  Fred W. Smith

Sun:     Las Vegas Sun, Inc.
P. O. Box 4279
Las Vegas, NV  89127
Attention:  Brian L. Greenspun

or, in the case of either party hereto, at such other address or marked for the attention of such other person, as such party may set forth in a written notice to the other party.

10.2  <u>Disclaimer of Labor Related Obligations</u>.  The parties specifically agree that neither party hereby assumes any obligations of the other party related to its employment practices or to any of its employees, whether or not arising under any collective bargaining agreements or arising prior to, on or subsequent to the Effective Date.

10.3  <u>Inspection of Books and Records</u>.  Either party shall have the right to authorize its independent certified public accountants or any of its corporate officers to inspect the books and records of the other party hereto at reasonable times and intervals in regard to the financial statements specified in Article 6, but only as to the three (3) years preceding the exercise of the right of inspection, commencing with the year immediately preceding the year in which the right is exercised. The expenses of any such inspection shall be borne by the party

-27-

SUN_00002022

APP110

SA319

causing such inspection to be made and shall not be included in Agency Expenses.

10.4  **Limited Effect**.  Nothing herein contained shall constitute the parties hereto partners, joint venturers, successors, alter egos, joint employers, an unincorporated association, or as having any relationship other than as specifically provided by this Agreement.  This Agreement is intended solely for the benefit of the parties hereto, and their permitted successors and assigns and not for the benefit of any other person or party.  This Agreement, including Appendices A through D hereto, and contracts and agreements supplemental hereto, comprises the entire understanding and agreement of the parties hereto on the subject matter herein contained and any and all other representations or agreements, which heretofore may have been made on such subject matter, whether oral or in writing, by any agent of either party shall be null, void and of no effect whatsoever.  Time is of the essence of this Agreement.

10.5  **Community Cable TV**.  As of the Effective Date, Sun shall assign or cause to be assigned to Donrey the right to receive ten percent (10%) of all dividends or distributions of any kind paid or made by Community Cable TV ("CCTV"), a Nevada corporation which owns and operates a cable television system serving Las Vegas and surrounding communities and certain unincorporated areas of Clark County, Nevada, to any of its shareholders, including any payments in excess of current salaries or current percentages of income as management or

-28-

SUN_00002023

APP111

SA320

consultant fees paid by CCTV to any of its shareholders. With respect to payments to be made to Donrey hereunder, Sun shall cause CCTV to make such payments, or make such payments directly to Donrey. As soon as permitted under the terms of certain shareholder and financing agreements, CCTV shall issue to Donrey ten percent (10%) of the total issued and outstanding common stock of CCTV, which shall be issued as fully paid and nonassessable. In addition, at such time as Sun or its affiliates have purchased all of the issued and outstanding common stock of CCTV owned by third parties, Donrey shall have the right to purchase an additional thirty-five percent (35%) of the issued and outstanding common stock of CCTV on the same terms and conditions, including price, as those on which Sun or its affiliates acquired such stock, which shall be issued as fully paid and nonassessable. In the event of the sale by Sun or its affiliates of any interest in CCTV prior to Donrey's acquisition of stock, Donrey shall be entitled to receive ten percent (10%) of the net sale proceeds, and Donrey's right to receive its ten percent (10%) stock interest shall be ratably reduced. Donrey's rights with respect to CCTV as herein provided shall survive the expiration or termination of this Agreement, provided, in the event the Review-Journal and Donrey withdraw from the application to the Department of Justice, pursuant to Section 1.1 of this Agreement, or if the Review-Journal terminates this Agreement pursuant to Section 9.1.4. within the first three (3) years of the term of this Agreement, Donrey's rights with

-29-

SUN_00002024

APP112

SA321

respect to CCTV shall terminate, and in the event Donrey has received any payments, issuances, or transfers of or with respect to CCTV stock pursuant hereto prior to Donrey's withdrawal from the application to the Department of Justice or the Review-Journal's termination of this Agreement as herein provided, such payments, issuances or transfers of or with respect to CCTV stock shall be refunded or rescinded.

10.6 <u>Sun Trademark, Tradenames, Service Marks and Copyrights</u>. In its use of such Sun trademarks, tradenames, service marks and copyrights as may be required to perform its obligations under this Agreement, Review-Journal shall use its best efforts to comply substantially with all relevant laws of the State of Nevada and of the United States pertaining to trademarks, tradenames, service marks and copyrights in force at any time during the term of this Agreement. Sun shall use its best efforts to maintain in effect said trademarks, tradenames, service marks and copyrights, and shall make applications for the registration and/or renewal thereof if and when required by law. Review-Journal acknowledges Sun's right, title and interest in and to said trademarks, tradenames, service marks and copyrights and all renewals thereof, and agrees that it shall not at any time permit, take, or cause to be taken any action within its control in any way impairing or tending to impair any part of such right, title and interest. Review-Journal agrees to publish such notices in the Sun and the jointly published newspapers as Sun reasonably may request in order to protect

-30-

SUN_00002025

APP113

SA322

said trademarks, tradenames, service marks and copyrights, or any of them. Review-Journal shall not in any manner represent that it has any ownership interest in said trademarks, tradename service marks or copyrights or in the registration thereof, and Review-Journal acknowledges that its use hereunder of said trademarks, tradenames, service marks or copyrights shall not create in its favor any right, title or interest in or to same beyond those created by this Agreement.

10.7  Tax Treatment of Payments to Sun. It is contemplated by the parties that the payments to Sun under Section 6.4 of this Agreement will be, for federal income tax purposes, ordinary income to Sun and will be deductible by Review-Journal as a business expense.

10.8  Specific Performance. Because of the public interest of maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs, and because of the inadequacy of damages in the event of default in the performance of material obligations hereunder, each party shall have the right to seek specific performance of the material provisions of this Agreement, provided, that in the event of any action by Sun for specific performance against Review-Journal, if Sun does not obtain an order of specific performance, Review-Journal shall be entitled to recover in such action its attorneys' fees and costs.

-31-

SUN_00002026

APP114

SA323

10.9 <u>Successors and Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their permitted successors and assigns.

10.10 <u>Governing Law; Modification</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of Nevada. This Agreement may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, modification or discharge shall be sought.

10.11 <u>Headings</u>. Headings have been inserted in this Agreement for the purpose of convenience only. They shall not be used to interpret or construe the meaning of any Articles or Sections, nor shall they have the effect of limiting or enlarging the meaning thereof.

IN WITNESS WHEREOF, this Agreement has been executed by the parties' respective corporate officers thereto duly authorized as of the day and year first above written.

DONREY, INC.

By_____
Fred W. Smith
President

LAS VEGAS SUN, INC.

By_____
Brian L. Greenspun
President

-32-

SUN_00002027
SA324

APPENDIX A

A.1.   Pursuant to Section 4.2 of this Agreement, for each fiscal year after the Effective Date Review-Journal shall establish an allocation for Review-Journal news and editorial expenses, and the allocation for, news and editorial expenses for the Sun shall be equal to sixty-five percent (65%) of the Review-Journal allocation, subject to a minimum of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) per fiscal year, which shall be increased each year by a percentage equal to the percentage increase in the CPI for the Las Vegas metro area. Such allocations shall be prorated for any period less than a full fiscal year.  The aggregate allocations for news and editorial expenses shall constitute Agency Expense.  On the first day of each month following the Effective Date, Review Journal shall pay to Sun an amount equal to one-twelfth (1/12th) of the Sun's annual allocation for news and editorial expenses as herein provided.

A.2.   Pursuant to Sections 4.3 and 4.4 of this Agreement, the reading content of the newspapers shall be in accordance with the following formulas:

(a) For Monday through Friday editions, the number of pages of the Sun and the number of pages of the Review-Journal shall be determined by the ratio of the number of inches of advertising to be printed in each newspaper and the size of the newshole in each newspaper shall be determined by the same ratio, provided that in no event

SUN_00002028

SA325

shall the average newshole of the Sun in any month be less than eighty-five percent (85%) of the newshole of the Review-Journal in such month.

(b) For the jointly published Sunday edition, Sun shall be entitled to a separate section of three (3) open pages (one cover page, one editorial page and one op. ed. page), plus four hundred fifty (450) column inches, provided, that the Review-Journal may add additional pages to the Sun section comprised of news and advertising, as may be required by composition or printing requirements. The Review-Journal shall attempt to place the Sun section within the first four (4) sections of the Sunday edition. The Review Journal shall determine the number of pages for a comic section for jointly published Sunday editions which shall consist of strips and features selected equally by the Review-Journal and the Sun.

(c) For jointly published Saturday and holiday editions, the Sun shall be entitled to one editorial or op. ed. page and one comic page.

A.3. Pursuant to Section 5.1.4 of this Agreement, the Review-Journal shall establish for each fiscal year after the Effective Date a budget for promotional activities of the Review-Journal and the Sun and at least forty percent (40%) of each total budget shall be allocated to the Sun.

A.4. Edition times for Monday through Friday issues of the Review-Journal and the Sun and for jointly published Sunday,

-2-

SUN_00002029

APP117

SA326

Saturday and holiday editions shall be established by the Review-Journal in accordance with normal industry standards.

A.5.  If the Review-Journal determines that it is feasible to publish an "extra" edition, such edition shall be a jointly published edition, but the content of any "extra" edition shall be determined solely by the Review-Journal.

-3-

APP118

SA327

APPENDIX B

B.1.   Except as otherwise expressly provided for in this Agreement, the term "Agency Expense" shall mean and include all costs and expenses of the performance of the Review-Journal's obligations under this Agreement, including but not limited to:

B.1.1.   The amounts allocated to Review-Journal and Sun for news and editorial expenses and for promotional expenses as set forth in Appendix A.

B.1.2.   Costs and expenses incurred by Review-Journal, with respect to the newspapers, supplements and Showbiz Magazine, for composition, printing, and distributing; news content of Showbiz Magazine; solicitation and sale of advertising; circulation sales expenses; collection of circulation and advertising accounts receivable, including a reasonable allowance for doubtful receivables and write-offs of receivables deemed uncollectible.

B.1.3.   Compensation of Review-Journal's non-news and non-editorial employees, including, without limitation, salaries, commissions, payroll taxes, the cost of group insurance, retirement benefits, workers' compensation coverage, and other benefits for such employees as may be customary in the newspaper industry from time to time.

B.1.4.   Accrued vacation or severance pay for Review-Journal's non-news and non-editorial employees.


Agency costs s/h/ include income taxes RJ liable ins.

SUN_00002031

APP119

SA328

B.1.5.   Costs for supplies, postage, private couriers, freight, Sunday comics and supplements, film, photo paper and chemicals, ink, newsprint, plates, cuts and mats and contract trucking, and similar costs for all Review-Journal newspaper departments, other than news and editorial.

B.1.6.   Expenses for travel, auto allowances, mileage reimbursement, employee relations, recruiting, and attendance at seminars and conventions for Review-Journal's non-news and non-editorial employees.

B.1.7.   Sales and use taxes on equipment and personal property purchased for use by Review-Journal or otherwise applied to Agency operations under this Agreement to the extent that such taxes are not capitalized for purposes of depreciation or amortization.

B.1.8.   Taxes, license or permit fees paid by Review-Journal with respect to or resulting from the conduct of business under this Agreement or with respect to property used by Review-Journal in the operations under this Agreement, except federal, state or local taxes, if any, measured by net income.

B.1.9.   The cost of membership for Review-Journal and Sun and their non-news and non-editorial employees in the Better Business Bureau, Las Vegas Chamber of Commerce, and other business-oriented

-2-

SUN_00002032

APP120

SA329

memberships which shall be determined by Review-Journal to be in the best interests of the Agency.

B.1.10.  The cost of Review-Journal and Sun membership in the Newspaper Advertising Bureau, American Newspaper Publishers Association, and other similar newspaper organizations.

B.1.11.  The cost of public liability insurance, insurance against interruption or suspension of publication of the newspapers, carrier insurance, and libel, invasion of privacy and related insurance covering advertising printed in the newspapers. Insurance costs relating to the news or editorial activities of the Review-Journal or the Sun shall not be considered Agency Expense and such costs shall be borne separately by the parties; provided, that each party shall attempt to add the other as an additional named insured under such insurance, but Review-Journal may procure libel, invasion of privacy and related insurance to cover any otherwise inadequately insured exposure it may have as a republisher of Sun news, editorial or advertising copy, and the cost of such additional insurance shall be an Agency Expense.

B.1.12.  The cost of fire and casualty insurance on buildings, equipment, and other property utilized by Review-Journal in the performance of the Agreement.

-3-

SUN_00002633

SA330

B.1.13.  The cost of all utilities related to the Review-Journal's performance of the Agreement.

B.1.14.  Costs and expenses incurred in connection with hazardous waste materials.

B.1.15.  Costs and expenses incurred by Review-Journal in obtaining legal and other professional services which it deems necessary in performing its obligations under this Agreement, including but not limited to the costs and fees related to any defense against third party claims, charges, complaints and related matters asserted against the Review-Journal related to the Agreement or Review-Journal's performance of the Agreement; provided, that such costs and fees related to news and editorial liabilities as defined in Section 8.1.2 shall not be Agency Expense, except insofar as such liabilities are asserted against Review-Journal solely due to its republication of Sun news, editorial or feature material or advertising copy.

B.1.16.  A monthly charge of Five Hundred Fifty Thousand Dollars ($550,000) for the rental value of all Review-Journal real property, plant and equipment (including the value of Sun office space provided by Review-Journal under Section 5.4 of the Agreement), except that devoted to non-agency activities such as the Review-Journal's news and editorial operations. The rental charge would be adjusted each five (5)

-4-

SUN_00002034

APP122

SA331

years on the basis of the change in the CPI for the Las Vegas, Nevada, market.

B.1.17. A monthly charge equal to one and one-half percent (1-1/2%) of the cost of all equipment acquired, expansion or remodeling of buildings, or other capital expenditures, in connection with Agency activities, subsequent to the date of the Agreement. The monthly charge would be subject to adjustment at any time on the basis of increases in the prime interest rate at First Interstate Bank, Las Vegas, Nevada. The Review-Journal shall have sole discretion regarding the purchase of equipment or other necessary capital expenditures for the performance of the Agreement.

B.1.18. A monthly charge for general management services equal to three and one-half percent (3-1/2%) of Agency Revenues.

B.2. All costs and expenses in connection with the news content, composition, production, distribution and advertising sales in connection with Showbiz Magazine shall be included in Agency Expense for the period Showbiz Magazine is governed by the terms of this Agreement, pursuant to Section 4.5.

B.3. Changes or additions in the Sun's newsroom equipment which may be required after the Effective Date to interface with Review-Journal production facilities shall be purchased or paid for by Review-Journal and a monthly charge equal to one and one-half percent (1-1/2%) of the cost thereof shall be

-5-

SUN_00002035

APP123

SA332

included in Agency Expense. This monthly charge would be subject to adjustment at any time on the basis of increases in the prime interest rate at First Interstate Bank, Las Vegas, Nevada.

-6-

SUN_00002036

APP124

SA333

APPENDIX C

AGENCY REVENUES

C.1.   Except as otherwise expressly provided in this Agreemer the term "Agency Revenues" shall mean and include:

C.1.1.   All advertising and circulation revenues of the newspapers, subject to the provisions of Section 7.1 of this Agreement with respect to accounts receivable outstanding on the Effective Date.

C.1.2.   All revenues from sales incidental to the publication of the newspapers or involving either the facilities used to produce the newspapers or personnel whose compensation is included in Agency Expense, such as sales of commercial printing, waste paper, press plates, and other production materials.

SUN_00002037

APP125

SA334

APPENDIX D

Operating profit under the Agreement shall mean the excess of Agency Revenues over Agency Expense, and shall be distributed as follows:

For each fiscal year during the term of the Agreement the operating profit shall be distributed ninety percent (90%) to the Review-Journal and ten percent (10%) to the Sun, with payment to be made to the Sun pursuant to the provisions of Section 6.4 of the Agreement, provided, that for the first fiscal year the Sun shall be guaranteed a minimum operating profit distribution of Three Million Dollars ($3,000,000).

SA335

## APPENDIX D

Operating profit under the Agreement shall mean the excess of Agency Revenues over Agency Expense, and shall be distributed as follows:

For each fiscal year during the term of the Agreement the operating profit shall be distributed ninety percent (90%) to the Review-Journal and ten percent (10%) to the Sun, with payment to be made to the Sun pursuant to the provisions of Section 6.4 of the Agreement.

SUN_00002039

# EXHIBIT 2

June 10, 2005, Amended and Restated Agreement (the "2005 JOA")
(SUN_00002045-69)

# EXHIBIT 2

## AMENDED AND RESTATED AGREEMENT

This Amended and Restated Agreement ("Restated Agreement") dated as of June 10, 2005 between DR Partners, a Nevada General Partnership, the successor-in-interest to Donrey of Nevada, Inc. ("DR") and the Las Vegas Sun, Inc., a Nevada corporation ("Sun").

### PRELIMINARY STATEMENT

WHEREAS, DR owns and publishes in Las Vegas, Nevada, a morning newspaper on weekdays, a morning newspaper on Saturdays and holidays, and a Sunday newspaper, each known as the Las Vegas Review-Journal (hereinafter referred to as the "Review-Journal"); and

WHEREAS, Sun owns in Las Vegas, Nevada, an afternoon newspaper on weekdays, known as the Las Vegas Sun (hereinafter referred to as the "Sun") and a combined Saturday and Sunday paper with the Review-Journal; and

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

### ARTICLE I
### REGULATORY FILING AND TERM

1.1    Regulatory Filing. Within ten business days (or on such later day as the parties may agree) the Parties agree to file the Restated Agreement with the Attorney General of the United States under the Newspaper Preservation Act within the Department of Justice and to use their best efforts and take all action necessary to effect the intent of this Restated Agreement. In the event of any action by the United States Department of Justice after the filing of the Restated Agreement which, in the sole opinion of either party, hinders, impairs, seeks to halt or otherwise materially impacts this Restated Agreement, then either party may declare the Restated Agreement null and void, and the 1989 Agreement between the parties shall be reinstituted and remain in full force and effect. The Restated Agreement does not constitute any limitation on either party's obligation to engage in good faith labor negotiations if and as required by the National Labor Relations Act, and to implement any understandings it may reach in such negotiations.

Upon execution hereof, each party shall furnish to the other a written opinion of its counsel that all necessary corporate or partnership action has been taken to authorize this Restated Agreement and that, subject to the conditions of the preceding paragraph, this Restated Agreement shall constitute the valid and binding obligation of the respective party. The parties agree to cooperate in coordinating meetings with government officials, community leaders, employees and their representatives, advertisers and others to explain the Restated Agreement.

1

JOA 020705

SaltLake-251719.2 0062095-00001

Each party shall pay its own costs and professional fees in connection with the formulation and drafting of the Restated Agreement and the preparation and filing of the Restated Agreement with the Department of Justice. From and after the filing of such Restated Agreement, all costs and professional fees in connection with seeking any required approval by the Department of Justice shall be controlled and approved by the Review-Journal and such cost and shall be borne solely by Review-Journal.

1.2    Term. The term of this Restated Agreement shall begin at 12:00 a.m. on June 10, 2005 ("the Effective Date"). The 1989 Agreement shall remain in full force and effect through September 30, 2005 (the "Transition Date"). Subject to the termination provisions set forth in Article 9, the Restated Agreement shall continue for an initial period ending at the close of business on the 31st day of December of the fiftieth (50th) year from July 1, 1990. The Restated Agreement shall then automatically renew for succeeding periods of ten (10) years unless either party shall notify the other in writing at least two (2) years prior to the end of the then current period that it elects to terminate the Restated Agreement at the end of said period. The phrase "term of this Agreement" as used hereafter shall mean the initial period and any renewal period or periods.

### ARTICLE 2
### AGENCY
### Intentionally omitted

### ARTICLE 3
### Intentionally omitted

### ARTICLE 4
### NEWS AND EDITORIAL COPY, FEATURES AND SERVICES

4.1    Maintenance of News and Editorial Staff; Feature Materials. Review-Journal and Sun each shall maintain a staff of news and editorial employees, and shall license such feature materials (including, but not limited to, news and editorial services supplied by third parties), adequate to provide its respective newspaper with all of the news and editorial copy and related services deemed necessary by each of them as to its respective newspaper. Review-Journal shall use commercially reasonable efforts to cause third party suppliers of feature materials and professional associations to provide such feature materials and association memberships to Sun at rates equivalent to those currently charged to Sun.

4.2    News and Editorial Allocations. The Review-Journal and the Sun shall each bear their own respective editorial costs and shall establish whatever budgets each deems appropriate.

4.3    Furnishing News and Editorial Copy and Services. In furnishing features, news and editorial copy, and like materials to Review-Journal for publication in the Sun, and in providing layout for such material, Sun shall provide all such material in a form appropriate for the production of its newspaper, in conformity with the mechanical standards, deadlines and production requirements which prevail in the Review-Journal plant from time to time, including

2

JOA 020705

SaltLake-251719.2 0062095-00001

deadlines, page sizes, column widths, and cut-offs established by Review-Journal, upon reasonable notice to Sun. Sun shall acquire and maintain at its expense such newsroom equipment (including, but not limited to, newspaper production systems, i.e., "front-end" systems) as may be required to interface with Review-Journal production facilities. In the event that the newspaper production system used by the Review-Journal is changed and (i) the Sun has utilized a production system that is current with systems commonly employed in the newspaper industry; (ii) the change by the Review-Journal results in any loss of a fully functional interface with the Sun newspaper production system, the Review-Journal shall be responsible to furnish such additional software, hardware and technical services to the Sun as may be necessary to establish such an interface. The Review-Journal shall give Sun ninety (90) days advance notice of anticipated changes to the Review-Journal's production system, including technical specifications for the new or modified system. The Sun shall treat any software provided as confidential and conform to all applicable licensing requirements for such software. Newshole limitations and other matters are set forth in Appendix A hereto. The parties agree to begin the publication cycle changes for the Sun on the Transition Date (or on such latter day as the parties may agree). The Review-Journal reserves the right to print conspicuous notices to the effect that the news content of the non-Sun portion of the Newspapers, including locally produced supplements, is produced by Review-Journal personnel. The Sun reserves the right to print conspicuous notices to the effect that the news content of the non-Review-Journal portion of the Newspapers, including locally produced supplements, is produced by Sun personnel.

    4.4    Intentionally omitted.

ARTICLE 5

CONTINUING PUBLICATION AND
NEWS AND EDITORIAL AUTONOMY

    5.1    Production and Promotion of the Newspapers. Subject to the terms of the Restated Agreement, and as of the Transition Date, Sun shall be a daily morning newspaper as specified in Appendix A. The Review-Journal shall be a daily morning newspaper, as specified in Appendix A, including such sections and materials as are consistent with custom and practice in the United States metropolitan daily newspaper industry. So long as Sun furnishes news and editorial copy, features and services to Review-Journal in accordance with Article 4 of this Restated Agreement, Review-Journal agrees to produce the Sun daily as a morning newspaper as provided herein to include the Sun copy and to sell all advertising for, promote and circulate such newspapers as provided herein. The daily Sun and the daily Review-Journal are hereinbefore and hereinafter referred to as the "Newspapers". Review-Journal shall print the Newspapers in the Review-Journal plant or plants located at such place or places as Review-Journal may determine, and all operations under this Restated Agreement, except the operation of the Sun' news and editorial department, shall be carried on and performed by the Review-Journal with Review-Journal employees and equipment and in the Review-Journal's said plant or plants or by independent contractors selected by the Review-Journal. All costs, including capital expenditures, of operations under this Restated Agreement, except the operation of the Sun's news and editorial department, shall be borne by Review-Journal.

3

JOA 020705

SaltLake-251719.2 0062095-00001

SUN_00002047

APP131

SA451

The Review-Journal shall control, supervise, manage and perform all operations involved in managing and operating under this Restated Agreement, including the need, if any, for Sunday supplements and comics, total or zoned market coverage, direct mail or other publication programs, zoned editions, and printing, selling and distributing the Newspapers, shall determine page sizes, number of columns per page, cut-offs, page makeup of non-news and non-editorial (subject to Appendix A), and all other mechanical and technical functions of the Newspapers, shall purchase newsprint, materials and supplies as required and shall determine the rates for, solicit and sell all advertising space in the Newspapers, shall determine circulation rates, collect the Newspapers' circulation and advertising accounts receivable, and shall make all determinations and decisions and do any and all acts and things related to the foregoing activities, provided:

    5.1.1   Format. Review-Journal shall not change the format of the Sun to any size or format different from that of the Review-Journal without approval of Sun.

    5.1.2   Sun Editions. The number of Sun editions shall not be changed without approval of Sun.

    5.1.3   Circulation. Review-Journal shall use commercially reasonable efforts to maximize the circulation of the Newspapers.

    5.1.4   Promotional Activities. Review-Journal shall use commercially reasonable efforts to promote the Newspapers. Any promotion of the Review-Journal as an advertising medium or to advance circulation shall include mention of equal prominence for the Sun. Either the Review-Journal or Sun may undertake additional promotional activities for their respective newspaper at their own expense. For all promotional activities for the Newspapers paid for by the Review-Journal, the Review-Journal shall be responsible for all promotional copy preparation and placement, provided however, that the Sun shall have the right to approve all promotional copy for the Sun that does not generically and concurrently promote both Newspapers.

    5.1.5   Intentionally omitted.

    5.1.6   Meetings of JOA Participants. DR senior management shall meet quarterly with Sun senior management to discuss performance under this Restated Agreement.

    5.1.7   Advertising Acceptability. Sun may reject any advertising or types of advertising for the Sun which is, in the opinion of Sun, undesirable or inappropriate for publication therein, and shall notify Review-Journal in writing of any specific advertising or types of advertising that Sun deems undesirable for publication. Review-Journal shall accept all advertising for the Sun other than the advertising indicated on Sun's written notice, subject to all laws affecting the acceptability of advertising.

    5.1.8   Intentionally omitted.

4

JOA 020705

SaltLake-251719.2 0062095-00001

5.2.    News and Editorial Autonomy.  Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the essence of this Restated Agreement.  Sun shall have exclusive and complete control, authority and direction over the news and editorial content, features and services to be furnished by Sun to Review-Journal to be included in its newspaper, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees.  Review-Journal shall have exclusive and complete control, authority and direction over the news and editorial content, features and services in its newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees.  The Review-Journal and Sun each hereby agrees to preserve high standards of newspaper quality throughout the term of this Restated Agreement consistent with United States metropolitan daily newspapers.

5.3.    Performance and Cooperation.  Sun and Review-Journal agree to take all corporate action necessary to carry out and effectuate the intent, purposes and provisions of this Restated Agreement, and to cooperate with the other party in every reasonable way that will promote successful and lawful operation under this Restated Agreement for both parties.

5.4    Sun Office Space.  The Sun shall provide and pay for its own offices for its news and editorial department and management.

ARTICLE 6
Intentionally omitted

ARTICLE 7
PAYMENT

During the term of this Restated Agreement, DR and the Sun shall receive the amounts set forth in Appendix D.

ARTICLE 8
NON-LIABILITY PROVISIONS

8.1    Defense of Claims and Indemnification.  Any claim, demand, suit, action, obligation or other liability asserted against or sustained by Review-Journal and Sun, or either of them, in respect of any third party ("Claims") shall be dealt with as provided in this Article 8.  For all purposes of this Article 8, the term "cost or expense" shall include reasonable attorneys' fees and costs, whether or not taken to trial or appeal or in any bankruptcy or other related proceeding.

8.1.1    Claims Related to the Joint Operation.  Review-Journal shall defend and shall control the defense or settlement of any third party Claims related to the joint operations or to its performance or non-performance under this Restated Agreement (including but not limited to Claims arising from any advertising published in, or excluded from, any of the Newspapers -

5

JOA 020705

SaltLake-251719.2 0062095-00001

except as provided in Section 8.1.2 - and claims in respect of feature, news and editorial content furnished by Sun hereunder arising as a result of any act or omission on the part of Review-Journal other than republication in the form furnished by Sun), devoting reasonable efforts to minimizing any resulting liability and related cost or expense. Any such liability, and the cost of expense related thereto, shall be borne by the Review-Journal, except to the extent any such Claim shall be covered by insurance.

8.1.2    Other Claims. Except as specifically provided in Section 8.1.1. or elsewhere in this Restated Agreement, neither party hereto shall be charged with or held responsible for any third party Claims, arising before or after the Effective Date by reason of any act or omission on the part of the other party, and the responsible party shall defend and indemnify and hold the other party harmless therefrom, including all related cost or expense. The responsible party shall defend, settle, pay or discharge any such Claim and shall indemnify and hold harmless the other party against any such Claim, and from any liability, cost or expense arising therefrom. By way of example under this Section 8.1.2 and without limitation, the entire cost or expense of defending, settling or paying and discharging Claims relating to any feature, news or editorial copy published in, or excluded from the daily Review-Journal or arising by reason of anything done or omitted by the news and editorial department of the Review-Journal in regard to its daily newspaper or arising by reason of any advertising rejected by the Review-Journal or accepted by the Review-Journal in situations where such advertising would be rejected pursuant to Sun guidelines, shall be borne by DR and any such liability, cost or expense on account of claims relating to any feature, news or editorial copy published in, or excluded by Sun from the daily Sun or, or arising by reason of anything done or omitted by the news and editorial department of the Sun, or arising by reason of any advertising rejected by the Review-Journal pursuant to Sun guidelines, or accepted in situations where such advertising would be rejected pursuant to Review-Journal guidelines, shall be borne by Sun, unless such Claims shall be an expense of the Review-Journal by reason of the operation of Section 8.1.1.

8.1.3    Insurance. For the purpose of this Article 8, each party shall separately maintain and pay for, as an item of news and editorial expense, insurance to the extent reasonably available protecting against losses from libel, invasion of privacy, copyright or trademark infringement and other matters related to the gathering or preparation of news and editorial matter for publication, in such amounts as the parties may agree upon from time to time, but in no event less than Ten Million Dollars ($10,000,000), and the other party shall be named as an additional insured.

8.2    Force Majeure. Neither party shall be liable to the other for any failure or delay in performance under this Restated Agreement, occasioned by war, riot, government action, act of God or public enemy, acts of terrorism, damage to or destruction of facilities, strike, labor dispute, failure of suppliers or worker, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform, provided that in the event partial performance under this Restated Agreement is feasible, notwithstanding the occurrence of one or more of the foregoing, performance shall be allocated between the newspapers by the Review-Journal, in its sole judgment, notwithstanding the provisions of Appendix A hereto, provided, that the Sun portion shall not be less than six (6) pages.

6

JOA 020705

SaltLake-251719.2 0062095-00001

SUN_00002050
APP134
SA454

## ARTICLE 9
## TERMINATION

9.1     Events of Termination. This Restated Agreement shall continue in full force and effect unless and until it may be terminated by the occurrence of one of the following events of termination:

9.1.1   Stated Duration. Expiration of the term set forth in Section 1.1

9.1.2   Bankruptcy or Default. If either party hereto makes an assignment of its assets for the benefit of creditors, an order of relief is entered by any bankruptcy court or has a receiver appointed for its business by a court of competent jurisdiction (provided, that such assignment, order of relief or adjudication shall continue unstayed on appeal or otherwise in effect for a period of ninety (90) days after the assignment, the entry of the order of relief or decree related thereto before such assignment or adjudication becomes an event of termination, and further provided that the appointment of the receiver must continue unvacated, not set aside, not stayed or otherwise in effect for a period of ninety (90) days after such appointment before such appointment becomes an event of termination), or if either party defaults in the performance of any of its material obligations hereunder and does not cure such default within sixty (60) days after receiving written notice thereof from the other party, then such other party may, at its election, and in addition to all other remedies available to it at law or in equity, terminate this Restated Agreement. In the event of the entry of an unstayed order of relief in an involuntary bankruptcy by DR, the Sun shall have the right, at its option, to purchase from DR, the equipment necessary to publish the Sun. The value of the equipment shall be set by the bankruptcy trustee. In the event of an unstayed order of relief in an involuntary bankruptcy, the Sun may lease, at fair market value, for a period not to exceed five (5) years the assets necessary to the publish the Sun.

9.1.3.  Change of Controlling Interest. In view of the nature of the relationship established by this Restated Agreement and the fact that the Sun is published under the direction and control of the Estate of Herman Greenspun and Brian L. Greenspun, the Review-Journal shall not be required to carry out the terms of this Restated Agreement or be associated with another party to which it reasonably objects. Accordingly, ownership or control of the Sun shall not be transferred to any other entity or person without notice to and prior approval by the Review-Journal, provided that the Review-Journal will not object to any transfer of the ownership or control of Sun to any entity under the immediate direction of Brian L. Greenspun, or any other lineal descendant of Herman M. Greenspun. Notwithstanding the foregoing, controlling interest of the Sun may be transferred to any person that can provide the necessary editorial background and expertise to produce the Sun pursuant to the terms of this Restated Agreement. Following an approved or permitted change of control of Sun, if a subsequent change of control occurs, notice as hereinabove shall be given and the Review-Journal may exercise the rights provided herein.

9.1.4   Intentionally omitted.

7

JOA 020705

SaltLake-251719.2 0062095-00001

9.2    Intentionally omitted.

9.3    Duties Upon Termination.  Upon termination of this Restated Agreement, either by expiration of its term or otherwise, the Review-Journal shall provide Sun with a complete list (including all contact information) of current newspaper subscribers and advertisers.

## ARTICLE 10
## MISCELLANEOUS

10.1    Notices.  Each notice or other communication given pursuant to this Agreement shall be given in writing, delivered in person or mailed by registered or certified mail, addressed to the respective parties as follows:

Review-Journal:    DR Partners
P. O. Box 70
Las Vegas, NV 89125
Attention: Sherman Frederick

Sun:    Brian L. Greenspun, Esq.
President & Editor
Las Vegas Sun
2275 Corporate Circle Drive
Suite 300
Henderson, Nevada 89074

Or, in case of either party hereto, at such other address or marked for the attention of such other person, as such party may set forth in a written notice to the other party.

10.2    Disclaimer of Labor Related Obligations.  The parties specifically agree that neither party hereby assumes any obligations of the other party related to its employment practices or to any of its employees, whether or not arising under any collective bargaining agreements or arising prior to, on or subsequent to the Effective Date.

10.3    Intentionally omitted.

10.4    Limited Effect.  Nothing herein contained shall constitute the parties hereto partners, joint venturers, successors, alter egos, joint employers, an unincorporated association, or as having any relationship other than as specifically provided by this Restated Agreement. This Restated Agreement is intended solely for the benefit of the parties hereto, and their permitted successors and assigns and not for the benefit of any other person or party.  This Restated Agreement, including Appendices A through D hereto, and the contracts and agreements supplemental hereto, comprises the entire understanding and agreement of the parties hereto on the subject matter herein contained and any and all other representations or agreements, which heretofore may have been made on such subject matter, whether oral or in

8

JOA 020705

SaltLake-251719.2 0062095-00001

writing, by any agent of either party shall be null, void and of no effect whatsoever. Time is of the essence of this Restated Agreement.

10.5    Intentionally omitted.

10.6    Sun Trademark, Tradenames, Service Marks and Copyrights. In its use of such Sun trademarks, tradenames, service marks and copyrights as may be required to perform its obligations under this Restated Agreement, including promotion of the Newspapers, Review-Journal shall use commercially reasonable effort to comply substantially with all relevant laws of the State of Nevada and of the United States pertaining to trademarks, tradenames, service marks and copyrights in force at any time during the term of this Restated Agreement. Review-Journal shall have the exclusive right and the obligation to distribute the Sun through electronic replica technology (i.e. technology customarily used by metropolitan daily newspapers which transmits an entire Sun page to the subscriber or consumer in any form) to the same extent the Review-Journal distributes its own pages by such means provided, however, that Sun shall have the right to republish, license, or otherwise use its editorial content in any form or media, other than as an entire Sun page or pages, upon the earliest of: (i) 7:00 a.m., (ii) the time the Review-Journal guarantees delivery to its subscribers, or (iii) the time the Review-Journal first uses its editorial content in any form or media other than in the printed newspaper or replica technology. Sun shall use commercial reasonable efforts to maintain in effect said trademarks, trade names, services marks and copyrights, and shall make applications for the registration and/or renewal thereof if and when required by law. Review-Journal acknowledges Sun's right, title and interest in and to said trademarks, trade names, service marks and copyrights and all renewals thereof, and agrees that it shall not at any time permit, take, or cause to be taken any action within its control in any way impairing or tending to impair any part of such right, title and interest. Review-Journal agrees to publish such notices in the Sun as Sun reasonably may request in order to protect said trademarks, trade names, service marks and copyrights, or any of them. Review-Journal shall not in any manner represent that it has any ownership interest in said trademarks, trade names, services marks or copyrights or in the registration thereof, and Review-Journal acknowledges that its use hereunder of said trademarks, trade names, services marks or copyrights shall not create in its favor any right, title or interest in or to same beyond those created by this Restated Agreement. The Review-Journal shall have the right to republish, license, or otherwise use its editorial content in any form or media.

10.7    Tax Treatment of Payments to Sun. Its is contemplated by the parties that the payments to Sun under Appendix D of this Restated Agreement will be, for federal income tax purposes, ordinary income to Sun and will be deductible by DR as a business expense.

10.8    Specific Performance. Because of the public interest in maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs, and because of the inadequacy of damages in the event of default in the performance of material obligations hereunder, each party shall have the right to seek specific performance of the material provisions of this Restated Agreement, provided, that in the event of any action by either party for specific performance, if that party does not obtain an order of specific

9

JOA 020705

SaltLake-251719.2 0062095-00001

APP137

SA457

performance, the other party shall be entitled to recover in such action its attorneys' fees and costs.

10.9    Successors and Assignment.  This Restated Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their permitted successors and assigns.

10.10  Governing Law; Modification.  This Restated Agreement shall be construed and enforced in accordance with the laws of the State of Nevada.  This Restated Agreement may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, modification or discharge shall be sought.

10.11  Headings.  Headings have been inserted in this Restated Agreement for the purpose of convenience only.  They shall not be used to interpret or construe the meaning of any Articles or Sections, nor shall they have the effect of limiting or enlarging the meaning thereof.

10.12  Ancillary Publications.  Nothing in this Restated Agreement shall preclude either party from engaging in any lawful business outside of this Restated Agreement, except that neither Review-Journal, or any Affiliate of Review-Journal nor Sun, or any Affiliate of Sun, shall, outside of this Restated Agreement, publish a newspaper that is published three or more days per week and that is directed primarily to Clark, Nye, or Lincoln Counties, Nevada or any parts thereof.  As used in this Restated Agreement, "Affiliate" means any person, corporation, partnership, trust or other entity which controls, is controlled by, or is under common control with either party.

10.13  Release.  As a material inducement to DR to enter into this Restated Agreement, and for other good and valuable consideration, Sun, for itself, and its assigns, hereby unconditionally releases and forever discharges DR and the Las Vegas Review-Journal and their partners, predecessors, successors, assigns, agents, stockholders, directors, officers, current or former employees, representatives, attorneys, divisions, subsidiaries, affiliates, receivers, trustees, shareholders and all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, including, but not limited to, attorneys' fees and costs actually incurred of any nature whatsoever with respect to all those claims asserted or which could have been asserted which arise out of, or are related to, operation of the Las Vegas Review-Journal or Sun between June 17, 1989, and June 10, 2005, known or unknown, including, but not limited to, any claims connected with operations under the 1989 Joint Operating Agreement between the parties, during that time period, including those items set forth on Exhibit C to a release agreement between the parties dated June 20, 2002 and any claims related to the conduct or operation of lvrj.com, reviewjournal.com, lasvegasnewspapers.com.

As a material inducement to Sun to enter into this Restated Agreement, and for other good and valuable consideration, DR, for itself, its affiliates and assigns, hereby unconditionally releases and forever discharges Sun its partners, predecessors, successors, assigns, agents, stockholders, directors, officers, current or former employees, representatives, attorneys,

10

JOA 020705

SaltLake-251719.2 0062095-00001

SUN_00002034

APP138

SA458

divisions, subsidiaries, affiliates, receivers, trustees, shareholders and all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, including, but not limited to, attorneys' fees and costs actually incurred of any nature whatsoever with respect to all those claims asserted or which could have been asserted which arise out of, or are related to, operation of the Las Vegas Review-Journal or Sun between June 17, 1989, and June 10, 2005, known or unknown, including, but not limited to, any claims connected with operations under the 1989 Joint Operating Agreement between the parties, during that time period, including those items set forth on Exhibit D to a release agreement between the parties dated June 20, 2002 and any claims related to the conduct or operation of lasvegassun.com or lasvegasnewspapers.com.

11

JOA 020705

SaltLake-251719.2 0062095-00001

SUN_00002095

APP139

SA459

IN WITNESS WHEREOF, this Restated Agreement has been executed by the parties' respective

corporate officers thereto duly authorized as of the day and year first above written.

DR PARTNERS.
By: Stephens Group, Inc.
General Partner

By: _Warren A. Stephens_
Warren Stephens
Chief Executive Officer

LAS VEGAS SUN, INC.

By: _____
Brian L. Greenspun
President

12

JOA 020705

SaltLake-251719.2 0062095-00001

APPENDIX A

A.1. Intentionally omitted

A.2. Pursuant to Section 4.3. of this Restated Agreement, the number, placement, and characteristics of Sun pages shall be in accordance with the following specifications:

(a)    For Monday through Friday editions, the Sun shall be composed of an open front page with the Las Vegas Sun flag and seven (7) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun. The remaining pages may include advertising, subject to the restrictions in (d) below.  For Monday-Friday editions, the Review-Journal shall be composed of as many pages as Review-Journal management determines in its sole discretion.

(b)    For the Sunday edition, the Sun shall be composed of an open front page with the Las Vegas Sun flag and nine (9) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun.  The remaining pages may include advertising, subject to restrictions in (d) below.  The Review-Journal shall determine the number of pages for a comic section for the Sunday edition which shall consist of strips and features selected by the Review-Journal.  The Sunday paper, including comics, shall be composed of as many Review-Journal pages as Review-Journal management determines in its sole discretion.

(c)    For Saturday and holiday editions, the Sun shall be composed of an open front page with the Las Vegas Sun flag and five (5) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun.  The Saturday and holiday editions shall be composed of as many Review-Journal pages as Review-Journal management determines in its sole discretion.  The remaining pages may include advertising, subject to restrictions in (d) below.

(d)    The Sun shall not include any Review-Journal editorial content. Standard materials such as weather pages, comics, standardized television listings and the like shall not be considered Review-Journal editorial material and may be included in the Sun as additional pages unless the Sun objects in writing thereto.  Other than open pages, the Sun may include advertising.  No Sun page shall be more than 50% advertising, except for full page ads, and no advertising shall appear "above the fold" in the Sun, except for full page ads.  Notwithstanding the foregoing, pages may contain, from time to time, more than 50% advertising due to production issues and advertising demands.  Advertising will not be stacked in a pyramid format and shall be evened out in terms of height on the page.  The Monday-Sunday editions of the Review-Journal shall include a noticeable mention of the

13

SUN_00002657

APP141

SA461

Sun, on the front page of the Review-Journal. The noticeable mention will appear in a box above the Review-Journal's masthead (the "Sun Box") and shall be in the form shown on Appendix B. The Sun Box shall not be smaller in proportion than shown in Appendix B. The Sun Box shall also include the Sun's masthead, and any emblem that is part of the Sun's masthead. The Sun Box shall include a promotion of a story in the Sun and refer readers to the Sun inside. The type face, editorial artwork, font, and editorial promotional content appearing in the Sun Box shall be determined by Sun, in its sole discretion. Any color in the Sun Box shall be restricted to constituent colors used by the Review-Journal on its front page. The Sun Box shall be the left-hand box unless it would be obscured by a spaeda fold, in which case the Sun Box shall be the right-hand box. In the event of major breaking news or for exigent production circumstances, the Sun Box may be moved below the Review-Journal's masthead. The Sun, on average, will receive as much editorial color as the local news section of the Review-Journal.

A.3. Edition times for Monday through Sunday issues of the Review-Journal shall be established by the Review-Journal in accordance with normal industry standards. Deadlines for the Sun shall be the same as those established for the last local news sections of the Review-Journal. The Sun will be placed as the third section of the Newspapers except on occasions when exigent production circumstances require that it be placed as the fourth section. The Sun will be printed in the same press run as the Review-Journal local news section. The Review-Journal shall be solely responsible for determining the need for replating the Newspapers, and shall treat the Sun and the Review-Journal equally with respect to replating of page one for major breaking national or international news events

A.4. If the Review-Journal determines that it is feasible to publish an "extra" edition, such edition shall be a Review-Journal edition and the content of any "extra" edition shall be determined solely by the Review-Journal.

A.5. In the event the Review-Journal determines that the Sun's continued placement in the Review-Journal has a material and substantial negative financial impact on the revenue and profit of the Newspapers it may deliver the Sun separately from the Review-Journal but at the same time, place, and manner as the Review-Journal. The Review-Journal shall provide written notice to the Sun within fifteen (15) days of beginning such separate delivery specifying in detail the factual basis for its determination.

In the event the Sun disagrees with the Review-Journal's determination, it shall within seven (7) days of receipt of notice from the Review-Journal, request that the matter be submitted to arbitration by an arbiter mutually agreed upon by the parties. If Sun requests arbitration, the Review-Journal shall not deliver the Sun separately until sixty (60) days after selection of the arbitrator. In the event the parties are not able to agree upon an arbiter within seven (7) days, an arbiter shall selected by the Chairman of the Department of Journalism of Northwestern University, Evanston, Illinois, or a similar journalism school if Northwestern University has ceased operations of its School of Journalism. The parties shall request the arbitrator to render a decision within sixty (60) days of his or her selection, and Sun and the Review-Journal each

14

JOA 20705

SaltLake-251719.2 0062095-00001

hereby covenant to cooperate with the arbitrator to facilitate such request.

The arbitrator shall have experience in the senior management of metropolitan daily newspapers. In determining material and substantial negative financial impact, only the following factors shall be considered; advertiser abandonment of the Newspapers specifically due to the Sun's inclusion within the Review-Journal or subscriber cancellations of the Newspapers specifically due to the Sun's inclusion within the Review-Journal. The material and substantial negative financial impact shall be determined by reference to generally accepted standard newspaper industry sources. The decision of the arbitrator shall be final. The cost of the arbitration shall be borne by the non-prevailing party. The Review-Journal's rights under this section shall be cumulative and may not be exercised more often than once every eighteen (18) months.

In the event Sun determines, in its sole discretion, that the Sun's continued placement in the Review-Journal negatively impacts the Sun, the Review-Journal shall, upon fifteen (15) day written notice from Sun, thereafter deliver the Sun separately from the Review-Journal but at the same time, place and manner as the Review-Journal, provided that Sun shall pay any incremental expenditure reasonably incurred because of such separate delivery, which separate delivery shall be effected without any derogation in the publication, production, or delivery of the Review-Journal. Prior to giving its fifteen (15) day written notice, Sun may request and the Review-Journal shall provide a good faith estimate of such incremental expenditures and the parties shall meet and confer regarding the estimate. If the Sun is separately delivered, it will no longer receive noticeable mention in the Review-Journal.

15

JOA 20705

SaltLake-251719.2 0062095-00001

SUN_00002059

APP143

SA463

APPENDIX B

[Sample to be attached]

16

JOA 20705

SaltLake-251719.2 0062095-00001

SUN_00002060

APP144

SA464

APPENDIX B

Help pick the new Las Vegas city seal

**DRAW YOUR OWN**
SEE LIVING

## Batter Up

After finally breaking their 86-year-old Curse, the Red Sox start the season in a new role: defending champs

**SEE SPORTS**

## LAS VEGAS SUN
DOE knew of Yucca e-mails in December

**INSIDE | SECTION E**

**MONDAY**

# LAS VEGAS REVIEW-JOURNAL

www.reviewjournal.com

50 CENTS

MONTH XX, 2005

★★★

# Agency pursued damage control

*Documents show how DOE coped with e-mails about Yucca Mountain*

By STEVE TETREAULT
STEPHENS WASHINGTON BUREAU

WASHINGTON — Although they were bracing for a big Sunday, Energy Department officials released initial transparency of possible falsified documents would not affect the science supporting the Yucca Mountain nuclear waste site, documents made public this Monday show.

Three dozen pages of newly released memos and other internal documents show how federal officials scrambled to weigh the effect after discovering a cache of e-mail messages in which scientists discussed a plan to "fudge" factors and fabricate quality assurance of computer models used for climate and water studies.

The e-mails were brought to the department's attention on March 11 and were announced on March 16.

In the days between their discovery and the announcement, officials dissected the e-mail messages, written between May 15, 1998, and March 29, 2000. They also pored over input government and taking points to be discussed with Energy secretary Samuel Bodman and used in public disclosures, memos show.

A central theme in the talking points is that a Yucca engineer in Las Vegas, Bodman was told, said the information in the e-mails "does not impact the Yucca site recommendation, and we do not believe that the questionable data has any meaningful effect" on the safety of the site for use as a nuclear waste repository.

During this same period, officials started a more detailed investigation, the documents show.

They also show the Energy Department was sensitive to how the disclosure would reflect on the Yucca Mountain

▶ SEE YUCCA MOUNTAIN PAGE 6A

PUBLIC VIEWING OF POPE

# Mourners pay respects




The late Pope John Paul II is carried to St. Peter's Basilica at the Vatican Monday for a period of public viewing before he is buried in the grotto of the Basilica after his funeral Friday.

## *Thousands pack St. Peter's Square to see John Paul II ahead of burial*

By WILLIAM J. KOLE and MARIA TALCONI
THE ASSOCIATED PRESS

VATICAN CITY — The mourners stood in line hour after hour, starting when the sun's heat blazed off the Vatican's old stones, and into the late night chill. Pilgrims older than the late pope struggled to remain standing. Young children, even infants, were unusually well behaved.

All the time, as the line inched forward, it grew longer and longer, out of St. Peter's Square, stretching out of sight down the Via della Conciliazione. Police said close to midnight it was two miles long, and many people wide.

For pilgrims mourning Pope John Paul II, it was a deeply moving scene: the pope lying lifeless on a crimson platform, wearing a pair of the simple brown leather shoes he so often wore on his trips around the world.

There was no stopping for a lingering view, a motionless moment of reflection. Many wept as they walked past the bier. Some collapsed against the wall outside after leaving St. Peter's Basilica, where the pope's remains were on public view Monday afternoon. He will be buried Friday.

People who had never had an audience with the pope felt as if they had lost a dear one. "Every time I saw him (on television), he told me something, he gave me a message."

A mourner weeps Monday as John Paul's body is carried through St. Peter's Square.

said Silvia Sandez, 23, a student in Rome, after viewing the body. "Now, I just saw him."

"His face was suffering," said Sister Tinuvy, a 76-year-old Italian nun who saw the pope's body. "I felt a sense of sadness, even though I know he's in heaven."

The crowd cheerfully chanted and clapped hands on the street leading to St. Peter's Square as it moved slowly toward the basilica. As soon as they entered the square, people fell silent. It became a procession of mourning, with people holding their hands tightly and whispering the rosary.

After taking a quick glimpse of the pope's remains as poles whispered "Hurry up," many leaned against the walls of the basilica and sobbed.

▶ SEE POPE PAGE 12A

▶ AMERICAN CATHOLICS HOPE FOR MAJOR CHANGES PAGE 10A
▶ POPE'S FUNERAL DELAYS CHARLES' WEDDING PAGE 12A

# Oil concerns increase as prices soar to record level

*Limited supply, rising demand, continued weakness of U.S. dollar cited*

By BRAD FOSS
THE ASSOCIATED PRESS

Oil prices briefly climbed to record territory above $58 a barrel Monday, as concerns about growing demand and potential supply disruptions once again overshadowed improving crude inventories.

"I've been doing this for 22 years, and I've never seen anything like this," said oil analyst Ken Miller at Purvin & Gertz in Houston. "I view this as a very unstable situation."

Late in the day, traders took profits and considered a possible production increase by the Organization of Petroleum Exporting Countries, sending light, sweet crude for May delivery down 26 cents to $57 at a barrel on the New York Mercantile Exchange.

Prices had climbed as high as $58.28, topping the previous intraday record of $57.70 a barrel reached Friday, when futures settled at a record $57.27.

▶ SEE OIL PAGE 4A

# Supreme Court rules IRAs protected from bankruptcy

By BUSINESS

▶ SUPREME COURT ASKED TO BLOCK AWARD AGAINST

# Witness says Michael Jackson molested him

By LINDA DEUTSCH
THE ASSOCIATED PRESS

SANTA MARIA, Calif — In a halting, emotion-choked voice, the son of Michael Jackson's former housekeeper testified

trying to show the jury that the singer has a pattern of luring young boys.

The judge told jurors the evidence of past uncharged crimes was being offered to show a "propensity" by the de-

their weight "by a preponderance of the evidence."

"Complicated, yes," the judge said, and promised to give them the instructions again later.

The witness, a tall, slender,

APPENDIX B

**LAS VEGAS SUN**
DOE knew of Yucca
e-mails in December
**INSIDE | SECTION E**



# Batter Up
After finally breaking their 86 year-old
Curse, the Red Sox start the season in a
new role: defending champs
**SEE SPORTS**

Help pick the
new Las Vegas
city seal
**DRAW YOUR OWN
SEE LIVING**

**MONDAY**

# LAS VEGAS
# REVIEW-JOURNAL

www.reviewjournal.com

50 CENTS                MONTH XX, 2005

## Agency pursued damage control

*Documents show how DOE coped with e-mails about Yucca Mountain*

By STEVE TETREAULT

WASHINGTON — Atlantic they were bracing for a big blow one Energy Department times officials believed initially that reports of possible failure of documents would not affect the science supporting the Yucca Mountain nuclear waste site, documents made public on Monday show.

There dozen pages of newly released memos and other internal documents show how federal officials scrambled to weigh the effect after discovering a cache of e-mail messages in which scientists discussed using "fudge factors" and fabricating quality assurance of computer models used for climate and water studies.

The e-mails were brought to the department's attention on March 11 and were announced on March 16.

"In the days between then they told the announcement, officials discussed the e-mail messages, written between May 18, 1998, and March 29, 2001. They prepared an initial assessment and taking points to be discussed with Energy Secretary Samuel Bodman and used in public disclosures, memos show.

According to a memo prepared by a Yucca manager at Las Vegas Bechtel was to be told the scientists in the e-mails have not impact the Yucca site reconsideration, and we do not believe that the practicable data has any meaningful effect on the safety supporting the site as a long-term waste repository.

During this same period, officials wanted a more detailed examination, the documents show.

They also chose the Energy Department was sensitive to how the disclosures would be first on the Yucca Mountain.

▶ SEE YUCCA MOUNTAIN PAGE 3A

### PUBLIC VIEWING OF POPE

# Mourners pay respects



The late Pope John Paul II is carried to St. Peter's Basilica at the Vatican Monday for a period of public viewing before he is buried in the grotto of the basilica after his funeral Friday.

*Thousands pack St. Peter's Square to see John Paul II ahead of burial*

By WILLIAM J. KOLE
and MARTA FALCONI
THE ASSOCIATED PRESS

VATICAN CITY — The mourners stood in line hour after hour, starting when the sun's heat blazed off the Vatican's old stones, and into the late night chill. Pilgrims older than the late pope struggled to remain standing. Young children, even infants, were unusually well behaved.

All the time, as the line inched forward, it grew longer and longer, out of St. Peter's Square, stretching out of sight down the Via Della Conciliazione. Police said close to midnight it was two miles long, and many people were.

For pilgrims mourning Pope John Paul II, it was a deeply moving scene: the pope lying lifeless on a crimson platform, wearing a pair of the simple brown leather shoes he so often wore on his trips around the world.

There was no stopping for a lingering view, a motionless minute of reflection. Many wept as they walked past the bier. Some collapsed against the wall outside after leaving St. Peter's Basilica, where the pope's remains went on public view Monday afternoon. He will be buried Friday.

People who had never had an audience with the pope felt as if they had lost a dear one. "Every time I saw him (on television), he told me something, he gave me a message,"



A mourner weeps Monday as John Paul II's body is carried through St. Peter's Square.

said Silvia Sanalon, 23, a student in Rome, after viewing the body. "How I just saw him."

"His face was suffering," said Sister Emma, a 74-year-old Italian nun who saw the pope's body. "I felt a sense of sadness, even though I know he's in heaven."

The crowd cheerfully cheered and clapped hands on the street leading to St. Peter's Square as it moved slowly toward the basilica. As soon as they entered the square, people fell silent. It became a procession of mourning, with people holding their hands tightly and whispering the rosary.

After taking a quick glimpse at the pope's remains as police whispered "Hurry up," many leaned against the walls of the basilica and sobbed.

▶ SEE POPE PAGE 10A

▶ AMERICAN CATHOLICS HOPE FOR MAJOR CHANGES PAGE 12A
▶ POPE'S FUNERAL DELAYS CHARLES' WEDDING PAGE 18A

# Oil concerns increase as prices soar to record level

*Limited supply, rising demand, continued weakness of U.S. dollar cited*

By BRAD FOSS
THE ASSOCIATED PRESS

Oil prices briefly climbed to record territory above $58 a barrel Monday, as concerns about growing demand and personal supply disruption once again overshadowed improving crude inventories.

"I've been doing this for 22 years, and I've never seen anything like this," said oil analyst Tom Miller in Houston. "I view this as a very unstable situation."

Late in the day, traders took profits and considered a possible production increase by the Organization of Petroleum Exporting Countries, sending light sweet crude for May delivery down 26 cents to $57.01 a barrel on the New York Mercantile Exchange.

Prices had climbed as high as $58.28, topping the previous intraday record of $57.70 a barrel reached Friday, when futures settled at a record $57.27.

▶ SEE OIL, PAGE 4A

## Supreme Court rules IRAs protected from bankruptcy

By HOPE YEN

▶ SUPREME COURT ASKED TO BLOCK AWARD AGAINST FORMER IRAQI REGIME

WASHINGTON —



## Witness says Michael Jackson molested him

By LINDA DEUTSCH
THE ASSOCIATED PRESS

SANTA MARIA, Calif. — In a halting, emotion-cracked voice, the son of Michael Jackson's former housekeeper testified Monday that the pop star was trying to show the jury that the singer has a pattern of abusing young boys.

The judge told jurors the evidence of past uncharged crimes was being offered to show a "propensity" by the defendant to commit similar acts.

their weight "by a preponderance of the evidence."

"Complicated, yes?" the judge said, and promised to give them the instructions again later.

The witness, a tall, slender, dark-haired young man, said

**APP146**
SA466







LAS VEGAS SUN

## Batter Up

After finally breaking their 86-year-old Curse, the Red Sox start the season in a new role: defending champs

**SEE SPORTS**

Help pick the new Las Vegas city seal

**DRAW YOUR OWN**
**SEE LIVING**

**MONDAY**

### LAS VEGAS
# REVIEW-JOURNAL

www.reviewjournal.com

50 CENTS

MONTH XX, 2005

masthead /flag

Sun logo, using Sun typeface



DOE knew of Yucca e-mails in December

**INSIDE | SECTION E**

## Batter Up

After finally breaking their 86-year-old Curse, the Red Sox start the season in a new role: defending champs

**SEE SPORTS**

Help pick the new Las Vegas city seal

**DRAW YOUR OWN**
**SEE LIVING**

**MONDAY**

### LAS VEGAS
# REVIEW-JOURNAL

www.reviewjournal.com

50 CENTS

MONTH XX, 2005

APPENDIX C
Intentionally omitted

17

JOA 20705

SaltLake-251719.2 0062095-00001

APP148

SA468

## APPENDIX D

Sun shall receive an annual profits payment (the "Annual Profits Payment"), one-twelfth $(1/12^{th})$ of which shall be paid monthly in advance on the first day of each month during the Term.  For the fiscal year beginning April 1, 2005, the Annual Profits Payment shall be Twelve Million Dollars ($12,000,000), provided, however, that payments to Sun shall continue in accordance with the 1989 Agreement until the Transition Date.  Each fiscal year thereafter during the term of this Agreement the Annual Profits Payment shall be adjusted as set forth in this Appendix D.  Within thirty (30) days following the beginning of each such fiscal year, Review-Journal shall calculate the percentage change (the "Percentage Change") between the earnings, before interest, taxes, depreciation and amortization ("EBITDA") for the fiscal year immediately preceding (the "LTM EBITDA") and the EBITDA for the penultimate fiscal year (the "Prior Period EBITDA").  The Annual Profits Payment shall be increased, or decreased, as the case may be, by the Percentage Change between the LTM EBITDA and the Prior Period EBITDA.

In calculating the EBITDA (i) for any period that includes earnings prior to April 1, 2005, such earnings shall not be reduced by any amounts that during such period may have been otherwise been deducted from earnings under section A.1 of Appendix A or sections B.1.16, B.1.17, B.1.18, or B.3 of Appendix B of the 1989 Agreement and (ii) for any period whether before or after April 1, 2005, such earnings shall not be reduced by any amounts paid to Sun as a percentage of operating profit under Appendix D of the 1989 Agreement or under this Appendix D.  Any expense of the Review-Journal attributable to a transaction with an Affiliate shall not exceed fair market value.  EBITDA shall include the earnings of the Newspapers and the

18

SUN_00002005

APP149

SA469

earnings of the Review-Journal's Affiliates derived from publications generally circulated in Clark, Nye, or Lincoln Counties, Nevada or any parts thereof. For purposes of this paragraph, Press Equipment shall mean the press equipment currently owned by the Review-Journal and identified in Appendix D-1 and any additional equipment, whether owned by the Review-Journal or third parties, to the extent that it produces substantially the same product or result, and Other Equipment shall mean all equipment and facilities used for production or operation of the printed Newspapers or other print publications whose earnings are included in EBITDA other than Press Equipment. EBITDA, whether determined for any period before or after April 1, 2005, shall not include (a) any expense for rents, leases or similar expense for Other Equipment (i) if such expense, under generally accepted accounting principles, should be treated as a capitalized lease obligation, or (ii) if such expense is made for the use of any capital asset the use of which is intended to replace any item of Other Equipment that is owned by the Review-Journal as of the Effective Date or (b) any expense for rents, leases, or similar expenses for Press Equipment, including any portion of a printing services contract that is fairly attributable to the use of Press Equipment. All calculations shall be made in accordance with generally accepted newspaper industry accounting principles consistently applied. The Parties intend that EBITDA be calculated in a manner consistent with the computation of "Retention" as that line item appears on the profit and loss statement for Stephens Media Group for the period ended December 31, 2004. Sun shall have the right, exercisable not more than once every twelve months and only after providing written notification no less than thirty days prior thereto, to appoint an certified public accounting firm or law firm as Sun's representative to examine and audit the books and records of the Review-Journal and the other publications whose earnings are included in EBITDA for purposes of verifying the determinations of the changes to the Annual Profit

19

JOA 20705

SaltLake-251719.2 0062095-00001

SUN_00002606

SA470

Payments. Such representative shall agree in writing to maintain the confidentiality of all such financial records inspected. The confidentiality agreement shall not restrict the representative from disclosing to the management of Sun information concerning the audit of the Review-Journal, but shall restrict the representative from disclosing any specific individual salary information or advertiser-specific information (e.g., names, prices, contract terms, discounts, total inches) for the other publications whose earnings are included in EBIDTA. With respect to such other publications, the representative may only disclose summary information (e.g., total advertising revenue or total salaries) that is not identifiable with individual advertisers or employees. If as a result of such an audit, there is a dispute between Sun and the Review-Journal as to amounts owed to Sun and they are not able to resolve the dispute within 30 days, they shall select a certified public accountant to arbitrate the dispute. The arbitration shall be conducted according to the commercial arbitration rules of the American Arbitration Association, including such rules for the selection of a single arbitrator if Sun and the Review-Journal are not able to agree upon an arbitrator. Sun and the Review-Journal shall request the arbitrator to render a decision within sixty (60) days of his or her selection, and Sun and the Review-Journal each hereby covenant to cooperate with the arbitrator to facilitate such request. The arbitrator shall agree to be bound by terms of confidentiality to the same extent as the Sun's representative. The arbitrator shall make an award to Sun in the amount of the arrearage, if any, found to exist, together with interest thereon from the date any arrearage was due until paid at the corporate prime rate as quoted by the Wall Street Journal on the first business day of each month. The arbitrator shall also make an award of the fees and cost of arbitration, which may include a division of such fees and costs among the parties in a manner determined by the arbitrator to be reasonable in light of the positions asserted and the determination made.

20

JOA 20705

SaltLake-251719.2 0062095-00001

DR shall be entitled to all of the profits of the Newspapers after the payments set forth above to the Sun during the term of this Restated Agreement.

21

JOA 20705

SaltLake-251719.2 0062095-00001

SUN_00002008

APP152

SA472

## APPENDIX D-1

1 Goss Urbanite Press (Pama Lane)
1 Goss Community Press (Press Annex)
2 Goss Newsliner presses (Main pressroom)
1  Didde press (Mailroom)
2 Lines of Heidelberg Inserters and GMA/Alphaliners

22

JOA 20705

SaltLake-251719.2 0062095-00001

SUN_00002069

APP153

SA473

# EXHIBIT 3

Comparison Chart

# EXHIBIT 3

APP154

# 1989 JOA vs. 2005 AMENDED JOA

## COLOR KEY AND EXAMPLES:

| 1989 JOA Sample Text for Color Key | 2005 Amended JOA Text for Color Key | Color Key |
|---|---|---|
| 5.1.1 Format. Review-Journal shall not change the format of the Sun to any size or format different from that of the Review-Journal without approval of Sun. | 5.1.1 Format. Review-Journal shall not change the format of the Sun to any size or format different from that of the Review-Journal without approval of Sun. | **Identical provisions** |
| Agreement | Amended and Restated Agreement | **Identical in substance** |
| § 1.2 Duration. Subject to the termination provisions set forth in Article 9, this Agreement shall continue for an initial period ending at the close of business on the 31st day of December of the fiftieth (50th) year following the Effective Date. The Agreement shall automatically renew for succeeding renewal periods of ten (10) years each unless either party shall notify the other in writing at least two (2) years prior to the end of the initial period that it elects to terminate the Agreement at the end of said fiftieth (50th) year, or unless either party shall notify the other in writing at least two (2) years prior to the end of the renewal period that it elects to terminate the Agreement as of the end of said renewal period. The phrase "term of this Agreement" as used hereafter shall mean the initial period and any renewal period or periods. | § 1.2 Term. The term of this Restated Agreement shall begin at 12:00 a.m. on June 10, 2005 ("the Effective Date"). The 1989 Agreement shall remain in full force and effect through September 30, 2005 (the "Transition Date"). Subject to the termination provisions set forth in Article 9, the Restated Agreement shall continue for an initial period ending at the close of business on the 31st day of December of the fiftieth (50th) year from July 1, 1990. The Restated Agreement shall then automatically renew for succeeding periods of ten (10) years unless either party shall notify the other in writing at least two (2) years prior to the end of the then current period that it elects to terminate the Restated Agreement at the end of said period. The phrase "term of this Agreement" as used hereafter shall mean the initial period and any renewal period or periods. | **Minor modifications / no change to core provisions**<br><br>Modifications in the 2005 Amended JOA will be shown in red font |
| 5.1.8 Sun Distribution. To the extent economically feasible, Review-Journal shall use its best efforts to substantially maintain the historical area and extent of distribution of the Sun. | 5.1.8 Intentionally omitted. | **Change / modification** |

1

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **TITLE** | | |
| AGREEMENT | AMENDED AND RESTATED AGREEMENT | Updated title of document |
| This Agreement is dated as of June 17, 1989, between Donrey of Nevada, Inc., a Nevada corporation ("Donrey"), and the Las Vegas Sun, Inc., a Nevada corporation ("Sun"). | This Amended and Restated Agreement ("Restated Agreement") dated as of June 10, 2005 between DR Partners, a Nevada General Partnership, the successor-in-interest to Donrey of Nevada, Inc. ("DR") and the Las Vegas Sun, Inc., a Nevada corporation ("Sun"). | Updated title of document<br><br>Updated date<br><br>Updated Parties: DR Partners acknowledging successor-in-interest to Donrey |
| **PRELIMINARY STATEMENT** | | |
| Donrey owns and publishes in Las Vegas, Nevada, an all day newspaper on weekdays, a morning newspaper on Saturdays and holidays, and a Sunday newspaper, each known as the Las Vegas Review-Journal (hereinafter referred to as the "Review-Journal"). | WHEREAS, DR owns and publishes in Las Vegas, Nevada, a morning newspaper on weekdays, a morning newspaper on Saturdays and holidays, and a Sunday newspaper, each known as the Las Vegas Review-Journal (hereinafter referred to as the "Review-Journal"); and | Updated party to DR<br><br>Updated newspaper format (weekday print from all day to morning) |
| Sun owns and publishes in Las Vegas, Nevada, a morning newspaper on weekdays and Saturdays and a Sunday newspaper, each known as the Las Vegas Sun (hereinafter referred to as the "Sun"). | **WHEREAS,** Sun owns in Las Vegas, Nevada, an afternoon newspaper on weekdays, known as the Las Vegas Sun (hereinafter referred to as the "Sun") and a combined Saturday and Sunday paper with the Review-Journal; and | Updated newspaper publication timing and weekend combination |
| The Sun presently operates and for a number of years has operated at a substantial loss, and is in probable danger of financial failure. It is the firm belief of the parties that the continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent, is of paramount importance to the citizens of Las Vegas and its environs. The parties further believe that publication of the Sun can be carried on profitably, and its continued editorial existence and independence thereby assured, if its production, distribution and advertising functions and related non-news and non-editorial activities are conducted and performed by the Review-Journal, through a single staff of Review-Journal employee utilizing Review-Journal's plant and equipment under a joint newspaper operating arrangement (hereinafter referred to as "Agreement"), under which the Review-Journal will act on its own behalf with | | Omitted language regarding Sun as failing newspaper and purpose for seeking joint operation |

2

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| respect to the Las Vegas Review-Journal and on behalf of the Sun with respect to the Las Vegas Sun. | | |
| NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows: | NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows: | Identical |
| **ARTICLE 1** | | |
| **TERM** | | |
| **1.1 Effective Date** | **1.1 Regulatory Filing** | |
| The term of this Agreement shall begin at 12:01 a.m. on the 10th day (or on such later day as the parties may agree) after the filing of written consent of the Attorney General of the United States to this Agreement under the Newspaper Preservation Act, which shall be known as "the Effective Date". The parties agree to pursue diligently the filing of the application for approval of this Agreement to the Department of Justice and to use their best efforts and take all action necessary to obtain such written consent as expeditiously as possible within the procedures set forth in applicable regulations of the Department of Justice. | Within ten business days (or on such later day as the parties may agree) the Parties agree to file the Restated Agreement with the Attorney General of the United States under the Newspaper Preservation Act within the Department of Justice and to use their best efforts and take all action necessary to effect the intent of this Restated Agreement. In the event of any action by the United States Department of Justice after the filing of the Restated Agreement which, in the sole opinion of either party, hinders, impairs, seeks to halt or otherwise materially impacts this Restated Agreement, then either party may declare the Restated Agreement null and void, and the 1989 Agreement between the parties shall be reinstituted and remain in full force and effect. | Altered language from initial application and various regulation language to filling amendment<br><br>Added reversion language<br><br>No change that parties will pursue filing with Department of Justice and using "best efforts" and "take all action necessary" to obtain any approvals |
| This Agreement does not constitute any limitation on either party's obligation to engage in good faith labor negotiations if and as required by the National Labor Relations Act, and to implement any understandings it may reach in such negotiations. | The Restated Agreement does not constitute any limitation on either party's obligation to engage in good faith labor negotiations if and as required by the National Labor Relations Act, and to implement any understandings it may reach in such negotiations. | Updated title of document<br><br>No change of party's obligations of any good faith labor negotiations if required |
| Upon execution hereof, each party shall furnish to the other a written opinion of its counsel that all necessary corporate action has been taken to authorize this Agreement and that, subject to the conditions of the preceding paragraph, this Agreement shall constitute the valid and binding obligation of the respective party | Upon execution hereof, each party shall furnish to the other a written opinion of its counsel that all necessary corporate or partnership action has been taken to authorize this Restated Agreement and that, subject to the conditions of the preceding paragraph, this Restated Agreement shall constitute the valid and binding obligation of the respective party. | Added language recognizing partnership<br><br>Updated title of document<br><br>No change parties provide written opinion of their counsel stating "all necessary corporate action has been taken" to authorize agreement |

3

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| The parties agree to cooperate in coordinating meetings with government officials, community leaders, employees and their representatives, advertisers and others to explain the Agreement. | The parties agree to cooperate in coordinating meetings with government officials, community leaders, employees and their representatives, advertisers and others to explain the Restated Agreement. | Updated title of document<br><br>No change parties would agree to cooperate in any required meetings to explain joint operations |
| If, within eighteen (18) months after the filing of the application with the Department of Justice, the application has neither been approved by the Attorney General without a hearing nor been the subject of an order for a hearing, or if, within eighteen (18) months after the Attorney General has issued an order for a hearing, the application has not been approved by the Attorney General, the parties shall discuss the feasibility of continuing to seek approval of the application and either party may, after notification to the other, withdraw from the application. The Review-Journal and Donrey intend to make a request, at the time of filing the application, under 28 CFR Section 48.5 for a protective order withholding from public disclosure their financial and other privileged and confidential commercial information to be filed with this application and restricting access to such materials to the applicants and the Department of Justice. If the request is not granted the Review-Journal and Donrey reserve the right to unilaterally withdraw the application. If the protective order is initially granted but, at a later date, access to or inspection of the protected information is to be afforded anyone other than the applicants, the Department of Justice, or an administrative law judge, and their respective employees, without restrictions as to disclosure acceptable to the Review-Journal and Donrey, then the Review-Journal and Donrey shall have the unilateral right to withdraw the application and dismiss any further hearing or proceedings concerning the application. | | Omitted language regarding deadline for AG approval, and request for protective order regarding public disclosure of financial documents |
| Each party shall pay its own costs and professional fees in connection with the formulation and drafting of this Agreement and the preparation and filing of the application to the Department of Justice. From and after the filing of such application all costs and professional fees shall be borne equally by the parties with each party having reasonable approval of costs and fees to be incurred | Each party shall pay its own costs and professional fees in connection with the formulation and drafting of the Restated Agreement and the preparation and filing of the Restated Agreement with the Department of Justice. | Updated title of document<br><br>No change each party was to bear own costs and fees for the agreement |

4

APP158

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| | From and after the filing of such Restated Agreement, all costs and professional fees in connection with seeking any required approval by the Department of Justice shall be controlled and approved by the Review-Journal and such cost and shall be borne solely by Review-Journal. | New language requiring Review-Journal to bear all costs in seeking any DOJ approval post-filing of amendment |
| **1.2 Duration** | **1.2 Term** | |
| Subject to the termination provisions set forth in Article 9, this Agreement shall continue for an initial period ending at the close of business on the 31st day of December of the fiftieth (50th) year following the Effective Date. The Agreement shall automatically renew for succeeding renewal periods of ten (10) years each unless either party shall notify the other in writing at least two (2) years prior to the end of the initial period that it elects to terminate the Agreement at the end of said fiftieth (50th) year, or unless either party shall notify the other in writing at least two (2) years prior to the end of the renewal period that it elects to terminate the Agreement as of the end of said renewal period. The phrase "term of this Agreement" as used hereafter shall mean the initial period and any renewal period or periods. | The term of this Restated Agreement shall begin at 12:00 a.m. on June 10, 2005 ("the Effective Date"). The 1989 Agreement shall remain in full force and effect through September 30, 2005 (the "Transition Date"). Subject to the termination provisions set forth in Article 9, the Restated Agreement shall continue for an initial period ending at the close of business on the 31st day of December of the fiftieth (50th) year from July 1, 1990. The Restated Agreement shall then automatically renew for succeeding periods of ten (10) years unless either party shall notify the other in writing at least two (2) years prior to the end of the then current period that it elects to terminate the Restated Agreement at the end of said period. The phrase "term of this Agreement" as used hereafter shall mean the initial period and any renewal period or periods. | Updated "Transition Date"<br><br>Updated Effective Date to July 1, 1990<br><br>Continued 50-year term<br><br>Continued automatic renewal |
| **ARTICLE 2** | | |
| **AGENCY** | | |
| Donrey of Nevada, Inc. now owns and operates the Review-Journal, together with other unrelated business operations in the State of Nevada. In order to facilitate management, administration, record keeping and tax administration under this Agreement, Donrey, as of the effective date of this Agreement, shall have established a separate Nevada business corporation which shall own or lease all assets related to the operation of the Las Vegas Review-Journal. Donrey shall cause such corporate entity to assume and agree to perform all duties and obligations of the Review-Journal under the terms of this Agreement. | Intentionally omitted | Omitted as agency was to have already been formed |

5

**APP159**

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **ARTICLE 3** | | |
| **TRANSFER OF CONTRACTS AND SALE OF SUPPLIES, INVENTORY AND EQUIPMENT BY SUN TO REVIEW-JOURNAL** | | |
| **3.1 Transfer to and Assumption by Review-Journal of Certain Contracts** | | |
| To enable Review-Journal to perform its functions hereunder on behalf of Sun, Sun shall (as of the Effective Date) transfer certain assets and assign certain contracts to Review-Journal subject to the procedures and conditions hereinafter specified in this Section 3.1. | Intentionally omitted | Omitted as already obligated and performed under 1989 JOA |
| 3.1.1 Delivery of Contracts and Data to Review-Journal. Upon consent of the Attorney General as specified in Section 1.1, Sun shall furnish to the Review-Journal: | Intentionally omitted | Omitted as already obligated and performed under 1989 JOA |
| 3.1.1.1 Circulation Contracts. All subscription, bulk sales, circulation, dealer and sub-dealer, and delivery agent lists and contracts related to the Sun in the possession or control of Sun, and all books and statements of account, records and other information relating to or concerning routes, daily draws by editions, distribution, delivery, sales returns, or prepaid subscriptions of the Sun in any territory, but not including the Sun's general books of account. | Intentionally omitted | Omitted as already obligated and performed under 1989 JOA |
| 3.1.1.2 Contracts for Supplies. All contracts and other available information as may be reasonably necessary to form business judgments respecting such contracts, then held by Sun for the purchase of newsprint, film, ink and supplies for the Sun's mechanical departments, and all other similar contracts (other than those relating to the Sun's news and editorial departments) which would be helpful or beneficial to the Review-Journal in fulfilling its obligations hereunder. | Intentionally omitted | Omitted as already obligated and performed under 1989 JOA |
| 3.1.1.3 Advertising Contracts. A list of all contracts then outstanding for publication of advertising in the Sun, which list shall indicate in each case the date of the contract, the name and address of the advertiser, the amount of space used up to that time, the amount unpaid and owing the Sun for advertising run to that time, the amount prepaid as of the Effective Date, the frequency of insertions, the rate, the expiration date, and any special conditions, records, requirements or publication orders with the date thereof, and any special instructions, agreements or commitments made by the Sun | Intentionally omitted | Omitted as already obligated and performed under 1989 JOA |

6

APP160

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| with the advertiser with respect thereto, and all insertion orders for advertising subsequent to the Effective Date. Sun shall make available to the Review-Journal at the Review-Journal's request copies of any or all such contracts. | | |
| 3.1.2 Analysis of Contracts and Assumption by Review-Journal. As soon as possible after such information and documents shall have been furnished to the Review-Journal, and in any event prior to the Effective Date, Review-Journal shall designate in writing to Sun those contracts that Sun shall assign to Review-Journal and which Review-Journal shall assume as of the Effective Date (excluding all portions which Sun had a duty to perform prior to the Effective Date); provided, that with respect to advertising contracts Review-Journal shall have no obligation to assume any advertising contract that is on a trade-out basis, and Review-Journal agrees that it will not refuse the assumption of any advertising contract solely on the basis of the contract rate. However, for advertising contracts containing rates which Review-Journal determines to be unreasonably low, Review-Journal shall have the right to charge to Sun the difference between the contract rate and a rate determined by Review-Journal to be reasonable, effective ninety (90) days after the date of assumption and continuing for the balance of such contracts. Subject to the foregoing, Review-Journal shall use its best efforts to maximize its designation of such contract to be assigned to and assumed by Review-Journal. Review-Journal's pre-assumption analysis of such contracts and information may include consultation with the contracting parties, and Sun agrees to assist Review-Journal in that process. Sun shall remit to Review-Journal (a) all dealers', vendors' and carriers' cash deposits (to the extent that the same shall not be due and owing to such depositors on the Effective Date) and (b) all sums in respect of prepaid subscriptions and prepaid advertising received by Sun but not earned prior to the Effective Date. As to any assigned and assumed advertising contracts, Review-Journal shall have the right to make adjustments, such as rebates or short ratings of any of same so long as this shall not alter indebtedness due Sun prior to the Effective Date without Sun's approval. All such contracts to be assumed by Review-Journal shall be assigned to Review-Journal by Sun as of the Effective Date, and such contracts shall be | Intentionally omitted | Omitted as already obligated and performed under 1989 JOA |

7

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| assumed by Review-Journal as of that date and thereafter shall be performed by Review-Journal, and Sun shall be relieved from any and all performance obligation under such contracts accruing after the Effective Date. | | |
| **3.2 Newsprint** | | |
| Review-Journal shall procure, as of the Effective Date and thereafter, a supply of newsprint adequate to produce the Newspapers as defined in Section 5.1 below provided, that Review-Journal shall have the purchase and assumption obligations specified in Section 3.3 as to Sun newsprint. | Intentionally omitted | Omitted as already obligated and performed under 1989 JOA |
| **3.3 Sale of Supplies, Inventory and Equipment** | | |
| As of the Effective Date, Review-Journal agrees to purchase Sun's inventory of newsprint and supplies common to or usable in the operations of both newspapers (i.e., newsracks, production film, rubber bands, plastic bags, etc.). Upon the consent of the Attorney General as specified in Section 1.1, Sun shall deliver to Review-Journal a schedule identifying all supplies, inventory (on hand or in transit) and equipment owned or leased by Sun and used or available to be used in the production and distribution of the Sun. On or before the Effective Date, Review-Journal shall designate in writing which of the scheduled items of supplies, inventory and equipment it wishes to purchase or sublease, as the case may be. As to such of the equipment as is owned by Sun, which Review-Journal determines to purchase, Sun shall be obligated to sell and deliver same and Review-Journal shall be obligated to buy at a purchase price equal to the purchase cost of such equipment or its then market value, whichever is lower. As to such of the supplies and inventory which Review-Journal is obligated to purchase or designates for purchase by it, Sun shall be obligated to sell and deliver same and Review-Journal shall be obligated to buy at a purchase price equal to the cost of same to Sun, or its then market value, whichever is lower. Any newspaper production equipment of the Sun which is not purchased by the Review-Journal may be sold by the Sun to a third party, provided that the sale of any such equipment to any party within the State of Nevada shall require Donrey's prior approval. | | Omitted as already obligated and performed under 1989 JOA |

8

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **ARTICLE 4** | | |
| **NEWS AND EDITORIAL COPY, FEATURES AND SERVICES** | | |
| **4.1 Maintenance of News and Editorial Staff: Feature Materials** | | |
| Review-Journal and Sun each shall maintain a staff of news and editorial employees, and shall license such feature materials (including, but not limited to, news and editorial services supplied by third parties), adequate to provide its respective newspaper with all of the news and editorial copy and related services deemed necessary by each of them as to its respective newspaper. | Review-Journal and Sun each shall maintain a staff of news and editorial employees, and shall license such feature materials (including, but not limited to, news and editorial services supplied by third parties), adequate to provide its respective newspaper with all of the news and editorial copy and related services deemed necessary by each of them as to its respective newspaper. | Identical – requiring each paper to maintain staff of news and editorial employees "adequate" to provide "all of the news and editorial copy and related services deemed necessary by each of them" for their papers |
| | Review-Journal shall use commercially reasonable efforts to cause third party suppliers of feature materials and professional associations to provide such feature materials and association memberships to Sun at rates equivalent to those currently charged to Sun. | New partnership requirement of RJ to obtain equal rates for features and association membership to be offered to Sun |
| **4.2 News and Editorial Allocations** | | |
| The Review-Journal and the Sun shall establish, in accordance with the provisions of Appendix A attached hereto and made a part hereof by reference, the amounts to be allocated to Agency Expense, as hereinafter defined, for each for news and editorial expenses. | The Review-Journal and the Sun shall each bear their own respective editorial costs and shall establish whatever budgets each deems appropriate. | Updating from establishing editorial allocations as Agency Expense to each party bearing their own editorial costs |
| **4.3 Furnishing News and Editorial Copy and Services** | | |
| In furnishing features, news and editorial copy, and like materials to Review-Journal for publication in the Sun or the Sun portion of jointly published newspapers as provided in Section 4.4, and in providing layout for such material, Sun shall provide all such material in a form appropriate for the production of its newspaper or its portion of jointly published newspapers hereunder, in conformity with the mechanical standards, deadlines and production requirements which prevail in the Review-Journal plant from time to time, including page sizes, column widths, and cut-offs established by Review-Journal, upon reasonable notice to Sun. | In furnishing features, news and editorial copy, and like materials to Review-Journal for publication in the Sun, and in providing layout for such material, Sun shall provide all such material in a form appropriate for the production of its newspaper, in conformity with the mechanical standards, deadlines and production requirements which prevail in the Review-Journal plant from time to time, including deadlines, page sizes, column widths, and cut-offs established by Review-Journal, upon reasonable notice to Sun. | Updating format references<br><br>No change to Sun requirement to provide news to RJ's mechanical standards for printing |
| Sun shall acquire and maintain at its expense such newsroom equipment (including, but not limited to, typewriters, video terminals and news editing systems) as may be required as of the Effective Date to interface with Review-Journal production facilities. | Sun shall acquire and maintain at its expense such newsroom equipment (including, but not limited to, newspaper production systems, i.e., "front-end" systems) as may be required to interface with Review-Journal production facilities. | Updating technology references<br><br>No change to Sun requirement to maintain news equipment to interface with RJ's equipment |

9

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| Any changes or additions thereafter required in such equipment shall be covered by Appendix B hereto.<br><br>[Cross-reference to Appendix B:<br>Changes or additions in the Sun's newsroom equipment which may be required after the Effective Date to interface with Review-Journal production facilities shall be purchased or paid for by Review-Journal and a monthly charge equal to one and one-half percent (1-1/2%) of the cost thereof shall be included in Agency Expense. This monthly charge would be subject to adjustment at any time on the basis of increases in the prime interest rate at First Interstate Bank, Las Vegas, Nevada.] | In the event that the newspaper production system used by the Review-Journal is changed and (i) the Sun has utilized a production system that is current with systems commonly employed in the newspaper industry; (ii) the change by the Review-Journal results in any loss of a fully functional interface with the Sun newspaper production system, the Review-Journal shall be responsible to furnish such additional software, hardware and technical services to the Sun as may be necessary to establish such an interface. The Review-Journal shall give Sun ninety (90) days advance notice of anticipated changes to the Review-Journal's production system, including technical specifications for the new or modified system. The Sun shall treat any software provided as confidential and conform to all applicable licensing requirements for such software. | Updating party payment responsibility if RJ changes newspaper interface technology from Agency Expense to either RJ-paid or Sun-paid depending on circumstance |
| Newshole limitations and other matters for separate and jointly published newspapers are set forth in Appendix A hereto. | Newshole limitations and other matters are set forth in Appendix A hereto. | Removing reference to format; Appendix A still sets forth "newshole limitations and other matters" |
| | The parties agree to begin the publication cycle changes for the Sun on the Transition Date (or on such latter day as the parties may agree). | Updating insert publication transition date |
| [§ 4.4: The Review-Journal reserves the right to print conspicuous notices in jointly published newspapers to the effect that the news content of the non-Sun portion of the newspaper, including locally produced supplements, is produced by Review-Journal personnel.] | The Review-Journal reserves the right to print conspicuous notices to the effect that the news content of the non-Sun portion of the Newspapers, including locally produced supplements, is produced by Review-Journal personnel. The Sun reserves the right to print conspicuous notices to the effect that the news content of the non-Review-Journal portion of the Newspapers, including locally produced supplements, is produced by Sun personnel. | Updating Sun may also print conspicuous notices<br><br>No change that Review-Journal may print conspicuous notices regarding non-Sun portion of newspapers produced by Review-Journal |

10

**APP164**

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **4.4 Furnishing Copy, Features and Services for Jointly Published Newspapers** | | |
| Sun shall furnish editorial copy, features and comics to permit the Review-Journal to include them within jointly published newspapers, which shall be Sundays, Saturdays, holidays, other special editions and total market coverage editions. The Sun portion of jointly published newspapers shall be in accordance with Appendix A hereto. All components of jointly published newspapers shall bear the Review-Journal's headdress, typeface and style. The front page logo of all jointly published newspapers shall read "Las Vegas REVIEW-JOURNAL and SUN," and all folios shall similarly refer to both papers, except for editorial and other pages described in Appendix A as being for the use of only one newspaper, which pages shall bear only the name of such newspaper. The Review-Journal shall provide all of the news content of jointly published newspapers, except for stories and features included on those pages described in Appendix A as being only for the use of the Sun. | Intentionally omitted.<br><br>[*But see* Appendix A] | 1989 JOA describing specifications for "jointly published newspapers" – including requiring accordance with Appendix A; typeface a, style, and front page logo specifications; Sun's portions was updated in 2005 Am. JOA App'x A.2 (describing similar specifications)<br><br>Updates to timing and certain formatting<br><br>No change to jointly published newspaper concept and requiring compliance with format specifications in App'x A |
| **4.5 Showbiz Magazine** | | |
| Showbiz Magazine, which is owned or controlled by Sun, is carried as an insert by the Sun and distributed to hotels in Las Vegas. As of the Effective Date, Showbiz Magazine shall be a department or division of the Sun and subject to the terms of this Agreement. If the Review-Journal determines that it no longer desires Showbiz Magazine to be governed by the terms of this Agreement and/or no longer desires to carry Showbiz Magazine as an insert in the jointly published Sunday newspaper, Review-Journal shall give sixty (60) days prior written notice to Sun, and Sun shall have the right to transfer Showbiz Magazine out of Sun, or continue publication and distribution of Showbiz Magazine, and in either case, outside the terms of this Agreement. In this event, Review-Journal agrees to perform, at the request of Sun, composition, production and printing services at reasonable costs and further agrees not to engage in the production of an entertainment magazine for distribution to Las Vegas hotels for a period of two (2) years. | | Omitted as already obligated and performed under 1989 JOA |

11

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **ARTICLE 5** | | |
| **CONTINUING PUBLICATION AND NEWS AND EDITORIAL AUTONOMY** | | |
| **5.1 Production and Promotion of the Newspapers** | | |
| Subject to the terms of this Agreement, and as of the Effective Date, Sun shall be a daily afternoon newspaper and Review-Journal shall be a daily morning newspaper and on Saturday, Sunday, holidays, and other special editions the newspapers shall be jointly published as provided in Section 4.4. | Subject to the terms of the Restated Agreement, and as of the Transition Date, Sun shall be a daily morning newspaper as specified in Appendix A. The Review-Journal shall be a daily morning newspaper, as specified in Appendix A, including such sections and materials as are consistent with custom and practice in the United States metropolitan daily newspaper industry. | Updated title and timing of publication<br><br>Added RJ requirement to have "sections and materials" consistent with US metro daily newspaper industry custom and practice<br><br>No change both papers are daily papers<br><br>No change the Newspapers shall be joint daily morning papers at least on weekends, holidays and special editions |
| So long as Sun furnishes news and editorial copy, features and services to Review-Journal in accordance with Article 4 of this Agreement, Review-Journal agrees to produce the Sun daily as an afternoon newspaper as provided herein, to include the Sun copy and features in jointly published newspapers as specified in Article 4 above, and to sell all advertising for, promote and circulate such newspapers as provided herein. | So long as Sun furnishes news and editorial copy, features and services to Review-Journal in accordance with Article 4 of this Restated Agreement, Review-Journal agrees to produce the Sun daily as a morning newspaper as provided herein to include the Sun copy and to sell all advertising for, promote and circulate such newspapers as provided herein. | Updated title and timing of publication<br><br>No change to RJ obligation to publish, sell advertising for, promote and circulate Sun newspaper "so long as" Sun furnishes news and editorial copy |
| Review-Journal agrees that the afternoon Sun and the Sun portion of jointly published newspapers shall contain no editorial content other than that furnished by Sun. | | Omitted as already obligated and performed under 1989 JOA |
| Also subject to the terms of this Agreement, Review-Journal further agrees to publish and produce for the term of this Agreement the Las Vegas Review-Journal daily as a morning newspaper and to produce jointly published newspapers as provided herein. | | Omitted as already obligated and performed under 1989 JOA |
| The daily Sun and the Sun portion of jointly published newspapers, and the daily Review-Journal and the balance of the jointly published newspapers are hereinbefore and hereinafter referred to as the "Newspapers". | The daily Sun and the daily Review-Journal are hereinbefore and hereinafter referred to as the "Newspapers". | Updated publication timing<br><br>No change to substance of "Newspapers" definition in agreement |

12

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| Review-Journal shall print the Newspapers on equipment owned or leased by the Review-Journal in the Review-Journal plant or plants located at such place or places as Review-Journal may determine, and all operations under this Agreement, except the operation of the Sun's news and editorial department, shall be carried on and performed by the Review-Journal with Review-Journal employees and equipment and in the Review-Journal's said plant or plants or by independent contractors selected by the Review-Journal. | Review-Journal shall print the Newspapers in the Review-Journal plant or plants located at such place or places as Review-Journal may determine, and all operations under this Restated Agreement, except the operation of the Sun' news and editorial department, shall be carried on and performed by the Review-Journal with Review-Journal employees and equipment and in the Review-Journal's said plant or plants or by independent contractors selected by the Review-Journal. | Removed reference to equipment ownership or lease<br><br>No change that Review-Journal shall print the Newspapers in the Review-Journal Plant, performed by its employees or its selected independent contractors and using its equipment |
| [*see* Article 6 (regarding Agency accounting) and Appendix B describing expenses to be borne by Agency] | All costs, including capital expenditures, of operations under this Restated Agreement, except the operation of the Sun's news and editorial department, shall be borne by Review-Journal. | 1989 Appendix B (describing various Agency Expenses)<br><br>No change that Review-Journal as host newspaper will perform all accounting functions and pay for all non-editorial expenses |
| The Review-Journal shall control, supervise, manage and perform all operations involved in managing and operating under this Agreement, including printing, selling and distributing the Newspapers, shall determine page sizes, number of columns per page, cut-offs, page makeup of non-news and non-editorial content (subject to the newshole formula set forth in Appendix A), and all other mechanical and technical functions of the Newspapers, shall purchase newsprint, materials and supplies as required (subject to Sun's obligations under Section 3.2), shall determine the rates for, solicit and sell all advertising space in the Newspapers, shall determine circulation rates, collect the Newspapers' circulation and advertising accounts receivable which come into existence after the Effective Date, and shall make all determinations and decisions and do any and all acts and things related to the foregoing activities, provided: | The Review-Journal shall control, supervise, manage and perform all operations involved in managing and operating under this Restated Agreement, including the need, if any, for Sunday supplements and comics, total or zoned market coverage, direct mail or other publication programs, zoned editions, and printing, selling and distributing the Newspapers, shall determine page sizes, number of columns per page, cut-offs, page makeup of non-news and non-editorial (subject to Appendix A), and all other mechanical and technical functions of the Newspapers, shall purchase newsprint, materials and supplies as required and shall determine the rates for, solicit and sell all advertising space in the Newspapers, shall determine circulation rates, collect the Newspapers' circulation and advertising accounts receivable, and shall make all determinations and decisions and do any and all acts and things related to the foregoing activities, provided: | Updated document title and minor Sunday supplements<br><br>No change that Review-Journal "control, supervise, manage and perform all operations" described in Agreement including printing, selling and distributing the Newspapers, printing newsprint, selling advertising, determining circulation rates, and collecting circulation and advertising accounts receivable |
| 5.1.1 Format. Review-Journal shall not change the format of the Sun to any size or format different from that of the Review-Journal without approval of Sun. | 5.1.1 Format. Review-Journal shall not change the format of the Sun to any size or format different from that of the Review-Journal without approval of Sun. | Identical<br><br>Review-Journal shall not change Sun's format without Sun approval |

13

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| 5.1.2 Editions. The number of Sun editions shall not be changed without approval of Sun. | 5.1.2 Sun Editions. The number of Sun editions shall not be changed without approval of Sun. | Identical<br><br>Review-Journal shall not change number of Sun editions without Sun approval |
| 5.1.3 Best Efforts. Review-Journal agrees that it will use its best efforts, using the same degree of diligence, to sell advertising space in the Sun and the Review-Journal and to promote and circulate the Sun and the Review-Journal. | 5.1.3 Circulation. Review-Journal shall use commercially reasonable efforts to maximize the circulation of the Newspapers. | Update from "best efforts" to "commercially reasonable efforts"<br><br>Removed descriptions regarding selling advertising space in Sun<br><br>Review-Journal still required to use efforts to circulate the Newspapers |
| 5.1.4 Promotional Activities. Review-Journal shall establish for each fiscal year a budget for promotional activities which shall be allocated between the Review-Journal and the Sun in accordance with the provisions of Appendix A, attached hereto and made a part hereof by reference. Promotional activities may include radio and television, outdoor advertising, in-paper or house advertisements, and other advertising media. All expenses of such promotional activities shall be Agency Expense, up to the amount of the promotional budget allocation.<br>. . . .<br>The newsroom of each newspaper shall determine the nature, extent and timing of its promotional activities and shall supply basic information therefor. Review-Journal promotion management shall be responsible for all final promotional copy preparation and placements. | 5.1.4 Promotional Activities. Review-Journal shall use commercially reasonable efforts to promote the Newspapers. Any promotion of the Review-Journal as an advertising medium or to advance circulation shall include mention of equal prominence for the Sun.<br><br>. . . .<br><br><br>For all promotional activities for the Newspapers paid for by the Review-Journal, the Review-Journal shall be responsible for all promotional copy preparation and placement, provided however, that the Sun shall have the right to approve all promotional copy for the Sun that does not generically and concurrently promote both Newspapers. | Updating from specific promotional budgets for each newspaper as Agency Expense to Review-Journal's obligation to promote the Newspapers<br><br>Added requirement of Sun to be mentioned in "equal prominence" in any promotion of the Newspapers as an advertising medium or to advance circulation<br><br><br>No change that Review-Journal still required to pay for and promote the Newspapers (including the Sun) |
| If either the Review-Journal or the Sun determines that it wishes to incur expenses in excess of those in the promotional budget, such expenses shall not be included in Agency Expense. | Either the Review-Journal or Sun may undertake additional promotional activities for their respective newspaper at their own expense. | Updating language from promotional budget / Agency Expense<br><br>No change that either party may promote separately at own expense |

14

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| Direct circulation sales expenses, including such items as carrier premiums and expenses of order generation shall not be included in the promotional budget and shall be allocated by Review-Journal between the newspapers so as to maximize the maintenance and enhancement of the circulation of the newspapers to the extent economically feasible. | | Omitted as circulation expenses already distinguished from promotional expenses in 1989 JOA |
| 5.1.5 Rates. Review-Journal shall not increase the single copy or subscription prices of the daily edition of the Sun to an amount higher than the comparable rates for the Review-Journal. Review-Journal shall not change the rates for advertising to be run solely in the Sun in relation to the rates charged for comparable advertising to be run solely in the Review-Journal, unless such change is justified by the then-relative circulation of the Sun and the Review-Journal and other factors considered relevant in the industry. | Intentionally omitted. | Omitted as individual Sun pricing unavailable with joint publication<br><br>No change that Review-Journal sets single copy and subscription pricing for the Newspapers. |
| 5.1.6 Meetings of JOA Participants. Periodically, not less than four times per year, Donrey senior management shall meet with Sun senior management to discuss operations under this Agreement and future plans and opportunities. | 5.1.6 Meetings of JOA Participants. DR senior management shall meet quarterly with Sun senior management to discuss performance under this Restated Agreement. | Updated title of document and timing of meetings<br><br>No change parties to discuss the joint operation's performance |
| 5.1.7 Advertising Acceptability. Sun may reject any advertising or types of advertising for the Sun which is in the opinion of Sun undesirable or inappropriate for publication therein, and shall notify Review-Journal in writing of any specific advertising or types of advertising that Sun deems undesirable for publication. Review-Journal shall accept all advertising for the Sun other than the advertising indicated on Sun's written notice, subject to all laws affecting the acceptability of advertising. | 5.1.7 Advertising Acceptability. Sun may reject any advertising or types of advertising for the Sun which is, in the opinion of Sun, undesirable or inappropriate for publication therein, and shall notify Review-Journal in writing of any specific advertising or types of advertising that Sun deems undesirable for publication. Review-Journal shall accept all advertising for the Sun other than the advertising indicated on Sun's written notice, subject to all laws affecting the acceptability of advertising. | Identical<br><br>Sun retained right to reject advertising or types of advertising in sole discretion |
| 5.1.8 Sun Distribution. To the extent economically feasible, Review-Journal shall use its best efforts to substantially maintain the historical area and extent of distribution of the Sun. | 5.1.8    Intentionally omitted. | Omitted as already obligated and performed under 1989 JOA |

15

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **5.2 News and Editorial Autonomy** | | |
| Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the essence of this Agreement. Sun shall have exclusive and complete control, authority and direction over the news and editorial content, features and services to be furnished by Sun to Review-Journal to be included in its newspaper and in its portion of the jointly published newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees. Review-Journal shall have exclusive and complete control, authority and direction over the news and editorial content, features and services in its newspapers and in its portion of the jointly published newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees. | Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the essence of this Restated Agreement. Sun shall have exclusive and complete control, authority and direction over the news and editorial content, features and services to be furnished by Sun to Review-Journal to be included in its newspaper, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees. Review-Journal shall have exclusive and complete control, authority and direction over the news and editorial content, features and services in its newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees. | Updated publication timings<br><br>No changes to "essence" of the agreement being "preservation of news and editorial independence and autonomy" of both newspapers<br><br>No change to recognition of each paper's "exclusive and complete control" regarding their news and editorial direction, and hiring and firing employees |
| The Review-Journal and Sun each hereby agrees to preserve high standards of newspaper quality throughout the term of this Agreement. | The Review-Journal and Sun each hereby agrees to preserve high standards of newspaper quality throughout the term of this Restated Agreement consistent with United States metropolitan daily newspapers. | Updated language regarding newspaper quality<br><br>No change that each paper agreed to "preserve high standards of newspaper quality" |
| All news and editorial expense of the Sun or the Review-Journal in excess of the amounts set forth in Appendix A shall be borne by the respective newspaper. | | Omitted as editorial "budget" omitted in 2005 Amended JOA (*see* 2005 Amended JOA § 4.2) |
| **5.3 Performance and Cooperation** | | |
| Sun and Review-Journal agree to take all corporate action necessary to carry out and effectuate the intent, purposes and provisions of this Agreement, and to cooperate with the other party in every reasonable way that will promote successful and lawful operation under this Agreement for both parties. | Sun and Review-Journal agree to take all corporate action necessary to carry out and effectuate the intent, purposes and provisions of this Restated Agreement, and to cooperate with the other party in every reasonable way that will promote successful and lawful operation under this Restated Agreement for both parties. | Identical<br><br>Both parties agreed to take "all corporate action necessary" to carry out the Agreement<br><br>Both parties agreed to cooperate with each other to "promote successful and lawful operation" |

16

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **5.4 Sun Office Space** | | |
| The Sun shall have the option to provide its own offices for its news and editorial department and senior management, or to occupy office space, to be provided by the Review-Journal, adjacent to the Review-Journal's newspaper building. | The Sun shall provide and pay for its own offices for its news and editorial department and management. | Updated option Review-Journal would provide office space for Sun newsroom<br><br>No change Sun has independent newsroom office space |
| **ARTICLE 6** | | |
| **PAYMENT OF EXPENSES, DISTRIBUTION OF REVENUES, AND OTHER FINANCIAL PROVISIONS** | | |
| **6.1 Expenses and Revenues** | | |
| Review-Journal shall pay and record all Agency Expense, as defined in Appendix B hereto, and collect and record all Agency Revenues as defined in Appendix C hereto, and shall pay to Sun, monthly, a sum for Sun news and editorial expense as provided in Appendix A hereto. | Intentionally omitted | Omitted as Review-Journal already performing most of these obligations (*see also* 2005 Amended JOA § 5.1 & App'x D) |
| **6.2 Accounting Records** | | |
| Accounting records of Agency Revenues and Agency Expense shall be maintained by Review-Journal. Accounting records of news and editorial expense shall be separately maintained by the Review-Journal and the Sun for their respective newspapers. All such records shall be kept on a fiscal year basis in reasonable detail and in accordance with generally accepted accounting principles. Financial statements to be provided under Section 6.3 shall be prepared in accordance with generally accepted accounting principles and the applicable provisions of this Agreement. | Intentionally omitted | Omitted as Review-Journal already performing most of these obligations (*see also* 2005 Amended JOA App'x D) |
| **6.3 Financial Statements** | | |
| Within ninety (90) days following the close of each fiscal year, Review-Journal shall furnish to Sun financial statements in respect of such year which summarize Agency Revenues and Agency Expense hereunder. Within thirty (30) days after the end of each month, except the last month of the fiscal year, Review-Journal shall furnish to Sun a monthly financial statement summarizing Agency Revenues and Agency Expense. All Agency financial statements furnished by Review-Journal shall be certified by a financial officer of Review-Journal. | Intentionally omitted | Omitted as Review-Journal already performing most of these obligations (*see also* 2005 Amended JOA App'x D) |

17

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **6.4 Distributions** | | |
| Payments of Sun's share of operating profit, pursuant to Appendix D, shall be made with each financial statement to be furnished to Sun under the provisions of Section 6.3 above. | Intentionally omitted | Omitted as Review-Journal already performing (*see also* 2005 Amended JOA App'x D) |
| | **ARTICLE 7** | |
| **TRANSITIONAL MATTERS** | **PAYMENT** | |
| **7.1 Collection of Sun Receivables** | | |
| After the Effective Date, Review-Journal shall use its best efforts (without any obligation to institute legal proceedings) to collect Sun advertising and circulation accounts receivable which are outstanding on the Effective Date and shall remit same to Sun on a monthly basis, less the Agency's reasonable collection costs specifically incurred in connection therewith. Such collections and collection costs recovered by Review-Journal shall not be Agency Revenues or Agency Expense. Any such advertising accounts which have not been collected by Review-Journal within sixty (60) days after the Effective Date shall be returned to Sun. Collections from particular subscribers shall first be applied to circulation accounts receivable unless otherwise agreed by Sun. As to any Sun advertising or circulation contracts assumed by Review-Journal under Section 3.1 above, Review-Journal will remit to Sun the portion of the receipts thereunder reflecting advertising run or circulation delivered by Sun prior to the Effective Date but not payable until on or after that date, and such portion shall not be Agency Revenues. | During the term of this Restated Agreement, DR and the Sun shall receive the amounts set forth in Appendix D. | Omitted as already obligated and performed under 1989 JOA<br><br>Updated Article 7 to be termed "Payment" regarding Sun's payments – *see* Notes in Appendix D regarding no changes to payment frequency and Sun's approximate 10% profit payment |
| **7.2 Termination Obligations** | | |
| Sun shall be solely responsible for all notices, severance allowances, accrued benefits, or other related payments or obligations which may become due or payable to any terminated employee or agent of Sun. | | Omitted as already obligated and performed under 1989 JOA |
| **7.3 Sun Personnel** | | |
| Review-Journal shall be under no obligation to employ any terminated Sun employee. | | Omitted as already obligated and performed under 1989 JOA |

18

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **ARTICLE 8** | | |
| **NONLIABILITY PROVISIONS** | | |
| **8.1 Defense of Claims and Indemnification** | | |
| Any claim, demand, suit, action, obligation or other liability asserted against or sustained by Review-Journal and Sun, or either of them, in respect of any third party ("Claims") shall be dealt with as provided in this Article 8. For all purposes of this Article 8, the term "cost or expense" shall include reasonable attorneys' fees. | Any claim, demand, suit, action, obligation or other liability asserted against or sustained by Review-Journal and Sun, or either of them, in respect of any third party ("Claims") shall be dealt with as provided in this Article 8. For all purposes of this Article 8, the term "cost or expense" shall include reasonable attorneys' fees and costs, whether or not taken to trial or appeal or in any bankruptcy or other related proceeding. | No substantive change – Article 8 specifies joint operation versus individual newspaper obligation |
| 8.1.1 Claims Related to the Joint Operation. Review-journal shall defend and shall control the defense or settlement of any third party Claims related to the joint operations or to its performance or non-performance under this Agreement (including but not limited to Claims arising from any advertising published in, or excluded from, any of the Newspapers except as provided in Section 8.1.2  and Claims in respect of feature, news and editorial content furnished by Sun hereunder arising as a result of any act or omission on the part of Review-Journal other than republication in the form furnished by Sun), devoting reasonable efforts to minimizing any resulting liability and related cost or expense. Any such liability, and the cost or expense related thereto, shall be an Agency Expense, except to the extent any such Claim shall be covered by insurance. Review-Journal shall give written notice to Sun of any material Claims arising under this Section 8.1.1. | 8.1.1 Claims Related to the Joint Operation. Review-Journal shall defend and shall control the defense or settlement of any third party Claims related to the joint operations or to its performance or non-performance under this Restated Agreement (including but not limited to Claims arising from any advertising published in, or excluded from, any of the Newspapers except as provided in Section 8.1.2 - and claims in respect of feature, news and editorial content furnished by Sun hereunder arising as a result of any act or omission on the part of Review-Journal other than republication in the form furnished by Sun), devoting reasonable efforts to minimizing any resulting liability and related cost or expense. Any such liability, and the cost of expense related thereto, shall be borne by the Review-Journal, except to the extent any such Claim shall be covered by insurance | Removed Review-Journal's requirement to provide notice to Sun of a material claim<br><br>No substantive change – Review-Journal still obligated to defend claims related to joint operation |
| 8.1.2 Other Claims. Except as specifically provided in Section 8.1.1. or elsewhere in this Agreement, neither party hereto shall be charged with or held responsible for any third party Claims (except to the extent certain Sun contracts shall be assumed by Review-Journal under Article 3), arising before or after the Effective Date by reason of any act or omission on the part of the other party, and the responsible party shall indemnify and hold the other party harmless therefrom, including all related cost or expense. The responsible party shall defend, settle, pay or discharge any such Claim and shall indemnify and hold harmless the other party against any such Claim, and | 8.1.2 Other Claims. Except as specifically provided in Section 8.1.1. or elsewhere in this Restated Agreement, neither party hereto shall be charged with or held responsible for any third party Claims, arising before or after the Effective Date by reason of any act or omission on the part of the other party, and the responsible party shall defend and indemnify and hold the other party harmless therefrom, including all related cost or expense. The responsible party shall defend, settle, pay or discharge any such Claim and shall indemnify and hold harmless the other party against any such Claim, and from any liability, cost or expense arising therefrom. | Removed references to RJ's assumptions of Sun's contracts<br><br>Updated party name<br><br>No substantive change to mutual indemnification provision |

19

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| from any liability, cost or expense arising therefrom.<br><br> By way of example under this Section 8.1.2 and without limitation, the entire cost or expense of defending, settling or paying and discharging Claims relating to any feature, news or editorial copy published in, or excluded from the daily Review-Journal or the Review-Journal portion of the jointly published newspaper, or arising by reason of anything done or omitted by the news and editorial department of the Review-Journal in regard to its daily newspaper or the Review-Journal portion of the jointly published newspaper, or arising by reason of any advertising rejected by the Review-Journal or accepted by the Review-Journal in situations where such advertising would be rejected pursuant to Sun guidelines, shall be borne by the Review-Journal, and any such liability, cost or expense on account of Claims relating to any feature, news or editorial copy published in, or excluded by Sun from the daily Sun or the Sun portion of any jointly published newspaper, or arising by reason of anything done or omitted by the news and editorial department of the Sun, or arising by reason of any advertising rejected by the Review-Journal pursuant to Sun guidelines, or accepted in situations where such advertising would be rejected pursuant to Review-Journal guidelines, shall be borne by Sun, unless such Claims shall be an Agency Expense by reason of the operation of Section 8.1.1. | By way of example under this Section 8.1.2 and without limitation, the entire cost or expense of defending, settling or paying and discharging Claims relating to any feature, news or editorial copy published in, or excluded from the daily Review-Journal or arising by reason of anything done or omitted by the news and editorial department of the Review-Journal in regard to its daily newspaper or arising by reason of any advertising rejected by the Review-Journal or accepted by the Review-Journal in situations where such advertising would be rejected pursuant to Sun guidelines, shall be borne by DR and any such liability, cost or expense on account of claims relating to any feature, news or editorial copy published in, or excluded by Sun from the daily Sun or, or arising by reason of anything done or omitted by the news and editorial department of the Sun, or arising by reason of any advertising rejected by the Review-Journal pursuant to Sun guidelines, or accepted in situations where such advertising would be rejected pursuant to Review-Journal guidelines, shall be borne by Sun, unless such Claims shall be an expense of the Review-Journal by reason of the operation of Section 8.1.1. | |
| 8.1.3 Insurance. For the purposes of this Article 8, each party shall separately maintain and pay for, as an item of news and editorial expense, insurance to the extent reasonably available protecting against losses from libel, invasion of privacy, copyright or trademark infringement and other matters related to the gathering or preparation of news and editorial matter for publication, in such amounts as the parties may agree upon from time to time, but in no event less than Ten Million Dollars ($10,000,000), and the other party shall be named as an additional insured. | 8.1. 3 For the purpose of this Article 8, each party shall separately maintain and pay for, as an item of news and editorial expense, insurance to the extent reasonably available protecting against losses from libel, invasion of privacy, copyright or trademark infringement and other matters related to the gathering or preparation of news and editorial matter for publication, in such amounts as the parties may agree upon from time to time, but in no event less than Ten Million Dollars ($10,000,000), and the other party shall be named as an additional insured. | Identical<br><br>Both parties required to maintain insurance and list each other as additional insured |

20

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **8.2 Force Majeure** | | |
| Neither party shall be liable to the other for any failure or delay in performance under this Agreement, occasioned by war, riot, government action, act of God or public enemy, damage to or destruction of facilities, strike, labor dispute, failure of suppliers or workers, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform, provided that in the event partial performance under this Agreement is feasible, notwithstanding the occurrence of one or more of the foregoing, performance shall be allocated between the newspapers by the Review-Journal, in its sole judgment, and if it is feasible to publish only one newspaper product, Review-Journal shall exercise its best efforts to produce a jointly published newspaper in which the Sun portion shall be determined by Review-Journal, notwithstanding the provisions of Appendix A hereto, provided, that the Sun portion shall not be less than two (2) pages. | Neither party shall be liable to the other for any failure or delay in performance under this Restated Agreement, occasioned by war, riot, government action, act of God or public enemy, acts of terrorism, damage to or destruction of facilities, strike, labor dispute, failure of suppliers or worker, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform, provided that in the event partial performance under this Restated Agreement is feasible, notwithstanding the occurrence of one or more of the foregoing, performance shall be allocated between the newspapers by the Review-Journal, in its sole judgment, notwithstanding the provisions of Appendix A hereto, provided, that the Sun portion shall not be less than six (6) pages. | Force Majeure circumstances identical<br><br>Updated document title<br><br>Updated Sun portion in force majeure circumstance<br><br>No change in that if publication of only one newspaper product is feasible given force majeure circumstance, Review-Journal must use best efforts to produce a jointly published newspaper with the Sun portion having at least two pages |
| **ARTICLE 9** | | |
| **TERMINATION** | | |
| 9.1 Events of Termination | | |
| This Agreement shall continue in full force and effect unless and until it may be terminated by the occurrence of one of the following events of termination: | This Restated Agreement shall continue in full force and effect unless and until it may be terminated by the occurrence of one of the following events of termination: | Identical |
| 9.1.1 Voluntary Termination. Voluntary termination under the provisions of Section 1.1. | 9.1.1 Stated Duration. Expiration of the term set forth in Section 1.1 | Voluntary Termination provision eliminated given 1989 JOA approval and § 1.1 voluntary termination provisions expired<br><br>Restated duration of JOA term |
| 9.1.2 Bankruptcy or Default. If either party hereto makes an assignment of its assets for the benefit of creditors, is adjudged a bankrupt or has a receiver appointed for its business by a court of competent jurisdiction (provided, that such adjudication shall continue unstayed on appeal or otherwise in effect for a period of ninety (90) days after the entry of the decree related thereto before such adjudication becomes an event of termination, and further provided that the appointment of the receiver must continue unvacated, not set aside, not | 9.1.2 Bankruptcy or Default. If either party hereto makes an assignment of its assets for the benefit of creditors, an order of relief is entered by any bankruptcy court or has a receiver appointed for its business by a court of competent jurisdiction (provided, that such assignment, order of relief or adjudication shall continue unstayed on appeal or otherwise in effect for a period of ninety (90) days after the assignment, the entry of the order of relief or decree related thereto before such assignment or | Updated bankruptcy language and added language regarding Review-Journal bankruptcy scenarios that Sun may purchase or lease equipment from DR to publish the Sun<br><br>No change to notice of default in performance of a material obligation language or ability to cure language |

21

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| stayed or otherwise in effect for a period of ninety (90) days after such appointment before such appointment becomes an event of termination), or if either party defaults in the performance of any of its material obligations hereunder and does not cure such default within sixty (60) days after receiving written notice thereof from the other party, then such other party may, at its election, and in addition to all other remedies available to it at law or in equity, terminate this Agreement upon thirty (30) days' written notice by the Sun and sufficient notice by the Review-Journal to enable the Sun to arrange for the separate production of the Sun, but not to exceed six (6) months; provided, that in the event of default, the other party shall have the additional option to cure such default and, on demand, be reimbursed by the defaulting party for all costs and expenses related thereto. | adjudication becomes an event of termination, and further provided that the appointment of the receiver must continue unvacated, not set aside, not stayed or otherwise in effect for a period of ninety (90) days after such appointment before such appointment becomes an event of termination), or if either party defaults in the performance of any of its material obligations hereunder and does not cure such default within sixty (60) days after receiving written notice thereof from the other party, then such other party may, at its election, and in addition to all other remedies available to it at law or in equity, terminate this Restated Agreement. In the event of the entry of an unstayed order of relief in an involuntary bankruptcy by DR, the Sun shall have the right, at its option, to purchase from DR, the equipment necessary to publish the Sun. The value of the equipment shall be set by the bankruptcy trustee. In the event of an unstayed order of relief in an involuntary bankruptcy, the Sun may lease, at fair market value, for a period not to exceed five (5) years the assets necessary to publish the Sun. | |
| 9.1.3 Change of Controlling Interest. In view of the nature of the relationship established by this Agreement and the fact that the Sun is published under the direction and control of Herman M. Greenspun and Brian L. Greenspun, the Review-Journal shall not be required to carry out the terms of this Agreement or be associated with another party to which it objects. Accordingly, ownership or control of the Sun shall not be transferred to any other entity or person without notice to and prior approval by the Review-Journal, provided that the Review-Journal will not object to any transfer of the ownership or control of Sun to any entity under the immediate direction and control of Herman M. Greenspun, or Brian L. Greenspun, or any other lineal descendant of Herman M. Greenspun. If, following an approved or permitted change of control of Sun, a subsequent change of control occurs, notice as hereinabove shall be given and the Review-Journal may exercise the rights provided herein. | 9.1.3. Change of Controlling Interest. In view of the nature of the relationship established by this Restated Agreement and the fact that the Sun is published under the direction and control of the Estate of Herman Greenspun and Brian L. Greenspun, the Review-Journal shall not be required to carry out the terms of this Restated Agreement or be associated with another party to which it reasonably objects. Accordingly, ownership or control of the Sun shall not be transferred to any other entity or person without notice to and prior approval by the Review-Journal, provided that the Review-Journal will not object to any transfer of the ownership or control of Sun to any entity under the immediate direction of Brian L. Greenspun, or any other lineal descendant of Herman M. Greenspun. Notwithstanding the foregoing, controlling interest of the Sun may be transferred to any person that can provide the necessary editorial background and expertise to produce the Sun pursuant to the terms of this Restated Agreement. Following an approved or permitted change | Updated language to allow for additional Sun change of ownership or control to include any person with "necessary editorial background"<br><br>No change that Review-Journal cannot object to any change of control or ownership of the Sun to any individual within lineal descendant line of Herman M. Greenspun |

22

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| | of control of Sun, if a subsequent change of control occurs, notice as hereinabove shall be given and the Review-Journal may exercise the rights provided herein. | |
| 9.1.4 Loss Operation. If there are any two (2) consecutive years in which the Agency does not have an operating Profit (Agency Expenses in excess of Agency Revenues), despite the Review-Journal's good faith efforts to produce an operating profit, the Review-Journal may terminate this Agreement upon ninety (90) days written notice. | 9.1.4 Intentionally omitted. | Removed loss operation provision |
| **9.2 Mechanics of Termination** | | |
| Upon termination of this Agreement, Review-Journal shall take appropriate action to transfer to Sun: (a) all then current circulation contracts, agreements or lists concerning bulk sales, subscriptions, dealers and sub-dealers, distributions, deliveries, sales returns and prepaid subscriptions of the Sun's daily newspaper, and of all jointly published newspapers, plus all pertinent portions of then current records and data pertaining thereto, and all sums received by Review-Journal in respect of prepaid subscriptions and cash deposits relating to daily Sun circulation, and a pro rata portion of all sums received by Review-Journal in respect of such subscriptions and deposits relating to the jointly published newspaper circulation, and (b) all then current advertising contracts and all pertinent portions of then current records and data relating to advertising to be published in the Sun and in all jointly published newspapers. Review-Journal shall further provide Sun with the originals and all copies of all contracts relating solely to circulation and advertising of the daily Sun, and copies of all other contracts referred to in the immediately preceding sentence. | Intentionally omitted.<br><br>[*But see* § 9.3  Duties Upon Termination. Upon termination of this Restated Agreement, either by expiration of its term or otherwise, the Review-Journal shall provide Sun with a complete list (including all contact information) of current newspaper subscribers and advertisers.] | Updated given publication formats<br><br>Updated to clarify all "newspaper subscribers and advertisers"<br><br>No change that Review-Journal to provide Sun with all subscribers and all advertisers |
| **ARTICLE 10** | | |
| **MISCELLANEOUS** | | |
| **10.1 Notices** | | |
| Each notice or other communication given pursuant to this Agreement shall be given in writing, delivered in person or mailed by registered or certified mail, addressed to the respective parties as follows:<br><br>Review-Journal: Donrey, Inc. | Each notice or other communication given pursuant to this Agreement shall be given in writing, delivered in person or mailed by registered or certified mail, addressed to the respective parties as follows:<br><br>Review-Journal: DR Partners | Notice provision identical save updated address for Sun |

23

APP177

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| P. O. Box 410<br>Las Vegas, NV 89125<br>Attention: Fred W. Smith<br><br>Sun: Las Vegas Sun, Inc.<br>P. O. Box 4279<br>Las Vegas, NV 89127<br>Attention: Brian L. Greenspun<br><br>or, in the case of either party hereto, at such other address or marked for the attention of such other person, as such party may set forth in a written notice to the other party. | P. O. Box 70<br>Las Vegas, NV 89125<br>Attention: Sherman Frederick<br><br>Sun: Brian L. Greenspun, Esq.<br>President & Editor<br>Las Vegas Sun<br>2275 Corporate Circle Drive Suite 300<br>Henderson, Nevada 89074<br><br>Or, in case of either party hereto, at such other address or marked for the attention of such other person, as such party may set forth in a written notice to the other party. | |
| **10.2 Disclaimer of Labor Related Obligations** | | |
| The parties specifically agree that neither party hereby assumes any obligations of the other party related to its employment practices or to any of its employees, whether or not arising under any collective bargaining agreements or arising prior to, on or subsequent to the Effective Date. | The parties specifically agree that neither party hereby assumes any obligations of the other party related to its employment practices or to any of its employees, whether or not arising under any collective bargaining agreements or arising prior to, on or subsequent to the Effective Date. | Identical |
| **10.3 Inspection of Books and Records** | | |
| Either party shall have the right to authorize its independent certified public accountants or any of its corporate officers to inspect the books and records of the other party hereto at reasonable times and intervals in regard to the financial statements specified in Article 6, but only as to the three (3) years preceding the exercise of the right of inspection, commencing with the year immediately preceding the year in which the right is exercised. The expenses of any such inspection shall be borne by the party causing such inspection to be made and shall not be included in Agency Expenses. | Intentionally omitted. | Mutual inspection of books omitted instead providing audit rights to Sun only (*see* 2005 Am. JOA App'x D)<br><br>No change Sun still able to review (audit) Review-Journal's joint operation accounting records |
| **10.4 Limited Effect** | | |
| Nothing herein contained shall constitute the parties hereto partners, joint venturers, successors, alter egos, joint employers, an unincorporated association, or as having any relationship other than as specifically provided by this Agreement. This Agreement is intended solely for the benefit of the parties hereto, and their permitted successors and assigns and not for the benefit of any other person or party. This Agreement, including Appendices A through D hereto, and contracts and agreements supplemental hereto, comprises the entire understanding and agreement of the parties hereto on the subject matter herein contained | Nothing herein contained shall constitute the parties hereto partners, joint venturers, successors, alter egos, joint employers, an unincorporated association, or as having any relationship other than as specifically provided by this Restated Agreement. This Restated Agreement is intended solely for the benefit of the parties hereto, and their permitted successors and assigns and not for the benefit of any other person or party. This Restated Agreement, including Appendices A through D hereto, and the contracts and agreements supplemental hereto, comprises the entire understanding | Updated document title<br><br>No change in description of relationship, that agreement is not for third parties, it is the entire agreement and time is of the essence requirements |

24

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| and any and all other representations or agreements, which heretofore may have been made on such subject matter, whether oral or in writing, by any agent of either party shall be null, void and of no effect whatsoever. Time is of the essence of this Agreement. | and agreement of the parties hereto on the subject matter herein contained and any and all other representations or agreements, which heretofore may have been made on such subject matter, whether oral or in writing, by any agent of either party shall be null, void and of no effect whatsoever. Time is of the essence of this Restated Agreement. | |
| 10.5 Community Cable TV | | |
| As of the Effective Date, Sun shall assign or cause to be assigned to Donrey the right to receive ten percent (10%) of all dividends or distributions of any kind paid or made by Community Cable TV ("CCTV"), a Nevada corporation which owns and operates a cable television system serving Las Vegas and surrounding communities and certain unincorporated areas of Clark County, Nevada, to any of its shareholders, including any payments in excess of current salaries or current percentages of income as management or consultant fees paid by CCTV to any of its shareholders. With respect to payments to be made to Donrey hereunder, Sun shall cause CCTV to make such payments, or make such payments directly to Donrey. As soon as permitted under the terms of certain shareholder and financing agreements, CCTV shall issue to Donrey ten percent (10%) of the total issued and outstanding common stock of CCTV, which shall be issued as fully paid and oonassessable. In addition, at such time as Sun or its affiliates have purchased all of the issued and outstanding common stock of CCTV owned by third parties, Donrey shall have the right to purchase an additional thirty-five percent (35%) of the issued and outstanding common stock of CCTV on the same terms and conditions, including price, as those on which Sun or its affiliates acquired such stock, which shall be issued as fully paid and nonassessable. In the event of the sale by Sun or its affiliates of any interest in CCTV prior to Donrey's acquisition of stock, Donrey shall be entitled to receive ten percent (10%) of the net sale proceeds, and Donrey's right to receive its ten percent (10%) stock interest shall be ratably reduced. Donrey's rights with respect to CCTV as herein provided shall survive the expiration or termination of this Agreement, provided, in the event the Review-Journal and Donrey withdraw from the application to the Department of Justice, pursuant to Section 1.1 of this Agreement, or if | Intentionally omitted | Omitted as already obligated and performed under 1989 JOA |

25

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| the Review-Journal terminates this Agreement pursuant to Section 9.1.4. within the first three (3) years of the term of this Agreement, Donrey's rights with respect to CCTV shall terminate, and in the event Donrey has received any payments, issuances, or transfers of or with respect to CCTV stock pursuant hereto prior to Donrey's withdrawal from the application to the Department of Justice or the Review-Journal's termination of this Agreement as herein provided, such payments, issuances or transfers of or with respect to CCTV stock shall be refunded or rescinded. | | |
| **10.6 Sun Trademark, Tradenames, Service Marks and Copyrights** | | |
| In its use of such Sun trademarks, tradenames, service marks and copyrights as may be required to perform its obligations under this Agreement, Review-Journal shall use its best efforts to comply substantially with all relevant laws of the State of Nevada and of the United States pertaining to trademarks, tradenames, service marks and copyrights in force at any time during the term of this Agreement. | In its use of such Sun trademarks, tradenames, service marks and copyrights as may be required to perform its obligations under this Restated Agreement, including promotion of the Newspapers, Review-Journal shall use commercially reasonable effort to comply substantially with all relevant laws of the State of Nevada and of the United States pertaining to trademarks, tradenames, service marks and copyrights in force at any time during the term of this Restated Agreement. | Updated from "best efforts" to "commercially reasonable" efforts<br><br>No change that Review-Journal to comply with all laws pertaining to its use of Sun's trademarks, etc. |
| | Review-Journal shall have the exclusive right and the obligation to distribute the Sun through electronic replica technology (i.e. technology customarily used by metropolitan daily newspapers which transmits an entire Sun page to the subscriber or consumer in any form) to the same extent the Review-Journal distributes its own pages by such means provided, however, that Sun shall have the right to republish, license, or otherwise use its editorial content in any form or media, other than as an entire Sun page or pages, upon the earliest of: (i) 7:00 a.m., (ii) the time the Review-Journal guarantees delivery to its subscribers, or (iii) the time the Review-Journal first uses its editorial content in any form or media other than in the printed newspaper or replica technology.<br>. . . .<br>The Review-Journal shall have the right to republish, license, or otherwise use its editorial content in any form or media. | Added Review-Journal's obligations to include Sun in electronic replica edition, and timing of republication on webpages |

26

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| Sun shall use its best efforts to maintain in effect said trademarks, tradenames, service marks and copyrights, and shall make applications for the registration and/or renewal thereof if and when required by law. | Sun shall use commercial reasonable efforts to maintain in effect said trademarks, trade names, services marks and copyrights, and shall make applications for the registration and/or renewal thereof if and when required by law. | Updated from "best efforts" to "commercially reasonable" efforts in maintaining Sun's trademarks, etc. |
| Review-Journal acknowledges Sun's right, title and interest in and to said trademarks, tradenames, service marks and copyrights and all renewals thereof, and agrees that it shall not at any time permit, take, or cause to be taken any action within its control in any way impairing or tending to impair any part of such right, title and interest. Review-Journal agrees to publish such notices in the Sun and the jointly published newspapers as Sun reasonably may request in order to protect said trademarks, tradenames, service marks and copyrights, or any of them. | Review-Journal acknowledges Sun's right, title and interest in and to said trademarks, trade names, service marks and copyrights and all renewals thereof, and agrees that it shall not at any time permit, take, or cause to be taken any action within its control in any way impairing or tending to impair any part of such right, title and interest. Review-Journal agrees to publish such notices in the Sun as Sun reasonably may request in order to protect said trademarks, trade names, service marks and copyrights, or any of them. | No change regarding Review-Journal's obligations regarding Sun's trademarks, publishing notices Sun requests to protect its trademarks |
| Review-Journal shall not in any manner represent that it has any ownership interest in said trademarks, tradename service marks or copyrights or in the registration thereof, and Review-Journal acknowledges that its use hereunder of said trademarks, tradenames, service marks or copyrights shall not create in its favor any right, title or interest in or to same beyond those created by this Agreement. | Review-Journal shall not in any manner represent that it has any ownership interest in said trademarks, trade names, services marks or copyrights or in the registration thereof, and Review-Journal acknowledges that its use hereunder of said trademarks, trade names, services marks or copyrights shall not create in its favor any right, title or interest in or to same beyond those created by this Restated Agreement. | No change regarding Review-Journal prohibited from representing it has any ownership of Sun's trademarks |
| **10.7 Tax Treatment of Payments to Sun** | | |
| It is contemplated by the parties that the payments to Sun under Section 6.4 of this Agreement will be, for federal income tax purposes, ordinary income to Sun and will be deductible by Review-Journal as a business expense. | It is contemplated by the parties that the payments to Sun under Appendix D of this Restated Agreement will be, for federal income tax purposes, ordinary income to Sun and will be deductible by DR as a business expense | Update to section identifying Sun's payments<br><br>No change in tax treatment of payments to Sun |
| **10.8 Specific Performance** | | |
| Because of the public interest of maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs, and because of the inadequacy of damages in the event of default in the performance of material obligations hereunder, each party shall have the right to seek specific performance of the material provisions of this Agreement, provided, that in the event of any action by Sun for specific performance against Review-Journal, if Sun does not obtain an order of specific performance, Review-Journal shall be entitled to recover in such action its attorneys' fees and costs. | Because of the public interest in maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs, and because of the inadequacy of damages in the event of default in the performance of material obligations hereunder, each party shall have the right to seek specific performance of the material provisions of this Restated Agreement, provided, that in the event of any action by either party for specific performance, if that party does not obtain an order of specific performance, the other party shall be entitled to recover in such action its attorneys' fees and costs. | Updated document title and updated that both parties would be liable for attorney fees and costs if sought an order of specific performance and fails<br><br>No change in specific performance rights<br><br>No change in parties' reiteration of the "public interest of maintaining editorially and reportorially independent and competitive newspapers in Las Vegas" |

27

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **10.9 Successors and Assignment** | | |
| This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their permitted successors and assigns. | This Restated Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their permitted successors and assigns. | Updated document title<br><br>No change that agreement would be binding on successors |
| **10.10 Governing Law; Modification** | | |
| This Agreement shall be construed and enforced in accordance with the laws of the State of Nevada. This Agreement may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, modification or discharge shall be sought. | This Restated Agreement shall be construed and enforced in accordance with the laws of the State of Nevada. This Restated Agreement may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, modification or discharge shall be sought. | Updated document title<br><br>No change to governing law or written requirements for modification |
| **10.11 Headings** | | |
| Headings have been inserted in this Agreement for the purpose of convenience only. They shall not be used to interpret or construe the meaning of any Articles or Sections, nor shall they have the effect of limiting or enlarging the meaning thereof. | Headings have been inserted in this Restated Agreement for the purpose of convenience only. They shall not be used to interpret or construe the meaning of any Articles or Sections, nor shall they have the effect of limiting or enlarging the meaning thereof. | Updated document title<br><br>No change to Headings disclaimer |
| | 10.12 Ancillary Publications. Nothing in this Restated Agreement shall preclude either party from engaging in any lawful business outside of this Restated Agreement, except that neither Review-Journal, or any Affiliate of Review-Journal nor Sun, or any Affiliate of Sun, shall, outside of this Restated Agreement, publish a newspaper that is published three or more days per week and that is directed primarily to Clark, Nye, or Lincoln Counties, Nevada or any parts thereof. As used in this Restated Agreement, "Affiliate" means any person, corporation, partnership, trust or other entity which controls, is controlled by, or is under common control with either party. | New language restricting potential new newspaper |
| | 10.13 Release. As a material inducement to DR to enter into this Restated Agreement, and for other good and valuable consideration, Sun, for itself, and its assigns, hereby unconditionally releases and forever discharges DR and the Las Vegas Review-Journal and their partners, predecessors, successors, assigns, agents, stockholders, directors, officers, current or former employees, representatives, attorneys, divisions, subsidiaries, affiliates, receivers, trustees, shareholders and all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, | New language regarding mutual release of all claims |

28

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
|  | liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, including, but not limited to, attorneys' fees and costs actually incurred of any nature whatsoever with respect to all those claims asserted or which could have been asserted which arise out of, or are related to, operation of the Las Vegas Review-Journal or Sun between June 17, 1989, and June 10, 2005, known or unknown, including, but not limited to, any claims connected with operations under the 1989 Joint Operating Agreement between the parties, during that time period, including those items set forth on Exhibit C to a release agreement between the parties dated June 20, 2002 and any claims related to the conduct or operation of lvrj.com, reviewjournal.com, lasvegasnewspapers.com.<br><br>As a material inducement to Sun to enter into this Restated Agreement, and for other good and valuable consideration, DR, for itself, its affiliates and assigns, hereby unconditionally releases and forever discharges Sun its partners, predecessors, successors, assigns, agents, stockholders, directors, officers, current or former employees, representatives, attorneys, divisions, subsidiaries, affiliates, receivers, trustees, shareholders and all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, including, but not limited to, attorneys' fees and costs actually incurred of any nature whatsoever with respect to all those claims asserted or which could have been asserted which arise out of, or are related to, operation of the Las Vegas Review-Journal or Sun between June 17, 1989, and June 10, 2005, known or unknown, including, but not limited to, any claims connected with operations under the 1989 Joint Operating Agreement between the parties, during that time period, including those items set forth on Exhibit D to a release agreement between the parties dated June 20, 2002 and any claims related to the conduct or operation of lasvegassun.com or lasvegasnewspapers.com |  |

29

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| SIGNATURE<br>IN WITNESS WHEREOF, this Agreement has been executed by<br>the parties' respective corporate officers thereto duly authorized as of the day and year first above written.<br><br>DONREY, INC.<br>By Fred W. Smith<br>President<br><br>LAS VEGAS SUN, INC<br>By Brian L. Greenspun<br>President | IN WITNESS WHEREOF, this Restated Agreement has been executed by the parties' respective<br>corporate officers thereto duly authorized as of the day and year first above written.<br><br>DR PARTNERS.<br>By: Stephens Group, Inc.<br>General Partner<br>BY: _Warren Stephens<br>Chief Executive Officer<br><br>LAS VEGAS SUN, INC.<br>By: Brian L. Greenspun<br>President | Updated signatories |
| **APPENDIX A** | | |
| **A.1** | | |
| Pursuant to Section 4.2 of this Agreement, for each fiscal year after the Effective Date Review-Journal shall establish an allocation for Review-Journal news and editorial expenses, and the allocation for, news and editorial expenses for the Sun shall be equal to sixty-five percent (65%) of the Review-Journal allocation, subject to a minimum of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) per fiscal year, which shall be increased each year by a percentage equal to the percentage increase in the CPI for the Las Vegas metro area. Such allocations shall be prorated for any period less than a full fiscal year. The aggregate allocations for news and editorial expenses shall constitute Agency Expense. On the first day of each month following the Effective Date, Review Journal shall pay to Sun an amount equal to one-twelfth (1/12th) of the Sun's annual allocation for news and editorial expenses as herein provided. | Intentionally omitted | Omitted as previously obligated and performed under 1989 JOA but modified payment structure in 2005 Amended JOA (*see, e.g.*, 2005 Am. JOA App'x D)<br><br>Review-Journal still to provide a joint operation payment that would be for Sun's news and editorial expenses |
| **A.2** | | |
| Pursuant to Sections 4.3 and 4.4 of this Agreement, the reading content of the newspapers shall be in accordance with the following formulas:<br>(a) For Monday through Friday editions, the number of pages of the Sun and the number of pages of the Review-Journal shall be determined by the ratio of the number of inches of advertising to be printed in each newspaper and the size of the newshole in each newspaper shall be determined by the same ratio, provided that | Pursuant to Section 4.3 of this Restated Agreement, the number, placement, and characteristics of Sun pages shall be in accordance with the following specifications:<br>For Monday through Friday editions, the Sun shall be composed of an open front page with the Las Vegas Sun flag and seven (7) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun. The | Updated language given production timing and formats, including Sun's noticeable mention on front page<br><br>A.2 still provides specifications for number of pages for Monday through Friday editions, Sunday edition, and Saturday and holiday editions |

30

APP184

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| in no event shall the average newshole of the Sun in any month be less than eighty-five percent (85%) of the newshole of the Review-Journal in such month.<br><br>(b) For the jointly published Sunday edition, Sun shall be entitled to a separate section of three (3) open pages (one cover page, one editorial page and one op. ed. page), plus four hundred fifty (450) column inches, provided, that the Review-Journal may add 'additional pages to the Sun section comprised of news and advertising, as may be required by composition or printing requirements. The Review-Journal shall attempt to place the Sun section within the first four (4) sections of the Sunday edition. The Review Journal shall determine the number of pages for a comic section for jointly published Sunday editions which shall consist of strips and features selected equally by the Review-Journal and the Sun.<br><br>(c) For jointly published Saturday and holiday editions, the Sun shall be entitled to one editorial or op. ed. page and one comic page. | remaining pages may include advertising, subject to the restrictions in (d) below. For Monday-Friday editions, the Review-Journal shall be composed of as many pages as Review-Journal management determines in its sole discretion.<br><br>For the Sunday edition, the Sun shall be composed of an open front page with the Las Vegas Sun flag and nine (9) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun. The remaining pages may include advertising, subject to restrictions in (d) below. The Review-Journal shall determine the number of pages for a comic section for the Sunday edition which shall consist of strips and features selected by the Review-Journal. The Sunday paper, including comics, shall be composed of as many Review-Journal pages as Review-Journal management determines in its sole discretion.<br><br>For Saturday and holiday editions, the Sun shall be composed of an open front page with the Las Vegas Sun flag and five (5) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun. The Saturday and holiday editions shall be composed of as many Review-Journal pages as Review-Journal management determines in its sole discretion. The remaining pages may include advertising, subject to restrictions in below.<br><br>(d)      The Sun shall not include any Review-Journal editorial content. Standard materials such as weather pages, comics, standardized television listings and the like shall not be considered Review-Journal editorial material and may be included in the Sun as additional pages unless the Sun objects in writing thereto. Other than open pages, the Sun may include advertising. No Sun page shall be more than 50% advertising, except for full page ads, and no advertising shall appear "above the fold" in the Sun, except for full page ads. Notwithstanding the foregoing, pages may contain, from time to time, more than 50% advertising due to production issues and advertising demands. Advertising will not be stacked in a pyramid format and shall be evened out in terms of height on the page. The Monday-Sunday editions of the Review- | *See also* 1989 JOA § 4.4 (describing logo and placement)<br><br>*See also* 2005 Am. JOA App'x A.3 (describing Sun placement) |

31

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| | Journal shall include a noticeable mention of the Sun, on the front page of the Review-Journal. The noticeable mention will appear in a box above the Review-Journal's masthead (the "Sun Box") and shall be in the form shown on Appendix B. The Sun Box shall not be smaller in proportion than shown in Appendix B. The Sun Box shall also include the Sun's masthead, and any emblem that is part of the Sun's masthead. The Sun Box shall include a promotion of a story in the Sun and refer readers to the Sun inside. The type face, editorial artwork, font, and editorial promotional content appearing in the Sun Box shall be determined by Sun, in its sole discretion. Any color in the Sun Box shall be restricted to constituent colors used by the Review-Journal on its front page. The Sun Box shall be the left-hand box unless it would be obscured by a spaeda fold, in which case the Sun Box shall be the right-hand box. In the event of major breaking news or for exigent production circumstances, the Sun Box may be moved below the Review-Journal's masthead. The Sun, on average, will receive as much editorial color as the local news section of the Review-Journal. | |
| **A.3** | | |
| Pursuant to Section 5.1.4 of this Agreement, the Review-Journal shall establish for each fiscal year after the Effective Date a budget for promotional activities of the Review-Journal and the Sun and at least forty percent (40%) of each total budget shall be allocated to the Sun. | Edition times for Monday through Sunday issues of the Review-Journal shall be established by the Review-Journal in accordance with normal industry standards. Deadlines for the Sun shall be the same as those established for the last local news sections of the Review-Journal. The Sun will be placed as the third section of the Newspapers except on occasions when exigent production circumstances require that it be placed as the fourth section. The Sun will be printed in the same press run as the Review-Journal local news section. The Review-Journal shall be solely responsible for determining the need for replating the Newspapers, and shall treat the Sun and the Review-Journal equally with respect to replating of page one for major breaking national or international news events | "Edition times" language found in 2005 Am. JOA App'x A.4

*See* 2005 Am. JOA § 5.1.4 (establishing Review-Journal tasked with promoting Sun)

No change that Review-Journal obligated to budget for and promote both newspapers |

32

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| **A.4** | | |
| Edition times for Monday through Friday issues of the Review-Journal and the Sun and for jointly published Sunday, Saturday and holiday editions shall be established by the Review-Journal in accordance with normal industry standards. | If the Review-Journal determines that it is feasible to publish an "extra" edition, such edition shall be a Review-Journal edition and the content of any "extra" edition shall be determined solely by the Review-Journal. [*See* 2005 Am. JOA App'x A.3] | 2005 Am. JOA App'x A.3 language found in 1989 JOA App'x A.4 No change regarding establishing edition times with "normal industry standards" |
| **A.5** | | |
| If the Review-Journal determines that it is feasible to publish an "extra" edition, such edition shall be a jointly published edition, but the content of any "extra" edition shall be determined solely by the Review-Journal. | [*See* 2005 Am. JOA App'x A.4: "If the Review-Journal determines that it is feasible to publish an "extra" edition, such edition shall be a Review-Journal edition and the content of any "extra" edition shall be determined solely by the Review-Journal."] | 2005 Am. JOA App'x A.4 language found in 1989 JOA App'x A.5 No change regarding feasibility of publishing an "extra" edition and Review-Journal maintains sole control |
| | In the event the Review-Journal determines that the Sun's continued placement in the Review-Journal has a material and substantial negative financial impact on the revenue and profit of the Newspapers it may deliver the Sun separately from the Review-Journal but at the same time, place, and manner as the Review-Journal. The Review-Journal shall provide written notice to the Sun within fifteen (15) days of beginning such separate delivery specifying in detail the factual basis for its determination. In the event the Sun disagrees with the Review-Journal's determination, it shall within seven (7) days of receipt of notice from the Review-Journal, request that the matter be submitted to arbitration by an arbiter mutually agreed upon by the parties. If Sun requests arbitration, the Review-Journal shall not deliver the Sun separately until sixty (60) days after selection of the arbitrator. In the event the parties are not able to agree upon an arbiter within seven (7) days, an arbiter shall selected by the Chairman of the Department of Journalism of Northwestern University, Evanston, Illinois, or a similar journalism school if Northwestern University has ceased operations of its School of Journalism. The parties shall request the arbitrator to render a decision within sixty (60) days of his or her selection, and Sun and the Review-Journal each hereby covenant to cooperate with the arbitrator to facilitate such request. The arbitrator shall have experience in the senior management of metropolitan daily | Updated language regarding Review-Journal's financial impact considerations and reverting to separate delivery |

33

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| | newspapers. In determining material and substantial negative financial impact, only the following factors shall be considered; advertiser abandonment of the Newspapers specifically due to the Sun's inclusion within the Review-Journal or subscriber cancellations of the Newspapers specifically due to the Sun's inclusion within the Review-Journal. The material and substantial negative financial impact shall be determined by reference to generally accepted standard newspaper industry sources. The decision of the arbitrator shall be final. The cost of the arbitration shall be borne by the non-prevailing party. The Review-Journal's rights under this section shall be cumulative and may not be exercised more often than once every eighteen (18) months. In the event Sun determines, in its sole discretion, that the Sun's continued placement in the Review-Journal negatively impacts the Sun, the Review-Journal shall, upon fifteen (15) day written notice from Sun, thereafter deliver the Sun separately from the Review-Journal but at the same time, place and manner as the Review-Journal, provided that Sun shall pay any incremental expenditure reasonably incurred because of such separate delivery, which separate delivery shall be effected without any derogation in the publication, production, or delivery of the Review-Journal. Prior to giving its fifteen (15) day written notice, Sun may request and the Review-Journal shall provide a good faith estimate of such incremental expenditures and the parties shall meet and confer regarding the estimate. If the Sun is separately delivered, it will no longer receive noticeable mention in the Review-Journal. | |
| **APPENDIX B** | | |
| **B.1** | | |
| Except as otherwise expressly provided for in this Agreement, the term "Agency Expense" shall mean and include all costs and expenses of the performance of the Review-Journal's obligations under this Agreement, including but not limited to: | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses) |
| | [Sample to be attached] | 2005 Am. JOA added sample of front page and Sun's noticeable mention requirements |

34

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| B.1.1. The amounts allocated to Review-Journal and Sun for news and editorial expenses and for promotional expenses as set forth in Appendix A. | | Omitted as 2005 Am. JOA § 4.2 removed both parties editorial costs from joint operation expenses |
| B.1.2. Costs and expenses incurred by Review-Journal, with respect to the newspapers, supplements and Showbiz Magazine, for composition, printing, and distributing; news content of Showbiz Magazine; solicitation and sale of advertising; circulation sales expenses; collection of circulation and advertising accounts receivable, including a reasonable allowance for doubtful receivables and write-offs of receivables deemed uncollectible. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |
| B.1.3. Compensation of Review-Journal's non-news and non-editorial employees, including, without limitation, salaries, commissions, payroll taxes, the cost of group insurance, retirement benefits, workers' compensation coverage, and other benefits for such employees as may be customary in the newspaper industry from time to time. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |
| B.1.4. Accrued vacation or severance pay for Review-Journal's non-news and non-editorial employees. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |
| B.1.5. Costs for supplies, postage, private couriers, freight, Sunday comics and supplements, film, photo paper and chemicals, ink, newsprint, plates, cuts and mats and contract trucking, and similar costs for all Review-Journal newspaper departments, other than news and editorial. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |

35

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| B.1.6. Expenses for travel, auto allowances, mileage reimbursement, employee relations, recruiting, and attendance at seminars and conventions for Review-Journal's non-news and non-editorial employees. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |
| B.1.7. Sales and use taxes on equipment and personal property purchased for use by Review-Journal or otherwise applied to Agency operations under this Agreement to the extent that such taxes are not capitalized for purposes of depreciation or amortization. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses except in certain situations described in 2005 Am. JOA App'x D |
| B.1.8. Taxes; license or permit fees paid by Review-Journal with respect to or resulting from the conduct of business under this Agreement or with respect to property used by Review-Journal in the operations under this Agreement, except federal, state or local taxes, if any, measured by net income. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |
| B.1.9. The cost of membership for Review-Journal and Sun and their non-news and non-editorial employees in the Better Business Bureau, Las Vegas Chamber of Commerce, and other business-oriented memberships which shall be determined by Review-Journal to be in the best interests of the Agency. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |

36

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| B.1.10. The cost of Review-Journal and Sun membership in the Newspaper Advertising Bureau, American Newspaper Publishers Association, and other similar newspaper organizations. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |
| B.1.11. The cost of public liability insurance, insurance against interruption or suspension of publication of the newspapers, carrier insurance, and libel, invasion of privacy and related insurance covering advertising printed in the newspapers. Insurance costs relating to the news or editorial activities of the Review-Journal or the Sun shall not be' considered Agency Expense and such costs shall be borne separately by the parties, provided, that each party shall attempt to add the other as an additional named insured under such insurance, but Review-Journal may procure libel, invasion of privacy and related insurance to cover any otherwise inadequately insured exposure it may have as a republisher of Sun news, editorial or advertising copy, and the cost of such additional insurance shall be an Agency Expense. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |
| B.1.12. The cost of fire and casualty insurance on buildings, equipment, and other property utilized by Review-Journal in the performance of the Agreement. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |
| B.1.13. The cost of all utilities related to the Review-Journal's performance of the Agreement. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |

37

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| B.1.14. Costs and expenses incurred in connection with hazardous waste materials. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |
| B.1.15. Costs and expenses incurred by Review-Journal in obtaining legal and other professional services which it deems necessary in performing its obligations under this Agreement, including but not limited to the costs and fees related to any defense against third party claims, charges, complaints and related matters asserted against the Review-Journal related to the Agreement or Review-Journal's performance of the Agreement; provided, that such costs and fees related to news and editorial liabilities as defined in Section 8.1.2 shall not be Agency Expense, except insofar as such liabilities are asserted against Review-Journal solely due to its republication of Sun news, editorial or feature material or advertising copy. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses |
| B.1.16. A monthly charge of Five Hundred Fifty Thousand Dollars ($550,000 for the rental value of all Review-Journal real property, plant and equipment (including the value of Sun office space provided by Review-Journal under Section 5.4 of the Agreement), except that devoted to non-agency activities such as the Review-Journal's news and editorial operations. The rental charge would be adjusted each five (5) years on the basis of the change in the CPI for the Las Vegas, Nevada, market. | | Monthly rent charge omitted in 2005 Am. JOA App'x D (describing joint operation revenues and expenses) |
| B.1.17. A monthly charge equal to one and one-half percent (1-1/2%) of the cost of all equipment acquired, expansion or remodeling of buildings, or other capital expenditures, in connection with Agency activities, subsequent to the date of the Agreement. The monthly charge would be subject to adjustment at any time on the basis of increases in the prime interest rate at First Interstate Bank, Las Vegas, Nevada. The Review-Journal shall have sole discretion regarding the purchase of equipment or other necessary capital expenditures for the performance of the Agreement. | | Monthly equipment charge omitted in 2005 Am. JOA App'x D (describing joint operation revenues and expenses) |

38

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| | | |
| B.1.18. A monthly charge for general management services equal to three and one-half percent (3-1/2%) of Agency Revenues. | | Monthly management fee omitted in 2005 Am. JOA App'x D (describing joint operation revenues and expenses) |
| B.2 | | |
| All costs and expenses in connection with the news content, composition, production, distribution and advertising sales in connection with Showbiz Magazine shall be included in Agency Expense for the period Showbiz Magazine is governed by the terms of this Agreement, pursuant to Section 4.5. | | Omitted as obligations and expenses ended |
| B.3 | | |
| Changes or additions in the Sun's newsroom equipment which may be required after the Effective Date to interface with Review-Journal production facilities shall be purchased or paid for by Review-Journal and a monthly charge equal to one and one-half percent (1-1/2%) of the cost thereof shall be included in Agency Expense. This monthly charge would be subject to adjustment at any time on the basis of increases in the prime interest rate at First Interstate Bank, Las Vegas, Nevada. | [*See* 2005 Am. JOA § 4.3 (describing Review-Journal's obligation to pay for new Sun equipment to interface in certain scenarios)] | Omitted in 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these joint operation expenses in certain scenarios |
| **APPENDIX C** | | |
| C.1 | | |
| Except as otherwise expressly provided in this Agreement term "Agency Revenues" shall mean and include: | Intentionally omitted | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in revenues of joint operation |
| C.1.1. All advertising and circulation revenues of the newspapers, subject to the provisions of Section 7.1 of this Agreement with respect to accounts receivable outstanding on the Effective Date. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these revenues of joint operation |

39

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| C.1.2. All revenues from sales incidental to the publication of the newspapers or involving either the facilities used to produce the newspapers or personnel whose compensation is included in Agency Expense, such as sales of commercial printing, waste paper, press plates, and other production materials. | | 1989 JOA App'x B language omitted as already incorporated into joint operation accounting; *see also* 2005 Am. JOA App'x D (describing joint operation revenues and expenses)<br><br>No change in these revenues of joint operation |
| **APPENDIX D** | | |
| Operating profit under the Agreement shall mean the excess of Agency Revenues over Agency Expense, and shall be distributed as follows:<br>For each fiscal year during the term of the Agreement the operating profit shall be distributed ninety percent (90%) to the Review-Journal and ten percent (10%) to the Sun, with payment to be made to the Sun pursuant to the provisions of Section 6.4 of the Agreement, provided, that for the first fiscal year the Sun shall be guaranteed a minimum operating profit distribution of Three Million Dollars ($3,000,000). | Sun shall receive an annual profits payment (the "Annual Profits Payment"), one-twelfth (1/12th) of which shall be paid monthly in advance on the first day of each month during the Term. For the fiscal year beginning April 1, 2005, the Annual Profits Payment shall be Twelve Million Dollars ($12,000,000), provided, however, that payments to Sun shall continue in accordance with the 1989 Agreement until the Transition Date. Each fiscal year thereafter during the term of this Agreement the Annual Profits Payment shall be adjusted as set forth in this Appendix D. Within thirty (30) days following the beginning of each such fiscal year, Review-Journal shall calculate the percentage change (the "Percentage Change") between the earnings, before interest, taxes, depreciation and amortization ("EBITDA") for the fiscal year immediately preceding (the "LTM EBITDA") and the EBITDA for the penultimate fiscal year (the "Prior Period EBITDA"). The Annual Profits Payment shall be increased, or decreased, as the case may be, by the Percentage Change between the LTM EBITDA and the Prior Period EBITDA.<br>In calculating the EBITDA (i) for any period that includes earnings prior to April 1, 2005, such earnings shall not be reduced by any amounts that during such period may have been otherwise been deducted from earnings under section A.1 of Appendix A or sections B.1.16, B.1.17, B.1.18, or B.3 of Appendix B of the 1989 Agreement and (ii) for any period whether before or after April 1, 2005, such earnings shall not be reduced by any amounts paid to Sun as a percentage of operating profit under Appendix D of the 1989 Agreement or | Update to Sun's profit payment formula but Sun still to receive approximately 10% of joint operation profit<br><br>Update to Sun's audit rights<br><br>No change that Review-Journal still controls accounting and records revenues and expenses to determine profit<br><br>No change that joint operation profit includes revenues from affiliate publications (*see* 1989 JOA § C.1.2) |

40

**APP194**

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| | under this Appendix D. Any expense of the Review-Journal attributable to a transaction with an Affiliate shall not exceed fair market value. EBITDA shall include the earnings of the Newspapers and the earnings of the Review-Journal's Affiliates derived from publications generally circulated in Clark, Nye, or Lincoln Counties, Nevada or any parts thereof. For purposes of this paragraph, Press Equipment shall mean the press equipment currently owned by the Review-Journal and identified in Appendix D-1 and any additional equipment, whether owned by the Review-Journal or third parties, to the extent that it produces substantially the same product or result, and Other Equipment shall mean all equipment and facilities used for production or operation of the printed Newspapers or other print publications whose earnings are included in EBITDA other than Press Equipment. EBITDA, whether determined for any period before or after April 1, 2005, shall not include (a) any expense for rents, leases or similar expense for Other Equipment (i) if such expense, under generally accepted accounting principles, should be treated as a capitalized lease obligation, or (ii) if such expense is made for the use of any capital asset the use of which is intended to replace any item of Other Equipment that is owned by the Review-Journal as of the Effective Date or (b) any expense for rents, leases, or similar expenses for Press Equipment, including any portion of a printing services contract that is fairly attributable to the use of Press Equipment. All calculations shall be made in accordance with generally accepted newspaper industry accounting principles consistently applied. The Parties intend that EBITDA be calculated in a manner consistent with the computation of "Retention" as that line item appears on the profit and loss statement for Stephens Media Group for the period ended December 31, 2004. Sun shall have the right, exercisable not more than once every twelve months and only after providing written notification no less than thirty days prior thereto, to appoint an certified public accounting firm or law firm as Sun's representative to examine and audit the books and records of the Review-Journal and the other publications whose earnings are included in EBITDA for purposes of verifying the determinations of the changes to the Annual Profit Payments. Such representative shall agree in writing to maintain the confidentiality of all such financial records | |

41

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
| | inspected. The confidentiality agreement shall not restrict the representative from disclosing to the management of Sun information concerning the audit of the Review-Journal, but shall restrict the representative from disclosing any specific individual salary information or advertiser-specific information (e.g., names, prices, contract terms, discounts, total inches) for the other publications whose earnings are included in EBIDTA. With respect to such other publications, the representative may only disclose summary information (e.g., total advertising revenue or total salaries) that is not identifiable with individual advertisers or employees. If as a result of such an audit, there is a dispute between Sun and the Review-Journal as to amounts owed to Sun and they are not able to resolve the dispute within 30 days, they shall select a certified public accountant to arbitrate the dispute. The arbitration shall be conducted according to the commercial arbitration rules of the American Arbitration Association, including such rules for the selection of a single arbitrator if Sun and the Review-Journal are not able to agree upon an arbitrator. Sun and the Review-Journal shall request the arbitrator to render a decision within sixty (60) days of his or her selection, and Sun and the Review-Journal each hereby covenant to cooperate with the arbitrator to facilitate such request. The arbitrator shall agree to be bound by terms of confidentiality to the same extent as the Sun's representative. The arbitrator shall make an award to Sun in the amount of the arrearage, if any, found to exist, together with interest thereon from the date any arrearage was due until paid at the corporate prime rate as quoted by the Wall Street Journal on the first business day of each month. The arbitrator shall also make an award of the fees and cost of arbitration, which may include a division of such fees and costs among the parties in a manner determined by the arbitrator to be reasonable in light of the positions asserted and the determination made. DR shall be entitled to all of the profits of the Newspapers after the payments set forth above to the Sun during the term of this Restated Agreement.<br><br>APPENDIX D-1:<br> 1 Goss Urbanite Press (Pama Lane)<br>1 Goss Community Press (Press Annex)<br>2 Goss Newsliner presses (Main pressroom) | |

42

APP196

| 1989 JOA | 2005 Amended JOA | Notes |
|---|---|---|
|  | 1 Didde press (Mailroom)<br>2 Lines of Heidelberg Inserters and GMA/Alphaliners |  |

43