E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavilion Center Dr., Suite 500
Las Vegas, Nevada 89135
Tel: 702.862.8300
Fax: 702.778.9709
Email: lreid@clarkhill.com
        kmartini@clarkhill.com
        nsscott@clarkhill.com

James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Tel: 702.214.2100
Fax: 702.214.2101
Email: JJP@pisanellibice.com
        TLB@pisanellibice.com

Jordan T. Smith, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Tel: 702.464.7022
Fax: 702.382.8135
Email: jtsmith@bhfs.com

Joseph M. Alioto, PRO HAC VICE
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

*Attorneys for Plaintiff/Counterdefendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation,<br><br>                    Plaintiffs,<br><br>v.<br><br>SHELDON ADELSON (Estate Of), an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC,, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC dba ADFAM, a Delaware limited liability company and as the alter ego of Las Vegas Review-Journal, Inc., and News+Media Capital Gorup, LLC; and DOES, | Case No.: 2:19-CV-01667-ART-MDC<br><br>**(REDACTIONS/FILED UNDER SEAL)**<br><br>**PLAINTIFF/COUNTERDEFENDANTS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PER ECF NO. 1112** |

I-X, inclusive,

Defendants.

LAS VEGAS REVIEW-JOURNAL, a Delaware corporation,

Counterclaimant,

v.

LAS VEGAS SUN, INC., a Nevada corporation; BRIAN GREENSPUN, an individual and as alter ego of Las Vegas Sun, Inc.; GREENSPUN MEDIA GROUP, LLC, a Nevada limited liability company, as the alter ego of Las Vegas Sun, Inc.,

Counterclaim Defendants.

Pursuant to this Court's Order (ECF No. 1112), Plaintiff/Counterdefendant Las Vegas Sun, Inc., and Counterdefendants Brian Greenspun and Greenspun Media Group, LLC (together, for purposes of this Motion and for ease of reference, referred to as, the "Sun"), move this Court pursuant Federal Rule of Civil Procedure 65 and Section 16 of the Clayton Act, 15 U.S.C. § 26, for a temporary restraining order ("TRO") and preliminary injunction due to Defendants' (the "RJ") ongoing threats to end and actual ending of the parties' joint operation and ceasing the printing and distribution of the Sun in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The Sun requests a TRO and preliminary injunction that:

1. Defendants are enjoined from refusing to perform under the 1989 JOA, including that the Defendants are enjoined from refusing to print and distribute the Sun on a daily basis under the joint edition format provided for in Section 4.4, Section 5.1, Appendix A.2(b) and (c), and Section 8.2 of the 1989 JOA until such time that the RJ determines it is feasible to publish more than one newspaper product, following which the RJ shall not refuse to publish and distribute the Sun as a daily newspaper in accordance with Section 5.1 of the 1989 JOA;

2. Defendants are enjoined and shall not unilaterally end the joint operation or cease to print and distribute the Sun until June 10, 2040, or until a final judgment on the

ii

merits in this case permitting them otherwise; and

3.      Defendants shall immediately provide the Sun with the list of subscribers to the Newspapers.

This Motion is based on the following Memorandum of Points and Authorities, the attached Declaration of Kristen L. Martini and Exhibits, and the pleadings and papers on file herein.

Dated this 10th day of April, 2026.

CLARK HILL PLC

By: */s/ Kristen L. Martini*
E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
1700 S. Pavilion Center Drive, Suite 500
Las Vegas, Nevada 89135

PISANELLI BICE PLLC
James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

BROWNSTEIN HYATT FARBER
SHRECK, LLP
Jordan T. Smith, Nevada Bar No. 12097
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

ALIOTO LAW FIRM
Joseph M. Alioto, Pro Hac Vice
One Sansome Street, 35th Floor
San Francisco, California 94104

*Attorneys for Plaintiff/Counterdefendants*

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I.       INTRODUCTION……….............................................................................................. 1

II.      STATEMENT OF THE FACTS ................................................................................. 3

         A.       The Parties' Original Combination Under the 1989 Joint Operating Agreement.... 3

         B.       The Parties' 2005 JOA and the RJ's Continuing Control ....................................... 6

         C.       The Parties' Litigation ......................................................................................... 10

         D.       The RJ's Anticompetitive Conduct ...................................................................... 12

                  1.       Accounting Abuses ................................................................................. 12

                  2.       Failure to Maximize Joint Operation Profits.......................................... 14

                  3.       Actions that Reduced Consumer Knowledge of the Sun and Its
                           Value  ..................................................................................................... 17

                  4.       Efforts to Terminate the Joint Operation ................................................ 19

III.     THE LEGAL STANDARD........................................................................................ 23

IV.      A TRO AND PRELIMINARY INJUNCTION ARE NECESSARY ............................ 24

         A.       The Sun has a Likelihood of Success on the Merits of Its Section 2 Claims: The
                  Facts and Law Clearly Favor It.............................................................................. 24

                  1.       Monopolization ....................................................................................... 24

                           i.       *The Relevant Market* ..................................................................... 24

                                    The Product Market ..................................................................... 24

                                    The Geographic Market ............................................................... 27

                           ii.      *The RJ Possesses Monopoly Power in the Newspaper Market* ..... 27

                           iii.     *The RJ Has Willfully Acquired and Maintained Monopoly Power* 30

                           iv.      *The RJ's Conduct Has Caused Antitrust Injury*............................ 32

                                    Unlawful Conduct ....................................................................... 32

                                    Injury to the Sun.......................................................................... 35

                                    Injury Flowing from That which Makes the Conduct Unlawful ... 35

The Sun's Injury is the Type Antitrust Laws were Intended to Prevent ........................................................................... 36

The Sun Participates in the Market ................................................ 37

2.    Attempted Monopolization ............................................................ 38

B.    It Is Well Within This Court's Equitable Authority to Compel the RJ to Perform Under the Governing 1989 JOA ..................................................... 39

C.    The Sun Is Suffering and Will Continue to Suffer Extreme, Irreparable Harm .... 40

D.    The Balance of Hardships Tips Sharply in the Sun's Favor ................................. 43

E.    The Public Interest is Served by Granting Injunctive Relief ............................. 44

F.    A Bond Should Not be Required ............................................................. 45

V.    CONCLUSION............................................................................... 45

CERTIFICATE OF SERVICE ......................................................................... 47

DECLARATION OF KRISTEN L. MARTINI IN SUPPORT OF PLAINTIFF/COUNTERDEFENDANTS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PER ECF NO. 1112 ............... 48

v

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Airs Intern., Inc. v. Perfect Scents Distribs., Ltd.*,
902 F. Supp. 1141 (N.D. Cal. 1995) ................................................................. 34, 39

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of,*
*Ca.*, 190 F.3d 1051 (9th Cir. 1999) ........................................................ 32, 35, 36

*Am. Impex Corp. v. Int'l. Ace Tex, Inc.*,
2009 WL 3963791 (C.D. Cal. Nov. 16, 2019) ...................................................... 43

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) .............................................................................. 40

*Archetype Capital Partners, LLC v. Bullock Legal Group, LLC*,
2025 WL 3500688 (D. Nev. Dec. 5, 2025) ............................................................ 43

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) .............................................................................................. 32

*Barahona-Gomez v. Reno*,
167 F.3d 1228 (9th Cir. 1999) .............................................................................. 45

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ........................................................................ 40, 44

*Bristol-Myers Squibb Co. v. Ben Venue Laboratories*,
90 F. Supp. 2d 540 (D. N.J. 2000) ........................................................................ 24

*Brown Shoe Co. v. U.S.*,
370 U.S. 294 (1962) .............................................................................................. 25

*California v. American Stores*,
492 U.S. 1301 (1989) ...................................................................................... 23, 40

*Cascade Health Solutions v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ................................................................................ 38

*Citizen Pub. Co. v. United States*,
394 U.S. 131 (1969) .............................................................................................. 34

*City of Vernon v. S. California Edison Co.*,
955 F.2d 1361 (9th Cir. 1992) .............................................................................. 34

*Cmty. Publishers, Inc. v. DR Partners*,
  139 F.3d 1180 (8th Cir. 1998).................................................................................. 25

*Comm. for Indep. P-I v. Hearst Corp.*,
  704 F.2d 467 (9th Cir. 1983)............................................................................ 33, 44

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*,
  99 F.3d 937 (9th Cir. 1996).................................................................................. 24

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
  150 F.4th 1056 (9th Cir. 2025) ............................................................................. 28

*Doe v. Snyder*,
  28 F.4th 103 (9th Cir. 2022) ................................................................................ 23

*Dreamstime.com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) .......................................................................... 30, 34

*Federal Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020)................................................................................. 34

*Forro Precision, Inc. v. Int'l Bus. Machs. Corp.*,
  673 F.2d 1045 (9th Cir. 1982)............................................................................... 38

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2020)............................................................................... 42

*Great Caesars Ghost LLC v. Unachukwu*,
  2020 WL 2394052 (D.N.J. May 12, 2020) ............................................................ 43

*Hawaii ex rel. Anzai v. Gannett Pac. Corp.*,
  99 F. Supp. 2d 1241 (D. Haw. 1999) ............................................................... passim

*Hawaii v. Standard Oil Co. of Cal.*,
  405 U.S. 251 (1972)............................................................................................. 34

*High Tech. Careers v. San Jose Mercury News*,
  996 F.2d 987 (9th Cir. 1993)................................................................................. 24

*Hillstone Restaurant Group Inc. v. Houston's Hot Chicken Inc.*,
  2023 WL 110926 (D. Ariz. Jan. 5, 2023) .............................................................. 43

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997)............................................................................... 30

*In re Multidistrict Vehicle Air Pollution*,
  538 F.2d 231 (9th Cir. 1976)................................................................................. 23

*L.A. Land Co. v. Brunswick Corp.*,
  6 F.3d 1422 (9th Cir. 1993)............................................................................. 27, 35

*Las Vegas Sun v. Adelson*,
  147 F.4th 1103 (9th Cir. 2025) ................................................................................. 11

*Life Flight Network, LLC v. Metro Aviation, Inc.*,
  2017 WL 192706 (D. Or. Jan. 17, 2017) ................................................................. 45

*MetroPCS Georgia, LLC v. Metro Dealer, Inc.*,
  2019 WL 1597111 (W.D. Wa. Apr. 15, 2019) ......................................................... 45

*Moltan Co. v. Eagle-Picher Industries, Inc.*,
  55 F.3d 1171 (6th Cir. 1995) .................................................................................... 45

*Nebaco, Inc. v. Riverview Realty Co.*,
  482 P.2d 305 (Nev. 1971) .................................................................................. 39, 40

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) .................................................................................. 24

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) .................................................................................................. 24

*Paparazzi, LLC v. Souza*,
  2025 WL 3705493 (D. Utah Dec. 22, 2025) ............................................................ 45

*Patmont Motor Werks, Inc. v. Pedego LLC*,
  2012 WL 13071201 (D. Nev. Mar. 6, 2012) ............................................................ 23

*PharmacyChecker.com LLC v. LegitScript LLC*,
  137 F.4th 1031 (9th Cir.) .......................................................................................... 34

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) .................................................................................... 33

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .............................................................................. 27, 28

*Recycle for Change v. City of Oakland*,
  856 F.3d 666 (9th Cir. 2017) .................................................................................... 23

*Reilly v. Medianews Group, Inc.*,
  2006 WL 2419100 (N.D. Cal. July 28, 2006) .......................................................... 25

*Reno v. Am. C.L. Union*,
  521 U.S. 844 (1997) .................................................................................................. 25

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir.1991) ..................................................................................... 40

*Save Our Sonoran, Inc. v. Flowers*,
  408 F.3d 1113 (9th Cir. 2005) .................................................................................. 45

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013)........................................................................................ 32, 38

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993) .......................................................................................................... 34

*State College Area School Dist. v. Royal Bank of Canada*,
   2012 WL 12893876 (M.D. Pa. Oct. 5, 2012).................................................................. 22

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009).......................................................................................... 44

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001)............................................................................................ 23

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co.*,
   284 F.2d 1 (9th Cir. 1960)................................................................................................ 38

*United States v. Daily Gazette Co.*,
   567 F. Supp. 2d 859 (S.D. W. Va. 2008) ................................................................ passim

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) .......................................................................................................... 27

*William Inglis & Sons Banking Co. v. ITT Continental Banking Co.*,
   668 F.2d 1014 (9th Cir. 1981).......................................................................................... 34

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) .............................................................................................................. 23

## Statutes

15 U.S.C. § 26.......................................................................................................................... 23

15 U.S.C. §§ 1801-04 ...................................................................................................... passim

28 U.S.C. § 48.1 ........................................................................................................................ 7

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

This Court is well versed in the history between the parties and this antitrust dispute, having presided over this litigation for the better half of a decade and having ruled on the parties' cross-motions for summary judgment. This Court is also privy to the recent Ninth Circuit's Opinion, the Supreme Court's denial of the Sun's Petition for a Writ of Certiorari, and the Ninth Circuit's recent mandate. As a result of these recent events, together with the RJ's ongoing threats to eliminate the Sun and refusal to print and distribute the Sun as of April 3, 2026, the Sun is currently excluded from the market, suffering present harms, and further harm of irreversible elimination forever. The RJ has openly refused to even provide the Sun with its subscriber list so the Sun can communicate with its readers. ECF No. 1121 at 66-68.

This antitrust action was borne from the RJ's initial threats to end the parties' joint operation and cease printing and distributing the Sun. That plan was thwarted first by the Sun's filing of this action, and second by the entry of a (stipulated) injunction from this Court which required the RJ to abide by the terms of the JOA (as amended in 2005). But things have changed. According to the RJ, the Ninth Circuit's judicial declaration that the 2005 JOA is unlawful (because there was no Attorney General approval), and mandate that the RJ cannot be compelled to continue to "perform" under the 2005 JOA, is the final nail in the Sun's coffin, absolving the RJ of anticompetitive conduct spanning over 10 years and entitling it to eliminate the Sun from the market. The RJ is wrong. The RJ's position is just another spoke in its wheel of anticompetitive conduct. The Ninth Circuit's recent divergence from 50-years of established law and practice to conclude the 2005 JOA is unlawful for lack of Attorney General approval neither exonerates the RJ from antitrust liability nor grants it permission to snuff out its only competitor. The Ninth Circuit made no conclusions about the merits of the Sun's claims for relief or the current enforceability of the 1989 JOA. It did not address the Attorney General's approval of the 1989 JOA, nor its impact on the continuation of those material obligations post-2005. It reiterated in its mandate, "[W]e do not have before us any issue concerning a reversion to the 1989 JOA, and we express no views on any such questions." ECF No. 1106 at 7.

1

Even with the Ninth Circuit's rulings, the unenforceability of the 2005 JOA cannot function to end the joint operation under any circumstance. An unlawful 2005 JOA cannot terminate the lawful 1989 JOA, and this Court concluded as a matter of law that the 2005 JOA did not operate expressly or impliedly as a novation of the 1989 JOA. ECF No. 970 at 18. Equally important, under both the 1989 and the 2005 JOA, the RJ was obligated to use its "best efforts" and "take all action necessary" to comply with the NPA's requirements and cooperate to ensure the parties' "lawful operation" under the JOAs.[1] The Sun and RJ further solidified their intentions to ensure their operations were always lawful by memorializing a contingency provision providing for reversion to the 1989 JOA if the DOJ hindered or impaired the parties' 2005 amendment. In the simplest of terms, the RJ cannot now claim that the joint operation can be terminated when the 1989 JOA is the governing agreement and where it expressly and willingly agreed to revert back to the 1989 JOA in all circumstances where the 2005 JOA was otherwise ineffective.[2] And where the RJ argues that it is not feasible to print the Sun as an afternoon newspaper, the RJ is required to use its best efforts to print the Sun in a joint edition under the 1989 JOA as an interim measure until such time that it can fully perform under the 1989 JOA.[3] The RJ's material obligations to the joint operation under the 1989 JOA have remained in place since the Attorney General's approval. And under all circumstances, terminating the joint operation and eliminating the Sun was never the outcome of an invalid 2005 JOA.

Over 36 years ago, under the NPA[4] and with the Attorney General's blessing, the RJ voluntarily agreed to possess complete control over, and bear sole responsibility for, all non-editorial and -reportorial operations of the Sun, and they shared in the joint operation's profits. As a result of their combined operations in 1989, the Sun became entirely dependent on the RJ for business management, and printing, distributing, promoting, and accounting and disbursing profits to the Sun. After availing itself for decades of the benefits and privileges of its dominance, the RJ

---

[1] *See* 2SA293 § 1.1; 2SA310 § 5.3; 2SA449 § 1.1; 2SA453 § 5.3. The Sun's citations to its Appendices are in the form of: Volume "SA" page number.

[2] *See* 2SA294 § 1.1.

[3] 2SA315 § 8.2.

[4] The NPA refers to the Newspaper Preservation Act of 1970, 15 U.S.C. §§ 1801-04.

2

has wielded its power as a sword, undertaking a litany of anticompetitive conduct to terminate the longstanding, voluntary, and beneficial course of dealing under the joint operation, thereby reducing competition and harming the Sun and consumers. This is the opposite of the NPA's purpose and the Attorney General's intent when approving the parties' combination. The RJ's control over the joint operation was bestowed to *preserve* the Sun, not eliminate it. The 1989 JOA required the RJ to continue to print and distribute the Sun through 2040. These obligations, in all material respects, remained unchanged under the 2005 framework and remain unchanged today. The fact that the RJ manipulated the 2005 JOA framework (believing it was the enforceable, governing agreement) does not moot the RJ's anticompetitive conduct even in the face of the 2005 JOA's unenforceability.

Despite the undisputable fact that the 1989 JOA remains effective even after the Ninth Circuit's ruling, the RJ has stopped printing and distributing the Sun. The RJ's prior threats are now reality. Now that the Sun is currently suffering the tangible and intangible harms recognized by this Court last month, the Sun is facing the present threat of being shut down permanently. Even the *threatened* loss of a competitor, especially a JOA newspaper, is the exact type of irreparable harm Congress contemplated when enacting Section 16 of the Clayton Act to afford antitrust plaintiffs, like the Sun, injunctive relief. Because the Sun satisfies all required elements for a TRO and preliminary injunction, an Order granting the Sun's Motion is required.

## II.    STATEMENT OF THE FACTS

### A.    The Parties' Original Combination Under the 1989 Joint Operating Agreement

Prior to April 3, 2026, the Sun had been in publication for 76 years, and was the only other local, daily print newspaper in Clark County besides the Review-Journal (together, the "Newspapers"). 2SA000342-43. The Sun is an alternative, award-winning, newspaper editorial voice for the Las Vegas metropolitan area, often featuring attitudes, opinions, and coverage diametrically opposed to the RJ. ECF No. 1 ¶¶ 3, 4, 6; 1SA45-47; 2SA271-72; 2SA290.

By the late 1980s, the Sun had been operating at a substantial loss and was in probable danger of financial failure, with its losses likely irreversible. 2SA343-46. To ensure the continued publication of two separate and independent daily newspapers in Las Vegas, in June 1989, the Sun

and the Review-Journal voluntarily entered into a 50-year Joint Operating Agreement (the "1989 JOA") to combine all non-editorial and -reportorial operations pursuant to the NPA, with the intention that the joint operation would continue until December 31, 2040. *See* 2SA293 at Prelim. Statement & 2SA296 § 1.2. The parties believed that the "continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent, is of paramount importance to the citizens of Las Vegas and its environs." 2SA293 at Prelim. Statement.; 2SA309 § 5; 2SA323 § 10.8; *see also* 15 U.S.C. 15 U.S.C. § 1801.

The Sun and RJ agreed that merging non-editorial and -reportorial operations under the RJ's stewardship would allow the Sun to be profitable and preserved as a distinct newspaper voice. 2SA293 at Prelim. Statement. Accordingly, the RJ would be responsible for and in control of all business aspects of the joint operation, including: "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation (2SA293 § 5.1); acting on behalf of both Newspapers (2SA293 at Prelim. Statement); printing and producing the Newspapers, using the RJ's printing plant, employees, and equipment (*id.*; 2SA302-3 § 4.3; 2SA305-06 § 5.1); sales and distribution (2SA305-06 § 5.1); purchasing newsprint, materials, and supplies (*id.*); soliciting, selling, and collecting on the Newspapers' advertising and circulation (*id.*; 2SA307 § 5.1.3); promoting and circulating the Newspapers, using the RJ's "best efforts" (2SA305-06 § 5.1; 2SA307-08 § 5.1.3-.4); establishing advertising and circulation rates for the Newspapers (2SA305-06 § 5.1); paying, recording, and maintaining all expenses and revenues of the joint operation (2SA310-11 §§ 6.1, 6.2); accounting to the Sun after the close of each fiscal year (2SA311 § 6.3); and distributing the Sun's share of the joint operation's profits, derived from all advertising and circulation revenues of the Newspapers and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel. 2SA311 § 6.4. "So long as [the] Sun furnish[ed] news and editorial copy, features and services to [the] Review-Journal in accordance with Article 4" (setting forth the technical specifications for publishing), the RJ "agree[d] to produce the Sun" and "include the Sun copy and features in jointly published newspapers ... and to sell all advertising for, promote and circulate such newspapers." 2SA305-06 § 5.1.

4

For the format of the Newspapers, the RJ agreed to produce the Sun as an afternoon newspaper and the Review-Journal as a morning newspaper, with the Newspapers being published in a joint edition bundle on weekends, holidays, and special editions. 2SA303-04 § 4.4; 2SA325-26 at App'x A.2; 2SA327 at App'x A.5. The joint edition included the Sun within the sections of the Review-Journal and featured both the Sun and the Review-Journal on the front-page nameplate and on all folios. *Id.*; 7SA1357-76. Despite their separate distribution times and subscriber lists, the RJ was in sole control of all of it. The parties agreed to share the joint operation's profit with the RJ receiving 90 percent and the Sun receiving 10 percent. 2SA311 § 6.4; 2SA335 at App'x D.

To enable Review-Journal to perform its functions" as the controlling party over the joint operation, the Sun relinquished its printing press and all equipment and supplies, and turned over all subscriber and other contracts to the RJ, leaving the Sun with no infrastructure to print and distribute its Newspaper independently and rendering it entirely dependent on the RJ. 2SA297-302 at Art. 3 & § 3.1. As such, the Sun relied on, and the RJ was obligated to use, the RJ's best efforts in managing and controlling the joint operation, for the benefit of both Newspapers. 2SA307 § 5.1.3; 2SA309 § 5.1.8; 2SA310 § 5.3. While executed by Donrey of Nevada, Inc., the 1989 JOA was binding upon and inured to the benefit of the parties and their successors and assigns. 2SA324 § 10.9; 6SA1286-87.

The Sun and RJ agreed to seek and jointly applied for Attorney General approval for the 1989 JOA for the NPA's antitrust exemptions pursuant to Section 1803(b). 2SA293 § 1.1; 2SA340. They followed the requisite procedures with the DOJ, and the DOJ thoroughly investigated the 1989 JOA and the parties' separate businesses. *See* 2SA408-20; 2SA410; 2SA415-18; 2SA361-62.

The DOJ's approval recommendation found that the Sun's losses were cumulative and not likely to reverse, satisfying the "failing newspaper" test. 2SA344, 388. It further found that the 1989 JOA provided the Sun "sufficient operating guarantees" "to enable it to continue to provide an independent reportorial and editorial voice in the Las Vegas community," with the RJ being "responsible for and have ultimate decision-making authority with respect to advertising and circulation rates, printing functions, managerial services, and all other functions of both newspapers except for news and editorial functions." 2SA346, 360-63. Because the RJ could not unilaterally

revise or reduce the Sun and could not interfere with the Sun's editorial and reportorial autonomy (among other Sun protections), the DOJ concluded the combination furthered the purpose of the NPA. 2SA391-92, 363-66.

The Attorney General adopted the DOJ's recommendation and granted its written approval of the 1989 JOA. *See* 2SA408-20. In doing so, the Attorney General restated that the "proposed JOA is intended to combine the business operations of the two newspapers, while preserving the newspapers' editorial and reportorial independence." 2SA408. It approved all terms of the 1989 JOA, including: the 50-year term of the agreement; the "joint edition on Saturdays, Sundays, and holidays"; the RJ's responsibility for "the management, printing, and other commercial functions of the newspapers"); and the parties' profit split. *E.g.*, 2SA408-09. Concluding that the Sun was a "failing newspaper," the Attorney General agreed that the 1989 JOA would effectuate the policy and purpose of the NPA by "preserv[ing] the Sun in operation ... as a second editorial voice." 2SA418-19 (emphasis added); 2SA411.

The Sun became profitable under the 1989 JOA. ECF No. 296 at 35 ¶ 31. The parties operated under it for 16 years, where the Sun remained dependent on the joint operation under the RJ's control and management. *See* ECF 830-1 ¶¶ 4-5.

**B.    The Parties' 2005 JOA and the RJ's Continuing Control**

In 2005, the Sun remained without infrastructure to independently print, publish, or distribute its Newspaper, and without the ability to survive outside the JOA as the Attorney General found 15 years earlier. The RJ sought to amend the 1989 JOA. 2SA445 ¶ 3. The parties entered into the Amended and Restated [Joint Operating] Agreement on June 10, 2005 ("2005 JOA"). 2SA449-81. The 2005 JOA identified the Review-Journal's owner as "DR Partners, a Nevada General Partnership, the successor-in-interest to Donrey of Nevada, Inc. ('DR')." 2SA449. Like the 1989 JOA, the parties stated that the 2005 JOA would bind all successors and assigns, and the RJ has admitted that it was the ultimate successor in interest of DR Partners, "stepp[ing] into the shoes" of the prior owners of the Review-Journal. 2SA458 § 10.9; 6SA1286; ECF No. 978 at 34 ¶ 1, 40 ¶ 25;

6

ECF No. 970 at 35.[5] And as this Court already found, the parties did not terminate the 1989 JOA when entering into the 2005 JOA. ECF No. 970 at 18-1.

Based on the 30 years of caselaw, DOJ Regulations, and practice throughout the country, both the Sun and the RJ believed that the 2005 JOA would be valid and enforceable upon submission of the amendment to, and absent an enforcement action by, the DOJ. 2SA438-41; 2SA481-82; 2SA495; *see also* ECF No. 970 at 16-17, 19 (collecting cases); 28 U.S.C. § 48.1; 3SA505-07. To ensure compliance with their original combination under the 1989 JOA, and at the advice of the parties' NPA/former DOJ lawyers, the Sun and RJ agreed to continue their original combination in all "material" respects, which were the focus of the DOJ 15 years prior. 2SA438-41; 2SA481-82; 2SA495; 3SA538-41; ECF No. 970 at 18. The parties tracked the 1989 JOA as closely as possible. *See* 2SA481-82. And the RJ remained in complete control over, and continued bearing all responsibility for, the non-editorial and -reportorial aspects of the joint operation and the Sun. *Compare* 2SA449-81 *with* 2SA-293-336.

The parties voluntarily continued the 50-year term of the 1989 JOA, intending their joint operation to run to December 31, 2040. 2SA450 § 1.2. They reaffirmed their commitment to the "public interest" in remaining editorially and reportorially independent, reaffirming that preserving their editorial and reportorial autonomy was "the essence" of their agreement in furtherance of the public interest. 2SA453 § 5.2; 2SA457 § 10.8.

Operating under the same material framework approved by the Attorney General in 1989, the RJ remained responsible for and in control of all business aspects of the joint operation, including: "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation (2SA452 § 5.1); acting on behalf of both Newspapers (*see generally* 2SA449-73); printing and producing the Newspapers, using the RJ's printing plant, employees, and equipment (*id.* & 2SA450-51 § 4.3, 2SA452 § 5.1); sales and distribution (2SA452 § 5.1); purchasing newsprint, materials, and supplies (2SA450-51 § 4.3); soliciting, selling, and collecting on the Newspapers' advertising and circulation (2SA451-52 §§ 5.1, 5.1.3); promoting

---

[5] The RJ also relied on the 1989 JOA as its primary defense in the parties' 2019 arbitration. *See, e.g.*, 6SA1287 ¶¶ 12-13; 6SA1289 n.7; 6SA1297-99; 3SA695.

and circulating the Newspapers, using "commercially reasonable efforts to maximize the circulation of the Newspapers" and the same efforts to "promote the Newspapers" (2SA451-52 §§ 5.1 & 5.1.3-.4); establishing advertising and circulation rates for the Newspapers (2SA452 § 5.1); paying, recording, and maintaining all expenses of the joint operation (2SA469-72 at App'x D); accounting to the Sun after the close of each fiscal year (*id.*); and distributing the Sun's share of the joint operation's profits, derived from all advertising and circulation revenues of the Newspapers, and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel. *Id*. Just as they agreed in 1989, "[s]o long as the Sun furnish[ed] news and editorial copy, features and services to the Review-Journal in accordance with Article 4" (setting for the technical specifications for publishing), the RJ would "produce the Sun" and "include the Sun copy and to sell all advertising  for, promote and circulate such newspapers." 2SA451 § 5.1. Because of the RJ's continued control over the joint operation, the Sun retained rights to examine (and also audit) the Review-Journal's books and records. *Id.*

Regarding the format of the Newspapers, the parties elected to print and distribute the Newspapers on a daily basis in a joint edition like they had been doing for nearly 15 years on weekends, holidays, and special editions (the "Newspaper Bundle"). *See* 2SA325-27 at App'x A.2-.4. And, like before, the Newspaper Bundle included the Sun within the sections of the Review-Journal and continued to feature both the Sun and Review-Journal on the front page. *Id.*; 2SA464-67 at App'x B. To maintain visibility of the Sun and promote its branding in the Newspaper Bundle, the RJ agreed to publish a box above the Review-Journal's nameplate containing a "noticeable mention" with the Sun's logo and a headline promoting the Sun's lead story (the "Sun Box"). *E.g.*, *compare* 2SA303-04 § 4.4 *with* 2SA461-62 at App'x A.2-.4. The RJ had physical control over publishing the Sun Box along with the rest of the Newspaper Bundle.

The RJ also remained in control of promoting the Sun. In contemplation of the now daily joint edition Newspaper Bundle, the RJ agreed to use commercially reasonable efforts to maximize the circulation of both Newspapers and include the Sun in equal prominence in the RJ's promotional material and activities. 2SA452 § 5.1.4. In similar vein, the RJ also voluntarily agreed that the Sun

would be a part of the electronic replica edition of the Newspapers distributed to consumers. 2SA457 § 10.6.

As before, the parties continued sharing in the joint operation's profits. 2SA469-72 at App'x D. Similar to the 90/10 split under the 1989 JOA, the Sun's profit share for each year under the 2005 JOA formula approximated 9.87 percent of the previous year's reported joint operation EBITDA. 3SA545 & *id.* n.61.

Having already received Attorney General consent for their combination in 1989, in accordance with existing caselaw, DOJ Regulations, and practice for amendments to previously approved post-NPA JOA, the Sun and RJ "agree[d] to file the Restated Agreement" with the DOJ. 2SA449 § 1.1; 2SA482; 2SA439, 441; 3SA563-68; 3SA505-07. The RJ again covenanted "to use [its] best efforts and take all action necessary to effect the intent of this Restated Agreement" in this process. 2SA449 § 1.1. It reaffirmed the same obligation when "agree[ing] to take all corporate action necessary *to carry out and effectuate the intent, purposes* and provisions of th[e] Restated Agreement, and to cooperate with the [Sun] in every reasonable way that will promote *the successful **and lawful** operation* under this Restated Agreement for both parties." 2SA453 § 5.3 (emphasis added). The RJ was to bear all fees and costs of post-submission proceedings connected to "seeking any required approval by the Department of Justice" from and after the filing of the 2005 JOA. 2SA450 § 1.1.

The Sun and RJ included a contingency provision in the 2005 JOA requiring the parties to revert to the 1989 JOA as the agreement that "shall be reinstituted and remain in full force and effect" in the event their lawful performance under the 2005 JOA was hindered or impaired by the DOJ. 2SA449 § 1.1 (emphasis added).

With the reversion proviso included, the RJ and the Sun jointly filed the 2005 JOA with the DOJ. 3SA539-42; 3SA576-87. The DOJ accepted the filing and thoroughly investigated the 2005 JOA as an amendment. *See* 3SA589-99; 3SA601-610; 3SA611-14; 2SA440-41; 3SA623; 2SA495; *see also* ECF 830-1 ¶ 6. Like before, the DOJ focused on whether the 2005 JOA preserved the Sun's as a separate and independent editorial and reportorial voice in the community. *See, e.g.*, 3SA639; 3SA593 (CID Nos. 4(a) and (b)). The RJ represented to the DOJ that the RJ could not

unilaterally terminate the 2005 JOA and that the Sun had exclusive control over its content. 3SA642-44. The DOJ closed its investigation without an enforcement action, stating that the conduct not integral to the parties' revised arrangements remained subject to antitrust scrutiny. *See* 3SA647. Both parties understood and believed that this "no action letter" was not a hindrance to the lawful performance of the 2005 JOA. allowed the parties to operate under the 2005 JOA. 2SA482; 2SA439-441; 3SA624-35; *see also* 3SA559-65, 571-72; 3SA506-07; 2SA495.

### C.    The Parties' Litigation

The parties operated under the 2005 JOA for nearly 15 years without any suggestion that it was unlawful or otherwise reduced competition in any way not already sanctioned by the Attorney General in 1989. 3SA634-35; 3SA664; *see also* 3SA680-81 (where Adelson informed Greenspun that "he was going to abide by the letter of the JOA, to the letter and [Greenspun] didn't have to worry"). The RJ even argued for its enforcement during the parties' arbitration over an accounting dispute in 2019. *See*, *e.g.*, 3SA691-702.

Only after the Sun won a multi-million-dollar judgment in that arbitration—which barred the RJ from charging millions of improper expenses to the joint operation—did the RJ seek to terminate the joint operation. *See* 3SA700-02; 3SA704-06. But, even then, the RJ's 60-day notice of termination was for the Sun's purported breaches of the 2005 JOA—not that the 2005 JOA was unlawful. *See* 3SA704-06.

Shortly after the Sun initiated this antitrust action, the RJ stipulated, and this Court ordered, that the RJ "w[ould] maintain the status quo" and perform under the 2005 JOA, refraining from taking non-judicial steps to terminate the joint operation until after the entry of final judgment allowing such termination. ECF No. 6 at 3-4; 3SA710-11; ECF No. 13. Almost immediately, the RJ initiated its campaign to have the 2005 JOA declared unlawful for lack of Attorney General signature. *See* ECF No. 20 at 9, 13-21. Once the parties cross-moved for summary judgment on this issue, the RJ moved to dissolve the Stipulated Order. *See* ECF No. 829 at 12-13, 34-43; ECF No. 843 at 47-53, 853. This Court entered summary judgment in favor of the Sun on the 2005 JOA's enforceability, and denied the RJ's motion to dissolve on the same basis. ECF No. 970 at 19. The RJ appealed.

At the RJ's behest, the Ninth Circuit entered its Opinion diverging from half a century of caselaw, DOJ Regulations, and practice. *See Las Vegas Sun v. Adelson*, 147 F.4th 1103 (9th Cir. 2025). Despite that the parties had been operating under the framework of the 2005 JOA for 20 years, the Ninth Circuit concluded that the 2005 JOA was illegal and unenforceable under Section 1803(b) of the NPA. *Id.* at 1121-22. When the Supreme Court denied the Sun's Petition for a Writ of Certiorari, the Sun filed an *Emergency* Motion for TRO and Preliminary Injunction. ECF Nos. 1040, 1047. The RJ rejected the 1989 JOA as the governing agreement, and rejected all forms of relief that would not immediately eliminate the Sun from the market. ECF No. 1070; *see also* 6SA1331-33; 6SA1335-40.

On March 12, 2026, this Court granted the Sun's Motion in part, finding that the Sun satisfied all of the *Winter* factors supporting injunctive relief, and enjoining the RJ from ceasing to print and distribute the Sun. ECF No. 1096. The RJ filed a Petition for Writ of Mandamus with the Ninth Circuit, which the Ninth Circuit granted on March 30. *See* ECF No. 1100. The Ninth Circuit concluded that because this Court's relief granted was not based on the 1989 JOA but was compelling the RJ to perform the core of the 2005 JOA as the "status quo" for printing and publication as the Newspaper Bundle, the injunction violated the mandate. ECF No. 1106. The Ninth Circuit held, "We reiterate, however, that we do not have before us any issue concerning a reversion to the 1989 JOA, and we express no views on any such questions." *Id.* at 7.

The Sun filed a Renewed *Emergency* Motion for TRO and Preliminary Injunction, and Motion to Reset Hearing on the Sun's pending request for injunctive relief. ECF Nos. 1103-06. This Court vacated its injunction on April 2, 2026. ECF No. 1109. On April 3, the RJ did not print and distribute the Sun, while still maintaining its subscriber webpage indicating that consumers would be receiving the Sun. 6SA1344-45; 6SA1342. By noon that same day, the Sun had received over 40 phone calls, social media comments, and letters from readers voicing the harm they suffered as a result of the RJ's failure to print and distribute the Sun, and the loss of the Sun's newspaper voice. 7SA1461-64; 6SA1347-55. That afternoon, the parties appeared before this Court where the RJ refused to provide the Sun with its subscriber list. ECF No. 1121 at 66-68. As a result of this

11

Court's order directing the Sun to file a new motion for TRO and preliminary injunction, this Motion now follows. ECF No. 1112.

### D.     The RJ's Anticompetitive Conduct

Even before the Adelson family's purchase of the Review-Journal closed, the RJ began exploring ways to terminate the Sun, including through squeezing the Sun out of the market by eliminating its profits payments. *See* 3SA722; 4SA753-59 (where the RJ's then-publisher Jason Taylor testified to frequent meetings in which the Adelson family: inquired, "How can we get out of this with the Sun?" "▮▮▮▮▮▮▮▮▮▮▮▮?" and asking more than once, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?" and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?"; criticized the Sun's "▮▮▮▮▮▮▮"; and expressed desire for the Sun to be excluded from the Newspaper Bundle); 4SA778-80. This is precisely the plan the RJ embarked on. The RJ used its exclusive power over the joint operation and the Sun—harnessed since 1989—to manipulate the framework under which both parties believed was valid and enforceable to: (1) abuse the RJ's joint operation accounting to reduce and eliminate the Sun's profit payments; (2) fail to maximize the joint operation's profits to further drive the joint operation into a loss and eliminate the Sun's profits; (3) reduce the Sun's visibility and consumers' knowledge of the Sun; and (4) threaten unilateral termination of the joint operation through pretextual, sham litigation (together, "Anticompetitive Conduct"). *See*, *e.g.*, ECF No. 970 at 24-25; 1SA171-83. These categories of Anticompetitive Conduct are discussed below, in turn.

### 1.     Accounting Abuses

The NPA does not determine how JOA newspapers are to account for their joint operation's revenues and expenses. *See* 15 U.S.C. §§ 1801-04. Rather, the NPA's standard is "the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States …." *Id.* § 1801. Consequently, how the newspapers account for joint operation expenses and revenues are determined by the parties, and are sufficient so long as the weaker newspaper has enough resources to deliver on the NPA's policy and purpose. *See* 3SA509-11; *see also* 2SA388-90. The Sun's share of the joint operation's profits under both JOAs approximated 10 percent (2SA336; 2SA469-70; 3SA545 & *id.* n.61), which the DOJ deemed a

"sufficient operating guarantee[ ]" "to enable [the Sun] to continue to provide an independent reportorial and editorial voice in the Las Vegas community." 2SA346, 365, 388-89.

In contravention of the NPA and the parties' long-standing course of dealing, the RJ abused its power over the joint operation accounting to eliminate the Sun's profits—the Sun's sole revenue source to fund its newsroom. 1SA71-72; 3SA508-21. The RJ's power over the joint operation accounting was highlighted when the RJ directed its accounting department to write off hundreds of thousands of dollars specifically because "████████████████████████████████████████ ████████████████████████." 4SA792. When asked what "prevented [the RJ] from increasing expenses so much that the Sun would receive nothing from the JOA calculation," the RJ testified, "<u>Nothing.</u>" 4SA803. The RJ knew that higher operating expenses under the 2005 JOA formula would reduce the joint operation EBITDA and, consequently, lead to lower profit payments to the Sun. The RJ continued to exploit its power.

To illustrate, the RJ increased the Review-Journal's editorial costs from ███ million in 2016 to ████ million in 2017, and charged all of it to the joint operation even though the parties' editorial costs were disallowed expenses under the 2005 framework. 4SA813; 3SA691-702; *see also* 3SA508-12. For a comparison of how excessive the RJ's disallowed charges were, the RJ charged ███ million in editorial costs to the joint operation in 2016 when the RJ-reported joint operation EBITDA was ████████████: the RJ charged ███ million to the joint operation in 2005 when the RJ-reported joint operation EBITDA was ████████████. 4SA816; 4SA820; 4SA823. The RJ continued to charge the Review-Journal's editorial costs against the joint operation and did so even after the 2019 arbitration judgment confirmed it legally could not. *See, e.g.*, 4SA837-40; 4SA852-53; 4SA808-10.

The RJ, again under the belief that the 2005 JOA was valid and enforceable, further manipulated and abused the joint operation accounting under that framework to harm the Sun by: charging disallowed promotional expenses that did not include equal mention of the Sun, and/or that promoted the RJ's separate digital entity (4SA853, 854, 856; 3SA513-16); charging the RJ's separate, non-JOA digital entity's expenses to the joint operation (4SA854, 855, 857; 3SA516-17); charging other, miscellaneous disallowed expenses (4SA856-57; 3SA517-19); removing joint

13

operation revenue categories (4SA856-57; 3SA519-21); and diverting joint operation revenue to the RJ's separate digital entity. 4SA855-57; 3SA521. Compounding these accounting abuses, the RJ systematically failed to maintain separate books and records for the joint operation, conflating the joint operation accounting with its separate accounting (which included the RJ's separate digital entity), even after the arbitrator criticized the RJ's practices in 2019. 4SA850-51; 3SA697. The RJ concealed this conduct by blocking the Sun's attempts to review the RJ's books and records 3SA698.

In short, the RJ's accounting practices have worked to overstate the costs attributable, and understate the revenues attributed to the joint operation, thereby suppressing the joint operation EBITDA and reducing the Sun's profit payments. 1SA171-72; 4SA851, 858. This is true even under the terms of the 1989 JOA. 7SA1436-59; 7SA1391-97.

### 2.      Failure to Maximize Joint Operation Profits

Both newspaper owners in a JOA traditionally have strong economic interests in the success of the joint operation and the combined financial results. 3SA503-04. Since 1989, the RJ committed to the Sun—and the DOJ—that it would control and manage the joint operation in furtherance of the NPA and preservation of the Sun's competing editorial voice. *E.g.*, 2SA293-336; 2SA340, 388-90. This commitment included using its "best efforts" or, at minimum "commercially reasonable efforts," to maximize the Newspapers' circulation, and agreeing to take all reasonable measures to promote the successful operation of the Newspapers for the benefit of both parties. 2SA307 §§ 5.1.3, 5.1.8, 5.3; 2SA452 §§ 5.1.3, 5.1.4, 5.3; 3SA502-04; 7SA1436-59; 7SA1426-34; 7SA1414-24. Especially in a declining market, newspapers have an increased incentive to generate even incremental profits. *See* 3SA525-26, 534-35.

However, the RJ again exploited its dominant position by failing to maximize the joint operation's profits. The RJ failed to undertake commercially reasonable efforts to reduce costs and raise the revenues of the joint operation. 3SA501, 526, 534. As one method of the RJ's failure to maximize the joint operation's profits, it unreasonably rejected revenue and expense initiatives set out by the Review-Journal's then-publisher Jason Taylor; instead, the RJ removed and replaced

14

Taylor with a publisher who would accomplish the RJ's plan to drive the joint operation EBITDA into the ground and eliminate the Sun. 3SA526-34.

The Review-Journal's prior owners (GateHouse) brought Taylor on as publisher in July 2015. 4SA730-31. Soon after Taylor's arrival, he began implementing a 2016 strategic action plan to reduce unnecessary costs and increase revenue through various means. 4SA738-43. Taylor's plan incited improved financial performance almost immediately. 4SA732-37. Before the Adelson family's acquisition, Taylor projected that the joint operation would have a financially strong close for fiscal year-end 2016, and that, based on trend, the joint operation profits in 2016-2017 were projected to be substantial, with the Sun's profit payments increasing by more than 18 percent in 2017. *Id.*; 4SA863-84; 4SA774-77, 785-86; 4SA732-37. Taylor's projections were consistent with the RJ's valuation obtained from a third party, VRC—both projected the joint operation EBITDA to grow to $███████. 4SA863-84; 4SA889-923, 892, 899. The RJ heavily lobbied for Taylor to remain as publisher after the Adelson family's purchase, which Taylor did. 4SA748-50.

In his role as publisher, Taylor discovered that profit payments were due and owed to the Sun. 4SA744-47. Because Taylor believed it was important to resolve any outstanding profit payment issues with the Sun in order to successfully implement his strategic plan, he raised the issue with Adelson on several occasions. 4SA753-63. No resolution ever came. *See*, *e.g.*, *id*. Based on Adelson's statements, the RJ "did not want the Sun to exist." 4SA789.

Six weeks after the purchase, the RJ removed Taylor because the RJ wanted someone who was more in line with its vision and control. *See*, *e.g.*, 4SA751-52. GateHouse, which had stayed on as manager of the Review-Journal with Taylor, ended its management agreement with the Adelson family, noting, "████████████████████████████████████████ █████████," attaching Taylor's strategic plan. 4SA861-87, 862.

The RJ hired Craig Moon as Taylor's replacement in January 2016. 4SA787-88; 4SA801. Thereafter, the RJ did not follow Taylor's commercially reasonable strategic plan, or any other commercially reasonable strategy. 3SA529-33. The RJ not only diverged from implementing Taylor's or any other reasonable expense initiatives, but, as company revenue was decreasing, the

15

RJ also unreasonably increased the joint operation's expenses. 3SA531-33, 535-36. Naturally, the revenue that was trending upward under Taylor quickly evaporated after his departure. 3SA527-33.

At the close of the fiscal year on March 31, 2016—buoyed by Taylor's performance the prior year—the joint operation still reported a profit, though much smaller than Taylor had projected. *See* 4SA820. By February 2017, the RJ informed the Sun that its profit payments were expected to significantly decrease by fiscal year-end March 31, 2017, and the RJ did not project *any* joint operation profits going forward. *See* 4SA925. The RJ simultaneously threatened the Sun: "███████████████████████████████████████████████████████████ ███████████████████████████." *Id.* No offer made by the RJ was sufficient to maintain the Sun as an independent editorial voice. 3SA687. And the RJ made good on its threats to squeeze the Sun out with "no profits." 4SA778-80; 4SA925.

It was in March 2017, before the close of fiscal year, that the RJ directed its accounting department to make the Sun's profit payment zero. 4SA792. Upon the close of the first full fiscal year under the Adelson family's ownership (ending March 31, 2017, a mere two months after Taylor's departure), the RJ reported a negative joint operation EBITDA for the first time in the history of the parties' combination. 4SA816. As the RJ intended, the Sun's profit payment for the following year was, in fact, zero. *Id.* The joint operation's performance worsened each year, while the RJ wrote off all goodwill associated with its purchase of the Newspaper. 4SA928-47, 942, 947; 4SA833-34; *see also* 4SA835-36. The RJ has not made any profit payment to the Sun since the close of the fiscal year on March 31, 2017. 4SA816; 5SA949; 5SA953-54.

The RJ's failure to undertake commercially reasonable efforts to lower the costs and raise the revenues of the joint operation reduced and eliminated the Sun's profit payments. 1SA15, 172. The RJ has failed to take all reasonable measures to promote the successful operation for the benefit of both Newspapers (2SA310 § 5.3; 2SA453 § 5.3) and abused its power to drive the joint operation into a loss, in turn, threatening the Sun's existence. Even under the 1989 JOA, the RJ has failed to conduct the joint operations in a commercially reasonable manner, resulting in lower revenues and higher costs than would have been realized if the RJ had acted in a commercially reasonable manner. 7SA1436-59; 7SA1426-34; 7SA1414-24.

### 3. Actions that Reduced Consumer Knowledge of the Sun and Its Value

The RJ has been responsible for and in control of promoting the Sun since 1989. 2SA305 § 5.1 & 2SA297-98 §§ 5.1.3 & 5.1.4; 2SA452 § 5.1.4. The RJ has always been required to use, at minimum, commercially reasonable efforts in doing so. 2SA307 § 5.1.3; 2SA452 § 5.1.4; 7SA1414-24. The Sun, like all weaker newspapers in a JOA, has a long-term interest in ensuring that its voice is preserved, a key part of which is how the Sun's separate brand and content are promoted. 3SA524; 2SA277-78; *see* 2SA422-23. If the RJ were honoring the joint operation and the intent of the NPA, the RJ would share in that interest, too. Ensuring that both Newspapers are healthy benefits the joint operation by expanding consumer awareness of the diverse editorial voices, bolstering joint operation revenue. 3SA522-24; 5SA957-58; 7SA1414-24.

Yet again, the RJ has exploited its control over the Sun's promotions and brand visibility by taking actions that undermine the Sun's ability to communicate with consumers about the nature and value of its Newspaper and brand, in turn reducing people's awareness of the Sun's presence and content. 1SA172-73; 5SA972-81; 5SA1012-19; 7SA1414-24. The RJ's anticompetitive promotional abuses involve its (1) failure to promote the Sun in equal prominence with the RJ, (2) destroying the Sun Box and diminishing the Sun's presence on the front page of the Newspaper Bundle, and (3) omitting the Sun from the electronic replica edition of the Newspaper Bundle.

First, the RJ voluntarily agreed to mention the Sun in "equal prominence" with the Review-Journal in any promotion of the Review-Journal to ensure the Sun's brand remained as robust as the Review-Journal's. 2SA452 § 5.1.4 The RJ omitted the Sun entirely in virtually all external advertising—including sponsorships, billboards, banners, displays, other signage, events, house ads and circulars, bills and renewal notices, television and radio advertising, and trade and barter agreements. 5SA968-72; 5SA1021-25. The RJ could not produce any examples of promotional activities that mentioned the Sun in equal prominence. *See id.* In the less than 1 percent of times the RJ did mention the Sun, it displayed the Sun's logo disproportionately to the Review-Journal's. 5SA968-72. The RJ's exclusion of the Sun in equal prominence from the Review-Journal's promotions is a change from past practices pre-Adelson family purchase. *See* 5SA1027.

17

Second, the RJ agreed to publish the Sun's noticeable mention in the form of the Sun Box to effectively communicate the Sun to consumers to advance their knowledge of the Sun and the Sun's brand. 2SA451 § 5.1, 2SA461 at App'x A.2(d); *see* 5SA1008-09, 1012-19; 5SA981-90. But the RJ used its control over the physical printing of the Newspaper Bundle to remove the Sun Box and reduce the Sun's noticeable mention on the front page of the Newspaper Bundle. *See* 5SA1032-33; 5SA1009-12. In 2017, shortly after promising no further profit payments and attempting to coerce the Sun into selling, the RJ deviated from the parties' practice of 12 years and unilaterally removed the Sun Box, and instead published an inconspicuous noticeable mention in the form of a weak banner. *See id.*; *see also* 5SA1008; 5SA991. Besides its diminished visibility, by destroying the Sun's Box, the RJ ensured that when a "spadea fold" (an advertising element covering approximately 40 percent of the left side of the page) was published or when advertising stickers are placed on the Newspaper Bundle, the Sun's banner would be covered. 5SA1012-15; 5SA992-1002.

Third, the RJ voluntarily exercised its control over publishing and distributing the electronic replica edition of the Newspapers and removed the Sun from it. *See* 2SA457 § 10.6; 5SA1035-37. Both parties agree that the electronic replica edition constitutes a meaningful percentage of the Newspapers' circulation and is mostly used in educational environments to communicate with younger readers. 5SA1047-48. It is one of the Sun's promotional strategies to advance these readers' knowledge of the Sun and its brand. *See* 5SA1003-04. The RJ had a longstanding practice (13 years) of including the Sun in the electronic replica edition of the Newspapers. However, on or about January 25, 2018, the RJ admittedly and intentionally just "t[ook]" the Sun out, depriving the Sun of opportunity to reach and introduce itself to new young readers, *i.e.*, future consumers, reducing the Sun's visibility. 5SA1063. The RJ only restored the Sun in the electronic replica edition on May 3, 2019, amidst the parties' 2019 arbitration. 5SA1063-65.

The RJ's various actions harmed the Sun's ability to communicate with consumers about the nature and value of its Newspaper and brand, reducing people's awareness of the Sun's presence and content, and harming the Sun's brand and value. This is true under both the 1989 JOA and the

2005 JOA. 7SA1436-59; 7SA1414-24. Since April 3, 2026, the RJ has completely excluded the Sun from all promotions, significantly worsening the harm to the Sun's brand and value.

### 4.       Efforts to Terminate the Joint Operation

Because the Sun gave up control of its assets and non-editorial and -reportorial operations as a condition of entering into the 1989 JOA, the Sun lost its ability to independently print and distribute its Newspaper and became dependent on the joint operation and the RJ. 2SA293 at Prelim. Statement; 2SA307 §§ 5.1.3, 2SA309 § 5.1.8, 2SA310 § 5.3; 2SA297-302 Art. 3 & 3.1; 2SA450-51 § 4.3; 2SA451-52 § 5.1; *see also* 2SA346, 363. The Sun did so based on the parties' and the DOJ's intentions that the Sun would be preserved as a second, independent Newspaper voice until at least 2040. 2SA296-97 § 1.2; 2005 JOA 2SA450 § 1.2; 2SA409; *see also* 2SA391-92; 3SA642-44. Since April 3, 2026, the RJ has a literal monopoly in the market, excluding the Sun entirely. If the RJ is allowed to continue to exclude the Sun, the exclusion will be irreversible. 7SA1461-64.

When the RJ's efforts to starve the Sun out of existence were decelerated by the 2019 arbitration judgment (*see supra* § II(D)(1), (2)), the RJ swiftly implemented a more direct, two-part plan to hasten the Sun's shut down. For the first part, the RJ attempted to terminate by serving the Sun with a 60-day notice "to cure" alleged defaults under "*the governing agreement*," *i.e.*, the 2005 JOA. 3SA704-06 (emphasis added). The RJ claimed that the Sun failed to publish a "quality" Newspaper, and attempted to divert print readers to lasvegassun.com through a 2018 "Note to Readers" ("Note"). *Id.* The RJ realleged these bases as counterclaims and affirmative defenses in an underlying state court action and here. *See* ECF No. 621 at 30; *see generally* ECF No. 296. (The RJ also claimed frustration of purpose as a reason to terminate, but this Court subsequently granted the Sun summary judgment on this 'reason.' 3SA705-06; ECF No 970 at 49.) For the second part, the RJ sought to terminate the Sun by obtaining a judicial declaration that the 2005 JOA is unenforceable under the NPA for lack of Attorney General approval. *See supra* § II(D). The RJ's attempts to terminate the joint operation for these reasons are not only essential to the RJ's overall anticompetitive scheme, but they are objectively meritless. Because the RJ's notice of default and counterclaims are contract claims, the RJ's alleged breaches of the now unenforceable 2005 JOA objectively baseless.

Nonetheless, regarding the RJ's quality challenge, it is nonsensical that the Sun would fail to maintain its own quality electively. The Sun has both short- and long-term incentives to maintain its quality, including the success of the joint operation from which its revenues flow, and maintaining and increasing its own value and going concern for a stronger bargaining position in renegotiation or renewal discussions, or for partnership or saleability to a third party. 2SA291; 1SA39-42; *see also* ECF No. 970 at 22-23; ECF No. 876-6 ¶ 3; ECF No. 876-7 ¶ 3. The timing of the RJ's quality challenge is significant: only after the RJ undertook the Anticompetitive Conduct to eliminate the Sun's profit payments and weaken the Sun's ability to compete, did the RJ use the consequence of its conduct as a reason to terminate the Sun. *See supra* § II(D)(1)-(3)). The level of quality provided by a newspaper is affected by the resources available for news operations. *See* 2SA288. The RJ's elimination of the Sun's sole source of revenue naturally impacted its ability to compete by impacting the Sun's quality. 1SA14-15.

Even under these circumstances the Sun remains a quality newspaper by all reasonable measures. 2SA270-76, 282-291; 5SA1070-73; 5SA1078; 5SA1088-89; *see generally* ECF No. 876-7. Dr. Robert Picard, the Sun's JOA newspaper and media industry expert, concluded that the nebulous quality standard in both JOAs is to ensure that quality remains at a level that does not affect sales or advertising revenue by negatively affecting the reputation of either paper. 2SA283-84; *see also* 2SA462-63 at App'x A.5. Nowhere did the parties specify what "quality" meant or stipulate to the number, percentage, or kinds of content the Sun would publish. *See generally* 2SA293-336, 449-73; 2SA285, 287. The NPA actually prevents such oversight. *E.g.*, 15 U.S.C. § 1801; SUN 24439-40, 24411-14; 3SA593 (CID Nos. 4(a) and (b)). Consistent with the NPA, the parties repeatedly emphasized the Sun's complete editorial and reportorial independence as being of "paramount importance" and the "essence" of their agreements. 2SA293 at Prelim. Statement & 2SA309 § 5.2, 2SA323; § 10.8; 2SA453 § 5.2; 2SA457-58 § 10.8. This Court, too, concluded that the RJ's quality challenge cannot interfere with the Sun's "choices" that fall within the Sun's "exercise of editorial control and judgment," and cannot "impermissibly control the viewpoints the Sun promotes or the news it covers." ECF No. 970 at 42-44.

The Review-Journal's own newsroom guide is silent as to the aspects over which the RJ criticizes the Sun—speaking only to journalistic standards and ethical practices. 5SA1092-108. Dr. Picard likewise concluded:



2SA286. Former RJ publisher Tayor agreed. 4SA781-84. The Sun meets every reasonable quality element, and more. 2SA286-87, 289-90; 7SA1400-12. Even had the 2005 JOA been enforceable, the Sun's quality was not a terminable basis.

Concerning the Sun's Note as a reason for termination for "material breach" of the unenforceable 2005 JOA, as a preliminary matter, the RJ has been promoting its separate digital operations for years, and did so in the Sun's stead. *E.g.*, 5SA959-62; 5SA1110. The RJ has also tied the Newspaper Bundle subscriptions to the RJ's digital website. *E.g.*, 5SA1061-62. Moreover, to be clear, the Note only ran from January 11, 2018, to February 13, 2018; therefore, the Sun had 'cured' this alleged breach over a year before the RJ's 60-day notice. 5SA1112; 5SA1114; *see also* 5SA1116. Notwithstanding all of this, like the RJ's challenge to the Sun's quality raised *after* eliminating the Sun's sole revenue source, the Note is yet another consequence of the RJ's Anticompetitive Conduct. Because the RJ had plunged the joint operation into a loss, acting on its threats that there would be no profits going forward (*see supra* § II(D)(1)-(2)), the Sun had to find ways to replace its newsroom funding. *See* 5SA1112. The Note merely informed readers that their free access to lasvegassun.com's articles would be capped at 10 stories per month, after which the reader would be asked to subscribe for further access. *Id*. Nothing in the Note directed readers to not subscribe, or to cancel their subscriptions, to the Newspaper Bundle. *See id*. There is also no evidence that any reader subscribing to lasvegassun.com had replaced his or her subscription to the Newspaper Bundle, or that the Newspaper Bundle otherwise lost any subscriber as a result of the Note. This Court already granted the Sun summary judgment on the RJ's claimed damages from

loss of subscribers (which the RJ didn't even bother to oppose). ECF No. 970 at 45-46. The Note is not a valid reason to eliminate the Sun.

Lastly, turning to the RJ's effort to terminate the Sun by having the 2005 JOA declared invalid, the RJ believes its effort succeeded when it obtained the circuit-splitting Opinion from the Ninth Circuit. The unenforceability of the 2005 JOA, however, cannot operate to end the joint operation and the Sun. The RJ's obligations to the joint operation, the material aspects of which remained unchanged under the 2005 JOA framework, continue under the governing 1989 JOA. Because the 2005 JOA is unlawful, it is legally incapable of terminating the 1989 JOA. Importantly, this Court already concluded, as a matter of law, that the 2005 JOA was not a novation. ECF No. 970 at 18-19. Despite the unenforceability of the 2005 JOA, the parties' intentions in this regard are discernible from the terms they memorialized in it. *State College Area School Dist. v. Royal Bank of Canada*, 2012 WL 12893876, at **7-8 (M.D. Pa. Oct. 5, 2012) (relying on invalidated amendment to agreement to determine parties intended to maintain the provisions of the original agreement). They specifically accounted for this contingency and agreed that in the event the lawful operation of the 2005 JOA was hindered or impaired, reversion to the 1989 JOA was *the* remedy— not termination. 2SA449 § 1.1. In 2019, when the RJ believed the 2005 JOA was unlawful for lack of Attorney General approval, the RJ was required to perform under the 1989 JOA as the governing agreement. Instead, it initiated years' long litigation to have the courts conclude that the 2005 JOA did not comply with the NPA's procedures for the specific purpose of using that judicial declaration to eliminate the Sun from the market, now rearguing that the unenforceable 2005 JOA terminated the 1989 JOA, the 1989 JOA has been abandoned, and that it is impossible to print the Sun as an afternoon newspaper. The RJ has had seven years to prepare to perform under the 1989 JOA if it succeeded in having the 2005 JOA declared unenforceable and it did nothing. The RJ has refused all options that would allow the Sun to compete. The RJ litigated the enforceability of the 2005 JOA solely to use it as a sword to drive the Sun out of the market.

Under no circumstances do the Ninth Circuit's rulings allow the RJ to terminate the joint operation and eliminate its only competitor and JOA partner. The Ninth Circuit did not address the governing 1989 JOA, expressly stating so. ECF No. 1106 at 7. Under all circumstances, terminating

the joint operation was never a potential outcome under an invalid 2005 JOA. Yet the RJ specifically engaged in litigation as a war of attrition, using the costs of the litigation to increase the Sun's costs, and creating uncertainty that raises the Sun's costs of capital and labor. 1SA174-75; 7SA1436-59.

## III.    THE LEGAL STANDARD

Plaintiffs have the right to "injunctive relief … against threatened loss or damage by a violation of the antitrust laws" "when and under the same conditions and principles as injunctive relief ... is granted by courts of equity, under the rules governing such proceedings." 15 U.S.C. § 26; *see Cal. v. Am. Stores Co.*, 495 U.S. 271, 279 (1990). Preliminary injunctive relief under Section 16 may encompass both structural relief and prohibitions on antitrust conduct. *See Am. Stores Co.*, 495 U.S. at 279. It is available to end conduct in violation of the antitrust laws, deprive violators of the benefits of that conduct, and restoring competition. *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 234-35 (9th Cir. 1976).

The legal standard for issuing a temporary restraining order is the same for issuing a preliminary injunction. *E.g.*, *Patmont Motor Werks, Inc. v. Pedego LLC*, 2012 WL 13071201, at *1 (D. Nev. Mar. 6, 2012) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). To prevail on a TRO and preliminary injunction pursuant to Federal Rule of Civil Procedure 65, the moving party must establish: (1) a likelihood of success on the merits, (2) the threat of irreparable injury, (3) the balance of equities tips in its favor, and (4) the injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in the Ninth Circuit evaluate "these factors on a sliding scale, such that a stronger showing of one element may offset a weaker showing of another." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (quotations omitted)). For a mandatory injunction, it will be granted upon a showing that "extreme or very serious damage" will result in the absence of the injunction. *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). The Sun satisfies all combinations of the test for granting its requested relief.

## IV.   A TRO AND PRELIMINARY INJUNCTION ARE NECESSARY

### A.   <u>The Sun has a Likelihood of Success on the Merits of Its Section 2 Claims: The Facts and Law Clearly Favor It</u>

This Court already found that the Sun satisfied the first *Winter* factor. ECF No. 1096. For clarity in the record, below, the Sun sets forth the facts and law establishing that it is likely to succeed on the merits of its monopolization and attempted monopolization claims.

### 1.   Monopolization

For monopolization, the plaintiff must show: "(1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury." *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996).

#### i.   *The Relevant Market*

The first step in any antitrust case is to accurately define the relevant market, *i.e.*, "the area of effective competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018). It is determined only after a factual inquiry into the "'commercial realities' faced by consumers" (*High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993)), and includes both a product market and geographical market. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 n.4 (9th Cir. 2008). As the Sun's expert economist Dr. Michael Katz concluded, the relevant market here is English-language, local, daily, print newspapers in Clark County and the southern portion of Nye County, Nevada (the "Newspaper Market"). 1SA50; 7SA1436-59.[6] This Court already found that the Sun has satisfied this element. ECF No. 1096 at 6-7.

The Product Market

The relevant product market "must encompass the product at issue as well as all economic substitutes for the product." *Newcal Indus., Inc.*, 513 F.3d at 1045. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," which "may be determined by examining

---

[6] Given that the market definition is a highly fact-based inquiry governed by the evidence, where the plaintiff has offered expert testimony defining the relevant market, that market controls. *E.g.*, *Bristol-Myers Squibb Co. v. Ben Venue Laboratorie*s, 90 F. Supp. 2d 540, 546-47 (D. N.J. 2000).

[the] practical indicia" identified in *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325-28 (1962). *See* ECF No. 970 at 23-24. These practical indicia include: (1) industry or public recognition of the market as a separate economic entity, (2) "the product's peculiar characteristics and uses," (3) unique production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors. *Brown Shoe*, 370 U.S. at 325-28. Dr. Katz analyzed the factual realities of the market in which the Sun and the RJ compete, including the *Brown Shoe* indicia, and concluded that the relevant product market in this matter is the Newspaper Market.[7] 1SA60-153 & 6SA1150-95; 7SA1436-59.

The industry and the public recognize the Newspaper Market as a separate economic entity. Courts, including this Court, have recognized that daily print newspapers are a distinct relevant product market. *E.g.*, *Reilly v. Medianews Group, Inc.*, 2006 WL 2419100, at *7 (N.D. Cal. July 28, 2006) (restricting the relevant market to "daily newspapers" for the purposes of analyzing temporary restraining order); *Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180, 1184 (8th Cir. 1998) (affirming the district court's finding of "local daily newspapers" as the relevant market definition); ECF No. 970 at 22-23; ECF No. 243 at 10; *see also United States v. Daily Gazette Co.*, 567 F. Supp. 2d 859, 868 (S.D. W. Va. 2008) (recognizing that the elimination of a JOA newspaper represents a cognizable injury to interests protected by the antitrust laws); *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1251-52 (D. Haw. 1999) (same). Not only have courts found that local, daily print newspapers constitute a relevant product market, but the DOJ and the parties also recognize daily print newspapers as a distinct product market. 1SA88-91, 140-45; 2005 JOA at § 10.12; *see also* ECF No. 876-6 ¶¶ 3-13 & 876-7.

Newspapers have peculiar characteristics and use, comprising of a unique bundle of

---

[7] Throughout this litigation, the RJ has failed to undertake the proper antitrust analysis for the relevant market, refusing to engage with the data supporting the Newspaper Market. And, a decline in industry trends does not change the fact that only sufficiently close competitors are properly included in the relevant market; thus, even when long-term, or secular trends, suggest that one or more products might be replacing the core product around the relevant market (the Newspaper Market here) does *not* mean that those other products *should be included* in the relevant market when assessing newspaper competition. 6SA1165-78; 1SA88-92; *see also Reno v. Am. C.L. Union*, 521 U.S. 844, 850 (1997) (recognizing the internet as enabling "tens of millions of people … to access vast amounts of information" back in 1997).

25

characteristics that readers value, not possessed by other media. 1SA60-88; 2SA249-63; *see also* ECF No. 1 ¶ 36 (attested by the Sun's Publisher); ECF No. 876-7 ¶¶ 6-14; 6SA124-43; 2SA251-52, 255. Newspaper readers enjoy the mix of news, analysis, commentary, and opinion, along with the other features of local daily newspapers like entertainment events, legal notices, comics, and syndicated columns. 2SA255-57; ECF No. 1 ¶ 36. Newspapers offer content in a timely manner that is in a convenient, portable, hardcopy format, requiring no specialized equipment for consumption, and can be read at readers' convenience, for which they are specifically willing to pay. 1SA65-67, 76-78. Newspapers also play a significant role in political and community engagement. 1SA127-30. Additionally, they have unique production facilities in that they are created, placed in a template, and printed by a newspaper printing press, which is distinct from other types of media. 2SA249. Newspapers are platforms that serve multiple, distinct sets of customers, including older readers, and advertisers, which have been recognized by both economists and courts. 1SA73-75, 86, 58-60, 59 n.116.; *see also* 2SA258-63. Newspapers are priced distinctly when compared to other media, particularly in that newspapers have a price and many other news media are free. 1SA76, 126-27, 127 n.304; 2SA249-50. Finally, they have specialized vendors in the form of their home delivery network. 2SA265. Each of these practical indicia demonstrate that the Newspaper Market is a distinct product market.

While the Newspapers in this case do not have data on the price sensitivity between each other because they are not separately priced, the data regarding the price sensitivity of demand between the Newspaper Bundle and other media shows a lack price sensitivity compared to other media. 1SA53, 92-127; *see also* 1SA145-53 (where Dr. Katz analyzed the market under the "██████████████████" as well and concluded that the test supported the Newspaper Market defined). This elasticity data evidences that the RJ has been able to raise, and has in fact raised, the price of the Newspaper Bundle through small but significant increases in price (SSNIP), and when it did, the Newspaper Bundle did not lose consumers to any other media. Consequently, there is a low cross-elasticity between the Newspapers and other media products. 1SA92-127. The evidence of low own-price elasticity for the Newspaper Bundle—of which the Sun is a part—still separates the Newspapers from other media and demonstrates that the Newspapers are a distinct

product in the defined product market. *Id.* English-language, local, daily, print newspapers are the appropriate relevant product market.

The Geographic Market

The relevant geographic market is the area in which the defendant faces competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases. *United States v. Grinnell Corp.*, 384 U.S. 563, 575-76 (1966). Dr. Katz examined the geographic market and concluded that the area in which the Newspaper Bundle faces competition from other firms in the Newspaper Market is Clark County and the southern portion of Nye County, Nevada. 1SA12; 7SA1436-59. His conclusion was supported by his findings that: (1) "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████" (1SA131); (2) "███████████████████████████████████████████████████████████████████████████████████████████████████████████████" (1SA131-32); (3) "███████████████████████████████████████████████████████████████" (1SA132-34); and (4) the Sun does not consider newspapers outside of the Las Vegas metropolitan area to be competitive threats for readers.[8] 1SA134-37; *see also* ECF No. 876-6 ¶¶ 8-10 & 876-7 ¶¶ 6-8. Dr. Katz's findings were consistent with other evidence, including the parties' statements made in Section 10.12 of the 2005 JOA, PEW foundation data studies, and findings made by the U.S. Office of Management and Budget. 1SA138-39. Clark County and the southern portion of Nye County, Nevada, is the appropriate relevant geographic market.

ii.      *The RJ Possesses Monopoly Power in the Newspaper Market*

"Monopoly power is the power to control prices or exclude competition." *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) (quotations omitted). Monopoly power can be established by direct or indirect evidence. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). A defendant's ability to profitably raise prices substantially above the competitive

---

[8] *See also* 1SA137; *see also* ECF No. 877-6 ¶ 10; ECF No. 877-7 ¶ 7; ECF No. 877-16 ¶ 8.

level for a significant period of time is direct evidence that the defendant is a monopolist. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1069 (9th Cir. 2025). Indirect evidence in the form of a market share analysis, *i.e.*, the defendant's possession of a dominant share of a relevant market protected by entry barriers is "evidence from which the existence of monopoly power may be inferred." *Rebel Oil Co.*, 51 F.3d at 1437-38. A "market share of 44 percent is sufficient as a matter of law to support a finding of market power, if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing." *Id.* at 1438.

There is both direct and indirect evidence demonstrating the RJ's power to control prices and exclude competition, which this Court previously concluded. ECF No. 1096 at 6-7. Even before the RJ eliminated the Sun from the Newspaper Market on April 3, 2026, at which time it gained exclusive monopoly power and 100 percent of the market share, the direct evidence proved that the RJ has had exclusive and unilateral control over the prices charged by the RJ and its sole competitor (the Sun) spanning back to 1989. 1SA11, 155; 2SA306-07 § 5.1; 2SA451-52 § 5.1; *see also* 3SA658-61 (the RJ confirming that the Sun has no ability to set prices, and no control over subscription sales and circulation). Dr. Katz's investigation of consumer responses to the RJ's past changes in the prices of the Newspaper Bundle revealed that the RJ "███████████████████ ███████████████████████████████████████████," which "██████ ██████████████████████." 1SA155, 126-27; 7SA1436-59. In other words, because the RJ has been able to set the price of the Newspaper Bundle at its own choosing without regard for competition, the RJ controls price.

The direct evidence  prior to the RJ's exclusion of the Sun on April 3, further shows that the RJ has the ability to exclude competition. 1SA155-57. Since the parties' combination in 1989, the Sun has been operationally and economically dependent on the joint operation, which is exclusively controlled by the RJ. 2SA306-07 § 5.1; 2SA451-52 § 5.1. The Sun has neither printing facilities nor a newspaper distribution network, among other assets necessary to operate a newspaper. 1SA156; ECF No. 877-6 ¶ 15; 2SA279-82, 264-69; 7SA1461-64. Terminating the joint operation and allowing the RJ to continue excluding the Sun from the Newspaper Market will cause the Sun to shut down permanently because of the large startup costs and inability to reach a financially

viable scale. 1SA156; ECF No. 877-6 ¶ 15; 2SA279-82, 264-69; 7SA1461-64; 7SA13400-12.

The RJ also had the ability to exercise direct control over its competitor's output (1SA155-66), which has played out in the RJ's complete exclusion of the Sun from the market on April 3. In addition to controlling overall pricing and marketing of the Newspaper Bundle and the relative promotion of the RJ and Sun (all of which affects the Newspaper Bundle's sales and thus the Sun's output), the RJ controls the number of pages available to the Sun for news and editorial content (*i.e.*, the size of the Sun's newshole). 1SA156-57. The Sun would need the RJ's permission and agreement to expand its output per issue. 2SA450-51 § 4.3; 2SA462 at App'x A.2; 6SA1258. The RJ's April 3 exclusion evidences that the Sun would need the RJ's compliance to print and distribute the Sun at all. Stated another way, the RJ has the power to exclude its competitor.

Turning to the indirect evidence, even prior to April 3, Dr. Katz analyzed the RJ's market share and concluded that the RJ possessed a "              " of the Newspaper Market, and trends make entry by new competitors unlikely, demonstrating the RJ's substantial market power. 1SA157-66; *see also* 7SA1436-59. "                          ," Dr. Katz concluded, "          

                              ." 1SA167-69. Dr. Katz detailed the RJ's market share in various categories and found as follows: (1) readership—between 2013 and 2018, the RJ's market share ranged from 61 to 94 percent and was at least 83 percent in the 2016 and 2018 surveys of readers, with at least six non-advertising sections read by a higher percentage of readers, rendering the RJ's market share over 83 percent; (2) newshole—RJ's market share was more than 75 percent; (3) newsroom staff—RJ's market share was between 82 and 86 percent; (4) division of profit share—RJ's market share was 90 percent; and (5) capacity—RJ's market share is much greater than 50 percent. 1SA159-70. Dr. Katz further concluded that "                    

                                                         

                              ." 1SA164. Since April 3, the RJ has 100 percent of the market share.

When considering the possibility of entry by new competitors, the RJ controls inputs (*e.g.*, suitable printing facilities and a home-delivery distribution network) essential to the production of daily print newspapers in Clark and southern Nye Counties. 1SA165; 7SA13400-12. These inputs

could not be replicated by an entrant on commercially viable terms because it would have difficulty reaching efficient scale or density. *Id.*; 7SA13400-12. There are also significant barriers to entry in the form of capital investments required, lack of access to established distribution channels, limited market resources (consumers and advertising), constraints on consumer willingness to pay, workforce requirements, economic advantages of incumbent competitors (economies of scale and marginal costs), and competitive advantages of incumbent competitors (quality, reputation, market knowledge, and contracts). 2SA264-269; 7SA13400-12. No local, daily print newspaper has successfully entered the Newspaper Market since the Sun was founded in 1950, and the Sun would not be able to survive as an independently printed and produced newspaper. 1SA165; 2SA279-82; ECF No. 877-7 ¶¶ 15, 27; 7SA13400-12; 7SA1461-64. This is why the Attorney General approved the parties' combination in 1989.

Under all considerations, the RJ has the ability to control the price of the Newspaper Bundle and exclude the Sun. The RJ has monopoly power in the Newspaper Market.

> iii.   *The RJ Has Willfully Acquired and Maintained Monopoly Power*

"Willful acquisition or maintenance of monopoly power involves exclusionary conduct, not power gained from growth or development as a consequence of a superior product, business acumen, or historic accident." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) (quotations omitted). "Exclusionary conduct" refers to acts that "tend[ ] to impair the opportunities of rivals" and "do[ ] not further competition on the merits or do[ ] so in an unnecessarily restrictive way." *See*, *e.g.*, *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) (quotations omitted) (alterations in original).

The RJ's Anticompetitive Conduct described above in Section II(D) was exclusionary, not from the creation of a superior product or exercise of business acumen. Instead of actions to improve the RJ's product, the RJ's Anticompetitive Conduct was purely aimed at degrading the Sun's product. The RJ has exploited its power over the Sun in ways that do not further competition on the merits and, instead, raise the Sun's costs of competing. 1SA30-31; 7SA1436-59. This Court already found that the Sun satisfied this element for monopolization under *Winter*. ECF No. 1096 at 5-6.

This Court is already aware of Dr. Katz's conclusions on this subject. *See* ECF No. 970 at

30

24-25. To recap, he concluded that, due to the RJ's accounting abuses, the RJ has artificially depressed the joint operation's EBITDA, thereby improperly reducing and eliminating the Sun's profit payments, weakening the Sun's ability to compete with the RJ, and threatening to drive the Sun out of business. 1SA14, 170-72; 4SA816; 4SA820; 5SA949; 5SA952-53. Dr. Katz likewise concluded that the RJ's failure to maximize the joint operation's profits also reduced and eliminated the Sun's payments and similarly weakened the Sun's ability to compete and threatening the Sun's shut down. 1SA15, 172. He opined that the RJ's actions in its failure to promote the Sun diminished the Sun's appearance, hindering the Sun's ability to communicate with consumers and potential readers about its newspaper, in turn reducing consumer knowledge of the Sun and "███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████." 1SA14-16, 172-74. Finally, Dr. Katz opined that the RJ's pursuit of its termination litigation harms competition "██████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████." *Id.* The RJ's efforts to terminate the joint operation by having the 2005 JOA declared unlawful while baselessly disavowing the present enforceability of, and its obligation to perform under, the 1989 JOA, has further harmed competition for the same reasons. *See id.*; 7SA1436-59. These different categories of the RJ's conduct work together to reinforce and amplify one another's harm to competition, as explained by Dr. Katz. 1SA170, 181-82; 7SA1436-59. None of it amounts to the RJ harming the Sun merely because the RJ is offering a product that is more attractive to readers. 1SA183-84; 7SA1436-59. There is no evidence that the RJ's Anticompetitive Conduct has spurred the RJ to be a better newspaper either. To the contrary, the RJ's own Publisher testified that (because the Sun is the RJ's only competitor), more reportorial competition from the Sun would spur the RJ to be a better newspaper. 6SA1255-63; 6SA1256 ("Would we rather the Sun be more competitive with us[?] ... Actually, we would … [I]t would be ... good ... for both newspapers and the joint operat[ion]."). This is true under either JOA. 7SA1436-59.

31

In summary, the RJ's conduct was not competition on the merits. "███████████████████████████████████," Dr. Katz concluded that "███████████████████████████████████████████████████████████████████████████████████████████████." 1SA14, 170-87; 7SA1436-59. The evidence shows that the RJ has willfully acquired and maintained monopoly power.

<em>iv.    The RJ's Conduct Has Caused Antitrust Injury</em>

This Court is well-versed in the law and facts supporting the Sun's antitrust injury, already finding that the Sun satisfied this element for monopolization under *Winter*, and also defeating summary judgment. ECF No. 1096 at 5-6; ECF No. 970 at 20-28. As it previously explained, "[A]ntitrust laws are only intended to preserve competition for the benefit of consumers." ECF No. 970 at 20 (quotations omitted). The five requirements for antitrust injury are: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, … (4) that is of the type the antitrust laws were intended to prevent" (*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Ca.*, 190 F.3d 1051, 1055 (9th Cir. 1999)), and (5) the plaintiff is "a participant in the same market as the alleged malefactors, meaning 'the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market.'" *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quotations omitted). Like this Court already considered, and further discussed below, the Sun satisfies all five requirements for antitrust injury. *See* ECF No 970 at 20-28.

Unlawful Conduct

The first factor of antitrust injury requires a showing that there was some "competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). The plaintiff must therefore demonstrate that (1) there was competition in the relevant market, and (2) the defendant's conduct reduced competition. ECF No. 970 at 21.

First, courts, including this Court on <u>three</u> separate occasions (ECF No. 1096 at 7-8; ECF No. 970 at 22-23; ECF No. 243 at 13), have held that editorial competition between JOA newspapers, like the Sun and the RJ, is cognizable competition for purposes of antitrust laws. *See*,

32

*e.g.*, *Comm. for Indep. P-I v. Hearst Corp.*, 704 F.2d 467, 477 n.8 (9th Cir. 1983); *United States v. Daily Gazette Co.*, 567 F. Supp. 2d 859, 869-70 (S.D. W. Va. 2008); *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1249, 1251-52 (D. Haw. 1999). This Court also ruled that even when newspapers merge operations and share in profits, they have at least "'two competitive and economic incentives in pursuing particular editorial and news-gathering efforts that attract readers, subscribers, and advertisers to its own newspaper, namely, (1) increasing its value, particularly in the eyes of potential acquisitors, and (2) enhancing its bargaining position when the JOA is up for re-negotiation or termination.'" ECF No. 970 at 22-23 (quoting *Daily Gazette Co.*, 567 F. Supp. 2d at 870); ECF No. 1096 at 8. Dr. Katz opined on the Sun's economic incentives identified in *Daily Gazette*, and more, including increasing traffic to the Newspapers' digital operations outside of the JOA, and promoting their principal owners' economic or business interests more broadly. 1SA39-45; ECF No. 876-6 ¶¶ 4-6 & 876-7 ¶ 3-4; 7SA1436-59; 7SA1461-64.

This Court further concluded that the Sun and the RJ are competitors in the Newspaper Market, for both the Sun and the RJ fall within the same *Brown Shoe* indicia identifying the outer bounds of the relevant product market as explained *supra* § IV(A)(1)(i). ECF No. 1096 at 6-7; ECF No. 970 at 23-24. Therefore, despite being sold in the Newspaper Bundle, the parties engage in editorial and reportorial competition in the Newspaper Market.

Second, the RJ's Anticompetitive Conduct reduced competition in the Newspaper Market. As explained above and twice concluded by this Court (ECF No. 1096 at 6, 7; ECF No. 970 at 24-25), the RJ's Anticompetitive Conduct has harmed "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." 1SA1, 13-17; ECF No. 876-6 ¶¶ 17-20; *see also supra* §§ IV(A)(1)(iii), II(D); 7SA1436-59; 7SA1391-97; 7SA1426-34; 7SA1414-24; 7SA1378-89. This is true regardless of the enforceability of the 2005 JOA, because "the Sun's claims turn on allegations of anticompetitive conduct, not breach of the 2005 JOA." ECF No. 1096 at 7.

Because the purpose of antitrust laws is to "promot[e] consumer welfare" (*PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 832 (9th Cir. 2022) (quotations omitted)), "[t]he law directs

itself … against conduct which unfairly tends to destroy competition itself … out of concern for the public interest." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). In encouraging Congress's deputization of citizens, like the Sun, to act as "private attorneys general" in bringing antitrust actions to further serve the public good (*Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972)), when firms with monopoly power, like the RJ, undertake conduct that could generally be considered "legal" in other contexts, that conduct is anticompetitive when it is not competition on the merits and has reduced competition, excluded rivals, or harmed consumers.[9] In cases just like this one, courts will allow antitrust plaintiffs to proceed even in the face of an illegal agreement. *PharmacyChecker.com LLC v. LegitScript LLC*, 137 F.4th 1031, 1041 (9th Cir.), *cert. denied*, 146 S. Ct. 209 (2025).[10] Therefore, because the RJ's Anticompetitive Conduct is competition-reducing and is not competition on the merits, not only is the Sun harmed but so are consumers. *See* ECF No. 1096 at 6, 7. The fact that the 2005 JOA was declared unenforceable does not alter this antitrust analysis.[11] *Id.* at 7. And the RJ's conduct was anticompetitive even under the 1989 JOA.[12]

[9] *See also*, *e.g.*, *Federal Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (finding that otherwise competitive conduct is anticompetitive when it "harm[s] the competitive *process* and thereby harm[s] consumers") (alteration in original); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) ("Exclusionary conduct" refers to acts that "tend[ ] to impair the opportunities of rivals" and "do[ ] not further competition on the merits or do[ ] so in an unnecessarily restrictive way.") (alterations in original and quotations omitted); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. at 458-59 (holding that conduct is "unlawful only when it actually monopolizes or dangerously threatens to do so"); *accord William Inglis & Sons Banking Co. v. ITT Continental Banking Co.*, 668 F.2d 1014, 1030-31 (9th Cir. 1981).

[10] Accordingly, antitrust liability is treated as distinct from contract disputes, and that while antitrust liability can be predicated on conduct that also happens to create a contract dispute, even in that instance any contractual rights do not grant the defendant "the freedom to act anticompetitively." *City of Vernon v. S. California Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992). Contractual "limitations do[ ] not speak to antitrust concerns." *Id.*

[11] The reason newspaper JOAs were deemed illegal was because of price fixing. *See Citizen Pub. Co. v. United States*, 394 U.S. 131, 135-36 (1969). The parties here eliminated all price competition between them in the 1989 JOA, and the Attorney General approved it.

[12] It is a fundamental principle of contract law that the unenforceable 2005 JOA cannot operate to displace or extinguish the valid, Attorney General-approved 1989 JOA. *See*, *e.g.*, *Airs Intern., Inc. v. Perfect Scents Distribs., Ltd.*, 902 F. Supp. 1141, 1148-49 (N.D. Cal. 1995) (providing that where "the new contract is invalid, there is no novation and the parties' previous obligations are not extinguished") (citations omitted). This Court already disposed of the RJ's argument (as a matter of law) when it found that the parties clearly did not intend to terminate the 1989 JOA when they entered into the 2005 JOA. ECF No. 970 at 18-19. The RJ is not immunized of its anticompetitive

7SA1436-59. Furthermore, when the Ninth Circuit declared the 2005 JOA unenforceable, the 1989 JOA became the governing agreement between the parties by operation of law.

Injury to the Sun

The second consideration for antitrust injury requires the plaintiff to establish "some credible injury caused by the unlawful conduct. There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1056. This Court already found that there is no evidence that the Sun "stands to gain" from the RJ's Anticompetitive Conduct (ECF No. 970 at 26), and that the Sun demonstrated the requisite injury under the *Winter* analysis. ECF No. 1096 at 6. As explained above, the RJ's Anticompetitive Conduct has weakened the Sun's ability to compete, resulting in harm to the Sun and its value "as a going concern for saleability purposes" and harm to competition in the Newspaper Market and consumers. ECF No. 970 at 26 (quoting *Daily Gazette Co.*, 567 F. Supp. 2d at 870); *see supra* §§ IV(A)(1)(iii), II(D); *see also* 1SA39-45. Now that the RJ has completely excluded the Sun from the market, the Sun is suffering the most extreme injury that antitrust laws were enacted to prevent. 7SA1461-64.

Injury Flowing from That which Makes the Conduct Unlawful

Under the third antitrust injury requirement, when a defendant's conduct harms the plaintiff but actually preserves competition, the plaintiff's injury does not flow from that which makes the conduct unlawful. *See* ECF No. 970 at 26-27 (citing *Brunswick Corp.*, 429 U.S. at 489)). Because the RJ's conduct reduces editorial and reportorial competition in the Newspaper Market and harms consumers, nothing about the RJ's conduct preserves competition. *See supra*; 1SA170-87; *see also* 1SA49, 49 n.92 (citing 6SA1259-60 & 3SA662-63 (where the RJ's Publisher and Executive Editor recognized the benefits to consumers from the editorial competition between the Sun and the RJ); 6SA1266, 6SA1268, 6SA12706SA1272-736SA1275, 6SA1277, 6SA1279-80 (readers voicing the harm they will suffer if the Sun is excluded from the Newspaper). When the RJ ceased printing and distributing the Sun on April 3, readers responded loudly with the harm they were suffering as a

---

conduct that abused the structure and power that it garnered over the Sun, and in the Newspaper Market, resulting from the Attorney General's approval of the 1989 JOA.

result. 6SA1347-55; 6SA1344-45. The threated harm from the defendants' conduct discussed in *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1244-45 (D. Haw. 1999), *i.e.*, depriving readers "of independent editorial and reportorial voices," and lead to the loss of jobs and the loss of competition for "creators of news, editorial, and entertainment content" is happening to the Sun now. 7SA1461-64; 6SA1347-55. Consequently, the RJ's Anticompetitive Conduct itself is unlawful "because it reduces editorial competition in the relevant market and harms consumers. The Sun's claimed injury is harm to its ability to compete and decreased visibility, which hurts its value. This claimed injury flows directly" from the RJ's unlawful conduct. ECF No. 970 at 27.

<u>The Sun's Injury is the Type Antitrust Laws were Intended to Prevent</u>

Because "the plaintiff's injuries must be 'of the type the antitrust laws were intended to prevent,'" under the fourth factor for antitrust injury, "injuries which result from *increased* competition or lower (but non-predatory) prices are not encompassed by the antitrust laws." ECF No. 970 at 27 (quoting *Am. Ad Mgmt., Inc.*, 190 F.3d at 1057). There is no evidence, nor has the RJ ever argued, that Sun's injury is the result of increased competition or lower, non-predatory prices. *Id.* at 28. Courts have repeatedly held that elimination of a JOA newspaper like the Sun establishes antitrust injury. *E.g.*, *Daily Gazette Co.*, 567 F. Supp. 2d at 868; *Gannett*, 99 F. Supp. 2d at 1251. Like this Court found before, "The Sun's claimed injury, especially as it pertains to its reduced ability to compete, is exactly the type of injury the antitrust laws were intended to prevent." ECF No. 970 at 28; ECF No. 1096 at 7.

The Sun's evidence demonstrates that the RJ used its exclusive power over the joint operation and the Sun—harnessed since 1989—to manipulate the framework under which both parties believed was valid and enforceable to: (1) abuse the RJ's joint operation accounting to reduce and eliminate the Sun's profit payments; (2) fail to maximize the joint operation's profits to further drive the joint operation into a loss and eliminate the Sun's profits; (3) reduce the Sun's visibility and consumers' knowledge of the Sun; and (4) threaten and now execute unilateral termination of the Sun through pretextual, sham litigation. *See, e.g.*, ECF No. 970 at 24-25; ECF No. 1041 at 1SA171-83; ECF No. 1096 at 6, 7. None of this conduct is competition on the merits, and each aspect has worked together, compounding their anticompetitive effects to harm the Sun,

reduce competition, and harm consumers. All of it is antithetical to consumer welfare, regardless of the enforceability of the 2005 JOA, which is the focus of antitrust laws. The RJ's Anticompetitive Conduct has the same impact under the 1989 JOA. 7SA1436-59; 7SA1391-98; 7SA1426-34; 7SA1414-24; 7SA1378-89.[13]

### The Sun Participates in the Market

When considering the fifth, and final, requirement for antitrust injury, this Court twice concluded that the Sun is a market participant, and that the editorial and reportorial competition between the Newspapers is economic competition. ECF No. 970 at 28, 21-23 (citing *United States v. Daily Gazette Co.*, 567 F. Supp. 2d 859 (S.D. W. Va. 2008), and *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241 (D. Haw. 1999)[14]); ECF No. 1096 at 7-8. The purpose of both the 1989 and the 2005 JOAs, as intended and memorialized by the parties, is to preserve "editorially and reportorially independent and competitive newspapers in Las Vegas and its environs." 2SA293 at Prelim. Statement; 2SA309 § 5.2; 2SA323 § 10.8; 2SA453 § 5.2; 2SA457 §10.8. The Sun supplies content to the RJ "for publication in the Sun," not in the RJ. 2SA305 § 5.1; *see also* 2SA451 § 5.1. The Sun has full editorial independence, and the RJ must publish the Sun so long as the Sun complies with production requirements. *See id.* Given the parties' treatment of the Sun in

---

[13] The Sun and the RJ are not mere stranger-competitors either. The RJ has a duty to deal with the Sun because of the parties' combination in 1989 under the NPA and with the Attorney General's blessing. The RJ's duties to the joint operation for the preservation of the Sun are specifically to protect the editorial and reportorial competition between them. *See Comm. for an Indep. P-I*, 704 F.2d at 482; 15 U.S.C. § 1801. The Sun's relinquishing of all its infrastructure and assignment to the RJ of all its subscriber, advertising, and other contracts (among other things), and <u>elimination of price competition</u>, from which the RJ has received the benefits for decades, highlights the outrageousness of the RJ's conduct.

[14] The fact that the JOA newspapers in those cases were sold separately, or had different subscriber and advertiser bases, was not a qualification for these courts' well-reasoned holdings, nor was it for this Court's. ECF No. 970 at 22-23. JOA newspapers have already combined all non-editorial and -reportorial business aspects, and price competition between them. In doing so, one party to the JOA sets all sales, circulation, and advertising rates, and the newspapers pool all revenue and then share in the profits. They do not compete for sales, subscriptions, and advertising in the economic sense that the RJ attempts to distinguish from the Sun and the RJ, and courts considering this issue have found the editorial and reportorial competition between them as economic competition within antitrust laws. *See* ECF No. 871 at 35-36. This Court's previous rejection of the RJ's attempts to distinguish these instructive cases from the Sun and RJ was supported by the law and the evidence. *See* ECF No. 871 at 15-16, 35.

37

their joint operation, "the Sun is a separate and independent newspaper product distributed in the newspaper bundle," and the Sun editorially competes with the RJ for readers' attention in the relevant market," rendering it a competitor of the alleged violator in the restrained market"—"meaning the Sun is a participant in the relevant market." ECF No. 970 at 28 (quoting *Somers*, 729 F.3d at 963); *see also supra* § IV(A)(1)(iv); 6SA1255 (The RJ "look[s] at [the Sun]—we look at it every day."); 6SA1266-80. That the Sun has not controlled the prices of the Newspapers since 1989, does not exclude the Sun as a market participant. In every host-tenant JOA relationship, like that of the Sun and the RJ, one critical element of the combination under the NPA is that the dominant paper sets the prices of both Newspapers (thereby eliminating price competition). *See* 15 U.S.C. § 1802(2); 6SA1303; ECF No. 970 at 18.

Having demonstrated that the facts and law on all elements for monopolization clearly favor the Sun, the Sun has satisfied its burden in showing that it will likely succeed on this claim.

### 2.    Attempted Monopolization

To succeed on a claim for attempted monopolization, "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2008) (quotations omitted). The specific intent necessary for attempted monopolization "may … be proved by direct evidence but is more usually proved by inference from anticompetitive conduct." *Forro Precision, Inc. v. Int'l Bus. Machs. Corp.*, 673 F.2d 1045, 1059 (9th Cir. 1982) (citations omitted). Where "behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way," specific intent may be inferred. *Cascade Health Sols.*, 515 F.3d at 894; *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co.*, 284 F.2d 1, 18 (9th Cir. 1960) (explaining that specific intent can be inferred from anticompetitive conduct "since everyone is presumed to intend the natural and probable results or consequences of his conduct"), *rev'd on other grounds by Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19 (1962).

The RJ's specific intent to monopolize the Newspaper Market is inferred by the RJ's Anticompetitive Conduct. *See supra* § II(D) & § IV(A)(1)(iii)-(iv). Destruction of competition and

38

the Sun was not only the probable and foreseeable consequences of the RJ's Anticompetitive Conduct, but it was the specific result the RJ desired to achieve. Section IV(A)(1)(ii), above, establishes the RJ's substantial market power for monopolization before April 3. The RJ's Anticompetitive Conduct—specifically designed to eliminate the only other competitor with the RJ facing no constraining influence or potential new entrants—satisfies this factor. *See supra* & 1SA13; 2SA264-69, 279-82. The RJ has a dangerous probability of achieving a literal monopoly in the Newspaper Market. 1SA13.With the law and the facts clearly in its favor, the Sun has demonstrated a likelihood of success on its attempted monopolization claim.

**B.**     **It Is Well Within This Court's Equitable Authority to Compel the RJ to Perform Under the Governing 1989 JOA**

The RJ would have this Court believe that it cannot grant any injunctive relief, including the status quo ante litem where the parties' performed under the 1989 JOA, and the legally operative outcome due to the unenforceability of the 2005 JOA, furthered by the parties' expressed intent that the 1989 JOA shall be the operative agreement in this circumstance. *See supra*; *Airs Intern., Inc. v. Perfect Scents Distribs., Ltd.*, 902 F. Supp. 1141, 1148-49 (N.D. Cal. 1995) (providing that where "the new contract is invalid, there is no novation and the parties' previous obligations are not extinguished") (citations omitted). The RJ's already-rejected argument that the 2005 JOA terminated the 1989 JOA, or that the 1989 JOA has been abandoned, fails. *See supra*; ECF No. 970 at 18-19. The parties continued performing the material obligations of the 1989 JOA after 2005.

The RJ's recent "impossibility" and "impracticality" arguments similarly fail because the circumstances of this dispute were foreseeable. *See* ECF No. 970 at 47-49. Where the claimed "unforeseen contingency is one which the promissor should have foreseen, and for which he should have provided, this defense [if impossibility/impracticality] is unavailable to him." *E.g.*, *Nebaco, Inc. v. Riverview Realty Co.*, 482 P.2d 305, 307 (Nev. 1971) (cited by ECF No. 970 at 47-49). The RJ asked for the circumstance it currently faces when it sought to have the 2005 JOA declared unenforceable, knowing that the 1989 JOA would become the valid and enforceable agreement to which the parties would revert. The cost and expense of reverting to the 1989 JOA were foreseeable when the parties agreed to Section 1.1's contingency provision in 2005. Aware of these risks, the

RJ sought to invalidate the 2005 JOA, knowing the consequence of doing so. *See Nebaco*, 482 P.2d at 307.[15]

In summary, nothing prevents this Court from granting the Sun's requested relief.

**C.     The Sun Is Suffering and Will Continue to Suffer Extreme, Irreparable Harm**

Under Section 16 of the Clayton Act, even the threatened elimination of competition, including the threat of being driven out of business, is a *per se* showing of irreparable harm. *E.g., California v. American Stores*, 492 U.S. 1301, 1304 (1989); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). The elimination of a JOA newspaper, like the Sun, has been held to warrant an injunction due to the irreparable injury sustained from the loss of competition. *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1253 (D. Haw. 1999) (reasoning that the dominant JOA newspaper's impairment of circulation and access to the weaker paper, which harmed the public perception of the viability of the weaker paper, would cause irreparable injury if not enjoined because the weaker paper "would no longer be a viable newspaper," and "[o]nce closed, the [weaker paper] is unlikely to be reopened"). "[N]o monetary amount will be able to compensate for the loss of the [weaker paper]'s editorial and reportorial voice, the elimination of a significant forum for the airing of ideas and thoughts, the elimination of an important source of democratic expression, and the removal of a significant facet by which news is disseminated in the community." *Id.* at 1253-54 (citing *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991) ("[W]e have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.")).

---

[15] The evidence binding the RJ to the 1989 JOA is also unequivocal: the RJ is a successor-in-interest based on the agreements themselves. 2SA293 (identifying Donrey of Nevada, Inc.) 2SA324 § 10.9; 2SA449 (identifying DR Partners as "the successor-in-interest to Donrey of Nevada, Inc.); 2SA458 § 10.9. The RJ has repeatedly admitted the same. ECF No. 978 ¶ 1; *see also* ECF 978 ¶ 25. The RJ knew of the 1989 JOA during due diligence for its purchase of the Review-Journal in 2015 (*See* ECF 832-1 at DEFS0112091) and used the 1989 JOA as its primary defense in the state court action and the 2019 arbitration. *See* 6SA1287 ¶¶ 12-13; 6SA1289, 1289 n.7; 6SA1297-99. As this Court held, the RJ has "stepped into the shoes of their predecessors, as if they had been present at the JOA's formation." ECF No. 970 at 34.

40

Even before the RJ excluded the Sun from the market entirely, this Court found that "[s]topping the printing and distribution of the *Sun* would cause the Sun to suffer immediate and intangible harms in the form of 'loss of staff and ability to recruit new employees … loss of readership and visibility, and loss of goodwill," and that the Sun faced an imminent risk of closure. ECF No. 1096 at 8-9. Now, the Sun has been publicly ousted from the Newspaper Market completely, a scenario even more compelling than the threat at issue in *Gannett*.

The Sun was without capability to continue independently printing and distributing its newspaper in 1989. *Supra* § II; 7SA1461-64. In exchange for, and in consideration of, all of the benefits the RJ received from the joint operation in 1989, the Sun also agreed to surrender to the RJ all of its printing, distribution, and marketing resources, among other things. *Id.* In an even more difficult market today, with the high barriers to entry, the Sun does not have the ability to print and distribute its newspaper independently, outside of the 1989 JOA. *Id.*; 2SA422; 6SA1196, 1199-1204; 7SA1400-SA1412. Accordingly, if the RJ is allowed to continue excluding the Sun from the Newspaper Market, the Sun will not be reopened due to lack of infrastructure necessary to print and distribute its Newspaper, and its loss of staff and ability to recruit new employees, loss of future capital with which to fund operations, and loss of readership and visibility. *E.g.*, 7SA1461-64; 2SA422-23 ¶¶ 2-4; 2SA264-69, 279-82; 1SA185.

There are no "alternatives" besides the RJ's printing press for the Sun to explore. 6SA1313-20; *see also* 2SA422; 2SA264-49; 7SA1400-SA1412. Even with the RJ's pretextual offer to "print" the Sun at market rates, the RJ is silent on fundamental questions about when the Sun would be produced and at what cost, the significant production scheduling issues and the RJ's willingness to accommodate the Sun as a daily morning newspaper, even aside from all the other high barriers to entry that the Sun cannot overcome, among other issues. 7SA1400-SA1412.[16] In short, the Sun will shut down permanently if the RJ is not compelled to comply with the 1989 JOA. No monetary amount can compensate the Sun's lost editorial and reportorial voice. 2SA422-23 ¶ 5; *see Gannett*,

---

[16] The Sun's website is not an option to preserve the Sun newspaper or competition between the RJ and the Sun because it is not a local, daily print newspaper. The Sun attested, and Dr. Katz opined, that terminating the joint operation would eliminate the Sun and continuing lasvegassun.com would not be commercially viable. 6SA1202-03; 2SA422 ¶ 3; ECF No. 876-6 ¶ 14; 7SA1436-59.

41

99 F. Supp. 2d at 1253-54. This harm is happening now. It is critical, irreparable, and becoming irreversible should the Sun's requested preliminary relief be denied.

This Court can put an end to the soon-to-be irreversible harm suffered by the Sun by enjoining the RJ from failing to print and distribute the Sun under, and otherwise comply with the terms of, the 1989 JOA. Again, the 1989 JOA is not only the governing agreement since the RJ had the 2005 JOA declared unenforceable, but, importantly, it has also been expressly approved by the Attorney General and is the "status quo ante litem" for purposes of a preliminary injunction. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2020) (defining "the status quo ante litem" as "not simply to any situation before the filing of a lawsuit, but instead to "the last uncontested status which preceded the pending controversy"). This remedy is valid and legal, and would effectuate the policy and purpose of the NPA by as the Attorney General concluded.

As a  temporary remedy, this Court can require the RJ to print and distribute the Sun "on an interim basis pursuant to Section 8.2 until such time that the RJ determines that it is feasible to publish more than one newspaper product and that it is able to fully perform under the 1989 JOA. This remedy is requested because the RJ has argued in numerous filings that the afternoon publication and distribution of the Sun as required by the 1989 JOA would be 'impossible' now after the Ninth Circuit's Opinion. Under Section 5.1 of the 1989 JOA, separate daily publication of both Newspapers is the default obligation which the RJ should be required to perform, besides the requirement of joint publication on weekends, holidays, and special editions. 2SA305. Section 8.2, however, adds to this obligation when the RJ claims that it cannot publish and distribute the Sun as a separate newspaper per Section 5.1, providing, "if it is feasible to publish only one newspaper product, Review-Journal **shall** exercise its best efforts to produce a jointly published newspaper in which the Sun portion shall be determined by Review-Journal ... provided, that the Sun portion shall not be less than two (2) pages." 2SA315 (emphasis added). There is simply never an excuse under the 1989 JOA for the RJ to refuse to publish the Sun, and the Sun has requested injunctive relief to ensure that this obligation is preserved and performed. Every assertion the RJ has made about the impossibility of afternoon publication is a concession that Section 8.2's triggering conditions are satisfied, and that the RJ is affirmatively required to publish a joint edition including

42

the Sun, until such time that the RJ ceases to make this argument and separately publishes and distributes the Sun.

### D.    The Balance of Hardships Tips Sharply in the Sun's Favor

As this Court already concluded, "The balance of equities tops sharply in the Sun's favor," where the potential hardship to the Sun ranges from loss of institutional memory to 'economic demise.'" ECF No. 1096 at 9 (quoting *Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1254 (D. Haw.)). Before the RJ's April 3 exclusion of the Sun, the harm to the Sun was irrefutable (2SA422-23 ¶¶ 3-5; 2SA264-69, 279-82; 1SA185) when compared to the RJ's lost opportunity to eliminate its sole competitor from the market (which was "not a relevant harm"). *See Archetype Capital Partners, LLC v. Bullock Legal Group, LLC*, 2025 WL 3500688, at *17 (D. Nev. Dec. 5, 2025)).

Furthermore, the RJ will only be required to continue printing and publishing the Sun, and maintaining its responsibilities to the joint operation in the interim. The 1989 JOA required the RJ to continue to print and distribute the Sun through 2040, and the same material obligations to print and distribute the Sun continued under the 2005 JOA framework. *See* ECF No. 970 at 18; *Hillstone Restaurant Group Inc. v. Houston's Hot Chicken Inc.*, 2023 WL 110926, at *5 (D. Ariz. Jan. 5, 2023) (finding the balance of equities favored the plaintiff where the defendants "knowingly and freely entered into the Agreement," and concluding, "[t]heir failure to abide by the terms that the parties bargained for continues to cause substantial hardship to Plaintiff"); *accord Am. Impex Corp. v. Int'l. Ace Tex, Inc.*, 2009 WL 3963791, at *3 (C.D. Cal. Nov. 16, 2019); *Great Caesars Ghost LLC v. Unachukwu*, 2020 WL 2394052, at *4 (D.N.J. May 12, 2020). Thus, that the injunction would be both prohibitory and mandatory is inconsequential: the mandatory nature of the relief sought (reversion to the 1989 JOA) is nothing more than fulfillment of the express contractual terms that the RJ willingly and knowingly agreed to. And they are all part of the bargained-for exchange that resulted in the RJ reaping the many benefits of JOA for decades. To allow the RJ to repudiate its promises under the guise of "harm" from an injunction would set not only the promises and intentions made in both the 1989 and 2005 JOAs on their head, but also pervert the public policy underlying the NPA and the law governing equitable relief generally. And, in the meantime, the RJ would continue receiving the benefits of the joint operation, including increased competition as a

43

result of the Sun (6SA1255-56, 1258-63; 3SA660, 662-63), and revenues from consumers who would otherwise terminate their subscriptions if the Sun continues to be excluded from the market. *See* 6SA1266-80; 6SA1347-55.

Every inequity the RJ has claimed to "suffer" to date is self-inflicted and in furtherance of the RJ's monopolistic intent. The RJ deliberately elected to invalidate the 2005 JOA. The 1989 JOA is a bargained-for Attorney-General-approved agreement under which the RJ has received the benefits for 36 years.[17] And yet, the RJ has continually requested that this Court relieve it of the "hardships" of performing its obligations under the 1989 JOA, when those very hardships were either caused by the RJ itself, or were exacerbated by the RJ's chosen lethargy. The RJ cannot consummate its anticompetitive plan and allow it to permanently end the publication of the Sun.

### E.      The Public Interest is Served by Granting Injunctive Relief

This Court previously concluded that the public interest is served by injunctive relief compelling the Sun to be printed and distributed. ECF No. 1096 at 10. When considering whether to grant injunctive relief, this Court must determine whether "'the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences.'" *Boardman*, 822 F.3d at 1023-24 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009)). Injunctive relief in an antitrust case is always deemed to further the public interest, for "the central purpose of the antitrust laws is to preserve competition," which is "*vital to the public interest*." *Id.* at 1024. Even more significant, the preservation of a JOA newspaper's distinct editorial and reportorial voice is a paramount public interest. *E.g.*, 15 U.S.C. § 1801; *Comm. for Indep. P-I v. Hearst Corp.*, 704 F.2d 467, 480 (9th Cir. 1983); 1SA26-50. The RJ and consumers agree. *E.g.*, 6SA1255-63-80. Because the loss of the Sun's independent editorial and reportorial voice, the loss of competition to attract creators of news, editorial, and entertainment content, and the loss of jobs "would severely harm the public interest," "this factor weighs in favor of granting injunctive relief." *See Gannett*, 99 F. Supp. 2d at 1254.

---

[17] No First Amendment harm to the RJ would occur either for the reasons already stated by this Court. ECF No. 1096 at 9-11. Moreover, the RJ knowingly and voluntarily waived its First Amendment rights to not print and distribute the Sun when it entered into the 1989 JOA. *See also Gannett*, 99 F. Supp. 2d at 1248-52; ECF No. 970 at 42-4.

44

**F.      A Bond Should Not be Required**

The Court has broad discretion to set a bond under Federal Rule of Civil Procedure 65(c), including a nominal bond or no bond at all in cases involving the public interest. *E.g.*, *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999), *supplemented by Baharona-Gomez v. Reno*, 236 F.3d 1115 (9th Cir. 2001); *Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). The Sun's financial resources are already significantly strained because of the RJ's Anticompetitive Conduct, and this case centers around the public's interest in maintaining competition and a diverse newspaper editorial voice, warranting a nominal bond at most. *See Gannett*, 99 F. Supp. 2d at 1255. There is also no basis for the Sun to post anything more than a nominal bond where the RJ is merely being compelled to do what it is either contractually obligated to do. *E.g.*, *MetroPCS Georgia, LLC v. Metro Dealer, Inc.*, 2019 WL 1597111, at *4 (W.D. Wa. Apr. 15, 2019); *Life Flight Network, LLC v. Metro Aviation, Inc.*, 2017 WL 192706, at *2 (D. Or. Jan. 17, 2017); *Paparazzi, LLC v. Souza*, 2025 WL 3705493, at *8 (D. Utah Dec. 22, 2025). Given that this matter involves public interest it is appropriate for the Court to waive or require a nominal bond. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).[18]

**V.      CONCLUSION**

For the foregoing reasons, the Sun respectfully requests that this court issue the Sun's request relief set forth in this Motion to prevent the irreparable harm the Sun is currently suffering.

DATED this 10th day of April, 2026.

CLARK HILL PLC

By: */s/ Kristen L. Martini*
E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
1700 S. Pavilion Center Drive, Suite 500
Las Vegas, Nevada 89135

---

[18] The RJ previously requested a bond of at least $51.4M "to cover the Review-Journal's costs of being enjoined for five years." ECF No. 1070 at 24. This proffered number is intentionally misleading because it improperly conflates the RJ's annual cost to publish and distribute the Sun (calculated by the RJ to be $1.4M) with the RJ's remaining contractual obligations under the 1989 JOA to make payments to support the Sun's editorial and promotional expenses. *See also* 6SA1331-33; 6SA1335-40.

45

PISANELLI BICE PLLC
James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

BROWNSTEIN HYATT FARBER
SHRECK, LLP
Jordan T. Smith, Nevada Bar No. 12097
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

ALIOTO LAW FIRM
Joseph M. Alioto, Pro Hac Vice
One Sansome Street, 35th Floor
San Francisco, California 94104

*Attorneys for Plaintiff/Counterdefendants*

**CERTIFICATE OF SERVICE**

I certify that I am an employee of CLARK HILL PLC, and I caused a true and correct copy of the foregoing **PLAINTIFF/COUNTERDEFENDANTS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PER ECF NO. 1112** to be served by electronically filing the foregoing with the CMECF electronic filing system which will send notice of electronic filing to:

J. Randall Jones, Esq.
Mona Kaveh, Esq.
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169

Michael J. Gayan, Esq.
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite 100
Las Vegas, NV 89107

Amy M. Gallegos, Esq.
David R. Singer, Esq.
Andrew G. Sullivan, Esq.
Alison I Stein, Esq.
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, CA 90071

Richard L. Stone, Esq.
850 Deveon Avenue
Los Angeles, CA 90024

DATED: April 10, 2026.

/s/  Kristen L. Martini
An Employee of Clark Hill PLC

47

**DECLARATION OF KRISTEN L. MARTINI IN SUPPORT OF PLAINTIFF/COUNTERDEFENDANTS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PER ECF NO. 1112**

I, Kristen L. Martini, do hereby swear under penalty of perjury that the following assertions are true and correct to the best of my knowledge:

1.      I am a duly licensed attorney admitted to practice in the State of Nevada. I am a member of Clark Hill PLC, and counsel for Plaintiff/Counterdefendant Las Vegas Sun, Inc., and Counterdefendants Brian Greenspun and Greenspun Media Group, LLC (together, for purposes of this Motion and for ease of reference, referred to as, the "Sun") in this matter. I make this Declaration in support of Plaintiff/Counterdefendants' Renewed Motion for Temporary Restraining Order and Preliminary Injunction Per ECF No. 1112 ("Motion").

2.      Attached as **Exhibit 1** to the Motion is a true and correct copy of excerpts of the September 19, 2022, Expert Report of Las Vegas Sun, Inc's Expert Dr. Michael Katz, in this action. This document has been **FILED UNDER SEAL**.

3.      Attached as **Exhibit 2** to the Motion is a true and correct copy of September 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Robert Picard, in this action.

4.      Attached as **Exhibit 7** to the Motion is a true and correct copy of excerpts of the transcript of Mark Hinueber's testimony during a hearing in the arbitration captioned *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case No. 01-16-0001-9187 (Oct. 6, 2016) (Vol. 4) (SUN_00023106-08, 273-74, 278, 280, 282-86, 383). This document has been **FILED UNDER SEAL**.

5.      Attached as **Exhibit 8** to the Motion is a true and correct copy of the September 8, 2016, Declaration of Mark Hinueber in Support of Stephens Media LLC's Opposition to Las Vegas Sun's Motion for Summary Judgment, *Las Vegas Sun, Inc. v. Stephens Media LLC,* AAA Case No. 01-16-0001-9187(SUN-00064364-67). This document has been **FILED UNDER SEAL**.

6.      Attached as **Exhibit 10** to the Motion is a true and correct copy of the Hearing Transcript Excerpts of Jackson Farrow, *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case

48

No. 01-16-0001-9187 (Oct. 5, 2016) (Vol. 3) (SUN_00021972-74, 76-83, 159)). This document has been **FILED UNDER SEAL**.

7. Attached as **Exhibit 11** to the Motion is a true and correct copy of Hearing Transcript Excerpts of Brian Greenspun, *Las Vegas Sun, Inc. v. Stephens Media LLC*, AAA Case No. 01-16-0001-9187 (Oct. 3, 2016) (Vol. 1) (SUN_00019641-43, 70, 96-97, 99, 703, 842). This document has been **FILED UNDER SEAL**.

8. Attached as **Exhibit 12** to the Motion is a true and correct copy of the September 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Lawrence Aldrich in this action. This document has been **FILED UNDER SEAL**.

9. Attached as **Exhibit 14** to the Motion is a true and correct copy of the September 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Russell Lamb in this action. This document has been **FILED UNDER SEAL.**

10. Attached as **Exhibit 15** to the Motion is a true and correct copy of the March 15, 2023, Deposition Transcript Excerpts of the Las Vegas Sun, Inc.'s Expert Lawrence Aldrich in this action.

11. Attached as **Exhibit 20** to the Motion is a true and correct copy of Deposition Transcript Excerpts of the February 16, 2022, deposition of Las Vegas Sun, Inc.'s 30(b)(6) Corporate Representative Robert Cauthorn, in this action. This document has been redacted and **FILED UNDER SEAL.**

12. Attached as **Exhibit 23** to the Motion is a true and correct copy of the Apr. 9, 2008, letter from B. Matelson to G. Lang, et al., re Las Vegas Joint Operating Agreement ("No Action Letter") (DEFS0000418) produced by Defendants in this action.

13. Attached as **Exhibit 24** to the Motion is a true and correct copy of Deposition Transcript Excerpts of the August 19, 2022, deposition of Las Vegas Review-Journal 30(b)(6) Corporate Representative Glenn Cook, in this action. This document has been redacted and **FILED UNDER SEAL.**

49

14. Attached as **Exhibit 25** to the Motion is a true and correct copy of Deposition Transcript Excerpts of the March 23, 2022, deposition of Brian Greenspun, in this action. This document has been redacted and **FILED UNDER SEAL.**

15. Attached as **Exhibit 26** to the Motion is a true and correct copy of the Final Award of Arbitrator, *Las Vegas Sun, Inc. v. News+Media Capital Group, LLC*, AAA Case No. 01-18-0000-7568 (July 2, 2019) (SUN_00013635-46). This document has been **FILED UNDER SEAL.**

16. Attached as **Exhibit 28** to the Motion is a true and correct copy of a September 27-October 4, 2019, email chain between counsel re Preliminary Injunction Motion.

17. Attached as **Exhibit 29** to the Motion is a true and correct copy of Jan. 11, 2015, email from R. Pergament to P. Dumont et al., re Preliminary Observations (DEFS0028645-47) produced by Defendants in this action. This document has been **FILED UNDER SEAL.**

18. Attached as **Exhibit 30** to the Motion is a true and correct copy of Deposition Transcript Excerpts of the March 21, 2019, deposition of Jason Taylor, *Las Vegas Sun, Inc. v. News+Media Capital Group, LLC*, AAA Case No. 01-18-0000-7568. This document has been **FILED UNDER SEAL.**

19. Attached as **Exhibit 31** to the Motion is a true and correct copy of Deposition Transcript Excerpts of the May 12, 2022, deposition of Jason Taylor, in this action.

20. Attached as **Exhibit 32** to the Motion is a true and correct copy of an April 3, 2017, email from J. Wilson to N. Cusick re Monday Meeting Notes (DEFS0016006-07) produced by Defendants in this action. This document has been **FILED UNDER SEAL.**

21. Attached as **Exhibit 33** to the Motion is a true and correct copy of Deposition Transcript Excerpts of the March 3, 2022, deposition of Craig Moon in this action.

22. Attached as **Exhibit 34** to the Motion is a true and correct copy of the Jan. 18, 2023, Rebuttal Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Barbara Gottlieb. This document has been **FILED UNDER SEAL.**

23. Attached as **Exhibit 35** to the Motion is a true and correct copy of the Las Vegas Review Journal Payment Calculation JOA Fiscal Year Ending March 2018. This document has been **FILED UNDER SEAL.**

24.     Attached as **Exhibit 36** to the Motion is a true and correct copy of the March 3, 2017, email from P. McGuire to C. Moon re Revised Summary of JOA Pmt. Calc. (DEFS0165095-97) produced by Defendants in this action. This document has been **FILED UNDER SEAL.**

25.     Attached as **Exhibit 37** to the Motion is a true and correct copy of the Stephens Media Group's Las Vegas Review Journal Fiscal Year End March 31, 2006, Financials (Exhibit 7 to Deposition of Robert Cauthorn, *Las Vegas Sun, Inc. v. News+Media Capital Group, LLC*, AAA Case No. 01-18-0000-7568 (Mar. 27, 2019)). This document has been **FILED UNDER SEAL.**

26.     Attached as **Exhibit 38** to the Motion is a true and correct copy of Deposition Transcript Excerpts of the May 12, 2022, deposition of Las Vegas Review-Journal 30(b)(6) Corporate Representative Stephen Hall, in this action. This document has been redacted and **FILED UNDER SEAL.**

27.     Attached as **Exhibit 39** to the Motion is a true and correct copy of the September 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Barbara Gottlieb. This document has been **FILED UNDER SEAL.**

28.     Attached as **Exhibit 40** to the Motion is a true and correct copy of the Feb. 12, 2016, email from P. Sack to S. Garfinkel re Las Vegas (DEFS0093000-24) produced by Defendants in this action. This document has been **FILED UNDER SEAL.**

29.     Attached as **Exhibit 41** to the Motion is a true and correct copy of the Feb. 9, 2015, VRC Valuation of Certain Intangible Assets of Las Vegas Review Journal as of Dec. 10, 2015 (DEFS0092587-621) produced by Defendants in this action. This document has been **FILED UNDER SEAL.**

30.     Attached as **Exhibit 42** to the Motion is a true and correct copy of the March 3, 2017, Email from C. Moon to F. Vega re an update and two quick questions. Defendants produced this document as DEFS0013609-10. This document has been **FILED UNDER SEAL**.

31.     Attached as **Exhibit 43** to the Motion is a true and correct copy of the Las Vegas Review-Journal, Inc. Financial Statements December 31, 2019 and 2018. Defendants produced this document as DEFS0083496-515. This document has been **FILED UNDER SEAL**.

51

32.    Attached as **Exhibit 46** to the Motion is a true and correct copy of the September 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Gregory Gundlach. This document has been **FILED UNDER SEAL.**

33.    Attached as **Exhibit 47** to the Motion is a true and correct copy of the September 19, 2022, Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert J. David Kordalski. This document has been **FILED UNDER SEAL.**

34.    Attached as **Exhibit 48** to the Motion is a true and correct copy of the April 4, 2023, Supplemental Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Gregory Gundlach. This document has been **FILED UNDER SEAL.**

35.    Attached as **Exhibit 49** to the Motion is a true and correct copy of the Sept. 19, 2016, email from J. Wilson to E. Cassidy re: RJ with Sun?. This document was produced by Defendants in this action as DEFS01454464-67. This document has been **FILED UNDER SEAL.**

36.    Attached as **Exhibit 50** to the Motion is a true and correct copy of the Apr. 2, 2017, email from C. Moon to R. Cauthorn Re: Concerns about your new design. This document was produced by Defendants in this action as DEFS0002488-89. This document has been **FILED UNDER SEAL.**

37.    Attached as **Exhibit 51** to the Motion is a true and correct copy of the Apr. 17, 2019, email from K. Espejo to K. Moyer re: The Sun in eEdition. This document was produced by Defendants in this action as DEFS0166089-94. This document has been **FILED UNDER SEAL.**

38.    Attached as **Exhibit 52** to the Motion is a true and correct copy of excerpts of Defendants' First Amended Responses to Plaintiff's Interrogatories (First Set), served March 19, 2021.

39.    Attached as **Exhibit 53** to the Motion is a true and correct copy of Deposition Transcript Excerpts of the August 11, 2022, deposition of Las Vegas Review-Journal 30(b)(6) Corporate Representative Chris Blaser, in this action. This document has been redacted and **FILED UNDER SEAL.**

40.    Attached as **Exhibit 55** to the Motion is a true and correct copy of Steve Kanigher's article, *Sun deal with R-J "a tremendous opportunity" Newspaper to return to morning delivery*,

52

published in the Las Vegas Sun on June 15, 2005. This document was produced by Defendants in this action as DEFS0190559-61.

41. Attached as **Exhibit 56** to the Motion is a true and correct copy of Deposition Transcript Excerpts of the June 24, 2022, deposition of Ray Brewer in this action.

42. Attached as **Exhibit 57** to the Motion is a true and correct copy of Las Vegas Review Journal Newsroom Guide. This document was produced by Defendants in this action as DEFS0185654-69. This document has been **FILED UNDER SEAL.**

43. Attached as **Exhibit 59** to the Motion is a true and correct copy of the January 11, 2018, Front Page of Newspapers. This document was produced by Defendants in this action as DEFS0001703.

44. Attached as **Exhibit 60** to the Motion is a true and correct copy of the February 13, 2018, Front Page of Newspapers. This document was produced by Defendants in this action as DEFS0001697.

45. Attached as **Exhibit 62** to the Motion is a true and correct copy of the January 18, 2023, Rebuttal Expert Report Excerpts of Las Vegas Sun, Inc.'s Expert Dr. Michael Katz. This document has been **FILED UNDER SEAL.**

46. Attached as **Exhibit 63** to the Motion is a true and correct copy of Deposition Transcript Excerpts of the October 28, 2021, deposition of Patrick Dumont in this action. This document has been **FILED UNDER SEAL.**

47. Attached as **Exhibit 64** to the Motion is a true and correct copy of Deposition Transcript Excerpts of the April 5, 2022, deposition of Keith Moyer in this action.

48. Attached as **Exhibit 72** to the Motion is a true and correct copy of the June 13, 2016, email from J. Perdigao to F. Vega et al., re JOA Info. Defendants produced this document as DEFS0146935. This document has been **FILED UNDER SEAL.**

49. Attached as **Exhibit 73** to the Motion is a true and correct copy of excerpts of Defendants News+Media Capital Group LLC and Las Vegas Review-Journal Inc.'s RJ's First Amended Answer to Complaint and Counterclaims, in the case styled *Las Vegas Sun, Inc. v. News+Media Capital Group LLC* (Clark Cnty. Dist. Ct. Sept. 30, 2019).

50. Attached as **Exhibit 74** to the Motion is a true and correct copy of excerpts of the transcript of the RJ's Rule 30(b)(6) corporate representative Stephen Hall's deposition testimony in the arbitration captioned *Las Vegas Sun, Inc. v. News+Media Capital Group LLC*, AAA Case No. 01-18-0000-7567 (Mar. 13, 2019) (SUN_00024708-09, 11, 14, 16, 32-33, 946). This document has been **FILED UNDER SEAL**.

51. Attached as **Exhibit 75** to the Motion is a true and correct copy of excerpts from the September 19, 2022, initial report of Las Vegas Sun, Inc.'s expert Lawrence Aldrich. This document has been **FILED UNDER SEAL**.

52. Attached as **Exhibit 76** to the Motion is a true and correct copy of excerpts of the transcript of the Sun's Rule 30(b)(6) corporate representative Robert Cauthorn's deposition testimony from February 16, 2022, in this case.

53. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of April, 2026.

_____

KRISTEN L. MARTINI

54