J. RANDALL JONES, ESQ., SBN 1927
r.jones@kempjones.com
MONA KAVEH, ESQ., SBN 11825
m.kaveh@kempjones.com
KEMP JONES LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone:      +1 702 385 6000

DAVID R. SINGER, ESQ. (*pro hac vice*)
dsinger@jenner.com
AMY M. GALLEGOS, ESQ. (*pro hac vice*)
agallegos@jenner.com
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, California 90071
Telephone:      +1 213 239 5100
Facsimile:      +1 213 239 5199

MICHAEL J. GAYAN, ESQ., SBN 11135
mike@claggettlaw.com
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite 100
Las Vegas, Nevada 89107
Telephone:      +1 702 333 7777
Facsimile:      +1 702 655 3763

RICHARD L. STONE, ESQ. (*pro hac vice*)
rstone@fastmail.com
850 Devon Avenue
Los Angeles, California 90024
Telephone:      +1 310 993 2068

*Attorneys for Defendants/Counterclaimant*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., | Case No. 2:19-cv-01667-ART-MDC |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| SHELDON ADELSON, et al., | |
| Defendants. | |
| AND RELATED COUNTERCLAIM | |

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ..............................................................................................5

I.        The Review-Journal's Then-Owner, Donrey, Enters the 1989 JOA with the Sun, Owner of the Failing *Las Vegas Sun* Newspaper. ............................5

II.       With the *Sun* Still Failing as an Afternoon Newspaper, the Sun and the Review-Journal's Then-Owner, Stephens Media, Form the 2005 JOA. ................6

III.     Stephens and the Sun Terminate the 1989 JOA and Illegally Put the 2005 JOA Into Effect Without the Attorney General's Approval. .........................7

IV.     The Review-Journal's Current Owners Acquire the Newspaper; Greenspun Schemes to Force a Buyout. ..................................................................8

V.      Greenspun Degrades the Print *Sun*'s Quality and Sabotages the Joint Newspaper.........................................................................................................9

VI.     After Greenspun Fails to Force a Buyout, the Sun Sues the Review-Journal, Alleging Breaches of the 2005 JOA.........................................................11

VII.    The Sun Repackages its Breach of Contract Claims into an Antitrust Lawsuit................................................................................................................12

VIII.   The Review-Journal Stipulates to Maintain the Status Quo; Discovery Proves the 2005 JOA Was Never Approved by the Attorney General..................13

IX.    After the Court Refuses to Dissolve the Stipulated Injunction, the Ninth Circuit Reverses and Holds that the 2005 JOA Is Unlawful. ......................13

X.      The Sun Obtains a New TRO Which the Ninth Circuit Quickly Reverses. ........................................................................................................14

XI.     The Sun Amends its Complaint and Seeks a New Preliminary Injunction ........................................................................................................15

ARGUMENT..................................................................................................................16

I.        The Sun Cannot Meet the Stringent Requirements for a Mandatory Injunction. ........................................................................................................16

       A.     To Obtain a Mandatory Injunction, the Sun Must Show the Law and Facts Clearly Favor It on all Four Preliminary Injunction Factors. ...........................................................................16

       B.     The Sun Cannot Show That It Will Clearly Succeed on the Merits Because There Is No Cognizable Anticompetitive Conduct................................................................................................18

             1.     The Sun Will Not Clearly Succeed on Its "Accounting Abuse" Claims. ........................................................................19

i

2.    The Sun Will Not Clearly Succeed on Its Claim that the Review-Journal "Failed to Maximize Joint Operation Profits." ................................................................................21

3.    The Sun Will Not Clearly Succeed on Its Claim that the Review-Journal Reduced "Consumer Knowledge of the Sun." ..............................................................................24

4.    The Sun Will Not Clearly Succeed on Its Claim that the Review-Journal's "Efforts to Terminate the Joint Operation" are Anticompetitive. ......................................25

C.    Because There Is No Cognizable Anticompetitive Conduct, the Sun's Incorrect Assertion that the 1989 JOA is in Effect Cannot Justify an Injunction. ..................................................30

D.    The Sun Cannot Clearly Show that the Review-Journal and Sun Are Competitors. ......................................................................37

E.    The Sun Cannot Clearly Show That Its Relevant Market Is Viable or that It Even Competes in Its Claimed Relevant Market. ............................................................................................41

F.    The Sun Cannot Clearly Show Irreparable Harm. ...................................43

G.    The Balance of Equities and Public Interest Weigh Against an Injunction. ..........................................................................................46

II.    The Court Cannot Issue the Injunctive Relief the Sun Seeks. ..............................47

A.    The Sun's Proposed Injunction Violates the Mandate. ...........................48

B.    Reviving the 1989 JOA Is Unworkable Without Violating the Mandate and Will Not Achieve the Outcome of a Viable Print Sun ......................................................................................................50

C.    Ordering the Review-Journal to Share Its Subscriber Lists with the Sun Is Not an Appropriate Remedy. ..................................53

III.    A Substantial Bond Is Required. ...............................................................................54

CONCLUSION ............................................................................................................................58

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ...................................................................................................19

*Airs International, Inc. v. Perfect Scents Distributors, Inc.*,
902 F. Supp. 1141 (N.D. Cal. 1995) .....................................................................................28, 32

*Apex Hosiery Co. v. Leader*,
310 U.S. 469 (1940)....................................................................................................................39

*Avitech, LLC v. Embrex, Inc.*,
2008 WL 11287093 (D. Md. Aug. 19, 2008) ............................................................................29

*Barahona-Gomez v. Reno*,
167 F.3d 1228 (9th Cir. 1999) ...................................................................................................56

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
223 F. Supp. 2d 718 (D. Md. 2002)............................................................................................21

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ...........................................................................................................21

*Bray v. Safeway Stores, Inc.*,
392 F. Supp. 851 (N.D. Cal. 1975) .............................................................................................52

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................................................................................................................19

*Buddy Sys., Inc. v. Exer-Genie, Inc.*,
545 F.2d 1164 (9th Cir. 1976) ..............................................................................................54, 55

*Califano v. Yamasaki*,
442 U.S. 682 (1979)....................................................................................................................48

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ......................................................................................................45

*Centner v. TMG Util. Advisory Servs. Inc.*,
2022 WL 17266856 (D. Ariz. Nov. 29, 2022)............................................................................17

*Century Sur. Co. v. Casino W., Inc.*,
677 F.3d 903 (9th Cir. 2012) ......................................................................................................35

*Citizen Publishing Co. v. United States*,
394 U.S. 131 (1969) ...................................................................................................................24

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
   254 F.3d 882 (9th Cir. 2001) .................................................................................29

*City of Vernon v. S. California Edison Co.*,
   955 F.2d 1361 (9th Cir. 1992) ...........................................................................18, 37

*Committee for Independent P-I v. Hearst Corp.*,
   704 F.2d 467 (9th Cir. 1983) ................................................................................40

*CoStar Grp. Inc. v. Comm. Real Estate Exchange Inc.*,
   619 F. Supp. 3d 983 (C.D. Cal. 2022) ....................................................................21

*Cruz v. Noem*,
   2025 WL 2995008 (C.D. Cal. Sept. 23, 2025) ........................................................16

*Cypress Semiconductor Corp. v. Fujitsu Semiconductor Ltd.*,
   2020 WL 906710 (N.D. Cal. Feb. 25, 2020) ...........................................................45

*Dedication & Everlasting Love to Animals (DELTA) v. Humane Soc. of U.S., Inc.*,
   50 F.3d 710 (9th Cir. 1995) .........................................................................37, 38, 39

*Dickinson v. Trump*,
   2026 WL 279917 (D. Or. Feb. 3, 2026)...................................................................47

*Dobson v. Crawford*,
   2022 WL 22893355 (C.D. Cal. Oct. 14, 2022)........................................................17

*Doe v. Snyder*,
   28 F.4th 103 (9th Cir. 2022) .................................................................................17

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961)..............................................................................................26

*Eaton v. J.H. Inc.*,
   94 Nev. 446 (1978) ...............................................................................................37

*Facebook, Inc. v. BrandTotal Ltd.*,
   2021 WL 3885981 (N.D. Cal. Aug. 31, 2021) .........................................................25

*Fed. Trade Comm'n v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ...........................................................21, 25, 39, 43

*Food Mktg. Inst. v. Argus Leader Media*,
   588 U.S. 427 (2019)..............................................................................................56

*Foremost Int'l Tours, Inc. v. Qantas Airways Ltd.*,
   478 F. Supp. 589 (D. Haw. 1979).......................................................................21, 25

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ...........................................................................16, 43

*George Foreman Assocs., Ltd. v. Foreman*,
  389 F. Supp. 1308 (N.D. Cal. 1974) ........................................................................32

*Guild v. Levi*,
  539 F.2d 755 (D.C. Cir. 1976) ................................................................................56

*Hall v. USDA*,
  467 F. Supp. 3d 838 (N.D. Cal. 2022) ....................................................................17

*Harper v. Charter Commc'ns, LLC*,
  2019 WL 3683706 (E.D. Cal. Aug. 6, 2019) ..........................................................32

*Harris Const. Co. v. Tulare Loc. Healthcare Dist.*,
  2013 WL 6576034 (E.D. Cal. Dec. 13, 2013) .........................................................52

*Harrison W. Corp. v. United States*,
  792 F.2d 1391 (9th Cir. 1986) ...........................................................................31, 32

*Hawaii ex rel. Anzai v. Gannet Pacific Corp.*,
  99 F. Supp. 2d 1241 (D. Haw. 1999) ......................................................................40

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) .................................................................................41

*Hillis v. Heineman*,
  626 F.3d 1014 (9th Cir. 2010) .................................................................................56

*Hostetler v. Driscoll*,
  2026 WL 608585 (N.D. Cal. Mar. 4, 2026) .............................................................21

*In re Meta Pixel Healthcare Litig.*,
  647 F. Supp. 3d 778 (N.D. Cal. 2022) ....................................................................52

*J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*,
  120 Nev. 277 (2004) ...............................................................................................34

*Johnson v. Commission on Presidential Debates*,
  869 F.3d 976 (D.C. Cir. 2017) ................................................................................38

*Johnson v. Zerbst*,
  304 U.S. 458 (1938) ................................................................................................47

*Jorgensen v. Cassiday*,
  320 F.3d 906 (9th Cir. 2003) ..................................................................................56

*Kaiser Steel Corp. v. Mullins*,
  455 U.S. 72 (1982) ..................................................................................................18

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
  941 F.2d 970 (9th Cir. 1991) .............................................................................47, 53

*Las Vegas Skydiving Adventures LLC v. Groupon, Inc.*,
2019 WL 5454488 (D. Nev. 2019) ......................................................................................43

*Las Vegas Sun, Inc. v. Adelson*,
147 F.4th 1103 (9th Cir. 2025) ...................................................................................... *passim*

*Liberty Lake Invs., Inc. v. Magnuson*,
12 F.3d 155 (9th Cir. 1993) ................................................................................................28

*Life Flight Network, LLC v. Metro Aviation, Inc.*,
2017 WL 192706 (D. Or. Jan. 17, 2017) ...........................................................................57

*Lord & Taylor, LLC v. White Flint, L.P.*,
780 F.3d 211 (4th Cir. 2015) ..............................................................................................52

*Madani v. Equilon Enters. LLC*,
2009 WL 2148664 (C.D. Cal. July 13, 2009) ....................................................................52

*Mallet and Co. Inc. v. Lacayo*,
16 F.4th 364 (3d Cir. 2021) ...............................................................................................55

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) ..............................................................................................16

*Mead Johnson & Co. v. Abbott Labs.*,
201 F.3d 883 (7th Cir. 2000) ..............................................................................................55

*MetroPCS Georgia, LLC v. Metro Dealer, Inc.*,
2019 WL 1597111 (W.D. Wash. Apr. 15, 2019)................................................................57

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974)............................................................................................................47

*Mickelson v. PGA Tour, Inc.*,
2022 WL 3229341 (N.D. Cal. Aug. 10, 2022) ...................................................................16

*Moltan Co. v. Eagle-Picher Industries, Inc.*,
55 F.3d 1171 (6th Cir. 1995) ..............................................................................................56

*Nebaco, Inc. v. Riverview Realty Co.*,
87 Nev. 55 (1971) ...............................................................................................................35

*Nevada Bank of Com. v. Esquire Real Est., Inc.*,
86 Nev. 238 (1970) .............................................................................................................31

*News+Media Cap. Grp. LLC v. Las Vegas Sun, Inc.*,
137 Nev. 447 (2021) ...........................................................................................................37

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ..........................................................................................19

*Olympic Fin. Co. v. Thyret*,
  337 F.2d 62 (9th Cir. 1964) .................................................................................31

*Omega World Travel, Inc. v. Trans World Airlines*,
  111 F.3d 14 (4th Cir. 1997) .................................................................................48

*Omni Fin., LLC v. Kal-Mor-USA, LLC*,
  138 Nev. 973 (2022) .............................................................................................31

*Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd.*,
  20 F.4th 466 (9th Cir. 2021) ................................................................................54

*Overstreet v. United Bhd. of Carpenters & Joiners of Am., Loc. Union No. 1506*,
  409 F.3d 1199 (9th Cir. 2005) .............................................................................47

*Pac. Express, Inc. v. United Airlines, Inc.*,
  959 F.2d 814 (9th Cir. 1992) ...............................................................................25

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
  810 F.3d 631 (9th Cir. 2015) ....................................................................37, 48, 54

*Paparazzi, LLC v. Souza*,
  2025 WL 3705493 (D. Utah Dec. 22, 2025) .......................................................57

*Pennsylvania Water & Power Co. v. Consol. Gas, Elec. Light & Power Co.*,
  186 F.2d 934 (4th Cir. 1951) ...............................................................................32

*PharmacyChecker.com LLC v. LegitScript LLC*,
  137 F.4th 1031 (9th Cir. 2025) ............................................................................18

*Preaseau v. Prudential Ins. Co. of Am.*,
  591 F.2d 74 (9th Cir. 1979) .................................................................................29

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993) ...................................................................................27, 28, 29

*Relevant Gtp., LLC v. Nourmand*,
  116 F.4th 917 (9th Cir. 2024) ..............................................................................26

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) .............................................................................................52

*Sheppard v. Lee*,
  929 F.2d 496 (9th Cir. 1991) ..........................................................................38, 39

*State Coll. Area Sch. Dist v. Royal Bank of Can.*,
  2012 WL 12893876 (M.D. Pa. Oct. 5, 2012) .....................................................32

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
  546 F.3d 991 (9th Cir. 2008) ...............................................................................26

*Toscano v. PGA Tour, Inc.*,
201 F. Supp. 2d 1106 (E.D. Cal. 2002)............................................................37, 38

*Toscano v. Pro. Golfers Ass'n*,
258 F.3d 978 (9th Cir. 2001) ........................................................................37

*Tovar v. U.S. Postal Service*,
3 F.3d 1271 (9th Cir. 1993) ..........................................................................55

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)......................................................................................48

*United States v. Daily Gazette Co.*,
567 F. Supp. 2d 859 (S.D. W. Va. 2008)......................................................38, 39

*United States v. Fort*,
472 F.3d 1106 (9th Cir. 2007) ......................................................................56

*United States v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) ........................................................................43

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
914 F.2d 1256 (9th Cir. 1990) ......................................................................23

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ......................................................................47

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)......................................................................23, 25, 43

*Williams v. Crusader Disc. Corp.*,
75 Nev. 67 (1959) .........................................................................................31

*Winter v. NRDC*,
555 U.S. 7 (2008)..........................................................................43, 53

**Statutes, Rules, and Other Authorities**

HERBERT HOVENKAMP AND PHILLIP E. AREEDA, ANTITRUST LAW: AN ANALYSIS
OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (4th and 5th Eds. 2018–
2022) ..............................................................................................................40

Newspaper Preservation Act, 15 U.S.C. §§ 1801 *et seq.*......................................... *passim*

Sherman Act, 15 U.S.C. §§ 1 *et seq.*........................................................................ *passim*

**INTRODUCTION**

The Sun's renewed motion seeks to enlist this Court as an ally in its unwinnable battle against the Ninth Circuit. The Ninth Circuit has held in no uncertain terms that the substance of the 2005 JOA is unlawful to perform or enforce. This necessarily means the Court cannot hold the Review-Journal liable for failing to perform obligations that only ever existed in the first place because they were in the 2005 JOA. That would be enforcing the 2005 JOA, and it is not allowed regardless of the legal theory. It does not matter whether the Sun is trying to enforce the 2005 JOA prospectively (e.g., through injunctive relief) or retrospectively (e.g., by challenging the Review-Journal's supposed past failures to comply with the terms of the 2005 JOA). It also does not matter how many times the Sun amends its complaint or has its experts hastily revise their reports. Changing the phrase "2005 JOA" to "joint operation" in the complaint is not a clever way to skirt the Ninth Circuit's mandate. Nor is calling the 2005 JOA a "course of dealing," a "voluntary agreement," a "framework," an "economic setting," or a "yardstick" for assessing whether the Review-Journal's conduct was anticompetitive. These are just different ways of saying that the Review-Journal was legally obligated to comply with the substance of the 2005 JOA and that its alleged failure to do so violated the law. Without the 2005 JOA, the Sun has no antitrust claim: the Review-Journal was under *no* independent legal obligation to share profits with the Sun, promote the *Sun* newspaper, display the *Sun* logo on its front page, or allow the Sun to audit its books. Colluding with a competitor violates the Sherman Act. Failing to collude with a competitor does not.

Undeterred by the Ninth Circuit's mandate and its lack of a cognizable antitrust claim, the Sun demands a sweeping mandatory injunction requiring the Review-Journal to continue printing and distributing the *Sun*. But because the Ninth Circuit has now twice reversed this Court's injunctions enforcing the 2005 JOA, the Sun asks the Court to order the Review-Journal to comply with the long-ago abandoned 1989 JOA instead. The Sun justifies its request by arguing that the 1989 JOA somehow sprung back into effect "by operation of law" when the Ninth Circuit invalidated the 2005 JOA—but that is both wrong and beside the point. It is wrong because, among other reasons, the parties terminated and abandoned the 1989 JOA 20 years ago. And it is beside

the point because this is an *antitrust* case, not a contract case. The Court *cannot* order the parties to revert back to the 1989 JOA as an antitrust remedy *unless* it finds that the Sun is clearly likely to prove an antitrust violation that would be remedied by reverting back to the 1989 JOA. The Sun cannot make such a showing here.

With its claims based on alleged non-performance of the substance of the 2005 JOA dead-on-arrival, the Sun now contends that challenging the legality of the 2005 JOA in the Ninth Circuit and then opposing the Sun's argument that the 1989 JOA sprung back to life when the 2005 JOA was invalidated are also anticompetitive acts that subject the Review-Journal to antitrust liability. This is nonsense. The *Noerr-Pennington* doctrine prohibits the Court from imposing antitrust liability on the Review-Journal based on its litigation positions. And the exceedingly narrow "sham" litigation exception plainly does not apply because the Review-Journal *won on appeal*, so its arguments are by definition not objectively baseless. The Review-Journal's position that the 1989 JOA was terminated 20 years ago also is not objectively baseless and there is no evidence that the Review-Journal has taken this position in bad faith. The 1989 JOA was expressly terminated when the parties replaced it with the 2005 JOA, after which they abandoned it and did not perform under it for 20 years. This is textbook abandonment and novation under controlling law. Indeed, it is the Sun that cites no pertinent authority for its claim that the 1989 JOA is somehow still operative. The provision the Sun relies upon, Section 1.1 of the 2005 JOA, is not applicable because (a) the 2005 JOA is a nullity and cannot be lawfully enforced, and (b) Section 1.1 only contemplates reversion to the 1989 JOA in the narrow circumstance where the Department of Justice ("DOJ") takes actions that impair or hinder the 2005 JOA, which did not occur here, and (c) context makes clear that provision was at most a temporary bridge before the 1989 JOA expressly terminated later in 2005.

The Court should deny the Sun's motion for the reasons above and need not reach any other issues. But there are additional independent reasons the Sun cannot prevail on its antitrust claims. For one, the Sun cannot show that the print *Review-Journal* and the print *Sun* insert competed with each other between 2005 and 2026 because they were only sold together as a joint product. In addition, the Sun's alleged relevant product market is not viable. The Sun's market

2

definition and its experts' reports assume a market for the sale of daily print newspapers where there is no competition with online sources—which defies the reality of the modern media landscape. And the Sun concedes it does not compete with the *Review-Journal* in the market for the sale of daily print newspapers. Instead, the Sun says it competes with the Review-Journal for ***post-purchase reader attention***, a "market" where a person who has already purchased the joint *Review-Journal/Sun* newspaper decides whether to read *Review-Journal* articles or *Sun* articles. The Sun's experts do not analyze this supposed market or even explain how one is supposed to measure competition in it. Under settled Ninth Circuit law, harms occurring outside the relevant market are not cognizable.

The standard for a mandatory injunction is very high. There is no sliding scale, and "serious questions" on the merits do not suffice. The Sun must prove that it is ***clearly likely*** to succeed on the merits, which it cannot do. The Sun must also establish that all of the ***other*** factors ***clearly*** favor an injunction, which it also cannot do. There is no evidence of irreparable harm. It is not serious to contend that in 2026 the Sun's "voice" will be extinguished if its small insert is no longer printed. The content of the Sun's printed insert, which carries days-old, stale news, is fully accessible via the Sun's news website—which carries all the locally-produced content in the Sun's print insert and more. The Sun's owner, Brian Greenspun, owns a sprawling media company that includes multiple print publications and websites, as well as its social media presence. His voice has not been silenced just because the *Sun* insert no longer appears in the *Review-Journal.* In fact, Greenspun admitted that ███████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████ This is and always has been about a buyout for the Sun, not preserving an editorial voice. This is why the Sun will not consider simply renting the Review-Journal's printing press and printing its own newspaper, which the Review-Journal has offered many times.

Even if the Sun could meet the standard for a mandatory preliminary injunction—which it cannot do—there is yet another insurmountable hurdle. The proposed injunction the Sun seeks violates the Ninth Circuit's mandate and the writ of mandamus it issued vacating this Court's last injunction in this case. Instead of asking the Court to enforce the 1989 JOA—which would require

the Sun to produce a daily standalone afternoon print newspaper that nobody would buy or advertise in—the Sun asks the Court to order the Review-Journal to print and distribute a daily *Sun* insert pursuant to the force majeure clause from the 1989 JOA and the 1989 JOA's formatting requirements for joint weekend and holiday editions. None of those provisions apply here. Building an injunction out of modified parts of the old, abandoned 1989 JOA is not a way around the mandate. Indeed, the Mandamus Order clearly prohibits the Court from creating any new, hybrid JOA. Mandamus Op. at 6. To the extent the Sun seeks an injunction enforcing the 1989 JOA according to its actual terms, this is not something the Sun is entitled to and not something the Court could feasibly order. And it would not even help the Sun—the 1989 JOA was abandoned and replaced because even 37 years ago the afternoon print *Sun* was a failure.

The Sun's request that this Court order the Review-Journal to hand over its subscriber list fares no better. That request rests on a false premise—there is no separate list of "Sun subscribers" in the Review-Journal's possession. The Review-Journal's subscriber list is its own, built from its own readers; when the papers merged circulation more than two decades ago, Brian Greenspun himself acknowledged that the Review-Journal had nearly ten times the Sun's subscriber base. The customers on that list today are not Sun subscribers by virtue of a merger that happened over twenty years ago. Beyond the false premise, the Sun's request is a mandatory injunction requiring a competitor to turn over its own customer data — a remedy that raises serious antitrust concerns, would contravene the Review-Journal's commitments to its own customers regarding data privacy, and would hand the Sun something it has made no effort to earn on its own, given that it has ample means to build a subscriber list through its digital platform, social media following, and affiliated print publications. The Review-Journal will agree to undertake best efforts to contact subscribers who cancelled after the *Sun* insert stopped printing and to share their information with the Sun for any who consent. Blaser Decl. ¶ 26 (2 OPP 1074). Compelling disclosure of data for non-consenting customers would be unfair to those individuals and would undermine the trust they have placed in the Review-Journal. For all of these reasons, the Court should deny the Sun's motion.

4

**STATEMENT OF FACTS**

I.      **The Review-Journal's Then-Owner, Donrey, Enters the 1989 JOA with the Sun, Owner of the Failing *Las Vegas Sun* Newspaper.**

The *Las Vegas Sun* newspaper is owned and controlled by multimillionaire media magnate Brian Greenspun. Mr. Greenspun inherited the newspaper from his father, a prominent real-estate tycoon who acquired most of the western portion of Henderson, Nevada, for a development that eventually became Green Valley. But despite the Greenspun family's immense wealth, they have never been able to make the *Sun* profitable and were not willing to absorb the losses it would take to produce the newspaper on their own. ECF No. 450-3 ¶ 47; ECF No. 862-7. Brian Greenspun uses the Sun to promote his political and financial interests – for example, after Greenspun co-founded a company that operated cannabis farms and dispensaries, the *Sun* published a stream of editorials and guest columns advocating for the legalization of recreational marijuana. ECF No. 858-9. In 2018, after recreational marijuana was legalized in Nevada, Mr. Greenspun cashed in, selling his cannabis business for over a quarter billion dollars. ECF No. 858-10.

By the late 1980s, the *Sun* newspaper was on the verge of collapse. On June 12, 1989, the Sun entered a joint operating arrangement (the "1989 JOA") with Donrey Media which, at the time, published the more successful *Las Vegas Review-Journal* newspaper. Under the 1989 JOA, the *Sun* and *Review-Journal* each continued as separate, standalone newspapers with their own separate subscriber bases. ECF No. 830-2 § 5.1. The 1989 JOA required the Review-Journal to publish a daily morning newspaper, and required Sun to provide the content for a daily afternoon newspaper that the Review-Journal would print and distribute to the Sun's subscribers. *See id*. The 1989 JOA also required the Review-Journal to sell advertising in and promote both papers. *Id*., §5.1.3.

To manage the newspapers' business functions, the 1989 JOA required creation of a new entity called the "Agency." 1989 JOA Art. 2. The 1989 JOA set forth detailed provisions about what costs and expenses could be charged to the Agency. *Id*. App'x B. And it provided that the Review-Journal and Sun would share the Agency's operating profit. *Id*. App'x D. The 1989 JOA

5

also gave the Review-Journal the right to terminate the arrangement if there were two consecutive years in which the Agency did not earn an operating profit. *Id*. § 9.1.4.

## II.  With the *Sun* Still Failing as an Afternoon Newspaper, the Sun and the Review-Journal's Then-Owner, Stephens Media, Form the 2005 JOA.

The 1989 JOA was a disaster for the Sun. Its "circulation dropped precipitously" because of its "less desirable afternoon position." ECF No. 1 ¶ 20. Even back then, nobody wanted an afternoon *Sun* newspaper. According to Brian Greenspun, ██████████████████████████████████████████████████████████████████████ 2 OPP 1044-1050. As Bob Cauthorn explained, ██████████████████████████████████████████████████████████████████████ 2 OPP 1006-1010. By 2005, ████████████████████████████████████ 2 OPP 1011-1014.

In 2005, the Sun and Stephens Media ("Stephens"), which at that time published the *Review-Journal* newspaper, terminated the 1989 JOA and replaced it with the 2005 JOA. The 2005 JOA eliminated the print *Sun* as a standalone afternoon newspaper and converted it into an insert that would not be sold separately but instead would be distributed as the third section inside the morning *Review-Journal* newspaper. 2005 JOA App'x. A § A.3; *see also id.* App'x. A § A.2(a)–(c). One purpose for the change was to increase the Sun's circulation. On the Sun's first day as an insert, in a column titled "Back Where We Belong," Brian Greenspun wrote: "Just like a bank robber robs banks because that is where the money is, moving to the morning makes sense because that is where the circulation is." 1 OPP 1-2.

In addition to converting the afternoon *Sun* newspaper into an insert inside the *Review-Journal*, the 2005 JOA made a number of other material changes to the parties' relationship. Among other things, it eliminated the Agency concept, created new financial terms reflecting the new arrangement, including a new methodology for determining the Sun's share of JOA profits and added new and materially different provisions relating to how editorial costs and promotions were to be handled and how the newly-combined joint newspaper would be formatted. *Id.* §§ 4.2, 5.1.4, App'x B, App'x D.

### III.   Stephens and the Sun Terminate the 1989 JOA and Illegally Put the 2005 JOA Into Effect Without the Attorney General's Approval.

Under the NPA, it is unlawful to enter into, perform, or enforce a newspaper JOA that was not already in effect when the statute was enacted in 1970, unless the JOA has been approved in writing by the Attorney General of the United States. 15 U.S.C. § 1803(b). This was the rule in 2005 just as it is the rule today. Yet Stephens and the Sun did not seek or obtain the Attorney General's approval for the 2005 JOA. Instead, believing that approval was unnecessary, they filed the 2005 JOA with the Department of Justice and immediately began performing under it. 2005 JOA § 1.1; ECF No. 837 at SA219–22. The last afternoon *Sun* newspaper was published on September 30, 2005.

The 2005 JOA contained express provisions making clear that it was intended to be a replacement for, and not a mere continuation of, the prior joint operating arrangement. It ***expressly terminated*** the 1989 JOA as of September 30, 2005, stating that the 1989 JOA would only "remain in full force and effect through September 30, 2005 (the Transition Date)." 2005 JOA § 1.2. Ensuring that no obligations survived the now-terminated 1989 JOA, each party "unconditionally release[d] and forever discharge[d]" the other party "from any and all . . . claims connected with operations under the 1989 Joint Operating Agreement between the parties." *Id.* § 10.13. And it was a standalone agreement that did not require the parties to consult the 1989 JOA for additional terms or the 2005 JOA's meaning. *See generally id.*

Consistent with the parties' intent to replace and abandon the 1989 JOA, for the next ten years, Stephens and the Sun operated pursuant to the 2005 JOA, believing that its terms applied and that the 1989 JOA was no longer controlling. 2 OPP 1006-1010; ECF No. 839, Ex. 53 ¶¶ 30, 34; 2 OPP 1044-1050; 2 OPP 1051-1052; 1 OPP 3-6. During this entire time period, the *Sun* was printed and distributed as an insert inside the *Review-Journal* newspaper. It was not sold separately and did not have its own subscribers or advertisers. 1 OPP 3-6; 2005 JOA § 5.1. The Agency concept ceased to exist and instead of receiving a fixed percentage of joint revenues, the Sun instead received an annual payment based on a formula set out in the 2005 JOA. ECF No. 621 ¶¶ 37–38. The Sun concedes that Stephens and the Sun both believed the 2005 JOA was a lawful,

controlling agreement. ECF No. 1162 ("Second Amended Complaint" or "SAC") ¶¶ 14, 81, 101, 124, 126, 137, 157, 161, 163.

## IV.    The Review-Journal's Current Owners Acquire the Newspaper; Greenspun Schemes to Force a Buyout.

In March 2015, GateHouse Media bought Stephens' newspaper assets, including the *Review-Journal* newspaper. ECF No. 862-2. In December 2015, the Adelson family, longtime residents of Las Vegas, purchased the *Review-Journal* newspaper from GateHouse through News+Media Capital Group LLC, in which the Adelsons indirectly own a controlling interest. *Id.* ¶ 5. Under this new ownership, the Review-Journal has redesigned the print edition, improved its news operation, rebuilt its marketing and circulation departments, improved customer service, and invested in technology—all of which had been gutted by prior ownership. *See, e.g.*, ECF No. 858-16 at 22:6–24:3, 268:7–20; ECF No. 858-12 at 80:21–23; ECF No. 858-17 at 192:25–193:25, 194:14–25, 232:21–233:14; ECF No. 858-18 at 137:12–19, 241:19–242:19, 284:4–7; ECF No. 858-19 at 116:14–23, 307:12–19; ECF No. 858-20 at 88:22–89:18, 90:20–91:5, 134:8–23, 171:24–172:11. As of June 2022, ███████████████████████████████████ ████████ Since 2015, the Review-Journal has received substantial praise and awards for its quality journalism, local news, and investigative journalism—more than any other newspaper in the State of Nevada. *See, e.g.*, ECF No. 858-18 at 152:11–23; ECF No. 858-22.

As the Sun admits, during due diligence, Stephens "never suggested that [the 2005 JOA] was unenforceable." ECF No. 836 at 14:23–27; ECF No. 862-2 ¶ 3. GateHouse likewise never indicated that the 2005 JOA was unlawful. ECF No. 862-2 ¶ 5. The Review-Journal's current owners did not learn the 2005 JOA was unlawful because it was never approved in writing by the Attorney General until shortly before the Sun filed this lawsuit. *Id.* ¶ 15.[1]

When Mr. Greenspun learned the Adelsons were buying the newspaper, he saw dollar signs. Within days of the acquisition, he and Mr. Cauthorn started scheming to manipulate the Adelsons into paying Mr. Greenspun an exorbitant amount to end the JOA. Their text messages show that ████████████████████████████████████████

---

[1] GateHouse continued to operate its other newspapers (it became part of Gannett, which is now known as USA Today Co., Inc.).

8

████████████████  *See, e.g.*, 2 OPP 1015-1034 (████████████████████████ ████████████████████████████████████████████ (emphasis added); *see also id.* (Mr. Cauthorn responding, ██████████████████████ ████████████████████████████████████████████ ██████) Indeed, in March 2017, Mr. Greenspun memorialized his intent to stop publishing the Sun, writing: "*I am prepared to exit the JOA.*" ECF No. 858-30 (emphasis added). He went on to confirm: "[*I am*] [*n*]*ot just selling out of* [*the*] *joa but ending my commitment to Las Vegas through a daily newspaper,*" and "*I will be out of daily newspaper business.*" *Id.*; *see also* ECF No. 861 at 7–15. Mr. Greenspun said nothing about preserving his "editorial voice" or preserving the *Sun* newspaper for the community—he just wanted money.

## V.    Greenspun Degrades the Print *Sun*'s Quality and Sabotages the Joint Newspaper.

After the Review-Journal refused to pay $20 million (ECF No. 862-2 ¶ 14), Mr. Greenspun stopped trying to cajole the Review-Journal into buying him out and instead turned all of his ammunition toward sabotaging and destroying the *Review-Journal* newspaper. Although the Sun's quality had been declining before the Adelsons acquired the *Review-Journal*, once Mr. Greenspun started angling for a buyout, he began aggressively working to divert readers away from the joint printed newspaper to his separately-owned online news site, LasVegasSun.com.[2] To drive readers away from the *Review-Journal/Sun* newspaper, the print *Sun* largely stopped publishing original local news stories. Although the Sun has a newsroom of reporters writing news stories, the majority of those stories run only on LasVegasSun.com, not in the print *Sun* insert. ECF No. 863-1 at 25, 51. The Sun instead filled its printed *Sun* pages with national syndicated and wire-service content that is readily available from other sources and was often published elsewhere days before it appears in the print *Sun*. *Id*. at 13–22, 26–36, 39–44; *see also* ECF No. 862-18 at 93:11–21.

Internal documents and testimony by Sun employees confirm that the Sun intentionally abandoned original local news. In a 2016 email, the Sun's former Managing Editor and Editorial Page Editor, Ric Anderson, confirmed to Mr. Greenspun that the Sun, ██████████████ ████████████████████████████████████████████████████ ECF No.

---

[2] LasVegasSun.com is outside of the JOA, so the Review-Journal receives no revenue from it.

9

576 at Ex. B (emphasis added); *see also* ECF No. 859-3 at 258:11–20. Mr. Anderson also admitted that "a stale, dated paper with yesterday's news in it is less valuable than a newspaper with . . . today's news[.]" ECF No. 859-3 at 153:16–24. In 2018, the Sun's Managing Editor Ray Brewer ██████████████████████████████████████████████ ECF No. 863-4. The Sun's failure to include fresh local news in its print insert was not due to lack of funds, since the Sun's newsroom was creating timely local content for its website every day. *See, e.g.*, ECF No. 863-1 at 20.

Mr. Greenspun also openly declared war on the Review-Journal, running content in the print *Sun* insert asking readers to subscribe to the Sun website ***instead of*** the joint print newspaper. For more than 30 days beginning on January 11, 2018, the Sun published a message on the first page of its printed insert inside the *Review-Journal*. It was called "A Note from the Sun" (the "Note"). ECF No. 863-5. In the Note, the Sun urged readers to "subscribe to the Las Vegas Sun online" and promised that by doing so readers would be "doing your part in providing fact-based, quality journalism to readers across the valley who depend on that information for their daily family, business and political decisionmaking." *Id*. The Note did not explain why the "fact-based, quality journalism" readers could access on LasVegasSun.com was not appearing in the printed *Sun*. *Id*.[3] Shockingly, the Note encouraged readers who wanted to support the Sun ***not*** to subscribe to the printed *Review-Journal/Sun*, advising them that "***no, purchasing a print subscription to the Sun and R-J doesn't benefit the Sun in this current scenario***." *Id.* (emphasis added).

In addition to urging readers not to subscribe to the joint *Review-Journal/Sun* newspaper, the Sun used the free printing and distribution being provided by the Review-Journal to advertise ***against*** the joint product—leveraging its own substandard print content to drive readers away. The Sun hoarded its most popular stories for its website and intentionally withheld them from the print *Sun* insert. ECF No. 863-1 at 13–22. And, from before this litigation began until the Review-Journal stopped printing the Sun in April 2026, the printed *Sun* carried an advertisement urging readers to go to its website "TO FIND EVERYTHING WE'VE GOT." ECF No. 863-6.

---

[3] The Review-Journal, by contrast, also has an online version (ReviewJournal.com) that is outside the parties' JOA—but the most important original, breaking news stories that appear in the online Review-Journal are also published in the printed newspaper. *See, e.g.*, ECF 862-18 at 45:19–46:12, 92:9–93:25, 116:14–17.

## VI.   After Greenspun Fails to Force a Buyout, the Sun Sues the Review-Journal, Alleging Breaches of the 2005 JOA.

When the current owners acquired the Review-Journal, the Sun was in litigation with Stephens over the accounting methodology used to calculate the Sun's profits payment under the 2005 JOA. For the first nine years after the 2005 JOA was entered, the Sun never complained about the accounting methodology Stephens used to calculate the Sun's annual profits payment. ECF No. 863-7 at 189:12–20; ECF No. 863-8 at 282:24–283:10, 307:14–308:15, 321:5–15; ECF No. 863-9 at 15:20–16:20. The Sun disputed that methodology for the first time in 2014; that dispute led to a confidential arbitration against Stephens that resolved without an adjudication on the merits. When the current owners took over the JOA, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, ECF No. 862-20 at 133:6–133:17, 249:2–249:20, 261:24–262:3; ECF No. 863-10 at 48:10–50:10, 157:4–159:4, 181:14–182:12; ECF No. 863-11 at 224:10–225:5; ECF No. 863-7 at 21:7–22:22.

The Sun subsequently sued the Review-Journal in Nevada state court, alleging breaches of the 2005 JOA. Among other things, the Sun alleged that the Review-Journal breached the 2005 JOA by using the incorrect accounting methodology to calculate the Sun's profit payment; failing to promote the Sun as required by the 2005 JOA; failing to comply with the front-page formatting requirements set out in Appendix B of the 2005 JOA; and failing to abide by the audit provisions in the 2005 JOA. ECF No. 839, Ex. 53 ¶¶ 86–132. The accounting-related claims were compelled to arbitration. A decision was issued in July 2019 awarding the Sun less than $2 million. ECF No. 837 at SA196. Although the Review-Journal did not agree with the award, it paid the judgment.

In August 2019, the Review-Journal sought permission from the state court, where the remainder of the Sun's lawsuit not addressed in the arbitration was pending, to bring counterclaims against the Sun for its breaches of the quality and cooperation provisions in the 2005 JOA, and sought approval to terminate the 2005 JOA due to the Sun's material breaches, as its terms allow. ECF No. 836 at 17–18; 2005 JOA § 9.1.2.

11

**VII.**    <u>**The Sun Repackages its Breach of Contract Claims into an Antitrust Lawsuit.**</u>

On September 24, 2019, the day before the state court granted the Review-Journal permission to file its counterclaims, the Sun filed this antitrust lawsuit. The Sun's complaint alleged the Review-Journal violated antitrust law by breaching and attempting to terminate the 2005 JOA. ECF No. 1, ¶¶ 119-57. In March 2022, the Sun filed an amended complaint that added some new defendants but was otherwise based on the same substantive allegations and theories. *See* ECF No. 621, ¶¶ 30–42, 55–121, 148–94.

All of the Sun's antitrust claims were based on the theory that the 2005 JOA was lawful and enforceable, and that the Review-Journal violated the Sherman Act by allegedly breaching the 2005 JOA and using judicial processes to attempt to terminate the 2005 JOA. Specifically, the Sun alleged that the Review-Journal engaged in anticompetitive conduct consisting of:

- Charging the Review-Journal's editorial costs against the joint operation, because doing so allegedly breached a clause in the 2005 JOA that stated the parties were to "bear their own respective editorial costs," ECF No. 621 at ¶¶ 81–85;

- Firing Jason Taylor as publisher because he supposedly had a plan to make the Review-Journal profitable (and share those profits with the Sun pursuant to the sharing arrangement in the 2005 JOA) and because he allegedly "discovered" that the Review-Journal's accounting methodology did not comply with the 2005 JOA, *id*. at ¶¶ 67–70, 79;

- Charging certain of the Review-Journal's joint promotional costs to the joint operation even when those promotions allegedly did not mention the Sun in "equal prominence," supposedly in violation of the 2005 JOA, *id*. at ¶¶ 86–96;

- Changing the joint newspaper's front page such that it allegedly no longer complied with the formatting requirements in the 2005 JOA, id. at ¶¶ 97–106;

- Eliminating the Sun from the Review-Journal's electronic replica edition, allegedly contrary to the requirements of the 2005 JOA, *id*. at ¶¶ 107–12;

- Failing to comply with the audit provisions in the 2005 JOA, *id*. at ¶¶ 113–119; and

- Planning and seeking to terminate the 2005 JOA, including by asserting counterclaims in the state-court litigation, *id*. at ¶¶ 65–66, 120–21.

## VIII. The Review-Journal Stipulates to Maintain the Status Quo; Discovery Proves the 2005 JOA Was Never Approved by the Attorney General.

Shortly after the Sun filed its antitrust lawsuit, the Sun threatened to seek a preliminary injunction against the termination of the 2005 JOA and asked whether the Review-Journal would stipulate to preserve the status quo. *See* ECF No. 13 ¶ 6. The Review-Journal agreed, while reserving its rights and arguments. The parties thus stipulated that the Review-Journal would "continue to perform under the 2005 JOA," and "refrain from taking any non-judicial steps to terminate the 2005 JOA until after the entry of final judgment by a court of competent jurisdiction permitting such termination." *Id*. ¶ 7. The district court entered the stipulated order on October 9, 2019. *Id*.

By this point, the Review-Journal's current owners had become aware that the 2005 JOA was never approved by the Attorney General, as the NPA expressly requires. The Review-Journal moved to dismiss the complaint on the ground that the 2005 JOA was unlawful, ECF No. 20, but the Court denied the motion, finding that the Sun's complaint alleged the DOJ had "permitted" the 2005 JOA and the Review-Journal's challenge to this allegation went beyond the pleadings. ECF No. 243 at 8. Several years of discovery ensued, during which it became clear that there was no evidence supporting the Sun's allegation that the DOJ had "permitted" the 2005 JOA.

## IX. After the Court Refuses to Dissolve the Stipulated Injunction, the Ninth Circuit Reverses and Holds that the 2005 JOA Is Unlawful.

The parties subsequently filed cross-motions for summary judgment, and the Review-Journal moved to dissolve the stipulated injunction on the ground that the 2005 JOA was unlawful. ECF Nos. 836, 845. This Court granted summary judgment to the Sun on the issue of the 2005 JOA's enforceability and denied the motion to dissolve the stipulated injunction. ECF No. 970 at 13–20.

The Ninth Circuit reversed. In a published opinion, the unanimous panel held that under the NPA's plain language, a newspaper JOA entered after the statute's enactment in July 1970 must be approved in writing by the Attorney General, or else it is unlawful to perform or enforce. *Las Vegas Sun, Inc. v. Adelson*, 147 F.4th 1103, 1114–16 (9th Cir. 2025). The Court's conclusion to the contrary, the Ninth Circuit held, was "squarely foreclosed by the plain language of the

13

statute." *Id*. at 1114. Thus, because the Sun and the Review-Journal's prior owner had not obtained "the prior written consent of the Attorney General" before entering the 2005 JOA, it was "unlawful and unenforceable" as a matter of law. *Id*. at 1109, 1121–22 (quoting 15 U.S.C. § 1803(b)).

Notably, one of the Sun's arguments in the appeal was that the 2005 JOA did not require approval because all of the material elements in the approved 1989 JOA carried through to the 2005 JOA. *See* 1 OPP 7-17. The Ninth Circuit rejected this argument, explaining that "even assuming *arguendo* that it was the original JOA, and not the 2005 JOA, that '*established*' the 'joint or common production facilities,' it nonetheless remains true that, after the 2005 JOA, those facilities are thereafter '*operated*' 'pursuant' to that amended agreement." *Adelson*, 147 F.4th at 1118.

## X.   The Sun Obtains a New TRO Which the Ninth Circuit Quickly Reverses.

The Sun petitioned for en banc review; its petition was denied. The Sun then filed a petition for a writ of certiorari with the United States Supreme Court, which was also denied. *Las Vegas Sun, Inc. v. Adelson*, No. 25-697, 2026 WL 490865 (U.S. Feb. 23, 2026). On February 23, 2026, two days before the mandate issued, the Sun moved for a TRO and preliminary injunction asking the Court to order the Review-Journal to continue printing and distributing the *Sun* insert notwithstanding the Ninth Circuit's ruling. ECF No. 1061. That same day, the Review-Journal filed a motion to dissolve the existing stipulated injunction in light of the Ninth Circuit's ruling that the 2005 JOA was unlawful to perform or enforce. ECF No. 1055. Several days after filing its TRO motion, the Sun filed a motion seeking leave to amend its complaint. ECF No. 1065. The Court set an expedited briefing schedule for the Sun's motion for leave, but then never ruled on it. ECF No. 1079. The Court held off on dissolving the stipulated injunction for 3 weeks until March 12, when it dissolved the original stipulated injunction and, in the same order, issued a new TRO ordering the Review-Journal to continue printing and distributing the *Sun*. ECF No. 1096.

On March 18, 2026, the Review-Journal filed a petition for a writ of mandamus in the Ninth Circuit. The Ninth Circuit granted the petition on March 30, 2026, directing this Court to vacate its March 12, 2026, injunction. ECF No. 1106 ("Mandamus Op."). In its order, the Ninth Circuit held that "[t]o the extent that the TRO requires continued compliance with the 2005 JOA

14

in full, it squarely violates our explicit holding that 'the 2005 JOA' is prohibited by § 4(b) and is therefore 'unlawful and unenforceable.'" Mandamus Op. at 6. The Ninth Circuit went on to hold that "[to] the extent that the TRO instead requires the parties to act to preserve the "core" of the 2005 JOA, any such modified arrangement would constitute an *amendment* of the parties' post-NPA JOA under our prior opinion." *Id*. Because Section 4(b) of the NPA prohibits both brand-new and amended JOAs made without the prior consent of the Attorney General, the Court held that "[f]or the parties to fashion such a new modified 'core' of the 2005 JOA would therefore squarely violate § 4(b) under our opinion." *Id.* at 6–7.

### XI.     The Sun Amends its Complaint and Seeks a New Preliminary Injunction.

On March 31, 2026, the day after the Ninth Circuit issued its writ of mandate ordering the Court to dissolve its replacement injunction, the Sun filed another motion for a TRO and preliminary injunction. ECF No. 1103. Just like its prior motion, the Sun's new motion sought an order requiring the Review-Journal to continue printing and distributing the *Sun* insert. *Id*. at 6–7, 10. On April 2, 2026, the Court vacated its prior injunction and set a status conference for the next day, April 3, 2026. ECF No. 1109. At the status conference, the Sun stated that it would file yet another motion to amend its complaint, mooting the pending TRO motion. ECF No. 1121 at 80:22–25, 81:17–82:13. The Court set an expedited briefing schedule for the Sun's motion for leave to amend, and set a deadline of April 10, 2026, for the Sun to move for a TRO and preliminary injunction based on the amended complaint. ECF No. 1112.

The Sun's Second Amended Complaint, by its own admission, asserts the same substantive claims that have been in the case all along—namely, antitrust claims based on the Review-Journal's alleged non-performance of certain terms in the 2005 JOA. ECF No. 1118 at 1–2, 11. However, in an attempt to circumvent the Ninth Circuit's rulings, the Sun replaced the phrase "2005 JOA" in its proposed amended complaint with the phrase "joint operation" and referred to the Review-Journal's obligations under the 2005 JOA as a "course of dealing" and/or "voluntary agreements." *See* ECF No. 1122 at 5–10 (collecting examples and citing, e.g., SAC ¶¶ 126, 177). The Sun also revised its complaint to allege that the Review-Journal's successful Ninth Circuit appeal was predatory and anticompetitive because it resulted in the termination of the 2005 JOA.

15

*See* SAC ¶¶ 126, 205, 224. And it added a claim for declaratory relief seeking reversion to the 1989 JOA, *id*. ¶¶ 293-307, and a request that the Court order the Review-Journal to print and distribute the *Sun* insert "until such time as the RJ determines that it is feasible to publish more than one newspaper product and that it is able to fully perform under the 1989 JOA," *id*. ¶ 267. The Court granted the Sun's motion on April 13, 2026. ECF No. 1161. The Sun's Second Amended Complaint was filed as the operative complaint in this action later that day. ECF No. 1162.

On April 10, 2026, the Sun filed the instant motion for a Temporary Restraining Order and Preliminary Injunction, based on the Second Amended Complaint. ECF No. 1128.

<strong>ARGUMENT</strong>

**I.      <u>The Sun Cannot Meet the Stringent Requirements for a Mandatory Injunction.</u>**

**A.  To Obtain a Mandatory Injunction, the Sun Must Show the Law and Facts Clearly Favor It on all Four Preliminary Injunction Factors.**

As the Court and Ninth Circuit have already recognized, ordering the Review-Journal to comply with the 1989 JOA would be a form of mandatory relief. ECF No. 1096 at 4 n.1; Mandamus Op. at 5. Mandatory injunctions are "particularly disfavored" and "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).

A party seeking a mandatory injunction must establish that the "***law and facts clearly favor***" its position on all four preliminary injunction factors. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis added). This means the Sun must (1) demonstrate that the facts and law "clearly favor" its claims; (2) "muster a clear showing of irreparable harm," *see id.* at 740, 746; (3) show that the balance of equities and hardship "clearly or strongly favor" it; and (4) establish that the public interest "clearly favor[s]" or "strongly favor[s] the [Sun] as well." *Cruz v. Noem*, 2025 WL 2995008, at *13 (C.D. Cal. Sept. 23, 2025). Although the Sun insists the Court has "broad authority" to issue injunctions under Section 16 of the Clayton Act, Section 16 is not a shortcut around these requirements. *See Mickelson v. PGA Tour, Inc.*, 2022 WL 3229341, at *7 (N.D. Cal. Aug. 10, 2022) (applying heightened *Garcia* standard in an antitrust case); *Lamb-*

16

*Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (prohibiting overbroad injunctions and noting that any relief "must be tailored to the specific harm alleged").

Unable to meet this standard, the Sun makes several attempts to circumvent it. First, the Sun suggests that the Court can simply re-adopt the findings in its prior injunction order. ECF No. 1152 at 24, 28, 30, 32–37, 41, 43, 44. That order, which explicitly did not reach the Sun's requests for mandatory injunctive relief, was vacated by the Ninth Circuit and thus should not be relied upon. That order was also based on a more lenient "serious questions" standard that does not apply now that the Sun is seeking mandatory relief. *See* ECF No. 1096 at 4–11. Second, the Sun suggests the Court can apply a "sliding scale" standard where a stronger showing of irreparable harm can offset a weaker showing on the merits, ECF No. 1152 at 23, but that is not the law (nor can the Sun make a strong showing of either in any event). *Doe v. Snyder*, 28 F.4th 103, 111 n.4 (9th Cir. 2022) (noting that the "sliding scale" standard does not apply to mandatory injunctions).

Third, the Sun concedes that the injunction it seeks would be mandatory (*see* ECF No. 1152 at 43) yet also argues that an injunction requiring performance of the 1989 JOA would merely preserve the status quo and is thus not mandatory. That is absurd and the Court can disregard that stilted mis-framing. *See, e.g.*, *Hall v. USDA*, 467 F. Supp. 3d 838, 844 (N.D. Cal. 2022) (rejecting plaintiff's attempt to "frame their requested injunctive relief" as prohibitory rather than mandatory), *aff'd* 984 F.3d 825 (9th Cir.); *Dobson v. Crawford*, 2022 WL 22893355, at *1 (C.D. Cal. Oct. 14, 2022) (same); *Centner v. TMG Util. Advisory Servs. Inc.*, 2022 WL 17266856, at *5 (D. Ariz. Nov. 29, 2022) (same). The 1989 JOA is obviously not the status quo since nobody has been operating under it since September 2005. 2 OPP 1006-1016; ECF No. 839, Ex. 53 ¶¶ 30, 34; 2 OPP 1044-1050; 2 OPP 1051-1052; 1 OPP 18-23. Indeed, the Ninth Circuit recognized that starting in 2005 the parties were operating under the 2005 JOA—not the 1989 JOA. *See Adelson*, 147 F.4th at 1108, 1111–12 ("after the 2005 JOA, those [joint] facilities" established under the 1989 JOA ***"are thereafter 'operated' 'pursuant' to" the 2005 JOA***) (emphasis added); *see also* Mandamus Op. at 6 (describing "core" of the status quo as the 2005 JOA).

17

**B. The Sun Cannot Show That It Will Clearly Succeed on the Merits Because There Is No Cognizable Anticompetitive Conduct.**

The Sun argues the Review-Journal engaged in four types of anticompetitive conduct: (1) accounting abuses, (2) failure to maximize joint operation profits, (3) limiting "consumer knowledge of the Sun," and (4) undertaking "efforts to terminate the joint operation." *See* ECF No. 1152 at 12-23. The Sun cannot establish a clear likelihood of success on the merits as to any after the Ninth Circuit's rulings, and each fails when analyzed separately.

The conduct in each category is based on alleged failure to comply with terms of the 2005 JOA, even if the Sun pretends the obligations arise elsewhere. *See id.* at 36, 43 (referring to the "framework" underlying the 2005 JOA). But any such failure cannot qualify as anticompetitive conduct because the Ninth Circuit has now twice held that the 2005 JOA is unlawful and unenforceable as a matter of law. *Adelson*, 147 F.4th at 1121–22; Mandamus Op. at 6. It would also flout the basic rule of law that unlawful contracts may not be a predicate for liability. *See* Mandamus Op. at 6 (citing *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982)).[4]

Nor can the conduct be deemed anticompetitive when measured against the 2005 JOA as a so-called "yardstick" or "economic setting"—meaning that the Review-Journal's alleged failures to comply with the 2005 JOA were anticompetitive even if the 2005 JOA had never existed. *See, e.g.*, Evans Decl. ¶ 17 (2 OPP 1038). The Ninth Circuit has explicitly directed this Court to abide by both "the letter and the spirit of the mandate, taking into account the appellate court's opinion

---

[4] The Sun cites *PharmacyChecker.com LLC v. LegitScript LLC*, 137 F.4th 1031, 1041 (9th Cir. 2025), for the proposition that this Court may find that failing to perform an unlawful agreement can qualify as anticompetitive conduct. *See* ECF No. 1152 at 34. *PharmacyChecker* says no such thing. It merely rejected the *in pari delicto* defense and found antitrust standing for injuries suffered "when competing in a legitimate market, even if some of the property interest "possibly" was "attained by unlawful means." That is not what happened here, where the unlawful and unenforceable 2005 JOA is the entire basis for the parties' arrangement since 2005, and the Sun contends that failure to perform the substance of that unlawful agreement constitutes anticompetitive conduct.

In a footnote, the Sun cites *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992), for the proposition that "antitrust liability is treated as distinct from contract disputes." *See* ECF No. 1152 at 34 n.10. But that principle certainly does not mean that the Sun can derive antitrust liability from alleged non-performance of an unenforceable contract. If anything, it *undermines* the Sun's antitrust claim, which is essentially a contract dispute dressed up in antitrust jargon.

18

and the circumstances it embraces." Mandamus Op. at 3. That means that, as a matter of law, this Court cannot find that the Review-Journal engaged in predatory conduct by failing to follow the "spirit" of the 2005 JOA (or the "framework," "economic setting," "course of dealing," or "practice" under the 2005 JOA) even though the Review-Journal was not required to follow the "letter" of the 2005 JOA (and doing so would have been unlawful).

The Ninth Circuit has similarly rejected the Sun's contention that it can continue to rely on allegations that the Review-Journal failed to comply with the substance of the 2005 JOA because when the Review-Journal acted it "believed that the 2005 JOA" was "valid and enforceable." ECF No. 1152 at 7; *see also id.* at 3, 10, 12, 36. "[I]ntent to foreclose competition" is not "sufficient to establish § 2 liability," because the Sherman Act "regulates anti-competitive conduct, not merely anticompetitive aspirations." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183 (9th Cir. 2016); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013) ("Were intent to harm a competitor alone the marker of antitrust liability, the law would risk retarding consumer welfare by deterring vigorous competition."). So the Review-Journal's alleged failure to perform any substance of the unlawful 2005 JOA—which is not anticompetitive as a matter of law, based on the Ninth Circuit's decisions—*cannot* qualify as anticompetitive conduct regardless of the Review-Journal's subjective beliefs.

No matter how many times the Sun falsely claims otherwise, *see, e.g.*, ECF No. 1152 at 33–35, the Review-Journal was *not* obligated by the 1989 JOA or any other agreement to undertake any of the alleged conduct. And, critically, the alleged conduct itself is not anticompetitive. To the contrary, the Review-Journal would likely have *violated* the antitrust laws if it had been engaging in the conduct the Sun now complains about.

### 1. The Sun will not Clearly Succeed on its "Accounting Abuse" Claims.

First, the Sun claims that the Review-Journal engaged in "accounting abuses" by changing its editorial costs to the joint operation which, in turn, reduced the Sun's profit share. ECF No. 1152 at 12–14. In particular, the Sun claims that the Review-Journal increased its editorial costs

19

"even though the parties' editorial costs were disallowed expenses under the 2005 framework" and the parties' "long-standing course of dealing." *Id.* at 13 (citing accounting decisions made in 2017 and results from 2016-2019). But this cannot qualify as anticompetitive conduct because—as the Sun itself admits—the conduct is clearly predicated on the 2005 JOA. Indeed, the Sun does not cite *any* provision of the 1989 JOA in this section of its brief, but it cites multiple provisions of the 2005 JOA. *See id.* (citing 2SA469-70). Without the 2005 JOA, nothing about the alleged conduct the Sun cites would be noteworthy—and again, the Sun cannot point to noncompliance with the 2005 JOA to substantiate its claims of anticompetitive conduct. For that reason, these actions are not anticompetitive as a matter of law.

Next, the Sun lists examples of alleged instances when the Review-Journal, "under the belief that the 2005 JOA was valid and enforceable," "further manipulated and abused the joint operation accounting under that framework"—meaning the 2005 JOA. ECF No. 1152 at 13-14. But again, the Sun describes the conduct as anticompetitive because it allegedly failed to comply with the 2005 JOA, and every example the Sun cites relates to accounting decisions in relation to aspects of the 2005 JOA. *See id.* (citing expenses relating to "equal mention of the Sun," the Review-Journal's "digital entity," and "books and records" requests).

Moreover, though it does not matter because they are based on the unlawful 2005 JOA, the Sun's allegations are factually false and ignore that the Review-Journal's current owners merely continued the same accounting methods the prior owners used and the Sun acquiesced to for roughly a decade. ECF No. 863-7 at 189:12–20; 863-8 at 282:24–283:10, 307:14–308:15, 321:5–15; ECF No. 863-9 at 15:20–16:20. The Sun's own COO admitted to the Review-Journal's publisher that "most of the issues pre-date your arrival on the scene" and the new owners "inherited this mess." ECF No. 531-5 at SUN_00007665.

The Sun closes with the conclusory statement that the alleged conduct is anticompetitive "even under the terms of the 1989 JOA." ECF No. 1152 at 14. That is false: the 1989 JOA's accounting provisions are completely different from the 2005 JOA's, *see* 1989 JOA App'x A-D, and the Sun offers no explanation whatsoever to explain how accounting after 2015 might have violated a JOA that was terminated a decade earlier. And the supplemental expert reports from Dr.

20

Katz and Gottlieb the Sun cites do not say otherwise. But, those new expert reports do not actually analyze why the conduct was anticompetitive under the 1989 JOA. Dr. Katz simply relies on Gottlieb's report, and repeats that ██████████████████████████████ ███████████████████████████████████████████████ ██████ 7SA1440–41, 1445. In other words, Katz's ███████████████████████ ███████████████████████████████████████████████ ████ That renders his analysis unreliable under Federal Rule of Evidence 702 and requires this Court to exclude it. *See, e.g.*, *Hostetler v. Driscoll*, 2026 WL 608585, at *1 (N.D. Cal. Mar. 4, 2026) (excluding expert opinion that was rested on an unfounded "counterfactual assumption" that was "not supported by the evidence" because the expert "simply assumes a world where" the challenged action "did not happen"); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions.").

At bottom, the Sun is unable to show that the Review-Journal's allegedly improper accounting is an issue separate and apart from the 2005 JOA or required by any other agreement. That conduct therefore cannot be a basis for this Court to find that the Sun is clearly likely to prevail in showing that the Review-Journal engaged in anticompetitive conduct. *See* Mandamus Op. at 3; *CoStar Grp. Inc., v. Comm. Real Estate Exchange Inc*, 619 F. Supp. 3d 983, 992 (C.D. Cal. 2022) (a defendant's failure to provide information it was "under no obligation to provide" is not anticompetitive as a matter of law); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 998 (9th Cir. 2020) (holding that disputes over whether financial terms reflect their fair value are contract or regulatory matters and do not "amount to anticompetitive harm in the antitrust sense"); *Foremost Int'l Tours, Inc. v. Qantas Airways Ltd.*, 478 F. Supp. 589, 600 (D. Haw. 1979) (finding the selection of a cost accounting methodology was "a reasonable business judgment … and no inference of predation can be drawn therefrom"); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 735 (D. Md. 2002) (dismissing claim that a defendant newspaper's cost calculation methodology constituted anticompetitive or predatory pricing because "simply losing money" is not predatory).

**2. The Sun will not Clearly Succeed on its Claim that the Review-Journal "Failed to Maximize Joint Operation Profits."**

Second, the Sun argues the Review-Journal engaged in anticompetitive conduct because it supposedly "exploited" the Sun by "failing to maximize the joint operation's profits." ECF No. 1152 at 14. To support that contention, the Sun goes on at length about the Review-Journal's decisions in 2016 and 2017 to replace one publisher (Jason Taylor) with another (Craig Moon), and to manage the paper's financial performance, asserting the decisions were intended to reduce the profit payments to the Sun. *See* ECF No. 1152 at 14-16.[5]

On its face, the Sun's theory makes no sense. As the Sun itself admits, "[b]oth newspaper owners in a JOA traditionally have strong economic interests in the success of the joint operation and the combined financial results," and those incentives are "increased" in "a declining market." ECF No. 1152 at 14.

The Sun's theory also has no support in the factual record. In April 2016, Greenspun wrote that there was a "breathtaking" revenue and EBITDA decline on Taylor's watch. ECF No. 862-25 at APP_000200. Daily print circulation "declined year after year" during Taylor's last three years at the Chattanooga Times Free Press. 1 OPP 24-29. Frank Vega testified extensively about how ███████████████████████████████████████ 2 OPP 1053-1059; 2 OPP 1060-1065. Patrick Dumont explained ██████████████████████████████ ████████████████████████████ 2 OPP 1125-1129. Since purchasing the Review-Journal, the Adelsons ███████████████████████████ ECF No. 862-21. And the Review-Journal has *never* stopped trying to maximize profits under the 2005 JOA.[6] The Sun's unsupported narrative also ignores that the Review-Journal's ██████████████████ ████████████████████████████████████

---

[5] The Sun further alleges that Taylor was fired because he "discovered" discrepancies in "profit payments pursuant to the 2005 JOA." SAC ¶ 137. These allegations are untrue: The Review-Journal replaced Taylor because his claims of improved financial performance were smoke and mirrors. The Review-Journal needed a publisher who would honestly try to make the newspaper as good as it could be.

[6] And, even under the terms of the unenforceable 2005 JOA, there is no duty on the Review-Journal to maximize profits. There is only a duty to maximize *circulation*. 2005 JOA § 5.1.3. The Sun admits as much. *See* ECF No. 1152 at 8, 14.

██████████████████████████████████████████████████████

██████████████████ ECF No. 864-4 at ¶ 100; *see also id.* ¶ 23 (████████████

█████████████████████████████). Whatever the Sun wants to lead this Court to believe, the reduction in profit payments was due to these industry-wide forces, not predatory conduct.

Setting aside that fatal flaw, the conduct the Sun relies on is not cognizable because the 2005 JOA is the only basis for the annual profits payment at the heart of the Sun's allegations. *See* ECF No. 1152 at 14, 16 (citing provisions of 2005 JOA); 2005 JOA App'x D (explaining the procedure to calculate the Sun's profit payment from the Review-Journal). And the Sun's fig-leaf attempt to suggest that "[e]ven under the 1989 JOA, the Review-Journal has failed to conduct the joint operations in a commercially reasonable manner" falls apart. ECF No. 1152 at 16. The 1989 JOA itself states that the Review-Journal maintains complete control over its staff, including who to hire as a publisher. 1989 JOA § 5.2. And the Sun cites no evidence prior to 2015 to support that contention and instead only cites evidence that is premised on the 2005 JOA. *See* ECF No. 1152 at 16 (citing Gundlach, Aldrich, and Katz supplemental expert reports).

Nor can the Sun show that the Review-Journal's decisions about how to staff and operate its business qualify as anticompetitive conduct independent of the joint arrangement. The Sherman Act "does not restrict the long-recognized right of [a] [company] engaged in an entirely private business, freely to exercise [its] own independent discretion as to parties with whom [it] will deal," *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004), and which employees it hires, *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) (hiring decisions are "predatory" only "when talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor"). Nor does the Sherman Act permit antitrust claims to be predicated on business decisions—like which strategic plan to adopt—even if those decisions have negative consequences for competitors. *Pac. Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814 (9th Cir. 1992) ("The Sherman Act was not designed, and has never been interpreted, to reach all business practices, unfair or otherwise, damaging to individual companies."). Were it otherwise, *every* business decision by one company to improve its results

vis-à-vis competitors would be transformed into an antitrust violation. And, importantly, the Sherman Act makes it *unlawful* for competitors to share profits without an operative JOA. *See Citizen Publishing Co. v. United States*, 394 U.S. 131, 134-35 (1969).

### 3. The Sun will not Clearly Succeed on its Claim that the Review-Journal Reduced "Consumer Knowledge of the Sun."

Third, the Sun argues that the Review-Journal engaged in anticompetitive actions "that reduced consumer knowledge of the Sun and its value." ECF No. 1152 at 17. These purported "promotional abuses" include the Review-Journal's "(1) failure to promote the Sun in equal prominence with the Review-Journal, (2) destroying the Sun Box and diminishing the Sun's presence on the front page of the Newspaper Bundle, and (3) omitting the Sun from the electronic replica edition of the Newspaper Bundle." *Id.*

Although the Sun's arguments mischaracterize the evidence in numerous ways, the overarching problem with this claim is that, again, the supposedly anticompetitive conduct is based solely on failure to perform the substance of the 2005 JOA. The Sun admits as much, as the 2005 JOA itself and expert reports principally, if not entirely, relying on the 2005 JOA are the *only* sources the Sun cites for these obligations. *See id.* at 17-18; *accord* 2005 JOA § 5.1.4 (requiring the Review-Journal to mention the Sun in "equal prominence"), 2005 JOA App'x B (setting forth standards for the Sun's front-page noticeable mention), 2005 JOA § 10.6 (setting forth the "obligation to distribute the *Sun* through electronic replica technology … to the same extent the Review-Journal distributes its own pages"). Without the 2005 JOA, the Review-Journal has no obligation to mention the Sun on the front page at all, let alone in the specific ways the Sun says the Review-Journal should have. Because the 2005 JOA is unlawful and unenforceable, the Review-Journal's alleged failure to satisfy that supposed obligation cannot be considered predatory conduct.

Here too, the Sun asserts in a concluding sentence that the Review-Journal's alleged actions are anticompetitive "under both the 1989 JOA and the 2005 JOA," citing to the Sun's supplemental expert reports. ECF No. 1152 at 18–19. But as with the other categories of purported anticompetitive conduct, these unreliable expert reports cannot overcome the undisputed reality that all of the Sun's allegations are premised on the Review-Journal's supposed failure to take

24

actions that were allegedly required under the 2005 JOA and not mentioned anywhere in the 1989 JOA. As a matter of law, the Sun simply cannot transform alleged failure to perform an unenforceable provision of a contract into an anticompetitive act cognizable under the antitrust laws.

Moreover, independent of any (void) agreement with the Sun, the conduct the Sun cites is not anticompetitive and thus cannot support antitrust liability. The Review-Journal was under no freestanding obligation to promote its competitor or its business. *See Trinko,* 540 U.S. at 411 (noting there "is no duty to aid competitors"); *Qualcomm*, 969 F.3d at 995 (defendant's licensing practices with respect to rival chip makers were not anticompetitive because defendant was not "under any antitrust duty to license rival chip makers"); *Foremost Int'l Tours*, 478 F. Supp. at 598 (holding that "subsequent to the termination of its agreement with plaintiff, [defendant] was of course under no obligation to render preferential treatment to [plaintiff]"). To the contrary: taking actions to boost a competitor's business is the type of anticompetitive behavior that the antitrust laws are designed to foreclose. *Cf. Facebook, Inc. v. BrandTotal Ltd.*, 2021 WL 3885981, at *7 (N.D. Cal. Aug. 31, 2021) (citing *Trink*o for the proposition that "a market participant's right to refuse to deal with competitors generally serves *procompetitive* purposes").

### 4. The Sun Will Not Clearly Succeed on its Claim that the Review-Journal's "Efforts to Terminate the Joint Operation" are Anticompetitive.

The Sun argues that the Review-Journal engaged in anticompetitive conduct by asserting "counterclaims and affirmative defenses in an underlying state court action and here," and "by obtaining a judicial declaration that the 2005 JOA is unenforceable." ECF No. 1152 at 19.[7] These two actions, the Sun asserts, "are … essential to the RJ's overall anticompetitive scheme." *Id.*; *see also id.* at 1 (asserting the Review-Journal's legal "position is just another spoke in its wheel of anticompetitive conduct"). The Sun then goes on to argue that, having obtained a ruling that the 2005 JOA was unenforceable, the Review-Journal engaged in further anticompetitive conduct by

---

[7] The Review-Journal has already filed a summary judgment motion in state court acknowledging that the Ninth Circuit's "binding conclusion that the 2005 JOA is unlawful and unenforceable has necessarily resolved" the contract-based counterclaims. *See* Defs. Mot. To Lift Stay and Mot. for Summary Judgment at 10, *Las Vegas Sun, Inc. v. News+Media Capital Group, LLC, et al.*, No. A-18-772591-B (Nev. D. Ct. Mar. 24, 2026).

refusing to accede to the Sun's argument that the 1989 JOA is now the operative agreement and obligates the Review-Journal to continue printing and distributing the Sun. *Id*. at 22 ("In 2019, when the RJ believed the 2005 JOA was unlawful for lack of Attorney General approval, the RJ was required to perform under the 1989 JOA as the governing agreement. Instead, it initiated years' long litigation to have the courts conclude that the 2005 JOA did not comply with the NPA …"); *see* SAC ¶¶ 209–10.

As a matter of law, none of these actions give rise to antitrust liability. Under the doctrine of *Noerr-Pennington* immunity, courts are presumptively ***prohibited*** from treating litigation activity as anticompetitive conduct. *Relevant Gtp., LLC v. Nourmand*, 116 F.4th 917, 927 (9th Cir. 2024) ("Under the Noerr-Pennington doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct."); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008). Built on the First Amendment rights of petition and association, and a concern about chilling legitimate advocacy with the government, the doctrine is meant to limit the Sherman Act to only punish private restraints on trade, not legitimate acts seeking government action—like seeking redress in litigation. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136-38, 141 (1961) ("No violation of the [Sherman] Act can be predicated upon mere attempts to influence the … enforcement of laws.").

Trying to avoid this well-established rule, the Sun asserts that the Review-Journal's petitioning efforts were "pretextual, sham litigation" and thus not protected under *Noerr-Pennington*. ECF No. 1152 at 12, 36. But the "sham" litigation exception only applies when two very narrow requirements are met. First, the Sun must show that the Review-Journal's litigation positions were "objectively meritless" such that "no reasonable litigant could realistically expect success on the merits." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61, 65 (1993) (finding litigation was not a "sham" when someone in the litigant's "position could have believed that it had some chance of winning" because its claim "was arguably" meritorious). This purposefully high bar reflects the Supreme Court's deliberate choice to err on the side of protecting petitioning activity rather than risk converting antitrust law into a tool for

26

punishing vigorous adversaries. *See id.* Second, *if* (and only if) the court finds the Review-Journal's position is objectively meritless, the court must *then* assess whether the suit is subjectively intended to "interfere directly" with a competitor's business relationships through the "use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Id.* (citing *Columbia v. Omni Outdoor Advertising, Inc.* 499 U.S. 365 (1991)).

The Sun cannot possibly satisfy this standard and hold the Review-Journal liable under the antitrust laws for its successful, good-faith efforts in litigation. Under no circumstance could the Sun show the Review-Journal's efforts to invalidate the 2005 JOA were "objectively meritless" sham litigation, and thus grounds for antitrust liability, because the Review-Journal *prevailed*: the Ninth Circuit *agreed with the Review-Journal* and held that the 2005 JOA *was indeed unlawful*. The Review-Journal's winning legal argument is "by definition … not a sham." *Pro. Real Est.*, 508 U.S. at 62-63.[8] Nor can the Sun show that arguments regarding the 2005 JOA were subjectively intended to interfere with competition. The Sun's claim that the Review-Journal "litigated the enforceability of the 2005 JOA solely to use it as sword to drive the Sun out of the market" is false and backed by no evidence. ECF No. 1152 at 22. It also conflates process (filing an appeal) with outcome (a judicial determination that the 2005 JOA was unenforceable). Yet the Review-Journal's achievement of a legal outcome that harms the Sun is not anticompetitive. *Pro. Real Est.*, 508 U.S. 49, 60-61, 65 (1993). The Sun is flatly prohibited under *Noerr-Pennington* from asserting that the Review-Journal's litigation filings and positions to invalidate the 2005 JOA constitute anticompetitive conduct. This Court must reject this argument. To do otherwise would

---

[8] As further support for its argument, the Sun cites this Court's summary judgment opinion finding "triable issues of fact" on the issue of predatory conduct and this Court's decision to issue an emergency injunction following remand. *See* ECF No. 1152 at 36 (citing ECF No. 970 at 24-25, ECF No. 1096 at 6, 7). Neither helps the Sun. The summary judgment finding was premised on the 2005 JOA being enforceable, so it is now superseded by the Ninth Circuit's rulings. And in any event, the summary judgment findings actually support *the Review-Journal*, as they show that a reasonable jury *could* agree with the Review-Journal's position. And the post-remand injunction was vacated by the Ninth Circuit when it granted the Review-Journal's mandamus petition. So it cannot possibly support an argument that the Review-Journal's litigation position was "objectively baseless"—because, again, the Review-Journal *prevailed* in court.

27

flout the Supreme Court and run roughshod over the Review-Journal's First Amendment right to petition the government that this immunity protects.

The Sun likewise cannot satisfy this standard and hold the Review-Journal liable for its good faith arguments that the 1989 JOA did not spring back and does not compel the Review-Journal to print and distribute the *Sun*. The Review-Journal's position that the 1989 JOA is dead and gone is not "objectively meritless"—indeed, it is strongly supported by law and facts. To the contrary, it is the Sun whose position is baseless. The evidence is clear that the parties terminated and abandoned the 1989 JOA when they replaced it with the unlawful 2005 JOA. Both Mr. Greenspun and Mr. Cauthorn ▉▉▉▉▉▉▉▉▉▉▉. 2 OPP 1044-1050; 2 OPP 1051-1052. The Sun relies on Section 1.1 of the 2005 JOA to argue that the parties have reverted back to the 1989 JOA, but that provision is unenforceable because it was part of the unenforceable 2005 JOA. And even if it were enforceable, it would not apply because it envisions reversion only in the narrow, specific situation where an "action by the United States Department of Justice . . . . hinders, impairs, seeks to halt or otherwise materially impacts" the 2005 JOA. 2005 JOA § 1.1. That did not happen here. The Ninth Circuit—not the DOJ—invalidated the 2005 JOA because it was unlawful. Moreover, the only authority the Sun cites is *Airs International, Inc. v. Perfect Scents Distributors, Inc.*, 902 F. Supp. 1141 (N.D. Cal. 1995), which is off point because it only applies to cases where the new contract is invalidated due to fraud. *See also infra* at I.C (detailing five independent reasons why the 1989 JOA is not in effect).

Critically, the Review-Journal's position regarding the 1989 JOA is not "objectively baseless" even if this Court (incorrectly) sides with the Sun and disagrees with the Review-Journal. As the Supreme Court has made clear, in a case where a litigant lost at summary judgment, litigation is not a sham if the litigant's position "was arguably 'warranted by existing law' or at the very least was based on an objectively 'good faith argument for the extension, modification, or reversal of existing law.'" *Pro. Real Est. Invs., Inc.*, 508 U.S. at 65 (citations omitted). And the Supreme Court likewise warned that even "when the antitrust defendant has lost the underlying litigation, a court must 'resist the understandable temptation to engage in *post hoc* reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without

foundation.'" *Id.* at 61 n.5; *see also Liberty Lake Invs., Inc. v. Magnuson*, 12 F.3d 155, 158 (9th Cir. 1993) (reminding that litigation is not a "sham" even when it is "not ultimately successful or of overwhelming strength").[9]

Finally, the Sun also fails in claiming that the Review-Journal's litigation in this Court and its state-court counterclaims based on the 2005 JOA's quality and cooperation clause were "objectively baseless." *See* ECF No. 1152 at 19-22. The record is replete with evidence that the Sun breached those provisions. *See, e.g.*, ECF No. 863-1 at 13-38 (expert report of media professor Ken Paulson explaining that the low proportion of timely, local, staff-written news and opinion in the *Sun* insert causes it to fall far short of the high standards of quality consistent with United States daily metropolitan newspapers); *see also* ECF No. 861 at 36-37 (cataloguing evidence that the Sun intentionally stuffed its print insert with syndicated and outdated content and filler, and withheld the "most read" stories from the print *Sun* and published them only on the website). Moreover, the fact that the Review-Journal survived summary judgment on this issue—meaning this Court held that as a matter of law a reasonable jury could find for the Review-Journal based on evidence that "the Sun's quality has deteriorated," ECF No. 970 at 44—establishes that its claims were not a sham. *See* ECF No. 970 at 41-44; *Avitech, LLC v. Embrex, Inc.*, 2008 WL 11287093, at *4 (D. Md. Aug. 19, 2008) (crediting "the proposition accepted by the majority of federal courts that an action that survives summary judgment is not objectively baseless as a matter of law"). And, it is not "nonsensical" that the Sun would degrade the quality of its product. ECF No. 1152 at 20. As the Review-Journal's expert explained, ███████████████████

---

[9] Nor can the Sun argue that the Review-Journal's position is "objectively baseless" based on the Court's summary judgment decision—issued more than two years and two Ninth Circuit decisions ago—finding that the 2005 JOA was an "amended" JOA and not a "new" JOA. To start, that decision was issued in a completely different context—deciding whether the 2005 JOA required separate DOJ approval, not whether the 1989 JOA springs back to life twenty years after it was terminated. The Review-Journal is well within its rights to ask this Court to reconsider that position. *See, e.g.*, *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 888–89 (9th Cir. 2001) (a court may reconsider its orders "for cause seen by it to be sufficient"); *Preaseau v. Prudential Ins. Co. of Am.*, 591 F.2d 74, 79–80 (9th Cir. 1979) (describing summary judgment order as "generally interlocutory and 'subject to reconsideration by the court at any time'"). And the Supreme Court has explicitly extended *Noerr-Pennington* immunity to cover arguments advocating for "reversal of existing law." *Pro. Real Est. Invs., Inc.*, 508 U.S. at 65.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████ *See* ECF No. 864-4 at 12–16.

### C. Because There Is No Cognizable Anticompetitive Conduct, the Sun's Incorrect Assertion that the 1989 JOA is in Effect Cannot Justify an Injunction.

The Sun devotes substantial time and effort to arguing that the consequence of the Ninth Circuit holding the 2005 JOA unlawful is that the 1989 JOA sprung back to life automatically and now controls the parties' relationship. Thus, the Sun concludes, even though the 2005 JOA is unenforceable, the Court can issue an injunction ordering the Review-Journal to continue printing and distributing the *Sun* pursuant to the 1989 JOA. ECF No. 1152 at 39–40. This whole premise is faulty. This is an ***antitrust*** case and the Sun is asking the Court to enforce the 1989 JOA as an ***antitrust*** remedy. This means that the Court can only issue such an injunction—which would be highly disfavored mandatory relief—if it finds that the Sun has established that it will clearly succeed in establishing an antitrust violation and also that compelling compliance with the 1989 JOA would remedy that violation. *See* ECF No. 1152 at 23 (Sun stating that relief is available for "loss or damage by a violation of the antitrust laws"). As explained above, the Sun cannot meet this standard. So whether the 1989 JOA has revived as a pure legal matter is beside the point.

That said, the law and facts are clear that the 1989 JOA is dead and gone, has not revived, and is not enforceable under the circumstances present today. There are at least five independent reasons for this.

First, the 2005 JOA was a novation that terminated and replaced the 1989 JOA. The 2005 JOA is a textbook example of a novation. When parties replace one agreement with another—as these parties indisputably did—the new agreement governs, and the old one is extinguished, regardless of what the parties call the new agreement.

Here, the parties both killed the 1989 JOA in explicit terms and totally superseded all its material provisions. Although the 2005 JOA is not enforceable, its terms reflect the parties' intent to permanently end the 1989 JOA. The 2005 JOA provided that the 1989 JOA would terminate on the "Transition Date" of September 30, 2005 (§ 1.2), that the 1989 JOA "shall be null, void and of no effect whatsoever" (§ 10.4), and that the Review-Journal was "unconditionally release[d] and forever discharge[d]" from any obligations under the 1989 JOA (§ 10.13). This is the "plain

30

language" that "expressly and unambiguously extinguish[es]" a prior agreement, effecting novation as a matter of law. *Omni Fin., LLC v. Kal-Mor-USA, LLC*, 138 Nev. 973 (2022).

Even setting aside these express provisions, novation is clear from the substance of the two contracts. The 2005 JOA was a substitute for the 1989 JOA. When "it is clear from the terms" of the subsequent agreement that it was "intended to substitute" for the original agreement, the original agreement is extinguished by novation. *Williams v. Crusader Disc. Corp.*, 75 Nev. 67, 334 P.2d 843 (1959).

The radical changes between the 1989 JOA and the 2005 JOA show that the parties intended novation: afternoon delivery became morning delivery; a standalone newspaper became an insert; the Sun went from a full-sized newspaper to being capped at six to ten pages; separate advertisements became joint advertisements; and the "Agency" profit-sharing formula was replaced with an EBITDA-based formula. Compare 2005 JOA §§ 5.1, 4.2, App'x D with 1989 JOA §§ 5.1, 4.2, App'x D. These agreements are "so entirely inconsistent" that they "could not possibly be operative at the same time." *Olympic Fin. Co. v. Thyret*, 337 F.2d 62, 66 (9th Cir. 1964). In addition, the 2005 JOA was "complete in itself" and addressed "the same subject matter" as the 1989 JOA—further proof that the parties intended it as a substitute. *Harrison W. Corp. v. United States*, 792 F.2d 1391, 1393 (9th Cir. 1986); SAC ¶¶ 55–56 (the 2005 JOA "tracked the 1989 JOA as closely as possible" and "restated identical or substantively identical provisions from the 1989 JOA"). This was not an agreement where some terms were amended but the parties still had to consult the prior agreement for other terms.

Then, the parties acted for two decades as though the 2005 JOA had superseded the 1989 JOA, confirming their intent to novate. *See Nevada Bank of Com. v. Esquire Real Est., Inc.*, 86 Nev. 238, 241 (1970) (consent to a novation may be implied from subsequent conduct of the parties). The parties ceased producing, printing, and distributing the afternoon *Sun*—the central obligation of the 1989 JOA. And they stopped performing the other obligations as well: the Sun never received the editorial expense allocations it was entitled to under the 1989 JOA (§ 6.1, App'x A); the parties stopped sharing profits under the Agency formula (App'x B–D); and there was no longer a budget for Sun-specific promotions (§ 5.1.4). Yet neither party ever claimed that this total

31

desertion of the 1989 JOA was a breach. That is because the parties understood that the 2005 JOA had replaced the 1989 JOA. Their words confirm this. In 2019 arbitration testimony, Bob Cauthorn ███████████████████████████████████████ 2 OPP 1006-1010. In a state court complaint, the Sun alleged that, in 2004, the parties "began renegotiating the 1989 JOA," which resulted in a "new agreement" that "combined the two newspapers into a single media product." ECF No. 839, Ex. 53 ¶¶ 30, 34. Brian Greenspun was even more direct: ██████████████████████ ████ 2 OPP 1044-1050.

The fact that the 2005 JOA is unlawful and unenforceable does not change this analysis. The doctrine of novation reflects the foundational principle that a new agreement between the same parties on the same subject matter signals the parties' intent that the original obligation has been discharged and replaced, not merely supplemented. *See Williams*, 75 Nev. at 70-72; *Thyret*, 337 F.2d at 65-66; *Harrison W. Corp.*, 792 F.2d at 1393. It exists to provide parties with certainty and finality, and to avoid confusion caused by having competing or overlapping obligations on the same subject matter. *See Williams*, 75 Nev. at 70-72. Applying those principles, a replacement contract that is "entered into without fraud" and "merely void on statutory grounds" can still extinguish the agreement it replaced. *Harper v. Charter Commc'ns, LLC*, 2019 WL 3683706, at *7–8 (E.D. Cal. Aug. 6, 2019); *see also George Foreman Assocs., Ltd. v. Foreman*, 389 F. Supp. 1308, 1310 (N.D. Cal. 1974). This case presents those exact circumstances. As the Sun's own Second Amended Complaint concedes, the parties entered the 2005 JOA in good faith, without fraud, and performed exclusively under it for two decades. SAC ¶¶ 14, 81, 101, 124, 126, 137, 157, 161, 163. Courts confronting these circumstances have found it "obvious that the parties never intended" to revert to the original arrangement, and that forcing reversion would be "unjust after the long lapse of time." *Pennsylvania Water & Power Co. v. Consol. Gas, Elec. Light & Power Co.*, 186 F.2d 934, 937 (4th Cir. 1951).

The Sun's cited authority does not help it. In *Airs International, Inc. v. Perfect Scents Distributors, Ltd.*, 902 F. Supp. 1141, 1148–49 (N.D. Cal. 1995), the court held that novation could not occur in an agreement "procured by fraud." But *Airs* does not rebut *Harper*. In fact, the *Harper* court cited and distinguished *Airs*, holding that—so long as there is no fraud—a contract voided

32

by statute can effect a valid novation. 2019 WL 3683706, at *7. Under these authorities, the 2005 JOA, void only by statute, effectively novated the 1989 JOA. The other out-of-circuit case the Sun relies on is not applicable. *See State Coll. Area Sch. Dist v. Royal Bank of Can.*, 2012 WL 12893876 (M.D. Pa. Oct. 5, 2012). There the court found that the invalidity of a "supplement[al]" agreement that was expressly "subject to" an original agreement did not render the original agreement invalid based on state severability law. Here, the 1989 JOA was expressly terminated and replaced wholesale.

Indeed, if the 1989 JOA had been in effect all along, what need would there have been for the Justice Department to separately approve the 2005 JOA in the first place? The Ninth Circuit explained that the "status quo" arrangement between the parties was the 2005 JOA—indeed, the Court says nothing about the 1989 JOA at all. Mandamus Op. at 6. That basic fact cannot be squared with the Sun's incorrect notion that the 1989 JOA nonetheless continues to guide the parties' conduct in the background after all this time.

Second, the parties have long abandoned the 1989 JOA. After the final edition of the afternoon Sun was produced and delivered on the "Transition Date" of September 30, 2005, no one treated the 1989 JOA as a live agreement—least of all the Sun. In fact, Brian Greenspun testified that ███████████████████████████ (2 OPP 1044-1050) and Bob Cauthorn wrote that ████████████████████████████ (2 OPP 1051-1052). The Sun did not merely say ████████████—it acted accordingly. After the Transition Date, the Sun never demanded the editorial expense payments that it received monthly under the 1989 JOA, it never submitted pages to run in an afternoon edition, and it never demanded a budget for its own advertisements. Once, when the Review-Journal requested financial documents from the Sun in 2020, the Sun refused, responding that "[u]nlike the 1989 JOA, the 2005 Amended JOA [does not grant] the Review-Journal a right to audit the Sun," and, therefore, the Review-Journal "[has] no right to inspect the financial records of the Sun." 1 OPP 18-23. These words and actions

33

are "inconsistent with the contract's existence"—proving abandonment as a matter of law. *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 292 (2004).

This Court and the Ninth Circuit have also recognized this abandonment. This Court acknowledged the parties' abandonment of the 1989 JOA when discussing revival, noting that the parties "weren't abiding by the 1989 agreement starting in 2005 when their course of conduct… became different." ECF No. 1121 at 10:8–15. And the Ninth Circuit, without prompting, has twice acknowledged the parties' abandonment of the 1989 JOA. *See Adelson*, 147 F.4th at 1108, 1111–12 ("after the 2005 JOA" was signed, the joint facilities established under the 1989 JOA were "thereafter 'operated' 'pursuant' to" the terms of the 2005 JOA); Mandamus Op. at 6 (the 2005 JOA was the "status quo arrangement"). The Sun accepts this in its own brief. *See* ECF No. 1152 at 11 ("The parties had been operating under the framework of the 2005 JOA for 20 years."). The Sun repudiated the 1989 JOA for two decades, and this Court and the Ninth Circuit observed this plain abandonment. The Sun cannot revive the long-abandoned 1989 JOA now.

Third, the Sun's claim that Section 1.1 "specifically accounted for" a scenario where the 2005 JOA would be found unlawful decades later is baseless. ECF No. 1152 at 22, 39. Section 1.1 has no legal effect, as it is a provision of the unenforceable 2005 JOA. And to the extent Section 1.1 is relevant to show the parties' intent, it plainly does not show that the parties intended reversion after decades of performance under the 2005 JOA. To start, that section only contemplates that the 1989 JOA would be reinstituted "[i]n the event of any action by the United States Department of Justice … which … hinders, impairs, seeks to halt or otherwise materially impacts" this agreement. *See* 2005 JOA § 1.1. But it was the Ninth Circuit that invalidated the 2005 JOA, not the Department of Justice. Although the Sun misleadingly contends that Section 1.1 provides for reversion in "all circumstances where the 2005 JOA was otherwise ineffective" (ECF No. 1152 at 2), that is not what it says or what it means.

Further, Section 1.1 is part of an Article entitled "Regulatory Filing and Timing" where the parties agreed to "file" the 2005 JOA with DOJ, use "best efforts" to effectuate "the intent" of the agreement, and to create a three-month bridge while the parties waited to see how DOJ would react. *See* § 1.2 (keeping the 1989 JOA alive until September 30, 2005). This was an explicit

34

change from § 1.1 of the 1989 JOA, where the parties to that JOA agreed to use "best efforts" to obtain "written consent as expeditiously as possible" from DOJ. 1989 JOA § 1.1. These parties said nothing in the 2005 JOA or elsewhere to suggest they intended § 1.1 to be a powerful springing option to revive the 1989 JOA from the ashes decades after it was terminated, and the Sun cannot credibly advance that self-serving reading now. *See Century Sur. Co. v. Casino W., Inc.*, 677 F.3d 903, 908 (9th Cir. 2012) (contract "should not be construed so as to lead to an absurd result"). Furthermore—even though, again, the 2005 JOA is not controlling—the Sun's reading cannot be squared with the other 2005 JOA provisions that reinforce that no one intended the 1989 JOA to be resuscitated decades after its death. *See* § 1.2 (terminating 1989 JOA on Sept. 30, 2005), § 10.4 (declaring all agreements prior to the 2005 JOA "null, void and of no effect whatsoever"), § 10.13 (providing the Sun's "unconditional[] release[] and forever discharge[]" of all obligations under the 1989 JOA). Read alongside § 1.1, these provisions show the parties clearly intended to permanently terminate the 1989 JOA—not for it to lay dormant in case the DOJ's action was found to be adverse decades later.

Section 1.1 confirms that the 1989 JOA does not spring back to life as a matter of law just because the 2005 JOA was declared unlawful. In the 2005 JOA, the parties expressly terminated the 1989 JOA and agreed on the specific and narrow circumstances under which the 1989 JOA would be revived. Those circumstances never came to pass, and the Sun cannot now argue that the 1989 JOA somehow revives as a matter of law notwithstanding that fact.

Fourth, the 1989 JOA cannot be resuscitated because performance is impossible or impracticable. *Nebaco, Inc. v. Riverview Realty Co.*, 87 Nev. 55, 57 (1971); Restatement § 263 (performance excused when a "specific thing" necessary for performance ceases to exist). Here, performance is impossible because performing under the 1989 JOA requires an afternoon print *Sun* newspaper to exist—but it does not. There is no afternoon *Sun* newspaper and no contracts with any subscribers who are paying for afternoon delivery of a newspaper, and there have not been for twenty years. And, even if it was theoretically possible, performance would be impracticable. *See* Restatement (Second) of Contracts § 261 cmt. d (1981) (performance is

impracticable when it would impose "extreme and unreasonable difficulty, expense, injury, or loss").

Afternoon print newspapers have become obsolete in the two decades since the 1989 JOA was abandoned. ████████████████████████████████████████ (Nolte Decl. ¶¶ 8, 53–54 (2 OPP 1079-1116)) ████████████████████ ████████████ (*id*. ¶ 48). ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ *See id*. ¶ 9, 70–72. The 1989 JOA required the Review-Journal to distribute the *Sun* only "to the extent economically feasible," 1989 JOA § 5.1.8, and permitted it to cease distribution entirely after two consecutive unprofitable years, id. § 9.1.4; *see* ECF No. 1035 at 2SA436 (noting ████████████████████████████████████████; ECF No. 1 ¶ 20 (the "Sun's circulation dropped precipitously" because of its "less desirable afternoon position"). If the economics were tenuous then, they are hopeless now. And revival of the 1989 JOA was unforeseeable, despite the Sun's argument to the contrary. ECF No. 1152 at 39–40. This argument is irreconcilable with the Sun's representation that the Ninth Circuit's invalidation was an unforeseeable "dramatic, intervening change in the law" that excused its failure to plead reversion, which the Court credited. ECF No. 1115 at 10; ECF No. 1161 at 3–4.

Fifth, requiring the current Review-Journal entity to comply with the 1989 JOA would be particularly inequitable because it was neither a party to that agreement nor a successor-in-interest. DB Nevada Holdings, Inc.—the holding company the Review-Journal's current owners purchased—was assigned only the 2005 JOA, not the 1989 JOA. ECF No. 1074 at Exs. A, B, G. The Sun has presented no evidence otherwise. *See* ECF No. 1152 at 40 n.15.[10] Its evidence only

---

[10] The Sun contends that the Review-Journal "relied on the 1989 JOA as its primary defense" in a prior arbitration. ECF No. 1152 at 7 n.5; ECF No. 1152 at 40 n. 15. The material the Sun cites does not support that claim. See 6SA1287 ¶¶ 12-13 (referring to historical facts of the 1989 JOA and 2005 JOA); 6SA1289 n.7 (referring to 1989 JOA preliminary statement); 6SA1297-99 (testimony referring to 1989 JOA in response to question asking about whether a certain Review-Journal accounting practice "predated the 2005" JOA); 3SA691-702 (arbitration decision about expenses under 2005 JOA).

36

shows that the Review-Journal believed it was bound to the unenforceable 2005 JOA, and once argued that a provision in the 2005 JOA should be interpreted similarly to one in the 1989 JOA. *See id.*; *see also News+Media Cap. Grp. LLC v. Las Vegas Sun, Inc.*, 137 Nev. 447, 454, 495 P.3d 108, 116 (2021). That is not sufficient. Under Nevada law, a business purchaser is only bound to contracts it agrees to assume—not every contract that bound a prior owner. *Eaton v. J.H. Inc.*, 94 Nev. 446, 449 (1978). The Review-Journal agreed to assume the 2005 JOA specifically and never agreed to assume the 1989 JOA.

For all of these reasons, the 1989 JOA is a dead letter. But if this Court concludes that the 1989 JOA is in effect and that a preliminary injunction is warranted, that injunction must be tailored to address the *antitrust violation*—not simply to enforce the terms of the 1989 JOA. *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (requiring a "sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself"). Indeed, the Sun has not brought a claim for breach of contract, and an injunction flatly compelling performance of the 1989 JOA to remedy an antitrust violation would thus exceed the equitable authority of the court. *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992) (antitrust liability is treated as distinct from contract disputes).

**D.  The Sun Cannot Clearly Show that the Review-Journal and Sun Are Competitors.**

The Sun cannot show that it is clearly likely to succeed on its Sherman Act claims for another independent reason: the Review-Journal and the Sun are not competitors, and any alleged competition between them is not the type of competition that the Sherman Act protects.

The Sherman Act only protects competition in business and commercial transactions. *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 494 (1940); *Dedication & Everlasting Love to Animals (DELTA) v. Humane Soc. of U.S., Inc.*, 50 F.3d 710, 712 (9th Cir. 1995). Other forms of what we think of as competition—like competing for awards, or competing in sports, or competition between political ideologies—are not covered by the Sherman Act. *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1121-22 (E.D. Cal. 2002) (sports contests are not competition under the

37

Sherman Act); *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 983 (D.C. Cir. 2017) (political competition is not competition under the Sherman Act).

Here, the Sun and its experts concede that the Review-Journal and Sun do not compete to sell newspapers. *See* ECF No. 845 at SUF ¶¶ 31–61 (collecting admissions). Instead, the Sun contends that the Review-Journal and Sun engage in "editorial and reportorial competition." ECF No. 871 at 12, 25. According to the Sun, this form of competition occurs *after* a reader buys the joint *Review-Journal/Sun* newspaper, when she decides which sections or articles to read. ECF No. 871 at 10–12, 25, 30. In six plus years of litigation, the Sun has never cited a single case holding that post-purchase competition for "readers' attention" between articles or sections within a publication is cognizable competition protected by antitrust law. And of course it isn't. A person deciding which articles to read in a newspaper *she has already purchased* is not engaging in commercial activity in a market for newspapers. Her market activity ended when she bought the paper. Her subsequent personal thoughts about what articles within the paper to read are not business transactions. A reader's mind is not an economic marketplace in which trade can be unlawfully restrained. *See Johnson*, 869 F.3d at 983 (antitrust laws do not regulate "the marketplace of ideas").

Citing *United States v. Daily Gazette Co.*, 567 F. Supp. 2d 859 (S.D. W. Va. 2008), the Sun argues that post-purchase competition for "readers' attention" is cognizable commercial competition because the parties have "economic incentives" to attract readers to their sections of the joint newspaper. For example, the Sun suggests, an increase in post-purchase *Sun* readership could increase its value in the eyes of potential acquisitors; enhance its bargaining position in JOA negotiations; increase traffic to its digital operations; or promote its owners' other financial interests. ECF No. 871 at 34. This argument fails for numerous reasons.

First, merely because a party has an economic incentive to compete does not make the competition cognizable commercial competition under antitrust law. *See, e.g.*, *DELTA*, 50 F.3d at 712 (competition for charitable donations is not commercial competition); *Sheppard v. Lee*, 929 F.2d 496, 499–500 (9th Cir. 1991) (competing for elected office is not commercial competition even though the winner receives a salary for performing his duties once in office); *Toscano*, 201

38

F. Supp. 2d at 1121 (professional golfers are not in economic competition just because they compete for cash prizes). To the extent *Daily Gazette* holds otherwise, it is out of step with Ninth Circuit law. *DELTA*, 50 F.3d at 712; *Sheppard*, 929 F.2d at 499–500.

Second, all of the "economic incentives" the Sun cites involve potential harms not in the alleged market for newspaper "readership" but in other, different markets—*i.e.*, the market for acquiring newspaper companies, the market for JOA partners, or the market for digital products. Because these are not the markets in which trade has allegedly been restrained, the Sun cannot establish an antitrust violation based on alleged harms in these other markets. *Qualcomm*, 969 F.3d at 992 ("Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."). To the extent *Daily Gazette* holds that a JOA newspaper can state a claim under antitrust law on the theory that a restraint in the market for editorial competition can have adverse economic effects in other markets, it is out of step with Ninth Circuit law for this reason as well. *See id.*

Third, to the extent the Sun argues that the Court should disregard controlling Ninth Circuit law in favor of *Daily Gazette* because the Ninth Circuit cases do not specifically address newspaper JOAs under the NPA, the Court should reject that argument. Even if, theoretically, the law on what constitutes cognizable economic competition were different in NPA cases, this is not an NPA case. During the time period the Review-Journal was supposedly engaging in anticompetitive conduct against the Sun, the parties were operating under the unapproved, illegal 2005 JOA. Because there was no lawful JOA in effect between 2015 and 2026, any special rules that might apply to JOAs that are approved and lawful under the NPA do not apply here.

Fourth, in addition to conflicting with controlling Ninth Circuit authority, *Daily Gazette* is distinguishable because the two newspapers in that case were separately sold and had separate advertisers. In that case, the court held that the competition between two JOA newspapers *for sales* could be commercial competition even though subscription revenues went into a common fund. 567 F. Supp. 2d at 866, 870. This was because even though revenues were shared, each newspaper still had economic incentives to sell more newspapers because a larger subscriber base would

increase the newspaper's value as an acquisition target or JOA partner. *Id*. at 870.[11] The facts here are different because the *Sun* was not a separately-sold newspaper with its own subscriber base; it was an insert in the *Review-Journal*.

Finally, there is no evidence in the record that the *Review-Journal* and *Sun* insert even compete for readers' attention post-purchase. In the antitrust context, to say that two products "compete" means that they are *economic substitutes* for each other, *i.e.*, one product can take sales away from another product. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–21 (9th Cir. 2018) (substitutes are "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business"). Substitutes "can replace one another and thus 'compete' for the user's purchase." HERBERT HOVENKAMP AND PHILLIP E. AREEDA, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 565a (4th and 5th Eds. 2018–2022); *see also* ECF No. 846, Ex. F ¶ 27. Here, the *Sun* insert and print *Review-Journal* cannot be economic substitutes because they do not compete for sales. The buyer makes one purchase and gets them both. Presumably, by arguing that the *Sun* insert and print *Review-Journal* newspaper compete for readers' attention, the Sun means that once a person buys the joint *Review-Journal/Sun* newspaper, each paper can take readers away from the other paper by having the best content in the bundle. *Cf. Hicks*, 897 F.3d at 1120–21. But the Sun's industry expert, Dr. Picard, testified that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. ECF No. 846, Ex. H at 83:15–19, *see also* ECF No. 845 at SUF ¶¶ 62–79. This makes sense: nothing prevents a person who has purchased the *Review-Journal/Sun* newspaper from reading all of the articles that interest her regardless of which section they appear in. *See also* ECF No. 846, Ex. H at 54:11–56:5 (Dr. Picard testifying that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[11] *Hawaii ex rel. Anzai v. Gannet Pacific Corp.*, 99 F. Supp. 2d 1241 (D. Haw. 1999), which the Sun also cites, is distinguishable for the same reason: it involved two newspapers that were separately sold and thus competed with each other for sales and advertisers. *Id*. at 1249. The last case the Sun cites, *Committee for an Independent P-I v. Hearst Corp.*, 704 F.2d 467 (9th Cir. 1983), is not an antitrust case and the footnote the Sun cites has nothing to do with whether "editorial competition" between two JOA newspapers is cognizable commercial competition under the Sherman Act. *See id*. at 477 n.8



And both Dr. Picard and Dr. Katz testified that ▮▮▮▮▮▮

*Id*., Ex. F at 82:5–7 (Katz testified that ▮▮▮▮▮

▮▮▮▮▮▮ *id*., Ex. J at 59:16–18 (Picard likewise testified that ▮▮▮▮▮

### E. The Sun Cannot Clearly Show That Its Relevant Market Is Viable Or That It Even Competes In Its Claimed Relevant Market.

The Sun cannot clearly demonstrate a likelihood of success on its market definition—sales or readership of only local, daily, print newspapers in Clark County. A relevant product market must "encompass the product at issue as well as all economic substitutes for the product." *Hicks* 897 F.3d at 1120. "Including economic substitutes ensures that the relevant product market encompasses 'the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'" *Id.* at 1120-21. In reviewing a market definition, courts must apply "judicial experience and common sense" in assessing whether the product market plead accounts for obvious substitutes. *Id.* at 1121; *see* ECF No. 1152 at 34 (conceding that market definition "is determined only after a factual inquiry into the 'commercial realities faced' by consumers").

The Sun's market definition requires the Court to accept that Las Vegas residents seeking daily news in 2026 can choose only between the *Review-Journal* and the *Sun* insert (even assuming anyone could choose between them, when they were sold as one joint product)—and that no online news source or any other of the vast array of other media choices, journalistic and otherwise, is a substitute. These premises are far from "clearly demonstrated." In fact, they defy judicial experience, common sense, and the overwhelming evidence in this case:

- Between 2011 and 2021 the amount of time people spent reading newspapers



ECF No. 1074, Exs. E, F at ¶ 154. Over the same period, ▮▮▮▮▮▮

*Id.* ¶

162 (citing Pew Research Center data). This is true in Las Vegas as well, where



ECF No. 864-4 at ¶ 74.

- ECF No. 1074, Exs. E, F ¶ 163 (

- . *Id.* ¶ 115.

- Second Nolte Decl. ¶ 41 (2 OPP 1093). ECF No. 864-4 at ¶ 23.

Against the undeniable reality that print newspapers are locked in fierce competition with online sources, the Sun cites court decisions from 1995 to 2008 to support its print-only market definition. ECF No. 1152 at 25. But the market definition inquiry is grounded in *present* competitive realities, not historical ones. *See Hicks*, 897 F.3d at 1120. So the Sun's cases from before the era of ubiquitous smartphones and online news cannot clearly establish a print-only market definition in 2026, when the evidence overwhelmingly shows that consumers have substituted online sources for print newspapers. The Sun also cites analysis by its expert, Dr. Katz. *See* ECF No. 1152 at 24-29. But the Review-Journal's experts describe Katz's work, and

ECF No. 1074, Exs. E, F ¶¶ 73–96, 176–191; Evans Decl. (2 OPP 1035-1043); *see also* ECF No.

864-4 ¶¶ 66–92; ECF No. 864-5 ¶¶ 68–123. Under the heightened standard for the mandatory injunction the Sun seeks, the Sun cannot "establish that the laws and facts *clearly favor* [its] position." *Garcia*, 786 F.3d at 740.[12]

Moreover, the Sun cannot show that it competes in the relevant market that it asserts. Insofar as the Sun's alleged relevant market is the sale of local daily newspapers in Clark County, the Sun obviously does not compete in that market because it does not actually sell any newspapers. And insofar as the Sun purports to advance a relevant market for "readers' attention" after a newspaper is sold—i.e., where a reader decides which articles within the newspaper to read—the Sun and its experts have made no attempt to satisfy the requirement to analyze the competition in such a market or how it has been harmed. *See Qualcomm*, 969 F.3d at 992 ("in assessing alleged antitrust injuries, courts must focus on anticompetitive effects in the market where competition is [allegedly] being restrained"); *Las Vegas Skydiving Adventures LLC v. Groupon, Inc.*, 2019 WL 5454488, at *2 (for purposes of a Sherman Act claim, "[i]t is not enough that two firms compete; rather they must compete in the market in which trade was restrained").

**F. The Sun Cannot Clearly Show Irreparable Harm.**

In addition to needing to show that it will clearly prevail on the merits, which it cannot do, the Sun must also make a "clear showing" that, absent injunctive relief, it will suffer irreparable harm that is both likely and imminent. *Winter*, 555 U.S. at 22; *Garcia*, 786 F.3d at 746. It cannot make this showing either. The Sun has a functioning online news operation, a declining print presence, and no evidence that the loss of its insert in the Review-Journal's print bundle will cause

---

[12] Nor is the Sun clearly likely to show the Review-Journal exercises monopoly power. The Sun claims the Review-Journal has monopoly power because it controls prices and output under the unenforceable 2005 JOA. *See* ECF No. 1152 at 27–30. But the Sun ignores that the antitrust laws are designed to "prevent[] the accumulation of monopoly *profits*," and that "when a producer … eschews monopoly profits," then "the goals of competition are served." *United States v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990); *see also Trinko*, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. … [T]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."). Here, the undisputed evidence is that since 2005 the Review-Journal has not earned monopoly profits; like other print newspapers, its profits have dropped dramatically and it has suffered major losses. *See* ECF No. 1074, Exs. E, F ¶¶ 196-205.

the kind of immediate, concrete, and unrecoverable harm that warrants emergency injunctive relief—let alone the extreme and unprecedented mandatory injunctive relief the Sun asks this Court to order.

Preliminarily, the Sun's contention that monetary damages will not suffice is disingenuous since Brian Greenspun made clear he would have been perfectly happy to shutter the *Sun* if the Review-Journal had only paid him enough. *See supra* pp. 8–9. In any event, contrary to the Sun's histrionics, Brian Greenspun's "editorial voice" has not been silenced just because the *Sun* insert no longer appears inside the *Review-Journal*. Greenspun controls numerous print and online publications that deliver his "editorial voice" to much larger audiences than the print *Sun* did. For example, the Sun has a fully functional digital news operation at lasvegassun.com, where it publishes content without any involvement from the Review-Journal. Greenspun has long bragged that the online Sun has ***more and better news coverage*** than the print *Sun*. *See, e.g.,* 2 OPP 1122-1124 ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████ FAQ, LAS VEGAS SUN, https://lasvegassun.com/faq/#lvrj (last visited Sept. 11, 2022) (boasting that the online Sun has "original content as well as a great deal of content that does not appear in the print edition."); ECF No. 859-6 (Sun advertisement directing readers to go online "TO FIND EVERYTHING WE'VE GOT").[13] Nor has the Sun presented evidence refuting the reality that its print readers would shift to the online platform or another online source—as the *Review-Journal* and other print papers have experienced. It is the year 2026, and we are already decades into the internet age. Greenspun does not need a print newspaper to share his "editorial voice" with the public.[14]

With that said, Greenspun also has other print publications to carry his voice to the tiny minority of individuals who cannot or will not access the internet. Greenspun's publishing

---

[13] In addition to more original local news stories and comprehensive news coverage, the online Sun also carries Greenspun's column, titled "Where I Stand."

[14] The Sun argues that the Court should ignore the Sun's website because it is not a local daily print newspaper, but that is irrelevant to the question of whether it is a vehicle for the Sun's editorial voice.

company puts out multiple Las Vegas focused print publications (including a weekly newspaper) which he has admitted have "*a bigger audience*" than the print *Sun*. 2 OPP 1026; *see also id.* at 2 OPP 1021 (Cauthorn texted Greenspun: ███████████████ ). In fact, Greenspun has admitted that he would still have a voice even without the print *Sun*:

> Greenspun: And I said, 'We could compete with our voice in the weeklies.' What I was trying to say then is *I would have a place for my voice in the weeklies*. I've been doing this for 50/60 years or more. I needed a place and an outlet for me. And if I didn't have a sufficient outlet in—in a revised or amended JOA, I wanted to have it in whatever I had left, which would have been my weekly newspapers."

2 OPP 1044-1050 (emphasis added).

Moreover, the Sun has failed to explore reasonable alternatives that would allow it to stay in print. *See Cypress Semiconductor Corp. v. Fujitsu Semiconductor Ltd.*, 2020 WL 906710, at *2 (N.D. Cal. Feb. 25, 2020) (finding no irreparable harm "where the aggrieved party has alternative options" even if the party "may find fault with his alternatives"). Despite claiming for years now that the sky will fall if the 2005 JOA is terminated, the Sun has not offered any evidence that it has taken steps to develop an independent print distribution strategy or otherwise position itself to operate without the benefit of the 2005 JOA. The availability of alternatives—including the Sun's existing and fully operational digital platform and its print and digital sister publications— confirms that any harm from the cessation of the print insert is not immediate or irreparable. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm" and "must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief").

As explained in the prior preliminary-injunction briefing and at the April 3, 2026 status conference, if the Sun wishes to continue being available in print, the Review-Journal's printing presses are available for the Sun to rent at the market rate. Blaser Decl. ¶ 23 (2 OPP 1074); Owen

45

Decl., ¶¶ 2-8 (1 OPP 32-33).[15] The Review-Journal's presses currently print several other newspapers on a commercial basis in addition to the Review-Journal, including *USA Today* and the *New York Times*, as well as regional publications. Owen Decl. ¶ 4 (1 OPP 32-33). The Review-Journal's presses have availability and can accommodate printing the *Las Vegas Sun* on a schedule similar to the one the Sun followed when its newspaper was an insert in the Review-Journal. *Id*., ¶ 5. The total cost would vary depending on variables such as the total number of pages, the number of sections, the quantity of color pages, the total number of issues to be printed, and other factors such as paper stock, trim size, and production scheduling. *Id*. at 6. Generally speaking, pricing for the *Sun*, if it were printed with the same specifications as the standard weekday edition of the *Review-Journal*, would run from $1,846 per day for 1,000 issues up to $2,521 per day for 5,000 issues. *Id*., ¶ 7. If the *Sun* were printed with the same specification as the most recently published weekday edition of the *Sun* insert, it would run from $611 per day for 1,000 issues to $789 per day for 5,000 issues. *Id*. at ¶ 8.

### G.  The Balance of Equities and Public Interest Weigh Against an Injunction.

The balance of equities tips sharply against the Sun. The Sun's requested injunction illegally modifies the 1989 JOA to impose new and different obligations on the Review-Journal, violating the Newspaper Preservation Act and the Ninth Circuit's mandate. The Sun insists that the Ninth Circuit's mandamus order does not alter the balance of equities (*see* ECF No. 1152 at 43), but the mandamus order changes everything. The Ninth Circuit has now confirmed that "any such modified arrangement" between the parties—like the Section 8.2 relief the Sun seeks here—violates both the NPA and the mandate. Mandamus Op. at 6–7. The Court's prior equities analysis, which predated the mandamus order, must be reassessed in light of the Ninth Circuit's holding that the very relief the Sun requests is unlawful. It is not "equitable or in the public's interest [for a

---

[15] In its brief, the Sun acknowledges that the Review-Journal's printing press is available and gripes that it lacks information about the cost and logistics to use it. See ECF No. 1152 at 41. Yet it is undisputed that the Sun has never explored that option. *See* 1 OPP 3-6.

party] to violate the requirements of federal law." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

Moreover, regardless of how the Court frames the injunction, the injunction would violate the Review-Journal's First Amendment rights by forcing the Review-Journal to disseminate content it does not want to disseminate. It would even go so far as to change the name of the *Review-Journal*, requiring its front page to read "The Las Vegas Review-Journal and Sun" every day. ECF No. 1103 at 6–7; 1989 JOA § 4.4. The Sun (again) attempts to invoke this Court's equitable power in a manner that would limit the Review-Journal's right to "exercise [] editorial control and judgment" over the material it publishes. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (striking down statute compelling speech). And "[t]he public interest in protecting First Amendment rights cannot be overemphasized." *Dickinson v. Trump*, 2026 WL 279917, at *9 (D. Or. Feb. 3, 2026); *Overstreet v. United Bhd. of Carpenters & Joiners of Am., Loc. Union No. 1506*, 409 F.3d 1199, 1208 n.13 (9th Cir. 2005) (a party must make an "especially strong showing" to obtain a preliminary injunction where there is "at least some risk that constitutionally protected speech will be enjoined"). *See also* ECF No. 1070 at 22–24. And, despite the Sun's suggestions otherwise, it cannot possibly make the "clear and compelling" showing required to establish that the Review-Journal waived its First Amendment rights under the 1989 JOA. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); ECF No. 1152 at 44 n. 17. The Review-Journal's current owners were never parties to the 1989 JOA, which was novated, abandoned, and is impossible to perform. *See supra*. Courts must "indulge every reasonable presumption against waiver"—and here, every presumption cuts against it. *Johnson*, 304 U.S. at 464. The balance of equities favors the Review-Journal decisively.

The public interest likewise weighs against the Sun's requested relief. The public interest is not served by an injunction unconstitutionally compelling the Review-Journal to carry speech. *Miami Herald*, 418 U.S. 261 (White, J, concurring). Contrary to the Sun's arguments, there is no public interest in government-mandated viewpoint diversity. *Id*. at 260 (White, J., concurring) (when the First Amendment is properly applied, "society must take the risk that occasionally debate on vital matters will not be comprehensive and that all viewpoints may not be expressed");

*see also* ECF No. 1088 at 8–12; ECF No. 1070 at 24–25. Moreover, forcing Las Vegas's one successful daily print newspaper to divert scarce financial resources from supporting quality journalism to propping up a six-page insert filled with syndicated filler that few people would bother subscribing to if it were a separate product does not serve the public interest.

## II.  The Court Cannot Issue the Injunctive Relief the Sun Seeks.

As explained above, no injunction can issue because the Sun cannot establish that it is clearly likely to succeed on the merits, nor can it establish that any of the other factors clearly support a preliminary injunction. But even beyond these fatal defects, the relief the Sun seeks is improper, violates the Ninth Circuit mandate, and is wholly unworkable as a practical matter given the substantial court supervision that would be required.

Moreover, in evaluating proposed injunctive relief, this Court must ensure that any injunctive relief is related to the antitrust injury the Sun has shown it will suffer. *See Lamb-Weston*, 941 F.2d at 974 (noting that injunctive relief "must be tailored to the specific harm alleged"); *Pac. Radiation*, 810 F.3d at 638 (plaintiff "cannot seek interim equitable relief of a nature it is not seeking in the final adjudication of its lawsuit."); *see also Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action."). As the Sun recognizes, it cannot simply show that it has suffered harm—it must show that its harm flows from a cognizable violation of the antitrust laws. *See* ECF No. 1152 at 23.

In addition, any "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U. S. 682, 702 (1979). As the Supreme Court recently explained, the fact that a court "can award" injunctive relief "is not to say that it should do so," or that it should issue relief that is "the maximum a court can provide." *Trump v. CASA, Inc.*, 606 U.S. 831, 853–54 (2025). Instead, the Court should "mold each decree to the necessities of the particular case" and recognize that "the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff 's story needs to be." *Id.* As the Sun

48

acknowledges, this requirement applies in full to Section 16 of the Sherman Act, which explicitly limits its reach to "injunctive relief … granted by courts of equity." ECF No. 1152 at 23.

### A.  The Sun's Proposed Injunction Violates the Mandate.

The preliminary injunction the Sun seeks is an order compelling the Review-Journal to print and distribute the *Sun* insert. ECF No. 1152 at ii. This Court cannot order the Review-Journal to print and distribute the *Sun* insert without violating the Ninth Circuit's mandate a second time. The mandate is unequivocal. The Ninth Circuit has made clear that this Court is not just prohibited from ordering compliance with the illegal 2005 JOA—it is also prohibited from fashioning a modified arrangement between the parties that requires the Review-Journal to print and distribute the *Sun*. Mandamus Op. at 6–7. As the Ninth Circuit explained, "***any such modified arrangement would constitute an amendment of the parties' post-NPA JOA***" and thus violate Section 4(b) of the NPA, which prohibits "both brand-new post-NPA JOAs and amended post-NPA JOAs" entered without the Attorney General's consent. *Id*. at 4, 6–7 (emphasis added). At the April 3, 2026 status conference, the Court acknowledged that the mandate prohibited it from modifying a JOA. ECF No. 1121 at 30–31.

The Sun claims it is seeking enforcement of the 1989 JOA, not the 2005 JOA. But in reality it is asking the Court to do precisely what the Ninth Circuit prohibited: fashion a modified arrangement requiring the Review-Journal to print and distribute the *Sun* insert. The 1989 JOA does not contemplate a *Sun* insert being published inside the morning *Review-Journal* newspaper every day. The 1989 JOA requires the Sun to produce, and the Review-Journal to print and distribute, a ***standalone daily afternoon print Sun newspaper*** to a separate set of *Sun* subscribers—among many other obligations. *See generally*, 1989 JOA, §§ 5.1, 5.1.1–5.1.8, 6.1–6.4, App'x A–D. The Sun conspicuously does not ask the Court to enforce both parties' obligations under the 1989 JOA. Nor does the Sun say that it wants to or is able to produce a standalone afternoon newspaper—likely because it knows that arrangement, which led to the Sun's financial failure in the early 2000s, would be an even bigger economic disaster for the Sun in 2026.[16]

---

[16] The Sun's own allegations confirm that its "circulation dropped precipitously" because of its "less desirable afternoon position" ECF No. 1 ¶ 20.

Instead, the Sun proposes that the Court order the Review-Journal to print the *Sun* insert supposedly pursuant to the force majeure clause in Section 8.2 of the 1989 JOA. This is nonsensical. Section 8.2 does not create an affirmative right in the Sun to have a daily insert published inside the *Review-Journal* instead of producing an afternoon newspaper. Section 8.2 is an exculpatory provision excusing the parties' performance if they are unable to perform due to circumstances out of their control such as war, natural catastrophes, labor disputes, and the like. *See* 1989 JOA § 8.2. It also provides that the Review-Journal shall make its best efforts to publish a joint newspaper under such circumstances, although the format of the joint paper is ***entirely up to the Review-Journal*** provided the Sun gets at least two pages. 1989 JOA § 8.2 (in a joint newspaper under Section 8.2, "the Sun portion shall be determined by the Review-Journal, notwithstanding the provisions of Appendix A hereto, provided, that the Sun portion shall not be less than two (2) pages").

No force majeure event has prevented the parties from performing under the 1989 JOA. The Sun has not sued for breach of the 1989 JOA (nor could it since it has not performed that agreement since 2005 either), and the Review-Journal did not invoke the force majeure provision as a defense. The reason nobody is performing under the 1989 JOA is not because of a force majeure. It is because two decades ago the Sun, along with the Review-Journal's prior owner, abandoned the 1989 JOA in favor of a new JOA that turned out to be illegal because they did not obtain the Attorney General's approval as the NPA requires. To the extent the Sun tries to argue that market conditions making an afternoon newspaper unprofitable are a force majeure event, that argument is precluded by the Court's summary-judgment ruling. ECF No. 970 at 48–49. Moreover, even if a force majeure event had occurred, which it did not, Appendix A.2(b)-(c)—which the Sun claims should govern the format of the joint paper—does not apply when the joint paper is produced under force majeure conditions. 1989 JOA § 8.2 (Review-Journal determines the format of the jointly published newspaper "notwithstanding the provisions of Appendix A").

The Sun is not asking the Court to order the parties to perform the 1989 JOA. It is asking the Court to cobble together a modified joint operating arrangement out of pieces of the defunct 1989 JOA to maintain the unlawful status quo—*i.e.*, invoke Section 8.2 and Appendix A.2(b)-(c)

50

when neither actually would apply if the 1989 JOA were in effect—while disregarding all of the terms the Sun does not want to comply with or that are inconsistent with the Sun's arguments. The end result illegally replicates the "core" of the unlawful 2005 JOA. This is precisely the sort of modification the Ninth Circuit held was not allowed. Mandamus Op. at 6–7. The Court should not flout the Ninth Circuit's mandate a second time.

### B. Reviving the 1989 JOA Is Unworkable Without Violating the Mandate and Will Not Achieve the Outcome of a Viable Print *Sun.*

Simply ordering the parties to immediately comply with the abandoned 1989 JOA is not workable and cannot be done without violating the mandate. If the Court adopts the Sun's view and orders the Review-Journal to follow the obligations in the 1989 JOA, this is what would happen: very few people, if anyone, would subscribe to or advertise in the afternoon print *Sun*. The Review-Journal, which currently publishes the only viable daily print newspaper in Las Vegas, would have to waste substantial resources on the print *Sun*, which would inevitably fail due to a complete lack of market demand. The Review-Journal would invoke Section 9.1.4 of the 1989 JOA, which allows it to "terminate" the 1989 JOA "upon ninety (90) days written notice" after there are "two (2) consecutive years" without "an operating profit."[17] The Sun would blame its failure on the Review-Journal supposedly not doing enough to promote the afternoon *Sun* (ignoring of course that no amount of promotion could possibly make an afternoon print newspaper viable in 2026). More litigation would ensue—and the Review-Journal would prevail on the merits.

In the meantime, ordering compliance with the 1989 JOA would require the Court to expend substantial time and resources fashioning the terms of the injunction, monitoring compliance, and resolving disputes. The 1989 JOA requires the Review-Journal to deliver the *Sun* to its subscribers in the afternoon, 1989 JOA § 5.1, but the *Sun* has no afternoon subscribers (or advertisers). And the 1989 JOA requires the Review-Journal to maintain the "appearance" of the

---

[17] The Review-Journal could invoke the termination provision at any time. The Sun's position is that the 1989 JOA was never terminated, has been in force continuously since 1989, and that the "parties continued performing the material obligations of the 1989 JOA after 2005." ECF No. 1152 at 39; *see id.* at 2, 7, 43. And the Sun itself alleges that the so-called "joint operation"—which, again, the Sun believes was the performance of the 1989 JOA—has not turned a profit since 2016. SAC ¶ 146.

51

*Sun,* 1989 JOA, § 5.1.1, but because the *Sun* does not exist as a standalone print newspaper, there is no "appearance" to maintain. At every turn, the 1989 JOA presumes the "continued operation" of an afternoon newspaper that ceased to exist two decades ago. 1989 JOA at 1; *id*. §§ 3.1.1, 3.1.3. The Court would have to issue new orders setting forth how the parties are supposed to get from where they are now to the two-newspaper structure envisioned by the 1989 JOA. The Court would then have to monitor compliance and resolve the numerous disputes likely to arise. To be clear, the Court cannot just order, verbatim, the preliminary injunction the Sun requests in its motion because the Sun's request lacks the requisite specificity under Rule 65(d). Fed. R. Civ. P. 65(d)(1); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

None of this is appropriate preliminary injunctive relief. Courts deny requests for injunctive relief that "would compel the parties to continue a commercial relationship, or require the court to closely monitor the caliber of their performance." *Lord & Taylor, LLC v. White Flint, L.P.*, 780 F.3d 211, 216, 219 (4th Cir. 2015) (affirming denial of injunction requiring defendant to restore and maintain shopping mall, noting that courts "retain discretion to deny specific performance or injunctive relief … where enforcement would be 'unreasonably difficult' or require 'long-continued supervision' by the court."); *see also Bray v. Safeway Stores, Inc.*, 392 F. Supp. 851, 868, 871 (N.D. Cal. 1975) (declining to issue an order that would entail overseeing the "reorganiz[ation] [of] a large corporation," holding that "[i]t has long been settled that a court shall not issue an injunction that would be inconvenient or inefficient to administer"). "Courts are ill-equipped to engage in what inevitably would require on-going micro-management of complex business affairs." *Madani v. Equilon Enters. LLC*, 2009 WL 2148664, at *15–16 (C.D. Cal. July 13, 2009) (rejecting mandatory injunction requiring defendant to restructure wholesale pricing system); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 783–84 (N.D. Cal. 2022) (holding "plaintiffs do not meet the high standard required for a mandatory injunction" because the injunction would "be unfairly burdensome and technologically infeasible"); *Harris Const. Co. v. Tulare Loc. Healthcare Dist.*, 2013 WL 6576034, at *1 (E.D. Cal. Dec. 13, 2013) ("This Court is not, and cannot be, an account manager for the project.").

52

And if the Court accepts the Sun's legal theory and imposes the injunction the Sun seeks despite all of this, the injunction will at most last for 90 days. *See* 1989 JOA § 9.1.4 (allowing termination of 1989 JOA ninety days after notice). That is further reason to reject the injunction in the first place, rather than requiring the parties and the Court to bear the incredible burden of complying with an injunction that provides the Sun with at best only temporary fleeting relief. *Winter v. NRDC*, 555 U.S. 7, 20 (2008) (finding plaintiff did not meet its burden to establish that the benefit of the injunction outweighs the harm); *see infra* at I.G (discussing balance of equities).

### C. Ordering the Review-Journal to Share Its Subscriber Lists with the Sun is not an Appropriate Remedy.

This Court should not grant the Sun's request to order the Review-Journal to "immediately provide the Sun with the list of subscribers" to the Review-Journal. *See* ECF No. 1152 at iii. The Sun's request is for a mandatory injunction requiring the Review-Journal to take action. As described above, the Sun has not satisfied the high bar to obtain that extraordinary relief.

First, the Sun's request is based on the false premise that there is a list of *Sun* subscribers that the Review-Journal is withholding. No such list exists. The only customer list that the Review-Journal has is a list of subscribers to the *Review-Journal*. And the customers on the Review-Journal's subscriber list in 2026 are not *Sun* subscribers merely because the Sun and Review-Journal merged lists more than two decades ago. *See* Blaser Decl. ¶ 8 (2 OPP 1069).

Moreover, the Sun is not asking to be put in the position it was in under the 1989 JOA—it is asking to be put in a far *better* position. Back in 2005, Brian Greenspun admitted in a column on the first day of joint circulation that the *Review-Journal* had nearly *10 times* the number of subscribers as the *Sun*. *See* 1 OPP 1-2. (Greenspun noting that Sun circulation went from "somewhere around 23,000 copies" as an afternoon paper "to almost 225,000 homes" as "part of the morning newspaper package," which was "nearly a tenfold increase in circulation!"). But the Sun is not purporting to limit its request to those subscribers (which list of course does not exist), it is asking for *all* the subscribers, including those that never even tried to sign up for the *Sun*. The Sun is essentially asking the Court to allow it to avoid putting in any of the legwork to build its own list of subscribers. There is no dispute that the Sun has ample avenues to do so. ███

████████████████████████████████████████

████████████████████████████ *See* Second Nolte Decl. at ¶¶ 13–17 (2 OPP 1083-1085). The Sun could also take out advertisements across various platforms to promote its offerings. But the Sun does not propose to do any of that work—it instead asks the Court to issue mandatory injunctive relief requiring the Sun's competitor to drop its own subscriber list in the Sun's lap. That is further reason to reject the relief the Sun seeks. *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (prohibiting overbroad injunctions and noting that relief "must be tailored to the specific harm alleged"); *Pac. Radiation*, 810 F.3d at 636.

There are other major problems with ordering the Review-Journal to share its own customer list with Sun. Sharing customer information is a classic violation of the antitrust laws, which generally bar competitors from sharing customer data with each other. *See Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd.*, 20 F.4th 466, 481 (9th Cir. 2021) (holding that sharing information to "divide customers or potential customers" is anticompetitive conduct). This Court should not order the Review-Journal to *violate* the antitrust laws as a remedy for purported antitrust violations. Ordering the Review-Journal to share customer information would also violate the spirit of the Review-Journal's commitment to not share customer data with third parties without customer permission. *See* Las Vegas Review-Journal Privacy Policy, https://www.reviewjournal.com/privacy/ (accessed Apr. 16, 2026). The Review-Journal will agree to undertake best efforts to contact subscribers who cancelled after the *Sun* insert stopped printing and to share their information with the Sun for any who consent. Blaser Decl. ¶ 26 (2 OPP 1074). For this Court to order the Review-Journal to share information of customers who *do not* consent would not only be unfair to those customers but also risk undermining their trust in the Review-Journal.

## III.   A Substantial Bond Is Required

The Court's prior temporary restraining order did not require the Sun to post a bond despite the Sun's failure to provide *any evidence* of an inability to post a bond. ECF No. 1096 at 12-13; ECF No. 1070 at 24. Under the law, the Review-Journal can never recover its losses suffered while operating under that unlawful order. *See Buddy Sys., Inc. v. Exer-Genie, Inc.*, 545 F.2d 1164, 1167-

68 (9th Cir. 1976) (holding no recovery is available for damages sustained by wrongful injunction in absence of bond). Those permanent losses constitute irreparable harm to the Review-Journal. *See Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000) (holding setting bond too low "produces irreparable injury" because "damages for an erroneous preliminary injunction cannot exceed the amount of the bond"); *see also Mallet and Co. Inc. v. Lacayo*, 16 F.4th 364, 391 (3rd Cir. 2021) (reasoning that "the consequences of wrongfully enjoining a defendant could be dire if a district court were to significantly underestimate the economic impact of an injunction it issues").

Because the Sun once again seeks injunctive relief tied to claims on which it cannot lawfully prevail and, like before, has not presented evidence of its inability to post an adequate bond,[18] the Court must require the Sun to post a substantial bond to fully protect the Review-Journal from irreparable harm. *See Buddy Sys Inc.*, 545 F.2d at 1167-68; *Mead Johnson & Co.*, 201 F.3d at 888; *Mallet*, 16 F.4th at 391. Without a bond, the Review-Journal will be left without recourse for damages suffered from another wrongful injunction. *See Buddy Sys., Inc.*, 545 F.2d at 1167-68. As detailed below, the Review-Journal will incur significant losses if compelled to perform the Sun's requested "interim" or other relief under the auspices of the terminated, abandoned, and unenforceable 1989 JOA.

Rule 65(c) unambiguously provides: "The court *may issue* a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FRCP 65(c) (emphasis added). A district court may not enjoin a party without requiring a bond unless "it concludes there is no realistic likelihood of harm to the defendant from

---

[18] The Sun did not offer *any* evidence to support its claimed lack of funds for a bond, and its litigation spend strongly suggests the opposite. *See* ECF No. 1073 at ¶ 11. In reality, the Sun could pay if it wanted but prefers to saddle the Review-Journal with bearing all risk while the Sun enjoys all benefits of the injunctive relief. A moving party may not present new facts or arguments in a reply brief. *See Fireman's Funds Ins. Co. v. Sloan Valve Co.*, 2012 WL 4962957, at *2 (D. Nev. Oct. 16, 2012) (quoting *Tovar v. U.S. Postal Service*, 3 F.3d 1271, 1273 n.3 (9th Cir. 1993)). The Review-Journal's due process rights preclude the Sun from presenting bond-related arguments or evidence for the first time in its reply brief.

enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citing *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)).

The Sun cites *Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171 (6th Cir. 1995), which correctly "recognize[s] that the language of Rule 65(c) appears to be mandatory" and then relies on cases from 50-plus years ago as support for courts having discretion in whether to require security. *Moltan Co.*, 55 F.3d at 1176 (citing cases from 1978 and 1954). The cases ignoring Rule 65(c)'s mandatory language are from the same "bygone era of statutory construction" as *Guild v. Levi*, 539 F.2d 755 (D.C. Cir. 1976)—the case the Sun relied on for its now-rejected argument that the 2005 JOA did not need the Attorney General's written approval under the NPA. The Ninth Circuit, relying on *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019), directly rejected that form of statutory interpretation in this case. *Adelson*, 147 F.4th at 1116. That holding calls into question any cases giving courts discretion where Rule 65(c) provides none. "Only the most compelling of reasons will persuade us to imply an exception where the statutory text does not supply one." *Hillis v. Heineman*, 626 F.3d 1014, 1017 (9th Cir. 2010). "This same principle of statutory construction applies to interpreting the Federal Rules of Civil Procedure." *Id.* (citing *United States v. Fort*, 472 F.3d 1106, 1123-24 (9th Cir. 2007)). Because Rule 65(c) is mandatory, the Sun may obtain injunctive relief "only if" it posts a bond sufficient to pay the Review-Journal for "the costs and damages sustained" from the wrongful injunctive relief the Sun seeks.

The Sun seeks to skirt Rule 65's mandatory bond requirement with two unsupported and ineffective excuses. First, the Sun latches onto decades-old cases suggesting courts may waive the bond requirement based solely on public interest considerations. ECF No. 1152 at 45:2-6, 13-15. Rule 65(c) does not contain any exceptions, and the Court may not write one into the rule where it does not exist. *See Hillis*, 626 F.3d at 1017. Even if the Court had the discretion to revise the rule to include that exception, the *Moltan* decision is not binding on this Court and is questionable for the reasons already noted. The *Barahona-Gomez* court did not rely on public interest to waive the bond. Instead, it found that "any cost to the government, in the event it is found to have been wrongfully enjoined, would be minimal." *Barahona-Gomez*, 167 F.3d at 1237 (making this finding after "defendants did not tender any evidence on the issue"). Finally, the public interest—as

56

expressed by Congress—is that competing news organizations must not violate the antitrust laws or exceed the NPA's limits. Thus, the Court may not rely on any public interest considerations to absolve the Sun of its obligation to post a bond that adequately protects the Review-Journal from the massive, well-documented losses from the Sun's requested injunctive relief.

Second, the Sun contends a nominal bond suffices because it merely seeks to force the Review-Journal to do what it is already contractually obligated to do. ECF No. 1152 at 45. The Sun cites three unpublished district court decisions to support this point, but none of them apply to the Sun's untenable position regarding the terminated, long-abandoned 1989 JOA. At the outset, unlike here, there was no dispute in these cases about the validity or enforceability of the underlying contract. The *MetroPCS* court found "no realistic likelihood of harm" due to the enjoined party blatantly violating a valid, enforceable non-competition agreement that was reasonable in time and geographic scope. *MetroPCS Georgia, LLC v. Metro Dealer, Inc.*, 2019 WL 1597111, at *4 (W.D. Wa. Apr. 15, 2019). The *Life Fight Network* court did not enjoin the defendant based on a clear obligation to provide contracted-for services. To the contrary, the court expressly noted that "neither of the parties has provided the Court with an adequate explanation of the contract or the particular events that gave rise to this action." *Life Flight Network, LLC v. Metro Aviation, Inc.*, 2017 WL 192706, at *2 (D. Or. Jan. 17, 2017). And the *Paparazzi* court declined to require a bond where the plaintiff sought to enforce a non-disparagement clause in a settlement agreement after the defendant made public comments suggesting the plaintiff's "products caused her to develop colon cancer and other health issues." *Paparazzi, LLC v. Souza*, 2025 WL 3705493, at *8 (D. Utah Dec. 22, 2025). None of the Sun's cases remotely resembles the Sun's theory that the 1989 JOA, which the Sun and Review-Journal stopped performing and abandoned more than 20 years ago (and which the current Review-Journal entity never performed), springs back to life and obligates the Review-Journal to publish the *Sun* insert or a non-existent full afternoon *Sun* newspaper.

Because the Sun seeks to compel the "interim" performance of an unlawful JOA, specifically by forcing the Review-Journal to print and distribute the *Sun* insert (without calling it the 2005 JOA), that relief would come with a quantifiable cost. The Review-Journal's expert,

David Nolte, has prepared a report calculating the cost of the Review-Journal complying with the Sun's request. *See* Nolte Decl. (2 OPP 1079-1116). ████

████

████

████ [19] *Id.* ¶ 86. ██

████

████

████ .[20] *Id.*

If the Court orders full compliance with the 1989 JOA, ████

████ . *Id.* ¶ 10. ██

████

████

████

████ *Id.* ¶¶ 52-80. ██

████

████

████ *Id.* ¶¶ 8-10. ██

Should the Court order relief other than what is discussed in this section, Mr. Nolte ████

████

**CONCLUSION**

For the reasons set forth above, the Review-Journal respectfully requests that the Court deny the Sun's motion for temporary restraining order and preliminary injunction.

.

---

[19] As Mr. Nolte explains, ████ *Id.* at ¶ 87.

[20] The time horizon is based on estimates for proceedings that are likely to occur between issuance of an injunction and final judgment: appeal of this Court's preliminary injunction order (~16 months); appeal from final judgment after trial (~16 months); petitions for rehearing and certiorari (~6 months); Supreme Court proceedings (~14 months); and proceedings on remand (~12 months).

Dated:    April 17, 2026                         CLAGGETT & SYKES LAW FIRM

                                    By:   /s/ Michael J. Gayan
                                          MICHAEL J. GAYAN, ESQ., SBN 11135
                                          4101 Meadows Lane, Suite 100
                                          Las Vegas, Nevada 89107

                                          J. RANDALL JONES, ESQ., SBN 1927
                                          MONA KAVEH, ESQ., SBN 11825
                                          KEMP JONES LLP
                                          3800 Howard Hughes Parkway, 17th Floor
                                          Las Vegas, Nevada 89169

                                          DAVID R. SINGER, ESQ. (*pro hac vice*)
                                          AMY M. GALLEGOS, ESQ. (*pro hac vice*)
                                          ANDREW G. SULLIVAN, ESQ. (*pro hac vice*)
                                          JENNER & BLOCK LLP
                                          515 South Flower Street, Suite 3300
                                          Los Angeles, California 90071

                                          RICHARD L. STONE, ESQ. (*pro hac vice*)
                                          850 Devon Avenue
                                          Los Angeles, California 90024

                                          *Attorneys for Defendants/Counterclaimant*

59

**PROOF OF SERVICE**

I hereby certify that on the 17th day of April, 2026, I served a true and correct copy of the foregoing **DEFENDANTS' OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION** via the United States District Court's CM/ECF electronic filing system to all parties on the e-service list.

E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavilion Center Dr., Suite 500
Las Vegas, Nevada 89135

James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

Jordan T. Smith, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

Joseph M. Alioto, *pro hac vice*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104

*Attorneys for Plaintiff/Counterdefendants*

/s/ *Tyler Edwards*

An employee of Jenner & Block LLP

60