E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavilion Center Dr., Suite 500
Las Vegas, Nevada 89135
Tel: 702.862.8300
Fax: 702.778.9709
Email: lreid@clarkhill.com
kmartini@clarkhill.com
nsscott@clarkhill.com

James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Tel: 702.214.2100
Fax: 702.214.2101
Email: JJP@pisanellibice.com
        TLB@pisanellibice.com

Jordan T. Smith, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Tel: 702.464.7022
Fax: 702.382.8135
Email: jtsmith@bhfs.com

Joseph M. Alioto, *PRO HAC VICE*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

*Attorneys for Plaintiff/Counterdefendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation,<br><br>Plaintiffs,<br><br>v.<br><br>SHELDON ADELSON (Estate Of), an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC,, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC dba ADFAM, a Delaware limited liability company and as the alter ego of Las Vegas Review-Journal, Inc., and | Case No.: 2:19-CV-01667-ART-MDC<br><br>**(REDACTED)**<br><br>**PLAINTIFF'S POST-HEARING SUPPLEMENTAL BRIEF PER ECF NO. 1182** |

i

105559\1015963\287709625.v1-5/5/26

News+Media Capital Gorup, LLC; and DOES, I-X, inclusive,

Defendants.

LAS VEGAS REVIEW-JOURNAL, a Delaware corporation,

Counterclaimant,

v.

LAS VEGAS SUN, INC., a Nevada corporation; BRIAN GREENSPUN, an individual and as alter ego of Las Vegas Sun, Inc.; GREENSPUN MEDIA GROUP, LLC, a Nevada limited liability company, as the alter ego of Las Vegas Sun, Inc.,

Counterclaim Defendants.

Pursuant to this Court's Order (ECF No. 1182), Plaintiff Las Vegas Sun, Inc. ("Sun"), submits the following as its Post-Hearing Supplemental Brief. This Brief is based on the following Memorandum of Points and Authorities, the pleadings and papers on file herein, and the evidence received at the April 20-21, 2026, hearing.

DATED this 5th day of May, 2026.

CLARK HILL PLC

By: /s/ *Kristen L. Martini*
E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
1700 S. Pavilion Center Drive, Suite 500
Las Vegas, Nevada 89135

PISANELLI BICE PLLC
James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

BROWNSTEIN HYATT FARBER SHRECK, LLP

ii

105559\1015963\287709625.v1-5/5/26

Jordan T. Smith, Nevada Bar No. 12097
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

ALIOTO LAW FIRM
Joseph M. Alioto, Pro Hac Vice
One Sansome Street, 35th Floor
San Francisco, California 94104

*Attorneys for Plaintiff/Counterdefendants*

105559\1015963\287709625.v1-5/5/26

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **I.   INTRODUCTION**

Since the RJ completely excluded the Sun from the market on April 3, 2026, the Sun's need for injunctive relief could not be more immediate. With its survival on the line, the Sun asks that the RJ be enjoined from refusing to perform under the 1989 JOA, to restore competition in the Newspaper Market.[1] This relief is the only available interim remedy until the Sun prevails at trial that would prevent the RJ from making its monopoly in the Newspaper Market permanent and irremediable.

Given the immediacy of the Sun's need to be printed and distributed (the subject of the April 20-21, 2026, hearing), the Sun's focus on the *Winter* factors in this brief is tailored to the RJ's complete exclusion of the Sun and its efforts to ensure the exclusion is permanent.[2] *See also* ECF No. 1186 ("2Tr.") at 539:10-20. While issues of this sort are ordinarily complex and nuanced, here the Court has the benefit of simply holding the RJ to its own words from the evidentiary hearing (*e.g.*, that the Sun is the RJ's "chief editorial rival"[3]), its own data,[4] and the obvious fact that the Sun cannot survive as an independent print newspaper in the absence of the RJ performing the obligations of the 1989 JOA. The Sun met the definition of a "failing newspaper" in 1989, and its ability to independently operate outside of the JOA have only become more infeasible after 36 years of reliance on the RJ's infrastructure and management of the joint operation. In the absence of injunctive relief, the Sun will be forced out of the market, unable to re-enter. The resulting harm

---

[1] While the Sun also requested in its original papers that the RJ be enjoined from (1) ending the joint newspaper operation thereunder prior to 2040 or a final judgment on the merits permitting otherwise, and (2) refusing to provide the Sun with the list of subscribers to the Newspaper Bundle (where even the RJ's witnesses testified that the subscribers subscribed to the Newspaper Bundle, not just the RJ, and the 1989 JOA accounts for subscribers to the joint edition published on weekends, holidays, and special editions), the Sun does not focus on that relief here because such relief is unnecessary where the joint operation continues pursuant to the terms of the 1989 JOA. *See* ECF No. 1152; *also infra* n.2.

[2] The Sun incorporates all of its arguments set forth in and the evidence attendant to the Sun's Renewed Motion, and prior briefing on its initial motion and reply. *See* ECF Nos. 1152-1159, 1092.

[3] Reply in Support of Pet. for Writ of Mandamus, *Adelson v. Dist. Ct.*, Case No. 26-1646, Dkt. Entry: 23.1, at 8 (9th Cir. Mar. 26, 2026).

[4] ECF No. 1185 ("1Tr.") at 149:6-161:23, 167:5-182:13; 1SA92-126, 145-53, 188-207.

105559\1015963\287709625.v1-5/5/26

to the Sun, newspaper editorial and reportorial competition, and consumers cannot be remedied after-the-fact.

## II.    THE SUN'S REQUESTED RELIEF IS PROHIBITORY

The Sun's request for injunctive relief seeks nothing more than what is required by the 1989 JOA, which is the "status quo ante litem." *E.g.*, *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). The 1989 JOA is the legally valid agreement, approved by the United States Attorney General, for the parties' combined operations: it is "the last uncontested status which preceded" this controversy. *Id.* The Court can "order a party to take certain affirmative actions required to reinstate the status quo" "[w]hen granting prohibitory relief." *E.g.*, *Bullock v. Arizona Bd. of Regents*, 2024 WL 4680575, at *4 (D. Ariz. Nov. 5, 2024). While the Sun's requested relief is prohibitory, the distinction between prohibitory or mandatory is inconsequential here because the Sun also satisfies the higher standard associated with mandatory injunctive relief.

## III.    THE SUN HAS ESTABLISHED A CLEAR LIKELIHOOD OF SUCCESS ON ITS ANTITRUST CLAIMS

### A.    The Newspaper Market is the Proper Market

The reason for defining the relevant antitrust market is to determine the area of effective competition for evaluation of the firm's monopoly power and the competitive effects the challenged conduct has had on consumers. *E.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962); *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018); 1Tr.142:14-143:6; 1SA52. It "must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953); 1SA52-59.[5] In short, it is a highly fact-based inquiry into whether the defendant has the ability to reduce competition within the defined area, and the test focuses on which products are sufficiently close substitutes. *E.g.*, *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993); *Brown Shoe Co.*, 370 U.S. at 325; 1Tr.143:7-25.

---

[5] The Sun's Appendix citations herein, styled as, Volume "SA" page number, refers to the Sun's appendices submitted with its Renewed Motion (ECF No. 1152), which Volumes are filed at ECF Nos. 1153-1159.

105559\1015963\287709625.v1-5/5/26

The inquiry is not whether the relevant market has many consumers, has long-term viability, or an expansion trajectory, and the test is not based on anecdotal evidence or overly broad notions of substitution, as the RJ would have this Court conclude. *See, e.g.*, 2Tr.387:15-23, 490:3-491:24. Regardless of whether the Newspaper Market is declining, it remains the appropriate relevant market in this case, and the subscribers who are participating in the market are no less entitled to the protections of the antitrust laws. *E.g.*, 1Tr.144:1-149:5, 157:7-15; 1SA54-56, 85, 91. The fact that other people choose not to subscribe to print newspapers does not protect those consumers who do subscribe to a print newspaper from the loss of newspaper competition.

Only the Sun's expert, Dr. Katz, undertook the applicable analyses employed by antitrust economists to determine the proper scope of the relevant market, *i.e.*, the *Brown Shoe* indicia, the Hypothetical Monopolist Test, and the quantitative analysis of demand. *See* 1Tr.149:6-161:23, 167:5-182:13; 1SA 53, 60-130, 140-53, 188-207. He concluded that each of the analyses and tests demonstrated that the Newspaper Market is the appropriate market, and that both the Sun and the RJ both fell within that market. *Id.*; *see also* 1SA35-50. Importantly, the RJ completely ignored its own data on consumer behavior related to price increases over several years (collected and analyzed by its consultant, Mather Economics). Dr. Katz did not. *E.g.*, 1Tr.157:16-158:3; 1SA35-50, 188-207.

Dr. Katz reviewed Mather's analyses and undertook quantitative analyses of his own to determine the Newspaper Bundle's own-price elasticity of demand, which reflects the cross-elasticity between the Newspaper Bundle and other media, and which in turn shows whether consumers view other media as sufficiently close substitutes for interchangeability purposes. 1Tr.157:16-161:23, 167:5-182:13; 1SA 92-127, 188-207. And he concluded that consumers do not. 1Tr.152:5-8, 167:5-18, 175:13-177:2; 1SA126-27. This data established that the RJ has repeatedly raised the price of the Newspaper Bundle by significant amounts, and when it did, the Newspaper Bundle did not lose consumers to any other media. 1Tr.175:13-178:14. Consequently, the low cross-price elasticity between the Newspaper Bundle and other media products evidences that subscribers to the Bundle do not consider other media to be close substitutes for daily, local, print newspapers. *Id.*

3

The RJ knows that this data is fatal to its challenge to the Newspaper Market, so its economic experts have ignored it. None of them attempted to conduct any quantitative analysis to define the relevant market, and Dr. Evans did not appear at the hearing to "rebut[ ]" Dr. Katz's testimony (because he couldn't). *See* ECF No. 1170 at 4. The actual evidence establishes that the Newspaper Market is the proper relevant antitrust market here.

The RJ has also argued that, even if one accepts the Newspaper Market as valid, there is no evidence that the Sun competes in the Newspaper Market. The RJ focuses on the *absence* of data on the *cross*-elasticity of demand *between* the Sun and the RJ because of their bundled format to argue that the Sun is not a competitor within the Newspaper Market. *See, e.g.*, 1Tr.220:21-221:10; ECF No. 843 at 23. The RJ's allegation that the Sun did not provide evidence of cross-elasticity between the Sun and the RJ is false.

Dr. Katz undertook the *Brown Shoe* analysis and concluded from it that, not only is the Newspaper Market an appropriate relevant market, but that the Sun and the RJ each fall within the Newspaper Market under the *Brown Shoe* factors, evidencing that they are both newspapers within the Newspaper Market. 1Tr.145:14-153:1; 1SA60-92, 127-45. It is widely recognized that when "evaluating reasonable substitutability and measuring cross-elasticity of demand, the case law states that it is appropriate to consider a wide range of evidentiary sources" as indicated in the *Brown Shoe* factors, which factors are "evidentiary proxies for direct proof" of "cross-elasticities." *E.g.*, *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986); *Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1154 (W.D. Ark. 1995), *aff'd sub nom. Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180 (8th Cir. 1998); *see also Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1082-83 (D. Colo. 2004). The Sun has offered clear evidence of cross-elasticity between the Sun and the RJ.

To conclude that the Newspapers are not sufficiently close substitutes for one another would require the Court to find that: (1) the Sun is not a local, daily, print newspaper; and (2) consumers do not view the Sun as a distinct product from the RJ. Such findings would require the Court to ignore not only the *Brown Shoe* factors indicating that the two newspapers are close substitutes (1SA60-92, 127-30, 140-45), but also the evidence that the parties, the DOJ, and consumers viewed

4

the Sun and RJ as distinct newspapers that competed editorially and reportorially. *See* 1SA35-50, 60-92, 140-45; 3SA662-63; 1Tr.51-13; *see also* ECF No. 1096 at 6-8. The RJ's own representations to the Ninth Circuit on this subject were revelatory: "[RJ] is being forced to carry its chief editorial rival."[6] All of the evidence dictates that the Newspaper Market is the appropriate relevant antitrust market in this case, and that the Sun is a competitor within the market.

**B.    The RJ has Willfully Acquired and Possesses Monopoly Power in the Newspaper Market**

It cannot reasonably be disputed that the RJ possesses monopoly power in the Newspaper Market. The RJ has possessed monopoly power since its inception. 2SA367-68. Since 1989, the RJ has controlled the prices of the Newspapers (and has repeatedly raised them while losing few subscribers as a result) and has had the ability to exclude competition: the RJ's exclusion of the Sun since April 3 proves its ability to exclude competition and control its competitor's output. *See* ECF No. 1152 at 28-32 (citing evidence). Since the Sun's entry in 1950, no other newspaper has successfully entered the Newspaper Market. As Dr. Picard opined, the barriers to entry are substantial, and include capital investment costs and operational and personnel issues, amounting to more than $100 million in re-entry, start-up costs. 2Tr.283:23-302:5; 2SA264-69, 80-82. With the RJ's already high market share by all reasonable measures, and now 100% market share, together with the high barriers to entry, the direct and indirect evidence proves the RJ possesses monopoly power in the Newspaper Market. *Id.* at 29-32. This evidence is uncontroverted.

The RJ has willfully acquired and maintained its monopoly power by not only engaging in steadfast Anticompetitive Conduct to weaken the Sun's ability to compete (*see* ECF No. 1152 at 12-23, 30-31, 36-37 (citing evidence); 1SA50-153, 7SA1443; 1Tr.51:21-52:12), but as of April 3, by completely foreclosing the Sun's opportunities and ability to compete. 1Tr.62:11-64:8; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) ("Willful acquisition or maintenance of monopoly power involves exclusionary conduct, not power gained from growth or development as a consequence of a superior product, business acumen, or historic accident.") (quotations omitted); *see also Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir.

---

[6] *Supra* n.3.

5

2022) ("Anticompetitive conduct" refers to acts that "tend[ ] to impair the opportunities of rivals" and "do[ ] not further competition on the merits or do[ ] so in an unnecessarily restrictive way.") (quotations omitted) (alterations in original). The RJ's complete exclusion of the Sun from the Newspaper Market, exploitation of its power over the Sun, and continued refusal to acknowledge the validity of the governing 1989 JOA[7] is not competition on the merits. *See* ECF No. 1152 at 31 (citing evidence). It is impairing the Sun's ability to compete even further by making the Sun inaccessible to consumers, attempting to force the Sun to publish and distribute itself independently (thus raising the Sun's costs and rendering it economically infeasible to continue) and imposing large litigation costs on the Sun. ECF No. 1152 at 30-32 (citing evidence).

### C.    The RJ's Anticompetitive Conduct has Caused Antitrust Injury

#### 1.    The RJ's Conduct is Unlawful

Even before the Adelson family purchased the Review-Journal, they were planning to squeeze the Sun out of the market by eliminating all profit payments. *See* ECF No. 1152 at 12. The RJ immediately commenced its multi-faceted Anticompetitive Conduct, all elements of which worked toward the end goal of eliminating the Sun.[8] *See id.* at 12-23 (citing evidence).

Since obtaining the Ninth Circuit's Opinion declaring the 2005 JOA unlawful and unenforceable, the RJ has refused to recognize or perform under the governing 1989 JOA. To be clear, the Sun does not contend that the RJ's litigation to declare the 2005 JOA unenforceable is sham litigation:[9] it is the RJ's refusal to recognize the 1989 JOA as the governing agreement, and refusal to perform under it, that is a sham. The RJ's position is objectively baseless and taken with subjective and monopolistic intent to eliminate the Sun from the Newspaper Market.

The 1989 JOA is the governing agreement now that the 2005 JOA is unenforceable. This Court already concluded that the 2005 JOA was not a novation and the parties did not intend to

---

[7] Through the 1989 JOA, the Sun provided the RJ with consideration valuing over $25 million in exchange for the RJ's commitment to publish, promote, and distribute the Sun for the term of the agreement, *i.e.*, 2040. 1Tr.21:13-22:19; Hr'g Ex. 3 at 2-3.

[8] *See supra* n.2.

[9] The Sun's original allegations of sham litigation were based on the RJ's Notice of Default, which did not seek to end the joint operation on the basis that the 2005 JOA was unenforceable. *See* ECF No. 1 at 26.

6

terminate the 1989 JOA. ECF No. 970 at 17-19. The unlawful 2005 JOA could not operate to displace the 1989 JOA either. Nevada law, which governs this issue, is crystal clear: a novation could have only occurred if the 2005 JOA was <u>valid and enforceable</u>, and it is not. *See, e.g.*, *United Fire Ins. Co. v. McClelland*, 780 P.2d 193, 195 (Nev. 1989); *Internet Sports Int'l, Ltd. v. Amelco USA, LLC*, 2025 WL 1676573, at *5 (D. Nev. June 13, 2025) (same).

Moreover, the RJ has never met its burden of proving "by clear and convincing evidence" the additional element that both parties clearly and unequivocally intended for the 2005 JOA to extinguish the 1989 JOA. *McClelland*, 780 P.2d at 196; 2SA435-41, 44-45, 79-85, 89-95. This Court's conclusion was supported by its findings that the parties intended the 2005 JOA to be an amendment, and not a new agreement terminating the 1989 JOA, based on the text and history of the 2005 JOA itself, and the parties' and the DOJ's treatment of the 2005 JOA. ECF No. 970 at 17-19 (citing evidence); *see also* ECF No. 1152 at 7 (citing evidence). The 2005 JOA also expressly referred to certain accounting provisions in the 1989 JOA that governed the parties' accounting under the 2005 JOA, requiring consultation of the 1989 JOA. *See* 2SA469-70. The RJ kept the 1989 JOA together with the 2005 JOA in its business records, and RJ witnesses reviewed it in preparation for their depositions. 2Tr.383:23-24, 451:15-19. The Court's findings and conclusions were further supported by the fact that the purpose of the 1989 JOA was undisturbed by the parties' amendment, *i.e.*, the combined operations of the two newspapers, whereby the RJ would be in control of and responsible for all printing and distribution, sales, circulation, promotion, and every other non-editorial and -reportorial function of the Sun and the joint operation. Despite the modification of certain details, as this Court already concluded, the "material elements" remained unchanged. ECF No. 970 at 18-19; *see also* ECF No. 1152 at 7-9 (citing evidence); ECF No. 871 at 3-8 (citing evidence).

The fact that the parties included the express contingency provision memorializing their intentions that the parties would revert to the 1989 JOA, as the agreement that "<u>shall be reinstituted and remain in full force and effect</u>" in the event their lawful performance under the 2005 JOA was hindered or impaired by the DOJ, solidifies that the parties never intended to terminate or abandon the 1989 JOA. 2SA449 § 1.1 (emphasis added). It also cannot reasonably be disputed that the DOJ's

7

action, *i.e.*, not giving written consent for the 2005 JOA pursuant to 15 U.S.C. § 1803(b), hindered and impaired the parties' lawful performance under the 2005 JOA. *See* 3SA647. The RJ's position is objectively baseless. This evidence clearly demonstrates that the 1989 JOA is the valid and governing agreement, to which the RJ is bound.

Nevertheless, the RJ has taken the position that it can permanently exclude the Sun from the Newspaper Market due to "impossibility" and "impracticability" of performance under the 1989 JOA. The RJ has complained about the costs and burdens associated with having to print and distribute the Sun as an afternoon newspaper on weekdays. But this is not a basis to terminate the 1989 JOA or exclude the Sun from the Newspaper Market. Even accepting the RJ's arguments that printing and distributing the Sun as an afternoon newspaper would present logistical and financial burdens, the RJ must avail itself of Section 8.2 in the 1989 JOA, the Force Majeure provision. Yet, the RJ is specifically refusing to do so because performing under Section 8.2 would eliminate the burdens of which the RJ now complains and would preserve competition in the Newspaper Market.

Section 8.2 in the 1989 JOA specifically provides that

> in the event <u>partial</u> performance under this Agreement *is feasible*, notwithstanding the occurrence of one or more of the foregoing, performance shall be allocated between the newspapers by the Review-Journal, in its sole judgment, and <u>if it is feasible to publish only one newspaper product, Review-Journal shall exercise its *best efforts* to produce a jointly published newspaper</u> in which the Sun portion shall be determined by Review-Journal, notwithstanding the provisions of Appendix A hereto, <u>provided that the sun portion shall not be less than two (2) pages</u>.

2SA315 § 8.2 (emphasis added). It is obviously feasible to publish and distribute the Sun in a joint edition on a daily basis because—until April 3, the RJ had been printing and distributing the Sun in a similar format for 20 years.

The recent continuation of events in this case also falls within the "foregoing" events referred to in Section 8.2, including "government action" and "any other cause substantially beyond the control of the party required to perform." *Id.* The DOJ's adoption of invalid regulations and failure to require written Attorney General approval for the 2005 JOA, together with the Ninth Circuit's Opinion declaring the 2005 JOA unlawful, and this Court's ruling that the 2005 JOA was not a novation, is all "government action" as contemplated by Section 8.2 (even if it was inspired

8

by the RJ's efforts to eliminate the Sun). It is this series of government actions that triggered the RJ's full performance under the 1989 JOA even after two decades of the parties' distributing the Newspapers in the Bundle. And, under the RJ's own analysis, in *1989* no one could have foreseen the introduction of smart phones and the internet, and the massive disruption in advertising revenue—all of which was beyond the RJ's control. *See* 2Tr.386:9-24; ECF No. 970 at 48.

While the introduction of digital media was not a force majeure event allowing for *termination* of the *2005* JOA, as digital media was in full swing and foreseeable (where the parties expressly referred to it in the 2005 JOA), the context has now changed. ECF No. 970 at 47-48. Those "technological challenges" simply did not exist in 1989. *Id.* at 48. The Force Majeure provision in Section 8.2 of the 1989 JOA still cannot operate to terminate the agreement; however, as the RJ elicited, afternoon newspapers cannot most likely and feasibly survive in the Newspaper Market today. 2Tr.454:20-23, 512:11-15. This is precisely the type of unforeseeable event in 1989 that the RJ could avail itself of to not publish the Sun as an afternoon newspaper on weekdays. Yet, when the RJ has an actual argument to employ force majeure to feasibly print and distribute a joint edition on a daily basis under the 1989 JOA, the RJ refuses. ECF No. 1172 at 50-51. Its refusal contradicts its own witnesses' testimony and expert reports. *See, e.g.*, 2Tr.390:8-12, 454:16-23, 512:11-15; ECF No. 1173 at 1067-72, 1080, 1088-90. The RJ contradicts itself because acknowledging that Section 8.2 can be triggered would require the RJ to use its best efforts to print and distribute the Sun, which would restore competition.

The RJ's litigation conduct in refusing to perform under the 1989 JOA and acknowledge that the RJ is fully capable and it is feasible to print the Sun as a joint edition under Section 8.2 is solely to exclude the Sun from the Newspaper Market.

### 2.    Injury to the Sun

The Sun has established more than "some credible injury caused by the unlawful conduct." *See Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1056 (9th Cir. 1999). Complete exclusion from the relevant market is clear evidence of an antitrust plaintiff's injury. *See, e.g.*, *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 840-41 (9th Cir. 2022) (recognizing "antitrust injury before the[ plaintiff] actually [is] driven from the market and competition is thereby

9

lessened," where the exclusionary conduct has not yet "succeeded in displacing all competition") (quotations omitted). There is no evidence that the Sun stands to gain from the RJ excluding the Sun from the Newspaper Market, and the RJ has never argued otherwise. *See* ECF No. 970 at 26; *see also Am. Ad Mgmt., Inc.*, 190 F.3d at 1056. To the contrary, the evidence clearly shows that the RJ's continued refusal to acknowledge the validity of the governing 1989 JOA to permanently exclude the Sun from the Newspaper Market is impairing the Sun's abilities to compete. ECF No. 1152 at 22-23, 31-32 (citing evidence); 1Tr.184:19-185:4, 192:2-197:10. The RJ's exclusion of the Sun directly injures the Sun's "business or property" by eliminating its ability to operate in the Newspaper Market. 15 U.S.C. § 15(a); *Am. Ad Mgmt., Inc.*, 190 F.3d at 1056, 1059; *see infra* § V.

### 3. Injury Flowing from Conduct which Makes it Unlawful

The Sun's claimed injury flows directly from the RJ's exclusionary conduct and continued efforts to ensure the Sun's exclusion is permanent. The RJ's exclusion of the Sun in no way *preserves* editorial and reportorial competition in the Newspaper Market. *See* ECF No. 1152 at 35-36 (citing evidence). Before the RJ's literal exclusion of the Sun on April 3, this Court recognized that because the RJ's conduct "*reduces* editorial competition in the relevant market and harms consumers," it was unlawful, and because it harmed the Sun's "ability to compete and decreased visibility, which hurts its value," the Sun's "claimed injury flows directly" from the RJ's unlawful conduct. ECF No. 970 at 27 (emphasis added). Today, the RJ's conduct has *eliminated* all editorial and reportorial competition in the Newspaper Market, harming consumers. It remains unlawful, and the Sun's claimed injuries flow directly therefrom.

### 4. Injury of the Type Antitrust Laws are Intended to Prevent

Preserving and promoting "consumer welfare" is the purpose of antitrust laws. *E.g.*, *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 832 (9th Cir. 2022) (quotations omitted); *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 128 (9th Cir. 1973) (the "basic and underlying purposes of the anti-trust laws [are] to preserve competition and to protect the consumer"). Notwithstanding the RJ's recently crafted testimony, the evidence has consistently and clearly demonstrated that consumers, *i.e.*, subscribers, benefitted from the editorial and reportorial competition between the Sun and the RJ. *See* ECF No. 871 at 3-5, 15, 31-32 (citing

105559\1015963\287709625.v1-5/5/26

evidence); 1SA35-50; 6SA1265-80, 1347-55. Beyond the subscribers to the Newspaper Bundle, there are also public benefits that accrue to the community from newspapers' editorial and reportorial competition, not only as declared by Congress (15 U.S.C. § 1801), but also recognized by courts and academic studies of data. *E.g.*, *U.S. v. Daily Gazette Co.*, 567 F. Supp. 2d 859, 868-69 (S.D. W. Va. 2008); *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1251-52 (D. Haw. 1999); *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1195 (N.D. Cal. 2000); 1Tr.150:11-24; 1SA32-50, 127-39.

Nolte conceded that there is no way to calculate the harm to the market as a whole for loss of civic engagement caused by a reduction in the Sun's editorial and reportorial competition in the Newspaper Market. 2Tr.528:17-529:13 ("In terms of the market overall, I'm not sure how to do it."). The RJ's complete elimination of its sole competitor is the exact kind of injury Section 16 was intended to prevent. ECF No. 970 at 28; ECF No. 1096 at 7; *Cal. v. Am. Stores Co.*, 492 U.S. 1301, 1304 (1989); ECF No. 1096 at 8-9.

### 5.    The Sun Participates in the Newspaper Market

Prior to April 3, the Sun was a direct participant in the Newspaper Market. This Court already concluded that the Sun was an independent newspaper that provided its pages to the RJ for publication *in the Sun*. *See* ECF No. 970 at 28, 21-23 (citing *Daily Gazette Co.*, 567 F. Supp. 2d 859 & *Gannett*, 99 F. Supp. 2d 1241); ECF No. 1096 at 7-8; *see also* ECF No. 1152 at 26-27 (citing evidence). That the RJ supplied printing and distribution services to the Sun, and that the Sun Newspaper was distributed in the Bundle, does not dictate that the Sun did not participate in the market. It evidences the opposite. *See also supra* § III(A).

## IV.    THE SUN HAS ESTABLISHED A CLEAR LIKELIHOOD OF SUCCESS ON ITS DECLARATORY RELIEF CLAIM

In addition to satisfying the first *Winter* factor for its monopolization and attempted monopolization claims, the Sun has also satisfied the first factor for its Declaratory Relief claim on the present controversy regarding the 1989 JOA. The Sun's claim seeks a judgment that the 1989 JOA is "the present valid and enforceable agreement between the parties" with "which the RJ is obligated to comply," including by printing and distributing the Sun as a daily newspaper pursuant

105559\1015963\287709625.v1-5/5/26

to the terms of the 1989 JOA (whether the Sun is printed and distributed under Section 5.1 and Appendix A.2 on weekdays with a joint edition on weekends, holidays and special editions, or whether it is printed under Section 8.2). ECF No. 1162 ¶¶ 297, 296; *see also id.* ¶¶ 298-300, 90, 205, 210-11, 219-24. As discussed above, Nevada law, the law of the case, and the evidence establishes that the 1989 JOA is the governing agreement between the parties. *Supra* § III(C)(1). To the extent it is infeasible to print and distribute the Sun as a daily afternoon paper on weekdays, and a joint edition on weekends, holidays, and special editions (for all the reasons the RJ has asserted), the 1989 JOA requires the RJ to use its best efforts to print the Sun on a daily basis in a joint edition (which is indisputably feasible). *Id.*

The Sun's request for injunctive relief predicated on this declaratory judgment claim is proper while the parties' rights and obligations under the 1989 JOA are pending a final adjudication on the merits. *See, e.g.*, *Doe v. Horne*, 115 F.4th 1083, 1091 (9th Cir. 2024) (affirming preliminary injunction predicated on declaratory judgment claim);[10] *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *8 (D. Nev. April 9, 2025) (granting preliminary injunction on declaratory judgment claim seeking determination on the validity of contracts). The Sun has satisfied its burden in obtaining injunctive relief on its declaratory judgment claim.

## V.    THE SUN IS SUFFERING AND WILL CONTINUE TO SUFFER EXTREME IRREPARABLE HARM, AND ORDERING THE RJ TO COMPLY WITH THE 1989 JOA IS THE PROPER REMEDY

### A.    The Sun's Harm is Irreparable

The law and evidence establish that the Sun's elimination from the Newspaper Market constitutes clear irreparable injury. *See* ECF No. 1152 at 40-43 (citing authority and evidence); *see also* ECF No. 1096 at 8-9 (finding that stopping printing and distributing the Sun would cause irreparable injury). The Sun's owner and Dr. Picard further testified as to the Sun's inability to operate outside of a JOA, where it has been without infrastructure and unable to independently continue since 1989, and given the amount of time it would take to re-enter the market assuming

---

[10] *See also Nat'l Rifle Ass'n of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 924-25, 970 (C.D. Cal. 2019) (granting preliminary injunction sought solely on declaratory judgment claim).

105559\1015963\287709625.v1-5/5/26

the other high barriers to entry could be overcome. 1Tr.21:16-22:19, 25:5-17; 2Tr.267:19-280:6. The RJ does not disagree. 2Tr.395:20-398:22, 400:2-4; ECF No. 1173 at 1082.

While the RJ has offered to "print" the Sun at "market rates," that offer does not alleviate the irreparable harm suffered by the Sun. 2Tr.354:13-21. Access to printing facilities is only one of the enormous barriers to entry into the Newspaper Market. *See* 2Tr.282:2-284:12, 286:14-288:3, 300:25-302:5, 305:17-306:9; 2SA264-69; *see also* 2Tr.395:23-398:19. Tellingly, the RJ has historically offered printing services for non-local newspapers (including the New York Times) (2Tr.399:1-7), but despite the availability of the RJ's printing services, <u>no other local, daily, print newspaper has successfully entered the market since the Sun in 1950</u>. The RJ's printing services offer does not lessen or otherwise alleviate the other barriers that prevent the Sun from re-entering the market absent the JOA (*e.g.*, the high costs of distribution separate from the RJ). The evidence clearly shows that it is simply infeasible not only from a cost perspective, but with the Sun's lack of economies of scale and the time it would take to re-enter the Newspaper Market.

The RJ's accounting expert David Nolte's testimony that the Sun's harm can be satisfied by money years from now (2Tr.520:15-19) contravenes well-established Ninth Circuit law, newspaper cases, and the purpose of Section 16 of the Clayton Act. While "'[m]onetary injury is not normally considered irreparable,' … '[t]he threat of being driven out of business is sufficient to establish irreparable harm.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) & *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)) (second alteration in original). As the Ninth Circuit explained:

> [T]he loss of ... an ongoing business representing many years of effort and the livelihood of its ... owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages. Thus, showing a threat of "extinction" is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable.

*Id.* (quotations omitted). The Ninth Circuit also "recognize[s] that intangible injuries such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-a-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

13

Nolte's argument is also defeated by on-point caselaw specifically speaking to the irreparable injury suffered as a result of the loss of a newspaper and its editorial and reportorial voice, which harms the public perception and its viability, which cannot be monetized. *Gannett Pac. Corp.*, 99 F. Supp. 2d at 1253-54. Even before the RJ completely excluded the Sun, this Court found, "Stopping the printing and distribution of the *Sun* would cause the Sun to suffer immediate and intangible harms in the form of 'loss of staff and ability to recruit new employees … loss of readership and visibility, and loss of goodwill," and that the Sun credibly faced an imminent risk of closure.[11] ECF No. 1096 at 8. Now the Sun is, in fact, currently suffering each of those tangible and intangible harms, and only this Court's order can prevent this irreparable harm from becoming permanent. *See* 1Tr.29:24-31:1, 55:21-61:3, 126:19-127:5.

The RJ's testimony that the Sun's owner's "voice" can be carried in other media is factually flawed and irrelevant. *See* 2Tr.465:5-15, 498:4-9. First, it disregards the uniqueness of the daily, print newspaper product, and the specialized consumers it reaches. *See supra* § II(A); 1Tr.66:1-67:24, 119:14-121:4; 2Tr.281:19-22; 2SA270-72. Second, it ignores the credible evidence that in the absence of operating under a JOA, the Sun's newsroom will be shut down, along with its website. ECF No. 1152 at 41-42 (citing evidence); 1Tr.20:6-12, 57:19-58:7, 67:2-24. The Sun has clearly shown, as this Court previously concluded, that the Sun is suffering irreparable injury which monetary damages cannot rectify. ECF No. 1096 at 8-9.

**B.    The Sun's Requested Relief is the Proper Remedy**

An Order from this Court enjoining the RJ from refusing to recognize and perform under the 1989 JOA is proportional to the immediate and irreparable injury the Sun is suffering. This requested relief is specifically tailored to address and would rectify that harm.

Section 16 of the Clayton Act explicitly grants competitors the right to injunctive relief to enjoin against the "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26;

---

[11] This is why Dr. Lamb's expert damages report was not supplemented, where Dr. Lamb's damages calculations concern compensation for money damages as a result of the RJ's other Anticompetitive Conduct, *i.e.*, accounting abuses and failures to maximize profits of the joint operation, prior to the RJ's refusal to print and distribute the Sun under the 1989 JOA. *See* 2Tr.506:5-19.

14

*see, e.g., In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 945 (9th Cir. 2025). The general principles applicable to fashioning equitable remedies in an antitrust case are applicable here. The Supreme Court has repeatedly confirmed district courts' broad authority to fashion equitable antitrust remedies that "'unfetter a market from anticompetitive conduct,' but also to 'pry open to competition a market that has been closed by defendants' illegal restraints.'" *In re Google Play*, 147 at 945-46 (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 573, 577-78 (1972); *U.S. v. Google LLC*, 803 F. Supp. 3d 18, 36 (D.D.C. 2025)). Therefore, where the Sun has clearly satisfied its burden for injunctive relief, the proper remedy is "to redress the violation and restore competition." *Id.* (citing *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950) & *Ford*, 405 U.S. at 573). The way to do so is to adopt a "'reasonable method' of redressing problems" that are causally connected to the conduct. *In re Google Play*, 147 F.4th at 949; *see Cal. v. Am. Stores Co.*, 495 U.S. 271, 282 (1990) (providing when the court finds that the conduct at issue threatens economic harm to consumers, the court is well within its discretion to fashion equitable relief that prohibits that conduct from causing harm). Thus, here, the "appropriate remedy [is to] restor[e] conditions in which the competitive process is revived" while being "tailored to fit the wrong creating the occasion for the remedy," is one in which the RJ performs under the 1989 JOA and the Sun is printed and distributed as a daily newspaper. *See Google LLC*, 803 F. Supp. 3d at 68; *Ford*, 405 U.S. at 575 (emphasizing that the relief ordered "must fit the exigencies of the particular case" (quotations and citation omitted)).

The RJ's exclusion of the Sun from the Newspaper Market is now complete as a result of its refusal to recognize the 1989 JOA as the governing agreement. The Sun's total exclusion is the most extreme hardship it can suffer as a result of the RJ's Anticompetitive Conduct. And, a direct causal connection exists between the RJ's refusal to perform under the governing 1989 JOA and the Sun's requested remedy of enjoining the RJ from refusing to do so. Absent the RJ's refusal, the Sun would be competing in the Newspaper Market.

There is simply no lesser available remedy in this case. Enjoining the RJ from refusing performance under the 1989 JOA is the sole means to not only restore competition in the Newspaper Market (a direct remedy for the Sun's Section 2 claims), but it would also restore the parties'

15

ongoing relationship—whereby the RJ would continue to manage all business aspects of the joint operation, on which the Sun has been dependent for 36 years—under the governing 1989 JOA (a direct remedy for the Sun's declaratory relief claim). *See supra* §§ III, IV. This is the "key to the whole question of an antitrust remedy," *i.e.*, the "measure[ ] effective to restore competition," where the RJ is currently operating without any competitive restraint, taking advantage of its economies of scale and existing infrastructure (where the Sun, in exchange for substantial consideration, relinquished to the RJ its infrastructure and control over its business operations with the Attorney General's approval in 1990), and harboring all revenues from subscribers who paid to receive both the Sun and the RJ. *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961); *see also* 2Tr.419:20-420:4.

Further discussed below but equally applicable when considering the propriety of the remedy, the RJ's complaints of hardship in having to print and distribute the Sun under the 1989 JOA do not render the requested remedy inappropriate. "The harshness of a remedy is not reason alone to reject it." *Google LLC*, 803 F. Supp. 3d at 69; *E. I. du Pont*, 366 U.S. at 327 ("Economic hardship can influence choice only as among two or more effective remedies. If the remedy chosen is not effective, it will not be saved because an effective remedy would entail harsh consequences."). The RJ has rejected <u>all</u> effective remedies in this case. *See, e.g.*, ECF No. 1096 at 11-12. As explained above, the RJ's pretextual offer to print the Sun is not an effective remedy. The RJ "cannot 'avoid an undoing of their unlawful project on the plea of hardship or inconvenience.'" *Google LLC*, 803 F. Supp. 3d at 69-70 (quoting *E. I. du Pont*, 366 U.S. at 326-27).

The harm that the Sun is suffering and will continue to suffer (*see supra* § III(C)(A)) ripples to consumers, which drove Congress's empowering courts to grant, and competitors to obtain, preliminary relief to enjoin a defendant from the mere threatened elimination of a business and competition. 15 U.S.C. § 26; *Am. Stores Co.*, 495 U.S. at 283-84; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969).

16

## VI.    THE BALANCE OF HARDSHIPS TIPS SHARPLY IN THE SUN'S FAVOR

When it comes to the Sun's hardships, there has been only one change since the Court's March 12 Order, wherein this Court conclusively found that "[t]he balance of equities tips sharply in the Sun's favor." ECF No. 1096 at 9. That one change is the Sun's total exclusion from the Newspaper Market since April 3. Since then, the potential harms to the Sun this Court described, including the "loss of institutional memory" and the "economic demise" of the Sun are happening in real time. *See* ECF No. 1096 at 9-10; *see also* 1Tr.55:21-56:19, 63:16-64:8. Should the Sun prevail on its antitrust claims, it will be the duty of this Court to restore competition. *See Google LLC*, 803 F. Supp. 3d at 36. The economic demise of the Sun in the interim will mean that, when the time comes, the Court will have no means to remedy the loss of competition. *See* ECF No. 1096 at 12 (concluding that the Sun's grievances "should be resolved before an irremediable loss is dealt, not afterwards").

"While the Sun may face a risk of closure if preliminary injunctive relief is not granted, the RJ faces no such corresponding risk." ECF No. 1096 at 9. The RJ's financial cost to comply with the 1989 JOA is correctly seen as either: (1) its contractual obligation, and thus not a legally cognizable "harm" because it is conduct to which the RJ is bound;[12] or (2) the direct result of its legal strategy to invalidate the 2005 JOA, and therefore, a foreseeable cost that the RJ has failed to mitigate. Either way, the balance of hardships weighs categorically in the Sun's favor because the RJ's claimed injury is the result of its own actions and conduct.

In addition, the RJ exaggerates the costs to comply with the 1989 JOA. Nolte's calculations for the RJ's performance under the 1989 JOA radically overstate the costs. *See generally* ECF No. 1173 at 1080-116.[13] He ignores that, if the RJ were enjoined from refusing to perform under the 1989 JOA, then the RJ would have the option to behave reasonably and mitigate those costs at its

---

[12] *See, e.g.*, *Commure, Inc. v. Canopy Works, Inc.*, 792 F. Supp. 3d 971, 981-82 (N.D. Cal. 2025) (finding that where the injunction would merely require the defendant to comply with a valid, enforceable contract, it is not a substantial burden, for balance of hardships considerations).

[13] Notably, besides the RJ's eleventh-hour disclosure of the backup for Nolte's calculations the night before the hearing (which Nolte had in his possession for <u>four months</u>), the RJ has still not produced the complete data underlying his calculations.

17

own election. It could do so by printing and distributing the Sun in a joint edition under Section 8.2 of the 1989 JOA if separately printing and distributing separate newspapers is not feasible.[14] The RJ has previously estimated its claimed damages from printing and distributing a 6-to-10-page edition of the Sun jointly with the RJ. *See* ECF No. 834-7 at 24. The production and distribution costs for joint distribution are far below those Nolte calculated for the standalone Sun. (Compare Nolte's estimated cost of $█████ for Residential Delivery of the standalone Sun in (Table 5)[15] with his estimate of $█████ for the inflation-adjusted cost of a joint edition (¶ 83). ECF No. 1173 at 1100, 1109.)[16]

Under the 1989 JOA, the RJ's promotional costs for the Sun can also be mitigated. Compliance with the 1989 JOA does not require the RJ to incur any additional promotional expense. It only impacts how those expenses are allocated as between the respective Newspapers. *See* 2SA307, 326. The other significant cost cited by Nolte is for the Sun's editorial and reportorial payment, but this would generate monetary damages that are easily calculated based purely on the amounts paid and an accounting for foregone interest.

Besides cost, the lone argument the RJ asserts into the balance of hardship discussion is that the RJ's First Amendment rights would be violated by requiring it to publish the Sun. This Court has already disposed of this argument in its March 12 Order, and no new RJ assertions since that time alter the appropriate analysis. *See* ECF No. 1096 at 9-10 (citing *Gannett*, 99 F. Supp. 2d at 125 & *Associated Press v. United States*, 326 U.S. 1, 20 (1945) ("The First Amendment 'rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society.'");

---

[14] After seeking to invalidate the 2005 JOA, the RJ has also refused to submit the 2005 JOA for Attorney General approval, which approval would eliminate the alleged economic hardship the RJ claims; instead, arguing financial harm for having to perform under the 1989 JOA. This is unreasonable behavior, as the RJ should not be able to have it both ways.

[15] This number is used by Nolte to calculate the losses the joint operations would allegedly suffer from printing and distributing a standalone edition of the Sun. ECF No. 1173 at 1082, 1000 (Nolte Tables 1, 2, and 5).

[16] Nolte also identifies costs that he claims Mr. Hall omitted. ECF No. 1173 at 1110-11. However, Nolte provides neither any calculation of these costs nor any evidence that they are significant or even valid. Additionally, the actual costs could be less than those estimated by Mr. Hall if the RJ elected to limit the Sun to only two pages under the terms of Section 8.2 of the 1989 JOA.

*see also* ECF No. 1152 at 44 n.17; ECF No. 970 at 42-43. Preserving two editorial voices in the Newspaper Market *furthers* the aims of the First Amendment, while excluding the Sun from the Newspaper Market violates the Sun's First Amendment rights.

## VII.    THE PUBLIC INTEREST AND CONSUMER WELFARE IS FURTHERED BY GRANTING THE INJUNCTION

The public interest in maintaining the Sun Newspaper and enforcing the 1989 JOA is not subject to reasonable dispute. *See* 15 U.S.C. § 1801; 1SA26-33; *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (injunctive relief is always deemed to be "<u>vital to the public interest</u>," for "the central purpose of the antitrust laws …. is to preserve competition"); *OnPointe Comm. Care LV LLC v. Charter Health Holds., Inc.*, 2023 WL 2430192, at *4 (D. Nev. Jan. 10, 2023) (recognizing the "public interest in the enforcement of contracts" (collecting cases)). Congress, the DOJ, the parties themselves, consumers, courts, and data studies have all agreed. *See, e.g.*, *id.*; ECF No. 1152 at 44 (citing evidence and authority); *see also* 1Tr.23:24:6, 27:12-29:23; 1SA32-92, 180. This is true despite that the RJ's Anticompetitive Conduct had weakened the Sun's abilities and incentives to compete with the RJ even before April 3. 1Tr.29:24-31:1, 55:21-61:3; 1SA60-88; 7SA1448-51. "All these considerations counsel that the public interest weighs heavily in favor of maintaining two competing editorial voices in the relevant market, especially insofar as the failure to do so now may lead to irreversible harms and foreclose this Court's ability to consider injunctive relief if the Sun prevails at trial." ECF No. 1096 at 10-11.

## VIII.    A DE MINIMUS BOND, IF ANY, IS PROPER

The RJ's exorbitant bond request of at least $36 million requires this Court to disregard: (1) the public considerations at issue, (2) controlling Ninth Circuit precedent that harnesses district courts with discretion to waive bond obligations, and (3) the Sun's financial position. <u>First</u>, given the inescapable public interest considerations at stake (*see supra*), no bond or a nominal bond should be required. *E.g.*, *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999); *Am. Fed. of State Cnty. & Municipal Emps., AFL-CIO v. United States Office of Manag. & Budget*, 813 F. Supp. 3d 944, 968 (N.D. Cal. 2025); *Castillo v. Johnson*, 2021 WL 75829, at *5 (D. Ariz. Jan. 8, 2021); *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1071 (S.D. Cal. 2023). <u>Second</u>, this Court is well

within its discretion to waive or order a nominal bond, as confirmed by controlling Ninth Circuit precedent. *E.g.*, *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review."); *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir.), *amended on other grounds by*, 775 F.2d 998 (9th Cir. 1985) (same); *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("Rule 65(c) invests the district court with discretion as to the amount of security required, if <u>any</u>." (quotations omitted)). <u>Finally</u>, notwithstanding the public interest, where "requiring security would effectively deny access to judicial review," this Court should exercise its discretion to waive the bond requirement or request nominal security. *See Save Our Sonoran, Inc.*, 408 F.3d at 1126 & *Van De Kamp*, 766 F.2d at 1325. The RJ's exorbitant bond request operates as an effective bar to any relief granted. It is undisputed that the Sun has not received any profit payment since 2017 (1Tr.47:20-49:9), and this Court has already heard testimony on the Sun's lack of financial means and should exercise its discretion to require a nominal bond, if any.[17] *See Castillo* 2021 WL 75829, at *5.

## IX. CONCLUSION

For the foregoing reasons, an order granting the Sun's request and enjoining the RJ from refusing to perform under the 1989 JOA is necessary and warranted.

Dated this 5th day of May, 2026.

CLARK HILL PLC

By: /s/ *Kristen L. Martini*
E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
1700 S. Pavilion Center Drive, Suite 500
Las Vegas, Nevada 89135

---

[17] If a plaintiff's financial capacity is considered to reduce or waive the bond requirement, the consideration is focused on the plaintiff, not an owner. *See, e.g.*, *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975) (nominal bond ordered as plaintiff's limited resources were considered, not the resources of plaintiff's members and supporters). Surely the RJ would object to introduction of the Adelson family's wealth as a factor to consider in the balance of hardships. The RJ can't have it both ways.

20

PISANELLI BICE PLLC
James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

BROWNSTEIN HYATT FARBER
SHRECK, LLP
Jordan T. Smith, Nevada Bar No. 12097
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

ALIOTO LAW FIRM
Joseph M. Alioto, Pro Hac Vice
One Sansome Street, 35th Floor
San Francisco, California 94104

*Attorneys for Plaintiff/Counterdefendants*

21

105559\1015963\287709625.v1-5/5/26

**CERTIFICATE OF SERVICE**

I certify that I am an employee of CLARK HILL PLC, and I caused a true and correct copy of the foregoing **PLAINTIFF'S POST-HEARING SUPPLEMENTAL BRIEF PER ECF NO. 1182** to be served by electronically filing the foregoing with the CMECF electronic filing system which will send notice of electronic filing to:

J. Randall Jones, Esq.
Mona Kaveh, Esq.
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169

Michael J. Gayan, Esq.
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite 100
Las Vegas, NV 89107

Amy M. Gallegos, Esq.
David R. Singer, Esq.
Andrew G. Sullivan, Esq.
Alison I Stein, Esq.
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, CA 90071

Richard L. Stone, Esq.
850 Devon Avenue
Los Angeles, CA 90024


DATED: May 5, 2026.

/s/ Kristen L. Martini
An Employee of Clark Hill PLC

22

105559\1015963\287709625.v1-5/5/26