J. RANDALL JONES, ESQ., SBN 1927
r.jones@kempjones.com
MONA KAVEH, ESQ., SBN 11825
m.kaveh@kempjones.com
KEMP JONES LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone:     +1 702 385 6000

DAVID R. SINGER, ESQ. (*pro hac vice*)
dsinger@jenner.com
AMY M. GALLEGOS, ESQ. (*pro hac vice*)
agallegos@jenner.com
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, California 90071
Telephone:     +1 213 239 5100
Facsimile:     +1 213 239 5199

MICHAEL J. GAYAN, ESQ., SBN 11135
mike@claggettlaw.com
CLAGGETT & SYKES LAW FIRM
1160 N. Town Center Drive, Suite 200
Las Vegas, Nevada 89144
Telephone:     +1 702 333 7777
Facsimile:     +1 702 655 3763

RICHARD L. STONE, ESQ. (*pro hac vice*)
rstone@fastmail.com
850 Devon Avenue
Los Angeles, California 90024
Telephone:     +1 310 993 2068

*Attorneys for Defendants/Counterclaimant*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC.,<br><br>                          Plaintiff,<br><br>          v.<br><br>SHELDON ADELSON, et al.,<br><br>                          Defendants.<br><br>_____<br><br>AND RELATED COUNTERCLAIM | Case No. 2:19-cv-01667-ART-MDC<br><br>Filed Under Seal Under Court Orders (ECF Nos. 882, 883, 1181)<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S POST-HEARING BRIEF [ECF NO. 1189]** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................3

I.     The Sun Has Not Met the Stringent Requirements for a Mandatory Injunction. ...............3

     A.     The Sun Has Not Shown That It Will Clearly Succeed on the Merits. ..................4

         1.     The Sun Has Not Clearly Shown Any Cognizable Competition In A Valid Relevant Product Market. ...........................................................4

         2.     The Sun Has Not Met Its Burden To Clearly Show The Review-Journal Exercises Monopoly Power. ...............................................8

         3.     The Sun Has Not Clearly Shown Any Cognizable Anticompetitive Conduct. ...............................................................................9

     B.     The Sun Has Not Clearly Shown Irreparable Harm. .............................................13

     C.     The Balance of Equities and Public Interest Weigh Against an Injunction. ...................................................................................................15

II.     The Court Will Be Reversed Again If It Issues The Injunction The Sun Seeks................16

     A.     An Injunction Must Be Closely Tied To Remedying The Alleged Antitrust Harm. ...................................................................................................17

     B.     The Sun's Requested Relief Does Not Fit The Alleged Antitrust Harm. ..............18

III.     If The Court Grants An Injunction, It Must Require A Substantial Bond. ........................19

CONCLUSION .................................................................................................................20

i

**INTRODUCTION**

The two-day evidentiary hearing was devastating for the Sun and vindicating for the Review-Journal. Each of the Sun's witnesses failed to support its theories or fell apart on cross. The Review-Journal's witnesses offered credible testimony to support the Review-Journal's case, which the Sun did not meaningfully impeach or rebut.

Confronted with that reality, the Sun's post-hearing brief proceeds as if the hearing never happened. It rehashes much of the Sun's pre-hearing brief, ignores the testimony this Court heard, and treats the Ninth Circuit's controlling decisions as irrelevant background. But the Sun cannot wish away the hearing any more than it can wish away the Ninth Circuit's decisions. To obtain a mandatory injunction, the Sun must meet a doubly demanding standard: to show the law and facts *clearly* favor it on *every* preliminary-injunction factor. On this record, the Sun has not come close.

*First*, the Sun's antitrust case collapsed at the threshold. Greenspun, Picard, and Katz all admitted the Sun and the Review-Journal *do not compete to sell newspapers*. The Sun's claims thus rest on the idea that it competes with the Review-Journal for "reader attention" *after* the joint product is purchased. That theory requires evidence that the Sun is an economic substitute for the Review-Journal. But Katz's admissions foreclose that. He admitted he was "not able to find sufficient data" and was "not aware of any data" to analyze post-purchase reader attention. He also admitted that he conducted no substitution analysis and was not aware of any data showing readers switching between the *Sun* and the *Review-Journal*. On this record, it would be reversible error for the Court to find the Sun *clearly* showed an antitrust violation. Additionally, it would be reversible error for this Court to set aside its judicial common sense and experience and find that the evidence *clearly* supports the Sun's print-only market definition. Every single witness testified, and every piece of evidence from third parties agreed, that print competes with digital and has been losing badly for years as subscribers and advertisers switch to online news. This is the very definition of competition under the antitrust laws, so the market must be defined to include these sources.

*Second*, the hearing testimony confirmed that the Sun cannot identify any cognizable anticompetitive conduct by the Review-Journal. Any alleged past violations of the 2005 JOA are irrelevant because that agreement is unlawful and unenforceable.

1

Nor can the Review-Journal be accused of failing to perform under the 1989 JOA. The undisputed evidence shows it was terminated and entirely replaced by the 2005 JOA; in any event, it was abandoned when both sides stopped performing under it 21 years ago; and it is unenforceable as a matter of law because its subject matter (*i.e.*, an afternoon print *Sun* with separate subscribers) ceased to exist in 2005, making performance impossible. The Sun's reliance on the 1989 JOA's force majeure clause does not change that: it is a contractual defense the Review-Journal has not invoked, has not been triggered, and does not require printing the *Sun* as a daily insert indefinitely.

Recognizing the futility of enforcing the 1989 JOA, Katz proposes that the Court analyze the Review-Journal's conduct in what he called the "economic setting" of the 2005 JOA. But he was forced to admit that is neither a "term of art" in antitrust economics nor even "a term people use." He simply made it up at the Sun's direction, to get around the Ninth Circuit's clear mandate that enforcement of the 2005 JOA terms is illegal. And beyond those legal defects, the conduct itself was not anticompetitive: Chris Blaser and Glenn Cook—long-time newspaper professionals with no prior ties to the Adelson family—provided legitimate business reasons for the editorial, circulation, and operational decisions the Sun labels anticompetitive, and confirmed that no one ever directed or suggested they should harm the Sun or undermine the joint operation.

*Third*, the Sun's own witnesses admitted under oath that injunctive relief is unavailable here. Brian Greenspun, the Sun's owner and publisher, confirmed that the Sun's purported harms are quantifiable; he conceded that when the Adelsons purchased the Review-Journal, Greenspun was willing to take money to "exit the JOA" and "be out of daily newspaper business." He also admitted that without an injunction, the Sun's "voice" can still be heard through the Sun's website, affiliated weeklies, and social media followers—which reach orders of magnitude more people than the print *Sun*. The Sun proffered zero evidence that it has been harmed at all since April 3; that a handful of people offered messages of support in person or by email does not show the Sun's reputation or goodwill will be irreparably damaged, or that the Sun cannot continue as a going concern, unless the Review-Journal is forced to publish the *Sun* as an insert within the *Review-Journal*. And Greenspun admitted that there is no cognizable barrier to printing the Sun: it can rent press time at market rates and operate as any other print paper in 2026. Picard's testimony also

2

dealt a fatal blow to the Sun's claims. He admitted (under the Court's own questioning) that the Sun can rent press time as other newspapers do, that his cost estimates were wildly inflated and inapplicable, and that JOAs have "done a very poor job of preserving" newspapers and instead "hastened their decline." Restoring the 1989 JOA will be no different. David Nolte, the Review-Journal's expert, then walked the Court through how each category of the Sun's alleged injuries—printing costs, loss of staff, readership, business value, and goodwill—can be quantified in money. And the Sun did not rebut his bond calculations. Boiled down, the Sun seeks an order requiring the Review-Journal to subsidize a doomed business while Greenspun litigates. But the antitrust laws and equitable principles do not authorize such relief on this record.

At the close of the hearing, the Court asked two questions. First, the Court asked whether the Sun's requested relief is "overbroad" relative to the alleged antitrust violation. *Yes*. The Sun is not entitled to *any* relief because it has not shown an antitrust violation. Even if it had, compelling compliance with the 1989 JOA would not be tailored to the alleged violation or provide effective relief, because it would not remedy the alleged competitive harm or lead to more competition. It would do the opposite by requiring the Review-Journal to subsidize the Sun and engage in the collusive conduct the antitrust laws exist to *prevent*. And any relief would be short lived: all agree that reviving the 1989 JOA in 2026 is an economic albatross that cannot rescue the Sun and may bring down the Review-Journal with it. An injunction would thus harm, not help, the public.

Second, the Court asked the parties to "justify different numbers" for a bond. It should be at least $51.4M, *i.e.*, the cost the injunction would impose on the Review-Journal. Anything less leaves the Review-Journal unable to recover if an injunction is vacated—which is likely here given the mandate, the 2005 JOA's unenforceability, and the doubly high standard the Sun faces.[1]

<strong>ARGUMENT</strong>

I.     <u>**The Sun Has Not Met the Stringent Requirements for a Mandatory Injunction.**</u>

The Sun asks this Court to order the Review-Journal to "perform under the 1989 JOA." ECF No. 1189 ("Br.") at 1; *id.* at 2, 6, 14–15, 20. Neither the Review-Journal nor the Sun has

---

[1] Unless otherwise stated, emphasis is added and citations are cleaned up. Defined terms have the meaning in the Review-Journal's pre-hearing brief, ECF No. 1172. The preliminary injunction hearing is cited using the convention in the Sun's post-hearing brief, *i.e.*, 1Tr.## and 2Tr.##.

3

performed under the 1989 JOA for more than 20 years, so the Sun seeks a mandatory injunction. *See Hall v. USDA*, 467 F. Supp. 3d 838, 844 (N.D. Cal. 2020) ("mandatory injunctions order a responsible party to take action." (quoting Ninth Circuit cases)). This Court and the Ninth Circuit have already recognized that the Sun's request to enforce the 1989 JOA seeks a mandatory injunction. *See* ECF No. 1096 at 4 n.1 (noting "Sun concedes that it seeks mandatory relief" to "compel the RJ to revert to the 1989 JOA"); Mandamus Op. 5–6 (describing Sun as seeking a mandatory injunction and 2005 JOA as the "core" of the status quo); *accord* ECF No. 1152 at 43 (Sun describing "mandatory nature of the relief sought (reversion to the 1989 JOA)"). The Sun's disingenuous attempt to re-frame its request as seeking "prohibitory" relief should be ignored. *See* ECF No. 1172 at 17 (citing cases rejecting attempt to cast mandatory relief as prohibitory).

To obtain a mandatory injunction, the Sun must satisfy a "doubly demanding" standard. *Garcia v. Google, Inc.*, 786 F.3d 733, 740, 746 (9th Cir. 2015). It must show that the "law and facts clearly favor" or "strongly favor" its position on all four preliminary injunction factors. *Cruz Utiz v. Noem*, 2025 WL 2995008, at *13 (C.D. Cal. Sept. 23, 2025) (citing *Garcia* and other Ninth Circuit cases); *see also* ECF No. 1172 at 16–17 (citing cases applying heightened standard in cases seeking an injunction under Section 16 of the Clayton Act). Based on the record adduced before this Court, including the testimony at the hearing, the Sun has not met this very heavy burden.[2]

**A. The Sun Has Not Shown That It Will Clearly Succeed on the Merits.**

**1. The Sun Has Not Clearly Shown Any Cognizable Competition In A Valid Relevant Product Market.**

As a threshold matter, even if the Sun had alleged a valid product market (it has not, but more on that below), to clearly show it is likely to prevail on its antitrust claims, the Sun must clearly show that it competes with the Review-Journal in that alleged market. To do that, the Sun must show it is an economic substitute for the Review-Journal—meaning they have the "actual or potential ability to deprive each other of significant levels of business." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–21 (9th Cir. 2018). The Sun fails that test.

---

[2] The Sun misleadingly claims that the Court decided issues that resolve this motion at summary judgment. *See* Br. 10–11. But the Court found *disputed* issues of fact, for the *jury* to decide, on competition in the relevant market, harm to competition, antitrust injury, and market participation.

At the hearing, every Sun witness admitted under oath that the Sun and the Review-Journal *do not* compete to sell newspapers. *See* 1Tr.114:5–14 (Greenspun); *id.* at 216:16–218:18 (Katz); 2Tr.321:23–322:23 (Picard). Dr. Katz then pinned the Sun's entire case on the theory that the Sun and Review-Journal "compete for readers … after the consumers' purchase decision." 1Tr.216:20–218:2; *see* Br. 5. But the Sun has not defined or presented any evidence that a market for post-purchase readership exists. And, on cross, Katz's admissions foreclose the Sun's ability to prove this theory. Katz conceded he was "not able to find sufficient data" to analyze competition for reader attention, was "not aware of any data" that would allow him to do so, and was not aware of any "tracking of the Sun readership." 1Tr.219:5–222:8; *id.* at 114:17–116:22 (Greenspun admitting there is no "unit of measurement for reader attention" or way to "gauge" such competition); ECF No. 846, Ex. H at 81:19–82:7 (Katz: "[I] did not conduct any analysis that formally measures the degree of substitution or the degree of competition"). Katz admitted that he has no data showing the *Sun* content is a "substitute" for the *Review-Journal*, rather than a "complement" to it, and that he has no data showing consumers switch between the *Sun* and *Review-Journal*. 1Tr.220:21–222:8; 2Tr.330:23–331:1 (Picard agreeing the *Sun* is not a "news substitute" for the *Review-Journal*). Katz further admitted that although the Sun could show it is a substitute if "consumers respond to changes in quality," he lacked "sufficient data" to "conduct such an analysis." 1Tr.221:19–222:1.

These admissions foreclose the Sun from showing competition for post-purchase reader attention—the only market asserted. As Katz explained, ███████████████████████ ████████████████████████████████████ ECF No. 875 at SOA263; *see* ECF No. 1172 at 40 (substitutes "can replace one another and thus 'compete' for the user's purchase" (quoting Areeda)); 2 OPP 1035–1043 ("Evans Decl.") ¶¶ 14, 19–20, 25–26 ███ ████████████████████████████████. But Katz admitted he had no evidence the Sun and Review-Journal compete on price or quality, and he could not say they are substitutes rather than complements. By definition, then, they do not compete and the Sun cannot prevail.

It is irrelevant whether some consumers "view the Sun as a *distinct* product from the RJ"

5

and subscribe to the print product. Br. 4. To prevail on *antitrust* claims, the Sun must show the *Sun* is a *competing* product that *substitutes* for the *Review-Journal*. *See U.S. v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990) ("It can't be said often enough that the antitrust laws protect competition, not competitors"); ECF No. 1172 at 40, 43 n.12. But the Sun presented zero evidence of substitution or competition. And because the Sun cannot show it competes in the relevant market, it cannot prevail (let alone "clearly") on its antitrust claims. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 999–1000 (9th Cir. 2020) (rejecting claim where plaintiff showed "no direct impact on competition"); *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (to prevail a plaintiff "must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market").

Against these case-ending admissions, the Sun claims Katz's analysis of the *Brown Shoe* factors is sufficient to show competition between the *Sun* and the *Review-Journal*. Br. 4–5 (citing 1Tr.145:14–153:1). But Katz only analyzed whether print competes with digital media, *not* whether the *Sun* and *Review-Journal* compete with each other. *See id*. And even if print *Sun* and *Review-Journal* share certain attributes and are both read by consumers, that is not *evidence* of actual competition between them. So it cannot overcome Katz's admissions that he has *no* evidence showing competition for reader attention post-purchase or evidence that the *Sun* and *Review-Journal* were substitutes rather than complements. Katz's *Brown Shoe* analysis is thus a dead end because, even under it, the Sun cannot show competition required to prevail in an antitrust case.

It also makes no difference if the *Sun* is the *Review-Journal's* "chief editorial rival." *See* Br. 5. Editorial page debates, *i.e.*, competing in "the marketplace of ideas" that has no impact on trade or commerce, are not engaging in economic competition protected by the antitrust laws. *See Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 983 (D.C. Cir. 2017); ECF No. 1172 at 37–38. And Katz admitted he is not aware of any "quantitative measure" showing how editorial competition impacts reader attention post-purchase. 1Tr.219:5–222:8.

Independent of its failure to show economic competition, the Sun failed to meet its burden to clearly show "daily print newspapers" is a viable product market. The Sun does not dispute that its alleged product market must include "all economic substitutes" that may "deprive each other

of significant levels of business," that the Court must apply "judicial experience and common sense" when evaluating the market definition, and that the definition must match "the 'commercial realities faced' by consumers." ECF No. 1172 at 41 (quoting Ninth Circuit authority).

The Court cannot ignore that witness after witness testified that for decades print newspapers have been competing with digital media, which has been taking subscribers, revenue, circulation, and market share. *See* 2Tr.386:9–387:23 (Blaser: print "is in serious decline" due to competition from digital); *id*. at 470:2–471:11 (Cook: print must "fight … against anything and everything that is accessible on a cell phone… and newspapers are losing badly"); *id*. at 490:18–491:7 (Nolte: digital alternatives are "eating the lunch of print"); *id*. at 332:12–333:2 (Picard: "large portions of the public are now fleeing newspapers" and "increasing competition from other types of media … is wreaking havoc" on print); *see also* ECF No. 450-3 ¶ 57 (Greenspun: "online newspaper websites are considered adequate substitutions for printed newspapers" and print "has struggled in recent years and sales have dropped"); *see also* Evans Decl. ¶¶ 25–26. Industry analysts like Pew Research (relied on by the Sun's expert) agree. *See* ECF No. 1172 at 41–42.

In response, the Sun contends print newspapers are a valid market because some consumers prefer print. *See* Br. 3. But the Ninth Circuit has rejected similar efforts to define a market based on only the most inelastic sub-group of consumers. *See, e.g.*, *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063–65 (9th Cir. 2001) (affirming rejection of market definition based on product being "unique" and "not interchangeable" with obvious competitors due to "personal preference"); P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles & Their Application ¶ 533c (5th ed. 2020) (explaining that although a subset of consumers may "find substitution more difficult" than others, those inelastic consumers "are not a 'submarket'" for antitrust purposes).

The Sun also contends that Katz's data analysis supports its market definition. Br. 3. But as Drs. Hausman and Evans have explained, Katz's work is methodologically unsound, ignores competition from digital media, and implies the Review-Journal could profitably raise prices by 30%–300%—which flatly contradicts both the Review-Journal and the industry's reality. *See* ECF No. 1074, Exs. E & F ¶¶ 18, 228–237 (Evans: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); ECF No. 864-5 ¶¶ 97, 102–116 (Hausman:

███████████████████████████████████████████████████

██████████ ); *see also* Evans Decl. Even setting aside experts, no court applying "judicial experience and common sense" could conclude on this record that the "commercial realities" show print newspapers *clearly* do not compete with digital media.[3] That precludes the Court from issuing the mandatory injunction the Sun seeks, even if the Court somehow finds the Sun has "clearly" shown economic competition in the market for reader attention post-purchase.

**2. The Sun Has Not Met Its Burden To Clearly Show The Review-Journal Exercises Monopoly Power.**

To prove the necessary element of monopoly power, the Sun must *clearly* show the Review-Journal has accumulated monopoly ***profits***. *See* ECF No. 1172 at 43 n.12 (citing Ninth Circuit precedent). The Sun cannot possibly meet that burden when any profits, let alone *monopoly* profits, are non-existent for print newspapers. The Sun sidesteps this necessary element, claiming the record "proves" the Review-Journal has unlawfully exercised monopoly power because it has "exclude[d]" the *Sun* insert and "control[led]" the Sun's output since April 3. Br. 5. Again, the Sun misdirects the Court. The Review-Journal ceased printing the *Sun* because the Ninth Circuit said doing so would be *illegal*, and has done nothing to prevent the Sun from printing or to control its content. *See* 2Tr.341:4–11 (Picard unaware if the Sun pursued the RJ's print press offer); Brian Greenspun, *Las Vegas Deserves More Than Just Adelson's Voice*, Las Vegas Sun (Apr. 26, 2026).

Nor can the Sun meet its heightened burden through Dr. Picard's outlandish estimates of "capital investment," "operational," and "start-up costs." Br. 5 (citing Picard's testimony on direct). Those new business start-up costs are *not* "barriers to entry" under antitrust law. *See, e.g.*, *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 727 (9th Cir. 2026) (rejecting "the cost of specialized machinery and professional knowledge" as a barrier to entry because they are "start-up costs" any entrant "would encounter"); *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1428 (9th Cir. 1993) ("The mere fact that entry requires a large absolute expenditure of funds does not constitute a 'barrier to entry'"); *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d

---

[3] All but one of the cases the Sun relies on predate the internet era. *See* ECF No. 1172 at 42 (citing cases from 1995 to 2008); 1Tr.146:14–149:5. The other did not involve digital media. *See U.S. v. Trib. Publ'g Co.*, 2016 WL 2989488, at *4 (C.D. Cal. 2016) (noting Tribune identified no "on-line local sources" and that Google News and Apple News are content aggregators, not creators).

1191, 1200 (3d Cir. 1995) ("High capital requirements also pose no barrier to entry.").

Picard's credibility was further shredded when he was forced to admit that his barriers-to-entry analysis was exaggerated and unmoored from reality. For example, after testifying the Sun would need more than $100M to print a paper—$47M–$70M to buy land and develop a building, plus $20M–$50M for a printing press—on cross he conceded (in response to the Court's question) that the Sun did not need to buy land or build a facility at all, and could "certainly" contract with the "many places" with a press as other papers do. *See* 2Tr.293:24–294:6; 295:2–13; 297:10–12; 300:20–24; 356:2–357:3. Picard also admitted that the very appraisal he relied upon for his printing press estimate pegged the cost as low as $310,000—roughly 1% of what he originally claimed. *Id.* at 343:1–345:13. The only barriers the Sun faces are thus its own unwillingness to incur expenses and the market's lack of demand. Neither justifies an extreme mandatory injunction.

### 3. The Sun Has Not Clearly Shown Any Cognizable Anticompetitive Conduct.

The Sun alleged the Review-Journal engaged in four types of anticompetitive conduct: accounting abuses; failure to maximize joint operation profits; efforts to limit "consumer knowledge of the Sun"; and "efforts to terminate the joint operation." ECF No. 1152 at 12–23; *see* Br. 5. The Sun cannot establish a clear likelihood of success because they all relate to alleged failure to perform under the unlawful and unenforceable 2005 JOA. *See* ECF No. 1172 at 18–19.

At the evidentiary hearing, the Sun's witnesses admitted that the Review-Journal's alleged anticompetitive conduct was all grounded in the 2005 JOA. *See, e.g.*, 1Tr.229:4–16 (Katz: analysis focused on 2005 JOA); 1Tr.232:15–21 (Katz: "R-J's anticompetitive conduct" was "undertaken under the 2005 amendment"); 1Tr.34:15–35:5 (Greenspun: 2005 JOA required Review-Journal to give the Sun a "presence on the front page of the Review-Journal" and "promote us equally"). So, none of the alleged anticompetitive conduct the Sun cites can support its claims because the 2005 JOA is (and has always been) unlawful and unenforceable.

Katz (again) misdirected, bizarrely claiming that although he analyzed conduct under the 2005 JOA, his analysis was "framed in terms of how the R-J deviated from its obligations under the 1989 [JOA]." 1Tr.232:15–21. Katz said the Sun instructed him to "assume" the 2005 JOA was "legally valid" and to analyze the "economic setting" where "people believe" it was "valid and

enforceable." *Id.* at 229:4–230:23. In other words, the Sun is still trying to enforce the 2005 JOA.

Katz's testimony is incomprehensible. As Katz himself admitted on the stand, he did not know if "the term 'economic setting' [is] a term of art in antitrust economics," and he is "not aware of it being a term people use." *Id.* at 231:25–232:3. Dr. Evans, a renowned antitrust economist, was also unaware of Katz's terminology or concept. *See* Evans Decl. ¶ 17. Katz apparently made up a fictional term to evaluate a fictional world where the 2005 JOA was lawful and enforceable and antitrust laws are violated whenever a company thinks it is harming a competitor. But none of that is true in the real world. The Ninth Circuit held that the parties' prior conduct was under the 2005 JOA, and that the 2005 JOA is unlawful. The antitrust laws regulate anticompetitive conduct, not belief or intent. *See* ECF No. 1172 at 19 (citing cases). And an expert may not offer opinions based on applying a methodology that no one else in the field follows or "assum[ing] a world" where key facts "did not happen." *See* ECF No. 1172 at 21; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999); *Cooper v. Brown*, 510 F.3d 870, 946 (9th Cir. 2007). Simply put, Katz cannot enforce the 2005 JOA through the backdoor after the Ninth Circuit slammed the front door.

Finally, the Sun argues that the Review-Journal's "refusal to recognize the 1989 JOA as the governing agreement" is anticompetitive because that position is "objectively baseless." Br. 6. But under *Noerr-Pennington*, the Review-Journal's legal position is not a "sham" and thus *cannot* be the basis for antitrust liability because there are *multiple* reasons the Review-Journal "could realistically expect success on the merits." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61, 65 (1993) (litigation only a "sham" if litigant could not "have believed that it had some chance of winning" an "arguably" valid claim); *see* ECF No. 1172 at 26–29.

**The 2005 JOA was a novation.** At the hearing, the Court heard Greenspun admit the 2005 JOA was "intended to substitute" for the 1989 JOA and was thus a novation. *See Williams v. Crusader Disc. Corp.*, 75 Nev. 67, 70 (1959). Far from a "modification of certain details," Br. 7, Greenspun confirmed that the 2005 JOA superseded the 1989 JOA's material terms, including the form of the newspaper product (1Tr.31:18–24), the financial structure (*id.* at 33:10–23, 103:20–25), and promotion structure (*id.* at 34:15–35:5). He admitted that the Sun "gave up" the preferred terms of the 1989 JOA and "changed" the terms to the 2005 JOA. 1Tr.33:13–35:5. And he admitted

10

that as of 2015 "[t]he 2005 [JOA] was in effect" and the parties were bound to "carry out" its terms, not the terms of the 1989 JOA. *See* 1Tr.104:1–110:21 (conceding § 5.3 obligated the Sun to "effectuate the intent, purposes, and provisions" of the 2005 JOA, not the 1989); *see also* ECF No. 1172 at 6 (cataloging differences between 2005 JOA and 1989 JOA); *News+Media Cap. Grp. LLC v. Las Vegas Sun, Inc.*, 137 Nev. 447, 448 (2021) (listing "several important changes" between 1989 and 2005 JOA).[4] The 2005 JOA's text, Greenspun's admissions, and the parties' exclusive performance under the 2005 JOA since its execution establish an intent to novate by "clear and convincing" evidence. *Omni Fin., LLC v. Kal-Mor-USA, LLC*, 138 Nev. 973 (2022).[5] And multiple courts have held that even when a novation contract is found to be illegal, the novated contract remains *terminated—not reinstated*—by operation of law. *See* ECF No. 1172 at 32–33.

**The 1989 JOA was abandoned.** This Court heard Sun and Review-Journal witnesses testify that no one thought the 1989 JOA was in effect after 2005. On this record, it is thus undisputed that the 1989 JOA was abandoned more than 20 years ago—and so is not enforceable today. *See J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 292 (2004). After Greenspun tried to claim the 1989 JOA was operative in 2015, he was impeached by his prior admission that the 2005 JOA is "the only JOA that exists." 1Tr.111:10–25; *see* 2 OPP 1044–1050. Then Katz testified that in "***the actual world***" the parties operated solely under the 2005 JOA (1Tr.189:5–191:18), and the Sun did not demand performance of any provisions of the 1989 JOA between the formal transition date in 2005 and 2026. 1Tr.234:13–22, 244:7–245:2. Blaser and Cook testified they did not consider the Review-Journal obligated to perform under the 1989 JOA, had never been told by anyone at the Review-Journal or the Sun that "the 1989 JOA was still in effect," and only read it in preparing for depositions. *See* 2Tr.383:9–384:6 (describing 1989 JOA

---

[4] The Sun has it backwards to claim the 2005 JOA was not a novation because a provision "require[d] consultation of the 1989 JOA." Br. 7. The cited provisions directed the parties to *not follow* a term in the 1989 JOA, meaning that the prior term was superseded. *See, e.g.,* 2005 JOA App'x D ("earnings shall not be reduced by any amounts that … [were deducted under] the 1989 Agreement"); *accord News+Media Cap. Grp.*, 137 Nev. at 449, 458 (holding that calculation under 2005 JOA should not be interpreted by reference to the 1989 JOA).

[5] The Court's prior summary judgment ruling incorrectly relied on document headers and should be revisited following the Ninth Circuit's remand. *See* ECF No. 1172 at 29–33 & n.9; *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169–70 (9th Cir. 2013) (looking to "the substance" of the agreement and rejecting argument that "the labels parties use" is conclusive).

as "an archaic, abandoned document"), 432:8–433:5 (describing 1989 JOA as "a historical document" that was "long abandoned" and "not … relevant"), 450:13–451:19 (similar); *accord* ECF No. 1172 at 33–34 (citing additional evidence, including Bob Cauthorn testifying that █████ ████████████████████████████████████████████████████████████████ ).

**Performance under the 1989 JOA is impossible or impracticable.** The Court heard undisputed testimony that the subject matter of the 1989 JOA no longer exists. There is no afternoon *Sun* newspaper, no subscribers who are paying for an afternoon newspaper, no contracts with advertisers for an afternoon newspaper, and no arrangements to print or deliver an afternoon newspaper. *See* 2Tr.284:13–19, 339:23–24, 402:20–403:18. That makes this a textbook case of impossibility. *See* ECF No. 1172 at 35–36. At the hearing, witnesses on both sides told the Court that reviving the 1989 JOA would require the parties to create an afternoon Sun from scratch— and that performing under the 1989 JOA would be a financial calamity and a certain failure. 1Tr.69:24–70:15, 112:1–20 (Greenspun blaming "precipitous" pre-2005 circulation drops on afternoon distribution and declining to say he wants the Sun to be an afternoon paper today); *id.* at 309:15–310:15 (Picard: JOAs hasten the decline of weaker papers); 2Tr.390:1–7 (Blaser: an afternoon Sun is "absolutely not" economically viable today), *id.* at 454:16–23 (Cook: launching such a paper would be a "catastrophic waste of money"); *id.* at 512:11–15 (Nolte: there is "no chance" an afternoon Sun would be a success). This is a clear case of impracticability due to "extreme and unreasonable difficulty" or "expense." ECF No. 1172 at 35–36. The Court would abuse discretion to use its equitable powers to order such obvious waste.

**The 1989 JOA's force majeure provision is irrelevant and inapplicable.** Finally, the Sun contends that the Review-Journal "must avail itself" of the 1989 JOA's force majeure provision, which the Sun says requires the Review-Journal to "print the Sun as a joint edition." Br. 8–9. Force majeure provisions excuse performance upon the occurrence of a specified event beyond a party's control. *See Baroi v. Platinum Condo. Dev., LLC*, 874 F. Supp. 2d 980, 985–86 (D. Nev. 2012). But there has been no force majeure event here. *See* 1989 JOA § 8.2 (listing qualifying events). The Ninth Circuit's invalidation (or the DOJ's non-approval) of the *2005 JOA* was not a "government action" preventing performance of the *1989 JOA*. *See* Mandamus Op. 7

12

(reserving decision on 1989 JOA). The parties' choice to abandon the 1989 JOA and end the afternoon *Sun* 21 years ago was obviously not an act "beyond [their] control." 1989 JOA § 8.2. And neither the rise of online media nor the lack of consumer demand for an afternoon paper is a force majeure event under the 1989 JOA. *See* ECF No. 970 at 48–49 (holding identical force majeure provision in 2005 JOA "cannot be stretched to apply" to "catastrophic decline" of print).[6]

\* \* \* \* \*

Unable to rely on alleged violations of the unlawful 2005 JOA or the irrelevant 1989 JOA, the Sun cannot satisfy its doubly demanding burden to clearly show the Review-Journal engaged in any anticompetitive act. The conduct alleged in the complaint was not anticompetitive as a matter of law. *See* ECF No. 1172 at 21, 23, 25. Blaser's and Cook's credible, unrefuted testimony proved that the Review-Journal has repeatedly sought to improve quality, customer service, and circulation—which benefited consumers and the Sun, too—and Blaser and Cook were never explicitly or implicitly directed to harm the Sun's brand or reduce the joint paper's circulation. *See* 2Tr.374:13–382:15, 394:23–395:19, 405:14–406:3, 442:23–446:1, 458:14–459:1; *accord* ECF No. 1172 at 22–23 (cataloging evidence corroborating valid business reasons for the Review-Journal's actions).[7] That puts the nail in the coffin of the Sun's claims of anticompetitive conduct.[8]

### B. The Sun Has Not Clearly Shown Irreparable Harm.

The Sun has not come close to making the required "clear showing" that it will suffer imminent irreparable harm without an injunction. *Garcia*, 786 F.3d at 746.

*First*, an injunction requiring the Review-Journal to print the *Sun* insert is not necessary to preserve the Sun's "voice." Greenspun confirmed that his "voice" can be heard through the Sun's

---

[6] Even if there had been a qualifying event, the force majeure provision is a contract *defense* to non-performance that the Review-Journal has not asserted. *See* ECF No. 1172 at 50.

[7] Meanwhile, they testified about the "several instances" when the Sun's owners "tried to undermine or harm the Review-Journal brand." 2Tr.457:23–458:13, 390:22–391:10, 468:1–15, 392:23–394:22; *see also* 2Tr.463:7–464:22 (the Sun's award-winning coverage of the 2017 mass shooting did not appear in the print *Sun*); ECF No. 1172 at 9–10 (gathering Sun statements); ECF No. 863-1 at 13–22, 25–36, 39–44, 51 (analyzing *Sun* content).

[8] For the reasons discussed above, the Sun has not shown that it is clearly likely to prevail on its declaratory judgment claim because it has not shown it is clearly likely to prevail on its antitrust claims. *See Hoeck v. City of Portland*, 57 F.3d 781, 787 (9th Cir. 1995) (evaluating success of declaratory judgment claim based on underlying substantive claim).

website, weekly print papers, other publications distributed by Greenspun Media Group, and 400,000+ social media followers. *See* 1Tr.66:1–16; 2Tr.462:9–467:23. Each of these platforms has a much larger audience than the print *Sun*, and there is no evidence that any requires a print presence to be effective. *See, e.g.*, 1Tr.67:2–11 (Greenspun testifying that without the print insert, the *Sun* content will "find its way to the websites"), 68:9–21 (Greenspun admitting that since 2017 he has funded the Sun website without any revenue from the print *Sun*); 2Tr.462:9–467:23 (Cook: the Sun's voice "has not been diminished" without print because of alternative platforms); *see also* ECF No. 1172 at 44–45 (citing Greenspun admissions). Nor is there any *evidence* that consumer awareness of the Sun has or will drop if the *Sun* is not printed. *See* 1Tr.65:14–67:24 (Greenspun offering speculation without data or support). And the Sun did not identify any consumer in the market without access to the Sun's or Greenspun's viewpoint through these other sources.

*Second*, the Sun has waived any right to injunctive relief because it refused to explore reasonable alternatives to stay in print. ECF No. 1172 at 45 (citing cases); *see also Second City Music, Inc. v. City of Chi.*, 333 F.3d 846, 850 (7th Cir. 2003) ("[i]njury caused by failure to secure a readily available [solution] is self-inflicted, and self-inflicted wounds are not irreparable injury"). The Sun asserts that the Review-Journal's offer to rent its press at market rates, on a similar schedule to what the Sun followed as an insert, is a "pretext" and "not an effective remedy." Br. 12–13, 16. But the Review-Journal offered unrefuted evidence that its offer was real. *See* Owen Decl., ¶¶ 2–8 (1 OPP 32–33). And, as noted above, Picard lost all credibility when testifying about the Sun's supposed barriers to entry. Even more fundamentally, a lack of time and money is not irreparable harm. *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended...are not enough."). While Greenspun may not wish to put in more good money after bad to print the *Sun*, his desire for a free ride is not irreparable harm that warrants *any* injunction, let alone the mandatory relief the Sun seeks here.

*Third*, an injunction is improper because money damages would adequately compensate the Sun. The cross-examination of Greenspun established that shortly after the Adelsons bought the Review-Journal, Greenspun pursued a buyout—"not just selling out of the joa but ending [his]

14

commitment to Las Vegas through a daily newspaper." 1Tr.73:20–74:2, 87:25–89:14, 93:21–94:24. He admitted in writing that he was concerned about a windfall payday, not preserving his voice or the *Sun*. *See* 1Tr.77:12–79:24, 98:2–11 (Greenspun texting Cauthorn that Mr. Adelson "should pay" him "[c]lose to 100 million" to stop printing the Sun); *see also* 2 OPP 1015–1035 (Cauthorn responded: ███████████████████████████████████████████████████ ███████████████████████ ); ECF No. 858-30 (Greenspun: "I am prepared to exit the JOA" and "be out of daily newspaper business."). The Review-Journal's expert, David Nolte, corroborated that the Sun's claimed losses are calculable and compensable through money damages and walked the Court through how to quantify each category of alleged damages: printing costs (2Tr.503:1–15), loss of staff (*id.* at 508:2–16), loss of readership (*id.* at 509:7–18), loss of business value (*id.* at 509:14–510:7), and loss of goodwill (*id.* at 510:14–511:6). The Sun did not rebut his testimony or offer any competing analysis.[9]

Finally, the Sun is wrong to contend that it cannot be compensated if the *Sun* goes out of business. *See* Br. 13–14. As Nolte explained, Greenspun's personal desire to spread his "voice" and run a newspaper is "hedonic damage" suffered by Greenspun as an individual, not a corporate injury suffered by the plaintiff. 2Tr.501:15–502:19; *see Roemer v. Comm'r*, 716 F.2d 693, 699 n.4 (9th Cir. 1983) ("a corporation by its very nature cannot suffer a personal injury"). Those desires therefore cannot be the basis for establishing irreparable harm. In any event, the Sun did not proffer any evidence that it will be "driven out of business" absent an injunction. *See* Br. 13. To the contrary, the record shows the Sun has ample alternatives to share its message without being a small print insert. And there is no *evidence* that the Sun has been harmed at all since April 3.

**C.  The Balance of Equities and Public Interest Weigh Against an Injunction.**

Far from clearly supporting the Sun, the record shows that the balance of equities weighs decisively in the Review-Journal's favor.

It is undisputed that an injunction requiring the Review-Journal to print and distribute the

---

[9] The Sun snippets Nolte's testimony to suggest he conceded that the Sun's harm and "loss of civic engagement" cannot be quantified. Br. 11. But Nolte also explained that he has "regularly" calculated damages for those "put out of business." 2Tr.521:3–19. And the Sun offered no *evidence* that the *Sun* insert has *any* impact on "civic engagement."

Sun cannot be in the public interest if it violates the Ninth Circuit's mandate or the Review-Journal's First Amendment rights. *See* ECF No. 1172 at 45–48 (citing Ninth Circuit and Supreme Court cases). An injunction requiring the Review-Journal to comply with the 1989 JOA will do both. *See* Br. 18–19 (describing editorial differences). That alone forecloses the Sun from meeting its burden because it is not "equitable or in the public's interest [for a party] to violate the requirements of federal law." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

This Court heard multiple witnesses testify that the Sun's injunction will inflict severe and concrete financial harm on the Review-Journal—which would degrade the quality of local news in Las Vegas and potentially threaten the viability of the print *Review-Journal*. Nolte calculated that complying with the 1989 JOA would cost the Review-Journal at least $51.4M over five years. 2Tr.512:6–513:14; 2 OPP 1079–1116 ("Nolte Decl.") ¶¶ 8, 10, 49–88.[10] But the Review-Journal operates at a loss and does not have money to comply with the 1989 JOA. *See* 2Tr.452:9–453:16.

Compared to this risk of public harm, the hearing testimony left no doubt that the public will get minimal (if any) benefit from the print insert. The Court heard evidence that there is no demand for a print *Sun*: only ~400 people (~1% of subscribers) cancelled because the *Sun* was not printed (and many of those cited the loss of crosswords, Sudoku, and comics). 2Tr.414:10–21; 416:24–417:11; 2 OPP 1074 & Ex. B. The evidence, described above, also shows there is no demand for an afternoon print paper. If the Court ordered the Review-Journal to comply with the 1989 JOA, it would be ignoring the public interest rather than advancing it. *See Lord & Taylor, LLC v. White Flint, L.P.*, 780 F.3d 211, 218 (4th Cir. 2015) (denying injunction that "would serve neither party to the dispute, let alone the interests of the general public").

Finally, as explained below, the Sun's requested injunction is not in the public interest because it is not tailored to remedy the alleged antitrust harms. Instead, enforcement of the 1989 JOA would offend the antitrust laws, not promote them.

## II.   **The Court Will Be Reversed Again If It Issues The Injunction The Sun Seeks.**

At the end of the hearing, the Court asked "whether there is good caselaw" addressing

---

[10] Contrary to the Sun's claim (at 18), this Court *can* consider these extreme costs and deny an injunction because of them. *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320–22 (9th Cir. 1994).

"whether the relief requested is overbroad relative to the harm alleged in the complaint," and whether there must be a "fit between the harm alleged in the complaint as antitrust harm and the relief being sought." 2Tr.539:10–20. Although the Sun does not address the questions directly, the answer to both is yes. That is why, among other reasons, the Court must deny the Sun's motion.

**A.      An Injunction Must Be Closely Tied To Remedying The Alleged Antitrust Harm.**

Any injunction must fit the antitrust violation the Sun alleges and this Court finds. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486–87 (9th Cir. 2021). Because this is an antitrust case, the Court cannot simply issue an injunction to enforce the terms of the 1989 JOA under contract law. Instead, as the Sun has recognized (*see* ECF No. 1152 at 23), to reinstate the 1989 JOA, the Court must find that doing so will remedy *antitrust* harm—that is, harm to *competition*. *Id*.; *see In re Google Play Store Antitrust Litig*., 147 F.4th 917, 949 (9th Cir. 2025) (an antitrust injunction is a "reasonable method" of redressing antitrust harms only if it has a "significant causal connection" to the anticompetitive conduct); *U.S. v. Microsoft Corp*., 253 F.3d 34, 105 (D.C. Cir. 2001) (vacating injunction in antitrust case where there was no "causal connection" between the "conduct enjoined or mandated" and the "violation found [that was] directed toward the remedial goal"). That requirement is consistent with general rules governing equitable relief. *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr*., 810 F.3d 631, 636 (9th Cir. 2015) (requiring a "sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself"); *Lamb-Weston*, *Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (injunctive relief "must be tailored to the specific harm alleged").

The fit between the alleged antitrust harm and the injunctive relief sought must be tight. *Accord* Br. 15. Equitable principles—which govern relief under § 16—require that an injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Trump v. CASA, Inc.*, 606 U.S. 831, 852–54 (2025). Thus, while the Court has broad discretion to fashion relief, it must exercise that power with care. It should "mould" an injunction "to the necessities of the particular case" and recognize that "the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." *Id.* at 854. And the Court should ensure that it adopts a "reasonable method of redressing problems," *Google*, 147 F.4th at 949, not

just "the maximum a court can provide," *CASA*, 606 U.S. at 854.

**B. The Sun's Requested Relief Does Not Fit The Alleged Antitrust Harm.**

Applying these principles here, the Sun's requested injunction—to order the Review-Journal to comply with the 1989 JOA—is improper for at least four reasons.

*First*, the requested injunction will harm competition, not protect it. The Sun essentially asks this Court to reenact the core of the 2005 JOA by requiring the Review-Journal "to print the Sun on a daily basis in a joint edition." Br. 12; *see id.* at 15 (seeking injunction where "the Sun is printed and distributed as a daily newspaper"). But as the Ninth Circuit has twice recognized, and Dr. Picard acknowledged, the antitrust laws do not allow the Sun and the Review-Journal to "lawfully collude on market division, joint price setting, profit pooling, and profit division" without Attorney General approval. 2Tr.319:9–320:8. And the Attorney General has never approved the modified version of the 1989 JOA that the Sun asks this Court to adopt.

If instead this Court ordered the revival of the 1989 JOA in its entirety, there would be no doubt that competition would suffer. Dr. Picard, the Sun's self-proclaimed JOA expert, conceded that JOAs harm competition more than they help. He explained that they involve "a variety of actions that are anticompetitive restraints of trade," result in "ending advertising and circulation competition," "create[] a disincentive for newspapers to compete with each other editorially," and do a "very poor job of preserving a second newspaper." 2Tr.310:10–20, 313:10–314:12. Entering an injunction that compels the parties to do exactly what the Sun's expert says *harms* competition is not a proper injunction under Section 16.

It is irrelevant that the Sun claims the loss of the print insert will cause generic "extreme hardship." Br. 15. The evidence does not support that assertion, and shows the Sun can print a paper if it chooses. Antitrust law is not a cure-all for the Sun's decades of failure. It is aimed at protecting "the competitive *process*" and "preserving free and unfettered competition" that will "yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress." *Qualcomm*, 969 F.3d at 988, 990–91. That goal is not met by reviving a defunct JOA authorized under an anachronistic statute that failed to preserve competition and indeed harmed it—even if doing so would allow the Sun to keep free-riding for years to come.

*Second*, mandating compliance with the 1989 JOA would not remedy any of the alleged antitrust violations asserted in the Complaint. They all relate to requirements of the unlawful 2005 JOA and have nothing to do with the 1989 JOA. *See supra* I.A.3; ECF No. 1172 at 18–30. Some easy examples: the Sun says it was anticompetitive for the Review-Journal to change the specs on the "Sun Box" on the paper's front page, but reviving the 1989 JOA would not require the Review-Journal to include a "Sun Box" at all. And the accounting practices the Sun complains the Review-Journal wrongly engaged in would actually be *mandated* under the 1989 JOA. So under the Sun's own theory, reviving the 1989 JOA would remedy none of the alleged anticompetitive conduct. Nor does reviving the 1989 JOA protect the "joint operation" from being terminated. To the contrary, the 1989 JOA expressly *allows* the Review-Journal to terminate the JOA on 90 days' written notice if there are two "consecutive years" without "an operating profit." 1989 JOA § 9.1.4. And the "joint operation" has not been profitable for nearly a decade.

*Third*, the Sun's actual requested relief is broader than what would be necessary to remedy a supposed "refusal to perform" under the 1989 JOA. *See* Br. 15. The Sun seeks an order requiring the Review-Journal to "immediately provide the Sun with the list of subscribers." ECF No. 1152 at iii. That request has not been withdrawn, *see* Br. 1 n.1, and it is not required by the 1989 JOA.

*Fourth*, an injunction compelling 1989 JOA compliance would not be an "effective" remedy because, as detailed above, reviving an afternoon *Sun* would not preserve competition. Every witness, including the Sun's own expert, agreed an afternoon paper would be a colossal failure; the Sun itself concedes the format "cannot most likely and feasibly survive." Br. 9. Picard's admission that JOAs have "historically done a very poor job of preserving a second newspaper voice" and "hasten[] the[] decline" of weaker papers (2Tr.310:4–9, 313:10–314:12) confirms the requested remedy is the opposite of effective. Even worse, the resulting financial drag could end print newspapers in Las Vegas altogether, as the Review-Journal is forced to spend millions it does not have to print and distribute a doomed afternoon *Sun*.

**III.    If The Court Grants An Injunction, It Must Require A Substantial Bond.**

The Court also asked for briefs "justifying different" bond amounts. 2Tr.539:21–25. Under no circumstances should the Court issue another injunction, in which case no bond is needed. But

19

if this Court issues another injunction, it must require a substantial bond because the record does not permit the Court to "conclude[] there is no realistic likelihood of harm" from the injunction. ECF No. 1172 at 54–58 (quoting *Jorgensen v. Cassiday*, 320 F.3d 909, 919 (9th Cir. 2003)).

The unrebutted evidence, including Mr. Nolte's conservative calculations, shows the Sun's requested injunction would cause the Review-Journal to incur $10M per year on average if forced to start complying with the 1989 JOA in full, and $7M per year if complying with certain parts (as the Sun requests). ECF No. 1172 at 57–58; 2Tr.515:4–516:7; Nolte Decl. at ¶¶ 8–10, 81–88 (detailing calculations). The Sun offered no contrary evidence, and its cross-examination of Mr. Nolte did not create a reasonable question about these amounts. *See* 2Tr.516:18–530:17.

If wrongfully enjoined, the Review-Journal cannot recover its substantial damages without a bond. ECF No. 1070 at 24 (citing Ninth Circuit precedent). Thus, the Court should aim high when setting the bond amount. *Id.* If the Court fails to do so, the Review-Journal will suffer irreparable harm from a wrongful injunction (*i.e.*, permanent losses it can never recover). *Thakur v. Trump*, 163 F.4th 1198, 1207 (9th Cir. 2025) ("[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'"); ECF No. 1172 at 55 (citing authority).

The Sun tells the Court that it can waive the bond requirement or order only a nominal bond. But, on this record, doing so would be an abuse of discretion. The Review-Journal debunked the Sun's contention that no bond is appropriate. ECF No. 1172 at 56–57 (explaining that Rule 65(c) may not be waived and there is no public interest in the Sun's requested injunction). And the non-binding cases the Sun cites do not support a de minimis bond here. *See* Br. 19 (citing cases where, unlike here, there was no realistic likelihood of harm to the defendant or a sufficient bond would deny access to judicial review). And while the Sun has chosen to spend $40+ million on litigation, it has offered no evidence that it cannot post an adequate bond or that it has made any effort to secure other financing. *See* 1Tr.72:6–73:19.

### CONCLUSION

For the reasons set forth above, the Review-Journal respectfully requests that the Court deny the Sun's motion for temporary restraining order and preliminary injunction.

Dated:    May 12, 2026                    CLAGGETT & SYKES LAW FIRM

                                By:    /s/ Michael J. Gayan
                                      MICHAEL J. GAYAN, ESQ., SBN 11135
                                      1160 N. Town Center Drive, Suite 200
                                      Las Vegas, Nevada 89144

                                      J. RANDALL JONES, ESQ., SBN 1927 MONA
                                      KAVEH, ESQ., SBN 11825
                                      KEMP JONES LLP
                                      3800 Howard Hughes Parkway, 17th Floor
                                      Las Vegas, Nevada 89169

                                      DAVID R. SINGER, ESQ. (*pro hac vice*)
                                      AMY M. GALLEGOS, ESQ. (*pro hac vice*)
                                      JENNER & BLOCK LLP
                                      515 South Flower Street, Suite 3300
                                      Los Angeles, California 90071

                                      RICHARD L. STONE, ESQ. (*pro hac vice*)
                                      850 Devon Avenue
                                      Los Angeles, California 90024

                                      *Attorneys for Defendants/Counterclaimant*

21

**PROOF OF SERVICE**

I hereby certify that on the 12th day of May, 2026, I served a true and correct copy of the foregoing **DEFENDANTS' RESPONSE TO PLAINTIFF'S POST-HEARING BRIEF [ECF NO. 1189]** via the United States District Court's CM/ECF electronic filing system to all parties on the e-service list.

*/s/ Melisa Pytlik*
An Employee of Claggett & Sykes Law Firm

22