E. LEIF REID, Nevada Bar No. 5750
KRISTEN L. MARTINI, Nevada Bar No. 11272
NICOLE SCOTT, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavilion Center Dr., Suite 500
Las Vegas, Nevada 89135
Tel: 702.862.8300
Fax: 702.778.9709
Email: lreid@clarkhill.com
        kmartini@clarkhill.com
        nsscott@clarkhill.com

JAMES J. PISANELLI, Nevada Bar No. 4027
TODD L. BICE, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Tel: 702.214.2100
Fax: 702.214.2101
Email: JJP@pisanellibice.com
        TLB@pisanellibice.com

*Attorneys for Plaintiff/Counterdefendants*

JORDAN T. SMITH, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Tel: 702.464.7022
Fax: 702.382.8135
Email: jtsmith@bhfs.com

JOSEPH M. ALIOTO, *PRO HAC VICE*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation, <br><br> Plaintiffs, <br><br> v. <br><br> SHELDON ADELSON (Estate Of), an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC,, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC dba ADFAM, a Delaware limited liability company and as the alter ego of Las Vegas Review-Journal, Inc., and News+Media Capital Gorup, LLC; and DOES, | Case No.: 2:19-CV-01667-ART-MDC <br><br> **(REDACTED)** <br><br> **PLAINTIFF'S REPLY IN SUPPORT OF POST-HEARING SUPPLEMENTAL BRIEF PER ECF NO. 1182** |

I-X, inclusive,

                    Defendants.

LAS VEGAS REVIEW-JOURNAL, a
Delaware corporation,

                    Counterclaimant,

v.

LAS VEGAS SUN, INC., a Nevada
corporation; BRIAN GREENSPUN, an
individual and as alter ego of Las Vegas Sun,
Inc.; GREENSPUN MEDIA GROUP, LLC, a
Nevada limited liability company, as the alter
ego of Las Vegas Sun, Inc.,

                    Counterclaim Defendants.

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

I.     INTRODUCTION ........................................................................................................1

II.    THE SUN HAS ESTABLISHED A CLEAR LIKELIHOOD OF SUCCESS ON ITS
ANTITRUST AND DECLARATORY RELIEF CLAIMS ...........................................2

      A.     The Newspaper Market is the Valid and Appropriate Antitrust Market ...............2

      B.     The Editorial and Reportorial Competition Between the Sun and the RJ is
Cognizable Competition Under Antitrust Laws ......................................................4

      C.     The RJ has Willfully Acquired and Possesses Monopoly Power..........................7

      D.     The RJ's Conduct is Clearly Anticompetitive .........................................................8

III.    THE SUN IS SUFFERING EXTREME IRREPARABLE HARM .................................14

IV.    THE BALANCE OF EQUITIES TIPS SHARPLY IN THE SUN'S FAVOR ...............16

V.     THE PUBLIC INTEREST TIPS SHARPLY IN THE SUN'S FAVOR .........................17

VI.    THE SUN'S REQUESTED REMEDY IS SPECIFICALLY TAILORED TO THE RJ'S
CONDUCT, AND RESTORES COMPETITION IN THE NEWSPAPER MARKET...18

VII.    A DE MINIMUS BOND, IF ANY, IS PROPER ............................................................19

VIII.    CONCLUSION............................................................................................................20

CERTIFICATE OF SERVICE ..........................................................................................................22

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

The RJ litigates this case in a state of constant revision. Each position is advanced with arrogance, peppered with inaccurate and mischaracterized quotes to both facts and law, relied upon until its consequences arrive, and then renounced in favor of what suits the RJ for its next filing. This pattern is the litigation strategy.

The RJ initially argued that the 2005 JOA's terms allowed it to inflate its editorial expenses to deprive the Sun of profit payments, the Sun's lifeblood. When the 2019 arbitration stripped the RJ of its ability to employ this strategy, the RJ responded by asserting that the 2005 JOA had been invalid all along. The RJ now asks this Court to relieve it of the consequence of successfully raising this argument—reimposition of the parties' original JOA—and to allow it to walk away from all Anticompetitive Conduct unincumbered by the Attorney General-approved JOA.

The RJ similarly argues that the Sun is not its competitor. But before the Ninth Circuit, the RJ described the Sun as its "chief editorial rival," something both parties and consumers have always agreed. At the same time, the RJ's First Amendment defense rests on the assumption that the parties are competing editorial voices, a premise that its market-definition argument attempts (but fails) to disprove. After prevailing at the Ninth Circuit, the RJ quickly adopted a new strategy to harm the Sun: arguing the 1989 JOA wasn't valid either. But the RJ's own conduct demonstrates that it is. On multiple occasions the RJ relied on the 1989 JOA and recognized its binding nature.

The RJ's infeasibility argument exhibits similar intellectual dissonance. The RJ has repeatedly asserted that afternoon publication of the Sun is economically infeasible, but Section 8.2 of the 1989 JOA provides that when the RJ determines that publication of an afternoon paper is not feasible, it must publish a joint edition including the Sun. Confronted with the mandatory remedy that attaches to the very determination it asserts, the RJ demurs again, even though varying from the terms of the Attorney-General approved JOA would conflict with the Ninth Circuit mandate that the RJ repeatedly threatens the Court with, using the mandate as a sword and its shield. The RJ's pattern of argument, misdirection, and denials reveals its strategy. The RJ advances whatever argument is available to permanently exclude the Sun from the Newspaper Market. The RJ violated

1

the Sherman Act by eliminating its only competitor from the market. This Court must enter an injunction to prevent this harm from becoming permanent.

## II. THE SUN HAS ESTABLISHED A CLEAR LIKELIHOOD OF SUCCESS ON ITS ANTITRUST AND DECLARATORY RELIEF CLAIMS

### A. The Newspaper Market is the Valid and Appropriate Antitrust Market

The RJ still fails to rebut its own data and consultant's (Mather's) analysis establishing a lack of cross-elasticity between print newspapers and all other media. *Compare* Br. 2-5 & ECF No. 1152 ("Mot.") at 24-27 *with* Opp'n 6-8. Neither did the RJ controvert Dr. Katz's analysis under *Brown Shoe*. *Id.*[1] The RJ asks this Court to ignore this conclusive, "highly fact-based" evidence and instead rely on "judicial experience and commonsense" to adopt the RJ's anecdotal 'evidence.' Opp'n 6-8.

However, the "judicial experience and commonsense" standard cited by the RJ is not applicable at this stage. Opp'n 6-8 (citing *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117, 1120 (9th Cir. 2018) (inquiring whether the plaintiffs' relevant market alleged was "facially unsustainable" under Rule 12, and merely reiterating that district courts are required to "draw[ ] on judicial experience and common sense" when examining the plausibility of the allegations plead)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").[2] The Sun's Newspaper Market already survived at the pleading stage, and summary judgment (ECF Nos. 61, 243, 970), and the Sun has presented clear, uncontroverted expert testimony and analysis of subscriber behavior data and the relevant antitrust market.

Despite being belied by the evidence and the purpose of defining the relevant market (to evaluate the area of competition to determine the anticompetitive effects on consumers (Br. 2-5)),

---

[1] The RJ's sole assertion is that "[a]ll but one" of the Sun's cited cases recognizing the Newspaper Market "predate the internet era" (Opp'n 8 n.3); yet, the decline in the newspaper industry has been discussed since 1953 with the introduction of other media, and the internet was widely adopted by 1997. *See* ECF No. 1091 at 14; 1Tr. 146:10-149:20.

[2] Unless otherwise stated, emphasis is as added and the citations are cleaned up. Where the Sun cites to prior filings, the Sun is incorporating the argument, authority, and evidence cited therein.

the RJ continues to argue that the newspaper industry's secular decline and discrete consumer base renders the Newspaper Market unviable. Opp'n 7 (citing *Tanaka v. University of S. Cal.*, 252 F.3d 1059, 1063-65 (9th Cir. 2001)). But the *Tanaka* court did not "reject[ ]" the relevant market based on the behavior of consumers participating in the market: it rejected the plaintiff's attempt to define the relevant market based on the *plaintiff's* personal preference. 252 F.3d at 1063; *Compass, Inc. v. Nw. Multiple Listing Serv.*, 2026 WL 776138, at *4-5 (W.D. Wash. Mar. 19, 2026) (discussing *Tanaka*). The Newspaper Market here is based on actual consumer (subscriber) behavior, not the Sun's individualized preference.

Of course courts recognize distinct relevant markets due to distinct user experiences and distinct pricing from other products, as evidenced by the *Brown Shoe* indicia. *E.g.*, *F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037-39 (D.C. Cir. 2008). "[A] core group of particularly dedicated, distinct customers, paying distinct prices, may constitute a recognizable submarket,[3] whether they are dedicated because they need a complete cluster of products, because their particular circumstances dictate that a product is the only realistic choice, or because they find a particular product uniquely attractive." *Id.* at 1039 (citations and quotations omitted). "After all, market definition focuses on what products are *reasonably* substitutable; what is reasonable must ultimately be determined by settled consumer preference."[4] *Id.*

Without the support of law or the data, the RJ next attempts to dispute Dr. Katz's *findings* (inherently disputing *Mather's findings*) on the data by summarily asserting that Dr. Katz's "data

---

[3] A submarket and a broader market "are fundamentally the same phenomenon….If a subcomponent of that [broader] market meets th[e] test, then it is not a 'submarket' but a product market in its own right." P. Areeda & H. Hovencamp, Antitrust Law: An Analysis of Antitrust Principles & Their Application ¶ 533b (5th ed. 2020) ("Areeda").

[4] The RJ misleadingly asserts, "[A]lthough a subset of consumers may 'find substitution more difficult' than others, those inelastic consumers 'are not a "submarket"' for antitrust purposes." Opp'n 7. Preliminarily, Dr. Katz analyzed and calculated price elasticities for the "total population" of *all* the Newspapers' subscribers, not *only* a 'subset of inelastic consumers.' 1Tr.171:16-175:1; ECF No. 1153 at 1SA124-26 & 188-207. Additionally, the RJ mischaracterizes Areeda ¶ 533c, which says that if "price could be raised above competitive levels for the [product] sold in these end-use segments, those segments would be proper topics for antitrust concern not because they are submarket, but because they would be relevant product markets in their own right." That is what Dr. Katz showed. *E.g.*, Br. 3-4. Finally, because the RJ targets consumers (*i.e.*, engage in price discrimination), it would also be appropriate to identify narrower groups of consumers. *See, e.g.*, *Merger Guidelines* § 4.3.D.1. (2023); 1Tr.155:18-156:18.

analysis" is "unsound, ignores competition from digital media, and implies the Review-Journal could profitably raise prices by 30%-300%" in contravention of the RJ's and industry reality. Opp'n 7-8 (citing Evans and Hausman). Each part of this assertion is flawed.

For the first part, the RJ cannot plausibly label Dr. Katz's analysis "unsound" when neither Evans nor Hausman ever undertook their own analysis of the data, challenged the accuracy of the data, or identified any methodological errors in Dr. Katz's analysis of the data. *See* Opp'n 7. Hausman's criticism of Dr. Katz's use of a priced-based Hypothetical Monopolist Test is not supported by any caselaw or the *Merger Guidelines* (the authority on the Hypothetical Monopolist Test). *See Merger Guidelines* § 4.3 (2023) & 1SA146.[5] For the second part, the methodology employed by Mather, and Dr. Katz's independent analysis, do not "ignore[ ] competition from other media" as the RJ maintains. Opp'n 7. As Dr. Katz testified, the methodology inherently captures competition from all other products. 1Tr.177:3-178:14. For the final part, *i.e.*, that Dr. Katz "implies" the RJ could "profitably raise prices by 30%-300%" (Opp'n 7), not only is it undisputed that between 2015 and 2020, the RJ did raise price over 53% in that duration alone and the price increases were profitable, but Dr. Katz never concluded that elasticities would hold with a price increase of 250% or more (naturally, they would not). 1SA145-53 & Table 12. Importantly, none of the RJ's specious criticisms change the fact that the RJ raised prices and consumers did not turn to other media. This conclusively establishes a low elasticity of demand for the Newspaper Bundle with other media, providing that the Newspaper Market is the appropriate relevant market here.[6]

### B.    The Editorial and Reportorial Competition Between the Sun and the RJ is Cognizable Competition Under Antitrust Laws

According to the RJ, the Sun and RJ do not compete because *only* price competition is economic competition within the purview of antitrust laws. *See* Opp'n 4-6. This is untrue. Nonprice competition benefits consumer welfare and has been recognized as economic competition protected by antitrust laws. *E.g.*, 1SA26-29;[7] *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 336-37

---

[5] The Sun's citations to "1SA" and page number are filed at ECF No. 1153.

[6] The 2013 Sun complaint cited by the RJ (Opp'n 7) has no consequence on the Newspaper Market in this case as the Sun explained during the pleading stage (ECF No. 40 at 5 n.5), and as proved by the actual evidence and economic analyses undertaken by Dr. Katz.

[7] Dr. Katz opined at length as to nonprice competition and the economic competition between the

4

(1990) (recognizing restraints on non-price competition was illegal under antitrust laws). The RJ's cited authority (Opp'n 7), as this Court previously rejected, does not deal with competition between newspapers, and JOA newspapers present their own unique economics. ECF No. 970 at 22;[8] ECF No. 871 at 38 n.23; *Michigan Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1300, 1302 (D.D.C. 1989) (explaining that Congress "thought the unusual economics of the newspaper industry compelled that exception to the antitrust laws" in the NPA). Courts specifically addressing competition between JOA newspapers have held that the editorial and reportorial competition between them—as declared to be in the public interest—is economic competition under antitrust laws. ECF No 843 at 45-46; ECF No. 243 at 11-13; ECF No. 970 at 21-23.[9]

The RJ's further argument that the absence of quantitative *data* of cross-elasticity *between* the Sun and the RJ translates to the absence of competition is a false red herring. *See* Opp'n 5-6. Quantitative data analysis is not required to show cross-elasticities, and the evidence demonstrates that the Sun and the RJ compete. *See* Br. 4-5. Starting with the RJ's concessions, it does not dispute that: (1) when "evaluating reasonable substitutability and measuring cross-elasticity of demand," the *Brown Shoe* factors are "evidentiary proxies for direct proof" of "cross-elasticities"; or (2) both the Sun and the RJ satisfy the *Brown Shoe* indicia. *Compare id. with* Opp'n 6. Thus, where the purpose of using the substitution analysis is to determine the boundaries of competition within the product market, and the Supreme Court has identified how to define the outer bounds of that market with the *Brown Shoe* factors, because both the Sun and the RJ satisfy those factors is evidence that they compete within the Newspaper Market. *E.g.*, Br. 4; Mot. 24-27; ECF No. 871 at 38-42; *supra* § II(A). In other words, the absence of quantitative *data* of cross-elasticity between the Newspapers does <u>not</u> mean there is *no evidence* of cross-elasticity between the Newspapers—that is what the *Brown Shoe* factors are proxies for and Dr. Katz's analysis and the supporting evidence is

Sun and the RJ. *See* 1SA27-50. As evidenced by this analysis, Dr. Katz's general statement about "buyer" substitutability ignores his conclusions that subscribers are the buyers and can still substitute the offerings of the Sun and RJ, where subscribers purchased the Newspaper Bundle and still choose what they read. *Compare* Opp'n 5 (citing 1SA27 ¶ 27) *with* 1SA26-50.

[8] *E.g.*, *United States v. Real Prop. Located at Incline Vill.*, 958 F. Supp. 482, 487 (D. Nev. 1997) ("[W]here [the] court previously decided upon a rule of law," it is law of the case).

[9] That the newspapers in those cases were sold separately was of no moment to those courts' analyses and conclusions. *See* ECF No. 871 at 31-37; ECF No. 970 at 22-23.

uncontroverted. Br. 4; Mot. 24-27; 1SA37-38, 140-143 (further citing evidence from staff of both Newspapers confirming that the Newspapers are each other's competitor); ECF No. 871 at 38-42; *supra* § II(A). The RJ's misrepresentation of Dr. Katz's testimony about the absence of *data* as the absence of *"evidence"* of competition, and that the inability to conduct data analysis on substitutability is the inability to conduct other analysis on substitutability, must be rejected. Opp'n 5.[10]

Not unlike the RJ's concessions, are the RJ's omissions. The RJ cites to Evans' Declaration for the proposition that the "Sun supplies intra-product, complementary content and does not compete." Opp'n 5 (ECF No. 1173 at 1039-43 ¶¶ 14, 19-20, 25-26). Besides being disproven by the evidence, Evans cites no evidence to support such propositions. *See id.* It also bears reminding, as the Sun previously explained, even under Evans' proffered (and made-up) approach to market definition,[11] the Sun and the RJ are substitutes. *See* ECF No. 871 at 38-42.

In sum, the RJ's focus on testimony that the Sun and Review-Journal do not compete to "sell" the Newspapers (as they eliminated that price competition when they entered into the 1989 JOA with the Attorney General's written consent) is inconsequential. *See* Opp'n 5-6. The evidence is clear in demonstrating that the Sun and RJ engage in economic competition within the meaning of antitrust laws. And the RJ cannot relegate its own admissions that the Sun is the RJ's "chief editorial competitor" as inconsequential, where the RJ has repeatedly and explicitly characterized the Sun as a competitor to the RJ in the Newspaper Market. 1SA38, 142-143; Reply in Support of Pet. for Writ of Mandamus, *Adelson v. Dist. Ct.*, Case No. 26-1646, Dkt.Entry: 23.1, at 8-9, 10-11 (9th Cir. Mar. 26, 2026).

---

[10] The RJ's citation to Dr. Picard's testimony regarding "news substitute[ability]" should also be disregarded. Opp'n 5. As the RJ elicited, Dr. Picard does not have a degree in economics, is not an expert on antitrust issues, was not retained to and did not offer any antitrust economic opinions or analysis on the Newspaper Market or substitutability between the Sun and the RJ, and did not conduct any substitutability analysis. 2Tr.307:15-308:17, 346:25-347:8, 353:4-13.

[11] ECF No. 876-10 at 3SOA688 ¶ 46 ("          ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .").

6

**C.      The RJ has Willfully Acquired and Possesses Monopoly Power**

Although the RJ argues the Sun must "show the Review-Journal has accumulated monopoly ***profits***" (Opp'n 8 & ECF No. 1070 at 19 n.5), the law does require that the plaintiff prove monopoly profits to establish monopoly power, and the RJ's cited authority does not hold otherwise. *See* ECF No. 1091 at 23-24 & nn.15-16.

"Monopoly power is the power to control prices <u>or</u> exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) (emphasis added). The *direct* evidence establishing that the RJ has had control over the prices charged by the RJ and its sole competitor since 1989 is not in dispute. *Compare* Mot. 28-29 *with* Opp'n 8-9. Nor is it disputed that, even prior to April 3, the RJ had the ability to exclude competition by way of its operational and economic control over the Sun.[12] *Compare* Mot. 28-29 & 1SA155-57 *with* Opp'n 8-9. Either piece of direct evidence is sufficient on its own to show the RJ possesses monopoly power.

Turning to the *indirect* evidence, the RJ does not dispute its "very high" market share. *Compare* Br. 5 & Mot. 29-30 *with* Opp'n 8-9. Instead, the RJ argues there are no barriers to entry except the Sun's "unwillingness to incur expenses and the market's lack of demand." Opp'n 8-9. The RJ's argument slights the existence of multiple barriers to entry (despite later arguing that these same barriers render the RJ's performance under the 1989 JOA infeasible). *See id.* at 15-16. Barriers that give rise to monopoly power are those that constitute significant impediments to new, timely, and effective entry sufficient to constrain the defendant's market power. *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440-41 (9th Cir. 1995); *Merger Guidelines* §§ 2.4.C. & 3.2 (2023). The Ninth Circuit (like others) has explicitly recognized that "[c]ommon entry barriers include: … control of essential or superior resources, … high capital entry costs and economies of scale." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997); *United States v. Syufy Enters.*, 903 F.2d 659, 667 (9th Cir. 1990) (recognizing that certain types of industries that "require[ ] onerous front-end investments that might deter competition from all but the hardiest and most financially secure investors" are barriers to entry). "Congress obviously

---

[12] The RJ's assertion that it was the Ninth Circuit that excluded the Sun and controlled the Sun's output since April 3 is absurd given the RJ's refusal to perform under the governing 1989 JOA. *See* Opp'n 8.

7

would not have passed the Newspaper Preservation Act unless it had perceived entry barriers that prevented an effective challenge to a monopoly newspaper." *Michigan Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1300, 1301 (D.D.C. 1989) (Silberman, J., concurring).

High, cognizable barriers to entry exist here due to the combination of fixed, sunk capital investment costs amounting to over $100 million (ECF No. 1154 at 2SA264-69; Br. 13) and the need to achieve large scale in order to distribute newspapers cost-effectively (ECF No. 1173 at 1105-08). These conditions imply that a newspaper can be profitable only if it attains a substantial subscriber base. ECF No. 1154 at 2SA264-69; 2Tr.275:16-279:11. However, it takes a protracted time necessary to build a subscriber base in the presence of an established incumbent, during which time the new entrant will be losing money. 2Tr.282:25-293:8. The riskiness of the entrant's investments will drive up its costs of obtaining capital relative to that of the incumbent. Moreover, a smaller entrant competing with a larger incumbent will attract a disproportionately small share of advertising revenues. 2Tr.275:16-277:4, 286:14-287:4. Collectively, these conditions give rise to barriers to entry. *See Image Tech. Servs.*, 125 F.3d at 1208. That no successful market entry has occurred since the Sun (in 1950) is evidence of the high barriers to entry. *Merger Guidelines* § 3.2 (2023) (providing that lack of successful past entry "will likely suggest that entry may be slow or difficult").

**D.    The RJ's Conduct is Clearly Anticompetitive**

The RJ continues to wrongfully assert that its Anticompetitive Conduct cannot be competition-reducing or harmful to consumers because its conduct occurred while the parties believed the 2005 JOA was the governing agreement. *E.g.*, Opp'n 9-10. This assertion defies long-standing, controlling authority. Mot. 33-34.[13] The Ninth Circuit's rulings spoke only to the enforceability of the 2005 JOA, and the RJ's *continued* performance thereunder. Nothing in the

---

[13] The RJ's attempt to distinguish the facts of *PharmacyChecker.com LLC v. Legitscript LLC*, 137 F.4th 1031 (9th Cir. 2025) (cited in Mot. 33), and *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992), is unpersuasive. *See* ECF No. 1172 at 18 n.4. *PharmacyChecker.com* is only the most recent progeny in a lengthy line of binding jurisprudence. 137 F.4th at 1037-41 (collecting cases). Further, this Court twice addressed the fundamental principle iterated in *City of Vernon*: antitrust liability is focused on harm to competition, and can exist even in the *absence* of a breach of contract. *See* ECF No. 970 at 26; ECF No. 61 at 7.

8

Ninth Circuit's rulings address the RJ's Anticompetitive Conduct or whether that conduct reduced competition—the focus of antitrust laws. *See Las Vegas Sun, Inc. v. Adelson*, 147 F.4th 1103 (9th Cir. 2025); ECF No. 1106; *see also* Mot. 32-37; ECF No. 1092 at 16-17, 19-23. The evidence is clear that the RJ's exploitation of its power and control over the Sun is exclusionary, regardless of the 2005 JOA's enforceability. *Id.*

Dr. Katz correctly analyzed the economic effects of the RJ's <u>actual</u> conduct.[14] This Court bore witness to the RJ's attempt to mischaracterize Dr. Katz's analysis in real time. Contrary to the RJ's same attempt now, as Dr. Katz testified, he did not assume the 2005 JOA itself was "legally valid" when analyzing the anticompetitive effects of the RJ's conduct. *Compare* Opp'n 9-10 *with* 1Tr.229:9-16, 189:5-191:18, 229:25-231:11. He was tasked to examine how the Ninth Circuit's Opinion impacted his prior analysis, and he found it reasonable to assume the "*legal validity*" of the Sun's ability to recover under antitrust laws even if the 2005 JOA is invalid, as instructed by counsel. 1Tr.188:4-191:19; ECF No. 1159 at 7SA1140-41. This instruction was accurately premised on controlling authority (*see supra*) and given where Dr. Katz was not in a position to opine on the law. 1Tr.189:18-19, 229:25:230:7.

Where Dr. Katz is "certainly in a position to say whether that economic setting is one that makes sense" he "*us[ed] th[e 2005 JOA] as the framework in which to then conduct the economic analysis that flows from the effects of the conduct.*" 1Tr.189:21-190:2, 229:12-16; *see also id.* at 1231:25-32:3. Dr. Katz validly applied the standard antitrust economic methodology of "but-for analysis"—which assesses the difference between the actual world in which the conduct occurred, and the counterfactual (or, "but-for") world in which the conduct did not occur. 1Tr.190:3-12. It is undisputed that the actual world here is one in which the RJ (and the Sun) believed the 2005 JOA was the governing agreement and was operating under that framework. 1Tr.190:13-191:8. Therefore, to properly analyze the effects of the RJ's actual conduct on competition (and therefore consumers), that conduct must be viewed in comparison to what would have occurred in its absence. *Id.* The RJ's position that the actual world is, in fact, a hypothetical world in which the RJ

---

[14] Even when analyzing the RJ's Anticompetitive Conduct under the 1989 JOA, Dr. Katz concluded that the RJ's conduct had the same competition-reducing effects and harm to consumers. ECF No. 1159 at 1443-51.

realized in 2015 that the 2005 JOA was unenforceable and proceeded as such, is an incorrect application of the but-for methodology. *Compare* 1Tr.191:9-18 *with* Opp'n 10.[15] The Sun has clearly shown that the RJ's Anticompetitive Conduct has weakened the Sun's ability and incentives to compete, harming competition and consumers. *E.g.*, Mot. 12-23, 30-37.

Specifically examining the RJ's Anticompetitive Conduct by refusing to perform under the 1989 JOA to permanently exclude the Sun from the Newspaper Market, the RJ's conclusory and unsupported assertions that it had "multiple" reasons to believe it would succeed on the merits does not make it a "reasonable litigant." *See* Opp'n 10.

**First**, as a matter of fact, the 2005 JOA was not a novation because, as this Court already concluded, the parties did not intend to terminate the 1989 JOA. ECF No. 970 at 18-19; Br. 6-8. As Mr. Greenspun further testified, at no time would he "ever have considered doing anything to end the JOA earlier than the 50 year[ term]" set forth in the 1989 JOA (1Tr.125:5-126:6), and the RJ cites no testimony that Mr. Greenspun "intended to substitute" the 2005 JOA for the 1989 JOA. *Compare* Opp'n 10 *with* 1Tr. & 2Tr. Nor could the 2005 JOA ever be a novation <u>as a matter of law</u>, for Nevada law is well-settled and dictates that the 2005 JOA be valid and enforceable for it to operate as a novation. Br. 7. The RJ's citation to *Williams v. Crusader Disc. Corp.*, 75 Nev. 67, 71-72 (1959), is inapposite because it did not involve a subsequent illegal or unenforceable agreement, and its discussion about novation was expressly subject to "the rules governing sureties" when discussing substitution. Opp'n 11. Any out-of-state authority diverging from controlling Nevada law is irrelevant. *See id.*

**Second**, the 1989 JOA was not abandoned. *Compare* Opp'n 11-12 *with* Br. 6-8; Mot. 7-8; ECF No. 1091 at 7-8; ECF No. 970 at 17-19. The parties' express memorialization in the 2005 JOA that the 1989 JOA shall be reinstituted as the governing agreement in the event their lawful performance of the 2005 JOA was hindered or otherwise impaired is conclusive evidence that the parties never intended to abandon the 1989 JOA. Mot. 7-8; ECF No. 1091 at 7-8. The fact that, post-acquisition, the RJ sought to enter into the *Second* Amended and Restated Joint Operating

---

[15] The RJ's cited cases are completely inapplicable here, where Dr. Katz's analysis was based on a standard antitrust economic methodology and his analysis was based on the actual conduct undertaken by the RJ. *See* Opp'n 10.

Agreement and not a "*First*" amendment, as would have been the case if the 1989 JOA was terminated, and further attempted to release all claims connected with operating under the 1989 JOA, further confirms the RJ agreed the 1989 JOA was not terminated. ECF No. 832-14 at SA595-667. The RJ's cited testimony about the parties' belief that the 2005 JOA was the governing agreement does not direct otherwise. *See* Opp'n 11-12. The Sun has always maintained that the parties expressly intended to revert to the 1989 JOA in the event the 2005 JOA was unenforceable (*see* ECF No. 1093 at 11-12), and the RJ kept the 1989 JOA together with the 2005 JOA in its business records. Br. 7.

Importantly, this Court already concluded that the 2005 JOA was an amendment—not a novation—and that the "material elements" of the 1989 JOA remained unchanged even after 2005. ECF No. 970 at 18-19; Mot. 4-5, 7-9. Since the 1989 JOA and continuing after 2005, the RJ was responsible for and in control of all business aspects of the joint operation. Mot. 4-5, 7-9 (detailing the elements of the RJ's control). This structure where business functions were consolidated and editorial and reportorial competition remained separate and unrestrained was precisely what Congress envisioned when enacting the NPA, and the parties intentionally adhered to that structure in a deliberate effort to maintain antitrust immunity. *Id.* at 6-7.

The RJ's fixation on the details of certain modifications in the 2005 JOA did not render the 2005 JOA anything other than a modification to the 1989 JOA. *Compare* Opp'n 9-10 *with Rowland v. Lepire*, 662 P.2d 1332, 1333, 1334-35 (Nev. 1983) (where the contract was modified, not abandoned, despite "numerous changes," including "increas[ing] the floor space in the house from 4,500 square feet to 6,500 square feet and rais[ing] the house several inches" where "[t]he foundations and outside dimensions remained the same"). The Newspapers were printed in a joint edition format for a third of the year under the 1989 JOA, the Sun's profit share of the joint operation approximated 10% even under the 2005 JOA, and the RJ remained responsible for and in control of promoting the Sun. *See, e.g.*, Mot. 8-9. Because the parties, in fact, continued to perform the material obligations of the 1989 JOA after 2005, they did not abandon the 1989 JOA and could not have acted inconsistent with the 1989 JOA's existence.[16] *See id.* at 4-5, 7-9.

---

[16] Because the RJ's obligations under the 1989 JOA and 2005 JOA remain unchanged in all material

**Third**, the RJ's arguments that performance under the 1989 JOA is impossible or impractical because "the subject matter of the 1989 JOA no longer exists" is belied by material elements that remained unchanged since 1989. *Compare* Opp'n 12 *with supra*. The Sun was printed and distributed as a local, daily, print newspaper until April 3. The fact that it was printed and delivered at a different *time* does not render the Sun nonexistent.

Importantly, the RJ cannot complain of the burden in performing under the 1989 JOA now, as such burdens were foreseeable in 2005 and yet the parties' express intentions were that the RJ would perform under the 1989 JOA in this scenario. *See* Br. 8-9; Mot. 39-40. Section 1.1 in no uncertain terms directs that the 1989 JOA "shall be reinstituted and remain in full force and effect." ECF No. 1155 at 2SA449 §1.1; *id.* at 9, 22-23. It has no temporal limitation. ECF No. 1155 at 2SA449 §1.1. That the DOJ investigated the 2005 JOA for three years, and then informed the parties that their joint operation remained subject to antitrust scrutiny evidences that the DOJ could have brought an enforcement action at any time. ECF No. 1155 at 3SA647. In fact, the termination of a JOA newspaper itself triggers antitrust scrutiny. *E.g.*, *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1243-44 (D. Haw. 1999), *aff'd sub nom. State of Hawaii v. Gannett Pac. Corp.*, 203 F.3d 832 (9th Cir. 1999); ECF No. 1158 at 3SA1336, 1337. Section 1.1 is evidence that the RJ explicitly contemplated this risk in 2005, and agreed to assume and bear the risk. *Myricks v. Shields*, 587 P.3d 289 (Nev. App. 2026) ("Nevada recognizes impossibility only where performance is objectively impossible, not merely more difficult or financially burdensome, and that monetary payment obligations are rarely excused"); 28 Williston on Contracts § 70:167 (4th ed.).

The irony in the RJ arguing that having to print and distribute the Sun separately—even with its existing infrastructure—would be impossible and impractical due to "extreme and unreasonable difficulty or expense," while simultaneously advocating that the Sun is capable of doing so on its own should not be lost on the Court. Opp'n 12. In the RJ's own words, the only barriers the RJ faces are its own "unwillingness to incur expenses and the market's lack of demand."

---

respects, the RJ's assertion that "the Sun is still trying to enforce the 2005 JOA" because the RJ's Anticompetitive Conduct is also a violation under the material provisions of the 1989 JOA is absurd. *See* Opp'n 10; *see also supra* § II(C).

12

Opp'n 8-9.

Even if one were to accept the RJ's arguments regarding the costs of separately printing and distributing the Sun, the RJ is able to print the Sun as a joint edition pursuant to Section 8.2, which entirely moots all claimed burdens associated with printing and distributing the Sun as an afternoon newspaper. Br. 8-9. Where performance is still possible despite supervening events—as expressly memorialized in Section 8.2—full discharge is inappropriate because the parties expressly contracted for continued performance in this scenario. (Also telling, the RJ could have sought Attorney General approval of the 2005 JOA; instead, it expressly repudiated that alternative to attempt to permanently exclude the Sun.)

The requirement contained in Section 8.2 to continue publication of the Sun is <u>mandatory:</u> once publication of the Sun as an afternoon paper is determined to be infeasible, the RJ must publish a joint edition. Br. 8. The RJ's only counter is that Section 8.2 is not triggered because no party has *formally invoked* it. Opp'n 12-13. But Section 8.2's text does not require formal invocation—it operates when performance under the 1989 JOA is infeasible. Br. 8. The RJ has repeatedly asserted infeasibility in this proceeding. The RJ cannot be heard to complain of the infeasibility of an afternoon publication, while refusing the consequence that Section 8.2 attaches to that determination.

The RJ's witnesses' testimony about other purported "benefi[cial] actions" the RJ undertook—none of which was supported by any documentary evidence (Opp'n 13)—are not procompetitive justifications for the RJ's conduct that the Sun has <u>challenged in this case</u>. "[T]he procompetitive benefit must justify the specific means here in question," *i.e.*, the procompetitive benefits must derive from the challenged conduct in question. *See, e.g.*, *U.S. v. Google LLC*, 747 F.Supp.3d 1, 171 (D.D.C. 2024).

The RJ has failed to advance any procompetitive benefits to its Anticompetitive Conduct, which the Sun has clearly established harmed the Sun, reduced competition, and harmed consumers. The RJ's Anticompetitive Conduct is the conduct challenged in this case—including its multi-million dollar spend in editorial expenses that it improperly charged to the joint operation

to reduce the Sun's payments to zero—is not competition on the merits.[17] Mot. 12-23, 30-37. Even had any procompetitive benefit existed (none do), the anticompetitive harm that eliminates the RJ's sole competitor clearly outweighs the RJ's claimed procompetitive benefits where consumers are deprived of editorial and reportorial diversity.[18]

## III.    THE SUN IS SUFFERING EXTREME IRREPARABLE HARM

The settled and binding authority directing that the elimination of competition is a per se showing of irreparable harm is undisputed. *Compare* Opp'n 13-15 *with* Mot. 40. Unable to refute the law and the very purpose of Section 16 of the Clayton Act, the RJ argues that the Sun won't suffer harm because (1) the Sun's owner's "voice" can be heard through other media, (2) the Sun has other "alternatives" for continued "print[ing]," and (3) money damages can compensate the Sun for being driven out of the Newspaper Market. Opp'n 13-15. These arguments are meritless.

As to the RJ's 'availability of other media' argument, daily, local print newspapers are the relevant product market. *See supra* § II(A). Whether it would be possible to offer a different product in a different market is irrelevant to whether the Sun is suffering irreparable harm and antitrust injury in the Newspaper Market. Br. 14. Further, the Sun's owner's editorial column is not the product at issue: the product is the Sun, a daily, local, print newspaper. *Id.* What is more, the Sun will not exist in any market because the Sun will close both its newsroom and lasvegassun.com if the Sun is forced to operate outside of a JOA. *Id.*; *compare* Opp'n 13-15 (mischaracterizing Greenspun's testimony) *with* 1Tr.67:2-11.

Next, when the RJ argues that the Sun has other alternatives to be printed, it first bears reminding that, though the Sun had incurred substantial investments and had established subscriber

---

[17] The RJ's other "valid business reasons for the Review-Journal's actions" (citing ECF No. 1172 at 22-23) are pretextual. Opp'n 13. The testimony of the RJ's former publisher, and expert opinions of Larry Aldrich establish otherwise. Mot. 14-16; ECF No. 1091 at 19-21; ECF No. 1040 at 13-14, 16-18. The RJ's fallback position that it had no duty to deal with the Sun (ECF No. 1172 at 22-23 & n.6) is disproved by the Attorney General-approved JOA.

[18] The RJ's testimony that the Sun "tried to undermine" the Review-Journal's brand (Opp'n 13 n.7) is neither a procompetitive justification for its Anticompetitive Conduct nor factually correct. *See* Mot. 21-22; ECF No. 836 at 42 n.16; ECF No. 1158 at 6SA1343-45; ECF No. 876-11; *see also High Technology Careers v. San Jose Mercury News*, 996 F.2d 987, 991 (9th Cir. 1993) (where the defendant never complained about the content of the Sun or other problems, and therefore finding that the defendants' proffered explanation "suspect").

and advertiser lists, the Sun relinquished those assets in 1989 (together with a $25 million payment to the RJ to ensure its access to necessary assets and infrastructure until 2040). The Sun would therefore have to acquire those assets over again and make the same investments if forced to re-enter outside of the JOA today. *E.g.*, 2Tr.300:14-24; *see supra* § II(C). Dr. Picard's cost calculations (totaling $100 million) represent real investment costs to reestablish the Sun's full daily print operations.[19] The substantial cost of newspaper distribution, which—due to the inability to benefit from scale—would alone render an independent Sun unprofitable. ECF No. 1173 at 1102-1107 & 1100 (Table 5).[20] The RJ's argument further speaks nothing of the *time* it would take for the Sun to re-enter and establish a distribution network, and subscriber and advertiser bases, while bearing fixed costs such as the cost of the newsroom. 2Tr.292:25-2, 276:4-279:11, 286:14-287:4, 357:4-358:13.

The RJ's offer to print the Sun to reduce the Sun's capital expenditure for <u>printing infrastructure</u> does not eliminate the high barriers to entry. *See supra* § II(C). Even if the RJ's offer to print the Sun was legitimate, absent a JOA framework, the Sun's reliance on its sole competitor for a critical input (printing) is itself a barrier to entry. *See Merger Guidelines* § 2.5.C. (2023) ("Firms may be reluctant to invest in a market if their success is dependent on continued supply from a rival," where the "firm may become more likely to foreclose its competitor as that competitor becomes more successful."); 2Tr.302:10-304:3, 360:20-23. Other, out-of-state printing facilities, as Dr. Picard explained, are neither economical nor competitive alternatives either.[21] *Compare* 2Tr.356:22-357:3 *with* Opp'n 9 (misquoting testimony).

---

[19] As a result, Dr. Picard properly aligned his estimates with replacement costs rather than the RJ's self-serving depreciated book value. *Compare* Opp'n 9 *with* 2Tr.346:9-24.

[20] By contrast, when the RJ distributes the Sun with the Review-Journal, the incremental costs are nominal. Br. 17-18; ECF No. 834 at 5SA1135; ECF No. 858-3.

[21] Because printing facilities are only one barrier to entry into the Newspaper Market, the authority cited by the RJ to assert the Sun's harm is "self-inflicted" because it could be printed elsewhere has no bearing on this issue. Opp'n 14 (citing *Second City Music, Inc. v. City of Chi.*, 333 F.3d 846, 849-50 (7th Cir. 2003) (where the barrier to entry was a license and there was no evidence that it would not receive the license if it applied); *Cypress Semiconductor Corp. v. Fujitsu Semiconductor Ltd.*, 2020 WL 906710, at *2 (N.D. Cal. Feb. 25, 2020) (where the plaintiff merely complained of the potential destruction of valuable inventory; however, the court found that the plaintiff simply could pay the defendant to retain the inventory to avoid the destruction)).

Turning to the purported availability of money damages, the RJ's argument and Nolte's opinion flout the law. Opp'n 14-15; Br. 12-14. While "[m]onetary injury is not normally considered irreparable,' … '[t]he threat of being driven out of business is sufficient to establish irreparable harm." Br. 13-14. The Ninth Circuit's statement in *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (where the sole harm at issue was "lost revenues"), quoted by the RJ (Opp'n 14), does not override the Ninth Circuit's subsequent rule of law that "the loss of ... an ongoing business representing many years of effort and the livelihood of its ... owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages. Thus, showing a threat of extinction is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022). Given the tangible and intangible harms the Sun is presently suffering, money damages cannot compensate the Sun for the irreversible harm of being driven out of business.[22] Br. 12-14.

## IV.    THE BALANCE OF EQUITIES TIPS SHARPLY IN THE SUN'S FAVOR

The facts on which this Court based its conclusion that "[t]he balance of equities tips sharply in the Sun's favor" have not changed. ECF No. 1096 at 9. But, the RJ ignores both the Ninth Circuit's and this Court's rulings to argue that an injunction would "violate" federal law as: (1) an illegal modification of the JOA prohibited by the Ninth Circuit, and (2) a violation of the RJ's First Amendment rights. Opp'n 15-16. Neither is true. Not only did the Ninth Circuit state, "[W]e do not have before us any issue concerning a reversion to the 1989 JOA, and we express no views on any such questions" (ECF No. 1106 at 7), but the Sun's requested relief is simply that the RJ abide by the 1989 JOA's terms, which were approved by the Attorney General. Failure to enforce the 1989 JOA's terms would, in and of itself, violate the Ninth Circuit mandate by effectually creating an unapproved amendment terminating the 1989 JOA. Additionally, the RJ's First Amendment arguments were already properly rejected by this Court. Br. 18-19; Mot. 17 n.17.

Despite having numerous earlier opportunities, only after this Court concluded, "While the

[22] The RJ's misrepresents that the Sun was willing to be "bought out" is unsupported by the documents and was directly contradicted by Mr. Greenspun's testimony. *Compare* Opp'n 14-15 *with* 1Tr.73:23-74:9, 84:8-10, 96:9-11; *see also* 1Tr.87:9-11, 89:15-18.

Sun may face a risk of closure if preliminary injunctive relief is not granted, [but] the RJ faces no such corresponding risk" (ECF No. 1096 at 9), did the RJ claim that performing under the 1989 JOA would "*potentially*" threaten its viability. Opp'n 16. The RJ has provided no evidentiary support for its position, only parroting the Sun's argument that *the Sun* has not been paid a profit payment since 2017 to assert the *RJ* is operating at a loss. *Id.* However, the RJ's claimed 'losses' are precisely what the Sun is challenging in this case. *See, e.g.*, Mot. 12-16.

Notwithstanding, but equally important, the RJ could easily mitigate the costs incurred to promote the Sun, and—as the Sun has repeatedly explained—the RJ has the ability to reduce its claimed monetary harms by printing and distributing the Sun pursuant to the governing Section 8.2. *E.g.*, Br. 17-18 & n.17; *see, e.g.*, *supra* § II(D). As a result, those claimed harms cannot tip the balance of equities in its favor "by the fact that the [RJ] brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.,* 290 F.3d 578, 596 (3rd. Cir. 2002); *Env't Democracy Project v. Green Sage Mgmt., LLC*, 2022 WL 4596616, at *4 (N.D. Cal. Aug. 23, 2022); *IHOP Franchising, LLC v. Hameed*, 2015 WL 429547, at *5-6 (E.D. Cal. Feb. 2, 2015).[23]

Even apart from the capital expenditures for printing infrastructure, the RJ, itself (which already possesses the infrastructure, networks, subscriber and advertiser contracts, and other assets), has argued that establishing a separate distribution network for the Sun would be prohibitively costly and economically infeasible for the RJ to undertake, which confirms it would be even more economically infeasible for the Sun to undertake if it had to re-enter the market on its own. *E.g.*, Opp'n 16; 2Tr.361:5-11; 2728-273:11; Br. 17-18.

## V.    THE PUBLIC INTEREST TIPS SHARPLY IN THE SUN'S FAVOR

The point of the Attorney General's approval of the 1989 JOA under the NPA was to allow the Sun and the RJ to combine operations to preserve editorial and reportorial competition in furtherance of the public's interest. *E.g.*, Br. 19; ECF No. 1096 at 10. "Otherwise, one newspaper may achieve a stunning fusion of economic and editorial (political) power due to the loss of actual

---

[23] The RJ's assertion that this Court "*can*" consider its inflated costs is not supported by *Stanley v. University of Southern California*, 13 F.3d 1313, 1320-22, 1325-26 (9th Cir. 1994) where the balance of hardship analysis did not turn on "extreme costs" as the RJ states. Opp'n 16 n.10.

and potential competition." *Michigan Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1300, 1302 (D.D.C. 1989) (Silberman, J., concurring). This Court's prior conclusion that the public interest favors preserving the Sun and granting the injunction is correct. ECF No. 1096 at 10; Mot. 44; Br. 19. The RJ's unfounded contention that the public will "get minimal (if any) benefit" from the Sun's continued existence (Opp'n 16 ) is diametrically opposed to the "vital public interest" in preserving competition and diverse newspapers in a given market, and the RJ's executive's and consumers' own statements. Br. 19 & 1SA35-50. The RJ's point of fact that only hundreds of subscribers cancelled their subscriptions in the week following the RJ's elimination of the Sun in no way evidences a lack of demand for the Sun (even after the RJ has weakened the Sun's incentives and ability to compete, including after years of reducing consumer knowledge of the Sun's existence (*see* Mot. 12-23, 30-37)). Opp'n 16. When the RJ totally excluded the Sun from the market, the RJ became the *only* local, daily, print newspaper, and consumers participating in the Newspaper Market were deprived of any other choice.

**VI.    THE SUN'S REQUESTED REMEDY IS SPECIFICALLY TAILORED TO THE RJ'S CONDUCT, AND RESTORES COMPETITION IN THE NEWSPAPER MARKET**

The RJ's recitation of the Sun's authority only proves the point: enjoining the RJ from refusing to perform under the 1989 JOA is narrowly tailored to prevent the continued loss or damage caused by its Anticompetitive Conduct. Opp'n 17-18; Br. 14-16. All of the RJ's arguments reassert those made in other parts of its Opposition. *See generally* Opp'n. For the reasons discussed above, and further noted below, the RJ's arguments continue to lack merit.

The RJ's initial argument—that an injunction requiring performance under the 1989 JOA would not preserve competition and would violate the Ninth Circuit's mandate—fails. *See supra* § IV. The RJ's citation to Dr. Picard's policy opinions about JOAs in general—not the Sun and the RJ's JOA—is irrelevant. *See* Opp'n 18. The NPA and the Attorney General's written approval of the 1989 JOA say otherwise, and the Sun has been preserved since 1989. The RJ's further argument that the Sun would not be excluded from the market absent an injunction because it has "print[ing]" alternatives is in dereliction of the high barriers to entry. *Compare* Opp'n 18 *with supra* § II(C).[24]

---

[24] The RJ's conclusory characterization of the Sun as "free riding for years to come" remains

Next, regardless of whether the Sun has also alleged Anticompetitive Conduct for the RJ's actions undertaken under the 2005 JOA framework (*i.e.*, accounting abuses, failure to maximize joint operation profits, reducing consumer knowledge of the Sun and its value (*see* Mot. 12-23)), the Sun also alleged that the RJ's "refus[al] to acknowledge the enforceability of the 1989 JOA and comply with it" was Anticompetitive Conduct. *E.g.*, ECF No. 1162 ¶¶ 224, 204-226, 296-300. Enjoining the RJ from refusing to perform under the governing 1989 JOA is exactly what the Sun is requesting. The RJ cannot pretend that its total exclusion of the Sun would not be remedied by an injunction that restores the Sun as a daily print newspaper in the Newspaper Market. Opp'n 19.

The Sun's requested relief would not be mooted by the 1989 JOA's two-year loss operation provision either. *See* Opp'n 19. The RJ cites no authority for its claim that it could terminate the 1989 JOA within 90 days from the date of the injunction. *Id.* Given that the material elements of the 1989 JOA have always been in effect and have become the operative agreement, there is no legal basis for the RJ to contend that the loss-operation provision could be backward looking—the RJ was not accounting pursuant to the 1989 JOA and the RJ has neither created the "Agency" nor has it been paying the Sun for its editorial expenses or promotional budget. It is also incorrect that the joint operation was suffering a loss. *Id.* Absent the RJ's Anticompetitive Conduct for accounting abuses and failure to maximize the joint operation's profits, the joint operation was profitable. *E.g.*, ECF No. 871 at 18; 1SA14-15, 171-72.

As to the RJ's final argument that performing under the 1989 JOA "would not preserve competition" (Opp'n 19), that is nonsensical: the Sun would be an alternative newspaper to the RJ, restoring competition. *See supra*. And for all the reasons stated above, the RJ's contention that the "financial drag" could "potentially" threaten the RJ's continued existence (Opp'n 19, 16) is an unsupported red herring. *Supra* § IV.

## VII.   A DE MINIMUS BOND, IF ANY, IS PROPER

The RJ asserts that it will incur substantial expenditures if an injunction is issued, and that the RJ would be unable to recover its alleged damages without a bond. Opp'n 19. As the Sun has

---

unsupported by any analysis, law, or evidence, including the $25 million in consideration the Sun paid for the 1989 JOA. *See* ECF No. 902 at 29.

already shown (Br. 17-18), the RJ's costs of complying with the 1989 JOA are the result of its own actions, and its expert, Mr. Nolte, has radically overstated these costs in calculations based on financial data the RJ concedes it never provided to the Sun. *Compare* Opp'n *with* Br. 17 n.13. The RJ contends that it "cannot recover" any potential damages absent a bond; however, it cites no testimony, documents, or data whatsoever to support this assertion. Opp'n 20.

In seeking an exorbitant bond, the RJ asks this Court to ignore controlling Ninth Circuit precedent, public interest considerations, and the Sun's financial position. Opp'n 19-20. The Sun has already countered the RJ's belabored argument suggesting Rule 65(c) "may not be waived." Opp'n 20; Br. 20. The RJ's cited authority does not support its position that a bond requirement is always mandatory and the very case the RJ cites establishes a bond requirement is discretionary. *Id.* Recent authority from the Ninth Circuit reiterates this Court has discretion and is in the best position to determine a bond, and can dispense of it where a party will not suffer damages from the injunction. *See, e.g.*, *Goldwater Bank, N.A.. v. Elizarov*, 2023 WL 387037, at *2 (9th Cir. Jan. 25, 2023). The public interest considerations here are inescapable, and the RJ has not rebutted the public interest at stake. Br. 19-20. Indeed, the RJ's expert conceded that he could not "calculate the harm to consumers" arising from the exclusion of the Sun that will occur if a substantial bond is required. *See* 2Tr.522:20-523:14, 528:17-529:13; Br. 19-20.

Finally, and unrebutted by the RJ, the consideration of financial means is based upon the entity seeking the injunction, not any potential donors. *See* Br. 20 & n.17. This Court heard testimony on the Sun's lack of financial means due to the RJ's direct control over the Sun's financial situation. *Id.* at 19-20. This consideration warrants the Court's discretion to order a nominal bond or no bond at all. The fact that the Sun's owner has had to loan the Sun millions of dollars to enforce the Sun's rights under the NPA and antitrust laws or cede to the RJ's Anticompetitive Conduct, harming consumers, should not be the basis to impose a prohibitive bond.

**VIII. CONCLUSION**

For the foregoing reasons, an Order granting the Sun's Motion is warranted.

DATED this 19th day of May, 2026.

CLARK HILL PLC

By: */s/ Kristen L. Martini*
    E. Leif Reid, Nevada Bar No. 5750
    Kristen L. Martini, Nevada Bar No. 11272
    Nicole Scott, Nevada Bar No. 13757
    1700 S. Pavilion Center Drive, Suite 500
    Las Vegas, Nevada 89135

PISANELLI BICE PLLC
James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

BROWNSTEIN HYATT FARBER
SHRECK, LLP
Jordan T. Smith, Nevada Bar No. 12097
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

ALIOTO LAW FIRM
Joseph M. Alioto, Pro Hac Vice
One Sansome Street, 35th Floor
San Francisco, California 94104

*Attorneys for Plaintiff/Counterdefendants*

# CERTIFICATE OF SERVICE

I certify that I am an employee of CLARK HILL PLC, and I caused a true and correct copy of the foregoing **PLAINTIFF'S REPLY IN SUPPORT OF POST-HEARING SUPPLEMENTAL BRIEF PER ECF NO. 1182** to be served by electronically filing the foregoing with the CM/ECF electronic filing system which will send notice of electronic filing to:

J. Randall Jones, Esq.
Mona Kaveh, Esq.
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169

Michael J. Gayan, Esq.
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite 100
Las Vegas, NV 89107

Amy M. Gallegos, Esq.
David R. Singer, Esq.
Andrew G. Sullivan, Esq.
Alison I Stein, Esq.
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, CA 90071

Richard L. Stone, Esq.
850 Devon Avenue
Los Angeles, CA 90024

DATED: May 19, 2026.

/s/ *Kristen L. Martini*
An Employee of Clark Hill PLC