UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC.,<br>Plaintiff,<br>v.<br>SHELDON ADELSON, *et al.*,<br>Defendants. | Case No. 2:19-cv-01667-ART-MDC<br><br>ORDER ON RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF Nos. 1128/1144) |
| LAS VEGAS REVIEW-JOURNAL, INC.,<br>Counter Claimant,<br>v.<br>LAS VEGAS SUN, INC., *et al.*,<br>Counter Defendants. | |

This is an antitrust and declaratory judgment action between the Las Vegas Sun ("Sun") and the Las Vegas Review-Journal ("RJ"). After a pair of orders from the Ninth Circuit invalidated the 2005 Joint Operating Agreement ("JOA") between the parties and a temporary restraining order that preserved the status quo under the 2005 JOA (ECF Nos. 1016, 1106), the Sun amended its complaint (ECF No. 1162) and submitted a new motion for a temporary restraining order and preliminary injunction. (ECF Nos. 1128/1144.) On April 20 and 21, 2026, the parties presented evidence and argument on the motion. (ECF Nos. 1181, 1182, 1185, 1186.) A round of supplemental briefing followed. (ECF Nos. 1189/1190, 1191/1192, 1196/1197.) The Court now denies the Sun's motion for preliminary injunctive relief.

**I. BACKGROUND**

The following facts are drawn from the Sun's Second Amended Complaint (ECF No. 1162), exhibits admitted without objection at the preliminary injunction hearing, and, as necessary for context, hearing testimony (ECF Nos. 1185, 1186).

In 1989, the Sun and the RJ were independent local daily newspapers. The Sun had been losing money for about a decade due to a decline in circulation and advertising. (ECF No. 1154 at 109-11) (report of the Assistant Attorney General, Antitrust Division regarding the 1989 proposed JOA). The RJ, on the other hand, was growing. (*Id.*) The two parties drafted a JOA that provided the Sun with substantial ongoing funding and preserved the reporting and editorial independence of the two newspapers. (*Id.* at 107.) Under the authority granted by the Newspaper Preservation Act ("NPA"), which creates a limited exemption from antitrust liability in order to preserve independent editorial voices in a community, the Attorney General approved the 1989 JOA. (*Id.* at 108-09, 174); *see also Las Vegas Sun, Inc. v. Adelson*, 147 F.4th 1103, 1110 (9th Cir. 2025), cert. denied, 224 L. Ed. 2d 9 (Feb. 23, 2026) (summarizing this history).

Under the joint operation, the RJ published a morning edition, the Sun published an afternoon edition, and both newspapers published a "joint edition on Saturdays, Sundays, and holidays." (ECF No. 1154 at 72) (1989 JOA § 5.1). The 1989 JOA also entitled the Sun to sixty-five percent of the RJ's news and editorial expense allocation and a ten percent profit share. (*Id.* at 92, 102) (1989 JOA Appendix A.1, D). On its face, the agreement was to last at least fifty years or until the termination clause was invoked. (*Id.* at 63-64, 83-85) (1989 JOA §§ 1.2 & 9). In return for continued survival, the Sun gave up its circulation lists and advertising contacts, and sold its preproduction and postproduction facilities. (*Id.* at 64-69) (1989 JOA § 3). The RJ's owner took charge of circulation, printing, and the commercial functions of both newspapers. (*Id.* at 72-73) (1989 JOA § 5.1).

Although, according to the Sun, the 1989 JOA put the Sun in a positive cash flow position, readership continued to decline. (ECF No. 1185 at 24-26.) In 2005, the parties negotiated an "Amended and Restated" JOA. Under the terms of the 2005 JOA, the Sun ceased publication as an afternoon newspaper and instead was distributed as a freestanding insert of up to ten pages placed within the morning edition of *The Review-Journal.* (ECF No. 1154 at 228-29) (2005 JOA Appendix A.2). The 2005 JOA also changed the formula for calculating the Sun's profit share, eliminating the fixed ten percent profit share from the 1989 JOA and instead providing that the Sun's payments would be subject to adjustment based on fluctuations in the RJ's annual earnings. (*Id.* at 236) (2005 JOA Appendix D). According to Greenspun, the Sun gave up its promotion budget, receiving instead a presence on the front page of the joint edition and a promise by the RJ to promote both newspapers equally. (ECF No. 1185 at 34-35.)

The Sun and the RJ did not seek the Attorney General's approval for the 2005 JOA. Instead, in June 2005, they delivered the amended JOA to the Department of Justice, together with a cover letter stating that it was being submitted under 28 C.F.R. § 48.16, a regulation that provided for the filing of JOAs amending or restating "an existing arrangement." (ECF No. 1155 at 59.) The Department of Justice opened and then closed an investigation into the 2005 JOA without further action. (*Id.* at 164.) The parties thus continued their joint operation on the premise that the 2005 JOA was the governing arrangement.

On December 10, 2015, the Adelson family purchased the RJ. The new owners hired a new publisher, who the Sun alleges implemented a less aggressive financial plan in order to drive the Sun's JOA payments to zero dollars. (ECF No. 1156 at 83.) In 2017, joint operation profits indeed went negative, eliminating the Sun's ten percent profit payment. (*Id.* at 49.) The Sun has reportedly not received any payment from the joint operation since. (ECF No. 1185 at 30.) The RJ also allegedly defaulted in its contractual obligations to promote the Sun and feature

it in equal prominence in its own advertisements, while still charging the cost of these separate advertisements to the joint operation. (ECF No. 1155 at 214-15.) Meanwhile, in a continuing dispute that preceded the Adelson family's ownership of the RJ, the Sun argued that the RJ's practice of charging separate editorial costs to the joint operation violated the 2005 JOA. (ECF No. 531-5 at 3.)

The Sun took the RJ to arbitration over the accounting of editorial costs and promotional expenses. On July 2, 2019, the arbitrator awarded the Sun over $1.8 million plus fees and costs. (ECF No. 1155 at 218.) A state district court confirmed the arbitrator's decision, and the Supreme Court of Nevada upheld the district court's decision on appeal. *News+Media Cap. Grp. LLC v. Las Vegas Sun, Inc.*, 495 P.3d 108, 113-24 (Nev. 2021). After the arbitrator's decision, the RJ sought termination of the joint operation in state court. (ECF Nos. 1155 at 221-223, 833-4.)

The Sun filed this antitrust action against the RJ in September 2019, alleging in essence that the RJ sought to "strangl[e] the sole remaining competitor and dissenting voice" in the Las Vegas newspaper market by "weaponiz[ing]" the 2005 JOA. (ECF No. 1.) The RJ counterclaimed for termination of the 2005 JOA. (ECF No. 296.) The parties entered a stipulated preliminary injunction to continue operating under the 2005 JOA, and after some years the RJ moved to dissolve it. (ECF No. 852/853.) This Court denied the motion to dissolve the preliminary injunction, but the Ninth Circuit reversed, finding that the 2005 JOA was unlawful and unenforceable. *Las Vegas Sun*, 147 F.4th at 1122. The Ninth Circuit held that regardless of whether the 2005 JOA amended or replaced the 1989 JOA, it required the prior written consent of the Attorney General under Section 4(b) of the NPA, which it had not received. *Id.* at 1121.

After the stipulated preliminary injunction was dissolved in conformance with the Ninth Circuit's order and new temporary injunctive relief was ordered to preserve the status quo (ECF No. 1096), the RJ petitioned the Ninth Circuit for a

writ of mandamus on the basis that the temporary injunctive relief granted to the Sun de facto enforced the unlawful 2005 JOA. (ECF No. 1061); *see also Las Vegas Sun, Inc. v. Adelson*, No. 2:19-CV-01667-ART-VCF, 2026 WL 705754, at *6 (D. Nev. Mar. 12, 2026) (granting temporary injunctive relief pending a hearing on the Sun's motion for a preliminary injunction). The Ninth Circuit granted the writ on the basis that the temporary relief awarded violated Section 4(b)'s requirement that any JOA or amendment to a JOA be approved by the Attorney General. (ECF No. 1106); *In re Adelson*, No. 26-1646, 2026 WL 895611, at *3 (9th Cir. Mar. 30, 2026). This Court accordingly vacated its order preserving the status quo on April 2, 2026, and the RJ promptly thereafter halted production and distribution of the Sun. (ECF No. 1109.)

The Sun has filed a new motion for preliminary injunctive relief (ECF Nos. 1128/1144), which is tied to the new Second Amended Complaint (ECF No. 1162). In its motion, the Sun seeks, among other relief, to enforce compliance with the 1989 JOA, which would require either that the RJ print and distribute *The Sun* as a standalone weekday afternoon newspaper and as a joint edition with *The Review-Journal* on weekends and holidays, or that the parties avail themselves of the force majeure clause providing for joint distribution. (ECF No. 1144 at 2.) In the alternative, the Sun requests that the RJ be enjoined from terminating the joint operation and that the Court order the RJ to disclose the list of subscribers to the joint newspaper bundle. (*Id.* at 2-3.)

The Court held a two-day evidentiary hearing on the Sun's motion on April 20 and 21, 2026. (ECF Nos. 1181, 1182.) The Sun presented three witnesses. First, Brian Greenspun, the Sun's owner, testified about the history of the Sun and its independent and joint operations (ECF No. 1185 at 11-12), the civic impact and quality of its reporting (*id.* at 28-29), and the deterioration of the parties' relationship after the Adelson family purchased the RJ (*id.* at 37-41). Dr. Michael Katz, an expert in antitrust economics, testified that quantitative and

qualitative evidence showed that the scope of the relevant market for the purposes of this litigation was limited to English language daily newspapers in the Las Vegas metro area, and opined that several of the typical economic concerns implicated by duties to deal did not apply in this case. (*Id.* at 145, 148-49.) Dr. Robert Picard, an expert on barriers to entry into the newspaper industry (ECF No. 1186 at 10), testified that the Sun had no feasible alternative to the joint operation because of high fixed costs that newspapers with small distribution find unmanageable, among other reasons (*id.* at 21, 29-30).

The RJ then presented three witnesses. Chris Blaser, the RJ's senior vice president of audience and circulation (*id.* at 117), testified about industry-wide challenges with retention and subscriber recruitment, and how the RJ's performance began improving and exceeding the industry norm after the Adelson family acquired it (*id.* at 120-21, 134). Glenn Cook, the RJ's executive editor and senior vice president for news (*id.* at 185), testified as to the quality and integrity of the RJ's reporting, and the marginal role of the Sun in the Greenspun Media Group suite of publications (*id.* at 187, 201-02). David Nolte, an expert in the fields of accounting and business valuation (*id.* at 233), testified that digital news "is eating the lunch of print" news operations and that the Sun's asserted damages are all quantifiable (*id.* at 237, 249, 254-56).

This order addresses the Sun's renewed motion for preliminary injunctive relief. The parties' remaining pending motions will be addressed separately.

## II. LEGAL STANDARD

A plaintiff seeking a preliminary injunction ordinarily must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if preliminary relief is not granted, (3) that the balance of equities is in their favor, and (4) that the injunction they seek is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief can be either mandatory or prohibitory. The distinction is whether the injunction

requires the parties to take action or to refrain from taking action; in other words, whether the injunction alters or preserves the status quo pending a determination on the merits of the case. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060-61 (9th Cir. 2014). The status quo is "the last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Regents of the Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 514 (9th Cir. 1984)).

The mandatory injunction standard is imposing. In addition to the four traditional preliminary injunction factors stated above, a movant requesting a mandatory injunction must also show that "the facts and law clearly favor" the request. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (citing *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 744 (9th Cir. 2015) (requiring "more than a possible or fairly debatable claim" to justify issuing a mandatory preliminary injunction). Mandatory injunctions require a higher level of proof than prohibitory injunctions because they place affirmative obligations on parties before full discovery or a trial on the merits has taken place. They are "particularly disfavored," not granted unless "extreme or very serious damage will result," and "not issued in doubtful cases." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (quoting *Marlyn Nutraceuticals*, 571 F.3d at 879). Although both mandatory and prohibitory injunctions may be appropriate to resolve antitrust violations and effectuate the purposes of the Sherman Act, *see California v. Am. Stores Co.*, 495 U.S. 271, 283 (1990), the imposing mandatory injunction standard still applies in antitrust cases. *See, e.g., Martinson v. Nat'l Collegiate Athletic Ass'n*, 804 F. Supp. 3d 1109, 1119 (D. Nev. 2025).

//

//

## III. DISCUSSION

In its motion, the Sun seeks three forms of preliminary injunctive relief: (1) enjoining the RJ from refusing to perform under the 1989 JOA; (2) enjoining the RJ from unilaterally ending the joint operation before 2040; and (3) ordering the RJ to provide the Sun with the list of subscribers to both newspapers. (ECF No. 1136 at 1-2, 1189 at 1 n.1-2.) The Court denies the request for the reasons below.

### A. Most of the relief that the Sun seeks is unlawful.

As a threshold matter, of these three forms of relief, only the first is cognizable. The Ninth Circuit has made clear that anything short of complete performance of a joint operation constitutes an amended JOA, and an amended JOA violates the NPA unless the Attorney General has given prior written consent. *In re Adelson*, 2026 WL 895611, at *2. Therefore, both the Sun's desired injunction against early termination of the joint operation and its desired order to provide the Sun with a list of subscribers would amount to a "modified arrangement" lacking Attorney General approval, thus violating the NPA. *Id.* Indeed, enjoining the RJ from unilaterally ending the joint operation is the same relief that the Ninth Circuit previously found unlawful in this case. *Id.* And ordering the RJ to provide the Sun with the list of subscribers to both newspapers is akin to enforcing some of the Sun's rights under the termination provision of Section 9 of the 1989 JOA, without requiring the triggering events or procedural steps that the joint agreement contemplates. (ECF No. 1162 at 109.) The Court thus has no authority to issue these forms of injunctive relief.

In contrast, because the 1989 JOA was approved by the Attorney General (ECF No. 1154 at 174), it is lawful under the NPA. Accordingly, this order only considers the Sun's request for reversion to the 1989 JOA.

### B. The Sun seeks a mandatory injunction.

Reversion to the 1989 JOA is mandatory relief. It would require the RJ to take action pursuant to an agreement that has not been in effect since at least

2005, when the unlawful 2005 JOA went into effect and altered the terms of the parties' performance. *See Ariz. Dream Act Coal.*, 757 F.3d at 1060-61 (distinguishing mandatory injunctions from prohibitory ones). The Court acknowledges the ambiguity in identifying the relevant status quo in this case, where the request for preliminary injunctive relief comes many years into the litigation and after numerous shifts in the parties' litigation positions. But whether the status quo is defined by looking to the parties' relationship at the onset of the underlying controversy—as of 2015, before the Adelsons purchased the RJ and allegedly began engaging in the anticompetitive conduct—or their relationship prior to the most immediate developments that prompted the pending request for injunctive relief—as of April 2, 2026, before the RJ stopped printing the Sun (ECF No. 1109)—the dispositive fact remains the same: at neither time did the 1989 JOA describe the actual conduct of the parties and their joint operation.

Instead, the parties were performing under what they believed to be a legally applicable amended version of the 1989 JOA. *In re Adelson*, 2026 WL 895611, at *2. The Court cannot order the parties to return to an *ante litem* status quo that has since been declared unlawful. *Id.*; *see Las Vegas Sun*, 147 F.4th at 1121-22 (establishing that "the 2005 JOA is unlawful and unenforceable"). And while the 1989 JOA was a direct predecessor to the 2005 JOA in many material respects, granting the Sun the relief it requests would require afternoon distribution by the RJ, which would be a meaningful change from any relevant status quo. (ECF No. 1186 at 12, 16.) The Court therefore proceeds to evaluate the Sun's request under the heightened standard for mandatory injunctive relief.

**C. The Sun has not shown that injunctive relief is warranted.**

Under the *Winter* framework, 555 U.S. at 20, the Court first evaluates the Sun's likelihood of success on the merits of its claims. For the purposes of this motion for preliminary injunctive relief, which can only take the form of

enforcement of the 1989 JOA, the Sun's most important claim on the merits is its claim for a declaratory judgment that the 1989 JOA is the present valid and enforceable agreement between the parties, with which the RJ is obligated to comply. The Court then briefly addresses the Sun's likelihood of success on its antitrust claims, but only insofar as is necessary to demonstrate why those claims ultimately fail to support the Sun's request for a preliminary injunction. The Court then turns to the remaining *Winter* requirements: whether the Sun would face irreparable harm if the 1989 JOA were not enforced, the balance of the equities to the parties if enforcement is granted or withheld, and the public interest in enforcement.

**1. The Sun is clearly likely to show that the 1989 JOA is the present valid and enforceable agreement between the parties.**

In its Second Amended Complaint, the Sun seeks a judicial declaration that the 1989 JOA is the present valid and enforceable agreement between the parties. (ECF No. 1162 at 74-77.) The Sun also argues that reversion to the 1989 JOA encompasses an entitlement to the force majeure clause, under which the RJ must print and distribute both newspapers in a daily morning joint edition format. (ECF No. 1190 at 11-12.) In response, the RJ advances three main contract defenses—abandonment, impossibility, and novation—and argues that the force majeure clause has not been triggered. (ECF No. 1192 at 12-15.)

The Ninth Circuit has not expressed an opinion on whether the 1989 JOA sprang back into effect upon invalidation of the 2005 JOA. *In re Adelson*, 2026 WL 895611, at *3 ("We reiterate, however, that we do not have before us any issue concerning a reversion to the 1989 JOA, and we express no views on any such questions.") But unlike the 2005 JOA, the 1989 JOA was indisputably approved by the Attorney General, *Las Vegas Sun*, 147 F.4th at 1110, and thus valid and enforceable at least at the time it was entered. For the reasons discussed below, the Court finds likely unavailing the RJ's defenses that the agreement is no longer

valid and enforceable today. The Court also concludes, however, that the Sun is not clearly likely to show that the force majeure clause has been activated.

**a. The 1989 JOA has not been abandoned**

The RJ argues that the 1989 JOA was abandoned because the parties have not performed under it for over 20 years. "Generally, contract abandonment occurs when both parties depart from the terms of the contract by mutual consent." *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1019 (Nev. 2004). "[P]arties to a contract may possibly agree to changes from the original agreement which are so extensive that the contract must be deemed abandoned as a matter of law." *Modern Builders, Inc. of Tacoma v. Manke*, 615 P.2d 1332, 1337 (Wash. 1980) (citing *V.C. Edwards Contracting Co. v. Port of Tacoma*, 514 P.2d 1381 (Wash. 1973)). Courts find abandonment where, in the course of performing the contract, changes were made to the original agreement that were so fundamental that the original agreement could no longer be followed at all. *Paterson v. Condos*, 28 P.2d 499, 500 (Nev. 1934) ("[I]t is *only* where the alterations and changes are so great that it is impossible to follow the original contract that it will be deemed to have been wholly abandoned") (emphasis added). Where the changes are less fundamental, the original contract "is held to exist as far as it can be traced to have been followed." *Id.; see also Rowland v. Lepire*, 662 P.2d 1332, 1334 (Nev. 1983); *Goldstein v. Turnberry Pavilion Partners Ltd. P'ship,* No. 0207CV-00387-LRH-VPC, 2007 WL 3353410, at *4 (D. Nev. Nov. 9, 2007), on reconsideration in part, No. 0207-CV-00387-LRH-PA, 2008 WL 53559 (D. Nev. Jan. 2, 2008).

Here, the 1989 JOA can still be followed. The Sun is not asking to apply a contract to a situation so fundamentally different that the original agreement can no longer be followed. In many material respects, the state of affairs between the parties following the 2005 JOA was not so different than it was under the 1989 JOA. As previously found, both JOAs eliminated price and other forms of

competition, and provided for a joint distribution scheme on Saturdays, Sundays, holidays, and special editions. (ECF No. 970.) Where they are different, nothing makes the unique characteristics of the 1989 JOA "impossible to follow" today. *Paterson,* 28 P.2d at 500. The RJ's abandonment argument is thus unsuccessful here.

**b. The 1989 JOA is not impossible to perform.**

The RJ also argues that compliance with the 1989 JOA is impossible or impracticable. This argument must clear a high bar: performance is considered impossible or impracticable only when it would impose "extreme and unreasonable difficulty, expense, injury, or loss" on a party. *See* Restatement (Second) of Contracts § 261 cmt. d (1981) (describing the standard as contemplating events "generally due either to 'acts of God' or to acts of third parties"); *Nebaco, Inc. v. Riverview Realty Co.*, 482 P.2d 305, 307 (Nev. 1971) (citing Restatement when analyzing impracticability). For example, a person who contracts to repair a building that is subsequently destroyed in a fire can be discharged from the contract for impossibility. Restatement (Second) of Contracts § 261 cmt. d (1981).

"However, 'impracticability' means more than 'impracticality.' A mere change in the degree of difficulty or expense . . . , unless well beyond the normal range, does not amount to impracticability." *Id.* The Nevada Supreme Court has limited this defense to cases where the difficulty in performance is one that a reasonable party could not have foreseen. *Nebaco*, 482 P.2d at 307. Similarly, a contract is not invalidated just because it turns out to be a bad deal. 102 Am. Jur. Proof of Facts 3d 401 § 6 (2008) ("[T]he inability to perform under a contract due to financial reasons will not generally discharge a contract for impossibility."); *see also P & Z Pac., Inc. v. Panorama Apartments, Inc.*, 372 F.2d 759, 762 (9th Cir. 1967); Restatement (Second) of Contracts § 261 cmt. d (1981).

The RJ argues that compliance with the 1989 JOA is impossible or impracticable because there is currently no afternoon edition of *The Sun* in circulation, there is no market for an afternoon edition of *The Sun*, and delivery and print costs make distribution economically infeasible. (ECF No. 1172 at 44-45.) This is, in essence, an argument that compliance with the terms of the 1989 JOA would be unprofitable for the RJ. That argument fails to satisfy the high standard for discharging the RJ from its contractual obligations established by the above authorities. Moreover, if it did establish a viable defense, the 1989 JOA would have been unenforceable from the moment it was entered, as the market for afternoon newspapers was unfavorable well before 1989. (ECF No. 1185 at 16) (testimony from Brian Greenspun that, from 1963 to 1965, "[the RJ's] circulation grew almost exponentially as [the Sun's] reduced because people couldn't get their paper until late in the afternoon"). Indeed, at the time that the RJ's predecessor-in-interest entered into the 1989 JOA, it should have been foreseeable that a fifty-year agreement providing for afternoon distribution of *The Sun* could turn out to be a losing deal. The Court thus concludes that this defense is not likely to succeed at the merits stage.

**c. The 2005 JOA did not replace the 1989 JOA through novation.**

The RJ next argues that the 2005 JOA was a novation of the 1989 JOA, rendering the latter inoperable. (ECF No. 1172 at 39-42.) The Court previously rejected this argument, holding that the 2005 JOA was an amendment, not a novation. (ECF No. 970 at 16-19.) "The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.'" *Musacchio v. United States*, 577 U.S. 237, 244-45 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)). This doctrine is a matter of discretion, however, and a court may elect to revisit a previously decided question where "(1) the first

decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; [or] (5) a manifest injustice would otherwise result." *Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir. 1993).

On summary judgment, the Court concluded that the 2005 JOA was not a novation as a matter of law. (ECF No. 970 at 16-19.) None of the above conditions require revisiting this conclusion. Although an intervening change in law did occur when the Ninth Circuit ruled that the 2005 JOA was unlawful, the Ninth Circuit specified that it "express[ed] no views on any [] questions" regarding the operability of the 1989 JOA. *In re Adelson*, 2026 WL 895611, at *3. If anything, the 2005 JOA's unlawfulness undermines the RJ's argument that it wholly superseded the 1989 JOA as a matter of law. *See United Fire Ins. Co. v. McClelland*, 780 P.2d 193, 195 (Nev. 1989) (listing as the first element of a novation "an existing *valid* contract") (emphasis added); *cf. Airs Int'l, Inc. v. Perfect Scents Distrib.*, 902 F. Supp. 1141, 1148-49 (N.D. Cal. 1995) ("If the new contract is invalid, there is no novation and the parties' previous obligations are not extinguished.")

Moreover, the Court's prior conclusion is not clearly erroneous. For a novation to occur, the intent of all parties to terminate the existing contract and enter a new one must be clear. *See McClelland,* 780 P.3d at 195-96. The 2005 JOA is titled "Amended and Restated Agreement," it tracks the structure and language of the 1989 JOA, it continues the term of the 1989 JOA, and the parties' contemporaneous statements show that the parties intended it to be an amendment. (ECF No. 970 at 18.) For example, the RJ's then-owners told the Department of Justice that they were submitting the 2005 JOA "pursuant to . . . 28 CFR § 48.16," which requires the parties to submit copies "after a renewal of or an amendment to the terms of an existing arrangement." (ECF No. 1155 at 59.)

Rather than establish the parties' clear intent to effectuate a novation, these characteristics and historical facts weigh against the RJ's novation defense.

In light of the above discussion, each of the RJ's contract defenses appears unlikely to succeed. In the absence of a contract defense, the Sun is likely correct that when the 2005 amendment was invalidated, the 1989 JOA sprang back in its original form. The Sun has therefore shown a clear likelihood of success on its claim for a judicial declaration that the 1989 JOA is in force.

**d. The Sun has not shown that the 1989 JOA's force majeure clause was triggered.**

The Sun next argues that, given the 1989 JOA's operability, the force majeure clause in Section 8.2 requires that the RJ must print and distribute both newspapers in a daily morning joint edition format. (ECF No. 1162 at 106.) At stake for the Sun is whether it is entitled to be distributed as a daily morning newspaper, or whether it must settle for distribution on weekday afternoons under the 1989 JOA's ordinary terms. (ECF No. 1154 at 72) (1989 JOA § 5.1). On weekends, the two newspapers would be distributed as a jointly published edition, with the timing of distribution to be determined by the RJ. (*Id.* at 92-94) (1989 JOA Appendix A). With the force majeure clause, *The Sun* could be published with *The Review-Journal* in a daily joint edition. (*Id.* at 106) (1989 JOA § 8.2).

In contract law, force majeure protections usually must be provided for explicitly and with specificity, and courts are generally loathe to overextend catch-all provisions that do not precisely describe what kind of events can trigger force majeure. Jennifer M. Bund, *Force Majeure Clauses: Drafting Advice for the CISG Practitioner*, 17 J.L. & Com. 381, 411 (1998); (ECF No. 970 at 49). Unfavorable changes in market conditions are typically not force majeure events within the scope of these catch-all clauses. *See Monolith Portland Cement Co. v. Douglas Oil Co. of Cal.*, 303 F.2d 176, 180 (9th Cir. 1962); *B.F. Goodrich Co. v.*

*Vinyltech Corp.*, 711 F. Supp. 1513, 1519 (D. Ariz. 1989); *Langham-Hill Petroleum Inc. v. S. Fuels Co.*, 813 F.2d 1327, 1330 (4th Cir. 1987). In *Monolith Portland Cement*, the Ninth Circuit interpreted under California law a force majeure clause that provided that "neither party hereto shall be liable for delays in shipment or failure to deliver . . . by reason of fires, flood, earthquakes, acts of God . . . or any other cause whatsoever beyond the control of such party, whether similar or dissimilar to the causes herein enumerated . . . ." 303 F.2d at 180. The Ninth Circuit concluded that the catch-all language—"or any other cause whatsoever beyond the control of such party"—did not insure the parties against adverse market forces. *Id.* "In other words, the clause was no escape for bad economic projecting." *Id.*

Within the 1989 JOA, the force majeure clause kicks in if certain triggering events cause failure, partial failure, or delay in performance by one of the parties. (ECF No. 1154 at 82) (1989 JOA § 8.2). Force majeure events include "war, riot, government action," and other causes, including "any other cause substantially beyond the control of the party provided to perform." *Id.* If one such event occurs and "it is feasible to publish only one newspaper product," then the RJ must "exercise its best efforts to produce a jointly published newspaper." *Id.*

In its post-hearing brief, the Sun proposes several potential force majeure events that it argues may relieve the RJ of its responsibility to produce two newspapers under the 1989 JOA. The Sun argues that the failure of the afternoon newspaper market and the rise of digital media are "cause[s] substantially beyond the control of" the RJ, within the meaning of the force majeure clause. (ECF No. 1190 at 11-12.) The Sun also asserts that judicial orders and Department of Justice regulations going to the legality of the joint operation qualify as "government action" and are thus also triggering events. (*Id.*) In addition to arguing that the force majeure clause has not been triggered (ECF No. 1192 at 15-16), the RJ responds that this argument is not for the Sun to raise, since force

majeure provisions establish a contract defense that must be raised by the party seeking to avoid its obligations—here, the RJ (*id.* at 15 n.6).

The Court first notes that it is not necessary to decide the merits of this argument at this stage. Nevertheless, so that the full impact on the parties of enforcing the 1989 JOA can be understood and considered, the Court addresses the merits of the Sun's entitlement to force majeure relief and concludes that the argument is not clearly likely to succeed.

First, the nonviability of an afternoon newspaper and the rise of digital media do not qualify as force majeure events. As with the RJ's impracticability argument above, that the publication of an afternoon newspaper would be nonviable is, in effect, an argument that the 1989 JOA amounts to a losing deal on both sides. But force majeure catch-all clauses do not protect parties from a deal that turns out to be unprofitable. *Monolith Portland Cement*, 303 F.2d at 180. The rise of digital media is an adverse market force similarly beyond the scope of force majeure. Neither of these developments provide grounds for the parties to escape a lawful contract.

The Sun also claims that judicial and regulatory action around the parties' agreements constitute "government action" triggering the 1989 JOA's force majeure clause. These events include the Department of Justice's adoption of regulations—subsequently declared invalid by the Ninth Circuit, *Las Vegas Sun*, 147 F.4th at 1116—enshrining the NPA § 4(b) interpretation that amended JOAs did not require written AG approval; the Ninth Circuit's order declaring the 2005 JOA unlawful, *id.* at 1122; and this Court's ruling that the 2005 JOA was not a novation (ECF No. 970 at 16-19). However, none of these regulatory or judicial acts are sufficient to relieve the RJ of its obligation to perform under the 1989 JOA. Rather, these events affect the legality of the 2005 JOA, not the feasibility of the RJ's performance under the 1989 JOA.

In sum, the Sun has shown a clear likelihood of success on the merits of its request for a judicial declaration that the 1989 JOA is the valid governing agreement between the parties, but not that the agreement's force majeure provision has been triggered. Having failed to show that any force majeure event has clearly occurred, the Sun's options at the preliminary injunction stage are narrowed to the full 1989 JOA with afternoon distribution under Section 4.4, or no joint operation at all.

**2. The Sun is clearly likely to succeed on the merits of its Section 2 monopolization claim.**

In addition to the declaratory relief claim, the Sun also brings four antitrust claims under the Sherman Act and Nevada's Unfair Trade Practices Act. (ECF No. 1162 at 67-74.) As discussed above, the Sun's claim for declaratory relief is precisely tailored to the only preliminary injunctive remedy available to the Sun under law: reversion to the 1989 JOA. The same cannot be said for the Sun's antitrust claims.

"Injunctive relief . . . must be tailored to remedy the specific harm alleged. An overb[roa]d injunction is an abuse of discretion." *Lamb–Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (quoting *United States v. BNS Inc.*, 858 F.2d 456, 460 (9th Cir. 1988)); *see Park Vill. Apartment Tenants Ass'n*, 636 F.3d at 1161. While district courts ordinarily have "considerable discretion" to craft appropriately tailored injunctive relief, *Lamb–Weston*, 941 F.2d at 974, the Ninth Circuit has made clear that in this case, any relief regarding the relationship between the parties must be fully consistent with an Attorney General-approved JOA; otherwise, it would violate the NPA. *In re Adelson*, 2026 WL 895611, at *2. This means that, to the extent the Sun's complaint alleges harms that would *not* be remedied by the only relief available here (i.e., full enforcement of the 1989 JOA), those harms fall outside the scope of the Court's power to resolve the present motion and are thus of limited relevance. On the flip

side, even if ordering full compliance with the 1989 JOA is the *only* available injunctive remedy, it may still be improper where it would be overbroad relative to the specific harms alleged.

The Sun's antitrust claims are premised on the RJ's alleged anticompetitive conduct, including its failure to maximize joint profits, accounting abuses, failure to promote, and engagement in sham litigation. (ECF No. 1162 at 67-74.) Well-tailored remedies in response to these allegations might be to order the RJ to cease failing to maximize joint profits, to cease misallocating expenses and revenue under the joint operation, or to comply with any joint promotion requirement under the governing JOA. But none of these remedies, standing alone, would be lawful, since they would amount to amended partial enforcement of a joint operation. *In re Adelson*, 2026 WL 895611, at *2. It would also be impermissibly overbroad to reinstate an entire agreement as a remedy for discrete antitrust violations, even if those violations also run afoul of specific terms of the 1989 JOA. Moreover, because injunctive relief providing for enforcement of the 1989 JOA *is* tailored—and precisely so—to the Sun's declaratory relief claim, that relief may be awarded even without the antitrust claims.

Nevertheless, through its antitrust claims, the Sun ultimately seeks a declaration that the RJ is engaging in anticompetitive conduct with the goal of completely snuffing out the Sun's newspaper. (ECF No. 1162 at 77-79.) Full enforcement of the 1989 JOA is thus responsive to these claims insofar as it would prevent the RJ from reaching that allegedly monopolistic end state. For this reason, and to fully flesh out the below discussion of the final *Winter* factors regarding the equities of the Sun's requested relief and the public interest in a just resolution of this protracted litigation, the Court briefly addresses the Sun's likelihood of success on the merits of its antitrust claims.

The Sun's first antitrust claim is monopolization in violation of Section 2 of the Sherman Act. Section 2 of the Sherman Act makes it an offense to monopolize,

attempt to monopolize, or combine or conspire to monopolize any part of the nation's interstate or foreign commerce. *See* 15 U.S.C. § 2. To establish a claim for monopolization, the plaintiff must show that "(1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury." *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996).

The Sun has shown a clear likelihood of success in establishing the first element of its monopolization claim: that the RJ wields monopoly power. Through the expert testimony of Dr. Michael Katz and Dr. Robert Picard, the Sun has shown that the RJ possesses a large market share in the relevant local market for daily English-language print newspapers, and that its market share is protected by high barriers to entry. *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) (establishing that Section 2 plaintiffs must define the relevant market, show that the defendant possess sufficient market share, and show that there are significant barriers to entry). The RJ fails to support its counterargument that the Internet must be part of this market because it has presented no evidence that the Internet is distinctive from other mass media platforms, including television, radio, and magazines, that have weakened newspapers over the decades. *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 613 n. 31 (1953).

The Sun has also shown a clear likelihood of success on the second element of its monopolization claim, namely that the RJ "willfully acquired or maintained" monopoly power by engaging in anticompetitive conduct undertaken with anticompetitive intent. *See Verizon Commc'ns Inc. v. L. Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). The Sun alleges that the RJ engaged in four forms of anticompetitive conduct with the intent to harm competition: it (1) failed to maximize the joint operation's profits to drive the joint operation into a loss and

eliminate the Sun's profits; (2) abused its control over the joint operation accounting to further reduce and eliminate the Sun's profit payments; (3) reduced the Sun's visibility and consumers' knowledge of the Sun; and (4) threatened unilateral termination of the joint operation and complete exclusion of the Sun from the newspaper market through pretextual sham litigation. (ECF No. 1162 at 39.) The RJ responds that this conduct cannot qualify as anticompetitive because there is no duty to aid competitors. (ECF No. 1172 at 34.)

While true that there is no general duty to aid competitors or so-called "duty to deal," a company's refusal to deal or cooperate with a rival can violate antitrust laws if it was pursued for anticompetitive reasons. *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020). The "one, limited exception" to the no-duty-to-deal rule comes from *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). *Qualcomm Inc.*, 969 F.3d at 993. In the Ninth Circuit, a refusal to deal is an anticompetitive act within the *Aspen Skiing* exception when it (1) "unilateral[ly] terminat[es] . . . a voluntary and profitable course of dealing," *MetroNet Servs. Corp.*, 383 F.3d at 1132; (2) "the only conceivable rationale or purpose [of doing so] is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition,'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (quoting *MetroNet Servs. Corp.*, 383 F.3d at 1132); and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers. *See MetroNet Servs.*, 383 F.3d at 1132–33; *Qualcomm Inc.*, 969 F.3d at 993-94 (laying out these three elements). The Supreme Court has cautioned, however, that *Aspen Skiing* provides a "limited exception" "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409.

Even so, two of the Sun's four alleged forms of anticompetitive conduct appear cognizable under the narrow *Aspen Skiing* test. These are the Sun's

allegations first that the RJ intentionally drove the joint operation's profits to zero, and second that the RJ refused to promote the Sun in its advertising and on the front page of its newspaper. The Sun has supported both theories with evidence showing that, in essence, the RJ voluntarily engaged in a particular course of dealing with the Sun then unilaterally decided to cease performance and self-inflict short-term losses in order to harm the Sun and obtain longer-term market dominance. (ECF No. 1156 at 83; *see generally* ECF No. 1157 at 21-71) (Expert Report of Dr. Gregory Gundlach). Such conduct resembles that found to be anticompetitive in *Aspen Skiing*. *See MetroNet Servs.*, 383 F.3d at 1131-33 (detailing the facts of *Aspen Skiing* as compared to other cases); *Trinko*, 540 U.S. at 408-410 (same).

Third, the Sun's allegation that the RJ played foul with the 2005 JOA accounting provisions does not appear be a cognizable refusal to deal under the *Aspen Skiing* test. By shifting its costs to the joint operation, the RJ engaged in competitive conduct that "increased [its] separate bottom line." (ECF No. 1155 at 32.) Setting aside the issue of whether this was a breach of the then-governing JOA, the RJ's conduct was plausibly self-interested and, therefore, competitive conduct not sanctionable in antitrust. Fourth and finally, the Sun's allegation that the RJ conducted anticompetitive sham litigation fails because the alleged sham litigation is not objectively baseless. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993).

Proceeding to the third step of the Section 2 inquiry with respect to the two theories of anticompetitive conduct that do appear cognizable, the Sun has clearly shown a likelihood of success on the merits that it has experienced antitrust injury. At the summary judgment stage, the Sun established a genuine issue for trial on this element. (ECF No. 970 at 26-28.) After submission of new exhibits and the two-day evidentiary hearing, its position has strengthened: the Sun has plausibly shown that the harms it alleges, arising from the RJ's reduction of the

joint operation's profit and its failure to promote the Sun, have decreased the Sun's value "as a going concern and for saleability purposes." *United States v. Daily Gazette Co.*, 567 F. Supp. 2d 859, 870 (S.D. W. Va. 2008) (denying a motion to dismiss antitrust claims). Versions of the RJ's present counterarguments were rejected at the summary judgment stage and at other points earlier in this litigation. (ECF Nos. 843 at 45-46, 243 at 11-13.)

In sum, the Sun has established a clear likelihood of success on the merits of its Section 2 monopolization claim as to at least some of its theories.

**3. The Sun's remaining claims either likely succeed where its Section 2 monopolization claim succeeds, or they have not been briefed.**

In addition to monopolization under Section 2 of the Sherman Act, the Sun brings three other antitrust claims.

First, the Sun's likelihood of success on its attempted (as opposed to completed) monopolization claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, is at least as great as its likelihood of success on its monopolization claim. "The traditional claim for attempted monopolization arises when the danger of monopolization is clear and present, but before a full-blown monopolization has necessarily been accomplished." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541–42 (9th Cir. 1991). If the Sun can succeed in showing that the RJ did in fact engage in monopolization, that necessarily translates to success in showing that the RJ attempted to do so.

Second, and similarly, the Sun's claims under the Nevada Unfair Trade Practices Act ("NUTPA"), Nev. Rev. Stat. § 598A, succeed where its Section 2 claims succeed. This is because the NUTPA "tracks the provisions of the Sherman Act." *Boulware v. State of Nev., Dep't of Hum. Res.*, 960 F.2d 793, 800 (9th Cir. 1992); *see also* Nev. Rev. Stat. § 598A.060 (declaring unlawful any "contract,

combination or conspiracy in restraint of trade," such as "monopolization of trade or commerce . . . including . . . attempting to monopolize.")

Finally, the Court declines to evaluate the merits of the Sun's claim under Section 1 of the Sherman Act. A Section 1 claim arises when two or more firms "restrain[] . . . trade" in some manner short of threatened monopolization. 15 U.S.C. § 1; *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767-69 (1984). This claim was not briefed in either the motion for preliminary injunctive relief or the post-hearing briefing, making it unnecessary to address here.

**4. The Sun has failed to show that in the absence of preliminary relief, it faces a clear likelihood of irreparable harm and extreme or very severe damage.**

The Sun's primary problem in obtaining the injunctive relief it seeks is its inability to meet the heightened showing of harm required under the mandatory injunction standard. To obtain a mandatory injunction, a movant must show both that irreparable harm is likely and that the damage will be "extreme" or "very serious." *Park Vill. Apartment Tenants Ass'n,* 636 F.3d at 1160. On the evidence in the record, the Sun has not made this showing. This is fatal to its claim for injunctive relief: failure to show harm sufficient to meet the mandatory injunction standard is sufficient reason to deny the motion. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal.*, 757 F.3d at 1068 (citation omitted). "Because intangible injuries generally lack an adequate legal remedy, 'intangible injuries [may] qualify as irreparable harm'" sufficient to justify the exercise of equitable jurisdiction. *Id.* (quoting *Rent-A-Ctr.*, 944 F.2d at 603). Cognizable intangible injuries include damage to reputation and goodwill. *Rent-A-Ctr.*, 944 F.2d at 603; *see Regents*, 747 F.2d at 520 (holding that threatened diminution in college sports teams' reputation and following was

sufficient to support a "very narrow" prohibitory injunction). Because mandatory injunctions are "particularly disfavored," the magnitude of the harm matters as well as its character. *Park Vill. Apartment Tenants Ass'n,* 636 F.3d at 1160. Therefore, in addition to showing that the harm is irreparable, a movant requesting a mandatory injunction must also show that "extreme or very serious damage will result" if they are not granted relief. *Id.*

The Sun has shown that in the absence of a joint operation, it would go dormant at least from now until the end of trial, resulting in some loss of goodwill. Brian Greenspun testified that without the joint operation the Sun would be incapable of printing and distributing its newspaper. (ECF No. 1185 at 20, 127). According to Greenspun, this would cause immediate and intangible harms in the form of "loss of staff and ability to recruit new employees, loss of future capital with which to fund operations, loss of readership and visibility, and loss of goodwill." (ECF No. 1028 at 184.) Indeed, evidence shows that the Sun gave up its printing and distribution capabilities, as well as its subscriber lists and advertising contacts, and that if it had to build those things from scratch again it would face a new market entrant's all-but-insuperable barriers to entry. (ECF No. 1186 at 14-15.) Although the RJ argues that the Sun can rent time to use its press or the nearest regional press located at a facility in Riverside, California (ECF No. 1186 at 249-51), this proposal solves only one of the several severe barriers to entry that the Sun faces without a JOA, and the RJ provides no evidence to show that the Sun can overcome the others.

But despite having shown that it would likely experience a loss of goodwill absent preliminary injunctive relief, the Sun is less successful in showing that these harms would be *irreparable* and, under the mandatory injunction standard, cause "very serious" damage that the Sun would not otherwise suffer.

First, although loss of goodwill is usually considered irreparable harm, due to the special characteristics of the JOA, any reputational damage in this case

*would* likely be reparable in substantial part if the Sun wins relief at the end of trial. On this point, the Sun's situation is distinguishable from the circumstances at issue in its most favorable precedents. In *Regents*, 747 F.2d 511, a business moved for a preliminary injunction to enforce a contractual restriction on its competitor's ability to compete, and in *Rent-A-Center*, 944 F.2d 597, college sports teams moved for a preliminary injunction to enjoin a restriction that broadcast networks had imposed on their ability to air their games on television. In both *Regents* and *Rent-A-Center*, the Ninth Circuit held that the movants were likely to suffer irreparable injury in the absence of relief, because the market conditions they would otherwise face would inflict upon them a loss of reputation among customers and in the relevant communities. In both cases, the movants faced the possibility that another business or sports team would attract the customers or potential athletic recruits, whom the plaintiffs could not simply reclaim at the end of the litigation. Here, in contrast, the realities of the relevant market—daily English-language print newspapers in the Las Vegas metro area, of which the parties are responsible for the only two—make it such that the Sun's readers and advertisers cannot irretrievably stray to some third-party alternative; rather, to receive a print newspaper, they must continue to do business with the RJ. As such, if the Sun wins full enforcement of the 1989 JOA at the end of trial, the RJ will have to once again distribute *The Sun* as an afternoon newspaper to those same customers.

The Sun argues that its risk of irreparable harm extends beyond loss of goodwill to encompass an immediate risk of permanent closure in the absence of preliminary relief. Indeed, "[t]he threat of being driven out of business is sufficient to establish irreparable harm." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). But the Sun's argument is not supported by the evidence in the record. In terms of revenue and expenses, according to the Sun's own testimony (ECF No. 1185 at 30), it has not received payment from the

joint operation since 2017, despite receiving injunctive relief under the 2005 JOA from 2019 until earlier this year (ECF Nos. 13, 1096). It is thus unclear how or why, absent preliminary injunctive relief, the Sun would face a more daunting balance sheet now than it did previously. While enforcing the 1989 JOA should yield some payment under that agreement's terms (ECF No. 1154 at 92, 102) (1989 JOA Appendix A.1, D), the Sun has not sufficiently demonstrated that if it does not immediately receive those payments, it will have to cease operations.

Second, the Sun's position is constrained by the fact that the only available relief is enforcement of the 1989 JOA. This is crucial: given the limited relief available, a preliminary injunction at this stage would not remedy the loss of the daily morning newspaper, which prompted this round of motions from the Sun. Rather, for the purposes of this analysis, the stakes for the Sun are represented by the difference between (a) the harm it would suffer from no distribution at all, and (b) the benefit it would obtain from distribution under a fully enforced 1989 JOA. Under that agreement, the Sun is only entitled to distribution as a standalone weekday afternoon newspaper with joint editions on weekends and holidays. (ECF No. 1154 at 72) (1989 JOA § 5.1). The parties agree that consumers strongly prefer morning newspapers over afternoon newspapers. (ECF No. 1186 at 12-13) (testimony of Dr. Robert Picard affirming this trend). Indeed, Brian Greenspun testified that when the 1989 JOA was last in effect, the Sun suffered a "precipitous[]" drop in circulation because consumers did not want an afternoon newspaper. (ECF No. 1185 at 71, 112.) And because afternoon distribution is not as valuable, the reputational damage that the Sun would suffer in the absence of weekday afternoon distribution is correspondingly limited. It follows, then, that while the Sun would suffer reputational harm in the *absence* of the 1989 JOA, that harm is not clearly "extreme" or "very serious."

To receive a mandatory injunction, the Sun must demonstrate that the facts and law are clearly in its favor, that it would suffer irreparable harm in the

absence of preliminary relief, and that the damage in the absence of relief would be extreme or very serious. This standard is imposing, particularly the showing of harm that it requires. Regardless of how strong the movant's showing on the likelihood of success on the merits is, a preliminary injunction must be denied unless the movant also makes the required showing of irreparable harm. *Rent-A-Ctr.*, 944 F.2d at 603. The Sun has not done so here. Although it would suffer intangible harms by not being published as an afternoon newspaper under the 1989 JOA, the Court concludes based on the above discussion that these harms are not irreparable due to the particular features of *this* joint operation in *this* market. Rather, any harms to Sun that would be ameliorated by the restoration of the 1989 JOA at this stage would more appropriately be compensated by damages at the end of trial.

**5. The balance of equities and public interest weigh modestly in the Sun's favor.**

The final preliminary injunction factors require assessing the balance of the equities and whether issuing the requested injunctive relief would be in the public interest. *Winter*, 555 U.S. at 20. These factors are not dispositive in this case, since the above failure to show irreparable harm is sufficient to defeat a motion for a preliminary injunction. *Rent-A-Ctr.*, 944 F.2d at 603. For the sake of completeness, however, the Court concludes that the balance of the equities is relatively even, given the RJ's legitimate arguments against being compelled to perform under an arrangement that has not been operative for over two decades, while the public interest favors the Sun's position.

To determine the balance of equities, a court must weigh the "competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Here, incorporating the caveats above regarding the limited upside of afternoon distribution, the Sun would benefit from the requested relief. Under the 1989

JOA, the Sun would be printed and distributed to readers as an afternoon publication and in a joint edition with *The Review-Journal* on weekends and holidays, would receive a ten percent profit share in the joint operation, and would get funding for its newsroom equal to sixty-five percent of the RJ's news and editorial expense allocation. (ECF No. 1154 at 92, 102) (1989 JOA Appendix A.1, D). The RJ voluntarily assumed any obligations owed to the Sun under the 1989 JOA when it became the successor-in-interest. *See* Restatement (Second) of Contracts § 328(2) (1981) ("Unless the language or the circumstances indicate the contrary, the acceptance by an assignee of such an assignment operates as a promise to the assignor to perform the assignor's unperformed duties . . . ."); *In re Boyajian*, 564 F.3d 1088, 1091 (9th Cir. 2009) ("[U]nder general principles of assignment law an assignee steps into the shoes of the assignor."). The 1989 JOA expressly binds "successors and assigns." (ECF No. 1154 at 91) (1989 JOA § 10.9) ("This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their permitted successors and assigns.").

The equitable factor cutting compellingly in the RJ's favor, however, is the notable gap between the Sun's requested relief and the status quo. As discussed throughout this order, the relief that the Sun seeks is the restoration of a joint operation that has not been performed since 2005. Even then, performance was only partial. (ECF No. 1185 at 102.) The RJ provided evidence that printing and distributing *The Sun* as an afternoon newspaper would have a significant impact on its bottom line, which, like that of many local newspapers, already stands on shaky ground. (ECF No. 1186 at 126, 134) (testimony of Chris Blaser). "[T]he broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." *Trump v. CASA, Inc*., 606 U.S. 831, 852–54 (2025). Requests for the Court to impose a form of relief that would work a fundamental and mandatory change to the operations of the nonmoving party, made before a decision on the merits of the complaint, must be handled with restraint.

Finally, the public interest generally weighs in favor of granting the Sun relief. Congress has declared that public policy favors preserving local newspapers. 15 U.S.C. § 1801 (establishing that it is the "public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into"). The Court does not underestimate that denying the Sun's request would mean that the Sun's readers must go without their preferred newspaper until at least the end of this litigation. And having found that the Sun is likely to succeed on at least their claim for declaratory judgment, the public interest factor also generally favors preliminary enforcement because it is not "in the public's interest [for a party] to violate the requirements of federal law." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

Although the public interest in relief is present, it is limited by the risk that the specific injunctive relief on the table here could destroy more value than it creates. *See Lord & Taylor, LLC v. White Flint*, L.P., 780 F.3d 211, 210 (4th Cir. 2015). The JOA requires that *The Sun* be distributed as an afternoon newspaper, which the evidence tends to show is less valuable to the public than a morning newspaper would be. And the RJ presented evidence that the production and distribution of the afternoon newspaper would be costly and burdensome. Because the Sun's audience for an afternoon newspaper would likely be small, the gain to the newsreading public would likely also be small, while the loss of economic value could potentially be substantial.

In sum, the Sun's showing across the preliminary injunction factors is conditioned by the fact that the only possible relief for the Sun at this stage is full enforcement of the 1989 JOA, which would work a marked change on the way that the parties do business while likely producing minimal value for the parties and the public alike. Because the 1989 JOA requires producing what would likely be a relatively unpopular afternoon newspaper, the Sun has been

unable to show that irreparable harm and extreme or very serious damage would result absent an injunction. The Sun's inability to show that the facts and law are clearly in its favor on this factor is decisive, but all of the preliminary injunction considerations are affected by the extraordinary nature of the relief sought.

## IV. CONCLUSION

It is THEREFORE ORDERED that Plaintiff's motion for preliminary injunctive relief is DENIED. (ECF No. 1128/1144).

DATED: October 21, 2026

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE